**I**N THE **U**NITED **S**TATES **D**ISTRICT **C**OURT
**D**ISTRICT OF **M**ASSACHUSETTS

| | |
|---|---|
| **T**HE **S**ATANIC **T**EMPLE, **I**NC. | **C**ASE NO. 1:21-CV-10102 |
| P**LAINTIFF**, | |
| *v.* | **C**OMPLAINT |
| **C**ITY OF **B**OSTON, MA | |
| D**EFENDANT**. | |

**C**OMES NOW The Satanic Temple, Inc. ("**TST**"), by and through counsel Brendan Durrigan BBO # 668680 and Matthew A. Kezhaya, *pro hac vice* pending, with a complaint about a discriminatory legislative prayer practice.

## INTRODUCTION

1. This lawsuit attacks the constitutionality of Boston's legislative prayer selection process. The Constitution permits legislative prayers, but the prayer selection process must be nondiscriminatory. Pursuant to an unregulated practice, Boston affords its Councilors the unrestricted permission to select prayer-givers through legislative fiat. As a result, the City broadcasts two constitutionally impermissible messages: those religions who make the cut are endorsed and are therefore insiders of the politically favored community; those who don't make the cut are not endorsed and are therefore outsiders from the politically favored community. Despite demand, TST was refused a prayer opportunity. Boston's legislative prayer process is unconstitutional on its face and is unconstitutional as applied to TST. The Court should order Boston to grant TST a prayer opportunity.

2. As important as what this case is, it is equally important what this case is not. This case is not a challenge to legislative prayers, generally; and it is not a challenge to offensive prayers, particularly. We take no issue with the fact that the City permits many congregations to invoke Jesus before Council

meetings. We just want an equal opportunity–one guaranteed by the Constitution–to invoke Satan.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case under 28 USC § 1331 (federal question) because TST complains of alleged constitutional violations under color of state law which are actionable under 42 USC § 1983 (authorizing a cause of action for such claims) and 28 USC § 2201 (authorizing declaratory judgments), both of which are federal laws. See also Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978) (cities incur legal liability under § 1983 when their policies, practices, etc., are unconstitutional and cause a redressable legal harm).

4. This Court has general personal jurisdiction over the City because Boston is in this District. This Court has specific personal jurisdiction over the City because the situs of the injury took place in this Court's district and it is reasonable to exercise jurisdiction here, given that all of the parties and witnesses exist are within this District.

5. Venue properly lies with this Court under 28 USC § 1391(b) because the conduct complained of happened in this Court's District.

## PARTIES

6. **The Satanic Temple, Inc.**, plaintiff, (abbreviated to "**TST**") is an infamous IRS-recognized atheistic religious corporation with its principal place of business in Salem, Massachusetts. TST's membership exceeds 270,000 and was recently the subject of the acclaimed film, "Hail Satan?" (2019, Magnolia Films). See also Satanic Temple v. City of Scottsdale, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion). TST's membership can be found in every state, importantly to include the Boston metro area. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny. For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against

impossible odds to seek justice and egalitarianism for himself and others.  TST propagates its Seven Tenets:

(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend.  To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world.  One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible.  If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought.  The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited November 11, 2020).  Far from the Seven Tenets being the sole "core" of TST's religious beliefs and practices, other core practices of TST includes (among many other things) a demand for an equal opportunity to present its beliefs whenever a government provides a platform for other religions to express theirs.  In 2018, TST sought a prayer opportunity before the City Council but was rejected because TST lacked the political clout to obtain a Councilor's sponsorship.

7. **The City of Boston**, defendant, is a municipal corporation located in Suffolk County, MA.

Boston serves as Massachusetts' capital and is its most populous city. Boston's government includes a unicameral legislative branch (the "**Council**") which consists of thirteen Councilor seats, all of which are publicly elected positions; one of which serves as chair, called the Council President. Before Council meetings, the Council hears a legislative prayer which is selected by a rotating Councilor who has plenary authority to extend an invitation to whomever the Councilor desires. In 2018, Boston refused TST a prayer opportunity because TST lacked sponsorship from a Councilor.

## FACTS ALLEGED

### Background

8. Every week, unless otherwise ordered and except on holidays, the Council holds a meeting.

9. There are about 35 meetings per year, but the number fluctuates year-to-year.

10. The meetings are broadcasted to local television and, going back to at least January 2011, were audio/video recorded. Recordings as early as January 2011 can be viewed by following this link: http://meetingrecords.cityofboston.gov/sirepub/meetresults.aspx (last visited December 30, 2020).

