# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-10102 |
| PLAINTIFF, | |
| V. | NOTICE OF DEPOSITION |
| CITY OF BOSTON, MA | For Michelle Wu |
| DEFENDANT. | On November 2, 2021 at 9:00 am |
| | At 64 Bridge St., Salem, MA 01970 |

**To**: Defendant and its counsel of record, Ms. Nailah Freeman and Mr. Robert Arcangeli

**LET IT BE KNOWN** that, pursuant to FCRP 26 and 30, TST will take the deposition of **Ms. Michelle Wu** by oral examination, before a person authorized to administer oaths and take testimony, and recorded by stenographic, audiographic, and videographic means. The deposition will take place in person at the headquarters for The Satanic Temple, **64 Bridge St., Salem, MA 01970** on **November 2, 2021** beginning at **9:00 am** and continuing thereafter until complete.

Propounded on October 22, 2021,
on behalf of The Satanic Temple

By:  /s/ Matthew A. Kezhaya

Matthew A. Kezhaya, ABA# 2014161
**KEZHAYA LAW PLC**
1202 NE McClain Rd
Bentonville, AR 72712
phone:  (479) 431-6112
facsimile:  (479) 282-2892
email:  matt@kezhaya.law

### CERTIFICATE AND NOTICE OF SERVICE

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, emailed a copy of this document to Ms. Nailah Freeman at nailah.freeman@boston.gov and Mr. Robert Arcangeli at robert.arcangeli@boston.gov on October 22, 2021. /s/ Matthew A. Kezhaya

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Massachusetts

| | |
|---|---|
| The Satanic Temple, Inc. | ) |
| _Plaintiff_ | ) |
| v. | )   Civil Action No.   21-cv-10102 |
| City of Boston, MA | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                          Michelle Wu

_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Bridge St., Salem, MA 01970 | Date and Time: |
|---|---|
| | 11/02/2021 9:00 am |

The deposition will be recorded by this method:   stenographic, audiographic, videographic

❏ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   10/22/2021

_CLERK OF COURT_

                                                          OR

|  |  |
|---|---|
| | /s/ Matthew A. Kezhaya |
| _Signature of Clerk or Deputy Clerk_ | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
The Satanic Temple, Inc. (Plaintiff)                                   , who issues or requests this subpoena, are:

Matthew A. Kezhaya; 1202 NE McClain Rd., Bentonville, AR 72712; matt@kezhaya.law; 479-431-6112

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   21-cv-10102

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-10102 |
| PLAINTIFF, | |
| *v.* | FIRST AMENDED COMPLAINT |
| CITY OF BOSTON, MA | |
| DEFENDANT. | |

COMES NOW The Satanic Temple, Inc. ("**TST**"), by and through counsel Brendan Durrigan BBO # 668680 and Matthew A. Kezhaya, *pro hac vice*, with a first amended complaint about a discriminatory legislative prayer practice.

## INTRODUCTION

1.   This first amended complaint is filed pursuant to FRCP 15(a)(1)(B) ("a party may amend its pleading once as a matter of course within 21 days after service of a motion under Rule 12(b)).  The City filed its Rule 12(b)(6) motion on April 5, 2021–which was 21 days ago.  This amendment adds a state law claim under the Massachusetts Constitutional analog of the Free Exercise Clause.  As further explained under Count 4, below, TST is afforded greater protections under Massachusetts law than the Federal counterpart.

2.   This lawsuit attacks the constitutionality of Boston's legislative prayer selection process.  The Constitution permits legislative prayers, but the prayer selection process must be nondiscriminatory.  Pursuant to an unregulated practice, Boston affords its Councilors the unquestioned freedom to select prayer-givers through legislative fiat.  TST does not make the cut and, despite demand, was refused a prayer opportunity.  As a result, the City broadcasts two constitutionally impermissible messages: those religions who make the cut are endorsed and are therefore insiders of the politically favored

community; those who don't make the cut are not endorsed and are therefore outsiders from the politically favored community. This legislative prayer process is unconstitutional on its face and is unconstitutional as applied to TST.

