IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC.<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF BOSTON, MA<br><br>DEFENDANT. | CASE NO. 21-CV-10102<br><br>TST'S NOTICE OF DEPOSITION OF THE CITY OF BOSTON, MA |

**To**: Defendant and its counsel of record, Nicole O'Connor and Robert Arcangeli, 1 City Hall Square, Boston, MA 02201.

**LET IT BE KNOWN** that, pursuant to FRCP 26 and 30(b)(6), Plaintiff will take the deposition of the City of Boston, MA through one or more of Defendant's officers, directors, managing agents, or such other persons who consent to testify on its behalf, concerning the matters set forth below.

The deposition(s) will take place by oral examination, before a person authorized to administer oaths and take testimony and will be recorded by stenographic and videographic means. The deposition(s) will take place at 64 Bridge Street, Salem, MA, 01970 on **August 1, 2022** beginning at **9:30 am EST** and continuing thereafter until complete.

DEFINITIONS

(1) "TST" is The Satanic Temple, a congregation of atheistic Satanists which began in 2013 and continues to present. TST is the plaintiff in this action.

(2) The "City" is the City of Boston, Massachusetts, a world-renowned center of cultural significance. The City is the defendant in this action.

(3) TST's "first demand" is the first time TST demanded of the City to have an equal right to participate in the invocation ceremony.

(4) The "invocation ceremony" is an opportunity for a person to speak before the regular meeting of the City Council for the contemplated purpose of engaging in a religious expression, which opportunity is available only to those who have been expressly invited by the City.

MATTERS FOR EXAMINATION

1. The identity of the 30(b)(6) deponent, the scope of their agency for the City, any other relationship they have with the City or its decisionmakers, the grounds for their testimony on any of the following topics, and what investigation or preparation (if any) they have done to speak for the City on any of the following topics.

2. Any policies, practices, or customs surrounding the public's opportunity to influence the City's decision-making; both as a general matter and specific to the invocation ceremony at issue.

3. A background on the City's invocation ceremony, including without limitation: when it first arose, what legal challenges (if any) it has faced over time, how (if at all) the invocation ceremony has changed over time, how (if at all) any policies, practices, or customs surrounding the invocation ceremony have changed over time, the bases for limiting who may participate, how and why a particular speaker is selected, how and why any particular speaker is not selected, and the City's concept of a typical invocation.

4. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony.

5. The City's record keeping policies surrounding written communications sent or received by any City agent about this case, from January 1, 2015 to the date of the original complaint.

6. All intra-City written communications about TST's invocation demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the

date of the original complaint.

7. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's invocation demands, up to the date of the original complaint.

8. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

9. General information about any individuals or groups who have demanded participation in the City's invocation ceremony, from January 1, 2011 to present. Including without limitation: their name, faith group, residential address at the time of the demand, business or congregation address at the time of the demand, and how many times the guest speaker has performed an invocation for the City or otherwise, and whether the City extended a demand to the subject individual or group.

10. The subjective bases for why each Councilor did or did not heed the demand described in ¶ 9, from January 1, 2011 to present.

11. Identifying information about each invited speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business or congregation address at the

time of the invite, how many times the guest speaker has performed the invocation for the City, how much money or other valuable consideration the City provided to the guest speaker in return for their services, and any other collateral benefits the guest speaker received because of the speaking opportunity.

12. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

13. Any instances in which the City had a vacancy in the guest speaker role for the invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present. Particularly: why there was a vacancy, the date of the meeting in which there was a vacancy for the invocation ceremony and how (if at all) the time slotted for the invocation ceremony

14. Any instances in which the invocation ceremony did not implore a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence).

15. Any instances in which the invocation ceremony addressed a topic which was not reflected on the Council's agenda for that meeting (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not

generalized statements imploring divine wisdom be granted to the Council).

16. Any instances in which a guest speaker identified the Council as subservient to any literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or which otherwise subordinates the will of the Council to the will of the supernatural entity; or which otherwise implies the Council is unable to perform their public service function without reliance on the deity being prayed to).

17. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18. The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

19. Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20. Each Councilor's subjective understanding about TST's engagement with

the broader community, and the bases therefor.

21. Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

23. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the invocation ceremony (including without limitation: any instance in which any City personnel sought to review a invocation before it was given, any instance in which any City personnel sought to modify a invocation before it was given, any instance in which any City personnel commented on a invocation after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated invocation, and any other facts the City finds important to the question of whether it exercised any level of control over the invocation ceremony).

24. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present; and relied-upon grounds therefor.

25. The relative proportionate share of each faith groups' representation in the City's invocation ceremony, year-over-year, from January 1, 2011 to present; and relied-upon grounds therefor.

26. The sum of money the City has paid to each guest speaker at the invocation ceremony, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received.

27. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the invocation ceremony.

28. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the invocation ceremony.

29. Any other facts the City finds relevant to the litigation.

30. Any documents provided by the City to TST in discovery.

Propounded on June 24, 2022,
on behalf of Plaintiff

By: /s/ Matthew A. Kezhaya

Matthew A. Kezhaya, ABA# 2014161
KEZHAYA LAW PLC
300 N. Washington Ave. #300,
Minneapolis MN 55401
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

## CERTIFICATE AND NOTICE OF SERVICE

NOTICE IS GIVEN that I, Matthew A. Kezhaya, provided the foregoing document by email to opposing counsel at nicole.oconnor@boston.gov and robert.arcangeli@boston.gov on June 24, 2022. /s/ Matthew A. Kezhaya