IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-10102 |
| PLAINTIFF, | |
| V. | MOTION FOR RECUSAL |
| CITY OF BOSTON, MA | |
| DEFENDANT. | |

COMES NOW TST, by and through counsel of record, on motion to recuse District Judge Kelley because a reasonable member of the public would suspect, and TST reasonably does suspect, that Judge Kelley is biased and incompetent. 28 USC § 455(a). To protect the People's perception that the Judiciary is both unbiased and competent, Judge Kelley must recuse.

## 1: Timeliness

A motion for disqualification under § 455(a) must be timely filed. *In re United States*, 666 F.2d 690, 694 (1st Cir.1981). This motion for recusal is timely. The initial showing of bias occurred a year ago and the insults, threats, and incompetent actions of Judge Kelley have culminated up to the present time.

**2: Judge Kelley "shall" recuse for appearing biased.**

The following facts create a reasonable question of Judge Kelley's impartiality:

1) Judge Kelley *sua sponte* ordered Plaintiff's counsel, Matt Kezhaya, to disclose opinion work product to the public and to opposing counsel.

2) Judge Kelley ignored Kezhaya's work product objection.

3) Judge Kelley exceeded the scope of Boston's Motion for Protective Order, finding that the ultimate fact question of this case is outside the scope of relevance.

4) Judge Kelley sanctioned Kezhaya despite his willingness to accommodate Boston's requests.

5) Judge Kelley sanctioned Kezhaya using the privileged opinion work product he candidly produced upon her order.

6) Judge Kelley inserted herself as advocate for Boston when she denied the Motion for Certificate of Appealability before Boston even responded, precluding the inevitability that Boston would steer her analysis towards the legal issue Kezhaya raised.

7) Judge Kelley ignored TST's legal argument in support of a case-dispositive Motion for Certificate of Appealability.

8) Judge Kelley stated that Kezhaya's good faith attempt to appeal her critically flawed determination as to the scope of discovery was the product of either "simple incompetence" or a "more pernicious desire to misstate the record."

9) Judge Kelley prevented the deposition of the principal actor at the heart of the Establishment Clause claim.

10) Judge Kelley threatened Kezhaya with more sanctions and

ordered him not to submit status reports to the court, obstructing the appeal record and placing a prior restraint upon his zealous representation.

*2.1: Legal standard*

The recusal statute provides that a judge "shall" disqualify herself from any proceeding in which her "impartiality might reasonably be questioned." 28 USC § 455(a). While recognizing that the "challenged judge enjoys a margin of discretion," the First Circuit has held that "doubts ordinarily ought to be resolved in favor of recusal." *In re U.S.*, 441 F.3d 44, 56–57 (1st Cir. 2006); *see also United States v. Snyder*, 235 F.3d 42, 46 (1st Cir.2000). The question is whether an objective, reasonable member of the public, "fully informed of all the relevant facts, would fairly question the trial judge's impartiality." *Id.* The professed absence of subjective bias is irrelevant, for the question is the appearance of bias. *Liteky v. United States*, 510 U.S. 540, 553 n. 2 (1994); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988) ("[J]ustice must satisfy the appearance of justice.")

*2.2: Judge Kelley ordered Plaintiff to disclose opinion work product.*

Judge Kelley showed bias when she *sua sponte* ordered Plaintiff's

counsel to disclose privileged opinion work product to Boston, even after TST had relented on the disputed issue.

TST first scheduled the deposition of Michelle Wu, former Boston City Council President and now Mayor, on November 2, 2021. This was election day in Boston and Wu was a candidate for mayor. Boston made an emergency motion to quash the subpoena and issue a Protective Order precluding any deposition of Wu. The parties agreed via phone conference to reschedule Wu's deposition. See ECF 35 Exhibit 1. Boston modified the agreement and pressed forward with their emergency motion to quash. ECF 35 Exhibit 2.

In response, TST wrote a letter to Judge Kelley on October 28, 2021, requesting that the Court decline to dispose of the matter on an emergency basis and afford a full 14-day response time to Boston's Motion for Protective Order under Rule 7.1(b)(2). ECF 35. Such a request necessarily precluded deposing Wu on November 2, 2021. Wu would not be deposed on election day.

Nonetheless, at 2:29 PM the same day, Judge Kelley ordered Plaintiff to "file a statement explaining *why* the deposition of Councilor Michelle Wu was scheduled for November 2, 2021" by 9:00 AM the next day.

