**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE SATANIC TEMPLE, INC.<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF BOSTON, MA<br><br>DEFENDANT. | CASE NO. 21-CV-10102<br><br><br>MOTION TO RECONSIDER<br>PROTECTIVE ORDER |

COMES NOW TST, by and through counsel of record, on motion to reconsider the Protective Order precluding the deposition of Michelle Wu. (ECF 47). Plaintiff regrets that this issue has caused no small amount of chaos to the discovery phase of this litigation and will make the argument to lift the Protective Order pursuant to the path set forth by the Court. ECF 63.

The Court should lift the Protective Order because subsequent discovery permissible under the Protective Order has confirmed that Wu possesses unique relevant information, Plaintiff has attempted to obtain this information through permissible means, and factors supporting modification outweigh the potential for the deposition to be harassing, duplicative and unduly burdensome.

The Court's Protective Order went further than precluding Wu from deposition. To show that Wu has unique relevant information, Plaintiff must

also contend with an assertion within the Protective Order that the "only relevant and discoverable information to be obtained from current or former City Councilors would be of a relatively general nature regarding the Council's prayer scheme." ECF 47 at 9. Legislative prayers have raised a litany of Establishment Clause cases, and courts often look to the motivations and intent of legislators to determine if the prayer scheme is constitutional, not just to the nature and form of the scheme. Therefore, this brief will argue according to the Court's prescribed pathway to modification of the Protective Order with the addition of a rebuttal to the assertion regarding the scope of relevant discovery.[1]

## 1: Background

On April 6, 2022, this Court granted Defendant's emergency motion for a Protective Order to preclude Plaintiff's deposition of Wu, giving the following reasons:

> 1) "Because the Court dismissed the Equal Protection claim in July 2021, *the only relevant and discoverable information to be obtained from current or former City Councilors would be of a relatively general nature regarding the Council's prayer scheme*, which further diminished the importance of Mayor Wu's testimony and indicated this information could easily be provided by lower-ranking government officials." ECF 47 at 9. (emphasis added).

---

[1] Plaintiff raised this argument in its Motion for Certificate of Appealability. ECF 50. The Court did not address the merits of the argument in its denial. ECF 51.

2) The City provided readily available alternatives that would be "more convenient, less burdensome, [and] less expensive" when it provided Plaintiff a list of 47 individuals who might possess relevant information *Id*.
3) The discovery process was still newly underway, so TST still had "ample opportunity to obtain the information by discovery in the action" under Fed. R. Civ. P. 26(b)(2)(C). *Id*. at 10.
4) Michelle Wu's absence from Plaintiff's allegations in its Complaint. *Id*. at 12.
5) The lack of any compelling reasons to believe Michelle Wu possesses relevant information personally. *Id*.
6) Plaintiff's stated desire to target Mayor Wu due to her status as a mayoral candidate supported finding of undue burden, annoyance, and oppression in violation of Rule 26(c)(1). *Id*.

Finding that the *only* relevant and discoverable information to be obtained from current or former City Councilors would be of a relatively general nature regarding the Council's prayer scheme and precluding an inquiry into potential impermissible selective treatment by the City Councilors went further than granting Defendant's motion for Protective Order precluding the deposition of Michelle Wu. Plaintiff argued in a motion for certificate of appealability that "[b]arring discovery on intentional selective treatment is tantamount to barring discovery on the question of a discriminatory motive, which, as previously addressed, was the explicit reason TST's Establishment Clause claim survived the motion to dismiss." ECF 50 at 4-5.

Plaintiff's argument was not grounded in whether the information was available elsewhere, nor did they contest any other reason given by the Court.

The argument prioritized the declaration that inquiries into potential impermissible selective treatment were not relevant.

The Court did not address the primary legal issue raised in Plaintiff's motion for certificate of appealability in its denial: whether inquiries into potential impermissible selective treatment were relevant. Instead, the Court answered that Plaintiff significantly misunderstood and misstated the Protective Order, due to "simple incompetence" or "a more pernicious desire" and reiterated that the Protective Order was issued due to Plaintiff's intent to depose Mayor Wu for publicity-related reasons and the availability of other alleged sources of the same information. ECF 51 at 2.

Plaintiff, in turn, misunderstood the Court when it stated, "contrary to Plaintiff's misstatements, the Court has not barred any categories of discovery, nor has it prohibited TST from taking depositions of Mayor Wu or any other current of former Councilor." Id. (cleaned up). Taking this as a green light for deposing Wu in the future, non-election day, with publicity-related motives expired and discovery in hand that indicated Wu was the sole source of relevant information, Plaintiff tried to depose Wu in September 2022. Defendant's emergency motion to quash was granted and the Court set forth the path for future modification of the Protective Order. ECF 63.

