# EXHIBIT 1

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                         CASE NO. 21-cv-10102

4    - - - - - - - - - - - - - - - - - -

5    THE SATANIC TEMPLE, INC.,

6                    Plaintiff,

7         v.

8    CITY OF BOSTON, MA,

9                    Defendant.

10   - - - - - - - - - - - - - - - - - -

11

12

13

14         AUDIOVISUAL DEPOSITION of CHRISTINE

15   O'DONNELL, a witness called by counsel for the

16   Plaintiff, taken pursuant to the Federal Rules of Civil

17   Procedure before Kristen L. Kelly, Registered

18   Professional Reporter, MA CSR No. 115893 and Notary

19   Public in and for the Commonwealth of Massachusetts, at

20   The Satanic Temple, 64 Bridge Street, Salem,

21   Massachusetts, on Thursday, August 25, 2022, commencing

22   at 9:32 a.m.

23

24

```
                                            Page 2
1   A P P E A R A N C E S:
2   CROWN LAW
3     By:  Matthew A. Kezhaya, Esquire
4          Sonia A. Kezhaya, Esquire
5          300 N. Washington Avenue, #300
6          Minneapolis, Minnesota 55401
7          479.431.6112
8          matt@crown.law
9          sonia@crown.law
10         For the Plaintiff
11
12  CITY OF BOSTON LAW DEPARTMENT
13    By:  Nicole O'Connor, Esquire
14         Robert S. Arcangeli, Esquire
15         City Hall, Room 615
16         Boston, Massachusetts 02201
17         617.635.2902
18         nicole.oconnor@boston.gov
19         robert.arcangeli@boston.gov
20         For the Defendant
21
22  ALSO PRESENT:
23    Shawn Budd, Videographer
24    Lucien Greaves, Ada King, and Mobius
```

Page 3

```
 1                       I N D E X
 2    Deponent:              Direct  Cross  Redirect  Recross
 3    CHRISTINE O'DONNELL
 4       By Mr. Kezhaya
 5
 6
 7                     E X H I B I T S
 8    No.
 9    Exhibit 1   8.30.2017 Mark Thomas Email;
10                DEF0002870
11    Exhibit 2   10.19.2020 Email, Gabriela Coletta
12                to Fr. Paolo; DEF0003434-3436
13    Exhibit 3   2.19.2020 BHM Planning Meeting
14                Notes; DEF0002320-2322
15    Exhibit 4   11.03.2020 Email, Elizabeth Pimentel
16                to Makayla Parkin; DEF0002391
17    Exhibit 5   06.16.2020 Email, Michael Bonetti to
18                Yuleidy Valdez; DEF0002733-2734
19    Exhibit 6   09.29.2020 Email, David Vittorini to
20                Makayla Parkin; DEF0002723-2726
21    Exhibit 7   06.16.2020 Email, Yuleidy Valdez to
22                Michael Bonetti; DEF0002729-2730
23    Exhibit 8   12.12.20 Email, R. Zed to Kim Janey;
24                DEF2849
```

```
 1                    E X H I B I T S

 2    No.                                          Page

 3    Exhibit 9   10.19.2017 Email, Alana Olsen to

 4                Annissa Essaibi-George; DEF0002890

 5    Exhibit 10  02.14.2019 Email, Marie Szaniszlo to

 6                David Vittorini; DEF0003373-3374

 7    Exhibit 11  TST Brochure                 ID ONLY

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        (Exhibits provided electronically to reporter.)
```

Page 5

1                   P R O C E E D I N G S

2

3                   THE VIDEOGRAPHER:  We are on the record.

4      The time is 9:32.

5                   MR. KEZHAYA:  Okay.  Ada, if you could

6      get us started please.

7                   MS. KING:  Very good.  Welcome,

8      everyone.  My name is Ada King.  I'm an ordained

9      Minister of Satan.  And I will be lowering the lights,

10     lighting some candles and reading our invocation.

11                  Let us stand now unavowed and unfettered

12     by arcane doctrines borne of fearful minds in darkened

13     times.

14                  Let us embrace the Luciferian impulse to

15     eat of the tree of knowledge and dissipate our blissful

16     and comforting delusions of old.

17                  Let us demand that individuals be judged

18     for their concrete actions not their fealty to

19     arbitrary social norms and elusory categorizations.

20                  Let us reason our solutions with

21     agnosticism in all things, holding fast only to that

22     which is demonstrably true.

23                  Let us stand firm against any and all

24     arbitrary authority that threatens the personal

Page 6

1    sovereignty of one or of all.

2              That which will not bend must break and

3    that which can be destroyed by the truth should never

4    be spared its demise.

5              It is done.  Hail Satan.

6              MR. KEZHAYA:  Hail Satan.  Great.

7

8              DIRECT EXAMINATION

9    BY MR. KEZHAYA:

10   Q    So pleased that you all are gathered here

11   today.  I want to be very, very clear.  The purpose of

12   today's meeting is to get to the truth, that's it.  We

13   are not a threat to you.  I want you to know that.

14   It's very important to me that you are aware of that.

15   Do you understand that, Christine?

16   A    I do.

17   Q    Thank you.

18              MR. KEZHAYA:  I presumed -- sorry.  I

19   shouldn't have been so presumptuous.  We should start

20   with who we are.  So I'm Matt Kezhaya.  I represent The

21   Satanic Temple against the City of Boston on charges

22   that City of Boston is not inviting TST to the

23   legislative prayer event that opens public meetings.

24              You just heard the invocation that we

```
 1   would have done.  We've demanded it three times.  The
 2   consistent response has been unless you have a
 3   invitation, you are not welcome.  We cannot get an
 4   invitation of our own devices, so we are seeking the
 5   court's assistance to give us that invitation.  That's
 6   it.  That's all we're here for.  The City denies the
 7   charge.  Says that it's our speech, and you are subject
 8   to invitation-only policies because that's just how we
 9   like to do things.  And so that's the, the nature of
10   the dispute.
11                  Once again, I'm Matt Kezhaya.  I
12   represent plaintiffs.
13                  We have -- Rob and Nicole, if you guys
14   could introduce yourselves for the defendants.
15                  MS. O'CONNOR:  Sure.  So Nicole O'Connor
16   for the City of Boston.
17                  MR. ARCANGELI:  Rob Arcangeli for the
18   City of Boston.
19                  MR. KEZHAYA:  I have also with me my
20   wife and law partner, Sonia, at counsel table.  And
21   representative -- or plural, representatives of TST,
22   Lucien Greaves, co-founder is also at counsel table.
23   And this matter is being publicly recorded by agreement
24   of the parties to be used only for posterity purposes
```

Page 8

```
 1    not live broadcast.  That was a subject of dispute.  We
 2    resolved it through rational discourse.
 3               That's what we're here for today is just
 4    rationale discourse to try to seek an understanding, a
 5    joint understanding as to our side of the story and
 6    your side of the story.
 7               We have brought pamphlets so that you
 8    guys can see who we are.  You will take notice that
 9    this pamphlet will be -- I'll just use this one as
10    Exhibit 1.  You guys already have copies.  Have you
11    guys looked through these pamphlets yet?
12               MS. O'CONNOR:  No.
13               MR. KEZHAYA:  Okay.
14               MS. O'CONNOR:  Are we doing the usual
15    stipulations, Matt?
16               MR. KEZHAYA:  No.  No, no stipulations
17    so far.  We can get to that point.  Actually, that's a,
18    that's a good point.  In terms of stipulations I
19    propose as follows:  There are lots of legal rules.  I
20    can't, frankly, remember all of them unless they're
21    very specifically cited and I'm researching at the
22    time, so I propose to simplify them as follows:  I
23    promise not to harass.  I promise not to intimidate.  I
24    am trying to be -- although I'm angry about this
```

Page 9

1  matter, I'm trying to be very, very clear that my anger

2  is not directed at you personally or anyone in this

3  room.  I feel angry personally about being excluded

4  from things.  That's, that's my deal.  I'm trying to

5  keep it under wraps.  So please bear with me if I

6  sometimes get excitable in the matter.  I relatedly

7  will not threaten anyone.  I ask that no one threatens

8  me because, again, I'm prone to excitement.

9              Only questions about this dispute, no

10  getting into anything untoward.  If anyone has an

11  objection as to anything that I do please let it be

12  known.  We'll try to address it, again, through

13  rational discourse.  No statements only questions.  I'm

14  inquiring into your mind.  I'm not here to make any

15  particular points.

16              These are my proposed offers.  Are these

17  offers acceptable to you guys?

18              MS. O'CONNOR:  That's acceptable to me.

19  I'm also going to abide by the usual stipulation in

20  that I'm going to reserve all of my objections as to --

21  except as to form, until the time of trial.

22              MR. KEZHAYA:  Okay.  I would like, if

23  it's a form objection, for us to have like a specific

24  addressing of what the objection is --

Page 10

1              MS. O'CONNOR:  Sure.

2              MR. KEZHAYA:  -- so that I can try to

3    fix it.  I also request no semantics games, no games

4    of, you know, I don't know, mincing of words.  I'm not

5    very good with words myself.  Despite being a lawyer, I

6    find myself consulting the dictionary quite regularly,

7    in fact.

8              No leaving.  We're kinda stuck in here

9    until we understand each other.  That's all I'm trying

10   to get to.  No talking to your lawyers during these

11   proceedings.  So we are now in the part of the

12   conversation where I'm inquiring into your state of

13   mind, yours, of course, being the City of Boston's.

14             Also, short of there being a privilege

15   objection, I ask that you answer the question.  It will

16   be sometimes perhaps subject to an objection as to form

17   perhaps or some other kind of objection.  To the extent

18   we can't resolve the objection amongst ourselves, I

19   propose that we just discretely table them.  That's all

20   I ask is that the issue be discretely stated.

21             Any, any objections as to that?

22             MS. O'CONNOR:  No.

23             MR. KEZHAYA:  Okay.

24             THE VIDEOGRAPHER:  Before we begin, can

1    we put the lights up just a little bit to where they

2    were?  Thank you.

3                   MR. KEZHAYA:  Let's see here.  So phase

4    two of things, you mentioned that you're going to

5    reserve all objections for trial, that would resolve

6    the next phase.  To the extent you have any

7    objections -- I say for trial.  For, you know, whatever

8    next set of proceedings.

9                   I also propose that any disputes be

10   resolved by Rob.  I know Rob.  I trust Rob.  I know

11   that Rob knows the law.

12                  MS. O'CONNOR:  So it will be either one

13   of us.  It may be me.  I'm sorry if you're stuck with

14   me.  I'll do my best to get the law right, but you've

15   got me today.

16                  MR. KEZHAYA:  I'm not -- hold on.  I'm

17   not stuck with you.  To be clear, I want to talk with

18   you.  I brought you guys here for the purpose of

19   talking to you, for the purpose of saying here's where

20   we are coming from.  I want to know where you are

21   coming from.  That's it.

22                  And again, not through statement because

23   that part happened already, through a question.  So you

24   and I might have a dispute.  I say you, counsel table,

Page 12

1  City of Boston and I might have a dispute.  All I

2  request is that to the extent there be contention, Rob

3  be intervening to fix the contention.

4             MS. O'CONNOR:  I hope it's a nonissue,

5  but I think, I think this will be an issue that we

6  don't need to worry about.

7             MR. KEZHAYA:  Okay.  Can we table that

8  then in the event of contention?

9             MS. O'CONNOR:  I mean these are very

10  bizarre sort of stipulations or suggestions for a

11  typical deposition.  I'm happy to -- we'll work with

12  you amicably to resolve any issues, and I think this is

13  nonissue that we don't need to worry about.  And if we

14  should get into some sort of dispute, I think we can

15  cross that bridge when we get to it.

16             MR. KEZHAYA:  Understood.  Once again,

17  no contention.  Just looking for the truth.  And to the

18  extent we have any tabled issues, those obviously have

19  to go to the judge.

20             Any objections as to anything that I, I

21  have proposed here?

22             MS. O'CONNOR:  No.

23             MR. KEZHAYA:  Anyone at all?  Okay.

24             All right.  So that being the case, we

Page 13

1   have some important public documents that I just want

2   to make reference to.  I see no reason to show anyone

3   them.  There was the Complaint.  There was the answer.

4   There was a motion to dismiss.  There was the order

5   granting the motion to dismiss as to part, importantly

6   on the issue of government speech, and then Shurtleff

7   came out which importantly said that government speech

8   cannot be used to exclude certain religions.

9           Any objections as to the court taking

10  note in, in the court -- in the course of understanding

11  the rest of this deposition of its own public docket?

12          MS. O'CONNOR:  I don't really understand

13  what you're asking on the record but ...

14          MR. KEZHAYA:  And to be clear, I'm not

15  saying this for the court's benefit.  I'm saying this

16  for the congregants' benefit.

17          MS. O'CONNOR:  Okay.  I don't --

18          MR. KEZHAYA:  The congregants are, are

19  gonna be needing to know that they need to take a look

20  at the Complaint, the answer, the motion to dismiss,

21  the order granting motion to dismiss importantly as to

22  government speech and Shurtleff which overturned

23  government speech.  That's the only thing that the

24  congregants need to take note of.  I'm telling them

Page 14

1    this by using those words.

2            MS. O'CONNOR:  Okay.

3            MR. KEZHAYA:  But, you know, again,

4    obviously the court's going to take note of its own

5    docket.  We'll -- we'll figure out docket numbers if,

6    if the needs end up being.

7            So, that all being the case, I propose

8    that we proceed with the deposition.  Any objections?

9            MS. O'CONNOR:  No.

10    Q    Please identify yourself for the benefit of

11   the public.

12    A    Christine O'Donnell.  I'm the Compliance

13   Director and staff counsel for the Boston City Council.

14            THE REPORTER:  Do you want -- I'm sorry

15   to interrupt.  Do you want her sworn in first or ...

16    Q    Oh.  Christine, are you gonna lie?

17    A    I'm not but ...

18            MS. O'CONNOR:  I think we should swear

19   her in just for consistency of the testimony.

20            MR. KEZHAYA:  I like ceremony.  Let's

21   swear her in.

22

23            CHRISTINE O'DONNELL

24

Page 15

1    having been satisfactorily identified by the production

2    of her Massachusetts driver's license and duly sworn

3    was examined and testified as follows:

4

5    BY MR. KEZHAYA:

6         Q     Great.  Let's -- let's start over.

7         A     Okay.

8         Q     Please identify yourself.

9         A     Christine O'Donnell.  I'm the Compliance

10   Director and staff counsel for the Boston City Council.

11        Q     Okay.  And why are you here?

12        A     I am here under the deposition.  I'm

13   representing the City of Boston.

14        Q     Okay.  And that's pursuant to a Rule 30(b)(6)

15   deposition; is that correct?

16        A     Correct.

17        Q     What is a Rule 30(b)(6) deposition to your

18   understanding?

19        A     To my understanding, I'm here to represent

20   the City of Boston under the federal rules.

21        Q     And with regard to the federal rules, you're

22   referring to the Federal Rules of Procedure, I gather;

23   is that correct?

24        A     Yes.  Yes.

Page 16

1      Q    Tell us more about the Federal Rules of Civil

2   Procedure.

3                  MS. O'CONNOR:  Objection.

4                  MR. KEZHAYA:  What -- what's the nature

5   of your objection?

6                  MS. O'CONNOR:  As they pertain to what?

7                  MR. KEZHAYA:  She's the one who said it.

8   I'm asking her to expound.

9                  MS. O'CONNOR:  On her understanding of

10  what the Federal Rules of Civil Procedure are?

11                 MR. KEZHAYA:  Correct.

12                 MS. O'CONNOR:  Okay.

13     A    Just my understanding is I'm here because of

14  that rule.  I am not a litigator for the Boston City

15  Council so that -- it's my understanding that I'm here

16  pursuant to that rule.

17     Q    Let me back up with a little bit of

18  exposition.  The lawyers in the room speak a certain

19  language that the congregants do not speak.  I'm trying

20  to take out the legalese.  So 30(b)(6) means something

21  to all four of us and also Sonia.  I doesn't mean

22  anything to them.  So when you say 30(b)(6), I know

23  what you mean.  They don't know what you mean.

24                 What is a 30(b)(6) deposition?

Page 17

```
 1        A     To my understanding, I am here representing
 2   the City of Boston.
 3        Q     In the matter of The Satanic Temple vs. The
 4   City of Boston, --
 5        A     Yes.
 6        Q     -- correct?
 7        A     Yes.
 8        Q     Okay.  And you are here because we called for
 9   the deposition, correct?
10        A     Yes.
11        Q     And more particularly, we called the City of
12   Boston to send a representative to defend itself
13   against the Complaint, and we're gonna be talking,
14   generally speaking, about the Complaint and answer and
15   the allegations therein.  Is that also correct?
16        A     Correct.
17        Q     Okay.  Would you agree that the subject of
18   dispute is whether The Satanic Temple is entitled to an
19   invitation as opposed to subject to an invitation-only
20   policy with regard to the opening of public proceedings
21   with a legislative prayer?
22        A     Could you repeat that?
23        Q     Sorry.  What is your understanding of the
24   nature of the dispute?
```

Page 18

1      A    My understanding of the nature of the dispute

2   is that The Satanic Temple is suing the City of Boston

3   so that The Satanic Temple can give the invocation.

4      Q    And you heard the invocation earlier; is that

5   correct?

6      A    I did.

7      Q    Okay.  How did the invocation make you feel?

8                MS. O'CONNOR:  Objection.  So she's here

9   for a 30(b)(6) deposition.

10               MR. KEZHAYA:  Correct.

11               MS. O'CONNOR:  Her personal thoughts and

12  opinions are not relevant and not part of a 30(b)(6)

13  deposition.

14               MR. KEZHAYA:  Do you have a rule to

15  support your premise?

16               MS. O'CONNOR:  Rule 30(b)(6).

17               MR. KEZHAYA:  What does the text of Rule

18  30(b)(6) say?

19               MS. O'CONNOR:  I don't have these types

20  of rules offhand.  But my position throughout this

21  deposition, so that we're clear, is that Christine will

22  only be answering questions about the topics that we

23  have designated her to testify about in the 30(b)(6)

24  subpoena.

1             MR. KEZHAYA:  I respectfully disagree.

2    It's my understanding of 30(b)(6), and I'm quoting here

3    from my 30(b)(6) book and I'm -- the title of the book

4    being 30(b)(6) Deposing Corporations, Organizations and

5    the Government, second decision, by an author whose

6    name I can't pronounce.  I'm looking at page 172 now.

7    The title of this, of this section is:  What can you

8    ask in the matters of examination.  Given the title of

9    book, we all know it's about a 30(b)(6) deposition.  It

10   states:  30(b)(6) itself does not limit the matters of

11   examination that a requesting party may seek in any

12   way.  So your proposition of the law is inconsistent

13   with mine.  Do you have authority that overpowers my

14   authority?

15             MS. O'CONNOR:  So my position is that

16   she's not going to be answering questions that are

17   outside the topic on the 30(b)(6) deposition subpoena.

18             MR. KEZHAYA:  So --

19             MS. O'CONNOR:  Perhaps it makes sense

20   for us to caucus.  Rob and I can caucus.  And maybe we

21   need to file a motion with the court to get some

22   parameters on what will govern this deposition, because

23   we're in for a long day if we don't have at least a

24   basic understanding of, of that.

Page 20

1            MR. KEZHAYA:  I thought we just
2   addressed that when I said I'm not gonna be doing any
3   harassing, any -- no threats, only questions about this
4   dispute.  You guys agreed to all of this.  This is
5   about this dispute; is it not?
6            MS. O'CONNOR:  This dispute in the
7   context of a 30(b)(6) deposition.  And I'm not
8   suggesting that you're harassing her.  I don't think
9   you intend to do anything like that.  But the purpose
10   of a 30(b)(6) is the designated topics.
11            MR. KEZHAYA:  Yes.
12            MS. O'CONNOR:  And she is here to
13   testify about the topics for which we have designated
14   her.
15            MR. KEZHAYA:  Okay.  So it seems to me
16   that you're proposing that this is outside of the
17   topics listed in the deposition notice.  Is that
18   correct?
19            MS. O'CONNOR:  Exactly.
20            MR. KEZHAYA:  Okay.  Let me pull that up
21   because, frankly, I don't remember what it says.
22            And you also invited a possibility of
23   caucusing.  Do you guys want to caucus and then --
24   caucus off the record, reconvene and then we can

Page 21

1   discuss further or how do you guys want to do it?

2                    MS. O'CONNOR:  Sure.  While you review

3   the, the 30(b)(6) topics, why don't Rob and I go speak,

4   and we'll see how we want to proceed.

5                    MR. KEZHAYA:  Okay.

6                    THE VIDEOGRAPHER:  Okay.  The time is

7   9:49.  We're off the record.

8                        (Break was taken.)

9                    THE VIDEOGRAPHER:  Okay.  We are back on

10  the record.  The time is 9:53.

11                   MR. KEZHAYA:  All right.  Are you guys

12  ready to proceed?

13                   MS. O'CONNOR:  We are.

14                   THE WITNESS:  Yes.

15                   MR. KEZHAYA:  Okay.  I did not get very

16  far into my 30(b)(6) notice.  I noticed that the first

17  clause of the first enumerated paragraph is the

18  identity of the 30(b)(6) deponent.  Part of identity is

19  the internal workings of the mind is my understanding.

20  That was my intended meaning with the word "identity".

21  Did I misuse the word "identity"?

22                   MS. O'CONNOR:  My plain reading of that

23  clause is just her name, Christine O'Donnell, is the

24  identity of the 30(b)(6) deponent.

Page 22

1                    MR. KEZHAYA:  But I didn't say --

2                    MS. O'CONNOR:  Her inner workings of her

3      mind are not relevant to a 30(b)(6) deposition.  And I

4      want to be clear that that is the position that we will

5      take throughout this deposition.

6                    MR. KEZHAYA:  Okay.  It's my

7      understanding that the City of -- my burden of proof is

8      that I must prove that the City of Boston intentionally

9      did not invite TST; is that correct?

10                   MS. O'CONNOR:  Correct.

11                   MR. KEZHAYA:  And she's here to speak

12     for the City of Boston, also correct?

13                   MS. O'CONNOR:  Correct.

14                   MR. KEZHAYA:  And she's speaking as the

15     City of Boston.  Is that also correct?

16                   MS. O'CONNOR:  Correct.

17                   MR. KEZHAYA:  So I don't understand why

18     her inner workings of her mind is not the question --

19     the ultimate question of the case.

20                   MS. O'CONNOR:  Because she's not

21     designated on the subjective intent questions, but

22     also, they're not topics that she's been identified to

23     talk about.

24                   MR. KEZHAYA:  Well, again, that was my

Page 23

1    intended meaning with the word "identity" of the

2    30(b)(6) deponent instead of just their name and

3    designation of, you know, their office title or

4    whatever.  That -- that was my intended meaning.

5                    Are you telling me that you're asserting

6    privilege on this matter or are you telling me that you

7    just are instructing her not to answer these questions

8    on some nonprivilege ground?

9                    MS. O'CONNOR:  I'm instructing her not

10   to answer questions that she was not designated to

11   testify about on the 30(b)(6) notice.  And I appreciate

12   that perhaps we have disagreements as to what your

13   intentions were with certain clauses.  I'm going by the

14   plain reading of what's written, as well as the usual

15   practice in every 30(b)(6) deposition I have ever been

16   a part of.

17                    MR. KEZHAYA:  I understand.  That's your

18   experience.  My experience is different.

19                    MS. O'CONNOR:  Mm-hmm.

20                    MR. KEZHAYA:  When I take someone's

21   deposition, I can ask them questions about how they

22   feel normally.  Not in a 30(b)(6) deposition, just in a

23   normal deposition.  That's why it's a deposition.

24                    MS. O'CONNOR:  I agree with you there.

Page 24

1            MR. KEZHAYA:  Well, this is a

2    subcategory of normal depositions.  This is a

3    subcategory of deposing organiza -- because

4    organizations are a legal fiction, you see.  The City

5    doesn't have feelings.  The City is comprised of people

6    who have feelings.

7            MS. O'CONNOR:  I think we're in for a

8    long day, Matt, if we're gonna have to debate all of

9    these issues.  So unless it's a specific topic -- she's

10   more than happy to answer all of your questions on the

11   items that we have designated her for, but we're in for

12   a long day if we're gonna be talking about the meaning

13   of identity.

14           MR. KEZHAYA:  I agree we are in a -- in,

15   in for a long time day.  That's why I started off with

16   no semantics games.  I don't play semantics games.  I

17   don't like semantics games.  They make me frustrated.

18   My intention was to depose someone at the City of

19   Boston who can speak to why the City of Boston will not

20   invite TST.

21           MS. O'CONNOR:  But that's not the topics

22   that she's been designated for, Matt.

23           MR. KEZHAYA:  Okay.  So what's your

24   understanding of word "identity" again?

Page 25

1              MS. O'CONNOR:  Her name.

2              MR. KEZHAYA:  That's your, that's your

3    understanding?

4              MS. O'CONNOR:  I think that's the, the

5    plain understanding in the usual 30(b)(6) context.

6              MR. KEZHAYA:  Okay.  So in my world

7    identity includes name as a subordinate understanding.

8    It includes name, in other words.  It's not only name.

9    Is, is that different from the way you use identity?

10             MS. O'CONNOR:  It seems that way.  But I

11   also don't find these exchanges particularly helpful.

12             MR. KEZHAYA:  I agree, but you're the

13   one telling me I'm not allowed to ask these questions.

14   That's why we're having this discussion right now.

15             MS. O'CONNOR:  Sure.  And so that's our

16   position.  So I'm going to instruct her not to answer

17   questions about her personal feelings --

18             MR. KEZHAYA:  Okay.

19             MS. O'CONNOR:  -- on a particular

20   matter.  But if you have any questions about the topics

21   that she's been designated to testify about, and there

22   are many of them, --

23             MR. KEZHAYA:  Yes, many.

24             MS. O'CONNOR:  -- she will answer them.

Page 26

1           MR. KEZHAYA:  Many indeed.

2           One additional question.  Are you

3   asserting a particular privilege ground or is it

4   literally just it's not specifically identified as an

5   enumerated topic in my matters of examination in my

6   30(b)(6) notice?

7           MS. O'CONNOR:  It's the latter.

8           MR. KEZHAYA:  Okay.  Just making sure.

9   Let's skip that part.

10  BY MR. KEZHAYA:

11      Q    You have read the pamphlet; is that correct?

12      A    This pamphlet?

13      Q    Have you read the pamphlet?  Let's start with

14  that.

15      A    I have not.

16      Q    Okay.  Let's read it.  So --

17          MS. O'CONNOR:  Objection again.  Matt,

18  again, what does this have to do with any of the topics

19  that she's designated for?

20          MR. KEZHAYA:  She's --

21          MS. O'CONNOR:  For the 30(b)(6).

22          MR. KEZHAYA:  Okay.  Let's return to the

23  30(b)(6) notice.  I seem to remember putting at the

24  very end here:  Any other facts the City finds

Page 27

1   relevant, any documents provided by the City in

2   discovery, any pleadings.

3            We talked about the pleadings earlier

4   today.  The pleadings obviously includes the plaintiff

5   as one of the people in this dispute.  This is about

6   us, quite literally.  I don't understand how this is

7   not within the scope of the dispute.

8            MS. O'CONNOR:  So if you're referring to

9   paragraphs 28-29-30, those are facts that the City

10  finds important.

11           MR. KEZHAYA:  Ah-huh.

12           MS. O'CONNOR:  Facts that the City finds

13  relevant.

14           MR. KEZHAYA:  Okay.

15           MS. O'CONNOR:  And documents provided to

16  the City during discovery, was that pamphlet provided

17  to the City during discovery?

18           MR. KEZHAYA:  No.  No.  Again, my

19  understanding of 30(b)(6) is that I'm not limited to

20  these things.  This is just me telling you what to be

21  ready to hear.

22           MS. O'CONNOR:  Yeah, so we have a

23  fundamental disagreement about the scope of a 30(b)(6)

24  deposition then.

Page 28

1                    MR. KEZHAYA:  I see that.

2                    MS. O'CONNOR:  So maybe it makes to

3     table this entire deposition --

4                    MR. KEZHAYA:  No.

5                    MS. O'CONNOR:  -- and get some guidance

6     from the court.

7                    MR. KEZHAYA:  No, we're not doing that.

8                    MS. O'CONNOR:  Well, we're --

9                    MR. KEZHAYA:  If you do that, I'll be

10    moving to strike your answer, and I'll be seeking a

11    default judgment.  We are not exiting this conversation

12    until she and I have a meeting of the minds.  That's

13    the point of depositions.

14                    MS. O'CONNOR:  That's not how this is

15    going to work.  We'll -- we will leave if we feel it's

16    necessary to leave or if we're not sticking to the

17    topics that are on the 30(b)(6) deposition notice.

18                    MR. KEZHAYA:  Okay.  So do you want to

19    take the deposition?

20                    MS. O'CONNOR:  I don't.  I didn't --

21    this is not helpful, Matt.  This is not how typical

22    depositions proceed.  I can't help but underscore one

23    more time and give you another opportunity to ask her a

24    question about any of the topics for which she has been

Page 29

1    identified --

2                    MR. KEZHAYA:  You say --

3                    MS. O'CONNOR:  -- as a witness.

4                    MR. KEZHAYA:  Sorry.  I don't mean to

5    interrupt.

6                    You say one more time.  You're telling

7    me that I get one strike and then you're going to

8    revoke the witness from my opportunity to understand

9    where the City is coming from, correct?

10                   MS. O'CONNOR:  I don't think it's

11   helpful to proceed with a line of questions that she's

12   not here to testify about.  So if -- I will instruct

13   her not to answer any questions about the pamphlet.

14                   MR. KEZHAYA:  Okay.  I think that's the

15   subject of the dispute.  So it appears to me that your

16   position is that you provided her of your own free will

17   not I pulled her into the temple; is that correct?

18                   MS. O'CONNOR:  I don't understand what

19   you just said.

20                   MR. KEZHAYA:  A 30(b)(6) notice is a

21   summons.  She shall attend or you guys don't get to

22   have an answer.  That's how depositions work.  That's

23   how the rules of procedure work.  Correct?

24                   MS. O'CONNOR:  I'm still not

Page 30

```
 1   understanding what you're trying to say.
 2                MR. KEZHAYA:  What part do you not
 3   understand?
 4                MS. O'CONNOR:  About her answer?
 5                MR. KEZHAYA:  No.  No.  No.  About what
 6   I'm saying right now.  Do you disagree that the rules
 7   of procedure allow me to have a -- entitle me, in fact,
 8   to a deposition?
 9                MS. O'CONNOR:  Of course.
10                MR. KEZHAYA:  Okay.  Do you agree also
11   that you have to provide the person to speak to
12   specifically designated topics?
13                MS. O'CONNOR:  Yes.
14                MR. KEZHAYA:  Okay.  You also agree that
15   I'm the one who drafts the notice, correct?
16                MS. O'CONNOR:  Yes.
17                MR. KEZHAYA:  And it seems odd that you
18   would have a right to tell me how I go about my notice.
19   So that's where the confusion's happening here.  What's
20   going on?
21                MS. O'CONNOR:  So we had a discussion,
22   right.  We had a phone conversation in which we went
23   through all of these topics, and I thought we had a
24   meeting of the minds as to what things meant.
```

                                                    Page 31

 1                    MR. KEZHAYA:   Well, back up.   Back up.

 2       Back up.

 3                    MS. O'CONNOR:   Okay.

 4                    MR. KEZHAYA:   It's August 25th.   We had

 5       this that discussion when, like July?

 6                    MS. O'CONNOR:   Yes.

 7                    MR. KEZHAYA:   I don't remember it.   I've

 8       been doing other things.   What happened in that

 9       discussion?

10                    MS. O'CONNOR:   We had a discussion about

11       any items that Rob and I had some confusion about and

12       we had a meetings of minds and I think we were all on

13       the same page as to the topics were and what

14       information you were looking for.   And so far in this

15       deposition none of the questions have been about any of

16       those topics that we understood she was here to testify

17       about.

18                    So this isn't personal to TST.   I take

19       this position in every 30(b)(6) deposition.

20                    MR. KEZHAYA:   I understand.

21                    MS. O'CONNOR:   And I don't want to waste

22       anyone's time by proceeding with a bunch of questions

23       that I'm not going to have her answer.

24                    MR. KEZHAYA:   I understand that, but the

Page 32

```
 1    subject of dispute is whether she should answer it.
 2                 MS. O'CONNOR:  Yes.
 3                 MR. KEZHAYA:  So that's what we're
 4    talking about.
 5                 MS. O'CONNOR:  Yes.
 6                 MR. KEZHAYA:  So going back to the
 7    original premise that we last agreed to, I'm entitled
 8    to a deposition.  I'm entitled to notice the
 9    deposition, meaning you don't -- it's not a stipulated
10    deposition.  It's a notice of deposition.  Then we
11    talked about it.  We agreed that these were the items
12    that we were going to talk about.  We had an
13    opportunity for you guys to object and say, no, not
14    identity, specifically name.  You didn't strike any of
15    those words.
16                 MS. O'CONNOR:  Well, of course I
17    wouldn't understand that you were going to ask a
18    question about her identity that was beyond its plain
19    meaning in the subpoena.  So --
20                 MR. KEZHAYA:  Well --
21                 MS. O'CONNOR:  -- to expect for me to
22    put all of my potential objections, when I don't even
23    know what your questions are, at the beginning of the
24    deposition just doesn't make a whole lot of sense on my
```

Page 33

1    end.

2              MR. KEZHAYA:  Well, maybe I'm the one

3    who's misusing the word "identity".  As I said, I find

4    myself finding need to consult a dictionary

5    periodically.  Do you have a preferred dictionary that

6    we use?

7              MS. O'CONNOR:  I don't.  So I'm not here

8    to answer questions or be cross-examined by you

9    about --

10             MR. KEZHAYA:  Whoa.  Whoa.  Whoa.  Whoa.

11   There's no cross-examination.

12             MS. O'CONNOR:  And that's how it feels.

13             MR. KEZHAYA:  I know it feels like that

14   because we are in contention.  That's what this is.

15   This is just contention.  You and I are trying to have

16   rational discourse to resolve a dispute.  If it cannot

17   be resolved, that's the end of that, but I, I feel like

18   this is something that's resolvable.

19             So I'm just opening up Microsoft Bing

20   because I've got Microsoft and all of my stuff is

21   Microsoft now.  I'm kind of a Microsoft guy nowadays.

22   Identity:  The fact of being who or what a person or

23   thing is.  Who, it seems to me, includes what they

24   feel.  What, obviously would also include what they

Page 34

1    feel.  And is, I feel like if you are experiencing it,

2    you are feeling that thing.  You are angry.  That's how

3    I normally use the word.  For example, with angry or,

4    you know, what have you.  I don't know how she feels

5    about it.  That's why I'm asking the question.

6                 MS. O'CONNOR:  So we're in for a long

7    day if we're going to be consulting dictionaries on

8    meanings of words.

9                 MR. KEZHAYA:  I agree.  But again, this

10   is why I tried to avoid semantics games by --

11                MS. O'CONNOR:  This does feel an awful

12   lot like semantics.

13                MR. KEZHAYA:  It does feel an awful lot

14   like semantics, but I'm not the one who's brought the

15   discussion.

16                MS. O'CONNOR:  So we're not --

17                MR. KEZHAYA:  I want out of the

18   discussion.  I want to be asking the questions.

19                MS. O'CONNOR:  We're not having this

20   conversation anymore.  I don't think it's helpful.  Why

21   don't you ask your next question.  And we can go

22   question by question if we have to, and we'll see how

23   it unfolds.

24                MR. KEZHAYA:  I'm not quite done yet.

Page 35

```
 1    You said that identity by the plain meaning only means
 2    thing, to your understanding, by the plain meaning.
 3    You've used the word "plain" quite a few times.  I
 4    don't see anywhere in identity that it says name only.
 5    So where are you coming from?  What dictionary
 6    definition are you using to say name only means
 7    identity?  Is there a dictionary that supports that
 8    definition?
 9              MS. O'CONNOR:  Well, when you started
10    the deposition, you said identify yourself for the
11    record, and she said I'm Christine O'Donnell.
12              MR. KEZHAYA:  Ah-huh.
13              MS. O'CONNOR:  So that's my
14    understanding.  I think that was probably Christine's
15    understanding.  I'm not going to speak for her.  But
16    this exchange is not helpful, Matt, so ask your next
17    question, please.
18              MR. KEZHAYA:  I -- I'm not there yet.
19    You told me that the plain meaning only means name.
20    You told me that you are understanding that based off
21    of how she answered.  You're also telling me that
22    that's what you're consistently understanding based off
23    of your prior experience with depositions, but that's
24    inconsistent with my prior deposition experience.
```

Page 36

1   That's why I had to go to the deposition -- or the

2   dictionary.

3                    So it seems to me that when I use the

4   word "identity" and I'm the one who's entitled to send

5   the notice and I'm entitled to write the notice and you

6   guys don't have an opportunity to say no to the notice,

7   it seems to me that how I feel like the word "identity"

8   is defined should be how it goes.  I'm not seeing from

9   your perspective how that's not the case other than you

10  don't want her to answer the question.  Is that the

11  case?

12                    MS. O'CONNOR:  I think I've answered the

13  question, and we can agree to disagree about the

14  meaning of the word "identity".

15                    MR. KEZHAYA:  Okay.

16                    MS. O'CONNOR:  I will ask you to ask

17  your next question, please, so we can proceed with the

18  deposition.

19                    MR. KEZHAYA:  Very well.  To, to be

20  clear, the dispute which we are tabling for later is

21  the meaning of the word "identity".  Is that your

22  understanding as well?

23                    MS. O'CONNOR:  It appears as much.

24                    MR. KEZHAYA:  Okay.  Let's continue.  So

Page 37

```
 1   do you object to us considering and talking about the

 2   plaintiffs in this matter?

 3                   MS. O'CONNOR:  It depends on the

 4   question.

 5                   MR. KEZHAYA:  Well, right now we haven't

 6   gotten to the question yet.  I don't know what the

 7   question is.

 8                   MS. O'CONNOR:  Well, I can't tell you if

 9   I object yet until I hear the question.  So depositions

10   are questions and answers.  So I have to hear the

11   question before I know what the answer is -- what my

12   response will be.

13                   MR. KEZHAYA:  Okay.  I feel like I was

14   being unclear here.  My, my topic question, it's not a

15   specific question.  My question to you is whether the

16   topic of who the plaintiffs are and how, how she

17   perceives the plaintiffs is part of this dispute?

18                   MS. O'CONNOR:  No, I would object to

19   that question.

20                   MR. KEZHAYA:  What is your ground to

21   object to that?

22                   MS. O'CONNOR:  Because it's not part of

23   the 30(b)(6) topics for which she was designated to

24   testify about.
```

1              MR. KEZHAYA:  Okay.  Let's return back
2    to my 30(b)(6) book which says I'm not limited to the
3    topics.  You have not presented me with --
4              MS. O'CONNOR:  I disagree with that
5    understanding, and I don't have to present you with any
6    sort of -- I don't, I don't have my legal paperwork
7    here.  I'm very comfortable maintaining that position
8    with the court.
9              MR. KEZHAYA:  Okay.  Why is that?
10             MS. O'CONNOR:  You'll see when I
11   probably oppose your motion to compel.  I'm not sure.
12             MR. KEZHAYA:  Oh, no, I won't be moving
13   to compel.  I'll be moving to strike your answer if you
14   guys leave without some kind of privilege-based
15   objection to not answer the question as posed.
16             MS. O'CONNOR:  Are you free to file
17   whatever you see fit.
18             MR. KEZHAYA:  Ah, I see.  You're -- I'm,
19   I'm kind of gathering in between your words that the
20   judge might be biased.  Is that your position?
21             MS. O'CONNOR:  Not at all.  I'm just
22   saying in any litigation are you, of course, free to
23   file whatever you would like.
24             MR. KEZHAYA:  Of course.

Page 39

1              MS. O'CONNOR:  And I will oppose.

2     That's just what the rules provide.  If you think

3     you --

4              MR. KEZHAYA:  What is the nature of your

5     opposition?

6              MS. O'CONNOR:  Matt, this is not

7     helpful.  I object to questions about her feelings

8     about the people who have brought this lawsuit.

9              MR. KEZHAYA:  You object --

10             MS. O'CONNOR:  If you have another

11    question --

12             MR. KEZHAYA:  You object to the witness

13    testifying about the people that the City will not

14    invite to the City's meeting.

15             MS. O'CONNOR:  Because she --

16             MR. KEZHAYA:  That is the nature of the

17    objection, correct?

18             MS. O'CONNOR:  That's not the nature of

19    the objection.

20             MR. KEZHAYA:  Oh, please correct my

21    understanding.

22             MS. O'CONNOR:  She is not designated --

23    that is, first of all, not a topic on your 30(b)(6)

24    deposition notice, and she's not been designated to

Page 40

1   talk about that particular topic.

2               So the spirit of the 30(b)(6) rule is so

3   that we can prepare the witness to answer your

4   questions, and so she has a right to know the topics

5   about which she is testifying at a 30(b)(6) depo.  We

6   can't possibly prepare her for questions that are

7   beyond the scope of what she's been designated to

8   testify about.

9               MR. KEZHAYA:  That's the point.  I don't

10  expect --

11              MS. O'CONNOR:  Not in a 30(b)(6).

12              MR. KEZHAYA:  Okay.  Well, we're just

13  going to have to agree to disagree on that point.  But

14  you're telling me that if it's not specifically

15  identified, I don't get to talk about it, and yet, we

16  also talked about the pleadings in which the plaintiff

17  is the subject matter of the dispute.

18              MS. O'CONNOR:  But the pleadings are not

19  a topic on the 30(b)(6) notice.

20              MR. KEZHAYA:  Why would I need to

21  identify all of the pleadings in the 30(b)(6) notice?

22              MS. O'CONNOR:  Because if you want a

23  witness to talk about them, we need to be apprised of

24  what we need to educate the witness about in the

Page 41

1    context of a 30(b)(6) deposition.

2                    And while this is perhaps fun, I'm not

3    sure, this seems like a waste of time if we're in

4    disagreement about what a 30(b)(6) deposition is.  I

5    would suggest you ask your next question.  But I think

6    we are at an impasse because we're not going to resolve

7    that issue.  So we might need some court intervention

8    and have to table this deposition, unfortunately.

9                    MR. KEZHAYA:  Well, no, we're just going

10   to table the issue, and I'm going to move on to the

11   next set of questions.

12                   MS. O'CONNOR:  Okay.  Then please do.

13                   MR. KEZHAYA:  I just wanted to reach the

14   point of impasse.

15                   Before we proceed, though, I want to

16   understand and make very precise my understanding of

17   what impasse means.  Impasse to you is that she, short

18   of it being specifically identified here in the matters

19   of examination, not in the style, the style did not

20   adequately apprize her that this is about The Satanic

21   Temple, but the matters of examination part of the

22   30(b)(6) notice, it has to be enumerated, correct?

23                   MS. O'CONNOR:  Correct.

24                   MR. KEZHAYA:  Okay.  Just making sure.

Page 42

1   And she shall not answer pursuant to your, Nicole
2   O'Connor's, orders.
3                MS. O'CONNOR:  That's just my
4   instruction to my client.
5                MR. KEZHAYA:  Yes.  Yeah, instruction,
6   order, directive, I don't care what you call it.
7                MS. O'CONNOR:  Sure.
8                MR. KEZHAYA:  Okay.  And there's not a
9   privilege ground.
10               MS. O'CONNOR:  There's no privilege
11  ground.  I mean if there was --
12               MR. KEZHAYA:  Okay.  No.  No.  No.
13  That's sufficient for my purposes.  Thank you.
14               Well, that being the case, I'm going to
15  scrap my old plan and just start a new one as we speak.
16  So let's start over.
17  BY MR. KEZHAYA:
18       Q    Remind me who you are.
19       A    Christine O'Donnell.  I'm the Compliance
20  Director and staff counsel for the Boston City Council.
21       Q    Okay.  I see that the next clause of this is
22  the scope of your agency.  So why don't you tell me
23  about the scope of your agency for the City.
24               Well, wait.  Let's, let's define our words

Page 43

1   here real quick.  What is agent -- are you a lawyer?

2         A    I am, yes.

3         Q    You're trained in law?

4         A    Yes.

5         Q    Have you practiced law like in a litigation

6   context?

7         A    Not in litigation, no.

8         Q    Okay.  How about --

9              MR. KEZHAYA:  May I ask her about her

10  background just so I can understand when she's using

11  words the context with which she's --

12             MS. O'CONNOR:  Sure.  That's --

13  absolutely.

14             MR. KEZHAYA:  Okay.

15        Q    What's your background?  You're a lawyer.

16  What does that mean?

17             What -- how you -- you went to law school

18  presumably at some point, and now you're here.

19  Operatively speaking within the bounds of, you know,

20  legal education, what has your experience been?

21        A    So I am primarily a government attorney.  I

22  provide legal research, legal writing.  In my capacity

23  for the Boston City Council, I provide legal research

24  for all 13 councilors.  It's a 13-member body.

Page 44

1          Primarily I handle the Government Operations
2     Committee which deals with all proposed ordinances and
3     home rule petitions to ensure that they're valid within
4     the City's charter, that it's within the City's
5     authority.  I --
6          Q    Can I interject there?  That was a lot of
7     words.  I've already started losing you.
8          So you're a government -- you're a government
9     attorney, correct?
10         A    Yes.
11         Q    You do government law-related things; is that
12    correct?
13         A    Legal research and writing primarily.
14         Q    Yeah.  Well, again, they don't know what
15    legal research and writing is.  Those have words --
16    those words mean something to me.  They don't know what
17    that means.  So what does --
18              MS. O'CONNOR:  Matt, if you have a
19    question, a follow-up question about what she means by
20    a particular word, you're free to ask her that, but
21    she's not here to educate whoever maybe watching this
22    deposition down the road.  So if you have a question,
23    feel free to ask her what she means by a particular
24    word.

Page 45

1                    MR. KEZHAYA:  I do have these questions.

2        I'm trying to examine her statements.

3             Q    So going back to my question, what is legal

4        research and writing?  How do you define that?

5             A    In my role in the context of what I do, I

6        instruct and advise the councilors on what they are

7        proposing if they have the authority to do it.

8             Q    Okay.  So your, your job includes receiving a

9        request from a councilor and opining upon that request;

10       is that correct?

11            A    Correct.

12            Q    Okay.  And specifically within the bounds of

13       the law like the legal rules that are written down

14       somewhere presumably which is why you have to do legal

15       research and writing; is that correct?

16            A    Yes.

17            Q    Okay.  So within the bounds of the legal

18       rules, if they want to do something are they authorized

19       to do so; is that correct?

20            A    Yes.

21            Q    And I assume also on the opposite side of

22       things, if the law -- when you can't do that, that goes

23       past the law, you can't do that.  Do you also tell

24       them, hey, you can't do that?

Page 46

1        A     Sure.

2        Q     Have you ever had to do that?

3        A     I -- in my capacity I write legal memorandums

4    all the time.

5        Q     Okay.

6        A     And provide options.  I cite case law.  I

7    cite Massachusetts state law, federal law.

8        Q     Do you handle much First Amendment law?

9        A     It depends on the issue.  Generally it's

10   local issues because Boston City Council is a local

11   form of government.

12       Q     Okay.  Do you dispute that Boston is subject

13   to the requirements of the First Amendment?

14       A     I do not.

15       Q     Okay.  Do you -- do you do a lot of research

16   and interpretation of what the First Amendment means,

17   how it applies, stuff like that?

18       A     I've done some.

19       Q     Okay.  What -- please tell me about some.

20             MS. O'CONNOR:  Objection.  You can

21   answer that to the extent you're not divulging any sort

22   of attorney work product and attorney-client

23   communications.

24             MR. KEZHAYA:  I agree.  Don't -- you

Page 47

1   know, whatever, whatever privilege objection she has

2   that's, that's clearly not objectionable.

3       A    If the issue comes up, if a councilor wants

4   to propose an ordinance, I would, I would research the

5   impact of the First Amendment in that case.

6       Q    Okay.

7            MR. KEZHAYA:  Give me just a second

8   here.  We're just going to start over with a new

9   paragraph 1.

10      Q    Did you do any research on this matter?

11      A    I have.

12      Q    Okay.  Did you do any legal writing on this

13  matter?

14      A    I did.

15      Q    Okay.  Did you issue any legal opinions in

16  this matter?

17      A    It wasn't a formal legal opinion, but I did

18  legal research for a particular councilor advising how

19  to respond to a request by TST.

20      Q    Okay.  Who that was councilor?

21           MS. O'CONNOR:  You can answer.

22      A    Councilor Andrea Campbell.

23      Q    Okay.  When was that?

24      A    About two -- no, it wasn't.  2018/2019,

Page 48

1    approximately.

2        Q    So if I understand -- if I understand your

3    testimony so far, in or around 2018/2019 a councilor

4    came to you with a question - the nature of the

5    question I'm not asking about - to you with a request

6    as to whether the law allows them to do something,

7    correct?

8        A    Not exactly.

9        Q    Oh.  Tell me, tell me what it was --

10                MS. O'CONNOR:  Well, objection.  If you

11   can answer that without divulging any conversations.

12       Q    Yeah, no conversations, but the subject

13   matter.

14                MR. KEZHAYA:  Unless you object.

15                MS. O'CONNOR:  Let me hear that question

16   again.

17                MR. KEZHAYA:  Well, I don't recall.

18       Q    To the effect of Andrea Campbell, a

19   councilor, came to you with a request to ask if she was

20   allowed to do something within the bounds of the law,

21   and you said not exactly.

22       A    It wasn't more so if she was allowed to do

23   something.  It was what would the City Council's

24   obligations be.

Page 49

1      Q     Ah, so she asked if she had to do something?

2      A     I wouldn't classify it as that.  She was

3  asking me to look into what the City Council's

4  obligations would be for a particular issue.

5      Q     Well, the City Council is comprised of

6  people, yes?

7      A     Yes.

8      Q     Is she on the Council?

9      A     She -- at the time she was a City Councilor.

10     Q     Okay.

11     A     She's no longer on the Council.

12     Q     I see.  Yeah, at the time.  I don't, I don't

13 care what she is now.

14           At -- at the relevant time she was on the

15 Council asking you what councilors generally are

16 required to do then; is that correct?

17     A     What the City Council's obligations were for

18 a particular issue.  So her as a councilor and the body

19 as a whole, as an entity.  They're an entity, a

20 governmental entity.

21     Q     Yeah, they're an entity like TST is an

22 entity.  But again, TST's not like a, like a ship or a

23 thing.  It's a body of people.  It's a number of people

24 are together, and it's just a convenient way for

Page 50

1    lawyers to, you know, assign designations to those

2    people.  Or at least that's my understanding.  Do you

3    disagree with that understanding?

4         A    I do not disagree.

5         Q    Okay.  So going back to my question then,

6    she's on the Council or -- what was her title at the

7    time?

8         A    She was a City Councilor for District 4, but

9    at the time she was council president.

10        Q    And what does a Council President do?

11        A    The Council President is the head of the City

12   Council, the administrative head.  And the Council

13   President is the chair when the City Council meets for

14   its weekly meetings.  The chair of the --

15        Q    Way too much information.

16        A    Okay.

17        Q    I'm asking very specific questions because I

18   can't remember all, all of your statements.

19        A    That's the responsibilities of the Council

20   President.

21        Q    Okay.  So they're admin president so far; is

22   that right?

23        A    Mm-hmm.

24        Q    They do -- what is it again that they do in

Page 51

```
 1    the course?

 2         A     They chair the weekly City Council meetings.

 3         Q     Okay.  So there are weekly meetings --

 4         A     Yes.

 5         Q     -- as City Council?

 6         A     Yes.

 7         Q     Is that all that they do?

 8         A     She's also a District City Councilor so she

 9    has constituents that she represents.

10         Q     Okay.

11         A     And the Council is legislative body.  She

12    also serves on City Council committees where

13    legislation passes through.  Councilors have to vote on

14    it.  She has a vote.

15         Q     So if I'm, if I'm reading in between your

16    lines, it seems to me that someone may have come to her

17    with an objection to TST getting an invite at some

18    point.  Is that, is that the case?

19                    MS. O'CONNOR:  Objection.

20         A     No.

21         Q     No?

22                    MS. O'CONNOR:  You can answer if you

23    know.

24         A     No, that's not the case.
```

Page 52

1      Q     Okay.  Or at least not to your knowledge?

2      A     Not to my knowledge.

3      Q     Okay.  Let's see here.

4            Okay.  So going back to the topic at hand,

5      the Council President came to you with a request as to

6      the Council's legal obligations as to a nondescript

7      matter; is that correct?

8      A     Yes.

9      Q     What was the matter?

10     A     The matter was at the time I believe she

11     received an email from TST to request being put on to

12     give the invocation, requesting an invitation to give

13     the invocation.

14     Q     Okay.  And so her --

15     A     And I believe the email to her, in my review

16     I believe it was around the Lund case, citing because

17     of recent case law the Satanic Temple would like to be

18     put on the next available meeting to give the

19     invocation.

20           I was asked to look into the -- that case and

21     whether or not the City Council was required to oblige.

22     The City Council does not take requests.  It -- the

23     invitations for the invocation are based upon personal

24     relationships the councilors have.  It's by invitation

Page 53

1    only.

2          Q    Don't take requests.

3               Why don't -- why doesn't the City Councilors

4    take requests?  What's the reason why not?

5          A    Because the invocation is each councilor has

6    a turn for a particular meeting to invite someone to

7    give the invocation, and it's based upon personal

8    relationships that that councilor has.  It's based upon

9    people that they have relationships with because of

10   their districts.  It might be work that the individual

11   does in their districts or does for their constituents.

12   That has been the policy.

13         Q    That's been the policy or has that been the

14   custom?

15         A    Policy and custom.  I would say both.

16         Q    And I, I -- I do a lot of First Amendment.

17   I'll just tell you.  In my understanding those two mean

18   slightly different things.  Policies are written down,

19   codified, and there are like procedures involved;

20   whereas, customs are just like this is kinda how we do

21   things.  So was this -- is this more of a custom or is

22   this more of a policy?

23         A    In my capa -- in my work, what I do, I do not

24   really consider a policy being written down.

Page 54

1     Q    Okay.

2     A    I use the terms interchangeably.  With your

3  definition, I would define it more as a custom.

4     Q    Okay.

5     A    The City Council does not have a written

6  policy --

7     Q    Okay.

8     A    -- about it's -- but it's understood that

9  it's by invitation.

10     Q    Okay.  I understand that it's understood that

11  it's by invitation.  I'm asking why not.

12           MS. O'CONNOR:  Objection.  But you can

13  answer if you understand.

14     A    You're -- can I ask a clarification?

15     Q    Yeah.  Yeah.

16     A    You're asking me why not -- why it's not

17  written down?

18     Q    Well, yeah, let's start there.  Why isn't it

19  written down?

20     A    I am not sure.

21     Q    Okay.  I was actually going a different, a

22  different route which is why is there not some kind of

23  a mechanism for people to request an invite?

24     A    Because the mechanism is that the councilor

Page 55

1   is the individual that controls who they invite.

2        Q    Okay.  It sounds like it's just whatever the

3   councilor wants to do then.

4        A    Correct.

5        Q    Okay.  Why?

6        A    That's been the custom.

7        Q    That's just how things go, in other words?

8        A    Yes.

9        Q    Okay.  All right.  So you issued an opinion,

10  the details of which I don't much care about,

11  essentially, no, suffice it to say, you don't have to

12  order them in because the way we've always done things

13  is that you can if you want to.  If you don't want to,

14  you don't have to.  Is that a fair recitation of the

15  way things go?

16       A    Yes.

17       Q    Okay.

18       A    And if I could just clarify.

19       Q    Yeah.

20       A    It wasn't a formal legal memo.  I was asked

21  to assist the councilor in drafting a letter.  I

22  believe she provided an email response back to TST.

23       Q    I, I think that ... let's see here.

24       A    If I recall.

Page 56

1        Q     Well, I have --

2        A     In my review of the emails that were

3    produced, I recall documents relating to this.

4        Q     Yeah.

5                    MR. KEZHAYA:  Ada, do we have -- well,

6    more importantly, do you have a means to put up the,

7    the Complaint, the FAC?

8                    MS. KING:  I certainly do.  Give me just

9    one moment to get that set up.

10                   MR. KEZHAYA:  Do you guys have a copy of

11   the Amended -- the First Amended Complaint.  It's

12   docket 16.  I'm specifically looking for 16-2.  I see

13   an email by Christine.  Let's see if I have a prior

14   one.

15       Q     Christine, I have an email attached to the

16   Complaint that bears your name.  And you say you helped

17   her write it.  I'm a little bit confused because it

18   came from your email address.  Are there -- is there

19   another email that I'm not thinking of that's -- I'll

20   just show you this while we get that set up.

21                   MR. KEZHAYA:  Do you want to see first?

22                   MS. O'CONNOR:  Sure.  We can look

23   simultaneously.

24                   MR. KEZHAYA:  Okay.  Yeah.

Page 57

1      Q     And so for the benefit of a clear record, we

2    are looking at -- well ... Exhibit 2 to the First

3    Amended Complaint, Docket 16-2 and 1:21-cv-10102, the

4    matter of Satanic Temple vs. Boston, i.e., this case,

5    this is Exhibit 2.  It's -- it appears to be an email

6    from Christine O'Donnell.  And since --

7                    MR. KEZHAYA:  You know what, Ada, never

8    mind.  I'll just show them on my tablet.  And then we

9    can, we can probably like put this in later I assume.

10   Oh, there we go.  What do we have here?  This is not

11   that.  This is not that.

12     Q     Okay.  So I instead have the Exhibit 2 to the

13   First Amended Complaint.

14                    MR. KEZHAYA:  If you could just hide

15   that.  We're not, we're not talking about that yet.

16     Q     The, the details of the body is not what I'm

17   specifically referring to.  I'm just referring to the

18   from line.

19     A     Yes, that is me.

20     Q     That's -- well, I know that's you.  My

21   question is if this is the email you're talking about.

22     A     And that date is just my -- that's --

23   October 9th, 2018, correct?  It's not 2016?  That's

24   2018?

Page 58

1      Q     Let me see.  Oh, you were talking about an
2   '18 email.  Yeah, this one's '18.
3      A     Yes, that's the email I was talking about.
4      Q     Oh, okay.  Cool.
5      A     Sorry.  I just need -- I couldn't tell if it
6   was an 8 or a 6.
7      Q     Oh, yeah.  Ah, bad copy.  What can you do.
8      A     Yes, that's the email I'm referring to.
9      Q     Okay.
10     A     I could not remember if I sent the email or
11  if Councilor Campbell sent the email.
12     Q     Oh, I don't, I don't care who sent it.  I was
13  just making sure we were talking about the same thing.
14     A     No, we are.  We are.
15     Q     Okay.
16     A     I was just clarifying why I was a tad
17  confused because I couldn't remember if the email came
18  from Councilor Campbell or myself.  That is the email.
19     Q     No need to be defensive.
20     A     I'm not being defensive.  Just answering.
21     Q     Okay.  I apologize.  I apologize.  I
22  apologize for misunderstanding.
23            Okay.  So going back to what we were talking
24  about, you received a request from the Council

Page 59

1   President at the time.  She asked if she has to accept

2   this -- or has to accept this request for invitation.

3   Essentially you reviewed the case law and you found,

4   no, I don't think you have to do that, and the

5   substantiating ground is that's how we've always done

6   things?

7          A    Correct.

8          Q    Okay.  So the councilors are -- well,

9   actually, going back to the original matter at hand,

10  we're back at paragraph 1 of the matters of

11  examination.  I asked about scope, some more particular

12  matters.  Basically you give legal opinions, and you do

13  legal research and writing for the City of Boston in

14  matters of legal stuff.  Is that basically the gist?

15         A    Correct.

16         Q    Okay.  On to agency.  What is agency in this,

17  in this legal context?

18         A    Agency is when you have the authority to act

19  for somebody.

20         Q    Okay.  And does that carry additional like

21  legal implications when you're acting for someone?

22              MS. O'CONNOR:  Objection.  You can

23  answer.

24         A    Yes, it does.  You're -- in some instances

Page 60

1    you're responsible for -- in this case I'm an agent of

2    the City in Bos -- of Boston.  I'm an employee.  So in

3    some cases, yes, if you're acting on behalf of the

4    employer.

5         Q    Well, you're referring to the respondeat

6    superior; is that correct?  Do you know what --

7         A    I'm not -- I don't understand your ...

8         Q    Sorry, that's, that's a jargon term.

9    Respondeat superior is the tort liability that

10   sometimes a principal will have because of the actions

11   or misactions of their agents.  Is that what you're

12   referring to?

13        A    Yes, I beli -- but I know with government

14   there's -- in Massachusetts there's limits on tort

15   liability.

16        Q    Yeah, but this isn't a tort.  This is, this

17   is not a tort.

18        A    No, I understand that.

19        Q    Yeah.  So more generally with respect to

20   agency, like principles of attribution of the agent's

21   knowledge, things of that nature, are you familiar with

22   these concepts?

23        A    Not really.

24        Q    Okay.  So how about you tell me again your,

Page 61

1   your understanding of the word "agency".

2        A    I already answered that I feel like.

3        Q    I know.  I forgot, though.

4        A    My understanding of an agent is you're acting

5   on behalf of somebody, whether it's a supervisor.  It

6   can -- it -- my understanding is the definition of an

7   agent depends upon what relationship you're talking

8   about.  I used the example, and you said, oh, well,

9   that's a tort.

10       Q    Yeah.  Yeah.

11       A    So that's the example I gave.  I feel that I

12  answered the question.

13       Q    Okay.  So that's a discrete example of, it

14  sounds like, a more umbrella terminology; is that

15  correct?

16       A    Sure.

17       Q    And that's, that's your understanding.

18  Again, I'm not trying to inject understanding into your

19  mind.  I'm literally just trying to understand where

20  you're coming from.

21            Is that the full understanding of your

22  concept of agency?

23       A    I guess it would depend on a fact pattern or

24  the situation.  But that's my answer.  That's my full

Page 62

1   understanding.

2       Q    Okay.  Well, let's try a fact pattern then.

3   A person charged with a decision to invite or not

4   invite a religious organization has requested a -- an

5   invite.  They approach their attorney to ask whether

6   they have to.  You are the attorney who reviewed the

7   matter and found that, no, you don't have to.  Was that

8   within the scope of your agency?

9               MS. O'CONNOR:  Objection.  This is

10  outside the scope of the 30(b)(6) notice.  You asked

11  her about her, her partic --

12              MR. KEZHAYA:  This --

13              MS. O'CONNOR:  Let me finish.  -- about

14  her particular agency with the City, and if you'd like

15  to ask her that, that's fair game.  But you're asking

16  her hypotheticals about what she would do, I don't

17  know, as a lawyer in a particular situation.  So that's

18  not what she's here to testify about.

19              MR. KEZHAYA:  I'm sorry.  I, I was

20  unclear.  The -- your -- fair point.

21      Q    Remove the "if".  That in fact did happen.

22  Was it within the scope of your agency to issue that

23  opinion?

24      A    It was in the scope of my employment.

Page 63

1        Q     Yeah.

2        A     My duties as the Compliance Director and

3   staff counsel.

4        Q     Would you disagree with -- you emphasized

5   employment.  Is there a legal difference between

6   employment and agent, to your mind?

7        A     There could be.

8        Q     Yes, I agree.  Okay.  As pertains to this

9   case, though, is there?

10       A     Are you -- I am not an agent of Councilor

11  Campbell.

12       Q     No.  No.  Agency for the City.  You all are

13  co-agents, in other words, in my opinion, correct?

14              MS. O'CONNOR:  Objection.

15       Q     Well, remove the "my opinion" part.

16             Are you all co-agents?

17       A     We all work for the City.

18       Q     Yes.

19       A     Yes.

20       Q     Okay.  So are you both agents of the City?

21       A     Yes.

22       Q     Okay.  Outside of your co-working

23  relationship do you have any other relationship with

24  City decision makers, any personal relationship, for

Page 64

1    example?

2          A     With City decision makers?

3          Q     Yeah.  I mean the people at the City who make

4    the decisions I assume are called the Council; is that

5    correct?

6          A     I know them because I work for them.

7          Q     Yeah.  Outside of that, though, do you have

8    any relationship of any sort?

9          A     No.

10         Q     Okay.  Investigation, okay.

11               What investigation or preparation have you

12   done so far?  Up to, up to walking into that door, what

13   preparation, what did that entail?

14         A     So I've met with my counsel, Rob and Nicole,

15   numerous times to talk about this.  I spoke with

16   Councilors' staff, the employees that work for the City

17   Councilors.  I've researched City Council minutes, City

18   Council agendas.  I looked through the documents that

19   were produced for discovery.

20         Q     Okay.

21         A     I spoke with other relevant parties that

22   were -- that have experience with the subject matter in

23   the, the deposition to find out, you know, City

24   policies.

Page 65

1      Q    Okay.  Let's take these in turn.

2           So you said you talked with members of the

3   Coun -- well, you said Council.  I may have misheard.

4   Did you speak with members of the people who vote on

5   things for the City or did you speak with your

6   attorney's counsel, because those are -- you know, they

7   sound the same.

8      A    I spoke with Rob and Nicole.

9      Q    Okay.  Did you talk to any of the people who

10  actually send the invitations or request the

11  invitations?

12     A    Oh, okay.  I'm sorry.  I -- when you -- when

13  I said counsel, I meant my counsel, Rob and Nicole.

14     Q    Okay.

15     A    The City Councilors, --

16     Q    Mm-hmm.

17     A    -- I spoke with their staff about how the

18  councilors decide.

19     Q    Councilors, okay.

20     A    And I also have -- only because in my

21  capacity I attend the City Council meetings.

22     Q    Oh, okay.

23     A    They generally happen on Wednesdays.

24     Q    Okay.

1       A    I attend them, and I've been present for the

2   invocations, so I see how they work.

3       Q    Okay.  So that's another topic I want to talk

4   about.

5       A    So I, I didn't speak to -- to clarify.

6       Q    Yeah.

7       A    I didn't speak to the City Councilors.

8       Q    Yeah, that's why the X is there.

9       A    I have spoken to their staff.

10      Q    Yeah.  Yeah.

11           MR. KEZHAYA:  I'm -- a lot -- for

12  benefit of the record, she's seeing me handwrite on my

13  tablet here.  I'm just trying to keep track of what all

14  is going on.

15      Q    I have a big X on councilors to mean that you

16  did not speak to the people who actually issue the

17  invitations or do not issue the invitations?

18      A    Correct.

19      Q    Okay.  But you did talk to their staff?

20      A    Yes.

21      Q    You did talk to their employees.  You looked

22  through discovery.

23           And then I have another category that just

24  says other parties.  I've already forgotten what you

Page 67

1    said.  Do you know what that means?

2        A    I believe that there was a question in there

3    about the length of time for keeping documents.  So I

4    spoke with the City's public records officer.

5        Q    Okay.  In legal jargon I would call that a

6    records retention policy.  Is that something you looked

7    at?

8        A    Sure.

9        Q    What is the City's record retention pol --

10   well, actually let's start by defining.  What is a

11   records retention policy?  What does that mean?

12       A    Well, under the state's public records law,

13   the City of Boston is a local government.

14       Q    Mm-hmm.

15       A    So the City of Boston must retain certain

16   records.

17       Q    Okay.

18       A    And I believe one of the questions in the

19   deposition was how long -- it specifically related to

20   payment of individuals that give the invocations and

21   how long do the City -- does the City have to maintain

22   payment records.

23       Q    Okay.  So we're gonna add --

24       A    So I spoke with the retentions records

Page 68

1    officer to confirm how long the City has to retain

2    those records.

3         Q    And how long is that?

4         A    It's seven years.

5         Q    Seven years, okay.

6              Did you find in the course of the produced

7    discovery materials any payment records produced?

8         A    I did not, I did not review those types of

9    records.

10        Q    But they exist and there's -- they go back

11   seven years?

12        A    I believe that they exist with the City's

13   treasury department.

14        Q    Okay.

15        A    They did not exist in the City Council's.

16        Q    Okay.  But it's -- importantly, though, so go

17   back seven years.  Seven years.  And they are held by,

18   what did you say, treasury?

19        A    I believe so.

20        Q    Treasury department, okay.

21        A    Either treasurer or auditing.

22        Q    Or maybe auditing, okay.

23             Anyone else that I should look for these?

24        A    No.

Page 69

1        Q     Okay.  Okay.  When -- just still narrowing

2  down on this other parties.  Are there any other other

3  parties that are in this other parties category?

4        A     No, I think that covers it.

5        Q     Okay.  So then we've got that one done.

6              You talked to staff.  Who, who did you -- who

7  all staff did you talk to?

8        A     So there's 13 City Councilors.  So I asked

9  the employees -- do you want specific names or ...

10       Q     Yeah.  Yeah, let's talk names.  What have we

11 got?

12       A     I spoke to Amanda Curley.  She works for

13 Councilor Baker.  I asked her how does the councilor

14 generally decide, and she said it's people that he has

15 a personal relationship with or that he knows from the

16 district that are -- that do work within the district.

17       Q     Okay.

18       A     I've spoken to -- I can't even recall.

19 Most -- I've spoken to pretty much someone in every

20 single council office to ask.

21       Q     But that's the gist?

22       A     Yes.

23       Q     Is that ...

24       A     Yes.  For all of them it's those common

Page 70

1    factors exist.

2         Q    How far back does this custom go?

3         A    So I did research as I indicated.

4         Q    Oh.

5         A    I did research the City documents and City

6    Council minutes.  I am not sure of the exact time that

7    the invocation originated, but going back to the 1800s,

8    the City Council has had someone give an invocation.

9    When I went back to look at the documents from the

10   1800s, the -- a clergy person gave the invocation

11   generally at the inauguration.  With the way the

12   minutes were done back then, it's hard to tell if every

13   single meeting after that there was an invocation.

14        Q    Mm-hmm.

15        A    But from the 1800s, clergy and invocations

16   were part of the City Council meetings.

17        Q    It's basically always been part of the thing?

18        A    Yes.

19        Q    Did anyone address why it's part of the

20   thing, in any of the records that you've seen?

21        A    Not that I have seen.

22        Q    Do you have an opinion as to why it is?

23             MS. O'CONNOR:  Objection.  You can

24   answer that.

Page 71

1     Q     Not a legal opinion, just literally like an
2  opinion.  As a person who has seen these things do you
3  have an opinion?
4     A     My -- I don't have a personal opinion.  I --
5  my guess would be tradition.
6     Q     Tradition.
7     A     Looking as, as, you know, councilors -- you
8  know, as different councilors come in, I am assuming
9  that they look back to see what was done previously.
10    Q     But you didn't ask that question?
11    A     I did not, no.
12    Q     Okay.  So the notion of where did this policy
13 come from probably needs to be answered by someone
14 else?
15    A     Yes.
16    Q     Well, actually, who, who better than you
17 could answer the question of where did this come from,
18 if anyone?
19    A     I'm not sure because -- my guess would be if
20 you ask a councilor, they would probably have a similar
21 answer to mine that --
22    Q     Probably it just has always been like this?
23    A     Mm-hmm.
24    Q     Okay.  You mentioned that you went through

Page 72

1     some kind of primary historical rec -- I'm using jargon

2     terms again.  You looked through papers from like the

3     1800s; is that correct?

4          A     Yes, the minutes.

5          Q     Okay.  Where did you find those?

6          A     The City of Boston has books of all the past

7     minutes going back to the 1800s.  In the 1800s it was

8     an alderman form of government so it's a little bit

9     different.  But the City Council has books that are

10    available to the public.  It's also at the City of

11    Boston archives.  And more recently, all of the City

12    Council meetings are online.

13         Q     Yes.  Yes.  I think they're on YouTube

14    nowadays, right?

15         A     Yes.  And I believe they have been online

16    since 2011.

17         Q     Okay.  Now, you said it used to be an

18    alderman government, and things are different now.

19    What's the distinction between aldermen and whatever it

20    is now?

21              And do you -- actually, let me back up.

22    Before, before you answer that question, let's start

23    with you said it was aldermen before, and now it's

24    something different.  What is it called now, so we have

Page 73

1    a short designation for that?

2         A    City Council.

3         Q    Okay.  So alderman vs. city council.

4         A    They, they both were the local government for

5    the City of Boston.

6         Q    Yeah.  Yeah.

7         A    And -- right.  The City Council has 13

8    members.

9         Q    Yeah, I'm starting off because I want to, I

10   want to understand the distinction between al -- you

11   saw fit to mention.  It's clearly something of

12   interest.  What is the difference between alderman and

13   City Council form of government?

14        A    I'm not sure what the difference is except

15   for the -- they're both local form of governments.  I

16   didn't look into what the difference was.

17        Q    I see.

18        A    I just know that right now it's the City

19   Council.  1909 was the Chapter 486 of the Acts of 1909.

20        Q    Wait.  Wait.  Wait.  Slow down.  Slow down.

21   So Chapter 84.

22        A    Chapter 486.

23        Q    Sorry.  486?

24        A    Yes.

Page 74

1      Q      486.

2      A      Of the Acts of 1909.

3      Q      Of 1909.

4      A      That was when the City of Boston became a

5  council form of government.

6      Q      Was that like a charter by the state

7  government or like a --

8      A      It was a charter within the City of Boston.

9      Q      Okay.  So it sounds like a statute was passed

10  in Massachusetts proper.  Boston encoded its

11  organizational purposes into some kind of a written

12  document.  Is that right so far?

13      A      Boston -- Boston -- it, it started with

14  Boston then the state approved it.

15      Q      Okay.

16      A      That's how it works.

17      Q      So internal inside of Boston sometime before

18  1909 there was some kind of internal movement to say,

19  hey, things are different.  We should encode, encode

20  how things are -- should be going moving forward?

21      A      I'm assuming that that's how --

22      Q      Well, yeah.

23      A      -- it happened.

24      Q      Well, yeah.  That's, that's the best that we

Page 75

1    can surmise based off the fact that it's here.

2         A    But, but that -- the cite that I gave you,

3    that is what established the City Council form of

4    government.

5         Q    Okay.  Let's see.  So I think that answers

6    all of my history-related questions.

7              Did you have any other staff who were

8    noteworthy in the course of your investigation?

9         A    No.

10        Q    Okay.  What about employees?

11        A    No.

12        Q    Okay.  I have a note looked through.  I think

13   that had something to do with discovery.  Did you find

14   anything of interest in the course of looking through

15   discovery, in your opinion?

16        A    No.

17        Q    Okay.  I have -- okay.  This is just

18   generally about meetings.  Payment records I think I'm

19   good on that.

20             Okay.  You addressed meetings.  You said, if

21   I remember correctly, they happen on Wednesdays.  How

22   long do these meetings usually last?

23        A    So it depends on what's on the agenda.  And

24   it's not every single Wednesday, but it's most

Page 76

1    Wednesdays.  It depends on what the agenda is.  The

2    City Council controls the agenda.  The agenda is based

3    upon -- it's when the City Council receives legislation

4    from the mayor, and councilors, as the legislative

5    body, also are allowed to file legislation so ...

6        Q    Let me interject real quick because we've got

7    to unpack that.

8             So you said the mayor creates a request that

9    legislation be passed.  Is that, is that right so far?

10       A    No.

11       Q    Okay.

12       A    The mayor, when the mayor files legislation,

13   the Council has to approve legislation from the mayor

14   as well in the City of Boston.  So when the mayor files

15   legislation, that is on the City Council agenda at its

16   meetings.

17       Q    Okay.  And ...

18       A    And the agendas are all available online.

19   The City Council meetings recorded.

20       Q    Yeah.

21       A    Available online.  When the Council has its

22   meetings, anything that's on the agenda gets referred

23   to a City Council com -- committee.

24       Q    Wait.  Wait.  Wait.  Let's back up.  It

Page 77

1    sounds like you're getting into a topic of this is what
2    the Council does.  Is that, is that fair to assume?
3        A    Yes, but you had asked --
4        Q    Yeah.
5        A    -- you had asked a question about the mayor's
6    legislation so it's -- my explanation is relevant to
7    that, what happens at the meetings.
8        Q    Oh, no, that's fine.  I just wanted to -- I
9    like this topic of --
10       A    Yeah.
11       Q    -- what does the council do --
12       A    Mm-hmm.
13       Q    -- because, frankly, I know nothing about
14   them.
15       A    Okay.
16       Q    But -- well, let's, let's do it like this.
17            The Council does meetings; is that right?  Do
18   they do other things than meetings?
19       A    Yeah, so the, the structure of the City
20   Council, as I said, there's 13 of them.
21       Q    Mm-hmm.
22       A    The Wednesday meetings are when matters are
23   referred to the City Council from the mayor, and at its
24   Council meetings the Council also votes on legislative

Page 78

1   matters.  The Council in addition -- the City Council

2   meetings are when all 13 councilors come together, and

3   that's -- it's at those meetings where the Council

4   votes on matters.  In addition to that, the councilors

5   also -- they -- they're the legislative body.  They

6   serve constituents.  They also do constituent work.

7        Q    Well --

8        A    I am not part of their constituent work.

9        Q    Well --

10       A    That's their office staff.

11       Q    Let's -- let's just interject there because

12   I'm gonna have two follow-up questions and ... let's --

13   let's see.  And they do constituent work.  Do

14   constituent work.

15            Okay.  So you've used this term "legislative

16   matters" a bunch of times.  I don't know that I

17   understand what you mean.

18       A    Okay.

19       Q    What's a legislative matter?

20       A    So it's -- for agenda purposes they all have

21   docket numbers.

22       Q    Mm-hmm.

23       A    Legislative matters can be grants, loan

24   orders which are budgetary matters, ordinances, home

Page 79

1    rule petitions, resolutions, hearing orders.

2         Q    Local government stuff basically?

3         A    Yes.

4         Q    Okay.

5         A    Yes.

6         Q    They, they do constituent work.  What is

7    constituent work?

8         A    In -- based on my -- I don't really deal with

9    constituent work, but because I've worked for the City

10   Council for many years, the councilors assist

11   constituents with City services.  If constituents need

12   help navigating, you know, assistance with City

13   departments and things like that, the councilors' staff

14   assists them with that.

15        Q    Okay.

16        A    You know, local things like trash pickup.

17   Help, you know, help with government documents, things

18   like that.  Just kind of -- sort of a referral service

19   and helping them through that.

20        Q    Yeah, point of contact for the public

21   basically.

22        A    Mm-hmm.  Yes.

23        Q    Okay.  How do councilors typically run into

24   members of the public?  Like how do they, how do

1    they -- literally for the first time how do they

2    interact?

3        A    City Hall's a public building.  Councilors

4    all have their own offices.  The public can come in and

5    meet with them.  The public can email them.  The public

6    can call them.  A lot of councilors go -- there's

7    events throughout the City.  A lot of them go to events

8    in their districts.  They meet councilors that way.

9    Some of them have office hours set aside for their

10   constituents.  That's how they interact with them.

11       Q    Okay.  It seems to me that this procedure of

12   having these councilors send the -- issue invitations

13   if they feel like it, it seems like that's at risk of

14   selection bias.  What is your, what is your position on

15   that?

16                 MS. O'CONNOR:  Objection.  She's not

17   going to answer that question.

18                 MR. KEZHAYA:  Why not?

19                 MS. O'CONNOR:  It's not part of the

20   30(b)(6) notice.

21                 MR. KEZHAYA:  It's outside of the

22   30(b)(6) notice --

23                 MS. O'CONNOR:  Correct.

24                 MR. KEZHAYA:  -- for me to ask her

Page 81

1    whether, whether this is subject to a selection-bias

2    concern?

3                MS. O'CONNOR:   Yes.   Her personal

4    thoughts on that, yes.

5                MR. KEZHAYA:   Okay.

6    BY MR. KEZHAYA:

7        Q    All right.   So they do constituent work.

8    They run into members of the public because basically

9    they're public officers.   They -- they're, you know,

10   the point of interaction between the public and their

11   government.   Is that fair to summarize as constituent

12   work?

13       A    Yes.

14       Q    Okay.   Do they do anything else you find

15   noteworthy with regard to this -- specifically with

16   regard to this dispute?

17       A    No.

18       Q    Okay.   All right.   In addition, obviously,

19   they do meetings, so let's talk about those.   They

20   happen on Wednesdays, to recap.   They are of varying

21   lengths depending on the nature of the agenda.

22       A    Yes.

23       Q    What else do you have to say about meetings?

24       A    So the meetings -- so again, that's where all

Page 82

1  of the councilors, that's where the councilors vote on

2  matters.

3        Q     Mm-hmm.

4        A     That's where anything that -- any budgetary

5  matter, any proposed law needs the approval of the City

6  Council before it goes to the mayor, and at these

7  meetings that's where all of those documents are voted

8  on.  Or, if it's something that's initially filed, it's

9  referred to one of the relevant City Council

10  committees.

11        Q     Okay.

12        A     And as I said, they vary according to length.

13  It's where -- it depends upon what's on the agenda.

14  Each councilor has an opportunity to speak on the

15  dockets that are on the agenda.  Sometimes -- some of

16  them always speak or, you know, all of them may speak

17  on a docket, only a couple may speak.  It just, it just

18  depends on, on the councilor.

19        Q     It depends on the thing basically.  Not

20  everyone has an opinion about everything.

21        A     Correct.  Correct.

22        Q     Okay.  All right.

23        A     But the main thing is that's -- it's at those

24  Council meetings where the Council votes on matters and

Page 83

```
 1   then once that happens, it goes to the mayor.

 2        Q    Okay.  So if I understand correctly, if we

 3   can, if we can kind of break down meetings into a

 4   who-what-when-where-why.  Why, they're voting on stuff.

 5   When, Wednesdays for varying amounts of time.  Who,

 6   obviously the councilors.  And also the public's at

 7   these meetings; is that correct?

 8        A    The public can attend, but there's not a

 9   public comment period.

10        Q    Not at all?

11        A    No.

12        Q    How do peop -- how do people get their voices

13   by heard by their --

14        A    So the City Council has standing

15   committees --

16        Q    Mm-hmm.

17        A    -- based on the topic and usually there's

18   public hearings on particular and that's when the

19   public -- that's the time for a public comment period.

20             But in addition to that, the public can also

21   weigh in.  They can email their councilors.  They all

22   have emails.  They can email their councilors.  They

23   can call their councilor and tell them how they feel

24   about things.  They can submit testimony.
```

Page 84

1              And that happens a lot.  That's a big part of

2    what the City Council staff handles, the constituent

3    work, where members are calling telling their

4    councilors how they feel about something, whether they

5    support or are against something.  That's how the

6    public weighs in.

7         Q    Okay.  How -- what is the volume of time that

8    a councilor has spent interfacing with these matters of

9    just basically like public discussion, public

10   discourse?

11        A    I can't really answer to a specific amount of

12   time.

13        Q    A lot?  A little?

14        A    Yeah, I mean that -- yes, they're, they're

15   the legislative body.  They're the ones that the

16   constituents primarily interact with.

17        Q    Okay.  So if the constituents care about

18   something, they will let their councilors know, and

19   they expect the councilor to vote appropriately on the,

20   on the Council meeting?

21        A    They -- I mean they -- as, as a member of the

22   public, they have -- I mean some are more engaged than

23   others.

24        Q    Sure.

Page 85

1        A     So ...

2        Q     You've got to --

3        A     I mean I don't know if the councilor is -- I

4    don't know how councilors weigh the votes, you know.

5    I'm sure, I'm sure some of them --

6        Q     Oh, I'm not suggesting weights.  I'm

7    literally just asking the volume.

8        A     Again, it depends on the issue.

9        Q     Yeah.

10       A     And it depends on the engagement.  There --

11   you know, some districts, people are just more engaged

12   in government than others.

13       Q     Okay.  I, I very much imagine so.  People get

14   very, very excitable about their public government, I

15   imagine; is that correct?

16       A     Yes.  Some, yeah.

17       Q     Do you have any entertaining stories about

18   people getting excitable about things?

19       A     I --

20            MS. O'CONNOR:  Objection.  She's not

21   providing personal anecdotes.

22            MR. KEZHAYA:  Oh, no, no personal

23   anecdotes just entertaining stories.

24       A     I, I don't --

Page 86

1              MS. O'CONNOR:  No.  Objection.

2              MR. KEZHAYA:  Very well.

3     Q    Okay.  Let's see here.  So you've mentioned

4  public input.  As pertains to this particular dispute

5  did the public make objections known to any of the

6  councilors or ...

7     A    I did see some emails when I was looking

8  through what was produced during discovery where some

9  members of the public didn't want their councilor to

10  invite TST.

11    Q    Okay.  And do you think that had any weight

12  in the councilors' minds?

13             MS. O'CONNOR:  Objection.  She can't

14  answer that question.

15             MR. KEZHAYA:  Why not?

16             MS. O'CONNOR:  Because she can't speak

17  to the subjective intent of the councilors.

18             MR. KEZHAYA:  Well, I mean it's -- well,

19  let's back up a little bit.

20  BY MR. KEZHAYA:

21    Q    So in terms of agency do you understand the

22  principle of attribution?

23    A    Are you speaking of that in terms of quid pro

24  quo that for which or --

Page 87

1      Q    No.  No.  Attribu --

2      A    If you don't do something then I'm not going

3   to do this for you or ...

4      Q    No.  No.  No.  No.  No.  So backing up to the

5   definition of agency, we talked about sometimes people

6   will do something for some -- someone or something else

7   which is designated the, the principal; is that

8   correct?

9      A    Yeah.  Yes.

10      Q    Principals have agents.

11      A    Yeah.

12      Q    You have principal up here.  Principal tells

13   agent what to do.  Agent does the thing.

14           Are you familiar with the other way around?

15   Sometimes an agent does a thing, and it's treated as if

16   the principal did the thing?

17      A    Okay.

18      Q    I'm asking.  Is that a thing that you're

19   already familiar with?

20      A    Not real -- not in my work it doesn't apply

21   that way.

22      Q    But in, in terms of like the --

23      A    I'm not --

24      Q    -- just the general legal understanding of an

Page 88

1    agent, agents do stuff, and sometimes it's treated as

2    if the principal did the thing?

3        A    Sure.  Yes.

4        Q    Are you also aware that sometimes agents know

5    things and that is presumed to be known by the

6    principal as well?

7        A    Sure.

8        Q    Okay.  And you know that there's -- well, I'm

9    asking.  Question posed being do you know whether

10   there's like a delineation between what things are or

11   are not passed up, so to speak, to the principal?

12                MS. O'CONNOR:  Objection.  You can

13   answer if you understand.

14       A    Can you clarify that question?  I'm not -- I

15   don't really understand it.

16       Q    I'm struggling to say this.  Agents sometimes

17   receive information, and the question is whether that

18   information is known by the principal is whether it's

19   material to the agent's scope of duties.  I proffer

20   that as a legal role.  Do you accept that proffer or do

21   you dispute it?

22       A    I --

23                MS. O'CONNOR:  Objection.  You can

24   answer.

Page 89

1        A     I accept.  It's just when you're -- you're

2    using the term "agency" and "principal" with -- in --

3    yes, I'm an agent of the City of Boston and councilors

4    are too.  Their staffs are, are agents.  But councilors

5    are elected officials.

6        Q     Yeah.

7        A     So it's a little bit -- it's different

8    because the councilors are elected officials.  They've

9    have their staff and then there's the public.

10        Q     Yeah.

11        A     So are you talking about -- when you're --

12    are you talking about an agent with the councilor's

13    staff and the councilor being principal?

14        Q     Well --

15        A     Or I guess I just ...

16        Q     Let's, let's try to speak in terms of

17    analogies.

18        A     Okay.

19        Q     All right.  TST is a corporation.  TST as a

20    body knows certain things because TST as a corporation

21    is comprised of people, fundamentally is comprised of

22    people.  People doing stuff.

23        A     Yeah.

24        Q     People doing stuff all for a singular unitary

1   purpose.  It's a body of people doing things; likewise,

2   Boston is a body of people doing things.  They're doing

3   the public's business.  They're picking up trash.

4   They're, I don't know, sewers, roads.  I don't know

5   what you guys do.  Presumably very important stuff

6   because society I see is doing all right.  You

7   understand that these two are analogous terms?

8       A     Mm-hmm.

9       Q     Okay.  Both are corporations as I understand

10  it.  TST's a proper corporation.  Is Boston a proper

11  like corporate body?  Is there a term for the

12  designation of its legal structure?

13      A     That -- I'm not aware of.  I think it's ...

14      Q     Is it fair to say they're analogous, though?

15      A     Sure.  Sure.

16      Q     I mean they're groups of people doing

17  things --

18      A     Sure.

19      Q     -- pursuant to certain purposes.

20            TST's purposes are the seven fundamental

21  tenets.  The City of Boston has a charter.  These are

22  our organizational purposes.  I don't -- I haven't read

23  your charter.  Presumably it also has like procedures

24  and stuff.  This is how you go about doing stuff.  So

Page 91

1    yours are little bit more refined than the seven

2    fundamental tenets.  You know, there's, there's more,

3    obviously, to TST than just those seven things.

4            So next layer down is the people inside of

5    the organization who actually do the things.  TST has,

6    obviously, for example, Lucien Greaves is here.  They

7    do stuff.  You met Ada.  There's Mobius.  People doing

8    things pursuant to the organizational purpose.

9    Likewise, you, for example, have your business purpose

10   which is, for example, issuing legal memoranda, legal

11   opinions, legal research, et cetera.  You see how those

12   two are synonomous.

13       A    (Nodded.)

14       Q    Next layer down -- and I, I saw that you nod.

15   I just want to make sure there's a clear record.  Yes?

16       A    Yes.

17       Q    Okay.  Next layer down is the cutoff.  So in

18   between the people doing the things pursuant to the

19   organizational purposes for the public body, next layer

20   down there's a cutoff here on TST's side of things.

21   There's the congregants.  There's these people who

22   follow these organizational purposes, and they identify

23   as members of this body.  And then the public, on the

24   other hand, these are just people who identify as

Page 92

1 members of this public body which happens to be defined

2 by the geographic scope over here, which is to say the

3 City is defined by a geographic scope; whereas, TST is

4 not. TST is defined by organizational ideals. Do you

5 understand that?

6     A    Yes.

7     Q    Okay. So you see how they're all analogous,

8 right. So as I understand it, what you're saying is

9 here at the bottom, the members of the public, which to

10 draw an analogy is the congregants, their beliefs and

11 opinions and whatnot are not attributable up to the

12 corporate body.

13           MS. O'CONNOR: Objection.

14     Q    That's what you're saying, right?

15           MS. O'CONNOR: Objection. You can

16 answer if you can.

17     Q    I'm just asking to understand your point.

18     A    I just -- I don't -- I don't understand the,

19 the question. Whether or not -- I, I just -- I don't

20 understand the question.

21           MS. O'CONNOR: I mean this is a

22 five-minute question almost. I mean if we could break

23 it down with more straightforward questions, I think it

24 would be helpful.

Page 93

1              MR. KEZHAYA:  Well, I mean I had to

2    define my terms so ...

3         Q    Your earlier statement was the, the people's

4    opinions.  I gather the implicit meaning was the

5    people's opinions are not the City of Boston's

6    opinions; is that accurate?

7         A    I mean they, they could be some -- sometimes.

8         Q    Well, they're not synonymous, you see.  Like

9    people --

10             MS. O'CONNOR:  Objection but you can

11   answer.  I don't know if you're trying to educate her

12   or if you're looking to get a factual response from

13   her.

14             MR. KEZHAYA:  I'm trying to get a

15   factual response from her.

16             MS. O'CONNOR:  Okay.  Let's do it.

17             MR. KEZHAYA:  But in order to get the

18   factual response, I need to start with some exposition.

19        A    Are you asking me -- are you asking me if

20   councilors attribute what their constituents feel

21   onto ...

22        Q    No.

23        A    I just -- I don't understand the question.

24        Q    Maybe I've forgotten your sentence.  Could

Page 94

1    you restart your sentence to the effect of --

2         A    You were asking me about agency and if I was

3    familiar with attribution and you went into a big

4    analogy and I just -- I don't understand the question.

5         Q    It was prompted by an earlier statement.  Do

6    you remember your earlier statement?

7                   MS. O'CONNOR:  Objection.  What earlier

8    statement?  Enlighten her, please.

9         Q    The preceding statement that you made which

10   was itself prompted by my question which is what we're

11   doing here today which is called a deposition prompted

12   me to ask you a clarifying question which I felt like

13   we were speaking two different languages so I tried to

14   speak your language by using analogy.  Are we still

15   speaking two different languages?

16        A    I believe so, yes.

17        Q    Okay.  Where did I lose you?

18        A    Your -- you were talking about agency,

19   principal and then if I was familiar with the concept

20   of attribution, and that's where you lost me.

21        Q    Okay.

22        A    So if you could just ask me a question.

23        Q    I'll just back up before that.  So backing up

24   before that, you had mentioned that people sometimes

Page 95

1    communicate things to their councilors.

2        A    Yes.

3        Q    They communicate more particularly how they

4    feel about things to their councilors.

5        A    Yes.

6        Q    Okay.  My question posed to you was whether

7    councilors receive those feelings communicated in the

8    course of doing their job?

9                MS. O'CONNOR:  Objection.  You can

10   answer.

11       A    Yes, if -- you know, they, they may receive

12   it by a phone message.  They may talk to the individual

13   themselves.  They may receive an email.  They may

14   receive a letter.  So, yes, they do receive.

15       Q    Okay.  And --

16       A    The messages.

17       Q    And not only do they receive messages but

18   do you -- would the City of Boston suggest that the

19   councilors will hear a policy request or something like

20   that, for example, legislative matter, and will, you

21   know, vote on it based on the way that they think their

22   constituents would feel about that matter?

23                MS. O'CONNOR:  Objection.  She can't

24   answer that question.

```
 1                  MR. KEZHAYA:  She's the City of Boston.
 2                  MS. O'CONNOR:  On the topics for which
 3    she has been designated.  She has not been designated
 4    to talk about how the councilors may vote in a
 5    particular situation, so she can't answer that
 6    question.  What's your next question?
 7                  MR. KEZHAYA:  Well, that was -- the
 8    question posed wasn't pertaining to any of these
 9    particular topics.  One of the particular topics was
10    scope of agency for the City which led to --
11                  MS. O'CONNOR:  Her scope of agency for
12    the City.
13                  MR. KEZHAYA:  Their, actually.
14                  MS. O'CONNOR:  Her is what you're actual
15    deposition notice says.
16                  MR. KEZHAYA:  I'm reading it right now.
17    The scope of their agency for the City, page 2,
18    paragraph 1, clause 2.
19                  MS. O'CONNOR:  Because you haven't
20    identified the deponent.  The their, if we want to get
21    into it, I think is referring to the deponent in
22    paragraph 1.
23                  MR. KEZHAYA:  Nicole, this is why I
24    don't like semantics games.
```

Page 97

1      A    I agree with you.  So she can't answer

2    questions about what the councilors were feeling or if

3    they would have voted in a certain way.  She can't

4    possibly answer that.  That's not what she's here to --

5                    MR. KEZHAYA:  Why can't she possibly

6    answer that?

7                    MS. O'CONNOR:  Because she's not the

8    councilor.  She doesn't know how they would vote.

9                    MR. KEZHAYA:  Well, as we already

10   addressed, she's representing the City which is

11   analogous to TST.  So if we go down two levels --

12                   MS. O'CONNOR:  I lost -- you lose me on

13   that analogy too.  So she can't answer that question.

14   If you have a next question, if you want to file a

15   motion about it, please -- please do so but ...

16                   MR. KEZHAYA:  I'm, I'm confused, Nicole.

17   Are you really suggesting to me that the City is not a

18   legal entity?

19                   MS. O'CONNOR:  No.

20                   MR. KEZHAYA:  You're not suggesting

21   that?

22                   MS. O'CONNOR:  I'm not suggesting that

23   at all.  I'm suggesting that --

24                   MR. KEZHAYA:  Okay.  Well, then let's --

Page 98

1          MS. O'CONNOR:  Let me finish, please.

2    Christine is here to answer questions for which she has

3    been designated on the 30(b)(6) topics.

4          MR. KEZHAYA:  Correct.

5          MS. O'CONNOR:  She has not been

6    designated to talk about whether a councilor adopts the

7    opinions of its voters when it's making its decision in

8    terms of passing legislation or voting in a particular

9    way.  That's what she's not here to testify about.

10          MR. KEZHAYA:  Okay.  I proffer that that

11   is true.  Does the City deny my proffer?

12          MS. O'CONNOR:  I, I don't understand

13   what you mean when you say -- what, what proffer?

14          MR. KEZHAYA:  I posit a point which I

15   suppose is deducible using Boston's statements against

16   it.  Said proffer is as follows:  The City of Boston is

17   a legal entity which is also a principal.  Its agents

18   are the City Councilors.  And as we have already

19   addressed in the course of this discussion, as

20   councilors they are agents who do things for their

21   principal which is to say the body public.

22          MS. O'CONNOR:  Sure, as a general matter

23   I'm sure that that is true.

24          MR. KEZHAYA:  Okay.  So we agree there.

Page 99

1   Next layer down --

2                   MS. O'CONNOR:  We're not doing this.

3   Ask your question.

4                   MR. KEZHAYA:  Well, I'm trying to ask my

5   question.

6                   MS. O'CONNOR:  I don't have to

7   explain --

8                   MR. KEZHAYA:  You're telling her to stop

9   answering my questions.  That's why I'm getting

10  frustrated very quickly here.

11                  MS. O'CONNOR:  And you can be

12  frustrated.  But I'm frustrated that you're asking her

13  to answer things -- and I've given some leeway here

14  because I think it's helpful in terms of the background

15  of the council, but she's not testifying about

16  subjective opinions, thoughts, the way the councilors

17  think.

18                  MR. KEZHAYA:  Okay.

19                  MS. O'CONNOR:  So your question

20  necessarily asks her to know what the councilors are

21  thinking when they're taking a particular action.

22                  MR. KEZHAYA:  I believe I have found an

23  impasse.  I propose that the impasse is as follows:  I

24  want to know what is going on in the minds of the

Page 100

1    specific councilors who are not voting TST's -- or not

2    voting, rather, they are extending an invitation to TST

3    proper.  I am wanting that information.  You are

4    telling me she does not have that information for me.

5                    MS. O'CONNOR:  Absolutely.  And as I

6    expressed --

7                    MR. KEZHAYA:  No.  No.  That's

8    sufficient.

9                    MS. O'CONNOR:  No.  No.  You don't get

10   to shut me off like that.

11                   MR. KEZHAYA:  Well, okay.

12                   MS. O'CONNOR:  So as I explained in my

13   email to you, we are not designating individuals and

14   certainly not Christine.  Christine has not been

15   designated to testify about the subjective intent of

16   the councilors.  We did offer chiefs of staff for some

17   of the councilors.

18                   MR. KEZHAYA:  Ah.

19                   MS. O'CONNOR:  But she is not here to

20   testify about that.

21                   MR. KEZHAYA:  That's, that's where the

22   confusion is.  I did not read your email.

23                   MS. O'CONNOR:  You should have.

24                   MR. KEZHAYA:  I received the email.  I

Page 101

```
1    know, but I get a lot of emails.
2                    MS. O'CONNOR:  Okay.  Well, that would
3    avoid a lot of confusion then.
4                    MR. KEZHAYA:  Perhaps but here we are.
5    So I want that information.  Who will give me that
6    information?
7                    MS. O'CONNOR:  Not Christine O'Donnell.
8                    MR. KEZHAYA:  Great.  Who will give me
9    that information?
10                   MS. O'CONNOR:  The people that I
11   identified in the email.
12                   MR. KEZHAYA:  I see.  Where are they?
13                   MS. O'CONNOR:  And I told you that they
14   would be here on the dates that we identified.  We put
15   certain dates on hold in September, and we articulated
16   to you that they would be present on those dates in
17   September.
18                   MR. KEZHAYA:  Yeah, but I don't remember
19   that conversation.  We don't have it in writing so --
20                   MS. O'CONNOR:  We do have it in writing.
21   I emailed it to you.
22                   MR. KEZHAYA:  No, you emailed me your
23   position.  I did not accept or deny your position.  I
24   did not read it.
```

Page 102

1                MS. O'CONNOR:  Okay.

2                MR. KEZHAYA:  So you communicated

3    something to me which I did not accept or reject.  My

4    position was that when I issue a notice to the City of

5    Boston certain things that I want to know that pursuant

6    to Rule 30(b)(6), to which we have previously addressed

7    I'm entitled to know this information, they were going

8    to send me someone who does, in fact, know that

9    information.  So I see that this is an impasse.  Do you

10   agree that this is an impasse?

11               MS. O'CONNOR:  I agree this is an

12   impasse.

13               MR. KEZHAYA:  Okay.  And do you also

14   agree that you're instructing the witness not to answer

15   to the specific items relating to subjective

16   motivations of the particular people who do not extend

17   the invitations to the congregants which is the subject

18   matter of this dispute?

19               MS. O'CONNOR:  Yes.

20               MR. KEZHAYA:  Okay.  Okay.

21               MS. O'CONNOR:  So as I explained in the

22   email, I would not be producing Christine O'Donnell to

23   answer those questions.  We identified a couple of

24   individuals who would testify on behalf of certain

Page 103

1    councilors.

2                    MR. KEZHAYA:  Okay.

3                    MS. O'CONNOR:  And we suggested that if

4    you disagree with our premise, go ahead and file a

5    motion, but we have -- you have been on notice of the

6    City's position about that at least a month prior to

7    this deposition.

8                    MR. KEZHAYA:  Yeah, but before that I

9    sent a Notice of Deposition that says let it be known

10   that pursuant to Rule 26 and 30(b)(6), Federal Rules of

11   Civil Procedure, I will deposing the City of Boston

12   through anyone who consent to testify on its behalf

13   concerning the matters set forth below.  Said

14   deposition taking place here now.  She is here now.

15                   MS. O'CONNOR:  Correct, but she wasn't

16   designated on those topics.

17                   MR. KEZHAYA:  Oh, you didn't designate

18   her?

19                   MS. O'CONNOR:  Correct.

20                   MR. KEZHAYA:  I see.  Why didn't you

21   designate her?

22                   MS. O'CONNOR:  Because she's not

23   knowledgeable about those topics and we designated

24   other individuals.

Page 104

1              MR. KEZHAYA:  I see.  When will they get

2    here?

3              MS. O'CONNOR:  I gave you the dates in

4    the email.

5              MR. KEZHAYA:  I understand you suggested

6    dates in the email, but the deposition is here and now.

7              MS. O'CONNOR:  So I don't know how they

8    do things in Arkansas, but typically if you -- those

9    dates don't work for you, we're happy to coordinate

10   dates.  A 30(b)(6) depo can oftentimes take more than

11   one day.

12             MR. KEZHAYA:  Mmm.

13             MS. O'CONNOR:  So if you had a different

14   position, I think the time to volunteer it would have

15   been in response to my email over a month ago.

16             MR. KEZHAYA:  Perhaps.  But I would

17   proffer that Rule 26 provides for protective orders

18   which you guys did not move for one.  So I issued my

19   notice, and I expect that something will be filed with

20   the court if there's something wrong with my notice.

21             MS. O'CONNOR:  Okay.

22             MR. KEZHAYA:  And nothing was filed with

23   the court.

24             MS. O'CONNOR:  We did not file anything

Page 105

1   with the court.

2                   MR. KEZHAYA:  And we are here in the

3   deposition.

4                   MS. O'CONNOR:  You are correct.

5                   MR. KEZHAYA:  And one of the matters in

6   the deposition notice is something that you're telling

7   this witness not to give me.

8                   MS. O'CONNOR:  Because she's not

9   designated on that topic, that's correct.

10                  MR. KEZHAYA:  I don't care that she's

11  not to give me the information --

12                  MS. O'CONNOR:  Okay.  So how do you

13  suggest we move forward and resolve the issue?

14                  MR. KEZHAYA:  Could they be here

15  tomorrow?

16                  MS. O'CONNOR:  No.

17                  MR. KEZHAYA:  When can they -- Okay.  So

18  you want me to fly from Minneapolis to Boston twice

19  because you don't want her to tell me the information?

20                  MS. O'CONNOR:  She doesn't have the

21  information that you want.  So this is very standard

22  practice.

23                  MR. KEZHAYA:  I understand it's

24  standard, but I don't care what's standard.  I care

Page 106

1    what the rules say.

2                    MS. O'CONNOR:   Okay.

3                    MR. KEZHAYA:   I'm following the rules.

4                    MS. O'CONNOR:   So if we were in a

5    disagreement about what would be happening here, I

6    tried to put you on notice of what the City's position

7    was.

8                    MR. KEZHAYA:   Okay.

9                    MS. O'CONNOR:   So as to avoid these

10   potential issues so that you're not booking flights

11   unnecessarily.   If you had a differing view, it would

12   have been helpful at that time.   But there is no one

13   here to testify on those topics today because as I told

14   you in the email, those dates were on hold for dates in

15   September.   And I think Rob can also attest to the fact

16   that we talked about this on our phone call, and I said

17   we're going to need to put some holds on dates in

18   September.

19                   MR. KEZHAYA:   Yeah.   Yeah.

20                   MS. O'CONNOR:   And we agreed on dates in

21   September, and I think they're September 12th, 13th,

22   and 14th.

23                   MR. KEZHAYA:   Yeah, that would be the,

24   the subject of disagreement here because we held those

Page 107

1    dates.  I blocked them down as necessary in the event

2    we needed to get there.  But the deposition's here and

3    now.

4                    MS. O'CONNOR:  Okay.  So we just

5    fundamentally disagree then so how do you propose that

6    we resolve it?

7                    MR. KEZHAYA:  Table it and move on.

8                    MS. O'CONNOR:  Great.

9    BY MR. KEZHAYA:

10        Q    All right.  So you mentioned earlier that

11   sometimes members of the public body will make known

12   their opinions to their counselors, correct?

13        A    Members of the public will, yes.

14        Q    Yeah.  Sorry.  When I say public body, I mean

15   literally members of the public --

16        A    Okay.

17        Q    -- who are not part of the organization, --

18        A    Okay.

19        Q    -- that is, the corporation or whatever you

20   call it.

21        A    In my, in my work, just for clarification,

22   when you say public body, I think of the City Council

23   because that's ...

24        Q    You know what, you're right.  I am misusing

Page 108

1    that.

2         A     No, it's ...

3         Q     Public body is actually the organization.

4    The public is the not body.  So members of the public

5    will communicate to the public body their desires

6    pursuant to designated person?

7         A     Yes.

8         Q     Okay.  And some of those opinions were we

9    don't want TST to give a prayer?

10        A     I reviewed some emails where the public sent

11   to their councilors.  I can't recall which ones in

12   particular, but I did see emails where members of the

13   public expressed that view to their councilor.

14        Q     Okay.  Do you have any specific instances in

15   mind?

16        A     I, I can't recall.  I just -- I remember

17   seeing some emails.

18              MR. KEZHAYA:  You know, we've been going

19   on for a decent amount of time now.  I'm parched.  Does

20   anyone else want a break?  Because I also have to like

21   get some emails together and do some exhibit stuff.

22              MS. O'CONNOR:  Sure, we can take a

23   break.

24              THE VIDEOGRAPHER:  Okay.  The time is

Page 109

1    11:13.  We're going off the record.

2                    (Break was taken.)

3                    THE VIDEOGRAPHER:  Okay.  We are back on

4    the record.  The time is 11:37.

5    BY MR. KEZHAYA:

6         Q    Great.  Okay.  You mentioned earlier that we

7    have invocations at these meetings.  Do you remember

8    that?

9         A    Yes.  Yes.

10                   MR. KEZHAYA:  Oops.  Sorry.  I don't

11   have my mic on.  Do I need to retake?

12                   THE VIDEOGRAPHER:  No, we're good.

13                   MR. KEZHAYA:  Okay.  Great.

14        Q    So meetings happen.  It's meetings of the

15   public body.  The public body has these meetings for

16   the purpose of voting on things.  And is it fair to say

17   that the public body starts its meetings with an

18   invocation?

19        A    Yes.

20        Q    Okay.  Tell me about these invocations.

21        A    So like I said, the councilors invite someone

22   to give the invocation and at the beginning of --

23   before the meeting starts, at the beginning an

24   invocation is given.

Page 110

1      Q     Okay.  Describe the invocations that are

2    typically given.

3      A     So generally they're relatively short.  Some

4    have been a few minutes, but generally they're

5    relatively short.  And whoever is giving it -- let me

6    backtrack a little bit.  The councilor that extends the

7    invitation introduces the individual prior to the in --

8    prior to the individual giving the invocation.

9      Q     Can I, can I pause you there?

10     A     Sure.

11     Q     What does a typical introduction look like?

12     A     The councilor says, oh, I'm here with

13   so-and-so.  So-and-so is from wherever.  I know

14   so-and-so personally.  We've been friends.  Or I know

15   so-and-so because they do work in my district or

16   they've done -- you know, my constituents are familiar

17   with them.  Things of that nature.

18     Q     Okay.  And to recap, this is happening at a

19   public proceeding, correct?

20     A     Yes.

21     Q     Okay.

22     A     They're re -- they're recorded.

23     Q     Yeah.  And they're on YouTube we talked

24   about?

Page 111

1      A    Yes.

2      Q    I happen to have a YouTube ready to go for an

3   example invocation introduction.  Let's watch it

4   together.  This is for benefit --

5                  MR. KEZHAYA:  Do -- does it have the

6   caption in the official court record?  Meaning like

7   does it say when this meeting takes place or do I need

8   to identify that benefit of the record?

9                  THE VIDEOGRAPHER:  You'd have to ask

10   her.

11                  THE WITNESS:  It says it up there I

12   believe.

13                  MR. KEZHAYA:  Well, let's just, let's

14   just make it easy.  This is August 18, 2021 which

15   obviously is after the Complaint.  If we could press

16   play, please.

17                  (Video playing.)

18                  MR. KEZHAYA:  Let's pause here.

19      Q    We are presently watching a video with some

20   guy in a suit with red hair talking.  He appears to be

21   at the hem -- head of the proceeding.  Who is this guy?

22      A    That is former councilor Matt O'Malley.  He

23   was the Council president pro tempore at the time of

24   that meeting, which means because the Council president

Page 112

1    before him was serving as acting mayor at the time.   So

2    when the Council president becomes acting mayor, the

3    title that we give Councilor O'Malley was vice

4    president of the Council, but when he's acting as the

5    president, the title is Council President pro tempore.

6         Q    Latin for literally just temporary?

7         A    Yes.

8         Q    Okay.  So this person is actually

9    administering the proceedings.  He's not just some guy;

10   he's officiating the proceedings?

11        A    I wouldn't use the term "officiating".

12        Q    Oh, I'm sorry.

13        A    But he's acting as the chair.

14        Q    Yes.

15        A    Council president.  And he also is the

16   District 6 City Councilor.

17        Q    Sorry.  That's a --

18        A    At the time.

19        Q    That's a -- that's a translation error.  So

20   officiate, what you just said to me is the word

21   "officiate".

22        A    Okay.

23        Q    Literally just to administer a matter.

24             MR. KEZHAYA:  So this person is

Page 113

1    officiating.  He's about to introduce someone

2    presumably.  Let's -- let's proceed.

3                         (Video playing.)

4                    MR. KEZHAYA:  Okay.  Let's pause here.

5         Q    This is now Mayor Wu, correct?

6         A    Correct.

7         Q    And as we see on the subtitles, pro --

8    temporary officiant says she invited this person.  She

9    decided, in fact, to invite, as, as I recall what he

10   said.

11        A    Yes.

12        Q    Is that consistent with your recollection?

13        A    Yes.

14        Q    Okay.  Is this phase so far pretty much the

15   norm?

16        A    Yes.

17        Q    Okay.  Let's continue.

18                       (Video playing.)

19                   MR. KEZHAYA:  Pause here.

20        Q    Is it normal for an introduction to involve

21   some kind of an endorsement of the person who's being

22   introduced, humbled and honored?

23                   MS. O'CONNOR:  Objection.  You can

24   answer.

Page 114

1      A    I've, I've heard it said in the past.

2      Q    I mean --

3      A    I don't know if I'd consider that an

4  endorsement.  I mean obviously if the councilor is

5  extending an invite to somebody, they know the

6  person --

7      Q    Yeah.

8      A    -- through various work and things like that.

9      Q    Yeah.

10      A    So I would think that that's common speak in

11  the interest of politeness.

12      Q    Okay.  And common, though, this is pursuant

13  to the custom?

14      A    I -- well, maybe I should -- I've heard it

15  said before.  I, I can't approximate how many times,

16  but I've heard similar language.

17      Q    Okay.  And --

18      A    I'm pleased, I'm pleased to have with us,

19  things like that.

20      Q    Okay.  And when you said you've heard it

21  said -- how many of these meetings have you seen

22  personally?

23      A    Oh, well, I've been --

24      Q    A lot?

Page 115

```
1        A    -- there 11 years and they're on Wednesdays.
2   We have give or take about 25 to 30 a year so -- and
3   I've attended most of them unless I'm on vacation or
4   things like that so I -- because of my, my job.
5        Q    Okay.  So if I, if I understood you
6   correctly, you've been there 11 years.  There's on the
7   order of 25 to 30 per year.  Whatever that math works
8   out to is give or take probably about as many as you've
9   seen?
10       A    Yes.
11       Q    How often can you recall them not including
12  some kind of pleased to introduce, I'm humbled and
13  honored, some kind of a, you know, like a welcoming
14  introduction?
15       A    I mean I don't know if I can say an exact
16  amount generally because the councilor brings the
17  person up.  They say I'm inviting so-and-so up.  So I
18  don't how else --
19       Q    That's okay.
20       A    -- they would bring a person up.
21       Q    Is it fair to say that it's the City of
22  Boston's perspective that obviously they're inviting
23  this person; they literally invited them?
24       A    Yes.
```

Page 116

1      Q    Okay.  All right.  Let's continue.

2                 (Video playing.)

3                 MR. KEZHAYA:  Pause here.

4      Q    The banner is covering it or maybe the

5   subtitles are, but I seem to remember -- well,

6   actually, I deduce from the way that she's looking, she

7   appears to be looking down as if at her phone.  Is it

8   normal for the -- who would normally write this

9   introductory speech or whatever it is that you want to

10  call it?

11     A    It depends on offices.  Some councilors write

12  their own notes.  Some have a staffer do it and make

13  edits.

14     Q    Okay.

15     A    So it would, it would depend on how Councilor

16  Wu at the time structured her office.

17     Q    Okay.  This was in August of 2021.  I

18  designated this deposition in June of 2022.  So this is

19  on the order of like ten months beforehand.  Did you

20  talk with any of Mayor Wu's staff at any point?

21     A    Are you asking if I talked about this

22  particular meeting or --

23     Q    No, just generally --

24     A    I --

Page 117

1      Q     Generally.  I'm trying to understand her

2   general way of doing things.

3      A     I talk to her staff all the time.

4      Q     Well, remember earlier we talked about you

5   performed some kind of an investigation in preparation

6   for today's meeting.  I'm inquiring into whether that

7   deposition(verbatim) included determining whether she

8   normally reads off her own notes or she normally reads

9   off someone else's given speech?

10     A     I have -- did not talk to her staff about

11  that.

12     Q     Okay.  That's fine.

13              MR. KEZHAYA:  Well, hold on now.  Let

14  me -- let me note that.  Did not talk to staff.  Wu

15  staff.  Let's proceed.

16                   (Video playing.)

17              MR. KEZHAYA:  Pause here.

18     Q     She specified a university in Boston neither

19  of which I'm familiar with.  Are these fancy degrees?

20  Is this, is this something that I'm suppose to be

21  impressed by?

22              MS. O'CONNOR:  Objection.

23     Q     In your opinion.

24              MS. O'CONNOR:  I don't know.  Are you?

Page 118

1           You can answer, if you can, Christine.

2      A    I mean I don't know.  I, I imagine some

3   people are impressed by advanced degrees.

4      Q    Well, I'm asking if these are fancy

5   institutions?

6               MS. O'CONNOR:  Objection.  You can

7   answer.

8      Q    In your opinion.

9      A    I don't know.  Perhaps.

10      Q    Have you heard of these -- have you heard of

11   these institutions?

12      A    I have, yes.

13      Q    Okay.  When did you first hear of these

14   institutions?

15      A    I can't recall.

16      Q    When did you most recently hear of these

17   institutions other than this?

18      A    Well, I mean this was -- like I said, you

19   know, we -- we're busy in the City of Boston.  So I

20   can't remember if I first heard of them then.  This was

21   in 2021.  Now I'm, I'm recalling it so ...

22      Q    Well, I -- yeah, I don't care about this.

23   I'm asking something different.

24      A    I don't, I don't -- I can't recall when I

Page 119

1    first heard of the institutions.

2         Q    I more accurately asked you when most

3    recently short of hearing it on here.

4         A    I cannot recall.

5         Q    So it's something that without a particular

6    event, you just know what these things are, these

7    institutions that she's describing, correct?

8         A    Yes.

9         Q    Famous would be a word that I would use to

10   describe something that I don't need to specifically

11   recall.  I just know what it is.  Would you describe

12   these institutions as famous?

13        A    No.

14        Q    No?  Okay.

15             What is your definition of famous?

16        A    I normally don't think of it, but something

17   that is widely known.  But again, famous can be

18   subjective based on an individual's interest.

19        Q    Okay.  So you're, you're eliminating the

20   subjectivity from the matter.  How would you describe

21   these institutions that she is designating?

22        A    I don't know how I would describe them.

23        Q    You have no way of knowing how you would

24   describe these institutions that you have no need to

Page 120

1    specifically recall.  You just know what it is?

2        A    I guess higher, higher --

3              MS. O'CONNOR:  Objection.  You can

4    answer.

5        A    Higher educational institutions.

6        Q    Okay.

7              MR. KEZHAYA:  Please continue.

8                (Video playing.)

9              MR. KEZHAYA:  Pause here.

10       Q    I take note in the subtitles that she's

11   referring to this church as a dynamic church.  She's

12   characterizing the church in the course of this speech.

13   Do you take note of this?

14       A    Yes, I see that.

15       Q    Okay.

16              MR. KEZHAYA:  Please continue.

17                (Video playing.)

18              MR. KEZHAYA:  Pause there.

19       Q    In your, in your experience how frequently do

20   the inviting councilors vouch for the credibility or

21   integrity of the people whom they invite?

22       A    Often because, like I said, it's by

23   invitation, and the councilors have a personal

24   relationship with the individual or are familiar with

Page 121

1    them because of work in their district.

2         Q    Okay.  Vouch has a very particular meaning to

3    me, and I don't want to color your understanding of the

4    word.  How do you define the meaning of the word

5    "vouch"?

6         A    That you're -- that you're standing -- not

7    standing.  That you're attesting to somebody.

8         Q    Okay.  So she is -- well when you say

9    attesting, to me that means just in court.  So maybe

10   that's not -- maybe that word's not carrying over.

11   What do you mean by attesting to someone's character?

12        A    That you know the person.

13        Q    Well, she's describing the person's character

14   and --

15        A    Well, my definition of vouch is that I know

16   somebody.

17        Q    Okay.  All right.  And so as City of Boston's

18   representative, this is your City employee currently

19   vouching for the integrity of a particular clergy

20   member.  How do you respond to the charge that that is

21   a governmental endorsement of a particular religion?

22             MS. O'CONNOR:  Objection.  She's not

23   answering that question.

24        Q    Admit or deny?

Page 122

1                MS. O'CONNOR:  It's not within the scope

2      of the 30(b)(6) deposition topics for which she has

3      been identified.

4         Q     Admit or deny?

5                MS. O'CONNOR:  No, she's not answering

6      the question.

7                MR. KEZHAYA:  Oh, I'm sorry.  You're

8      telling this witness that whether the government

9      endorsed this particular religious belief is outside

10     the scope of this 30(b)(6) examination, correct?

11               MS. O'CONNOR:  Correct.

12               MR. KEZHAYA:  Okay.  And once again, you

13     don't assert any privilege ground for this, correct?

14               MS. O'CONNOR:  Correct.

15               MR. KEZHAYA:  Let's continue.

16                    (Video playing.)

17               MR. KEZHAYA:  Pause here.

18        Q     Is it common for the councilors in these

19     kinds of introductory speeches to make mention that not

20     only is this person that you're about to hear from a

21     religious leader, but they also are a leader in the

22     public as well?

23        A     Yes, that is common.

24        Q     Okay.

```
                                              Page 123

 1                    MR. KEZHAYA:  Please continue.

 2                        (Video playing.)

 3                    MR. KEZHAYA:  Pause here.

 4        Q     Have you heard of this BMA, Black ... I don't

 5   remember the rest of it, but basically whatever this

 6   alliance organization is, is that a public body or is

 7   that some nonpublic charity?

 8        A     I am not sure.  I don't believe it's a public

 9   body, according to my definition.

10        Q     Okay.  Yeah, well, literally is it part of

11   the City is what I'm trying to ask.

12        A     No.

13        Q     Like a City organization.

14        A     No.

15        Q     Okay.  Cool.

16              So I didn't hear anything that appeared to be

17   abnormal relative to the norm in this example

18   introductory speech.  Do you agree with me that that

19   was a relatively normal speech?

20        A     Yes.

21        Q     Was there anything about that which sets you

22   off as that -- that's abnormal?

23        A     That it's what?

24        Q     Abnormal?
```

Page 124

1      A    No.

2      Q    You said it's relatively normal.  I just want

3  to, you know, back in it from the other end.  It's --

4  you know, this is a, this is a normal intro, --

5      A    Yes.

6      Q    -- in other words?

7      A    Yes.

8      Q    Okay.  Cool.

9           All right.  Now, let's watch -- we've seen

10  the introduction.  Now let's see how these things

11  normally go.

12                 MR. KEZHAYA:  Resume.

13                    (Video playing.)

14                 MR. KEZHAYA:  Pause here.

15      Q    How often, how often does this begin with

16  some kind of pre-blessing blessing?

17      A    So I can't state a specific time.  Like I've

18  said, I've gone to numerous of these.  They're all

19  recorded.  They're all online.

20      Q    Mm-hmm.

21      A    So it just depends.

22      Q    Did you watch any other invocations than what

23  we're watching right now?

24      A    Yes.  As I said, I've attended pretty much

Page 125

1    every single meeting since I started in 2011.

2        Q    I asked a poor question.  I apologize.  I

3    meant, more particularly, did you watch any of these

4    pursuant to your investigation for this particular

5    purpose?

6        A    No.

7        Q    Okay.

8             MR. KEZHAYA:  Please continue.

9                  (Video playing.)

10            MR. KEZHAYA:  Pause here.

11       Q    She mentions that she's been here earlier

12   this year which means since this Complaint this person

13   that we're looking at has been here at least two times.

14   Do you agree with this?

15       A    Yes.  And if I could just -- I didn't watch

16   any videos, but I reviewed the minutes --

17       Q    Mm-hmm.

18       A    -- which list the clergy.  And, yes, there

19   are some individuals that have come more than once.

20       Q    I see.  So she's a -- how often is it that

21   people are invited more than once in any given year?

22       A    I don't know an exact amount.  But there has

23   been times.  In my research there may be -- you know,

24   probably, probably under, under ten people have done it

Page 126

1    more than once.  But there are people that have come

2    more than once.  And reasons for that is there's 13

3    members of the council.  There's four at-large members.

4    So four members are city-wide, and there may be times

5    where a citywide councilor and a district councilor

6    have overlap so that ...

7         Q    That could be?

8         A    Yes.

9         Q    But you didn't actually talk to Wu's people.

10   So you have no idea whether or not that's actually the

11   case, correct?

12        A    I didn't talk to Wu's people about who wrote

13   her notes.

14        Q    Oh, I'm sorry.  Did you talk to Wu's people

15   about this particular invocation and why this

16   particular person was invited more than once?

17        A    No.

18        Q    I didn't think so.

19             Let's -- you said that there were ten people

20   over the course of your research that have been invited

21   more than once.

22        A    I said approximately.  I was trying to --

23        Q    Thereabouts.

24        A    -- give a number based upon my review of the

Page 127

1    minutes, and I -- I did notice that some people have

2    come more than once.

3        Q    Do you have a list of -- like have you taken

4    notes?  Did you literally write down the number of

5    people or the identities of said people who have come

6    more than once?

7        A    I didn't write them down.  I did take some

8    notes, but I didn't write every single one down.  But I

9    did notice that there were some people that gave an

10   invocation more than once.  I don't know if it was a

11   particular year where it was more than once or if it

12   was over my course of review --

13       Q    Yeah.

14       A    -- that they've come more than once

15   throughout my 11 years of being there.

16       Q    Okay.  You mentioned you took notes.  Did you

17   take the notes for the purpose of preparing for this

18   deposition?

19       A    I did, yes.

20       Q    Can I have those notes?

21            MS. O'CONNOR:  Objection.  I'll think

22   about that.

23            MR. KEZHAYA:  Well, you're objecting to

24   it, and you're saying you'll think about it.  I'm not

Page 128

1    sure which it is.

2                    MS. O'CONNOR:  Well, I'll think about

3    whether we'll produce them.

4                    MR. KEZHAYA:  Okay.

5         Q    When did you create these notes?

6         A    Over the course of the last couple weeks.

7         Q    Okay.  How -- what form are those notes in?

8         A    They're handwritten because they're my

9    personal notes.

10        Q    Handwritten.

11             Well, they're not really your personal notes.

12   They're pursuant to the requirements of your job,

13   correct?

14        A    (Nodded.)

15        Q    Okay.  So they're handwritten notes made

16   because --

17        A    Well, actually, it's not the requirement of

18   my job.  I was taking them in preparation for this

19   deposition.

20        Q    Yeah, but you're here for the purpose of

21   deposition, right?

22        A    Yes.

23        Q    Who told you that you have to be the person

24   who's doing this?

Page 129

1        A       I was designated as the person on City

2   Council central staff that can speak to the policies of

3   how the invocation is given.

4        Q       Okay.  So you're talking about central staff.

5   What is central staff?

6        A       Central staff is where I work.  We work --

7   there's ten of us about that work for all 13

8   councilors.

9        Q       Okay.  So it's just like a, like a cen --

10  literally central staff?

11       A       Yes.  Yes.

12       Q       Other than you who are the kinds of people

13  are on this central staff?

14       A       We have a technology person; we have a budget

15  person; and we have legislative aides.

16       Q       Do you have --

17       A       That --

18       Q       Oh, sorry.  Please continue.

19       A       That -- they help with committee hearings and

20  things like that.

21       Q       Do legislative aides have any notes or

22  anything to the effect of -- basically is there

23  anything relevant to this dispute within central

24  staff's --

1        A     No.

2        Q     -- records?

3        A     No.

4        Q     Okay.  You guys did a comprehensive sweep of

5   everything, then I have everything of relevance?

6        A     Yes.

7        Q     Other than your notes?

8        A     Yes.

9        Q     Okay.  So you made this -- so some -- you

10  were designated you emphasize or, rather, I emphasize.

11  You were, passive tense, designated.  Who designated

12  you?

13       A     Well, for certain subject matters I was

14  designated.

15       Q     I understand that.  I -- it's been made

16  abundantly clear that for certain matters you were

17  designated.  I'm asking you who designated you.  Who

18  made the decision to designate you?

19       A     When I met with counsel and I explained what

20  I did, it was agreed by the president of the City

21  Council and in discussions with our counsel that I

22  would be the one designated for these topics.

23       Q     I honestly don't know what you're saying.

24  I'm asking who's the person who told you that you have

Page 131

1    to do this?  Did you volunteer or were you directed to

2    do it?

3        A    I mean I, I volunteered based on my role for

4    the City Council.

5        Q    Okay.  Okay.  So you --

6        A    And in discussions with the City's lawyers in

7    preparation for this.

8        Q    I see.  And to recap, you are an agent of the

9    City, and also, you made these notes pursuant to your

10   agency and, more importantly, pursuant to the greater

11   purpose of preparing for this here deposition, correct?

12       A    Yes.

13       Q    Okay.  And so to recap, they're handwritten

14   notes.  They were made within the past two weeks.

15   Where are these notes?

16       A    They're in my office.

17       Q    Okay.  So you --

18       A    And they're not complete, by the way.  I just

19   review -- I was going through past minutes from years

20   2011 to 2015 --

21       Q    Yeah.

22       A    -- just to refresh my memory.

23       Q    Yeah.  Yeah.

24       A    So they're not complete.  They're very -- you

Page 132

1    know, just to -- so I would have a track in my memory.

2    So they're not complete.

3        Q    Well, if I have -- I mean if you're anything

4    like me, your notes are nothing more than chicken

5    scratch anyway.

6        A    (Gestured.)

7        Q    I mean I'm just saying that that's what my

8    notes are.  I'm not suggesting that yours are.  I'm

9    just saying that those are mine.

10       A    Yeah, probably.  Yeah.

11       Q    So two weeks, handwritten notes.

12            You are the custodian?

13       A    Yes.

14       Q    Okay.  I'm notifying you now.  Please don't

15   shred those.  Please don't --

16       A    Sure.

17       Q    -- lose those.  I will be seeking those

18   pursuant to the rules of discovery.

19            Okay.  So we're turning back to central

20   staff.  There's on the order of ten people.  No, we

21   don't need -- we're done with that.

22                 MR. KEZHAYA:  Okay.  Let's continue.

23                      (Video playing.)

24                 MR. KEZHAYA:  Pause here.

Page 133

1       Q    She is directing this blessing to the people

2   who vote on public matters, correct?

3       A    She's -- you're asking if she's addressing it

4   to them?

5       Q    She's literally blessing those people.  The

6   body public which is being met, she is literally

7   blessing the proceedings.  You understand this, right?

8       A    I don't know if I'd --

9                 MS. O'CONNOR:  Objection.  But you can

10  answer.

11      A    I don't know if I'd classify it as that.

12  I --

13      Q    She's --

14      A    I --

15      Q    -- said let us pray like three times in the

16  past, I don't know, minute or so that she's been

17  talking.  You would not characterize let us pray as a

18  blessing?

19      A    No.

20      Q    How would you describe it?

21      A    I look at it, it's, it's a time to -- before

22  the proceedings for government work start, it's a time

23  to recognize the seriousness of the proceedings.

24  That's how I look at it.

Page 134

1          Q     Well, sure.  Yeah, I mean we did the same

2    thing here.  This is, this is an analogous concept that

3    both, that both of our separate institutions follow.

4          A     Mm-hmm.

5          Q     I get that.  That's not the question posed.

6    The question posed is how is this not a blessing?

7          A     I don't interpret it like that.

8          Q     Would you interpret what we just did as a

9    blessing at the beginning of this thing?

10                    MS. O'CONNOR:  Objection.  You can

11    answer that question.

12          A     I, I don't.

13          Q     Okay.  How would you describe what we did

14    earlier?

15          A     I -- having a, a moment to come together

16    before a proceeding is started.

17          Q     Okay.  Having a moment before the proceeding

18    has started is how you describe a blessing?

19          A     Mm-hmm.  And this is different than what

20    you're showing on video.

21          Q     Why is it different?

22          A     What we're doing right now is different

23    than what we're -- we're in a deposition.

24          Q     Yeah.

Page 135

1    A    This is a City Council that is at their

2    regular meeting where they're voting on City matters.

3    So in my opinion that is different to me.

4    Q    Do you know why we're entitled to require you

5    guys to be here?

6              MS. O'CONNOR:   Objection.

7    Q    Question posed.

8    A    Yes.

9    Q    Why are we entitled to be here?

10   A    Be -- under the, the deposition.   The

11   30(b)(6) I believe is the cite.

12   Q    Okay.  And why do those rules require us guys

13   to come here?

14             MS. O'CONNOR:   Objection.

15   Q    Do you know?

16             MS. O'CONNOR:   Matt, she's not going to

17   answer these questions.   They have nothing to do with

18   the reason for --

19             MR. KEZHAYA:   She's a lawyer.   She knows

20   how to say that the --

21             THE WITNESS:   I'm not a litigator.   I, I

22   told you that.

23   Q    Okay.  Let's start with the basics.  Are you

24   familiar with the text of the First Amendment?

```
                                            Page 136

1                 MS. O'CONNOR:  Objection.  Matt --
2          Q    Yes or no.
3                 MS. O'CONNOR:  She's not -- no, she's
4    not answering questions about -- I've given I think
5    significant leeway about general background questions.
6    But Christine's not here to talk about her
7    understanding of the law.  It has no relation to the
8    topics for which she's been designated.
9                 MR. KEZHAYA:  Why is that not literally
10   the subject matter of this dispute?
11                MS. O'CONNOR:  She's not here to testify
12   about the subject matter of this dispute.
13                MR. KEZHAYA:  Ah.
14                MS. O'CONNOR:  She's here to testify
15   about the topics for which she has been designated.
16                MR. KEZHAYA:  That was a mistranslation.
17   It was my intended purpose that she would be discussing
18   the topics of this dispute, the subject matter of the
19   dispute.  In my opinion all of these questions go to
20   the ultimate question of fact which is did the City
21   discriminate, yes or no.  You all posit no.  We post it
22   yes.
23                I'm trying to figure out what's going on
24   in between the yes and the no so that we can see if we
```

1    can at least join minds and understand what we're

2    arguing about.  That's what I'm trying to figure out

3    here.  Your position is, no, we're not here.  We are

4    doing literally the least we can get away with under

5    the rules, correct?

6              MS. O'CONNOR:  I am following the rules.

7    I'm following the rules of what a 30(b)(6) deposition

8    is, and so I'm limiting her testimony to the topics for

9    which she has been designated.  And I appreciate that

10   you have a different understanding, but that's my

11   position on the record.

12             MR. KEZHAYA:  I understand that's your

13   on-record position.  I just want to make sure one more

14   point is abundantly clear.  You are not asserting a

15   privilege.  You're just telling her not to answer.

16   Correct?

17             MS. O'CONNOR:  Correct.

18             MR. KEZHAYA:  You, Nicole O'Connor,

19   specifically are directing this witness specifically

20   not to answer this question even though you don't have

21   a privilege argument, correct?

22             MS.O'CONNOR:  I'm object -- I'm

23   instructing her not to answer questions outside the

24   scope of her designated topics, and I think I've given

```
1   significant leeway where appropriate to be reasonable;
2   but I think we're going down avenues that are not
3   productive.
4              MR. KEZHAYA:  Well, I'm asking a yes/no
5   question because I'm trying to find a point of impasse.
6              MS. O'CONNOR:  I can only answer the
7   best I can.
8              MR. KEZHAYA:  Well, I asked you a yes/
9   no question --
10             MS. O'CONNOR:  I'm not here to answer
11  your questions.
12             MR. KEZHAYA:  Well, then that means
13  we're not at a point of impasse.
14             MS. O'CONNOR:  We -- I don't, I don't --
15  we don't -- this isn't some sort of proceeding where we
16  need to reach points of impasse.  You know my position.
17  She's not answering questions about the legalities of
18  certain things.  And if you have a next question, I
19  think now's the time to ask it.
20             MR. KEZHAYA:  I think that's -- I think
21  that's what the misunderstanding is.  I'm not asking
22  her legal opinion.  I'm literally asking her
23  definitionally.  I asked a question that used the word
24  "blessing".  She's disagreeing with me about the word
```

Page 139

1   "blessing".  This is why I try to avoid semantics

2   games.  She said no.  I don't see how it's different.

3   I'm asking her to substantiate her no.

4             MS. O'CONNOR:  And her personal opinion

5   as to whether this is a blessing or not is not within

6   the scope of the 30(b)(6).

7             MR. KEZHAYA:  Well, then I'm getting

8   confused about your understanding of a 30(b)(6) because

9   her role in your mind seems to dance whether or not you

10  want her to give me the answer.

11            MS. O'CONNOR:  It doesn't.  I'm giving

12  some leeway on -- she knows a lot about these hearings

13  having sat in them.

14            MR. KEZHAYA:  Fine.  All right.  My

15  client representative informs me to tell you that

16  O'Malley -- I wanted to have this as a surprise for

17  trial, but since I'm having to spoil the surprise

18  anyway, he literally called it a blessing, all right.

19  Do we need to rewind and go re-watch him call it a

20  blessing or can we get over this blessing impasse with

21  semantics?

22            MS. O'CONNOR:  No, she's going to answer

23  the questions how she sees fit.  She doesn't answer

24  them to reach the conclusion that you want her to

Page 140

1    reach.  She, in her opinion, said that this wasn't a

2    blessing, okay.  Her opinion not only is not relevant

3    to her 30(b)(6) topics, but her opinion is what it is.

4    So that's her answer to the question.  You are here to

5    ask questions, and she is here to give her answers.

6    Whether you like her answers or not is not the question

7    for today.

8                    MR. KEZHAYA:  I disagree.

9                    MS. O'CONNOR:  Okay.

10                   MR. KEZHAYA:  That's literally our role

11   here.  That's what a deposition is.  Let's rewind.

12   Let's watch him say blessing and then let's have you

13   say it's not a blessing.

14                   MS. O'CONNOR:  Well, you can ask her did

15   she say it's a blessing.  That's a fair question.  But

16   whether Christine feels it's a blessing is an entirely

17   different question.

18                   MR. KEZHAYA:  Christine's not talking

19   today.  The City of Boston is talking through Christine

20   today.

21                   MS. O'CONNOR:  We're at a, a

22   fundamental -- I agree with that, that she has been

23   designated on certain topics.  But whether this

24   constitutes a blessing in Christine's opinion is not a

Page 141

1    question before these 30(b)(6) topics.

2                    MR. KEZHAYA:  I see.  Okay.  So I'm

3    stuck with the 30(b)(6) matters of designation when you

4    don't want me to go outside of that, but I'm also stuck

5    outside of the 30(b)(6) matters of deposition when I'm

6    talking to Christine.  So I'm stuck with her personal

7    knowledge pursuant to her investigation.  I'm not

8    allowed to ask the things that I want to know from the

9    person who the City of Boston sent here to talk about

10   the subject matter of this case.

11                   MS. O'CONNOR:  If you had issued a

12   subpoena in her personal capacity or in her individual

13   capacity, sure, those questions would be appropriate --

14                   MR. KEZHAYA:  Ah.

15                   MS. O'CONNOR:  -- perhaps, but she

16   wasn't designated on those topics.

17                   MR. KEZHAYA:  So maybe the confusion

18   goes like this.  City of Boston, I speak to you through

19   this human who stands before me.  Let's rewatch your

20   employee call this a blessing first.

21                   Rewind ... I don't know.  Let's just go

22   back to about 5:00.  5:00-ish.  Right before Wu starts

23   talking.

24                   MS. KING:  How's this?

Page 142

1          MS. O'CONNOR:  A little bit further.
2   More like 4:30.  All right.  Take note, everyone.
3   We're at 7:00.  A little bit more.  That's fine.
4   Let's, let's just start here.
5          MS. KING:  At 4:30 or 4:07?
6          MR. KEZHAYA:  4:07 is fine.  Okay.  Let
7   us resume.
8               (Video playing.)
9          MR. KEZHAYA:  Pause.
10     Q    Did anyone else in the room take notice how
11  he emphasized the word "bless"?  I did.  Did you, City
12  of Boston, notice that your employee emphasized the
13  word "bless"?
14     A    I just heard him say that, yes.
15     Q    I see.  And, City of Boston, would you also
16  agree that this, in fact, is a blessing?
17          MS. O'CONNOR:  Objection.
18     Q    Yes or no.
19          MS. O'CONNOR:  No, her personal opinion
20  is irrelevant.
21          MR. KEZHAYA:  I'm not talking to
22  Christine.  I'm talking to the City of Boston that
23  hovers over her.
24          MS. O'CONNOR:  But she is not --

Page 143

1                    MR. KEZHAYA:  City of Boston --

2                    MS. O'CONNOR:  -- designated on those

3     topics.  And, Matt, this is not productive.  So if you

4     want to seek leave of court to perhaps put some

5     parameters on what our understanding of what this

6     deposition is.  You know my position.  I know your

7     position.  We don't have the same position.  So

8     continuing to go down this road is neither productive,

9     helpful or a productive use of anyone's time.

10                   MR. KEZHAYA:  I agree.

11                   MS. O'CONNOR:  So I've got my objection

12    on the record.

13                   MR. KEZHAYA:  Mm-hmm.

14                   MS. O'CONNOR:  If you would like to, to

15    revisit that in court, you are certainly welcome to do

16    so, but the next question, please.

17                   MR. KEZHAYA:  Thank you.

18    BY MR. KEZHAYA:

19        Q    City of Boston, is this in fact a blessing?

20                   MS. O'CONNOR:  Objection.  So if we are

21    going to continue to do this, I'm more -- I'm telling

22    you that we're going to leave.

23                   MR. KEZHAYA:  I'm confused.  I'm asking

24    a different question from my prior one that you just

Page 144

1   objected to.  Is there something that I'm

2   misunderstanding about your objection?

3            MS. O'CONNOR:  Ask your question again.

4   Let me hear it.

5   BY MR. KEZHAYA:

6      Q    City of Boston, do you bless your meetings?

7            MS. O'CONNOR:  That's a fair question.

8      Q    Yes or no.

9      A    No.

10     Q    You do not.  Okay.

11            MR. KEZHAYA:  Let us continue.  Back at

12   7:00.

13            MS. KING:  7:00?

14            MR. KEZHAYA:  Seven minutes even.  Ah,

15   6:50, 7:00 minutes.  That's fine.  Whatever, 7:00.  I'm

16   sure she's saying nothing of importance.  That's good.

17   6:49, that's good too.

18                (Video playing.)

19            MR. KEZHAYA:  Pause here.

20     Q    In the past 45 seconds I've heard her call

21   the councilors your servants, servants.  She's called

22   this a blessing, and she has requested that God

23   literally endow his servants with knowledge.  Have you

24   heard all those things or do we need to watch the last

Page 145

```
1    45 seconds?

2         A    I heard it.

3         Q    Okay.

4              MR. KEZHAYA:  Please continue.

5                   (Video playing.)

6              MR. KEZHAYA:  Pause.

7         Q    Where are we at?  8:09.  In the past call it

8    35 seconds I've heard this person with an emphatically

9    impassionate voice describe this current speech as a

10   prayer.  She has once again recited that the councilors

11   require God's wisdom and knowledge to do their basic

12   governmental tasks.  And I, I believe I, I remember

13   somewhere in here I heard the word "need".  So I just

14   want to emphasize that the word "need" is in here.

15   They need God to do their job.  Is that correct?

16             From the City of Boston's perspective is it

17   correct that the government needs God to do its job?

18             MS. O'CONNOR:  Objection.

19        Q    Yes or no.

20             MS. O'CONNOR:  She's not answering that

21   question.

22        Q    You are not answering that question?

23        A    I am not on the advice of counsel.

24        Q    Okay.  And once again, on advice of counsel
```

```
                                        Page 146
 1    you're not answering it even though there is no
 2    privilege, correct?
 3         A    Yes, correct.
 4         Q    Thank you.
 5              MS. O'CONNOR:  It's not within the scope
 6    of the 30(b)(6) topics, correct.
 7              MR. KEZHAYA:  Okay.  Continuing forward.
 8                   (Video playing.)
 9              MR. KEZHAYA:  Pause.
10         Q    Why is the government inviting someone to
11    bless the councilors' families?
12              MS. O'CONNOR:  Objection.
13         Q    It happened.  We see that it just happened.
14    Why is the government doing that?
15              MS. O'CONNOR:  Objection.  So that's
16    again not a topic that's designated on the 30(b)(6)
17    subpoena.
18              MR. KEZHAYA:  Do I really need to go
19    read through my 30(b)(6) to go find something that
20    sounds a lot like I want to inquire as to why you guys
21    have this policy?  Because I can do that.  We can do it
22    off the record too if you all don't mind.
23              MS. O'CONNOR:  Why you have the policy
24    of what?
```

Page 147

1            MR. KEZHAYA:  Having this person come up
2    here, deliver an impassioned plea to God that the
3    servants, which is to say our public employees, be
4    endowed with knowledge and wisdom that they otherwise
5    lack.  Why is that a thing?  I can look through the
6    30(b)(6) depo or you guys can answer the question,
7    which is your preference?
8            MS. O'CONNOR:  Well, why don't you
9    explain to me where you see that in the 30(b)(6)
10   deposition subpoena.
11           MR. KEZHAYA:  Let's take a break.  I
12   will go find it and highlight very many instances in
13   which I can do that.
14           MS. O'CONNOR:  Great.
15           THE VIDEOGRAPHER:  Okay.  The time is
16   12:17.  We're off the record.
17               (Break was taken.)
18           THE VIDEOGRAPHER:  Okay.  We are back on
19   the record.  The time is 12:17.
20   BY MR. KEZHAYA:
21       Q    Okay.  Taking note of the 30(b)(6) notice,
22   paragraph 3 states as follows:  A background on the
23   City's invocation policy ceremo -- or invocation
24   ceremony, including without limitation: when it first

```
                                          Page 148
1    arose - we've covered that - what legal challenges (if
2    any) it has faced over time - very interested in
3    hearing about that - how (if at all) the invocation
4    ceremony has changed over time - sounds like the
5    answer's not - how (if at all) any policies, practices,
6    or customs surrounding the ceremony has changed over
7    time.
8            Employee, what -- has it changed over time,
9    to the best of your knowledge, or has it pretty much
10   been the same?
11       A    It's been the same.
12       Q    Okay.  The bases for limiting who may
13   participate.  Why won't you invite TST?  What is your
14   basis or, plural, bases?
15               MS. O'CONNOR:  So she can't answer
16   specifically as to TNT, but she can answer in general
17   why --
18               MR. KEZHAYA:  Sorry.  To interject, it's
19   The Satanic Temple, not T-N-T, T-S-T.
20               MS. O'CONNOR:  I apologize if I
21   misspoke.
22               MR. KEZHAYA:  Thank you.  Please
23   continue.
24               MS. O'CONNOR:  She can answer as to the
```

Page 149

1   bases for why any entity is -- or why any entity is
2   limited from participating.
3                   MR. KEZHAYA:  Where in paragraph 3 which
4   states:  A bacro -- a background on the City's
5   invocation policy ceremony suggesting to you that I'm
6   asking about other people's ceremonies which is not the
7   subject matter of this dispute?
8                   MS. O'CONNOR:  To me this reads as a
9   general, you want to know the general background on the
10  City's invocation ceremony process and who is invited
11  to participate and who isn't.
12                  MR. KEZHAYA:  You said just the City.
13  Who is the City in this context?
14                  MS. O'CONNOR:  I am not asking --
15  answering your questions, Matt.  I don't --
16                  MR. KEZHAYA:  Well, then she will answer
17  my question.
18                  MS. O'CONNOR:  I don't -- I'm
19  fundamentally confused.  I'm really not trying to be
20  difficult.  I think this is all really straightforward,
21  and I would really love for her to answer the
22  questions.
23                  MR. KEZHAYA:  Okay.  Let's recap.
24                  MS. O'CONNOR:  But she can certainly

```
                                         Page 150
 1   answer how the City determines who may or may not
 2   participate in the invocation process.
 3                    MR. KEZHAYA:  I designated the bases for
 4   the City to limit who may participate in the City's
 5   invocation ceremony.  That's part of paragraph 3.
 6   You're not gonna get away with that one.  No one's
 7   getting away with that one.
 8                    MS. O'CONNOR:  No one's trying to get
 9   away with anything.
10                    MR. KEZHAYA:  Okay.
11                    MS. O'CONNOR:  I'm trying to be clear
12   about what the position is during this --
13                    MR. KEZHAYA:  Your position has been
14   made adequately clear.  Let's restate the question.
15   BY MR. KEZHAYA:
16       Q    City of Boston who brought this human here to
17   talk about this very subject matter pursuant to a
18   30(b)(6) deposition in which I stated that I want to
19   know the bases for you, City of Boston, to limit who
20   may participate.  I demand that you tell me now --
21                    MS. O'CONNOR:  So -- you --
22       Q    -- where are your bases?
23                    MS. O'CONNOR:  You -- we have to give
24   respect to the witness.  And I appreciate that you're
```

Page 151

1  very excited about this topic, but she can certainly

2  answer how invocation speakers are selected and when

3  they may or may not participate.  That's a fair

4  question that you just asked.  But I'm asking that you

5  please show some respect to the witness.  And you don't

6  need to issue demands.  She is more than happy to

7  answer your questions.

8              MR. KEZHAYA:  This is a legal demand.

9  You all are not here of your own accord.  You are here

10  because I demanded pursuant to a Complaint that you

11  come here.  You acquiesced.  You brought this one.

12  This one is to speak to the bases for limiting who may

13  participate.

14              MS. O'CONNOR:  So this --

15              MR. KEZHAYA:  That one is telling me

16  that this one will not answer.

17              MS. O'CONNOR:  Please.  This is

18  Christine O'Donnell.  I'm Nicole O'Connor.  You can

19  call me Nicole, but you can't refer to me as "this

20  one".  I'm really uncomfortable with the way that this

21  deposition is unfolding.

22              MR. KEZHAYA:  Fine.

23              MS. O'CONNOR:  I'm really trying to

24  have our witness answer your questions, but we can't do

Page 152

1   it disrespectfully.

2                    MR. KEZHAYA:  Then I need a break.

3                    MS. O'CONNOR:  Okay.  That makes sense.

4                    THE VIDEOGRAPHER:  Okay.  The time is

5   12:21.  We're off the record.

6                         (Break was taken.)

7                    THE VIDEOGRAPHER:  Okay.  We are back on

8   the record.  The time is 12:31.

9                    MR. KEZHAYA:  Okay.  Off the record I

10  apologized for my errant ways.  Once again, looking you

11  both eyes, I apologize sincerely.  Sincerely, okay?

12                   MS. O'CONNOR:  Thank you.

13                   MR. KEZHAYA:  You're welcome.

14  BY MR. KEZHAYA:

15      Q    The subject of dispute is basically I'm

16  coloring outside the lines of my 30(b)(6) notice.  So

17  that being the case, specifically with regard to "the

18  bases for limiting who may participate" which is more

19  particularly included with the term "a background on

20  the City's invocation ceremony", my question to you is

21  whether there are bases for limiting who may

22  participate, yes or no?

23      A    It's by invitation.  So the limit would be if

24  you don't get an invitation, you don't give the

Page 153

1   invocation.

2        Q    So the answer is yes, and the basis is

3   singular which is you were not invited?

4        A    Yes.

5        Q    Okay.  All right.  And as I recall, earlier

6   you said you investigated why -- how and why a

7   particular speaker is selected in the course of

8   preparing for this deposition; is that correct?

9        A    I didn't investigate how or why -- oh, well,

10  if you're asking -- I asked staffers of city councilors

11  how a councilor determines who they invite.  Is that

12  what you're asking?

13       Q    That is what I'm trying to ask.

14       A    Yes.

15            MR. KEZHAYA:  Nicole, may I rephrase it

16  as I see fit or am I bound --

17            MS. O'CONNOR:  Sure.

18            MR. KEZHAYA:  -- to the language?

19       Q    Basically what I'm trying to get at here is

20  pursuant to your earlier conversation here, you -- like

21  you got here.  Before you got here, --

22       A    Yes.

23       Q    -- you did an investigation.  That

24  investigation included talking to people.

Page 154

1      A     Yes.

2      Q     Did you talk to the people for your

3  investigation why a particular matter or why a

4  particular speaker is selected or any permutation in

5  your mind thereof?

6      A     I asked how a councilor determines who

7  they're going to invite for the invocation.

8      Q     Okay.  Pause there.  And why.  Did you ask

9  why, yes or no?

10     A     I did not because that answer was part of the

11 answer that the staff person gave me.

12     Q     So the -- I tasked you with giving me how and

13 why a particular speaker is selected.  You went out.

14 You found how.  You did not investigate why; is that

15 correct?

16     A     The --

17           MS. O'CONNOR:  Objection.  You can

18 answer.

19     A     The response from the staff persons that I

20 asked said, oh, it's someone that the councilor has a

21 personal relationship with or does work within our

22 district or has done work with our constituents.

23     Q     Okay.  And --

24     A     So that would be the why.  That would be why

Page 155

1   a councilor extends an invitation to somebody.

2        Q    Yes.  Yes.  Thank you.

3             That sounded like a quote.  Were you given a

4   quote or is this just you referencing your prior

5   statement?

6        A    It's not a quote.  It's me summarizing the

7   question that I asked the staffers.

8        Q    Okay.  So you had some kind of a dialogue

9   with staffers?

10       A    Yes.

11       Q    Minimally you asked a question.  Did you get

12  one statement or more than one statement in return?

13       A    I, I asked more than one staffer so, yes,

14  more than one statement.

15       Q    Did you ask each staffer -- let's do it like

16  this.  How did you ask each staffer this question?

17       A    I asked what does -- how, how does the

18  councilor determine who to invite for the invocation.

19       Q    In what form --

20       A    The same question.

21       Q    Yeah.  Yeah.

22            What form was this inquiry made?  Was it

23  spoken, written or something else?

24       A    Spoken.

Page 156

```
 1        Q     Okay.  So you met with them in person or did
 2    you talk to them on the phone or was there some other
 3    means of communication?
 4        A     It was in person.
 5        Q     Okay.  When was this meeting?
 6        A     It wasn't a meeting.  It was just a
 7    conversation.  Probably about two weeks ago.
 8        Q     Okay.  So give or take two weeks ago.  How
 9    many -- well, was this -- did you guys all meet in one
10    place?  Because you mentioned you talked to multiple
11    staff, plural staff people.
12        A     Talked to a couple of people.
13        Q     Okay.  Who were the two people that you
14    talked to?
15        A     Amanda Curley.
16        Q     C -- how do I spell Curley?
17        A     C-u-r-l-e-y.
18        Q     E-y.  Thank you.
19        A     You're welcome.
20        Q     And just for sake of good notes, a-n-d-a.
21              Okay.  So you talked to Amanda.  Who else did
22    you ...
23        A     Sophia Wang.
24        Q     Sophia Wang.
```

Page 157

1                Okay.  Who is Amanda Curley in the

2        organization?

3        A        Amanda Curley is the Chief of Staff for

4        Councilor Baker.

5        Q        Chief Staff Baker.  K-e-r?

6        A        Yes.

7        Q        Okay.  Sophia Wang is?

8        A        She is the policy director for councilor

9        Flynn.

10       Q        C director for F-l-y-n-n.

11               And it's the City's position that the

12       councilors may -- basically the councilors have -- you

13       know, whatever they do, that's pretty much up to them.

14       That's pretty much the custom; is that correct?

15       A        Yes.

16       Q        In terms of extending invites, each -- each

17       person does whatever they feel like is essentially ...

18       A        Yes.

19       Q        You talked to two, by my count, councilors

20       for a time period, an agreed time period discoverable

21       scope of 2011 until minimally the date of the

22       complaint, although that's a subject of dispute as

23       well.  How, how many councilors have been, you know,

24       employed by the City during that timeframe?

Page 158

```
1       A    So there has been a lot of turnover.

2       Q    Yeah.

3       A    The City Council has -- their election is

4  every two years.  It's a two-year term.  So since I

5  started in 2011, there -- actually, all of the

6  councilors are gone since I first started in 2011.

7  It's all new councilors right now.

8       Q    Okay.

9       A    So part of the reason why I reached out to

10 those two councilors' offices, Councilor Baker started

11 in 2012/2013.

12      Q    Okay.

13      A    And although Councilor Flynn is a newer

14 councilor, I believe his first term was 20 ... 2018.  I

15 think.  But he is the Council president.  So that is my

16 reasoning for speaking to those two offices.

17      Q    So he's the council president?

18      A    Councilor Flynn is the council president,

19 yes, the current council president.

20      Q    Okay.  So Flynn is currently the -- currently

21 the Council president, correct?

22      A    Yes.

23      Q    When did he first became council president?

24      A    This, this year.
```

Page 159

```
 1      Q    Oh, wow, okay.

 2      A    Yes.

 3      Q    Council pres, all right.

 4           You gave me beginning dates for both Baker

 5   and Flynn.  Are they still --

 6      A    Yeah, approximately.

 7      Q    Well, yeah, obviously.

 8      A    Yeah.

 9      Q    Yeah, everything's approximate.  I'm not

10   playing semantics games here.  Give or take 2012,

11   that's what this squiggly line means for my purposes.

12      A    Mm-hmm.

13      Q    Are they still councilors, though?

14      A    Yes.

15      Q    Okay.  Present.  And present.

16           Okay.  So you talked to Flynn to determine

17   how Flynn does things, but you did not talk to anyone

18   else, it seems, or other than Baker?

19      A    No.

20      Q    Okay.  All right.  Turning once again back to

21   here.  Mm-hmm.  Mm-hmm.  Mm-hmm.

22           All right.  Why didn't you talk to anyone

23   other than Flynn's people?

24      A    Well, I talked to Councilor Baker's --
```

Page 160

1        Q    Oh, yes.

2        A    -- people because, again, he's been there the

3    longest now and Councilor Flynn because he's the

4    council president.

5        Q    Oh, so you --

6        A    And I -- as I said previously, I have

7    attended the meetings so I can see from the

8    introduction and I know that the policy is based on

9    invitation and that's why I'm here to discuss that

10   policy.  So I spoke to those two offices just to get an

11   idea how their councilors pick the individual that

12   gives the invocation.

13       Q    You specify how, but I also charged you with

14   specifying why.

15       A    And again, I feel that I answered that.  It's

16   individuals that the councilors have a relationship

17   with, and the Council -- it's by invitation.

18       Q    Well, sorry, I was --

19       A    I, I -- I feel that the councilors are the

20   only ones that can speak to why they're asking

21   somebody.  I can infer based on the invites that it's

22   people that they know because of a personal

23   relationship or work they do within the City.

24       Q    Yes, but that's an inference, and as their

Page 161

1    employer who has charged them to do certain tasks for

2    your business purposes, that, I posit, is a material

3    aspect of the agency seeing as how you, 30(b)(6)

4    witness, are unable or unwilling to testify to that

5    effect.  Would you agree then that I need to talk to

6    the individual councilors, each?

7        A    Yes.

8        Q    Okay.  In order -- to be more -- to make a

9    better record, I heard yes.  I interpreted that to mean

10   yes for the particular purpose of why are they not

11   inviting TST, why are they inviting these other people.

12   For example, I would need to talk to Wu about this

13   particular person and why Wu in particular would not

14   invite TST, correct?

15       A    Wu didn't invite TST.  There -- there was

16   never an invite.

17       Q    I understand.  The why question is addressed

18   to Wu, though, correct?

19       A    Yes.

20       Q    Okay.  Who would I talk to in Wu's office or

21   on Wu's behalf in order to get her deposition set up

22   because we only have like two months left in discovery?

23            MS. O'CONNOR:  Objection.  I mean I'm

24   happy to coordinate --

```
                                         Page 162
 1            MR. KEZHAYA:  Okay.
 2            MS. O'CONNOR:  -- that information.  I
 3   don't think Christine will know it.  You can ask her.
 4            MR. KEZHAYA:  You don't need to call an
 5   objection.  You can just ...
 6            MS. O'CONNOR:  Okay.
 7            MR. KEZHAYA:  Okay.  All right.  I, I
 8   bring that up because words like "objection" have a
 9   tendency to, to get me riled up.  I'm trying to, trying
10   to keep it down.
11            MS. O'CONNOR:  That's just pretty
12   standard.
13            MR. KEZHAYA:  Okay.
14   BY MR. KEZHAYA:
15      Q    All right.  And I also see on my handy list
16   here, paragraph 4, City's recordkeeping policies
17   surrounding payment to guest speakers at the invocation
18   policy which presupposes that this person who is
19   presently blessing the proceedings, although that's
20   subject to dispute, Wu invited this priest and this
21   priest is paid by the City for speaking at this event;
22   is that correct?
23      A    The people that give the invocation are no
24   longer paid.
```

Page 163

1        Q     No longer paid.  When did that stop?

2        A     I believe it stopped in 2016 or 2017.  I'm

3   not sure of the actual year.

4        Q     How do you know that they stopped being paid?

5        A     Because, again, I was, I was in my same job,

6   and the staff director at the time informed us that the

7   clergy weren't being paid anymore.

8        Q     2016 or 2017, that was the timeframe that

9   people stopped getting paid; is that correct?

10       A     Yes.  That was when now Mayor Wu was council

11  president.

12       Q     Mm-hmm.  That coincides with TST's first

13  request to TST -- to demand, basically, an invitation;

14  is that correct?

15       A     Yes.

16       Q     Was it because of TST's demand?

17       A     It was looked at and considered best practice

18  to stop the stipend.

19       Q     I understand.  But did the process of looking

20  at the process of whether we are giving money to these

21  priests, was that occasioned by TST's demand for

22  invite?

23       A     Yes, the policy was looked at then.

24       Q     Okay.  So just to make, just to make a

Page 164

1    cohesive sentence, in 2016 TST demanded an invite of

2    the City Council.  City Council goes to you requesting

3    a legal opinion as to whether they have to.  Is there

4    anything --

5         A    They, they -- I was not involved in that

6    decision whether or not to stop the payment.  I was not

7    involved in it.

8         Q    Ah, I was mistaken.  I'm so sorry.

9              So TST demanded an invite in 2016.  I was

10   confused as to which one you opined as to the City

11   doesn't have to extended an invite.  That was 2018.

12        A    Yes.

13        Q    So there have been at least two demands for

14   invitation.  Do you know how many times TST has

15   demanded, legally demanded an invite?

16        A    I do not.

17        Q    Okay.  If I told you it's at least three does

18   that sound like something you can disprove, as we sit

19   here today?

20        A    No, that seems reasonable.  I don't ...

21        Q    Okay.

22        A    Again, I'm not aware how many times.

23        Q    Okay.  That's, that's fine.  I don't really

24   care about the number anyway.

Page 165

1            So TST first issues a demand in 2016 which
2    prompts a process of reviewing its prayer policy to
3    avoid a subject lawsuit not unlike this one.  Because
4    of TST's legal demand and it seems, from my perspective
5    at least and I'm curious as to your position on the
6    matter, it seems like it was for the purpose of either
7    avoiding or winning a lawsuit not unlike this one.
8                    MS. O'CONNOR:  Objection.
9       Q    City of Boston, do I need to have your
10   employee speak to this matter?
11                   MS. O'CONNOR:  Objection.  You can
12   answer if you can.
13      A    I --
14                   MR. KEZHAYA:  I object to this if you
15   can business.  She can -- she knows that she answer my
16   questions if she can.
17      A    Can you repeat your question?
18      Q    Was the purpose of reviewing the
19   determination to pay these priests part of a purpose of
20   avoiding liability thereby avoiding a court order
21   requiring TST to have an invitation?  Is that why you
22   guys did your, your review?
23                   MS. O'CONNOR:  Objection.
24      A    The re -- the review was done.  And again, I

Page 166

1    did not conduct this review.  But the review of the

2    policy of paying the people giving the invocation was

3    looked at, and it was determined that it was best

4    practice to stop the stipend.

5         Q    Okay.  And, City of Boston, was it -- is it

6    your testimony, as we sit here today, that since

7    approximately 2016 - let's bookend it at 2018 - people

8    have not been getting paid since at least going back to

9    2018-ish?

10        A    Correct.  And I'm, I'm pretty -- I'm pretty

11   sure it was 2017.  I'm pretty sure you can settle on,

12   on that.

13        Q    Okay.

14        A    That it was 2017 when the payment stopped.

15        Q    Okay.  Who made that decision?

16        A    At the time it was Council President Wu.

17        Q    Oh, so Councilor Wu, here who invited this

18   particular person, I should probably ask her why she

19   decided to turn off this money thing?

20        A    Yes.

21        Q    Okay.

22             MR. KEZHAYA:  Let us proceed.

23                  (Video playing.)

24             MR. KEZHAYA:  Amen.  All right.  Pause

Page 167

1    it, please.

2        Q    So going back to this matter, I have a lot of

3    follow-up questions about this.  I feel like you're not

4    the right person for me to talk to.  Should I talk to

5    Michelle Wu about this?

6                    MS. O'CONNOR:  It probably depends on

7    the question.

8                    MR. KEZHAYA:  Oh, do we want to go

9    through that?

10        Q    Okay.  That felt a lot like proselytizing to

11   me.  What say you, City of Boston?

12                   MS. O'CONNOR:  So, yes, objection.  That

13   is not a question that Christine can answer based on

14   the 30(b)(6) topics.

15                   MR. KEZHAYA:  Okay.  I can, I can go

16   through the list or --

17                   MS. O'CONNOR:  You need not.

18                   MR. KEZHAYA:  -- that's basically the

19   topic.

20                   All right.  Now, I feel like this is a

21   good time for lunch unless the witness would like to

22   proceed.

23                   MS. O'CONNOR:  It's totally up to

24   Christine.

Page 168

1               MR. KEZHAYA:  It's entirely up to you,

2    Christine.

3               THE WITNESS:  I'm -- I mean I'm fine

4    with ...

5               MS. O'CONNOR:  You can break now.  You

6    can take -- you can go for another half hour if you

7    wanted.  You could -- whatever you want to do.

8               MR. KEZHAYA:  The next phase of things

9    will be public input to councilors.  It's probably

10   gonna run into another impasse.  Suffice it to say,

11   we're just going to look at them.  I'm not gonna -- I'm

12   not gonna get too detailed on it.  I feel like I have a

13   lot of why questions that are really better addressed

14   to Wu.  So I'm just going to leave those for her.  How

15   about we just take a look at the emails and then call

16   it a day?

17              MS. O'CONNOR: Sure.

18              THE WITNESS:  Okay.

19              MR. KEZHAYA:  Sound good?

20              THE WITNESS:  Sure.

21              MR. KEZHAYA:  All right.

22   BY MR. KEZHAYA:

23      Q    Let's just drop this, drop this YouTube

24   thing.  We now have some emails that we received

Page 169

1    through discovery.

2            To recap, Christine, you looked at the

3    discovery, correct?

4         A    Yes.

5         Q    Okay.  And more particularly, I apologize,

6    discovery is a legal jargon term.  Could you please

7    explain to the, the congregants what it means to have

8    discovery?

9            MS. O'CONNOR:  Objection.  You can

10   answer.

11        A    My understanding is that it's requests for

12   information and documents pur -- before litigation or

13   during litigation.  Again, I'm not a litigator so I'm

14   not familiar with the proper terms.

15        Q    That's okay.  If I, if I dispute any part of

16   what you have to say to me, I ask further examining

17   questions until we get to the place where I feel like

18   we're either at an impasse or I understand what you're

19   saying.

20        A    Okay.

21        Q    So if I could rephrase it in my own words, is

22   it fair to say that discovery is a means by which you

23   prepare for trial that the rules allow you to have?

24        A    Yes.

Page 170

1            (Exhibit 1 was introduced.)

2       Q    Okay.  All right.  So pursuant to that we

3  sent discovery requests, the details of which are

4  irrelevant.  Because of the discovery requests, you

5  guys gave us documents.  These are some of the

6  documents.

7            You will take note that this particular item

8  is designated as Defendant's 2870, Bates stamp 2870.

9  If we could please open it up and then let's scroll

10  down to the very bottom so we can see in fact this is

11  Defendant's 0002870.  This is 2870.

12            There and then on -- well, sorry, August 30,

13  2017, Mark Thomas states to -- is it -- would you

14  describe this list of email addresses as the City

15  Council?

16       A    Yes, at that time those are all of the

17  councilors, and I believe the current mayor, Martin

18  Walsh, is on that email as well.

19       Q    Okay.  The subject line states:  Satanic City

20  Council Meetings.  Is that correct?

21       A    Yes.

22       Q    Okay.  And there and then marked Tom -- first

23  of all, before we get into the text of the email, is

24  this pretty normal to see -- you know, we talked about

Page 171

1    members of the public communicating to their

2    councilors.  Is this pretty much what that looks like?

3         A    The -- honestly, the City Council doesn't

4    really get many requests for the invocation.  Usually

5    communications from the public relate to legislation,

6    if there's issues in the community, things like that.

7         Q    Okay.  So if I --

8         A    But it's a -- but if you're asking about

9    means of communication, --

10        Q    Yeah.

11        A    -- that would be a means to communicate with

12   the councilors via email.

13        Q    I was literally just asking as to form.

14        A    Okay.

15        Q    This appears normal, in other words, is

16   that -- is that fair?

17             Is this abnormal that someone would send an

18   email to the whole City Council?

19        A    No, that's normal.

20        Q    As stated there and then, Mark Thomas states:

21   Dear Councilors, it has come to my attention that a

22   proposal is being circulated to open City Council

23   meetings with a "prayer" from an alleged Satanist.  If

24   it isn't clear to every City councilor and Mayor Martin

Page 172

1   Walsh, that would be a very bad idea and cross far over

2   any bounds of sanity and decency.

3          Moreover, as an act of hate blasphemy, and

4   rejection of God it should be immediately commended as

5   just that.

6          I trust that this is all that needs to be

7   said on the matter.  It is a very matter to incur the

8   wrath of God for either yourselves or the City of

9   Boston.  Respectfully, Mark Thomas - Boston.

10         Did I read that email in full correctly?

11     A    Yes.

12     Q    Okay.  And then I see from Andrea Campbell to

13   Christine O'Donnell.  You're the To:; is that correct?

14     A    Yes.

15     Q    Okay.  And Andrea Campbell is the then

16   Council president.  No.  No.  No, actually --

17     A    Yeah.  No.  No.  No.  She was a district

18   councilor at that time.

19     Q    Okay.  And to reiterate, "that time" being

20   August 30, 2017 was the original email.  The secondary

21   email being or the responsive email, whatever this is,

22   maybe forward.  Is this a forward?  You tell me.

23     A    It is a forward because, as you can see, the

24   August 30th email I was not on.

Page 173

1        Q     Mm-hmm.

2        A     And then from the text --

3        Q     Ah.

4        A     -- of the email on September 1st, it looks as

5    if I was forwarded that email because it was a public

6    records request.

7        Q     I see.  I also now take note, this would have

8    probably made things easier, above Mark Thomas it

9    literally says forwarded message.  So we know now that

10   it was forwarded to you.

11       A     Oh.

12       Q     So going back, September 1, 2017, Andrea says

13   to you, Christine O'Donnell:  Hi Christine, I'm

14   checking on the Councilor's email during her leave and

15   will send you all emails related to this request now.

16             You received this email.  I did not receive

17   any other responsive documentation about this.  Who is

18   the councilor, to your understanding, from Andrea

19   Campbell?

20       A     That -- Eli is -- was Councilor Campbell's

21   chief of staff at the time.  So she's telling me that

22   she's reviewing the councilor's emails.

23       Q     Okay.

24       A     That related --

Page 174

1       Q    Oh, I see.

2       A    This was subject to a public rec -- looking

3   at the context in the sense that that was forwarded to

4   me.

5       Q    Okay.

6       A    It look -- it appears to me that this was

7   subject to a public records request, and that's why

8   Eli, who was Council Campbell's Chief of Staff is

9   forwarding this to me.

10      Q    I see now also this email is sub -- well, no.

11  How do you know this is a public records request?

12      A    Based on my job for the past 11 years, it

13  says:  I'm checking the councilor's email during her

14  leave and will send you all emails related to this

15  request now.

16      Q    Ah.

17      A    When I get a public records request, I work

18  with the City's records access officer, and I also

19  reach out to all the councilors and say do you have any

20  emails, documents responsive to this request.  There

21  must have been a request.  I don't know if it was from

22  TST or if it was from -- any member of the public can

23  request records.

24      Q    Sure.

Page 175

1        A    Emails, unless they're privileged, are

2    subject to public records.  Any document is subject to

3    a public record, unless the statutory exemption

4    applies.

5        Q    Mm-hmm.

6        A    So it looks like the language from Eli to me,

7    that someone requested a public record.

8        Q    Okay.

9        A    And this, this was subject to that public

10   record.  Again, I'm just looking at it on the one page,

11   but that's what it looks like to me.

12       Q    Well, that makes sense because, you know, we

13   have August 30 --

14       A    Yes.

15       Q    -- and checking so-and-so's.  I didn't see

16   this Eli.  I saw the Andrea Campbell.  So that, that

17   all makes sense, especially with this request now.

18   This request being public records request.

19                 MR. KEZHAYA:  Okay.  Let's move on to

20   the next exhibit.  This is -- for benefit of the

21   record, we're going to call this Bates ... All right.

22   So we've called -- if we could scroll back down I've

23   already forgotten the Bates number.  Here we are, 2870.

24   And this is -- I'm going to call this the frightening

Page 176

1    email.

2              Okay.  Let's just tab on to the number

3    next one, whatever we're going to call it.  I see this

4    is Defendant's 3434.  Scroll all the way to the bottom

5    because it's a page range.  3436.

6              Does anyone object to me disregarding --

7    we just saw -- if we could scroll down one more time.

8    For benefit of the record, we're looking at 3434

9    through 3436.  Pages 3435 and 3436 are just a bunch of

10   signatures.  Does anyone object to me disregarding 3435

11   and 3436 in the presentation of the argument at trial?

12             MS. O'CONNOR:  No.

13             MR. KEZHAYA:  Okay.  So I'm going to

14   strike those remaining two.

15             (Exhibit 2 was introduced.)

16        Q    Now, we're looking now at 3434 which

17   subsequently is gonna just be a one-page.  This is

18   appearing -- appearing to be an email dated October 19,

19   2020 from someone named P. Cumin to Gabriel Coletta --

20   or, sorry, Gabriela Coletta.

21             And I'm afraid my eyes have failed me.  Madam

22   witness, could you please, to the, to the best of your

23   ability, I imagine you can probably decipher these

24   people's names and whatnot better than I can.

Page 177

1        A    Yep.

2        Q    From -- well, on date, from who, to who, cc

3    who, subject what?

4        A    Date: Monday, October 19th, 2020; from P.

5    Cummin to Gabriela Coletta.  Oh, I skipped subject:

6    Regarding Providing Virtual Invocation to City Council

7    Meeting; To: Gabriela Coletta; Cc: Theresa Malionek.

8        Q    Okay.  So I, I note the To: has a Boston.gov

9    email address.  Who is this Gabriela Coletta?

10       A    At that time she was Chief of Staff for

11   Councilor Lydia Edwards.

12       Q    A chief of staff -- oh, here we are,

13   Councilor Edwards.  Oh, that's great.

14       A    Yup.

15       Q    P. Cumin appears to be I see at the

16   signature, some kind of a priest.  So why don't you,

17   why don't you read us this, this email, madam -- madam

18   witness.

19       A    Hi Gabriela, Thank you for your email.  I'm

20   honored to accept Councilor Edwards' invitation to

21   provide the opening invocation for the City Council

22   this coming Wednesday but I have a practical question

23   to ask to make sure that that's something feasible for

24   me.  I have a mass at 12:10 pm on Wednesday.  Do you

1  think the City Council will start at 12 pm sharp?  I'm

2  just asking because I could stay on the call until

3  12:05 but then I'll have to leave and get ready for

4  mass.  Do you think it'd be feasible for me to give the

5  invocation and then leave the call to get ready for my

6  mass?  Please let me know what Councilor Edwards

7  thinks.  Thank you for your help.  Take care, Fr.

8  Parlo -- Paolo.

9      Q    Okay.  So I see here that -- I think it's

10 friar is F-r.  Is it father or friar?

11     A    No, it's father.

12     Q    I'm so sorry.

13     A    That's been my experience.  I don't know.

14 Could be friar.  I don't know.

15     Q    I apologize.  I have difficulty with

16 language.  So it's -- if it's an abbreviation then I

17 just assume it's the shortest one it could be.

18          So Fr. Paolo, are you personally familiar

19 with Fr. Paola?

20     A    No.

21     Q    Okay.  Are you personally familiar with

22 whatever San Carlo.org is?

23     A    I am not.

24     Q    Okay.  Let's scroll down.  Maybe this will

Page 179

1    give us some more insight.

2           So this is in re -- this prior email I see is

3    in response to an email dated when, by whom, to, et

4    cetera.  Please -- please explain to the people.

5           A    Do you want me to read the email?

6           Q    Oh, no, literally say -- we have to do some

7    minimal legal required stuff.  We have to give

8    background on what is it that we're looking at.  So for

9    people that are not literally looking at this document,

10   they're going to be seeing a court transcript of

11   everything that's going on here so for --

12          A    It's an email on October 19th, 2020 at

13   7:51 AM.  Gabriela Coletta wrote:  Good morning Father

14   Paola, I'm reaching out on behalf of Boston City

15   Councilor Lydia Edwards to ask if you'd be willing to

16   provide the opening invocation for this week's virtual

17   Boston City Council hearing on Wednesday at 12 PM.

18   We'd be honored to have you represent our district for

19   this hearing.  Kindly let me know when you can.  Best,

20   Gabriela.

21          Q    Okay.  So I see now the relevance of this

22   document appears to be that Councilor Lydia Edwards

23   invited Fr. Paolo.  I probably needn't figure out who

24   or why, rather, Fr. Paola was invited which is outside

Page 180

1    your, your knowledge scope.  So we're going to set that

2    aside.

3                  MR. KEZHAYA:  We're calling this the Fr.

4    Paolo invite.  How do I spell that?  P-a-o-l-o.

5    Invitation.  All right.

6                  And for benefit of a more clear record,

7    Exhibit 1 was 2870 "frightening email".  Exhibit 2 is

8    Bates 3434.  I'm calling it the Fr. Paolo invitation.

9    No need for email.

10                 Now, let's move on to number next one.

11   Q    Okay.  Madam witness, if you could -- earlier

12   you said I skipped over subject.  That's actually -- it

13   makes more sense to know who's talking with whom, when,

14   and about what.  So if you could say the From, To, Cc,

15   when and then about and then we'll figure out together

16   what this is all about.

17   A    From Gabriela Coletta; sent Tuesday,

18   February 19th, 2019; To: Carl -- Carl Jean-Louis; Cc:

19   Candace Morales, Makayla Parkin, Elizabeth Pimen --

20   Q    Oh, you can, you can just summarize.  Just a

21   bunch of people at Boston.

22   A    Okay.  Okay.  Sent -- cc'd to Boston

23   employees.  Subject: Regarding agenda for tomorrow's

24   planning meeting.

Page 181

1      Q    Okay.  All I see is a sea of Boston.gov

2   emails and I see also a Gmail in here.  Do you have any

3   idea who any of these people are?

4      A    I do.  Some not all.

5      Q    I, I don't care about the ones you don't

6   know.  Tell me about the ones you do know.

7      A    So Candace Morales is one of my colleagues on

8   central staff.  She is the communications person for

9   the City Council.  Makayla Parkin used to work for

10  former Councilor Janey.  She is no longer employed at

11  City Council.  Elizabeth Pimentel used to be Council

12  Campbell's Chief of Staff.  Mark Mur -- I don't know --

13  Yuleidy Valdez used to be the staff director for City

14  Council.  And Kristen Halbert used to be a staffer for

15  Councilor Michelle Wu.

16     Q    Basically a bunch of support staff for

17  councilors.  Is that fair to say?

18     A    Yes.

19          MR. KEZHAYA:  Okay.  Let's scroll down,

20  see what our Bates stamp is.  Bates numbering that is

21  to say.  I just need to know the first page and then

22  the last page.  2320.  Beginning and ending when?

23  2322.

24          (Exhibit 3 was introduced.)

Page 182

1      Q    Okay.  What is this all about?  This appears

2  to be some kind of meeting notes.  Is -- is that fair

3  to say?

4      A    BHM stands for Black History Month.

5      Q    Okay.

6      A    That's an event that the City Council has.

7      Q    Okay.  What is CJ?  Who is CJ?

8      A    CJ worked for Councilor Campbell.

9      Q    "Will check with staff from president's

10  office."  Do these words mean anything to you?

11      A    It looks like, based on the agenda, that he's

12  looking to the council president's office for guidance

13  but ...

14      Q    Okay.  What is UMB?

15      A    I, I do not know.

16      Q    Okay.  All right.  Well, it seems to me --

17  let's scroll down so I can just kind of skim through

18  this email.

19      A    UMB is -- sometimes refers to UMass Boston,

20  but in this context I don't know if that's what that

21  means.

22      Q    Oh, you know what, I am vaguely familiar that

23  some of these documents appear to suggest that there's

24  like last-minute needs for invocations.  Maybe I could

Page 183

1    summarize all this by asking you just directly.

2              How -- was it ever the case that there's like

3    a last-minute need, we need an invocation for whatever

4    meeting?  Is that a thing that happens at the City?

5         A    Yes.

6         Q    Okay.  How often does that happen?

7         A    It happens -- I can't give an approximate

8    amount, but maybe a couple of times a year, a few times

9    a year.  Five.  Five times a year.  But not, not often

10   in the overall amount of meetings.

11        Q    Okay.  So about two to five times per year

12   there's an opening for invocations that requires

13   someone to -- need to fill and obviously that we all

14   know that TST was not invited; is that correct?

15        A    Yes.

16        Q    Okay.  Let's move on to the next document.

17                  MR. KEZHAYA:  No.  No.  No.  We don't --

18   we're done with this one.

19                  For benefit of a clean record, this was

20   Exhibit 3, Bates range 2320 to 2322.  I'll figure out a

21   designation later.  We can move on to the next one.

22                  Let's see here.  Okay.  Let's just

23   scroll down to the, to the Bates number.  It will be --

24   it'll be at the bottom of the page.  Okay.  23 -- well,

Page 184

1    actually, what's gonna be four is beginning 2391 to

2    2392.

3              (Exhibit 4 was introduced.)

4         Q    This appears to me to be another instance in

5    which -- another discrete instance, provable instance

6    in which someone needed a last-minute invite.  Is that

7    consistent with your reading of this email?

8         A    Do you need me to read it out loud?

9         Q    No.

10        A    It looks as if it's last-minute since it's

11   tomorrow, but it also looks as if they found someone.

12        Q    Okay.  Last minute, that's -- that brings a

13   good point.  Last minute isn't discrete terminology.

14             Does the City of Boston have a meaning for

15   last minute or is it just used in its common parlance?

16        A    Used in its common parlance.

17        Q    Okay.  Last minute as used in common term.

18        A    Actually, after looking at this again, I

19   cannot confirm whether or not it was last minute

20   because Makayla Parkin worked for the time it was

21   Council President Janey.  And since the Council

22   president chairs the Council meeting, it looks as if

23   Makayla is emailing Eli since it was Councilor

24   Campbell's turn to see who was giving the invocation.

Page 185

1          So I'm not sure -- Makayla sent it on Monday.
2     The meeting's on Wednesday.  I'm not sure if -- when
3     Councilor Campbell reached out to Pastor Yansen it
4     looks like.
5          Q    In other --
6          A    So I don't want to be inaccurate and say that
7     Councilor Campbell waited til the last minute when I'm
8     not clear on that based on the email.
9          Q    Okay.  I, I don't mean to be contentious, but
10    I see Makayla here ends the email or the second to last
11    sentence of the Monday, November 2 at 1:01 PM Makayla
12    writes:  Please let me know if you can find someone by
13    end of day tomorrow!
14         A    And Makayla likely sent that because the
15    staffers of whoever, whoever the Council president
16    is --
17         Q    Mm-hmm.
18         A    -- generally prepare prep notes --
19         Q    Mm-hmm.
20         A    -- for the Council president.  So Makayla --
21    and like I said, our meetings are on Wednesday.
22    Makayla likely sent Eli that email so she could include
23    the name of the individual giving the invocation in
24    Council President Janey's script.

Page 186

1      Q    I see.

2           What, what is the usual advanced notice that

3    the City receives that it will have a particular person

4    giving a particular ... I'm going to call it blessing.

5    I know it's a subject of dispute.  I'm just going to

6    keep calling it blessing.  How -- you've got this

7    person who's going to be doing a blessing.  How long

8    before the meeting do you know they're going to be

9    doing the blessing?

10     A    Do I know or does the --

11     Q    The City.

12     A    I -- the individual councilor, I -- they may

13   reach out to them well ahead in advance whoever is, is

14   inviting someone.  That I can't speak to.

15     Q    Sorry.  I, I -- again, I hate the theatrics

16   about it, but technically I'm not talking to you.  I'm

17   talking to the City of Boston.

18     A    So it would vary --

19     Q    Yeah.

20     A    -- on councilors.

21     Q    Yeah.

22     A    Depending on how much notice they would give.

23     Q    So I probably need to talk to them, huh?

24     A    Yes.

Page 187

1     Q    Okay.

2              MR. KEZHAYA:  All right.  So how much

3    advanced notice do councilors give.

4     Q    And now that's, that's in terms of what the

5    councilors receive.  What about in terms of putting

6    together an agenda?  Presumably an agenda gets put

7    together for these meetings.  Is that fair to say?

8     A    Yes.

9     Q    When does that get locked in?

10    A    The agenda has to come out the Monday before

11   the Wednesday meeting.

12    Q    Monday before the Wednesday meeting?

13    A    Yes.

14    Q    Okay.  So we're turning back to our email

15   then.  This is Monday at 1:01.  She's freaking out

16   because it's, it's due tomorrow, and she probably needs

17   to have the agenda done.

18    A    This email does not refer to the agenda.

19    Q    Ah.

20    A    Makayla is asking her for the name so she can

21   put it in the script that she preps for Councilor

22   Janey's notes.  Makayla is a staff person for Councilor

23   Janey who was president at the time, Council president

24   at the time.  As president they -- the president chairs

Page 188

1    the City Council meetings.  So she -- whoever the

2    Council president is opens the meetings and has a

3    script, and likely says, oh, I now invite so-and-so who

4    has -- I, I invite Councilor so -- in this case,

5    Councilor Campbell up who has invited Pastor James W.S.

6    Yansen to come to speak.

7             So this looks like to me that Makayla is

8    reaching out to Eli so she can have the name to put in

9    the script because Councilor Janey liked to look at the

10   script the night before the Council meeting.

11       Q    Okay.

12       A    So this is not the agenda.

13       Q    I know.

14       A    This is not the agenda.

15       Q    I understand.  I'm saying that she needs it

16   for purposes of the agenda possibly or actually more

17   likely it seems because I see November at 3:00 PM.  If

18   the thing's -- if the meeting is actually on Wednesday,

19   you know, it, it seems to me that they're just looking

20   to fill the slot.

21       A    I disagree with that characterization.

22       Q    Okay.  Well, that's an impasse.  Let's move

23   on.

24             MR. KEZHAYA:  And for benefit of the

Page 189

1   record, this is 2391 to 2392.  I'll figure out a
2   designation later.  Let's move on to number next one.
3                   Oh, thank you.  2733 to 2734.  Let's see
4   the top of 34.  Yeah, those are just signatures so
5   we're just gonna do 2733.  Unless, unless, opposing
6   counsel, do you object to me only using --
7                   MS. O'CONNOR:  No problem.
8                   MR. KEZHAYA:  As a, as a general
9   proposition, can I just skip signatures?
10                  MS. O'CONNOR:  Please.  Yes.
11                  MR. KEZHAYA:  Okay.  Less paper I
12  prefer.
13                  (Exhibit 5 was introduced.)
14      Q    Let's scroll up slightly more.  What is going
15  on here?  So these are a lot of emails.  Let's start
16  with the bottom most.  We are looking at an email --
17  and, sorry, I'm just going to take over this.  I think
18  it's going to be a little more efficient.  We see
19  June 10, 2020 at 8:33 AM.  Michael Bonetti writes to
20  someone named ... madam witness, could you please state
21  the pronunciation?
22      A    Yuleidy.
23      Q    Yuleidy, thank you.
24                  Please -- please carry away with the body of

Page 190

1    the text.

2         A    We have a priest to preside over the

3    invocation today.  His name is Fr. Michael Della Penna,

4    ofm, pastor of Saint Leonard of Port Maurice Parish in

5    the North End.  Thanks, Michael.

6         Q    Okay.  Does the shorthand OFM mean anything

7    to you?

8         A    It does not.

9         Q    Okay.  I see that the -- it follows a

10   priest -- you're going to have to forgive me.  I

11   apologize.  I don't, I don't speak the, the jargon of

12   the Catholic tongue.  Is this Fr. Michael Della Penna,

13   is that correct, an ofm -- ofm pastor.  It seems to be

14   like a priest, some kind of honorary suffix.  Is

15   that --

16        A    I, I don't know --

17        Q    Okay.

18        A    -- what the -- what that is.

19        Q    Okay.  But --

20        A    I don't know what that reference is.

21        Q    Okay.  And he's a pastor of somewhere in the

22   North End which I presume from context that this is a

23   neighborhood or smaller subpart of the City of Boston;

24   is that correct?

1      A    Yes, it's a neighborhood of the City.

2      Q    Okay.  So we see that once again happened at

3   Wednesday at 8:33 AM.  And as we've been over multiple

4   times, the meetings are on Wednesday.  So this appears

5   to be what I would call a last-minute email example.

6      A    Again, you're -- you are taking this out of

7   context.  Yuleidy was the staff director.  Michael is a

8   staffer for Senator -- excuse me, for Councilor

9   Edwards.  He is letting Yuleidy know who is giving the

10  invocation.  This was also during when we were on Zoom.

11     Q    Mm-hmm.

12     A    So we were having staffers coordinate who was

13  going to be let into -- as a, as a pa -- as a panelist.

14  So Mike is letting Yuleidy know that this person is

15  giving the invocation.  It doesn't necessarily mean it

16  was last-minute.  It's just that this is the day of the

17  meeting.

18     Q    Mm-hmm.

19     A    So Michael is letting Yuleidy know.

20     Q    Okay.  So --

21     A    So it's -- I do not think that we can say

22  that it's last-minute.

23     Q    Well, not on the strength of this email

24  alone.  I'd probably need to go talk to someone.  So is

Page 192

1    Yuleidy still at the City.

2         A    Not with the City Council.

3         Q    Is she anywhere in the City?

4         A    Yes.

5         Q    Okay.  What does she do with the City?

6    Sorry.  I'm assuming genders.  What is the preferred

7    gender denomination?

8         A    I believe she prefers she/her.

9         Q    Okay.

10        A    I'm not sure of her exact title.  I know

11   she's in the property management division.

12        Q    Do you know Yuleidy's last name?

13        A    Yes.

14        Q    What's --

15        A    Valdez, V-a-l-d-e-z.

16        Q    Okay.  And who is this Michael Bonetti?  I

17   see a long string of texts but --

18        A    Michael Bonetti used to work for Councilor

19   Edwards.

20        Q    Okay.  So he is a staff member of Edwards?

21        A    Yes.

22        Q    Okay.  Let's scroll up to see -- slowly to

23   see if we can see if there's anything of any

24   recognizable relevance.  No.  No.  No.

Page 193

1          Okay.  On Wednesday, June 10, Yuleidy --

2   well, now I'm confused.  "Would you forward the link to

3   him.  Already did.  Thanks!  I will be using my zoom to

4   log him in.  Okay.  You are simply AWESOME!"

5          Does it -- in the norms of your organization

6   is it normal to inform someone that is simply awesome

7   in all caps with an exclamation mark about just a --

8   what appears to be a simple notice that this is who

9   we're, you know, gonna have at the meeting, you know,

10  and here's, here's the means by which to get to the

11  meeting?

12      A    I would say it's normal to thank people.

13      Q    Well, sure, but simply awesome is kind of a,

14  kind of an emphatic thanks.  Would you not agree with

15  that?

16      A    I would agree with that.

17      Q    And we see that she said simply awesome.  You

18  see this, correct?

19      A    Yes.

20      Q    And you're telling me that it's normal in the

21  Boston culture to -- that this is normal to call

22  someone simply awesome for simply providing the Zoom

23  meeting information.  This is normal?

24      A    I would say that's not normal.

Page 194

1        Q    Oh, what's abnormal about it?

2        A    I would, I would say that a simply -- a

3   simple thank you would suffice, but perhaps this is how

4   Yuleidy communicates.

5        Q    I should probably talk to Yuleidy about that.

6        A    Sure.

7        Q    Let's scroll up to see if there's anything

8   else of relevance.  Scrolling up.  Scrolling up.

9             All of these people, I mean that's not

10  inconsistent with the rest of these communications.

11  They appear to be -- there's a lot more exclamation

12  marks than I see in, in my business, that's for sure,

13  but I'm not mad about that one in the slightest.  I

14  like people thanking people.  That's nice.

15                 MR. KEZHAYA:  So this appears to be the

16  exhaustion of use on here.  So we're at Exhibit 5, once

17  again, 2733.  I'm gonna call this the simply awesome

18  email.  Awesome being in caps, of course, exclamation

19  mark.

20                 All right.  Let's go on to number next

21  one.  Scrolling to the bottom, 2723 to 2726.  Let's

22  begin with the bottom most, please, so that we see a

23  proper chronological order.  What did we say, 23 to 26?

24  To 26.

Page 195

1          (Exhibit 6 was introduced.)

2     Q    Okay.  This email correspondence begins --

3  it's a series of emails that begins on June 17, 2020

4  from, once again, Michael Bonetti to -- madam witness,

5  does Kerry Jordan ring any bells?

6     A    Yes.

7     Q    Who is that?

8     A    Kerry was my former coworker.  He was the

9  technology manager.

10    Q    Okay.

11    A    For the City Council.

12    Q    And please refresh my memory.  At the time

13  who was Yuleidy?  What was she doing in the

14  organization?

15    A    The staff director for the City Council.

16    Q    Okay.  For, for all of the City Council or

17  any particular person?

18    A    For central staff.

19    Q    Okay.  So basically central staff is talking

20  about logging in Fr. Scrima?

21    A    Central staff is not talk -- well, Michael

22  Bonetti, --

23    Q    Mm-hmm.

24    A    -- who Councilor Edwards was inviting this

Page 196

1    person, is emailing Kerry because he is the

2    individual -- at this time the -- all the City Council

3    meetings were on Zoom because of the pandemic.  So

4    Michael is emailing Kerry and Yuleidy the name so they

5    know to let this person in.

6         Q    Okay.

7         A    For the meeting.

8         Q    Okay.

9         A    That's the context of this.

10        Q    Yeah, that's, that's what begins our

11   discussion with whatever's going on with these

12   documents.

13             MR. KEZHAYA:  So let's scroll up ever so

14   slightly just to the next email enough to see the body,

15   the who and the when.  Okay.  That's good.

16        Q    September 15, 2020 at 6:54 AM someone writes?

17        A    Good morning Yuleidy, Pastor Alcevedo from

18   Lion de Judas will be joining us to pray over the

19   council.  I've cc'd him here.  He just needs the Zoom

20   link and details.  Thank you again Pastor Alcevedo.

21   Zoom you tomorrow.  Julia.

22             MR. KEZHAYA:  Okay.  Once again, we are

23   at what I'll probably describe as an impasse as to

24   whether this is a last-minute email or just an -- a

1    scheduling email.  No problem, we'll skip over the

2    impasse.

3              Scrolling up slightly.  Please -- let's

4    see here.  Zoom link.  Don't care.  Skip.  I have no

5    idea what this is.  Scrolling up.  Scrolling up.  Okay.

6    Let's pause here.

7         Q    June 24 at 8:05 someone writes.  Please.

8         A    This is from Councilor Bok.  Dear Yuleidy,

9    Connecting you here with the Reverend Paige Fisher, who

10   is going to do our opening prayer today.  If you could

11   get her the Zoom link and all that she needs to get

12   connected, that would be great.  Thanks, Kenzi.

13        Q    Is that the same thing we just read?  Scroll

14   down again.  I don't remember.

15        A    I don't think so.  No, the other one was from

16   Julia.

17        Q    Huh, that's odd.  So September 15.

18   September 15.  June 24.  Can you make any sense of

19   this?

20        A    It's just -- it's councilors emailing Yuleidy

21   with the name.

22        Q    Okay.  So this is basically just internal

23   communication as to who and when invitations are

24   happening from the -- from at least the City's

```
                                            Page 198
1    perspective?
2         A    They're on the -- they're on Wednesdays.  So
3    they -- those are the dates of the Council meeting.
4         Q    Correct.  Yeah.
5         A    So it looks like Councilor Bok is giving
6    Yuleidy the person's name so that she can give them the
7    Zoom link and make sure that they're in the Zoom
8    meeting.
9         Q    Perfectly understood.
10                  MR. KEZHAYA:  Let's scroll up some more.
11   It's basically the same thing again.  Let's scroll up.
12   Okay.  Just scrolling.  We're just skimming at this
13   point.  This all seems to be pretty much the same
14   thing.
15                  I'm confused as to why there's one
16   PDF -- oh, I get it.  I sent RFPs, and I just got
17   basically a document dump.  These are probably just
18   what my people said these are things I should look at,
19   and I'm looking at them for the first time with you.
20   So let's scroll up, scroll up.
21                  Okay.  What is this again?  This is 6,
22   2723 to 2726.  Miscellaneous ...
23        Q    Madam witness, how would you describe this,
24   this PDF?  I can't think of a designation.
```

Page 199

1        A      Emails regarding invocation Zoom links.

2        Q      Re Zoom.   Sorry.   Zoom -- what -- how did

3   you -- prior to saying Zoom links, you said emails

4   regarding ...

5        A      Invocation names for Zoom links.

6        Q      Invocation links.

7        A      And, and I don't know if you want to indicate

8   that they're internal.

9        Q      Yeah.   Yeah, I like that.   Internal --

10  miscellaneous internal emails about invocation Zoom

11  links.   Great.

12               MR. KEZHAYA:   Number next one, please.

13  Oh, wait.   For benefit of a clear record, we just

14  finished looking at Exhibit 6 that begins Bates stamps

15  2723 to 26.   So designated.   Let's move on.

16               MS. O'CONNOR:   Could we take a quick

17  restroom break?

18               MR. KEZHAYA:   Yes.   Yes.   Absolutely.

19               MS. O'CONNOR:   Thank you.

20               THE VIDEOGRAPHER:   Okay.   The time is

21  1:27.   We're off the record.

22                    (Break was taken.)

23               THE VIDEOGRAPHER:   Okay.   We are back on

24  the record.   The time is 1:38.

Page 200

1          (Exhibit 7 was introduced.)

2    BY MR. KEZHAYA:

3        Q    Okay.  I apparently neglected to take note of

4    something else that was important on Defendant's 2320

5    which we had an undesignated number 3.  I now see why

6    this was brought to my attention.  Let's scroll up ever

7    so slightly to something about honoree.  There it is,

8    honoree.

9              What, City of Boston, does honoree mean in

10   whatever this kind of document is that we're looking

11   at?

12       A    I believe that document is -- refers to the

13   Black History Month event.  So honoree, each councilor

14   was picking a black member from their community to

15   honor at the event.

16       Q    Okay.  And how do you know -- well, first of

17   all, is this name -- how, how did you come to that

18   conclusion?  Help me, help me draw the dots between

19   honoree --

20       A    Because I knew about the event because I was

21   working at the City Council in my same job --

22       Q    Oh.

23       A    -- at the time.  So I knew about the event,

24   and I knew the councilors were picking people to

Page 201

1    recognize at the event.

2         Q    Basically you remember?

3         A    Yes.

4         Q    Okay.  Cool.  No longer care about this one.

5                   MR. KEZHAYA:  Let's skip to number next

6    one which is after 2723 to 26.  Oh, I'm sorry.  Are

7    there -- are there more things that we should care

8    about on here?  I think we're looking for ... 2723 to

9    26 was the preceding one.

10                  MS. KING:  Okay.  So next one here?

11                  MR. KEZHAYA:  Yeah, number next one.

12                  Okay.  We're looking at ... Bates number

13   all the way at the bottom, please.  That's a signature

14   page.  Let's scroll up.  Scroll up.  Scroll up.  Scroll

15   up.  2729 all the way.  Could we zoom in so madam

16   witness can read the body here, also me?

17        Q    Let's see here.  This appears to be a June

18   10, 2020 email from one Michael Bonetti with whom we

19   are adequately familiar.  Have we already gone through

20   this?  This looks familiar.

21                  MS. O'CONNOR:  Yes.

22                  THE WITNESS:  It does look familiar.

23                  MR. KEZHAYA:  Yeah.  I'm pretty sure

24   this is the same thing.  We're going to skip -- wait.

Page 202

1   Wait.  Let's go all the way to the top.  Maybe there's
2   something that I missed.
3       Q    How about this one, Tuesday, June 16:  Hi
4   Michael, Would you have some invocation tomorrow.  I
5   don't remember if I informed you or the councilor.
6   Apologize if I didn't.
7           And as I recall, Yuleidy is the staff -- the
8   central staff chief.  Basically Yuleidy -- it seems to
9   me that Yuleidy administers support staff for all of
10  the councilors.  Is that ...
11      A    Yes.
12      Q    Okay.  Support staff head talks to guy for
13  councilor.  "Would you have some for invocation
14  tomorrow?"  I deduce under the circumstances that some
15  more adequately or more appropriately means someone for
16  an invocation tomorrow.  Is that consistent with your
17  reading?
18      A    Yes.
19           MR. KEZHAYA:  Okay.  And once again,
20  that was June 16, 2020.  So number 7, once again,
21  please, someone, remind me what my Bates stamps are,
22  very bottom.  2729.  And I'm going to call this just
23  another scheduling email.
24      Q    Okay.  And scrolling back at the top, the,

Page 203

1   the notice was issued on June -- well, the inquiry was

2   made on June 16 which Google helpfully tells us is

3   Tuesday and at 1:24.

4           What time do the councilor meetings happen

5   again?

6       A   They happen at Wednesdays -- on Wednesdays at

7   noon.

8       Q   At noon.  So this is basically about a day

9   beforehand.  And the, the agenda items actually don't

10  get cemented in til Tuesday.  So this doesn't seem

11  unusual in terms of timing.

12      A   The agenda items are completed on Monday

13  afternoon.  The agenda is released on Monday afternoon.

14  The invocations are not part of the agenda.

15      Q   Mmm.  Huh.  So when is the decision to lock

16  in who's doing the invocation?  Like when's the

17  deadline?  Surely at some point it's too late.

18      A   Again, that is the councilor invites someone.

19  I imagine councilors have different timeframes.

20      Q   Yeah.

21      A   This email is between Yuleidy and Michael

22  Bonetti.  And for context purposes, it was during the

23  time when the City Council was remote because of the

24  pandemic.

1          And it looks as if Yuleidy is asking Michael

2     for the name so that Yuleidy is able to let the

3     individual into the Zoom meeting.  Because you needed

4     to be let into the Zoom meeting because it was for the

5     councilors and they were participating via Zoom.

6          It was on the City of Boston's website for

7     the public to watch because there is not a common

8     public period for City Council meetings.  So that is

9     why -- it appears that Julie was looking for the name

10    so she would have -- so she would know who to let in to

11    the Zoom meeting.

12         Q    I --

13         A    And to give the infor -- and to give the link

14    to that individual.

15         Q    Okay.  I understand that's the proposition,

16    but all I see is this text.  So where are you getting

17    that extra information that's not in the text?

18         A    Because I know how the process works because

19    I worked there at the time.

20         Q    Okay.  So --

21         A    We were all on Zoom.  So we all get the Zoom

22    link.  And Yuleidy would need to know because she was

23    the one that let people in.  Yuleidy Valdez or Kerry

24    Jordan would let people, the councilors, people meaning

Page 205

```
 1   staffers and councilors, into the Zoom meeting.
 2        Q    Okay.  And to be discrete here, the next --
 3   after the question "Would you have someone for an avoca
 4   -- an invocation tomorrow?" is followed up with "I
 5   don't remember if I informed you or the councilor.
 6   Apologize if I didn't."
 7             Why would this person need to inform the
 8   recipient of this email or the councilor?  What's the
 9   inform part tell you?
10        A    I don't know if that's -- I don't know if she
11   meant to put if I asked you or the councilor.  I don't,
12   I don't know --
13        Q    Well, I mean --
14        A    -- what she means by that.
15        Q    We're stuck with the text, right.  I mean we
16   can't change the text with what we propose this email
17   could mean.  We're -- it has to -- this email very
18   clearly requires some kind of an information being
19   transmitted.  I, I proffer.  Do you disagree with this
20   proffer?
21        A    It looks as if she's asking if they have
22   someone for the invocation.  She's asking a question.
23        Q    I understand that.  I asked you a yes/no
24   question, but I didn't receive a yes or a no.
```

Page 206

1      A    Yes.

2      Q    Okay.

3              MR. KEZHAYA:  Scrolling up slightly.

4  Okay.  In case I didn't mention this already, this

5  is -- we just finished talking about No. 7, 2729.  Is

6  this 2729; am I mistaken?  Scrolling down again to the

7  Bates stamp.  Yep, 2729, I described this as another

8  scheduling email dated June 16, Tuesday at 1:24 PM for

9  a Wednesday -- Wednesday at noon meeting.

10             Okay.  Eight, what does our No. 8 look

11 like?  Scrolling down to the bottom, this is 2720 --

12 wait, 2-7-7-1.

13             Okay.  Scrolling up just enough to --

14 whoa.  Whoa.  Whoa.  The first email, please.  Hmm.

15 Well, this is confusing.  Let's scroll up ever so

16 slightly.  It looks like the first email is offset

17 dated September 15 at 6:54 AM.

18     Q    Madam witness, I believe you already read

19 this email to me.

20     A    Yes.

21             MR. KEZHAYA:  Okay.  Skipping 8.

22 Deleting 2771.

23             (Exhibit 8 was introduced.)

24             MR. KEZHAYA:  All right.  Number next

Page 207

1    one, we have a December 12, 2020 email.  Bates stamp

2    number, please.  2849.

3                    (Exhibit 9 was introduced.)

4         Q    This is an email from an R. Zed to Kim Janey

5    at Boston.gov.  A bunch of people are cc'd.  Who is Kim

6    Janey at Boston.gov?

7         A    At the time she was City Council President.

8         Q    Okay.

9         A    And also a district councilor.

10        Q    Okay.  And so this is December 12, 2020 at

11   2:26 AM Eastern Time.  R. Zed asks to - functionally

12   the Council for our purposes - about the invocation

13   request.  States:  Dear President Janey, Will you

14   please schedule me to read invocation remotely in the

15   next city council meeting -- sorry, Boston City Council

16   meeting and inform me accordingly.  I am a Hindu

17   leader.  Thank you.  Sincerely, sender.

18             So it appears that it's not just TST who

19   wants in and is not being invited, to me.  Is that

20   consistent with your reading of this email?

21        A    Yes.

22        Q    Okay.

23                    MR. KEZHAYA:  And once again, that's

24   2849 to confirm, please.

Page 208

1          MS. KING:  Yes.

2          MR. KEZHAYA:  Confirmed as 2849.  That's

3   number 8, email dated Decem -- or actually, scheduling

4   request or invitation request is how I'll call it.  I'm

5   gonna call this Hindu.  Hindu or Hindi?  Hindu.  Hindu

6   invitation request.  Invocation request.  And that

7   satisfies my purposes.

8               So let's move on to the next one.  Oh,

9   sorry, number next one, whatever the next PD -- or are

10  we done with PDFs?

11          MS. KING:  Let's see.  Yeah, that's the

12  last one.

13          MR. KEZHAYA:  Okay.  That's the last one

14  Nick found, but there's another one that's more

15  important to me.  So we're gonna take another break

16  while I find it.

17          MS. KING:  Very good.

18          THE VIDEOGRAPHER:  Okay.  The time is

19  1:49.  We're off the record.

20                   (Break was taken.)

21          THE VIDEOGRAPHER:  Okay.  We're back on

22  the record.  The time is 2:45.

23  BY MR. KEZHAYA:

24     Q   Okay.  Due to technological errors, I have an

Page 209

1  email dated October 19, 2017 that I can't put up on the

2  projector.  We will fix this later.  The Bates stamp

3  number is 2890.  This comes from 2890.  Once again,

4  it's not going to be up there.  It's on my tablet.  You

5  guys gotta come huddle in and take a look at it.  I

6  will zoom in.  Everyone come see.

7          This is an email from Alana Olsen, for

8  benefit of the record, dated Thursday, October 19, 2017

9  to ... madam witness, could you please state the

10 person's name here?

11      A    To Annissa Essaibi-George.

12      Q    Okay.  And who is that in the City?

13      A    She was a former At-large City Councilor.

14      Q    Okay.  And as of October 19, 2017 was that

15 her position?

16      A    Yes.

17      Q    Okay.  Recently Mayor Wu had a -- an opponent

18 who I believe is the same person.  Is this the mayoral

19 candidate opponent against Mayor Wu?

20      A    Yes.

21      Q    Okay.  Great.

22          Please read, for benefit of the record, in

23 full this, this paragraph here, the body.

24      A    It is absurd that this group feels entitled

Page 210

1   to being invited to give remarks at the beginning of

2   the Council Meeting, and frankly its insulting to all

3   of the amazing religious and secular leaders who are

4   invited.  They are invited because of all of the

5   incredible work that they do across the City, work to

6   end youth violence, work to provide shelter and

7   stability to the homeless, or compassion and support

8   for people in recovery.  I will not give up the

9   opportunity to highlight one of these amazing leaders

10  who I am privileged to work with for the Satanic

11  Temple.  The City Council does important, serious work

12  for the people of Boston and when we invite someone to

13  participate in our meeting it is out of a profound

14  respect, not a sense of obligation.

15                  THE REPORTER:  Excuse me.  I'm sorry.

16                  MR. KEZHAYA:  Oh, I'm so sorry.

17                  THE REPORTER:  I'm having a technical

18  issue can I just have a ...

19                  MR. KEZHAYA:  Yeah, of course.  Let's

20  take a break.

21                  THE VIDEOGRAPHER:  The time is 2:47.

22  We're off the record.

23                         (Pause.)

24                  THE VIDEOGRAPHER:  Okay.  We are back on

Page 211

```
 1    the record.  The time is 2:48.
 2    BY MR. KEZHAYA:
 3         Q    Okay.  Due to technological issues, we are --
 4    we are back on the record.  I'm gonna take over with
 5    some expository background and then follow up with a
 6    question.
 7              So I take note, please, - everyone else also
 8    take note - that the bottom of the screenshot states in
 9    bold:  Please remember, this is a City of Boston email
10    account, and the content is a matter of public record.
11    Alana Olsen being the chief of staff for Mayor Wu's
12    former opponent.
13              I know nothing more about this email which is
14    why I called for the 30(b)(6) deposition about all
15    discovery because I figured stuff like this would
16    probably be in here.
17              So, City of Boston, is it true that your
18    position or at least your employee's position finds it
19    absurd that TST would demand legally an invitation?
20         A    It looks as if --
21              MS. O'CONNOR:  Objection.  You may
22    answer.
23         A    It looks as if that's the statement that was
24    prepared.
```

Page 212

1    Q    Okay.  And it appears to be a matter of

2  public record and contemporaneously so that Mayor Wu's

3  former political opponent found it to be a matter that

4  "I will not give up the opportunity to highlight one of

5  these amazing leaders who I am privileged to work

6  for -- or work with for the Satanic Temple."

7            That is the text of the email.  Do you agree

8  with me that that's the text of the email?

9            MS. O'CONNOR:  Matt, I'm sorry, are you

10  reading -- this is an email to Annissa Essaibi-George

11  or from Annissa Essaibi-George?

12            MR. KEZHAYA:  This is from Alana, the

13  chief of staff, to Annissa.

14            MS. O'CONNOR:  Okay.  So that's not --

15            MR. KEZHAYA:  For Annissa.

16            MS. O'CONNOR:  Those aren't -- just

17  because I can't see the email, those aren't Annissa

18  Essaibi-George's words; those are the emailer's words?

19            MR. KEZHAYA:  No.  No.  This is her

20  words by her person on her behalf.  That's what we're

21  looking at right now.  Again, basic agency principals

22  flow up to her which in turn flow up to the city body

23  public.

24    Q    So I'm very confused by this email because it

Page 213

```
1    seems to me as if it's exclusionary which is why, City
2    of Boston, I inquire in to you as to your employee
3    whether you think as well that your employee appears to
4    be something giving up an opportunity for someone good
5    so that they have to give someone an opportunity to
6    TST.  Would you agree with me this is your employee's
7    statement?
8                    MS. O'CONNOR:  Objection.  So this is
9    the same type of objection as before, that she can't
10   speak to whatever this person's state of mind is in
11   this email.
12                   MR. KEZHAYA:  Oh, so I should talk to
13   Annissa then.  That's who I should talk to in a
14   deposition --
15                   MS. O'CONNOR:  You should talk to
16   someone other than Christine O'Donnell, correct.
17                   MR. KEZHAYA:  Okay, cool.  We will
18   depose her personally unless you object right now
19   because it seems to me that before when I sought to
20   take Mayor Wu's individual testimony for the purpose of
21   talking about that there video, you know, it was a
22   whole thing.  So I'm, I'm confused as to what's going
23   on here.  You're blocking me with Michelle Wu.  You're
24   blocking me with her.  Are you gonna block me with
```

Page 214

1   Michelle Wu again?

2                   MS. O'CONNOR:  I'm -- I don't agree with

3   the characterization that you just provided, but

4   Christine is not here to testify about what other

5   people's opinions are or the actions that they took on

6   a specific occasion.

7                   MR. KEZHAYA:  That's true.

8   BY MR. KEZHAYA:

9       Q    City of Boston, I would like to depose your

10  former employee about this matter.  Do you have an

11  objection about this?

12                  MS. O'CONNOR:  Well, I will make

13  objections(verbatim) as to who is or is not deposed.

14  And if we get a deposition subpoena, we'll cross that

15  bridge when we get to it.  But I'm not making a, a

16  statement on the record now as to what the City will or

17  will not do in response to a deposition subpoena that's

18  properly noticed.

19                  MR. KEZHAYA:  I see.  Very good.  Okay.

20  Well, then we're at an impasse because I called a

21  30(b)(6) deposition for all things discovery-related

22  and this witness cannot speak to it and you are also

23  not providing me a different witness today who can

24  speak to it.  And you're also not agreeing that I can

Page 215

1    depose a person.  So how do you propose that we resolve

2    this issue?

3                  MS. O'CONNOR:  This, to me, is not

4    responsive to any 30(b)(6) topic for which Christine

5    O'Donnell is identified.

6                  MR. KEZHAYA:  Really, it's not within

7    the 30(b)(6) designation?  That is your, Nicole

8    O'Conner's for and on behalf of the City of Boston's

9    position on this matter, correct?

10                  MS. O'CONNOR:  If you want to point out

11   to me which paragraph you think it's responsive to, I'm

12   happy to take a look.

13                  MR. KEZHAYA:  I would be very happy to.

14   Very, very happy to indeed.  Paragraph 30, any

15   documents provided by the City to TST in discovery,

16   very end, page 9, right above the signature.

17                  MS. O'CONNOR:  To the extent that you

18   want to ask about what the intent was of the document,

19   to me that's a totally different request.  So I think

20   we have a different understanding of what this means.

21   This is -- she has testified about what this document

22   is, but as far as what the person's intent was who sent

23   it, that's a totally different question.

24                  MR. KEZHAYA:  Mm-hmm.  And so where in

Page 216

1    30 does it eliminate intent from any?

2                MS. O'CONNOR:   I mean we're not having a

3    discussion about the semantics.   That's never how I

4    interpreted it.   We have a disagreement then about what

5    is within the scope of a 30(b)(6) depo.

6                MR. KEZHAYA:   Ah, okay.   That's fine.

7    Let's start over from the top and see if I missed

8    anything else of importance.

9    BY MR. KEZHAYA:

10        Q    Okay.   On to phase 2 of the deposition.

11   We've covered your identity.   We've covered your scope.

12   We've covered your agency.   We've covered that you

13   don't have any other relationships.   Grounds for your

14   testimony, we covered that.   What investigation you

15   did, covered that.   This sounds good.

16                Madam -- madam witness, did the City have you

17   investigate Mayor Wu's former political opponent on any

18   of the discovery that it provided, namely, this email

19   that we just looked at?

20        A    I looked at the emails that were produced.   I

21   don't specifically recall this one.   There was -- there

22   was numerous pages.

23        Q    That's fine.

24                MR. KEZHAYA:   Could we put up the next,

Page 217

1   the next email, the number next one?

2                  MS. O'CONNOR:  I do just want to put on

3   the record that we had a discussion about this during

4   our call about the deposition, and you agreed that you

5   would provide any emails that you had particular

6   concerns about or --

7                  MR. KEZHAYA:  Yeah, I forgot that.

8                  MS. O'CONNOR:  Well, I'm -- well, that's

9   a -- that's, that's part of the problem here.  And I

10  just want to put this on the record, that you said that

11  you would pull certain emails that you intended to

12  inquire of the witness about, and I would make sure

13  that she was prepared on those emails.  We never

14  received from you the emails that you were intending to

15  inquire about.  So to now suggest that she's not

16  prepared or she -- you know, is, is not appropriate

17  given our past discussions.

18                  MR. KEZHAYA:  Okay.  So I want to be

19  abundantly clear here.  My understanding from the

20  City's attorney, for and on behalf of the City's

21  attorney's behalf is that it provided these, the City,

22  which is to say it, it, the City, received requests,

23  document requests from me about a religious

24  discrimination case, produced emails one of which

Page 218

1    appears to be a smoking gun of religious

2    discrimination, received a 30(b)(6) notice saying I

3    want to ask about everything that you've been given --

4    you have given to me with -- and the City did not think

5    to have the witness look at the smoking gun email?

6                    MS. O'CONNOR:  So when we spoke, as you

7    recognize, the federal rules require us to confer prior

8    to a 30(b)(6) deposition to make sure we're all on the

9    same page.  I flagged this concern that there were so

10   many emails I couldn't possibly prepare her on all of

11   them, and you agreed to provide me, two weeks in

12   advance of the deposition, with the emails that you

13   intended to inquire about.

14                   MR. KEZHAYA:  I see.

15                   MS. O'CONNOR:  You didn't do that so

16   she's not prepared to testify about this particular

17   email further than what she already has.

18                   MR. KEZHAYA:  I see.  Okay.  Well, let's

19   take a look at the next one, and we'll all see it

20   together.  Scrolling all the way to the bottom -- well,

21   actually, scroll all the way to the bottom, please.

22                   And by the way, the last one was number

23   9, 2890.  I call it the absurd email.  Number 10, this

24   is number 3374.  Let's see here.  Scrolling up.

Page 219

1   Scrolling up.  Scrolling up.  Scrolling up a little bit
2   more.  Continuing.  Continuing.  Okay.  Little bit more
3   because we need to be able to see who sent it.  There
4   we go.
5              (Exhibit 10 was introduced.)
6       Q    Okay.  This is 3373, I apologize, to 3374.
7   On February 14, 2019, which I take note is during the
8   course of this litigation, Molly Jacobson at Jacobson
9   Strategy emails to someone at Boston Herald a forwarded
10  message stating:  Hi Meghan -- again, with Boston
11  Herald which I presume everyone takes note is a
12  publication of general circulation in Boston; is that
13  correct?
14      A    Yes.
15      Q    Thank you.
16           So Boston Herald takes note that -- from
17  Meghan:  Please let me know if I can schedule an
18  interview with The Satanic Temple regarding this
19  breaking news.  Breaking news is the characterization
20  of importance.  Thanks!  Details unnecessary.
21           MR. KEZHAYA:  Scrolling down, we're just
22  looking for the word "absurd".  Ah, there it is.
23      Q    On 3374, line one, two, three, four, the
24  sentence begins -- preceding sentence, line 3, that is

```
                                        Page 220
1    to say, the sentence begins midway through:  The City
2    Council maintains that this practice is
3    nondiscriminatory, a claim that TST views as absurd.
4              So we receive your statement that it's
5    absurd.  We respond in kind that your position is
6    absurd.  I feel like we're at an impasse here.  Is that
7    fair to say, City of Boston witness?
8         A    Yes.
9         Q    Okay.
10              MR. KEZHAYA:  So scrolling up a little
11   bit more.  Okay.  Pausing here.
12        Q    Boston Herald then on February 14, 2019,
13   which again I take note is during the pendency of this
14   dispute, Subject:  Story running tomorrow about claim
15   against City Council, to someone at Boston.gov.
16              Madam witness, who is this Boston.gov person,
17   if you know?
18        A    At the time David Viterinni was chief of
19   staff to at the time Councilor Wu.
20        Q    Councilor Wu.  Councilor Wu's person received
21   notice that TST, generally speaking, takes issue with
22   not getting an invite as of at least 2019.  Is that a
23   correct understanding of this document here?
24        A    Yes.
```

Page 221

1       Q    Now, madam witness, we've talked about

2  Councilor Wu before.  On or around 2017 things changed

3  where people stopped giving or stopped receiving money

4  for and in consideration of providing the blessing to

5  the City.  The importance being 2017.  Is that a

6  correct recollection of mine about your prior

7  testimony?

8       A    Yes.

9       Q    Did you take note of the timing of the email

10  that we took note of earlier?

11       A    No.

12       Q    Okay.  Let's --

13            MR. KEZHAYA:  Suffice it to say, 2017

14  everyone agree that they remember it?  Otherwise, we

15  can see it again.  Any objections?

16            MS. O'CONNOR:  It's up to Christine.

17       Q    Madam witness, do you recall that it was

18  2017?

19       A    That the council stopped paying?

20       Q    Well, no, more particularly that Mayor

21  Wu's --

22       A    Oh, that TST reached out?

23       Q    No.  No.  No.  The prior, the prior exhibit

24  that we looked at, this email dated, let's see here,

Page 222

1    October 19 - it's not up there; it's on my thing -

2    October 19, 2017.  Everyone can see.  Madam witness in

3    particular.

4         A    Oh, yes.  Yes.

5         Q    Yes, right here.

6         A    I couldn't remember the date.

7         Q    Yeah, of course not.  It's a date.  Who would

8    remember that.

9              So it seems to me that there's a very heavy

10   cluster of activity in and around the City which I'm

11   being precluded from talking about with you.  Who do

12   you think would be the best person for me to talk to to

13   shed light on what happened that the money stopped

14   changing hands and also that your other employees

15   stated that they would not give up the opportunity to

16   highlight one of these amazing leaders to work -- "who

17   I am privileged to work with" for The Satanic Temple?

18              That's the end of the sentence, but I take

19   the implication that they are not privileged to work

20   with The Satanic Temple and also The Satanic Temple is

21   not amazing nor are they leaders in the public.

22              MS. O'CONNOR:  Objection.  You can

23   answer.

24        A    The payment issue, that was Councilor Wu when

Page 223

1    she was President Wu.

2        Q    Okay.

3        A    Again, around 2016/2017.

4        Q    Okay.

5        A    And any other questions about the intent of

6    the councilors would be for the councilors themselves.

7        Q    I agree.

8             Is it normal for a chief of staff inside the

9    organization to have made press release-like

10   statements?

11       A    It depends on the councilor, but it's -- it

12   is normal, generally normal.

13       Q    Okay.  All I have is bookending quotes, you

14   know, beginning this email and ending this email.

15            Did you in the course of your investigation

16   run into anything that could shed light

17   documentary-wise, like in terms of literally physical

18   documents that I could look at or, you know, electronic

19   data consisting of the same, within the City that could

20   help me understand, without talking to Mayor Wu's

21   former political opponent, why she found it to be

22   absurd for TST to insist on this invitation?

23       A    No.

24       Q    So I really have to talk to her?

Page 224

1       A    Yes.

2       Q    Okay.  Same for Wu, you're the best person to

3    have talked about it, and you can't talk about it so I

4    really have to talk to Wu, right?

5       A    Yes.

6            MR. KEZHAYA:  Let's see.  Let's scroll

7    up to see if there's anything of interest here.  Scroll

8    up.  Scroll up.  Huh.

9       Q    Okay.  So I see then that press request for

10   invita -- oh, I'm sorry.  I don't think we ever covered

11   this.  So going back to the next one, this email dated

12   February 14 from Boston Herald to Boston.gov which,

13   madam witness, could you please remind me who this guy

14   is?

15      A    At the time chief of staff for Councilor Wu.

16      Q    Okay.  So Boston Herald asks Councilor Wu

17   about this present dispute wherein it gets forwarded up

18   to Elizabeth Pimentel.  Is that a correct ...

19      A    Pimentel, yeah.

20      Q    Pimentel I apologize.  Who is that?

21      A    She was the chief of staff for Councilor

22   Campbell.

23      Q    And --

24      A    And at that time Councilor Campbell was --

Page 225

1   no, no, at that time she was just council -- Councilor

2   Campbell.

3       Q   Okay.  I remember --

4       A   I can't recall.  No, excuse me.  Sorry.  She

5   was Council President in 2019.

6       Q   I seem to remember seeing an email ... ah,

7   here we go.  So Exhibit 1 to the First Amended

8   Complaint, this is doc 16-1, also known here apparently

9   as ECF 16-1, another email.

10          MR. KEZHAYA:  For benefit of counsel,

11  I'm showing them on my tablet because it's faster.

12      Q   So this is -- my understanding of the email

13  that TST sent -- oh, there we go, to Andrea Campbell on

14  October 2, 2018.  That's my understanding, but I didn't

15  receive it from the City.

16          Does the City dispute that on or around

17  October 2, 2018, The Satanic Temple sent an email to

18  Andrea Campbell at Boston.gov with cc to Michelle Wu at

19  Boston.gov requesting essentially an invitation?  Is

20  that a subject of dispute?

21      A   No.

22      Q   Okay.  The details of the email I don't care

23  about, and I don't want to waste your time with.

24          Okay.  Let's just make sure I don't miss

Page 226

1    anything at all.  We're back on the 30(b)(6) matters of

2    exam -- matters for examination.  It's not up there.

3    I'm gesturing generally.  So, madam witness, if you

4    could take a look with me while we go through it.

5              Okay.  One, we've dealt with.  Two, what have

6    we got here?  Both as a general matter.  Okay.  I feel

7    like I've have kinda covered this.

8              Ah, this text -- oh, no, never mind that's

9    just ... okay.

10             I've seen this policy written down somewhere.

11   I don't recall.  Have you seen the policy written down

12   anywhere?  I say policy.  I'm using your words.  Custom

13   is the word I would use.

14        A    I have not.

15        Q    Okay.  All right.  And to be a little bit

16   more precise, I remember seeing it in an email from

17   Michelle Wu to TST essentially stating the position

18   that we don't have to give you an invite if we don't

19   want to.  Is that a fair recitation of the email?

20        A    Yes.

21        Q    Okay.  Let's see here.  So background on

22   ceremony.  When it first arose.  Covered it.

23             Legal chal -- has anyone challenged this

24   before, this, this custom legally?

1        A     No.

2        Q     Okay.  Covered it.  Sorry for getting ...

3    Okay.  Okay.  Okay.  Very good.  Surrounding payment,

4    covered that.

5              Record keeping policies, I don't remember if

6    we addressed that.  You said they hold, they hold it

7    seven years, and it goes to treasury department; is

8    that correct?

9        A     For payments.

10       Q     For payments specifically.  I don't really

11   care about the rest of it.

12             Okay.  City's recordkeeping policies

13   surrounding written communications sent or received

14   by ...  Okay.  Recordkeeping policies, have you all

15   given me anything or everything?  Has anything

16   mysteriously gone missing, things of that nature?

17       A     No.

18       Q     No?  Cool.

19             Intra-City written communications up to the

20   date of the original, okay.  So here's paragraph 6

21   where I also I felt adequately specified that it's an

22   intra-City written communication about TST's invocation

23   demand.  Apparently that was unclear.  I apologize for

24   wasting your time once again, madam witness.

1           Seven:  Dates, time, attendees, subjects of

2    discussion, ah, those are agendas.  I can get those

3    later.

4           Subjective bases, that's a Wu question.

5           General information about any individuals or

6    groups who have demanded participation.  Okay.  Number

7    9, we saw the Hindu leader Raj Zed, if memory serves,

8    Mr. Zed.  Has anyone else other than TST -- well, let

9    me, let me strike that and start over.

10           Other than TST and Mr. Zed has anyone else,

11   to the best of your knowledge, requested an invitation?

12       A    No.

13       Q    Okay.  They always only receive the

14   invitation?

15       A    Yes.

16       Q    They never have any discussions off the

17   record or anything like that you're aware of at least

18   because the City doesn't keep contemporaneous records

19   of the fact that discussions may or may not be

20   happening between councilors and, you know, potential

21   officiants?

22       A    Correct.

23       Q    Okay.  Subjective bases for why each

24   Councilor did or did not heed the demand described in

1  9.   That's a Wu question.   11 --

2        Well, actually correct me if I'm wrong, madam

3  witness.  Would you agree with me this paragraph 10,

4  the subjective bases for why each Councilor did or did

5  not heed the demand described in paragraph 9 from

6  January 1, 2011 to the present, would minimally address

7  Michelle Wu and also Michelle Wu's former political

8  opponent?

9        A    Yes.

10       Q    Okay.  11, identifying information.  Eh, I

11  don't care about that.  Twelve, same thing.  Thirteen.

12       Have you been over these?  I've forgotten

13  these since I've sent them.

14       A    I have been, but I don't remember all of

15  them.

16       Q    Okay.  That's -- yeah, there's a lot of words

17  in here.

18       A    Yeah, I've gone over them.

19       Q    Okay.  Any instances in which the City had a

20  vacancy.  Okay.  So we covered instances in which the

21  City had a vacancy.  I feel like it's adequately clear

22  that vacancies happen.  There are, you know, needs to

23  fill and then that need for filling it does not usually

24  happen until sometimes at least, of the times that we

Page 230

1    saw -- I say usually.  Let me back up.

2          There are probably instances where a need was

3    unmet as of call it the day before the meeting.  Do you

4    recall those exhibits?

5          A    I recall them, but I don't agree with the

6    fact that a need was unmet.

7          Q    Okay.  What is, what is the subject of the

8    dispute there?

9          A    Because a lot of those documents were

10   internal between staff from different offices where a

11   staffer was asking for information in order to prepare

12   notes for their respective boss, and other documents

13   regarding the names were internal for purposes of

14   sending out the Zoom link.

15         Q    Okay.

16         A    So from, from those documents alone it is not

17   clear to me that it was the day before when the person

18   given the invocation knew.  They could have known a

19   couple of weeks before.  They could have known a month

20   before.  Those were just internal emails where other

21   individuals were asking for the name so that they could

22   complete their jobs.

23              MR. KEZHAYA:  Okay.  I propose rather

24   than deposing each of the individuals and asking them

Page 231

1   like one question to issue an interrogatory.  Would it

2   suit the organization's purpose that we reduce the

3   number of depositions and instead resolve the questions

4   as to why this need was unmet as of that date -

5   informational need, I apologize - why this

6   informational need was left unmet until such time and

7   more importantly when that informational need is

8   typically filled?

9          MS. O'CONNOR:  I think written discovery

10  would be an excellent tool to get to the answers to

11  these questions.

12         MR. KEZHAYA:  Great.  I don't want to

13  play semantics with that.  So I propose to write it out

14  right now.  Interrogatory number 1 or whatever,

15  interrogatory number next one:  For each exhibit made

16  reference -- actually, I can actually identify them

17  discretely.  So scheduling emails we've got 5, 4, 6, 7.

18         Four through 7, I propose to have an

19  interrogatory explicitly state for each of Exhibits 4

20  through 7 provide, call in, whatever's in that 30(b)(6)

21  deposition notice, I'm going to copy, paste it, and

22  specifically sub-itemize.  It might be letters.  It

23  might be bullet points.  I don't know.  We'll figure it

24  out as we go.  For now we're going to do A.  I don't

Page 232

1  feel the need to copy/paste those in handwriting.

2              Am I going to get a form objection when

3  I send an interrogatory for each of Exhibits 4 through

4  7, please provide A through whatever discretely copied?

5              MS. O'CONNOR:  I, I don't know --

6              MR. KEZHAYA:  Are these words --

7              MS. O'CONNOR:  -- remember what exhibits

8  your referencing.  I can't --

9              MR. KEZHAYA:  That's okay.

10             MS. O'CONNOR:  I can't give you an

11  answer to that without being served with an actual

12  written discovery request, but rather, --

13             MR. KEZHAYA:  Oh.

14             MS. O'CONNOR:  -- I agree with you that

15  rather --

16             MR. KEZHAYA:  Okay.

17             MS. O'CONNOR:  -- than have unnecessary

18  depos, I'd much rather answer interrogatories.

19             MR. KEZHAYA:  Yeah, I -- well, I do too.

20             MS. O'CONNOR:  So I'll work with you to

21  be reasonable about that.

22             MR. KEZHAYA:  Okay.  So more

23  particularly, so for each of Exhibits 4 through 7,

24  please identify with particularity as follows:  (a) why

Page 233

1  was there a vacancy at that time; (b) the date of the

2  meeting in which there was a vacancy for the invocation

3  at that time; and (c) how, if at all, the time slotted

4  for the invocation ceremony.  The text ends but I'll

5  fill it off.  How, if at all, the time slotted for the

6  invocation ceremony typically gets filled.  Like when,

7  when is this normally filled.  Is it abnormal that

8  Tuesday right before the -- in my opinion right before

9  the meeting we don't know who's blessing the thing.

10            MS. O'CONNOR:  Those seem like

11  reasonable questions that can be answered.

12            MR. KEZHAYA:  Okay.  I agree that they

13  are reasonable questions.  I agree that they can be

14  answered.  I'm questioning you as to whether there's

15  going to be a form objection with that exact text that

16  I just described.

17            MS. O'CONNOR:  I, I don't know.  I, I

18  can't imagine so.

19            MR. KEZHAYA:  I would like you to please

20  waive any opportunity to waive that; otherwise, we're

21  going to have to have another 30(b)(6) depo.

22            MS. O'CONNOR:  I think this is a

23  discussion we can have after the deposition.  If you

24  want to have it on the record we can do that.

1            MR. KEZHAYA:  I strongly prefer to have

2    the deposition -- the conversation on the record

3    because you and I took materially different

4    understandings of our last phone call.  That's why

5    we're having it here and now.

6            MS. O'CONNOR:  Correct.

7            MR. KEZHAYA:  Yes, correct.  So --

8            MS. O'CONNOR:  What do you mean by a

9    form objection?  This seems like a waste of everyone's

10   time, but what do you mean by a form objection?

11           MR. KEZHAYA:  A form objection is one to

12   the effect of I don't understand what this

13   interrogatory is asking.

14           MS. O'CONNOR:  No, you're not gonna get

15   an objection like that.

16           MR. KEZHAYA:  Okay.  That's a form

17   objection.  Great.

18   BY MR. KEZHAYA:

19      Q    Okay.  So number next one, 14, any instances

20   in which the invocation ceremony did not literally

21   implore a supernatural entity to give advice and

22   guidance to the Councilors.

23           Madam witness, you've been seemingly

24   functionally a part of all of them.  You're probably

Page 235

1    the best person to talk about these invocation

2    ceremonies.  How often do people give benediction for

3    Satan to bless the matter?

4         A    There hasn't been any.

5         Q    Never.

6              How often do people suggest that Satan as a

7    general concept is bad?

8         A    That hasn't happened.

9         Q    Not ever?

10        A    Not for the invocation.

11        Q    I'm confused.  Not for the invocation or ...

12   during the invocation your --

13        A    There hasn't been references that I recall

14   that ...

15        Q    Well, earlier you said not ever.  Now you're

16   telling me not that you recall.  So now my job task is

17   gonna be to go find each and every instance that

18   someone said something bad about Satan so that I can

19   clip it out and have, I don't know, however long -- how

20   ever many clips we'd need for trial.  So are you going

21   to go back on that or are you just gonna agree that

22   sometimes people say bad things about Satan?

23              MS. O'CONNOR:  Objection.  You can

24   answer.

Page 236

1      A    To the best of my knowledge, I haven't heard

2   anyone in the invocation say anything bad about Satan.

3      Q    To the best of your recollection as we speak

4   today?

5      A    Yes.

6      Q    But you reserve the opportunity to change

7   that at trial should hypothetically I go through

8   YouTube, find a whole bunch of instances of people

9   talking bad stuff about Satan, --

10     A    Sure.

11     Q    -- correct?  Great.

12          All right.  Fifteen:  Any instances in which

13   the invocation ceremony addressed a topic which was not

14   reflected on the agenda, for example, praying for

15   emotional relief from a tragedy.

16          How often do these blessings entail

17   non-council agenda items?

18     A    Generally they do not, they do not address

19   agenda items.

20     Q    Mmm.

21     A    Sometimes they may speak to issues that are

22   going on in the City.

23     Q    Mm-hmm.

24     A    But all the agenda items have specific docket

Page 237

1    numbers, and I do not recall any instance where an

2    invocation referenced a specific document number.

3            Invocations may, may reference topics in the

4    City, such as violence, homelessness, hunger, things

5    like that, but other than that the invocations do not

6    reference specific items on the agenda.

7        Q    Okay.  So I'm sorry.  I'm using the word

8    "agenda".  You used docket to refer to that.  I, I got

9    confused.

10       A    The agenda is made up of dockets.

11       Q    Yeah.  Okay.  And, and --

12       A    And they're all online.  Available online.

13       Q    Yes.  Yes.  In my parlance docket literally

14   just refers to a court's docket, so I'm not familiar

15   with your words.

16           Going back to this, so it seems fairly often

17   is a fair response to, I don't know, sometimes people

18   talk about -- actually, pretty much exclusively they

19   don't address specific topics on the agenda was my

20   understanding of your response.

21       A    Correct.  Yes.

22       Q    Okay.  How often -- expanding somewhat beyond

23   the agenda, how often does this invocation not just

24   bless the event or, or, you know, the proceeding, but

Page 238

1    just more generally give blessings?  For example, we

2    saw the former -- in the earlier YouTube clip, the

3    priest giving blessings to the, the congre -- or not

4    congregants, the councilors' families.

5              I asked an unclear question.  I apologize.

6              How often do they bless people or things or

7    ideas outside of the notion of this discrete event?

8         A    They -- I don't know of an exact number

9    because the individuals use different terminology.

10        Q    Sure.

11        A    But the invocations are there to recognize

12   the seriousness of the work.

13        Q    Sure.

14        A    They're done before the councilors begin

15   their proceedings for the day.  I do not recall how

16   many times a person giving an invocation has blessed

17   the councilor's family.

18        Q    Okay.  Well, at least one is the ... I

19   mean ...

20        A    Sure, we all saw it today.

21        Q    Yeah.  So I mean really that's, that's all

22   the number I care about.

23             Now, going back more discretely to the

24   question, would you take note, would you take note if

Page 239

1   you're watching a blessing happen and they happen to

2   bless something that's not the discrete event because

3   to you you're just hearing a blessing?  Is that

4   something that would happen?

5       A    I'm not sure I understand.

6       Q    Would you take note -- like, for example, did

7   you take note that this priest or whatever, blessed the

8   councilors' families?  Did you take note of that

9   because I took note of that?

10      A    I did not take note of that.

11      Q    Okay.  So you don't recall, but it's entirely

12  possible with the information that we have available

13  that it's happened other times as well?

14      A    Yes.

15      Q    Okay.  Let's see here.  Any instances in

16  which a guest.

17           Is it the general norm that these blessings

18  generally propose that the council is subservient to

19  some literal supernatural deity?

20      A    That is not the general norm.  I know we all

21  saw a video today where the person giving the

22  invocation referred to the councilors as God's

23  servants, but that generally isn't the norm.

24      Q    Okay.  As a proportion, how often do they

Page 240

1    say, you know, generally bless the event and more

2    particularly these are literally your slaves?

3                  MS. O'CONNOR:  Objection.  You can

4    answer.

5        A    I can't give an exact number.  I am not sure

6    if -- and I -- honestly, I can't even recall if the

7    video we saw today referenced the councilors as slaves.

8    I don't recall any instance where they were referenced

9    as slaves.

10               Occasionally there may be a reference to the

11   councilors as servants, sheep.  However, I do not

12   recall where there's ever been a reference of the

13   councilors doing God's work, where that's the norm for

14   the invocation.

15       Q    Okay.  In the -- are you familiar with

16   biblical history and text -- literally the book, the

17   Bible?

18       A    I know what the Bible is.  I'm not a scholar

19   on it.

20       Q    Okay.  You don't have to be.

21               You know it wasn't written in English, right?

22   Originally, it was not originally written in English.

23       A    Sure.

24       Q    It, it had to be translated for something for

Page 241

1    us to have it in English.

2            Do you know how many times it was translated?

3        A    I do not.

4        Q    Okay.  Do you know when it was originally

5    written?

6        A    I do not.

7        Q    If I told you it was written, give or take, I

8    mean it's about a 200-year period, but call it about up

9    to 200 common era/ -- well, do they call it common era

10   nowadays?  You know, within the past 2,000 years it's

11   not been written.  So about 2,000 years ago it was,

12   wide margin.  Back then they didn't have butlers.  You

13   would agree with me, yes?

14       A    Yes.

15       Q    They had slaves, right?

16           MS. O'CONNOR:  Objection.  You can

17   answer.

18       A    Yes.

19       Q    Okay.  But the Lord's servants to you, City

20   of Boston - not this particular witness - City of

21   Boston, it's not your position that Lord servants is

22   really meaningfully different from Lord slaves or is

23   it?

24           MS. O'CONNOR:  Objection.  She can't

Page 242

1  offer the City's opinion on that particular question of

2  what the City's impression or use of that phrase is.

3      Q    I will ask you.  What is the material

4  distinction between servants and slaves in your

5  parlance?

6              MS. O'CONNOR:  Objection.  You can

7  answer as to you individually.

8      A    My understanding, not in a biblical sense,

9  ser -- I'm sure some use the term interchangeably.

10  Servants may be paid in -- during some times.  Slaves,

11  it's forced labor.

12      Q    Yes.  Yes, it is.  I agree that slavery is

13  forced labor.  It's subservience.  You don't have a

14  choice.  That's obsequiousness is the word I would use.

15          That priest described governmental employees,

16  in my opinion, as Lord's slaves.  She used the words

17  "Lord's servants", but it's a reference to a book that

18  says Aramaic words for literally slaves or so I

19  proffer.

20          As you sit here right now are you in a

21  position to challenge my proffer?

22              MS. O'CONNOR:  Objection.

23      Q    Yes or --

24              MS. O'CONNOR:  She can answer that

Page 243

1    question.

2                    MR. KEZHAYA:  She can answer yes or no.

3                    MS. O'CONNOR:  Can she challenge your

4    proffer?  As to what?  I, I don't understand your

5    question.

6                    Christine, I don't know if you

7    understand that question.

8                    THE WITNESS:  No, I do not.

9                    MR. KEZHAYA:  I object to speaking

10   objections.

11                   MS. O'CONNOR:  Okay.

12                   MR. KEZHAYA:  There shall be no speaking

13   objections or that's gonna be an issue for me.

14                   MS. O'CONNOR:  Okay.

15                   MR. KEZHAYA:  Okay.  No speaking

16   objections.  I know we've been doing a little

17   loosey-goosey but no instructing the witness on the

18   record.

19                   MS. O'CONNOR:  I'm not instructing the

20   witness.  I'm confused by your question.  It's a form

21   objection.  I can't even make heads or tails of that

22   question.

23                   MR. KEZHAYA:  Okay.  The form of a form

24   objection is object.  Please con -- please answer.

Page 244

1  That's the full statement; otherwise, it's a speaking

2  objection which is objectionable and grounds for

3  discovery sanctions.

4          MS. O'CONNOR:  Oh, okay.  Christine,

5  answer that question if you can.

6     Q    Please do.  Yes or no:  Are you in a position

7  to disprove that in Aramaic words 2000 years ago Lord's

8  servants was meaningfully different from Lord's slaves?

9     A    No.

10    Q    Okay.

11          MR. KEZHAYA:  That's a Wu question.  17

12 is just a Wu question.  I'm kinda just skimming through

13 to get us through the end of this.  Bases or source of

14 each.  Ah, that's a Wu question.  Wu question.  Wu

15 question.  Wu question.  Mm-hmm.

16    Q    I take note, number 22, once again

17 specifically identifies any statement -- inclusive of

18 any statements that were written that any councilor has

19 made or either has prepared or has had prepared for

20 them but did not make about Satanism, TST, its

21 membership or its activities.

22          I take note that you are not prepared to talk

23 about that Mayor Wu's former political opponent email

24 in which she found TST and its viewpoint absurd; is

Page 245

1   that correct?

2       A    Yes.

3       Q    Okay.

4            MR. KEZHAYA:  Just once again making

5   very abundantly clear that the witness was unprepared

6   to speak to item number 22.

7       Q    Number 23 --

8            MS. O'CONNOR:  She's prepared to speak

9   about 22.

10            MR. KEZHAYA:  Oh, she is.  Fantastic.

11       Q    So what was going on in Mayor Wu's former

12   political opponent's head when she described it as

13   absurd that TST would think it entitled to an invite?

14            MS. O'CONNOR:  So paragraph 22 doesn't

15   ask for the subjective intent of the councilor.  It

16   just asks for a statement that any councilor has made

17   and so she has fully answered those questions today

18   about that statement that was put up on the screen.

19            MR. KEZHAYA:  These are matters for

20   examination.  I get to ask the who-what-when-where-why.

21            MS. O'CONNOR:  We fundamentally disagree

22   about that.

23            MR. KEZHAYA:  I see.  Well, you

24   understand that my next thing is to move for discovery

Page 246

1  sanctions.

2          MS. O'CONNOR:  You, you can certainly do

3  that.

4  BY MR. KEZHAYA:

5      Q    Okay.  Going back to the next thing, if I can

6  find it.

7          Number 23 was just basically let's talk about

8  the invocation.  Let me be abundantly clear as to the

9  kinds of questions I want to ask.

10          24, City demographics, that's a good one.

11  City of Boston, do you keep official statistics of

12  people's religious beliefs or preferences?

13      A    No.

14      Q    Do you feel like it would be appropriate for

15  the City to take note of the public's religious beliefs

16  or preferences?

17          MS. O'CONNOR:  Objection.  You can

18  answer.

19      A    No.

20      Q    Okay.  Why not?

21          MS. O'CONNOR:  Objection.  Again, you

22  can answer.  Again, this is outside the scope of the

23  30(b)(6), but I will give a bit of leeway here.

24          MR. KEZHAYA:  Thank you.

Page 247

1    A    I'm just not sure if it's relevant for the
2  government's work with regard to trash pickup, public
3  works, parks, things like that.
4    Q    I think we may have had a misunderstanding as
5  to the question and answer.
6    A    Sure.
7    Q    I asked if it would be improper not proper.
8    A    Oh, okay.
9    Q    So I -- as I understand your statement then,
10  I should have asked, to make your statement make sense,
11  would it be proper for the City to do that, and I think
12  that would make your statement make sense; is that
13  correct?
14              MS. O'CONNOR:  Objection.  You can
15  answer.
16    A    So you're asking if it's proper if the City
17  of Boston would take ...
18    Q    Yeah, socially proper.  Let's start with
19  that.
20    A    If the City took data on the religious
21  demographics?
22    Q    Correct.  If the City had a record within its
23  own records that identified here's how many Christians
24  are here in the City.  This is the proportion of our

Page 248

1    population that identify as Christian at least as of

2    the date of this record.

3                    MS. O'CONNOR:  Objection.  So I maintain

4    the position that this is outside the scope of the

5    30(b)(6) topics for which she is designated to testify.

6                    MR. KEZHAYA:  So noted.

7        Q    Witness, please answer the question.  Would

8    that be right or wrong?

9                    MS. O'CONNOR:  No, so I'm instructing my

10   client not to answer the question.

11                   MR. KEZHAYA:  Oh, I'm sorry.  I

12   misunderstood.

13                   MS. O'CONNOR:  It's outside of the scope

14   of the 30(b)(6) topics for which she is identified.

15                   MR. KEZHAYA:  And once again, because we

16   have to keep going through this, you, Nicole O'Connor,

17   is speci -- are specifically directing the witness not

18   to answer a why-not question as to follow up on the

19   response to item number 24?  I want to make sure I'm

20   abundantly clear about that.

21                   MS. O'CONNOR:  Correct.  I don't think

22   that falls within the scope of topic of 24.

23                   MR. KEZHAYA:  Okay.  And you do not

24   assert a privilege objection, correct?

```
                                             Page 249

 1              MS. O'CONNOR:  There's no privilege.

 2              MR. KEZHAYA:  I agree.

 3  BY MR. KEZHAYA:

 4      Q    Okay.  Twenty-five, relative proportionate

 5  share.  Well, 25's basically the same thing.  It's a

 6  spin on the same question.  Does the City take note or

 7  otherwise record or otherwise even consider the

 8  relative proportion of how many people within the City

 9  are of any particular religious persuasion?

10      A    No.

11      Q    Okay.  So, for example, the City doesn't have

12  anything to compete with my Pew research article I

13  found on the internet that says Christianity is, give

14  or take, a 50 percent populous pursuant to its

15  following practices?

16      A    No.

17      Q    Can we agree that that's probably right?

18              MS. O'CONNOR:  Objection.

19      Q    Do you dispute it?

20              MS. O'CONNOR:  You can answer.

21      A    No.

22      Q    You do not dispute, okay.

23      A    (Shakes head.)

24      Q    Okay.  Sum of money the City has ...
```

1           Having sat through 11 years worth of
2    meetings, how many of these invocations are Christian?
3       A    I don't have an exact number.  There -- the
4    majority Christian but within Christianity there's
5    different sects of religion.
6       Q    Sure.
7       A    There's also been a number of representatives
8    from other types of religion.  There's been some
9    laypeople throughout the years.
10      Q    So --
11      A    So I cannot give -- I do not have an exact
12   number or percentage.
13      Q    Okay.  So the City will even extend
14   invitations to nonministers of proper religious
15   entities, just any random person of the public who
16   wants to give a prayer?
17              MS. O'CONNOR:  Objection.
18      Q    Correct?
19              MS. O'CONNOR:  You can answer.
20      A    Again, it's by invitation from the City
21   Councilor.
22      Q    Mm-hmm.
23      A    And there have been instances where an
24   individual from an organization that does work within

Page 251

1    the community may give the invocation.

2              MR. KEZHAYA:   Okay.   Number 27, skip.

3    Skip.   Skip.   Okay.   That's the end of those topics.

4       Q    I posit -- I keep using words like posit and

5    proffer.   These are formal legal -- formal logic, I

6    should say, not legal.   Law is based on formal

7    discourse which is formal logic, so I kind of use the

8    terms interchangeably.   I apologize.   Again, I'm bad

9    with words.

10             A proffer is to make a statement that you

11   posit is true.   Something can be either true or false.

12   Opinions cannot be proved true or false.   Not because

13   opinions are not true or false, but because the First

14   Amendment says that the government may not punish true

15   or false opinions.   That's where we get defamation law

16   from.

17             So back in the day in common law, defamation

18   was strict liability.   You said something bad about

19   someone, well, you better be prepared -- you better be

20   ready to prove it's true.   All of that changed in the

21   mid 1960s or so with a bunch of free speech stuff.

22             I say all of that to say that irrespective as

23   to the impasse on whether, in fact, the City of Boston

24   finds TST's religious viewpoint to be absurd, we see

Page 252

1    that at least one member of its governing body found

2    that to be the case.  Do you agree with me that we see

3    that that person said that?

4         A    Yes.

5         Q    Okay.  How is that not definitionally

6    discrimination?

7                   MS. O'CONNOR:  Objection.  She can't

8    answer that question.  It's not within the scope of the

9    30(b)(6) topics.

10                  MR. KEZHAYA:  We took note earlier at

11   the beginning of these proceedings of the answer in

12   which the City denies that this is religious

13   discrimination.  We took note of that.  I don't

14   understand how that text is not definitionally

15   discrimination.  I need the City's position as to

16   whether the City thinks that is definitionally

17   discrimination, yes or no.

18                  MS. O'CONNOR:  And that's not a topic

19   for which she has been designated to testify, so she

20   can't answer that question.

21                  MR. KEZHAYA:  I see.  So going back then

22   to number 30, am I really to believe that the witness

23   was not informed that the City's position is that it

24   will not extend an invite to TST?  They file an answer

```
                                    Page 253
1   providing it to TST.  It's a matter of public record.
2   And the City's 30(b)(6) witness is unprepared to speak
3   as to the why not of its legal position.  Is that my
4   understanding?
5                   MS. O'CONNOR:  This witness cannot
6   testify as to whether something constitutes
7   discrimination or not under the law.
8                   MR. KEZHAYA:  I'm not asking the
9   witness's opinion.  I'm asking the witness to explain
10  to me how that is not discrimination in the regular
11  sense.  I'm not talking legal sense.  Literally just it
12  seems to me that a conscious decision was made by a
13  City employee in writing to explicitly state that they
14  intentionally do not invite TST because they find them
15  not amazing and not leaders of the public.
16                  I'm just trying to understand how I lose
17  this case from the City's perspective seeing as how
18  this is my opportunity to speak to the City about its
19  legal positions.  That's what depositions are, you see.
20                  MS. O'CONNOR:  So same objection.
21  That's not actually a question.  Thank you for that
22  explanation.  She cannot answer the question about
23  whether this constitutes discrimination.  That is not
24  for Christine O'Donnell to answer during this
```

Page 254

1   deposition.  And if you -- I don't think it's helpful
2   to have continuous debate about this.  If you'd like to
3   add this to your motion, that makes sense.
4            MR. KEZHAYA:  Yes, this is -- I believe
5   we are at a point of impasse.  I posit that the point
6   of the impasse is as follows beginning, quote, now,
7   whether the City discriminated against TST by refusing
8   to extend an invitation is not a valid subject for the
9   30(b)(6) deposition, correct?
10           MS. O'CONNOR:  Correct.
11           MR. KEZHAYA:  And that is the position
12   of Nicole O'Connor, once again, chief -- counsel of
13   record for City of Boston in the course and scope of
14   Nicole O'Connor's employment?
15           MS. O'CONNOR:  And --
16           MR. KEZHAYA:  Correct?
17           MS. O'CONNOR:  -- just so that the
18   record is clear, because it was not a topic for which
19   she is designated to talk about.
20           MR. KEZHAYA:  Great.  Okay.  And one
21   more just, just to put a bow on it, there is not an
22   assertion of privilege, correct?
23           MS. O'CONNOR:  There is no privilege.
24           MR. KEZHAYA:  I agree.  There is no

1  privilege.   I propose to adjourn this meeting.

2                    MS. O'CONNOR:  Sounds good.

3                    THE VIDEOGRAPHER:  Okay.  The time is

4  3:36.  We're off the record.

5                    (Whereupon the deposition was

6                     adjourned at 3:36 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 256

1                    CERTIFICATE

2     Commonwealth of Massachusetts

3     Suffolk, ss.

4

5         I, Kristen L. Kelly, Registered Professional

6     Reporter, CSR and Notary Public in and for the

7     Commonwealth of Massachusetts, do hereby certify that

8     CHRISTINE O'DONNELL, the witness whose deposition is

9     hereinbefore set forth, was duly sworn by me and that

10    such deposition is a true record of the testimony given

11    by the witness.

12        I further certify that I am neither related to or

13    employed by any of the parties in or counsel to this

14    action, nor am I financially interested in the outcome

15    of this action.

16        In witness whereof, I have hereunto set my hand

17    and seal this 9th day of September 2022.

18

19

20

21    CSR No. 115893

22

23    My commission expires:

24    February 3, 2023

```
                                                       Page 257
1                        Veritext Legal Solutions
                              1100 Superior Ave
2                                Suite 1820
                            Cleveland, Ohio 44114
3                           Phone: 216-523-1313
4

     September 13, 2022
5

     To: Nicole O'Connor, Esq.
6

     Case Name: The Satanic Temple, Inc. v. City of Boston, MA
7

     Veritext Reference Number: 5406929
8

     Witness:  Christine O'Donnell      Deposition Date:  8/25/2022
9

10   Dear Sir/Madam:

11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown

17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20

21   Sincerely,

22   Production Department

23

24   NO NOTARY REQUIRED IN CA
```

Page 258

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 5406929
 3       CASE NAME: The Satanic Temple, Inc. v.
                    City of Boston, MA
         DATE OF DEPOSITION: 8/25/2022
 4       WITNESS' NAME: Christine O'Donnell
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8
    _____        _____
 9  Date                     Christine O'Donnell
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
                 Statement; and
14       Their execution of this Statement is of
                 their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

Page 259

```
1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5406929
3        CASE NAME: The Satanic Temple, Inc. v.
                   City of Boston, MA
         DATE OF DEPOSITION: 8/25/2022
4        WITNESS' NAME: Christine O'Donnell
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9        I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                     Christine O'Donnell
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23            _____
              Notary Public
24
              _____
25            Commission Expiration Date
```

Page 260

1                      ERRATA SHEET
             VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 5406929
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____     _____
20   Date                 Christine O'Donnell
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                 _____
                   Notary Public
24
                   _____
25                 Commission Expiration Date

**[0002870 - 27]**

**0**

**0002870**   170:11
**02.14.2019**   4:5
**02201**   2:16
**06.16.2020**   3:17
3:21
**09.29.2020**   3:19

**1**

**1**   3:9 8:10 47:9
59:10 96:18,22
170:1 173:12
180:7 225:7
229:6 231:14
**10**   4:5 189:19
193:1 201:18
218:23 219:5
229:3
**10.19.2017**   4:3
**10.19.2020**   3:11
**10102**   1:3 57:3
**11**   4:7 115:1,6
127:15 174:12
229:1,10 250:1
**11.03.2020**   3:15
**1100**   257:1
**115893**   1:18
256:21
**11:13**   109:1
**11:37**   109:4
**12**   178:1 179:17
207:1,10
**12.12.20**   3:23
**12:05**   178:3
**12:10**   177:24
**12:17**   147:16,19
**12:21**   152:5

**12:31**   152:8
**12th**   106:21
**13**   43:24,24 69:8
73:7 77:20 78:2
126:2 129:7
257:4
**13th**   106:21
**14**   219:7 220:12
224:12 234:19
**14th**   106:22
**15**   196:16 197:17
197:18 206:17
**16**   56:12 202:3
202:20 203:2
206:8
**16-1**   225:8,9
**16-2**   56:12 57:3
**17**   195:3 244:11
**172**   19:6
**18**   58:2,2 111:14
**1800s**   70:7,10,15
72:3,7,7
**1820**   257:2
**19**   176:18 209:1
209:8,14 222:1,2
**1909**   73:19,19
74:2,3,18
**1960s**   251:21
**19th**   177:4
179:12 180:18
**1:01**   185:11
187:15
**1:21**   57:3
**1:24**   203:3 206:8
**1:27**   199:21
**1:38**   199:24
**1:49**   208:19

**1st**   173:4

**2**

**2**   3:11 57:2,5,12
96:17,18 176:15
180:7 185:11
216:10 225:14
225:17
**2,000**   241:10,11
**2-7-7-1**   206:12
**2.19.2020**   3:13
**20**   158:14 258:16
259:22 260:22
**200**   241:8,9
**2000**   244:7
**2011**   72:16 125:1
131:20 157:21
158:5,6 229:6
**2012**   159:10
**2012/2013**
158:11
**2015**   131:20
**2016**   57:23 163:2
163:8 164:1,9
165:1 166:7
**2016/2017**   223:3
**2017**   163:2,8
166:11,14
170:13 172:20
173:12 209:1,8
209:14 221:2,5
221:13,18 222:2
**2018**   57:23,24
158:14 164:11
166:7,9 225:14
225:17
**2018/2019**   47:24
48:3

**2019**   180:18
219:7 220:12,22
225:5
**2020**   176:19
177:4 179:12
189:19 195:3
196:16 201:18
202:20 207:1,10
**2021**   111:14
116:17 118:21
**2022**   1:21 116:18
256:17 257:4
**2023**   256:24
**21**   1:3
**21433**   256:20
**216-523-1313**
257:3
**22**   244:16 245:6
245:9,14
**23**   183:24 194:23
245:7 246:7
**2320**   181:22
183:20 200:4
**2322**   181:23
183:20
**2391**   184:1 189:1
**2392**   184:2 189:1
**24**   197:7,18
246:10 248:19
248:22
**25**   1:21 115:2,7
**25's**   249:5
**25th**   31:4
**26**   103:10 104:17
194:23,24
199:15 201:6,9
**27**   251:2

**2720** 206:11
**2723** 194:21
 198:22 199:15
 201:6,8
**2726** 194:21
 198:22
**2729** 201:15
 202:22 206:5,6,7
**2733** 189:3,5
 194:17
**2734** 189:3
**2771** 206:22
**28-29-30** 27:9
**2849** 207:2,24
 208:2
**2870** 170:8,8,11
 175:23 180:7
**2890** 209:3,3
 218:23
**2:26** 207:11
**2:45** 208:22
**2:47** 210:21
**2:48** 211:1

### 3

**3** 3:13 147:22
 149:3 150:5
 181:24 183:20
 200:5 219:24
 256:24
**30** 15:14,17
 16:20,22,24 18:9
 18:12,16,18,23
 19:2,3,4,9,10,17
 20:7,10 21:3,16
 21:18,24 22:3
 23:2,11,15,22
 25:5 26:6,21,23

27:19,23 28:17
29:20 31:19
37:23 38:2
39:23 40:2,5,11
40:19,21 41:1,4
41:22 62:10
80:20,22 98:3
102:6 103:10
104:10 115:2,7
122:2,10 135:11
137:7 139:6,8
140:3 141:1,3,5
146:6,16,19
147:6,9,21
150:18 152:16
161:3 167:14
170:12 172:20
175:13 211:14
214:21 215:4,7
215:14 216:1,5
218:2,8 226:1
231:20 233:21
246:23 248:5,14
252:9,22 253:2
254:9
**300** 2:5,5
**30th** 172:24
**3373** 219:6
**3374** 218:24
 219:6,23
**34** 189:4
**3434** 176:4,8,16
 180:8
**3435** 176:9,10
**3436** 176:5,9,9
 176:11
**35** 145:8

**3:00** 188:17
**3:36** 255:4,6

### 4

**4** 3:15 50:8
 162:16 184:3
 231:17,19 232:3
 232:23
**44114** 257:2
**45** 144:20 145:1
**479.431.6112** 2:7
**486** 73:19,22,23
 74:1
**4:07** 142:5,6
**4:30** 142:2,5

### 5

**5** 3:17 189:13
 194:16 231:17
**50** 249:14
**5406929** 257:7
 258:2 259:2
 260:2
**55401** 2:6
**5:00** 141:22,22

### 6

**6** 3:19 15:14,17
 16:20,22,24 18:9
 18:12,16,18,23
 19:2,3,4,9,10,17
 20:7,10 21:3,16
 21:18,24 22:3
 23:2,11,15,22
 25:5 26:6,21,23
 27:19,23 28:17
 29:20 31:19
 37:23 38:2
 39:23 40:2,5,11
 40:19,21 41:1,4

41:22 58:6
62:10 80:20,22
98:3 102:6
103:10 104:10
112:16 122:2,10
135:11 137:7
139:6,8 140:3
141:1,3,5 146:6
146:16,19 147:6
147:9,21 150:18
152:16 161:3
167:14 195:1
198:21 199:14
211:14 214:21
215:4,7 216:5
218:2,8 226:1
227:20 231:17
231:20 233:21
246:23 248:5,14
252:9 253:2
254:9
**615** 2:15
**617.635.2902**
 2:17
**64** 1:20
**6:49** 144:17
**6:50** 144:15
**6:54** 196:16
 206:17

### 7

**7** 3:21 200:1
 202:20 206:5
 231:17,18,20
 232:4,23
**7:00** 142:3
 144:12,13,15,15

**[7:51 - agent]**                                                    Page 3

| | | | |
|---|---|---|---|
| **7:51**   179:13 | 223:22 244:24 | **add**   67:23 254:3 | **advance**   186:13 |
| **8** | 245:13 251:24 | **addition**   78:1,4 | 218:12 |
| **8**   3:23 58:6 | **abundantly** | 81:18 83:20 | **advanced**   118:3 |
| 206:10,21,23 | 130:16 137:14 | **additional**   26:2 | 186:2 187:3 |
| 208:3 | 217:19 245:5 | 59:20 | **advice**   145:23,24 |
| **8.30.2017**   3:9 | 246:8 248:20 | **address**   9:12 | 234:21 |
| **8/25/2022**   257:8 | **accept**   59:1,2 | 56:18 70:19 | **advise**   45:6 |
| 258:3 259:3 | 88:20 89:1 | 177:9 229:6 | **advising**   47:18 |
| **84**   73:21 | 101:23 102:3 | 236:18 237:19 | **affixed**   258:15 |
| **8:05**   197:7 | 177:20 | 257:15 | 259:21 |
| **8:09**   145:7 | **acceptable**   9:17 | **addressed**   20:2 | **afraid**   176:21 |
| **8:33**   189:19 | 9:18 | 75:20 97:10 | **afternoon** |
| 191:3 | **access**   174:18 | 98:19 102:6 | 203:13,13 |
| **9** | **accord**   151:9 | 161:17 168:13 | **agency**   42:22,23 |
| **9**   4:3 207:3 | **account**   211:10 | 227:6 236:13 | 59:16,18 |
| 215:16 218:23 | **accurate**   93:6 | **addresses** | 60:20 61:1,22 |
| 228:7 229:1,5 | **accurately**   119:2 | 170:14 | 62:8,14,22 63:12 |
| **9:32**   1:22 5:4 | **acknowledge** | **addressing**   9:24 | 86:21 87:5 89:2 |
| **9:49**   21:7 | 258:11 259:16 | 133:3 | 94:2,18 96:10,11 |
| **9:53**   21:10 | **acquiesced** | **adequately** | 96:17 131:10 |
| **9th**   57:23 256:17 | 151:11 | 41:20 150:14 | 161:3 212:21 |
| **a** | **act**   59:18 172:3 | 201:19 202:15 | 216:12 |
| **a.m.**   1:22 | 258:14 259:20 | 227:21 229:21 | **agenda**   75:23 |
| **abbreviation** | **acting**   59:21 | **adjourn**   255:1 | 76:1,2,2,15,22 |
| 178:16 | 60:3 61:4 112:1 | **adjourned**   255:6 | 78:20 81:21 |
| **abide**   9:19 | 112:2,4,13 | **admin**   50:21 | 82:13,15 180:23 |
| **ability**   176:23 | **action**   99:21 | **administer** | 182:11 187:6,6 |
| **able**   204:2 219:3 | 256:14,15 | 112:23 | 187:10,17,18 |
| **abnormal** | **actions**   5:18 | **administering** | 188:12,14,16 |
| 123:17,22,24 | 60:10 214:5 | 112:9 | 203:9,12,13,14 |
| 171:17 194:1 | **activities**   244:21 | **administers** | 236:14,17,19,24 |
| 233:7 | **activity**   222:10 | 202:9 | 237:6,8,10,19,23 |
| **absolutely**   43:13 | **acts**   73:19 74:2 | **administrative** | **agendas**   64:18 |
| 100:5 199:18 | **actual**   96:14 | 50:12 | 76:18 228:2 |
| **absurd**   209:24 | 163:3 232:11 | **admit**   121:24 | **agent**   43:1 60:1 |
| 211:19 218:23 | **ada**   2:24 5:5,8 | 122:4 | 61:4,7 63:6,10 |
| 219:22 220:3,5,6 | 56:5 57:7 91:7 | **adopts**   98:6 | 87:13,13,15 88:1 |
| | | | 89:3,12 131:8 |

**agent's** 60:20
88:19
**agents** 60:11
63:13,16,20
87:10 88:1,4,16
89:4 98:17,20
**agnosticism** 5:21
**ago** 104:15 156:7
156:8 241:11
244:7
**agree** 17:17
23:24 24:14
25:12 30:10,14
34:9 36:13
40:13 46:24
63:8 97:1 98:24
102:10,11,14
123:18 125:14
140:22 142:16
143:10 161:5
193:14,16 212:7
213:6 214:2
221:14 223:7
229:3 230:5
232:14 233:12
233:13 235:21
241:13 242:12
249:2,17 252:2
254:24
**agreed** 20:4 32:7
32:11 106:20
130:20 157:20
217:4 218:11
**agreeing** 214:24
**agreement** 7:23
**ah** 27:11 35:12
38:18 49:1 58:7
100:18 136:13

141:14 144:14
164:8 173:3
174:16 187:19
216:6 219:22
225:6 226:8
228:2 244:14
**ahead** 103:4
186:13
**aides** 129:15,21
**al** 73:10
**alana** 4:3 209:7
211:11 212:12
**alcevedo** 196:17
196:20
**alderman** 72:8
72:18 73:3,12
**aldermen** 72:19
72:23
**allegations**
17:15
**alleged** 171:23
**alliance** 123:6
**allow** 30:7
169:23
**allowed** 25:13
48:20,22 76:5
141:8
**allows** 48:6
**amanda** 69:12
156:15,21 157:1
157:3
**amazing** 210:3,9
212:5 222:16,21
253:15
**amen** 166:24
**amended** 56:11
56:11 57:3,13
225:7

**amendment** 46:8
46:13,16 47:5
53:16 135:24
251:14
**amicably** 12:12
**amount** 84:11
108:19 115:16
125:22 183:8,10
**amounts** 83:5
**analogies** 89:17
**analogous** 90:7
90:14 92:7
97:11 134:2
**analogy** 92:10
94:4,14 97:13
**andrea** 47:22
48:18 172:12,15
173:12,18
175:16 225:13
225:18
**anecdotes** 85:21
85:23
**anger** 9:1
**angry** 8:24 9:3
34:2,3
**annissa** 4:4
209:11 212:10
212:11,13,15,17
213:13
**answer** 10:15
13:3,20 17:14
23:7,10 24:10
25:16,24 28:10
29:13,22 30:4
31:23 32:1 33:8
36:10 37:11
38:13,15 40:3
42:1 46:21

47:21 48:11
51:22 54:13
59:23 61:24
70:24 71:17,21
72:22 80:17
84:11 86:14
88:13,24 92:16
93:11 95:10,24
96:5 97:1,4,6,13
98:2 99:13
102:14,23
113:24 118:1,7
120:4 133:10
134:11 135:17
137:15,20,23
138:6,10 139:10
139:22,23 140:4
147:6 148:15,16
148:24 149:16
149:21 150:1
151:2,7,16,24
153:2 154:10,11
154:18 165:12
165:15 167:13
169:10 211:22
222:23 232:11
232:18 235:24
240:4 241:17
242:7,24 243:2
243:24 244:5
246:18,22 247:5
247:15 248:7,10
248:18 249:20
250:19 252:8,11
252:20,24
253:22,24
**answer's** 148:5

answered   35:21
  36:12 61:2,12
  71:13 160:15
  233:11,14
  245:17
answering   18:22
  19:16 58:20
  99:9 121:23
  122:5 136:4
  138:17 145:20
  145:22 146:1
  149:15
answers   37:10
  75:5 140:5,6
  231:10
anymore   34:20
  163:7
anyone's   31:22
  143:9
anyway   132:5
  139:18 164:24
apologize   58:21
  58:21,22 125:2
  148:20 152:11
  169:5 178:15
  190:11 202:6
  205:6 219:6
  224:20 227:23
  231:5 238:5
  251:8
apologized
  152:10
apparently
  200:3 225:8
  227:23
appear   182:23
  194:11 258:11
  259:15

appeared   123:16
appearing
  176:18,18
appears   29:15
  36:23 57:5
  111:20 116:7
  171:15 174:6
  177:15 179:22
  182:1 184:4
  191:4 193:8
  194:15 201:17
  204:9 207:18
  212:1 213:3
  218:1
appended
  259:11,18
applies   46:17
  175:4
apply   87:20
appreciate   23:11
  137:9 150:24
apprize   41:20
apprized   40:23
approach   62:5
appropriate
  138:1 141:13
  217:16 246:14
appropriately
  84:19 202:15
approval   82:5
approve   76:13
approved   74:14
approximate
  114:15 159:9
  183:7
approximately
  48:1 126:22
  159:6 166:7

aramaic   242:18
  244:7
arbitrary   5:19
  5:24
arcane   5:12
arcangeli   2:14
  7:17,17
archives   72:11
arguing   137:2
argument
  137:21 176:11
arkansas   104:8
arose   148:1
  226:22
article   249:12
articulated
  101:15
aside   80:9 180:2
asked   49:1 52:20
  55:20 59:1,11
  62:10 69:8,13
  77:3,5 119:2
  125:2 138:8,23
  151:4 153:10
  154:6,20 155:7
  155:11,13,17
  205:11,23 238:5
  247:7,10
asking   13:13
  16:8 34:5,18
  48:5 49:3,15
  50:17 54:11,16
  62:15 85:7
  87:18 88:9
  92:17 93:19,19
  94:2 99:12
  116:21 118:4,23
  130:17,24 133:3

138:4,21,22
  139:3 143:23
  149:6,14 151:4
  153:10,12
  160:20 171:8,13
  178:2 183:1
  187:20 204:1
  205:21,22
  230:11,21,24
  234:13 247:16
  253:8,9
asks   99:20
  207:11 224:16
  245:16
aspect   161:3
assert   122:13
  248:24
asserting   23:5
  26:3 137:14
assertion   254:22
assign   50:1
assignment
  258:2 259:2
  260:2
assist   55:21
  79:10
assistance   7:5
  79:12
assists   79:14
assume   45:21
  57:9 64:4 77:2
  178:17
assuming   71:8
  74:21 192:6
attached   56:15
  259:7
attend   29:21
  65:21 66:1 83:8

**attended** 115:3
124:24 160:7
**attendees** 228:1
**attention** 171:21
200:6
**attest** 106:15
**attesting** 121:7,9
121:11
**attorney** 43:21
44:9 46:22,22
62:5,6 217:20
**attorney's** 65:6
217:21
**attribu** 87:1
**attributable**
92:11
**attribute** 93:20
**attribution**
60:20 86:22
94:3,20
**audiovisual** 1:14
**auditing** 68:21
68:22
**august** 1:21 31:4
111:14 116:17
170:12 172:20
172:24 175:13
**author** 19:5
**authority** 5:24
19:13,14 44:5
45:7 59:18
**authorize** 259:11
**authorized**
45:18
**available** 52:18
72:10 76:18,21
237:12 239:12

**ave** 257:1
**avenue** 2:5
**avenues** 138:2
**avoca** 205:3
**avoid** 34:10
101:3 106:9
139:1 165:3
**avoiding** 165:7
165:20,20
**aware** 6:14 88:4
90:13 164:22
228:17
**awesome** 193:4
193:6,13,17,22
194:17,18
**awful** 34:11,13

**b**

**b** 3:7 4:1 15:14
15:17 16:20,22
16:24 18:9,12,16
18:18,23 19:2,3
19:4,9,10,17
20:7,10 21:3,16
21:18,24 22:3
23:2,11,15,22
25:5 26:6,21,23
27:19,23 28:17
29:20 31:19
37:23 38:2
39:23 40:2,5,11
40:19,21 41:1,4
41:22 62:10
80:20,22 98:3
102:6 103:10
104:10 122:2,10
135:11 137:7
139:6,8 140:3

141:1,3,5 146:6
146:16,19 147:6
147:9,21 150:18
152:16 161:3
167:14 211:14
214:21 215:4,7
216:5 218:2,8
226:1 231:20
233:1,21 246:23
248:5,14 252:9
253:2 254:9
**back** 16:17 21:9
31:1,1,2 32:6
38:1 45:3 50:5
52:4 55:22
58:23 59:9,10
68:10,17 70:2,7
70:9,12 71:9
72:7,21 76:24
86:19 94:23
109:3 124:3
132:19 141:22
144:11 147:18
152:7 159:20
166:8 167:2
173:12 175:22
187:14 199:23
202:24 208:21
210:24 211:4
224:11 226:1
230:1 235:21
237:16 238:23
241:12 246:5
251:17 252:21
257:15
**background**
43:10,15 99:14
136:5 147:22

149:4,9 152:19
179:8 211:5
226:21
**backing** 87:4
94:23
**backtrack** 110:6
**bacro** 149:4
**bad** 58:7 172:1
235:7,18,22
236:2,9 251:8,18
**baker** 69:13
157:4,5 158:10
159:4,18
**baker's** 159:24
**banner** 116:4
**based** 35:20,22
38:14 52:23
53:7,8 75:1 76:2
79:8 83:17
95:21 119:18
126:24 131:3
160:8,21 167:13
174:12 182:11
185:8 251:6
**bases** 148:12,14
149:1 150:3,19
150:22 151:12
152:18,21 228:4
228:23 229:4
244:13
**basic** 19:24
145:11 212:21
**basically** 59:12
59:14 70:17
79:2,21 81:8
82:19 84:9
123:5 129:22
152:15 153:19

157:12 163:13
167:18 181:16
195:19 197:22
198:11,17 201:2
202:8 203:8
246:7 249:5
**basics** 135:23
**basis** 148:14
153:2
**bates** 170:8
175:21,23 180:8
181:20,20
183:20,23
199:14 201:12
202:21 206:7
207:1 209:2
**bear** 9:5
**bears** 56:16
**beginning** 32:23
109:22,23 134:9
159:4 181:22
184:1 210:1
223:14 252:11
254:6
**begins** 195:2,3
196:10 199:14
219:24 220:1
**behalf** 60:3 61:5
102:24 103:12
161:21 179:14
212:20 215:8
217:20,21
**beli** 60:13
**belief** 122:9
**beliefs** 92:10
246:12,15
**believe** 52:10,15
52:16 55:22

67:2,18 68:12,19
72:15 94:16
99:22 111:12
123:8 135:11
145:12 158:14
163:2 170:17
192:8 200:12
206:18 209:18
252:22 254:4
**bells** 195:5
**bend** 6:2
**benediction**
235:2
**benefit** 13:15,16
14:10 57:1
66:12 111:4,8
175:20 176:8
180:6 183:19
188:24 199:13
209:8,22 225:10
**best** 11:14 74:24
138:7 148:9
163:17 166:3
176:22 179:19
222:12 224:2
228:11 235:1
236:1,3
**better** 71:16
161:9 168:13
176:24 251:19
251:19
**beyond** 32:18
40:7 237:22
**bhm** 3:13 182:4
**bias** 80:14 81:1
**biased** 38:20
**bible** 240:17,18

**biblical** 240:16
242:8
**big** 66:15 84:1
94:3
**bing** 33:19
**bit** 11:1 16:17
56:17 72:8
86:19 89:7 91:1
110:6 142:1,3
219:1,2 220:11
226:15 246:23
**bizarre** 12:10
**black** 123:4
182:4 200:13,14
**blasphemy**
172:3
**bless** 142:11,13
144:6 146:11
235:3 237:24
238:6 239:2
240:1
**blessed** 238:16
239:7
**blessing** 124:16
124:16 133:1,5,7
133:18 134:6,9
134:18 138:24
139:1,5,18,20,20
140:2,12,13,15
140:16,24
141:20 142:16
143:19 144:22
162:19 186:4,6,7
186:9 221:4
233:9 239:1,3
**blessings** 236:16
238:1,3 239:17

**blissful** 5:15
**block** 213:24
**blocked** 107:1
**blocking** 213:23
213:24
**bma** 123:4
**body** 43:24
49:18,23 51:11
57:16 76:5 78:5
84:15 89:20
90:1,2,11 91:19
91:23 92:1,12
98:21 107:11,14
107:22 108:3,4,5
109:15,15,17
123:6,9 133:6
189:24 196:14
201:16 209:23
212:22 252:1
**bok** 197:8 198:5
**bold** 211:9
**bonetti** 3:17,22
189:19 192:16
192:18 195:4,22
201:18 203:22
**book** 19:3,3,9
38:2 240:16
242:17
**bookend** 166:7
**bookending**
223:13
**booking** 106:10
**books** 72:6,9
**borne** 5:12
**bos** 60:2
**boss** 230:12
**boston** 1:8 2:12
2:16 6:21,22

**[boston - caps]**

7:16,18 12:1
14:13 15:10,13
15:20 16:14
17:2,4,12 18:2
22:8,12,15 24:19
24:19 42:20
43:23 46:10,12
57:4 59:13 60:2
67:13,15 72:6,11
73:5 74:4,8,10
74:13,13,14,17
76:14 89:3 90:2
90:10,21 95:18
96:1 98:16
102:5 103:11
105:18 117:18
118:19 140:19
141:9,18 142:12
142:15,22 143:1
143:19 144:6
150:16,19 165:9
166:5 167:11
172:9,9 179:14
179:17 180:21
180:22 182:19
184:14 186:17
190:23 193:21
200:9 207:15
210:12 211:9,17
213:2 214:9
219:9,10,12,16
220:7,12 224:12
224:16 241:20
241:21 246:11
247:17 251:23
254:13 257:6
258:3 259:3

**boston's** 10:13
93:5 98:15
115:22 121:17
145:16 204:6
215:8
**boston.gov** 2:18
2:19 177:8
181:1 207:6
220:16 224:12
225:18,19
**boston.gov.**
207:5 220:15
**bottom** 92:9
170:10 176:4
183:24 189:16
194:21,22
201:13 202:22
206:11 211:8
218:20,21
**bound** 153:16
**bounds** 43:19
45:12,17 48:20
172:2
**bow** 254:21
**break** 6:2 21:8
83:3 92:22
108:20,23 109:2
147:11,17 152:2
152:6 168:5
199:17,22
208:15,20
210:20
**breaking** 219:19
219:19
**bridge** 1:20
12:15 214:15
**bring** 115:20
162:8

**brings** 115:16
184:12
**broadcast** 8:1
**brochure** 4:7
**brought** 8:7
11:18 34:14
39:8 150:16
151:11 200:6
**budd** 2:23
**budget** 129:14
**budgetary** 78:24
82:4
**building** 80:3
**bullet** 231:23
**bunch** 31:22
78:16 176:9
180:21 181:16
207:5 236:8
251:21
**burden** 22:7
**business** 90:3
91:9 161:2
165:15 194:12
**busy** 118:19
**butlers** 241:12

**c**

**c** 2:1 5:1 156:16
156:17 157:10
233:3
**ca** 257:24
**call** 42:6 67:5
80:6 83:23
106:16 107:20
116:10 139:19
141:20 144:20
145:7 151:19
162:4 168:15

175:21,24 176:3
178:2,5 186:4
191:5 193:21
194:17 202:22
208:4,5 217:4
218:23 230:3
231:20 234:4
241:8,9
**called** 1:15 17:8
17:11 64:4
72:24 94:11
139:18 144:21
175:22 211:14
214:20
**calling** 84:3
180:3,8 186:6
**campbell** 47:22
48:18 58:11,18
63:11 172:12,15
173:19 175:16
182:8 185:3,7
188:5 224:22,24
225:2,13,18
**campbell's**
173:20 174:8
181:12 184:24
**candace** 180:19
181:7
**candidate**
209:19
**candles** 5:10
**capa** 53:23
**capacity** 43:22
46:3 65:21
141:12,13
**caps** 193:7
194:18

**[caption - christine]** <span style="float:right">Page 9</span>

**caption** 111:6
**care** 42:6 49:13
  55:10 58:12
  84:17 105:10,24
  105:24 118:22
  164:24 178:7
  181:5 197:4
  201:4,7 225:22
  227:11 229:11
  238:22
**carl** 180:18,18
**carlo.org** 178:22
**carry** 59:20
  189:24
**carrying** 121:10
**case** 1:3 12:24
  14:7 22:19 36:9
  36:11 42:14
  46:6 47:5 51:18
  51:24 52:16,17
  52:20 57:4 59:3
  60:1 63:9
  126:11 141:10
  152:17 183:2
  188:4 206:4
  217:24 252:2
  253:17 257:6
  258:3 259:3
**cases** 60:3
**categorizations**
  5:19
**category** 66:23
  69:3
**catholic** 190:12
**caucus** 19:20,20
  20:23,24
**caucusing** 20:23

**cc** 177:2,7
  180:14,18
  225:18
**cc'd** 180:22
  196:19 207:5
**cemented** 203:10
**cen** 129:9
**central** 129:2,4,5
  129:6,10,13,23
  132:19 181:8
  195:18,19,21
  202:8
**ceremo** 147:23
**ceremonies**
  149:6 235:2
**ceremony** 14:20
  147:24 148:4,6
  149:5,10 150:5
  152:20 226:22
  233:4,6 234:20
  236:13
**certain** 13:8
  16:18 23:13
  67:15 89:20
  90:19 97:3
  101:15 102:5,24
  130:13,16
  138:18 140:23
  161:1 217:11
**certainly** 56:8
  100:14 143:15
  149:24 151:1
  246:2
**certificate** 256:1
  259:11
**certification**
  258:1 259:1

**certify** 256:7,12
**cetera** 91:11
  179:4
**chair** 50:13,14
  51:2 112:13
**chairs** 184:22
  187:24
**chal** 226:23
**challenge** 242:21
  243:3
**challenged**
  226:23
**challenges** 148:1
**change** 205:16
  236:6 257:13,14
  259:8 260:3
**changed** 148:4,6
  148:8 221:2
  251:20
**changes** 257:12
  258:7 259:7,9
**changing** 222:14
**chapter** 73:19,21
  73:22
**character**
  121:11,13
**characterization**
  188:21 214:3
  219:19
**characterize**
  133:17
**characterizing**
  120:12
**charge** 7:7
  121:20
**charged** 62:3
  160:13 161:1

**charges** 6:21
**charity** 123:7
**charter** 44:4
  74:6,8 90:21,23
**check** 182:9
**checking** 173:14
  174:13 175:15
**chicken** 132:4
**chief** 157:3,5
  173:21 174:8
  177:10,12
  181:12 202:8
  211:11 212:13
  220:18 223:8
  224:15,21
  254:12
**chiefs** 100:16
**choice** 242:14
**christian** 248:1
  250:2,4
**christianity**
  249:13 250:4
**christians**
  247:23
**christine** 1:14
  3:3 6:15 14:12
  14:16,23 15:9
  18:21 21:23
  35:11 42:19
  56:13,15 57:6
  98:2 100:14,14
  101:7 102:22
  118:1 140:16,19
  141:6 142:22
  151:18 162:3
  167:13,24 168:2
  169:2 172:13
  173:13,13

213:16 214:4
215:4 221:16
243:6 244:4
253:24 256:8
257:8 258:4,9
259:4,13 260:20
**christine's** 35:14
136:6 140:18,24
**chronological**
194:23
**church** 120:11
120:11,12
**circulated**
171:22
**circulation**
219:12
**circumstances**
202:14
**cite** 46:6,7 75:2
135:11
**cited** 8:21
**citing** 52:16
**city** 1:8 2:12,15
6:21,22 7:6,16
7:18 10:13 12:1
14:13 15:10,13
15:20 16:14
17:2,4,11 18:2
22:7,8,12,15
24:4,5,18,19
26:24 27:1,9,12
27:16,17 29:9
39:13 42:20,23
43:23 46:10
48:23 49:3,5,9
49:17 50:8,11,13
51:2,5,8,12
52:21,22 53:3

54:5 59:13 60:2
62:14 63:12,17
63:20,24 64:2,3
64:16,17,17,23
65:5,15,21 66:7
67:13,15,21,21
68:1,15 69:8
70:5,5,8,16 72:6
72:9,10,11 73:2
73:3,5,7,13,18
74:4,8 75:3 76:2
76:3,14,15,19,23
77:19,23 78:1
79:9,11,12 80:3
80:7 82:5,9
83:14 84:2 89:3
90:21 92:3 93:5
95:18 96:1,10,12
96:17 97:10,17
98:11,16,18
102:4 103:11
107:22 112:16
115:21 118:19
121:17,18
123:11,13 126:4
129:1 130:20
131:4,9 135:1,2
136:20 140:19
141:9,18 142:11
142:15,22 143:1
143:19 144:6
145:16 149:12
149:13 150:1,4
150:16,19
153:10 157:24
158:3 160:23
162:21 164:2,2
164:10 165:9

166:5 167:11
170:14,19 171:3
171:18,22,24
172:8 177:6,21
178:1 179:14,17
181:9,11,13
182:6 183:4
184:14 186:3,11
186:17 188:1
190:23 191:1
192:1,2,3,5
195:11,15,16
196:2 200:9,21
203:23 204:6,8
207:7,15,15
209:12,13 210:5
210:11 211:9,17
212:22 213:1
214:9,16 215:8
215:15 216:16
217:21,22 218:4
220:1,7,15 221:5
222:10 223:19
225:15,16
227:19,22
228:18 229:19
229:21 236:22
237:4 241:19,20
246:10,11,15
247:11,16,20,22
247:24 249:6,8
249:11,24
250:13,20
251:23 252:12
252:16 253:13
253:18 254:7,13
257:6 258:3
259:3

**city's** 39:14 44:4
44:4 67:4,9
68:12 103:6
106:6 131:6
147:23 149:4,10
150:4 152:20
157:11 162:16
174:18 197:24
217:20,20
227:12 242:1,2
252:15,23 253:2
253:17
**citywide** 126:5
**civil** 1:16 16:1
16:10 103:11
258:5 259:5
**cj** 182:7,7,8
**claim** 220:3,14
**clarification**
54:14 107:21
**clarify** 55:18
66:5 88:14
**clarifying** 58:16
94:12
**classify** 49:2
133:11
**clause** 21:17,23
42:21 96:18
**clauses** 23:13
**clean** 183:19
**clear** 6:11 9:1
11:17 13:14
18:21 22:4
36:20 57:1
91:15 130:16
137:14 150:11
150:14 171:24
180:6 185:8

199:13 217:19
229:21 230:17
245:5 246:8
248:20 254:18
**clearly** 47:2
73:11 205:18
**clergy** 70:10,15
121:19 125:18
163:7
**cleveland** 257:2
**client** 42:4 46:22
139:15 248:10
**clip** 235:19
238:2
**clips** 235:20
**cluster** 222:10
**codified** 53:19
**cohesive** 164:1
**coincides** 163:12
**coletta** 3:11
176:19,20 177:5
177:7,9 179:13
180:17
**colleagues** 181:7
**color** 121:3
**coloring** 152:16
**com** 76:23
**come** 51:16 71:8
71:13,17 78:2
80:4 125:19
126:1 127:2,5,14
134:15 135:13
147:1 151:11
171:21 187:10
188:6 200:17
209:5,6
**comes** 47:3
209:3

**comfortable**
38:7
**comforting** 5:16
**coming** 11:20,21
29:9 35:5 61:20
177:22
**commencing**
1:21
**commended**
172:4
**comment** 83:9
83:19
**commission**
256:23 258:19
259:25 260:25
**committee** 44:2
76:23 129:19
**committees**
51:12 82:10
83:15
**common** 69:24
114:10,12
122:18,23
184:15,16,17
204:7 241:9,9
251:17
**commonwealth**
1:19 256:2,7
**communicate**
95:1,3 108:5
171:11
**communicated**
95:7 102:2
**communicates**
194:4
**communicating**
171:1

**communication**
156:3 171:9
197:23 227:22
**communications**
46:23 171:5
181:8 194:10
227:13,19
**community**
171:6 200:14
251:1
**compassion**
210:7
**compel** 38:11,13
**compete** 249:12
**complaint** 13:3
13:20 17:13,14
56:7,11,16 57:3
57:13 111:15
125:12 151:10
157:22 225:8
**complete** 131:18
131:24 132:2
230:22
**completed**
203:12 257:15
**compliance**
14:12 15:9
42:19 63:2
**comprehensive**
130:4
**comprised** 24:5
49:5 89:21,21
**con** 243:24
**concept** 61:22
94:19 134:2
235:7
**concepts** 60:22

**concern** 81:2
218:9
**concerning**
103:13
**concerns** 217:6
**conclusion**
139:24 200:18
**concrete** 5:18
**conduct** 166:1
**confer** 218:7
**confirm** 68:1
184:19 207:24
**confirmed** 208:2
**confused** 56:17
58:17 97:16
139:8 143:23
149:19 164:10
193:2 198:15
212:24 213:22
235:11 237:9
243:20
**confusing**
206:15
**confusion** 31:11
100:22 101:3
141:17
**confusion's**
30:19
**congre** 238:3
**congregants**
13:16,18,24
16:19 91:21
92:10 102:17
169:7 238:4
**connected**
197:12
**connecting**
197:9

conscious
  253:12
consent   103:12
consider   53:24
  114:3 249:7
consideration
  221:4
considered
  163:17
considering   37:1
consistency
  14:19
consistent   7:2
  113:12 184:7
  202:16 207:20
consistently
  35:22
consisting
  223:19
constituent   78:6
  78:8,13,14 79:6
  79:7,9 81:7,11
  84:2
constituents
  51:9 53:11 78:6
  79:11,11 80:10
  84:16,17 93:20
  95:22 110:16
  154:22
constitutes
  140:24 253:6,23
consult   33:4
consulting   10:6
  34:7
contact   79:20
contemporane...
  228:18

contemporane...
  212:2
content   211:10
contention   12:2
  12:3,8,17 33:14
  33:15
contentious
  185:9
context   20:7
  25:5 41:1 43:6
  43:11 45:5
  59:17 149:13
  174:3 182:20
  190:22 191:7
  196:9 203:22
continue   36:24
  113:17 116:1
  120:7,16 122:15
  123:1 125:8
  129:18 132:22
  143:21 144:11
  145:4 148:23
continuing   143:8
  146:7 219:2,2
continuous
  254:2
controls   55:1
  76:2
convenient
  49:24
conversation
  10:12 28:11
  30:22 34:20
  101:19 153:20
  156:7 234:2
conversations
  48:11,12

cool   58:4 123:15
  124:8 201:4
  213:17 227:18
coordinate   104:9
  161:24 191:12
copied   232:4
copies   8:10
copy   56:10 58:7
  231:21 232:1
corporate   90:11
  92:12
corporation
  89:19,20 90:10
  107:19
corporations
  19:4 90:9
correct   15:15,16
  15:23 16:11
  17:6,9,15,16
  18:5,10 20:18
  22:9,10,12,13,15
  22:16 26:11
  29:9,17,23 30:15
  39:17,20 41:22
  41:23 44:9,12
  45:10,11,15,19
  48:7 49:16 52:7
  55:4 57:23 59:7
  59:15 60:6
  61:15 63:13
  64:5 66:18 72:3
  80:23 82:21,21
  83:7 85:15 87:8
  98:4 103:15,19
  105:4,9 107:12
  110:19 113:5,6
  119:7 122:10,11
  122:13,14

126:11 128:13
  131:11 133:2
  137:5,16,17,21
  145:15,17 146:2
  146:3,6 153:8
  154:15 157:14
  158:21 161:14
  161:18 162:22
  163:9,14 166:10
  169:3 170:20
  172:13 183:14
  190:13,24
  193:18 198:4
  213:16 215:9
  219:13 220:23
  221:6 224:18
  227:8 228:22
  229:2 234:6,7
  236:11 237:21
  245:1 247:13,22
  248:21,24
  250:18 254:9,10
  254:16,22
corrections
  257:12 259:17
correctly   75:21
  83:2 115:6
  172:10
correspondence
  195:2
coun   65:3
council   14:13
  15:10 16:15
  42:20 43:23
  46:10 49:5,8,11
  49:15 50:6,9,10
  50:11,12,12,13
  50:19 51:2,5,11

51:12 52:5,21,22
54:5 58:24 64:4
64:17,18 65:3,21
69:20 70:6,8,16
72:9,12 73:2,3,7
73:13,19 74:5
75:3 76:2,3,13
76:15,19,21,23
77:2,11,17,20,23
77:24,24 78:1,1
78:3 79:10 82:6
82:9,24,24 83:14
84:2,20 99:15
107:22 111:23
111:24 112:2,4,5
112:15 126:3
129:2 130:21
131:4 135:1
158:3,15,17,18
158:19,21,23
159:3 160:4,17
163:10 164:2,2
166:16 170:15
170:20 171:3,18
171:22 172:16
174:8 177:6,21
178:1 179:17
181:9,11,11,14
182:6,12 184:21
184:21,22
185:15,20,24
187:23 188:1,2
188:10 192:2
195:11,15,16
196:2,19 198:3
200:21 203:23
204:8 207:7,12
207:15,15 210:2

210:11 220:2,15
221:19 225:1,5
236:17 239:18
**council's** 48:23
49:3,17 52:6
68:15
**councilor** 45:9
47:3,18,20,22
48:3,19 49:9,18
50:8 51:8 53:5,8
54:24 55:3,21
58:11,18 63:10
69:13,13 71:20
82:14,18 83:23
84:8,19 85:3
86:9 89:13 97:8
98:6 108:13
110:6,12 111:22
112:3,16 114:4
115:16 116:15
126:5,5 153:11
154:6,20 155:1
155:18 157:4,8
158:10,13,14,18
159:24 160:3
166:17 171:24
172:18 173:18
173:20 177:11
177:13,20 178:6
179:15,22
181:10,15 182:8
184:23 185:3,7
186:12 187:21
187:22 188:4,5,9
191:8 192:18
195:24 197:8
198:5 200:13
202:5,13 203:4

203:18 205:5,8
205:11 207:9
209:13 220:19
220:20,20 221:2
222:24 223:11
224:15,16,21,24
225:1 228:24
229:4 244:18
245:15,16
250:21
**councilor's**
89:12 173:14,22
174:13 238:17
**councilors** 43:24
45:6 49:15
51:13 52:24
53:3 59:8 64:16
64:17 65:15,18
65:19 66:7,15
69:8 71:7,8 76:4
78:2,4 79:10,13
79:23 80:3,6,8
80:12 82:1,1
83:6,21,22 84:4
84:18 85:4 86:6
86:12,17 89:3,4
89:8 93:20 95:1
95:4,7,19 96:4
97:2 98:18,20
99:16,20 100:1
100:16,17 103:1
108:11 109:21
116:11 120:20
120:23 122:18
129:8 144:21
145:10 146:11
153:10 157:12
157:12,19,23

158:6,7,10
159:13 160:11
160:16,19 161:6
168:9 170:17
171:2,12,21
174:19 181:17
186:20 187:3,5
197:20 200:24
202:10 203:19
204:5,24 205:1
223:6,6 228:20
234:22 238:4,14
239:8,22 240:7
240:11,13
**counsel** 1:15
7:20,22 11:24
14:13 15:10
42:20 63:3
64:14 65:6,13,13
130:19,21
145:23,24 189:6
225:10 254:12
256:13
**counselors**
107:12
**count** 157:19
**county** 258:10
259:15
**couple** 82:17
102:23 128:6
156:12 183:8
230:19
**course** 10:13
13:10 30:9
32:16 38:22,24
51:1 68:6 75:8
75:14 95:8
98:19 120:12

126:20 127:12
128:6 153:7
194:18 210:19
219:8 222:7
223:15 254:13
**court** 1:1 13:9,10
19:21 28:6 38:8
41:7 104:20,23
105:1 111:6
121:9 143:4,15
165:20 179:10
258:7
**court's** 7:5 13:15
14:4 237:14
**covered** 148:1
216:11,11,12,12
216:14,15
224:10 226:7,22
227:2,4 229:20
**covering** 116:4
**covers** 69:4
**coworker** 195:8
**create** 128:5
**creates** 76:8
**credibility**
120:20
**cross** 3:2 12:15
33:8,11 172:1
214:14
**crown** 2:2
**crown.law** 2:8,9
**csr** 1:18 256:6
256:21
**culture** 193:21
**cumin** 176:19
177:15
**cummin** 177:5

**curious** 165:5
**curley** 69:12
156:15,16 157:1
157:3
**current** 145:9
158:19 170:17
**currently** 121:18
158:20,20
**custodian**
132:12
**custom** 53:14,15
53:21 54:3 55:6
70:2 114:13
157:14 226:12
226:24
**customs** 53:20
148:6
**cutoff** 91:17,20
**cv** 1:3 57:3

**d**

**d** 3:1 5:1 156:20
192:15
**dance** 139:9
**darkened** 5:12
**data** 223:19
247:20
**date** 57:22
157:21 177:2,4
222:6,7 227:20
231:4 233:1
248:2 257:8
258:3,9,19 259:3
259:13,25
260:20,25
**dated** 176:18
179:3 206:8,17
208:3 209:1,8

221:24 224:11
**dates** 101:14,15
101:16 104:3,6,9
104:10 106:14
106:14,17,20
107:1 159:4
198:3 228:1
**david** 3:19 4:6
220:18
**day** 19:23 24:8
24:12,15 34:7
104:11 168:16
185:13 191:16
203:8 230:3,17
238:15 251:17
256:17 258:16
259:22 260:22
**days** 257:18
**de** 196:18
**deadline** 203:17
**deal** 9:4 79:8
**deals** 44:2
**dealt** 226:5
**dear** 171:21
197:8 207:13
257:10
**debate** 24:8
254:2
**decem** 208:3
**december** 207:1
207:10
**decency** 172:2
**decent** 108:19
**decide** 65:18
69:14
**decided** 113:9
166:19

**decipher** 176:23
**decision** 19:5
62:3 63:24 64:2
98:7 130:18
164:6 166:15
203:15 253:12
**decisions** 64:4
**deduce** 116:6
202:14
**deducible** 98:15
**deed** 258:14
259:20
**deemed** 257:19
**def0002320-2...**
3:14
**def0002391** 3:16
**def0002723-2...**
3:20
**def0002729-2...**
3:22
**def0002733-2...**
3:18
**def0002870** 3:10
**def0002890** 4:4
**def0003373-3...**
4:6
**def0003434-3...**
3:12
**def2849** 3:24
**defamation**
251:15,17
**default** 28:11
**defend** 17:12
**defendant** 1:9
2:20
**defendant's**
170:8,11 176:4
200:4

defendants   7:14
defensive   58:19
  58:20
define   42:24
  45:4 54:3 93:2
  121:4
defined   36:8
  92:1,3,4
defining   67:10
definition   35:6,8
  54:3 61:6 87:5
  119:15 121:15
  123:9
definitionally
  138:23 252:5,14
  252:16
degrees   117:19
  118:3
deity   239:19
deleting   206:22
delineation
  88:10
deliver   147:2
della   190:3,12
delusions   5:16
demand   5:17
  150:20 151:8
  163:13,16,21
  165:1,4 211:19
  227:23 228:24
  229:5
demanded   7:1
  151:10 164:1,9
  164:15,15 228:6
demands   151:6
  164:13
demise   6:4

demographics
  246:10 247:21
demonstrably
  5:22
denies   7:6
  252:12
denomination
  192:7
deny   98:11
  101:23 121:24
  122:4
department   2:12
  68:13,20 227:7
  257:22
departments
  79:13
depend   61:23
  116:15
depending   81:21
  186:22
depends   37:3
  46:9 61:7 75:23
  76:1 82:13,18,19
  85:8,10 116:11
  124:21 167:6
  223:11
depo   40:5
  104:10 147:6
  216:5 233:21
deponent   3:2
  21:18,24 23:2
  96:20,21
depos   232:18
depose   24:18
  213:18 214:9
  215:1
deposed   214:13

deposing   19:4
  24:3 103:11
  230:24
deposition   1:14
  12:11 13:11
  14:8 15:12,15,17
  16:24 17:9 18:9
  18:13,21 19:9,17
  19:22 20:7,17
  22:3,5 23:15,21
  23:22,23,23
  27:24 28:3,17,19
  30:8 31:15,19
  32:8,9,10,10,24
  35:10,24 36:1,18
  39:24 41:1,4,8
  44:22 64:23
  67:19 94:11
  96:15 103:7,9,14
  104:6 105:3,6
  116:18 117:7
  122:2 127:18
  128:19,21
  131:11 134:23
  135:10 137:7
  140:11 141:5
  143:6 147:10
  150:18 151:21
  153:8 161:21
  211:14 213:14
  214:14,17,21
  216:10 217:4
  218:8,12 231:21
  233:23 234:2
  254:1,9 255:5
  256:8,10 257:8
  257:11 258:1,3
  259:1,3

deposition's
  107:2
depositions   24:2
  28:13,22 29:22
  35:23 37:9
  231:3 253:19
describe   110:1
  119:10,11,20,22
  119:24 133:20
  134:13,18 145:9
  170:14 196:23
  198:23
described   206:7
  228:24 229:5
  233:16 242:15
  245:12
describing   119:7
  121:13
designate   103:17
  103:21 130:18
designated   18:23
  20:10,13 22:21
  23:10 24:11,22
  25:21 26:19
  30:12 37:23
  39:22,24 40:7
  87:7 96:3,3 98:3
  98:6 100:15
  103:16,23 105:9
  108:6 116:18
  129:1 130:10,11
  130:11,14,17,17
  130:22 136:8,15
  137:9,24 140:23
  141:16 143:2
  146:16 150:3
  170:8 199:15
  248:5 252:19

254:19
**designating**
100:13 119:21
**designation** 23:3
73:1 90:12
141:3 183:21
189:2 198:24
215:7
**designations**
50:1
**desires** 108:5
**despite** 10:5
**destroyed** 6:3
**detailed** 168:12
**details** 55:10
57:16 170:3
196:20 219:20
225:22
**determination**
165:19
**determine**
155:18 159:16
**determined**
166:3
**determines**
150:1 153:11
154:6
**determining**
117:7
**devices** 7:4
**dialogue** 155:8
**dictionaries** 34:7
**dictionary** 10:6
33:4,5 35:5,7
36:2
**difference** 63:5
73:12,14,16

**different** 23:18
25:9 53:18
54:21,22 71:8
72:9,18,24 74:19
89:7 94:13,15
104:13 118:23
134:19,21,22
135:3 137:10
139:2 140:17
143:24 203:19
214:23 215:19
215:20,23
230:10 234:3
238:9 241:22
244:8 250:5
**differing** 106:11
**difficult** 149:20
**difficulty** 178:15
**direct** 3:2 6:8
**directed** 9:2
131:1
**directing** 133:1
137:19 248:17
**directive** 42:6
**directly** 183:1
**director** 14:13
15:10 42:20
63:2 157:8,10
163:6 181:13
191:7 195:15
**disagree** 19:1
30:6 36:13 38:4
40:13 50:3,4
63:4 103:4
107:5 140:8
188:21 205:19
245:21

**disagreeing**
138:24
**disagreement**
27:23 41:4
106:5,24 216:4
**disagreements**
23:12
**discourse** 8:2,4
9:13 33:16
84:10 251:7
**discoverable**
157:20
**discovery** 27:2
27:16,17 64:19
66:22 68:7
75:13,15 86:8
132:18 161:22
169:1,3,6,8,22
170:3,4 211:15
214:21 215:15
216:18 231:9
232:12 244:3
245:24
**discrete** 61:13
184:5,13 205:2
238:7 239:2
**discretely** 10:19
10:20 231:17
232:4 238:23
**discriminate**
136:21
**discriminated**
254:7
**discrimination**
217:24 218:2
252:6,13,15,17
253:7,10,23

**discuss** 21:1
160:9
**discussing**
136:17
**discussion** 25:14
30:21 31:5,9,10
34:15,18 84:9
98:19 196:11
216:3 217:3
228:2 233:23
**discussions**
130:21 131:6
217:17 228:16
228:19
**dismiss** 13:4,5
13:20,21
**disprove** 164:18
244:7
**dispute** 7:10 8:1
9:9 11:24 12:1
12:14 17:18,24
18:1 20:4,5,6
27:5,7 29:15
32:1 33:16
36:20 37:17
40:17 46:12
81:16 86:4
88:21 102:18
129:23 136:10
136:12,18,19
149:7 152:15
157:22 162:20
169:15 186:5
220:14 224:17
225:16,20 230:8
249:19,22
**disputes** 11:9

**disregarding**
  176:6,10
**disrespectfully**
  152:1
**dissipate** 5:15
**distinction** 72:19
  73:10 242:4
**district** 1:1,2
  50:8 51:8 69:16
  69:16 110:15
  112:16 121:1
  126:5 154:22
  172:17 179:18
  207:9
**districts** 53:10
  53:11 80:8
  85:11
**division** 192:11
**divulging** 46:21
  48:11
**doc** 225:8
**docket** 13:11
  14:5,5 56:12
  57:3 78:21
  82:17 236:24
  237:8,13,14
**dockets** 82:15
  237:10
**doctrines** 5:12
**document** 74:12
  175:2 179:9,22
  183:16 198:17
  200:10,12
  215:18,21
  217:23 220:23
  237:2
**documentary**
  223:17

**documentation**
  173:17
**documents** 13:1
  27:1,15 56:3
  64:18 67:3 70:5
  70:9 79:17 82:7
  169:12 170:5,6
  174:20 182:23
  196:12 215:15
  223:18 230:9,12
  230:16
**doing** 8:14 20:2
  28:7 31:8 89:22
  89:24 90:1,2,6
  90:16,24 91:7,18
  94:11 95:8 99:2
  117:2 128:24
  134:22 137:4
  146:14 186:7,9
  195:13 203:16
  240:13 243:16
**door** 64:12
**dots** 200:18
**drafting** 55:21
**drafts** 30:15
**draw** 92:10
  200:18
**driver's** 15:2
**drop** 168:23,23
**due** 187:16
  208:24 211:3
**duly** 15:2 256:9
**dump** 198:17
**duties** 63:2
  88:19
**dynamic** 120:11

**e**

**e** 2:1,1 3:1,7 4:1
  5:1,1 156:17,18
  157:5 192:15
**earlier** 18:4 27:3
  93:3 94:5,6,7
  107:10 109:6
  117:4 125:11
  134:14 153:5,20
  180:11 221:10
  235:15 238:2
  252:10
**easier** 173:8
**eastern** 207:11
**easy** 111:14
**eat** 5:15
**ecf** 225:9
**edits** 116:13
**educate** 40:24
  44:21 93:11
**education** 43:20
**educational**
  120:5
**edwards** 177:11
  177:13,20 178:6
  179:15,22 191:9
  192:19,20
  195:24
**effect** 48:18 94:1
  129:22 161:5
  234:12
**efficient** 189:18
**eh** 229:10
**eight** 206:10
**either** 11:12
  68:21 165:6
  169:18 172:8
  244:19 251:11

**elected** 89:5,8
**election** 158:3
**electronic**
  223:18
**electronically**
  4:24
**eli** 173:20 174:8
  175:6,16 184:23
  185:22 188:8
**eliminate** 216:1
**eliminating**
  119:19
**elizabeth** 3:15
  180:19 181:11
  224:18
**else's** 117:9
**elusory** 5:19
**email** 3:9,11,15
  3:17,19,21,23
  4:3,5 52:11,15
  55:22 56:13,15
  56:18,19 57:5,21
  58:2,3,8,10,11
  58:17,18 80:5
  83:21,22 95:13
  100:13,22,24
  101:11 102:22
  104:4,6,15
  106:14 170:14
  170:18,23
  171:12,18
  172:10,20,21,21
  172:24 173:4,5
  173:14,16
  174:10,13 176:1
  176:18 177:9,17
  177:19 179:2,3,5
  179:12 180:7,9

182:18 184:7
185:8,10,22
187:14,18
189:16 191:5,23
194:18 195:2
196:14,24 197:1
201:18 202:23
203:21 205:8,16
205:17 206:8,14
206:16,19 207:1
207:4,20 208:3
209:1,7 211:9,13
212:7,8,10,17,24
213:11 216:18
217:1 218:5,17
218:23 221:9,24
223:14,14
224:11 225:6,9
225:12,17,22
226:16,19
244:23 257:17
**emailed** 101:21
101:22
**emailer's** 212:18
**emailing** 184:23
196:1,4 197:20
**emails** 56:2
83:22 86:7
101:1 108:10,12
108:17,21
168:15,24
173:15,22
174:14,20 175:1
181:2 189:15
195:3 199:1,3,10
216:20 217:5,11
217:13,14,24
218:10,12 219:9

230:20 231:17
**embrace** 5:14
**emotional**
236:15
**emphasize**
130:10,10
145:14
**emphasized** 63:4
142:11,12
**emphatic** 193:14
**emphatically**
145:8
**employed**
157:24 181:10
256:13
**employee** 60:2
121:18 141:20
142:12 148:8
165:10 213:2,3
214:10 253:13
**employee's**
211:18 213:6
**employees** 64:16
66:21 69:9
75:10 147:3
180:23 222:14
242:15
**employer** 60:4
161:1
**employment**
62:24 63:5,6
254:14
**enclosed** 257:11
**encode** 74:19,19
**encoded** 74:10
**endorsed** 122:9
**endorsement**
113:21 114:4

121:21
**endow** 144:23
**endowed** 147:4
**ends** 185:10
233:4
**engaged** 84:22
85:11
**engagement**
85:10
**english** 240:21
240:22 241:1
**enlighten** 94:8
**ensure** 44:3
**entail** 64:13
236:16
**entered** 259:9
**entertaining**
85:17,23
**entire** 28:3 258:5
259:5
**entirely** 140:16
168:1 239:11
**entities** 250:15
**entitle** 30:7
**entitled** 17:18
32:7,8 36:4,5
102:7 135:4,9
209:24 245:13
**entity** 49:19,19
49:20,21,22
97:18 98:17
149:1,1 234:21
**enumerated**
21:17 26:5
41:22
**era** 241:9,9
**errant** 152:10

**errata** 257:13,18
259:7,10,18
260:1
**error** 112:19
**errors** 208:24
**especially**
175:17
**esq** 257:5
**esquire** 2:3,4,13
2:14
**essaibi** 4:4
209:11 212:10
212:11,18
**essentially** 55:11
59:3 157:17
225:19 226:17
**established** 75:3
**et** 91:11 179:3
**event** 6:23 12:8
107:1 119:6
162:21 182:6
200:13,15,20,23
201:1 237:24
238:7 239:2
240:1
**events** 80:7,7
**everyone's** 234:9
**everything's**
159:9
**exact** 70:6
115:15 125:22
192:10 233:15
238:8 240:5
250:3,11
**exactly** 20:19
48:8,21
**exam** 226:2

| | | | |
|---|---|---|---|
| **examination** 6:8 | **exemption** 175:3 | **explain** 99:7 | 102:8 106:15 |
| 19:8,11 26:5 | **exhaustion** | 147:9 169:7 | 113:9 136:20 |
| 33:11 41:19,21 | 194:16 | 179:4 253:9 | 142:16 143:19 |
| 59:11 122:10 | **exhibit** 3:9,11,13 | **explained** | 170:10 228:19 |
| 226:2 245:20 | 3:15,17,19,21,23 | 100:12 102:21 | 230:6 251:23 |
| **examine** 45:2 | 4:3,5,7 8:10 | 130:19 | **factors** 70:1 |
| **examined** 15:3 | 57:2,5,12 108:21 | **explanation** 77:6 | **facts** 26:24 27:9 |
| 33:8 | 170:1 175:20 | 253:22 | 27:12 |
| **examining** | 176:15 180:7,7 | **explicitly** 231:19 | **factual** 93:12,15 |
| 169:16 | 181:24 183:20 | 253:13 | 93:18 |
| **example** 34:3 | 184:3 189:13 | **exposition** 16:18 | **failed** 176:21 |
| 61:8,11,13 64:1 | 194:16 195:1 | 93:18 | **fair** 55:14 62:15 |
| 91:6,9,10 95:20 | 199:14 200:1 | **expository** 211:5 | 62:20 77:2 |
| 111:3 123:17 | 206:23 207:3 | **expound** 16:8 | 81:11 90:14 |
| 161:12 191:5 | 219:5 221:23 | **expressed** 100:6 | 109:16 115:21 |
| 236:14 238:1 | 225:7 231:15 | 108:13 | 140:15 144:7 |
| 239:6 249:11 | **exhibits** 4:24 | **extend** 102:16 | 151:3 169:22 |
| **excellent** 231:10 | 230:4 231:19 | 250:13 252:24 | 171:16 181:17 |
| **exchange** 35:16 | 232:3,7,23 | 254:8 | 182:2 187:7 |
| **exchanges** 25:11 | **exist** 68:10,12,15 | **extended** 164:11 | 220:7 226:19 |
| **excitable** 9:6 | 70:1 | **extending** 100:2 | 237:17 |
| 85:14,18 | **exiting** 28:11 | 114:5 157:16 | **fairly** 237:16 |
| **excited** 151:1 | **expanding** | **extends** 110:6 | **falls** 248:22 |
| **excitement** 9:8 | 237:22 | 155:1 | **false** 251:11,12 |
| **exclamation** | **expect** 32:21 | **extent** 10:17 | 251:13,15 |
| 193:7 194:11,18 | 40:10 84:19 | 11:6 12:2,18 | **familiar** 60:21 |
| **exclude** 13:8 | 104:19 | 46:21 215:17 | 87:14,19 94:3,19 |
| **excluded** 9:3 | **experience** 23:18 | **extra** 204:17 | 110:16 117:19 |
| **exclusionary** | 23:18 35:23,24 | **eyes** 152:11 | 120:24 135:24 |
| 213:1 | 43:20 64:22 | 176:21 | 169:14 178:18 |
| **exclusively** | 120:19 178:13 | | 178:21 182:22 |
| 237:18 | **experiencing** | **f** | 201:19,20,22 |
| **excuse** 191:8 | 34:1 | | 237:14 240:15 |
| 210:15 225:4 | **expiration** | **f** 157:10 178:10 | **families** 146:11 |
| **executed** 259:10 | 258:19 259:25 | **fac** 56:7 | 238:4 239:8 |
| **execution** 258:14 | 260:25 | **faced** 148:2 | **family** 238:17 |
| 259:19 | **expires** 256:23 | **fact** 10:7 30:7 | **famous** 119:9,12 |
| | | 33:22 61:23 | 119:15,17 |
| | | 62:2,21 75:1 | |

**[fancy - form]**

**fancy** 117:19
118:4
**fantastic** 245:10
**far** 8:17 21:16
31:14 48:3
50:21 64:12
70:2 74:12 76:9
113:14 172:1
215:22
**fast** 5:21
**faster** 225:11
**father** 178:10,11
179:13
**fealty** 5:18
**fearful** 5:12
**feasible** 177:23
178:4
**february** 180:18
219:7 220:12
224:12 256:24
**federal** 1:16
15:20,21,22 16:1
16:10 46:7
103:10 218:7
**feel** 9:3 18:7
23:22 28:15
33:17,24 34:1,1
34:11,13 36:7
37:13 44:23
61:2,11 80:13
83:23 84:4
93:20 95:4,22
157:17 160:15
160:19 167:3,20
168:12 169:17
220:6 226:6
229:21 232:1
246:14

**feeling** 34:2 97:2
**feelings** 24:5,6
25:17 39:7 95:7
**feels** 33:12,13
34:4 140:16
209:24
**felt** 94:12 167:10
227:21
**fiction** 24:4
**fifteen** 236:12
**figure** 14:5
136:23 137:2
179:23 180:15
183:20 189:1
231:23
**figured** 211:15
**file** 19:21 38:16
38:23 76:5
97:14 103:4
104:24 252:24
**filed** 82:8 104:19
104:22
**files** 76:12,14
**fill** 183:13
188:20 229:23
233:5
**filled** 231:8
233:6,7
**filling** 229:23
**financially**
256:14
**find** 10:6 25:11
33:3 64:23 68:6
72:5 75:13
81:14 138:5
146:19 147:12
185:12 208:16
235:17 236:8

246:6 253:14
257:11
**finding** 33:4
**finds** 26:24
27:10,12 211:18
251:24
**fine** 77:8 117:12
139:14 142:3,6
144:15 151:22
164:23 168:3
216:6,23
**finish** 62:13 98:1
**finished** 199:14
206:5
**firm** 5:23
**first** 14:15 21:16
21:17 39:23
46:8,13,16 47:5
53:16 56:11,21
57:2,13 80:1
118:13,20 119:1
135:24 141:20
147:24 158:6,14
158:23 163:12
165:1 170:22
181:21 198:19
200:16 206:14
206:16 225:7
226:22 251:13
**fisher** 197:9
**fit** 38:17 73:11
139:23 153:16
**five** 92:22 183:9
183:9,11 249:4
**fix** 10:3 12:3
209:2
**flagged** 218:9

**flights** 106:10
**flow** 212:22,22
**fly** 105:18
**flynn** 157:9
158:13,18,20
159:5,16,17
160:3
**flynn's** 159:23
**follow** 44:19
78:12 91:22
134:3 167:3
211:5 248:18
**followed** 205:4
**following** 106:3
137:6,7 249:15
**follows** 8:19,22
15:3 98:16
99:23 147:22
190:9 232:24
254:6
**forced** 242:11,13
**foregoing**
258:13 259:18
**forgive** 190:10
**forgot** 61:3
217:7
**forgotten** 66:24
93:24 175:23
229:12
**form** 9:21,23
10:16 46:11
72:8 73:13,15
74:5 75:3 128:7
155:19,22
171:13 232:2
233:15 234:9,10
234:11,16
243:20,23,23

formal  47:17
  55:20 251:5,5,6
  251:7
former  111:22
  181:10 195:8
  209:13 211:12
  212:3 214:10
  216:17 223:21
  229:7 238:2
  244:23 245:11
forth  103:13
  256:9
forward  74:20
  105:13 146:7
  172:22,22,23
  193:2 257:15
forwarded  173:5
  173:9,10 174:3
  219:9 224:17
forwarding
  174:9
found  59:3 62:7
  99:22 154:14
  184:11 208:14
  212:3 223:21
  244:24 249:13
  252:1
founder  7:22
four  16:21 126:3
  126:4 184:1
  219:23 231:18
fr  3:12 178:7,18
  178:19 179:23
  179:24 180:3,8
  190:3,12 195:20
frankly  8:20
  20:21 77:13
  210:2

freaking  187:15
free  29:16 38:16
  38:22 44:20,23
  251:21 258:14
  259:20
frequently
  120:19
friar  178:10,10
  178:14
friends  110:14
frightening
  175:24 180:7
frustrated  24:17
  99:10,12,12
full  61:21,24
  172:10 209:23
  244:1
fully  245:17
fun  41:2
functionally
  207:11 234:24
fundamental
  27:23 90:20
  91:2 140:22
fundamentally
  89:21 107:5
  149:19 245:21
further  21:1
  142:1 169:16
  218:17 256:12

**g**

g  5:1
gabriel  176:19
gabriela  3:11
  176:20 177:5,7,9
  177:19 179:13
  179:20 180:17

game  62:15
games  10:3,3
  24:16,16,17
  34:10 96:24
  139:2 159:10
gather  15:22
  93:4
gathered  6:10
gathering  38:19
gender  192:7
genders  192:6
general  87:24
  98:22 117:2
  136:5 148:16
  149:9,9 189:8
  219:12 226:6
  228:5 235:7
  239:17,20
generally  17:14
  46:9 49:15
  60:19 65:23
  69:14 70:11
  75:18 110:3,4
  115:16 116:23
  117:1 185:18
  220:21 223:12
  226:3 236:18
  238:1 239:18,23
  240:1
geographic  92:2
  92:3
george  4:4
  209:11 212:10
  212:11
george's  212:18
gestured  132:6
gesturing  226:3

getting  9:10
  51:17 77:1
  85:18 99:9
  139:7 150:7
  163:9 166:8
  204:16 220:22
  227:2
gist  59:14 69:21
give  7:5 18:3
  28:23 47:7
  52:12,12,18 53:7
  56:8 59:12
  67:20 70:8
  101:5,8 105:7,11
  108:9 109:22
  112:3 115:2,8
  126:24 139:10
  140:5 150:23
  152:24 156:8
  159:10 162:23
  178:4 179:1,7
  183:7 186:22
  187:3 198:6
  204:13,13 210:1
  210:8 212:4
  213:5 222:15
  226:18 232:10
  234:21 235:2
  238:1 240:5
  241:7 246:23
  249:13 250:11
  250:16 251:1
given  19:8 99:13
  109:24 110:2
  117:9 125:21
  129:3 136:4
  137:24 155:3
  217:17 218:3,4

227:15 230:18
256:10
**gives**   160:12
**giving**   110:5,8
139:11 154:12
163:20 166:2
184:24 185:23
186:4 191:9,15
198:5 213:4
221:3 238:3,16
239:21
**gmail**   181:2
**go**   12:19 21:3
30:18 34:21
36:1 55:7,15
57:10 68:10,16
70:2 80:6,7
90:24 97:11
103:4 111:2
124:11 136:19
139:19 141:4,21
143:8 146:18,19
147:12 167:8,15
168:6 191:24
194:20 202:1
219:4 225:7,13
226:4 231:24
235:17,21 236:7
**god**   144:22
145:15,17 147:2
172:4,8
**god's**   145:11
239:22 240:13
**goes**   36:8 45:22
82:6 83:1
141:18 164:2
227:7

**going**   9:19,20
11:4 14:4 19:16
23:13 25:16
28:15 29:7
30:20 31:23
32:6,12,17 34:7
35:15 40:13
41:6,9,10 42:14
45:3 47:8 50:5
52:4 54:21
58:23 59:9
66:14 70:7 72:7
74:20 80:17
87:2 99:24
102:7 106:17
108:18 109:1
131:19 135:16
136:23 138:2
139:22 143:21
143:22 154:7
166:8 167:2
168:11,14
173:12 175:21
175:24 176:3,13
179:10,11 180:1
186:4,5,7,8
189:14,17,18
190:10 191:13
196:11 197:10
201:24 202:22
209:4 213:22
224:11 231:21
231:24 232:2
233:15,21
235:20 236:22
237:16 238:23
245:11 246:5
248:16 252:21

**gonna**   13:19
14:16 17:13
20:2 24:8,12
67:23 78:12
150:6 168:10,11
168:12 176:17
184:1 189:5
193:9 194:17
208:5,15 211:4
213:24 234:14
235:17,21
243:13
**good**   5:7 8:18
10:5 75:19
109:12 144:16
144:17 156:20
167:21 168:19
179:13 184:13
196:15,17
208:17 213:4
214:19 216:15
227:3 246:10
255:2
**google**   203:2
**goosey**   243:17
**gotta**   209:5
**gotten**   37:6
**govern**   19:22
**governing**   252:1
**government**
13:6,7,22,23
19:5 43:21 44:1
44:8,8,11 46:11
60:13 67:13
72:8,18 73:4,13
74:5,7 75:4 79:2
79:17 81:11
85:12,14 122:8

133:22 145:17
146:10,14
251:14
**government's**
247:2
**governmental**
49:20 121:21
145:12 242:15
**governments**
73:15
**granting**   13:5,21
**grants**   78:23
**great**   6:6 15:6
101:8 107:8
109:6,13 147:14
177:13 197:12
199:11 209:21
231:12 234:17
236:11 254:20
**greater**   131:10
**greaves**   2:24
7:22 91:6
**ground**   23:8
26:3 37:20 42:9
42:11 59:5
122:13
**grounds**   216:13
244:2
**group**   209:24
**groups**   90:16
228:6
**guess**   61:23 71:5
71:19 89:15
120:2
**guest**   162:17
239:16
**guidance**   28:5
182:12 234:22

gun  218:1,5
guy  33:21
  111:20,21 112:9
  202:12 224:13
guys  7:13 8:8,10
  8:11 9:17 11:18
  20:4,23 21:1,11
  29:21 32:13
  36:6 38:14
  56:10 90:5
  104:18 130:4
  135:5,12 146:20
  147:6 156:9
  165:22 170:5
  209:5

**h**

h  3:7 4:1
hail  6:5,6
hair  111:20
halbert  181:14
half  168:6
hall  2:15
hall's  80:3
hand  52:4 59:9
  91:24 256:16
handle  44:1 46:8
handles  84:2
hands  222:14
handwrite  66:12
handwriting
  232:1
handwritten
  128:8,10,15
  131:13 132:11
handy  162:15
happen  62:21
  65:23 75:21

81:20 109:14
111:2 183:6
203:4,6 229:22
229:24 239:1,1,4
happened  11:23
31:8 74:23
146:13,13 191:2
222:13 235:8
239:13
happening  30:19
106:5 110:18
197:24 228:20
happens  77:7
83:1 84:1 92:1
183:4,7
happy  12:11
24:10 104:9
151:6 161:24
215:12,13,14
harass  8:23
harassing  20:3,8
hard  70:12
hate  172:3
186:15
head  50:11,12
111:21 202:12
245:12 249:23
heads  243:21
hear  27:21 37:9
37:10 48:15
95:19 118:13,16
122:20 123:16
144:4
heard  6:24 18:4
83:13 114:1,14
114:16,20
118:10,10,20
119:1 123:4

142:14 144:20
144:24 145:2,8
145:13 161:9
236:1
hearing  79:1
119:3 148:3
179:17,19 239:3
hearings  83:18
129:19 139:12
heavy  222:9
heed  228:24
229:5
held  68:17
106:24
help  28:22 79:12
79:17,17 129:19
178:7 200:18,18
223:20
helped  56:16
helpful  25:11
28:21 29:11
34:20 35:16
39:7 92:24
99:14 106:12
143:9 254:1
helpfully  203:2
helping  79:19
hem  111:21
herald  219:9,11
219:16 220:12
224:12,16
hereinbefore
256:9
hereunto  256:16
hey  45:24 74:19
hi  173:13 177:19
202:3 219:10

hide  57:14
higher  120:2,2,5
highlight  147:12
210:9 212:4
222:16
hindi  208:5
hindu  207:16
208:5,5,5,5
228:7
historical  72:1
history  75:6
182:4 200:13
240:16
hmm  23:19
50:23 65:16
67:14 70:14
71:23 77:12,21
78:22 79:22
82:3 83:16 90:8
124:20 125:17
134:4,19 143:13
159:12,21,21,21
163:12 173:1
175:5 185:17,19
191:11,18
195:23 206:14
215:24 236:23
244:15 250:22
hold  11:16
101:15 106:14
117:13 227:6,6
holding  5:21
holds  106:17
home  44:3 78:24
homeless  210:7
homelessness
237:4

**honestly**   130:23
171:3 240:6
**honor**   200:15
**honorary**   190:14
**honored**   113:22
115:13 177:20
179:18
**honoree**   200:7,8
200:9,13,19
**hope**   12:4
**hour**   168:6
**hours**   80:9
**hovers**   142:23
**how's**   141:24
**huddle**   209:5
**huh**   27:11 35:12
186:23 197:17
203:15 224:8
**human**   141:19
150:16
**humbled**   113:22
115:12
**hunger**   237:4
**hypothetically**
236:7
**hypotheticals**
62:16

**i**

**i.e.**   57:4
**idea**   126:10
160:11 172:1
181:3 197:5
**ideals**   92:4
**ideas**   238:7
**identified**   15:1
22:22 26:4 29:1
40:15 41:18

96:20 101:11,14
102:23 122:3
215:5 247:23
248:14
**identifies**   244:17
**identify**   14:10
15:8 35:10
40:21 91:22,24
111:8 231:16
232:24 248:1
**identifying**
229:10
**identities**   127:5
**identity**   21:18,18
21:20,21,24 23:1
24:13,24 25:7,9
32:14,18 33:3,22
35:1,4,7 36:4,7
36:14,21 216:11
**imagine**   85:13
85:15 118:2
176:23 203:19
233:18
**immediately**
172:4
**impact**   47:5
**impasse**   41:6,14
41:17,17 99:23
99:23 102:9,10
102:12 138:5,13
138:16 139:20
168:10 169:18
188:22 196:23
197:2 214:20
220:6 251:23
254:5,6
**impassionate**
145:9

**impassioned**
147:2
**implication**
222:19
**implications**
59:21
**implicit**   93:4
**implore**   234:21
**importance**
144:16 216:8
219:20 221:5
**important**   6:14
13:1 27:10 90:5
200:4 208:15
210:11
**importantly**
13:5,7,21 56:6
68:16 131:10
231:7
**impressed**
117:21 118:3
**impression**
242:2
**improper**   247:7
**impulse**   5:14
**inaccurate**   185:6
**inauguration**
70:11
**include**   33:24
185:22
**included**   117:7
152:19 153:24
257:13
**includes**   25:7,8
27:4 33:23 45:8
**including**   115:11
147:24

**inclusive**   244:17
**inconsistent**
19:12 35:24
194:10
**incorporated**
259:12
**incredible**   210:5
**incur**   172:7
**indicate**   199:7
**indicated**   70:3
**indicating**
257:13
**individual**   53:10
55:1 95:12
110:7,8 120:24
141:12 160:11
161:6 185:23
186:12 196:2
204:3,14 213:20
250:24
**individual's**
119:18
**individually**
242:7
**individuals**   5:17
67:20 100:13
102:24 103:24
125:19 160:16
228:5 230:21,24
238:9
**infer**   160:21
**inference**   160:24
**infor**   204:13
**inform**   193:6
205:7,9 207:16
**information**
31:14 50:15
88:17,18 100:3,4

101:5,6,9 102:7
102:9 105:11,19
105:21 162:2
169:12 193:23
204:17 205:18
228:5 229:10
230:11 239:12
**informational**
231:5,6,7
**informed** 163:6
202:5 205:5
252:23
**informs** 139:15
**initially** 82:8
**inject** 61:18
**inner** 22:2,18
**input** 86:4 168:9
**inquire** 146:20
213:2 217:12,15
218:13
**inquiring** 9:14
10:12 117:6
**inquiry** 155:22
203:1
**inside** 74:17 91:4
223:8
**insight** 179:1
**insist** 223:22
**instance** 184:4,5
184:5 235:17
237:1 240:8
**instances** 59:24
108:14 147:12
229:19,20 230:2
234:19 236:8,12
239:15 250:23
**institutions**
118:5,11,14,17

119:1,7,12,21,24
120:5 134:3
**instruct** 25:16
29:12 45:6
**instructing** 23:7
23:9 102:14
137:23 243:17
243:19 248:9
**instruction** 42:4
42:5
**insulting** 210:2
**integrity** 120:21
121:19
**intend** 20:9
**intended** 21:20
23:1,4 136:17
217:11 218:13
**intending** 217:14
**intent** 22:21
86:17 100:15
215:18,22 216:1
223:5 245:15
**intention** 24:18
**intentionally**
22:8 253:14
**intentions** 23:13
**interact** 80:2,10
84:16
**interaction**
81:10
**interchangeably**
54:2 242:9
251:8
**interest** 73:12
75:14 114:11
119:18 224:7
**interested** 148:2
256:14

**interfacing** 84:8
**interject** 44:6
76:6 78:11
148:18
**internal** 21:19
74:17,18 197:22
199:8,9,10
230:10,13,20
**internet** 249:13
**interpret** 134:7
134:8
**interpretation**
46:16
**interpreted**
161:9 216:4
**interrogatories**
232:18
**interrogatory**
231:1,14,15,19
232:3 234:13
**interrupt** 14:15
29:5
**intervening** 12:3
**intervention**
41:7
**interview** 219:18
**intimidate** 8:23
**intra** 227:19,22
**intro** 124:4
**introduce** 7:14
113:1 115:12
**introduced**
113:22 170:1
176:15 181:24
184:3 189:13
195:1 200:1
206:23 207:3
219:5

**introduces** 110:7
**introduction**
110:11 111:3
113:20 115:14
124:10 160:8
**introductory**
116:9 122:19
123:18
**investigate**
153:9 154:14
216:17
**investigated**
153:6
**investigation**
64:10,11 75:8
117:5 125:4
141:7 153:23,24
154:3 216:14
223:15
**invita** 224:10
**invitation** 7:3,4
7:5,8 17:19,19
52:12,24 54:9,11
59:2 100:2
110:7 120:23
152:23,24 155:1
160:9,17 163:13
164:14 165:21
177:20 180:5,8
208:4,6 211:19
223:22 225:19
228:11,14
250:20 254:8
**invitations** 52:23
65:10,11 66:17
66:17 80:12
102:17 197:23
250:14

**invite** 22:9 24:20
39:14 51:17
53:6 54:23 55:1
62:3,4,5 86:10
109:21 113:9
114:5 120:21
148:13 153:11
154:7 155:18
161:14,15,16
163:22 164:1,9
164:11,15 180:4
184:6 188:3,4
210:12 220:22
226:18 245:13
252:24 253:14
**invited** 20:22
113:8 115:23
125:21 126:16
126:20 149:10
153:3 162:20
166:17 179:23
179:24 183:14
188:5 207:19
210:1,4,4
**invites** 157:16
160:21 203:18
**inviting** 6:22
115:17,22
120:20 146:10
161:11,11
186:14 195:24
**invocation** 5:10
6:24 18:3,4,7
52:12,13,19,23
53:5,7 70:7,8,10
70:13 109:18,22
109:24 110:8
111:3 126:15

127:10 129:3
147:23,23 148:3
149:5,10 150:2,5
151:2 152:20
153:1 154:7
155:18 160:12
162:17,23 166:2
171:4 177:6,21
178:5 179:16
183:3 184:24
185:23 190:3
191:10,15 199:1
199:5,6,10 202:4
202:13,16
203:16 205:4,22
207:12,14 208:6
227:22 230:18
233:2,4,6 234:20
235:1,10,11,12
236:2,13 237:2
237:23 238:16
239:22 240:14
246:8 251:1
**invocations** 66:2
67:20 70:15
109:7,20 110:1
124:22 182:24
183:12 203:14
237:3,5 238:11
250:2
**involve** 113:20
**involved** 53:19
164:5,7
**irrelevant**
142:20 170:4
**irrespective**
251:22

**ish** 141:22 166:9
**issue** 10:20 12:5
13:6 41:7,10
46:9 47:3,15
49:4,18 62:22
66:16,17 80:12
85:8 102:4
105:13 151:6
210:18 215:2
220:21 222:24
231:1 243:13
**issued** 55:9
104:18 141:11
203:1
**issues** 12:12,18
24:9 46:10
106:10 165:1
171:6 211:3
236:21
**issuing** 91:10
**it'd** 178:4
**it'll** 183:24
**item** 170:7 245:6
248:19
**itemize** 231:22
**items** 24:11
31:11 32:11
102:15 203:9,12
236:17,19,24
237:6

**j**

**jacobson** 219:8,8
**james** 188:5
**janey** 3:23
181:10 184:21
187:23 188:9
207:4,6,13

**janey's** 185:24
187:22
**january** 229:6
**jargon** 60:8 67:5
72:1 169:6
190:11
**jean** 180:18
**job** 45:8 95:8
115:4 128:12,18
145:15,17 163:5
174:12 200:21
235:16
**jobs** 230:22
**join** 137:1
**joining** 196:18
**joint** 8:5
**jordan** 195:5
204:24
**judas** 196:18
**judge** 12:19
38:20
**judged** 5:17
**judgment** 28:11
**julia** 196:21
197:16
**julie** 204:9
**july** 31:5
**june** 116:18
189:19 193:1
195:3 197:7,18
201:17 202:3,20
203:1,2 206:8

**k**

**k** 157:5
**keep** 9:5 66:13
162:10 186:6
228:18 246:11

248:16 251:4
**keeping**   67:3
227:5
**kelly**   1:17 256:5
**kenzi**   197:12
**kerry**   195:5,8
196:1,4 204:23
**kezhaya**   2:3,4
3:4 5:5 6:6,9,18
6:20 7:11,19
8:13,16 9:22
10:2,23 11:3,16
12:7,16,23 13:14
13:18 14:3,20
15:5 16:4,7,11
18:10,14,17 19:1
19:18 20:1,11,15
20:20 21:5,11,15
22:1,6,11,14,17
22:24 23:17,20
24:1,14,23 25:2
25:6,12,18,23
26:1,8,10,20,22
27:11,14,18 28:1
28:4,7,9,18 29:2
29:4,14,20 30:2
30:5,10,14,17
31:1,4,7,20,24
32:3,6,20 33:2
33:10,13 34:9,13
34:17,24 35:12
35:18 36:15,19
36:24 37:5,13,20
38:1,9,12,18,24
39:4,9,12,16,20
40:9,12,20 41:9
41:13,24 42:5,8
42:12,17 43:9,14

45:1 46:24 47:7
48:14,17 56:5,10
56:21,24 57:7,14
62:12,19 66:11
80:18,21,24 81:5
81:6 85:22 86:2
86:15,18,20 93:1
93:14,17 96:1,7
96:13,16,23 97:5
97:9,16,20,24
98:4,10,14,24
99:4,8,18,22
100:7,11,18,21
100:24 101:4,8
101:12,18,22
102:2,13,20
103:2,8,17,20
104:1,5,12,16,22
105:2,5,10,14,17
105:23 106:3,8
106:19,23 107:7
107:9 108:18
109:5,10,13
111:5,13,18
112:24 113:4,19
116:3 117:13,17
120:7,9,16,18
122:7,12,15,17
123:1,3 124:12
124:14 125:8,10
127:23 128:4
132:22,24
135:19 136:9,13
136:16 137:12
137:18 138:4,8
138:12,20 139:7
139:14 140:8,10
140:18 141:2,14

141:17 142:6,9
142:21 143:1,10
143:13,17,18,23
144:5,11,14,19
145:4,6 146:7,9
146:18 147:1,11
147:20 148:18
148:22 149:3,12
149:16,23 150:3
150:10,13,15
151:8,15,22
152:2,9,13,14
153:15,18 162:1
162:4,7,13,14
165:14 166:22
166:24 167:8,15
167:18 168:1,8
168:19,21,22
175:19 176:13
180:3 181:19
183:17 187:2
188:24 189:8,11
194:15 196:13
196:22 198:10
199:12,18 200:2
201:5,11,23
202:19 206:3,21
206:24 207:23
208:2,13,23
210:16,19 211:2
212:12,15,19
213:12,17 214:7
214:8,19 215:6
215:13,24 216:6
216:9,24 217:7
217:18 218:14
218:18 219:21
220:10 221:13

224:6 225:10
230:23 231:12
232:6,9,13,16,19
232:22 233:12
233:19 234:1,7
234:11,16,18
243:2,9,12,15,23
244:11 245:4,10
245:19,23 246:4
246:24 248:6,11
248:15,23 249:2
249:3 251:2
252:10,21 253:8
254:4,11,16,20
254:24
**kim**   3:23 207:4,5
**kind**   10:17 33:21
38:14,19 54:22
72:1 74:11,18
79:18 83:3
113:21 115:12
115:13 117:5
124:16 155:8
177:16 182:2,17
190:14 193:13
193:14 200:10
205:18 220:5
251:7
**kinda**   10:8 53:20
226:7 244:12
**kindly**   179:19
**kinds**   122:19
129:12 246:9
**king**   2:24 5:7,8
56:8 141:24
142:5 144:13
201:10 208:1,11
208:17

**knew** 200:20,23
  200:24 230:18
**know** 6:13 10:4
  10:4 11:7,10,10
  11:20 13:19
  14:3 16:22,23
  19:9 23:3 32:23
  33:13 34:4,4
  37:6,11 40:4
  43:19 44:14,16
  47:1 50:1 51:23
  57:7,20 60:6,13
  61:3 62:17 64:6
  64:23 65:6 67:1
  71:7,8 73:18
  77:13 78:16
  79:12,16,17 81:9
  82:16 84:18
  85:3,4,4,11 88:4
  88:8,9 90:4,4
  91:2 93:11
  95:11,21 97:8
  99:20,24 101:1
  102:5,7,8 104:7
  107:24 108:18
  110:13,14,16
  114:3,5 115:13
  115:15 117:24
  118:2,9,19 119:6
  119:11,22 120:1
  121:12,15 124:3
  124:4 125:22,23
  127:10 130:23
  132:1 133:8,11
  133:16 135:4,15
  138:16 141:8,21
  143:6,6 149:9
  150:19 157:13

157:23 160:8,22
  162:3 163:4
  164:14 170:24
  173:9 174:11,21
  175:12 178:6,13
  178:14 179:19
  180:13 181:6,6
  181:12,21
  182:15,20,22
  183:14 185:12
  186:5,8,10
  188:13,19
  190:16,20 191:9
  191:14,19
  192:10,12 193:9
  193:9 196:5
  199:7 200:16
  204:10,18,22
  205:10,10,12
  211:13 213:21
  217:16 219:17
  220:17 223:14
  223:18 228:20
  229:22 231:23
  232:5 233:9,17
  235:19 237:17
  237:24 238:8
  239:20 240:1,18
  240:21 241:2,4
  241:10 243:6,16
**knowing** 119:23
**knowledge** 5:15
  52:1,2 60:21
  141:7 144:23
  145:11 147:4
  148:9 180:1
  228:11 236:1

**knowledgeable**
  103:23
**known** 9:12 86:5
  88:5,18 103:9
  107:11 119:17
  225:8 230:18,19
**knows** 11:11
  69:15 89:20
  135:19 139:12
  165:15
**kristen** 1:17
  181:14 256:5

**l**

**l** 1:17 156:17
  157:10 180:4
  192:15 256:5
**labor** 242:11,13
**lack** 147:5
**language** 16:19
  94:14 114:16
  153:18 175:6
  178:16
**languages** 94:13
  94:15
**large** 126:3
  209:13
**late** 203:17
**latin** 112:6
**law** 2:2,12 7:20
  11:11,14 19:12
  43:3,5,17 44:11
  45:13,22,23 46:6
  46:7,7,8 48:6,20
  52:17 59:3
  67:12 82:5
  136:7 251:6,15
  251:17 253:7

**lawsuit** 39:8
  165:3,7
**lawyer** 10:5 43:1
  43:15 62:17
  135:19
**lawyers** 10:10
  16:18 50:1
  131:6
**layer** 91:4,14,17
  91:19 99:1
**laypeople** 250:9
**leader** 122:21,21
  207:17 228:7
**leaders** 210:3,9
  212:5 222:16,21
  253:15
**leave** 28:15,16
  38:14 143:4,22
  168:14 173:14
  174:14 178:3,5
**leaving** 10:8
**led** 96:10
**leeway** 99:13
  136:5 138:1
  139:12 246:23
**left** 161:22 231:6
**legal** 8:19 24:4
  38:6 43:20,22,22
  43:23 44:13,15
  45:3,13,14,17
  46:3 47:12,15,17
  47:18 52:6
  55:20 59:12,13
  59:14,17,21 63:5
  67:5 71:1 87:24
  88:20 90:12
  91:10,10,11
  97:18 98:17

138:22 148:1
151:8 164:3
165:4 169:6
179:7 226:23
251:5,6 253:3,11
253:19 257:1
260:1
**legalese** 16:20
**legalities** 138:17
**legally** 164:15
211:19 226:24
**legislation** 51:13
76:3,5,9,12,13
76:15 77:6 98:8
171:5
**legislative** 6:23
17:21 51:11
76:4 77:24 78:5
78:15,19,23
84:15 95:20
129:15,21
**length** 67:3
82:12
**lengths** 81:21
**leonard** 190:4
**letter** 55:21
95:14 257:19
**letters** 231:22
**letting** 191:9,14
191:19
**levels** 97:11
**liability** 60:9,15
165:20 251:18
**license** 15:2
**lie** 14:16
**light** 222:13
223:16

**lighting** 5:10
**lights** 5:9 11:1
**liked** 188:9
**likewise** 90:1
91:9
**limit** 19:10 150:4
150:19 152:23
**limitation**
147:24
**limited** 27:19
38:2 149:2
**limiting** 137:8
148:12 151:12
152:18,21
**limits** 60:14
**line** 29:11 57:12
159:11 170:19
219:23,24
257:13 259:7
260:3
**lines** 51:16
152:16
**link** 193:2
196:20 197:4,11
198:7 204:13,22
230:14
**links** 199:1,3,5,6
199:11
**lion** 196:18
**list** 125:18 127:3
162:15 167:16
170:14
**listed** 20:17
259:7,17
**listing** 259:7
**literal** 239:19
**literally** 26:4
27:6 61:19 71:1

80:1 85:7
107:15 112:6,23
115:23 123:10
127:4 129:10
133:5,6 136:9
137:4 138:22
139:18 140:10
144:23 171:13
173:9 179:6,9
223:17 234:20
237:13 240:2,16
242:18 253:11
**litigation** 38:22
43:5,7 169:12,13
219:8
**litigator** 16:14
135:21 169:13
**little** 11:1 16:17
56:17 72:8
84:13 86:19
89:7 91:1 110:6
142:1,3 189:18
219:1,2 220:10
226:15 243:16
**live** 8:1
**loan** 78:23
**local** 46:10,10
67:13 73:4,15
79:2,16
**lock** 203:15
**locked** 187:9
**log** 193:4
**logging** 195:20
**logic** 251:5,7
**long** 19:23 24:8
24:12,15 34:6
67:19,21 68:1,3
75:22 186:7

192:17 235:19
**longer** 49:11
162:24 163:1
181:10 201:4
**longest** 160:3
**look** 13:19 49:3
52:20 56:22
68:23 70:9 71:9
73:16 110:11
133:21,24 147:5
168:11,15 174:6
188:9 198:18
201:22 206:10
209:5 215:12
218:5,19 223:18
226:4
**looked** 8:11
64:18 66:21
67:6 72:2 75:12
163:17,23 166:3
169:2 216:19,20
221:24
**looking** 12:17
19:6 31:14
56:12 57:2 71:7
75:14 86:7
93:12 116:6,7
125:13 152:10
163:19 174:2
175:10 176:8,16
179:8,9 182:12
184:18 188:19
189:16 198:19
199:14 200:10
201:8,12 204:9
212:21 219:22
**looks** 171:2
173:4 175:6,11

182:11 184:10
184:11,22 185:4
188:7 198:5
201:20 204:1
205:21 206:16
211:20,23
**loosey**  243:17
**lord**  241:21,22
**lord's**  241:19
242:16,17 244:7
244:8
**lose**  94:17 97:12
132:17 253:16
**losing**  44:7
**lost**  94:20 97:12
**lot**  32:24 34:12
34:13 44:6
46:15 53:16
66:11 80:6,7
84:1,13 101:1,3
114:24 139:12
146:20 158:1
167:2,10 168:13
189:15 194:11
229:16 230:9
**lots**  8:19
**loud**  184:8
**louis**  180:18
**love**  149:21
**lowering**  5:9
**lucien**  2:24 7:22
91:6
**luciferian**  5:14
**lunch**  167:21
**lund**  52:16
**lydia**  177:11
179:15,22

**m**

**ma**  1:8,18 257:6
258:3 259:3
**mad**  194:13
**madam**  176:21
177:17,17
180:11 189:20
195:4 198:23
201:15 206:18
209:9 216:16,16
220:16 221:1,17
222:2 224:13
226:3 227:24
229:2 234:23
257:10
**main**  82:23
**maintain**  67:21
248:3
**maintaining**
38:7
**maintains**  220:2
**majority**  250:4
**makayla**  3:16,20
180:19 181:9
184:20,23 185:1
185:10,11,14,20
185:22 187:20
187:22 188:7
**makers**  63:24
64:2
**making**  26:8
41:24 58:13
98:7 214:15
245:4
**malionek**  177:7
**management**
192:11

**manager**  195:9
**margin**  241:12
**marie**  4:5
**mark**  3:9 170:13
171:20 172:9
173:8 181:12
193:7 194:19
**marked**  170:22
**marks**  194:12
**martin**  170:17
171:24
**mass**  177:24
178:4,6
**massachusetts**
1:2,19,21 2:16
15:2 46:7 60:14
74:10 256:2,7
**material**  88:19
161:2 242:3
**materially**  234:3
**materials**  68:7
**math**  115:7
**matt**  2:8 6:20
7:11 8:15 24:8
24:22 26:17
28:21 35:16
39:6 44:18
111:22 135:16
136:1 143:3
149:15 212:9
**matter**  7:23 9:1
9:6 17:3 23:6
25:20 37:2
40:17 47:10,13
47:16 48:13
52:7,9,10 57:4
59:9 62:7 64:22
78:19 82:5

95:20,22 98:22
102:18 112:23
119:20 136:10
136:12,18
141:10 149:7
150:17 154:3
165:6,10 167:2
172:7,7 211:10
212:1,3 214:10
215:9 226:6
235:3 253:1
**matters**  19:8,10
26:5 41:18,21
59:10,12,14
77:22 78:1,4,16
78:23,24 82:2,24
84:8 103:13
105:5 130:13,16
133:2 135:2
141:3,5 226:1,2
245:19
**matthew**  2:3
**maurice**  190:4
**mayor**  76:4,8,12
76:12,13,14
77:23 82:6 83:1
112:1,2 113:5
116:20 163:10
170:17 171:24
209:17,19
211:11 212:2
213:20 216:17
221:20 223:20
244:23 245:11
**mayor's**  77:5
**mayoral**  209:18
**mean**  12:9 16:21
16:23,23 29:4

42:11 43:16
44:16 53:17
64:3 66:15
67:11 78:17
84:14,21,22 85:3
86:18 90:16
92:21,22 93:1,7
98:13 107:14
114:2,4 115:15
118:2,18 121:11
131:3 132:3,7
134:1 161:9,23
168:3 182:10
185:9 190:6
191:15 194:9
200:9 205:13,15
205:17 216:2
234:8,10 238:19
238:21 241:8
**meaning** 21:20
23:1,4 24:12
32:9,19 35:1,2
35:19 36:14,21
93:4 111:6
121:2,4 184:14
204:24
**meaningfully**
241:22 244:8
**meanings** 34:8
**means** 16:20
35:1,6,19 41:17
44:17,19,23
46:16 56:6 67:1
111:24 121:9
125:12 138:12
156:3 159:11
169:7,22 171:9
171:11 182:21

193:10 202:15
205:14 215:20
**meant** 30:24
65:13 125:3
205:11
**mechanism**
54:23,24
**meet** 80:5,8
156:9
**meeting** 3:13
6:12 28:12
30:24 39:14
52:18 53:6
70:13 84:20
109:23 111:7,24
116:22 117:6
125:1 135:2
156:5,6 177:7
180:24 182:2
183:4 184:22
186:8 187:11,12
188:10,18
191:17 193:9,11
193:23 196:7
198:3,8 204:3,4
204:11 205:1
206:9 207:15,16
210:2,13 230:3
233:2,9 255:1
**meeting's** 185:2
**meetings** 6:23
31:12 50:14
51:2,3 65:21
70:16 72:12
75:18,20,22
76:16,19,22 77:7
77:17,18,22,24
78:2,3 81:19,23

81:24 82:7,24
83:3,7 109:7,14
109:14,15,17
114:21 144:6
160:7 170:20
171:23 183:10
185:21 187:7
188:1,2 191:4
196:3 203:4
204:8 250:2
**meets** 50:13
**meghan** 219:10
219:17
**member** 43:24
84:21 121:20
174:22 192:20
200:14 252:1
**members** 65:2,4
73:8 79:24 81:8
84:3 86:9 91:23
92:1,9 107:11,13
107:15 108:4,12
126:3,3,4 171:1
**membership**
244:21
**memo** 55:20
**memoranda**
91:10
**memorandums**
46:3
**memory** 131:22
132:1 195:12
228:7
**mention** 73:11
122:19 206:4
**mentioned** 11:4
71:24 86:3
94:24 107:10

109:6 127:16
156:10
**mentions** 125:11
**message** 95:12
173:9 219:10
**messages** 95:16
95:17
**met** 64:14 91:7
130:19 133:6
156:1
**mic** 109:11
**michael** 3:17,22
189:19 190:3,5
190:12 191:7,19
192:16,18 195:4
195:21 196:4
201:18 202:4
203:21 204:1
**michelle** 167:5
181:15 213:23
214:1 225:18
226:17 229:7,7
**microsoft** 33:19
33:20,21,21
**mid** 251:21
**midway** 220:1
**midwest** 257:17
260:1
**mike** 191:14
**mincing** 10:4
**mind** 9:14 10:13
21:19 22:3,18
57:8 61:19 63:6
108:15 139:9
146:22 154:5
213:10 226:8
**minds** 5:12
28:12 30:24

31:12 86:12
99:24 137:1
**mine** 19:13
71:21 132:9
221:6
**minimal** 179:7
**minimally**
155:11 157:21
229:6
**minister** 5:9
**minneapolis** 2:6
105:18
**minnesota** 2:6
**minute** 92:22
133:16 182:24
183:3 184:6,10
184:12,13,15,17
184:19 185:7
191:5,16,22
196:24
**minutes** 64:17
70:6,12 72:4,7
110:4 125:16
127:1 131:19
144:14,15
**misactions** 60:11
**miscellaneous**
198:22 199:10
**misheard** 65:3
**missed** 202:2
216:7
**missing** 227:16
**misspoke** 148:21
**mistaken** 164:8
206:6
**mistranslation**
136:16

**misunderstand...**
58:22 138:21
144:2 247:4
**misunderstood**
248:12
**misuse** 21:21
**misusing** 33:3
107:24
**mm** 23:19 50:23
65:16 67:14
70:14 71:23
77:12,21 78:22
79:22 82:3
83:16 90:8
124:20 125:17
134:4,19 143:13
159:12,21,21,21
163:12 173:1
175:5 185:17,19
191:11,18
195:23 215:24
236:23 244:15
250:22
**mmm** 104:12
203:15 236:20
**mobius** 2:24
91:7
**molly** 219:8
**moment** 56:9
134:15,17
**monday** 177:4
185:1,11 187:10
187:12,15
203:12,13
**money** 163:20
166:19 221:3
222:13 249:24

**month** 103:6
104:15 182:4
200:13 230:19
**months** 116:19
161:22
**morales** 180:19
181:7
**morning** 179:13
196:17
**motion** 13:4,5,20
13:21 19:21
38:11 97:15
103:5 254:3
**motivations**
102:16
**move** 41:10
104:18 105:13
107:7 175:19
180:10 183:16
183:21 188:22
189:2 199:15
208:8 245:24
**movement** 74:18
**moving** 28:10
38:12,13 74:20
**ms.o'connor**
137:22
**multiple** 156:10
191:3
**mur** 181:12
**mysteriously**
227:16

**n**

**n** 2:1,5 3:1 5:1
148:19 156:20
157:10,10

**name** 5:8 19:6
21:23 23:2 25:1
25:7,8,8 32:14
35:4,6,19 56:16
185:23 187:20
188:8 190:3
192:12 196:4
197:21 198:6
200:17 204:2,9
209:10 230:21
257:6 258:3,4,15
259:3,4,21
**named** 176:19
189:20
**names** 69:9,10
176:24 199:5
230:13
**narrowing** 69:1
**nature** 7:9 16:4
17:24 18:1 39:4
39:16,18 48:4
60:21 81:21
110:17 227:16
**navigating** 79:12
**necessarily**
99:20 191:15
**necessary** 28:16
107:1
**need** 12:6,13
13:19,24 19:21
33:4 40:20,23,24
41:7 58:5,19
79:11 93:18
106:17 109:11
111:7 119:10,24
132:21 138:16
139:19 144:24
145:13,14,15

146:18 151:6
152:2 161:5,12
162:4 165:9
167:17 180:9
181:21 183:3,3
183:13 184:8
186:23 191:24
204:22 205:7
219:3 229:23
230:2,6 231:4,5
231:6,7 232:1
235:20 252:15
**needed** 107:2
184:6 204:3
**needing** 13:19
**needn't** 179:23
**needs** 14:6 71:13
82:5 145:17
172:6 182:24
187:16 188:15
196:19 197:11
229:22
**neglected** 200:3
**neighborhood**
190:23 191:1
**neither** 117:18
143:8 256:12
**never** 6:3 57:7
161:16 216:3
217:13 226:8
228:16 235:5
**new** 42:15 47:8
158:7
**newer** 158:13
**news** 219:19,19
**nice** 194:14
**nick** 208:14

**nicole** 2:13 7:13
7:15 42:1 64:14
65:8,13 96:23
97:16 137:18
151:18,19
153:15 215:7
248:16 254:12
254:14 257:5
**nicole.oconnor**
2:18
**night** 188:10
**nod** 91:14
**nodded** 91:13
128:14
**non** 236:17
**nondescript** 52:6
**nondiscrimina...**
220:3
**nonissue** 12:4,13
**nonministers**
250:14
**nonprivilege**
23:8
**nonpublic** 123:7
**noon** 203:7,8
206:9
**norm** 113:15
123:17 239:17
239:20,23
240:13
**normal** 23:23
24:2 113:20
116:8 123:19
124:2,4 170:24
171:15,19 193:6
193:12,20,21,23
193:24 223:8,12
223:12

**normally** 23:22
34:3 116:8
117:8,8 119:16
124:11 233:7
**norms** 5:19
193:5
**north** 190:5,22
**notarized** 257:14
**notary** 1:18
256:6 257:24
258:10,18
259:15,23
260:23
**note** 13:10,24
14:4 75:12
117:14 120:10
120:13 142:2
147:21 170:7
173:7 177:8
200:3 211:7,8
219:7,11,16
220:13 221:9,10
238:24,24 239:6
239:7,8,9,10
244:16,22
246:15 249:6
252:10,13
257:12
**noted** 248:6
**notes** 3:14
116:12 117:8
126:13 127:4,8
127:16,17,20
128:5,7,9,11,15
129:21 130:7
131:9,14,15
132:4,8,11
156:20 182:2

185:18 187:22
230:12
**noteworthy** 75:8
81:15
**notice** 8:8 20:17
21:16 23:11
26:6,23 28:17
29:20 30:15,18
32:8,10 36:5,5,6
39:24 40:19,21
41:22 62:10
80:20,22 96:15
102:4 103:5,9
104:19,20 105:6
106:6 127:1,9
142:10,12
147:21 152:16
186:2,22 187:3
193:8 203:1
218:2 220:21
231:21
**noticed** 21:16
214:18
**notifying** 132:14
**notion** 71:12
238:7
**november**
185:11 188:17
**now's** 138:19
**nowadays** 33:21
72:14 241:10
**number** 49:23
126:24 127:4
164:24 175:23
176:2 180:10
183:23 189:2
194:20 199:12
200:5 201:5,11

**[number - object]** Page 34

| | | | |
|---|---|---|---|
| 201:12 202:20 | 29:3,10,18,24 | 117:24 118:6 | 232:14,17,20 |
| 206:24 207:2 | 30:4,9,13,16,21 | 120:3 121:22 | 233:10,17,22 |
| 208:3,9 209:3 | 31:3,6,10,21 | 122:1,5,11,14 | 234:6,8,14 |
| 217:1 218:22,23 | 32:2,5,16,21 | 127:21 128:2 | 235:23 240:3 |
| 218:24 228:6 | 33:7,12 34:6,11 | 133:9 134:10 | 241:16,24 242:6 |
| 231:3,14,15 | 34:16,19 35:9,13 | 135:6,14,16 | 242:22,24 243:3 |
| 234:19 237:2 | 36:12,16,23 37:3 | 136:1,3,11,14 | 243:11,14,19 |
| 238:8,22 240:5 | 37:8,18,22 38:4 | 137:6,17,18 | 244:4 245:8,14 |
| 244:16 245:6,7 | 38:10,16,21 39:1 | 138:6,10,14 | 245:21 246:2,17 |
| 246:7 248:19 | 39:6,10,15,18,22 | 139:4,11,22 | 246:21 247:14 |
| 250:3,7,12 251:2 | 40:11,18,22 | 140:9,14,21 | 248:3,9,13,16,21 |
| 252:22 257:7,13 | 41:12,23 42:3,7 | 141:11,15 142:1 | 249:1,18,20 |

**numbering**
181:20

**numbers** 14:5
78:21 237:1
259:7

**numerous** 64:15
124:18 216:22

**o**

**o** 5:1 180:4,4
**o'connor** 2:13
7:15,15 8:12,14
9:18 10:1,22
11:12 12:4,9,22
13:12,17 14:2,9
14:18 16:3,6,9
16:12 18:8,11,16
18:19 19:15,19
20:6,12,19 21:2
21:13,22 22:2,10
22:13,16,20 23:9
23:19,24 24:7,21
25:1,4,10,15,19
25:24 26:7,17,21
27:8,12,15,22
28:2,5,8,14,20

42:10 43:12
44:18 46:20
47:21 48:10,15
51:19,22 54:12
56:22 59:22
62:9,13 63:14
70:23 80:16,19
80:23 81:3
85:20 86:1,13,16
88:12,23 92:13
92:15,21 93:10
93:16 94:7 95:9
95:23 96:2,11,14
96:19 97:7,12,19
97:22 98:1,5,12
98:22 99:2,6,11
99:19 100:5,9,12
100:19,23 101:2
101:7,10,13,20
102:1,11,19,21
103:3,15,19,22
104:3,7,13,21,24
105:4,8,12,16,20
106:2,4,9,20
107:4,8 108:22
113:23 117:22

142:17,19,24
143:2,11,14,20
144:3,7 145:18
145:20 146:5,12
146:15,23 147:8
147:14 148:15
148:20,24 149:8
149:14,18,24
150:8,11,21,23
151:14,17,18,23
152:3,12 153:17
154:17 161:23
162:2,6,11 165:8
165:11,23 167:6
167:12,17,23
168:5,17 169:9
176:12 189:7,10
199:16,19
201:21 211:21
212:9,14,16
213:8,15 214:2
214:12 215:3,10
215:17 216:2
217:2,8 218:6,15
221:16 222:22
231:9 232:5,7,10

250:17,19 252:7
252:18 253:5,20
254:10,12,15,17
254:23 255:2
257:5

**o'connor's** 42:2
215:8 254:14

**o'donnell** 1:15
3:3 14:12,23
15:9 21:23
35:11 42:19
57:6 101:7
102:22 151:18
172:13 173:13
213:16 215:5
253:24 256:8
257:8 258:4,9
259:4,13 260:20

**o'malley** 111:22
112:3 139:16

**object** 32:13
37:1,9,18,21
39:7,9,12 48:14
137:22 165:14
176:6,10 189:6
213:18 243:9,24

objected   144:1
objecting   127:23
objection   9:11
  9:23,24 10:15,16
  10:17,18 16:3,5
  18:8 26:17
  38:15 39:17,19
  46:20 47:1
  48:10 51:17,19
  54:12 59:22
  62:9 63:14
  70:23 80:16
  85:20 86:1,13
  88:12,23 92:13
  92:15 93:10
  94:7 95:9,23
  113:23 117:22
  118:6 120:3
  121:22 127:21
  133:9 134:10
  135:6,14 136:1
  142:17 143:11
  143:20 144:2
  145:18 146:12
  146:15 154:17
  161:23 162:5,8
  165:8,11,23
  167:12 169:9
  211:21 213:8,9
  214:11 222:22
  232:2 233:15
  234:9,10,11,15
  234:17 235:23
  240:3 241:16,24
  242:6,22 243:21
  243:24 244:2
  246:17,21
  247:14 248:3,24

249:18 250:17
  252:7 253:20
objectionable
  47:2 244:2
objections   9:20
  10:21 11:5,7
  12:20 13:9 14:8
  32:22 86:5
  214:13 221:15
  243:10,13,16
obligation
  210:14
obligations
  48:24 49:4,17
  52:6
oblige   52:21
obsequiousness
  242:14
obviously   12:18
  14:4 27:4 33:24
  81:18 83:6 91:3
  91:6 111:15
  114:4 115:22
  159:7 183:13
occasion   214:6
occasionally
  240:10
occasioned
  163:21
october   57:23
  176:18 177:4
  179:12 209:1,8
  209:14 222:1,2
  225:14,17
odd   30:17
  197:17
offer   100:16
  242:1

offers   9:16,17
offhand   18:20
office   23:3 69:20
  78:10 80:9
  116:16 131:16
  161:20 182:10
  182:12
officer   67:4 68:1
  174:18
officers   81:9
offices   80:4
  116:11 158:10
  158:16 160:10
  230:10
official   111:6
  246:11 258:15
  259:21
officials   89:5,8
officiant   113:8
officiants   228:21
officiate   112:20
  112:21
officiating
  112:10,11 113:1
offset   206:16
ofm   190:4,6,13
  190:13
oftentimes
  104:10
oh   14:16 38:12
  39:20 48:9
  57:10 58:1,4,7
  58:12 61:8
  65:12,22 70:4
  77:8 85:6,22
  103:17 110:12
  112:12 114:23
  122:7 126:14

129:18 153:9
  154:20 159:1
  160:1,5 166:17
  167:8 173:11
  174:1 177:5,12
  177:13 179:6
  180:20 182:22
  188:3 189:3
  194:1 198:16
  199:13 200:22
  201:6 208:8
  210:16 213:12
  221:22 222:4
  224:10 225:13
  226:8 232:13
  244:4 245:10
  247:8 248:11
ohio   257:2
okay   5:5 8:13
  9:22 10:23 12:7
  12:23 13:17
  14:2 15:7,11,14
  16:12 17:8,17
  18:7 20:15,20
  21:5,6,9,15 22:6
  24:23 25:6,18
  26:8,16,22 27:14
  28:18 29:14
  30:10,14 31:3
  36:15,24 37:13
  38:1,9 40:12
  41:12,24 42:8,12
  42:21 43:8,14
  45:8,12,17 46:5
  46:12,15,19 47:6
  47:12,15,20,23
  49:10 50:5,16,21
  51:3,10 52:1,3,4

52:14 54:1,4,7
54:10,21 55:2,5
55:9,17 56:24
57:12 58:4,9,15
58:21,23 59:8,16
59:20 60:24
61:13 62:2 63:8
63:20,22 64:10
64:10,20 65:1,9
65:12,14,19,22
65:24 66:3,19
67:5,17,23 68:5
68:14,16,20,22
69:1,1,5,17
71:12,24 72:5,17
73:3 74:9,15
75:5,10,12,17,17
75:20 76:11,17
77:15 78:15,18
79:4,15,23 80:11
81:5,14,18 82:11
82:22 83:2 84:7
84:17 85:13
86:3,11 87:17
88:8 89:18 90:9
91:17 92:7
93:16 94:17,21
95:6,15 97:24
98:10,24 99:18
100:11 101:2
102:1,13,20,20
103:2 104:21
105:12,17 106:2
106:8 107:4,16
107:18 108:8,14
108:24 109:3,6
109:13,20 110:1
110:18,21 112:8

112:22 113:4,14
113:17 114:12
114:17,20 115:5
115:19 116:1,14
116:17 117:12
118:13 119:14
119:19 120:6,15
121:2,8,17
122:12,24
123:10,15 124:8
125:7 127:16
128:4,7,15 129:4
129:9 130:4,9
131:5,5,13,17
132:14,19,22
134:13,17
135:12,23 140:2
140:9 141:2
142:6 144:10
145:3,24 146:7
147:15,18,21
148:12 149:23
150:10 152:3,4,7
152:9,11 153:5
154:8,23 155:8
156:1,5,8,13,21
157:1,7 158:8,12
158:20 159:1,15
159:16,20 161:8
161:20 162:1,6,7
162:13 163:24
164:17,21,23
166:5,13,15,21
167:10,15
168:18 169:5,15
169:20 170:2,19
170:22 171:7,14
172:12,15,19

173:23 174:5
175:8,19 176:2
176:13 177:8
178:9,21,24
179:21 180:11
180:22,22 181:1
181:19 182:1,5,7
182:14,16 183:6
183:11,16,22,24
184:12,17 185:9
187:1,14 188:11
188:22 189:11
190:6,9,17,19,21
191:2,20 192:5,9
192:16,20,22
193:1,4 195:2,10
195:16,19 196:6
196:8,15,22
197:5,22 198:12
198:21 199:20
199:23 200:3,16
201:4,10,12
202:12,19,24
204:15,20 205:2
206:2,4,10,13,21
207:8,10,22
208:13,18,21,24
209:12,14,17,21
210:24 211:3
212:1,14 213:17
214:19 216:6,10
217:18 218:18
219:2,6 220:9,11
221:12 223:2,4
223:13 224:2,9
224:16 225:3,22
225:24 226:5,6,9
226:15,21 227:2

227:3,3,3,12,14
227:20 228:6,13
228:23 229:10
229:16,19,20
230:7,15,23
232:9,16,22
233:12 234:16
234:19 237:7,11
237:22 238:18
239:11,15,24
240:15,20 241:4
241:19 243:11
243:14,15,23
244:4,10 245:3
246:5,20 247:8
248:23 249:4,11
249:22,24
250:13 251:2,3
252:5 254:20
255:3

**old**   5:16 42:15

**olsen**   4:3 209:7
211:11

**once**   7:11 12:16
83:1 122:12
125:19,21 126:1
126:2,16,21
127:2,6,10,11,14
145:10,24
152:10 159:20
191:2 194:16
195:4 196:22
202:19,20
207:23 209:3
227:24 244:16
245:4 248:15
254:12

**one's**  58:2 150:6
  150:8
**ones**  84:15
  108:11 160:20
  181:5,6
**online**  72:12,15
  76:18,21 124:19
  237:12,12
**oops**  109:10
**open**  170:9
  171:22
**opening**  17:20
  33:19 177:21
  179:16 183:12
  197:10
**opens**  6:23 188:2
**operations**  44:1
**operatively**
  43:19
**opined**  164:10
**opining**  45:9
**opinion**  47:17
  55:9 62:23
  63:13,15 70:22
  71:1,2,3,4 75:15
  82:20 117:23
  118:8 135:3
  136:19 138:22
  139:4 140:1,2,3
  140:24 142:19
  164:3 233:8
  242:1,16 253:9
**opinions**  18:12
  47:15 59:12
  91:11 92:11
  93:4,5,6 98:7
  99:16 107:12
  108:8 214:5

251:12,13,15
**opponent**  209:17
  209:19 211:12
  212:3 216:17
  223:21 229:8
  244:23
**opponent's**
  245:12
**opportunity**
  28:23 29:8
  32:13 36:6
  82:14 210:9
  212:4 213:4,5
  222:15 233:20
  236:6 253:18
**oppose**  38:11
  39:1
**opposed**  17:19
**opposing**  189:5
**opposite**  45:21
**opposition**  39:5
**options**  46:6
**ordained**  5:8
**order**  13:4,21
  42:6 55:12
  93:17 115:7
  116:19 132:20
  161:8,21 165:20
  194:23 230:11
**orders**  42:2
  78:24 79:1
  104:17
**ordinance**  47:4
**ordinances**  44:2
  78:24
**organiza**  24:3
**organization**
  62:4 91:5

107:17 108:3
  123:6,13 157:2
  193:5 195:14
  223:9 250:24
**organization's**
  231:2
**organizational**
  74:11 90:22
  91:8,19,22 92:4
**organizations**
  19:4 24:4
**original**  32:7
  59:9 172:20
  227:20
**originally**
  240:22,22 241:4
**originated**  70:7
**outcome**  256:14
**outside**  19:17
  20:16 62:10
  63:22 64:7
  80:21 122:9
  137:23 141:4,5
  152:16 179:24
  238:7 246:22
  248:4,13
**overall**  183:10
**overlap**  126:6
**overpowers**
  19:13
**overturned**
  13:22

**p**

**p**  2:1,1 5:1
  176:19 177:4,15
  180:4

**p.m.**  255:6
**pa**  191:13
**page**  4:2 19:6
  31:13 96:17
  175:10 176:5,17
  181:21,22
  183:24 201:14
  215:16 218:9
  257:13,15 259:7
  260:3
**pages**  176:9
  216:22
**paid**  162:21,24
  163:1,4,7,9
  166:8 242:10
**paige**  197:9
**pamphlet**  8:9
  26:11,12,13
  27:16 29:13
**pamphlets**  8:7
  8:11
**pandemic**  196:3
  203:24
**panelist**  191:13
**paola**  178:19
  179:14,24
**paolo**  3:12 178:8
  178:18 179:23
  180:4,8
**paper**  189:11
**papers**  72:2
**paperwork**  38:6
**paragraph**  21:17
  47:9 59:10
  96:18,22 147:22
  149:3 150:5
  162:16 209:23
  215:11,14

227:20 229:3,5
245:14
**paragraphs** 27:9
**parameters**
19:22 143:5
**parched** 108:19
**parish** 190:4
**parkin** 3:16,20
180:19 181:9
184:20
**parks** 247:3
**parlance** 184:15
184:16 237:13
242:5
**parlo** 178:8
**part** 10:11 11:23
13:5 18:12
21:18 23:16
26:9 30:2 37:17
37:22 41:21
63:15 70:16,17
70:19 78:8
80:19 84:1
107:17 123:10
150:5 154:10
158:9 165:19
169:15 203:14
205:9 217:9
234:24 259:9
**partic** 62:11
**participate**
148:13 149:11
150:2,4,20 151:3
151:13 152:18
152:22 210:13
**participating**
149:2 204:5

**participation**
228:6
**particular** 9:15
25:19 26:3 40:1
44:20,23 47:18
49:4,18 53:6
59:11 62:14,17
83:18 86:4 96:5
96:9,9 98:8
99:21 102:16
108:12 116:22
119:5 121:2,19
121:21 122:9
125:4 126:15,16
127:11 153:7
154:3,4,13
161:10,13,13
166:18 170:7
186:3,4 195:17
217:5 218:16
222:3 241:20
242:1 249:9
**particularity**
232:24
**particularly**
17:11 25:11
95:3 125:3
152:19 169:5
221:20 232:23
240:2
**parties** 7:24
64:21 66:24
69:2,3,3 256:13
**partner** 7:20
**party** 19:11
**passed** 74:9 76:9
88:11

**passes** 51:13
**passing** 98:8
**passive** 130:11
**paste** 231:21
232:1
**pastor** 185:3
188:5 190:4,13
190:21 196:17
196:20
**pattern** 61:23
62:2
**pause** 110:9
111:18 113:4,19
116:3 117:17
120:9,18 122:17
123:3 124:14
125:10 132:24
142:9 144:19
145:6 146:9
154:8 166:24
197:6 210:23
**pausing** 220:11
**pay** 165:19
**paying** 166:2
221:19
**payment** 67:20
67:22 68:7
75:18 162:17
164:6 166:14
222:24 227:3
**payments** 227:9
227:10
**pd** 208:9
**pdf** 198:16,24
**pdfs** 208:10
**pendency** 220:13
**penna** 190:3,12

**peop** 83:12
**people** 24:5 27:5
39:8,13 49:6,23
49:23 50:2 53:9
54:23 64:3 65:4
65:9 66:16
69:14 83:12
85:11,13,18 87:5
89:21,22,22,24
90:1,2,16 91:4,7
91:18,21,24 93:9
94:24 101:10
102:16 118:3
120:21 125:21
125:24 126:1,9
126:12,14,19
127:1,5,5,9
129:12 132:20
133:1,5 153:24
154:2 156:11,12
156:13 159:23
160:2,22 161:11
162:23 163:9
166:2,7 179:4,9
180:21 181:3
193:12 194:9,14
194:14 198:18
200:24 204:23
204:24,24 207:5
210:8,12 221:3
235:2,6,22 236:8
237:17 238:6
249:8
**people's** 93:3,5
149:6 176:24
214:5 246:12
**perceives** 37:17

percent 249:14
percentage
250:12
perfectly 198:9
performed 117:5
period 83:9,19
157:20,20 204:8
241:8
periodically
33:5
permutation
154:4
person 30:11
33:22 62:3
70:10 71:2
108:6 112:8,24
113:8,21 114:6
115:17,20,23
121:12 122:20
125:12 126:16
128:23 129:1,14
129:15 130:24
141:9 145:8
147:1 154:11
156:1,4 157:17
161:13 162:18
166:18 167:4
181:8 186:3,7
187:22 191:14
195:17 196:1,5
205:7 209:18
212:20 215:1
220:16,20
222:12 224:2
230:17 235:1
238:16 239:21
250:15 252:3

person's 121:13
198:6 209:10
213:10 215:22
personal 5:24
18:11 25:17
31:18 52:23
53:7 63:24
69:15 71:4 81:3
85:21,22 120:23
128:9,11 139:4
141:6,12 142:19
154:21 160:22
personally 9:2,3
110:14 114:22
178:18,21
213:18 258:11
259:15
persons 154:19
perspective 36:9
115:22 145:16
165:4 198:1
253:17
persuasion
249:9
pertain 16:6
pertaining 96:8
pertains 63:8
86:4
petitions 44:3
79:1
pew 249:12
phase 11:3,6
113:14 168:8
216:10
phone 30:22
95:12 106:16
116:7 156:2
234:4 257:3

phrase 242:2
physical 223:17
pick 160:11
picking 90:3
200:14,24
pickup 79:16
247:2
pimen 180:19
pimentel 3:15
181:11 224:18
224:19,20
place 103:14
111:7 156:10
169:17
plain 21:22
23:14 25:5
32:18 35:1,2,3
35:19
plaintiff 1:6,16
2:10 27:4 40:16
plaintiffs 7:12
37:2,16,17
plan 42:15
planning 3:13
180:24
play 24:16
111:16 231:13
playing 111:17
113:3,18 116:2
117:16 120:8,17
122:16 123:2
124:13 125:9
132:23 142:8
144:18 145:5
146:8 159:10
166:23
plea 147:2

pleadings 27:2,3
27:4 40:16,18,21
please 5:6 9:5,11
14:10 15:8
35:17 36:17
39:20 41:12
46:19 94:8
97:15,15 98:1
111:16 120:7,16
123:1 125:8
129:18 132:14
132:15 143:16
145:4 148:22
151:5,17 167:1
169:6 170:9
176:22 178:6
179:4,4 185:12
189:10,20,24,24
194:22 195:12
197:3,7 199:12
201:13 202:21
206:14 207:2,14
207:24 209:9,22
211:7,9 218:21
219:17 224:13
232:4,24 233:19
243:24,24 244:6
248:7 257:11,11
pleased 6:10
114:18,18
115:12
plural 7:21
148:14 156:11
pm 177:24 178:1
179:17 185:11
188:17 206:8
point 8:17,18
28:13 40:9,13

41:14 43:18
51:18 62:20
79:20 81:10
92:17 98:14
116:20 137:14
138:5,13 184:13
198:13 203:17
215:10 254:5,5
**points** 9:15
138:16 231:23
**pol** 67:9
**policies** 7:8
53:18 64:24
129:2 148:5
162:16 227:5,12
227:14
**policy** 17:20
53:12,13,15,22
53:24 54:6 67:6
67:11 71:12
95:19 146:21,23
147:23 149:5
157:8 160:8,10
162:18 163:23
165:2 166:2
226:10,11,12
**politeness**
114:11
**political** 212:3
216:17 223:21
229:7 244:23
245:12
**poor** 125:2
**population**
248:1
**populous** 249:14
**port** 190:4

**posed** 38:15 88:9
95:6 96:8 134:5
134:6 135:7
**posit** 98:14
136:21 161:2
251:4,4,11 254:5
**position** 18:20
19:15 22:4
25:16 29:16
31:19 38:7,20
80:14 101:23,23
102:4 103:6
104:14 106:6
137:3,11,13
138:16 143:6,7,7
150:12,13
157:11 165:5
209:15 211:18
211:18 215:9
220:5 226:17
241:21 242:21
244:6 248:4
252:15,23 253:3
254:11
**positions** 253:19
**possibility** 20:22
**possible** 239:12
**possibly** 40:6
97:4,5 188:16
218:10
**post** 136:21
**posterity** 7:24
**potential** 32:22
106:10 228:20
**practical** 177:22
**practice** 23:15
105:22 163:17
166:4 220:2

**practiced** 43:5
**practices** 148:5
249:15
**pray** 133:15,17
196:18
**prayer** 6:23
17:21 108:9
145:10 165:2
171:23 197:10
250:16
**praying** 236:14
**pre** 124:16
**preceding** 94:9
201:9 219:24
**precise** 41:16
226:16
**precluded**
222:11
**prefer** 189:12
234:1
**preference** 147:7
**preferences**
246:12,16
**preferred** 33:5
192:6
**prefers** 192:8
**premise** 18:15
32:7 103:4
**prep** 185:18
**preparation**
64:11,13 117:5
128:18 131:7
**prepare** 40:3,6
169:23 185:18
218:10 230:11
**prepared** 211:24
217:13,16
218:16 244:19

244:19,22 245:8
251:19
**preparing**
127:17 131:11
153:8
**preps** 187:21
**pres** 159:3
**present** 2:22
38:5 66:1
101:16 159:15
159:15 224:17
229:6
**presentation**
176:11
**presented** 38:3
**presently** 111:19
162:19
**preside** 190:2
**president** 50:9
50:10,11,13,20
50:21 52:5 59:1
111:23,24 112:2
112:4,5,5,15
130:20 158:15
158:17,18,19,21
158:23 160:4
163:11 166:16
172:16 184:21
184:22 185:15
185:20,24
187:23,23,24,24
188:2 207:7,13
223:1 225:5
**president's**
182:9,12
**press** 111:15
223:9 224:9

**presumably**
  43:18 45:14
  90:5,23 113:2
  187:6
**presume** 190:22
  219:11
**presumed** 6:18
  88:5
**presumptuous**
  6:19
**presupposes**
  162:18
**pretty** 69:19
  113:14 124:24
  148:9 157:13,14
  162:11 166:10
  166:10,11
  170:24 171:2
  198:13 201:23
  237:18
**previously** 71:9
  102:6 160:6
**priest** 162:20,21
  177:16 190:2,10
  190:14 238:3
  239:7 242:15
**priests** 163:21
  165:19
**primarily** 43:21
  44:1,13 84:16
**primary** 72:1
**principal** 60:10
  87:7,12,12,16
  88:2,6,11,18
  89:2,13 94:19
  98:17,21
**principals** 87:10
  212:21

**principle** 86:22
**principles** 60:20
**prior** 35:23,24
  56:13 103:6
  110:7,8 143:24
  155:4 179:2
  199:3 218:7
  221:6,23,23
**privilege** 10:14
  23:6 26:3 38:14
  42:9,10 47:1
  122:13 137:15
  137:21 146:2
  248:24 249:1
  254:22,23 255:1
**privileged** 175:1
  210:10 212:5
  222:17,19
**pro** 86:23 111:23
  112:5 113:7
**probably** 35:14
  38:11 57:9
  71:13,20,22
  115:8 125:24,24
  132:10 156:7
  166:18 167:6
  168:9 173:8
  176:23 179:23
  186:23 187:16
  191:24 194:5
  196:23 198:17
  211:16 230:2
  234:24 249:17
**problem** 189:7
  197:1 217:9
**procedure** 1:17
  15:22 16:2,10
  29:23 30:7

  80:11 103:11
  258:5 259:5
**procedures**
  53:19 90:23
**proceed** 14:8
  21:4,12 28:22
  29:11 36:17
  41:15 113:2
  117:15 166:22
  167:22
**proceeding**
  31:22 110:19
  111:21 134:16
  134:17 138:15
  237:24
**proceedings**
  10:11 11:8
  17:20 112:9,10
  133:7,22,23
  162:19 238:15
  252:11
**process** 149:10
  150:2 163:19,20
  165:2 204:18
**produce** 128:3
**produced** 56:3
  64:19 68:6,7
  86:8 216:20
  217:24
**producing**
  102:22
**product** 46:22
**production** 15:1
  257:15,17,22
**productive**
  138:3 143:3,8,9
**professional**
  1:18 256:5

**proffer** 88:19,20
  98:10,11,13,16
  104:17 205:19
  205:20 242:19
  242:21 243:4
  251:5,10
**profound** 210:13
**projector** 209:2
**promise** 8:23,23
**prompted** 94:5
  94:10,11
**prompts** 165:2
**prone** 9:8
**pronounce** 19:6
**pronunciation**
  189:21
**proof** 22:7
**proper** 74:10
  90:10,10 100:3
  169:14 194:23
  247:7,11,16,18
  250:14
**properly** 214:18
**property** 192:11
**proportion**
  239:24 247:24
  249:8
**proportionate**
  249:4
**proposal** 171:22
**propose** 8:19,22
  10:19 11:9 14:7
  47:4 99:23
  107:5 205:16
  215:1 230:23
  231:13,18
  239:18 255:1

**proposed** 9:16
12:21 44:2 82:5
**proposing** 20:16
45:7
**proposition**
19:12 189:9
204:15
**proselytizing**
167:10
**protective**
104:17
**provable** 184:5
**prove** 22:8
251:20
**proved** 251:12
**provide** 30:11
39:2 43:22,23
46:6 177:21
179:16 210:6
217:5 218:11
231:20 232:4
**provided** 4:24
27:1,15,16 29:16
55:22 214:3
215:15 216:18
217:21
**provides** 104:17
**providing** 85:21
177:6 193:22
214:23 221:4
253:1
**public** 1:19 6:23
13:1,11 14:11
17:20 67:4,12
72:10 79:20,24
80:3,4,5,5 81:8,9
81:10 83:8,9,18
83:19,19,20 84:6

84:9,9,22 85:14
86:4,5,9 89:9
91:19,23 92:1,9
98:21 107:11,13
107:14,15,22
108:3,4,4,5,10
108:13 109:15
109:15,17
110:19 122:22
123:6,8 133:2,6
147:3 168:9
171:1,5 173:5
174:2,7,11,17,22
175:2,3,7,9,18
204:7,8 211:10
212:2,23 222:21
247:2 250:15
253:1,15 256:6
258:10,18
259:15,23
260:23
**public's** 83:6
90:3 246:15
**publication**
219:12
**publicly** 7:23
**pull** 20:20
217:11
**pulled** 29:17
**punish** 251:14
**pur** 169:12
**purpose** 6:11
11:18,19 20:9
90:1 91:8,9
109:16 125:5
127:17 128:20
131:11 136:17
161:10 165:6,18

165:19 213:20
231:2
**purposes** 7:24
42:13 74:11
78:20 90:19,20
90:22 91:19,22
159:11 161:2
188:16 203:22
207:12 208:7
230:13
**pursuant** 1:16
15:14 16:16
42:1 90:19 91:8
91:18 102:5
103:10 108:6
114:12 125:4
128:12 131:9,10
132:18 141:7
150:17 151:10
153:20 170:2
249:14
**put** 11:1 32:22
52:11,18 56:6
57:9 101:14
106:6,17 143:4
187:6,21 188:8
205:11 209:1
216:24 217:2,10
245:18 254:21
**putting** 26:23
187:5

**q**

**question** 10:15
11:23 22:18,19
26:2 28:24
32:18 34:5,21,22
34:22 35:17

36:10,13,17 37:4
37:6,7,9,11,14
37:15,15,19
38:15 39:11
41:5 44:19,19,22
45:3 48:4,5,15
50:5 57:21
61:12 67:2
71:10,17 72:22
77:5 80:17
86:14 88:9,14,17
92:19,20,22
93:23 94:4,10,12
94:22 95:6,24
96:6,6,8 97:13
97:14 99:3,5,19
121:23 122:6
125:2 134:5,6,11
135:7 136:20
137:20 138:5,9
138:18,23 140:4
140:6,15,17
141:1 143:16,24
144:3,7 145:21
145:22 147:6
149:17 150:14
151:4 152:20
155:7,11,16,20
161:17 165:17
167:7,13 177:22
205:3,22,24
211:6 215:23
228:4 229:1
231:1 238:5,24
242:1 243:1,5,7
243:20,22 244:5
244:11,12,14,14
244:15,15 247:5

248:7,10,18
249:6 252:8,20
253:21,22
**questioning**
233:14
**questions** 9:9,13
18:22 19:16
20:3 22:21 23:7
23:10,21 24:10
25:13,17,20
29:11,13 31:15
31:22 32:23
33:8 34:18
37:10 39:7 40:4
40:6 41:11 45:1
50:17 67:18
75:6 78:12
92:23 97:2 98:2
99:9 102:23
135:17 136:4,5
136:19 137:23
138:11,17
139:23 140:5
141:13 149:15
149:22 151:7,24
165:16 167:3
168:13 169:17
223:5 231:3,11
233:11,13
245:17 246:9
**quick** 43:1 76:6
199:16
**quickly** 99:10
**quid** 86:23
**quite** 10:6 27:6
34:24 35:3
**quo** 86:24

**quote** 155:3,4,6
254:6
**quotes** 223:13
**quoting** 19:2

**r**

**r** 2:1 3:23 5:1
156:17 157:5
178:10 207:4,11
**raj** 228:7
**random** 250:15
**range** 176:5
183:20
**rational** 8:2 9:13
33:16
**rationale** 8:4
**reach** 41:13
138:16 139:24
140:1 174:19
186:13
**reached** 158:9
185:3 221:22
**reaching** 179:14
188:8
**read** 26:11,13,16
90:22 100:22
101:24 146:19
172:10 177:17
179:5 184:8
197:13 201:16
206:18 207:14
209:22 258:5,6
258:12 259:5,6
259:17
**reading** 5:10
21:22 23:14
51:15 96:16
184:7 202:17

207:20 212:10
257:19
**reads** 117:8,8
149:8
**ready** 21:12
27:21 111:2
178:3,5 251:20
**real** 43:1 76:6
87:20
**really** 13:12
53:24 60:23
79:8 84:11
88:15 97:17
128:11 146:18
149:19,20,21
151:20,23
164:23 168:13
171:4 215:6
223:24 224:4
227:10 238:21
241:22 252:22
**reason** 5:20 13:2
53:4 135:18
158:9 257:14
259:8 260:3
**reasonable**
138:1 164:20
232:21 233:11
233:13
**reasoning**
158:16
**reasons** 126:2
**rec** 72:1 174:2
**recall** 48:17
55:24 56:3
69:18 108:11,16
113:9 115:11
118:15,24 119:4

119:11 120:1
153:5 202:7
216:21 221:17
225:4 226:11
230:4,5 235:13
235:16 237:1
238:15 239:11
240:6,8,12
**recalling** 118:21
**recap** 81:20
110:18 131:8,13
149:23 169:2
**receipt** 257:18
**receive** 88:17
95:7,11,13,14,14
95:17 173:16
187:5 205:24
220:4 225:15
228:13
**received** 52:11
58:24 100:24
168:24 173:16
217:14,22 218:2
220:20 227:13
**receives** 76:3
186:3
**receiving** 45:8
221:3
**recipient** 205:8
**recitation** 55:14
226:19
**recited** 145:10
**recognizable**
192:24
**recognize** 133:23
201:1 218:7
238:11

recollection
113:12 221:6
236:3
reconvene 20:24
record 5:3 13:13
20:24 21:7,10
35:11 57:1
66:12 67:9
91:15 109:1,4
111:6,8 137:11
137:13 143:12
146:22 147:16
147:19 152:5,8,9
161:9 175:3,7,10
175:21 176:8
180:6 183:19
189:1 199:13,21
199:24 208:19
208:22 209:8,22
210:22 211:1,4
211:10 212:2
214:16 217:3,10
227:5 228:17
233:24 234:2
243:18 247:22
248:2 249:7
253:1 254:13,18
255:4 256:10
259:9
recorded 7:23
76:19 110:22
124:19
recordkeeping
162:16 227:12
227:14
records 67:4,6
67:11,12,16,22
67:24 68:2,7,9

70:20 75:18
130:2 173:6
174:7,11,17,18
174:23 175:2,18
228:18 247:23
recovery 210:8
recross 3:2
red 111:20
redirect 3:2
reduce 231:2
refer 151:19
187:18 237:8
reference 13:2
190:20 231:16
237:3,6 240:10
240:12 242:17
257:7 258:2
259:2
referenced 237:2
240:7,8 258:11
259:15
references
235:13
referencing
155:4 232:8
referral 79:18
referred 76:22
77:23 82:9
239:22
referring 15:22
27:8 57:17,17
58:8 60:5,12
96:21 120:11
refers 182:19
200:12 237:14
refined 91:1
reflected 236:14

refresh 131:22
195:12
refusing 254:7
regard 15:21
17:20 81:15,16
152:17 247:2
regarding 177:6
180:23 199:1,4
219:18 230:13
registered 1:17
256:5
regular 135:2
253:10
regularly 10:6
reiterate 172:19
reject 102:3
rejection 172:4
relate 171:5
related 44:11
67:19 75:6
173:15,24
174:14 214:21
256:12
relatedly 9:6
relating 56:3
102:15
relation 136:7
relationship
61:7 63:23,23,24
64:8 69:15
120:24 154:21
160:16,23
relationships
52:24 53:8,9
216:13
relative 123:17
249:4,8

relatively 110:3
110:5 123:19
124:2
release 223:9
released 203:13
relevance 130:5
179:21 192:24
194:8
relevant 18:12
22:3 27:1,13
49:14 64:21
77:6 82:9
129:23 140:2
247:1
relief 236:15
religion 121:21
250:5,8
religions 13:8
religious 62:4
122:9,21 210:3
217:23 218:1
246:12,15
247:20 249:9
250:14 251:24
252:12
remaining
176:14
remarks 210:1
remember 8:20
20:21 26:23
31:7 50:18
58:10,17 75:21
94:6 101:18
108:16 109:7
116:5 117:4
118:20 123:5
145:12 197:14
201:2 202:5

205:5 211:9
221:14 222:6,8
225:3,6 226:16
227:5 229:14
232:7
**remind**   42:18
202:21 224:13
**remote**   203:23
**remotely**   207:14
**remove**   62:21
63:15
**repeat**   17:22
165:17
**rephrase**   153:15
169:21
**reporter**   1:18
4:24 14:14
210:15,17 256:6
258:7
**represent**   6:20
7:12 15:19
179:18
**representative**
7:21 17:12
121:18 139:15
**representatives**
7:21 250:7
**representing**
15:13 17:1
97:10
**represents**   51:9
**request**   10:3
12:2 45:9,9
47:19 48:5,19
52:5,11 54:23
58:24 59:2
65:10 76:8
95:19 163:13

173:6,15 174:7
174:11,15,17,20
174:21,23
175:17,18,18
207:13 208:4,4,6
208:6 215:19
224:9 232:12
259:9,11
**requested**   62:4
144:22 175:7
228:11
**requesting**   19:11
52:12 164:2
225:19
**requests**   52:22
53:2,4 169:11
170:3,4 171:4
217:22,23
**require**   135:4,12
145:11 218:7
**required**   49:16
52:21 179:7
257:24
**requirement**
128:17
**requirements**
46:13 128:12
**requires**   183:12
205:18
**requiring**   165:21
**research**   43:22
43:23 44:13,15
45:4,15 46:15
47:4,10,18 59:13
70:3,5 91:11
125:23 126:20
249:12

**researched**
64:17
**researching**   8:21
**reserve**   9:20
11:5 236:6
**resolutions**   79:1
**resolvable**   33:18
**resolve**   10:18
11:5 12:12
33:16 41:6
105:13 107:6
215:1 231:3
**resolved**   8:2
11:10 33:17
**respect**   60:19
150:24 151:5
210:14
**respectfully**   19:1
172:9
**respective**
230:12
**respond**   47:19
121:20 220:5
**respondeat**   60:5
60:9
**response**   7:2
37:12 55:22
93:12,15,18
104:15 154:19
179:3 214:17
237:17,20
248:19
**responsibilities**
50:19
**responsible**   60:1
**responsive**
172:21 173:17
174:20 215:4,11

**rest**   13:11 123:5
194:10 227:11
**restart**   94:1
**restate**   150:14
**restroom**   199:17
**resume**   124:12
142:7
**retain**   67:15
68:1
**retake**   109:11
**retention**   67:6,9
67:11
**retentions**   67:24
**return**   26:22
38:1 155:12
**returned**   257:18
**reverend**   197:9
**review**   21:2
52:15 56:2 68:8
126:24 127:12
131:19 165:22
165:24 166:1,1
257:12 258:1
259:1
**reviewed**   59:3
62:6 108:10
125:16
**reviewing**   165:2
165:18 173:22
**revisit**   143:15
**revoke**   29:8
**rewatch**   141:19
**rewind**   139:19
140:11 141:21
**rfps**   198:16
**right**   11:14
12:24 21:11
25:14 30:6,18,22

37:5 40:4 50:22
55:9 72:14 73:7
73:18 74:12
76:9 77:17 81:7
81:18 82:22
89:19 90:6 92:8
92:14 96:16
107:10,24 116:1
121:17 124:9,23
128:21 133:7
134:22 139:14
139:18 141:22
142:2 153:5
158:7 159:3,20
159:22 162:7,15
166:24 167:4,20
168:21 170:2
175:21 180:5
182:16 187:2
194:20 205:15
206:24 212:21
213:18 215:16
222:5 224:4
226:15 231:14
233:8,8 236:12
240:21 241:15
242:20 248:8
249:17
**riled**   162:9
**ring**   195:5
**risk**   80:13
**road**   44:22 143:8
**roads**   90:4
**rob**   7:13,17
11:10,10,10,11
12:2 19:20 21:3
31:11 64:14
65:8,13 106:15

**robert**   2:14
**robert.arcangeli**
2:19
**role**   45:5 88:20
131:3 139:9
140:10
**room**   2:15 9:3
16:18 142:10
**route**   54:22
**rule**   15:14,17
16:14,16 18:14
18:16,17 40:2
44:3 79:1 102:6
103:10 104:17
**rules**   1:16 8:19
15:20,21,22 16:1
16:10 18:20
29:23 30:6 39:2
45:13,18 103:10
106:1,3 132:18
135:12 137:5,6,7
169:23 218:7
258:5 259:5
**run**   79:23 81:8
168:10 223:16
**running**   220:14

**s**

**s**   2:1,14 3:7 4:1
5:1 148:19
257:15 259:8,8
260:3
**saint**   190:4
**sake**   156:20
**salem**   1:20
**san**   178:22
**sanctions**   244:3
246:1

**sanity**   172:2
**sat**   139:13 250:1
**satan**   5:9 6:5,6
235:3,6,18,22
236:2,9
**satanic**   1:5,20
6:21 17:3,18
18:2,3 41:20
52:17 57:4
148:19 170:19
210:10 212:6
219:18 222:17
222:20,20
225:17 257:6
258:3 259:3
**satanism**   244:20
**satanist**   171:23
**satisfactorily**
15:1
**satisfies**   208:7
**saw**   73:11 91:14
175:16 176:7
228:7 230:1
238:2,20 239:21
240:7
**saying**   11:19
13:15,15 30:6
38:22 92:8,14
127:24 130:23
132:7,9 144:16
169:19 188:15
199:3 218:2
**says**   7:7 20:21
35:4 38:2 66:24
96:15 103:9
110:12 111:11
113:8 173:9,12
174:13 188:3

242:18 249:13
251:14
**schedule**   207:14
219:17
**scheduling**   197:1
202:23 206:8
208:3 231:17
**scholar**   240:18
**school**   43:17
**scope**   27:7,23
40:7 42:22,23
59:11 62:8,10,22
62:24 88:19
92:2,3 96:10,11
96:17 122:1,10
137:24 139:6
146:5 157:21
180:1 216:5,11
246:22 248:4,13
248:22 252:8
254:13
**scrap**   42:15
**scratch**   132:5
**screen**   245:18
**screenshot**   211:8
**scrima**   195:20
**script**   185:24
187:21 188:3,9
188:10
**scroll**   170:9
175:22 176:4,7
178:24 181:19
182:17 183:23
189:14 192:22
194:7 196:13
197:13 198:10
198:11,20,20
200:6 201:14,14

201:14,14
206:15 218:21
224:6,7,8
**scrolling** 194:8,8
194:21 197:3,5,5
198:12 202:24
206:3,6,11,13
218:20,24 219:1
219:1,1,21
220:10
**sea** 181:1
**seal** 256:17
258:15 259:21
**second** 19:5 47:7
185:10
**secondary**
172:20
**seconds** 144:20
145:1,8
**section** 19:7
**sects** 250:5
**secular** 210:3
**see** 8:8 11:3 13:2
21:4 24:4 28:1
34:22 35:4
38:10,17,18
42:21 49:12
52:3 55:23
56:12,13,21 58:1
66:2 71:9 73:17
75:5 78:13 86:3
86:7 90:6 91:11
92:7 93:8
101:12 102:9
103:20 104:1
108:12 113:7
120:14 124:10
125:20 131:8

136:24 139:2
141:2 142:15
146:13 147:9
153:16 160:7
162:15 170:10
170:24 172:12
172:23 173:7
174:1,10 175:15
176:3 177:15
178:9 179:2,21
181:1,2,20
183:22 184:24
185:10 186:1
188:17 189:3,18
190:9 191:2
192:17,22,23,23
193:17,18 194:7
194:12,22
196:14 197:4
200:5 201:17
204:16 208:11
209:6 212:17
214:19 216:7
218:14,18,19,24
219:3 221:15,24
222:2 224:6,7,9
226:21 239:15
245:23 251:24
252:2,21 253:19
**seeing** 36:8
66:12 108:17
161:3 179:10
225:6 226:16
253:17
**seek** 8:4 19:11
143:4
**seeking** 7:4
28:10 132:17

**seemingly**
234:23
**seen** 70:20,21
71:2 114:21
115:9 124:9
226:10,11
**sees** 139:23
**selected** 151:2
153:7 154:4,13
**selection** 80:14
81:1
**semantics** 10:3
24:16,16,17
34:10,12,14
96:24 139:1,21
159:10 216:3
231:13
**senator** 191:8
**send** 17:12 36:4
65:10 80:12
102:8 171:17
173:15 174:14
232:3
**sender** 207:17
**sending** 230:14
**sense** 19:19
32:24 152:3
174:3 175:12,17
180:13 197:18
210:14 242:8
247:10,12
253:11,11 254:3
**sent** 58:10,11,12
103:9 108:10
141:9 170:3
180:17,22 185:1
185:14,22
198:16 215:22

219:3 225:13,17
227:13 229:13
**sentence** 93:24
94:1 164:1
185:11 219:24
219:24 220:1
222:18
**separate** 134:3
**september**
101:15,17
106:15,18,21,21
173:4,12 196:16
197:17,18
206:17 256:17
257:4
**ser** 242:9
**series** 195:3
**serious** 210:11
**seriousness**
133:23 238:12
**servants** 144:21
144:21,23 147:3
239:23 240:11
241:19,21 242:4
242:10,17 244:8
**serve** 78:6
**served** 232:11
**serves** 51:12
228:7
**service** 79:18
**services** 79:11
**serving** 112:1
**set** 11:8 41:11
56:9,20 80:9
103:13 161:21
180:1 256:9,16
**sets** 123:21

settle  166:11
seven  68:4,5,11
  68:17,17 90:20
  91:1,3 144:14
  227:7 228:1
sewers  90:4
shakes  249:23
share  249:5
sharp  178:1
shawn  2:23
shed  222:13
  223:16
sheep  240:11
sheet  257:13
  259:7,10,18
  260:1
shelter  210:6
ship  49:22
short  10:14
  41:17 73:1
  110:3,5 119:3
shortest  178:17
shorthand  190:6
show  13:2 56:20
  57:8 151:5
showing  134:20
  225:11
shown  257:16
shred  132:15
shurtleff  13:6,22
shut  100:10
side  8:5,6 45:21
  91:20
signature  177:16
  201:13 215:16
  256:20 257:14
signatures
  176:10 189:4,9

signed  258:13
  259:18
significant  136:5
  138:1
signing  257:19
similar  71:20
  114:16
simple  193:8
  194:3
simplify  8:22
simply  193:4,6
  193:13,17,22,22
  194:2,17
simultaneously
  56:23
sincerely  152:11
  152:11 207:17
  257:21
single  69:20
  70:13 75:24
  125:1 127:8
singular  89:24
  153:3
sir  257:10
sit  164:18 166:6
  242:20
situation  61:24
  62:17 96:5
skim  182:17
skimming
  198:12 244:12
skip  26:9 189:9
  197:1,4 201:5,24
  251:2,3,3
skipped  177:5
  180:12
skipping  206:21

slavery  242:12
slaves  240:2,7,9
  241:15,22 242:4
  242:10,16,18
  244:8
slightest  194:13
slightly  53:18
  189:14 196:14
  197:3 200:7
  206:3,16
slot  188:20
slotted  233:3,5
slow  73:20,20
slowly  192:22
smaller  190:23
smoking  218:1,5
so's  175:15
social  5:19
socially  247:18
society  90:6
solutions  5:20
  257:1 260:1
somebody  59:19
  61:5 114:5
  121:7,16 155:1
  160:21
someone's  23:20
  121:11
somewhat
  237:22
sonia  2:4,9 7:20
  16:21
sophia  156:23,24
  157:7
sorry  6:18 11:13
  14:14 17:23
  29:4 58:5 60:8
  62:19 65:12

73:23 107:14
109:10 112:12
112:17 122:7
126:14 129:18
148:18 160:18
164:8 170:12
176:20 178:12
186:15 189:17
192:6 199:2
201:6 207:15
208:9 210:15,16
212:9 224:10
225:4 227:2
237:7 248:11
sort  12:10,14
  38:6 46:21 64:8
  79:18 138:15
sought  213:19
sound  65:7
  164:18 168:19
sounded  155:3
sounds  55:2
  61:14 74:9 77:1
  146:20 148:4
  216:15 255:2
source  244:13
sovereignty  6:1
spared  6:4
speak  16:18,19
  21:3 22:11
  24:19 30:11
  35:15 42:15
  65:4,5 66:5,7,16
  82:14,16,16,17
  86:16 88:11
  89:16 94:14
  114:10 129:2
  141:18 151:12

160:20 165:10
186:14 188:6
190:11 213:10
214:22,24 236:3
236:21 245:6,8
253:2,18
**speaker** 153:7
154:4,13
**speakers** 151:2
162:17
**speaking** 17:14
22:14 43:19
86:23 94:13,15
158:16 162:21
220:21 243:9,12
243:15 244:1
**speci** 248:17
**specific** 9:23
24:9 37:15
50:17 69:9
84:11 100:1
102:15 108:14
124:17 214:6
236:24 237:2,6
237:19
**specifically** 8:21
26:4 30:12
32:14 40:14
41:18 45:12
56:12 57:17
67:19 81:15
119:10 120:1
137:19,19
148:16 152:17
216:21 227:10
231:22 244:17
248:17

**specified** 117:18
227:21
**specify** 160:13
**specifying**
160:14
**speech** 7:7 13:6
13:7,22,23 116:9
117:9 120:12
123:18,19 145:9
251:21
**speeches** 122:19
**spell** 156:16
180:4
**spent** 84:8
**spin** 249:6
**spirit** 40:2
**spoil** 139:17
**spoke** 64:15,21
65:8,17 67:4,24
69:12 160:10
218:6
**spoken** 66:9
69:18,19 155:23
155:24
**squiggly** 159:11
**ss** 256:3
**stability** 210:7
**staff** 14:13 15:10
42:20 63:3
64:16 65:17
66:9,19 69:6,7
75:7 78:10
79:13 84:2 89:9
89:13 100:16
116:20 117:3,10
117:14,15 129:2
129:4,5,6,10,13
132:20 154:11

154:19 156:11
156:11 157:3,5
163:6 173:21
174:8 177:10,12
181:8,12,13,16
182:9 187:22
191:7 192:20
195:15,18,19,21
202:7,8,9,12
211:11 212:13
220:19 223:8
224:15,21
230:10
**staff's** 129:24
**staffer** 116:12
155:13,15,16
181:14 191:8
230:11
**staffers** 153:10
155:7,9 185:15
191:12 205:1
**staffs** 89:4
**stamp** 170:8
181:20 206:7
207:1 209:2
**stamps** 199:14
202:21
**stand** 5:11,23
**standard** 105:21
105:24,24
162:12
**standing** 83:14
121:6,7
**stands** 141:19
182:4
**start** 6:19 15:6
26:13 42:15,16
47:8 54:18

67:10 72:22
93:18 133:22
135:23 142:4
178:1 189:15
216:7 228:9
247:18
**started** 5:6 24:15
35:9 44:7 74:13
125:1 134:16,18
158:5,6,10
**starting** 73:9
**starts** 109:17,23
141:22
**state** 10:12 46:7
74:6,14 124:17
189:20 209:9
213:10 231:19
253:13 258:10
259:15
**state's** 67:12
**stated** 10:20
150:18 171:20
222:15
**statement** 11:22
93:3 94:5,6,8,9
155:5,12,12,14
211:23 213:7
214:16 220:4
244:1,17 245:16
245:18 247:9,10
247:12 251:10
258:13,14
259:19,19
**statements** 9:13
45:2 50:18
98:15 223:10
244:18

states  1:1 19:10
  147:22 149:4
  170:13,19
  171:20 207:13
  211:8
stating  219:10
  226:17
statistics  246:11
statute  74:9
statutory  175:3
stay  178:2
sticking  28:16
stipend  163:18
  166:4
stipulated  32:9
stipulation  9:19
stipulations  8:15
  8:16,18 12:10
stop  99:8 163:1
  163:18 164:6
  166:4
stopped  163:2,4
  163:9 166:14
  221:3,3,19
  222:13
stories  85:17,23
story  8:5,6
  220:14
straightforward
  92:23 149:20
strategy  219:9
street  1:20
strength  191:23
strict  251:18
strike  28:10 29:7
  32:14 38:13
  176:14 228:9

string  192:17
strongly  234:1
structure  77:19
  90:12
structured
  116:16
struggling  88:16
stuck  10:8 11:13
  11:17 141:3,4,6
  205:15
stuff  33:20 46:17
  59:14 79:2 83:4
  88:1 89:22,24
  90:5,24,24 91:7
  108:21 179:7
  211:15 236:9
  251:21
style  41:19,19
sub  174:10
  231:22
subcategory
  24:2,3
subject  7:7 8:1
  10:16 17:17,19
  29:15 32:1
  40:17 46:12
  48:12 64:22
  81:1 102:17
  106:24 130:13
  136:10,12,18
  141:10 149:7
  150:17 152:15
  157:22 162:20
  165:3 170:19
  174:2,7 175:2,2
  175:9 177:3,5
  180:12,23 186:5
  220:14 225:20

230:7 254:8
subjective  22:21
  86:17 99:16
  100:15 102:15
  119:18 228:4,23
  229:4 245:15
subjectivity
  119:20
subjects  228:1
submit  83:24
subordinate
  25:7
subpart  190:23
subpoena  18:24
  19:17 32:19
  141:12 146:17
  147:10 214:14
  214:17
subscribed
  258:10 259:14
  260:21
subsequently
  176:17
subservience
  242:13
subservient
  239:18
substantiate
  139:3
substantiating
  59:5
subtitles  113:7
  116:5 120:10
suffice  55:11
  168:10 194:3
  221:13
sufficient  42:13
  100:8

suffix  190:14
suffolk  256:3
suggest  41:5
  95:18 105:13
  182:23 217:15
  235:6
suggested  103:3
  104:5
suggesting  20:8
  85:6 97:17,20,22
  97:23 132:8
  149:5
suggestions
  12:10
suing  18:2
suit  111:20
  231:2
suite  257:2
sum  249:24
summarize
  81:11 180:20
  183:1
summarizing
  155:6
summons  29:21
superior  60:6,9
  257:1
supernatural
  234:21 239:19
supervisor  61:5
support  18:15
  84:5 181:16
  202:9,12 210:7
supports  35:7
suppose  98:15
  117:20
sure  7:15 10:1
  21:2 25:15 26:8

38:11 41:3,24
42:7 43:12 46:1
54:20 56:22
58:13 61:16
67:8 70:6 71:19
73:14 84:24
85:5,5 88:3,7
90:15,15,18
91:15 98:22,23
108:22 110:10
123:8 128:1
132:16 134:1
137:13 141:13
144:16 153:17
163:3 166:11,11
168:17,20
174:24 177:23
185:1,2 192:10
193:13 194:6,12
198:7 201:23
217:12 218:8
225:24 236:10
238:10,13,20
239:5 240:5,23
242:9 247:1,6
248:19 250:6
**surely** 203:17
**surmise** 75:1
**surprise** 139:16
139:17
**surrounding**
148:6 162:17
227:3,13
**swear** 14:18,21
**sweep** 130:4
**sworn** 14:15
15:2 256:9
258:10,13

259:14,18
260:21
**synonomous**
91:12
**synonymous**
93:8
**szaniszlo** 4:5

**t**

**t** 3:7 4:1 148:19
148:19,19,19
**tab** 176:2
**table** 7:20,22
10:19 11:24
12:7 28:3 41:8
41:10 107:7
**tabled** 12:18
**tablet** 57:8 66:13
209:4 225:11
**tabling** 36:20
**tad** 58:16
**tails** 243:21
**take** 8:8 13:19
13:24 14:4
16:20 22:5
23:20 28:19
31:18 52:22
53:2,4 65:1
104:10 108:22
115:2,8 120:10
120:13 127:7,17
142:2,10 147:11
156:8 159:10
168:6,15 170:7
173:7 178:7
189:17 199:16
200:3 208:15
209:5 210:20

211:4,7,8 213:20
215:12 218:19
219:7 220:13
221:9 222:18
226:4 238:24,24
239:6,7,8,10
241:7 244:16,22
246:15 247:17
249:6,14
**taken** 1:16 21:8
109:2 127:3
147:17 152:6
199:22 208:20
**takes** 111:7
219:11,16
220:21
**talk** 11:17 22:23
32:12 40:1,15,23
64:15 65:9 66:3
66:19,21 69:7,10
81:19 95:12
96:4 98:6
116:20 117:3,10
117:14 126:9,12
126:14 136:6
141:9 150:17
154:2 156:2
159:17,22 161:5
161:12,20 167:4
167:4 186:23
191:24 194:5
195:21 213:12
213:13,15
222:12 223:24
224:3,4 235:1
237:18 244:22
246:7 254:19

**talked** 27:3
32:11 40:16
65:2 69:6 87:5
106:16 110:23
116:21 117:4
156:10,12,14,21
157:19 159:16
159:24 170:24
221:1 224:3
**talking** 10:10
11:19 17:13
24:12 32:4 37:1
57:15,21 58:1,3
58:13,23 61:7
89:11,12 94:18
111:20 129:4
133:17 140:18
140:19 141:6,23
142:21,22
153:24 180:13
186:16,17
195:19 206:5
213:21 222:11
223:20 236:9
253:11
**talks** 202:12
**task** 235:16
**tasked** 154:12
**tasks** 145:12
161:1
**technical** 210:17
**technically**
186:16
**technological**
208:24 211:3
**technology**
129:14 195:9

tell   16:1 30:18
  37:8 42:22
  45:23 46:19
  48:9,9 53:17
  58:5 60:24
  70:12 83:23
  105:19 109:20
  139:15 150:20
  172:22 181:6
  205:9
telling   13:24
  23:5,6 25:13
  27:20 29:6
  35:21 40:14
  84:3 99:8 100:4
  105:6 122:8
  137:15 143:21
  151:15 173:21
  193:20 235:16
tells   87:12 203:2
temple   1:5,20
  6:21 17:3,18
  18:2,3 29:17
  41:21 52:17
  57:4 148:19
  210:11 212:6
  219:18 222:17
  222:20,20
  225:17 257:6
  258:3 259:3
temporary   112:6
  113:8
tempore   111:23
  112:5
ten   116:19
  125:24 126:19
  129:7 132:20

tendency   162:9
tenets   90:21 91:2
tense   130:11
term   60:8 78:15
  89:2 90:11
  112:11 152:19
  158:4,14 169:6
  184:17 242:9
terminology
  61:14 184:13
  238:9
terms   8:18 54:2
  72:2 86:21,23
  87:22 89:16
  90:7 93:2 98:8
  99:14 157:16
  169:14 187:4,5
  203:11 223:17
  251:8
testified   15:3
  215:21
testify   18:23
  20:13 23:11
  25:21 29:12
  31:16 37:24
  40:8 62:18 98:9
  100:15,20
  102:24 103:12
  106:13 136:11
  136:14 161:4
  214:4 218:16
  248:5 252:19
  253:6
testifying   39:13
  40:5 99:15
testimony   14:19
  48:3 83:24
  137:8 166:6

213:20 216:14
  221:7 256:10
  258:6,7 259:6,9
  259:12
text   18:17
  135:24 170:23
  173:2 190:1
  204:16,17
  205:15,16 212:7
  212:8 226:8
  233:4,15 240:16
  252:14
texts   192:17
thank   6:17 11:2
  42:13 143:17
  146:4 148:22
  152:12 155:2
  156:18 177:19
  178:7 189:3,23
  193:12 194:3
  196:20 199:19
  207:17 219:15
  246:24 253:21
thanking   194:14
thanks   190:5
  193:3,14 197:12
  219:20
theatrics   186:15
thereabouts
  126:23
thereof   154:5
theresa   177:7
thing   13:23
  33:23 34:2 35:2
  49:23 58:13
  70:17,20 82:19
  82:23 87:13,15
  87:16,18 88:2

134:2,9 147:5
  166:19 168:24
  183:4 197:13
  198:11,14
  201:24 213:22
  222:1 229:11
  233:9 245:24
  246:5 249:5
thing's   188:18
things   5:21 7:9
  9:4 11:4 27:20
  30:24 31:8
  44:11 45:22
  53:18,21 55:7,12
  55:15 59:6
  60:21 65:5 71:2
  72:18 74:19,20
  77:18 79:13,16
  79:17 83:24
  85:18 88:5,10
  89:20 90:1,2,17
  91:3,5,8,18,20
  95:1,4 98:20
  99:13 102:5
  104:8 109:16
  110:17 114:8,19
  115:4 117:2
  119:6 124:10
  129:20 138:18
  141:8 144:24
  159:17 168:8
  171:6 173:8
  198:18 201:7
  214:21 221:2
  227:16 235:22
  237:4 238:6
  247:3

**[think - topics]**

**think** 12:5,5,12
  12:14 14:18
  20:8 24:7 25:4
  29:10,14 31:12
  34:20 35:14
  36:12 39:2 41:5
  55:23 59:4 69:4
  72:13 75:5,12,18
  86:11 90:13
  92:23 95:21
  96:21 99:14,17
  104:14 106:15
  106:21 107:22
  114:10 119:16
  126:18 127:21
  127:24 128:2
  136:4 137:24
  138:2,19,20,20
  149:20 158:15
  162:3 178:1,4,9
  189:17 191:21
  197:15 198:24
  201:8 213:3
  215:11,19 218:4
  222:12 224:10
  231:9 233:22
  245:13 247:4,11
  248:21 254:1
**thinking** 56:19
  99:21
**thinks** 178:7
  252:16
**thirteen** 229:11
**thirty** 257:18
**thomas** 3:9
  170:13 171:20
  172:9 173:8

**thought** 20:1
  30:23
**thoughts** 18:11
  81:4 99:16
**threat** 6:13
**threaten** 9:7
**threatens** 5:24
  9:7
**threats** 20:3
**three** 7:1 133:15
  164:17 219:23
**thursday** 1:21
  209:8
**time** 5:4 8:22
  9:21 21:6,10
  24:15 28:23
  29:6 31:22 41:3
  46:4 49:9,12,14
  50:7,9 52:10
  59:1 67:3 70:6
  80:1 83:5,19
  84:7,12 104:14
  106:12 108:19
  108:24 109:4
  111:23 112:1,18
  116:16 117:3
  124:17 133:21
  133:22 138:19
  143:9 147:15,19
  148:2,4,7,8
  152:4,8 157:20
  157:20 163:6
  166:16 167:21
  170:16 172:18
  172:19 173:21
  176:7 177:10
  184:20 187:23
  187:24 195:12

  196:2 198:19
  199:20,24
  200:23 203:4,23
  204:19 207:7,11
  208:18,22
  210:21 211:1
  220:18,19
  224:15,24 225:1
  225:23 227:24
  228:1 231:6
  233:1,3,5
  234:10 255:3
**timeframe**
  157:24 163:8
**timeframes**
  203:19
**times** 5:13 7:1
  35:3 64:15
  78:16 114:15
  125:13,23 126:4
  133:15 164:14
  164:22 183:8,8,9
  183:11 191:4
  229:24 238:16
  239:13 241:2
  242:10
**timing** 203:11
  221:9
**title** 19:3,7,8
  23:3 50:6 112:3
  112:5 192:10
**tnt** 148:16
**today** 6:11 8:3
  11:15 27:4
  94:11 106:13
  140:7,19,20
  164:19 166:6
  190:3 197:10

  214:23 236:4
  238:20 239:21
  240:7 245:17
**today's** 6:12
  117:6
**told** 35:19,20
  101:13 106:13
  128:23 130:24
  135:22 164:17
  241:7
**tom** 170:22
**tomorrow**
  105:15 184:11
  185:13 187:16
  196:21 202:4,14
  202:16 205:4
  220:14
**tomorrow's**
  180:23
**tongue** 190:12
**tool** 231:10
**top** 189:4 202:1
  202:24 216:7
**topic** 19:17 24:9
  26:5 37:14,16
  39:23 40:1,19
  52:4 66:3 77:1,9
  83:17 105:9
  146:16 151:1
  167:19 215:4
  236:13 248:22
  252:18 254:18
**topics** 18:22
  20:10,13,17 21:3
  22:22 24:21
  25:20 26:18
  28:17,24 30:12
  30:23 31:13,16

37:23 38:3 40:4
96:2,9,9 98:3
103:16,23
106:13 122:2
130:22 136:8,15
136:18 137:8,24
140:3,23 141:1
141:16 143:3
146:6 167:14
237:3,19 248:5
248:14 251:3
252:9
**tort** 60:9,14,16
60:17 61:9
**totally** 167:23
215:19,23
**track** 66:13
132:1
**tradition** 71:5,6
**tragedy** 236:15
**trained** 43:3
**transcribed**
258:7
**transcript**
179:10 257:11
257:12 258:5,12
259:5,11,17
**translated**
240:24 241:2
**translation**
112:19
**transmitted**
205:19
**trash** 79:16 90:3
247:2
**treasurer** 68:21
**treasury** 68:13
68:18,20 227:7

**treated** 87:15
88:1
**tree** 5:15
**trial** 9:21 11:5,7
139:17 169:23
176:11 235:20
236:7
**tried** 34:10
94:13 106:6
**true** 5:22 98:11
98:23 211:17
214:7 251:11,11
251:12,13,14,20
256:10
**trust** 11:10
172:6
**truth** 6:3,12
12:17
**try** 8:4 9:12 10:2
62:2 89:16
139:1
**trying** 8:24 9:1,4
10:9 16:19 30:1
33:15 45:2
61:18,19 66:13
93:11,14 99:4
117:1 123:11
126:22 136:23
137:2 138:5
149:19 150:8,11
151:23 153:13
153:19 162:9,9
253:16
**tst** 4:7 6:22 7:21
22:9 24:20
31:18 47:19
49:21 51:17
52:11 55:22

86:10 89:19,19
89:20 91:3,5
92:3,4 97:11
100:2 108:9
148:13 161:11
161:14,15
163:13 164:1,9
164:14 165:1,21
174:22 183:14
207:18 211:19
213:6 215:15
220:3,21 221:22
223:22 225:13
226:17 228:8,10
244:20,24
245:13 252:24
253:1,14 254:7
**tst's** 49:22 90:10
90:20 91:20
100:1 163:12,16
163:21 165:4
227:22 251:24
**tuesday** 180:17
202:3 203:3,10
206:8 233:8
**turn** 53:6 65:1
166:19 184:24
212:22
**turning** 132:19
159:20 187:14
**turnover** 158:1
**twelve** 229:11
**twenty** 249:4
**twice** 105:18
**two** 11:4 47:24
53:17 78:12
90:7 91:12
94:13,15 97:11

125:13 131:14
132:11 156:7,8
156:13 157:19
158:4,4,10,16
160:10 161:22
164:13 176:14
183:11 218:11
219:23 226:5
**type** 213:9
**types** 18:19 68:8
250:8
**typical** 12:11
28:21 110:11
**typically** 79:23
104:8 110:2
231:8 233:6

**u**

**u** 156:17
**ultimate** 22:19
136:20
**umass** 182:19
**umb** 182:14,19
**umbrella** 61:14
**unable** 161:4
**unavowed** 5:11
**unclear** 37:14
62:20 227:23
238:5
**uncomfortable**
151:20
**underscore**
28:22
**understand** 6:15
10:9 13:12
22:17 23:17
27:6 29:8,18
30:3 31:20,24

32:17 41:16
43:10 48:2,2
54:10,13 60:7,18
61:19 73:10
78:17 83:2
86:21 88:13,15
90:7,9 92:5,8,17
92:18,20 93:23
94:4 98:12
104:5 105:23
117:1 130:15
133:7 137:1,12
161:17 163:19
169:18 188:15
204:15 205:23
223:20 234:12
239:5 243:4,7
245:24 247:9
252:14 253:16
**understanding**
8:4,5 13:10
15:18,19 16:9,13
16:15 17:1,23
18:1 19:2,24
21:19 22:7
24:24 25:3,5,7
27:19 30:1 35:2
35:14,15,20,22
36:22 38:5
39:21 41:16
50:2,3 53:17
61:1,4,6,17,18
61:21 62:1
87:24 121:3
136:7 137:10
139:8 143:5
169:11 173:18
215:20 217:19

220:23 225:12
225:14 237:20
242:8 253:4
**understandings**
234:4
**understood**
12:16 31:16
54:8,10 115:5
198:9
**undesignated**
200:5
**unfettered**  5:11
**unfolding**
151:21
**unfolds**  34:23
**unfortunately**
41:8
**unitary**  89:24
**united**  1:1
**university**
117:18
**unmet**  230:3,6
231:4,6
**unnecessarily**
106:11
**unnecessary**
219:20 232:17
**unpack**  76:7
**unprepared**
245:5 253:2
**untoward**  9:10
**unusual**  203:11
**unwilling**  161:4
**use**  8:9 25:9 33:6
34:3 36:3 54:2
112:11 119:9
143:9 194:16
226:13 238:9

242:2,9,14 251:7
**usual**  8:14 9:19
23:14 25:5
186:2
**usually**  75:22
83:17 171:4
229:23 230:1

| v |
|---|

**v**  1:7 192:15
257:6 258:3
259:3
**vacancies**
229:22
**vacancy**  229:20
229:21 233:1,2
**vacation**  115:3
**vaguely**  182:22
**valdez**  3:18,21
181:13 192:15
204:23
**valid**  44:3 254:8
**various**  114:8
**vary**  82:12
186:18
**varying**  81:20
83:5
**verbatim**  117:7
214:13
**veritext**  257:1,7
260:1
**veritext.com.**
257:17
**vice**  112:3
**video**  111:17,19
113:3,18 116:2
117:16 120:8,17
122:16 123:2

124:13 125:9
132:23 134:20
142:8 144:18
145:5 146:8
166:23 213:21
239:21 240:7
**videographer**
2:23 5:3 10:24
21:6,9 108:24
109:3,12 111:9
147:15,18 152:4
152:7 199:20,23
208:18,21
210:21,24 255:3
**videos**  125:16
**view**  106:11
108:13
**viewpoint**
244:24 251:24
**views**  220:3
**violence**  210:6
237:4
**virtual**  177:6
179:16
**viterinni**  220:18
**vittorini**  3:19 4:6
**voice**  145:9
**voices**  83:12
**volume**  84:7
85:7
**volunteer**  104:14
131:1
**volunteered**
131:3
**vote**  51:13,14
65:4 82:1 84:19
95:21 96:4 97:8
133:2

**voted** 82:7 97:3
**voters** 98:7
**votes** 77:24 78:4
  82:24 85:4
**voting** 83:4 98:8
  100:1,2 109:16
  135:2
**vouch** 120:20
  121:2,5,15
**vouching** 121:19
**vs** 17:3 57:4 73:3

**w**

**w.s.** 188:5
**wait** 42:24 73:20
  73:20,20 76:24
  76:24,24 199:13
  201:24 202:1
  206:12
**waited** 185:7
**waive** 233:20,20
**waived** 257:19
**walking** 64:12
**walsh** 170:18
  172:1
**wang** 156:23,24
  157:7
**want** 6:11,13
  11:17,20 13:1
  14:14,15 20:23
  21:1,4 22:4
  28:18 31:21
  34:17,18 36:10
  40:22 41:15
  45:18 55:13,13
  56:21 66:3 69:9
  73:9,10 86:9
  91:15 96:20

97:14 99:24
101:5 102:5
105:18,19,21
108:9,20 116:9
121:3 124:2
137:13 139:10
139:24 141:4,8
143:4 145:14
146:20 149:9
150:18 167:8
168:7 179:5
185:6 199:7
215:10,18 217:2
217:10,18 218:3
225:23 226:19
231:12 233:24
246:9 248:19
**wanted** 41:13
  77:8 139:16
  168:7
**wanting** 100:3
**wants** 47:3 55:3
  207:19 250:16
**washington** 2:5
**waste** 31:21 41:3
  225:23 234:9
**wasting** 227:24
**watch** 111:3
  124:9,22 125:3
  125:15 139:19
  140:12 144:24
  204:7
**watching** 44:21
  111:19 124:23
  239:1
**way** 19:12 25:9
  25:10 49:24
  50:15 55:12,15

70:11 80:8
87:14,21 95:21
97:3 98:9 99:16
116:6 117:2
119:23 131:18
151:20 176:4
201:13,15 202:1
218:20,21,22
**ways** 152:10
**we've** 7:1 55:12
  59:5 69:5 76:6
  108:18 110:14
  124:9 148:1
  175:22 191:3
  216:11,11,12,12
  221:1 226:5
  231:17 243:16
**website** 204:6
**wednesday**
  75:24 77:22
  177:22,24
  179:17 185:2,21
  187:11,12
  188:18 191:3,4
  193:1 206:9,9
**wednesdays**
  65:23 75:21
  76:1 81:20 83:5
  115:1 198:2
  203:6,6
**week's** 179:16
**weekly** 50:14
  51:2,3
**weeks** 128:6
  131:14 132:11
  156:7,8 218:11
  230:19

**weigh** 83:21 85:4
**weighs** 84:6
**weight** 86:11
**weights** 85:6
**welcome** 5:7 7:3
  143:15 152:13
  156:19
**welcoming**
  115:13
**went** 30:22
  43:17 70:9
  71:24 94:3
  154:13
**whatever's**
  196:11 231:20
**whatnot** 92:11
  176:24
**when's** 203:16
**whereof** 256:16
**whoa** 33:10,10
  33:10,10 206:14
  206:14,14
**wide** 126:4
  241:12
**widely** 119:17
**wife** 7:20
**willing** 179:15
**winning** 165:7
**wisdom** 145:11
  147:4
**wise** 223:17
**witness** 1:15
  21:14 29:3,8
  39:12 40:3,23,24
  102:14 105:7
  111:11 122:8
  135:21 137:19
  150:24 151:5,24

161:4 167:21
168:3,18,20
176:22 177:18
180:11 189:20
195:4 198:23
201:16,22
206:18 209:9
214:22,23
216:16 217:12
218:5 220:7,16
221:1,17 222:2
224:13 226:3
227:24 229:3
234:23 241:20
243:8,17,20
245:5 248:7,17
252:22 253:2,5,9
256:8,11,16
257:8,11 258:1,4
258:11 259:1,4
259:15
**witness's**  253:9
**witness'**  257:14
**word**  21:20,21
23:1 24:24 33:3
34:3 35:3 36:4,7
36:14,21 44:20
44:24 61:1
112:20 119:9
121:4,4 138:23
138:24 142:11
142:13 145:13
145:14 219:22
226:13 237:7
242:14
**word's**  121:10
**words**  10:4,5
14:1 25:8 32:15

34:8 38:19
42:24 43:11
44:7,15,16 55:7
63:13 124:6
162:8 169:21
171:15 182:10
212:18,18,20
226:12 229:16
232:6 237:15
242:16,18 244:7
251:4,9
**work**  12:11
28:15 29:22,23
46:22 53:10,23
63:17 64:6,16
66:2 69:16 78:6
78:8,13,14 79:6
79:7,9 81:7,12
84:3 87:20
104:9 107:21
110:15 114:8
121:1 129:6,6,7
133:22 154:21
154:22 160:23
174:17 181:9
192:18 210:5,5,6
210:10,11 212:5
212:6 222:16,17
222:19 232:20
238:12 240:13
247:2 250:24
**worked**  79:9
182:8 184:20
204:19
**working**  63:22
200:21
**workings**  21:19
22:2,18

**works**  69:12
74:16 115:7
204:18 247:3
**world**  25:6
**worry**  12:6,13
**worth**  250:1
**wow**  159:1
**wraps**  9:5
**wrath**  172:8
**write**  36:5 46:3
56:17 116:8,11
127:4,7,8 231:13
**writes**  185:12
189:19 196:16
197:7
**writing**  43:22
44:13,15 45:4,15
47:12 59:13
101:19,20
253:13
**written**  23:14
45:13 53:18,24
54:5,17,19 74:11
155:23 226:10
226:11 227:13
227:19,22 231:9
232:12 240:21
240:22 241:5,7
241:11 244:18
**wrong**  104:20
229:2 248:8
**wrote**  126:12
179:13
**wu**  113:5 116:16
117:14 141:22
161:12,13,15,18
162:20 163:10
166:16,17 167:5

168:14 181:15
209:17,19
213:23 214:1
220:19,20 221:2
222:24 223:1
224:2,4,15,16
225:18 226:17
228:4 229:1,7
244:11,12,14,14
244:14,15
**wu's**  116:20
126:9,12,14
161:20,21
211:11 212:2
213:20 216:17
220:20 221:21
223:20 229:7
244:23 245:11

| x |
|---|

**x**  3:1,7 4:1 66:8
66:15

| y |
|---|

**y**  156:17,18
157:10
**yansen**  185:3
188:6
**yeah**  27:22 42:5
44:14 48:12
49:12,21 54:15
54:15,18 55:19
56:4,24 58:2,7
60:16,19 61:10
61:10 63:1 64:3
64:7 66:6,8,10
66:10 69:10,10
73:6,6,9 74:22
74:24 76:20

77:4,10,19 79:20
84:14 85:9,16
87:9,11 89:6,10
89:23 101:18
103:8 106:19,19
106:23 107:14
110:23 114:7,9
118:22 123:10
127:13 128:20
131:21,23,23
132:10,10 134:1
134:24 155:21
155:21 158:2
159:6,7,8,9
171:10 172:17
186:19,21 189:4
196:10 198:4
199:9,9 201:11
201:23 203:20
208:11 210:19
217:7 222:7
224:19 229:16
229:18 232:19
237:11 238:21
247:18
**year** 115:2,7
125:12,21
127:11 158:4,24
163:3 183:8,9,9
183:11 241:8
**years** 68:4,5,11
68:17,17 79:10
115:1,6 127:15
131:19 158:4
174:12 227:7
241:10,11 244:7
250:1,9

**yep** 177:1 206:7
**youth** 210:6
**youtube** 72:13
110:23 111:2
168:23 236:8
238:2
**yuleidy** 3:18,21
181:13 189:22
189:23 191:7,9
191:14,19 192:1
193:1 194:4,5
195:13 196:4,17
197:8,20 198:6
202:7,8,9 203:21
204:1,2,22,23
**yuleidy's** 192:12
**yup** 177:14

**z**

**z** 192:15
**zed** 3:23 207:4
207:11 228:7,8
228:10
**zoom** 191:10
193:3,22 196:3
196:19,21 197:4
197:11 198:7,7
199:1,2,2,3,5,10
201:15 204:3,4,5
204:11,21,21
205:1 209:6
230:14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT 2

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MASSACHUSETTS

3    _____

4    THE SATANIC TEMPLE, INC.,

5            Plaintiff,

6        v.                           Civil Action No.

7    CITY OF BOSTON, MA,              1:21-cv-10102

8            Defendant.

9    _____

10               VIDEOCONFERENCE DEPOSITION OF

11                ANNISSA ESSAIBI-GEORGE

12   DATE:         Monday, September 19, 2022

13   TIME:         10:01 a.m.

14   LOCATION:     The Satanic Temple

15                 64 Bridge Street

16                 Salem, MA 01970

17   REPORTED BY:  Robert Lombardi, Notary Public

18   JOB NO.:      5488484

19

20

21

22

23

24

25

Page 2

1                    A P P E A R A N C E S
2      ON BEHALF OF PLAINTIFF THE SATANIC TEMPLE, INC.:
3           MATTHEW A. KEZHAYA, ESQUIRE (by videoconference)
4           Crown Law
5           333 North Washington Avenue, Suite 300
6           Minneapolis, MN 55401
7           matt@crown.law
8
9           SONIA KEZHAYA, ESQUIRE (by videoconference)
10          Crown Law
11          333 North Washington Avenue, Suite 300
12          Minneapolis, MN 55401
13          sonia@crown.law
14
15     ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS
16     ANNISSA ESSAIBI-GEORGE:
17          NICOLE O'CONNOR, ESQUIRE
18          City of Boston Law Department
19          1 City Hall Square, Room 615
20          Boston, MA 02201
21          nicole.oconnor@boston.gov
22
23
24
25

1            A P P E A R A N C E S (Cont'd.)

2   ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS

3   ANNISSA ESSAIBI-GEORGE:

4            ROBERT S. ARCANGELI, ESQUIRE

5            City of Boston Law Department

6            1 City Hall Square, Room 615

7            Boston, MA 02201

8            robert.arcangeli@boston.gov

9

10  ALSO PRESENT:

11            Sean Budd, Videographer

12            Lucien Greaves

13            Ada King

14            Mobius

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          I N D E X

2    EXAMINATION:                                    PAGE

3         By Mr. Kezhaya                             8

4

5                       E X H I B I T S

6    NO.            DESCRIPTION                      PAGE

7                      (None marked.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                P R O C E E D I N G S

2                THE VIDEOGRAPHER:  Okay.  We are on the

3      record.  This is the videographer speaking, Sean Budd,

4      with Veritext Legal Solutions.  Today's date is

5      September 19, 2022, and the time is 10:01 a.m.

6                We are here at The Satanic Temple,

7      Salem, Massachusetts, in the matter of The Satanic

8      Temple, Inc. vs. the City of Boston.

9                Would counsel please introduce

10     themselves for the record.

11               MR. KEZHAYA:  This is Matt Kezhaya

12     appearing on behalf of the plaintiff The Satanic

13     Temple, Inc.  I have with me Sonia Kezhaya, albeit

14     remotely, Lucien Greaves, Ada King, and Mobius.

15               MS. O'CONNOR:  And this is Nicole

16     O'Connor and with me is my colleague, Rob Arcangeli,

17     and we represent the City of Boston in this case, and

18     we are representing Annissa Essaibi-George in this

19     deposition.

20               THE VIDEOGRAPHER:  Court Reporter,

21     please swear in the witness.

22               THE REPORTER:  Thank you.  Good

23     morning, everybody.  My name is Robert Lombardi; I am

24     the reporter assigned by Veritext to take the record

25     of today's proceedings.

Page 6

1           I am a notary authorized to take
2    acknowledgments and administer oaths in the state of
3    Massachusetts.  Parties agree that I will swear in the
4    witness remotely outside of their presence.
5               Additionally, absent an objection on
6    the record before the witness is sworn, all parties
7    and the witness understand and agree that any
8    certified transcript produced from the recording
9    virtually of this proceeding:
10                        - is intended for all uses permitted
11                        under applicable procedural and
12                        evidentiary rules and laws in the same
13                        manner as a deposition recorded by
14                        stenographic means; and
15                        - shall constitute written stipulation
16                        of such.
17               Now, at this time, hearing no
18    objection, I will go ahead and swear in our witness.
19               Ms. Essaibi-George, if you'll please
20    raise your right hand for me.
21    WHEREUPON,
22               ANNISSA ESSAIBI-GEORGE,
23    called as a witness, and having been first duly sworn
24    to tell the truth, the whole truth, and nothing but
25    the truth, was examined and testified as follows:

```
                                                    Page  7

  1                    THE REPORTER:  You may proceed,

  2    Counsel.

  3                    MR. KEZHAYA:  Thank you.  Ada, if you

  4    could start us up on the invocation.

  5                    Is Ada within earshot?

  6                    MS. KING:  Yes.  Hello.  Hello, my name

  7    is Ada King.  I'm a minister of Satan and I will be

  8    performing our invocation.

  9                    Let us stand now, unbowed and

 10    unfettered by arcane doctrines born of fearful minds

 11    in darkened times.  Let us embrace the Luciferian

 12    impulse to eat of the Tree of Knowledge and dissipate

 13    our blissful and comforting delusions of old.  Let us

 14    demand that individuals be judged for their concrete

 15    actions, not their fealty to arbitrary social norms

 16    and illusory categorizations.  Let us reason our

 17    solutions with agnosticism in all things, holding fast

 18    only to that which is demonstrably true.  Let us stand

 19    firm against any and all arbitrary authority that

 20    threatens the personal sovereignty of One or All.

 21    That which will not bend must break, and that which

 22    cannot be spared -- or that which can be destroyed by

 23    the truth should never be spared its demise.  It is

 24    Done.  Hail Satan.

 25                    MR. KEZHAYA:  Hail Satan.
```

```
                                              Page 8

 1                       EXAMINATION
 2    BY MR. KEZHAYA:
 3         Q    Ms. Essaibi, do you object to me calling you
 4    Annissa throughout the course of this deposition?
 5         A    I'd prefer you to call me
 6    Ms. Essaibi-George.
 7         Q    Ms. Essaibi-George, are you familiar with
 8    the lawsuit in which you are appearing as a witness?
 9         A    I'm somewhat familiar; yes.
10         Q    Okay.  For benefit of the record -- well,
11    actually, off record, Ms. Essaibi-George, we addressed
12    the fact that you had not ever taken a deposition
13    before.  Is that correct?
14         A    That's correct.
15         Q    And more appropriately, is it also true that
16    you have not taken a deposition before?
17         A    That is true.
18         Q    Okay.  Sometimes I do things for the benefit
19    of the record.  What that means is that there is going
20    to be a transcript and I have to do things in a
21    certain way to make the transcript read appropriately
22    so that someone who is reading transcript can
23    understand what all is going on.  So when I say, for
24    benefit of the record, that's literally all that I'm
25    meaning out there.
```

```
                                              Page 9
 1              MR. KEZHAYA:  For benefit of the
 2   record, the readers of this transcript should take
 3   note of the Complaint, the Answer, the Motion to
 4   Dismiss, the Order Granting the Motion to Dismiss, and
 5   the Shurtleff opinion that recently came out.
 6   BY MR. KEZHAYA:
 7        Q    Now, Ms. Essaibi-George, you mentioned that
 8   you have some level of familiarity about this lawsuit.
 9   Have you read the Complaint?
10        A    I have not.
11        Q    Have you read the Answer?
12        A    I have not.
13        Q    Have you read the Motion to Dismiss?
14        A    I have not.
15        Q    Have you read the Order Granting Motion to
16   Dismiss?
17        A    I have not.
18        Q    Have you read the opinion Shurtleff vs. City
19   of Boston that the Supreme Court just came out with in
20   about June of this year?
21        A    I have not.
22        Q    Okay.  Where does your familiarity with this
23   lawsuit come from?
24        A    From the Subpoena that was served to me and
25   sort of conversation on the street that you were suing
```

Page 10

1    the City of Boston.

2         Q    Okay.  Who have you had these conversations

3    with?

4         A    I had it with, perhaps, my husband over the

5    weekend because I was served last week and was

6    planning on coming today.  And then the other

7    conversations, I don't recall who I've had them with,

8    just sort of conversation in the street.

9                   MS. O'CONNOR:  Sorry to interject for

10   just a moment.  I just wanted to put on the record

11   that I'm reserving all of my objections except as to

12   the form just to assist with the ease of this

13   deposition and making it flow smoothly.  So the City

14   is reserving all objections except as to form.

15                   MR. KEZHAYA:  Understood and

16   stipulated.

17   BY MR. KEZHAYA:

18        Q    You mentioned conversations on the street.

19   Have these been frequent conversations?

20        A    No.

21        Q    When is the earliest conversation that you

22   can recall before the one over the weekend with your

23   husband?

24        A    I actually can't recall.  I wasn't terribly

25   surprised when I received my Subpoena last week but I

Page 11

1  can't recall specific conversations.  I just know that

2  it's sort of been in, you know, in and out of the news

3  so it's been a topic of sometime conversation.

4      Q    Okay.  Prior to you coming here, you were on

5  the city council.  Is that correct?  The Boston City

6  Council.

7      A    Until the end of last year.

8      Q    Literally, December 31 of last year, or?

9      A    The day before swearing in of the new

10  council, so I don't know the exact date.

11      Q    Okay.  But suffice it to say --

12      A    But in effect, December 31st.

13      Q    Okay.  By the way, whenever I ask about

14  dates, I will be specific if I need to know a day.

15  I'm just trying to get general understanding of ideas.

16  There are no gotcha moments there.

17      A    Perfect.

18      Q    So as I recall, your testimony, essentially,

19  it's that you've kind of seen it in the news, you've

20  probably had some non-substantive passerby

21  conversations, but that's about it.

22      A    The non-substantive is the appropriate way

23  to describe it.

24      Q    Okay.  Thank you.

25              MR. KEZHAYA:  Mobi, we do not have the

```
                                               Page 12
 1   Complaint --
 2   BY MR. KEZHAYA:
 3        Q    Well, why were you not surprised to see your
 4   Subpoena?
 5        A    'Cause it's been in and out of the news and
 6   I remember and recall conversations about you suing
 7   the City; the Temple suing the City.
 8        Q    Okay.  But I'm having trouble understanding
 9   how that leads to you get a Subpoena, and it's like,
10   okay, this is expected.
11        A    I was a member of the city council at one
12   point.  I -- I just wasn't surprised when it hit my
13   door last week.
14        Q    Did it offend you that we personally served
15   you with a Subpoena?
16        A    No.
17             MR. KEZHAYA:  Mobi, if you could take a
18   look into the -- under the Exhibits' folder, there
19   should be a folder enumerated number 1, and in that
20   folder, there should be a file that begins 2021/08/26,
21   Joint 16.1 Statement.
22             And for benefit of the record and also
23   the witness, we're about to show some Exhibits.
24   Normally, I would show it to you physically on my
25   tablet, but, you know, again, illness.  So we have a
```

Page 13

1   projector that you should be seeing on your left.  I

2   don't know if it's down yet --

3                   THE WITNESS:  It is.

4                   MR. KEZHAYA:  Is the document up?

5                   THE WITNESS:  No.

6                   UNIDENTIFIED SPEAKER:  It is up now.

7   BY MR. KEZHAYA:

8       Q    Okay.  I can't see what you're looking at

9   and this actually works out quite well because I need

10  to make a good record anyway.  So at the very top, you

11  should see blue text; very top left of the text should

12  say "Case 1:21cv" and the end of it, should say "Page

13  1 of 4."  Do you see that blue text?

14      A    I do it's -- yes, I do.

15      Q    Okay.  Great.  Ms. Essaibi-George, if I

16  could direct your attention to paragraph D, sub b, and

17  read the text in full.  It's going to require you to

18  go over into the next page.  So also read the second

19  sentence as well.

20      A    Okay.  The parties propose increasing the

21  number of depositions to 15 per side see Fed. R. Civ.

22  P. 30(s)(2)(a)(1).  The default is 10 per side.  There

23  are 14 counselors, each of which has discoverable

24  knowledge for their reasons not to invite a

25  representative from plaintiff.

1        Q     At the top, you'll see it says file 8/26/21.

2    Do you see that?

3        A     I do.

4        Q     Did anyone tell you that you might be

5    deposed on or around August 26, 2021?

6        A     I don't recall.  It's possible but I don't

7    recall specifically.  But again, as I -- I wasn't

8    surprised last week so perhaps it was knowledge I had

9    and just don't recall.

10       Q     Okay.  That's no problem.  Let's see here.

11   Okay.

12              MR. KEZHAYA:  And I also want to direct

13   your attention now, Mobi, to page 3 of this PDF.

14   BY MR. KEZHAYA:

15       Q     And, Ms. Essaibi-George, if you take a note

16   of, there should be two signature blocks on the left;

17   it should say plaintiff The Satanic Temple, Inc.  On

18   the right, it should say defendant City of Boston.

19   Underneath defendant City of Boston, you should see a

20   signature line and then a name and a bar number.

21   Could you please read the first name and bar number?

22       A     Under City of Boston or under The Temple?

23       Q     Correct.  Under City of Boston.

24       A     The first attorney is Henry Lucien, I think?

25       Q     Okay.  Well, in that case, third name that

Page 15

1   you see in that --

2        A    Third name is Robert and I don't want to

3   mispronounce it.  Sorry.

4        Q    Robert, I gather you have in the room with

5   you.  Is that correct?

6        A    Yes.

7        Q    Are you familiar with Robert from before

8   today?

9        A    Yes.  We talked briefly last week.

10        Q    Okay.  When did you talk last week?

11        A    When I reached out after I received the

12   Subpoena.

13        Q    What form of communication did you send to

14   Rob?

15        A    Oh, I -- I first called the City Council and

16   then I called someone in the administration, our

17   former liaison to the City Council, who then connected

18   me with Robert.

19        Q    Okay.  Did you compensate Robert for his

20   time speaking with you?

21        A    I did not.

22        Q    Are you compensating Robert for his time

23   representing you today?

24        A    I am not.

25        Q    Do you have any form of written --

Page 16

```
 1        A     I just want to make sure I'm not receiving a
 2   bill.  I'm sorry.  I made a joke; that was
 3   inappropriate.
 4        Q     Oh, no.  Jokes are fine.  I have no
 5   objections to jokes.  I --
 6        A     I don't believe I am responsible for
 7   compensating Robert for his time.
 8        Q     Okay.  I take that also means then you don't
 9   have any form of written agreement with Robert or
10   anyone else associated with Robert?
11        A     Yes.  That is -- that's correct.
12        Q     Other than that one time, have you talked
13   with Robert?
14        A     We communicated via text, a brief phone
15   call, and then we had a follow-up more formal Zoom
16   including Nicole, just to -- I -- I have never done a
17   deposition before and wasn't sure what the expectation
18   was for me today.
19        Q     Okay.  How much time did you spend on the
20   first call with Robert?
21        A     Maybe ten minutes.
22        Q     How many text messages?
23        A     -- probably two or three just to set up a
24   time.
25        Q     Okay.  For the Zoom call?
```

Page 17

```
 1        A    Yes.

 2        Q    Was it just you, Robert, and Nicole on that

 3   Zoom call?

 4        A    Yes.

 5        Q    How long was that Zoom call?

 6        A    Well, the first one was about ten minutes;

 7   it was a -- a Zoom call.  And then the second one,

 8   that was a -- we took a little bit more time, it was

 9   maybe closer to thirty minutes.

10        Q    Were all of those communications since you

11   got served; whenever that was?

12        A    Yes.

13        Q    Okay.  Before then, did you talk with Robert

14   or Nicole or any other City of Boston attorneys about

15   this matter; meaning, the case?

16        A    I reached out to Christine O'Donnell [ph]

17   when I was served to see what do I do -- ask her, what

18   do I do.

19        Q    Was that the person in the City's --

20        A    She worked for the city council.

21        Q    But you mentioned something about city

22   administration; was that the person you reached out to

23   in city administration?

24        A    Yes.

25        Q    Okay.
```

Page 18

1    A    No -- no.  Christine works for the city

2  council and then I reached out -- so when I served as

3  a member of the city council, our IGR representative,

4  internal government relations representative, is who I

5  reached out to and they connected me to Robert.

6    Q    Okay.  Tell me more about IGR business.

7    A    It's just the - the sort of formal way that

8  the city council communicates with the administration.

9    Q    The administration --

10   A    Internal -- it's, like, internal government

11  relations.  So the mayor's office, our communication

12  with the mayor's office between the council and the

13  mayor's office.

14   Q    Is it specific to the mayor's office or is

15  more general for all of Boston City Government?

16   A    It's more general for -- well, I use it for

17  all city government -- my

18   Q    You use it for all city government, but is

19  this office's intended purpose for --

20   A    Well, they're -- yeah, I think that -- maybe

21  that role evolves a little bit over time.

22   Q    So it sounds like RGR [sic] doesn't have

23  strictly defined scope of services?

24   A    They probably do.  But I used them -- in my

25  capacity as the city council, if I needed something

Page 19

```
 1    from the mayor's office or various departments, I may
 2    communicate with them.
 3         Q    Sure.  You know people there and they know
 4    people --
 5         A    Yeah.  And you develop relationships over
 6    the years.
 7         Q    Sure.  That makes sense.  Did you tour the
 8    temple when you came in here?
 9         A    I did not.
10         Q    Do you have any interest, other than my
11    illness, in touring the temple otherwise?
12         A    Not really.
13         Q    Okay.  Why is this?
14         A    I don't know.  I've got to get home and make
15    sure my kids have food after school -- just other
16    things to do.
17         Q    I understand.  That answers --
18         A    I'm not sure how long this will take as well
19    so I don't know what the rest of my day will bring.
20         Q    I wasn't speaking specifically to today,
21    just literally, just at any time in the future, is
22    that something that piques your interest?
23         A    No.
24         Q    Why is that?
25         A    I can't tell you why; it just doesn't.
```

Page 20

1      Q     Are you averse to the idea or does it just

2   not pique your interest?

3      A     I'm not adverse to it, it just doesn't

4   interest me.

5      Q     Okay.  We've talked a little bit about the

6   fact that you've been on the council in the past.  How

7   long have you been on the council?

8      A     I was elected in 2015, took office in

9   January of 2016, and left at the end of 2021 or --

10  whatever -- I don't know the exact date between the

11  end of our council and the swearing in of the new

12  council earlier this year.

13     Q     Two thousand -- so, if --

14     A     -- 2016 to 2021.

15     Q     Okay.  So 2016 to 2021 is when you were on

16  the Council.  Is that correct?

17     A     Yes.

18     Q     Okay.  Did you enjoy your time on the

19  council?

20     A     I did.

21     Q     Do you have any future interest in

22  re-running for council politics?

23     A     Likely not, but I've learned to not say no

24  to things.

25     Q     Yes.  What got you interested in signing up

Page 21

1   for the council in the first place?

2        A    I've always been interested in local

3   government and city government since I was young.

4        Q    What --

5        A    Just, in high school I became involved in

6   student government, student activism, and eventually

7   it led me -- you know, there was a -- sort of a time

8   that there was some change on the council and I ran

9   for office the first time in 2013.  I ran at-large and

10  -- and large and ran again in 2015 and won.

11       Q    Okay.  You mentioned student activism.  What

12  was the activism that you were involved in?

13       A    As a high school student in Boston, just

14  really involved in making sure that my high school, in

15  particular, but schools had enough funding for the

16  things that they need.  I eventually became an

17  educator.  I was a former teacher in Boston.  And

18  active in my community and thought that my -- and saw

19  that my experiences both as a young person and as an

20  adult could really impact policy in the work that we

21  were doing at the city level in a helpful and

22  impactful way.

23       Q    Were you born in Boston?

24       A    I was.

25       Q    Were you raised in Boston?

Page 22

1      A     I was.

2      Q     So then this is your home, in other words?

3      A     Yeah.

4      Q     Were you born in Boston Proper or were you

5  born in Boston --

6      A     I was born in Dorchester, which is part of

7  Boston; neighborhood of Boston.

8      Q     Okay.  So Dorchester is a sub-part of

9  Boston?  It's --

10     A     It's a neighborhood of Boston.

11     Q     Okay.  Some cities, they have neighborhoods,

12  but the address is still -- like, for example, in

13  Minneapolis, I live in Elliot Park neighborhood, but

14  my address is Minneapolis, Minnesota.

15     A     You could mail a letter to either

16  Dorchester, Massachusetts, or Boston, Massachusetts,

17  it would get to me.

18     Q     Okay.  What was your flavor of student

19  activism?

20     A     I -- I don't -- what do you mean, flavor?

21     Q     You were involved in activism as a student

22  in some capacity --

23     A     Yeah.  I was a member of the student

24  government at my school.  I was a member of the Boston

25  Student Advisory Council which is the citywide city

Page 23

1    council.  I was a member of the Greater Boston, which

2    is a regional organization, and a member of the State

3    Student Advisory Council.

4         Q    Okay.  You got off the council at end of

5    2021, we had mentioned.  Is that correct?

6         A    Yes.

7         Q    Did you get off of it for the purpose of

8    entering into a mayoral race?

9         A    During my last term as a city councilor, I

10   chose instead of running for re-election, to run for

11   mayor.  So I -- I chose not to run for re-election; I

12   chose to run for Mayor of Boston.

13        Q    When did you form the intent to run for

14   mayor?

15        A    The intent to run for mayor, probably in

16   high school.  But I announced my candidacy in January

17   of 2021.

18        Q    Do you intend to run for mayor again?

19        A    I can't say "yes" or "no" to that question;

20   I'd like to keep those doors open.  But it's unlikely.

21        Q    Why is it unlikely?

22        A    I mean, I suppose anything is possible so I

23   don't -- I don't want to say "yes" or "no," but I

24   don't know.

25        Q    What was your platform as a mayoral

Page 24

1   candidate?

2       A    I mean, my platform is -- has been pretty

3   extensive.  But I'd say the experiences that I lean on

4   the most are being a small business owner; so economic

5   development and small business support.  And then

6   education; I'm a former classroom teacher and I know

7   our school system pretty intimately and understand the

8   weaknesses and challenges and the successes that it

9   faces.  And then, I leaned on my years on the council

10  and constituent services, and the other work I've done

11  around ending homelessness in our city for individuals

12  and for families; among other things.

13      Q    What are some of the other things?

14      A    You know, supporting our senior citizens,

15  making sure that transportation issues are responded

16  to, that public works in, you know, filling potholes

17  and repairing, you know, sidewalks; that sort of stuff

18  is happening.  Our park system, I, you know, used to

19  coach and have kids that play sports and our athletic

20  fields and that -- that work is important to me.

21  Making sure that we're supporting those programs and

22  making sure that they have the facilities and the

23  infrastructure in which to play on and -- and be on.

24  I mean, I -- my -- my work was extensive beyond that.

25      Q    Is it fair to summarize basically good

Page 25

1    common-sense government was your platform --

2         A    Yeah.  I think that's -- right; responsive

3    and present and engaged government.

4         Q    Who were your primary supporters?

5         A    I -- the people of Boston.  I mean, I -- I

6    spoke quite a bit to families that had children in the

7    school system or -- you know, people that worked to

8    end homelessness in our city.  I -- I don't -- I

9    haven't -- I can't identify who actually voted for me.

10   But I had some pretty based support across our city.

11        Q    In the course of being a mayoral candidate,

12   did you keep track of who gave you money --

13        A    I mean, it's -- it has been tracked.  Yes.

14   It's -- it's reported through the office of campaign

15   finance online.

16        Q    I'm asking, though, as to your knowledge,

17   without reference to the materials that are available

18   online, just generally, did you keep track of the

19   demographics of who gave you money?

20        A    No.  Not the demographics.

21        Q    Did you have someone who worked for you that

22   kept track of demographics --

23        A    Not the demographics; no.  Name, address,

24   amount, employer; 'cause that's something that we're

25   mandated to report over a certain dollar amount.  But

Page 26

1    not the demographics.

2         Q    I think we might be having a

3    miscommunication as to the definition of the word

4    demographics.  I'm literally just saying metadata

5    about people.  So, for example, name, address, age,

6    gender --

7         A    We wouldn't ask -- we wouldn't ask for age.

8    The only thing we would track would be name, address,

9    maybe a cell phone number or a phone number if we

10   received one, and their employer.  And, obviously, the

11   amount of the contribution.

12        Q    And nothing else?

13        A    Nothing else.  No.  I mean, if -- sometimes

14   on the back of a remittance envelope, there might be a

15   box to check if you'd like a yard sign or a box to

16   check if you'd like to volunteer for phone banking or

17   canvasing, but beyond that, there was no other sort of

18   personal information collected.

19        Q    Okay.  Did you have a general sense of who

20   your demographics of your financial supporters were

21   based off of speaking engagements that you were

22   invited to?

23        A    Again, it was very broad based.  I don't

24   think there's one particular demographic that I could

25   reference.

Page 27

1       Q     Okay.  Maybe we should break it down a
2   little further.  Were you invited to speak in the
3   course of your mayoral race?
4       A     Yes.
5       Q     Roughly, like, very round numbers roughly,
6   about how many speaking engagements did you engage in?
7       A     Hundreds.  I mean, I probably spoke multiple
8   times a day over the course of the campaign.
9       Q     How long was the campaign?
10      A     The mayoral campaign specifically, kicked
11  off the end of January and went until election night
12  in November of 2021.
13      Q     In preparation for the end of January --
14  formal mayoral race, did you give speeches prior to
15  that kind of --
16      A     I gave speeches almost every day as a member
17  of the city council -- as a candidate for the council.
18      Q     What was the nature of the speeches you were
19  giving as a --
20      A     I would speak to community groups.  I would
21  speak at public forums.  I would speak at small
22  gatherings.  So if it was a, you know, a meet-and-
23  greet or a -- a kickoff to an event or a road race,
24  classrooms, I spoke a lot at sort of all sorts of
25  different events.

Page 28

1      Q     Was being a city councilor a full-time job?

2      A     It was.

3      Q     And when I say full-time job, I want to be a

4   little bit more precise.  Was it literally a -- were

5   you paid as a full-time employee or was it just

6   something that takes up full-time?

7      A     So I don't know if there's any sort of

8   formal requirements.  Many -- I own a small business,

9   for example, so my -- there's no clock to punch as a

10   city councilor.  I treated it very much as a full-time

11   job; probably more like two full-time jobs.

12      Q     Okay.  Is that the norm on the city council?

13      A     Everyone approaches their work in a very

14   different way as a member of the council.  So I -- I

15   can't speak to how other people perceive their --

16   their work style.  And everyone does approach their

17   job in slightly different ways.

18      Q     So let's see here.  You were on there for

19   five years --

20      A     Six.

21      Q     Six?

22      A     Yes.

23      Q     So beginning of --

24      A     So January of 2016 through December of 2021.

25      Q     Okay.  So we'll call it six years then.

Page 29

1    During that time, again, roughly, this is not --

2        A    Yeah.

3        Q    -- question, about how many councilors did

4    you run into during that time period --

5        A    All of them --

6        Q    -- individuals who served as councilor?

7        A    All of them.

8        Q    I don't know how many that is though.

9        A    There are 13 members of the council, so my

10   12 colleagues, at any point, in time I'd see them at

11   community events, at council meetings and hearings, at

12   --

13       Q    If I may interrupt.  I think I asked a poor

14   question.  More particularly, I'm trying to determine

15   a unique number of how many councilors that is within

16   your personal knowledge during this six-year period.

17   So, for example --

18       A    Oh -- oh.  Well, I'd have to think about

19   that 'cause there were some councilors who had retired

20   or left or came on.  So I don't want to give you a

21   number -- it's probably -- oh, it's probably -- it's

22   going to be an extra five -- I'm trying to think of

23   how many seats turned over during my time on the

24   council.

25       Q    So call it five?

1      A    I -- I guess I don't want to call it
2   anything.  It's -- it's a relatively small number but
3   that's math I can do for you at another time perhaps.
4      Q    Well, we only have the one deposition that I
5   can --
6      A    Okay.  I mean -- it's -- it's documented.
7   It's in -- it's somewhere.  If you look through
8   election -- election results.
9      Q    This is just the preface to a follow-up
10  question.  So I'm just going to go with approximately
11  five.  If it ends up being four or three or seven or
12  whatever --
13     A    Give me one quick second, I can probably do
14  some of that now for you.
15     Q    Okay.
16     A    I think it's five.
17     Q    So let's go with five.  I'm not trying to
18  hold you to anything --
19     A    So that's 17 colleagues over my time.
20     Q    Okay.  So of those 17 people, how many did
21  you routinely encounter in the course of your -- what
22  I would describe as -- well, first of all, let's
23  backup and strike that, by the way.
24          Is it fair to summarize the speaking
25  engagements that you described earlier as community

1    engagement, can I use that as a shorthand?

2        A    Yeah.

3        Q    Okay.  In the course of your community

4    engagement, of those 17 members that you -- colleagues

5    that you had, how many did you routinely run into?

6        A    All of them.

7        Q    All of them during these?  So --

8        A    Yeah.  So I was an at-large -- I was an

9    at-large city councilor and whether it was a district

10   councilor or another at-large member throughout the

11   course of given events and days, I'd run into all of

12   them -- not all of them on one given day but over the

13   course of several weeks -- over the course of a few

14   weeks, I'd see all of them at something.

15       Q    Okay.  Let's backup a little bit.  So you're

16   an at-large councilor during --

17       A    I was; yes.

18       Q    Sorry; yes.  So during this time period;

19   January 2016 to December 2021, during your tenure, so

20   to speak, you were at large.  Correct?

21       A    Yes.

22       Q    Okay.  Please define at-large for me.

23       A    I represented the entire City of Boston; not

24   just a district.

25       Q    And is that distinct from other councilors

Page 32

1    and who they represented?

2        A    There were four at-large members and there

3    are nine district councilors representing different

4    parts of the city.

5        Q    Okay.  From a high-level perspective, is it

6    fair to say that districts are sub-parts of Boston,

7    where as you represented all of Boston?

8        A    Yes.

9        Q    Okay.  So during the course of your tenure,

10   you would be involved in community engagement, you

11   would regularly run into that particular district

12   person.  Is that a fair --

13       A    Yes.  Yep, and some of my at-large

14   colleagues.

15       Q    Okay.  Oh, that's right because you weren't

16   the only at-large colleague --

17       A    There were four -- there were four of us.

18       Q    Okay.  Let's talk about what is entailed in

19   this community engagement.  Do you have a just

20   prototypical or stereotypical event that is community

21   engagement that you engaged in?

22       A    No.  I would -- you know, community

23   engagement looks like -- it can look like something

24   different.  It could be a -- a parade.  It could be a

25   civic association meeting.  It could be engaging with

Page 33

1   a parent council.  It could be attending a school
2   committee meeting and offering testimony.  It could be
3   participating in a rally at the State House.  It could
4   be having a coffee hour at a coffee shop.  It could be
5   attending a meet-and-greet in someone's private home.
6   It could be lots of different things.  It could be
7   talking to a classroom full of students.  It could be
8   visiting a senior -- senior building.  It could be
9   attending a luncheon for someone's retirement.  It
10  could be lots of different things.
11      Q    During the course of your community
12  engagement, did religion ever come up in your
13  discussions with the community; the topic of religion,
14  to be fair?
15      A    I'm -- I'm sure it did.
16      Q    Would it have been noteworthy to you that
17  you were talking about religion at the time or would
18  this have just been you talking with a member of the
19  community?
20      A    I don't know what you mean, noteworthy.
21      Q    For example, earlier we talked about the
22  Subpoena.  You were not surprised that a Subpoena
23  arrived.  You don't specifically recall the nature of
24  why you weren't surprised, which means that you
25  learned that you will probably be subpoenaed at some

Page 34

1    point in the future --

2        A    Yes.

3        Q    -- but you didn't find it noteworthy, so you

4    don't remember it.

5        A    Right.

6        Q    So going back to this question --

7        A    Yeah.  So thinking about religion in

8    conversations I might have had for -- something that

9    comes to mind is, we -- during, you know, one of the

10   natural disasters and I think part of the civil unrest

11   that's happening in Haiti, we have a couple of pretty

12   engaged Haitian churches in the city and I -- I

13   remember attending an outdoor service I think because

14   it was probably during 2020 or maybe early 2021 -- an

15   outdoor service at a church that was organized by some

16   Haitian clergy members in sort of support for the

17   people of Haiti and recognizing the work that Boston

18   should do to support Haitian refugees during that

19   time.  So I think that that might be a noteworthy.  It

20   was very -- very directly related to not just the

21   Haitian community but it directly involved members of

22   the clergy that were Haitian or had Haitian and roots.

23       Q    Okay.  I have a cultural unfamiliarity with

24   Haiti.  Remind me again the timeframe that this

25   happened.

Page 35

1        A     I want to say this was at the, you know,
2    early months of 2021, maybe the end of 2020.  Although
3    I would -- unfortunately for the Haitian people,
4    they've had some great unrest and some natural
5    disasters that have happened, especially over my time
6    as a city councilor, so we've -- we've done lots of
7    things within the Haitian community, for example.  But
8    I -- I want to say this is probably early 2021.
9        Q     Okay.  Was this one engagement or was it
10   plural --
11       A     Well, so I'm -- when you asked the question
12   about a noteworthy event that involved religion,
13   that's the first thing that comes to mind.  I've also
14   participated in a political forum at a Baptist church
15   in -- in the city.  They hosted a community event for
16   candidates running for mayor and other offices.  So
17   although that wasn't religious in nature, it happened
18   in a religious place.
19       Q     There's a distinction I want to draw with
20   regard to the topic of religion.  Sometimes something
21   can happen in a religious place --
22       A     Right.  Right.
23       Q     -- and not be necessarily religious in
24   subject matter.
25       A     Right.

1        Q     So, for example, we are in a religious

2    temple right now so there is a religious color to

3    what's going --

4        A     Right.

5        Q     -- primarily, this is a simple dispute.  You

6    understand the distinction of something being subject

7    matter not exactly religious but, you know, it's kind

8    of -- it's got a tinge of religion to it.  Is that --

9        A     Yeah.  I mean, I've -- I've also visited a

10   mosque, for example, during a prayer service.

11   Although I didn't actively participate in prayer, and

12   had an opportunity to speak to the congregation after

13   prayer.  And I've done that a number of times as well.

14   So not religious in topic, but certainly, as you, I

15   think described appropriately, religious in color.

16       Q     I want to go back to this Haiti matter

17   because I'm unclear of whether this was one or plural

18   incidences that is within your recollection.

19       A     I've done -- I've -- we've done a number of

20   -- I've done a number of events around supporting

21   Haitian Americans and Haitians that need our both

22   literal actual support and emotional support.

23       Q     Are Haitians a politically engaged subsect

24   of the population of Boston?

25       A     Yeah, I'd say so.  I mean, they're -- we've

Page 37

1   -- we've probably the -- one of the largest Haitian

2   populations in the city of Boston, in the country.

3   And they're pretty engaged and -- and active.

4       Q    I may have misunderstood you earlier when

5   you first began talking about this.  I have notes of

6   natural disasters and I seem to remember there was

7   political unrest as well --

8       A    Yes.

9       Q    -- I don't have a note --

10      A    Yep.

11      Q    -- political unrest --

12      A    The people of Haiti have dealt with a lot of

13  turmoil and trauma and the effects of natural

14  disasters.

15      Q    Okay.  Now, I remember in, I think it was

16  early 2020, there was a massive hurricane, if I

17  remember correctly, or maybe an earthquake --

18      A    A earthquake; right.

19      Q    Was that 2020; is that the correct

20  recollection?

21      A    I -- I don't know.  I can't recall the dates

22  especially.

23      Q    In terms of stereotyping, would that be the

24  kind of event that would prompt your invitation to

25  these, whatever we want to call this, engagement?

Page 38

1      A     No.  I prefer not to stereotype but I have

2   -- I have -- I've had a reputation of being pretty

3   engaged and pretty present and there were very few

4   invitations I refused.

5      Q     Okay.  I want to drill further first into

6   the Haiti -- or Haitian, rather, matter.  How did the

7   speaking engagement, whichever one you remember best,

8   how did that one come to be?

9      A     How did that one come to be?  This one in

10  particular, was at -- that -- that came to mind, was

11  at St. Angela's Church and I don't know if there was a

12  formal speaking arrangement pre-set.  I don't know if

13  there was an agenda or any sort of formal speaking

14  program.  I do recall speaking at it but I think it

15  happened spontaneously as people arrived and

16  especially as a -- an elected official or a member --

17  or a member, you know, a prominent member of the

18  community, if they were present, they were often just

19  welcomed to the front stairs of the church to speak to

20  the -- to the group that had come together on that

21  particular day -- I'm thinking about that particular

22  event.

23     Q     Okay.  You have in your mind a fairly

24  precise recollection of a pretty particular event.

25  I'm unclear if I have that same event precise in my

Page 39

1   mind.  Is this the same one that you talked about

2   earlier?  If I remember correctly, you said it was

3   late 2020, early 2021?

4       A    Yeah.  That's the one.  I think it -- it

5   must have been 2021.

6       Q    Okay.  Well, I don't really care.  Can we

7   just --

8       A    Yeah.

9       Q    -- that was 2021.  If it turns out it was --

10      A    I think it was probably early 2021; this one

11  in particular.

12      Q    Okay.  So this particular event, it's early

13  2021.  You were at the church.  Is that correct?

14      A    Yep.  Yep --

15      Q    How did you get to the church?

16      A    I'm sure I drove my car.

17      Q    Okay.  You probably drove.  Do you remember

18  what time of day the event was in terms of morning,

19  noon, night?

20      A    I -- I don't know what time of day it was

21  but it was day, not night.

22      Q    Okay.  So it was daytime?

23      A    We were outside; yeah.

24      Q    Was it early day or late morning or

25  afternoon?

Page 40

1       A    I -- that I couldn't tell you.

2       Q    Okay.  You mentioned that --

3       A    I would say, like, it was -- it wasn't --

4    there was no issue with light or anything.

5       Q    So we're talking not twilight and not

6    nighttime; it's daytime?

7       A    Right.  Right.  And probably not super early

8    in the morning.

9       Q    Okay.  Was that the first --

10      A    That maybe leaves us with midday.  Let's

11   call it midday.

12      Q    Sure.  I don't much care.

13      A    Yeah.

14      Q    I'm trying to envision it in my mind as

15   we're going through it.

16      A    Right.

17      Q    So it's midday.  You drive there.  Is that

18   the first thing you do that day or did you do

19   something else beforehand that you recall?

20      A    I can't tell you.  I have no idea.

21      Q    That's fine.  Do you remember why you were

22   -- like, as you were driving there, do you remember

23   that your intention is to go to this particular place

24   or are you just kind of roaming the streets looking

25   for --

Page 41

1      A      No.  I'm sure it was on my schedule.

2      Q      Okay.  So it was a scheduled matter?

3      A      Yep.

4      Q      Do you recall how it got scheduled?  Like,

5      mechanically; who called who, et cetera?

6      A      No.

7      Q      If you were to investigate that matter, what

8      would you reference to make that determination?

9      A      Say that -- ask that again.  I'm sorry.

10     Q      If you were to research or investigate --

11     A      Oh, I'm sure they either called -- the

12     organizers of the event either called my office and

13     asked me to attend in my capacity as a city councilor

14     or they reached out if it was during a campaign, to my

15     campaign team.  So it would have ended up on either my

16     -- so the official schedule or on my campaign

17     schedule.

18     Q      So depending on whether you are in councilor

19     mode or mayoral race mode --

20     A      Yeah.

21     Q      -- someone called your people --

22     A      Yes.

23     Q      -- and told you go to this place, and that's

24     how you got there?

25     A      Yes.  Yes.

Page 42

1      Q     Okay.  All right.  So you mentioned it was

2    outside.  You first arrive, it's outside, tell me what

3    is it that you see?

4      A     A lot of people.  A lot of community

5    members.  Other elected officials.

6      Q     So these people who called your people, they

7    called other political people as well?  This was --

8      A     Yeah.  Yeah.  Community members, I'm certain

9    were there.  Yep.

10      Q     Was this church, was it in Boston Proper or

11   was it just --

12      A     Mattapan.

13      Q     I'm sorry?

14      A     Mattapan, which is a neighborhood of Boston.

15      Q     Okay.  So that's another neighborhood of

16   Boston?

17      A     Yep.

18      Q     Have you ever engaged in any of these kind

19   of political engagements outside of Boston city

20   limits?

21      A     Not something like this, I don't think.

22      Q     And when you say, "something like this" --

23      A     I've attended, for example, the democratic

24   -- the mass democratic party, whether it's our

25   convention, which often happens outside of the city of

Page 43

1  Boston.  But I haven't -- I'm trying to just sort of
2  recall when I've attended something like this outside
3  of the city and the --
4      Q    If I can put words in your mouth.  When you
5  say "like this," is it fair to say, like this means
6  more particularly, generally politicking in the course
7  of being a city councilor or a mayoral candidate?
8      A    Exactly.
9      Q    Okay.  Now, you mentioned also some kind of
10  a political forum at a Baptist church.
11      A    Yeah.
12      Q    When was that?
13      A    That's actually has happened several times;
14  Morning Star Baptist Church is a -- it's a -- it's a
15  large congregation in our city.  It is also a large
16  physical space in which community meetings and events
17  also often happen at.  And Morning Star hosted -- and
18  actually, I don't know if it was the church itself,
19  although they were host, whether they were directly
20  involved in coordinating the forum.  It could have
21  been -- and now that I'm saying it out loud, likely
22  community groups that came together to -- to organize
23  these forums.
24      Q    I'm not sure if I'm mishearing you.  Are you
25  saying Morning Star as in Venus?

Page 44

1      A      No.   The name of the church is Morning Star

2  Baptist Church.   I'm not sure -- they're referencing

3  as Morning Star.   The name of the church is Morning

4  Star.

5      Q      Literally, morning as opposed to, say, night

6  or nighttime --

7      A      Yes.

8      Q      And then, star as opposed to, say, moon?

9      A      Right.

10     Q      Okay.   I did not know other people used

11  these terminology.   I'm sorry.

12             So going back to this Morning Star Baptist

13  Church, I gather they're generically, politically

14  engaged.   They have a large congregation.   So they

15  have repeat political-ish matters.   Is that correct?

16     A      I think that they are -- I mean, they're a

17  large congregation but they're also a large physical

18  -- they have a large physical space so they also host

19  other events, and political forums are -- have been

20  part of that.   But what I'm saying is, I don't know

21  whether Morning Star formally -- although they were

22  formally the host, how much work they put into

23  organizing these political and candidate events.

24             So they would pull together forums where

25  candidates running for different offices would come

Page 45

1    and it would be a space in which community members,

2    not necessarily congregation members, would come and

3    attend, ask questions, whatever; participate in the

4    forum.

5         Q    I see.  And you said there were multiple --

6    or there were plural of these?

7         A    Yeah.  I -- I've, myself, have participated

8    in, I'd say, three, at least, there.  One as an

9    mayoral candidate and, likely, two others as a council

10   candidate.

11        Q    If that is approximately -- that is

12   approximately annual --

13        A    No.  I run for -- my election was every

14   other year so it was every other year.  But I -- I

15   certainly participated as a mayoral candidate, so that

16   would have been in 2021.  And then I for sure

17   participated as a council candidate in 2019.  There

18   may have also been a forum in 2017 but I -- I feel

19   like I've done it a number of times as a council

20   candidate.

21        Q    Okay.  It sounds like pretty much every time

22   there's an election, this --

23        A    The space is used.

24        Q    Yes.

25        A    Yeah.

Page 46

1      Q    What is the general tenor of the event.  I
2    mean, you've been to a bunch of these --
3      A    Yeah.
4      Q    -- so just tell me generically.
5      A    The candidates sit up front or stand up
6    front; I've done both sitting and standing.  There is
7    a moderator that asks questions or offers opportunity
8    to give either opening or closing remarks.  Then
9    community members line up behind -- generally, behind
10   a microphone or there's a passed mic and they ask
11   questions of the candidates over the course of, you
12   know, whatever the time period is.
13     Q    Of all of the time that you have been there,
14   do you have one that you remember the best?  One
15   that's just most precise in your recollection.
16     A    I mean, no -- no, 'cause I did so many
17   forums over the course of all of my races.  I mean,
18   the most recent was as a mayoral candidate.  But I --
19   I -- other than, I think I stood, if you're looking at
20   the front, I think I stood -- I think I was on the
21   left side, so I guess that would be, like, right
22   stage.  Other than -- and we stood.  I do recall
23   standing at that one and I recall sitting at the
24   council one just 'cause there were generally more
25   candidates.

Page 47

1          Q     Okay.  The one that you were standing, was
2     this just you -- well, how many people were there at
3     the one where you were standing?
4          A     There was just two of us and then a
5     moderator or a -- a facilitator.
6          Q     Was this a formal debate?
7          A     It wasn't a formal debate.  It was more of a
8     forum.  So it's really question-and-answer from the
9     audience or question-and-answer from the moderator.
10         Q     Okay.  You mentioned earlier that you've
11    done so many of these that they all kind of bleed
12    together --
13         A     They do kind of bleed together.
14         Q     So is it -- how do I phrase this best?  Do
15    you distinctly recall these -- how do you describe
16    these kinds of events?  What's the words that you
17    would use?
18         A     Sometimes stressful.  Sometimes, you know, I
19    feel like there wasn't enough time to get through all
20    the things that we want to get through.  And sometimes
21    it's too much time.
22         Q     I agree --
23         A     I -- I generally appreciate the
24    opportunities that I've had to talk to residents, to
25    engage in, I think thoughtful discussion around the

Page 48

1    issues that are important.  So I -- I didn't

2    necessarily dread them -- some people in public life

3    dread those opportunities; I appreciate them.

4    Although they can be stressful.

5        Q    Well, you know the old bit from Jerry

6    Seinfeld, on average, if you're at a funeral, you'd

7    rather be in the box than the one giving the eulogy.

8    Are you of the category of people who'd rather be in

9    the box?

10                MS. O'CONNOR:  Objection.  But she can

11    answer.

12        A    I -- I don't know -- I don't -- I don't --

13    I've never thought about and I don't know if I've seen

14    that episode, and I watch quite a -- I've seen most

15    Seinfeld episodes.

16        Q    It's okay.  So going back to --

17        A    I -- I guess I -- I'd like to not give a

18    eulogy.

19        Q    That's fine.  My question was poorly

20    phrased.  What I intended to ask was, can I call it a

21    campaign forum?  Can we just agree to call these kinds

22    of events a campaign forum?  I'm just looking for,

23    like, a two- to three-word shorthand for whatever it

24    is that --

25        A    Yeah.  That -- I mean, that would be a

Page 49

1   campaign forum or a candidates' event.

2        Q    Okay.  Campaign forum; I'm familiar with

3   that terminology.

4        A    Okay.

5        Q    So this campaign forum at Morning Star

6   Baptist Church, you're having a two person, kind of, Q

7   & A with members of the community.  Is that --

8        A    Yes.

9        Q    Do you remember about when that happened; in

10  terms of, like, month and year?

11       A    No.  I mean, in two thousand -- 2021.

12  That's all I can tell you.

13       Q    Some --

14       A    -- and -- and this one here, where there

15  were just two candidates, would have happened between

16  September and November.

17       Q    Okay.  So we're talking between September

18  and November of 2021, this is the tail end of the

19  race.  It's you and presumably, now, Mayor Wu.  Is

20  that correct?

21       A    Yes -- it was.  Yes, with Michelle Wu.

22       Q    So --

23       A    -- presume there was the two of us.

24       Q    Well, I don't know things.  My role in this

25  matter is to ask questions to determine --

Page 50

1        A     No.   No.   No.   So I could tell you who was
2    there; yes.
3        Q     Do you remember who the facilitator or
4    moderator was?
5        A     I think for that forum, it was Tanisha
6    Sullivan.
7        Q     Who is Tanisha Sullivan?
8        A     She is the president of the Boston Chapter
9    of the NC double -- the N --
10       Q     N double A CP?
11       A     N double A CP.  Thank you.  I -- she was in
12   -- in that role, she was serving as moderator.
13       Q     Is Morning Star Baptist a black affiliated
14   church.  You know, there are black Baptists and then
15   there are other kinds of Baptist.  Is this the black
16   Baptist or is this a generic Baptist?
17                    MS. O'CONNOR:  Objection.
18                    You can answer.
19                    THE WITNESS:  Yeah, I --
20   BY MR. KEZHAYA:
21       Q     You don't know?
22       A     Yeah, I don't -- I don't know how they would
23   -- I don't know how they would consider themselves.
24   It's a -- a predominately -- I've been to services at
25   Morning Star, a number of services at Morning Star,

1  and it's predominately a -- attended by individuals

2  who I think would identify as black although not

3  exclusively.

4       Q    All right.  Remind me who the facilitator

5  was again, by name.

6       A    Tanisha Sullivan.

7       Q    And remind me again what her general role is

8  with the N double A CP?

9       A    She was the chapter president for Boston.  I

10 -- I'm not sure if she remains the chapter president

11 today, but she was then.

12      Q    I only care, whenever I'm examining, I'm

13 specifically examining as to your recollection.  So

14 whatever she is today is irrelevant to my --

15      A    Yes.

16      Q    What were the general kinds of questions

17 that you and Wu were receiving?

18      A    You know, we were -- I'm sure that we were

19 asked questions about our schools and how we improve

20 education in the city of Boston.  I'm sure we were

21 asked about transportation and how do we improve

22 transportation in the city of Boston.  I'm sure that

23 we were asked about public safety and how do we, you

24 know, end and limit violence and the impacts of

25 violence in the city of Boston.  I'm sure that we were

Page 52

1    asked about climate change and, you know, impacts of

2    climate change on our environment.  I'm sure that we

3    were asked about housing; the cost of housing and the

4    impacts of increasing costs of housing on our

5    communities across the city of Boston.  And I'm sure

6    there were lots of more questions than that -- topics

7    covered than that.

8         Q    And of all the questions and answers that

9    you received and gave, pretty much all of them kind of

10   had a color of religious overtones because it's

11   happening in a church as we talked about earlier --

12                   MS. O'CONNOR:  Objection.

13                   You can answer

14                   THE WITNESS:  No.  No.  Sorry.  No.

15                   MR. KEZHAYA:  Nicole, we've talked

16   about speaking objections before.  Moving forward, I'm

17   just going to start keeping a tally of speaking

18   objections.  You can say, objection, but that's all I

19   need to hear.

20                   MS. O'CONNOR:  I said objection, you

21   can answer.

22                   MR. KEZHAYA:  Okay.  That counts as

23   two.  So going back to the question.

24   BY MR. KEZHAYA:

25        Q    About how long was this event?

Page 53

1      A      This one in particular, maybe an hour, maybe

2   an hour and a half.

3      Q      And you mentioned that this was pretty

4   prototypical of all your various candidate events.  Is

5   that correct?

6      A      Some were a little bit longer.  Some were a

7   little bit less.  Some didn't have both candidates at

8   the same time.  Some had one candidate after another.

9   Some had candidates on different evenings or different

10  mornings, depending on what the event was.  So there

11  wasn't -- there isn't sort of a -- a template for what

12  an event would look like, but, yeah.

13     Q      Would it be fair to say it fits within the

14  normal range of --

15     A      Yes.  Yes.

16     Q      You also had mentioned that you visited a

17  mosque a number of times.  Is that correct?

18     A      I've been to a few mosques a few times.

19     Q      Okay.  So a few times each or you've been to

20  a few different mosques one time each?

21     A      I've been to a few mosques a few times and a

22  few mosques one time.

23     Q      So, basically, you're no stranger to

24  mosques; in other words.  In Boston, in the course and

25  scope of, you know, being a politician?

1      A      I don't know if I'd say I was no stranger.

2   There are fewer mosques in Boston -- yeah, so I -- I

3   don't know if I'd categorize myself -- describe myself

4   as that.  But I have been to a number of mosques in

5   the city and a few of them a few times.

6      Q      I understand.  Did they all kind of have the

7   same general tenor or were there sub-categories of

8   incidences in which you visited the mosque in the

9   course of being a politician?

10     A      I'm sorry.  I don't understand the question.

11     Q      Basically, I'm trying to examine into -- you

12  went to mosques a number of times.  Is it pretty much

13  -- like, is there one line of questioning or is it

14  plural lines of questioning?  Were they all kind of

15  the same thing or, you know, sometimes you might go to

16  a candidate event.  Sometimes you might just go to

17  visit.  Does that make sense?

18     A      Yeah.  So I've done a number of different

19  things at different mosques.  We have the Islamic

20  Center of Boston that is a mosque and a community

21  center, so there's other things happening besides

22  prayer in -- in that mosque, in particular.  Although

23  most mosques also double as, I'd say, community

24  centers.  I have gone to -- I'm trying to -- I think

25  one of them -- I think the -- the Islamic Center, I

Page 55

1   think, has hosted -- absolutely, actually, has hosted

2   political events or -- or, like, voter engagement

3   slash forum events.  I've participated as a candidate

4   for council.  I don't -- I don't recall if I did one

5   there as a mayoral candidate but definitely as a city

6   council candidate.

7            And then following services, there's

8   generally, like, I -- I guess I'd call it coffee talk.

9   There's sort of conversation over coffee and pastry or

10  some sort of social element that is not related at all

11  to religion other -- other than that's what brought a

12  lot of people to -- to this space initially.

13       Q    What about general meet-and-greet outside of

14  the course and scope of running for office, just

15  visiting them in the course of just community

16  engagement more generally.  Was that something that

17  you --

18       A    Oh, yeah.  Yep.  Absolutely.

19       Q    Was that a common thing that you did as

20  well?

21       A    I don't know if I'd say it was common.

22  There was only 365 days in a year and there was lots

23  of commitments I had over the course of my council

24  duties.  So I don't know if regular or common would be

25  appropriate to describe it.

Page 56

1       Q    So you visited some kind of a political

2   forum at a Baptist Church.  I gather you visited some

3   kind of political forum at a mosque.  Did you visit

4   any political forums at a synagogue?

5       A    So I -- I've been -- I'm trying to think if

6   there's been a political forum at a synagogue.  I have

7   attended synagogues -- synagogue for -- I'm trying to

8   think what that was.  There's a large synagogue in

9   Boston.  I think it was following -- what was it

10  following -- and there was an incident, I don't recall

11  it specifically, it wasn't a -- something -- something

12  not good had happened and we were invited -- electeds

13  were invited, I assume all electeds were invited.  I

14  was invited, to sort of be in company with the

15  congregation.  I'm -- I can't -- I don't recall

16  exactly what it was though that brought me there.  But

17  I'm trying to think if -- I don't know if there's been

18  a political though, more of a forum, similar to what

19  maybe I did at Morning Star, at a synagogue.

20      Q    If you don't recall --

21      A    It might -- it might come to me while we're

22  continuing to talk.

23      Q    That's okay.  At any point, if something

24  comes up to you --

25      A    Yeah.

Page 57

```
 1        Q    -- feel free to volunteer anything.  So I
 2   gather, to the best of your recollection, at least
 3   outside of regular community engagement, the only
 4   particular event that brought you to the synagogue in
 5   the course of being a politician, was some kind of
 6   tragedy related support --
 7        A    Yeah.
 8        Q    Is that fair to say?
 9        A    Yeah.
10        Q    Now, was that something that you were
11   invited to or is that something that the electives
12   kind of came together and said, hey, this whole thing
13   happened, we better, you know, as a group, go to the
14   synagogue?
15        A    Yeah.  I don't recall that specifically on
16   -- on this one particular occasion that I'm thinking
17   of.
18        Q    Do you remember about when that would have
19   happened?
20        A    No.
21        Q    This event?
22        A    No.
23        Q    Well, it must have happened in the course of
24   being a politician --
25        A    Yeah.
```

Page 58

1        Q     -- sometime in --

2        A     Yeah.   Sometime between 2016 and 2021.

3        Q     Okay.   So this is not in the course of a

4   mayoral candidate, this is more particularly as a city

5   council.

6        Q     All right.   What about non-Abrahamic

7   religions?

8        A     Such as?

9        Q     Buddhist Temple; did you ever attend any

10   Buddhist temples?

11        A     Nope.

12        Q     Is there a substantial Buddhist population

13   in Boston?

14        A     Not a substantial one; no.

15        Q     What about atheistic, humanistic,

16   nontheistic, more generally?

17        A     No.   Not that I recall.

18        Q     What about pagan?

19        A     Not that I recall.

20        Q     What about non-Buddhist, other far Eastern

21   religions, Daoism, et cetera?

22        A     Not that I recall.

23        Q     Are you familiar with --

24        A     Being invited into their place of worship?

25   Yeah -- no -- nope, not that I recall.

Page 59

1      Q     I'm trying to parse through my understanding

2   of all the various religions; if you'll bear with me

3   for a second?

4      A     Yeah.

5      Q     What about Native American?

6      A     I have attended a day of remembrance,

7   actually, not far from City Hall around some of the --

8   the re-schooling efforts that happened to the Native

9   community and -- actually, I've participated in a

10  number -- not participated, I've been present in many

11  of those -- in a number of those -- several of those

12  over the years.

13     Q     Okay.  Several?

14     A     Yeah.

15     Q     Give me just a second here.  I have to make

16  a note for drilling deeper.  So, and to be clear, I'm

17  not asking about Native American culturally, I'm more

18  particularly asking about Native American spiritually;

19  religiously.

20     A     Yeah.  This -- the -- the one that I

21  attended most, sort of, that's recent in my memory,

22  was around some of the re-education efforts that had

23  happened and that certainly started with a moment of

24  prayer and remembrance that was certainly spiritual in

25  nature.

Page 60

1      Q    I have to confess ignorance about Native
2  American spiritualism other than more generally, they
3  -- well, as I understand it, to be clear, they're
4  animists of some sort.  What was the nature or --
5  let's strike everything I just said.  Starting over.
6           Please describe this spiritual ceremony that
7  you observed.
8      A    I remember being part of a -- a circle where
9  there was some reflections offered and music and I'd
10  say that was about it.
11     Q    Was the nature of it notably non-Abrahamic?
12     A    I'm not really sure what that means.
13     Q    Abrahamic is a generic term to refer to
14  Judaism, Christianity, Islam, and all various other
15  offshoots of each of those three primary religions all
16  coming from the prophet Abraham.  That's Abrahamic.
17  There are other non-Abrahamic religions like, for
18  example, Buddhism, Hindu, which I neglected to talk
19  about earlier -- that's the note that I had to take --
20  Native American, et cetera, Satanism included.  So
21  when I say notably something, like, literally, were
22  you able as a non-participant in this religion, rather
23  a non-congregant of this religion, able to take note,
24  ah ha, this is a foreign religion to my own?
25     A    Yeah.  I would say so.

Page 61

1      Q     How did that ceremony make you feel?

2      A     I recall it being very beautiful and moving.

3      Q     And as I recall your description of it,

4   there was a circle.  I think you mentioned there was

5   chanting.  Is that correct?

6      A     There was some singing --

7      Q     Oh, singing.

8      A     -- and some music and it was just very much

9   sort of a loving and peaceful and I -- I would

10  describe it as a beautiful moment.

11     Q     Under the circumstances, I imagine it was

12  probably also mournful.  Is that a fair --

13     A     Yeah.  Beautiful doesn't necessarily mean

14  joyful.  Beautiful to me means moving -- it means

15  beautiful.

16     Q     Okay.  And you had mentioned that it

17  pertains more generally to re-education --

18     A     Well, there was, you know, countless Native

19  Americans have been through some centers of

20  re-education, both in North America and beyond.  There

21  was -- it was a remembrance of those that have been

22  lost to that process and those that have been stripped

23  of their identity and their culture and their language

24  and from their families, and it was a -- it was a

25  moment to remember all -- to -- to note that, to

1    acknowledge that as part of our world's history, our

2    country's history, and beyond the United States'

3    history.  And I think for -- for me, it was very -- it

4    was -- like I said, beautiful to be -- sort of bear

5    witness to it.

6         Q    Were you there in the course of your role as

7    politician or were you there in the course of your

8    role as general member of the public?

9         A    I was there -- I was in my role as a public

10   official.  That's how I learned about it and that's

11   how I -- I think I -- I don't know -- I don't think I

12   was formally invited to it.  But that's how I came to

13   know of it.

14        Q    I see.  So this wasn't --

15        A    I wasn't acknowledged at this -- this -- I

16   don't want to call it an event because I think that

17   minimizes how powerful it was.  I wasn't invited to

18   it; I was just present for it.

19        Q    I see.  Okay.  I would posit that if you

20   weren't speaking in the center of attention, you were

21   there as a member of the public.  Would you agree with

22   that position or would you --

23        A    I don't think I would have known about it if

24   I wasn't an elected official.

25        Q    That makes sense.  Okay.  Well, first of

Page 63

1   all, you mentioned -- I want to follow up on one piece

2   and make a better record.  You said that people were

3   lost.  Is it more precise to say that people were

4   murdered?

5        A    Some were murdered.  Some -- my

6   understanding of the history, some were not but they

7   were stripped of their cultural, ethnic, linguistic

8   identity, and perhaps still survived but were, I

9   think, in many ways lost.

10       Q    Going back to the nature of this Native

11   American matter, when you say "stripped," who stripped

12   them of what I would summarize as their culture?

13       A    Like, I don't -- I'm not informed enough to

14   speak in any, like, more depth about what transpired

15   and what happened during that -- I mean, obviously,

16   not -- it's not right now but it is -- yeah, I'm not

17   -- I -- I don't know more about it than this.

18       Q    Do you know the general time period other

19   than in the past?

20       A    It's over the last hundreds of years.

21       Q    Oh, this --

22       A    But -- but -- no, but up to, I'd say, in the

23   last generation.

24       Q    Okay.  So --

25       A    But it happened over a period -- a long

Page 64

1    period of time.  And I would say has impacted up to

2    the last generation.

3         Q    Okay.  So maybe not within living memory but

4    within very close to within living memory --

5         A    Maybe not within my living memory but there

6    are those and they were present at that -- at that

7    time -- during this moment.  Again, I don't want to

8    call it an event 'cause I think that minimizes how

9    important it was.  But there were people there that

10   had firsthand knowledge or experience.

11        Q    So you were able to hear the experience of

12   people who went through this, in other words?

13        A    That have either -- they've gone through it

14   themselves or their immediate family members have.

15        Q    Okay.  So if not firsthand, then maybe

16   secondhand, possibly thirdhand, but no more than that?

17        A    Right.

18        Q    Okay.  Let's see.  Is there anything else of

19   importance about this -- I know you don't want to

20   minimize it by using the word event, I use event --

21        A    -- we can agree to that.  No.

22        Q    Nothing else of interest about it other than

23   what we've addressed?

24        A    Right.

25        Q    What about Hindu; is there any Hindi temples

Page 65

```
 1   in Boston -- are there any?
 2        A    I -- I don't know if there are but I haven't
 3   -- I don't think I've attended one.
 4        Q    Okay.  What about Caribbean native
 5   religions, Vudu related or otherwise?
 6        A    What about them?
 7        Q    Any events of that varietal?
 8        A    No.  Not that I recall.
 9        Q    Have you ever been to, especially, New
10   Orleans; have you ever been to New Orleans?
11        A    I have been.
12        Q    Would you agree with me if I told you that
13   Vudu is kind of a thing down there?  Is that a fair
14   characterization?
15        A    I -- I don't know if I would agree with that
16   statement.
17        Q    And when I say "a thing," I should be maybe
18   more precise to see if we can reach agreement.  As a
19   form of tourist attraction or possibly K'iche
20   paraphernalia --
21        A    Maybe K'iche -- I'd agree with K'iche.
22        Q    Yes.  If you were to look for Vudu
23   practitioners who were not there, you know, for show,
24   you would -- let's strike all that and start over.
25             If you were to look for a Vudu practitioner
```

Page 66

```
 1   in the United States, would you go to New Orleans or
 2   would you go somewhere else?
 3        A    I wouldn't so I don't know.
 4        Q    Why not?
 5        A    I don't have an interest.
 6        Q    Are you averse to the idea or just
 7   disinterested?
 8        A    Disinterested.
 9        Q    Okay.  Let's see.  Any other religions.
10   What about, there are certain death cults around, I
11   think, northern Mexico.  Are you familiar with Dia De
12   Los Muertos; Day of the Dead?
13        A    Yeah.  I'm familiar with it.
14        Q    Are there any Dia De Los Muertos events in
15   or around Boston?
16        A    I'm sure that there are.
17        Q    Have you attended that in the course of --
18        A    I don't -- I don't think I have.
19        Q    Okay.  Are there, to the best of your
20   knowledge, are there any Native Mexican or Mexican
21   area death cults in Boston?
22        A    Not that I'm aware of.
23        Q    Other than in an organized fashion that, you
24   know, are --
25        A    Yeah.  Not that I'm aware of.
```

Page 67

1       Q     I don't know anything about -- what about,

2   more broadly, South American/Native American

3   religions; any of that politically engaged that you

4   participated in?

5       A     Not that I'm aware of.

6       Q     That concludes all that.  What about North

7   American -- more broadly -- when I say Native

8   American, obviously, there's local Native Americans to

9   Boston but, you know, there's, of course, Native

10  America is all of the Western Hemisphere --

11      A     Native America; yep.

12      Q     -- going to Canada, Alaska, Inuit, any of

13  that -- any of those in Boston?

14      A     Not that I'm aware of.

15      Q     Okay.  What about Roman Catholic?  You had

16  mentioned Baptist before but I neglected to talk about

17  the Catholics.  Any Catholic political events?

18      A     Catholic political events; I don't think so.

19  Obviously, there's a very large Catholic population in

20  the city of Boston and many Catholic churches and

21  parishes, but where there has been a political event

22  in the church -- some community meetings happen in

23  church spaces so community forums, for example, but,

24  yeah, I can't -- I -- I can't think of a time where

25  I've had sort of very specific political event or

Page 68

```
 1   forum or something of that nature in a Roman Catholic
 2   Church.
 3                   THE VIDEOGRAPHER:  This is the
 4   videographer, Sean.  Can we go off the record for a
 5   second?
 6                   MR. KEZHAYA:  Yes.
 7                   THE VIDEOGRAPHER:  Thanks.  Time is
 8   11:19.  We're off the record.
 9                   (Off the record.)
10                   THE VIDEOGRAPHER:  We are back on the
11   record.  The time is 11:51.
12   BY MR. KEZHAYA:
13       Q    Ms. Essaibi-George, first of all, am I
14   pronouncing your last name correctly?
15       A    Yes.
16       Q    Thank you.  Of all of those various
17   religion-centric political engagement, was that of the
18   same tenor as your other community engagement that
19   does not incidentally happen to engage with religion?
20       A    I don't -- I -- you used the word religious-
21   centric events, I don't think I participated in any
22   religious-centric events.
23       Q    I'm sorry.  I misspoke then.  All of the
24   events, the political-ish events that we've talked
25   about, happened within some kind of religious context;
```

Page 69

1   whether they're in a church or a synagogue or a mosque

2   or the Native American ceremony, all of those, that

3   was the scope of my inquiry.  I'm asking if the

4   subject matter that I was inquiring into is

5   meaningfully different from other forms of political

6   events that did not happen to happen with some kind of

7   religious element involved as well?

8        A    I think that they were all very similar.  A

9   -- a political event or a community event that

10  happened in a church or in a -- a religious place, is

11  very similar to ones that would happen in a

12  neighborhood playground or in a community center that

13  isn't, you know, connected to or any direct relation

14  to a religious institution.  I don't think there is

15  much of a difference between them.

16       Q    What are some, just off the top of your

17  head, maybe, like, one or two instances that didn't

18  happen to involve a church or other form of religious

19  group that was pretty much the same thing?

20       A    Yeah.  If I go to a neighborhood association

21  meeting that is in a community center, I -- I don't --

22  there isn't much of a difference between those things.

23  Maybe the -- the few times that I've been to a mosque,

24  I may be coming at the end of prayer so prayer may be

25  wrapping up or I might be -- I might witness some of

Page 70

1   the prayer.  But then afterwards, the conversation is

2   about traffic.  Or it's about cost of housing.

3       Q    If I remember correctly, you said a

4   neighborhood association event is similar to, for

5   example, at a mosque community event.  Is that a

6   correct recollection?

7       A    Like, the -- the conversation that happens

8   that I participate in --

9       Q    Well, I'm not -- sorry, please continue.

10      A    The issue that -- the issues that arise or

11  the -- the conversation that I have -- the

12  conversations I would say are pretty -- pretty close

13  to one another.  You know, one group may be more

14  interested in the cost of housing.  Another group may

15  be more interested in, you know, the challenges around

16  the education system.  Another group might be more

17  interested in traffic.  The -- generally, the

18  conversation is the same regardless of where the --

19  the event or the meeting or the reason for being

20  somewhere -- you know, that may be different but the

21  conversations were often almost identical.

22      Q    You and I are having two different

23  discussions.  What I'm trying to examine into is a

24  comparison between literally just whether -- let me

25  strike that and start over.

1          You mentioned a neighborhood event.  Is that

2     correct?  Some kind of neighborhood association event,

3     I think.  Is that correct?

4          A    Yep.

5          Q    Okay.  Do you have a particular one, off the

6     top of your head, that you can remember distinctly?

7          A    I'm trying to think of the last -- if I went

8     to -- yeah, so there's -- my -- my next -- my

9     neighboring to where live, my neighboring community

10    association, civic association, is a Columbia-Savin

11    Hill Civic Association.  I went to, you know, one of

12    their meetings in fall of 2021.  And those meetings

13    consist of, whether it was some sort of community

14    presentation about a housing project that was coming

15    up -- some sort of development project that was coming

16    up, but then I may also participate in that -- that

17    meeting where I'd get asked questions from the

18    audience; from the members about my position, perhaps,

19    on something.  I don't remember one specifically.  I

20    could go through my notes to recall something

21    specific, but --

22         Q    That's really not necessary.  I'm just

23    trying to examine off the top of your head.  So let's

24    drill a little bit deeper into this civic association

25    matter.  So you mentioned that there was some kind of

Page 72

1    a community presentation.  Is that correct?

2         A    Most civic association meetings consist of

3    some formal presentation and then at the end there

4    might be old business/new business discussion.  As an

5    elected official, when I would attend a community

6    meeting, a civic association meeting, or a

7    neighborhood association meeting, for example, I would

8    be recognized, almost always, asked to offer some

9    remarks.  So I might share something that I'm working

10   on in particular and then I might get some questions

11   from the audience.  And depending -- the topic could

12   depend on lots of different things for that day -- for

13   that meeting.

14        Q    As I understand it, you said the norm is

15   that you are recognized in the course of being the

16   politician and you usually have some kind of a

17   speaking role.  Is that correct?

18        A    Yeah.  Yeah.  Almost always address the --

19   whoever's assembled.

20        Q    Is that something that is pre-arranged at

21   the outset or is it something to the effect of, you

22   know, you're there, you're a politician, so just

23   naturally, the limelight is attracted to you?

24        A    It -- it -- sometimes I'm on -- formally on

25   the agenda; sometimes I'm not.

Page 73

1    Q    As a relative proportion, is it about 50/50
2  or more of one to the other?
3    A    I'd say it's probably more that I'd be
4  formally on the agenda.
5    Q    Okay.  And to be clear --
6    A    Like, maybe 75 percent I'm on the agenda; 25
7  percent I'm not.  I did have a reputation of just
8  showing up to things sort of, you know, unannounced.
9    Q    Okay.  And to be clear, we're specifically
10  referring to community association matters.  Is that
11  correct?
12    A    Mm-hmmm.
13    Q    Approximately 75/25 you're on the agenda
14  versus you kind of just showed up.  Is that correct?
15    A    Yep.
16    Q    Is that the same relative proportions as
17  when you are engaging with religious bodies of some
18  sort or, you know, entering into a church of some sort
19  or what have you?
20    A    I would say probably more formal than
21  informal; maybe 90/10 on the agenda versus not.
22    Q    Okay.  So in the civic association side of
23  things, it's about 75 percent of the time you're
24  formally on the agenda; 25 percent of the time, you
25  just kind of showed up.

Page 74

```
 1        A     Yep.

 2        Q     Or, as on the other hand, if it's some kind

 3   of -- I say church, I don't mean it to have any

 4   particular religious connotation --

 5        A     Yes.

 6        Q     -- I just mean a generic term for a building

 7   that has a religious purpose.

 8        A     Yeah.  Well, so then if that's the case,

 9   'cause sometimes community meetings happen in the

10   basement of a church or a religious building -- a

11   building with a religious affiliation.  So I guess

12   it's 75/25 -- actually, it'd probably be 50/50 at that

13   point.  Wasn't about -- specific, you know, I -- I --

14   I don't think I have -- yeah, maybe 50/50 then -- the

15   building itself 'cause sometimes many community groups

16   meet in religious affiliated buildings but have

17   nothing to do with the religion; it's just the space

18   that they use.

19        Q     Fascinating.  I didn't know that was a

20   thing.

21        A     Well, if they've got the space --

22        Q     They're kind of renting it out or whatever,

23   I guess?

24        A     Renting it out but it's, you know, I think a

25   lot of places it's seen as community space.
```

1      Q     Interesting.  That makes sense.  Okay.  So
2    to recap my understanding then.  About 75 percent of
3    the time, you're formally on the agenda for formal
4    civic association matters.  Formal, meaning there's a
5    specified pre-arranged meeting as opposed to just,
6    like, people are kind of hanging out.  Is that --
7      A     So I think there's two different things now.
8    If there is a community meeting that is scheduled;
9    that is planned, I generally, you know, if I'm there,
10   they know I'm coming 75 percent of the time; 25
11   percent of the time I, maybe, have a cancellation or
12   an opening on my agenda, my schedule, or I would -- I
13   knew that this meeting was happening and I freed up
14   earlier, so I'd pop into a meeting.  So I -- but they
15   were -- they would be organized meetings.
16     Q     And then 90/10; 90 percent of the time you
17   were formally expected in some capacity.  Remind me
18   again the connotation that that happens.
19     A     No.  I think I -- I would take away the
20   90/10 if we're just talking about buildings that have
21   religious affiliations --
22     Q     Oh, I --
23     A     -- 25.
24     Q     That was more like 50/50 just at a building
25   that happens to be a church?

1       A    We probably should start this over because

2    now I'm confused.

3       Q    Yes.  I think we've got into a rut so let's

4    start over.  Initially, what I attempted to ask,

5    poorly, was an attempt at a comparison between these

6    religious-ish community engagement matters which we

7    just spent the last, give or take, the past hour or

8    so, talking about.  For example, the Morning Star

9    Baptist Church, the mosque matters, the synagogue, the

10   Native American ceremony, St. Angela's Church -- ah,

11   yes, the Haitian matters; all of those were some kind

12   of a religious community, I gather, invited you into

13   their place, about 90 percent of the time, is what you

14   said earlier.  Is that a fair --

15      A    So one thing I would say is, I don't know if

16   I'd characterize all of those things as religious-ish.

17   They happen to take place in a building that has a

18   religious affiliation.  I don't know if I would

19   characterize it as a religious-ish.  It may be -- the

20   St. Angela's example may have been coordinated in

21   partnership with clergy, it wasn't just religious

22   individuals who are affiliated with St. Angela's; it

23   just happened to occur on the steps of St. Angela's.

24           So I think there's just some -- so -- so on

25   the percentage piece, community meetings that happen

Page 77

1    across the city, generally, I would -- if I were

2    present, 75 percent of the time, I would be -- they

3    would know I was coming or I'd be formally a part of

4    the agenda.  Twenty-five percent of the time, I might

5    just spontaneously appear.  But that goes across the

6    board.

7        Q    I'd like to re-direct to this point of

8    contention as pertains to religious-ish.  You say you

9    would not characterize it like that, and then you said

10   what you would characterize the matter as, which is to

11   say, not religious-ish, but rather fill in the blank.

12   How would you describe religious-ish because that's

13   poor terminology on my part?

14       A    So the -- you know, the Morning Star forum,

15   for example, is held in a -- a church but it is very

16   much a non-religious event.  It is a forum that is,

17   you know, candidates presenting themselves and talking

18   to community members.  Those community members are not

19   necessarily part of the congregation and in many

20   cases, I'd say, a number of them probably weren't of

21   the same faith.  But --

22       Q    Well --

23       A    -- so to me it was -- it's a building as

24   opposed to a religious place and there was no, sort

25   of, religious ceremony; no religious service.  With

Page 78

1   the mosque example, I, you know, oftentimes following

2   prayer, there is community engagement where after

3   prayer, people will stay and have coffee and maybe

4   have some sort of pastry or dessert or food and that

5   is when I would be present, although sometimes I would

6   come a little early and see the prayer and bear

7   witness to the prayers, whatever time of day, usually

8   late -- late day prayer.  And then I'd engage in

9   community conversation that had nothing to do with

10  religion.

11      Q    Okay.  But you acknowledge it happened in a

12  religious --

13      A    Oh, yes.  Yep.  Yep.

14      Q    Okay.  Are mosques foreign to you?

15      A    Nope.

16      Q    What is your earliest experience being in a

17  mosque?

18      A    Probably before my memory; my father was

19  Muslim.

20      Q    I see.  So before memory; I think memory

21  starts at about 3 years old.  So you've been --

22      A    I've been to -- I've been to mosques; I

23  haven't -- I am not Muslim; I have not prayed at a

24  mosque.

25      Q    I understand that.  I'm just trying to

1    understand familiarity.  Rather, I'm trying to examine

2    into your relative familiarity with a mosque relative

3    to, for example, this Native American ceremony.  And

4    we're going to be getting into that --

5          A    More familiar with the Muslim faith.

6          Q    Now this Native American ceremony, again, I

7    don't want to minimize it, but I use the term event

8    generically -- moment, I suppose we should agree on.

9          A    Yeah.

10         Q    The Native American moment, did that happen

11   at some kind of a religious space in the same sense

12   that a mosque was?

13         A    No.

14         Q    Okay.  Where did that happen?

15         A    Outside.

16         Q    Just outside; where?

17         A    It was outside the Federal Building in

18   downtown Boston, near City Hall.

19         Q    Okay.  So on the sidewalk, so to speak?

20         A    On the plaza.

21         Q    You'll have to forgive my unfamiliarity with

22   your city.

23         A    So it's not on the sidewalk, not on the

24   public way, but on the plaza; so solid surface,

25   concrete stone -- I don't exactly know -- in front of

Page 80

1    the Federal Building.

2        Q    If I were to describe it as like a concrete

3    park, is that a fair descriptor?

4        A    We would say plaza.

5        Q    This is a public space then.  Is that

6    correct?

7        A    Yes.

8        Q    I see.

9        A    Yes.

10       Q    All right.  And this Haitian matter, you

11   said it happened at St. Angela's Church.  I understand

12   that to be a church and with the word "Saint," I'm

13   assuming it's of Catholic origin.  Is that correct?

14       A    Yes.  And it happened in front of the church

15   and we utilized the church front stairs outside to

16   speak from.

17       Q    Okay.  Now I understand better.  All right.

18   And the synagogue, I didn't take any particular notes

19   about it.  I remember you had one particular event

20   there; there was a tragedy of some sort.  Was that in

21   the synagogue or was it appurtenant to the synagogue?

22       A    Inside.

23       Q    Okay.  I -- I used a legal jargon term.  I

24   apologize.  Do you understand appurtenant?

25       A    No.

1       Q    Appurtenant is like -- like you mentioned on

2    the stairs of the church for Haitian; that's

3    appurtenant.  Literally, not inside but kind of, like,

4    on the grounds.

5       A    This was inside.

6       Q    Okay.  What is your relative familiarity

7    with the Jewish faith?

8       A    I'm somewhat familiar.  I have many friends

9    that are Jewish and that are, you know, actively go to

10   temple and all of that.

11      Q    How many times, outside of your course and

12   scope of being a politician, have you been to a

13   synagogue?

14      A    Outside of the time I served on the council,

15   maybe a handful.

16      Q    What drew you to the synagogue in those

17   prior times?

18      A    I would have just -- going with a friend.

19      Q    So you were already familiar with it --

20      A    Somewhat -- somewhat I would -- I don't -- I

21   certainly don't understand to great detail but I have

22   some general familiarity with it.

23      Q    Okay.  Earlier I had asked you if you had

24   been in a Hindu temple within the course and scope of

25   being a politician -- you know, let's scrap all this

Page 82

1    and start over.

2            So earlier I asked you about, basically, all

3    the various religions and your experience with those

4    in the course and scope of being a politician.  Let's

5    run through the list outside of the course and scope

6    of being a politician, prior to it or -- well, I guess

7    when you were a politician, there is no real

8    distinction between work and not work, it's just --

9        A    Right.

10       Q    -- fair to say?

11       A    Yes.

12       Q    Law is the same way, by the way.  So let's

13   start with the Abrahamic faiths.  So I normally don't

14   inquire into these kinds of things, but do you have

15   any particular religious persuasion?

16       A    I'm Catholic.

17       Q    Okay.  Roman Catholic or --

18       A    Roman Catholic.

19       Q    Have you always been Roman Catholic?

20       A    I guess relative to my baptism.  I -- I was,

21   generally, raised Catholic but technically you don't

22   become a Catholic 'til you're baptized, I think, so --

23       Q    I guess I'm not particularly familiar with

24   Catholic theology as it pertains to the baptism.  So

25   tell me about baptism in the Catholic tradition.

Page 83

1      A     Baptism is sort of denote -- you know,
2   designates the moment that you sort of formally join
3   the church -- or the Catholic faith.  But I was -- I
4   was raised Catholic.
5      Q     Okay.  So were you baptized?
6      A     I was.
7      Q     At what age were you baptized?
8      A     I was baptized, actually, a little bit later
9   than most; I was probably about 8 years old.
10      Q     You say a little bit later than most --
11      A     Most -- most Catholics are baptized as
12   babies.
13      Q     Okay.  That's what I was under the
14   impression of.  Okay.  So let's see here.  So you are
15   raised Catholic, you formally joined the church at
16   approximately 8, and you never left the faith.  Is
17   that a correct summary?
18      A     Yes.
19      Q     Okay.  So do you regularly attend mass?
20      A     No.
21      Q     Sorry.  I --
22      A     I -- I chuckle just 'cause I -- I want to be
23   very honest.  I -- I would like to attend more than I
24   do.
25      Q     I respect and honor that.  But suffice it to

Page 84

1  say, you are very familiar with the inside of a

2  Catholic church?

3       A    Yes.

4       Q    So when you go to a Catholic church, this is

5  something that is not unfamiliar to you and in the

6  course of being a politician, you might not even

7  necessarily see this as church because to you it's

8  just a building.  Is that a fair summary?

9       A    No.

10      Q    Where is the error in my understanding?

11      A    You know, church is a building and a church

12  can be lots of different faiths.  During a service or

13  during mass, as a Catholic, that is a very different

14  experience than attending a community meeting in that

15  same church.

16      Q    Okay.  As I understand it then, the

17  distinction in your mind as to whether something is a

18  simple community event or rather a religious event, is

19  whether there is some kind of religious ceremony

20  entailed as well.  Is that correct?

21      A    Yes.

22      Q    Okay.  So we covered Roman Catholic.  What

23  about Eastern Orthodox.  Have you ever attended any

24  kind of Eastern Orthodox things; whether in or out of

25  your role as politician; I inherently neglected to --

Page 85

1        A     Yes.

2        Q     Okay.  You say, "yes," and I didn't

3   distinguish.  So is the "yes" to both or "yes" to one

4   but not the other?

5        A     Yes to both.

6        Q     Okay.  Let's start with pre-politician life.

7   What was your earliest -- well, I don't really care

8   about the earliest experience.  How familiar are you

9   with the Eastern Orthodox building; literally, just

10  the building?

11       A     I -- I guess somewhat familiar.  I -- you

12  know, I had -- one of my closest friends was Orthodox

13  so sometimes I would attend service with her and her

14  family.

15       Q     How long do those services run, usually?

16       A     Longer than a Catholic mass.  I don't know;

17  maybe an hour.

18       Q     Oh, okay.  That's not bad.  Some religious

19  ceremonies --

20       A     Yes.

21       Q     -- are very long indeed.

22       A     They are.

23       Q     So you said somewhat familiar.  I'm

24  envisioning, like, maybe once or so a year or

25  something like this.  Is that a fair summary?

Page 86

1        A     Previous to my -- no, that's not -- no.

2   Maybe when I was younger, I went once a year with this

3   particular friend -- maybe once a year.  And then as

4   an -- like, in my -- you know, as a city councilor for

5   sure, maybe I went to an Orthodox service twice.  And

6   then, you know, I attended a wedding, actually, of a

7   good friend, so I'd say that wasn't in my official

8   capacity but that was, like, a full, you know, full

9   service because it was a wedding ceremony as well.

10        Q     Okay.  I'm familiar with a branch of

11   Christianity called Coptic; I think it's Catholic and

12   I think it might be sub-set of Orthodox.  Are you

13   familiar with the Coptic church?

14        A     It's Christian as far as I understand and

15   some familiarity.  I was -- went on vacation to Egypt

16   and visited a number of Coptic churches.

17        Q     In the course of your role as politician,

18   did you engage in any Coptic matters?

19        A     No.

20        Q     To the best of your understanding, is there

21   a substantial Coptic presence in Boston?

22        A     Not substantial.

23        Q     Okay.  That exhausts my understanding of the

24   Catholic tradition.  Now, let's go to the Protestant

25   tradition.  Are you familiar with the branches of the

Page 87

1   Protestant tradition?

2        A    Some.

3        Q    What are the branches you are familiar with?

4        A    If you name them, I could probably tell you

5   if I am familiar with them 'cause I know there's a

6   number of them.

7        Q    Well, let's see here.  Let's start with --

8   I'll perhaps offensively summarize it as Anglican-ish

9   which would include the Anglican church, the

10  Lutherans, the Episcopalians; and I can think of no

11  others.  Any of those?

12       A    Yes.  Some -- well, I'm familiar that they

13  exist.

14       Q    But in terms of your pre-politician life,

15  did you find yourself in those churches?

16       A    I had a good friend that was a -- a

17  Congregationalist, which I think is another branch;

18  so, on occasion.

19       Q    Okay.  But not unfamiliar, suffice it to say

20  --

21       A    Right.

22       Q    -- fair summary?  Okay.  Now, what about as

23  a politician, did you find yourself involved in that?

24       A    Not involved in the faith directly, but I

25  have attended services and have participated in

Page 88

1    community events in those spaces.

2        Q    And of that varietal, while you were a

3    politician, were you invited in or did your people

4    reach out to them and say, hey, you know, well --

5    let's finish the question.  Did your people invite you

6    in?  Were you voluntold to go, in other words?

7        A    I'm not voluntold to do anything.  First, I

8    make decisions about my schedule pretty -- I would

9    make decisions about my schedule and the use of my

10   time myself and I'd say it was a combination of -- of

11   invitation and showing up.  I'd say that 75/25 rule

12   applies to this.  But I -- you know, I'd have to

13   distinguish between religious and community-based

14   events.

15       Q    Okay.  Go ahead and distinguish.

16       A    No.  I'm just -- I'd have to think about

17   that.  I've attended both for services.  I've also

18   attended for community-based non-religious events in

19   those spaces -- very same spaces.

20       Q    So let's start with the religious services

21   side of things.  Were you usually invited to go or did

22   you usually go -- I say of your own accord --

23       A    Yes.

24       Q    -- I'm misusing the phrasing.  I'm trying to

25   say, did you invite yourself?  I'm not sure how to

Page 89

1    annunciate that.

2         A    To services?

3         Q    Correct.

4         A    Generally -- generally, I would not invite

5    myself to a religious service unless -- I'm trying to

6    think, like, for a funeral where I wasn't invited but

7    I thought it was important to be present.  And then

8    community events, I might just invite myself.

9         Q    So that covers the Anglican/Protestant

10   tradition -- well, yes, Anglicans are technically

11   Protestant.  Baptist is the next set and I don't feel

12   any need to distinguish; there's a bunch of them and

13   they're all to me Baptists.  Pre-politician life, did

14   you find yourself in Baptist traditions?

15        A    Pre-political life?  Again, maybe.  I'm

16   trying to, like, think back -- again, maybe once or

17   twice with a friend.

18        Q    Is it fair to say that of all the

19   pre-political life interactions you've had with any

20   religions that's not Roman Cathlicism -- Catholicism,

21   I'm sorry -- you were invited by a friend of some

22   sort?

23        A    Right.  I did not go on -- I didn't just

24   show up to a service.

25        Q    All right.  Well, I'm going to stop asking

Page 90

1     that question then --

2          A     Thank you.

3          Q     -- assume that's an ongoing characteristic.

4     So of the Baptist tradition, as I recall, you

5     mentioned you went a few times; you were not

6     unfamiliar.  Is that suffice to say?  And then of your

7     political life, it seems, at least this Morning Star

8     Baptist, as I recall, you had three plus events that

9     you went to.  Is that also correct?

10         A     Three what events?

11         Q     Three plus events as --

12         A     Oh, three plus.  Oh, yeah.  Correct.

13         Q     And that was that particular church.  Did

14    you find yourself as a politician going to Baptist

15    buildings, literally, building church for political

16    events fairly common as a politician?

17         A     Really more community events; I wouldn't

18    call them political events for community meetings, you

19    know, some sort of community engagement.  Yes.

20         Q     And so that's Baptist --

21         A     Again, oftentimes, church space, whatever

22    the religion -- religious denomination is, is used for

23    community events, community meetings, that sort of

24    stuff.

25         Q     And is that true for all religious groups or

Page 91

```
1   is that specific to the Christian faith?
2        A    I -- I don't know if I -- I don't know -- I
3   couldn't say if it was true for all religious faiths
4   but I would say it's true for both -- for the Catholic
5   churches, the Baptist churches, the Jewish temples,
6   the mosques; I'd say it's the case for them.  I've
7   attended community non-religious events in all of
8   those spaces.
9        Q    Okay.  But you haven't attended community
10  non-religious services in a Hindu temple, for example?
11       A    Not -- not that I'm aware of; no.  Not that
12  I recall.
13       Q    Or a Buddhist temple?
14       A    Not that I recall.
15       Q    Or a Humanist/Secular -- I say "secular,"
16  that's a bad example.  Are you familiar with the
17  nontheistic branch of religion?
18       A    No.
19       Q    Okay.  I can't testify for you so that ends
20  my inquiry.  Have you -- well, actually, I can get
21  through it in a different way.  Have you, whether pre-
22  or post-political life -- I say post-political life --
23  pre- or post-beginning service as councilor, have you
24  attended any events in a building that is created for
25  the purpose of the study of non-Abrahamic faith
```

Page 92

1    religion?

2         A    Maybe.  I don't know.

3         Q    Is the maybe a failure of my part to define

4    non-Abrahamic appropriately?

5         A    It's to say I don't know whether I've been

6    in buildings that have been set up for that.  You

7    know, again, I may attend a community meeting in what

8    appears to be a church, but I maybe couldn't tell you

9    the faith or the denomination of that particular

10   church.  And so if we're in a building that is

11   nondescript, there may be other purposes for that

12   building but I'm there for a community meeting.

13        Q    Allow me to try asking the same question a

14   different way.  You are presently in a Satanic temple;

15   literally, The Satanic Temple.

16        A    I am.  I am.

17        Q    This is a non -- well, actually, I have a

18   better way of doing this.  Do you still have that

19   pamphlet near you?

20        A    I do.

21        Q    Okay.  Great.  I'm not going to have you

22   read the whole thing out loud.  Could you please just,

23   like, generally skim through it, and I don't want to

24   make you feel like you're on the spot.  So if we want

25   to take a break while you do that, that's fine.

Page 93

1      A    I've looked through it quickly here.  What's
2  your question?
3      Q    I don't have a question; I'm just asking you
4  to please familiarize yourself first --
5      A    Okay.
6      Q    -- with the context of the building that you
7  are in.
8      A    Okay.  I've looked through it.
9      Q    You've read the whole pamphlet in this --
10     A    No.  I've familiarized myself with what's in
11 it.  Did you want me to read it?
12     Q    Yes, please.  Sorry.  When I said
13 familiarize yourself with the context of the building,
14 that requires you to read the whole pamphlet.
15                MR. KEZHAYA:  Let's take a break.  This
16 might take -- I actually need to take a break myself.
17                THE VIDEOGRAPHER:  Time is 12:26.
18 We're off the record.
19                (Off the record.)
20                THE VIDEOGRAPHER:  And we are back on
21 the record.  The time is 12:31.
22 BY MR. KEZHAYA:
23     Q    You have read through the pamphlet.  Is that
24 correct?
25     A    I have.

Page 94

1      Q     Have you experienced any religions of a

2   similar varietal of what you have just read through?

3      A     I don't think so.

4      Q     Have you ever engaged with any secular

5   humanists?

6      A     Not that I know of.

7      Q     Have you heard of the American Humanist

8   Association?

9      A     I don't think so.

10     Q     Now, let me think of who else is out there

11  --

12     A     I know I have lots of conversations with

13  lots of people who maybe don't identify specifically

14  as such so I can't say that I have or I haven't.

15     Q     When you say they don't specifically

16  identify as such, what are you referring to?

17     A     I, over the course of my time being a city

18  councilor, have countless conversations in which I

19  don't know the person's religious belief or their

20  religious affiliation at all.  So it's not generally

21  part of any conversation I ever have.

22     Q     I see.  I understand and respect what you're

23  saying.  I'm asking more particularly though of the --

24  atheists; have you ever had discussions with people

25  who are loudly atheistic?

Page 95

1      A    Did you say wildly?

2      Q    Loudly; sorry.

3      A    Oh, loudly.

4      Q    Correct.

5      A    Not that I recall.

6      Q    And to be clear, when I say "loudly," I'm

7   not referring to volume, but like, visibly atheistic

8   or, you know, you can tell they're atheistic.  I don't

9   know, maybe they tell you that or they're -- they have

10  maybe a shirt on that says, I'm an atheist,

11  essentially?

12     A    I -- I don't really know how to tell the

13  difference between an atheist and someone who isn't an

14  atheist.  I don't know -- so I'm sure that I have, I

15  just don't -- it wasn't a point of conversation.  But

16  I'm sure that I have.

17     Q    I understand that.  You and I are talking

18  about two different things though.  In the same

19  context as you've gone to synagogue and you understand

20  that the people that you are talking are Jewish, have

21  you had that same analogous -- well, have you had an

22  analogous experience with someone who is some varietal

23  of atheist?

24     A    I don't know.  Perhaps.  But again, I share

25  that experience of being in a synagogue; I'm in the

Page 96

1    synagogue and I am not Jewish.  So I can make an
2    assumption about people, which I try not to do, and in
3    the course of having a conversation with somebody.
4         Q    Okay.  I'm gathering that the answer is, no.
5    Other than the present --
6         A    I'm saying I don't -- I'm saying I don't
7    know.
8         Q    I understand that.  But to me it's the same
9    thing because unless they overtly tell you, I'm an
10   atheist or in this particular case, I am a Satanist,
11   you don't have any occasion to know their religious
12   identity, you're just, in your mind, talking to some
13   member of the community.  Is that a fair assumption?
14        A    Yes.  That's a fair assumption but that --
15   there is a difference to me about the response of, no,
16   versus, I don't know.
17        Q    What is the material difference?
18        A    I -- to say to someone, are you -- how do
19   you identify and having an answer, versus not asking
20   -- ever asking the question.  Or someone self-
21   identifying.  You've asked if I've ever had a
22   conversation with someone who is an atheist, and I
23   have said, I don't know.
24        Q    I more particularly asked you if you had an
25   analogous event, like, when you went to the synagogue

Page 97

1    at some kind of an atheistic temple of some sort other

2    than the present-tense conversation.

3         A    I don't know what analogous is?

4         Q    Analogous -- to draw analogy.  So, for

5    example, you go to synagogue for that tragedy event,

6    that is analogous.  You go to the Haitian event, that

7    is analogous even though those are two different

8    religious groups.

9         A    Okay.

10        Q    There are --

11        A    The Haitians aren't a religious group;

12   they're a group of -- that's a -- a racial and ethnic

13   group.

14        Q    I agree.  But I was under the impression

15   that the St. Angela's Church was specifically Haitian.

16        A    The St. Angela's Church is -- has a very

17   large Haitian population, but there are a number of

18   clergy from a number of places that just happened to

19   be there.

20        Q    I see.  I misunderstood.  Okay.  So then

21   that's a bad example.  What about the mosque/community

22   service as analogous to the synagogue?

23        A    The mosque -- those that participated in

24   prayer, I would assume, are Muslim.  But if they were

25   in the community room, I would not make that

Page 98

1    assumption.

2         Q    Why not?

3         A    Because they may be in the community room

4    like I am, to engage in conversation, to meet their

5    elected official, to talk about topics other than

6    religion that are important to them, like housing or

7    education or transportation or the environment or our

8    parks.

9         Q    Maybe I don't understand appropriately this

10   mosque event or side of events.  As I understand it,

11   you went to this mosque -- and on an ongoing basis,

12   when I say the mosque, just append slash community

13   center in your mind, it's just asterisk clear -- so

14   you go to the mosque, there's some kind of community

15   engagement happening after the prayer.  Is that

16   correct?

17        A    I've done both.  I've gone following prayer

18   to meet with people and I've gone to a mosque that has

19   served as community space.

20        Q    Okay.  Well, I want to focus particularly on

21   the prayer side of those.  So as I understood it,

22   there is a prayer and then some of the people who

23   prayed, stuck around and talked with you.  Is that --

24        A    Yes.

25        Q    Okay.  You did not assume that the people

Page 99

1   who were just doing a Muslim prayer were, in fact,

2   Muslims?

3       A    I'm -- I said I -- I would make that

4   assumption if they participated in prayer, then they

5   were likely Muslim.  But people could also be there

6   for the community portion of the time that we were

7   there.  They could have heard my local elected

8   official is going to be at the mosque following

9   prayer, I want to go ask about my child's experience

10  with school bus transportation.

11      Q    As the relative proportion of the number of

12  people who you would have seen prayed versus the

13  number of people who talked with you, which I was the

14  larger population?

15      A    If I were at the mosque following prayer,

16  I'd say the larger group would be -- the larger

17  percentage of the group would likely be Muslim.

18      Q    Did you see anyone come in from the not

19  praying group to speak with you at this event?

20      A    Yes.

21      Q    Okay.  You did see that?

22      A    Yep.

23      Q    As a relative proportion of the people who

24  you were speaking with at the mosque, you know, what

25  portion of the people were the ones who just prayed

Page 100

1    versus the ones who just came in off the street?

2         A    I would say it was smaller; a small

3    proportion.

4         Q    How small?

5         A    I couldn't tell you.  That, I don't know.

6    It was small proportion.

7         Q    Like, a very small proportion?  About half

8    and half?

9         A    Small.  Half and half is not small.

10        Q    So less than half and half?

11        A    Yeah.

12        Q    A quarter; more or less?

13        A    More or less.  Yeah.  I -- I -- yeah.

14        Q    So --

15        A    I can't -- I can't give you a number on

16    that.  I'm sorry.

17        Q    That's fine.  Okay.  So three-quarters came

18    from the praying group and approximately three-

19    quarters came from the group that had just prayed and

20    approximately one-quarter came in off the street.  Is

21    that correct?

22        A    That could be correct for, I'd say, at least

23    one of the times I've done something like that.

24        Q    That's fine.  I --

25        A    The larger the mosque, the larger percentage

Page 101

1   of individuals potentially that were part of the, sort
2   of, the community conversation that happened
3   afterwards that weren't participating in prayer.
4       Q    What would be the largest proportion that
5   you would estimate off of your recollection that came
6   in off the street?
7                MR. KEZHAYA:  I think I broke it.
8                THE WITNESS:  Oh, he's back.
9                MR. KEZHAYA:  There we go.  Yes, you
10  froze.
11               THE WITNESS:  You froze.
12               MR. KEZHAYA:  Well, Zoom froze.
13               (Off the record.)
14               THE VIDEOGRAPHER:  We're back on the
15  record.  The time is 12:42.
16  BY MR. KEZHAYA:
17      Q    Off record, I clarified the question of what
18  I'm trying to get at.  Could you please answer what I
19  was trying to -- the top end of the range?
20      A    So if I attended a mosque at the end of
21  prayer to talk with attendees of the prayer or
22  community members, if it was immediately following
23  prayer, the larger percentage would have been those
24  that just participated in prayer.  A small percentage,
25  maybe 25 percent, were community members who didn't

1   participate in the prayer.  I would assume those that
2   participated in prayer are of the Muslim faith.
3   Again, depending on the location, there are many
4   mosques in Boston of different sizes, some have --
5   often host more community-based events and therefore
6   attract a sort of wider population of maybe those that
7   don't -- that aren't Muslim that don't practice Islam
8   but are, you know, engaged in sort of the community
9   events that happen in that space.
10      Q    Okay.  But the question posed is, on the
11  small end, it's 25 percent.  You're saying that it's
12  bigger under these circumstances.  I'm just trying to
13  understand it's bigger to what extent; is it 50/50?
14  Is it 60/40?  Is it --
15      A    You know what, I don't -- I'm -- I'm sorry I
16  speak over you.
17              THE WITNESS:  Sorry about that, Rob.
18              I am -- I can't tell you 'cause I don't
19  ask and I don't take attendance.
20  BY MR. KEZHAYA:
21      Q    Okay.  So for all you know, there all
22  Muslims.  Is that fair to say?
23      A    I don't know.
24      Q    I understand --
25      A    -- for what I know because I don't know.

Page 103

1      Q    Not, from all you know; for all you know.
2  To the best of your knowledge, they could be all
3  Muslim; they could be no Muslims.  You have no way of
4  knowing.
5      A    It -- it could be -- it could be any of
6  those things.  Correct.
7      Q    Correct.
8      A    That's why I don't know and I -- I try to
9  not make assumptions.
10     Q    Correct.  Yes.  I'm trying to bookend that
11 part of the conversation to put a bow on it and finish
12 it off.  So that finishes up mosques.  I believe we've
13 completed all the Abrahamic faiths and nontheistic
14 faiths.  I think we've adequately covered the Hindu
15 tradition, Buddhist tradition -- sorry -- I don't
16 think we have.
17          Pre-political life, have you gone to any
18 Buddhist services of any sort at a Buddhist temple?
19     A    Yes.
20     Q    Well, during and post --
21     A    Pre.
22     Q    Say again.
23     A    Pre.  I don't think -- pre.  I don't think I
24 attended any, as far as I recall, I don't -- I did not
25 attend any Buddhist or Hindu services during my time

Page 104

1     in office.

2          Q    Okay.  And now let's see here.  That covers

3     all those.  What about African traditions; we never

4     covered any of those.  Whether before or during

5     political life, any African traditional faiths that

6     you were exposed to?

7          A    Such as?

8          Q    Well, there's quite a few of them.  Largely,

9     there are shamanistic and tribal -- there are many of

10    them, actually.  There's actually so many and I'm

11    frankly not very familiar.  They all kind of fall

12    generally -- you know Vudu is just Christianity

13    intermixed with that shamanistic tradition.  So

14    anything of the color of Vudu?

15         A    Not that I recall.  Nope.

16         Q    Whether pre-political life or during your

17    post-political life?

18         A    Not that I recall.

19         Q    Native Americans we talked about.  I say

20    Native Americans, that's a gross oversimplification.

21    It is what it is though.  The Native American ceremony

22    that you observed on the plaza, that was during your

23    political life.  What about before that?

24         A    Yes.  Not that I recall specifically.

25         Q    And is that fair to say even as a -- such

Page 105

1    that it is in oversimplification, whether we go down

2    to the middle Mesoamerican Aztec traditions or, you

3    know, following thereafter into the South American

4    traditions, any of those varietals of Native American

5    traditions, pre- or during or post-political life, did

6    you have any exposure to any of that?

7         A    Not that I recall.

8         Q    Okay.  And then back up north through, you

9    know, Canadian and leading into the Inuits, any of

10   those pre-, post-, or during?

11        A    Not that I recall; no.

12        Q    Can you speak to Michelle Wu's exposure to

13   the various religions of the world, whether pre-

14   political life, during political life, or now in her

15   mayoral life?

16        A    I cannot.

17        Q    Would you agree with me that I need to talk

18   to Michelle Wu about that?

19        A    That's not my decision to make.

20        Q    I understand that but since you --

21        A    I can't answer or speak for her or her

22   experiences.

23        Q    Correct.  That's all I need.

24                  MR. KEZHAYA:  This is a good stopping

25   point to take lunch.  Also, this laptop is about to

1    die.  We can go off record now if it pleases the

2    group.

3                    THE WITNESS:  I don't need to come off

4    record.  I don't -- I'd prefer to work through lunch

5    if possible.

6                    MR. KEZHAYA:  Oh, this is approximately

7    half of the deposition.  So I imagine you're going to

8    want to take lunch.  This is a good halfway point.

9                    THE WITNESS:  How --

10                   MR. KEZHAYA:  Once we get started into

11   the next thing, we're going to have a solid -- what

12   time is it now, it's 12:48; we've been here about four

13   hours.  This is an all-day affair.  I don't know if

14   you were apprised of this.

15                   MS. O'CONNOR:  What's the briefest

16   amount of time we can take for lunch?

17                   MR. KEZHAYA:  That's a question for the

18   group.  I don't know.

19                   MS. O'CONNOR:  I think 20 minutes would

20   probably be fine on our end.

21                   MR. KEZHAYA:  Well then let me confer

22   with my group and then we will reconvene.

23                   THE VIDEOGRAPHER:  Okay.  The time is

24   12:49.  We are off the record.

25                   (Off the record.)

1          THE VIDEOGRAPHER:  Okay.  We are back

2    on the record.  The time is 1:41.

3    BY MR. KEZHAYA:

4      Q    Ms. Essaibi-George, all of that background

5    was essentially to establish your relative familiarity

6    with essentially all of the world religions, both pre-

7    political life and during your political life.  That's

8    necessary background before we can get to the next

9    phase of the questioning which is as pertains to this

10   litigation.

11          As I understand it, the City of Boston has a

12   council and you were on that council.  Is that

13   correct?

14     A    I was on that council; yes.

15     Q    Okay.  And in the course and scope of your

16   employment for the City of Boston as a councilor, you

17   invited various people to give a blessing over city

18   council meetings.  Is that also correct?

19     A    Yes.  Blessing, invocation, opening remarks;

20   yes.

21     Q    All three of those words are interchangeable

22   in your parlance.  Is that correct?

23     A    Well, sometimes the remarks would be more of

24   a blessing as opposed to remarks.  Sometimes it was

25   more of a prayer as opposed to a poem or something

Page 108

1   like that.

2       Q    In our last deposition, which you were not a

3   part of, we listened to one that I would describe as a

4   sermon.  You attended these council sessions; did

5   sometimes people give sermons?

6       A    Some probably could be described as such;

7   yes.

8            MR. KEZHAYA:  Mobius, if you could take

9   us to folder number 2, the link to -- just open it but

10  don't play it.  I want it to be paused at the time

11  code that it's set to.

12  BY MR. KEZHAYA:

13      Q    Sorry.  I can't hear from the mic very well.

14  Ms. Essaibi-George, I see in the background there's

15  light, are you looking at the link that I displayed?

16      A    I'm looking at the video.  I am assuming

17  it's your link.

18      Q    Please describe for both my benefit and the

19  benefit of the record what you see.

20      A    I see Councilor O'Malley and Councilor Wu.

21      Q    Okay.  So it appears that you're looking at

22  -- let me, actually, just pull it up on my screen so I

23  can actually see what you're seeing as well.  What I

24  intended to show is one of the councilor meetings --

25  or, one of the council meetings, I should say, at

Page 109

1  which you invited a particular speaker.  Do you

2  remember this particular meeting?

3       A    That I invited somebody?

4       Q    Correct.

5       A    I -- I mean, I don't -- I don't know which

6  meeting this is.  It's not dated or anything.

7       Q    So at the top right, it should say September

8  26, 2018.  Do you see that?  You do not see that?

9       A    No.  I don't see a date.

10      Q    Okay.

11                MR. MOBIUS:  This says August 18, 2020.

12                MR. KEZHAYA:  Oh, this is the wrong

13  link; that's why.  Well then, here, allow me to send

14  the link to you through Teams chat.

15                THE REPORTER:  I -- I took to the

16  computer so you can see it.  Does that help out?

17                MR. KEZHAYA:  Yes.  That helps

18  immensely.  Thank you.  This is the wrong link, that's

19  why.

20                Mobi, I just sent you a new link.  It

21  should be September 26, 2018.

22                MR. MOBIUS:  Okay.  Give me one second

23  while I get that.  Sorry.

24                THE VIDEOGRAPHER:  Everybody, just a

25  quick reminder, we're still on the record.  Please try

Page 110

1    to limit the crosstalk if you can.  Thank you.

2                    MR. KEZHAYA:  To give a little bit of

3    exposition, cross chatter is very difficult to

4    transcribe.

5                    MR. MOBIUS:  And was there a specific

6    timecode on this one?  Were you --

7                    MR. KEZHAYA:  If you click the link, it

8    should take you to the precise one.

9                    MR. MOBIUS:  Yes.

10                   MR. KEZHAYA:  Yes.  Just click in the

11   link.  It should be a minute twenty-five.

12                   MR. MOBIUS:  Do you want to make note

13   of the date?

14                   MR. KEZHAYA:  Guys, I know I'm plague

15   ridden but do you mind if I come in there so I can

16   administer this a little bit more effectively.  Right

17   now, all I see is Mr. Court Reporter's name on my

18   laptop.

19                   MR. MOBIUS:  Matt, we've got it brought

20   up.  I just wanted to make note of the date of the --

21   of the video.

22                   MR. KEZHAYA:  The date of the video

23   should be September 26, 2018.

24                   MR. MOBIUS:  Thank you.

25                   MR. KEZHAYA:  Are we looking -- very

Page 111

1    good.  That's much better.

2                    THE WITNESS:  Yeah --

3    BY MR. KEZHAYA:

4        Q    Now that we're looking at the correct one,

5    Ms. Essaibi-George, do you remember this meeting?

6        A    I mean, that's obviously me, I don't

7    remember it specifically, but --

8        Q    That's okay.  Let's watch through the

9    invocation.  It doesn't take too much time; I think

10   it's about three minutes or so.  So if we could just

11   press play and then I may need to pause periodically

12   for further examination.

13                   MR. MOBIUS:  I don't know what the

14   level of volume is going to be when this starts.  I

15   apologize if it's loud.

16                   MR. KEZHAYA:  That's okay.  And before

17   we press play.  When I watched this in preparation for

18   the deposition, there's going to be some audio

19   glitches.  That's normal and expected so just rely on

20   the sub-titles more so than the audio.  And play when

21   ready.

22                   (Video played.)

23                   MR. KEZHAYA:  Pause.  There is no

24   audio.

25                   THE VIDEOGRAPHER:  Just a second --

Page 112

1    just doublecheck.

2                 MR. KEZHAYA:  Also, the screen does

3    flicker black sometimes so that's also expected.

4                 THE VIDEOGRAPHER:  I'm not getting any

5    -- audio through the set there -- speakers here but

6    I'm going to -- Matt, it's -- it's not going through

7    here.  It's going through the mobile -- so I'm going

8    to play it through my magical speakers.

9                 MR. KEZHAYA:  That's fine.  What's

10   important to me is that the witness can hear it; not

11   so much everyone else.  We can patch this all through

12   with a link.

13                 (Video played.)

14                 MR. KEZHAYA:  If we could pause here.

15   I didn't hear the Pledge of Allegiance on my end.  Did

16   part of the Pledge of Allegiance play on y'all's end?

17                 THE WITNESS:  Yes.

18                 MR. KEZHAYA:  Okay.  I'm sorry.  I just

19   misheard.  Please continue.

20                 (Video played.)

21                 MR. KEZHAYA:  Okay.  Pause here.

22   BY MR. KEZHAYA:

23       Q    Ms. Essaibi-George, I have not watched the

24   rest of this video.  I have no idea how long this goes

25   on.  Is the rest of this substantially about this

Page 113

1    particular organization?

2         A    I think so; yes.

3                   MR. KEZHAYA:  That fulfills my

4    purposes.  Could we please return the camera to Madam

5    Witness?

6                   THE WITNESS:  Here I am.

7                   MR. KEZHAYA:  Thank you.

8    BY MR. KEZHAYA:

9         Q    Was that a fairly normal invocation,

10   blessing, ceremony, however it is that you want to

11   describe it?

12        A    Yeah.  I'd say pretty normal.

13        Q    There were certain elements of this that I

14   just want to take note of and make sure that these are

15   all normal.  At the beginning, you acknowledged that

16   Rosh Hashanah had just happened and that, more

17   particularly, Jews celebrate Rosh Hashanah; this is a

18   Jewish holiday in other words.  Is that correct?

19        A    Yes.

20        Q    Is it also normal that, you know, if there's

21   some kind of --

22                   MR. KEZHAYA:  There's a lens flare.  If

23   we could get the camera modified slightly so that

24   there's not a lens flare.

25                   THE WITNESS:  That's coming from the

Page 114

1   mirror behind me.

2                 MR. KEZHAYA:  Yes.  Can we maybe move

3   the camera so that it's not -- because it's -- I don't

4   know, for example, if it's the laptop --

5                 THE WITNESS:  Is that better --

6                 MR. KEZHAYA:  So there are two sets of

7   video.  I'm trying to make a record as well as see

8   you.  If the video is good, that's all I care about.

9   Me seeing you, that's not the problem.

10                 Can we go off record so that I can

11  maybe get a better understanding?  I need to make a

12  good record as well as a good examination.  There are

13  two different things.

14                 THE VIDEOGRAPHER:  -- off the record.

15                 (Off the record.)

16                 THE VIDEOGRAPHER:  Okay.  We are back

17  on the record.  The time is 1:59.

18  BY MR. KEZHAYA:

19      Q    To recap, it's not abnormal for you to

20  acknowledge a particular religious holiday has

21  recently happened in the course of introducing a

22  particular religious speaker at the outset of a city

23  hall meeting.  Is that correct?

24      A    That's correct.

25      Q    Sorry; say again?

Page 115

1       A     That's correct; that's not unusual.

2       Q     Thank you.  It's also not abnormal for you

3    to introduce the speaker with some level of

4    endorsement.  Is that also correct?

5       A     That is correct.  We invite them ourselves

6    so there's also a level of assumed endorsement by

7    inviting them.

8       Q     And in the background, your head and there

9    was another city employee's head, both of which were

10   bowed as the religious speaker was praying over the

11   city hall meeting.  Is that abnormal?

12      A     I missed the tail end of your question but

13   it is not abnormal to bow one's head when a prayer is

14   being offered --

15      Q     I neglected to ask, but beforehand, the

16   other city employee who is not you, whose identity is

17   unknown to me, she stated to the effect of, everyone

18   please stand for the prayer and continue standing

19   while Ms. Essaibi-George officiates --

20      A     -- the Pledge; yes.

21      Q     Right.  Thank you.  Is that normal?

22      A     That is -- I don't know whether I

23   characterize it as normal.  Every council president or

24   whoever's leading the body, sometimes phrases it in

25   different ways.  Sometimes there are councilors and --

Page 116

1    and whoever's in the chamber is not necessarily asked,

2    stands on their own, if they're able.  So I actually

3    don't know whether I'd say that's normal.  But I think

4    there's an expectation that people generally stand

5    during the prayer, if they're --

6          Q    Okay.  And then after the prayer --

7          A    -- yep --

8          Q    -- remark, after the opening remarks while

9    the Pledge of Allegiance is given, I noticed the

10   superimposed American flag waiving during the

11   presentation of the Pledge of Allegiance.  Is that

12   normal?

13         A    I actually don't know whether that's normal.

14   I generally don't watch the council meetings,

15   especially during that time, I was in the chamber, so

16   I wasn't watching them.  And today, watching it, I

17   said, oh, that's kind of a cool graphic that they did

18   that.  So I don't know whether or not that's normal.

19         Q    Now the time duration between the remark and

20   the Pledge of Allegiance is essentially zero.  Is that

21   normal?

22         A    That's normal.  We generally move from that

23   opening prayer, remark, or blessing, whatever it is,

24   into the Pledge.

25         Q    Okay.  So insofar as the remarks and the

1   Pledge back-to-back like that, that whole process of

2   what we just saw was pretty normal; par for the

3   course, so to speak.  Is that correct?

4        A    Yes.

5        Q    Okay.

6        A    Yes.

7        Q    And then after that, I've candidly never

8   watched any of the Boston City meetings in full.  I

9   gather there was some kind of a Jewish educational

10  volunteer group that was being acknowledged at this

11  particular city hall meeting.  Is that a fair summary

12  of this particular meeting?

13       A    Yes.

14       Q    Okay.  Is that normal as well, that the

15  person who gives the prayer is also the subject of the

16  meeting as well?

17       A    On occasion; not always.

18       Q    Occasionally --

19       A    -- depends upon -- it depends again, as a

20  former teacher, there was some real direct correlation

21  between my work on the council and this group and --

22  and the work that they do.  So to have them there both

23  with Claudia to offer the opening blessing and to

24  recognize the work that her and her work were doing,

25  seemed to be very reasonable for me to do sort of

Page 118

1    those things together.

2            Councilors at different times throughout the

3    year, if there is something happening, which is either

4    seasonal or there's been a need to give some special

5    recognition to a group that might happen.  For

6    example, February, there is an event that I

7    participated in, still today, called the winter walk

8    which is an -- the organization is called the Winter

9    Walk and they organize a winter walk which is their

10   work to fundraise to end homelessness and bring

11   awareness to the plight of homelessness in the city of

12   Boston.  So they don't come and offer an opening

13   blessing or give remarks but I do invite them in

14   February to recognize them to bring attention to their

15   work because it's timely.

16       Q    You say timely because of it being winter or

17   --

18       A    It's when the walk is happening, for

19   example.  We may also recognize -- you know, I'm of

20   Polish descent and during Polish -- Polish

21   Constitution Day is in May so I may -- I have, on

22   occasion, recognized that day.  I'm trying to think if

23   I've ever brought a Polish group into the council

24   chamber before a meeting.  But things like that happen

25   and it is an opportunity to acknowledge work that's

Page 119

1    happening in our community and at times bring those

2    people or that -- a group of people from that

3    organization to the council to recognize that work.

4        Q    But redirecting your attention back to this

5    particular, if I remember correctly, September 26,

6    2018, meeting, the group that was being portrayed is

7    the same group that gave the blessing that day or

8    invocation or whatever you want to call it --

9        A    There was a -- there was certainly a

10   relationship between the two.  So the -- Claudia and

11   her congregation are actively involved in that

12   tutoring group, it's based out of their congregation,

13   so it was the -- a great opportunity to do both things

14   at once.

15       Q    Do you know where that congregation is

16   centered?

17       A    I think they're based out of Brookline and I

18   think they're -- they're a synagogue.

19       Q    I may have missed the geographic location;

20   what was it again?

21       A    I think that they're -- I think they're

22   actual synagogue is in Brookline.

23       Q    Okay.  Is Brookline another neighborhood of

24   Boston?

25       A    It is not.  It is a -- it is a neighboring

Page 120

1    -- I don't know if it's even a city officially; a town
2    or city of Boston.
3         Q     Some kind of Boston metro area --
4         A     Neighbor -- it's neighboring -- neighboring
5    town.
6         Q     But more particularly, it's within the
7    Boston metro area.  Is that correct?
8         A     I guess so, yeah.  It's not Boston; it's
9    next door.
10        Q     Yes.
11        A     But it's -- metro area; yes.
12        Q     In terms of driving distance, perhaps that
13   would be a better way of asking, if I were in Boston,
14   say, City Hall, and I want to go to wherever this
15   congregation is centered in, about how long would it
16   take to drive there?
17        A     Ten, fifteen minutes, tops.
18        Q     Okay.  Very close then.
19        A     Yeah.  Maybe; depending on traffic.
20        Q     All right.  Do you remember how they came to
21   be -- well, obviously, you invited them, but do you
22   remember what occasioned your invite to them?
23        A     I don't recall exactly but from some of the
24   remarks I gave in 2018, four years ago, I referenced
25   the work that they're doing -- they were doing at that

1  time in our public schools; I think I named a couple

2  of schools in which they work in.  So I'm sure I came

3  to know of them either during one of my visits to a

4  classroom in our school -- school district or one of

5  -- maybe a classroom teacher perhaps referenced some

6  of their work in our schools.  I don't -- I don't

7  recall exactly but I imagine that's how it could have

8  happened.

9       Q    Okay.  More --

10      A    -- schools I mentioned specifically in my

11  remarks here were the Ohrenberger, which is in West

12  Roxbury part of the city and the Winship which is in

13  the Brighton part of our city.

14      Q    Sorry.  I'm trying to figure out how to --

15  oh, that's the -- okay.  More particularly, do you

16  recall whether they solicited the invite?

17      A    They did not.

18      Q    They definitely did not?

19      A    I'm -- I'm certain that they didn't and I

20  don't think anyone's ever asked me, with the

21  exception, I think, why I'm here today, to offer

22  remarks, a prayer, or a blessing before the city

23  council.

24      Q    Okay.  In the course of giving these

25  remarks, did you prepare those or did they prepare

Page 122

1    those?

2        A    My remarks?

3        Q    The introductory remarks before the prayer

4    was given.

5        A    But my remarks; the ones I offered?

6        Q    I'm misusing my words.  So before the rabbi

7    gave the prayer, you introduced the rabbi.

8        A    Yes.

9        Q    The introductory commentary; did you write

10   the introductory commentary or did they give you the

11   introductory commentary?

12       A    I ether wrote them or a member of my staff

13   did.  We may have -- my office may have talked with

14   Claudia about some of the years of service when we

15   recognized some of the volunteers so that we had the

16   appropriate information.  But we, as an office, or

17   myself, or a member of my staff would write my

18   remarks; no one else would write them for me.

19       Q    Okay.  And before the -- how do I phrase

20   this?  Before the city council meeting that we just

21   watched, you mentioned something about meeting them

22   beforehand.  Is there some pre-city council meeting

23   schmoozing opportunity, for lack of better word?

24       A    Sometimes there are.  Again, where this

25   organization, this group of volunteers were doing work

Page 123

1    in our schools, I like to highlight that work 'cause

2    it both celebrates their commitment to our young

3    people and to our classrooms and to our, you know, our

4    students; our schools.  But it also is an opportunity

5    to highlight the need that remains for many of our

6    kids in the Boston public schools.  So this was an

7    opportunity to do that and depending on the

8    organization, depending on what their role is in our

9    city, and depending on the amount of time I have or

10   they have, we may -- we have a small, like, sort of

11   reception room, the currently room that we use, we

12   might have coffee and pastry, a snack, something like

13   that so that, you know, there can be some schmoozing.

14   But really, sharing of what the work is that they're

15   doing in our communities across the board.  That is

16   not -- that's not a usual occurrence every week.

17        Q    Okay.

18             MR. KEZHAYA:  Mobi, if you're still in

19   that folder number 2, if you could please open up the

20   second PDF; second from the top.  It should include

21   the DEF633 to 35 dot PDF at the very tail end of the

22   file name.

23             And, Madam Witness, if you could please

24   let me know when it's open --

25             THE WITNESS:  I'll -- I'll turn the

Page 124

1    camera just for you.

2                     MR. KEZHAYA:  Okay.  Thank you.

3                     MR. MOBIUS:  You said 633 to 635?

4                     MR. KEZHAYA:  Correct.

5                     Okay.  So the shot is very poor on my

6    end.  I see nothing but a white screen.

7                     Madam Witness, if you could turn me

8    back so I'm looking at you; it's just a white screen

9    to me.  If you could --

10                    THE WITNESS:  -- there's lots of words

11   on there --

12                    MR. KEZHAYA:  Say again.

13                    THE WITNESS:  There's lots of words.

14   BY MR. KEZHAYA:

15        Q    Okay.  So from the very top it should say

16   Emily Reichman.

17        A    Oh, yeah.  I see it.

18        Q    Okay.  Great.

19                    MR. KEZHAYA:  Mobi, if you could take

20   us to page 2 of this PDF, we're looking for an e-mail

21   from an Aaron Agulnek --

22                    THE WITNESS:  Oh, yeah.

23                    MR. KEZHAYA:  -- dated August 1, 2018,

24   at 11:01 a.m.

25                    THE WITNESS:  I see it.

Page 125

1    BY MR. KEZHAYA:

2        Q    Madam Witness, if you could please, there

3    are two, kind of, sub-headings in here; this

4    pre-council meeting and then a bullet point, then

5    council meeting and a bullet point.  It says, Clergy

6    Coleman.  If you could just, please, read everything

7    after Clergy Coleman.

8        A    I'm not seeing what you're referencing.

9        Q    It should say council -- well --

10       A    Oh, all right.  I see Clergy Coleman.  I'm

11   sorry, I was looking for something -- something else.

12   So, Clergy.  So this is -- I'm reading an e-mail from

13   Aaron to Karen.  Clergy, would an invited clergy

14   member have to be there from the City of Boston or if

15   we open it up to a rabbi that is involved in our

16   programming.

17       Q    Okay.  So this bullet point appears to me

18   that they are requesting an invite; that's in conflict

19   from your earlier testimony, so.

20       A    No.  I don't think so.

21       Q    So help me understand where I'm --

22       A    I -- can we -- this is -- this looks like

23   it's a thread of e-mails.  Could I see what pre-dated

24   this?  Just --

25       Q    This is the PDF that I was provided.  So if

1   you go to the next page, it's just a signature.  And

2   then after this --

3        A    No.  I'm looking at -- it looks like there's

4   some e-mails going back and forth.

5        Q    There are e-mails that go back and forth,

6   but as you go up, they go forward in time.  So this

7   August 1 e-mail is the earliest e-mail that I'm aware

8   of.

9        A    So it looks like he's asking us what the day

10  would look like.  We invited him, obviously, or -- or

11  the literacy program -- yeah, he's asking questions of

12  us what it would look like.  So I'm not reading that

13  the same way that you are.

14       Q    Okay.  Let's go back up to the top where the

15  e-mail begins, Karen, thank you again --

16       A    Yep.

17       Q    -- for helping to facilitate our

18  conversation with Councilor Essaibi-George two weeks

19  ago.  We're excited to showcase GBJCL parenthetical,

20  our literacy program, at the September 26th city

21  council meeting.

22       A    Yep.

23       Q    This, it seems to me, is consistent with

24  your other political engagements with religious or

25  quasi-religious matters, give it, be it, churches or

Page 127

1    congregations or what have you, wherein you were

2    invited to those.  It seems to me that this particular

3    group has requested an invite into the city council

4    chambers as well.  I don't have any e-mail --

5         A    -- I don't -- I don't know whether I would

6    agree with that because they are -- obviously, I knew

7    about their literacy program, or at least it seems

8    obvious to me that I knew about their literacy

9    program, and I wanted to invite them to showcase that

10   program to the council.  And we would do that during

11   that pre-council hearing coffee hour.

12        Q    Okay.  So this e-mail is dated August 1.

13   We're talking about a September 26th city council

14   meeting --

15        A    Yes.

16        Q    -- we started off by watching the city

17   council meeting but this is the earliest e-mail that I

18   can find that addresses that city council meeting.

19   Where would I go to find the proof that supports your

20   counter-proposition?

21        A    I don't know if it's necessarily a counter-

22   proposition, I just think it's -- you are making an

23   assumption based on this e-mail on how I came to know

24   of this program or invite them to the city council.

25        Q    Okay.  So other than your words, what

1   documents can I look to that would support your

2   reading of this e-mail because this e-mail predates

3   the city council meeting.  What you are describing is

4   what you saw from the city council meeting.

5          A    Yeah.

6          Q    And as you mentioned earlier, you don't

7   distinctly recall your words from the city council

8   meeting until you watched the city council meeting.

9   So I find it difficult to believe that you recall

10  issuing an invite before this e-mail unless there's

11  something else that I can see that would refresh your

12  --

13         A    Yes.  I could have seen them in a classroom,

14  the -- that was four years ago.  So I can't recall

15  anything specifically from four years ago.  But I

16  would say the video refreshes some of my memory, and a

17  lot of it seems very familiar to me.  This e-mail,

18  which I was cc'd on, was not from or to me directly,

19  and a very common practice is that staff reads e-mails

20  and communicates with constituents, especially on this

21  one where I'm cc'd.  I -- I don't see anything sort of

22  unusual at this.  You do; I don't.  And so for proof,

23  I can't tell you whether it was a conversation,

24  whether it was a classroom visit, whether it was

25  something that came up at a community meeting; that I

Page 129

1    can't recall specifically.  I don't even recall this
2    e-mail specifically and I'm cc'd on it.
3         Q    Of course.  I wouldn't expect you to recall
4    anything in detail, that's why we're having this --
5         A    But you're asking me to recall things in
6    detail.
7         Q    Well, no.  What I'm saying, is that it
8    appears to me that they invited themselves into the
9    meeting and you -- or rather they solicited an invite
10   and you extended an invite in return.  However, that
11   conflicts with your earlier emphatic statement that
12   that did not happen.
13        A    I -- I'm not saying that and I haven't said
14   that.
15        Q    Oh, I'm mistaken.  Please --
16        A    And when I read -- when I read that -- when
17   I read this e-mail, it is very clear to me that it's
18   in response to something that happened before it.
19        Q    Okay.  Let's scroll up to the next e-mail
20   dated August 7.  August 7, of course, is six days
21   after the fact.  Aaron writes, Karen, I wanted to
22   follow up with you on this e-mail.  We are eager to
23   get this going, exclamation mark.
24             You see this; yes?
25        A    I -- thank you, Karen, we are --

                                        Page 130

1            MS. O'CONNOR:  -- down, Mobius.

2            THE WITNESS:  Karen, I wanted to follow

3    up with you on this e-mail -- yes, I see that.

4    BY MR. KEZHAYA:

5        Q    This also seems in conflict with your

6    earlier testimony that you never accept solicitations

7    for an invite.

8        A    I -- I don't see that in conflict.  I see

9    that this is an extension of a conversation that has

10   happened.

11       Q    So explain to me where you're coming from

12   because I see it in a completely different way.

13       A    I -- I don't -- there's lots of

14   conversations that happened back and forth.  Love to

15   have coffee with you next week and then two weeks go

16   by and you reach out to me and say, let's get that

17   coffee going.  That's how I'm reading that.

18       Q    Okay.  But you don't distinctly recall that

19   that happened?

20       A    I'd love to have you -- I mean, I could see

21   how this would play out.  I don't know exactly how it

22   played out but there are invitations that happened.

23   There are conversations that happened that -- that get

24   caught up in day-to-day life and business.  And so I

25   don't -- I don't see that the same way you do --

Page 131

1      Q     Okay.  Madam Witness, what you're doing

2  right now is providing me hypotheticals.  I'm trying

3  to examine --

4      A     I don't have anything in addition to -- I

5  can't tell you what conversations happened outside of

6  these e-mails going back and forth.  You're making an

7  assumption based on these e-mails what you think may

8  -- may or not happened outside of those e-mails.

9      Q     Correct.  And you are attacking my

10 assumption by saying, I don't think that happened.

11     A     You are attacking -- you're attacking what

12 I'm saying.

13     Q     That's correct.  That's because your

14 statements are inconsistent with my reading.

15     A     I don't believe my statements are

16 inconsistent.

17     Q     Well, it's inconsistent with my reading.  So

18 my reading of it is one thing and your recollection,

19 or at least your statements, are a different thing.

20 You --

21     A     Well, I'm reading this also a different way

22 than you are, I believe.

23     Q     Okay.  Why don't you tell me how you are

24 reading it.  Let's start over.

25     A     This to me is -- I don't see an -- I don't

1    see anyone asking for an invitation.  And -- I see a

2    conversation that's gone back and forth at least

3    between Karen and Aaron.  I see that there are some

4    more up above that is, can you tell us how this will

5    work.  We'd like to know -- we'd like to understand

6    what would happen before the council meeting; what

7    would happen during the council meeting.

8        Q    Okay.  Where are you seeing that?

9        A    We are -- we are very low maintenance, but

10   we like to do things well.  Tell us how, basically,

11   the council meeting goes, what the clergy's role is,

12   what Annissa's role is, and how long it would take.

13   We -- and if you went through, I'm sure you'd find,

14   and you've obviously foiled my e-mails, you would

15   likely see similar conversations with other groups

16   happening like this.

17       Q    What are some other groups that I could find

18   that are similar to this --

19       A    I mean, you know every one that I've invited

20   before the city council?

21       Q    I do not.  I have people who are assisting

22   me with --

23       A    Yes.  I'm sure that they do.  I no longer

24   have access to my e-mails.  I'm no longer a city

25   councilor.  So I'm sure there's similar conversations

Page 133

1    that have taken place.

2         Q    You're certain of it?

3         A    I'm -- I'm -- I -- I guess I shouldn't say

4    I'm certain; I haven't looked.  But I'm -- I'm -- I

5    think it's reasonable to assume -- for -- I believe

6    that there are more like this and I'm sure you'll find

7    most conversations about inviting individuals or

8    organizations or groups that the city council would

9    follow a similar rhythm.  But I'm not -- I suppose I'm

10   not certain but I can't -- I don't have access to my

11   e-mails.

12        Q    Do you have any examples that you can think

13   of with particularity that would be similar to this?

14        A    Not specifically, no.  I'd have to look at

15   the calendar of who I've invited over the years to let

16   you know how those invitations maybe came about.

17        Q    I believe we can effectuate that if --

18        A    -- I'm fine --

19        Q    -- we will obtain that exactly.  Give me

20   just some time.

21             MR. KEZHAYA:  Let's go off record while

22   I prepare that.

23             THE VIDEOGRAPHER:  The time is 2:24.

24   We're off the record.

25             (Off the record.)

Page 134

1          THE VIDEOGRAPHER:  Okay.  We are back

2    on the record.  The time is 2:30.

3    BY MR. KEZHAYA:

4       Q     All right.  Annissa, earlier you also

5    mentioned that your staff writes the remarks.  Is that

6    correct?  The remarks that you give, the introductory

7    remarks; to be clear.

8       A     Yeah.  Sometimes me; sometimes them.

9    Sometimes I write them.  Most of the time, I would say

10   my staff wrote them.  You know, in certainly over my

11   time in -- on the council, my staff got better at my

12   voice so, you know, saying things the way I would say

13   things.  And certainly, while I was speaking, I might

14   edit something on the fly.

15      Q     Okay.  Have you ever received talking points

16   from the people who you are introducing on what to

17   say?

18      A     Oh, of course.

19      Q     Okay.  All right.  And earlier when we were

20   talking about talking points, does that pertain to

21   just the introductory remarks or more broadly,

22   whenever you're inviting someone in to showcase them,

23   would they also provide you talking points for the

24   organization as well?

25      A     It would depend on how much -- how well I

Page 135

1   knew the person or the organization.  It would also

2   depend on, you know, what it was I wanted to

3   highlight.  So if it was years of service, I'd want to

4   make sure I had the years of service accurate.  If it

5   were experiences or achievements or milestones that a

6   person or an organization was being recognized for or

7   had experienced, I'd want to make sure that I had that

8   information correct.  And so we'd reach out -- we may

9   also say, if I'm going to introduce you or your

10  organization before this body, are there particular

11  things that you want me to highlight.  Because

12  sometimes something may seem less important to me but

13  actually be an important point to know for the person

14  or the organization I was introducing before the body.

15       Q    Okay.  And turning your attention back to

16  that September -- not literally, we're going to watch

17  it, but turning your recollection back to that

18  September 26, 2018, meeting we watched, give or take,

19  the first five minutes of it which entailed the

20  introduction, the prayer, the Pledge of Allegiance and

21  then kind of what began what seems to me to be the

22  remainder of it, was that the kind of thing that you

23  would have written yourself or your staff would have

24  written for you or was that something that that

25  particular group wrote for you?

Page 136

1      A     I'm sure it was a collaboration.

2      Q     It was in collaboration?

3      A     Yeah.  We would not have known -- I would

4   not have known, my staff would not have known, for

5   example, that one volunteer's 20 years of service.  We

6   would have had to have done some math to get to -- you

7   saw in my remarks I noted the 100 years of service

8   between the group that was there that day, we would

9   not have been able to do that math without information

10  from the organization.

11     Q     And to be clear, I'm not referring to the

12  introductory remarks, I'm talking about the substance

13  of the meeting after the introduction, after the

14  prayer, after the Pledge of Allegiance, the substance

15  of the meeting occurred.  You understand this; yes?

16     A     The council meeting or my remarks in front

17  of the council?

18     Q     Well, it was my understanding that for the

19  next hour or so, it was pretty much talking about this

20  particular group, is that --

21     A     No.  Not at all.  There was probably --

22  there was probably two more minutes, maybe --

23     Q     Oh.

24     A     -- minutes and then we went back to regular

25  business.

1      Q    Okay.  I misunderstood.  I thought that was
2  pretty much the whole meeting.
3      A    No.  That was -- I would argue that many of
4  my colleagues probably hadn't even -- or several of my
5  colleagues probably weren't in the room yet.
6      Q    Okay.  Several of your --
7      A    That -- that is -- that is, I don't mean to
8  chuckle, that was probably one -- after where we
9  paused it, there might have been two, and I'll be
10  generous and say, four, more minutes about that
11  organization.
12      Q    Okay.  But I want to latch onto your point
13  that your colleagues may not have been there at the
14  time of these remarks?
15      A    Yes.  That was the very start of the meeting
16  and depending on people's schedules, you know, there's
17  13 members of the body.  I have, myself, as a city
18  councilor, arrived late to a council meeting and,
19  unfortunately, might have missed some of that opening
20  portion.
21      Q    Do you recall the September 26, 2018,
22  meeting?
23      A    No.  No.
24      Q    So you're talking generically across all of
25  the meetings.  Is that correct?

Page 138

1      A     Yep.

2      Q     If you were to guess, about how many of the

3  people do you think were there at that time?

4      A     I -- I couldn't guess.

5      Q     Okay.  But you did earlier.  You said that

6  you suspect that there --

7      A     I would say -- I would say out of all the

8  council meetings that would happen in any given year,

9  and there's a difference between a meeting and a

10  hearing, out of all the council meetings, that's our

11  weekly -- usually weekly Wednesday meeting, which the

12  full body is present and which we do these

13  presentations, I would say 85 percent of them do not

14  start with full attendance.

15      Q     They do not start with full attendance; what

16  proportion of attendance are we looking at?

17      A     I would say at least one person is late

18  every meeting -- almost every meeting.

19      Q     Okay.  So, like, one person might not have

20  seen it but, you know --

21      A     It could have been three.

22      Q     What defines a quorum for the city council?

23      A     I believe it is seven.

24      Q     So at least seven were there.  Is that --

25      A     Yes, at least seven were there.

1      Q    Okay.  And as I recall earlier, you

2  mentioned that the substantive remarks of which they

3  were on the order of up to four minutes more, that was

4  written in collaboration with that particular group.

5  Is that correct?

6      A    Likely.

7      Q    Earlier you testified that that was the

8  case.  Now, you're talking likely.

9      A    I am sure that we -- we did not write the

10  remarks in collaboration; we asked for factual

11  information to include in my remarks.

12      Q    Do you deny that you were given talking

13  points for that particular meeting?

14      A    I -- I'm certain that I did receive talking

15  points.

16      Q    You are certain that you did or didn't?

17      A    I -- I -- I'm sure that I did.  I don't

18  recall specifically but most of the time, if not all

19  of the time, that I recognized an individual or a

20  group before the city council, I will request from

21  them talking points, points of interest, factual

22  information around years of service to include in my

23  remarks.

24      Q    Let's take a look -- what document is up on

25  the screen if you can just generally describe it for

Page 140

1    me?

2         A    It's still that same e-mail.

3              MR. KEZHAYA:  Mobi, if you could hit --

4    at the top right, you might see arrows, back one, it

5    should say clergy, bios, and talking points dot PDF --

6              THE WITNESS:  It's not here.

7              MR. KEZHAYA:  Okay.  Well then, I'll

8    just send it to him.

9              Is it up?

10             MR. MOBIUS:  Yes.

11             THE WITNESS:  It's pulled up.

12   BY MR. KEZHAYA:

13        Q    You should see, if it's on the first page,

14   Susan E. Goodman's books and then Rabbi Claudia

15   Kreiman's.  You see those two?

16        A    Yep.

17        Q    Okay.

18             MR. KEZHAYA:  Go to the next page; it

19   should be page 2 of 2.

20             MR. MOBIUS:  Okay.

21   BY MR. KEZHAYA:

22        Q    This is the document that I was referencing.

23   It begins with talking points and then it's pretty

24   much a bullet point of, it seems to me, what they want

25   you to say.  Would you agree with me that that's the

Page 141

1    case?

2        A    Yes.

3        Q    Is this standard practice for you in the

4    course of inviting people to give a religious

5    invocation at the beginning of a government meeting of

6    some sort and then showcase that same religious group

7    with prepared talking points by that religious group?

8        A    Yes.

9        Q    It is normal?  Okay.

10       A    Yes.  I would absolutely ask for as much

11   information as possible that they want me to share as

12   part of my remarks.  And -- looking at this very

13   quickly and briefly, I would say some of those points

14   I hit and I added additional points that aren't on

15   this list.

16       Q    Okay.  So this is the collaborative matter

17   that you were addressing earlier.  Is that correct?

18       A    Say again.

19       Q    That's the collaboration that you were

20   referring to earlier.  Is that correct?

21       A    Yeah.  Or how I knew them because I'm

22   looking here quickly and they recognized the work that

23   they're doing at the Curley School, which is another

24   Boston public school.  But in my opening remarks, I

25   referenced the Ohrenberger and the Winship.  The

Page 142

1    Winship, in particular, is one that I had done a

2    number of readings at and I'm curious in my own mind

3    now if that's where I originally found out about this

4    -- about their work because it's not mentioned here in

5    the talking points that they shared.

6         Q    How would you go about chasing down that

7    ambiguity?

8         A    Which ambiguity?

9         Q    You said that it's the content of your --

10   you said that the recollection, I believe, that you

11   had testified to earlier is not in the talking points.

12   Or did I misunderstand?

13        A    I -- no.  When I watched the video that you

14   played for me, my remarks -- volunteers were at two

15   other Boston public schools, not the one that is

16   listed here on the talking points.  I would say -- I

17   -- that that indicates the collaboration that you

18   referenced but also the -- that I knew that they

19   existed previous; that I had some interaction with

20   them.  But we take talking points so that we're

21   hitting some of the high notes but also incorporating

22   the other parts that I know of their particular work.

23        Q    And as I recall, you don't distinctly

24   remember the events that lead up to you inviting them

25   to this particular government meeting.  Is that

Page 143

1    correct?

2        A    I don't distinctly remember them now.

3        Q    Well, we received about three or four

4    thousand pages of discovery from the City, we didn't

5    foil your e-mails, we received them from the City

6    through court processes.  We did not find any e-mails

7    pertaining to this particular meeting earlier than

8    August, which suggests to me that whatever happened,

9    started off with a phone call.  How would I determine

10   at this time who called who?

11       A    I would suggest that it probably started in

12   one of our school buildings, not with a phone call.

13   You're assuming that this would have started with a

14   phone call.  I'm actually going to make -- and again,

15   it's an assumption --

16       Q    Sure.

17       A    -- but because I have spent a lot of time

18   visiting the Boston public schools in my capacity as a

19   city councilor, that it is also likely that it

20   happened in a school setting.

21       Q    Okay.  But you don't distinctly recall?

22       A    I don't.  But I don't think it's fair for

23   you to make an assumption about where that happened

24   and to say that aloud.

25       Q    Oh, my purpose here is not to introduce

Page 144

1   facts; my purpose is only to examine your mind.  I'm
2   --
3        A     Right.  -- what's happening in my mind that
4   it happened in a phone call, when it could have
5   happened in lots of other settings.
6        Q     Other than a meeting at a school, what other
7   settings could it have happened in?
8        A     Could have happened at a -- a community
9   breakfast.  It could have happened in a library visit.
10  It could have happened in a conversation with a member
11  of my staff that said, oh, you have to, you know, hear
12  about this good work that's happening in this
13  particular place.  It could have happened in lots of
14  different ways.
15       Q     It could have; I agree.  How would I go
16  about finding out which is the truth?
17       A     I don't know.
18       Q     Let's see here.  Okay.  Very good.
19                   MR. KEZHAYA:  If we could now move on
20  to folder 3.  Now, we're just moving to folder 3 so
21  that we have the PDFs available.
22  BY MR. KEZHAYA:
23       Q     You were, as we've mentioned, a councilor
24  all throughout the period in which TST was demanding
25  invites to the legislative prayer ceremony.  Is that

Page 145

1    correct?

2         A    If you say so.  I don't -- I don't know what

3    the period of time you've demanded to be before the

4    council.

5         Q    Without going through the Complaint, I'll

6    just tell you it started in 2016, there was another

7    one in 2017, and another one in 2018, which eventually

8    culminated in this litigation.  And as I recall, it

9    was, if I remember correctly, it was about August-ish

10   of 2016 that the first demand for invite took place.

11   That would be during your tenure in the January 2016

12   to December 2021 period.

13        A    That's correct.

14        Q    So all of those are during your tenure.

15   Now, during this timeframe, was it ever spoken about

16   that my clients were seeking an invitation to this

17   government meeting to give their opening remarks?

18        A    Could I just ask why you use the word

19   demanded?  Were they demanding or seeking?

20        Q    Well, demand is a legal term of our.  To

21   demand something is to say I have a right to

22   something, I am collecting my right, I demand X.  So

23   it's different in colloquial parlance which demand

24   usually some kind of negative connotation --

25        A    Right.

Page 146

1          Q    -- like a demand letter to a lawyer doesn't
2    mean the same thing as, you know, so and so demanded
3    such and such in colloquial.  So when TST demands an
4    invite, to lawyers, it doesn't mean the same thing as
5    it might mean to a lay person.
6          A    Okay.  Thank you for the clarification.
7    'Cause you used both terms; I didn't know the
8    difference.
9          Q    Yes.  Demand and seek is really the same
10   thing, in my mind, in legal parliament.  So going back
11   to the question, was it spoken about within Boston
12   City Government during your tenure that TST was
13   seeking an invite?
14         A    I don't recall specific conversations about
15   it but I'm sure it was discussed or, you know,
16   offhanded comments about TST wanting to give an
17   invocation.
18         Q    When you say you're sure it was discussed,
19   help me understand -- drill down further for me.
20         A    Yeah.  I mean, I -- I can't tell you
21   specifically when I would have had any of those
22   conversations or participated in those conversations,
23   I just have a sense of it being something that was --
24   that was on, you know, around.  But beyond that, I
25   couldn't be any more specific.

Page 147

1      Q    Did you ever talk with your chief of staff
2  about TST and their demand for an invite?
3      A    I know it came up, again, a number of times
4  over the course of my time on the city council that
5  TST wanted to give the opening invocation but we,
6  beyond saying we weren't extending the invitation as
7  an office, that -- that was the extent of it.  I do
8  know that there was an e-mail that was sent between
9  myself and my chief of staff communicating what our
10  response would be and beyond that, that was it.
11              MR. KEZHAYA:  Okay.  Well, let's pull
12  up that e-mail.  In that folder 3, it's the bottom
13  most PDF, Moby.
14              MR. MOBIUS:  2890?
15              MR. KEZHAYA:  Correct.  Is it up?
16              THE WITNESS:  Yep.  Yes.
17  BY MR. KEZHAYA:
18      Q    If you could, please explain to me -- so is
19  it Alana Olsen?
20      A    Alana.
21      Q    Alana; that's your chief of staff.  Correct?
22      A    That was my chief of staff at that time.
23      Q    Yes.  At that time.  And that's sent to you.
24  Is that also correct?
25      A    That is correct.

Page 148

1        Q    And it's subject, statement on Satanic

2   Temple.  Also correct?

3        A    That's what I'm reading.

4        Q    And the date and time of this e-mail is

5   October 19, 2017, at 3:17 p.m.  Is that also correct?

6        A    That's what it says.

7        Q    Okay.  Please read the body of this e-mail

8   in full.

9        A    It --

10               THE WITNESS:  Mobius, could you make it

11  just a hair bigger for me?  Can you just zoom in just

12  a little bit?  I'll do my best.  That's great.  Thank

13  you.

14               It is absurd that this group feels

15  entitled to being invited to give remarks at the

16  beginning of the council meeting.  And frankly, it's

17  insulting to all of the amazing religious and secular

18  leaders who are invited.  They are invited because of

19  all the incredible work that they do across the city;

20  work to end youth violence, work to provide shelter

21  and stability to the homeless, or compassion and

22  support for those in recovery.  I will not give up the

23  opportunity to highlight one of those amazing leaders

24  who I am privileged to work with for The Satanic

25  Temple.  The city council does important, serious work

Page 149

1   for the people of Boston and when we invite someone to

2   participate in our meeting, it -- it is out of

3   profound -- a profound respect, not a sense of

4   obligation.

5   BY MR. KEZHAYA:

6       Q    Did you confer with any attorneys about the

7   state of constitutional while at the time you sent

8   this e-mail as pertains --

9       A    I --

10      Q    -- rights?

11      A    I -- I don't think so.

12      Q    Have you since conferred with any attorneys

13  about the state of constitutional law with respect to

14  TST's equal right to participate in this legislative

15  prayer ceremony?

16      A    I have not.

17              MS. O'CONNOR:   Objection.

18  BY MR. KEZHAYA:

19      Q    Let's drill down a little bit further.  As

20  of 2017, did you perform any form of investigation to

21  determine what, if any, involvement TST has with the

22  community of Boston at all?

23      A    I have not -- I have not.

24      Q    So you indicate, for example, that the

25  people who you do invite do incredible work, for

Page 150

1    example, to end youth violence, provide shelter and

2    stability to the homeless, or compassion and support

3    for people in recovery.  These are qualities of people

4    who you do invite.  Correct?

5         A    Those are qualities of people and

6    organizations; yes.

7         Q    Well, TST is an organization also.  Correct?

8         A    Yes.

9         Q    TST as an organization is comprised of

10   people.  Correct?

11        A    Yes.  I think so.

12        Q    Yes.  I'll tell you the answer's yes.

13             You, at the time of writing this e-mail, had

14   no basis to believe that TST as an organization does

15   not provide what I would describe as charitable

16   contributions to the Boston community.  Is that also

17   correct?

18        A    I had no reason to believe that you did or

19   did not.  I didn't look it up and the most information

20   I've ever read about TST is in the pamphlet that's

21   before me today.

22        Q    So before this reading of this pamphlet

23   today, you had essentially no idea who the membership

24   of TST or -- comprised of, what they do in the Boston

25   community.  All you knew is that you had never heard

Page 151

1    of them.  Is that correct?

2         A    That is correct.

3         Q    Is that why you felt it was absurd that this

4    group felt entitled to an equal --

5         A    I think any -- anyone that feels entitled to

6    offer an opening remark without having a relationship

7    or playing an important role in my -- my work, yes, I

8    think that that -- I didn't appreciate that sense of

9    entitlement.  Now, I can't speak for other councilors.

10   But for me, when I selected an individual or

11   organization or set of work to highlight before the

12   city council, I did it based on my experiences and the

13   work that I was doing in the City of Boston.

14        Q    Earlier you testified that your

15   understanding of an event being religious or community

16   oriented turned on there being a religious ceremony.

17   Do you recall that?

18        A    When we were in the questions around when an

19   event or community meeting took place in a building

20   that had a religious affiliation.

21        Q    So if there's a religious ceremony in a

22   building that does not happen to have religious

23   affiliation, that religious ceremony is not religious

24   to you?

25        A    It is -- it -- because I participated in,

Page 152

1    for example, a blessing offered by a rabbi, it does

2    not make me Jewish.

3        Q    When you, as the city government, direct

4    that the public stand for that particular prayer and

5    you bow your head and everyone is directed to bow

6    their head, that does not involve participation in the

7    ceremony that you have invited the officiant to

8    officiate?

9        A    I have -- I have never felt mandated to

10   stand and -- and bow my head.  I do that out of

11   respect for my guest and for the prayer and blessing

12   that they're offering for the council.  I would also

13   bow my head in a moment of reflection when we have

14   had, and I have had, offered a simple poem read before

15   the council.

16       Q    Who read this poem that you're referencing?

17       A    Oh, we've had poems and reflections read by

18   many people including our city -- our former city

19   clerk who would often do that if -- I once had, I

20   don't recall who it was, but a guest assigned to come

21   in and offer this blessing and that -- something

22   happened with the schedule, I don't recall exactly

23   what, but we would have our clerk step in and she had

24   a handy book of reflections that she would read from.

25       Q    Was that clerk -- is it Maureen Feeney?

Page 153

1          A     Yes.

2          Q     I saw a number of her invocations, for lack

3    of a better word.  Was that pretty much typical

4    whenever she's giving that blessings, something fell

5    through?

6          A     No, sometimes she was actually invited to

7    offer them by the individual; by the councilor.

8          Q     Okay.  So as I understand it, your grounds

9    for not inviting TST -- well, actually, let me just

10   back up.  Please recite your grounds for not inviting

11   TST during your tenure.

12         A     I had no relationship with TST.  Had no

13   interaction with TST.  And as the city councilor, I

14   have very few opportunities to invite someone to offer

15   either opening remarks or a blessing or a prayer prior

16   -- before the start of a council meeting and utilized

17   those opportunities for, you know, very specific folks

18   and organizations that I wanted to do that with.

19         Q     Did any of them ever drop out on you?

20         A     I -- like I just mentioned, I had one that

21   something happened last minute, so we had Maureen, the

22   Clerk Feeney, step in and offer a reflection.

23         Q     And yet you knew that TST wanted to get in,

24   why did you not invite this group that announced a

25   desire to come in?

Page 154

1        A     I didn't have a desire to invite you.

2        Q     Why not?

3        A     I can't tell you why I did or why I didn't;

4    I just didn't.

5        Q     I know that you didn't --

6        A     That, we have had -- huh?

7        Q     The purpose of the deposition is to

8    understand why not.

9        A     There -- there is no reason why not.  I

10   don't have a relationship with TST.  I did not have a

11   relationship with TST.  I, therefore, had no desire to

12   invite you as an organization for the city council.

13       Q     The people who you did invite up until about

14   2016 or so were paid.  Is that correct?

15       A     I did not take office until 2016.  I do

16   believe I recall a small stipend at some point being

17   discussed.  But I don't know when that ended over, you

18   know, what -- I don't know what year that was.

19       Q     As I recall prior testimony, it was during

20   your tenure.  If I remember correctly, it was 2017 or

21   2018.

22       A     Perhaps.  I don't know.

23       Q     You were not involved in that determination

24   to end the stipend?

25       A     Not that I recall.

Page 155

1          Q     Do you know who was involved in it?

2          A     Nope.  I do not.

3          Q     Do you know who participated in the

4     determination?

5          A     I do not.

6          Q     Earlier testimony informs us that an

7     investigation was performed as to the City's

8     legislative prayer practice.  Do you know anything

9     about this investigation?

10         A     What -- no.  What investigation?  Say it

11    again.

12         Q     An investigation into the City's legislative

13    prayer practice.

14         A     I don't know.  I don't -- I'm not familiar

15    with it.

16         Q     Are you familiar with the terminology

17    legislative prayer?

18         A     I am not.

19         Q     What we observed earlier, the rabbi giving

20    the prayer at a government meeting, that's called a

21    legislative prayer --

22         A     Okay.

23         Q     -- the city council legislative body; so

24    it's a prayer over the body.

25         A     I've never heard that reference made for

Page 156

1    that.

2         Q    I understand, but the question posed is as

3    to the investigation about this custom.

4         A    I'm sorry; is there a question there?

5         Q    The question posed is whether you know

6    anything about the investigation into this matter?

7         A    I -- isn't that why I'm here?

8         Q    Not exactly.  No, you're here because I need

9    to understand why TST was not afforded an invite; at

10   least from you.  Because each councilor had different

11   ways of going about things.  Correct?

12        A    That's my understanding.

13        Q    So you can only really speak to you and your

14   office as to why you did or did not invite certain

15   people.  Correct?

16        A    That is true.  Yes.

17        Q    Now, Mayor Wu had her own means of inviting

18   or not inviting people.  Correct?

19        A    I would say that's correct.

20        Q    Did you and then councilor, now Mayor Wu,

21   have any discussions as to her practices of inviting

22   or not inviting people?

23        A    No.

24        Q    So I really need to talk to Wu to determine

25   why she did or did not invite any particular groups.

Page 157

1    Is that correct?

2         A     Yes.

3                   MR. KEZHAYA:  Let's take a brief break.

4                   THE VIDEOGRAPHER:  The time is 3:01.

5    We're off the record.

6                   (Off the record.)

7                   THE VIDEOGRAPHER:  And we're back on

8    the record.  The time is 3:08.

9                   MR. KEZHAYA:  Okay.  Mobius, if you

10   could please take us to this -- and still in folder

11   number 3, the Boston Herald article dated February 14,

12   2019.

13                  MR. MOBIUS:  Okay.

14                  THE WITNESS:  2019?

15                  MR. KEZHAYA:  Well, that's the date of

16   -- or that's the -- yes.  That's correct; yes.  2019.

17                  THE WITNESS:  Oh.  No, I'm looking at

18   the print.  It says 2022, but --

19                  MR. KEZHAYA:  Oh, yes.  That's just

20   when we printed it off.  If you take a look, you'll

21   see a Lucien Greaves photo and then underneath, it

22   should say, published February 14, 2019, at 8:04 p.m.,

23   updated the next day.

24                  THE WITNESS:  I see it.

25                  MR. KEZHAYA:  Mobius, directing our

Page 158

1    attention to page 2, there should be some highlighted

2    text.

3    BY MR. KEZHAYA:

4         Q    Well, first of all, before we go down to

5    page 2, Ms. Essaibi-George, do you recall this

6    article?

7         A    No.

8         Q    Okay.  Well then, in that case, let's have

9    Ms. Essaibi-George read the article in full; it's all

10   of two pages so it'll take no time.

11              MS. O'CONNOR:  Do you want her to read

12   it aloud or to herself?

13              MR. KEZHAYA:  I don't care.

14              THE WITNESS:  Well, I'm going to have

15   to move up to it in order to --

16              MR. KEZHAYA:  Okay.  How about I just

17   read it.  It's super short.  It's no problem.

18              It states, A Salem based Satanist group

19   has claimed that it was denied a chance to say the

20   invocation at a city council meeting has filed a

21   Complaint with the Massachusetts Commission Against

22   Discrimination.  The city council traditionally opens

23   the meetings with an invocation, typically a prayer by

24   a clergy member.  But when The Satanic Temple asked to

25   deliver the invocation at any available date, it

Page 159

1    alleges the council denied the request saying that

2    invocation speakers are scheduled by invitation and

3    council members can choose whomever they see fit.

4                    Next page.  The idea of an invitation-

5    only policy being nondiscriminatory is nonsensical

6    said Lucien Greaves, a Temple spokesman; it's the very

7    definition of discrimination.

8                    Let's pause there.

9    BY MR. KEZHAYA:

10        Q    Ms. Essaibi-George, would you agree with me

11   that it is definitionally discrimination to invite

12   some groups but not others of, you know, a religious

13   category?

14        A    No.

15        Q    How would you define discrimination?

16        A    I don't think it's -- this is a definition

17   of discrimination.

18        Q    I understand.  How would you define

19   discrimination?

20        A    Well, that would be discrimination based on

21   race.

22        Q    You think that only race discrimination is

23   discrimination?

24        A    When I generally talk about discrimination,

25   it's around race.

Page 160

```
 1        Q    I understand that, but in context of what
 2   we're describing, it's actually religious
 3   discrimination.  So would you agree with me that it is
 4   religious discrimination to not invite a particular
 5   religion?
 6                  MS. O'CONNOR:  Objection.
 7   BY MR. KEZHAYA:
 8        Q    Yes?
 9        A    No.  I don't think so.
10        Q    Okay.  Why not?
11        A    I don't think that the process I follow is
12   discriminatory.
13        Q    Okay.  Because --
14        A    I have included -- I have included
15   individuals who represent lots of different groups in
16   the city of Boston to participate in our opening
17   remarks and I -- we've covered, I think, most, if not
18   all, people that represent the city.
19        Q    And when you say "represent the city," who
20   represents the city?
21        A    Well, I technically represented the city as
22   an elected official.
23        Q    So --
24        A    -- it was based on relationships and work
25   that I -- I was doing in the city and that's how we
```

Page 161

1    determined invitation to offer opening remarks and

2    prayers.  Not everything was done.  Not every

3    invitation was religious, specifically, in nature.

4         Q    So you invited even non-religious speakers

5    to give these invocations?

6         A    Yes.

7         Q    And when I say non-religious, please explain

8    to me what you mean by non-religious.

9         A    Well, I actually think the clerk is the --

10   is a -- a very good example of non-religious.

11        Q    And how are you defining non-religious?

12        A    She doesn't represent a church or a

13   particular faith when she is -- when she speaks from

14   the -- the podium.

15        Q    Okay.  But going back to the question, the

16   question posed is -- sorry, give me a second here --

17   my internet appears to be glitched up -- earlier you

18   had mentioned that people who are representative of

19   the city were invited.  Correct?

20        A    Yeah, through the work that I've done as a

21   city councilor.

22        Q    Well, irrespective of the work, your prior

23   testimony was that --

24        A    I -- I mean, if I didn't have -- I didn't

25   have a --

1       Q     Allow me to finish my question before you

2    start answering --

3       A     Go ahead.  Yeah.  Go ahead.  Sorry.

4       Q     -- for the record.  The question posed is,

5    earlier you testified that in order to qualify for an

6    invitation, they were a representative of the city.

7    Correct?

8       A     Representative of the work that was

9    happening in the city as it related to my work in my

10   capacity as a city council.

11      Q     Do you acknowledge that it's possible that

12   TST does do work in the city and you just didn't

13   happen to run across it in your duties?

14      A     Oh, yes, it's possible.

15      Q     Particularly, since you performed no

16   investigation into the good works, if any, of TST.

17   Correct?

18      A     Yes, it's possible.

19      Q     So, hypothetically, if TST did do good works

20   and you just didn't happen to run across it, would you

21   agree with me that that is discriminatory?

22                  MS. O'CONNOR:  Objection.

23                  You can answer.

24                  THE WITNESS:  Again, every councilor

25   has their own process to follow.  And I don't think

Page 163

1   it's discriminatory -- 'cause you can't -- not every

2   organization gets invited.  So I don't -- I don't know

3   how else other to answer your question.

4   BY MR. KEZHAYA:

5       Q    Well, you've not yet actually defined

6   discriminatory so let's go back to that.  How do you

7   define discriminatory?

8       A    I would -- I base discrimination to --

9   around race, really, is what I base discrimination on.

10      Q    Okay.  So if you only invited Catholics and

11  you never invited Protestants, you had an explicit

12  policy, I refuse to invite Protestants.  You deny that

13  that's discriminatory?

14      A    That -- no, I'd say to officially deny a

15  group would be discriminatory; yes.

16      Q    Did you not --

17      A    -- the question that way is, yes.

18      Q    Did you not explicitly deny TST in your

19  prepared statement?

20      A    I have not explicitly denied you.  I have

21  had no relationship with TST and didn't desire to

22  invite you.

23      Q    You had no desire to invite TST.  Correct?

24      A    [Unintelligible response.]

25      Q    I didn't hear; was that a "no"?

Page 164

1      A     No.  The answer was no.  I have no desire --
2  I had no desire.
3      Q     And if you were a councilor as you sit here
4  today, you still would not invite TST.  Is that also
5  correct?
6      A     That is correct.
7      Q     Why not?
8      A     I have zero relationship other than what
9  we've experienced today or knowledge of the work that
10  you may be doing in the City of Boston.
11      Q     Is it your position that TST must lobby you
12  for an invitation in order to receive an invitation?
13      A     It is not my position.
14      Q     Okay.  How would TST go about creating this
15  relationship but for seeking the relationship?
16                 MS. O'CONNOR:  Objection.
17                 You can answer.
18                 THE WITNESS:  Okay.  Thank you.  I
19  don't -- sorry.  I don't know what to do.
20                 I would have knowledge of your work and
21  I would have run across it in my work as an at-large
22  city councilor.
23  BY MR. KEZHAYA:
24      Q     So is it fair to say then that if TST had
25  more members, then TST would have gotten an

Page 165

1    invitation?

2         A    No.   That's incorrect.

3         Q    If TST had more members who were engaged in

4    the community in the way that you are familiar with,

5    then TST would have gotten an invitation?

6         A    Possibly, but not likely.

7         Q    Why not?

8         A    As a city councilor, I only have -- I have

9    very few opportunities to invite prior to the start of

10   a council meeting for just a few minutes, as you saw.

11   And again, with that limit and without, you know, now,

12   today, as much as I know and really don't know about

13   TST, I don't see how I would have you invited for the

14   council, as my guest.

15        Q    What I struggle with is how that is not

16   definitionally discrimination.  Perhaps we should have

17   the definition of discrimination.  Let's pull it up.

18             MR. KEZHAYA:  Mobi, if you could just

19   Google, define discrimination.

20   BY MR. KEZHAYA:

21        Q    Ms. Essaibi-George, once it's up, if you

22   could please just read the definition into the record.

23             MR. MOBIUS:  It's from -- Webster

24             THE WITNESS:  Make it -- would you mind

25   making it bigger?

Page 166

1                  Ready?

2    BY MR. KEZHAYA:

3        Q     Yes.

4        A     Definition of discrimination:  Prejudiced or

5    prejudicial -- sorry -- outlook, action, or treatment;

6    racial discrimination.  B:  the act, practice, or

7    instance of discriminating categorically rather than

8    individually.

9              I can also continue; 2:  the quality or

10   power of finely distinguishing.  3a:  the act of

11   making or perceiving a difference:  the act of

12   discriminating.  A bloodhound's scent is

13   discrimination.  3b:  psychology:  the process by

14   which two stimuli differing in some aspects are

15   responding -- responded to differently.

16       Q     And what source are you reading from?

17       A     It is Merriam-Webster.

18       Q     Let me see if I can read this because I hear

19   your words but I can't see them.

20             Would you agree with me that those are the

21   defining terms of discrimination?

22       A     Yes.

23       Q     Okay.  Let's see here.  I want to take note

24   that there's a link on 3a:  the act of making or

25   perceiving a difference.  There appears to be a colon,

Page 167

1    the act of discriminating.  Do you see that?

2         A    As in a bloodhound's scent.

3         Q    Well, a bloodhound's scent discriminates but

4    that's perceiving a difference.  You perceive a

5    difference between TST and other religions; yes?

6         A    I don't perceive a difference.  I don't know

7    about TST.

8         Q    You just read the pamphlet.  You do know

9    about TST.

10        A    -- now I know about you but I didn't know

11   about you before and I really don't know more than

12   what's on this pamphlet before me.

13        Q    Okay.  So --

14        A    I don't have a --

15        Q    -- having read the pamphlet, you still

16   decline to invite TST.  You understand that TST is a

17   religion.  Yes?

18        A    So two things:  One, I have no opportunity

19   to invite, and B, I have no working relationship with

20   TST.

21        Q    So it really boils down to whether TST has a

22   working relationship with you as to whether TST will

23   get an invite.  Correct?

24        A    I have no invitation to offer.  I am no

25   longer a Boston city councilor.  And I have no working

Page 168

1  relationship with you.  I didn't have one as a -- in

2  my capacity as a city councilor.  I don't have one

3  today in my capacity as a private citizen.

4      Q    I understand that.  Earlier you said that if

5  you were a counselor, you still would not invite TST.

6      A    I -- I would still today not have a working

7  relationship with TST.

8      Q    So it doesn't really much matter whether you

9  have an invitation; what really matters is that you

10  don't have a relationship with TST.  Correct?

11      A    I'd say both of those things are true.

12      Q    Okay.  Well, let's rewind back to 2017.  You

13  were aware of TST.  Yes?

14      A    I was made aware -- yes, through your

15  request and demand to offer invocation at the city

16  council.

17      Q    Okay.  So having been made aware of them and

18  having had the power, you still did not invite TST

19  despite knowing TST wanted in.  Correct?

20      A    That is correct.  I also did not and still

21  do not have a working relationship or any overlapping

22  my work as a member of the city council with TST.

23      Q    And that is the only reason why you did not

24  invite TST.  Correct?

25      A    I'd say so.  I would say there was never a

Page 169

1   decision made to invite or not invite.  You were not

2   on my radar.  We did not have any work or overlapping

3   work and my -- quite frankly, my dance card was very

4   much full every year thinking about who I would invite

5   to the few opportunities I had to invite someone to --

6   to kick off and start our council meetings.

7        Q    Then, why did you invite the clerk?

8        A    Because I had a last-minute cancellation.

9        Q    You had a last-minute cancellation, you knew

10  that TST wanted in --

11       A    No.  I -- I will tell you that I wasn't

12  thinking about TST.  TST has not ever been front of

13  mind for me.

14       Q    I see.  Have you ever invited any atheistic

15  religious speakers?

16       A    To open and give the opening blessing or

17  reflection, I don't believe so.

18       Q    To the best of your --

19       A    -- I'd have to look at -- I'd have to look

20  at my -- I don't believe so.  To the best of my

21  recollection, I do not believe so.  I have used my

22  opportunity as a city councilor to invite lots of

23  individuals and lots of organizations that have zero

24  connection to religious organizations to the council

25  to be recognized for the work that they're doing in

Page 170

1    our communities over -- over my six years serving as a

2    city councilor and I don't know any one of those

3    individuals that were on the podium with me, on the --

4    with me, they're religious beliefs, their preferences,

5    whether or not they had any.

6        Q    Did politics play any role in your decision

7    to invite people to give this ceremonial prayer?

8        A    I'm a politician.  Politics is very much a

9    part of every decision I made as a city councilor.

10       Q    Is that a "yes"?

11       A    Politics always plays a role in every

12   decision I make as a city councilor.

13       Q    Including in who to invite.  Correct?

14       A    Of course.  It's based on relationships and

15   the work that's happening in our city.

16                MR. KEZHAYA:  That concludes my

17   purposes.  I now pass the witness for cross.

18                MS. O'CONNOR:  No questions on our end.

19   Thank you.

20                MR. KEZHAYA:  All right.  Annissa,

21   thank you so much for your time.  This concludes the

22   deposition.  It ran a little bit longer than you may

23   have expected but this is about as long as depositions

24   take.  So thank you for your time today.

25                THE WITNESS:  Very good.  Thank you.

```
                                            Page 171
 1                 THE REPORTER:  Okay.  Counsel, before
 2     we jump off the record here, starting with Attorney
 3     Kezhaya, what can I do for you for a transcript order
 4     today?
 5                 MR. KEZHAYA:  We would like it by
 6     electronic means only, please.
 7                 THE REPORTER:  Okay.  Perfect.
 8                 And for defense, what can I do for you
 9     today?
10                 MS. O'CONNOR:  The City will take
11     electronic also.  That'd be great.
12                 THE REPORTER:  Okay.  Perfect.  Then
13     with that, Mr. Budd, if you'll take us off the record.
14                 THE VIDEOGRAPHER:  Time is 3:26.  We're
15     off the record.
16                 (Signature reserved.)
17                 (Whereupon, at 3:26 p.m., the
18                 proceeding was concluded.)
19
20
21
22
23
24
25
```

Page 172

1              CERTIFICATE OF DEPOSITION OFFICER

2              I, ROBERT LOMBARDI, the officer before whom

3       the foregoing proceedings were taken, do hereby

4       certify that any witness(es) in the foregoing

5       proceedings, prior to testifying, were duly sworn;

6       that the proceedings were recorded by me and

7       thereafter reduced to typewriting by a qualified

8       transcriptionist; that said digital audio recording of

9       said proceedings are a true and accurate record to the

10      best of my knowledge, skills, and ability; that I am

11      neither counsel for, related to, nor employed by any

12      of the parties to the action in which this was taken;

13      and, further, that I am not a relative or employee of

14      any counsel or attorney employed by the parties

15      hereto, nor financially or otherwise interested in the

16      outcome of this action.

17                                  ROBERT LOMBARDI

18                          Notary Public in and for the

19                          Commonwealth of Massachusetts

20

21      [X] Review of the transcript was requested.

22

23

24

25

Page 173

1                    CERTIFICATE OF TRANSCRIBER

2              I, SANDRA SCHWAB, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14                              *Sandra J Schwab*

15                              SANDRA SCHWAB

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 174
                         Veritext Legal Solutions
 1                          1100 Superior Ave
                               Suite 1820
 2                        Cleveland, Ohio 44114
                         Phone: 216-523-1313
 3
 4
     October 4, 2022
 5
     To: Ms. O'Connor
 6
     Case Name: The Satanic Temple, Inc. v. City Of Boston, MA
 7
     Veritext Reference Number: 5488484
 8
     Witness:  Annissa Essaibi-George      Deposition Date:  9/19/2022
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
                                                    Page 175
1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 5488484
3       CASE NAME: The Satanic Temple, Inc. v. City Of Boston, MA
        DATE OF DEPOSITION: 9/19/2022
4       WITNESS' NAME: Annissa Essaibi-George
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                    Annissa Essaibi-George
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                _____
18              Notary Public
19              _____
                Commission Expiration Date
20
21
22
23
24
25
```

```
 1                   DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2

         ASSIGNMENT REFERENCE NO: 5488484
 3       CASE NAME: The Satanic Temple, Inc. v. City Of Boston, MA
         DATE OF DEPOSITION: 9/19/2022
 4       WITNESS' NAME: Annissa Essaibi-George
 5           In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7           I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9           I request that these changes be entered
     as part of the record of my testimony.
10

             I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____      _____
     Date                  Annissa Essaibi-George
14

             Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22   this _____ day of_____, 20____.
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date
```

Page 177

1                          ERRATA SHEET
               VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 5488484
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                  Annissa Essaibi-George
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

                      _____
25                    Commission Expiration Date

| & |
| --- |
| **&**   49:7 |

| 0 |
| --- |
| **01970**   1:16 |
| **02201**   2:20 3:7 |

| 1 |
| --- |
| **1**   2:19 3:6 12:19 |
| 13:13,22 124:23 |
| 126:7 127:12 |
| **10**   13:22 |
| **100**   136:7 |
| **10102**   1:7 |
| **10:01**   1:13 5:5 |
| **1100**   174:1 |
| **11:01**   124:24 |
| **11:19**   68:8 |
| **11:51**   68:11 |
| **12**   29:10 |
| **12:26**   93:17 |
| **12:31**   93:21 |
| **12:42**   101:15 |
| **12:48**   106:12 |
| **12:49**   106:24 |
| **13**   29:9 137:17 |
| **14**   13:23 157:11 |
| 157:22 |
| **15**   13:21 |
| **16.1**   12:21 |
| **17**   30:19,20 31:4 |
| **18**   109:11 |
| **1820**   174:2 |
| **19**   1:12 5:5 |
| 148:5 |
| **1:21**   1:7 |
| **1:21cv**   13:12 |
| **1:41**   107:2 |

**1:59**   114:17

| 2 |
| --- |
| **2**   13:22 108:9 |
| 123:19 124:20 |
| 140:19,19 158:1 |
| 158:5 166:9 |
| **20**   106:19 136:5 |
| 175:16 176:22 |
| 177:22 |
| **2013**   21:9 |
| **2015**   20:8 21:10 |
| **2016**   20:9,14,15 |
| 28:24 31:19 |
| 58:2 145:6,10,11 |
| 154:14,15 |
| **2017**   45:18 145:7 |
| 148:5 149:20 |
| 154:20 168:12 |
| **2018**   109:8,21 |
| 110:23 119:6 |
| 120:24 124:23 |
| 135:18 137:21 |
| 145:7 154:21 |
| **2019**   45:17 |
| 157:12,14,16,22 |
| **2020**   34:14 35:2 |
| 37:16,19 39:3 |
| 109:11 |
| **2021**   14:5 20:9 |
| 20:14,15 23:5,17 |
| 27:12 28:24 |
| 31:19 34:14 |
| 35:2,8 39:3,5,9 |
| 39:10,13 45:16 |
| 49:11,18 58:2 |
| 71:12 145:12 |

| 2021/08/26 |
| --- |
| 12:20 |
| **2022**   1:12 5:5 |
| 157:18 174:4 |
| **216-523-1313** |
| 174:3 |
| **25**   73:6,24 75:10 |
| 75:23 101:25 |
| 102:11 |
| **26**   14:5 109:8,21 |
| 110:23 119:5 |
| 135:18 137:21 |
| **26493**   173:14 |
| **26th**   126:20 |
| 127:13 |
| **27024**   172:16 |
| **2890**   147:14 |
| **2:24**   133:23 |
| **2:30**   134:2 |

| 3 |
| --- |
| **3**   14:13 78:21 |
| 144:20,20 |
| 147:12 157:11 |
| **30**   13:22 |
| **300**   2:5,11 |
| **31**   11:8 |
| **31st**   11:12 |
| **333**   2:5,11 |
| **35**   123:21 |
| **365**   55:22 |
| **3:01**   157:4 |
| **3:08**   157:8 |
| **3:17**   148:5 |
| **3:26**   171:14,17 |
| **3a**   166:10,24 |
| **3b**   166:13 |

| 4 |
| --- |
| **4**   13:13 174:4 |
| **44114**   174:2 |

| 5 |
| --- |
| **50/50**   73:1 74:12 |
| 74:14 75:24 |
| 102:13 |
| **5488484**   1:18 |
| 174:7 175:2 |
| 176:2 177:2 |
| **55401**   2:6,12 |

| 6 |
| --- |
| **60/40**   102:14 |
| **615**   2:19 3:6 |
| **633**   124:3 |
| **635**   124:3 |
| **64**   1:15 |

| 7 |
| --- |
| **7**   129:20,20 |
| **75**   73:6,23 75:2 |
| 75:10 77:2 |
| **75/25**   73:13 |
| 74:12 88:11 |

| 8 |
| --- |
| **8**   4:3 83:9,16 |
| **8/26/21**   14:1 |
| **85**   138:13 |
| **8:04**   157:22 |

| 9 |
| --- |
| **9/19/2022**   174:8 |
| 175:3 176:3 |
| **90**   75:16 76:13 |
| **90/10**   73:21 |
| 75:16,20 |

**a**

**a.m.** 1:13 5:5
  124:24
**aaron** 124:21
  125:13 129:21
  132:3
**ability** 172:10
  173:7
**able** 60:22,23
  64:11 116:2
  136:9
**abnormal**
  114:19 115:2,11
  115:13
**abraham** 60:16
**abrahamic** 58:6
  60:11,13,16,17
  82:13 91:25
  92:4 103:13
**absent** 6:5
**absolutely** 55:1
  55:18 141:10
**absurd** 148:14
  151:3
**accept** 130:6
**access** 132:24
  133:10
**accord** 88:22
**accurate** 135:4
  172:9 173:5
**achievements**
  135:5
**acknowledge**
  62:1 78:11
  114:20 118:25
  162:11 175:11
  176:16

**acknowledged**
  62:15 113:15
  117:10
**acknowledgm...**
  6:2
**act** 166:6,10,11
  166:24 167:1
  175:14 176:20
**action** 1:6 166:5
  172:12,16 173:8
  173:12
**actions** 7:15
**active** 21:18 37:3
**actively** 36:11
  81:9 119:11
**activism** 21:6,11
  21:12 22:19,21
**actual** 36:22
  119:22
**ada** 3:13 5:14
  7:3,5,7
**added** 141:14
**addition** 131:4
**additional**
  141:14
**additionally** 6:5
**address** 22:12,14
  25:23 26:5,8
  72:18 174:15
**addressed** 8:11
  64:23
**addresses**
  127:18
**addressing**
  141:17
**adequately**
  103:14

**administer** 6:2
  110:16
**administration**
  15:16 17:22,23
  18:8,9
**adult** 21:20
**adverse** 20:3
**advisory** 22:25
  23:3
**affair** 106:13
**affiliated** 50:13
  74:16 76:22
**affiliation** 74:11
  76:18 94:20
  151:20,23
**affiliations**
  75:21
**affixed** 175:15
  176:21
**afforded** 156:9
**african** 104:3,5
**afternoon** 39:25
**age** 26:5,7 83:7
**agenda** 38:13
  72:25 73:4,6,13
  73:21,24 75:3,12
  77:4
**agnosticism** 7:17
**ago** 120:24
  126:19 128:14
  128:15
**agree** 6:3,7
  47:22 48:21
  62:21 64:21
  65:12,15,21 79:8
  97:14 105:17
  127:6 140:25
  144:15 159:10

  160:3 162:21
  166:20
**agreement** 16:9
  65:18
**agulnek** 124:21
**ah** 60:24 76:10
**ahead** 6:18
  88:15 162:3,3
**alana** 147:19,20
  147:21
**alaska** 67:12
**albeit** 5:13
**alleges** 159:1
**allegiance**
  112:15,16 116:9
  116:11,20
  135:20 136:14
**allow** 92:13
  109:13 162:1
**aloud** 143:24
  158:12
**amazing** 148:17
  148:23
**ambiguity** 142:7
  142:8
**america** 61:20
  67:10,11
**american** 59:5
  59:17,18 60:2,20
  63:11 67:2,2,7,8
  69:2 76:10 79:3
  79:6,10 94:7
  104:21 105:3,4
  116:10
**americans** 36:21
  61:19 67:8
  104:19,20

**amount** 25:24,25 26:11 106:16 123:9

**analogous** 95:21 95:22 96:25 97:3,4,6,7,22

**analogy** 97:4

**angela's** 38:11 76:10,20,22,23 80:11 97:15,16

**anglican** 87:8,9 89:9

**anglicans** 89:10

**animists** 60:4

**annissa** 1:11 2:16 3:3 5:18 6:22 8:4 134:4 170:20 174:8 175:4,9 176:4,13 177:20

**annissa's** 132:12

**announced** 23:16 153:24

**annual** 45:12

**annunciate** 89:1

**answer** 9:3,11 47:8,9 48:11 50:18 52:13,21 96:4,19 101:18 105:21 162:23 163:3 164:1,17

**answer's** 150:12

**answering** 162:2

**answers** 19:17 52:8

**anyone's** 121:20

**anyway** 13:10

**apologize** 80:24 111:15

**appear** 77:5 175:11 176:15

**appearing** 5:12 8:8

**appears** 92:8 108:21 125:17 129:8 161:17 166:25

**append** 98:12

**appended** 176:11,18

**applicable** 6:11

**applies** 88:12

**appreciate** 47:23 48:3 151:8

**apprised** 106:14

**approach** 28:16

**approaches** 28:13

**appropriate** 11:22 55:25 122:16

**appropriately** 8:15,21 36:15 92:4 98:9

**approximately** 30:10 45:11,12 73:13 83:16 100:18,20 106:6

**appurtenant** 80:21,24 81:1,3

**arbitrary** 7:15 7:19

**arcane** 7:10

**arcangeli** 3:4 5:16

**area** 66:21 120:3 120:7,11

**argue** 137:3

**arranged** 72:20 75:5

**arrangement** 38:12

**arrive** 42:2

**arrived** 33:23 38:15 137:18

**arrows** 140:4

**article** 157:11 158:6,9

**asked** 29:13 35:11 41:13 51:19,21,23 52:1 52:3 71:17 72:8 81:23 82:2 96:21,24 116:1 121:20 139:10 158:24

**asking** 25:16 59:17,18 69:3 89:25 92:13 93:3 94:23 96:19,20 120:13 126:9,11 129:5 132:1

**asks** 46:7

**aspects** 166:14

**assembled** 72:19

**assigned** 5:24 152:20

**assignment** 175:2 176:2 177:2

**assist** 10:12

**assisting** 132:21

**associated** 16:10

**association** 32:25 69:20 70:4 71:2,10,10 71:11,24 72:2,6 72:7 73:10,22 75:4 94:8

**assume** 56:13 90:3 97:24 98:25 102:1 133:5

**assumed** 115:6

**assuming** 80:13 108:16 143:13

**assumption** 96:2 96:13,14 98:1 99:4 127:23 131:7,10 143:15 143:23

**assumptions** 103:9

**asterisk** 98:13

**atheist** 95:10,13 95:14,23 96:10 96:22

**atheistic** 58:15 94:25 95:7,8 97:1 169:14

**atheists** 94:24

**athletic** 24:19

**attached** 176:7

**attacking** 131:9 131:11,11

**attempt** 76:5

**attempted** 76:4

**attend** 41:13 45:3 58:9 72:5

83:19,23 85:13
92:7 103:25
**attendance**
102:19 138:14
138:15,16
**attended**  42:23
43:2 51:1 56:7
59:6,21 65:3
66:17 84:23
86:6 87:25
88:17,18 91:7,9
91:24 101:20
103:24 108:4
**attendees**  101:21
**attending**  33:1,5
33:9 34:13
84:14
**attention**  13:16
14:13 62:20
118:14 119:4
135:15 158:1
**attorney**  14:24
171:2 172:14
173:10
**attorneys**  17:14
149:6,12
**attract**  102:6
**attracted**  72:23
**attraction**  65:19
**audience**  47:9
71:18 72:11
**audio**  111:18,20
111:24 112:5
172:8 173:3
**august**  14:5
109:11 124:23
126:7 127:12
129:20,20 143:8

145:9
**authority**  7:19
**authorize**  176:11
**authorized**  6:1
**available**  25:17
144:21 158:25
**ave**  174:1
**avenue**  2:5,11
**average**  48:6
**averse**  20:1 66:6
**aware**  66:22,25
67:5,14 91:11
126:7 168:13,14
168:17
**awareness**
118:11
**aztec**  105:2

**b**

**b**  4:5 13:16
166:6 167:19
**babies**  83:12
**back**  26:14 34:6
36:16 44:12
48:16 52:23
63:10 68:10
89:16 93:20
101:8,14 105:8
107:1 114:16
117:1,1 119:4
124:8 126:4,5,14
130:14 131:6
132:2 134:1
135:15,17
136:24 140:4
146:10 153:10
157:7 161:15
163:6 168:12

174:15
**background**
107:4,8 108:14
115:8
**backup**  30:23
31:15
**bad**  85:18 91:16
97:21
**banking**  26:16
**baptism**  82:20
82:24,25 83:1
**baptist**  35:14
43:10,14 44:2,12
49:6 50:13,15,16
50:16 56:2
67:16 76:9
89:11,14 90:4,8
90:14,20 91:5
**baptists**  50:14
89:13
**baptized**  82:22
83:5,7,8,11
**bar**  14:20,21
**base**  163:8,9
**based**  25:10
26:21,23 88:13
88:18 102:5
119:12,17
127:23 131:7
151:12 158:18
159:20 160:24
170:14
**basement**  74:10
**basically**  24:25
53:23 54:11
82:2 132:10
**basis**  98:11
150:14

**bear**  59:2 62:4
78:6
**beautiful**  61:2
61:10,13,14,15
62:4
**began**  37:5
135:21
**beginning**  28:23
91:23 113:15
141:5 148:16
**begins**  12:20
126:15 140:23
**behalf**  2:2,15 3:2
5:12
**belief**  94:19
**beliefs**  170:4
**believe**  16:6
103:12 128:9
131:15,22 133:5
133:17 138:23
142:10 150:14
150:18 154:16
169:17,20,21
**bend**  7:21
**benefit**  8:10,18
8:24 9:1 12:22
108:18,19
**best**  38:7 46:14
47:14 57:2
66:19 86:20
103:2 148:12
169:18,20
172:10 173:6
**better**  57:13
63:2 80:17
92:18 111:1
114:5,11 120:13
122:23 134:11

153:3

**beyond** 24:24
26:17 61:20
62:2 146:24
147:6,10

**bigger** 102:12,13
148:11 165:25

**bill** 16:2

**bios** 140:5

**bit** 17:8 18:21
20:5 25:6 28:4
31:15 48:5 53:6
53:7 71:24 83:8
83:10 110:2,16
148:11 149:19
170:22

**black** 50:13,14
50:15 51:2
112:3

**blank** 77:11

**bleed** 47:11,13

**blessing** 107:17
107:19,24
113:10 116:23
117:23 118:13
119:7 121:22
152:1,11,21
153:15 169:16

**blessings** 153:4

**blissful** 7:13

**blocks** 14:16

**bloodhound's**
166:12 167:2,3

**blue** 13:11,13

**board** 77:6
123:15

**bodies** 73:17

**body** 115:24
135:10,14
137:17 138:12
148:7 155:23,24

**boils** 167:21

**book** 152:24

**bookend** 103:10

**books** 140:14

**born** 7:10 21:23
22:4,5,6

**boston** 1:7 2:15
2:18,20 3:2,5,7
5:8,17 9:19 10:1
11:5 14:18,19,22
14:23 17:14
18:15 21:13,17
21:23,25 22:4,5
22:7,7,9,10,16
22:24 23:1,12
25:5 31:23 32:6
32:7 34:17
36:24 37:2
42:10,14,16,19
43:1 50:8 51:9
51:20,22,25 52:5
53:24 54:2,20
56:9 58:13 65:1
66:15,21 67:9,13
67:20 79:18
86:21 102:4
107:11,16 117:8
118:12 119:24
120:2,3,7,8,13
123:6 125:14
141:24 142:15
143:18 146:11
149:1,22 150:16
150:24 151:13

157:11 160:16
164:10 167:25
174:6 175:3
176:3

**boston.gov** 2:21
3:8

**bottom** 147:12

**bow** 103:11
115:13 152:5,5
152:10,13

**bowed** 115:10

**box** 26:15,15
48:7,9

**branch** 86:10
87:17 91:17

**branches** 86:25
87:3

**break** 7:21 27:1
92:25 93:15,16
157:3

**breakfast** 144:9

**bridge** 1:15

**brief** 16:14
157:3

**briefest** 106:15

**briefly** 15:9
141:13

**brighton** 121:13

**bring** 19:19
118:10,14 119:1

**broad** 26:23

**broadly** 67:2,7
134:21

**broke** 101:7

**brookline**
119:17,22,23

**brought** 55:11
56:16 57:4

110:19 118:23

**budd** 3:11 5:3
171:13

**buddhism** 60:18

**buddhist** 58:9,10
58:12,20 91:13
103:15,18,18,25

**building** 33:8
74:6,10,11,15
75:24 76:17
77:23 79:17
80:1 84:8,11
85:9,10 90:15
91:24 92:10,12
93:6,13 151:19
151:22

**buildings** 74:16
75:20 90:15
92:6 143:12

**bullet** 125:4,5,17
140:24

**bunch** 46:2
89:12

**bus** 99:10

**business** 18:6
24:4,5 28:8 72:4
72:4 130:24
136:25

**c**

**c** 2:1 3:1 5:1

**ca** 174:25

**calendar** 133:15

**call** 8:5 16:15,20
16:25 17:3,5,7
28:25 29:25
30:1 37:25
40:11 48:20,21

55:8 62:16 64:8
90:18 119:8
143:9,12,14
144:4
**called** 6:23 15:15
15:16 41:5,11,12
41:21 42:6,7
86:11 118:7,8
143:10 155:20
**calling** 8:3
**camera** 113:4,23
114:3 124:1
**campaign** 25:14
27:8,9,10 41:14
41:15,16 48:21
48:22 49:1,2,5
**canada** 67:12
**canadian** 105:9
**cancellation**
75:11 169:8,9
**candidacy** 23:16
**candidate** 24:1
25:11 27:17
43:7 44:23 45:9
45:10,15,17,20
46:18 53:4,8
54:16 55:3,5,6
58:4
**candidates** 35:16
44:25 46:5,11,25
49:1,15 53:7,9
77:17
**candidly** 117:7
**canvasing** 26:17
**capacity** 18:25
22:22 41:13
75:17 86:8
143:18 162:10

168:2,3
**car** 39:16
**card** 169:3
**care** 39:6 40:12
51:12 85:7
114:8 158:13
**caribbean** 65:4
**case** 5:17 13:12
14:25 17:15
74:8 91:6 96:10
139:8 141:1
158:8 174:6
175:3 176:3
**cases** 77:20
**categorically**
166:7
**categories** 54:7
**categorizations**
7:16
**categorize** 54:3
**category** 48:8
159:13
**cathlicism** 89:20
**catholic** 67:15
67:17,18,19,20
68:1 80:13
82:16,17,18,19
82:21,22,24,25
83:3,4,15 84:2,4
84:13,22 85:16
86:11,24 91:4
**catholicism**
89:20
**catholics** 67:17
83:11 163:10
**caught** 130:24
**cause** 12:5 25:24
29:19 46:16,24

64:8 74:9,15
83:22 87:5
102:18 123:1
146:7 163:1
**cc'd** 128:18,21
129:2
**celebrate** 113:17
**celebrates** 123:2
**cell** 26:9
**center** 54:20,21
54:25 62:20
69:12,21 98:13
**centered** 119:16
120:15
**centers** 54:24
61:19
**centric** 68:17,21
68:22
**ceremonial**
170:7
**ceremonies**
85:19
**ceremony** 60:6
61:1 69:2 76:10
77:25 79:3,6
84:19 86:9
104:21 113:10
144:25 149:15
151:16,21,23
152:7
**certain** 8:21
25:25 42:8
66:10 113:13
121:19 133:2,4
133:10 139:14
139:16 156:14
**certainly** 36:14
45:15 59:23,24

81:21 119:9
134:10,13
**certificate** 172:1
173:1 176:11
**certification**
175:1 176:1
**certified** 6:8
**certify** 172:4
173:2
**cetera** 41:5
58:21 60:20
**challenges** 24:8
70:15
**chamber** 116:1
116:15 118:24
**chambers** 127:4
**chance** 158:19
**change** 21:8 52:1
52:2 174:13,14
176:8 177:3
**changes** 174:12
175:7 176:7,9
**chanting** 61:5
**chapter** 50:8
51:9,10
**characteristic**
90:3
**characterization**
65:14
**characterize**
76:16,19 77:9,10
115:23
**charitable**
150:15
**chasing** 142:6
**chat** 109:14
**chatter** 110:3

**check** 26:15,16

**chief** 147:1,9,21
147:22

**child's** 99:9

**children** 25:6

**choose** 159:3

**chose** 23:10,11
23:12

**christian** 86:14
91:1

**christianity**
60:14 86:11
104:12

**christine** 17:16
18:1

**chuckle** 83:22
137:8

**church** 34:15
35:14 38:11,19
39:13,15 42:10
43:10,14,18 44:1
44:2,3,13 49:6
50:14 52:11
56:2 67:22,23
68:2 69:1,10,18
73:18 74:3,10
75:25 76:9,10
77:15 80:11,12
80:14,15 81:2
83:3,15 84:2,4,7
84:11,11,15
86:13 87:9
90:13,15,21 92:8
92:10 97:15,16
161:12

**churches** 34:12
67:20 86:16
87:15 91:5,5

126:25

**circle** 60:8 61:4

**circumstances**
61:11 102:12

**cities** 22:11

**citizen** 168:3

**citizens** 24:14

**city** 1:7 2:15,18
2:19 3:2,5,6 5:8
5:17 9:18 10:1
10:13 11:5,5
12:7,7,11 14:18
14:19,22,23
15:15,17 17:14
17:20,21,23 18:1
18:3,8,15,17,18
18:25 21:3,21
22:25 23:9
24:11 25:8,10
27:17 28:1,10,12
31:9,23 32:4
34:12 35:6,15
37:2 41:13
42:19,25 43:3,7
43:15 51:20,22
51:25 52:5 54:5
55:5 58:4 59:7
67:20 77:1
79:18,22 86:4
94:17 107:11,16
107:17 114:22
115:9,11,16
117:8,11 118:11
120:1,2,14
121:12,13,22
122:20,22 123:9
125:14 126:20
127:3,13,16,18

127:24 128:3,4,7
128:8 132:20,24
133:8 137:17
138:22 139:20
143:4,5,19
146:12 147:4
148:19,25
151:12,13 152:3
152:18,18
153:13 154:12
155:23 158:20
158:22 160:16
160:18,19,20,21
160:25 161:19
161:21 162:6,9
162:10,12
164:10,22 165:8
167:25 168:2,15
168:22 169:22
170:2,9,12,15
171:10 174:6
175:3 176:3

**city's** 17:19
155:7,12

**citywide** 22:25

**civ** 13:21

**civic** 32:25 71:10
71:11,24 72:2,6
73:22 75:4

**civil** 1:6 34:10
175:5 176:5

**claimed** 158:19

**clarification**
146:6

**clarified** 101:17

**classroom** 24:6
33:7 121:4,5
128:13,24

**classrooms**
27:24 123:3

**claudia** 117:23
119:10 122:14
140:14

**clear** 59:16 60:3
73:5,9 95:6
98:13 129:17
134:7 136:11

**clergy** 34:16,22
76:21 97:18
125:5,7,10,12,13
125:13 140:5
158:24

**clergy's** 132:11

**clerk** 152:19,23
152:25 153:22
161:9 169:7

**cleveland** 174:2

**click** 110:7,10

**clients** 145:16

**climate** 52:1,2

**clock** 28:9

**close** 64:4 70:12
120:18

**closer** 17:9

**closest** 85:12

**closing** 46:8

**coach** 24:19

**code** 108:11

**coffee** 33:4,4
55:8,9 78:3
123:12 127:11
130:15,17

**coleman** 125:6,7
125:10

**collaboration**
136:1,2 139:4,10

141:19 142:17
collaborative
  141:16
colleague   5:16
  32:16
colleagues   29:10
  30:19 31:4
  32:14 137:4,5,13
collected   26:18
collecting
  145:22
colloquial
  145:23 146:3
colon   166:25
color   36:2,15
  52:10 104:14
columbia   71:10
combination
  88:10
come   9:23 33:12
  38:8,9,20 44:25
  45:2 56:21 78:6
  99:18 106:3
  110:15 118:12
  152:20 153:25
comes   34:9
  35:13 56:24
comforting   7:13
coming   10:6
  11:4 60:16
  69:24 71:14,15
  75:10 77:3
  113:25 130:11
commentary
  122:9,10,11
comments
  146:16

commission
  158:21 175:19
  176:25 177:25
commitment
  123:2
commitments
  55:23
committee   33:2
common   25:1
  55:19,21,24
  90:16 128:19
commonwealth
  172:19
communicate
  19:2
communicated
  16:14
communicates
  18:8 128:20
communicating
  147:9
communication
  15:13 18:11
communications
  17:10
communities
  52:5 123:15
  170:1
community
  21:18 27:20
  29:11 30:25
  31:3 32:10,19,20
  32:22 33:11,13
  33:19 34:21
  35:7,15 38:18
  42:4,8 43:16,22
  45:1 46:9 49:7
  54:20,23 55:15

57:3 59:9 67:22
  67:23 68:18
  69:9,12,21 70:5
  71:9,13 72:1,5
  73:10 74:9,15,25
  75:8 76:6,12,25
  77:18,18 78:2,9
  84:14,18 88:1,13
  88:18 89:8
  90:17,18,19,23
  90:23 91:7,9
  92:7,12 96:13
  97:21,25 98:3,12
  98:14,19 99:6
  101:2,22,25
  102:5,8 119:1
  128:25 144:8
  149:22 150:16
  150:25 151:15
  151:19 165:4
company   56:14
comparison
  70:24 76:5
compassion
  148:21 150:2
compensate
  15:19
compensating
  15:22 16:7
complaint   9:3,9
  12:1 145:5
  158:21
completed
  103:13 174:15
completely
  130:12
comprised   150:9
  150:24

computer
  109:16
concluded
  171:18
concludes   67:6
  170:16,21
concrete   7:14
  79:25 80:2
confer   106:21
  149:6
conferred
  149:12
confess   60:1
conflict   125:18
  130:5,8
conflicts   129:11
confused   76:2
congregant
  60:23
congregation
  36:12 43:15
  44:14,17 45:2
  56:15 77:19
  119:11,12,15
  120:15
congregational...
  87:17
congregations
  127:1
connected   15:17
  18:5 69:13
connection
  169:24
connotation   74:4
  75:18 145:24
consider   50:23
consist   71:13
  72:2

**consistent**
126:23
**constituent**
24:10
**constituents**
128:20
**constitute** 6:15
**constitution**
118:21
**constitutional**
149:7,13
**cont'd** 3:1
**content** 142:9
**contention** 77:8
**context** 68:25
93:6,13 95:19
160:1
**continue** 70:9
112:19 115:18
166:9
**continuing** 56:22
**contribution**
26:11
**contributions**
150:16
**convention**
42:25
**conversation**
9:25 10:8,21
11:3 55:9 70:1,7
70:11,18 78:9
94:21 95:15
96:3,22 97:2
98:4 101:2
103:11 126:18
128:23 130:9
132:2 144:10

**conversations**
10:2,7,18,19
11:1,21 12:6
34:8 70:12,21
94:12,18 130:14
130:23 131:5
132:15,25 133:7
146:14,22,22
**cool** 116:17
**coordinated**
76:20
**coordinating**
43:20
**coptic** 86:11,13
86:16,18,21
**correct** 8:13,14
11:5 14:23 15:5
16:11 20:16
23:5 31:20
37:19 39:13
44:15 49:20
53:5,17 61:5
70:6 71:2,3 72:1
72:17 73:11,14
80:6,13 83:17
84:20 89:3 90:9
90:12 93:24
95:4 98:16
100:21,22 103:6
103:7,10 105:23
107:13,18,22
109:4 111:4
113:18 114:23
114:24 115:1,4,5
117:3 120:7
124:4 131:9,13
134:6 135:8
137:25 139:5

141:17,20 143:1
145:1,13 147:15
147:21,24,25
148:2,5 150:4,7
150:10,17 151:1
151:2 154:14
156:11,15,18,19
157:1,16 161:19
162:7,17 163:23
164:5,6 167:23
168:10,19,20,24
170:13
**corrections**
174:12 176:17
**correctly** 37:17
39:2 68:14 70:3
119:5 145:9
154:20
**correlation**
117:20
**cost** 52:3 70:2,14
**costs** 52:4
**council** 11:5,6,10
12:11 15:15,17
17:20 18:2,3,8
18:12,25 20:6,7
20:11,12,16,19
20:22 21:1,8
22:25 23:1,3,4
24:9 27:17,17
28:12,14 29:9,11
29:24 33:1 45:9
45:17,19 46:24
55:4,6,23 58:5
81:14 107:12,12
107:14,18 108:4
108:25 115:23
116:14 117:21

118:23 119:3
121:23 122:20
122:22 125:4,5,9
126:21 127:3,10
127:11,13,17,18
127:24 128:3,4,7
128:8 132:6,7,11
132:20 133:8
134:11 136:16
136:17 137:18
138:8,10,22
139:20 145:4
147:4 148:16,25
151:12 152:12
152:15 153:16
154:12 155:23
158:20,22 159:1
159:3 162:10
165:10,14
168:16,22 169:6
169:24
**councilor** 23:9
28:1,10 29:6
31:9,10,16 35:6
41:13,18 43:7
86:4 91:23
94:18 107:16
108:20,20,24
126:18 132:25
137:18 143:19
144:23 153:7,13
156:10,20
161:21 162:24
164:3,22 165:8
167:25 168:2
169:22 170:2,9
170:12

councilors 29:3 29:15,19 31:25 32:3 115:25 118:2 151:9
counsel 5:9 7:2 171:1 172:11,14 173:7,10
counselor 168:5
counselors 13:23
counter 127:20 127:21
countless 61:18 94:18
country 37:2
country's 62:2
counts 52:22
county 175:10 176:15
couple 34:11 121:1
course 8:4 25:11 27:3,8 30:21 31:3,11,13,13 32:9 33:11 43:6 46:11,17 53:24 54:9 55:14,15,23 57:5,23 58:3 62:6,7 66:17 67:9 72:15 81:11,24 82:4,5 84:6 86:17 94:17 96:3 107:15 114:21 117:3 121:24 129:3,20 134:18 141:4 147:4 170:14

court 1:1 5:20 9:19 110:17 143:6 175:7
covered 52:7 84:22 103:14 104:4 160:17
covers 89:9 104:2
cp 50:10,11 51:8
created 91:24
creating 164:14
cross 110:3 170:17
crosstalk 110:1
crown 2:4,10
crown.law 2:7 2:13
culminated 145:8
cults 66:10,21
cultural 34:23 63:7
culturally 59:17
culture 61:23 63:12
curious 142:2
curley 141:23
currently 123:11
custom 156:3
cv 1:7

**d**

d 4:1 5:1 13:16
dance 169:3
daoism 58:21
darkened 7:11
date 1:12 5:4 11:10 20:10

109:9 110:13,20 110:22 148:4 157:15 158:25 174:8 175:3,9,19 176:3,13,25 177:20,25
dated 109:6 124:23 125:23 127:12 129:20 157:11
dates 11:14 37:21
day 11:9,14 19:19 27:8,16 31:12 38:21 39:18,20,21,24 40:18 59:6 66:12 72:12 78:7,8 106:13 118:21,22 119:7 126:9 130:24,24 136:8 157:23 175:16 176:22 177:22
days 31:11 55:22 129:20 174:18
daytime 39:22 40:6
de 66:11,14
dead 66:12
dealt 37:12
dear 174:10
death 66:10,21
debate 47:6,7
december 11:8 11:12 28:24 31:19 145:12

decision 105:19 169:1 170:6,9,12
decisions 88:8,9
decline 167:16
deed 175:14 176:20
deemed 174:19
deeper 59:16 71:24
def633 123:21
default 13:22
defendant 1:8 2:15 3:2 14:18 14:19
defense 171:8
define 31:22 92:3 159:15,18 163:7 165:19
defined 18:23 163:5
defines 138:22
defining 161:11 166:21
definitely 55:5 121:18
definition 26:3 159:7,16 165:17 165:22 166:4
definitionally 159:11 165:16
deliver 158:25
delusions 7:13
demand 7:14 145:10,20,21,22 145:23 146:1,9 147:2 168:15
demanded 145:3 145:19 146:2

**demanding**
   144:24 145:19
**demands**   146:3
**demise**   7:23
**democratic**
   42:23,24
**demographic**
   26:24
**demographics**
   25:19,20,22,23
   26:1,4,20
**demonstrably**
   7:18
**denied**   158:19
   159:1 163:20
**denomination**
   90:22 92:9
**denote**   83:1
**deny**   139:12
   163:12,14,18
**department**   2:18
   3:5 174:22
**departments**
   19:1
**depend**   72:12
   134:25 135:2
**depending**   41:18
   53:10 72:11
   102:3 120:19
   123:7,8,9 137:16
**depends**   117:19
   117:19
**deposed**   14:5
**deposition**   1:10
   5:19 6:13 8:4,12
   8:16 10:13
   16:17 30:4
   106:7 108:2

111:18 154:7
170:22 172:1
174:8,11 175:1,3
176:1,3
**depositions**
   13:21 170:23
**depth**   63:14
**descent**   118:20
**describe**   11:23
   30:22 47:15
   54:3 55:25 60:6
   61:10 77:12
   80:2 108:3,18
   113:11 139:25
   150:15
**described**   30:25
   36:15 108:6
**describing**   128:3
   160:2
**description**   4:6
   61:3
**descriptor**   80:3
**designates**   83:2
**desire**   153:25
   154:1,11 163:21
   163:23 164:1,2
**despite**   168:19
**dessert**   78:4
**destroyed**   7:22
**detail**   81:21
   129:4,6
**determination**
   41:8 154:23
   155:4
**determine**   29:14
   49:25 143:9
   149:21 156:24

**determined**
   161:1
**develop**   19:5
**development**
   24:5 71:15
**dia**   66:11,14
**die**   106:1
**difference**   69:15
   69:22 95:13
   96:15,17 138:9
   146:8 166:11,25
   167:4,5,6
**different**   27:25
   28:14,17 32:3,24
   33:6,10 44:25
   53:9,9,20 54:18
   54:19 69:5
   70:20,22 72:12
   75:7 84:12,13
   91:21 92:14
   95:18 97:7
   102:4 114:13
   115:25 118:2
   130:12 131:19
   131:21 144:14
   145:23 156:10
   160:15
**differently**
   166:15
**differing**   166:14
**difficult**   110:3
   128:9
**digital**   172:8
   173:3
**direct**   13:16
   14:12 69:13
   77:7 117:20
   152:3

**directed**   152:5
**directing**   157:25
**directly**   34:20,21
   43:19 87:24
   128:18
**disasters**   34:10
   35:5 37:6,14
**discoverable**
   13:23
**discovery**   143:4
**discriminates**
   167:3
**discriminating**
   166:7,12 167:1
**discrimination**
   158:22 159:7,11
   159:15,17,19,20
   159:22,23,24
   160:3,4 163:8,9
   165:16,17,19
   166:4,6,13,21
**discriminatory**
   160:12 162:21
   163:1,6,7,13,15
**discussed**   146:15
   146:18 154:17
**discussion**   47:25
   72:4
**discussions**
   33:13 70:23
   94:24 156:21
**disinterested**
   66:7,8
**dismiss**   9:4,4,13
   9:16
**displayed**
   108:15

dispute 36:5
dissipate 7:12
distance 120:12
distinct 31:25
distinction 35:19
36:6 82:8 84:17
distinctly 47:15
71:6 128:7
130:18 142:23
143:2,21
distinguish 85:3
88:13,15 89:12
distinguishing
166:10
district 1:1,2
31:9,24 32:3,11
121:4
districts 32:6
doctrines 7:10
document 13:4
139:24 140:22
documented
30:6
documents
128:1
doing 21:21
92:18 99:1
117:24 120:25
120:25 122:25
123:15 131:1
141:23 151:13
160:25 164:10
169:25
dollar 25:25
door 12:13 120:9
doors 23:20
dorchester 22:6
22:8,16

dot 123:21 140:5
double 50:9,10
50:11 51:8
54:23
doublecheck
112:1
downtown 79:18
draw 35:19 97:4
dread 48:2,3
drew 81:16
drill 38:5 71:24
146:19 149:19
drilling 59:16
drive 40:17
120:16
driving 40:22
120:12
drop 153:19
drove 39:16,17
duly 6:23 172:5
duration 116:19
duties 55:24
162:13

e

e 2:1,1 3:1,1 4:1
4:5 5:1,1 124:20
125:12,23 126:4
126:5,7,7,15
127:4,12,17,23
128:2,2,10,17,19
129:2,17,19,22
130:3 131:6,7,8
132:14,24
133:11 140:2,14
143:5,6 147:8,12
148:4,7 149:8
150:13

eager 129:22
earlier 20:12
30:25 33:21
37:4 39:2 47:10
52:11 60:19
75:14 76:14
81:23 82:2
125:19 128:6
129:11 130:6
134:4,19 138:5
139:1,7 141:17
141:20 142:11
143:7 151:14
155:6,19 161:17
162:5 168:4
earliest 10:21
78:16 85:7,8
126:7 127:17
early 34:14 35:2
35:8 37:16 39:3
39:10,12,24 40:7
78:6
earshot 7:5
earthquake
37:17,18
ease 10:12
eastern 58:20
84:23,24 85:9
eat 7:12
economic 24:4
edit 134:14
education 24:6
51:20 59:22
61:17,20 70:16
98:7
educational
117:9

educator 21:17
effect 11:12
72:21 115:17
effectively
110:16
effects 37:13
effectuate
133:17
efforts 59:8,22
egypt 86:15
either 22:15
41:11,12,15 46:8
64:13 118:3
121:3 153:15
elected 20:8
38:16 42:5
62:24 72:5 98:5
99:7 160:22
electeds 56:12
56:13
election 23:10,11
27:11 30:8,8
45:13,22
electives 57:11
electronic 171:6
171:11
element 55:10
69:7
elements 113:13
elliot 22:13
email 174:17
embrace 7:11
emily 124:16
emotional 36:22
emphatic 129:11
employed
172:11,14 173:8
173:11

| | | | |
|---|---|---|---|
| **employee** 28:5 | **engaging** 32:25 | **esquire** 2:3,9,17 | 98:10 99:19 |
| 115:16 172:13 | 73:17 | 3:4 | 118:6 151:15,19 |
| 173:10 | **enjoy** 20:18 | **essaibi** 1:11 2:16 | **events** 27:25 |
| **employee's** | **entailed** 32:18 | 3:3 5:18 6:19,22 | 29:11 31:11 |
| 115:9 | 84:20 135:19 | 8:3,6,7,11 9:7 | 36:20 43:16 |
| **employer** 25:24 | **entered** 176:9 | 13:15 14:15 | 44:19,23 47:16 |
| 26:10 | **entering** 23:8 | 68:13 107:4 | 48:22 53:4 55:2 |
| **employment** | 73:18 | 108:14 111:5 | 55:3 65:7 66:14 |
| 107:16 | **entire** 31:23 | 112:23 115:19 | 67:17,18 68:21 |
| **enclosed** 174:11 | 175:5 176:5 | 126:18 158:5,9 | 68:22,24,24 69:6 |
| **encounter** 30:21 | **entitled** 148:15 | 159:10 165:21 | 88:1,14,18 89:8 |
| **ended** 41:15 | 151:4,5 | 174:8 175:4,9 | 90:8,10,11,16,17 |
| 154:17 | **entitlement** | 176:4,13 177:20 | 90:18,23 91:7,24 |
| **endorsement** | 151:9 | **essentially** 11:18 | 98:10 102:5,9 |
| 115:4,6 | **enumerated** | 95:11 107:5,6 | 142:24 |
| **ends** 30:11 91:19 | 12:19 | 116:20 150:23 | **eventually** 21:6 |
| **engage** 27:6 | **envelope** 26:14 | **establish** 107:5 | 21:16 145:7 |
| 47:25 68:19 | **environment** | **estimate** 101:5 | **everybody** 5:23 |
| 78:8 86:18 98:4 | 52:2 98:7 | **et** 41:5 58:21 | 109:24 |
| **engaged** 25:3 | **envision** 40:14 | 60:20 | **evidentiary** 6:12 |
| 32:21 34:12 | **envisioning** | **ether** 122:12 | **evolves** 18:21 |
| 36:23 37:3 38:3 | 85:24 | **ethnic** 63:7 | **exact** 11:10 |
| 42:18 44:14 | **episcopalians** | 97:12 | 20:10 |
| 67:3 94:4 102:8 | 87:10 | **eulogy** 48:7,18 | **exactly** 36:7 43:8 |
| 165:3 | **episode** 48:14 | **evenings** 53:9 | 56:16 79:25 |
| **engagement** | **episodes** 48:15 | **event** 27:23 | 120:23 121:7 |
| 31:1,4 32:10,19 | **equal** 149:14 | 32:20 35:12,15 | 130:21 133:19 |
| 32:21,23 33:12 | 151:4 | 37:24 38:22,24 | 152:22 156:8 |
| 35:9 37:25 38:7 | **errata** 174:13,18 | 38:25 39:12,18 | **examination** 4:2 |
| 55:2,16 57:3 | 176:7,10,18 | 41:12 46:1 49:1 | 8:1 111:12 |
| 68:17,18 76:6 | 177:1 | 52:25 53:10,12 | 114:12 |
| 78:2 90:19 | **error** 84:10 | 54:16 57:4,21 | **examine** 54:11 |
| 98:15 | **es** 172:4 | 62:16 64:8,20,20 | 70:23 71:23 |
| **engagements** | **especially** 35:5 | 67:21,25 69:9,9 | 79:1 131:3 |
| 26:21 27:6 | 37:22 38:16 | 70:4,5,19 71:1,2 | 144:1 |
| 30:25 42:19 | 65:9 116:15 | 77:16 79:7 | **examined** 6:25 |
| 126:24 | 128:20 | 80:19 84:18,18 | **examining** 51:12 |
| | | 96:25 97:5,6 | 51:13 |

**example**   22:12
26:5 28:9 29:17
33:21 35:7 36:1
36:10 42:23
60:18 67:23
70:5 72:7 76:8
76:20 77:15
78:1 79:3 91:10
91:16 97:5,21
114:4 118:6,19
136:5 149:24
150:1 152:1
161:10
**examples**   133:12
**exception**   121:21
**excited**   126:19
**exclamation**
129:23
**exclusively**   51:3
**executed**   176:10
**execution**   175:14
176:19
**exhausts**   86:23
**exhibits**   12:18
12:23
**exist**   87:13
**existed**   142:19
**expect**   129:3
**expectation**
16:17 116:4
**expected**   12:10
75:17 111:19
112:3 170:23
**experience**   64:10
64:11 78:16
82:3 84:14 85:8
95:22,25 99:9

**experienced**
94:1 135:7
164:9
**experiences**
21:19 24:3
105:22 135:5
151:12
**expiration**
175:19 176:25
177:25
**explain**   130:11
147:18 161:7
**explicit**   163:11
**explicitly**   163:18
163:20
**exposed**   104:6
**exposition**   110:3
**exposure**   105:6
105:12
**extended**   129:10
**extending**   147:6
**extension**   130:9
**extensive**   24:3
24:24
**extent**   102:13
147:7
**extra**   29:22

**f**

**faces**   24:9
**facilitate**   126:17
**facilitator**   47:5
50:3 51:4
**facilities**   24:22
**fact**   8:12 20:6
99:1 129:21
**facts**   144:1

**factual**   139:10
139:21
**failure**   92:3
**fair**   24:25 30:24
32:6,12 33:14
43:5 53:13 57:8
61:12 65:13
76:14 80:3
82:10 84:8
85:25 87:22
89:18 96:13,14
102:22 104:25
117:11 143:22
164:24
**fairly**   38:23
90:16 113:9
**faith**   77:21 79:5
81:7 83:3,16
87:24 91:1,25
92:9 102:2
161:13
**faiths**   82:13
84:12 91:3
103:13,14 104:5
**fall**   71:12 104:11
**familiar**   8:7,9
15:7 49:2 58:23
66:11,13 79:5
81:8,19 82:23
84:1 85:8,11,23
86:10,13,25 87:3
87:5,12 91:16
104:11 128:17
155:14,16 165:4
**familiarity**   9:8
9:22 79:1,2 81:6
81:22 86:15
107:5

**familiarize**   93:4
93:13
**familiarized**
93:10
**families**   24:12
25:6 61:24
**family**   64:14
85:14
**far**   58:20 59:7
86:14 103:24
**fascinating**
74:19
**fashion**   66:23
**fast**   7:17
**father**   78:18
**fealty**   7:15
**fearful**   7:10
**february**   118:6
118:14 157:11
157:22
**fed**   13:21
**federal**   79:17
80:1
**feel**   45:18 47:19
57:1 61:1 89:11
92:24
**feels**   148:14
151:5
**feeney**   152:25
153:22
**fell**   153:4
**felt**   151:3,4
152:9
**fewer**   54:2
**fields**   24:20
**fifteen**   120:17
**figure**   121:14

**file**  12:20 14:1
  123:22
**filed**  158:20
**fill**  77:11
**filling**  24:16
**finance**  25:15
**financial**  26:20
**financially**
  172:15 173:11
**find**  34:3 87:15
  87:23 89:14
  90:14 127:18,19
  128:9 132:13,17
  133:6 143:6
  174:11
**finding**  144:16
**fine**  16:4 40:21
  48:19 92:25
  100:17,24
  106:20 112:9
  133:18
**finely**  166:10
**finish**  88:5
  103:11 162:1
**finishes**  103:12
**firm**  7:19
**first**  6:23 14:21
  14:24 15:15
  16:20 17:6 21:1
  21:9 30:22
  35:13 37:5 38:5
  40:9,18 42:2
  62:25 68:13
  88:7 93:4
  135:19 140:13
  145:10 158:4
**firsthand**  64:10
  64:15

**fit**  159:3
**fits**  53:13
**five**  28:19 29:22
  29:25 30:11,16
  30:17 77:4
  110:11 135:19
**flag**  116:10
**flare**  113:22,24
**flavor**  22:18,20
**flicker**  112:3
**flow**  10:13
**fly**  134:14
**focus**  98:20
**foil**  143:5
**foiled**  132:14
**folder**  12:18,19
  12:20 108:9
  123:19 144:20
  144:20 147:12
  157:10
**folks**  153:17
**follow**  16:15
  30:9 63:1
  129:22 130:2
  133:9 160:11
  162:25
**following**  55:7
  56:9,10 78:1
  98:17 99:8,15
  101:22 105:3
**follows**  6:25
**food**  19:15 78:4
**foregoing**  172:3
  172:4 173:4
  175:13 176:18
**foreign**  60:24
  78:14

**forgive**  79:21
**form**  10:12,14
  15:13,25 16:9
  23:13 65:19
  69:18 149:20
**formal**  16:15
  18:7 27:14 28:8
  38:12,13 47:6,7
  72:3 73:20 75:3
  75:4
**formally**  44:21
  44:22 62:12
  72:24 73:4,24
  75:3,17 77:3
  83:2,15
**former**  15:17
  21:17 24:6
  117:20 152:18
**forms**  69:5
**forth**  126:4,5
  130:14 131:6
  132:2
**forum**  35:14
  43:10,20 45:4,18
  47:8 48:21,22
  49:1,2,5 50:5
  55:3 56:2,3,6,18
  68:1 77:14,16
**forums**  27:21
  43:23 44:19,24
  46:17 56:4
  67:23
**forward**  52:16
  126:6 174:15
**found**  142:3
**four**  30:11 32:2
  32:17,17 106:12
  120:24 128:14

128:15 137:10
  139:3 143:3
**frankly**  104:11
  148:16 169:3
**free**  57:1 175:14
  176:20
**freed**  75:13
**frequent**  10:19
**friend**  81:18
  86:3,7 87:16
  89:17,21
**friends**  81:8
  85:12
**front**  38:19 46:5
  46:6,20 79:25
  80:14,15 136:16
  169:12
**froze**  101:10,11
  101:12
**fulfills**  113:3
**full**  13:17 28:1,3
  28:5,6,10,11
  33:7 86:8,8
  117:8 138:12,14
  138:15 148:8
  158:9 169:4
**funding**  21:15
**fundraise**  118:10
**funeral**  48:6
  89:6
**further**  27:2
  38:5 111:12
  146:19 149:19
  172:13 173:9
**future**  19:21
  20:21 34:1

| g | | | |
|---|---|---|---|
| **g** 5:1 | 68:13 107:4 | 81:9 84:4 86:24 | 144:18 161:10 |
| **gather** 15:4 | 108:14 111:5 | 88:6,15,21,22 | 162:16,19 |
| 44:13 56:2 57:2 | 112:23 115:19 | 89:23 97:5,6 | 170:25 |
| 76:12 117:9 | 126:18 158:5,9 | 98:14 99:9 | **goodman's** |
| **gathering** 96:4 | 159:10 165:21 | 101:9 105:1 | 140:14 |
| **gatherings** 27:22 | 174:8 175:4,9 | 106:1 114:10 | **google** 165:19 |
| **gbjcl** 126:19 | 176:4,13 177:20 | 120:14 126:1,5,6 | **gotcha** 11:16 |
| **gender** 26:6 | **getting** 79:4 | 126:6,14 127:19 | **gotten** 164:25 |
| **general** 11:15 | 112:4 | 130:15 133:21 | 165:5 |
| 18:15,16 26:19 | **give** 27:14 29:20 | 140:18 142:6 | **government** |
| 46:1 51:7,16 | 30:13 46:8 | 144:15 158:4 | 18:4,10,15,17,18 |
| 54:7 55:13 62:8 | 48:17 59:15 | 162:3,3 163:6 | 21:3,3,6 22:24 |
| 63:18 81:22 | 76:7 100:15 | 164:14 | 25:1,3 141:5 |
| **generally** 25:18 | 107:17 108:5 | **goes** 77:5 112:24 | 142:25 145:17 |
| 43:6 46:9,24 | 109:22 110:2 | 132:11 | 146:12 152:3 |
| 47:23 55:8,16 | 118:4,13 122:10 | **going** 8:19,23 | 155:20 |
| 58:16 60:2 | 126:25 133:19 | 13:17 29:22 | **granting** 9:4,15 |
| 61:17 70:17 | 134:6 135:18 | 30:10 34:6 36:3 | **graphic** 116:17 |
| 75:9 77:1 82:21 | 141:4 145:17 | 40:15 44:12 | **great** 13:15 35:4 |
| 89:4,4 92:23 | 146:16 147:5 | 48:16 52:17,23 | 81:21 92:21 |
| 94:20 104:12 | 148:15,22 161:5 | 63:10 67:12 | 119:13 124:18 |
| 116:4,14,22 | 161:16 169:16 | 79:4 81:18 | 148:12 171:11 |
| 139:25 159:24 | 170:7 | 89:25 90:14 | **greater** 23:1 |
| **generation** 63:23 | **given** 31:11,12 | 92:21 99:8 | **greaves** 3:12 |
| 64:2 | 116:9 122:4 | 106:7,11 111:14 | 5:14 157:21 |
| **generic** 50:16 | 138:8 139:12 | 111:18 112:6,6,7 | 159:6 |
| 60:13 74:6 | **gives** 117:15 | 112:7 126:4 | **greet** 27:23 33:5 |
| **generically** | **giving** 27:19 | 129:23 130:17 | 55:13 |
| 44:13 46:4 79:8 | 48:7 121:24 | 131:6 135:9,16 | **gross** 104:20 |
| 137:24 | 153:4 155:19 | 143:14 145:5 | **grounds** 81:4 |
| **generous** 137:10 | **glitched** 161:17 | 146:10 156:11 | 153:8,10 |
| **geographic** | **glitches** 111:19 | 158:14 161:15 | **group** 38:20 |
| 119:19 | **go** 6:18 13:18 | **good** 5:22 13:10 | 57:13 69:19 |
| **george** 1:11 2:16 | 30:10,17 36:16 | 24:25 56:12 | 70:13,14,16 |
| 3:3 5:18 6:19,22 | 40:23 41:23 | 86:7 87:16 | 97:11,12,13 |
| 8:6,7,11 9:7 | 54:15,16 57:13 | 105:24 106:8 | 99:16,17,19 |
| 13:15 14:15 | 66:1,2 68:4 | 111:1 114:8,12 | 100:18,19 106:2 |
| | 69:20 71:20 | 114:12 144:12 | 106:18,22 |

117:10,21 118:5
118:23 119:2,6,7
119:12 122:25
127:3 135:25
136:8,20 139:4
139:20 141:6,7
148:14 151:4
153:24 158:18
163:15
**groups**  27:20
43:22 74:15
90:25 97:8
132:15,17 133:8
156:25 159:12
160:15
**guess**  30:1 46:21
48:17 55:8
74:11,23 82:6,20
82:23 85:11
120:8 133:3
138:2,4
**guest**  152:11,20
165:14
**guys**  110:14

**h**

**h**  4:5
**ha**  60:24
**hail**  7:24,25
**hair**  148:11
**haiti**  34:11,17,24
36:16 37:12
38:6
**haitian**  34:12,16
34:18,21,22,22
35:3,7 36:21
37:1 38:6 76:11
80:10 81:2 97:6

97:15,17
**haitians**  36:21
36:23 97:11
**half**  53:2 100:7,8
100:9,9,10,10
106:7
**halfway**  106:8
**hall**  2:19 3:6
59:7 79:18
114:23 115:11
117:11 120:14
**hand**  6:20 74:2
**handful**  81:15
**handy**  152:24
**hanging**  75:6
**happen**  35:21
43:17 67:22
68:19 69:6,6,11
69:18 74:9
76:17,25 79:10
79:14 102:9
118:5,24 129:12
132:6,7 138:8
151:22 162:13
162:20
**happened**  34:25
35:5,17 38:15
43:13 49:9,15
56:12 57:13,19
57:23 59:8,23
63:15,25 68:25
69:10 76:23
78:11 80:11,14
97:18 101:2
113:16 114:21
121:8 129:18
130:10,14,19,22
130:23 131:5,8

131:10 143:8,20
143:23 144:4,5,7
144:8,9,10,13
152:22 153:21
**happening**  24:18
34:11 52:11
54:21 75:13
98:15 118:3,18
119:1 132:16
144:3,12 162:9
170:15
**happens**  42:25
70:7 75:18,25
**hashanah**
113:16,17
**head**  69:17 71:6
71:23 115:8,9,13
152:5,6,10,13
**headings**  125:3
**hear**  52:19 64:11
108:13 112:10
112:15 144:11
163:25 166:18
**heard**  94:7 99:7
150:25 155:25
**hearing**  6:17
127:11 138:10
**hearings**  29:11
**held**  77:15
**hello**  7:6,6
**help**  109:16
125:21 146:19
**helpful**  21:21
**helping**  126:17
**helps**  109:17
**hemisphere**
67:10

**henry**  14:24
**herald**  157:11
**hereto**  172:15
173:11
**hey**  57:12 88:4
**high**  21:5,13,14
23:16 32:5
142:21
**highlight**  123:1
123:5 135:3,11
148:23 151:11
**highlighted**
158:1
**hill**  71:11
**hindi**  64:25
**hindu**  60:18
64:25 81:24
91:10 103:14,25
**history**  62:1,2,3
63:6
**hit**  12:12 140:3
141:14
**hitting**  142:21
**hmmm**  73:12
**hold**  30:18
**holding**  7:17
**holiday**  113:18
114:20
**home**  19:14 22:2
33:5
**homeless**  148:21
150:2
**homelessness**
24:11 25:8
118:10,11
**honest**  83:23
**honor**  83:25

host 43:19 44:18 44:22 102:5
hosted 35:15 43:17 55:1,1
hour 33:4 53:1,2 76:7 85:17 127:11 136:19
hours 106:13
house 33:3
housing 52:3,3,4 70:2,14 71:14 98:6
huh 154:6
humanist 91:15 94:7
humanistic 58:15
humanists 94:5
hundreds 27:7 63:20
hurricane 37:16
husband 10:4,23
hypothetically 162:19
hypotheticals 131:2

**i**

idea 20:1 40:20 66:6 112:24 150:23 159:4
ideas 11:15
identical 70:21
identify 25:9 51:2 94:13,16 96:19
identifying 96:21

identity 61:23 63:8 96:12 115:16
ignorance 60:1
igr 18:3,6
illness 12:25 19:11
illusory 7:16
imagine 61:11 106:7 121:7
immediate 64:14
immediately 101:22
immensely 109:18
impact 21:20
impacted 64:1
impactful 21:22
impacts 51:24 52:1,4
importance 64:19
important 24:20 48:1 64:9 89:7 98:6 112:10 135:12,13 148:25 151:7
impression 83:14 97:14
improve 51:19 51:21
impulse 7:12
inappropriate 16:3
incidences 36:18 54:8
incident 56:10

incidentally 68:19
include 87:9 123:20 139:11 139:22
included 60:20 160:14,14 174:13
including 16:16 152:18 170:13
inconsistent 131:14,16,17
incorporated 176:12
incorporating 142:21
incorrect 165:2
increasing 13:20 52:4
incredible 148:19 149:25
indicate 149:24
indicates 142:17
indicating 174:13
individual 139:19 151:10 153:7
individually 166:8
individuals 7:14 24:11 29:6 51:1 76:22 101:1 133:7 160:15 169:23 170:3
informal 73:21
information 26:18 122:16

135:8 136:9 139:11,22 141:11 150:19
informed 63:13
informs 155:6
infrastructure 24:23
inherently 84:25
initially 55:12 76:4
inquire 82:14
inquiring 69:4
inquiry 69:3 91:20
inside 80:22 81:3 81:5 84:1
insofar 116:25
instance 166:7
instances 69:17
institution 69:14
insulting 148:17
intend 23:18
intended 6:10 18:19 48:20 108:24
intent 23:13,15
intention 40:23
interaction 142:19 153:13
interactions 89:19
interchangeable 107:21
interest 19:10,22 20:2,4,21 64:22 66:5 139:21
interested 20:25 21:2 70:14,15,17

172:15 173:12
**interesting** 75:1
**interject** 10:9
**intermixed**
   104:13
**internal** 18:4,10
   18:10
**internet** 161:17
**interrupt** 29:13
**intimately** 24:7
**introduce** 5:9
   115:3 135:9
   143:25
**introduced**
   122:7
**introducing**
   114:21 134:16
   135:14
**introduction**
   135:20 136:13
**introductory**
   122:3,9,10,11
   134:6,21 136:12
**inuit** 67:12
**inuits** 105:9
**investigate** 41:7
   41:10
**investigation**
   149:20 155:7,9
   155:10,12 156:3
   156:6 162:16
**invitation** 37:24
   88:11 132:1
   145:16 147:6
   159:2,4 161:1,3
   162:6 164:12,12
   165:1,5 167:24
   168:9

**invitations** 38:4
   130:22 133:16
**invite** 13:24 88:5
   88:25 89:4,8
   115:5 118:13
   120:22 121:16
   125:18 127:3,9
   127:24 128:10
   129:9,10 130:7
   145:10 146:4,13
   147:2 149:1,25
   150:4 153:14,24
   154:1,12,13
   156:9,14,25
   159:11 160:4
   163:12,22,23
   164:4 165:9
   167:16,19,23
   168:5,18,24
   169:1,1,4,5,7,22
   170:7,13
**invited** 26:22
   27:2 56:12,13,13
   56:14 57:11
   58:24 62:12,17
   76:12 88:3,21
   89:6,21 107:17
   109:1,3 120:21
   125:13 126:10
   127:2 129:8
   132:19 133:15
   148:15,18,18
   152:7 153:6
   161:4,19 163:2
   163:10,11
   165:13 169:14
**invites** 144:25

**inviting** 115:7
   133:7 134:22
   141:4 142:24
   153:9,10 156:17
   156:18,21,22
**invocation** 7:4,8
   107:19 111:9
   113:9 119:8
   141:5 146:17
   147:5 158:20,23
   158:25 159:2
   168:15
**invocations**
   153:2 161:5
**involve** 69:18
   152:6
**involved** 21:5,12
   21:14 22:21
   32:10 34:21
   35:12 43:20
   69:7 87:23,24
   119:11 125:15
   154:23 155:1
**involvement**
   149:21
**irrelevant** 51:14
**irrespective**
   161:22
**ish** 44:15 68:24
   76:6,16,19 77:8
   77:11,12 87:8
   145:9
**islam** 60:14
   102:7
**islamic** 54:19,25
**issue** 40:4 70:10
**issues** 24:15 48:1
   70:10

**issuing** 128:10
**it'd** 74:12
**it'll** 158:10

**j**

**january** 20:9
   23:16 27:11,13
   28:24 31:19
   145:11
**jargon** 80:23
**jerry** 48:5
**jewish** 81:7,9
   91:5 95:20 96:1
   113:18 117:9
   152:2
**jews** 113:17
**job** 1:18 28:1,3
   28:11,17
**jobs** 28:11
**join** 83:2
**joined** 83:15
**joint** 12:21
**joke** 16:2
**jokes** 16:4,5
**joyful** 61:14
**judaism** 60:14
**judged** 7:14
**jump** 171:2
**june** 9:20

**k**

**k'iche** 65:19,21
   65:21
**karen** 125:13
   126:15 129:21
   129:25 130:2
   132:3
**keep** 23:20 25:12
   25:18

**keeping** 52:17
**kept** 25:22
**kezhaya** 2:3,9
 4:3 5:11,11,13
 7:3,25 8:2 9:1,6
 10:15,17 11:25
 12:2,17 13:4,7
 14:12,14 50:20
 52:15,22,24 68:6
 68:12 93:15,22
 101:7,9,12,16
 102:20 105:24
 106:6,10,17,21
 107:3 108:8,12
 109:12,17 110:2
 110:7,10,14,22
 110:25 111:3,16
 111:23 112:2,9
 112:14,18,21,22
 113:3,7,8,22
 114:2,6,18
 123:18 124:2,4
 124:12,14,19,23
 125:1 130:4
 133:21 134:3
 140:3,7,12,18,21
 144:19,22
 147:11,15,17
 149:5,18 157:3,9
 157:15,19,25
 158:3,13,16
 159:9 160:7
 163:4 164:23
 165:18,20 166:2
 170:16,20 171:3
 171:5
**kick** 169:6

**kicked** 27:10
**kickoff** 27:23
**kids** 19:15 24:19
 123:6
**kind** 11:19 27:15
 36:7 37:24
 40:24 42:18
 43:9 47:11,13
 49:6 52:9 54:6
 54:14 56:1,3
 57:5,12 65:13
 68:25 69:6 71:2
 71:25 72:16
 73:14,25 74:2,22
 75:6 76:11
 79:11 81:3
 84:19,24 97:1
 98:14 104:11
 113:21 116:17
 117:9 120:3
 125:3 135:21,22
 145:24
**kinds** 47:16
 48:21 50:15
 51:16 82:14
**king** 3:13 5:14
 7:6,7
**knew** 75:13
 127:6,8 135:1
 141:21 142:18
 150:25 153:23
 169:9
**know** 11:1,2,10
 11:14 12:25
 13:2 19:3,3,14
 19:19 20:10
 21:7 23:24 24:6
 24:14,16,17,18

25:7 27:22 28:7
 29:8 32:22
 33:20 34:9 35:1
 36:7 37:21
 38:11,12,17
 39:20 43:18
 44:10,20 46:12
 47:18 48:5,12,13
 49:24 50:14,21
 50:22,23 51:18
 51:24 52:1
 53:25 54:1,3,15
 55:21,24 56:17
 57:13 61:18
 62:11,13 63:17
 63:18 64:19
 65:2,15,23 66:3
 66:24 67:1,9
 69:13 70:13,15
 70:20 71:11
 72:22 73:8,18
 74:13,19,24 75:9
 75:10 76:15,18
 77:3,14,17 78:1
 79:25 81:9,25
 83:1 84:11
 85:12,16 86:4,6
 86:8 87:5 88:4
 88:12 90:19
 91:2,2 92:2,5,7
 94:6,12,19 95:8
 95:9,12,14,24
 96:7,11,16,23
 97:3 99:24
 100:5 102:8,15
 102:21,23,25,25
 103:1,1,8 104:12
 105:3,9 106:13

106:18 109:5
 110:14 111:13
 113:20 114:4
 115:22 116:3,13
 116:18 118:19
 119:15 120:1
 121:3 123:3,13
 123:24 127:5,21
 127:23 130:21
 132:5,19 133:16
 134:10,12 135:2
 135:13 137:16
 138:20 142:22
 144:11,17 145:2
 146:2,7,15,24
 147:3,8 153:17
 154:5,17,18,18
 154:22 155:1,3,8
 155:14 156:5
 159:12 163:2
 164:19 165:11
 165:12,12 167:6
 167:8,10,10,11
 170:2
**knowing** 103:4
 168:19
**knowledge** 7:12
 13:24 14:8
 25:16 29:16
 64:10 66:20
 103:2 164:9,20
 172:10 173:6
**known** 62:23
 136:3,4,4
**kreiman's**
 140:15

**l**

**lack** 122:23
153:2
**language** 61:23
**laptop** 105:25
110:18 114:4
**large** 21:9,10
31:8,9,10,16,20
31:22 32:2,13,16
43:15,15 44:14
44:17,17,18 56:8
67:19 97:17
164:21
**largely** 104:8
**larger** 99:14,16
99:16 100:25,25
101:23
**largest** 37:1
101:4
**latch** 137:12
**late** 39:3,24 78:8
78:8 137:18
138:17
**law** 2:4,10,18 3:5
82:12 149:13
**laws** 6:12
**lawsuit** 8:8 9:8
9:23
**lawyer** 146:1
**lawyers** 146:4
**lay** 146:5
**lead** 142:24
**leaders** 148:18
148:23
**leading** 105:9
115:24
**leads** 12:9

**lean** 24:3
**leaned** 24:9
**learned** 20:23
33:25 62:10
**leaves** 40:10
**led** 21:7
**left** 13:1,11
14:16 20:9
29:20 46:21
83:16
**legal** 5:4 80:23
145:20 146:10
174:1 177:1
**legislative**
144:25 149:14
155:8,12,17,21
155:23
**lens** 113:22,24
**letter** 22:15
146:1 174:19
**level** 9:8 21:21
32:5 111:14
115:3,6
**liaison** 15:17
**library** 144:9
**life** 48:2 85:6
87:14 89:13,15
89:19 90:7
91:22,22 103:17
104:5,16,17,23
105:5,14,14,15
107:7,7 130:24
**light** 40:4 108:15
**limelight** 72:23
**limit** 51:24 110:1
165:11
**limits** 42:20

**line** 14:20 46:9
54:13 174:13
176:7 177:3
**lines** 54:14
**linguistic** 63:7
**link** 108:9,15,17
109:13,14,18,20
110:7,11 112:12
166:24
**list** 82:5 141:15
**listed** 142:16
176:7,17
**listened** 108:3
**listing** 176:7
**literacy** 126:11
126:20 127:7,8
**literal** 36:22
**literally** 8:24
11:8 19:21 26:4
28:4 44:5 60:21
70:24 81:3 85:9
90:15 92:15
135:16
**litigation** 107:10
145:8
**little** 17:8 18:21
20:5 27:2 28:4
31:15 53:6,7
71:24 78:6 83:8
83:10 110:2,16
148:12 149:19
170:22
**live** 22:13 71:9
**living** 64:3,4,5
**lobby** 164:11
**local** 21:2 67:8
99:7

**location** 1:14
102:3 119:19
**lombardi** 1:17
5:23 172:2,17
**long** 17:5 19:18
20:7 27:9 52:25
63:25 85:15,21
112:24 120:15
132:12 170:23
**longer** 53:6
85:16 132:23,24
167:25 170:22
**look** 12:18 30:7
32:23 53:12
65:22,25 126:10
126:12 128:1
133:14 139:24
150:19 157:20
169:19,19
**looked** 93:1,8
133:4
**looking** 13:8
40:24 46:19
48:22 108:15,16
108:21 110:25
111:4 124:8,20
125:11 126:3
138:16 141:12
141:22 157:17
**looks** 32:23
125:22 126:3,9
**los** 66:12,14
**lost** 61:22 63:3,9
**lot** 27:24 37:12
42:4,4 55:12
74:25 128:17
143:17

**lots** 33:6,10 35:6
52:6 55:22
72:12 84:12
94:12,13 124:10
124:13 130:13
144:5,13 160:15
169:22,23
**loud** 43:21 92:22
111:15
**loudly** 94:25
95:2,3,6
**love** 130:14,20
**loving** 61:9
**low** 132:9
**lucien** 3:12 5:14
14:24 157:21
159:6
**luciferian** 7:11
**lunch** 105:25
106:4,8,16
**luncheon** 33:9
**lutherans** 87:10

**m**

**ma** 1:7,16 2:15
2:20 3:2,7 174:6
175:3 176:3
**madam** 113:4
123:23 124:7
125:2 131:1
174:10
**magical** 112:8
**mail** 22:15
124:20 125:12
126:7,7,15 127:4
127:12,17,23
128:2,2,10,17
129:2,17,19,22

130:3 140:2
147:8,12 148:4,7
149:8 150:13
**mails** 125:23
126:4,5 128:19
131:6,7,8 132:14
132:24 133:11
143:5,6
**maintenance**
132:9
**making** 10:13
21:14 24:15,21
24:22 127:22
131:6 165:25
166:11,24
**mandated** 25:25
152:9
**manner** 6:13
**mark** 129:23
**marked** 4:7
**mass** 42:24
83:19 84:13
85:16
**massachusetts**
1:2 5:7 6:3
22:16,16 158:21
172:19
**massive** 37:16
**material** 96:17
**materials** 25:17
**math** 30:3 136:6
136:9
**matt** 2:7 5:11
110:19 112:6
**mattapan** 42:12
42:14
**matter** 5:7 17:15
35:24 36:7,16

38:6 41:2,7
49:25 63:11
69:4 71:25
77:10 80:10
141:16 156:6
168:8
**matters** 44:15
73:10 75:4 76:6
76:9,11 86:18
126:25 168:9
**matthew** 2:3
**maureen** 152:25
153:21
**mayor** 23:11,12
23:14,15,18
35:16 49:19
156:17,20
**mayor's** 18:11
18:12,13,14 19:1
**mayoral** 23:8,25
25:11 27:3,10,14
41:19 43:7 45:9
45:15 46:18
55:5 58:4
105:15
**mean** 22:20
23:22 24:2,24
25:5,13 26:13
27:7 30:6 33:20
36:9,25 44:16
46:2,16,17 48:25
49:11 61:13
63:15 74:3,6
109:5 111:6
130:20 132:19
137:7 146:2,4,5
146:20 161:8,24

**meaning** 8:25
17:15 75:4
**meaningfully**
69:5
**means** 6:14 8:19
16:8 33:24 43:5
60:12 61:14,14
156:17 171:6
**mechanically**
41:5
**meet** 27:22 33:5
55:13 74:16
98:4,18
**meeting** 32:25
33:2 69:21
70:19 71:17
72:6,6,7,13 75:5
75:8,13,14 84:14
92:7,12 109:2,6
111:5 114:23
115:11 117:11
117:12,16
118:24 119:6
122:20,21,22
125:4,5 126:21
127:14,17,18
128:3,4,8,8,25
129:9 132:6,7,11
135:18 136:13
136:15,16 137:2
137:15,18,22
138:9,11,18,18
139:13 141:5
142:25 143:7
144:6 145:17
148:16 149:2
151:19 153:16
155:20 158:20

165:10
**meetings**  29:11
  43:16 67:22
  71:12,12 72:2
  74:9 75:15
  76:25 90:18,23
  107:18 108:24
  108:25 116:14
  117:8 137:25
  138:8,10 158:23
  169:6
**member**  12:11
  18:3 22:23,24
  23:1,2 27:16
  28:14 31:10
  33:18 38:16,17
  38:17 62:8,21
  96:13 122:12,17
  125:14 144:10
  158:24 168:22
**members**  29:9
  31:4 32:2 34:16
  34:21 42:5,8
  45:1,2 46:9 49:7
  64:14 71:18
  77:18,18 101:22
  101:25 137:17
  159:3 164:25
  165:3
**membership**
  150:23
**memory**  59:21
  64:3,4,5 78:18
  78:20,20 128:16
**mentioned**  9:7
  10:18 17:21
  21:11 23:5 40:2
  42:1 43:9 47:10

53:3,16 61:4,16
  63:1 67:16 71:1
  71:25 81:1 90:5
  121:10 122:21
  128:6 134:5
  139:2 142:4
  144:23 153:20
  161:18
**merriam**  166:17
**mesoamerican**
  105:2
**messages**  16:22
**metadata**  26:4
**metro**  120:3,7,11
**mexican**  66:20
  66:20
**mexico**  66:11
**mic**  46:10
  108:13
**michelle**  49:21
  105:12,18
**microphone**
  46:10
**midday**  40:10,11
  40:17
**middle**  105:2
**midwest**  174:17
  177:1
**milestones**  135:5
**mind**  34:9 35:13
  38:10,23 39:1
  40:14 84:17
  96:12 98:13
  110:15 142:2
  144:1,3 146:10
  165:24 169:13
**minds**  7:10

**minimize**  64:20
  79:7
**minimizes**  62:17
  64:8
**minister**  7:7
**minneapolis**  2:6
  2:12 22:13,14
**minnesota**  22:14
**minute**  110:11
  153:21 169:8,9
**minutes**  16:21
  17:6,9 106:19
  111:10 120:17
  135:19 136:22
  136:24 137:10
  139:3 165:10
**mirror**  114:1
**miscommunic...**
  26:3
**misheard**  112:19
**mishearing**
  43:24
**mispronounce**
  15:3
**missed**  115:12
  119:19 137:19
**misspoke**  68:23
**mistaken**  129:15
**misunderstand**
  142:12
**misunderstood**
  37:4 97:20
  137:1
**misusing**  88:24
  122:6
**mm**  73:12
**mn**  2:6,12

**mobi**  11:25
  12:17 14:13
  109:20 123:18
  124:19 140:3
  165:18
**mobile**  112:7
**mobius**  3:14
  5:14 108:8
  109:11,22 110:5
  110:9,12,19,24
  111:13 124:3
  130:1 140:10,20
  147:14 148:10
  157:9,13,25
  165:23
**moby**  147:13
**mode**  41:19,19
**moderator**  46:7
  47:5,9 50:4,12
**modified**  113:23
**moment**  10:10
  59:23 61:10,25
  64:7 79:8,10
  83:2 152:13
**moments**  11:16
**monday**  1:12
**money**  25:12,19
**month**  49:10
**months**  35:2
**moon**  44:8
**morning**  5:23
  39:18,24 40:8
  43:14,17,25 44:1
  44:3,3,5,12,21
  49:5 50:13,25,25
  56:19 76:8
  77:14 90:7

mornings 53:10

mosque 36:10
53:17 54:8,20,22
56:3 69:1,23
70:5 76:9 78:1
78:17,24 79:2,12
97:21,23 98:10
98:11,12,14,18
99:8,15,24
100:25 101:20

mosques 53:18
53:20,21,22,24
54:2,4,12,19,23
78:14,22 91:6
102:4 103:12

motion 9:3,4,13
9:15

mournful 61:12

mouth 43:4

move 114:2
116:22 144:19
158:15

moving 52:16
61:2,14 144:20

muertos 66:12
66:14

multiple 27:7
45:5

murdered 63:4,5

music 60:9 61:8

muslim 78:19,23
79:5 97:24 99:1
99:5,17 102:2,7
103:3

muslims 99:2
102:22 103:3

**n**

n 2:1 3:1 4:1 5:1
50:9,10,11 51:8

name 5:23 7:6
14:20,21,25 15:2
25:23 26:5,8
44:1,3 51:5
68:14 87:4
110:17 123:22
174:6 175:3,4,15
176:3,4,21

named 121:1

native 59:5,8,17
59:18 60:1,20
61:18 63:10
65:4 66:20 67:2
67:7,8,9,11 69:2
76:10 79:3,6,10
104:19,20,21
105:4

natural 34:10
35:4 37:6,13

naturally 72:23

nature 27:18
33:23 35:17
59:25 60:4,11
63:10 68:1
161:3

nc 50:9

near 79:18 92:19

necessarily
35:23 45:2 48:2
61:13 77:19
84:7 116:1
127:21

necessary 71:22
107:8

need 11:14 13:9
21:16 36:21
52:19 89:12
93:16 105:17,23
106:3 111:11
114:11 118:4
123:5 156:8,24

needed 18:25

negative 145:24

neglected 60:18
67:16 84:25
115:15

neighbor 120:4

neighborhood
22:7,10,13 42:14
42:15 69:12,20
70:4 71:1,2 72:7
119:23

neighborhoods
22:11

neighboring
71:9,9 119:25
120:4,4

neither 172:11
173:7

never 7:23 16:16
48:13 83:16
104:3 117:7
130:6 150:25
152:9 155:25
163:11 168:25

new 11:9 20:11
65:9,10 66:1
72:4 109:20

news 11:2,19
12:5

nicole 2:17 5:15
16:16 17:2,14

52:15

nicole.oconnor
2:21

night 27:11
39:19,21 44:5

nighttime 40:6
44:6

nine 32:3

non 11:20,22
58:6,20 60:11,17
60:22,23 77:16
88:18 91:7,10,25
92:4,17 161:4,7
161:8,10,11

nondescript
92:11

nondiscrimina...
159:5

nonsensical
159:5

nontheistic
58:16 91:17
103:13

noon 39:19

nope 58:11,25
78:15 104:15
155:2

norm 28:12
72:14

normal 53:14
111:19 113:9,12
113:15,20
115:21,23 116:3
116:12,13,18,21
116:22 117:2,14
141:9

normally 12:24
82:13

norms  7:15
north  2:5,11
  61:20 67:6
  105:8
northern  66:11
notably  60:11,21
notarized  174:14
notary  1:17 6:1
  172:18 174:25
  175:10,18
  176:15,23
  177:23
note  9:3 14:15
  37:9 59:16
  60:19,23 61:25
  110:12,20
  113:14 166:23
  174:12
noted  136:7
notes  37:5 71:20
  80:18 142:21
noteworthy
  33:16,20 34:3,19
  35:12
noticed  116:9
november  27:12
  49:16,18
number  12:19
  13:21 14:20,21
  26:9,9 29:15,21
  30:2 36:13,19,20
  45:19 50:25
  53:17 54:4,12,18
  59:10,11 77:20
  86:16 87:6
  97:17,18 99:11
  99:13 100:15
  108:9 123:19

142:2 147:3
153:2 157:11
174:7,13
numbers  27:5
176:7

**o**

o  5:1
o'connor  2:17
  5:15,16 10:9
  48:10 50:17
  52:12,20 106:15
  106:19 130:1
  149:17 158:11
  160:6 162:22
  164:16 170:18
  171:10 174:5
o'donnell  17:16
o'malley  108:20
oaths  6:2
object  8:3
objection  6:5,18
  48:10 50:17
  52:12,18,20
  149:17 160:6
  162:22 164:16
objections  10:11
  10:14 16:5
  52:16,18
obligation  149:4
observed  60:7
  104:22 155:19
obtain  133:19
obvious  127:8
obviously  26:10
  63:15 67:8,19
  111:6 120:21
  126:10 127:6

132:14
occasion  57:16
  87:18 96:11
  117:17 118:22
occasionally
  117:18
occasioned
  120:22
occur  76:23
occurred  136:15
occurrence
  123:16
october  148:5
  174:4
offend  12:14
offensively  87:8
offer  72:8
  117:23 118:12
  121:21 151:6
  152:21 153:7,14
  153:22 161:1
  167:24 168:15
offered  60:9
  115:14 122:5
  152:1,14
offering  33:2
  152:12
offers  46:7
offhanded
  146:16
office  18:11,12
  18:13,14 19:1
  20:8 21:9 25:14
  41:12 55:14
  104:1 122:13,16
  147:7 154:15
  156:14

office's  18:19
officer  172:1,2
offices  35:16
  44:25
official  38:16
  41:16 62:10,24
  72:5 86:7 98:5
  99:8 160:22
  175:15 176:21
officially  120:1
  163:14
officials  42:5
officiant  152:7
officiate  152:8
officiates  115:19
offshoots  60:15
oftentimes  78:1
  90:21
oh  15:15 16:4
  29:18,18,21
  32:15 41:11
  55:18 61:7
  63:21 75:22
  78:13 85:18
  90:12,12 95:3
  101:8 106:6
  109:12 116:17
  121:15 124:17
  124:22 125:10
  129:15 134:18
  136:23 143:25
  144:11 152:17
  157:17,19
  162:14
ohio  174:2
ohrenberger
  121:11 141:25

**okay** 5:2 8:10,18
9:22 10:2 11:4
11:11,13,24 12:8
12:10 13:8,15,20
14:10,11,25
15:10,19 16:8,19
16:25 17:13,25
18:6 19:13 20:5
20:15,18 21:11
22:8,11,18 23:4
26:19 27:1
28:12,25 30:6,15
30:20 31:3,15,22
32:5,9,15,18
34:23 35:9
37:15 38:5,23
39:6,12,17,22
40:2,9 41:2 42:1
42:15 43:9
44:10 45:21
47:1,10 48:16
49:2,4,17 52:22
53:19 56:23
58:3 59:13
61:16 62:19,25
63:24 64:3,15,18
65:4 66:9,19
67:15 71:5 73:5
73:9,22 75:1
78:11,14 79:14
79:19 80:17,23
81:6,23 82:17
83:5,13,14,19
84:16,22 85:2,6
85:18 86:10,23
87:19,22 88:15
91:9,19 92:21
93:5,8 96:4 97:9

97:20 98:20,25
99:21 100:17
102:10,21 104:2
105:8 106:23
107:1,15 108:21
109:10,22 111:8
111:16 112:18
112:21 114:16
116:6,25 117:5
117:14 119:23
120:18 121:9,15
121:24 122:19
123:17 124:2,5
124:15,18
125:17 126:14
127:12,25
129:19 130:18
131:1,23 132:8
134:1,15,19
135:15 137:1,6
137:12 138:5,19
139:1 140:7,17
140:20 141:9,16
143:21 144:18
146:6 147:11
148:7 153:8
155:22 157:9,13
158:8,16 160:10
160:13 161:15
163:10 164:14
164:18 166:23
167:13 168:12
168:17 171:1,7
171:12
**old** 7:13 48:5
72:4 78:21 83:9
**olsen** 147:19

**once** 85:24 86:2
86:3 89:16
106:10 119:14
152:19 165:21
**one's** 115:13
**ones** 69:11 99:25
100:1 122:5
**ongoing** 90:3
98:11
**online** 25:15,18
**open** 23:20
108:9 123:19,24
125:15 169:16
**opening** 46:8
75:12 107:19
116:8,23 117:23
118:12 137:19
141:24 145:17
147:5 151:6
153:15 160:16
161:1 169:16
**opens** 158:22
**opinion** 9:5,18
**opportunities**
47:24 48:3
153:14,17 165:9
169:5
**opportunity**
36:12 46:7
118:25 119:13
122:23 123:4,7
148:23 167:18
169:22
**opposed** 44:5,8
75:5 77:24
107:24,25
**order** 9:4,15
139:3 158:15

162:5 164:12
171:3
**organization**
23:2 113:1
118:8 119:3
122:25 123:8
134:24 135:1,6
135:10,14
136:10 137:11
150:7,9,14
151:11 154:12
163:2
**organizations**
133:8 150:6
153:18 169:23
169:24
**organize** 43:22
118:9
**organized** 34:15
66:23 75:15
**organizers** 41:12
**organizing**
44:23
**oriented** 151:16
**origin** 80:13
**originally** 142:3
**orleans** 65:10,10
66:1
**orthodox** 84:23
84:24 85:9,12
86:5,12
**outcome** 172:16
173:12
**outdoor** 34:13
34:15
**outlook** 166:5
**outset** 72:21
114:22

**outside** 6:4
  39:23 42:2,2,19
  42:25 43:2
  55:13 57:3
  79:15,16,17
  80:15 81:11,14
  82:5 131:5,8
**overlapping**
  168:21 169:2
**oversimplifica...**
  104:20 105:1
**overtly** 96:9
**overtones** 52:10
**owner** 24:4

**p**

**p** 2:1,1 3:1,1 5:1
  13:22
**p.m.** 148:5
  157:22 171:17
**pagan** 58:18
**page** 4:2,6 13:12
  13:18 14:13
  124:20 126:1
  140:13,18,19
  158:1,5 159:4
  174:13,15 176:7
  177:3
**pages** 143:4
  158:10
**paid** 28:5 154:14
**pamphlet** 92:19
  93:9,14,23
  150:20,22 167:8
  167:12,15
**par** 117:2
**parade** 32:24

**paragraph** 13:16
**paraphernalia**
  65:20
**parent** 33:1
**parenthetical**
  126:19
**parishes** 67:21
**park** 22:13
  24:18 80:3
**parks** 98:8
**parlance** 107:22
  145:23
**parliament**
  146:10
**parse** 59:1
**part** 22:6,8
  34:10 44:20
  60:8 62:1 77:3
  77:13,19 92:3
  94:21 101:1
  103:11 108:3
  112:16 121:12
  121:13 141:12
  170:9 176:9
**participant**
  60:22
**participate**
  36:11 45:3 70:8
  71:16 102:1
  149:2,14 160:16
**participated**
  35:14 45:7,15,17
  55:3 59:9,10
  67:4 68:21
  87:25 97:23
  99:4 101:24
  102:2 118:7
  146:22 151:25

  155:3
**participating**
  33:3 101:3
**participation**
  152:6
**particular** 21:15
  26:24 32:11
  38:10,21,21,24
  39:11,12 40:23
  53:1 54:22 57:4
  57:16 71:5
  72:10 74:4
  80:18,19 82:15
  86:3 90:13 92:9
  96:10 109:1,2
  113:1 114:20,22
  117:11,12 119:5
  127:2 135:10,25
  136:20 139:4,13
  142:1,22,25
  143:7 144:13
  152:4 156:25
  160:4 161:13
**particularity**
  133:13
**particularly**
  29:14 43:6 58:4
  59:18 82:23
  94:23 96:24
  98:20 113:17
  120:6 121:15
  162:15
**parties** 6:3,6
  13:20 172:12,14
  173:8,11
**partnership**
  76:21

**parts** 32:4,6
  142:22
**party** 42:24
**pass** 170:17
**passed** 46:10
**passerby** 11:20
**pastry** 55:9 78:4
  123:12
**patch** 112:11
**pause** 111:11,23
  112:14,21 159:8
**paused** 108:10
  137:9
**pdf** 14:13 123:20
  123:21 124:20
  125:25 140:5
  147:13
**pdfs** 144:21
**peaceful** 61:9
**people** 19:3,4
  25:5,7 26:5
  28:15 30:20
  34:17 35:3
  37:12 38:15
  41:21 42:4,6,6,7
  44:10 47:2 48:2
  48:8 55:12 63:2
  63:3 64:9,12
  75:6 78:3 88:3,5
  94:13,24 95:20
  96:2 98:18,22,25
  99:5,12,13,23,25
  107:17 108:5
  116:4 119:2,2
  123:3 132:21
  134:16 138:3
  141:4 149:1,25
  150:3,3,5,10

152:18 154:13
156:15,18,22
160:18 161:18
170:7
**people's** 137:16
**perceive** 28:15
167:4,6
**perceiving**
166:11,25 167:4
**percent** 73:6,7
73:23,24 75:2,10
75:11,16 76:13
77:2,4 101:25
102:11 138:13
**percentage**
76:25 99:17
100:25 101:23
101:24
**perfect** 11:17
171:7,12
**perform** 149:20
**performed** 155:7
162:15
**performing** 7:8
**period** 29:4,16
31:18 46:12
63:18,25 64:1
144:24 145:3,12
**periodically**
111:11
**permitted** 6:10
**person** 17:19,22
21:19 32:12
49:6 117:15
135:1,6,13
138:17,19 146:5
**person's** 94:19

**personal** 7:20
26:18 29:16
**personally** 12:14
175:11 176:15
**perspective** 32:5
**persuasion**
82:15
**pertain** 134:20
**pertaining** 143:7
**pertains** 61:17
77:8 82:24
107:9 149:8
**ph** 17:16
**phase** 107:9
**phone** 16:14
26:9,9,16 143:9
143:12,14 144:4
174:3
**photo** 157:21
**phrase** 47:14
122:19
**phrased** 48:20
**phrases** 115:24
**phrasing** 88:24
**physical** 43:16
44:17,18
**physically** 12:24
**piece** 63:1 76:25
**pique** 20:2
**piques** 19:22
**place** 21:1 35:18
35:21 40:23
41:23 58:24
69:10 76:13,17
77:24 133:1
144:13 145:10
151:19

**places** 74:25
97:18
**plague** 110:14
**plaintiff** 1:5 2:2
5:12 13:25
14:17
**planned** 75:9
**planning** 10:6
**platform** 23:25
24:2 25:1
**play** 24:19,23
108:10 111:11
111:17,20 112:8
112:16 130:21
170:6
**played** 111:22
112:13,20
130:22 142:14
**playground**
69:12
**playing** 151:7
**plays** 170:11
**plaza** 79:20,24
80:4 104:22
**please** 5:9,21
6:19 14:21
31:22 60:6 70:9
92:22 93:4,12
101:18 108:18
109:25 112:19
113:4 115:18
123:19,23 125:2
125:6 129:15
147:18 148:7
153:10 157:10
161:7 165:22
171:6 174:11,11

**pleases** 106:1
**pledge** 112:15,16
115:20 116:9,11
116:20,24 117:1
135:20 136:14
**plight** 118:11
**plural** 35:10
36:17 45:6
54:14
**plus** 90:8,11,12
**podium** 161:14
170:3
**poem** 107:25
152:14,16
**poems** 152:17
**point** 12:12
29:10 34:1
56:23 74:13
77:7 95:15
105:25 106:8
125:4,5,17
135:13 137:12
140:24 154:16
**points** 134:15,20
134:23 139:13
139:15,21,21
140:5,23 141:7
141:13,14 142:5
142:11,16,20
**policy** 21:20
159:5 163:12
**polish** 118:20,20
118:20,23
**political** 35:14
37:7,11 42:7,19
43:10 44:15,19
44:23 55:2 56:1
56:3,4,6,18

67:17,18,21,25
68:17,24 69:5,9
89:15,19 90:7,15
90:18 91:22,22
103:17 104:5,16
104:17,23 105:5
105:14,14 107:7
107:7 126:24
**politically** 36:23
44:13 67:3
**politician** 53:25
54:9 57:5,24
62:7 72:16,22
81:12,25 82:4,6
82:7 84:6,25
85:6 86:17
87:14,23 88:3
89:13 90:14,16
170:8
**politicking** 43:6
**politics** 20:22
170:6,8,11
**poor** 29:13 77:13
124:5
**poorly** 48:19
76:5
**pop** 75:14
**population**
36:24 58:12
67:19 97:17
99:14 102:6
**populations** 37:2
**portion** 99:6,25
137:20
**portrayed** 119:6
**posed** 102:10
156:2,5 161:16
162:4

**posit** 62:19
**position** 62:22
71:18 164:11,13
**possible** 14:6
23:22 106:5
141:11 162:11
162:14,18
**possibly** 64:16
65:19 165:6
**post** 91:22,22,23
103:20 104:17
105:5,10
**potentially**
101:1
**potholes** 24:16
**power** 166:10
168:18
**powerful** 62:17
**practice** 102:7
128:19 141:3
155:8,13 166:6
**practices** 156:21
**practitioner**
65:25
**practitioners**
65:23
**prayed** 78:23
98:23 99:12,25
100:19
**prayer** 36:10,11
36:13 54:22
59:24 69:24,24
70:1 78:2,3,6,8
97:24 98:15,17
98:21,22 99:1,4
99:9,15 101:3,21
101:21,23,24
102:1,2 107:25

115:13,18 116:5
116:6,23 117:15
121:22 122:3,7
135:20 136:14
144:25 149:15
152:4,11 153:15
155:8,13,17,20
155:21,24
158:23 170:7
**prayers** 78:7
161:2
**praying** 99:19
100:18 115:10
**pre** 38:12 72:20
75:5 85:6 87:14
89:13,15,19
91:21,23 103:17
103:21,23,23
104:16 105:5,10
105:13 107:6
122:22 125:4,23
127:11
**precise** 28:4
38:24,25 46:15
63:3 65:18
110:8
**predates** 128:2
**predominately**
50:24 51:1
**preface** 30:9
**prefer** 8:5 38:1
106:4
**preferences**
170:4
**prejudiced**
166:4
**prejudicial**
166:5

**preparation**
27:13 111:17
**prepare** 121:25
121:25 133:22
**prepared** 141:7
163:19 173:3
**presence** 6:4
86:21
**present** 3:10
25:3 38:3,18
59:10 62:18
64:6 77:2 78:5
89:7 96:5 97:2
138:12
**presentation**
71:14 72:1,3
116:11
**presentations**
138:13
**presenting** 77:17
**presently** 92:14
**president** 50:8
51:9,10 115:23
**press** 111:11,17
**presumably**
49:19
**presume** 49:23
**pretty** 24:2,7
25:10 34:11
37:3 38:2,3,24
45:21 52:9 53:3
54:12 69:19
70:12,12 88:8
113:12 117:2
136:19 137:2
140:23 153:3
**previous** 86:1
142:19

**primarily** 36:5
**primary** 25:4
    60:15
**print** 157:18
**printed** 157:20
**prior** 11:4 27:14
    81:17 82:6
    153:15 154:19
    161:22 165:9
    172:5
**private** 33:5
    168:3
**privileged**
    148:24
**probably** 11:20
    16:23 18:24
    23:15 27:7
    28:11 29:21,21
    30:13 33:25
    34:14 35:8 37:1
    39:10,17 40:7
    61:12 73:3,20
    74:12 76:1
    77:20 78:18
    83:9 87:4
    106:20 108:6
    136:21,22 137:4
    137:5,8 143:11
**problem** 14:10
    114:9 158:17
**procedural** 6:11
**procedure** 175:5
    176:5
**proceed** 7:1
**proceeding** 6:9
    171:18 173:4
**proceedings**
    5:25 172:3,5,6,9

173:6
**process** 61:22
    117:1 160:11
    162:25 166:13
**processes** 143:6
**produced** 6:8
**production**
    174:15,17,22
**profound** 149:3
    149:3
**program** 38:14
    126:11,20 127:7
    127:9,10,24
**programming**
    125:16
**programs** 24:21
**project** 71:14,15
**projector** 13:1
**prominent** 38:17
**prompt** 37:24
**pronouncing**
    68:14
**proof** 127:19
    128:22
**proper** 22:4
    42:10
**prophet** 60:16
**proportion** 73:1
    99:11,23 100:3,6
    100:7 101:4
    138:16
**proportions**
    73:16
**propose** 13:20
**proposition**
    127:20,22
**protestant** 86:24
    87:1 89:9,11

**protestants**
    163:11,12
**prototypical**
    32:20 53:4
**provide** 134:23
    148:20 150:1,15
**provided** 125:25
**providing** 131:2
**psychology**
    166:13
**public** 1:17
    24:16 27:21
    48:2 51:23 62:8
    62:9,21 79:24
    80:5 121:1
    123:6 141:24
    142:15 143:18
    152:4 172:18
    175:10,18
    176:15,23
    177:23
**published**
    157:22
**pull** 44:24
    108:22 147:11
    165:17
**pulled** 140:11
**punch** 28:9
**purpose** 18:19
    23:7 74:7 91:25
    143:25 144:1
    154:7
**purposes** 92:11
    113:4 170:17
**put** 10:10 43:4
    44:22 103:11

**q**

**qualified** 172:7
**qualify** 162:5
**qualities** 150:3,5
**quality** 166:9
**quarter** 100:12
    100:20
**quarters** 100:17
    100:19
**quasi** 126:25
**question** 23:19
    29:3,14 30:10
    34:6 35:11 47:8
    47:9 48:19
    52:23 54:10
    88:5 90:1 92:13
    93:2,3 96:20
    101:17 102:10
    106:17 115:12
    146:11 156:2,4,5
    161:15,16 162:1
    162:4 163:3,17
**questioning**
    54:13,14 107:9
**questions** 45:3
    46:7,11 49:25
    51:16,19 52:6,8
    71:17 72:10
    126:11 151:18
    170:18
**quick** 30:13
    109:25
**quickly** 93:1
    141:13,22
**quite** 13:9 25:6
    48:14 104:8
    169:3

**quorum** 138:22

**r**

**r** 2:1 3:1 5:1
13:21
**rabbi** 122:6,7
125:15 140:14
152:1 155:19
**race** 23:8 27:3
27:14,23 41:19
49:19 159:21,22
159:25 163:9
**races** 46:17
**racial** 97:12
166:6
**radar** 169:2
**raise** 6:20
**raised** 21:25
82:21 83:4,15
**rally** 33:3
**ran** 21:8,9,10
170:22
**range** 53:14
101:19
**reach** 65:18 88:4
130:16 135:8
**reached** 15:11
17:16,22 18:2,5
41:14
**read** 8:21 9:9,11
9:13,15,18 13:17
13:18 14:21
92:22 93:9,11,14
93:23 94:2
125:6 129:16,16
129:17 148:7
150:20 152:14
152:16,17,24

158:9,11,17
165:22 166:18
167:8,15 175:5,6
175:12 176:5,6
176:17
**readers** 9:2
**reading** 8:22
125:12 126:12
128:2 130:17
131:14,17,18,21
131:24 148:3
150:22 166:16
174:19
**readings** 142:2
**reads** 128:19
**ready** 111:21
166:1
**real** 82:7 117:20
**really** 19:12
21:14,20 39:6
47:8 60:12
71:22 85:7
90:17 95:12
123:14 146:9
156:13,24 163:9
165:12 167:11
167:21 168:8,9
**reason** 7:16
70:19 150:18
154:9 168:23
174:14 176:8
177:3
**reasonable**
117:25 133:5
**reasons** 13:24
**recall** 10:7,22,24
11:1,18 12:6
14:6,7,9 33:23

37:21 38:14
40:19 41:4 43:2
46:22,23 47:15
55:4 56:10,15,20
57:15 58:17,19
58:22,25 61:2,3
65:8 71:20 90:4
90:8 91:12,14
95:5 103:24
104:15,18,24
105:7,11 120:23
121:7,16 128:7,9
128:14 129:1,1,3
129:5 130:18
137:21 139:1,18
142:23 143:21
145:8 146:14
151:17 152:20
152:22 154:16
154:19,25 158:5
**recap** 75:2
114:19
**receipt** 174:18
**receive** 139:14
164:12
**received** 10:25
15:11 26:10
52:9 134:15
143:3,5
**receiving** 16:1
51:17
**reception** 123:11
**recite** 153:10
**recognition**
118:5
**recognize** 117:24
118:14,19 119:3

**recognized** 72:8
72:15 118:22
122:15 135:6
139:19 141:22
169:25
**recognizing**
34:17
**recollection**
36:18 37:20
38:24 46:15
51:13 57:2 70:6
101:5 131:18
135:17 142:10
169:21
**reconvene**
106:22
**record** 5:3,10,24
6:6 8:10,11,19
8:24 9:2 10:10
12:22 13:10
63:2 68:4,8,9,11
93:18,19,21
101:13,15,17
106:1,4,24,25
107:2 108:19
109:25 114:7,10
114:12,14,15,17
133:21,24,25
134:2 157:5,6,8
162:4 165:22
171:2,13,15
172:9 173:5
176:9
**recorded** 6:13
172:6
**recording** 6:8
172:8 173:4

**recovery**   148:22
150:3
**redirecting**
119:4
**reduced**   172:7
**refer**   60:13
**reference**   25:17
26:25 41:8
155:25 174:7
175:2 176:2
**referenced**
120:24 121:5
141:25 142:18
175:11 176:15
**referencing**   44:2
125:8 140:22
152:16
**referring**   73:10
94:16 95:7
136:11 141:20
**reflection**   152:13
153:22 169:17
**reflections**   60:9
152:17,24
**refresh**   128:11
**refreshes**   128:16
**refugees**   34:18
**refuse**   163:12
**refused**   38:4
**regard**   35:20
**regardless**   70:18
**regional**   23:2
**regular**   55:24
57:3 136:24
**regularly**   32:11
83:19
**reichman**   124:16

**related**   34:20
55:10 57:6 65:5
162:9 172:11
173:7
**relation**   69:13
**relations**   18:4,11
**relationship**
119:10 151:6
153:12 154:10
154:11 163:21
164:8,15,15
167:19,22 168:1
168:7,10,21
**relationships**
19:5 160:24
170:14
**relative**   73:1,16
79:2,2 81:6
82:20 99:11,23
107:5 172:13
173:10
**relatively**   30:2
**religion**   33:12,13
33:17 34:7
35:12,20 36:8
55:11 60:22,23
60:24 68:17,19
74:17 78:10
90:22 91:17
92:1 98:6 160:5
167:17
**religions**   58:7,21
59:2 60:15,17
65:5 66:9 67:3
82:3 89:20 94:1
105:13 107:6
167:5

**religious**   35:17
35:18,21,23 36:1
36:2,7,14,15
52:10 68:20,22
68:25 69:7,10,14
69:18 73:17
74:4,7,10,11,16
75:21 76:6,12,16
76:18,19,21 77:8
77:11,12,16,24
77:25,25 78:12
79:11 82:15
84:18,19 85:18
88:13,18,20 89:5
90:22,25 91:3,7
91:10 94:19,20
96:11 97:8,11
114:20,22
115:10 126:24
126:25 141:4,6,7
148:17 151:15
151:16,20,21,22
151:23,23
159:12 160:2,4
161:3,4,7,8,10
161:11 169:15
169:24 170:4
**religiously**   59:19
**rely**   111:19
**remainder**
135:22
**remains**   51:10
123:5
**remark**   116:8,19
116:23 151:6
**remarks**   46:8
72:9 107:19,23
107:24 116:8,25

118:13 120:24
121:11,22,25
122:2,3,5,18
134:5,6,7,21
136:7,12,16
137:14 139:2,10
139:11,23
141:12,24
142:14 145:17
148:15 153:15
160:17 161:1
**remember**   12:6
34:4,13 37:6,15
37:17 38:7 39:2
39:17 40:21,22
46:14 49:9 50:3
57:18 60:8
61:25 70:3 71:6
71:19 80:19
109:2 111:5,7
119:5 120:20,22
142:24 143:2
145:9 154:20
**remembrance**
59:6,24 61:21
**remind**   34:24
51:4,7 75:17
**reminder**   109:25
**remittance**
26:14
**remotely**   5:14
6:4
**renting**   74:22,24
**repairing**   24:17
**repeat**   44:15
**report**   25:25
**reported**   1:17
25:14

reporter 5:20,22
5:24 7:1 109:15
171:1,7,12 175:7
reporter's
110:17
represent 5:17
160:15,18,19
161:12
representative
13:25 18:3,4
161:18 162:6,8
represented
31:23 32:1,7
160:21
representing
5:18 15:23 32:3
represents
160:20
reputation 38:2
73:7
request 139:20
159:1 168:15
176:9,11
requested 127:3
172:21
requesting
125:18
require 13:17
required 174:25
requirements
28:8
requires 93:14
research 41:10
reserved 171:16
reserving 10:11
10:14
residents 47:24

respect 83:25
94:22 149:3,13
152:11
responded 24:15
166:15
responding
166:15
response 96:15
129:18 147:10
163:24
responsible 16:6
responsive 25:2
rest 19:19
112:24,25
results 30:8
retired 29:19
retirement 33:9
return 113:4
129:10
returned 174:18
review 172:21
174:12 175:1
176:1
rewind 168:12
rgr 18:22
rhythm 133:9
ridden 110:15
right 6:20 14:18
25:2 32:15 34:5
35:22,22,25 36:2
36:4 37:18 40:7
40:7,16 42:1
44:9 46:21 51:4
58:6 63:16
64:17,24 80:10
80:17 82:9
87:21 89:23,25
109:7 110:16

115:21 120:20
125:10 131:2
134:4,19 140:4
144:3 145:21,22
145:25 149:14
170:20
rights 149:10
road 27:23
roaming 40:24
rob 5:16 15:14
102:17
robert 1:17 3:4
5:23 15:2,4,7,18
15:19,22 16:7,9
16:10,13,20 17:2
17:13 18:5
172:2,17
robert.arcangeli
3:8
role 18:21 49:24
50:12 51:7 62:6
62:8,9 72:17
84:25 86:17
123:8 132:11,12
151:7 170:6,11
roman 67:15
68:1 82:17,18,19
84:22 89:20
room 2:19 3:6
15:4 97:25 98:3
123:11,11 137:5
roots 34:22
rosh 113:16,17
roughly 27:5,5
29:1
round 27:5
routinely 30:21
31:5

roxbury 121:12
rule 88:11
rules 6:12 175:5
176:5
run 23:10,11,12
23:13,15,18 29:4
31:5,11 32:11
45:13 82:5
85:15 162:13,20
164:21
running 20:22
23:10 35:16
44:25 55:14
rut 76:3

**s**

s 2:1 3:1,4 4:5
5:1 13:22
174:15 176:8,8
177:3
safety 51:23
saint 80:12
salem 1:16 5:7
158:18
sandra 173:2,15
satan 7:7,24,25
satanic 1:4,14
2:2 5:6,7,12
14:17 92:14,15
148:1,24 158:24
174:6 175:3
176:3
satanism 60:20
satanist 96:10
158:18
savin 71:10
saw 21:18 117:2
128:4 136:7

153:2 165:10
saying   26:4
43:21,25 44:20
94:23 96:6,6
102:11 129:7,13
131:10,12
134:12 147:6
159:1
says   14:1 95:10
109:11 125:5
148:6 157:18
scent   166:12
167:2,3
schedule   41:1,16
41:17 75:12
88:8,9 152:22
scheduled   41:2,4
75:8 159:2
schedules   137:16
schmoozing
122:23 123:13
school   19:15
21:5,13,14 22:24
23:16 24:7 25:7
33:1 99:10
121:4,4 141:23
141:24 143:12
143:20 144:6
schooling   59:8
schools   21:15
51:19 121:1,2,6
121:10 123:1,4,6
142:15 143:18
schwab   173:2,15
scope   18:23
53:25 55:14
69:3 81:12,24
82:4,5 107:15

scrap   81:25
screen   108:22
112:2 124:6,8
139:25
scroll   129:19
seal   175:15
176:21
sean   3:11 5:3
68:4
seasonal   118:4
seats   29:23
second   13:18
17:7 30:13 59:3
59:15 68:5
109:22 111:25
123:20,20
161:16
secondhand
64:16
secular   91:15,15
94:4 148:17
see   12:3 13:8,11
13:13,21 14:1,2
14:10,19 15:1
17:17 28:18
29:10 31:14
42:3 45:5 62:14
62:19 64:18
65:18 66:9 78:6
78:20 80:8
83:14 84:7 87:7
94:22 97:20
99:18,21 104:2
108:14,19,20,23
109:8,8,9,16
110:17 114:7
124:6,17,25
125:10,23

128:11,21
129:24 130:3,8,8
130:12,20,25
131:25 132:1,1,3
132:15 140:4,13
140:15 144:18
157:21,24 159:3
165:13 166:18
166:19,23 167:1
169:14
seeing   13:1
108:23 114:9
125:8 132:8
seek   146:9
seeking   145:16
145:19 146:13
164:15
seen   11:19 48:13
48:14 74:25
99:12 128:13
138:20
seinfeld   48:6,15
selected   151:10
self   96:20
send   15:13
109:13 140:8
senior   24:14
33:8,8
sense   19:7 25:1
26:19 54:17
62:25 75:1
79:11 146:23
149:3 151:8
sent   109:20
147:8,23 149:7
sentence   13:19
september   1:12
5:5 49:16,17

109:7,21 110:23
119:5 126:20
127:13 135:16
135:18 137:21
serious   148:25
sermon   108:4
sermons   108:5
served   9:24 10:5
12:14 17:11,17
18:2 29:6 81:14
98:19
service   34:13,15
36:10 77:25
84:12 85:13
86:5,9 89:5,24
91:23 97:22
122:14 135:3,4
136:5,7 139:22
services   18:23
24:10 50:24,25
55:7 85:15
87:25 88:17,20
89:2 91:10
103:18,25
serving   50:12
170:1
sessions   108:4
set   16:23 38:12
86:12 89:11
92:6 108:11
112:5 151:11
sets   114:6
setting   143:20
settings   144:5,7
seven   30:11
138:23,24,25
shamanistic
104:9,13

**share** 72:9 95:24
141:11
**shared** 142:5
**sharing** 123:14
**sheet** 174:13
176:7,10,18
177:1
**shelter** 148:20
150:1
**shirt** 95:10
**shop** 33:4
**short** 158:17
**shorthand** 31:1
48:23
**shot** 124:5
**show** 12:23,24
65:23 89:24
108:24
**showcase** 126:19
127:9 134:22
141:6
**showed** 73:14,25
**showing** 73:8
88:11
**shown** 174:16
**shurtleff** 9:5,18
**sic** 18:22
**side** 13:21,22
46:21 73:22
88:21 98:10,21
**sidewalk** 79:19
79:23
**sidewalks** 24:17
**sign** 26:15
**signature** 14:16
14:20 126:1
171:16 172:16
173:14 174:14

**signed** 175:13
176:18
**signing** 20:25
174:19
**similar** 56:18
69:8,11 70:4
94:2 132:15,18
132:25 133:9,13
**simple** 36:5
84:18 152:14
**sincerely** 174:21
**singing** 61:6,7
**sir** 174:10
**sit** 46:5 164:3
**sitting** 46:6,23
**six** 28:20,21,25
29:16 129:20
170:1
**sizes** 102:4
**skills** 172:10
173:6
**skim** 92:23
**slash** 55:3 98:12
**slightly** 28:17
113:23
**small** 24:4,5
27:21 28:8 30:2
100:2,4,6,7,9,9
101:24 102:11
123:10 154:16
**smaller** 100:2
**smoothly** 10:13
**snack** 123:12
**social** 7:15 55:10
**solicitations**
130:6
**solicited** 121:16
129:9

**solid** 79:24
106:11
**solutions** 5:4
7:17 174:1
177:1
**somebody** 96:3
109:3
**someone's** 33:5
33:9
**somewhat** 8:9
81:8,20,20 85:11
85:23
**sonia** 2:9,13 5:13
**sorry** 10:9 15:3
16:2 31:18 41:9
42:13 44:11
52:14 54:10
68:23 70:9
83:21 89:21
93:12 95:2
100:16 102:15
102:17 103:15
108:13 109:23
112:18 114:25
121:14 125:11
156:4 161:16
162:3 164:19
166:5
**sort** 9:25 10:8
11:2 18:7 21:7
24:17 26:17
27:24 28:7
34:16 38:13
43:1 53:11 55:9
55:10 56:14
59:21 60:4 61:9
62:4 67:25
71:13,15 73:8,18

73:18 77:24
78:4 80:20 83:1
83:2 89:22
90:19,23 97:1
101:1 102:6,8
103:18 117:25
123:10 128:21
141:6
**sorts** 27:24
**sounds** 18:22
45:21
**source** 166:16
**south** 67:2 105:3
**sovereignty** 7:20
**space** 43:16
44:18 45:1,23
55:12 74:17,21
74:25 79:11
80:5 90:21
98:19 102:9
**spaces** 67:23
88:1,19,19 91:8
**spared** 7:22,23
**speak** 27:2,20,21
27:21 28:15
31:20 36:12
38:19 63:14
79:19 80:16
99:19 102:16
105:12,21 117:3
151:9 156:13
**speaker** 13:6
109:1 114:2
115:3,10
**speakers** 112:5,8
159:2 161:4
169:15

speaking  5:3
  15:20 19:20
  26:21 27:6
  30:24 38:7,12,13
  38:14 52:16,17
  62:20 72:17
  99:24 134:13
speaks  161:13
special  118:4
specific  11:1,14
  18:14 67:25
  71:21 74:13
  91:1 110:5
  146:14,25
  153:17
specifically  14:7
  19:20 27:10
  33:23 51:13
  56:11 57:15
  71:19 73:9
  94:13,15 97:15
  104:24 111:7
  121:10 128:15
  129:1,2 133:14
  139:18 146:21
  161:3
specified  75:5
speeches  27:14
  27:16,18
spend  16:19
spent  76:7
  143:17
spiritual  59:24
  60:6
spiritualism
  60:2
spiritually  59:18

spoke  25:6 27:7
  27:24
spoken  145:15
  146:11
spokesman
  159:6
spontaneously
  38:15 77:5
sports  24:19
spot  92:24
square  2:19 3:6
st  38:11 76:10,20
  76:22,23 80:11
  97:15,16
stability  148:21
  150:2
staff  122:12,17
  128:19 134:5,10
  134:11 135:23
  136:4 144:11
  147:1,9,21,22
stage  46:22
stairs  38:19
  80:15 81:2
stand  7:9,18
  46:5 115:18
  116:4 152:4,10
standard  141:3
standing  46:6,23
  47:1,3 115:18
stands  116:2
star  43:14,17,25
  44:1,3,4,8,12,21
  49:5 50:13,25,25
  56:19 76:8
  77:14 90:7
start  7:4 52:17
  65:24 70:25

76:1,4 82:1,13
  85:6 87:7 88:20
  131:24 137:15
  138:14,15
  153:16 162:2
  165:9 169:6
started  59:23
  106:10 127:16
  143:9,11,13
  145:6
starting  60:5
  171:2
starts  78:21
  111:14
state  6:2 23:2
  33:3 149:7,13
  175:10 176:15
stated  115:17
statement  12:21
  65:16 129:11
  148:1 163:19
  175:13,14
  176:19,19
statements
  131:14,15,19
states  1:1 62:2
  66:1 158:18
stay  78:3
stenographic
  6:14
step  152:23
  153:22
steps  76:23
stereotype  38:1
stereotypical
  32:20
stereotyping
  37:23

stimuli  166:14
stipend  154:16
  154:24
stipulated  10:16
stipulation  6:15
stone  79:25
stood  46:19,20
  46:22
stop  89:25
stopping  105:24
stranger  53:23
  54:1
street  1:15 9:25
  10:8,18 100:1,20
  101:6
streets  40:24
stressful  47:18
  48:4
strictly  18:23
strike  30:23 60:5
  65:24 70:25
stripped  61:22
  63:7,11,11
struggle  165:15
stuck  98:23
student  21:6,6
  21:11,13 22:18
  22:21,23,25 23:3
students  33:7
  123:4
study  91:25
stuff  24:17 90:24
style  28:16
sub  13:16 22:8
  32:6 54:7 86:12
  111:20 125:3
subject  35:24
  36:6 69:4

117:15 148:1

**subpoena** 9:24
10:25 12:4,9,15
15:12 33:22,22

**subpoenaed**
33:25

**subscribed**
175:10 176:14
177:21

**subsect** 36:23

**substance**
136:12,14

**substantial**
58:12,14 86:21
86:22

**substantially**
112:25

**substantive**
11:20,22 139:2

**successes** 24:8

**suffice** 11:11
83:25 87:19
90:6

**suggest** 143:11

**suggests** 143:8

**suing** 9:25 12:6
12:7

**suite** 2:5,11
174:2

**sullivan** 50:6,7
51:6

**summarize**
24:25 30:24
63:12 87:8

**summary** 83:17
84:8 85:25
87:22 117:11

**super** 40:7
158:17

**superimposed**
116:10

**superior** 174:1

**support** 24:5
25:10 34:16,18
36:22,22 57:6
128:1 148:22
150:2

**supporters** 25:4
26:20

**supporting**
24:14,21 36:20

**supports** 127:19

**suppose** 23:22
79:8 133:9

**supreme** 9:19

**sure** 16:1,17
19:3,7,15,18
21:14 24:15,21
24:22 33:15
39:16 40:12
41:1,11 43:24
44:2 45:16
51:10,18,20,22
51:25 52:2,5
60:12 66:16
86:5 88:25
95:14,16 113:14
121:2 132:13,23
132:25 133:6
135:4,7 136:1
139:9,17 143:16
146:15,18

**surface** 79:24

**surprised** 10:25
12:3,12 14:8

33:22,24

**survived** 63:8

**susan** 140:14

**suspect** 138:6

**swear** 5:21 6:3
6:18

**swearing** 11:9
20:11

**sworn** 6:6,23
172:5 175:10,13
176:14,18
177:21

**synagogue** 56:4
56:6,7,8,19 57:4
57:14 69:1 76:9
80:18,21,21
81:13,16 95:19
95:25 96:1,25
97:5,22 119:18
119:22

**synagogues** 56:7

**system** 24:7,18
25:7 70:16

**t**

**t** 4:5

**tablet** 12:25

**tail** 49:18 115:12
123:21

**take** 5:24 6:1 9:2
12:17 14:15
16:8 19:18
60:19,23 75:19
76:7,17 80:18
92:25 93:15,16
93:16 102:19
105:25 106:8,16
108:8 110:8

111:9 113:14
120:16 124:19
132:12 135:18
139:24 142:20
154:15 157:3,10
157:20 158:10
166:23 170:24
171:10,13

**taken** 8:12,16
133:1 172:3,12
173:9

**takes** 28:6

**talk** 15:10 17:13
32:18 47:24
55:8 56:22
60:18 67:16
98:5 101:21
105:17 147:1
156:24 159:24

**talked** 15:9
16:12 20:5
33:21 39:1
52:11,15 68:24
98:23 99:13
104:19 122:13

**talking** 33:7,17
33:18 37:5 40:5
49:17 75:20
76:8 77:17
95:17,20 96:12
127:13 134:15
134:20,20,23
136:12,19
137:24 139:8,12
139:14,21 140:5
140:23 141:7
142:5,11,16,20

**tally** 52:17

**tanisha** 50:5,7
51:6

**teacher** 21:17
24:6 117:20
121:5

**team** 41:15

**teams** 109:14

**technically**
82:21 89:10
160:21

**tell** 6:24 14:4
18:6 19:25 40:1
40:20 42:2 46:4
49:12 50:1
82:25 87:4 92:8
95:8,9,12 96:9
100:5 102:18
128:23 131:5,23
132:4,10 145:6
146:20 150:12
154:3 169:11

**template** 53:11

**temple** 1:4,14
2:2 5:6,8,13
12:7 14:17,22
19:8,11 36:2
58:9 81:10,24
91:10,13 92:14
92:15 97:1
103:18 148:2,25
158:24 159:6
174:6 175:3
176:3

**temples** 58:10
64:25 91:5

**ten** 16:21 17:6
120:17

**tenor** 46:1 54:7
68:18

**tense** 97:2

**tenure** 31:19
32:9 145:11,14
146:12 153:11
154:20

**term** 23:9 60:13
74:6 79:7 80:23
145:20

**terminology**
44:11 49:3
77:13 155:16

**terms** 37:23
39:18 49:10
87:14 120:12
146:7 166:21

**terribly** 10:24

**testified** 6:25
139:7 142:11
151:14 162:5

**testify** 91:19

**testifying** 172:5

**testimony** 11:18
33:2 125:19
130:6 154:19
155:6 161:23
175:6,7 176:6,9
176:12

**text** 13:11,11,13
13:17 16:14,22
158:2

**thank** 5:22 7:3
11:24 50:11
68:16 90:2
109:18 110:1,24
113:7 115:2,21
124:2 126:15

129:25 146:6
148:12 164:18
170:19,21,24,25

**thanks** 68:7

**that'd** 171:11

**theology** 82:24

**thing** 26:8 35:13
40:18 54:15
55:19 57:12
65:13,17 69:19
74:20 76:15
92:22 96:9
106:11 131:18
131:19 135:22
146:2,4,10

**things** 7:17 8:18
8:20 19:16
20:24 21:16
24:12,13 33:6,10
35:7 47:20
49:24 54:19,21
69:22 72:12
73:8,23 75:7
76:16 82:14
84:24 88:21
95:18 103:6
114:13 118:1,24
119:13 129:5
132:10 134:12
134:13 135:11
156:11 167:18
168:11

**think** 14:24
18:20 25:2 26:2
26:24 29:13,18
29:22 30:16
34:10,13,19
36:15 37:15

38:14 39:4,10
42:21 44:16
46:19,20,20
47:25 50:5 51:2
54:24,25 55:1
56:5,8,9,17 61:4
62:3,11,11,16,23
63:9 64:8 65:3
66:11,18 67:18
67:24 68:21
69:8,14 71:3,7
74:14,24 75:7,19
76:3,24 78:20
82:22 86:11,12
87:10,17 88:16
89:6,16 94:3,9
94:10 101:7
103:14,16,23,23
106:19 111:9
113:2 116:3
118:22 119:17
119:18,21,21
121:1,20,21
125:20 127:22
131:7,10 133:5
133:12 138:3
143:22 149:11
150:11 151:5,8
159:16,22 160:9
160:11,17 161:9
162:25

**thinking** 34:7
38:21 57:16
169:4,12

**third** 14:25 15:2

**thirdhand** 64:16

**thirty** 17:9
174:18

**thought** 21:18
  48:13 89:7
  137:1
**thoughtful** 47:25
**thousand** 20:13
  49:11 143:4
**thread** 125:23
**threatens** 7:20
**three** 16:23
  30:11 45:8
  48:23 60:15
  90:8,10,11,12
  100:17,18
  107:21 111:10
  138:21 143:3
**time** 1:13 5:5
  6:17 15:20,22
  16:7,12,19,24
  17:8 18:21
  19:21 20:18
  21:7,9 28:1,3,5,6
  28:10,11 29:1,4
  29:10,23 30:3,19
  31:18 33:17
  34:19 35:5
  39:18,20 45:21
  46:12,13 47:19
  47:21 53:8,20,22
  63:18 64:1,7
  67:24 68:7,11
  73:23,24 75:3,10
  75:11,16 76:13
  77:2,4 78:7
  81:14 88:10
  93:17,21 94:17
  99:6 101:15
  103:25 106:12
  106:16,23 107:2

108:10 111:9
  114:17 116:15
  116:19 121:1
  123:9 126:6
  133:20,23 134:2
  134:9,11 137:14
  138:3 139:18,19
  143:10,17 145:3
  147:4,22,23
  148:4 149:7
  150:13 157:4,8
  158:10 170:21
  170:24 171:14
**timecode** 110:6
**timeframe** 34:24
  145:15
**timely** 118:15,16
**times** 7:11 27:8
  36:13 43:13
  45:19 53:17,18
  53:19,21 54:5,12
  69:23 81:11,17
  90:5 100:23
  118:2 119:1
  147:3
**tinge** 36:8
**titles** 111:20
**today** 10:6 15:8
  15:23 16:18
  19:20 51:11,14
  116:16 118:7
  121:21 150:21
  150:23 164:4,9
  165:12 168:3,6
  170:24 171:4,9
**today's** 5:4,25
**told** 41:23 65:12

**top** 13:10,11
  14:1 69:16 71:6
  71:23 101:19
  109:7 123:20
  124:15 126:14
  140:4
**topic** 11:3 33:13
  35:20 36:14
  72:11
**topics** 52:6 98:5
**tops** 120:17
**tour** 19:7
**touring** 19:11
**tourist** 65:19
**town** 120:1,5
**track** 25:12,18
  25:22 26:8
**tracked** 25:13
**tradition** 82:25
  86:24,25 87:1
  89:10 90:4
  103:15,15
  104:13
**traditional**
  104:5
**traditionally**
  158:22
**traditions** 89:14
  104:3 105:2,4,5
**traffic** 70:2,17
  120:19
**tragedy** 57:6
  80:20 97:5
**transcribe** 110:4
**transcribed**
  175:7
**transcriber**
  173:1

**transcript** 6:8
  8:20,21,22 9:2
  171:3 172:21
  173:3,5 174:11
  174:12 175:5,12
  176:5,11,17
**transcriptionist**
  172:8
**transpired** 63:14
**transportation**
  24:15 51:21,22
  98:7 99:10
**trauma** 37:13
**treated** 28:10
**treatment** 166:5
**tree** 7:12
**tribal** 104:9
**trouble** 12:8
**true** 7:18 8:15,17
  90:25 91:3,4
  156:16 168:11
  172:9 173:5
**truth** 6:24,24,25
  7:23 144:16
**try** 92:13 96:2
  103:8 109:25
**trying** 11:15
  29:14,22 30:17
  40:14 43:1
  54:11,24 56:5,7
  56:17 59:1
  70:23 71:7,23
  78:25 79:1
  88:24 89:5,16
  101:18,19
  102:12 103:10
  114:7 118:22
  121:14 131:2

**tst** 144:24 146:3
146:12,16 147:2
147:5 149:21
150:7,9,14,20,24
153:9,11,12,13
153:23 154:10
154:11 156:9
162:12,16,19
163:18,21,23
164:4,11,14,24
164:25 165:3,5
165:13 167:5,7,9
167:16,16,20,21
167:22 168:5,7
168:10,13,18,19
168:22,24
169:10,12,12
**tst's** 149:14
**turmoil** 37:13
**turn** 123:25
124:7
**turned** 29:23
151:16
**turning** 135:15
135:17
**turns** 39:9
**tutoring** 119:12
**twenty** 77:4
110:11
**twice** 86:5 89:17
**twilight** 40:5
**two** 14:16 16:23
20:13 28:11
45:9 47:4 48:23
49:6,11,15,23
52:23 69:17
70:22 75:7
95:18 97:7

114:6,13 119:10
125:3 126:18
130:15 136:22
137:9 140:15
142:14 158:10
166:14 167:18
**typewriting**
172:7
**typical** 153:3
**typically** 158:23

**u**

**unannounced**
73:8
**unbowed** 7:9
**unclear** 36:17
38:25
**underneath**
14:19 157:21
**understand** 6:7
8:23 19:17 24:7
36:6 54:6,10
60:3 72:14
78:25 79:1
80:11,17,24
81:21 84:16
86:14 94:22
95:17,19 96:8
98:9,10 102:13
102:24 105:20
107:11 125:21
132:5 136:15
146:19 153:8
154:8 156:2,9
159:18 160:1
167:16 168:4
**understanding**
11:15 12:8 59:1

63:6 75:2 84:10
86:20,23 114:11
136:18 151:15
156:12
**understood**
10:15 98:21
**unfamiliar** 84:5
87:19 90:6
**unfamiliarity**
34:23 79:21
**unfettered** 7:10
**unfortunately**
35:3 137:19
**unidentified**
13:6
**unintelligible**
163:24
**unique** 29:15
**united** 1:1 62:2
66:1
**unknown** 115:17
**unrest** 34:10
35:4 37:7,11
**unusual** 115:1
128:22
**updated** 157:23
**use** 18:16,18
31:1 47:17
64:20 74:18
79:7 88:9
123:11 145:18
**uses** 6:10
**usual** 123:16
**usually** 72:16
78:7 85:15
88:21,22 138:11
145:24

**utilized** 80:15
153:16

**v**

**v** 1:6 174:6
175:3 176:3
**vacation** 86:15
**varietal** 65:7
88:2 94:2 95:22
**varietals** 105:4
**various** 19:1
53:4 59:2 60:14
68:16 82:3
105:13 107:17
**venus** 43:25
**veritext** 5:4,24
174:1,7 177:1
**veritext.com.**
174:17
**versus** 73:14,21
96:16,19 99:12
100:1
**video** 108:16
110:21,22
111:22 112:13
112:20,24 114:7
114:8 128:16
142:13
**videoconference**
1:10 2:3,9
**videographer**
3:11 5:2,3,20
68:3,4,7,10
93:17,20 101:14
106:23 107:1
109:24 111:25
112:4 114:14,16
133:23 134:1

157:4,7 171:14
**violence** 51:24
  51:25 148:20
  150:1
**virtually** 6:9
**visibly** 95:7
**visit** 54:17 56:3
  128:24 144:9
**visited** 36:9
  53:16 54:8 56:1
  56:2 86:16
**visiting** 33:8
  55:15 143:18
**visits** 121:3
**voice** 134:12
**volume** 95:7
  111:14
**volunteer** 26:16
  57:1 117:10
**volunteer's**
  136:5
**volunteers**
  122:15,25
  142:14
**voluntold** 88:6,7
**voted** 25:9
**voter** 55:2
**vs** 5:8 9:18
**vudu** 65:5,13,22
  65:25 104:12,14

**w**

**waived** 174:19
**waiving** 116:10
**walk** 118:7,9,9
  118:18
**want** 14:12 15:2
  16:1 23:23 28:3

29:20 30:1 35:1
  35:8,19 36:16
  37:25 38:5
  47:20 62:16
  63:1 64:7,19
  79:7 83:22
  92:23,24 93:11
  98:20 99:9
  106:8 108:10
  110:12 113:10
  113:14 119:8
  120:14 135:3,7
  135:11 137:12
  140:24 141:11
  158:11 166:23
**wanted** 10:10
  110:20 127:9
  129:21 130:2
  135:2 147:5
  153:18,23
  168:19 169:10
**wanting** 146:16
**washington** 2:5
  2:11
**watch** 48:14
  111:8 116:14
  135:16
**watched** 111:17
  112:23 117:8
  122:21 128:8
  135:18 142:13
**watching** 116:16
  116:16 127:16
**way** 8:21 11:13
  11:22 18:7
  21:22 28:14
  30:23 79:24
  82:12,12 91:21

92:14,18 103:3
  120:13 126:13
  130:12,25
  131:21 134:12
  163:17 165:4
**ways** 28:17 63:9
  115:25 144:14
  156:11
**we've** 20:5 35:6
  35:6 36:19,25
  37:1 52:15
  64:23 68:24
  76:3 103:12,14
  106:12 110:19
  144:23 152:17
  160:17 164:9
**weaknesses** 24:8
**webster** 165:23
  166:17
**wedding** 86:6,9
**wednesday**
  138:11
**week** 10:5,25
  12:13 14:8 15:9
  15:10 123:16
  130:15
**weekend** 10:5,22
**weekly** 138:11
  138:11
**weeks** 31:13,14
  126:18 130:15
**welcomed** 38:19
**went** 27:11
  54:12 64:12
  71:7,11 86:2,5
  86:15 90:5,9
  96:25 98:11
  132:13 136:24

**west** 121:11
**western** 67:10
**whichever** 38:7
**white** 124:6,8
**whoever's** 72:19
  115:24 116:1
**wider** 102:6
**wildly** 95:1
**winship** 121:12
  141:25 142:1
**winter** 118:7,8,9
  118:16
**witness** 2:15 3:2
  5:21 6:4,6,7,18
  6:23 8:8 12:23
  13:3,5 50:19
  52:14 62:5
  69:25 78:7
  101:8,11 102:17
  106:3,9 111:2
  112:10,17 113:5
  113:6,25 114:5
  123:23,25 124:7
  124:10,13,22,25
  125:2 130:2
  131:1 140:6,11
  147:16 148:10
  157:14,17,24
  158:14 162:24
  164:18 165:24
  170:17,25 172:4
  174:8,11 175:1,4
  175:11 176:1,4
  176:15
**witness'** 174:14
**won** 21:10
**word** 26:3 48:23
  64:20 68:20

80:12 122:23
145:18 153:3
**words** 22:2 43:4
47:16 53:24
64:12 88:6
107:21 113:18
122:6 124:10,13
127:25 128:7
166:19
**work** 21:20
24:10,20,24
28:13,16 34:17
44:22 82:8,8
106:4 117:21,22
117:24,24
118:10,15,25
119:3 120:25
121:2,6 122:25
123:1,14 132:5
141:22 142:4,22
144:12 148:19
148:20,20,24,25
149:25 151:7,11
151:13 160:24
161:20,22 162:8
162:9,12 164:9
164:20,21
168:22 169:2,3
169:25 170:15
**worked** 17:20
25:7,21
**working** 72:9
167:19,22,25
168:6,21
**works** 13:9 18:1
24:16 162:16,19
**world** 105:13
107:6

**world's** 62:1
**worship** 58:24
**wrapping** 69:25
**write** 122:9,17
122:18 134:9
139:9
**writes** 129:21
134:5
**writing** 150:13
**written** 6:15
15:25 16:9
135:23,24 139:4
**wrong** 109:12,18
**wrote** 122:12
134:10 135:25
**wu** 49:19,21
51:17 105:18
108:20 156:17
156:20,24
**wu's** 105:12

| x |
|---|

**x** 4:1,5 145:22
172:21

| y |
|---|

**y'all's** 112:16
**yard** 26:15
**yeah** 18:20 19:5
22:3,23 25:2
29:2 31:2,8 34:7
36:9,25 39:4,8
39:23 40:13
41:20 42:8,8
43:11 45:7,25
46:3 48:25
50:19,22 53:12
54:2,18 55:18
56:25 57:7,9,15

57:25 58:2,25
59:4,14,20 60:25
61:13 63:16
66:13,25 67:24
69:20 71:8
72:18,18 74:8,14
79:9 90:12
100:11,13,13
111:2 113:12
120:8,19 124:17
124:22 126:11
128:5 134:8
136:3 141:21
146:20 161:20
162:3
**year** 9:20 11:7,8
20:12 29:16
45:14,14 49:10
55:22 85:24
86:2,3 118:3
138:8 154:18
169:4
**years** 19:6 24:9
28:19,25 59:12
63:20 78:21
83:9 120:24
122:14 128:14
128:15 133:15
135:3,4 136:5,7
139:22 170:1
**yep** 32:13 37:10
39:14,14 41:3
42:9,17 55:18
67:11 71:4
73:15 74:1
78:13,13 99:22
116:7 126:16,22
138:1 140:16

147:16
**young** 21:3,19
123:2
**younger** 86:2
**youth** 148:20
150:1

| z |
|---|

**zero** 116:20
164:8 169:23
**zoom** 16:15,25
17:3,5,7 101:12
148:11

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT 3

9/6/2017

City of Boston Mail - Boston Metro request for comment -- Satanic Temple letter



Michelle Wu <michelle.wu@boston.gov>

## Boston Metro request for comment -- Satanic Temple letter

6 messages

---

**Kristin Toussaint** <kristin.toussaint@metro.us>                     Mon, Aug 21, 2017 at 10:34 AM
To: Michelle Wu <Michelle.Wu@boston.gov>

Hi Michelle,
This is Kristin Toussaint from the Boston Metro, how are you?
I'm reaching out to follow up on a post I saw from the Satanic Temple Boston Chapter shared on their Facebook at the end of
last week.
The post said that a Chapter Head of the Satanic Temple here reached out to you and the Boston City Council about allowing a
member to present an invocation.
Are you able to comment on that request, as well as explaining what the invocations are in your meetings and the rules around
that?
Please let me know. I can be reached here or at 215-717-2696.
Thank you,
Kristin

---

Kristin Toussaint
News Reporter
P: (215) 717-2696 | | F:

metro.us<http://www.metro.us>
234 Congress St, Boston, MA 02210

[Facebook]<https://www.facebook.com/MetroBoston> [Twitter] <https://twitter.com/MetroBOS>  [Linkedin]
<https://www.linkedin.com/company/metro-us>  [Instagram] <https://instagram.com/metroboston/>
[MetroMedia]<http://media.metro.us>

---

**Michelle Wu** <michelle.wu@boston.gov>                     Mon, Aug 21, 2017 at 12:55 PM
To: Andrea Patton <andrea.patton@boston.gov>

Interview request

SW
--

## Michelle Wu

Boston City Councilor At-Large
One City Hall Square, 5th floor
Boston, MA 02201

Office: 617.635.3115
Fax: 617.635.4203
michelle.wu@boston.gov
[Quoted text hidden]

---

**Andrea Patton** <andrea.patton@boston.gov>                     Mon, Aug 21, 2017 at 2:15 PM
To: kristin.toussaint@metro.us
Cc: Michelle Wu <michelle.wu@boston.gov>

Hi Kristin,

My name is Andrea and I am Councilor Wu's Director of Communications. Thanks so much for reaching out to our office! We will
get back to you as soon as we can regarding this story. Do you have a deadline for the piece?

DEF0000228

EXHIBIT 4

To: Kristin Toussaint <kristin.toussaint@metro.us>
Cc: Michelle Wu <michelle.wu@boston.gov>

Hi Kristin,

Regarding your questions about what the invocations are and how clergy members are chosen:

There is time at the beginning of each Council meeting for an invited member of the clergy to say a few words before Council business begins. At the beginning of the legislative year meetings are assigned to Councilors. Councilors decide which clergy they wish to invite to speak. There are no rules for this selection. Traditionally, Councilors have invited members from their district (or in the case of at-large councilors, members from anywhere in the City of Boston) who are active in their neighborhood and engaged community members in addition to being members of the clergy.

Please let me know if you have any further questions.

Best,
Andrea

[Quoted text hidden]

---

**Kristin Toussaint** <kristin.toussaint@metro.us>                                    Mon, Aug 21, 2017 at 4:41 PM
To: Andrea Patton <andrea.patton@boston.gov>
Cc: Michelle Wu <michelle.wu@boston.gov>

Thank you Andrea,
Is there a comment directly on the Satanic Temples request that they be allowed to give an invocation? Has Michelle or any other council member responded to their letter?

Best
Kristin
[Quoted text hidden]

EXHIBIT 5



Michelle Wu <michelle.wu@boston.gov>

## Invocation Request

9 messages

---

**travis@thesatanictempleboston.com** <travis@thesatanictempleboston.com>      Tue, Oct 11, 2016 at 3:52 PM
To: MICHELLE.WU@boston.gov

Good afternoon Councilor Wu,

My name is Travis LeSaffre and I am the Chapter Head of The Satanic Temple –Boston. We're a group of politically aware, non-theistic Satanists active within your community. The mission of The Satanic Temple is to encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will.

I spoke to a representative of your office named David, and I was informed that the Boston City Council's invocation slots are invitation based. Over the past year, the invited clergy performing these actions have been overwhelmingly Christian. As a member of a religious minority, I plead with you to consider allowing me to perform an invocation. I was told by David that I would need to personally request a spot from a councilor. I've reached out to Mark Ciommo last week, but I haven't received a reply just yet. I have also sent an email to Tito Jackson in an attempt to be heard by someone who still has slots open for invocations during this calendar year.

While requiring some variety of sponsorship is understandable, it would be shocking if I am to be turned away due to my faith while other religions are allowed to hold prayers in a government building. In fact, I would say that it would be a breach of the first amendment.

The religious oppression felt by those outside the Christian community in Boston is a blight on an otherwise liberal state. Consider what your actions could do to increase the diversity of the city council's current invocation schedule and the light it can shine on religious plurality within the great Commonwealth of Massachusetts.

Regards,

**Travis LeSaffre | Chapter Head**
The Satanic Temple - Boston Chapter
*P: 781-854-1265 | E: travis@thesatanictemple.com*

📎 **Invocation-Request-to-Councilor-Wu.pdf**
237K

---

**Michelle Wu** <michelle.wu@boston.gov>      Wed, Oct 12, 2016 at 2:51 PM
To: travis@thesatanictempleboston.com

Travis,

Thank you very much for taking the time to reach out. As my staff mentioned, each Councilor has the chance to invite 2-3 faith leaders per year to deliver the opening invocation at one of our Council meetings. The invitations are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts. There is no restriction or criteria based on any Councilors' religious preferences. Many of us have a long list of folks we'd like to invite but haven't been able to accommodate. Everyone is welcome to attend the weekly City Council session, to testify at any City Council hearing, and to get involved in our policy work.

Michelle

--

EXHIBIT 6

**From:** R. Zed <rajanzed@hotmail.com>
**Sent:** Saturday, December 12, 2020 2:26 AM EST
**To:** kim.janey@boston.gov <kim.janey@boston.gov>
**CC:** matthew.omalley@boston.gov <matthew.omalley@boston.gov>; liz.breadon@boston.gov <liz.breadon@boston.gov>; mayor@boston.gov <mayor@boston.gov>; maureen.feeney@boston.gov <maureen.feeney@boston.gov>; kathryn.burton@boston.gov <kathryn.burton@boston.gov>; danielson.tavares@boston.gov <danielson.tavares@boston.gov>; karilyn.crockett@boston.gov <karilyn.crockett@boston.gov>; city.council@boston.gov <city.council@boston.gov>
**Subject:** Invocation request

Dear President Janey:
Will you please schedule me to read invocation remotely in the next Boston City Council meeting; and inform me accordingly.
I am a Hindu leader.
Thank you.
Sincerely,
Rajan Zed

EXHIBIT 7

**From:** Rebecca Shimshak <rshimshak@jcrcboston.org>
**Sent:** Tuesday, September 25, 2018 4:15 PM EDT
**To:** Emily Reichman <ereichman@jcrcboston.org>; Deborah Reiff <deborah.reiff@boston.gov>; Aaron Agulnek <aagulnek@jcrcboston.org>
**CC:** Karen Foley <karen.foley@boston.gov>; Annissa Essaibi-George <annissa.essaibi-george@boston.gov>
**Subject:** Re: JCRC and the City Council 9/26
**Attachment(s):** "Attendees as of 9-25.csv"

DB,

Glad we connected. Attached please find a list of attendees.

Thanks!

Becca

**Rebecca Shimshak**
Director of the Greater Boston Jewish Coalition for Literacy
Jewish Community Relations Council of Greater Boston
Kraft Family Building | 126 High Street | Boston, MA 02110
W: 617-457-8678
M: 646-872-6113
rshimshak@jcrcboston.org
www.jcrcboston.org

*Follow @BostonJCRC on Twitter, Instagram, and Facebook*

---

**From:** Emily Reichman
**Date:** Tuesday, September 18, 2018 at 2:32 PM
**To:** Deborah Reiff, Aaron Agulnek
**Cc:** Karen Foley, Annissa Essaibi-George, Rebecca Shimshak
**Subject:** RE: JCRC and the City Council 9/26

Hi DB,
Please find talking points about GBJCL and bios Rav Claudia and children's author Susan E Goodman attached. We will send you the names of volunteers attending for the citations by Friday.
I'm also including a rough outline of the timing breakdown for the day.  Please let me know if any changes need to be made.

11-11:15 Curley Room: Coffee/shmoozing
11:15-11:19 Program intro by Councilor Essaibi-George
11:19-11:25 Program overview from Jeremy Burton, Executive Director of JCRC
11:25- 11:45 Q and A
11:45-12 Move to City Council Chamber
12-12:15 Council President opens the session
12:15-12:19 Invocation from Rav Claudia
12:19-12:25 Recognize volunteers/photo ops

Thank you!
Emily

**Emily Reichman**
Director, Service Initiatives
Jewish Community Relations Council of Greater Boston
Kraft Family Building | 126 High Street | Boston, MA 02110
617-457-8669
www.jcrcboston.org
**Follow @BostonJCRC on** Twitter, Instagram**, and** Facebook

**From:** Deborah Reiff <deborah.reiff@boston.gov>
**Sent:** Friday, September 14, 2018 3:24 PM
**To:** Aaron Agulnek <aagulnek@jcrcboston.org>; Emily Reichman <ereichman@jcrcboston.org>
**Cc:** Karen Foley <karen.foley@boston.gov>; Annissa Essaibi-George <annissa.essaibi-george@boston.gov>
**Subject:** Re: JCRC and the City Council 9/26

Hi Aaron and Emily,

Very nice to talk with you today. We look forward to your bio of Rav Claudia and your talking points about the program As I mentioned we'll send an invitation to the Councilors and their staffs for the 11:00 event and there will be some refreshments there.

Please feel free to reach out to Karen or me if any questions occur or just to check in between now and then.

Best,

DB

DEF0000646

**DB Reiff**
Director of Communications
Office of Boston City Councilor Annissa Essaibi-George
1 City Hall Plaza 5th Floor
Boston, MA  02201

direct line 617.635.3594
office phone 617.635.4376
fax 617.635.4203

On Tue, Aug 14, 2018 at 12:11 PM, Aaron Agulnek <aagulnek@jcrcboston.org> wrote:

> Thank you Karen!
>
> We are excited for the event and will be in touch with questions/details.
>
> My best,
>
> Aaron Agulnek
>
> **From:** Karen Foley <karen.foley@boston.gov>
> **Sent:** Tuesday, August 14, 2018 11:02 AM
> **To:** Aaron Agulnek <aagulnek@jcrcboston.org>; Deborah Reiff <db.reiff@boston.gov>; Annissa Essaibi-George <annissa.essaibi-george@boston.gov>
> **Cc:** Emily Reichman <ereichman@jcrcboston.org>
> **Subject:** Re: JCRC and the City Council 9/26
>
> Aaron,
>
> We have the Curley Room reserved for September 26th at 11:00 am for you.
>
> Karen
>
> On Tue, Aug 7, 2018 at 2:45 PM, Aaron Agulnek <aagulnek@jcrcboston.org> wrote:
>
>> Karen,
>>
>> I wanted to follow up with you on this email. We are eager to get this going!
>>
>> Aaron
>>
>> **From:** Aaron Agulnek
>> **Sent:** Wednesday, August 1, 2018 11:01 AM
>> **To:** 'Karen Foley' <karen.foley@boston.gov>
>> **Cc:** 'annissa.essaibi-george@boston.gov' <annissa.essaibi-george@boston.gov>; Emily Reichman <ereichman@jcrcboston.org>
>> **Subject:** JCRC and the City Council 9/26
>>
>> Karen,
>>
>> Thank you again for helping to facilitate our conversation with Councilor Essaibi-George two weeks ago.  We are excited to showcase GBJCL (our literacy program) at the September 26th City Council meeting.
>>
>> As we put things together, we have a few questions about what the day would look like.  Please let us know who is best to walk this through.  We are very low maintenance, but like to do things well!
>>
>> Pre-Council Meeting
>>
>> - The Councilor mentioned a "coffee" of sorts in a conference room prior to the meeting.  What would this look like? Would other City Councilors be invited or attending? We are trying to determine who we should invite and whether this option makes sense.
>>
>> Council Meeting
>>
>> - Clergy: Would an invited clergy member have to be from the City of Boston or could we open it up to a Rabbi that is involved in our programming?
>> - What does this actually look like during the meeting? Would we have someone talk for a bit about the programming? Would Councilor Essaibi-George read a citation? Is it open?
>> - How long would this part be?
>>
>> These questions will help us ensure that we get the right people there and that we effectively lift up our work in the BPS.
>>
>> We look forward to working with the team.

DEF0000647

EXHIBIT 8

**From:** Michael Bonetti <michael.bonetti@boston.gov>
**Sent:** Tuesday, June 16, 2020 1:32 PM EDT
**To:** Yuleidy Valdez <yuleidy.valdez@boston.gov>
**Subject:** Re: Invocation - 6/10

Hi Yuleidy,

Let me ask Fr. Michael or Fr. Claude. I will let you know soon.

Michael

On Tue, Jun 16, 2020 at 1:25 PM Yuleidy Valdez <yuleidy.valdez@boston.gov> wrote:
> Hi Michael,
>
> Would you have some for invocation tomorrow? I don't remember if I informed you or the Councilor, apologize if I didn't.
>
> On Wed, Jun 10, 2020 at 11:54 AM Michael Bonetti <michael.bonetti@boston.gov> wrote:
>> No problem. Thank you!
>>
>> On Wed, Jun 10, 2020 at 11:54 AM Kerry Jordan <kerry.jordan@boston.gov> wrote:
>>> I renamed you, so we know its clergy, you may have to rename yourself next time you log in but not sure!
>>>
>>> On Wed, Jun 10, 2020, 10:32 AM Michael Bonetti <michael.bonetti@boston.gov> wrote:
>>>> Anytime! Here to help.
>>>>
>>>> Hopefully we'll be back in our offices soon!!!
>>>>
>>>> On Wed, Jun 10, 2020 at 9:00 AM Yuleidy Valdez <yuleidy.valdez@boston.gov> wrote:
>>>>> Mr. Bonetti, you are simply AWESOME!
>>>>>
>>>>> I miss you!
>>>>>
>>>>> On Wed, Jun 10, 2020 at 8:47 AM Michael Bonetti <michael.bonetti@boston.gov> wrote:
>>>>>> Already did. Thanks! I will be using my zoom to log him in so my name will appear at the bottom
>>>>>>
>>>>>> On Wed, Jun 10, 2020 at 8:46 AM Yuleidy Valdez <yuleidy.valdez@boston.gov> wrote:
>>>>>>> Great, thank you!
>>>>>>>
>>>>>>> Would you forward the meeting link to him?
>>>>>>>
>>>>>>> Here's the link for this week's Council meeting. Please sign in by 11:45.
>>>>>>>
>>>>>>> Join Zoom Meeting
>>>>>>> https://us02web.zoom.us/j/81953418328?pwd=cG5lY01MUFNoMnBPbWZac0dobDBKdz09
>>>>>>>
>>>>>>> Meeting ID: 819 5341 8328
>>>>>>> Password: 385844
>>>>>>>
>>>>>>> On Wed, Jun 10, 2020 at 8:33 AM Michael Bonetti <michael.bonetti@boston.gov> wrote:
>>>>>>>> Hi Yuleidy,
>>>>>>>>
>>>>>>>> We have a priest to preside over the invocation today. His name is Fr. Michael Della Penna, ofm. - pastor of Saint Leonard of Port Maurice Parish in the North End.
>>>>>>>>
>>>>>>>> Thanks,
>>>>>>>>
>>>>>>>> Michael
>>>>>>>> --
>>>>>>>> **Michael E. Bonetti**
>>>>>>>> North End Community Liaison & Scheduler
>>>>>>>> Office of Boston City Councilor Lydia Edwards
>>>>>>>> One Boston City Hall, Suite 550
>>>>>>>> 617-635-3200
>>>>>>>>
>>>>>>>> This email is subject to MGL: Chpt.66, Sec.10 Public Records Law.
>>>>>>>
>>>>>>> --
>>>>>>> Sent from Gmail Mobile
>>>>>>> --
>>>>>>> **Michael E. Bonetti**

EXHIBIT 9

**From:** Elizabeth Pimentel <elizabeth.pimentel@boston.gov>
**Sent:** Tuesday, November 03, 2020 3:04 PM EST
**To:** Makayla Parkin <makayla.parkin@boston.gov>
**Subject:** Re: FYI

Hi Makayla,
we're going to have Pastor James W. S. Yansen of Hyde Park Seventh-Day Adventist Church join us for tomorrow's meeting. His email is sydgrave@yahoo.com.

Let me know if you need any additional information from me, thanks,
Eli

On Mon, Nov 2, 2020 at 3:51 PM Elizabeth Pimentel <elizabeth.pimentel@boston.gov> wrote:
> Will do!
>
> On Mon, Nov 2, 2020 at 1:01 PM Makayla Parkin <makayla.parkin@boston.gov> wrote:
>> Hi Eli,
>>
>> It is Councilor Campbell's turn again to provide someone for the invocation this week's council meeting. Please let me know if you can find someone by EOD tomorrow! Thanks!
>>
>> Best,
>>
>> Makayla Parkin
>> Policy Director
>> Office of City Councilor Kim Janey, District 7
>> Boston City Council President
>> One City Hall Square, 5th Floor
>> Boston, MA 02201
>>
>> Direct Line: 617-635-0746
>> Office: 617-635-3510
>> makayla.parkin@boston.gov
>
>
> --
> Elizabeth J. Pimentel
> Chief of Staff
> Office of Councilor Andrea J. Campbell, District 4
> One City Hall Square, 5th floor
> Boston, MA 02201
>
> Cell: 617-680-5100
> Main office line: 617-635-3131
> elizabeth.pimentel@boston.gov
>
> This email is subject to MGL: Chpt.66, Sec.10 Public Records Law.


--
Elizabeth J. Pimentel
Chief of Staff
Office of Councilor Andrea J. Campbell, District 4
One City Hall Square, 5th floor
Boston, MA 02201

Cell: 617-680-5100
Main office line: 617-635-3131
elizabeth.pimentel@boston.gov

This email is subject to MGL: Chpt.66, Sec.10 Public Records Law.