11. These meetings start with a legislative invocation with an instruction for the audience to stand in observance of the prayer.

12. At the beginning of each calendar year, the Council promulgates a schedule of the dates of the year's upcoming Council meetings along with the names of the Councilors responsible for securing an invocation speaker.

13. Each Councilor has unfettered authority to select who gets to pray at their meeting.

14. The City has issued no contours or guidelines of each Councilor's right to choose who gives the prayer.

15. This practice has not been reduced to a formal policy. C.f. **EXHIBIT 1** "Rules of the Boston City Council" (establishing various rules for the Council).

16. Absent a Councilor's invitation, there is no opportunity to offer the legislative prayer. **Exhibit 1** at Rule 43 ("No person shall be permitted to speak, testify, or otherwise participate in any council meeting, hearing, or working session unless permitted to do so by the presiding officer or committee chair.")

17. So far as the City is concerned, the question of who gets to pray rests solely on the whim of the inviting Councilor.

18. As further detailed below, the City's policy disregards constitutional restrictions on legislative prayers. See Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983) (the prayer opportunity cannot be "exploited to proselytize or advance any one, or to disparage any other, faith or belief"); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014) (the selection policy must be one of "nondiscrimination"); and Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019) (government-sponsored religious practices, including legislative prayers, are constitutional only if they are "an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans.")

## TST's Request

19. TST is headquartered in Salem, which is a suburb of Boston.

20. TST has 2,449 members in the Boston metropolitan area.

21. At all times relevant, TST has been organized on two scales: the national organization and semi-autonomous local organizations called "chapters."

22. Prior to the events described below, members of TST's Boston Chapter had twice made requests, in 2016 and 2017 respectively, to bless the Council meeting.

23. Each time, the City rebuffed the request because the members lacked sponsorship from a

Councilor.

24. In 2018, the matter was escalated to the national organization and attracted the attention of one of TST's co-founders: Malcolm Jarry.

25. On October 2, 2018, Jarry issued an email to the then-Council President, Andrea Campbell.

26. Jarry's email demanded an invite for TST to offer an invocation before the City Council. **EXHIBIT 2**.

27. The next day, Jarry and Christine O'Donnell (then Compliance Director & Staff Counsel for the City) had a phone conversation about the issue.

28. During that conversation, O'Donnell informed Jarry that there is no waiting list to seek an invite. Religious groups either have a Councilor's sponsorship, or they aren't allowed to bless the meeting.

29. Jarry responded that, as a religious minority which is much maligned by a vocal segment of voting Christians, TST's constitutional right to equal participation in the ceremony could not be entrusted to the mechanisms of majoritarian rule.

30. Jarry was speaking from experience. In 2014, TST attempted to publicly perform a Black Mass ceremony at Harvard University, which is in neighboring Cambridge, through Harvard's Extension Cultural Studies.

31. A Black Mass is an act of ritual blasphemy which has religious significance to Satanists.

32. In response, the Archdiocese of Boston organized a public movement to preclude the event.

33. The controversy drew national headlines and more than 2,000 Catholics marched in protest. Joseph P. Laycock, *Oxford University Press*, "Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion" (2020) at p. 28.

34. This organized movement against TST was partly successful: Harvard rescinded the invitation,

but the show went on at the nearby Hong Kong Restaurant and Lounge.

35. Closer to these facts, TST's membership has made requests for equal participation in legislative prayers before the City of Scottsdale, Arizona and Kenai Peninsula Borough, Alaska.

36. In Scottsdale, TST's member was initially accepted, but then 15,207+ emails entitled "No Hail Satan Prayer" crashed city servers. TST's member was ultimately excluded because of the majoritarian outcry and the resulting litigation is now pending before the Ninth Circuit. <u>Satanic Temple v. Scottsdale</u> (20-15338). Oral argument is scheduled for March 18, 2021.

37. Similarly, in 2016, the Boston Chapter's prayer request was met with a loud and conspicuously religious objection to TST's equal participation. Choice selections of emails available pursuant to a public records include:

    (a) "Evil disguised as benign, doesn't make it ok"

    (b) "[T]hose who embrace satanism are those who worship the evil deception of humanity. . . . There can be no sane footing upon which to permit any form of satanic worship or intercession to infest government."