3. As important as what this case is, it is equally important what this case is not. This case is not a challenge to legislative prayers, generally; and it is not a challenge to offensive prayers, particularly. We take no issue with the fact that the City permits many congregations to invoke Jesus before Council meetings. We just want an equal opportunity–one guaranteed by the Constitution–to invoke Satan.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case under 28 USC § 1331 (federal question) because TST complains of alleged constitutional violations under color of state law which are actionable under 42 USC § 1983 (authorizing a cause of action for such claims) and 28 USC § 2201 (authorizing declaratory judgments), both of which are federal laws. See also Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978) (cities incur legal liability under § 1983 when their policies, practices, etc., are unconstitutional and cause a redressable legal harm). This Court further has supplemental jurisdiction over the state law claim (Count 4) under 28 USC § 1367 (supplemental jurisdiction).

5. This Court has general personal jurisdiction over the City because Boston is in this District. This Court has specific personal jurisdiction over the City because the situs of the injury took place in this District and it is reasonable to exercise jurisdiction here because all of the parties and witnesses are within this District.

6. Venue properly lies with this Court under 28 USC § 1391(b) because the conduct complained of happened in this Court's District.

# PARTIES

7.  **The Satanic Temple, Inc.**, plaintiff, (abbreviated to "**TST**") is a famous IRS-recognized atheistic religious corporation with its principal place of business in Salem, Massachusetts. TST's membership exceeds 270,000 and was recently the subject of the acclaimed film, "Hail Satan?" (2019, Magnolia Films). See also <u>Satanic Temple v. City of Scottsdale</u>, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion). TST's membership can be found in every state, importantly to include the Boston metro area. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny. For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others. TST propagates its Seven Tenets:

> (1)     One should strive to act with compassion and empathy toward all creatures in accordance with reason.

> (2)     The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

> (3)     One's body is inviolable, subject to one's own will alone.

> (4)     The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

> (5)     Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

> (6)     People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7)     Every tenet is a guiding principle designed to inspire nobility in action and thought.

The spirit of compassion, wisdom, and justice should always prevail over the written or spoken

word.

https://thesatanictemple.com/pages/about-us (last visited November 11, 2020).  Far from the Seven

Tenets being the sole "core" of TST's religious beliefs and practices, other core practices of TST

includes (among many other things) a demand for an equal opportunity to present its beliefs wherever

a government opens the door for some religions to express theirs.  In 2018, TST sought a prayer

opportunity before the City Council and was rejected because TST lacked the political clout to obtain

a Councilor's sponsorship.

8.     **The City of Boston**, defendant, is a municipal corporation located in Suffolk County, MA.

Boston serves as Massachusetts' capital and is its most populous city.  Boston's government includes

a unicameral legislative branch (the "**Council**") which consists of thirteen Councilor seats, all of which

are publicly elected positions and one of which serves as chair, the Council President.  Before Council

meetings, the Council hears a legislative prayer which is selected by a rotating Councilor who has

plenary authority to extend an invitation to whomever the Councilor desires.  In 2018, Boston refused

TST a prayer opportunity because TST lacked sponsorship from a Councilor.

## FACTS ALLEGED

## Background

9.   Every week, unless otherwise ordered and except on holidays, the Council holds a meeting.

10.  There are about 35 meetings per year, but the number fluctuates year-to-year.

11.  The meetings are broadcasted to local television and, going back to at least January 2011, were

audio/video recorded.  Recordings as early as January 2011 can be viewed by following this link:

http://meetingrecords.cityofboston.gov/sirepub/meetresults.aspx (last visited December 30, 2020).

12. These meetings start with a legislative invocation with an instruction for the audience to stand in observance of the prayer.

13. At the beginning of each calendar year, the Council promulgates a schedule of the dates of the year's upcoming Council meetings along with the names of the Councilors responsible for securing an invocation speaker.