ECF 36 (emphasis added).  Judge Kelley did not order counsel to merely submit a brief in opposition to the Protective Order. Instead, Judge Kelley ordered Kezhaya to tell her his legal strategy. Accordingly, Kezhaya separately responded to the court raising legitimate concerns that the Court was impermissibly prying into the mind of council in violation of work product privilege. ECF 37. Judge Kelley gave no response.

Kezhaya complied with Judge Kelley's order, revealing every reason why Wu was noticed for deposition on November 2, 2021. ECF 38.  In the letter, Kezhaya repeated that he was engaged in talks regarding re-scheduling with Boston. Id. at 2. He provided emails as evidence of this fact. Id.

Five months later, on April 6, 2022, Judge Kelley granted Boston's Protective Order in full. ECF 47. Judge Kelley never responded to Kezhaya's opinion work product privilege argument. Instead, Kezhaya was bludgeoned with the exposed opinion work product and sanctioned on the basis of the information impermissibly extracted.

The Court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Thus,

some Courts hold that opinion work product "enjoys a nearly absolute immunity." *See In re Murphy*, 560 F.2d 326, 336 (8th Cir.1977); *Director, Office of Thrift Supervision v. Vinson & Elkins*, LLP, 124 F.3d 1304, 1307 (D.C.Cir.1997) ("Opinion work product ... is virtually undiscoverable."). All courts, save Judge Kelley's, hold opinion work product to a higher standard than regular work product. When a judge demands to know "why" counsel acted in a certain way, at a minimum, the answer is for the judge only. *See e.g. Burden v. CSX Transp., Inc.*, No. 08-CV-04-DRH, 2010 WL 4292668, at *2 (S.D. Ill. Oct. 22, 2010) ("During a discovery dispute conference, at the request of Plaintiff's attorney so as not to reveal his trial strategy to defense counsel, a private conference was held between Plaintiff's counsel and the Magistrate Judge in order for Plaintiff's counsel to explain *why* he believed he had a good faith basis [for discovery efforts].").

Judge Kelley ordered Kezhaya to distill his opinion work product, the culmination of numerous strategic discussions with his client, into a statement and disclose it to opposing counsel and the entire public by 9:00

AM the next day.[1] Further demonstrating bias, Judge Kelley flatly ignored Kezhaya's plea to prevent this information from reaching opposing counsel and the public.

A reasonable member of the public would question the impartiality of a judge that demanded counsel reveal their legal strategy to opposing counsel, without any legal argument, much less one that could overturn a privilege with nearly absolute immunity. Especially when the opposing party had not requested the information. Especially when the matter had already been resolved. This conduct alone is grounds for recusal but was just the beginning.

*2.3: Judge Kelley denied Motion for Certificate of Appealability on key discovery ruling without so much as addressing TST's legal argument.*

Judge Kelley granted Boston's Protective Order precluding the deposition of Michelle Wu. ECF 47. Boston argued that Wu did not hold relevant information, claiming:

> Moreover, Plaintiff's Equal Protection claim
> has been dismissed so this case is not about

---

[1] The Satanic Temple brings First Amendment impact litigation suits across the nation to resist the pervasive influence of Christendom on state and federal government, including judiciaries. Drawing public attention to their cases is of paramount importance. Judges that are similarly bias against The Satanic Temple will no doubt draw fodder from Judge Kelley's impermissible prying into the mind of their legal counsel. This is a serious harm.

> selective treatment, but rather it is about whether the City's invocation speaker policy is permissible under the Establishment clause. The inquiry into whether the City's invocation speaker selection practice conforms to the Establishment clause boundaries does not depend on the subjective motives or preferences of each of the city councilors, but rather on the selection scheme.

ECF 43 at 2-3.

Judge Kelley repeated this critically flawed argument in her order

granting the Protective Order:

> Moreover, the City correctly points out that Plaintiff's primary surviving claim under the Establishment Clause of the First Amendment ultimately hinges on an analysis of the constitutionality of the invocation practice itself. This is as distinct from Plaintiff's claims under the Equal Protection Clause, which, had they survived the City's motion to dismiss, would have required an inquiry into potential impermissible selective treatment by the City Councilors. Because the Court dismissed the Equal Protection claim in July 2021, *the only relevant and discoverable information to be obtained from current or former City Councilors would be of a relatively general nature regarding the Council's prayer scheme*, which further diminishes the importance of Mayor Wu's testimony and indicates this information could easily be provided by lower-ranking government officials.