## 2: Impermissible selective treatment is relevant to an Establishment Clause claim.

Inquiry into a prayer practice's constitutionality remains "a fact-sensitive one." *Town of Greece v. Galloway*, 572 U.S. 656, 587 (2014). The constitutionality of legislative prayers may rest on the motivations of the legislators. "Performance and personal qualities," not denominational affiliation, are an acceptable motivation for retaining a paid clergy for regular prayers. *Marsh v. Chambers*, 463 U.S. 783, 793–94 (1983) ("Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause.") *Marsh* prohibited the selection of invocational speakers based on an "impermissible motive" to prefer certain beliefs over others. 463 U.S. at 793–94.

In Boston, invocation givers are selected by whim of the council members. As such, the selection is susceptible to the individual prejudices and motives of those council members. TST alleges that council members are excluding them from the prayer scheme due to an impermissible motive. Am. Compl. ¶¶ 62–64. This is the sole reason the Establishment Clause claim survived motion to dismiss.

> [A]lthough *Marsh* states that courts "cannot . . . perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a

> particular church," it explicitly did not address where a speaker's selection "stemmed from an impermissible motive." TST's amended complaint alleges a discriminatory motive, asserting that between 2011 and mid-2017, City Councilors have invited speakers representing Abrahamic religions to 87.5% of its meetings…Plaintiff's facts, taken as true, allege a discriminatory motive, and therefore, Defendant's policy falls outside of *Marsh*.

ECF 21 at 11 (citations omitted).

The determination that inquiry into the impermissible motives of council members is irrelevant flies in the face of the determinations of this very court.

## 3: The proper avenue for modification of the terms of the Protective Order.

The Court has stated that "the proper avenue for Plaintiff to seek modification of the terms of the Protective Order is through a motion for reconsideration." ECF 63. The Court now requires that any motion for reconsideration must:

1) state which additional facts, adduced through discovery in the intervening months, have materially changed the circumstances such that the adoption of Mayor Wu is now necessary;
2) specify how such facts were adduced;
3) state what efforts the parties have made to discover the information Plaintiff seeks through the avenues permitted by the Protective Order;
4) state why, on the basis of such newly discovered facts, there is reason to believe that Mayor Wu's testimony will be of unique relevance to this case; and

5) demonstrate that the above factors supporting modification outweigh the potential for the deposition to be harassing, duplicative, and unduly burdensome.

*3.1: Facts adduced through discovery that have materially changed the circumstances such that the adoption of Mayor Wu is necessary.*

### 3.1.1: Wu ended the pray-for-pay scheme.

Christine O'Donnell sat for deposition on behalf of Boston pursuant to a 30(b)(6) deposition. She revealed the practice of paying clergy for invocations ended shortly after TST first requested to give the invocation. Exhibit 1 at 162-66; 222-23. O'Donnell referred Plaintiff's counsel to Wu to answer questions about why the policy was changed.

> **O'Donnell**: [I]t was 2017 when the payment stopped.
> **Kezhaya**: Okay. Who made that decision?
> O'Donnell: At the time it was Council President Wu.
> **Kezhaya**: Oh, so Councilor Wu, here who invited this particular person, I should probably ask her why she decided to turn off this money thing?
> **O'Donnell**: Yes.

*Id.*

### 3.1.2: TST was repeatedly referred to Wu to answer questions about council member motives for selecting clergy.

O'Donnell also referred TST to Wu to answer questions about the motives for declining TST's invocation request.

> **Kezhaya**: I understand. The "why" question is addressed to Wu, though, correct?
> **O'Donnell**: Yes.

Id. at 161.

> **Kezhaya**: And any other questions about the intent of the councilors would be for the councilors themselves.
> **O'Donnell**: I agree.

Id. at 223.

> **Kezhaya**: Did you in the course of your investigation run into anything that could shed light documentary-wise, like in terms of literally physical documents that I could look at or, you know, electronic data consisting of the same, within the City that could help me understand, without talking to Mayor Wu's former political opponent, why she found it to be absurd for TST to insist on this invitation?
> **O'Donnell**: No.
> **Kezhaya**: So I really have to talk to her?
> **O'Donnell**: Yes.
> **Kezhaya**: Okay. Same for Wu, you're the best person to have talked about it, and you can't talk about it so I really have to talk to Wu, right?
> **O'Donnell**: Yes.