    (c) "Please reject Satan and keep us a nation under God."

    (d) "If it isn't clear to every City Councilor and Mayor Martin Walsh, that would be a very bad idea and cross far over any bounds of sanity and decency. Moreover, as an act of hate blasphemy, and rejection of God it should be immediately commended as just that."

The public records request and Boston's produced documents are available via Muckrock, a non-profit organization which assists anyone in filing public records requests, at "Boston City Council Invocation Schedule" August 18, 2017 (https://www.muckrock.com/foi/boston-3/boston-city-council-invocation-schedule-42280/) (Last visited January 18, 2021).

38. In Kenai, TST's member was initially rejected after a public outcry, ostensibly because she was not a member of a "qualifying" religious association. But the Alaska Superior Court found that her exclusion was really, "stemmed from intolerance for the controversial views expressed during two particular invocations." Hunt v. Kenai Peninsula Borough, No. 3AN-16-10652 CI at *18 (Alaska Super. Ct. Oct. 9, 2018). The ban was overturned under Alaska's analogs to the Establishment Clause, the Free Speech Clause, and the Equal Protection Clause. TST's member was subsequently permitted her invocation, the public's religious objections notwithstanding.

39. The City knew of the Harvard Black Mass fiasco and the 2016 objections to the Boston Chapter's request for a prayer and could reasonably anticipate that granting Jarry's request would result angry mob protesting the City's decision to comply with the Constitution.

40. So, on October 9, O'Donnell issued notice that TST would not be permitted a prayer opportunity without an invite from a Councilor. **EXHIBIT 3**.

41. TST lacked the political clout to procure a Councilor's invitation.

42. No other religious group has requested an opportunity to bless the Council's meeting, only to be denied. TST is sole group to have ever been excluded.

43. On October 17, 2018, TST raised a claim of discrimination in a place of "public accommodation" to the Massachusetts Commission Against Discrimination ("**MCAD**.")

44. The MCAD is a state agency charged with investigating claims of discrimination in places of "public accommodation." See generally G.L. c. 151B (prohibiting such discrimination).

45. MCAD has no authority to investigate or address claims of constitutional violations.

46. During the MCAD investigation, the City explained that invitees are "either a clergy person or a layperson who is a member of the Boston community and/or [sic] has some connection or relevance to the inviting City Councilor's constituents or personal life."

47. The City also specifically claimed that Councilor O'Malley "exclusively invited individuals from within their respective districts who are known for their outreach work."

48. Both of these were demonstrably untrue. The MCAD quickly found that prayer invitations were granted to six religious organizations from outside Boston city limits, just between 2018 and 2019.

49. One of those invitation were to Reverend Lindsay Popperson, of the United Church of Christ's branch in Marblehead, MA.

50. The invitation to Rev. Popperson was extended by none other than Councilor O'Malley, who the City had falsely claimed "exclusively" doled out invitations to his district's residents.

51. In response to the MCAD investigator's further inquiry, the City explained that Councilor O'Malley had a "personal connection" with the Reverend because the Reverend serves as the Chaplain for a nursing center where the Councilor's mother received care.

52. That's religious discrimination. The stated practice was that O'Malley "exclusively invited individuals from within their respective districts who are known for their outreach work." Changing that rule to benefit one ("preferred") religious group, but not affording that same benefit to a different ("undesirable") religious group *is* disparate treatment because of religious beliefs.

53. It's also a perfect microcosm of the problem with granting public officials unfettered authority to grant limited governmental benefits: it will inevitably result in a grant of that benefit to someone with a "personal connection" to the official and, necessarily, will deprive someone else of that benefit.

54. The City uniquely excluded TST based on TST's religious viewpoint and the second-order effects of avoiding a public outcry for allowing in an "undesirable" religious minority.

55. Ultimately, the MCAD investigator determined that the MCAD could not take up the matter because the prayer opportunity was not at a "place of public accommodation" within the meaning of

the statute because, although the meetings are open to attendance by the public, the Council determines who can speak at the meeting.

56. The MCAD investigator expressly declined to address the constitutional issues because the Commission lacks authority to address the constitutionality of the prayer ceremony.

57. The MCAD investigator's determination was not a "final ruling" for res judicata purposes and does not preclude TST from raising the same facts to this Court's attention.