14. Each Councilor has unfettered authority to select who gets to pray at their meeting.

15. The City has issued no contours or guidelines of each Councilor's right to choose who gives the prayer.

16. This practice has not been reduced to a formal policy.  C.f. "Rules of the Boston City Council" (establishing various rules for the Council).

17. Absent a Councilor's invitation, there is no opportunity to offer the legislative prayer.  See Council Rule 43 ("No person shall be permitted to speak, testify, or otherwise participate in any council meeting, hearing, or working session unless permitted to do so by the presiding officer or committee chair.")

18. So far as the City is concerned, the question of who gets to pray rests solely in the whim of the inviting Councilor.

19. As further detailed below, the City's policy disregards constitutional restrictions on legislative prayers.  E.g. Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983) (the prayer opportunity cannot be "exploited to proselytize or advance any one, or to disparage any other, faith or belief"); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014) (the selection policy must be one of of "nondiscrimination"); and Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019) (government-sponsored religious practices, including legislative prayers, are constitutional only if they are "an example of respect and tolerance for differing views, an honest

endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans.")

## TST's Request

20. TST is headquartered in Salem, which is a suburb of Boston.

21. TST has 2,449 members in the Boston metropolitan area.

22. At all times relevant, TST has been organized on two scales: the national organization and semi-autonomous local organizations called "chapters."

23. Prior to the events described below, members of TST's Boston Chapter had twice made requests, in 2016 and 2017 respectively, to bless the Council meeting.

24. Each time, the City rebuffed the request because the members lacked sponsorship from a Councilor.

25. In 2018, the matter was escalated to the national organization and attracted the attention of one of TST's co-founders: Malcolm Jarry.

26. On October 2, 2018, Jarry issued an email to the then-Council President, Andrea Campbell. **EXHIBIT 1**. Jarry's email demanded an invite for TST to offer an invocation before the City Council.

27. The next day, Jarry and Christine O'Donnell (then Compliance Director & Staff Counsel for the City) had a phone conversation about the issue.

28. During that conversation, O'Donnell informed Jarry that there is no waiting list to seek an invite. Religious groups either have a Councilor's sponsorship, or they aren't allowed to bless the meeting.

29. Jarry responded that, as a religious minority which is much maligned by a vocal segment of voting Christians, TST's constitutional right to equal participation in the ceremony could not be entrusted to the mechanisms of majoritarian rule.

30. Jarry was speaking from experience. In 2014, TST attempted to publicly show a Black Mass at Harvard University in neighboring Cambridge through Harvard's Extension Cultural Studies.

31. A Black Mass is an act of ritual blasphemy which has religious significance to Satanists.

32. In response, the Archdiocese of Boston organized a public movement to preclude the event.

33. The controversy drew national headlines and more than 2,000 Catholics marched in protest. Joseph P. Laycock, *Oxford University Press*, "Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion" (2020) at p. 28.

34. This organized movement against TST was partly successful: Harvard rescinded the invitation, but the show went on at the nearby Hong Kong Restaurant and Lounge.

35. Closer to these facts, TST's membership has made requests for equal participation in legislative prayers before the City of Scottsdale, AZ and Kenai Peninsula Borough, AK.

36. In Scottsdale, TST's member was initially accepted, but then 15,207+ emails entitled "No Hail Satan Prayer" crashed city servers. TST's member was ultimately excluded because of the majoritarian outcry and the resulting litigation is now pending before the Ninth Circuit. Oral arguments are in the process of scheduling for some time in March, April, or May of 2021.

37. Similarly, in 2016, the Boston Chapter's prayer request was met with a loud and conspicuously religious objection to TST's equal participation. Choice selections of emails available pursuant to a public records include:

    (a) "Evil disguised as benign, doesn't make it ok"

    (b) "[T]hose who embrace satanism are those who worship the evil deception of humanity. . . . There can be no sane footing upon which to permit any form of satanic worship or intercession to infest government."

    (c) "Please reject Satan and keep us a nation under God."