ECF 47 at 9 (emphasis added).

Even under this flawed analysis, Wu, as the City Council President who rejected TST's invitation request, holds uniquely relevant information. She personally spearheaded an overhaul to the prayer scheme after TST's first request, ending the practice of paying clergy who gave the invocation. Exhibit 1.

In cases where the government invites people to participate in a program, "the Court conducts a *holistic inquiry* to determine whether the government intends to speak for itself or, rather, to regulate private expression." *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1584 (2022) (emphasis added).

TST rightly took issue with Judge Kelley's extraordinarily limitation on the scope of discovery. There is a litany of Establishment Clause legislative prayer cases. Many of these cases share nearly identical schemes. However, courts come to different conclusions on their constitutional validity because of the varying legislative motives. For example, "performance and personal qualities" not denominational affiliation are an acceptable motivation for retaining a paid clergy for regular prayers. *Marsh v. Chambers*, 463 U.S. 783, 793–94 (1983) (finding absence of "impermissible motive" precluded Establishment Clause violation); *see also*

*Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1278 (11th Cir. 2008) (finding Planning Commissioner violated Establishment Clause when they "categorically excluded" certain faiths to uphold monotheistic tradition).

Indeed, the necessity of a fact intensive analysis of the legislators' motives is the very reason TST's Establishment Clause claim survived Boston's motion to dismiss.[2]

> [A]lthough Marsh states that courts "cannot . . . perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church," it explicitly did not address where a speaker's selection "stemmed from an impermissible motive." TST's amended complaint alleges a discriminatory motive, asserting that between 2011 and mid-2017, City Councilors have invited speakers representing Abrahamic religions to 87.5% of its meetings . . . Plaintiff's facts, taken as true, allege a discriminatory motive, and therefore, Defendant's policy falls outside of Marsh.

ECF 21 at 11.

TST raised this issue in a Motion for Certificate of Appealability. ECF 50. A Motion for Certificate of Appealability was appropriate because Judge Kelley's Protective Order involved a controlling question of

---

[2] Because impermissible motive goes to the heart of an Establishment Clause claim, Boston initially disclosed that City Councilors had discoverable information.

constitutional law. *In re Zofran (Ondansetron) Prod. Liab. Litig.*, 235 F. Supp. 3d 317, 319 (D. Mass. 2017) (citing 28 USC § 1292(b)). TST argued that Judge Kelley, in her foregone reasoning in support of a Protective Order, found it irrelevant for purposes of discovery under the Establishment Clause whether the Councilors engaged in "impermissible selective treatment" and thus had, in effect, precluded discovery from any deponent as to the motives behind the prayer scheme.[3]

Judge Kelley would not hear it. She ignored the merits of TST's argument. ECF 51. Instead, she accused Kezhaya of misstating the Protective Order, perhaps due to "simple incompetence" or some other unknown "pernicious desire". Id. at 2.

Bad rulings alone are not grounds for recusal, nor are aspersions towards counsel. Judge Kelley's conduct here goes far beyond a mere 'bad ruling'. Judge Kelley's ruling barring discovery on the ultimate issue of fact will impact every phase of litigation, including the ultimate outcome of the matter. Kezhaya sought to avoid this likely outcome by requesting permission for early appeal of a critically flawed ruling. Judge Kelley

---

[3] Indeed, Boston's counsel has vigorously raised objections when Kezhaya inquires to the motives or the "why" behind council members' selections and denials. Naturally, he was referred to Wu for insight into the motives.

refused to allow him to proceed. More egregiously, Judge Kelley's refusal did not even try to address Kezhaya's argument. Instead, Judge Kelley's denial was based solely on her suggestion that Kezhaya was incompetent. Had she allowed Boston to reply to the motion for themselves, perhaps she would have been steered towards the argument, but her interjection and advocacy for their cause precluded even that.

Perhaps, Judge Kelley, made an error in law and temperament due to a general unfamiliarity with First Amendment claims, rather than bias. Even if true, actual bias is not necessary. The mere appearance of bias is sufficient for her recusal. *Liteky*, 510 U.S. 553 n. 2. Regardless of her motives, Judge Kelley's conduct is egregious enough to give a reasonable member of the public the impression, the appearance, that she is biased. Even if the argument ended here, Kelley must recuse.