The deposition of Council Member Annissa Essaibi-George revealed the same requirement to speak to Wu as to her motivations for selecting clergy, and denying TST, for invocations.

> **Kezhaya**: Now, Mayor Wu had her own means

> of inviting or not inviting people. Correct?
> **Essaibi-George**: I would say that's correct.
> **Kezhaya**: Did you and then councilor, now Mayor Wu, have any discussions as to her practices of inviting or not inviting people?
> **Essaibi-George**: No. 24
> **Kezhaya**: So I really need to talk to Wu to determine why she did or did not invite any particular groups. Is that correct?
> **Essaibi-George**: Yes.

Exhibit 2 at 157-58.

### 3.1.3: Discovery revealed that Wu's stated reasons for not granting TST's requests were false.

Wu maintains that there "are no rules" for the council member selection of clergy members and that council members have long lists of individuals they would like to invite. Exhibit 3-5. Discovery contradicts her proffered excuses for not granting TST's request. Hindu and Jewish clergy were granted invitations upon request. Exhibits 6-7. Finding clergy to give invocations was often a last-minute scramble.[2] Exhibits 8-9. Wu knows why the reasons she gave to TST and the media as to why TST's request was not granted are inconsistent with the truth revealed in discovery. Understanding the prayer scheme requires a full and accurate description of the rules, not the

---

[2] "It is Councilor Wu's turn again to provide someone for the invocation at tomorrow's council meeting. Please let me know if you have found someone!" Exhibit 9.

inaccurate guidelines proffered to the media and TST by Wu.

*3.2: The facts were adduced through permissible discovery.*

The facts above were adduced through a 30(b)(6) deposition, the deposition of Council Member Essaibi-George, and emails provided to TST upon discovery request.

*3.3: TST unsuccessfully tried to uncover the motives behind clergy selection and pray-for-pay schemes through permissible means.*

TST asked the 30(b)(6) deponent and Council Member Essaibi-George to answer questions about why TST was not granted their request to give the invocation. Both referred TST to Wu. TST also asked the 30(b)(6) deponent why Wu ended pray-for-pay and were similarly referred to Wu.

*3.4: Wu's testimony will be of unique relevance because only she knows the answers as to why she declined TST's invocation request and why pray-for-pay was ended upon TST's request to give an invocation.*

As stated, TST was referred to Wu to understand her motives for declining TST's request and why she ended pray-for-pay. Understanding her motive for declining TST is relevant because an impermissible motive behind the prayer scheme would vindicate TST's Establishment Clause claim. *See Marsh,*

463 U.S. 783, 793–94; ECF 21 at 11. Understanding why Wu ended pray-for-pay goes to the heart of the prayer scheme's nature before and after the change was made. As such, it is relevant even under the erroneously limited scope given in the Protective Order. Wu instigated this change to the scheme.

### 3.5: Deposing Wu is not harassment, duplicative, or unduly burdensome.

TST agreed to hold Wu's initial deposition on a day other than election day. There is no question that TST's noticing of Wu on election drew attention to this important matter. Wu herself gained no small amount of attention from the headline.[3] Noticing Wu for deposition on election day was arguably shrewd and obviously frowned upon by this court. It is also arguable, and perhaps likely, the court would not have taken any issue with the deposition had it never been noticed for election day in the first place.  In any event, election day is long past. The fact remains that Wu holds unique, relevant information that goes to the heart of this Establishment Clause claim. As TST is willing to find a day that works for Wu, it is time to dispel the notion that it is harassment to request a deposition for the elected official at the heart of

---

[3] Wu's tweet "I will be slightly busy on this day," received more engagement than any other tweet leading up to the election.
https://twitter.com/wutrain/status/1453479768901423110?lang=en

an Establishment Clause claim. As it is no longer election day, it cannot be argued to be unduly burdensome. The information sought is not duplicative because it cannot be acquired from anyone other than Wu.

Try as they might, our political leaders do not rise supreme above the judicial process. Whether it is Donald Trump or Michelle Wu, we cannot give way to the trend of politicians flaunting the judicial process. Especially when core constitutional matters are at issue.

## 4: Conclusion

WHEREFORE, for all the above reasons, TST requests that the Protective Order precluding Michelle Wu's deposition be lifted immediately.

By: /s/ Matthew A. Kezhaya
AR # 2014161, MN # 0403196
*pro hac vice*
Crown Law
333 S. 7th Street, Suite 2450
Minneapolis, MN 55402
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

## CERTIFICATE AND NOTICE OF SERVICE

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on October 6, 2022 which sends service to registered users, including all other counsel of record in this cause. s/ Matthew A. Kezhaya