58. TST is damaged because the City grants invitations to "preferred" religions, but refuses to invite TST because of its "undesirable" status.

## The effect of the practice

59. After TST's exclusion, volunteers of TST dedicated substantial efforts into reviewing 233 invocations between January 3, 2011 and August 8, 2017.

60. The data show that, because Councilors are selecting prayers without any neutrality enforcing safeguards, the prayer opportunity is disproportionately being afforded to those that subscribe to Abrahamic belief traditions. Everyone else is disproportionately underrepresented.

61. According to the Pew Research Center, the Boston metropolitan area boasts a 57% Christian population. Pew Research Center Religious Landscape Study "Adults in the Boston metro area" (available at https://www.pewforum.org/religious-landscape-study/metro-area/boston-metro-area/).

62. Despite consisting of only 57% of the population, Christians gave 78.5% of the prayers.

63. The Muslim population has 1% of the population, yet 4.7% of the prayers.

64. The Jewish representation was close to right, with 4% of the population and 4.3% of prayers.

65. Christians, Muslims, and Jews are all over-represented because they all share the same Abrahamic tradition roots. They are safe and familiar to the Councilors, and they have the numbers

and political clout to command inclusion.

66. Combined, those who believe in the God of Abraham have only 62% of the population, yet seized 87.5% of the prayer opportunities.

67. The rest are left in the cold. Nonbelievers of various stripes consist of 33% of the Boston population. Yet, of 233 reviewed instances of prayers between 2011 and 2017, precisely one blessing–less than 0.5%–was nonreligious. That was offered by Sister Margaret Leonard of Project Hope (a laudable international health care organization, but not a religious congregation) on October 22, 2014.

68. Similarly, Hindus consist of 1% of the Boston population, yet were disproportionately underrepresented at one instance of 233 reviewed prayers, less than half their proportionate share.

69. Buddhists, also with 1% of the Boston population, received no representation at all.

70. Wiccans, other Pagans, and Native Americans, all, have adherents in Boston yet they, too, got no invite.

71. To some extent the disproportionate representation could be a function of interest. Maybe the Pagans are happier without the limelight. But the problem with the City's prayer selection system is that the prayer opportunity isn't equally shared among those who are interested–as the Constitution requires–instead, the opportunity is reserved for those who have the political clout to procure a Councilor's patronage.

72. TST wants into that club, but lacks the influence to buy admission.

73. Thus, TST needs this Court to enforce the City's compliance with the Constitution.

## CAUSES OF ACTION

### Count 1
Violation of the Establishment Clause

74. The First Amendment, which includes the Establishment Clause, was drafted to protect

against political division along religious lines. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

75. To that end, the Establishment Clause prohibits either governmental preference for, or disparagement of, any particular religion; it also prohibits governmental preference for religious belief over religious disbelief, and vice versa. E.g. U.S. Const. Amend. I ("Congress shall make no law respecting an establishment of religion."); Larson v. Valente, 456 U.S. 228, 245, 102 S. Ct. 1673, 1684 (1982) ("Free exercise thus can be guaranteed only when legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations"); Epperson v. State of Ark., 393 U.S. 97, 107, 89 S. Ct. 266, 272, 21 L. Ed. 2d 228 (1968) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them.")

76. In this framework, legislative prayer policies are constitutionally permissible only if the opportunity to pray is afforded without discrimination. Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014); Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019); accord id. at 2091 (Breyer, J., concurring) and 2094 (Kagan, J., concurring in part), Lund v. Rowan Cty., N. Carolina, 863 F.3d 268 (4th Cir. 2017) and Williamson v. Brevard Cty., 928 F.3d 1296 (11th Cir. 2019); c.f. Bormuth v. Cty. of Jackson, 870 F.3d 494 (6th Cir. 2017).

77. As further discussed in American Legion, governmental sponsorship of a religious practice is constitutional only if it is nondiscriminatory, i.e. it "stands out as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans. American Legion, 139 S. Ct. 2067 at 2089 (plurality opinion). Justice Kagan signed onto this sentence, but only because of its

"sensitivity to and respect for" pluralism, neutrality, and inclusion, all of which "the First Amendment demands." Id., 139 S.Ct. at 2094 (Kagan, J., concurring in part).

78. "Discrimination" is commonly but improperly confused with "religious animus." Intentional discrimination answers "what," it is the mental resolution to conduct or refrain from an act. Intentional religious discrimination, by a government, is what makes an action unconstitutional.