(d) "If it isn't clear to every City Councilor and Mayor Martin Walsh, that would be a very bad idea and cross far over any bounds of sanity and decency. Moreover, as an act of hate blasphemy, and rejection of God it should be immediately commended as just that."

The public records request and Boston's produced documents are available via Muckrock "Boston City Council Invocation Schedule" August 18, 2017 (https://www.muckrock.com/foi/boston-3/boston-city-council-invocation-schedule-42280/) (Last visited January 18, 2021).

38. In Kenai, TST's member was initially rejected after a public outcry, ostensibly because she was not a member of a "qualifying" religious association. But the Alaska Superior Court found that her exclusion was really, "stemmed from intolerance for the controversial views expressed during two particular invocations." Hunt v. Kenai Peninsula Borough, No. 3AN-16-10652 CI at *18 (Alaska Super. Ct. Oct. 9, 2018). The ban was overturned under Alaska's analogs to the Establishment Clause, the Free Speech Clause, and the Equal Protection Clause. TST's member was subsequently permitted her invocation, the public's religious objections notwithstanding.

39. The City knew of the Harvard Black Mass fiasco and the 2016 objections to the Boston Chapter's request for a prayer and could reasonably anticipate that granting Jarry's request would result in an angry mob protesting the City's decision to comply with the Constitution.

40. So, on October 9, O'Donnell issued notice that TST would not be permitted a prayer opportunity without an invite from a Councilor. **EXHIBIT 2**.

41. TST lacked the political clout to procure a Councilor's invitation.

42. No other religious group has requested an opportunity to bless the Council's meeting, only to be denied. TST is sole group to have ever been excluded.

43. On October 17, TST raised a claim of discrimination in a place of "public accommodation"

to the Massachusetts Commission Against Discrimination ("**MCAD**.")

44. The MCAD is a state agency charged with investigating claims of discrimination in places of "public accommodation." See generally G.L. c. 151B (prohibiting such discrimination).

45. MCAD has no authority to investigate or address claims of constitutional violations.

46. During the MCAD investigation, the City explained that invitees are "either a clergy person or a layperson who is a member of the Boston community and/or has some connection or relevance to the inviting City Councilor's constituents or personal life."

47. The City also claimed that Councilor O'Malley and another Councilor "exclusively invited individuals from withing their respective districts who are known for their outreach work."

48. Both of these claims were demonstrably untrue. The MCAD quickly found that prayer invitations were granted to six religious organizations from outside Boston city limits, just between 2018 and 2019.

49. One of those invitations was to Reverend Lindsay Popperson, of the United Church of Christ's branch in Marblehead, MA.

50. The invitation to Rev. Popperson was extended by none other than Councilor O'Malley, who the City had falsely claimed "exclusively" doled out invitations to his district's residents.

51. In response to the MCAD investigator's further inquiry, the City explained that Councilor O'Malley had a "personal connection" with the Reverend because the Reverend serves as the Chaplain for a nursing center where the Councilor's mother received care.

52. That's religious discrimination. The stated practice was that O'Malley "exclusively invited individuals from within their respective districts who are known for their outreach work." Changing that rule to benefit one ("preferred") religious group, but not affording that same benefit to a different ("undesirable") religious group *is* disparate treatment on the basis of religion.

53. It's also a perfect microcosm of the problem with granting public officials unfettered authority to grant limited governmental benefits: it will inevitably result in a grant of that benefit to someone with a "personal connection" to the official and, necessarily, will deprive someone else of that benefit.

54. The City uniquely excluded TST based on TST's religious viewpoint and the second-order effects of avoiding a public outcry for giving equal access to an "undesirable" religious minority.

55. Ultimately, the MCAD investigator determined that the MCAD could not take up the matter because the prayer opportunity was not a "place of public accommodation" within the meaning of the statute because, although the meetings are open to attendance by the public, the Council determines who can speak at the meeting.