*2.4: Judge Kelley went beyond ignoring Kezhaya's arguments and began suppressing his First Amendment rights and ability to preserve the record for appeal.*

On Sept 16, 2022, Judge Kelley ordered Kezhaya not to submit status updates to the court and threatened him with the risk of sanctions for future discovery motions. ECF 63. In doing so, Judge Kelley shifted from forcing Kezhaya to reveal his litigation strategy to outright dictating it for

him; she shifted from ignoring his legal arguments to suppressing them.

Kezhaya began submitting status reports to the court because Judge Kelley was showing a pattern of only accepting Boston's narrative. For example, Judge Kelley accepted Boston's assertion that Kezhaya was unwilling to move Wu's deposition date, the basis for the Protective Order and sanctions against Kezhaya. ECF 47 at 3. Kezhaya provided emails proving the contrary to Judge Kelley to no avail. It was critical that Kezhaya get the facts on the record for an inevitable appeal. It was Judge Kelley's bias against Kezhaya that made the status reports necessary.

"The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues." *United States v. Cooper*, 872 F.2d 1, 3 (1st Cir. 1989).

Threatening sanctions for further discovery motions unconstitutionally chills Kezhaya's advocacy for his client. Given Judge Kelley's hostile disposition towards Kezhaya, and her suspicion of his pernicious desires, even motions made in good faith could result in sanctions. This threat of sanctions is a prior restraint that violates the First Amendment and Due Process rights of Kezhaya and TST.

*2.5: Bias is more readily presumed against The Satanic Temple.*

The appearance of bias disqualifies Judge Kelley. The Satanic Temple, a religious minority, already faces discriminatory bias, unconscious or otherwise, at a degree higher than the common litigant. This heightens the likelihood that a fully informed member of the public would find Judge Kelley's actions bias, even if her unconscious bias against TST blinds her.

## 3: Prayer for Relief

WHEREFORE, for all the reasons given here, Judge Kelley must recuse herself from this matter. Kezhaya therefore requests that this Motion for Recusal be Granted.

By: /s/ Matthew A. Kezhaya
AR # 2014161, MN # 0403196
*pro hac vice*
Crown Law
333 S. 7th Street, Suite 2450
Minneapolis, MN 55402
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

CERTIFICATE AND NOTICE OF SERVICE

NOTICE IS GIVEN that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on September 30, 2022 which sends service to registered users, including all other counsel of record in this cause.  /s/ Matthew A. Kezhaya

# Exhibit 1

TRANSCRIPT - DEPOSITION of CHRISTINE O'DONNELL

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3                      CASE NO. 21-cv-10102

4    - - - - - - - - - - - - - - - - - -

5    THE SATANIC TEMPLE, INC.,

6                   Plaintiff,

7         v.

8    CITY OF BOSTON, MA,

9                   Defendant.

10   - - - - - - - - - - - - - - - - - -

11

12

13

14         AUDIOVISUAL DEPOSITION of CHRISTINE

15   O'DONNELL, a witness called by counsel for the

16   Plaintiff, taken pursuant to the Federal Rules of Civil

17   Procedure before Kristen L. Kelly, Registered

18   Professional Reporter, MA CSR No. 115893 and Notary

19   Public in and for the Commonwealth of Massachusetts, at

20   The Satanic Temple, 64 Bridge Street, Salem,

21   Massachusetts, on Thursday, August 25, 2022, commencing

22   at 9:32 a.m.

23

24

Page 162

1            MR. KEZHAYA:  Okay.

2            MS. O'CONNOR:  -- that information.  I

3    don't think Christine will know it.  You can ask her.

4            MR. KEZHAYA:  You don't need to call an

5    objection.  You can just ...

6            MS. O'CONNOR:  Okay.

7            MR. KEZHAYA:  Okay.  All right.  I, I

8    bring that up because words like "objection" have a

9    tendency to, to get me riled up.  I'm trying to, trying

10   to keep it down.

11           MS. O'CONNOR:  That's just pretty

12   standard.

13           MR. KEZHAYA:  Okay.

14   BY MR. KEZHAYA:

15      Q    All right.  And I also see on my handy list

16   here, paragraph 4, City's recordkeeping policies

17   surrounding payment to guest speakers at the invocation

18   policy which presupposes that this person who is

19   presently blessing the proceedings, although that's

20   subject to dispute, Wu invited this priest and this

21   priest is paid by the City for speaking at this event;

22   is that correct?