79. "Religious animus" is one possible answer to "why," but that is unnecessary to a favorable decree. See Hassan v. City of New York, 804 F.3d 277, 297–98 (3d Cir. 2015) (equal protection case) ("All you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic itself*") (emphasis in original).

80. Here, the intentional discrimination is in the City's refusal to extend TST an invitation to join in a government-sponsored religious ceremony while providing that imprimatur to other groups.

81. The City refused to provide TST an invite because of the nature of TST's beliefs: we extol the virtues of Satan, which is decidedly unpopular with the City's sizeable (and politically powerful) Christian constituency.

82. By refusing to invite TST, the City is sending a message that TST and its congregation are outsiders, not full members of the political community. Lynch v. Donnelly, 465 U.S. 668, 688, 104 S. Ct. 1355, 1367 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community. . . . Disapproval sends the opposite message.")

83. Simultaneously, by providing invites only to a select group of clergy, the City is sending a corresponding message that these clergy and their congregations are insiders, favored members of the political community. Id. ("Endorsement sends a message . . . to adherents that they are insiders, favored members of the political community.")

84. The City even admitted as much during MCAD proceedings: Councilor O'Malley issued his invite to Rev. Popperson because of their "personal connection."

85. By reserving it to the whim of publicly-elected Councilors to determine who gives the prayer, the City has upended the point of the Bill of Rights: "to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185 (1943).

86. TST's right to equal participation in the prayer ceremony is a fundamental First Amendment right.  See Town of Greece.  Thus, TST's right to equal participation "may not be submitted to vote" and does not depend on the outcome of an election.  Id. at 1185-86.

87. Yet, in Boston, TST's right to equal participation *does* depend on the outcome of an election: TST only gets to participate if an elected Councilor is sympathetic to TST's desire to participate.  This is an inversion of our constitutional norms.

88. The City's prayer selection policy needs to have neutrality enforcing safeguards and needs a mechanism to provide an equal prayer opportunity to all groups who want to participate.  Anything less runs afoul of the Establishment Clause.  Because Boston's prayer selection policy does not have these, it is unconstitutional.

89. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Establishment Clause because the City's prayer selection practice lacks neutrality enforcing safeguards, lacks a mechanism to provide an equal prayer opportunity to all groups who want to participate, and was exploited to exclude TST from participation.  42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

90. The Court should order Boston to provide TST equal access to offer the legislative prayer,

should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer the legislative prayer, and should order Boston to create a process for religions to sign up for the prayer opportunity.  42 USC § 1983.

## Count 2
Violations of the Free Speech Clause and the Free Exercise Clause

91. The First Amendment, which also includes the Free Speech and Free Exercise Clauses, was drafted to protect against political division along religious lines.  Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

92. To that end, the Free Exercise Clause prohibits governmental restraint on the free exercise of religion.  U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]"); Braunfeld v. Brown, 366 U.S. 599, 607, 81 S. Ct. 1144, 1148 (1961) ("If the purpose or effect of a law is to . . . discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect"); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227, 124 L. Ed. 2d 472 (1993) ("Facial neutrality is not determinative.")

93. Likewise, the Free Speech Clause prohibits governmental suppression of expression– particularly to include religious expression.  Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) ("government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.") (emphasis in original)

94. TST's intention to bless the Council's meetings with a Satanic prayer was an expression of religious significance.

95. The City withheld that prayer opportunity because it finds TST to be an "undesirable" religion

and wanted to avoid the public outcry which would inevitably ensue from granting TST equal participation rights to Christians.

96. The corollary is that if TST were not controversial, TST would have received an invite like all the other "permissible" minority groups who the overall public finds suitably inoffensive.

97. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Free Speech and Free Exercise Clauses because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions. 42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

98. The Court should order Boston to provide TST equal access to offer the legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer the legislative prayer, and should order Boston to create a process for religions to sign up for the prayer opportunity. 42 USC § 1983.

### Count 3
Violation of the Equal Protection Clause

99. The Equal Protection Clause prohibits governments from treating similarly situated groups differently. U.S. Const. Amend. XIV ("nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws.")

100. Religious discrimination is barred under the Equal Protection Clause just as well as the Religion Clauses (Counts 1 and 2, above). See In re Subpoena to Witzel, 531 F.3d 113, 118–19 (1st Cir. 2008).