56. The MCAD investigator expressly declined to address the constitutional issues because the Commission lacks authority to address the constitutionality of the prayer ceremony.

57. The MCAD investigator's determination was not a "final ruling" for res judicata purposes and does not preclude TST from raising the same facts to this Court's attention.

58. TST is damaged because the City grants invitations to "preferred" religions, but refuses to invite TST because of its "undesirable" status.

## <u>The effect of the practice</u>

59. After TST's exclusion, volunteers of TST dedicated substantial efforts into reviewing 233 invocations between January 3, 2011 and August 8, 2017.

60. The data show that, because Councilors are selecting prayers without any neutrality enforcing safeguards, the prayer opportunity is disproportionately being afforded to those that subscribe to Abrahamic belief traditions. Everyone else is disproportionately underrepresented.

61. According to the Pew Research Center, the Boston metropolitan area boasts a 57% Christian population. Pew Research Center Religious Landscape Study "Adults in the Boston metro area"

(available at https://www.pewforum.org/religious-landscape-study/metro-area/boston-metro-area/).

62. Despite consisting of only 57% of the population, Christians gave 78.5% of the prayers.

63. The Muslim population has 1% of the population, yet 4.7% of the prayers.

64. The Jewish representation was close to right, with 4% of the population and 4.3% of prayers.

65. Christians, Muslims, and Jews are all over-represented because they all share the same Abrahamic tradition roots. They are safe and familiar to the Councilors, and they have the numbers and political clout to demand inclusion.

66. Combined, those who believe in the God of Abraham have only 62% of the population yet command 87.5% of the prayer opportunities.

67. The rest are left in the cold. Nonbelievers of various stripes consist of 33% of the Boston population. Yet, of 233 reviewed instances of prayers between 2011 and 2017, precisely one blessing–less than 0.5%–was secular. That was offered by Sister Margaret Leonard of Project Hope (a laudable international health care organization, but not a religious congregation) on October 22, 2014.

68. Similarly, Hindus consist of 1% of the Boston population, yet were disproportionately underrepresented at one instance of 233 reviewed prayers, less than half their proportionate share.

69. Buddhists, also with 1% of the Boston population, received no representation at all.

70. Wiccans, other Pagans, and Native Americans, all, have adherents in Boston yet they, too, got no invite.

71. To some extent the disproportionate representation could be a function of interest. Maybe the Pagans are happier without the limelight. But the problem with the City's prayer selection system is that the prayer opportunity isn't equally shared among those who are interested–as the Constitution requires–instead, the opportunity is reserved for those who have the political clout to obtain a

Councilor's patronage.

72. TST wants into that club, but lacks the influence to buy admission.

73. Thus, TST needs this Court to enforce the City's compliance with the Constitution.

## CAUSES OF ACTION

### Count 1
Violation of the Establishment Clause

74. The First Amendment, which includes the Establishment Clause, was drafted to protect against political division along religious lines. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

75. To that end, the Establishment Clause prohibits either governmental preference for, or disparagement of, any particular religion; it also prohibits governmental preference for religious belief over religious disbelief, and vice versa. E.g. U.S. Const. Amend. I ("Congress shall make no law respecting an establishment of religion."); Larson v. Valente, 456 U.S. 228, 245, 102 S. Ct. 1673, 1684 (1982) ("Free exercise thus can be guaranteed only when legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations"); Epperson v. State of Ark., 393 U.S. 97, 107, 89 S. Ct. 266, 272, 21 L. Ed. 2d 228 (1968) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them.")

76. In this framework, legislative prayer policies are constitutionally permissible only if the opportunity to pray is afforded without discrimination. Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014); Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019); accord id. at 2091 (Breyer, J., concurring) and 2094 (Kagan, J., concurring in part), Lund v. Rowan Cty., N. Carolina,

863 F.3d 268 (4th Cir. 2017) and Williamson v. Brevard Cty., 928 F.3d 1296 (11th Cir. 2019); c.f. Bormuth v. Cty. of Jackson, 870 F.3d 494 (6th Cir. 2017).