23      A    The people that give the invocation are no

24   longer paid.

1       Q     No longer paid.  When did that stop?

2       A     I believe it stopped in 2016 or 2017.  I'm

3    not sure of the actual year.

4       Q     How do you know that they stopped being paid?

5       A     Because, again, I was, I was in my same job,

6    and the staff director at the time informed us that the

7    clergy weren't being paid anymore.

8       Q     2016 or 2017, that was the timeframe that

9    people stopped getting paid; is that correct?

10      A     Yes.  That was when now Mayor Wu was council

11   president.

12      Q     Mm-hmm.  That coincides with TST's first

13   request to TST -- to demand, basically, an invitation;

14   is that correct?

15      A     Yes.

16      Q     Was it because of TST's demand?

17      A     It was looked at and considered best practice

18   to stop the stipend.

19      Q     I understand.  But did the process of looking

20   at the process of whether we are giving money to these

21   priests, was that occasioned by TST's demand for

22   invite?

23      A     Yes, the policy was looked at then.

24      Q     Okay.  So just to make, just to make a

Page 164

1   cohesive sentence, in 2016 TST demanded an invite of

2   the City Council.  City Council goes to you requesting

3   a legal opinion as to whether they have to.  Is there

4   anything --

5        A    They, they -- I was not involved in that

6   decision whether or not to stop the payment.  I was not

7   involved in it.

8        Q    Ah, I was mistaken.  I'm so sorry.

9             So TST demanded an invite in 2016.  I was

10  confused as to which one you opined as to the City

11  doesn't have to extended an invite.  That was 2018.

12       A    Yes.

13       Q    So there have been at least two demands for

14  invitation.  Do you know how many times TST has

15  demanded, legally demanded an invite?

16       A    I do not.

17       Q    Okay.  If I told you it's at least three does

18  that sound like something you can disprove, as we sit

19  here today?

20       A    No, that seems reasonable.  I don't ...

21       Q    Okay.

22       A    Again, I'm not aware how many times.

23       Q    Okay.  That's, that's fine.  I don't really

24  care about the number anyway.

Page 165

1          So TST first issues a demand in 2016 which

2     prompts a process of reviewing its prayer policy to

3     avoid a subject lawsuit not unlike this one.  Because

4     of TST's legal demand and it seems, from my perspective

5     at least and I'm curious as to your position on the

6     matter, it seems like it was for the purpose of either

7     avoiding or winning a lawsuit not unlike this one.

8               MS. O'CONNOR:  Objection.

9     Q    City of Boston, do I need to have your

10    employee speak to this matter?

11              MS. O'CONNOR:  Objection.  You can

12    answer if you can.

13    A    I --

14              MR. KEZHAYA:  I object to this if you

15    can business.  She can -- she knows that she answer my

16    questions if she can.

17    A    Can you repeat your question?

18    Q    Was the purpose of reviewing the

19    determination to pay these priests part of a purpose of

20    avoiding liability thereby avoiding a court order

21    requiring TST to have an invitation?  Is that why you

22    guys did your, your review?

23              MS. O'CONNOR:  Objection.

24    A    The re -- the review was done.  And again, I

Page 166

1  did not conduct this review.  But the review of the

2  policy of paying the people giving the invocation was

3  looked at, and it was determined that it was best

4  practice to stop the stipend.

5       Q    Okay.  And, City of Boston, was it -- is it

6  your testimony, as we sit here today, that since

7  approximately 2016 - let's bookend it at 2018 - people

8  have not been getting paid since at least going back to

9  2018-ish?

10      A    Correct.  And I'm, I'm pretty -- I'm pretty

11 sure it was 2017.  I'm pretty sure you can settle on,

12 on that.

13      Q    Okay.

14      A    That it was 2017 when the payment stopped.

15      Q    Okay.  Who made that decision?

16      A    At the time it was Council President Wu.

17      Q    Oh, so Councilor Wu, here who invited this

18 particular person, I should probably ask her why she

19 decided to turn off this money thing?

20      A    Yes.

21      Q    Okay.

22                 MR. KEZHAYA:  Let us proceed.

23                 (Video playing.)

24                 MR. KEZHAYA:  Amen.  All right.  Pause