101. The benefit to Equal Protection is that it has what the Religion Clauses lack: consistency in interpretation. E.g. Rowan Cty., N.C. v. Lund, 138 S. Ct. 2564, 201 L. Ed. 2d 1101 (2018) (Thomas and Gorsuch, JJ., dissenting from the denial of certiorari) ("This Court's

Establishment Clause jurisprudence is in disarray.")

102.    "Disarray" is putting it lightly. It has been more aptly described as "schizophrenic." Paulsen, "Religion, Equality, and the Constitution: An Equal Protection Approach to Establishment Clause Adjudication," 61 Notre Dame L. Rev. 311, 315 (1986) (criticizing the Court's reading of the Establishment Clause as "producing a schizophrenic pattern of decisions")

103.    Analyzing this case under the Equal Protection Clause means we get to use a clean and settled tiered judicial scrutiny analysis, not simply stab in the dark with the "Rorsarch tests" offered by the Religion Clauses. Charles Truslow and Craig Jones, "Hunt v. Kenai Peninsula Borough: the Search for Clarity in Legislative Prayer Speaker Selection," 36 Alaska L. Rev. 119, 129 (June, 2019).

104.    Strict scrutiny attaches to the City's legislative prayer policy, either because (a) TST is a minority religion which lacks the political clout to overpower a majoritarian political process (i.e. TST is a "suspect class"); or (b) The City's legislative prayer selection practice is a determination of who gets to bless the Council's meeting (i.e. it "impinges upon the exercise of a fundamental right.") Plyler v. Doe, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95 (1982).

105.    Alternatively, intermediate scrutiny should attach because governments cannot determine permissible invokers by considering the contents of the prayers. Marsh, Town of Greece, and American Legion, above. Thus, any regulation of who gets to give the invocation can only be content-neutral. Intermediate scrutiny applies to content-neutral regulations of speech. E.g. Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020).

106.    But even if the Court selects rational basis, the City's practice can't survive because "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S. Ct. 2821, 2826 (1973).

107.     TST is similarly situated to every other "permissible" group which received a right to bless the Council's meeting.  The only distinction is that TST extols the virtues of Satan whereas the "permissible" groups predominately extol the virtues of Jesus.  This is a distinction without a constitutionally significant difference.

108.     The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Equal Protection Clause because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions.  42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

109.     The Court should order Boston to provide TST equal access to offer the legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer the legislative prayer, and should order Boston to create a process for religions to sign up for the prayer opportunity.  42 USC § 1983.

## PRAYER FOR RELIEF

**WHEREFORE** TST prays for orders as follows:

1. Find that Boston's legislative prayer scheme is unconstitutional as an affront to the Establishment Clause, the Free Speech and Free Exercise Clauses, and the Equal Protection Clause.

2. Order Boston to afford TST an opportunity to bless the Council's meeting within two weeks following entry of the order.

3. Issue a permanent injunction that Boston shall not exclude TST or any other religious groups from an equal opportunity to bless the Council's meetings.

4. Issue a permanent injunction that Boston shall create a mechanism for interested religious groups to obtain an equal opportunity to bless the Council's meetings.

5. Order Boston to compensate TST for costs and attorney's fees pursuant to FRCP 54 and 42

USC § 1988.

6. And for all other relief to which TST may be entitled.

|  |  |
|---|---|
|  | Respectfully submitted on January 21, 2021, on behalf of The Satanic Temple, Inc. |
| By: | /s/ Brendan Durrigan |
|  | Brendan Durrigan BBO # 668680 |
| Address: | 169 North Franklin St., Suite 7 |
|  | Holbrook, MA  02343 |
| phone: | (781) 726-0763 |
| email: | bdurrigan@gmail.com |
|  |  |
| And: | /s/ Matthew A. Kezhaya |
|  | Matthew A. Kezhaya, MN # 0402193, *phv* pending |
|  | KEZHAYA LAW PLC |
|  | 100 S. Fifth Street, 19th Floor |
|  | Minneapolis, MN 55402 |
| phone: | (479) 431-6112 |
| facsimile: | (479) 282-2892 |
| email: | matt@kezhaya.law |

## EXHIBIT LIST

1. Rules of the Boston City Council

2. October 2 email from Malcolm Jarry to Council President

3. October 9 email from Staff Counsel to Jarry