77. As further discussed in American Legion, governmental sponsorship of a religious practice is constitutional only if it is nondiscriminatory, i.e. it "stands out as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans. American Legion, 139 S. Ct. 2067 at 2089 (plurality opinion). Justice Kagan signed onto this sentence, but only because of its "sensitivity to and respect for" pluralism, neutrality, and inclusion, all of which "the First Amendment demands." Id., 139 S.Ct. at 2094 (Kagan, J., concurring in part).

78. "Discrimination" is commonly but improperly confused with "religious animus." Intentional discrimination answers "what," it is the mental resolution to conduct or refrain from an act. Intentional religious discrimination, by a government, is what makes an action unconstitutional.

79. "Religious animus" is one possible answer to "why," but that is unnecessary to a favorable decree. See Hassan v. City of New York, 804 F.3d 277, 297–98 (3d Cir. 2015) (equal protection case) ("All you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic itself*") (emphasis in original).

80. Here, the intentional discrimination is in the City's refusal to extend TST an invitation to join in a government-sponsored religious ceremony while providing that imprimatur to other groups.

81. The City refused to provide TST an invite because of the nature of TST's beliefs: we extol the virtues of Satan, which is decidedly unpopular with the City's sizeable (and politically powerful) Christian constituency.

82. By refusing to invite TST, the City is sending a message that TST and its congregation are outsiders, not full members of the political community. Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.

Ct. 1355, 1367 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community. . . . Disapproval sends the opposite message.")

83. Simultaneously, by providing invites only to a select group of clergy, the City is sending a corresponding message that these clergy and their congregations are insiders, favored members of the political community. Id. ("Endorsement sends a message . . . to adherents that they are insiders, favored members of the political community.")

84. The City even admitted as much during MCAD proceedings: Councilor O'Malley issued his invite to Rev. Popperson because of their "personal connection."

85. By reserving it to the whim of publicly-elected Councilors to determine who gives the prayer, the City has upended the point of the Bill of Rights: "to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185 (1943).

86. TST's right to equal participation in the prayer ceremony is a fundamental First Amendment right. See Town of Greece. Thus, TST's right to equal participation "may not be submitted to vote" and does not depend on the outcome of an election. Id. at 1185-86.

87. Yet, in Boston, TST's right to equal participation *does* depend on the outcome of an election: TST only gets equal participation if an elected Councilor is sympathetic to TST's desire to participate. This is an inversion of our constitutional norms.

88. The City's prayer selection policy needs to have neutrality-enforcing safeguards and needs a mechanism to provide an equal prayer opportunity to all groups who want to participate. Anything less runs afoul of the Establishment Clause. Because Boston's prayer selection policy does not have

these, it is unconstitutional.

89. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Establishment Clause because the City's prayer selection practice lacks neutrality enforcing safeguards, lacks a mechanism to provide an equal prayer opportunity to all groups who want to participate, and was exploited to exclude TST from participation. 42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

90. The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for the prayer opportunity. 42 USC § 1983.

### <u>Count 2</u>
Violations of the Free Speech Clause and the Free Exercise Clause

91. The First Amendment, which also includes the Free Speech and Free Exercise Clauses, was drafted to protect against political division along religious lines. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

92. To that end, the Free Exercise Clause prohibits governmental restraint on the free exercise of religion. U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]"); Braunfeld v. Brown, 366 U.S. 599, 607, 81 S. Ct. 1144, 1148 (1961) ("If the purpose or effect of a law is to . . . discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect"); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227, 124 L. Ed. 2d 472 (1993) ("Facial neutrality is not determinative.")

93. Likewise, the Free Speech Clause prohibits governmental suppression of expression–

particularly to include religious expression.  <u>Capitol Square Review and Advisory Bd. v. Pinette</u>, 515 U.S. 753, 760 (1995) ("government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.") (emphasis in original)

94. TST's intention to publicly bless the Council's meetings with a Satanic prayer was an expression of religious significance.

95. The City withheld that prayer opportunity because it finds TST to be an "undesirable" religion and wanted to avoid the public outcry which would inevitably ensue from granting TST equal participation rights to Christians.

96. The corollary is that if TST were not controversial, TST would have received an invite like all the other "permissible" minority groups who the overall public finds suitably inoffensive.

97. By refusing to grant TST equal access to the public prayer ceremony, the City issued a governmental restraint on the free exercise of religion.

98. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Free Speech and Free Exercise Clauses because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions.  42 USC § 1983; 28 USC § 2201; <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018 (1978).

99. The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for the prayer opportunity.  42 USC § 1983.

<u>**Count 3**</u>
Violation of the Equal Protection Clause

100. The Equal Protection Clause prohibits governments from treating similarly situated groups differently. U.S. Const. Amend. XIV ("nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws.")

101. Religious discrimination is barred under the Equal Protection Clause just as well as the Religion Clauses (Counts 1 and 2, above). See In re Subpoena to Witzel, 531 F.3d 113, 118–19 (1st Cir. 2008).

102. The benefit to Equal Protection is that it has what the Religion Clauses lack: consistency in interpretation. E.g. Rowan Cty., N.C. v. Lund, 138 S. Ct. 2564, 201 L. Ed. 2d 1101 (2018) (Thomas and Gorsuch, JJ., dissenting from the denial of certiorari) ("This Court's Establishment Clause jurisprudence is in disarray.")

103. "Disarray" is putting it lightly. It has been more aptly described as "schizophrenic." Paulsen, "Religion, Equality, and the Constitution: An Equal Protection Approach to Establishment Clause Adjudication," 61 Notre Dame L. Rev. 311, 315 (1986) (criticizing the Court's reading of the Establishment Clause as "producing a schizophrenic pattern of decisions")

104. Analyzing this case under the Equal Protection Clause means we get to use a clean and settled tiered judicial scrutiny analysis, not simply stab in the dark with the "Rorsarch tests" offered by the Religion Clauses. Charles Truslow and Craig Jones, "Hunt v. Kenai Peninsula Borough: the Search for Clarity in Legislative Prayer Speaker Selection," 36 Alaska L. Rev. 119, 129 (June, 2019).

105. Strict scrutiny attaches to the City's legislative prayer policy, either because (a) TST is a minority religion which lacks the political clout to overpower a majoritarian political process (i.e. TST is a "suspect class"); or (b) The City's legislative prayer selection practice is a determination of who gets to bless the Council's meeting (i.e. it "impinges upon the exercise of a fundamental right.") Plyler v. Doe, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95 (1982).

106.     Alternatively, intermediate scrutiny should attach because governments cannot determine permissible invokers by considering the contents of the prayers.  Marsh, Town of Greece, and American Legion, above.  Thus, any regulation of who gets to give the invocation can only be content-neutral.  Intermediate scrutiny applies to content-neutral regulations of speech.  E.g. Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020).

107.     But even if the Court selects rational basis, the City's practice can't survive because "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S. Ct. 2821, 2826 (1973).

108.     TST is similarly situated to every other "permissible" group which received a right to bless the Council's meeting.  The only distinction is that TST extols the virtues of Satan whereas the "permissible" groups predominately extol the virtues of Jesus.  This is a distinction without a constitutionally significant difference.

109.     By permitting a host of other religious viewpoints to publicly bless the Council meeting, but prohibiting TST equal access to officiate that ceremony, the City disparately treated two similarly situated groups in violation of the Equal Protection Clause.

110.     The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Equal Protection Clause because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions.  42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

111.     The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for

the prayer opportunity.  42 USC § 1983.

## Count 4
Violation of Massachusetts's Free Exercise Clause

112.     Similar to the First Amendment, the Massachusetts Constitution protects the free exercise of religion.  Mass. Const. Art. 46, § 1 ("No law shall be passed prohibiting the free exercise of religion.")

113.     The distinction is in the level of protection.  The Massachusetts Constitution affords greater religious freedom than the Federal Constitution.  See Att'y Gen. v. Desilets, 418 Mass. 316, 323, 636 N.E.2d 233, 237 (1994).  There, the Massachusetts Supreme Court rejected, on state law grounds, the United States Supreme Court's reasoning of Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).  In Smith, the Supreme Court held that Congress may prohibit the free exercise of religion provided that a court finds it was done by a generally-applicable, neutral rule which does not impact any other fundamental right.  Since then, Congress has rejected the Smith reasoning.  See the Religious Freedom Restoration Act (42 USC §§ 2000bb et seq.).  Most states–Massachusetts included–have done the same.

114.     Under the Massachusetts Constitution, general applicability and neutrality is beside the point.  Instead, a plaintiff need only show: "(1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the State requirement."  Krupien v. Ritcey, 94 Mass. App. Ct. 131, 136 n. 9, 112 N.E.3d 302, 307 n. 9 (2018).  At that point, the law is presumptively unconstitutional and the burden passes to the government to show "both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal."  Id.  This is the strict scrutiny test.  See id., 94 Mass. App. Ct. at 136, 112 N.E.3d at 307.

115.     TST's membership sincerely holds the religious beliefs propagated by The Satanic

Temple.

116.     The City's prayer selection policy is determined by a political calculus, which conflicts with and thus burdens TST's religious identity because TST's religious beliefs and identity are both unpopular with the politically powerful majority.

117.     Thus, even if the Court finds both that there is no Free Speech issue entailed in the City's prayer selection policy and the prayer selection policy is neutral and generally applicable in fact, the Court should still order Boston to provide TST equal access to offer a legislative prayer, should still permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should still order Boston to create a mechanism for religions to sign up for the prayer opportunity as an affront against the Massachusetts Constitution.  MGL ch. 231A, §§ 1 and 5.

## PRAYER FOR RELIEF

**WHEREFORE** TST prays for orders as follows:

1.   Find that Boston's legislative prayer scheme is unconstitutional as an affront to the Establishment Clause, the Free Speech and Free Exercise Clauses, the Equal Protection Clause, and the Massachusetts Constitution, art. 46 § 1.

2.   Order Boston to afford TST an opportunity to bless the Council's meeting within two weeks following entry of the order.

3.   Issue a permanent injunction that Boston shall not exclude TST or any other religious groups from an equal opportunity to bless the Council's meetings.

4.   Issue a permanent injunction that Boston shall create a mechanism for interested religious groups to obtain an equal opportunity to bless the Council's meetings.

5.   Order Boston to compensate TST for costs and attorney's fees pursuant to FRCP 54, 42 USC § 1988, and MGL ch. 231A § 7.

6. And for all other relief to which TST may be entitled.

|  | Respectfully submitted on April 26, 2021, on behalf of The Satanic Temple, Inc. |
|--|--|
| By: | /s/ Brendan Durrigan |
|  | Brendan Durrigan BBO # 668680 |
| Address: | 169 North Franklin St., Suite 7 |
|  | Holbrook, MA 02343 |
| phone: | (781) 726-0763 |
| email: | bdurrigan@gmail.com |
| And: | /s/ Matthew A. Kezhaya |
|  | Matthew A. Kezhaya, MN # 0402193, *phv* pending |
|  | KEZHAYA LAW PLC |
|  | 100 S. Fifth Street, 19th Floor |
|  | Minneapolis, MN 55402 |
| phone: | (479) 431-6112 |
| facsimile: | (479) 282-2892 |
| email: | matt@kezhaya.law |

### CERTIFICATE AND NOTICE OF SERVICE

NOTICE IS GIVEN that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on April 26, 2021 which sends service to registered users, including all other counsel of record in this cause.  /s/ Matthew A. Kezhaya

## EXHIBIT LIST

1. October 2 email from Malcolm Jarry to Council President

2. October 9 email from O'Donnell to Jarry