# 1:21-cv-10102

IN THE UNITED STATES COURT
FOR THE DISTRICT OF MASSACHUSETTS

**THE SATANIC TEMPLE**, INC.
*Plaintiff*

*v.*

CITY OF **BOSTON**
*Defendant.*

## APPENDIX

**Matt Kezhaya**
Ark. # 2014161
Minn. # 0403196

matt@crown.law
direct: (479) 431-6112
general: (612) 349-2216

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

# Table of contents

| Exhibit # | Title | Page |
|---|---|---|
| Exhibit A | Notice of Deposition | 3 |
| Exhibit B | Transcripts | 12 |
| Exhibit C | All Emails regarding 30(b)(6) | 332 |
| Exhibit D | Post Deposition Email | 389 |

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.**<br>PLAINTIFF,<br>*V.*<br>**CITY OF BOSTON, MA**<br>DEFENDANT. | CASE NO. 21-CV-10102<br><br>**TST'S NOTICE OF DEPOSITION OF THE CITY OF BOSTON, MA** |

**To**: Defendant and its counsel of record, Nicole O'Connor and Robert Arcangeli, 1 City Hall Square, Boston, MA 02201.

**LET IT BE KNOWN** that, pursuant to FRCP 26 and 30(b)(6), Plaintiff will take the deposition of the City of Boston, MA through one or more of Defendant's officers, directors, managing agents, or such other persons who consent to testify on its behalf, concerning the matters set forth below.

The deposition(s) will take place by oral examination, before a person authorized to administer oaths and take testimony and will be recorded by stenographic and videographic means. The deposition(s) will take place at 64 Bridge Street, Salem, MA, 01970 on **August 25, 2022** beginning at **9:30 am EST** and continuing thereafter until complete.

## Definitions

(1) "TST" is The Satanic Temple, a congregation of atheistic Satanists which began in 2013 and continues to present. TST is the plaintiff in this action.

(2) The "City" is the City of Boston, Massachusetts, a world-renowned center of cultural significance. The City is the defendant in this action.

(3) TST's "first demand" is the first time TST demanded of the City to have an equal right to participate in the invocation ceremony.

(4) The "invocation ceremony" is an opportunity for a person to speak before the regular meeting of the City Council for the contemplated purpose of engaging in a religious expression, which opportunity is available only to those who have been expressly invited by the City.

## Matters for examination

1. The identity of the 30(b)(6) deponent, the scope of their agency for the City, any other relationship they have with the City or its decisionmakers, the grounds for their testimony on any of the following topics, and what investigation or preparation (if any) they have done to speak for the City on any of the following topics.

2. Any policies, practices, or customs surrounding the public's opportunity to influence the City's decision-making; both as a general matter and specific to the invocation ceremony at issue.

    a. "The public's opportunity to influence the City's decision-making" more specifically refers to mechanisms, other than voting, for people to notify the City how the person feels about any issue of interest.

3. A background on the City's invocation ceremony, including without limitation: when it first arose, what legal challenges (if any) it has faced over time, how (if at all) the invocation ceremony has changed over time, how (if at all) any policies, practices, or customs surrounding the invocation ceremony have changed over time, the bases for limiting who may participate, how and why a particular speaker is selected, how and why any particular speaker is not selected, and the City's concept of a typical invocation.

4. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony.

5. The City's record keeping policies surrounding written communications sent or received by any City agent about this case, from January 1, 2015 to the

date of the original complaint.

6. All intra-City written communications about TST's invocation demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint.

7. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's invocation demands, up to the date of the original complaint.

8. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

9. General information about any individuals or groups who have demanded participation in the City's invocation ceremony, from January 1, 2011 to present. Including without limitation: their name, faith group, residential address at the time of the demand, business or congregation address at the time of the demand, and how many times the guest speaker has performed an invocation for the City or otherwise, and whether the City extended a demand to the subject individual or group.

10. The subjective bases for why each Councilor did or did not heed the

demand described in ¶ 9, from January 1, 2011 to present.

11. Identifying information about each invited speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business or congregation address at the time of the invite, how many times the guest speaker has performed the invocation for the City, how much money or other valuable consideration the City provided to the guest speaker in return for their services, and any other collateral benefits the guest speaker received because of the speaking opportunity.

12. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

13. Any instances in which the City had a vacancy in the guest speaker role for the invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present. Particularly: why there was a vacancy, the date of the meeting in which there was a vacancy for the invocation ceremony and how (if at all) the time slotted for the invocation ceremony

14. Any instances in which the invocation ceremony did not implore a literal

supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence).

15. Any instances in which the invocation ceremony addressed a topic which was not reflected on the Council's agenda for that meeting (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements imploring divine wisdom be granted to the Council).

16. Any instances in which a guest speaker identified the Council as subservient to any literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or which otherwise subordinates the will of the Council to the will of the supernatural entity; or which otherwise implies the Council is unable to perform their public service function without reliance on the deity being prayed to).

17. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18. The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first

impression and as that understanding has evolved over time, if at all.

19. Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20. Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21. Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

23. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the invocation ceremony (including without limitation: any instance in which any City personnel sought to review a invocation before it was given, any instance in which any City personnel sought to modify a invocation before it was given, any instance in which any City personnel commented on a invocation after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an

anticipated invocation, and any other facts the City finds important to the question of whether it exercised any level of control over the invocation ceremony).

24. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present; and relied-upon grounds therefor.

25. The relative proportionate share of each faith groups' representation in the City's invocation ceremony, year-over-year, from January 1, 2011 to present; and relied-upon grounds therefor.

26. The sum of money the City has paid to each guest speaker at the invocation ceremony, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received.

27. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the invocation ceremony.

28. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each

councilor to deny TST an invitation for equal access to the invocation ceremony.

29. Any other facts the City finds relevant to the litigation.

30. Any documents provided by the City to TST in discovery.

Propounded on July 6, 2022,
on behalf of Plaintiff
By: /s/ Matthew A. Kezhaya
Matthew A. Kezhaya, ABA# 2014161
KEZHAYA LAW PLC
300 N. Washington Ave. #300,
Minneapolis MN 55401
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

**CERTIFICATE AND NOTICE OF SERVICE**

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, provided the foregoing document by email to opposing counsel at nicole.oconnor@boston.gov and robert.arcangeli@boston.gov on July 6, 2022. /s/ Matthew A. Kezhaya

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CASE NO. 21-cv-10102

- - - - - - - - - - - - - - - - - - - - - - - - -

THE SATANIC TEMPLE, INC.,

Plaintiff,

v.

CITY OF BOSTON, MA,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

AUDIOVISUAL DEPOSITION of CHRISTINE O'DONNELL, a witness called by counsel for the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure before Kristen L. Kelly, Registered Professional Reporter, MA CSR No. 115893 and Notary Public in and for the Commonwealth of Massachusetts, at The Satanic Temple, 64 Bridge Street, Salem, Massachusetts, on Thursday, August 25, 2022, commencing at 9:32 a.m.

A P P E A R A N C E S:

CROWN LAW

By: Matthew A. Kezhaya, Esquire
Sonia A. Kezhaya, Esquire
300 N. Washington Avenue, #300
Minneapolis, Minnesota 55401
479.431.6112
matt@crown.law
sonia@crown.law
For the Plaintiff

CITY OF BOSTON LAW DEPARTMENT

By: Nicole O'Connor, Esquire
Robert S. Arcangeli, Esquire
City Hall, Room 615
Boston, Massachusetts 02201
617.635.2902
nicole.oconnor@boston.gov
robert.arcangeli@boston.gov
For the Defendant

ALSO PRESENT:

Shawn Budd, Videographer
Lucien Greaves, Ada King, and Mobius

I N D E X

| Deponent: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CHRISTINE O'DONNELL | | | | |
| By Mr. Kezhaya | | | | |

E X H I B I T S

| No. | |
|---|---|
| Exhibit 1 | 8.30.2017 Mark Thomas Email; DEF0002870 |
| Exhibit 2 | 10.19.2020 Email, Gabriela Coletta to Fr. Paolo; DEF0003434-3436 |
| Exhibit 3 | 2.19.2020 BHM Planning Meeting Notes; DEF0002320-2322 |
| Exhibit 4 | 11.03.2020 Email, Elizabeth Pimentel to Makayla Parkin; DEF0002391 |
| Exhibit 5 | 06.16.2020 Email, Michael Bonetti to Yuleidy Valdez; DEF0002733-2734 |
| Exhibit 6 | 09.29.2020 Email, David Vittorini to Makayla Parkin; DEF0002723-2726 |
| Exhibit 7 | 06.16.2020 Email, Yuleidy Valdez to Michael Bonetti; DEF0002729-2730 |
| Exhibit 8 | 12.12.20 Email, R. Zed to Kim Janey; DEF2849 |

E X H I B I T S

| No. | | Page |
|---|---|---|
| Exhibit 9 | 10.19.2017 Email, Alana Olsen to Annissa Essaibi-George; DEF0002890 | |
| Exhibit 10 | 02.14.2019 Email, Marie Szaniszlo to David Vittorini; DEF0003373-3374 | |
| Exhibit 11 | TST Brochure | ID ONLY |

(Exhibits provided electronically to reporter.)

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. The time is 9:32.

MR. KEZHAYA: Okay. Ada, if you could get us started please.

MS. KING: Very good. Welcome, everyone. My name is Ada King. I'm an ordained Minister of Satan. And I will be lowering the lights, lighting some candles and reading our invocation.

Let us stand now unavowed and unfettered by arcane doctrines borne of fearful minds in darkened times.

Let us embrace the Luciferian impulse to eat of the tree of knowledge and dissipate our blissful and comforting delusions of old.

Let us demand that individuals be judged for their concrete actions not their fealty to arbitrary social norms and elusory categorizations.

Let us reason our solutions with agnosticism in all things, holding fast only to that which is demonstrably true.

Let us stand firm against any and all arbitrary authority that threatens the personal

sovereignty of one or of all.

That which will not bend must break and that which can be destroyed by the truth should never be spared its demise.

It is done. Hail Satan.

MR. KEZHAYA: Hail Satan. Great.

DIRECT EXAMINATION

BY MR. KEZHAYA:

Q So pleased that you all are gathered here today. I want to be very, very clear. The purpose of today's meeting is to get to the truth, that's it. We are not a threat to you. I want you to know that. It's very important to me that you are aware of that. Do you understand that, Christine?

A I do.

Q Thank you.

MR. KEZHAYA: I presumed -- sorry. I shouldn't have been so presumptuous. We should start with who we are. So I'm Matt Kezhaya. I represent The Satanic Temple against the City of Boston on charges that City of Boston is not inviting TST to the legislative prayer event that opens public meetings.

You just heard the invocation that we

would have done. We've demanded it three times. The consistent response has been unless you have a invitation, you are not welcome. We cannot get an invitation of our own devices, so we are seeking the court's assistance to give us that invitation. That's it. That's all we're here for. The City denies the charge. Says that it's our speech, and you are subject to invitation-only policies because that's just how we like to do things. And so that's the, the nature of the dispute.

Once again, I'm Matt Kezhaya. I represent plaintiffs.

We have -- Rob and Nicole, if you guys could introduce yourselves for the defendants.

MS. O'CONNOR: Sure. So Nicole O'Connor for the City of Boston.

MR. ARCANGELI: Rob Arcangeli for the City of Boston.

MR. KEZHAYA: I have also with me my wife and law partner, Sonia, at counsel table. And representative -- or plural, representatives of TST, Lucien Greaves, co-founder is also at counsel table. And this matter is being publicly recorded by agreement of the parties to be used only for posterity purposes

not live broadcast. That was a subject of dispute. We resolved it through rational discourse.

That's what we're here for today is just rationale discourse to try to seek an understanding, a joint understanding as to our side of the story and your side of the story.

We have brought pamphlets so that you guys can see who we are. You will take notice that this pamphlet will be -- I'll just use this one as Exhibit 1. You guys already have copies. Have you guys looked through these pamphlets yet?

MS. O'CONNOR: No.

MR. KEZHAYA: Okay.

MS. O'CONNOR: Are we doing the usual stipulations, Matt?

MR. KEZHAYA: No. No, no stipulations so far. We can get to that point. Actually, that's a, that's a good point. In terms of stipulations I propose as follows: There are lots of legal rules. I can't, frankly, remember all of them unless they're very specifically cited and I'm researching at the time, so I propose to simplify them as follows: I promise not to harass. I promise not to intimidate. I am trying to be -- although I'm angry about this

matter, I'm trying to be very, very clear that my anger is not directed at you personally or anyone in this room. I feel angry personally about being excluded from things. That's, that's my deal. I'm trying to keep it under wraps. So please bear with me if I sometimes get excitable in the matter. I relatedly will not threaten anyone. I ask that no one threatens me because, again, I'm prone to excitement.

Only questions about this dispute, no getting into anything untoward. If anyone has an objection as to anything that I do please let it be known. We'll try to address it, again, through rational discourse. No statements only questions. I'm inquiring into your mind. I'm not here to make any particular points.

These are my proposed offers. Are these offers acceptable to you guys?

MS. O'CONNOR: That's acceptable to me. I'm also going to abide by the usual stipulation in that I'm going to reserve all of my objections as to -- except as to form, until the time of trial.

MR. KEZHAYA: Okay. I would like, if it's a form objection, for us to have like a specific addressing of what the objection is --

MS. O'CONNOR: Sure.

MR. KEZHAYA: -- so that I can try to fix it. I also request no semantics games, no games of, you know, I don't know, mincing of words. I'm not very good with words myself. Despite being a lawyer, I find myself consulting the dictionary quite regularly, in fact.

No leaving. We're kinda stuck in here until we understand each other. That's all I'm trying to get to. No talking to your lawyers during these proceedings. So we are now in the part of the conversation where I'm inquiring into your state of mind, yours, of course, being the City of Boston's.

Also, short of there being a privilege objection, I ask that you answer the question. It will be sometimes perhaps subject to an objection as to form perhaps or some other kind of objection. To the extent we can't resolve the objection amongst ourselves, I propose that we just discretely table them. That's all I ask is that the issue be discretely stated.

Any, any objections as to that?

MS. O'CONNOR: No.

MR. KEZHAYA: Okay.

THE VIDEOGRAPHER: Before we begin, can

we put the lights up just a little bit to where they were? Thank you.

MR. KEZHAYA: Let's see here. So phase two of things, you mentioned that you're going to reserve all objections for trial, that would resolve the next phase. To the extent you have any objections -- I say for trial. For, you know, whatever next set of proceedings.

I also propose that any disputes be resolved by Rob. I know Rob. I trust Rob. I know that Rob knows the law.

MS. O'CONNOR: So it will be either one of us. It may be me. I'm sorry if you're stuck with me. I'll do my best to get the law right, but you've got me today.

MR. KEZHAYA: I'm not -- hold on. I'm not stuck with you. To be clear, I want to talk with you. I brought you guys here for the purpose of talking to you, for the purpose of saying here's where we are coming from. I want to know where you are coming from. That's it.

And again, not through statement because that part happened already, through a question. So you and I might have a dispute. I say you, counsel table,

City of Boston and I might have a dispute. All I request is that to the extent there be contention, Rob be intervening to fix the contention.

MS. O'CONNOR: I hope it's a nonissue, but I think, I think this will be an issue that we don't need to worry about.

MR. KEZHAYA: Okay. Can we table that then in the event of contention?

MS. O'CONNOR: I mean these are very bizarre sort of stipulations or suggestions for a typical deposition. I'm happy to -- we'll work with you amicably to resolve any issues, and I think this is nonissue that we don't need to worry about. And if we should get into some sort of dispute, I think we can cross that bridge when we get to it.

MR. KEZHAYA: Understood. Once again, no contention. Just looking for the truth. And to the extent we have any tabled issues, those obviously have to go to the judge.

Any objections as to anything that I, I have proposed here?

MS. O'CONNOR: No.

MR. KEZHAYA: Anyone at all? Okay.

All right. So that being the case, we

have some important public documents that I just want to make reference to. I see no reason to show anyone them. There was the Complaint. There was the answer. There was a motion to dismiss. There was the order granting the motion to dismiss as to part, importantly on the issue of government speech, and then Shurtleff came out which importantly said that government speech cannot be used to exclude certain religions.

Any objections as to the court taking note in, in the court -- in the course of understanding the rest of this deposition of its own public docket?

MS. O'CONNOR: I don't really understand what you're asking on the record but ...

MR. KEZHAYA: And to be clear, I'm not saying this for the court's benefit. I'm saying this for the congregants' benefit.

MS. O'CONNOR: Okay. I don't --

MR. KEZHAYA: The congregants are, are gonna be needing to know that they need to take a look at the Complaint, the answer, the motion to dismiss, the order granting motion to dismiss importantly as to government speech and Shurtleff which overturned government speech. That's the only thing that the congregants need to take note of. I'm telling them

this by using those words.

MS. O'CONNOR: Okay.

MR. KEZHAYA: But, you know, again, obviously the court's going to take note of its own docket. We'll -- we'll figure out docket numbers if, if the needs end up being.

So, that all being the case, I propose that we proceed with the deposition. Any objections?

MS. O'CONNOR: No.

Q Please identify yourself for the benefit of the public.

A Christine O'Donnell. I'm the Compliance Director and staff counsel for the Boston City Council.

THE REPORTER: Do you want -- I'm sorry to interrupt. Do you want her sworn in first or ...

Q Oh. Christine, are you gonna lie?

A I'm not but ...

MS. O'CONNOR: I think we should swear her in just for consistency of the testimony.

MR. KEZHAYA: I like ceremony. Let's swear her in.

CHRISTINE O'DONNELL

having been satisfactorily identified by the production of her Massachusetts driver's license and duly sworn was examined and testified as follows:

BY MR. KEZHAYA:

Q Great. Let's -- let's start over.

A Okay.

Q Please identify yourself.

A Christine O'Donnell. I'm the Compliance Director and staff counsel for the Boston City Council.

Q Okay. And why are you here?

A I am here under the deposition. I'm representing the City of Boston.

Q Okay. And that's pursuant to a Rule 30(b)(6) deposition; is that correct?

A Correct.

Q What is a Rule 30(b)(6) deposition to your understanding?

A To my understanding, I'm here to represent the City of Boston under the federal rules.

Q And with regard to the federal rules, you're referring to the Federal Rules of Procedure, I gather; is that correct?

A Yes. Yes.

Q Tell us more about the Federal Rules of Civil Procedure.

MS. O'CONNOR: Objection.

MR. KEZHAYA: What -- what's the nature of your objection?

MS. O'CONNOR: As they pertain to what?

MR. KEZHAYA: She's the one who said it. I'm asking her to expound.

MS. O'CONNOR: On her understanding of what the Federal Rules of Civil Procedure are?

MR. KEZHAYA: Correct.

MS. O'CONNOR: Okay.

A Just my understanding is I'm here because of that rule. I am not a litigator for the Boston City Council so that -- it's my understanding that I'm here pursuant to that rule.

Q Let me back up with a little bit of exposition. The lawyers in the room speak a certain language that the congregants do not speak. I'm trying to take out the legalese. So 30(b)(6) means something to all four of us and also Sonia. I doesn't mean anything to them. So when you say 30(b)(6), I know what you mean. They don't know what you mean.

What is a 30(b)(6) deposition?

A To my understanding, I am here representing the City of Boston.

Q In the matter of The Satanic Temple vs. The City of Boston, --

A Yes.

Q -- correct?

A Yes.

Q Okay. And you are here because we called for the deposition, correct?

A Yes.

Q And more particularly, we called the City of Boston to send a representative to defend itself against the Complaint, and we're gonna be talking, generally speaking, about the Complaint and answer and the allegations therein. Is that also correct?

A Correct.

Q Okay. Would you agree that the subject of dispute is whether The Satanic Temple is entitled to an invitation as opposed to subject to an invitation-only policy with regard to the opening of public proceedings with a legislative prayer?

A Could you repeat that?

Q Sorry. What is your understanding of the nature of the dispute?

A My understanding of the nature of the dispute is that The Satanic Temple is suing the City of Boston so that The Satanic Temple can give the invocation.

Q And you heard the invocation earlier; is that correct?

A I did.

Q Okay. How did the invocation make you feel?

MS. O'CONNOR: Objection. So she's here for a 30(b)(6) deposition.

MR. KEZHAYA: Correct.

MS. O'CONNOR: Her personal thoughts and opinions are not relevant and not part of a 30(b)(6) deposition.

MR. KEZHAYA: Do you have a rule to support your premise?

MS. O'CONNOR: Rule 30(b)(6).

MR. KEZHAYA: What does the text of Rule 30(b)(6) say?

MS. O'CONNOR: I don't have these types of rules offhand. But my position throughout this deposition, so that we're clear, is that Christine will only be answering questions about the topics that we have designated her to testify about in the 30(b)(6) subpoena.

MR. KEZHAYA: I respectfully disagree. It's my understanding of 30(b)(6), and I'm quoting here from my 30(b)(6) book and I'm -- the title of the book being 30(b)(6) Deposing Corporations, Organizations and the Government, second decision, by an author whose name I can't pronounce. I'm looking at page 172 now. The title of this, of this section is: What can you ask in the matters of examination. Given the title of book, we all know it's about a 30(b)(6) deposition. It states: 30(b)(6) itself does not limit the matters of examination that a requesting party may seek in any way. So your proposition of the law is inconsistent with mine. Do you have authority that overpowers my authority?

MS. O'CONNOR: So my position is that she's not going to be answering questions that are outside the topic on the 30(b)(6) deposition subpoena.

MR. KEZHAYA: So --

MS. O'CONNOR: Perhaps it makes sense for us to caucus. Rob and I can caucus. And maybe we need to file a motion with the court to get some parameters on what will govern this deposition, because we're in for a long day if we don't have at least a basic understanding of, of that.

MR. KEZHAYA: I thought we just addressed that when I said I'm not gonna be doing any harassing, any -- no threats, only questions about this dispute. You guys agreed to all of this. This is about this dispute; is it not?

MS. O'CONNOR: This dispute in the context of a 30(b)(6) deposition. And I'm not suggesting that you're harassing her. I don't think you intend to do anything like that. But the purpose of a 30(b)(6) is the designated topics.

MR. KEZHAYA: Yes.

MS. O'CONNOR: And she is here to testify about the topics for which we have designated her.

MR. KEZHAYA: Okay. So it seems to me that you're proposing that this is outside of the topics listed in the deposition notice. Is that correct?

MS. O'CONNOR: Exactly.

MR. KEZHAYA: Okay. Let me pull that up because, frankly, I don't remember what it says.

And you also invited a possibility of caucusing. Do you guys want to caucus and then -- caucus off the record, reconvene and then we can

discuss further or how do you guys want to do it?

MS. O'CONNOR: Sure. While you review the, the 30(b)(6) topics, why don't Rob and I go speak, and we'll see how we want to proceed.

MR. KEZHAYA: Okay.

THE VIDEOGRAPHER: Okay. The time is 9:49. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 9:53.

MR. KEZHAYA: All right. Are you guys ready to proceed?

MS. O'CONNOR: We are.

THE WITNESS: Yes.

MR. KEZHAYA: Okay. I did not get very far into my 30(b)(6) notice. I noticed that the first clause of the first enumerated paragraph is the identity of the 30(b)(6) deponent. Part of identity is the internal workings of the mind is my understanding. That was my intended meaning with the word "identity". Did I misuse the word "identity"?

MS. O'CONNOR: My plain reading of that clause is just her name, Christine O'Donnell, is the identity of the 30(b)(6) deponent.

MR. KEZHAYA: But I didn't say --

MS. O'CONNOR: Her inner workings of her mind are not relevant to a 30(b)(6) deposition. And I want to be clear that that is the position that we will take throughout this deposition.

MR. KEZHAYA: Okay. It's my understanding that the City of -- my burden of proof is that I must prove that the City of Boston intentionally did not invite TST; is that correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: And she's here to speak for the City of Boston, also correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: And she's speaking as the City of Boston. Is that also correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: So I don't understand why her inner workings of her mind is not the question -- the ultimate question of the case.

MS. O'CONNOR: Because she's not designated on the subjective intent questions, but also, they're not topics that she's been identified to talk about.

MR. KEZHAYA: Well, again, that was my

intended meaning with the word "identity" of the 30(b)(6) deponent instead of just their name and designation of, you know, their office title or whatever. That -- that was my intended meaning.

Are you telling me that you're asserting privilege on this matter or are you telling me that you just are instructing her not to answer these questions on some nonprivilege ground?

MS. O'CONNOR: I'm instructing her not to answer questions that she was not designated to testify about on the 30(b)(6) notice. And I appreciate that perhaps we have disagreements as to what your intentions were with certain clauses. I'm going by the plain reading of what's written, as well as the usual practice in every 30(b)(6) deposition I have ever been a part of.

MR. KEZHAYA: I understand. That's your experience. My experience is different.

MS. O'CONNOR: Mm-hmm.

MR. KEZHAYA: When I take someone's deposition, I can ask them questions about how they feel normally. Not in a 30(b)(6) deposition, just in a normal deposition. That's why it's a deposition.

MS. O'CONNOR: I agree with you there.

MR. KEZHAYA: Well, this is a subcategory of normal depositions. This is a subcategory of deposing organiza -- because organizations are a legal fiction, you see. The City doesn't have feelings. The City is comprised of people who have feelings.

MS. O'CONNOR: I think we're in for a long day, Matt, if we're gonna have to debate all of these issues. So unless it's a specific topic -- she's more than happy to answer all of your questions on the items that we have designated her for, but we're in for a long day if we're gonna be talking about the meaning of identity.

MR. KEZHAYA: I agree we are in a -- in, in for a long time day. That's why I started off with no semantics games. I don't play semantics games. I don't like semantics games. They make me frustrated. My intention was to depose someone at the City of Boston who can speak to why the City of Boston will not invite TST.

MS. O'CONNOR: But that's not the topics that she's been designated for, Matt.

MR. KEZHAYA: Okay. So what's your understanding of word "identity" again?

MS. O'CONNOR: Her name.

MR. KEZHAYA: That's your, that's your understanding?

MS. O'CONNOR: I think that's the, the plain understanding in the usual 30(b)(6) context.

MR. KEZHAYA: Okay. So in my world identity includes name as a subordinate understanding. It includes name, in other words. It's not only name. Is, is that different from the way you use identity?

MS. O'CONNOR: It seems that way. But I also don't find these exchanges particularly helpful.

MR. KEZHAYA: I agree, but you're the one telling me I'm not allowed to ask these questions. That's why we're having this discussion right now.

MS. O'CONNOR: Sure. And so that's our position. So I'm going to instruct her not to answer questions about her personal feelings --

MR. KEZHAYA: Okay.

MS. O'CONNOR: -- on a particular matter. But if you have any questions about the topics that she's been designated to testify about, and there are many of them, --

MR. KEZHAYA: Yes, many.

MS. O'CONNOR: -- she will answer them.

MR. KEZHAYA: Many indeed.

One additional question. Are you asserting a particular privilege ground or is it literally just it's not specifically identified as an enumerated topic in my matters of examination in my 30(b)(6) notice?

MS. O'CONNOR: It's the latter.

MR. KEZHAYA: Okay. Just making sure. Let's skip that part.

BY MR. KEZHAYA:

Q You have read the pamphlet; is that correct?

A This pamphlet?

Q Have you read the pamphlet? Let's start with that.

A I have not.

Q Okay. Let's read it. So --

MS. O'CONNOR: Objection again. Matt, again, what does this have to do with any of the topics that she's designated for?

MR. KEZHAYA: She's --

MS. O'CONNOR: For the 30(b)(6).

MR. KEZHAYA: Okay. Let's return to the 30(b)(6) notice. I seem to remember putting at the very end here: Any other facts the City finds

relevant, any documents provided by the City in discovery, any pleadings.

We talked about the pleadings earlier today. The pleadings obviously includes the plaintiff as one of the people in this dispute. This is about us, quite literally. I don't understand how this is not within the scope of the dispute.

MS. O'CONNOR: So if you're referring to paragraphs 28-29-30, those are facts that the City finds important.

MR. KEZHAYA: Ah-huh.

MS. O'CONNOR: Facts that the City finds relevant.

MR. KEZHAYA: Okay.

MS. O'CONNOR: And documents provided to the City during discovery, was that pamphlet provided to the City during discovery?

MR. KEZHAYA: No. No. Again, my understanding of 30(b)(6) is that I'm not limited to these things. This is just me telling you what to be ready to hear.

MS. O'CONNOR: Yeah, so we have a fundamental disagreement about the scope of a 30(b)(6) deposition then.

MR. KEZHAYA: I see that.

MS. O'CONNOR: So maybe it makes to table this entire deposition --

MR. KEZHAYA: No.

MS. O'CONNOR: -- and get some guidance from the court.

MR. KEZHAYA: No, we're not doing that.

MS. O'CONNOR: Well, we're --

MR. KEZHAYA: If you do that, I'll be moving to strike your answer, and I'll be seeking a default judgment. We are not exiting this conversation until she and I have a meeting of the minds. That's the point of depositions.

MS. O'CONNOR: That's not how this is going to work. We'll -- we will leave if we feel it's necessary to leave or if we're not sticking to the topics that are on the 30(b)(6) deposition notice.

MR. KEZHAYA: Okay. So do you want to take the deposition?

MS. O'CONNOR: I don't. I didn't -- this is not helpful, Matt. This is not how typical depositions proceed. I can't help but underscore one more time and give you another opportunity to ask her a question about any of the topics for which she has been

identified --

MR. KEZHAYA: You say --

MS. O'CONNOR: -- as a witness.

MR. KEZHAYA: Sorry. I don't mean to interrupt.

You say one more time. You're telling me that I get one strike and then you're going to revoke the witness from my opportunity to understand where the City is coming from, correct?

MS. O'CONNOR: I don't think it's helpful to proceed with a line of questions that she's not here to testify about. So if -- I will instruct her not to answer any questions about the pamphlet.

MR. KEZHAYA: Okay. I think that's the subject of the dispute. So it appears to me that your position is that you provided her of your own free will not I pulled her into the temple; is that correct?

MS. O'CONNOR: I don't understand what you just said.

MR. KEZHAYA: A 30(b)(6) notice is a summons. She shall attend or you guys don't get to have an answer. That's how depositions work. That's how the rules of procedure work. Correct?

MS. O'CONNOR: I'm still not

understanding what you're trying to say.

MR. KEZHAYA: What part do you not understand?

MS. O'CONNOR: About her answer?

MR. KEZHAYA: No. No. No. About what I'm saying right now. Do you disagree that the rules of procedure allow me to have a -- entitle me, in fact, to a deposition?

MS. O'CONNOR: Of course.

MR. KEZHAYA: Okay. Do you agree also that you have to provide the person to speak to specifically designated topics?

MS. O'CONNOR: Yes.

MR. KEZHAYA: Okay. You also agree that I'm the one who drafts the notice, correct?

MS. O'CONNOR: Yes.

MR. KEZHAYA: And it seems odd that you would have a right to tell me how I go about my notice. So that's where the confusion's happening here. What's going on?

MS. O'CONNOR: So we had a discussion, right. We had a phone conversation in which we went through all of these topics, and I thought we had a meeting of the minds as to what things meant.

MR. KEZHAYA: Well, back up. Back up. Back up.

MS. O'CONNOR: Okay.

MR. KEZHAYA: It's August 25th. We had this that discussion when, like July?

MS. O'CONNOR: Yes.

MR. KEZHAYA: I don't remember it. I've been doing other things. What happened in that discussion?

MS. O'CONNOR: We had a discussion about any items that Rob and I had some confusion about and we had a meetings of minds and I think we were all on the same page as to the topics were and what information you were looking for. And so far in this deposition none of the questions have been about any of those topics that we understood she was here to testify about.

So this isn't personal to TST. I take this position in every 30(b)(6) deposition.

MR. KEZHAYA: I understand.

MS. O'CONNOR: And I don't want to waste anyone's time by proceeding with a bunch of questions that I'm not going to have her answer.

MR. KEZHAYA: I understand that, but the

subject of dispute is whether she should answer it.

MS. O'CONNOR: Yes.

MR. KEZHAYA: So that's what we're talking about.

MS. O'CONNOR: Yes.

MR. KEZHAYA: So going back to the original premise that we last agreed to, I'm entitled to a deposition. I'm entitled to notice the deposition, meaning you don't -- it's not a stipulated deposition. It's a notice of deposition. Then we talked about it. We agreed that these were the items that we were going to talk about. We had an opportunity for you guys to object and say, no, not identity, specifically name. You didn't strike any of those words.

MS. O'CONNOR: Well, of course I wouldn't understand that you were going to ask a question about her identity that was beyond its plain meaning in the subpoena. So --

MR. KEZHAYA: Well --

MS. O'CONNOR: -- to expect for me to put all of my potential objections, when I don't even know what your questions are, at the beginning of the deposition just doesn't make a whole lot of sense on my

end.

MR. KEZHAYA: Well, maybe I'm the one who's misusing the word "identity". As I said, I find myself finding need to consult a dictionary periodically. Do you have a preferred dictionary that we use?

MS. O'CONNOR: I don't. So I'm not here to answer questions or be cross-examined by you about --

MR. KEZHAYA: Whoa. Whoa. Whoa. Whoa. There's no cross-examination.

MS. O'CONNOR: And that's how it feels.

MR. KEZHAYA: I know it feels like that because we are in contention. That's what this is. This is just contention. You and I are trying to have rational discourse to resolve a dispute. If it cannot be resolved, that's the end of that, but I, I feel like this is something that's resolvable.

So I'm just opening up Microsoft Bing because I've got Microsoft and all of my stuff is Microsoft now. I'm kind of a Microsoft guy nowadays. Identity: The fact of being who or what a person or thing is. Who, it seems to me, includes what they feel. What, obviously would also include what they

feel. And is, I feel like if you are experiencing it, you are feeling that thing. You are angry. That's how I normally use the word. For example, with angry or, you know, what have you. I don't know how she feels about it. That's why I'm asking the question.

MS. O'CONNOR: So we're in for a long day if we're going to be consulting dictionaries on meanings of words.

MR. KEZHAYA: I agree. But again, this is why I tried to avoid semantics games by --

MS. O'CONNOR: This does feel an awful lot like semantics.

MR. KEZHAYA: It does feel an awful lot like semantics, but I'm not the one who's brought the discussion.

MS. O'CONNOR: So we're not --

MR. KEZHAYA: I want out of the discussion. I want to be asking the questions.

MS. O'CONNOR: We're not having this conversation anymore. I don't think it's helpful. Why don't you ask your next question. And we can go question by question if we have to, and we'll see how it unfolds.

MR. KEZHAYA: I'm not quite done yet.

You said that identity by the plain meaning only means thing, to your understanding, by the plain meaning. You've used the word "plain" quite a few times. I don't see anywhere in identity that it says name only. So where are you coming from? What dictionary definition are you using to say name only means identity? Is there a dictionary that supports that definition?

MS. O'CONNOR: Well, when you started the deposition, you said identify yourself for the record, and she said I'm Christine O'Donnell.

MR. KEZHAYA: Ah-huh.

MS. O'CONNOR: So that's my understanding. I think that was probably Christine's understanding. I'm not going to speak for her. But this exchange is not helpful, Matt, so ask your next question, please.

MR. KEZHAYA: I -- I'm not there yet. You told me that the plain meaning only means name. You told me that you are understanding that based off of how she answered. You're also telling me that that's what you're consistently understanding based off of your prior experience with depositions, but that's inconsistent with my prior deposition experience.

That's why I had to go to the deposition -- or the dictionary.

So it seems to me that when I use the word "identity" and I'm the one who's entitled to send the notice and I'm entitled to write the notice and you guys don't have an opportunity to say no to the notice, it seems to me that how I feel like the word "identity" is defined should be how it goes. I'm not seeing from your perspective how that's not the case other than you don't want her to answer the question. Is that the case?

MS. O'CONNOR: I think I've answered the question, and we can agree to disagree about the meaning of the word "identity".

MR. KEZHAYA: Okay.

MS. O'CONNOR: I will ask you to ask your next question, please, so we can proceed with the deposition.

MR. KEZHAYA: Very well. To, to be clear, the dispute which we are tabling for later is the meaning of the word "identity". Is that your understanding as well?

MS. O'CONNOR: It appears as much.

MR. KEZHAYA: Okay. Let's continue. So

do you object to us considering and talking about the plaintiffs in this matter?

MS. O'CONNOR: It depends on the question.

MR. KEZHAYA: Well, right now we haven't gotten to the question yet. I don't know what the question is.

MS. O'CONNOR: Well, I can't tell you if I object yet until I hear the question. So depositions are questions and answers. So I have to hear the question before I know what the answer is -- what my response will be.

MR. KEZHAYA: Okay. I feel like I was being unclear here. My, my topic question, it's not a specific question. My question to you is whether the topic of who the plaintiffs are and how, how she perceives the plaintiffs is part of this dispute?

MS. O'CONNOR: No, I would object to that question.

MR. KEZHAYA: What is your ground to object to that?

MS. O'CONNOR: Because it's not part of the 30(b)(6) topics for which she was designated to testify about.

MR. KEZHAYA: Okay. Let's return back to my 30(b)(6) book which says I'm not limited to the topics. You have not presented me with --

MS. O'CONNOR: I disagree with that understanding, and I don't have to present you with any sort of -- I don't, I don't have my legal paperwork here. I'm very comfortable maintaining that position with the court.

MR. KEZHAYA: Okay. Why is that?

MS. O'CONNOR: You'll see when I probably oppose your motion to compel. I'm not sure.

MR. KEZHAYA: Oh, no, I won't be moving to compel. I'll be moving to strike your answer if you guys leave without some kind of privilege-based objection to not answer the question as posed.

MS. O'CONNOR: Are you free to file whatever you see fit.

MR. KEZHAYA: Ah, I see. You're -- I'm, I'm kind of gathering in between your words that the judge might be biased. Is that your position?

MS. O'CONNOR: Not at all. I'm just saying in any litigation are you, of course, free to file whatever you would like.

MR. KEZHAYA: Of course.

MS. O'CONNOR: And I will oppose. That's just what the rules provide. If you think you --

MR. KEZHAYA: What is the nature of your opposition?

MS. O'CONNOR: Matt, this is not helpful. I object to questions about her feelings about the people who have brought this lawsuit.

MR. KEZHAYA: You object --

MS. O'CONNOR: If you have another question --

MR. KEZHAYA: You object to the witness testifying about the people that the City will not invite to the City's meeting.

MS. O'CONNOR: Because she --

MR. KEZHAYA: That is the nature of the objection, correct?

MS. O'CONNOR: That's not the nature of the objection.

MR. KEZHAYA: Oh, please correct my understanding.

MS. O'CONNOR: She is not designated -- that is, first of all, not a topic on your 30(b)(6) deposition notice, and she's not been designated to

talk about that particular topic.

So the spirit of the 30(b)(6) rule is so that we can prepare the witness to answer your questions, and so she has a right to know the topics about which she is testifying at a 30(b)(6) depo. We can't possibly prepare her for questions that are beyond the scope of what she's been designated to testify about.

MR. KEZHAYA: That's the point. I don't expect --

MS. O'CONNOR: Not in a 30(b)(6).

MR. KEZHAYA: Okay. Well, we're just going to have to agree to disagree on that point. But you're telling me that if it's not specifically identified, I don't get to talk about it, and yet, we also talked about the pleadings in which the plaintiff is the subject matter of the dispute.

MS. O'CONNOR: But the pleadings are not a topic on the 30(b)(6) notice.

MR. KEZHAYA: Why would I need to identify all of the pleadings in the 30(b)(6) notice?

MS. O'CONNOR: Because if you want a witness to talk about them, we need to be apprized of what we need to educate the witness about in the

context of a 30(b)(6) deposition.

And while this is perhaps fun, I'm not sure, this seems like a waste of time if we're in disagreement about what a 30(b)(6) deposition is. I would suggest you ask your next question. But I think we are at an impasse because we're not going to resolve that issue. So we might need some court intervention and have to table this deposition, unfortunately.

MR. KEZHAYA: Well, no, we're just going to table the issue, and I'm going to move on to the next set of questions.

MS. O'CONNOR: Okay. Then please do.

MR. KEZHAYA: I just wanted to reach the point of impasse.

Before we proceed, though, I want to understand and make very precise my understanding of what impasse means. Impasse to you is that she, short of it being specifically identified here in the matters of examination, not in the style, the style did not adequately apprize her that this is about The Satanic Temple, but the matters of examination part of the 30(b)(6) notice, it has to be enumerated, correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: Okay. Just making sure.

And she shall not answer pursuant to your, Nicole O'Connor's, orders.

MS. O'CONNOR: That's just my instruction to my client.

MR. KEZHAYA: Yes. Yeah, instruction, order, directive, I don't care what you call it.

MS. O'CONNOR: Sure.

MR. KEZHAYA: Okay. And there's not a privilege ground.

MS. O'CONNOR: There's no privilege ground. I mean if there was --

MR. KEZHAYA: Okay. No. No. No. That's sufficient for my purposes. Thank you.

Well, that being the case, I'm going to scrap my old plan and just start a new one as we speak. So let's start over.

BY MR. KEZHAYA:

Q Remind me who you are.

A Christine O'Donnell. I'm the Compliance Director and staff counsel for the Boston City Council.

Q Okay. I see that the next clause of this is the scope of your agency. So why don't you tell me about the scope of your agency for the City.

Well, wait. Let's, let's define our words

here real quick. What is agent -- are you a lawyer?

A I am, yes.

Q You're trained in law?

A Yes.

Q Have you practiced law like in a litigation context?

A Not in litigation, no.

Q Okay. How about --

MR. KEZHAYA: May I ask her about her background just so I can understand when she's using words the context with which she's --

MS. O'CONNOR: Sure. That's -- absolutely.

MR. KEZHAYA: Okay.

Q What's your background? You're a lawyer. What does that mean?

What -- how you -- you went to law school presumably at some point, and now you're here. Operatively speaking within the bounds of, you know, legal education, what has your experience been?

A So I am primarily a government attorney. I provide legal research, legal writing. In my capacity for the Boston City Council, I provide legal research for all 13 councilors. It's a 13-member body.

Primarily I handle the Government Operations Committee which deals with all proposed ordinances and home rule petitions to ensure that they're valid within the City's charter, that it's within the City's authority. I --

Q Can I interject there? That was a lot of words. I've already started losing you.

So you're a government -- you're a government attorney, correct?

A Yes.

Q You do government law-related things; is that correct?

A Legal research and writing primarily.

Q Yeah. Well, again, they don't know what legal research and writing is. Those have words -- those words mean something to me. They don't know what that means. So what does --

MS. O'CONNOR: Matt, if you have a question, a follow-up question about what she means by a particular word, you're free to ask her that, but she's not here to educate whoever maybe watching this deposition down the road. So if you have a question, feel free to ask her what she means by a particular word.

MR. KEZHAYA: I do have these questions. I'm trying to examine her statements.

Q So going back to my question, what is legal research and writing? How do you define that?

A In my role in the context of what I do, I instruct and advise the councilors on what they are proposing if they have the authority to do it.

Q Okay. So your, your job includes receiving a request from a councilor and opining upon that request; is that correct?

A Correct.

Q Okay. And specifically within the bounds of the law like the legal rules that are written down somewhere presumably which is why you have to do legal research and writing; is that correct?

A Yes.

Q Okay. So within the bounds of the legal rules, if they want to do something are they authorized to do so; is that correct?

A Yes.

Q And I assume also on the opposite side of things, if the law -- when you can't do that, that goes past the law, you can't do that. Do you also tell them, hey, you can't do that?

A Sure.

Q Have you ever had to do that?

A I -- in my capacity I write legal memorandums all the time.

Q Okay.

A And provide options. I cite case law. I cite Massachusetts state law, federal law.

Q Do you handle much First Amendment law?

A It depends on the issue. Generally it's local issues because Boston City Council is a local form of government.

Q Okay. Do you dispute that Boston is subject to the requirements of the First Amendment?

A I do not.

Q Okay. Do you -- do you do a lot of research and interpretation of what the First Amendment means, how it applies, stuff like that?

A I've done some.

Q Okay. What -- please tell me about some.

MS. O'CONNOR: Objection. You can answer that to the extent you're not divulging any sort of attorney work product and attorney-client communications.

MR. KEZHAYA: I agree. Don't -- you

know, whatever, whatever privilege objection she has that's, that's clearly not objectionable.

A If the issue comes up, if a councilor wants to propose an ordinance, I would, I would research the impact of the First Amendment in that case.

Q Okay.

MR. KEZHAYA: Give me just a second here. We're just going to start over with a new paragraph 1.

Q Did you do any research on this matter?

A I have.

Q Okay. Did you do any legal writing on this matter?

A I did.

Q Okay. Did you issue any legal opinions in this matter?

A It wasn't a formal legal opinion, but I did legal research for a particular councilor advising how to respond to a request by TST.

Q Okay. Who that was councilor?

MS. O'CONNOR: You can answer.

A Councilor Andrea Campbell.

Q Okay. When was that?

A About two -- no, it wasn't. 2018/2019,

approximately.

Q So if I understand -- if I understand your testimony so far, in or around 2018/2019 a councilor came to you with a question - the nature of the question I'm not asking about - to you with a request as to whether the law allows them to do something, correct?

A Not exactly.

Q Oh. Tell me, tell me what it was --

MS. O'CONNOR: Well, objection. If you can answer that without divulging any conversations.

Q Yeah, no conversations, but the subject matter.

MR. KEZHAYA: Unless you object.

MS. O'CONNOR: Let me hear that question again.

MR. KEZHAYA: Well, I don't recall.

Q To the effect of Andrea Campbell, a councilor, came to you with a request to ask if she was allowed to do something within the bounds of the law, and you said not exactly.

A It wasn't more so if she was allowed to do something. It was what would the City Council's obligations be.

Q Ah, so she asked if she had to do something?

A I wouldn't classify it as that. She was asking me to look into what the City Council's obligations would be for a particular issue.

Q Well, the City Council is comprised of people, yes?

A Yes.

Q Is she on the Council?

A She -- at the time she was a City Councilor.

Q Okay.

A She's no longer on the Council.

Q I see. Yeah, at the time. I don't, I don't care what she is now.

At -- at the relevant time she was on the Council asking you what councilors generally are required to do then; is that correct?

A What the City Council's obligations were for a particular issue. So her as a councilor and the body as a whole, as an entity. They're an entity, a governmental entity.

Q Yeah, they're an entity like TST is an entity. But again, TST's not like a, like a ship or a thing. It's a body of people. It's a number of people are together, and it's just a convenient way for

lawyers to, you know, assign designations to those people. Or at least that's my understanding. Do you disagree with that understanding?

A I do not disagree.

Q Okay. So going back to my question then, she's on the Council or -- what was her title at the time?

A She was a City Councilor for District 4, but at the time she was council president.

Q And what does a Council President do?

A The Council President is the head of the City Council, the administrative head. And the Council President is the chair when the City Council meets for its weekly meetings. The chair of the --

Q Way too much information.

A Okay.

Q I'm asking very specific questions because I can't remember all, all of your statements.

A That's the responsibilities of the Council President.

Q Okay. So they're admin president so far; is that right?

A Mm-hmm.

Q They do -- what is it again that they do in

the course?

A They chair the weekly City Council meetings.

Q Okay. So there are weekly meetings --

A Yes.

Q -- as City Council?

A Yes.

Q Is that all that they do?

A She's also a District City Councilor so she has constituents that she represents.

Q Okay.

A And the Council is legislative body. She also serves on City Council committees where legislation passes through. Councilors have to vote on it. She has a vote.

Q So if I'm, if I'm reading in between your lines, it seems to me that someone may have come to her with an objection to TST getting an invite at some point. Is that, is that the case?

MS. O'CONNOR: Objection.

A No.

Q No?

MS. O'CONNOR: You can answer if you know.

A No, that's not the case.

Q Okay. Or at least not to your knowledge?
A Not to my knowledge.
Q Okay. Let's see here.
Okay. So going back to the topic at hand, the Council President came to you with a request as to the Council's legal obligations as to a nondescript matter; is that correct?
A Yes.
Q What was the matter?
A The matter was at the time I believe she received an email from TST to request being put on to give the invocation, requesting an invitation to give the invocation.
Q Okay. And so her --
A And I believe the email to her, in my review I believe it was around the Lund case, citing because of recent case law the Satanic Temple would like to be put on the next available meeting to give the invocation.
I was asked to look into the -- that case and whether or not the City Council was required to oblige. The City Council does not take requests. It -- the invitations for the invocation are based upon personal relationships the councilors have. It's by invitation

only.

Q Don't take requests.

Why don't -- why doesn't the City Councilors take requests? What's the reason why not?

A Because the invocation is each councilor has a turn for a particular meeting to invite someone to give the invocation, and it's based upon personal relationships that that councilor has. It's based upon people that they have relationships with because of their districts. It might be work that the individual does in their districts or does for their constituents. That has been the policy.

Q That's been the policy or has that been the custom?

A Policy and custom. I would say both.

Q And I, I -- I do a lot of First Amendment. I'll just tell you. In my understanding those two mean slightly different things. Policies are written down, codified, and there are like procedures involved; whereas, customs are just like this is kinda how we do things. So was this -- is this more of a custom or is this more of a policy?

A In my capa -- in my work, what I do, I do not really consider a policy being written down.

Q Okay.
A I use the terms interchangeably. With your definition, I would define it more as a custom.
Q Okay.
A The City Council does not have a written policy --
Q Okay.
A -- about it's -- but it's understood that it's by invitation.
Q Okay. I understand that it's understood that it's by invitation. I'm asking why not.
MS. O'CONNOR: Objection. But you can answer if you understand.
A You're -- can I ask a clarification?
Q Yeah. Yeah.
A You're asking me why not -- why it's not written down?
Q Well, yeah, let's start there. Why isn't it written down?
A I am not sure.
Q Okay. I was actually going a different, a different route which is why is there not some kind of a mechanism for people to request an invite?
A Because the mechanism is that the councilor

is the individual that controls who they invite.

Q Okay. It sounds like it's just whatever the councilor wants to do then.

A Correct.

Q Okay. Why?

A That's been the custom.

Q That's just how things go, in other words?

A Yes.

Q Okay. All right. So you issued an opinion, the details of which I don't much care about, essentially, no, suffice it to say, you don't have to order them in because the way we've always done things is that you can if you want to. If you don't want to, you don't have to. Is that a fair recitation of the way things go?

A Yes.

Q Okay.

A And if I could just clarify.

Q Yeah.

A It wasn't a formal legal memo. I was asked to assist the councilor in drafting a letter. I believe she provided an email response back to TST.

Q I, I think that ... let's see here.

A If I recall.

Q Well, I have --
A In my review of the emails that were produced, I recall documents relating to this.
Q Yeah.
MR. KEZHAYA: Ada, do we have -- well, more importantly, do you have a means to put up the, the Complaint, the FAC?
MS. KING: I certainly do. Give me just one moment to get that set up.
MR. KEZHAYA: Do you guys have a copy of the Amended -- the First Amended Complaint. It's docket 16. I'm specifically looking for 16-2. I see an email by Christine. Let's see if I have a prior one.
Q Christine, I have an email attached to the Complaint that bears your name. And you say you helped her write it. I'm a little bit confused because it came from your email address. Are there -- is there another email that I'm not thinking of that's -- I'll just show you this while we get that set up.
MR. KEZHAYA: Do you want to see first?
MS. O'CONNOR: Sure. We can look simultaneously.
MR. KEZHAYA: Okay. Yeah.

Q And so for the benefit of a clear record, we are looking at -- well ... Exhibit 2 to the First Amended Complaint, Docket 16-2 and 1:21-cv-10102, the matter of Satanic Temple vs. Boston, i.e., this case, this is Exhibit 2. It's -- it appears to be an email from Christine O'Donnell. And since --

MR. KEZHAYA: You know what, Ada, never mind. I'll just show them on my tablet. And then we can, we can probably like put this in later I assume. Oh, there we go. What do we have here? This is not that. This is not that.

Q Okay. So I instead have the Exhibit 2 to the First Amended Complaint.

MR. KEZHAYA: If you could just hide that. We're not, we're not talking about that yet.

Q The, the details of the body is not what I'm specifically referring to. I'm just referring to the from line.

A Yes, that is me.

Q That's -- well, I know that's you. My question is if this is the email you're talking about.

A And that date is just my -- that's -- October 9th, 2018, correct? It's not 2016? That's 2018?

Q Let me see. Oh, you were talking about an '18 email. Yeah, this one's '18.

A Yes, that's the email I was talking about.

Q Oh, okay. Cool.

A Sorry. I just need -- I couldn't tell if it was an 8 or a 6.

Q Oh, yeah. Ah, bad copy. What can you do.

A Yes, that's the email I'm referring to.

Q Okay.

A I could not remember if I sent the email or if Councilor Campbell sent the email.

Q Oh, I don't, I don't care who sent it. I was just making sure we were talking about the same thing.

A No, we are. We are.

Q Okay.

A I was just clarifying why I was a tad confused because I couldn't remember if the email came from Councilor Campbell or myself. That is the email.

Q No need to be defensive.

A I'm not being defensive. Just answering.

Q Okay. I apologize. I apologize. I apologize for misunderstanding.

Okay. So going back to what we were talking about, you received a request from the Council

President at the time. She asked if she has to accept this -- or has to accept this request for invitation. Essentially you reviewed the case law and you found, no, I don't think you have to do that, and the substantiating ground is that's how we've always done things?

A Correct.

Q Okay. So the councilors are -- well, actually, going back to the original matter at hand, we're back at paragraph 1 of the matters of examination. I asked about scope, some more particular matters. Basically you give legal opinions, and you do legal research and writing for the City of Boston in matters of legal stuff. Is that basically the gist?

A Correct.

Q Okay. On to agency. What is agency in this, in this legal context?

A Agency is when you have the authority to act for somebody.

Q Okay. And does that carry additional like legal implications when you're acting for someone?

MS. O'CONNOR: Objection. You can answer.

A Yes, it does. You're -- in some instances

you're responsible for -- in this case I'm an agent of the City in Bos -- of Boston. I'm an employee. So in some cases, yes, if you're acting on behalf of the employer.

Q Well, you're referring to the respondeat superior; is that correct? Do you know what --

A I'm not -- I don't understand your ...

Q Sorry, that's, that's a jargon term. Respondeat superior is the tort liability that sometimes a principal will have because of the actions or misactions of their agents. Is that what you're referring to?

A Yes, I beli -- but I know with government there's -- in Massachusetts there's limits on tort liability.

Q Yeah, but this isn't a tort. This is, this is not a tort.

A No, I understand that.

Q Yeah. So more generally with respect to agency, like principles of attribution of the agent's knowledge, things of that nature, are you familiar with these concepts?

A Not really.

Q Okay. So how about you tell me again your,

your understanding of the word "agency".

A I already answered that I feel like.

Q I know. I forgot, though.

A My understanding of an agent is you're acting on behalf of somebody, whether it's a supervisor. It can -- it -- my understanding is the definition of an agent depends upon what relationship you're talking about. I used the example, and you said, oh, well, that's a tort.

Q Yeah. Yeah.

A So that's the example I gave. I feel that I answered the question.

Q Okay. So that's a discrete example of, it sounds like, a more umbrella terminology; is that correct?

A Sure.

Q And that's, that's your understanding. Again, I'm not trying to inject understanding into your mind. I'm literally just trying to understand where you're coming from.

Is that the full understanding of your concept of agency?

A I guess it would depend on a fact pattern or the situation. But that's my answer. That's my full

understanding.

Q Okay. Well, let's try a fact pattern then. A person charged with a decision to invite or not invite a religious organization has requested a -- an invite. They approach their attorney to ask whether they have to. You are the attorney who reviewed the matter and found that, no, you don't have to. Was that within the scope of your agency?

MS. O'CONNOR: Objection. This is outside the scope of the 30(b)(6) notice. You asked her about her, her partic --

MR. KEZHAYA: This --

MS. O'CONNOR: Let me finish. -- about her particular agency with the City, and if you'd like to ask her that, that's fair game. But you're asking her hypotheticals about what she would do, I don't know, as a lawyer in a particular situation. So that's not what she's here to testify about.

MR. KEZHAYA: I'm sorry. I, I was unclear. The -- your -- fair point.

Q Remove the "if". That in fact did happen. Was it within the scope of your agency to issue that opinion?

A It was in the scope of my employment.

Q Yeah.
A My duties as the Compliance Director and staff counsel.
Q Would you disagree with -- you emphasized employment. Is there a legal difference between employment and agent, to your mind?
A There could be.
Q Yes, I agree. Okay. As pertains to this case, though, is there?
A Are you -- I am not an agent of Councilor Campbell.
Q No. No. Agency for the City. You all are co-agents, in other words, in my opinion, correct?
MS. O'CONNOR: Objection.
Q Well, remove the "my opinion" part.
Are you all co-agents?
A We all work for the City.
Q Yes.
A Yes.
Q Okay. So are you both agents of the City?
A Yes.
Q Okay. Outside of your co-working relationship do you have any other relationship with City decision makers, any personal relationship, for

example?

A With City decision makers?

Q Yeah. I mean the people at the City who make the decisions I assume are called the Council; is that correct?

A I know them because I work for them.

Q Yeah. Outside of that, though, do you have any relationship of any sort?

A No.

Q Okay. Investigation, okay.

What investigation or preparation have you done so far? Up to, up to walking into that door, what preparation, what did that entail?

A So I've met with my counsel, Rob and Nicole, numerous times to talk about this. I spoke with Councilors' staff, the employees that work for the City Councilors. I've researched City Council minutes, City Council agendas. I looked through the documents that were produced for discovery.

Q Okay.

A I spoke with other relevant parties that were -- that have experience with the subject matter in the, the deposition to find out, you know, City policies.

Q Okay. Let's take these in turn.

So you said you talked with members of the Coun -- well, you said Council. I may have misheard. Did you speak with members of the people who vote on things for the City or did you speak with your attorney's counsel, because those are -- you know, they sound the same.

A I spoke with Rob and Nicole.

Q Okay. Did you talk to any of the people who actually send the invitations or request the invitations?

A Oh, okay. I'm sorry. I -- when you -- when I said counsel, I meant my counsel, Rob and Nicole.

Q Okay.

A The City Councilors, --

Q Mm-hmm.

A -- I spoke with their staff about how the councilors decide.

Q Councilors, okay.

A And I also have -- only because in my capacity I attend the City Council meetings.

Q Oh, okay.

A They generally happen on Wednesdays.

Q Okay.

A I attend them, and I've been present for the invocations, so I see how they work.

Q Okay. So that's another topic I want to talk about.

A So I, I didn't speak to -- to clarify.

Q Yeah.

A I didn't speak to the City Councilors.

Q Yeah, that's why the X is there.

A I have spoken to their staff.

Q Yeah. Yeah.

MR. KEZHAYA: I'm -- a lot -- for benefit of the record, she's seeing me handwrite on my tablet here. I'm just trying to keep track of what all is going on.

Q I have a big X on councilors to mean that you did not speak to the people who actually issue the invitations or do not issue the invitations?

A Correct.

Q Okay. But you did talk to their staff?

A Yes.

Q You did talk to their employees. You looked through discovery.

And then I have another category that just says other parties. I've already forgotten what you

said. Do you know what that means?

A I believe that there was a question in there about the length of time for keeping documents. So I spoke with the City's public records officer.

Q Okay. In legal jargon I would call that a records retention policy. Is that something you looked at?

A Sure.

Q What is the City's record retention pol -- well, actually let's start by defining. What is a records retention policy? What does that mean?

A Well, under the state's public records law, the City of Boston is a local government.

Q Mm-hmm.

A So the City of Boston must retain certain records.

Q Okay.

A And I believe one of the questions in the deposition was how long -- it specifically related to payment of individuals that give the invocations and how long do the City -- does the City have to maintain payment records.

Q Okay. So we're gonna add --

A So I spoke with the retentions records

officer to confirm how long the City has to retain those records.

Q And how long is that?

A It's seven years.

Q Seven years, okay.

Did you find in the course of the produced discovery materials any payment records produced?

A I did not, I did not review those types of records.

Q But they exist and there's -- they go back seven years?

A I believe that they exist with the City's treasury department.

Q Okay.

A They did not exist in the City Council's.

Q Okay. But it's -- importantly, though, so go back seven years. Seven years. And they are held by, what did you say, treasury?

A I believe so.

Q Treasury department, okay.

A Either treasurer or auditing.

Q Or maybe auditing, okay.

Anyone else that I should look for these?

A No.

Q Okay. Okay. When -- just still narrowing down on this other parties. Are there any other other parties that are in this other parties category?
A No, I think that covers it.
Q Okay. So then we've got that one done.
You talked to staff. Who, who did you -- who all staff did you talk to?
A So there's 13 City Councilors. So I asked the employees -- do you want specific names or ...
Q Yeah. Yeah, let's talk names. What have we got?
A I spoke to Amanda Curley. She works for Councilor Baker. I asked her how does the councilor generally decide, and she said it's people that he has a personal relationship with or that he knows from the district that are -- that do work within the district.
Q Okay.
A I've spoken to -- I can't even recall. Most -- I've spoken to pretty much someone in every single council office to ask.
Q But that's the gist?
A Yes.
Q Is that ...
A Yes. For all of them it's those common

factors exist.

Q How far back does this custom go?

A So I did research as I indicated.

Q Oh.

A I did research the City documents and City Council minutes. I am not sure of the exact time that the invocation originated, but going back to the 1800s, the City Council has had someone give an invocation. When I went back to look at the documents from the 1800s, the -- a clergy person gave the invocation generally at the inauguration. With the way the minutes were done back then, it's hard to tell if every single meeting after that there was an invocation.

Q Mm-hmm.

A But from the 1800s, clergy and invocations were part of the City Council meetings.

Q It's basically always been part of the thing?

A Yes.

Q Did anyone address why it's part of the thing, in any of the records that you've seen?

A Not that I have seen.

Q Do you have an opinion as to why it is?

MS. O'CONNOR: Objection. You can answer that.

Q Not a legal opinion, just literally like an opinion. As a person who has seen these things do you have an opinion?

A My -- I don't have a personal opinion. I -- my guess would be tradition.

Q Tradition.

A Looking as, as, you know, councilors -- you know, as different councilors come in, I am assuming that they look back to see what was done previously.

Q But you didn't ask that question?

A I did not, no.

Q Okay. So the notion of where did this policy come from probably needs to be answered by someone else?

A Yes.

Q Well, actually, who, who better than you could answer the question of where did this come from, if anyone?

A I'm not sure because -- my guess would be if you ask a councilor, they would probably have a similar answer to mine that --

Q Probably it just has always been like this?

A Mm-hmm.

Q Okay. You mentioned that you went through

some kind of primary historical rec -- I'm using jargon terms again. You looked through papers from like the 1800s; is that correct?

A Yes, the minutes.

Q Okay. Where did you find those?

A The City of Boston has books of all the past minutes going back to the 1800s. In the 1800s it was an alderman form of government so it's a little bit different. But the City Council has books that are available to the public. It's also at the City of Boston archives. And more recently, all of the City Council meetings are online.

Q Yes. Yes. I think they're on YouTube nowadays, right?

A Yes. And I believe they have been online since 2011.

Q Okay. Now, you said it used to be an alderman government, and things are different now. What's the distinction between aldermen and whatever it is now?

And do you -- actually, let me back up. Before, before you answer that question, let's start with you said it was aldermen before, and now it's something different. What is it called now, so we have

a short designation for that?

A City Council.

Q Okay. So alderman vs. city council.

A They, they both were the local government for the City of Boston.

Q Yeah. Yeah.

A And -- right. The City Council has 13 members.

Q Yeah, I'm starting off because I want to, I want to understand the distinction between al -- you saw fit to mention. It's clearly something of interest. What is the difference between alderman and City Council form of government?

A I'm not sure what the difference is except for the -- they're both local form of governments. I didn't look into what the difference was.

Q I see.

A I just know that right now it's the City Council. 1909 was the Chapter 486 of the Acts of 1909.

Q Wait. Wait. Wait. Slow down. Slow down. So Chapter 84.

A Chapter 486.

Q Sorry. 486?

A Yes.

Q 486.

A Of the Acts of 1909.

Q Of 1909.

A That was when the City of Boston became a council form of government.

Q Was that like a charter by the state government or like a --

A It was a charter within the City of Boston.

Q Okay. So it sounds like a statute was passed in Massachusetts proper. Boston encoded its organizational purposes into some kind of a written document. Is that right so far?

A Boston -- Boston -- it, it started with Boston then the state approved it.

Q Okay.

A That's how it works.

Q So internal inside of Boston sometime before 1909 there was some kind of internal movement to say, hey, things are different. We should encode, encode how things are -- should be going moving forward?

A I'm assuming that that's how --

Q Well, yeah.

A -- it happened.

Q Well, yeah. That's, that's the best that we

can surmise based off the fact that it's here.

A But, but that -- the cite that I gave you, that is what established the City Council form of government.

Q Okay. Let's see. So I think that answers all of my history-related questions.

Did you have any other staff who were noteworthy in the course of your investigation?

A No.

Q Okay. What about employees?

A No.

Q Okay. I have a note looked through. I think that had something to do with discovery. Did you find anything of interest in the course of looking through discovery, in your opinion?

A No.

Q Okay. I have -- okay. This is just generally about meetings. Payment records I think I'm good on that.

Okay. You addressed meetings. You said, if I remember correctly, they happen on Wednesdays. How long do these meetings usually last?

A So it depends on what's on the agenda. And it's not every single Wednesday, but it's most

Wednesdays. It depends on what the agenda is. The City Council controls the agenda. The agenda is based upon -- it's when the City Council receives legislation from the mayor, and councilors, as the legislative body, also are allowed to file legislation so ...

Q Let me interject real quick because we've got to unpack that.

So you said the mayor creates a request that legislation be passed. Is that, is that right so far?

A No.

Q Okay.

A The mayor, when the mayor files legislation, the Council has to approve legislation from the mayor as well in the City of Boston. So when the mayor files legislation, that is on the City Council agenda at its meetings.

Q Okay. And ...

A And the agendas are all available online. The City Council meetings recorded.

Q Yeah.

A Available online. When the Council has its meetings, anything that's on the agenda gets referred to a City Council com -- committee.

Q Wait. Wait. Wait. Let's back up. It

sounds like you're getting into a topic of this is what the Council does. Is that, is that fair to assume?

A Yes, but you had asked --

Q Yeah.

A -- you had asked a question about the mayor's legislation so it's -- my explanation is relevant to that, what happens at the meetings.

Q Oh, no, that's fine. I just wanted to -- I like this topic of --

A Yeah.

Q -- what does the council do --

A Mm-hmm.

Q -- because, frankly, I know nothing about them.

A Okay.

Q But -- well, let's, let's do it like this.

The Council does meetings; is that right? Do they do other things than meetings?

A Yeah, so the, the structure of the City Council, as I said, there's 13 of them.

Q Mm-hmm.

A The Wednesday meetings are when matters are referred to the City Council from the mayor, and at its Council meetings the Council also votes on legislative

matters. The Council in addition -- the City Council meetings are when all 13 councilors come together, and that's -- it's at those meetings where the Council votes on matters. In addition to that, the councilors also -- they -- they're the legislative body. They serve constituents. They also do constituent work.

Q Well --

A I am not part of their constituent work.

Q Well --

A That's their office staff.

Q Let's -- let's just interject there because I'm gonna have two follow-up questions and ... let's -- let's see. And they do constituent work. Do constituent work.

Okay. So you've used this term "legislative matters" a bunch of times. I don't know that I understand what you mean.

A Okay.

Q What's a legislative matter?

A So it's -- for agenda purposes they all have docket numbers.

Q Mm-hmm.

A Legislative matters can be grants, loan orders which are budgetary matters, ordinances, home

rule petitions, resolutions, hearing orders.

Q Local government stuff basically?

A Yes.

Q Okay.

A Yes.

Q They, they do constituent work. What is constituent work?

A In -- based on my -- I don't really deal with constituent work, but because I've worked for the City Council for many years, the councilors assist constituents with City services. If constituents need help navigating, you know, assistance with City departments and things like that, the councilors' staff assists them with that.

Q Okay.

A You know, local things like trash pickup. Help, you know, help with government documents, things like that. Just kind of -- sort of a referral service and helping them through that.

Q Yeah, point of contact for the public basically.

A Mm-hmm. Yes.

Q Okay. How do councilors typically run into members of the public? Like how do they, how do

they -- literally for the first time how do they interact?

A City Hall's a public building. Councilors all have their own offices. The public can come in and meet with them. The public can email them. The public can call them. A lot of councilors go -- there's events throughout the City. A lot of them go to events in their districts. They meet councilors that way. Some of them have office hours set aside for their constituents. That's how they interact with them.

Q Okay. It seems to me that this procedure of having these councilors send the -- issue invitations if they feel like it, it seems like that's at risk of selection bias. What is your, what is your position on that?

MS. O'CONNOR: Objection. She's not going to answer that question.

MR. KEZHAYA: Why not?

MS. O'CONNOR: It's not part of the 30(b)(6) notice.

MR. KEZHAYA: It's outside of the 30(b)(6) notice --

MS. O'CONNOR: Correct.

MR. KEZHAYA: -- for me to ask her

whether, whether this is subject to a selection-bias concern?

MS. O'CONNOR: Yes. Her personal thoughts on that, yes.

MR. KEZHAYA: Okay.

BY MR. KEZHAYA:

Q All right. So they do constituent work. They run into members of the public because basically they're public officers. They -- they're, you know, the point of interaction between the public and their government. Is that fair to summarize as constituent work?

A Yes.

Q Okay. Do they do anything else you find noteworthy with regard to this -- specifically with regard to this dispute?

A No.

Q Okay. All right. In addition, obviously, they do meetings, so let's talk about those. They happen on Wednesdays, to recap. They are of varying lengths depending on the nature of the agenda.

A Yes.

Q What else do you have to say about meetings?

A So the meetings -- so again, that's where all

of the councilors, that's where the councilors vote on matters.

Q Mm-hmm.

A That's where anything that -- any budgetary matter, any proposed law needs the approval of the City Council before it goes to the mayor, and at these meetings that's where all of those documents are voted on. Or, if it's something that's initially filed, it's referred to one of the relevant City Council committees.

Q Okay.

A And as I said, they vary according to length. It's where -- it depends upon what's on the agenda. Each councilor has an opportunity to speak on the dockets that are on the agenda. Sometimes -- some of them always speak or, you know, all of them may speak on a docket, only a couple may speak. It just, it just depends on, on the councilor.

Q It depends on the thing basically. Not everyone has an opinion about everything.

A Correct. Correct.

Q Okay. All right.

A But the main thing is that's -- it's at those Council meetings where the Council votes on matters and

then once that happens, it goes to the mayor.

Q Okay. So if I understand correctly, if we can, if we can kind of break down meetings into a who-what-when-where-why. Why, they're voting on stuff. When, Wednesdays for varying amounts of time. Who, obviously the councilors. And also the public's at these meetings; is that correct?

A The public can attend, but there's not a public comment period.

Q Not at all?

A No.

Q How do peop -- how do people get their voices by heard by their --

A So the City Council has standing committees --

Q Mm-hmm.

A -- based on the topic and usually there's public hearings on particular and that's when the public -- that's the time for a public comment period.

But in addition to that, the public can also weigh in. They can email their councilors. They all have emails. They can email their councilors. They can call their councilor and tell them how they feel about things. They can submit testimony.

And that happens a lot. That's a big part of what the City Council staff handles, the constituent work, where members are calling telling their councilors how they feel about something, whether they support or are against something. That's how the public weighs in.

Q Okay. How -- what is the volume of time that a councilor has spent interfacing with these matters of just basically like public discussion, public discourse?

A I can't really answer to a specific amount of time.

Q A lot? A little?

A Yeah, I mean that -- yes, they're, they're the legislative body. They're the ones that the constituents primarily interact with.

Q Okay. So if the constituents care about something, they will let their councilors know, and they expect the councilor to vote appropriately on the, on the Council meeting?

A They -- I mean they -- as, as a member of the public, they have -- I mean some are more engaged than others.

Q Sure.

A So ...

Q You've got to --

A I mean I don't know if the councilor is -- I don't know how councilors weigh the votes, you know. I'm sure, I'm sure some of them --

Q Oh, I'm not suggesting weights. I'm literally just asking the volume.

A Again, it depends on the issue.

Q Yeah.

A And it depends on the engagement. There -- you know, some districts, people are just more engaged in government than others.

Q Okay. I, I very much imagine so. People get very, very excitable about their public government, I imagine; is that correct?

A Yes. Some, yeah.

Q Do you have any entertaining stories about people getting excitable about things?

A I --

MS. O'CONNOR: Objection. She's not providing personal anecdotes.

MR. KEZHAYA: Oh, no, no personal anecdotes just entertaining stories.

A I, I don't --

MS. O'CONNOR: No. Objection.

MR. KEZHAYA: Very well.

Q Okay. Let's see here. So you've mentioned public input. As pertains to this particular dispute did the public make objections known to any of the councilors or ...

A I did see some emails when I was looking through what was produced during discovery where some members of the public didn't want their councilor to invite TST.

Q Okay. And do you think that had any weight in the councilors' minds?

MS. O'CONNOR: Objection. She can't answer that question.

MR. KEZHAYA: Why not?

MS. O'CONNOR: Because she can't speak to the subjective intent of the councilors.

MR. KEZHAYA: Well, I mean it's -- well, let's back up a little bit.

BY MR. KEZHAYA:

Q So in terms of agency do you understand the principle of attribution?

A Are you speaking of that in terms of quid pro quo that for which or --

Q No. No. Attribu --
A If you don't do something then I'm not going to do this for you or ...
Q No. No. No. No. No. So backing up to the definition of agency, we talked about sometimes people will do something for some -- someone or something else which is designated the, the principal; is that correct?
A Yeah. Yes.
Q Principals have agents.
A Yeah.
Q You have principal up here. Principal tells agent what to do. Agent does the thing.
Are you familiar with the other way around? Sometimes an agent does a thing, and it's treated as if the principal did the thing?
A Okay.
Q I'm asking. Is that a thing that you're already familiar with?
A Not real -- not in my work it doesn't apply that way.
Q But in, in terms of like the --
A I'm not --
Q -- just the general legal understanding of an

agent, agents do stuff, and sometimes it's treated as if the principal did the thing?

A Sure. Yes.

Q Are you also aware that sometimes agents know things and that is presumed to be known by the principal as well?

A Sure.

Q Okay. And you know that there's -- well, I'm asking. Question posed being do you know whether there's like a delineation between what things are or are not passed up, so to speak, to the principal?

MS. O'CONNOR: Objection. You can answer if you understand.

A Can you clarify that question? I'm not -- I don't really understand it.

Q I'm struggling to say this. Agents sometimes receive information, and the question is whether that information is known by the principal is whether it's material to the agent's scope of duties. I proffer that as a legal role. Do you accept that proffer or do you dispute it?

A I --

MS. O'CONNOR: Objection. You can answer.

A I accept. It's just when you're -- you're using the term "agency" and "principal" with -- in -- yes, I'm an agent of the City of Boston and councilors are too. Their staffs are, are agents. But councilors are elected officials.

Q Yeah.

A So it's a little bit -- it's different because the councilors are elected officials. They've have their staff and then there's the public.

Q Yeah.

A So are you talking about -- when you're -- are you talking about an agent with the councilor's staff and the councilor being principal?

Q Well --

A Or I guess I just ...

Q Let's, let's try to speak in terms of analogies.

A Okay.

Q All right. TST is a corporation. TST as a body knows certain things because TST as a corporation is comprised of people, fundamentally is comprised of people. People doing stuff.

A Yeah.

Q People doing stuff all for a singular unitary

purpose. It's a body of people doing things; likewise, Boston is a body of people doing things. They're doing the public's business. They're picking up trash. They're, I don't know, sewers, roads. I don't know what you guys do. Presumably very important stuff because society I see is doing all right. You understand that these two are analogous terms?

A Mm-hmm.

Q Okay. Both are corporations as I understand it. TST's a proper corporation. Is Boston a proper like corporate body? Is there a term for the designation of its legal structure?

A That -- I'm not aware of. I think it's ...

Q Is it fair to say they're analogous, though?

A Sure. Sure.

Q I mean they're groups of people doing things --

A Sure.

Q -- pursuant to certain purposes.

TST's purposes are the seven fundamental tenets. The City of Boston has a charter. These are our organizational purposes. I don't -- I haven't read your charter. Presumably it also has like procedures and stuff. This is how you go about doing stuff. So

yours are little bit more refined than the seven fundamental tenets. You know, there's, there's more, obviously, to TST than just those seven things.

So next layer down is the people inside of the organization who actually do the things. TST has, obviously, for example, Lucien Greaves is here. They do stuff. You met Ada. There's Mobius. People doing things pursuant to the organizational purpose. Likewise, you, for example, have your business purpose which is, for example, issuing legal memoranda, legal opinions, legal research, et cetera. You see how those two are synonomous.

A (Nodded.)

Q Next layer down -- and I, I saw that you nod. I just want to make sure there's a clear record. Yes?

A Yes.

Q Okay. Next layer down is the cutoff. So in between the people doing the things pursuant to the organizational purposes for the public body, next layer down there's a cutoff here on TST's side of things. There's the congregants. There's these people who follow these organizational purposes, and they identify as members of this body. And then the public, on the other hand, these are just people who identify as

members of this public body which happens to be defined by the geographic scope over here, which is to say the City is defined by a geographic scope; whereas, TST is not. TST is defined by organizational ideals. Do you understand that?

A Yes.

Q Okay. So you see how they're all analogous, right. So as I understand it, what you're saying is here at the bottom, the members of the public, which to draw an analogy is the congregants, their beliefs and opinions and whatnot are not attributable up to the corporate body.

MS. O'CONNOR: Objection.

Q That's what you're saying, right?

MS. O'CONNOR: Objection. You can answer if you can.

Q I'm just asking to understand your point.

A I just -- I don't -- I don't understand the, the question. Whether or not -- I, I just -- I don't understand the question.

MS. O'CONNOR: I mean this is a five-minute question almost. I mean if we could break it down with more straightforward questions, I think it would be helpful.

MR. KEZHAYA: Well, I mean I had to define my terms so ...

Q Your earlier statement was the, the people's opinions. I gather the implicit meaning was the people's opinions are not the City of Boston's opinions; is that accurate?

A I mean they, they could be some -- sometimes.

Q Well, they're not synonymous, you see. Like people --

MS. O'CONNOR: Objection but you can answer. I don't know if you're trying to educate her or if you're looking to get a factual response from her.

MR. KEZHAYA: I'm trying to get a factual response from her.

MS. O'CONNOR: Okay. Let's do it.

MR. KEZHAYA: But in order to get the factual response, I need to start with some exposition.

A Are you asking me -- are you asking me if councilors attribute what their constituents feel onto ...

Q No.

A I just -- I don't understand the question.

Q Maybe I've forgotten your sentence. Could

you restart your sentence to the effect of --

A You were asking me about agency and if I was familiar with attribution and you went into a big analogy and I just -- I don't understand the question.

Q It was prompted by an earlier statement. Do you remember your earlier statement?

MS. O'CONNOR: Objection. What earlier statement? Enlighten her, please.

Q The preceding statement that you made which was itself prompted by my question which is what we're doing here today which is called a deposition prompted me to ask you a clarifying question which I felt like we were speaking two different languages so I tried to speak your language by using analogy. Are we still speaking two different languages?

A I believe so, yes.

Q Okay. Where did I lose you?

A Your -- you were talking about agency, principal and then if I was familiar with the concept of attribution, and that's where you lost me.

Q Okay.

A So if you could just ask me a question.

Q I'll just back up before that. So backing up before that, you had mentioned that people sometimes

communicate things to their councilors.

A Yes.

Q They communicate more particularly how they feel about things to their councilors.

A Yes.

Q Okay. My question posed to you was whether councilors receive those feelings communicated in the course of doing their job?

MS. O'CONNOR: Objection. You can answer.

A Yes, if -- you know, they, they may receive it by a phone message. They may talk to the individual themselves. They may receive an email. They may receive a letter. So, yes, they do receive.

Q Okay. And --

A The messages.

Q And not only do they receive messages but do you -- would the City of Boston suggest that the councilors will hear a policy request or something like that, for example, legislative matter, and will, you know, vote on it based on the way that they think their constituents would feel about that matter?

MS. O'CONNOR: Objection. She can't answer that question.

MR. KEZHAYA: She's the City of Boston.

MS. O'CONNOR: On the topics for which she has been designated. She has not been designated to talk about how the councilors may vote in a particular situation, so she can't answer that question. What's your next question?

MR. KEZHAYA: Well, that was -- the question posed wasn't pertaining to any of these particular topics. One of the particular topics was scope of agency for the City which led to --

MS. O'CONNOR: Her scope of agency for the City.

MR. KEZHAYA: Their, actually.

MS. O'CONNOR: Her is what you're actual deposition notice says.

MR. KEZHAYA: I'm reading it right now. The scope of their agency for the City, page 2, paragraph 1, clause 2.

MS. O'CONNOR: Because you haven't identified the deponent. The their, if we want to get into it, I think is referring to the deponent in paragraph 1.

MR. KEZHAYA: Nicole, this is why I don't like semantics games.

A I agree with you. So she can't answer questions about what the councilors were feeling or if they would have voted in a certain way. She can't possibly answer that. That's not what she's here to --

MR. KEZHAYA: Why can't she possibly answer that?

MS. O'CONNOR: Because she's not the councilor. She doesn't know how they would vote.

MR. KEZHAYA: Well, as we already addressed, she's representing the City which is analogous to TST. So if we go down two levels --

MS. O'CONNOR: I lost -- you lose me on that analogy too. So she can't answer that question. If you have a next question, if you want to file a motion about it, please -- please do so but ...

MR. KEZHAYA: I'm, I'm confused, Nicole. Are you really suggesting to me that the City is not a legal entity?

MS. O'CONNOR: No.

MR. KEZHAYA: You're not suggesting that?

MS. O'CONNOR: I'm not suggesting that at all. I'm suggesting that --

MR. KEZHAYA: Okay. Well, then let's --

MS. O'CONNOR: Let me finish, please. Christine is here to answer questions for which she has been designated on the 30(b)(6) topics.

MR. KEZHAYA: Correct.

MS. O'CONNOR: She has not been designated to talk about whether a councilor adopts the opinions of its voters when it's making its decision in terms of passing legislation or voting in a particular way. That's what she's not here to testify about.

MR. KEZHAYA: Okay. I proffer that that is true. Does the City deny my proffer?

MS. O'CONNOR: I, I don't understand what you mean when you say -- what, what proffer?

MR. KEZHAYA: I posit a point which I suppose is deducible using Boston's statements against it. Said proffer is as follows: The City of Boston is a legal entity which is also a principal. Its agents are the City Councilors. And as we have already addressed in the course of this discussion, as councilors they are agents who do things for their principal which is to say the body public.

MS. O'CONNOR: Sure, as a general matter I'm sure that that is true.

MR. KEZHAYA: Okay. So we agree there.

Next layer down --

MS. O'CONNOR: We're not doing this. Ask your question.

MR. KEZHAYA: Well, I'm trying to ask my question.

MS. O'CONNOR: I don't have to explain --

MR. KEZHAYA: You're telling her to stop answering my questions. That's why I'm getting frustrated very quickly here.

MS. O'CONNOR: And you can be frustrated. But I'm frustrated that you're asking her to answer things -- and I've given some leeway here because I think it's helpful in terms of the background of the council, but she's not testifying about subjective opinions, thoughts, the way the councilors think.

MR. KEZHAYA: Okay.

MS. O'CONNOR: So your question necessarily asks her to know what the councilors are thinking when they're taking a particular action.

MR. KEZHAYA: I believe I have found an impasse. I propose that the impasse is as follows: I want to know what is going on in the minds of the

specific councilors who are not voting TST's -- or not voting, rather, they are extending an invitation to TST proper. I am wanting that information. You are telling me she does not have that information for me.

MS. O'CONNOR: Absolutely. And as I expressed --

MR. KEZHAYA: No. No. That's sufficient.

MS. O'CONNOR: No. No. You don't get to shut me off like that.

MR. KEZHAYA: Well, okay.

MS. O'CONNOR: So as I explained in my email to you, we are not designating individuals and certainly not Christine. Christine has not been designated to testify about the subjective intent of the councilors. We did offer chiefs of staff for some of the councilors.

MR. KEZHAYA: Ah.

MS. O'CONNOR: But she is not here to testify about that.

MR. KEZHAYA: That's, that's where the confusion is. I did not read your email.

MS. O'CONNOR: You should have.

MR. KEZHAYA: I received the email. I

know, but I get a lot of emails.

MS. O'CONNOR: Okay. Well, that would avoid a lot of confusion then.

MR. KEZHAYA: Perhaps but here we are. So I want that information. Who will give me that information?

MS. O'CONNOR: Not Christine O'Donnell.

MR. KEZHAYA: Great. Who will give me that information?

MS. O'CONNOR: The people that I identified in the email.

MR. KEZHAYA: I see. Where are they?

MS. O'CONNOR: And I told you that they would be here on the dates that we identified. We put certain dates on hold in September, and we articulated to you that they would be present on those dates in September.

MR. KEZHAYA: Yeah, but I don't remember that conversation. We don't have it in writing so --

MS. O'CONNOR: We do have it in writing. I emailed it to you.

MR. KEZHAYA: No, you emailed me your position. I did not accept or deny your position. I did not read it.

MS. O'CONNOR: Okay.

MR. KEZHAYA: So you communicated something to me which I did not accept or reject. My position was that when I issue a notice to the City of Boston certain things that I want to know that pursuant to Rule 30(b)(6), to which we have previously addressed I'm entitled to know this information, they were going to send me someone who does, in fact, know that information. So I see that this is an impasse. Do you agree that this is an impasse?

MS. O'CONNOR: I agree this is an impasse.

MR. KEZHAYA: Okay. And do you also agree that you're instructing the witness not to answer to the specific items relating to subjective motivations of the particular people who do not extend the invitations to the congregants which is the subject matter of this dispute?

MS. O'CONNOR: Yes.

MR. KEZHAYA: Okay. Okay.

MS. O'CONNOR: So as I explained in the email, I would not be producing Christine O'Donnell to answer those questions. We identified a couple of individuals who would testify on behalf of certain

councilors.

MR. KEZHAYA: Okay.

MS. O'CONNOR: And we suggested that if you disagree with our premise, go ahead and file a motion, but we have -- you have been on notice of the City's position about that at least a month prior to this deposition.

MR. KEZHAYA: Yeah, but before that I sent a Notice of Deposition that says let it be known that pursuant to Rule 26 and 30(b)(6), Federal Rules of Civil Procedure, I will deposing the City of Boston through anyone who consent to testify on its behalf concerning the matters set forth below. Said deposition taking place here now. She is here now.

MS. O'CONNOR: Correct, but she wasn't designated on those topics.

MR. KEZHAYA: Oh, you didn't designate her?

MS. O'CONNOR: Correct.

MR. KEZHAYA: I see. Why didn't you designate her?

MS. O'CONNOR: Because she's not knowledgeable about those topics and we designated other individuals.

MR. KEZHAYA: I see. When will they get here?

MS. O'CONNOR: I gave you the dates in the email.

MR. KEZHAYA: I understand you suggested dates in the email, but the deposition is here and now.

MS. O'CONNOR: So I don't know how they do things in Arkansas, but typically if you -- those dates don't work for you, we're happy to coordinate dates. A 30(b)(6) depo can oftentimes take more than one day.

MR. KEZHAYA: Mmm.

MS. O'CONNOR: So if you had a different position, I think the time to volunteer it would have been in response to my email over a month ago.

MR. KEZHAYA: Perhaps. But I would proffer that Rule 26 provides for protective orders which you guys did not move for one. So I issued my notice, and I expect that something will be filed with the court if there's something wrong with my notice.

MS. O'CONNOR: Okay.

MR. KEZHAYA: And nothing was filed with the court.

MS. O'CONNOR: We did not file anything

with the court.

MR. KEZHAYA: And we are here in the deposition.

MS. O'CONNOR: You are correct.

MR. KEZHAYA: And one of the matters in the deposition notice is something that you're telling this witness not to give me.

MS. O'CONNOR: Because she's not designated on that topic, that's correct.

MR. KEZHAYA: I don't care that she's not to give me the information --

MS. O'CONNOR: Okay. So how do you suggest we move forward and resolve the issue?

MR. KEZHAYA: Could they be here tomorrow?

MS. O'CONNOR: No.

MR. KEZHAYA: When can they -- Okay. So you want me to fly from Minneapolis to Boston twice because you don't want her to tell me the information?

MS. O'CONNOR: She doesn't have the information that you want. So this is very standard practice.

MR. KEZHAYA: I understand it's standard, but I don't care what's standard. I care

what the rules say.

MS. O'CONNOR: Okay.

MR. KEZHAYA: I'm following the rules.

MS. O'CONNOR: So if we were in a disagreement about what would be happening here, I tried to put you on notice of what the City's position was.

MR. KEZHAYA: Okay.

MS. O'CONNOR: So as to avoid these potential issues so that you're not booking flights unnecessarily. If you had a differing view, it would have been helpful at that time. But there is no one here to testify on those topics today because as I told you in the email, those dates were on hold for dates in September. And I think Rob can also attest to the fact that we talked about this on our phone call, and I said we're going to need to put some holds on dates in September.

MR. KEZHAYA: Yeah. Yeah.

MS. O'CONNOR: And we agreed on dates in September, and I think they're September 12th, 13th, and 14th.

MR. KEZHAYA: Yeah, that would be the, the subject of disagreement here because we held those

dates. I blocked them down as necessary in the event we needed to get there. But the deposition's here and now.

MS. O'CONNOR: Okay. So we just fundamentally disagree then so how do you propose that we resolve it?

MR. KEZHAYA: Table it and move on.

MS. O'CONNOR: Great.

BY MR. KEZHAYA:

Q All right. So you mentioned earlier that sometimes members of the public body will make known their opinions to their counselors, correct?

A Members of the public will, yes.

Q Yeah. Sorry. When I say public body, I mean literally members of the public --

A Okay.

Q -- who are not part of the organization, --

A Okay.

Q -- that is, the corporation or whatever you call it.

A In my, in my work, just for clarification, when you say public body, I think of the City Council because that's ...

Q You know what, you're right. I am misusing

that.

A No, it's ...

Q Public body is actually the organization. The public is the not body. So members of the public will communicate to the public body their desires pursuant to designated person?

A Yes.

Q Okay. And some of those opinions were we don't want TST to give a prayer?

A I reviewed some emails where the public sent to their councilors. I can't recall which ones in particular, but I did see emails where members of the public expressed that view to their councilor.

Q Okay. Do you have any specific instances in mind?

A I, I can't recall. I just -- I remember seeing some emails.

MR. KEZHAYA: You know, we've been going on for a decent amount of time now. I'm parched. Does anyone else want a break? Because I also have to like get some emails together and do some exhibit stuff.

MS. O'CONNOR: Sure, we can take a break.

THE VIDEOGRAPHER: Okay. The time is

11:13. We're going off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 11:37.

BY MR. KEZHAYA:

Q Great. Okay. You mentioned earlier that we have invocations at these meetings. Do you remember that?

A Yes. Yes.

MR. KEZHAYA: Oops. Sorry. I don't have my mic on. Do I need to retake?

THE VIDEOGRAPHER: No, we're good.

MR. KEZHAYA: Okay. Great.

Q So meetings happen. It's meetings of the public body. The public body has these meetings for the purpose of voting on things. And is it fair to say that the public body starts its meetings with an invocation?

A Yes.

Q Okay. Tell me about these invocations.

A So like I said, the councilors invite someone to give the invocation and at the beginning of -- before the meeting starts, at the beginning an invocation is given.

Q Okay. Describe the invocations that are typically given.

A So generally they're relatively short. Some have been a few minutes, but generally they're relatively short. And whoever is giving it -- let me backtrack a little bit. The councilor that extends the invitation introduces the individual prior to the in -- prior to the individual giving the invocation.

Q Can I, can I pause you there?

A Sure.

Q What does a typical introduction look like?

A The councilor says, oh, I'm here with so-and-so. So-and-so is from wherever. I know so-and-so personally. We've been friends. Or I know so-and-so because they do work in my district or they've done -- you know, my constituents are familiar with them. Things of that nature.

Q Okay. And to recap, this is happening at a public proceeding, correct?

A Yes.

Q Okay.

A They're re -- they're recorded.

Q Yeah. And they're on YouTube we talked about?

A Yes.

Q I happen to have a YouTube ready to go for an example invocation introduction. Let's watch it together. This is for benefit --

MR. KEZHAYA: Do -- does it have the caption in the official court record? Meaning like does it say when this meeting takes place or do I need to identify that benefit of the record?

THE VIDEOGRAPHER: You'd have to ask her.

THE WITNESS: It says it up there I believe.

MR. KEZHAYA: Well, let's just, let's just make it easy. This is August 18, 2021 which obviously is after the Complaint. If we could press play, please.

(Video playing.)

MR. KEZHAYA: Let's pause here.

Q We are presently watching a video with some guy in a suit with red hair talking. He appears to be at the hem -- head of the proceeding. Who is this guy?

A That is former councilor Matt O'Malley. He was the Council president pro tempore at the time of that meeting, which means because the Council president

before him was serving as acting mayor at the time. So when the Council president becomes acting mayor, the title that we give Councilor O'Malley was vice president of the Council, but when he's acting as the president, the title is Council President pro tempore.

Q Latin for literally just temporary?

A Yes.

Q Okay. So this person is actually administering the proceedings. He's not just some guy; he's officiating the proceedings?

A I wouldn't use the term "officiating".

Q Oh, I'm sorry.

A But he's acting as the chair.

Q Yes.

A Council president. And he also is the District 6 City Councilor.

Q Sorry. That's a --

A At the time.

Q That's a -- that's a translation error. So officiate, what you just said to me is the word "officiate".

A Okay.

Q Literally just to administer a matter.

MR. KEZHAYA: So this person is

                                          officiating. He's about to introduce someone presumably. Let's -- let's proceed.

(Video playing.)

MR. KEZHAYA: Okay. Let's pause here.

Q This is now Mayor Wu, correct?

A Correct.

Q And as we see on the subtitles, pro -- temporary officiant says she invited this person. She decided, in fact, to invite, as, as I recall what he said.

A Yes.

Q Is that consistent with your recollection?

A Yes.

Q Okay. Is this phase so far pretty much the norm?

A Yes.

Q Okay. Let's continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q Is it normal for an introduction to involve some kind of an endorsement of the person who's being introduced, humbled and honored?

MS. O'CONNOR: Objection. You can answer.

A I've, I've heard it said in the past.
Q I mean --
A I don't know if I'd consider that an endorsement. I mean obviously if the councilor is extending an invite to somebody, they know the person --
Q Yeah.
A -- through various work and things like that.
Q Yeah.
A So I would think that that's common speak in the interest of politeness.
Q Okay. And common, though, this is pursuant to the custom?
A I -- well, maybe I should -- I've heard it said before. I, I can't approximate how many times, but I've heard similar language.
Q Okay. And --
A I'm pleased, I'm pleased to have with us, things like that.
Q Okay. And when you said you've heard it said -- how many of these meetings have you seen personally?
A Oh, well, I've been --
Q A lot?

A -- there 11 years and they're on Wednesdays. We have give or take about 25 to 30 a year so -- and I've attended most of them unless I'm on vacation or things like that so I -- because of my, my job.

Q Okay. So if I, if I understood you correctly, you've been there 11 years. There's on the order of 25 to 30 per year. Whatever that math works out to is give or take probably about as many as you've seen?

A Yes.

Q How often can you recall them not including some kind of pleased to introduce, I'm humbled and honored, some kind of a, you know, like a welcoming introduction?

A I mean I don't know if I can say an exact amount generally because the councilor brings the person up. They say I'm inviting so-and-so up. So I don't how else --

Q That's okay.

A -- they would bring a person up.

Q Is it fair to say that it's the City of Boston's perspective that obviously they're inviting this person; they literally invited them?

A Yes.

Q Okay. All right. Let's continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q The banner is covering it or maybe the subtitles are, but I seem to remember -- well, actually, I deduce from the way that she's looking, she appears to be looking down as if at her phone. Is it normal for the -- who would normally write this introductory speech or whatever it is that you want to call it?

A It depends on offices. Some councilors write their own notes. Some have a staffer do it and make edits.

Q Okay.

A So it would, it would depend on how Councilor Wu at the time structured her office.

Q Okay. This was in August of 2021. I designated this deposition in June of 2022. So this is on the order of like ten months beforehand. Did you talk with any of Mayor Wu's staff at any point?

A Are you asking if I talked about this particular meeting or --

Q No, just generally --

A I --

Q Generally. I'm trying to understand her general way of doing things.

A I talk to her staff all the time.

Q Well, remember earlier we talked about you performed some kind of an investigation in preparation for today's meeting. I'm inquiring into whether that deposition(verbatim) included determining whether she normally reads off her own notes or she normally reads off someone else's given speech?

A I have -- did not talk to her staff about that.

Q Okay. That's fine.

MR. KEZHAYA: Well, hold on now. Let me -- let me note that. Did not talk to staff. Wu staff. Let's proceed.

(Video playing.)

MR. KEZHAYA: Pause here.

Q She specified a university in Boston neither of which I'm familiar with. Are these fancy degrees? Is this, is this something that I'm suppose to be impressed by?

MS. O'CONNOR: Objection.

Q In your opinion.

MS. O'CONNOR: I don't know. Are you?

You can answer, if you can, Christine.

A I mean I don't know. I, I imagine some people are impressed by advanced degrees.

Q Well, I'm asking if these are fancy institutions?

MS. O'CONNOR: Objection. You can answer.

Q In your opinion.

A I don't know. Perhaps.

Q Have you heard of these -- have you heard of these institutions?

A I have, yes.

Q Okay. When did you first hear of these institutions?

A I can't recall.

Q When did you most recently hear of these institutions other than this?

A Well, I mean this was -- like I said, you know, we -- we're busy in the City of Boston. So I can't remember if I first heard of them then. This was in 2021. Now I'm, I'm recalling it so ...

Q Well, I -- yeah, I don't care about this. I'm asking something different.

A I don't, I don't -- I can't recall when I

first heard of the institutions.

Q I more accurately asked you when most recently short of hearing it on here.

A I cannot recall.

Q So it's something that without a particular event, you just know what these things are, these institutions that she's describing, correct?

A Yes.

Q Famous would be a word that I would use to describe something that I don't need to specifically recall. I just know what it is. Would you describe these institutions as famous?

A No.

Q No? Okay.

What is your definition of famous?

A I normally don't think of it, but something that is widely known. But again, famous can be subjective based on an individual's interest.

Q Okay. So you're, you're eliminating the subjectivity from the matter. How would you describe these institutions that she is designating?

A I don't know how I would describe them.

Q You have no way of knowing how you would describe these institutions that you have no need to

specifically recall. You just know what it is?

A I guess higher, higher --

MS. O'CONNOR: Objection. You can answer.

A Higher educational institutions.

Q Okay.

MR. KEZHAYA: Please continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q I take note in the subtitles that she's referring to this church as a dynamic church. She's characterizing the church in the course of this speech. Do you take note of this?

A Yes, I see that.

Q Okay.

MR. KEZHAYA: Please continue.

(Video playing.)

MR. KEZHAYA: Pause there.

Q In your, in your experience how frequently do the inviting councilors vouch for the credibility or integrity of the people whom they invite?

A Often because, like I said, it's by invitation, and the councilors have a personal relationship with the individual or are familiar with

them because of work in their district.

Q Okay. Vouch has a very particular meaning to me, and I don't want to color your understanding of the word. How do you define the meaning of the word "vouch"?

A That you're -- that you're standing -- not standing. That you're attesting to somebody.

Q Okay. So she is -- well when you say attesting, to me that means just in court. So maybe that's not -- maybe that word's not carrying over. What do you mean by attesting to someone's character?

A That you know the person.

Q Well, she's describing the person's character and --

A Well, my definition of vouch is that I know somebody.

Q Okay. All right. And so as City of Boston's representative, this is your City employee currently vouching for the integrity of a particular clergy member. How do you respond to the charge that that is a governmental endorsement of a particular religion?

MS. O'CONNOR: Objection. She's not answering that question.

Q Admit or deny?

MS. O'CONNOR: It's not within the scope of the 30(b)(6) deposition topics for which she has been identified.

Q Admit or deny?

MS. O'CONNOR: No, she's not answering the question.

MR. KEZHAYA: Oh, I'm sorry. You're telling this witness that whether the government endorsed this particular religious belief is outside the scope of this 30(b)(6) examination, correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: Okay. And once again, you don't assert any privilege ground for this, correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: Let's continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q Is it common for the councilors in these kinds of introductory speeches to make mention that not only is this person that you're about to hear from a religious leader, but they also are a leader in the public as well?

A Yes, that is common.

Q Okay.

MR. KEZHAYA: Please continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q Have you heard of this BMA, Black ... I don't remember the rest of it, but basically whatever this alliance organization is, is that a public body or is that some nonpublic charity?

A I am not sure. I don't believe it's a public body, according to my definition.

Q Okay. Yeah, well, literally is it part of the City is what I'm trying to ask.

A No.

Q Like a City organization.

A No.

Q Okay. Cool.

So I didn't hear anything that appeared to be abnormal relative to the norm in this example introductory speech. Do you agree with me that that was a relatively normal speech?

A Yes.

Q Was there anything about that which sets you off as that -- that's abnormal?

A That it's what?

Q Abnormal?

A No.

Q You said it's relatively normal. I just want to, you know, back in it from the other end. It's -- you know, this is a, this is a normal intro, --

A Yes.

Q -- in other words?

A Yes.

Q Okay. Cool.

All right. Now, let's watch -- we've seen the introduction. Now let's see how these things normally go.

MR. KEZHAYA: Resume.

(Video playing.)

MR. KEZHAYA: Pause here.

Q How often, how often does this begin with some kind of pre-blessing blessing?

A So I can't state a specific time. Like I've said, I've gone to numerous of these. They're all recorded. They're all online.

Q Mm-hmm.

A So it just depends.

Q Did you watch any other invocations than what we're watching right now?

A Yes. As I said, I've attended pretty much

every single meeting since I started in 2011.

Q I asked a poor question. I apologize. I meant, more particularly, did you watch any of these pursuant to your investigation for this particular purpose?

A No.

Q Okay.

MR. KEZHAYA: Please continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q She mentions that she's been here earlier this year which means since this Complaint this person that we're looking at has been here at least two times. Do you agree with this?

A Yes. And if I could just -- I didn't watch any videos, but I reviewed the minutes --

Q Mm-hmm.

A -- which list the clergy. And, yes, there are some individuals that have come more than once.

Q I see. So she's a -- how often is it that people are invited more than once in any given year?

A I don't know an exact amount. But there has been times. In my research there may be -- you know, probably, probably under, under ten people have done it

more than once. But there are people that have come more than once. And reasons for that is there's 13 members of the council. There's four at-large members. So four members are city-wide, and there may be times where a citywide councilor and a district councilor have overlap so that ...

Q That could be?

A Yes.

Q But you didn't actually talk to Wu's people. So you have no idea whether or not that's actually the case, correct?

A I didn't talk to Wu's people about who wrote her notes.

Q Oh, I'm sorry. Did you talk to Wu's people about this particular invocation and why this particular person was invited more than once?

A No.

Q I didn't think so.

Let's -- you said that there were ten people over the course of your research that have been invited more than once.

A I said approximately. I was trying to --

Q Thereabouts.

A -- give a number based upon my review of the

minutes, and I -- I did notice that some people have come more than once.

Q Do you have a list of -- like have you taken notes? Did you literally write down the number of people or the identities of said people who have come more than once?

A I didn't write them down. I did take some notes, but I didn't write every single one down. But I did notice that there were some people that gave an invocation more than once. I don't know if it was a particular year where it was more than once or if it was over my course of review --

Q Yeah.

A -- that they've come more than once throughout my 11 years of being there.

Q Okay. You mentioned you took notes. Did you take the notes for the purpose of preparing for this deposition?

A I did, yes.

Q Can I have those notes?

MS. O'CONNOR: Objection. I'll think about that.

MR. KEZHAYA: Well, you're objecting to it, and you're saying you'll think about it. I'm not

                                                      sure which it is.

MS. O'CONNOR: Well, I'll think about whether we'll produce them.

MR. KEZHAYA: Okay.

Q When did you create these notes?

A Over the course of the last couple weeks.

Q Okay. How -- what form are those notes in?

A They're handwritten because they're my personal notes.

Q Handwritten.

Well, they're not really your personal notes. They're pursuant to the requirements of your job, correct?

A (Nodded.)

Q Okay. So they're handwritten notes made because --

A Well, actually, it's not the requirement of my job. I was taking them in preparation for this deposition.

Q Yeah, but you're here for the purpose of deposition, right?

A Yes.

Q Who told you that you have to be the person who's doing this?

A I was designated as the person on City Council central staff that can speak to the policies of how the invocation is given.

Q Okay. So you're talking about central staff. What is central staff?

A Central staff is where I work. We work -- there's ten of us about that work for all 13 councilors.

Q Okay. So it's just like a, like a cen -- literally central staff?

A Yes. Yes.

Q Other than you who are the kinds of people are on this central staff?

A We have a technology person; we have a budget person; and we have legislative aides.

Q Do you have --

A That --

Q Oh, sorry. Please continue.

A That -- they help with committee hearings and things like that.

Q Do legislative aides have any notes or anything to the effect of -- basically is there anything relevant to this dispute within central staff's --

A No.

Q -- records?

A No.

Q Okay. You guys did a comprehensive sweep of everything, then I have everything of relevance?

A Yes.

Q Other than your notes?

A Yes.

Q Okay. So you made this -- so some -- you were designated you emphasize or, rather, I emphasize. You were, passive tense, designated. Who designated you?

A Well, for certain subject matters I was designated.

Q I understand that. I -- it's been made abundantly clear that for certain matters you were designated. I'm asking you who designated you. Who made the decision to designate you?

A When I met with counsel and I explained what I did, it was agreed by the president of the City Council and in discussions with our counsel that I would be the one designated for these topics.

Q I honestly don't know what you're saying. I'm asking who's the person who told you that you have

to do this? Did you volunteer or were you directed to do it?

A I mean I, I volunteered based on my role for the City Council.

Q Okay. Okay. So you --

A And in discussions with the City's lawyers in preparation for this.

Q I see. And to recap, you are an agent of the City, and also, you made these notes pursuant to your agency and, more importantly, pursuant to the greater purpose of preparing for this here deposition, correct?

A Yes.

Q Okay. And so to recap, they're handwritten notes. They were made within the past two weeks. Where are these notes?

A They're in my office.

Q Okay. So you --

A And they're not complete, by the way. I just review -- I was going through past minutes from years 2011 to 2015 --

Q Yeah.

A -- just to refresh my memory.

Q Yeah. Yeah.

A So they're not complete. They're very -- you

know, just to -- so I would have a track in my memory. So they're not complete.

Q Well, if I have -- I mean if you're anything like me, your notes are nothing more than chicken scratch anyway.

A (Gestured.)

Q I mean I'm just saying that that's what my notes are. I'm not suggesting that yours are. I'm just saying that those are mine.

A Yeah, probably. Yeah.

Q So two weeks, handwritten notes.

You are the custodian?

A Yes.

Q Okay. I'm notifying you now. Please don't shred those. Please don't --

A Sure.

Q -- lose those. I will be seeking those pursuant to the rules of discovery.

Okay. So we're turning back to central staff. There's on the order of ten people. No, we don't need -- we're done with that.

MR. KEZHAYA: Okay. Let's continue.

(Video playing.)

MR. KEZHAYA: Pause here.

Q She is directing this blessing to the people who vote on public matters, correct?

A She's -- you're asking if she's addressing it to them?

Q She's literally blessing those people. The body public which is being met, she is literally blessing the proceedings. You understand this, right?

A I don't know if I'd --

MS. O'CONNOR: Objection. But you can answer.

A I don't know if I'd classify it as that. I --

Q She's --

A I --

Q -- said let us pray like three times in the past, I don't know, minute or so that she's been talking. You would not characterize let us pray as a blessing?

A No.

Q How would you describe it?

A I look at it, it's, it's a time to -- before the proceedings for government work start, it's a time to recognize the seriousness of the proceedings. That's how I look at it.

Q Well, sure. Yeah, I mean we did the same thing here. This is, this is an analogous concept that both, that both of our separate institutions follow.

A Mm-hmm.

Q I get that. That's not the question posed. The question posed is how is this not a blessing?

A I don't interpret it like that.

Q Would you interpret what we just did as a blessing at the beginning of this thing?

MS. O'CONNOR: Objection. You can answer that question.

A I, I don't.

Q Okay. How would you describe what we did earlier?

A I -- having a, a moment to come together before a proceeding is started.

Q Okay. Having a moment before the proceeding has started is how you describe a blessing?

A Mm-hmm. And this is different than what you're showing on video.

Q Why is it different?

A What we're doing right now is different than what we're -- we're in a deposition.

Q Yeah.

A This is a City Council that is at their regular meeting where they're voting on City matters. So in my opinion that is different to me.

Q Do you know why we're entitled to require you guys to be here?

MS. O'CONNOR: Objection.

Q Question posed.

A Yes.

Q Why are we entitled to be here?

A Be -- under the, the deposition. The 30(b)(6) I believe is the cite.

Q Okay. And why do those rules require us guys to come here?

MS. O'CONNOR: Objection.

Q Do you know?

MS. O'CONNOR: Matt, she's not going to answer these questions. They have nothing to do with the reason for --

MR. KEZHAYA: She's a lawyer. She knows how to say that the --

THE WITNESS: I'm not a litigator. I, I told you that.

Q Okay. Let's start with the basics. Are you familiar with the text of the First Amendment?

MS. O'CONNOR: Objection. Matt --

Q Yes or no.

MS. O'CONNOR: She's not -- no, she's not answering questions about -- I've given I think significant leeway about general background questions. But Christine's not here to talk about her understanding of the law. It has no relation to the topics for which she's been designated.

MR. KEZHAYA: Why is that not literally the subject matter of this dispute?

MS. O'CONNOR: She's not here to testify about the subject matter of this dispute.

MR. KEZHAYA: Ah.

MS. O'CONNOR: She's here to testify about the topics for which she has been designated.

MR. KEZHAYA: That was a mistranslation. It was my intended purpose that she would be discussing the topics of this dispute, the subject matter of the dispute. In my opinion all of these questions go to the ultimate question of fact which is did the City discriminate, yes or no. You all posit no. We post it yes.

I'm trying to figure out what's going on in between the yes and the no so that we can see if we

can at least join minds and understand what we're arguing about. That's what I'm trying to figure out here. Your position is, no, we're not here. We are doing literally the least we can get away with under the rules, correct?

MS. O'CONNOR: I am following the rules. I'm following the rules of what a 30(b)(6) deposition is, and so I'm limiting her testimony to the topics for which she has been designated. And I appreciate that you have a different understanding, but that's my position on the record.

MR. KEZHAYA: I understand that's your on-record position. I just want to make sure one more point is abundantly clear. You are not asserting a privilege. You're just telling her not to answer. Correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: You, Nicole O'Connor, specifically are directing this witness specifically not to answer this question even though you don't have a privilege argument, correct?

MS.O'CONNOR: I'm object -- I'm instructing her not to answer questions outside the scope of her designated topics, and I think I've given

significant leeway where appropriate to be reasonable; but I think we're going down avenues that are not productive.

MR. KEZHAYA: Well, I'm asking a yes/no question because I'm trying to find a point of impasse.

MS. O'CONNOR: I can only answer the best I can.

MR. KEZHAYA: Well, I asked you a yes/ no question --

MS. O'CONNOR: I'm not here to answer your questions.

MR. KEZHAYA: Well, then that means we're not at a point of impasse.

MS. O'CONNOR: We -- I don't, I don't -- we don't -- this isn't some sort of proceeding where we need to reach points of impasse. You know my position. She's not answering questions about the legalities of certain things. And if you have a next question, I think now's the time to ask it.

MR. KEZHAYA: I think that's -- I think that's what the misunderstanding is. I'm not asking her legal opinion. I'm literally asking her definitionally. I asked a question that used the word "blessing". She's disagreeing with me about the word

"blessing". This is why I try to avoid semantics games. She said no. I don't see how it's different. I'm asking her to substantiate her no.

MS. O'CONNOR: And her personal opinion as to whether this is a blessing or not is not within the scope of the 30(b)(6).

MR. KEZHAYA: Well, then I'm getting confused about your understanding of a 30(b)(6) because her role in your mind seems to dance whether or not you want her to give me the answer.

MS. O'CONNOR: It doesn't. I'm giving some leeway on -- she knows a lot about these hearings having sat in them.

MR. KEZHAYA: Fine. All right. My client representative informs me to tell you that O'Malley -- I wanted to have this as a surprise for trial, but since I'm having to spoil the surprise anyway, he literally called it a blessing, all right. Do we need to rewind and go re-watch him call it a blessing or can we get over this blessing impasse with semantics?

MS. O'CONNOR: No, she's going to answer the questions how she sees fit. She doesn't answer them to reach the conclusion that you want her to

reach. She, in her opinion, said that this wasn't a blessing, okay. Her opinion not only is not relevant to her 30(b)(6) topics, but her opinion is what it is. So that's her answer to the question. You are here to ask questions, and she is here to give her answers. Whether you like her answers or not is not the question for today.

MR. KEZHAYA: I disagree.

MS. O'CONNOR: Okay.

MR. KEZHAYA: That's literally our role here. That's what a deposition is. Let's rewind. Let's watch him say blessing and then let's have you say it's not a blessing.

MS. O'CONNOR: Well, you can ask her did she say it's a blessing. That's a fair question. But whether Christine feels it's a blessing is an entirely different question.

MR. KEZHAYA: Christine's not talking today. The City of Boston is talking through Christine today.

MS. O'CONNOR: We're at a, a fundamental -- I agree with that, that she has been designated on certain topics. But whether this constitutes a blessing in Christine's opinion is not a

question before these 30(b)(6) topics.

MR. KEZHAYA: I see. Okay. So I'm stuck with the 30(b)(6) matters of designation when you don't want me to go outside of that, but I'm also stuck outside of the 30(b)(6) matters of deposition when I'm talking to Christine. So I'm stuck with her personal knowledge pursuant to her investigation. I'm not allowed to ask the things that I want to know from the person who the City of Boston sent here to talk about the subject matter of this case.

MS. O'CONNOR: If you had issued a subpoena in her personal capacity or in her individual capacity, sure, those questions would be appropriate --

MR. KEZHAYA: Ah.

MS. O'CONNOR: -- perhaps, but she wasn't designated on those topics.

MR. KEZHAYA: So maybe the confusion goes like this. City of Boston, I speak to you through this human who stands before me. Let's rewatch your employee call this a blessing first.

Rewind ... I don't know. Let's just go back to about 5:00. 5:00-ish. Right before Wu starts talking.

MS. KING: How's this?

MS. O'CONNOR: A little bit further. More like 4:30. All right. Take note, everyone. We're at 7:00. A little bit more. That's fine. Let's, let's just start here.

MS. KING: At 4:30 or 4:07?

MR. KEZHAYA: 4:07 is fine. Okay. Let us resume.

(Video playing.)

MR. KEZHAYA: Pause.

Q Did anyone else in the room take notice how he emphasized the word "bless"? I did. Did you, City of Boston, notice that your employee emphasized the word "bless"?

A I just heard him say that, yes.

Q I see. And, City of Boston, would you also agree that this, in fact, is a blessing?

MS. O'CONNOR: Objection.

Q Yes or no.

MS. O'CONNOR: No, her personal opinion is irrelevant.

MR. KEZHAYA: I'm not talking to Christine. I'm talking to the City of Boston that hovers over her.

MS. O'CONNOR: But she is not --

MR. KEZHAYA: City of Boston --

MS. O'CONNOR: -- designated on those topics. And, Matt, this is not productive. So if you want to seek leave of court to perhaps put some parameters on what our understanding of what this deposition is. You know my position. I know your position. We don't have the same position. So continuing to go down this road is neither productive, helpful or a productive use of anyone's time.

MR. KEZHAYA: I agree.

MS. O'CONNOR: So I've got my objection on the record.

MR. KEZHAYA: Mm-hmm.

MS. O'CONNOR: If you would like to, to revisit that in court, you are certainly welcome to do so, but the next question, please.

MR. KEZHAYA: Thank you.

BY MR. KEZHAYA:

Q City of Boston, is this in fact a blessing?

MS. O'CONNOR: Objection. So if we are going to continue to do this, I'm more -- I'm telling you that we're going to leave.

MR. KEZHAYA: I'm confused. I'm asking a different question from my prior one that you just

objected to. Is there something that I'm misunderstanding about your objection?

MS. O'CONNOR: Ask your question again. Let me hear it.

BY MR. KEZHAYA:

Q City of Boston, do you bless your meetings?

MS. O'CONNOR: That's a fair question.

Q Yes or no.

A No.

Q You do not. Okay.

MR. KEZHAYA: Let us continue. Back at 7:00.

MS. KING: 7:00?

MR. KEZHAYA: Seven minutes even. Ah, 6:50, 7:00 minutes. That's fine. Whatever, 7:00. I'm sure she's saying nothing of importance. That's good. 6:49, that's good too.

(Video playing.)

MR. KEZHAYA: Pause here.

Q In the past 45 seconds I've heard her call the councilors your servants, servants. She's called this a blessing, and she has requested that God literally endow his servants with knowledge. Have you heard all those things or do we need to watch the last

45 seconds?

A I heard it.

Q Okay.

MR. KEZHAYA: Please continue.

(Video playing.)

MR. KEZHAYA: Pause.

Q Where are we at? 8:09. In the past call it 35 seconds I've heard this person with an emphatically impassionate voice describe this current speech as a prayer. She has once again recited that the councilors require God's wisdom and knowledge to do their basic governmental tasks. And I, I believe I, I remember somewhere in here I heard the word "need". So I just want to emphasize that the word "need" is in here. They need God to do their job. Is that correct?

From the City of Boston's perspective is it correct that the government needs God to do its job?

MS. O'CONNOR: Objection.

Q Yes or no.

MS. O'CONNOR: She's not answering that question.

Q You are not answering that question?

A I am not on the advice of counsel.

Q Okay. And once again, on advice of counsel

you're not answering it even though there is no privilege, correct?

A Yes, correct.

Q Thank you.

MS. O'CONNOR: It's not within the scope of the 30(b)(6) topics, correct.

MR. KEZHAYA: Okay. Continuing forward.

(Video playing.)

MR. KEZHAYA: Pause.

Q Why is the government inviting someone to bless the councilors' families?

MS. O'CONNOR: Objection.

Q It happened. We see that it just happened. Why is the government doing that?

MS. O'CONNOR: Objection. So that's again not a topic that's designated on the 30(b)(6) subpoena.

MR. KEZHAYA: Do I really need to go read through my 30(b)(6) to go find something that sounds a lot like I want to inquire as to why you guys have this policy? Because I can do that. We can do it off the record too if you all don't mind.

MS. O'CONNOR: Why you have the policy of what?

MR. KEZHAYA: Having this person come up here, deliver an impassioned plea to God that the servants, which is to say our public employees, be endowed with knowledge and wisdom that they otherwise lack. Why is that a thing? I can look through the 30(b)(6) depo or you guys can answer the question, which is your preference?

MS. O'CONNOR: Well, why don't you explain to me where you see that in the 30(b)(6) deposition subpoena.

MR. KEZHAYA: Let's take a break. I will go find it and highlight very many instances in which I can do that.

MS. O'CONNOR: Great.

THE VIDEOGRAPHER: Okay. The time is 12:17. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 12:17.

BY MR. KEZHAYA:

Q Okay. Taking note of the 30(b)(6) notice, paragraph 3 states as follows: A background on the City's invocation policy ceremo -- or invocation ceremony, including without limitation: when it first

arose - we've covered that - what legal challenges (if any) it has faced over time - very interested in hearing about that - how (if at all) the invocation ceremony has changed over time - sounds like the answer's not - how (if at all) any policies, practices, or customs surrounding the ceremony has changed over time.

Employee, what -- has it changed over time, to the best of your knowledge, or has it pretty much been the same?

A It's been the same.

Q Okay. The bases for limiting who may participate. Why won't you invite TST? What is your basis or, plural, bases?

MS. O'CONNOR: So she can't answer specifically as to TNT, but she can answer in general why --

MR. KEZHAYA: Sorry. To interject, it's The Satanic Temple, not T-N-T, T-S-T.

MS. O'CONNOR: I apologize if I misspoke.

MR. KEZHAYA: Thank you. Please continue.

MS. O'CONNOR: She can answer as to the

bases for why any entity is -- or why any entity is limited from participating.

MR. KEZHAYA: Where in paragraph 3 which states: A bacro -- a background on the City's invocation policy ceremony suggesting to you that I'm asking about other people's ceremonies which is not the subject matter of this dispute?

MS. O'CONNOR: To me this reads as a general, you want to know the general background on the City's invocation ceremony process and who is invited to participate and who isn't.

MR. KEZHAYA: You said just the City. Who is the City in this context?

MS. O'CONNOR: I am not asking -- answering your questions, Matt. I don't --

MR. KEZHAYA: Well, then she will answer my question.

MS. O'CONNOR: I don't -- I'm fundamentally confused. I'm really not trying to be difficult. I think this is all really straightforward, and I would really love for her to answer the questions.

MR. KEZHAYA: Okay. Let's recap.

MS. O'CONNOR: But she can certainly

answer how the City determines who may or may not participate in the invocation process.

MR. KEZHAYA: I designated the bases for the City to limit who may participate in the City's invocation ceremony. That's part of paragraph 3. You're not gonna get away with that one. No one's getting away with that one.

MS. O'CONNOR: No one's trying to get away with anything.

MR. KEZHAYA: Okay.

MS. O'CONNOR: I'm trying to be clear about what the position is during this --

MR. KEZHAYA: Your position has been made adequately clear. Let's restate the question.

BY MR. KEZHAYA:

Q City of Boston who brought this human here to talk about this very subject matter pursuant to a 30(b)(6) deposition in which I stated that I want to know the bases for you, City of Boston, to limit who may participate. I demand that you tell me now --

MS. O'CONNOR: So -- you --

Q -- where are your bases?

MS. O'CONNOR: You -- we have to give respect to the witness. And I appreciate that you're

very excited about this topic, but she can certainly answer how invocation speakers are selected and when they may or may not participate. That's a fair question that you just asked. But I'm asking that you please show some respect to the witness. And you don't need to issue demands. She is more than happy to answer your questions.

MR. KEZHAYA: This is a legal demand. You all are not here of your own accord. You are here because I demanded pursuant to a Complaint that you come here. You acquiesced. You brought this one. This one is to speak to the bases for limiting who may participate.

MS. O'CONNOR: So this --

MR. KEZHAYA: That one is telling me that this one will not answer.

MS. O'CONNOR: Please. This is Christine O'Donnell. I'm Nicole O'Connor. You can call me Nicole, but you can't refer to me as "this one". I'm really uncomfortable with the way that this deposition is unfolding.

MR. KEZHAYA: Fine.

MS. O'CONNOR: I'm really trying to have our witness answer your questions, but we can't do

it disrespectfully.

MR. KEZHAYA: Then I need a break.

MS. O'CONNOR: Okay. That makes sense.

THE VIDEOGRAPHER: Okay. The time is 12:21. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 12:31.

MR. KEZHAYA: Okay. Off the record I apologized for my errant ways. Once again, looking you both eyes, I apologize sincerely. Sincerely, okay?

MS. O'CONNOR: Thank you.

MR. KEZHAYA: You're welcome.

BY MR. KEZHAYA:

Q The subject of dispute is basically I'm coloring outside the lines of my 30(b)(6) notice. So that being the case, specifically with regard to "the bases for limiting who may participate" which is more particularly included with the term "a background on the City's invocation ceremony", my question to you is whether there are bases for limiting who may participate, yes or no?

A It's by invitation. So the limit would be if you don't get an invitation, you don't give the

invocation.

Q So the answer is yes, and the basis is singular which is you were not invited?

A Yes.

Q Okay. All right. And as I recall, earlier you said you investigated why -- how and why a particular speaker is selected in the course of preparing for this deposition; is that correct?

A I didn't investigate how or why -- oh, well, if you're asking -- I asked staffers of city councilors how a councilor determines who they invite. Is that what you're asking?

Q That is what I'm trying to ask.

A Yes.

MR. KEZHAYA: Nicole, may I rephrase it as I see fit or am I bound --

MS. O'CONNOR: Sure.

MR. KEZHAYA: -- to the language?

Q Basically what I'm trying to get at here is pursuant to your earlier conversation here, you -- like you got here. Before you got here, --

A Yes.

Q -- you did an investigation. That investigation included talking to people.

A Yes.

Q Did you talk to the people for your investigation why a particular matter or why a particular speaker is selected or any permutation in your mind thereof?

A I asked how a councilor determines who they're going to invite for the invocation.

Q Okay. Pause there. And why. Did you ask why, yes or no?

A I did not because that answer was part of the answer that the staff person gave me.

Q So the -- I tasked you with giving me how and why a particular speaker is selected. You went out. You found how. You did not investigate why; is that correct?

A The --

MS. O'CONNOR: Objection. You can answer.

A The response from the staff persons that I asked said, oh, it's someone that the councilor has a personal relationship with or does work within our district or has done work with our constituents.

Q Okay. And --

A So that would be the why. That would be why

a councilor extends an invitation to somebody.

Q Yes. Yes. Thank you.

That sounded like a quote. Were you given a quote or is this just you referencing your prior statement?

A It's not a quote. It's me summarizing the question that I asked the staffers.

Q Okay. So you had some kind of a dialogue with staffers?

A Yes.

Q Minimally you asked a question. Did you get one statement or more than one statement in return?

A I, I asked more than one staffer so, yes, more than one statement.

Q Did you ask each staffer -- let's do it like this. How did you ask each staffer this question?

A I asked what does -- how, how does the councilor determine who to invite for the invocation.

Q In what form --

A The same question.

Q Yeah. Yeah.

What form was this inquiry made? Was it spoken, written or something else?

A Spoken.

Q Okay. So you met with them in person or did you talk to them on the phone or was there some other means of communication?
A It was in person.
Q Okay. When was this meeting?
A It wasn't a meeting. It was just a conversation. Probably about two weeks ago.
Q Okay. So give or take two weeks ago. How many -- well, was this -- did you guys all meet in one place? Because you mentioned you talked to multiple staff, plural staff people.
A Talked to a couple of people.
Q Okay. Who were the two people that you talked to?
A Amanda Curley.
Q C -- how do I spell Curley?
A C-u-r-l-e-y.
Q E-y. Thank you.
A You're welcome.
Q And just for sake of good notes, a-n-d-a.
Okay. So you talked to Amanda. Who else did you ...
A Sophia Wang.
Q Sophia Wang.

                                              Okay. Who is Amanda Curley in the organization?

A Amanda Curley is the Chief of Staff for Councilor Baker.

Q Chief Staff Baker. K-e-r?

A Yes.

Q Okay. Sophia Wang is?

A She is the policy director for councilor Flynn.

Q C director for F-l-y-n-n.

And it's the City's position that the councilors may -- basically the councilors have -- you know, whatever they do, that's pretty much up to them. That's pretty much the custom; is that correct?

A Yes.

Q In terms of extending invites, each -- each person does whatever they feel like is essentially ...

A Yes.

Q You talked to two, by my count, councilors for a time period, an agreed time period discoverable scope of 2011 until minimally the date of the complaint, although that's a subject of dispute as well. How, how many councilors have been, you know, employed by the City during that timeframe?

A So there has been a lot of turnover.
Q Yeah.
A The City Council has -- their election is every two years. It's a two-year term. So since I started in 2011, there -- actually, all of the councilors are gone since I first started in 2011. It's all new councilors right now.
Q Okay.
A So part of the reason why I reached out to those two councilors' offices, Councilor Baker started in 2012/2013.
Q Okay.
A And although Councilor Flynn is a newer councilor, I believe his first term was 20 ... 2018. I think. But he is the Council president. So that is my reasoning for speaking to those two offices.
Q So he's the council president?
A Councilor Flynn is the council president, yes, the current council president.
Q Okay. So Flynn is currently the -- currently the Council president, correct?
A Yes.
Q When did he first became council president?
A This, this year.

Q Oh, wow, okay.
A Yes.
Q Council pres, all right.
You gave me beginning dates for both Baker and Flynn. Are they still --
A Yeah, approximately.
Q Well, yeah, obviously.
A Yeah.
Q Yeah, everything's approximate. I'm not playing semantics games here. Give or take 2012, that's what this squiggly line means for my purposes.
A Mm-hmm.
Q Are they still councilors, though?
A Yes.
Q Okay. Present. And present.
Okay. So you talked to Flynn to determine how Flynn does things, but you did not talk to anyone else, it seems, or other than Baker?
A No.
Q Okay. All right. Turning once again back to here. Mm-hmm. Mm-hmm. Mm-hmm.
All right. Why didn't you talk to anyone other than Flynn's people?
A Well, I talked to Councilor Baker's --

Q Oh, yes.
A -- people because, again, he's been there the longest now and Councilor Flynn because he's the council president.
Q Oh, so you --
A And I -- as I said previously, I have attended the meetings so I can see from the introduction and I know that the policy is based on invitation and that's why I'm here to discuss that policy. So I spoke to those two offices just to get an idea how their councilors pick the individual that gives the invocation.
Q You specify how, but I also charged you with specifying why.
A And again, I feel that I answered that. It's individuals that the councilors have a relationship with, and the Council -- it's by invitation.
Q Well, sorry, I was --
A I, I -- I feel that the councilors are the only ones that can speak to why they're asking somebody. I can infer based on the invites that it's people that they know because of a personal relationship or work they do within the City.
Q Yes, but that's an inference, and as their

employer who has charged them to do certain tasks for your business purposes, that, I posit, is a material aspect of the agency seeing as how you, 30(b)(6) witness, are unable or unwilling to testify to that effect. Would you agree then that I need to talk to the individual councilors, each?

A Yes.

Q Okay. In order -- to be more -- to make a better record, I heard yes. I interpreted that to mean yes for the particular purpose of why are they not inviting TST, why are they inviting these other people. For example, I would need to talk to Wu about this particular person and why Wu in particular would not invite TST, correct?

A Wu didn't invite TST. There -- there was never an invite.

Q I understand. The why question is addressed to Wu, though, correct?

A Yes.

Q Okay. Who would I talk to in Wu's office or on Wu's behalf in order to get her deposition set up because we only have like two months left in discovery?

MS. O'CONNOR: Objection. I mean I'm happy to coordinate --

MR. KEZHAYA: Okay.

MS. O'CONNOR: -- that information. I don't think Christine will know it. You can ask her.

MR. KEZHAYA: You don't need to call an objection. You can just ...

MS. O'CONNOR: Okay.

MR. KEZHAYA: Okay. All right. I, I bring that up because words like "objection" have a tendency to, to get me riled up. I'm trying to, trying to keep it down.

MS. O'CONNOR: That's just pretty standard.

MR. KEZHAYA: Okay.

BY MR. KEZHAYA:

Q All right. And I also see on my handy list here, paragraph 4, City's recordkeeping policies surrounding payment to guest speakers at the invocation policy which presupposes that this person who is presently blessing the proceedings, although that's subject to dispute, Wu invited this priest and this priest is paid by the City for speaking at this event; is that correct?

A The people that give the invocation are no longer paid.

Q No longer paid. When did that stop?
A I believe it stopped in 2016 or 2017. I'm not sure of the actual year.
Q How do you know that they stopped being paid?
A Because, again, I was, I was in my same job, and the staff director at the time informed us that the clergy weren't being paid anymore.
Q 2016 or 2017, that was the timeframe that people stopped getting paid; is that correct?
A Yes. That was when now Mayor Wu was council president.
Q Mm-hmm. That coincides with TST's first request to TST -- to demand, basically, an invitation; is that correct?
A Yes.
Q Was it because of TST's demand?
A It was looked at and considered best practice to stop the stipend.
Q I understand. But did the process of looking at the process of whether we are giving money to these priests, was that occasioned by TST's demand for invite?
A Yes, the policy was looked at then.
Q Okay. So just to make, just to make a

cohesive sentence, in 2016 TST demanded an invite of the City Council. City Council goes to you requesting a legal opinion as to whether they have to. Is there anything --

A They, they -- I was not involved in that decision whether or not to stop the payment. I was not involved in it.

Q Ah, I was mistaken. I'm so sorry.

So TST demanded an invite in 2016. I was confused as to which one you opined as to the City doesn't have to extended an invite. That was 2018.

A Yes.

Q So there have been at least two demands for invitation. Do you know how many times TST has demanded, legally demanded an invite?

A I do not.

Q Okay. If I told you it's at least three does that sound like something you can disprove, as we sit here today?

A No, that seems reasonable. I don't ...

Q Okay.

A Again, I'm not aware how many times.

Q Okay. That's, that's fine. I don't really care about the number anyway.

So TST first issues a demand in 2016 which prompts a process of reviewing its prayer policy to avoid a subject lawsuit not unlike this one. Because of TST's legal demand and it seems, from my perspective at least and I'm curious as to your position on the matter, it seems like it was for the purpose of either avoiding or winning a lawsuit not unlike this one.

MS. O'CONNOR: Objection.

Q City of Boston, do I need to have your employee speak to this matter?

MS. O'CONNOR: Objection. You can answer if you can.

A I --

MR. KEZHAYA: I object to this if you can business. She can -- she knows that she answer my questions if she can.

A Can you repeat your question?

Q Was the purpose of reviewing the determination to pay these priests part of a purpose of avoiding liability thereby avoiding a court order requiring TST to have an invitation? Is that why you guys did your, your review?

MS. O'CONNOR: Objection.

A The re -- the review was done. And again, I

did not conduct this review. But the review of the policy of paying the people giving the invocation was looked at, and it was determined that it was best practice to stop the stipend.

Q Okay. And, City of Boston, was it -- is it your testimony, as we sit here today, that since approximately 2016 - let's bookend it at 2018 - people have not been getting paid since at least going back to 2018-ish?

A Correct. And I'm, I'm pretty -- I'm pretty sure it was 2017. I'm pretty sure you can settle on, on that.

Q Okay.

A That it was 2017 when the payment stopped.

Q Okay. Who made that decision?

A At the time it was Council President Wu.

Q Oh, so Councilor Wu, here who invited this particular person, I should probably ask her why she decided to turn off this money thing?

A Yes.

Q Okay.

MR. KEZHAYA: Let us proceed.

(Video playing.)

MR. KEZHAYA: Amen. All right. Pause

it, please.

Q So going back to this matter, I have a lot of follow-up questions about this. I feel like you're not the right person for me to talk to. Should I talk to Michelle Wu about this?

MS. O'CONNOR: It probably depends on the question.

MR. KEZHAYA: Oh, do we want to go through that?

Q Okay. That felt a lot like proselytizing to me. What say you, City of Boston?

MS. O'CONNOR: So, yes, objection. That is not a question that Christine can answer based on the 30(b)(6) topics.

MR. KEZHAYA: Okay. I can, I can go through the list or --

MS. O'CONNOR: You need not.

MR. KEZHAYA: -- that's basically the topic.

All right. Now, I feel like this is a good time for lunch unless the witness would like to proceed.

MS. O'CONNOR: It's totally up to Christine.

MR. KEZHAYA: It's entirely up to you, Christine.

THE WITNESS: I'm -- I mean I'm fine with ...

MS. O'CONNOR: You can break now. You can take -- you can go for another half hour if you wanted. You could -- whatever you want to do.

MR. KEZHAYA: The next phase of things will be public input to councilors. It's probably gonna run into another impasse. Suffice it to say, we're just going to look at them. I'm not gonna -- I'm not gonna get too detailed on it. I feel like I have a lot of why questions that are really better addressed to Wu. So I'm just going to leave those for her. How about we just take a look at the emails and then call it a day?

MS. O'CONNOR: Sure.

THE WITNESS: Okay.

MR. KEZHAYA: Sound good?

THE WITNESS: Sure.

MR. KEZHAYA: All right.

BY MR. KEZHAYA:

Q Let's just drop this, drop this YouTube thing. We now have some emails that we received

through discovery.

To recap, Christine, you looked at the discovery, correct?

A Yes.

Q Okay. And more particularly, I apologize, discovery is a legal jargon term. Could you please explain to the, the congregants what it means to have discovery?

MS. O'CONNOR: Objection. You can answer.

A My understanding is that it's requests for information and documents pur -- before litigation or during litigation. Again, I'm not a litigator so I'm not familiar with the proper terms.

Q That's okay. If I, if I dispute any part of what you have to say to me, I ask further examining questions until we get to the place where I feel like we're either at an impasse or I understand what you're saying.

A Okay.

Q So if I could rephrase it in my own words, is it fair to say that discovery is a means by which you prepare for trial that the rules allow you to have?

A Yes.

(Exhibit 1 was introduced.)

Q Okay. All right. So pursuant to that we sent discovery requests, the details of which are irrelevant. Because of the discovery requests, you guys gave us documents. These are some of the documents.

You will take note that this particular item is designated as Defendant's 2870, Bates stamp 2870. If we could please open it up and then let's scroll down to the very bottom so we can see in fact this is Defendant's 0002870. This is 2870.

There and then on -- well, sorry, August 30, 2017, Mark Thomas states to -- is it -- would you describe this list of email addresses as the City Council?

A Yes, at that time those are all of the councilors, and I believe the current mayor, Martin Walsh, is on that email as well.

Q Okay. The subject line states: Satanic City Council Meetings. Is that correct?

A Yes.

Q Okay. And there and then marked Tom -- first of all, before we get into the text of the email, is this pretty normal to see -- you know, we talked about

members of the public communicating to their councilors. Is this pretty much what that looks like?

A The -- honestly, the City Council doesn't really get many requests for the invocation. Usually communications from the public relate to legislation, if there's issues in the community, things like that.

Q Okay. So if I --

A But it's a -- but if you're asking about means of communication, --

Q Yeah.

A -- that would be a means to communicate with the councilors via email.

Q I was literally just asking as to form.

A Okay.

Q This appears normal, in other words, is that -- is that fair?

Is this abnormal that someone would send an email to the whole City Council?

A No, that's normal.

Q As stated there and then, Mark Thomas states: Dear Councilors, it has come to my attention that a proposal is being circulated to open City Council meetings with a "prayer" from an alleged Satanist. If it isn't clear to every City councilor and Mayor Martin

Walsh, that would be a very bad idea and cross far over any bounds of sanity and decency.

Moreover, as an act of hate blasphemy, and rejection of God it should be immediately commended as just that.

I trust that this is all that needs to be said on the matter. It is a very matter to incur the wrath of God for either yourselves or the City of Boston. Respectfully, Mark Thomas - Boston.

Did I read that email in full correctly?

A Yes.

Q Okay. And then I see from Andrea Campbell to Christine O'Donnell. You're the To:; is that correct?

A Yes.

Q Okay. And Andrea Campbell is the then Council president. No. No. No, actually --

A Yeah. No. No. No. She was a district councilor at that time.

Q Okay. And to reiterate, "that time" being August 30, 2017 was the original email. The secondary email being or the responsive email, whatever this is, maybe forward. Is this a forward? You tell me.

A It is a forward because, as you can see, the August 30th email I was not on.

Q Mm-hmm.

A And then from the text --

Q Ah.

A -- of the email on September 1st, it looks as if I was forwarded that email because it was a public records request.

Q I see. I also now take note, this would have probably made things easier, above Mark Thomas it literally says forwarded message. So we know now that it was forwarded to you.

A Oh.

Q So going back, September 1, 2017, Andrea says to you, Christine O'Donnell: Hi Christine, I'm checking on the Councilor's email during her leave and will send you all emails related to this request now.

You received this email. I did not receive any other responsive documentation about this. Who is the councilor, to your understanding, from Andrea Campbell?

A That -- Eli is -- was Councilor Campbell's chief of staff at the time. So she's telling me that she's reviewing the councilor's emails.

Q Okay.

A That related --

Q Oh, I see.

A This was subject to a public rec -- looking at the context in the sense that that was forwarded to me.

Q Okay.

A It look -- it appears to me that this was subject to a public records request, and that's why Eli, who was Council Campbell's Chief of Staff is forwarding this to me.

Q I see now also this email is sub -- well, no. How do you know this is a public records request?

A Based on my job for the past 11 years, it says: I'm checking the councilor's email during her leave and will send you all emails related to this request now.

Q Ah.

A When I get a public records request, I work with the City's records access officer, and I also reach out to all the councilors and say do you have any emails, documents responsive to this request. There must have been a request. I don't know if it was from TST or if it was from -- any member of the public can request records.

Q Sure.

A Emails, unless they're privileged, are subject to public records. Any document is subject to a public record, unless the statutory exemption applies.

Q Mm-hmm.

A So it looks like the language from Eli to me, that someone requested a public record.

Q Okay.

A And this, this was subject to that public record. Again, I'm just looking at it on the one page, but that's what it looks like to me.

Q Well, that makes sense because, you know, we have August 30 --

A Yes.

Q -- and checking so-and-so's. I didn't see this Eli. I saw the Andrea Campbell. So that, that all makes sense, especially with this request now. This request being public records request.

MR. KEZHAYA: Okay. Let's move on to the next exhibit. This is -- for benefit of the record, we're going to call this Bates ... All right. So we've called -- if we could scroll back down I've already forgotten the Bates number. Here we are, 2870. And this is -- I'm going to call this the frightening

email.

Okay. Let's just tab on to the number next one, whatever we're going to call it. I see this is Defendant's 3434. Scroll all the way to the bottom because it's a page range. 3436.

Does anyone object to me disregarding -- we just saw -- if we could scroll down one more time. For benefit of the record, we're looking at 3434 through 3436. Pages 3435 and 3436 are just a bunch of signatures. Does anyone object to me disregarding 3435 and 3436 in the presentation of the argument at trial?

MS. O'CONNOR: No.

MR. KEZHAYA: Okay. So I'm going to strike those remaining two.

(Exhibit 2 was introduced.)

Q Now, we're looking now at 3434 which subsequently is gonna just be a one-page. This is appearing -- appearing to be an email dated October 19, 2020 from someone named P. Cumin to Gabriel Coletta -- or, sorry, Gabriela Coletta.

And I'm afraid my eyes have failed me. Madam witness, could you please, to the, to the best of your ability, I imagine you can probably decipher these people's names and whatnot better than I can.

A Yep.

Q From -- well, on date, from who, to who, cc who, subject what?

A Date: Monday, October 19th, 2020; from P. Cummin to Gabriela Coletta. Oh, I skipped subject: Regarding Providing Virtual Invocation to City Council Meeting; To: Gabriela Coletta; Cc: Theresa Malionek.

Q Okay. So I, I note the To: has a Boston.gov email address. Who is this Gabriela Coletta?

A At that time she was Chief of Staff for Councilor Lydia Edwards.

Q A chief of staff -- oh, here we are, Councilor Edwards. Oh, that's great.

A Yup.

Q P. Cumin appears to be I see at the signature, some kind of a priest. So why don't you, why don't you read us this, this email, madam -- madam witness.

A Hi Gabriela, Thank you for your email. I'm honored to accept Councilor Edwards' invitation to provide the opening invocation for the City Council this coming Wednesday but I have a practical question to ask to make sure that that's something feasible for me. I have a mass at 12:10 pm on Wednesday. Do you

think the City Council will start at 12 pm sharp? I'm just asking because I could stay on the call until 12:05 but then I'll have to leave and get ready for mass. Do you think it'd be feasible for me to give the invocation and then leave the call to get ready for my mass? Please let me know what Councilor Edwards thinks. Thank you for your help. Take care, Fr. Parlo -- Paolo.

Q Okay. So I see here that -- I think it's friar is F-r. Is it father or friar?

A No, it's father.

Q I'm so sorry.

A That's been my experience. I don't know. Could be friar. I don't know.

Q I apologize. I have difficulty with language. So it's -- if it's an abbreviation then I just assume it's the shortest one it could be.

So Fr. Paolo, are you personally familiar with Fr. Paola?

A No.

Q Okay. Are you personally familiar with whatever San Carlo.org is?

A I am not.

Q Okay. Let's scroll down. Maybe this will

give us some more insight.

So this is in re -- this prior email I see is in response to an email dated when, by whom, to, et cetera. Please -- please explain to the people.

A Do you want me to read the email?

Q Oh, no, literally say -- we have to do some minimal legal required stuff. We have to give background on what is it that we're looking at. So for people that are not literally looking at this document, they're going to be seeing a court transcript of everything that's going on here so for --

A It's an email on October 19th, 2020 at 7:51 AM. Gabriela Coletta wrote: Good morning Father Paola, I'm reaching out on behalf of Boston City Councilor Lydia Edwards to ask if you'd be willing to provide the opening invocation for this week's virtual Boston City Council hearing on Wednesday at 12 PM. We'd be honored to have you represent our district for this hearing. Kindly let me know when you can. Best, Gabriela.

Q Okay. So I see now the relevance of this document appears to be that Councilor Lydia Edwards invited Fr. Paolo. I probably needn't figure out who or why, rather, Fr. Paola was invited which is outside

your, your knowledge scope. So we're going to set that aside.

MR. KEZHAYA: We're calling this the Fr. Paolo invite. How do I spell that? P-a-o-l-o. Invitation. All right.

And for benefit of a more clear record, Exhibit 1 was 2870 "frightening email". Exhibit 2 is Bates 3434. I'm calling it the Fr. Paolo invitation. No need for email.

Now, let's move on to number next one.

Q Okay. Madam witness, if you could -- earlier you said I skipped over subject. That's actually -- it makes more sense to know who's talking with whom, when, and about what. So if you could say the From, To, Cc, when and then about and then we'll figure out together what this is all about.

A From Gabriela Coletta; sent Tuesday, February 19th, 2019; To: Carl -- Carl Jean-Louis; Cc: Candace Morales, Makayla Parkin, Elizabeth Pimen --

Q Oh, you can, you can just summarize. Just a bunch of people at Boston.

A Okay. Okay. Sent -- cc'd to Boston employees. Subject: Regarding agenda for tomorrow's planning meeting.

Q Okay. All I see is a sea of Boston.gov emails and I see also a Gmail in here. Do you have any idea who any of these people are?

A I do. Some not all.

Q I, I don't care about the ones you don't know. Tell me about the ones you do know.

A So Candace Morales is one of my colleagues on central staff. She is the communications person for the City Council. Makayla Parkin used to work for former Councilor Janey. She is no longer employed at City Council. Elizabeth Pimentel used to be Council Campbell's Chief of Staff. Mark Mur -- I don't know -- Yuleidy Valdez used to be the staff director for City Council. And Kristen Halbert used to be a staffer for Councilor Michelle Wu.

Q Basically a bunch of support staff for councilors. Is that fair to say?

A Yes.

MR. KEZHAYA: Okay. Let's scroll down, see what our Bates stamp is. Bates numbering that is to say. I just need to know the first page and then the last page. 2320. Beginning and ending when? 2322.

(Exhibit 3 was introduced.)

Q Okay. What is this all about? This appears to be some kind of meeting notes. Is -- is that fair to say?

A BHM stands for Black History Month.

Q Okay.

A That's an event that the City Council has.

Q Okay. What is CJ? Who is CJ?

A CJ worked for Councilor Campbell.

Q "Will check with staff from president's office." Do these words mean anything to you?

A It looks like, based on the agenda, that he's looking to the council president's office for guidance but ...

Q Okay. What is UMB?

A I, I do not know.

Q Okay. All right. Well, it seems to me -- let's scroll down so I can just kind of skim through this email.

A UMB is -- sometimes refers to UMass Boston, but in this context I don't know if that's what that means.

Q Oh, you know what, I am vaguely familiar that some of these documents appear to suggest that there's like last-minute needs for invocations. Maybe I could

summarize all this by asking you just directly.

How -- was it ever the case that there's like a last-minute need, we need an invocation for whatever meeting? Is that a thing that happens at the City?

A Yes.

Q Okay. How often does that happen?

A It happens -- I can't give an approximate amount, but maybe a couple of times a year, a few times a year. Five. Five times a year. But not, not often in the overall amount of meetings.

Q Okay. So about two to five times per year there's an opening for invocations that requires someone to -- need to fill and obviously that we all know that TST was not invited; is that correct?

A Yes.

Q Okay. Let's move on to the next document.

MR. KEZHAYA: No. No. No. We don't -- we're done with this one.

For benefit of a clean record, this was Exhibit 3, Bates range 2320 to 2322. I'll figure out a designation later. We can move on to the next one.

Let's see here. Okay. Let's just scroll down to the, to the Bates number. It will be -- it'll be at the bottom of the page. Okay. 23 -- well,

                                              actually, what's gonna be four is beginning 2391 to 2392.

(Exhibit 4 was introduced.)

Q This appears to me to be another instance in which -- another discrete instance, provable instance in which someone needed a last-minute invite. Is that consistent with your reading of this email?

A Do you need me to read it out loud?

Q No.

A It looks as if it's last-minute since it's tomorrow, but it also looks as if they found someone.

Q Okay. Last minute, that's -- that brings a good point. Last minute isn't discrete terminology.

Does the City of Boston have a meaning for last minute or is it just used in its common parlance?

A Used in its common parlance.

Q Okay. Last minute as used in common term.

A Actually, after looking at this again, I cannot confirm whether or not it was last minute because Makayla Parkin worked for the time it was Council President Janey. And since the Council president chairs the Council meeting, it looks as if Makayla is emailing Eli since it was Councilor Campbell's turn to see who was giving the invocation.

So I'm not sure -- Makayla sent it on Monday. The meeting's on Wednesday. I'm not sure if -- when Councilor Campbell reached out to Pastor Yansen it looks like.

Q In other --

A So I don't want to be inaccurate and say that Councilor Campbell waited til the last minute when I'm not clear on that based on the email.

Q Okay. I, I don't mean to be contentious, but I see Makayla here ends the email or the second to last sentence of the Monday, November 2 at 1:01 PM Makayla writes: Please let me know if you can find someone by end of day tomorrow!

A And Makayla likely sent that because the staffers of whoever, whoever the Council president is --

Q Mm-hmm.

A -- generally prepare prep notes --

Q Mm-hmm.

A -- for the Council president. So Makayla -- and like I said, our meetings are on Wednesday. Makayla likely sent Eli that email so she could include the name of the individual giving the invocation in Council President Janey's script.

Q I see.

What, what is the usual advanced notice that the City receives that it will have a particular person giving a particular ... I'm going to call it blessing. I know it's a subject of dispute. I'm just going to keep calling it blessing. How -- you've got this person who's going to be doing a blessing. How long before the meeting do you know they're going to be doing the blessing?

A Do I know or does the --

Q The City.

A I -- the individual councilor, I -- they may reach out to them well ahead in advance whoever is, is inviting someone. That I can't speak to.

Q Sorry. I, I -- again, I hate the theatrics about it, but technically I'm not talking to you. I'm talking to the City of Boston.

A So it would vary --

Q Yeah.

A -- on councilors.

Q Yeah.

A Depending on how much notice they would give.

Q So I probably need to talk to them, huh?

A Yes.

Q Okay.

MR. KEZHAYA: All right. So how much advanced notice do councilors give.

Q And now that's, that's in terms of what the councilors receive. What about in terms of putting together an agenda? Presumably an agenda gets put together for these meetings. Is that fair to say?

A Yes.

Q When does that get locked in?

A The agenda has to come out the Monday before the Wednesday meeting.

Q Monday before the Wednesday meeting?

A Yes.

Q Okay. So we're turning back to our email then. This is Monday at 1:01. She's freaking out because it's, it's due tomorrow, and she probably needs to have the agenda done.

A This email does not refer to the agenda.

Q Ah.

A Makayla is asking her for the name so she can put it in the script that she preps for Councilor Janey's notes. Makayla is a staff person for Councilor Janey who was president at the time, Council president at the time. As president they -- the president chairs

the City Council meetings. So she -- whoever the Council president is opens the meetings and has a script, and likely says, oh, I now invite so-and-so who has -- I, I invite Councilor so -- in this case, Councilor Campbell up who has invited Pastor James W.S. Yansen to come to speak.

So this looks like to me that Makayla is reaching out to Eli so she can have the name to put in the script because Councilor Janey liked to look at the script the night before the Council meeting.

Q Okay.

A So this is not the agenda.

Q I know.

A This is not the agenda.

Q I understand. I'm saying that she needs it for purposes of the agenda possibly or actually more likely it seems because I see November at 3:00 PM. If the thing's -- if the meeting is actually on Wednesday, you know, it, it seems to me that they're just looking to fill the slot.

A I disagree with that characterization.

Q Okay. Well, that's an impasse. Let's move on.

MR. KEZHAYA: And for benefit of the

record, this is 2391 to 2392. I'll figure out a designation later. Let's move on to number next one.

Oh, thank you. 2733 to 2734. Let's see the top of 34. Yeah, those are just signatures so we're just gonna do 2733. Unless, unless, opposing counsel, do you object to me only using --

MS. O'CONNOR: No problem.

MR. KEZHAYA: As a, as a general proposition, can I just skip signatures?

MS. O'CONNOR: Please. Yes.

MR. KEZHAYA: Okay. Less paper I prefer.

(Exhibit 5 was introduced.)

Q Let's scroll up slightly more. What is going on here? So these are a lot of emails. Let's start with the bottom most. We are looking at an email -- and, sorry, I'm just going to take over this. I think it's going to be a little more efficient. We see June 10, 2020 at 8:33 AM. Michael Bonetti writes to someone named ... madam witness, could you please state the pronunciation?

A Yuleidy.

Q Yuleidy, thank you.

Please -- please carry away with the body of

the text.

A We have a priest to preside over the invocation today. His name is Fr. Michael Della Penna, ofm, pastor of Saint Leonard of Port Maurice Parish in the North End. Thanks, Michael.

Q Okay. Does the shorthand OFM mean anything to you?

A It does not.

Q Okay. I see that the -- it follows a priest -- you're going to have to forgive me. I apologize. I don't, I don't speak the, the jargon of the Catholic tongue. Is this Fr. Michael Della Penna, is that correct, an ofm -- ofm pastor. It seems to be like a priest, some kind of honorary suffix. Is that --

A I, I don't know --

Q Okay.

A -- what the -- what that is.

Q Okay. But --

A I don't know what that reference is.

Q Okay. And he's a pastor of somewhere in the North End which I presume from context that this is a neighborhood or smaller subpart of the City of Boston; is that correct?

A Yes, it's a neighborhood of the City.

Q Okay. So we see that once again happened at Wednesday at 8:33 AM. And as we've been over multiple times, the meetings are on Wednesday. So this appears to be what I would call a last-minute email example.

A Again, you're -- you are taking this out of context. Yuleidy was the staff director. Michael is a staffer for Senator -- excuse me, for Councilor Edwards. He is letting Yuleidy know who is giving the invocation. This was also during when we were on Zoom.

Q Mm-hmm.

A So we were having staffers coordinate who was going to be let into -- as a, as a pa -- as a panelist. So Mike is letting Yuleidy know that this person is giving the invocation. It doesn't necessarily mean it was last-minute. It's just that this is the day of the meeting.

Q Mm-hmm.

A So Michael is letting Yuleidy know.

Q Okay. So --

A So it's -- I do not think that we can say that it's last-minute.

Q Well, not on the strength of this email alone. I'd probably need to go talk to someone. So is

Yuleidy still at the City.

A Not with the City Council.

Q Is she anywhere in the City?

A Yes.

Q Okay. What does she do with the City? Sorry. I'm assuming genders. What is the preferred gender denomination?

A I believe she prefers she/her.

Q Okay.

A I'm not sure of her exact title. I know she's in the property management division.

Q Do you know Yuleidy's last name?

A Yes.

Q What's --

A Valdez, V-a-l-d-e-z.

Q Okay. And who is this Michael Bonetti? I see a long string of texts but --

A Michael Bonetti used to work for Councilor Edwards.

Q Okay. So he is a staff member of Edwards?

A Yes.

Q Okay. Let's scroll up to see -- slowly to see if we can see if there's anything of any recognizable relevance. No. No. No.

Okay. On Wednesday, June 10, Yuleidy -- well, now I'm confused. "Would you forward the link to him. Already did. Thanks! I will be using my zoom to log him in. Okay. You are simply AWESOME!"

Does it -- in the norms of your organization is it normal to inform someone that is simply awesome in all caps with an exclamation mark about just a -- what appears to be a simple notice that this is who we're, you know, gonna have at the meeting, you know, and here's, here's the means by which to get to the meeting?

A I would say it's normal to thank people.

Q Well, sure, but simply awesome is kind of a, kind of an emphatic thanks. Would you not agree with that?

A I would agree with that.

Q And we see that she said simply awesome. You see this, correct?

A Yes.

Q And you're telling me that it's normal in the Boston culture to -- that this is normal to call someone simply awesome for simply providing the Zoom meeting information. This is normal?

A I would say that's not normal.

Q Oh, what's abnormal about it?
A I would, I would say that a simply -- a simple thank you would suffice, but perhaps this is how Yuleidy communicates.
Q I should probably talk to Yuleidy about that.
A Sure.
Q Let's scroll up to see if there's anything else of relevance. Scrolling up. Scrolling up.
All of these people, I mean that's not inconsistent with the rest of these communications. They appear to be -- there's a lot more exclamation marks than I see in, in my business, that's for sure, but I'm not mad about that one in the slightest. I like people thanking people. That's nice.
MR. KEZHAYA: So this appears to be the exhaustion of use on here. So we're at Exhibit 5, once again, 2733. I'm gonna call this the simply awesome email. Awesome being in caps, of course, exclamation mark.
All right. Let's go on to number next one. Scrolling to the bottom, 2723 to 2726. Let's begin with the bottom most, please, so that we see a proper chronological order. What did we say, 23 to 26? To 26.

(Exhibit 6 was introduced.)

Q Okay. This email correspondence begins -- it's a series of emails that begins on June 17, 2020 from, once again, Michael Bonetti to -- madam witness, does Kerry Jordan ring any bells?

A Yes.

Q Who is that?

A Kerry was my former coworker. He was the technology manager.

Q Okay.

A For the City Council.

Q And please refresh my memory. At the time who was Yuleidy? What was she doing in the organization?

A The staff director for the City Council.

Q Okay. For, for all of the City Council or any particular person?

A For central staff.

Q Okay. So basically central staff is talking about logging in Fr. Scrima?

A Central staff is not talk -- well, Michael Bonetti, --

Q Mm-hmm.

A -- who Councilor Edwards was inviting this

person, is emailing Kerry because he is the individual -- at this time the -- all the City Council meetings were on Zoom because of the pandemic. So Michael is emailing Kerry and Yuleidy the name so they know to let this person in.

Q Okay.

A For the meeting.

Q Okay.

A That's the context of this.

Q Yeah, that's, that's what begins our discussion with whatever's going on with these documents.

MR. KEZHAYA: So let's scroll up ever so slightly just to the next email enough to see the body, the who and the when. Okay. That's good.

Q September 15, 2020 at 6:54 AM someone writes?

A Good morning Yuleidy, Pastor Alcevedo from Lion de Judas will be joining us to pray over the council. I've cc'd him here. He just needs the Zoom link and details. Thank you again Pastor Alcevedo. Zoom you tomorrow. Julia.

MR. KEZHAYA: Okay. Once again, we are at what I'll probably describe as an impasse as to whether this is a last-minute email or just an -- a

scheduling email. No problem, we'll skip over the impasse.

Scrolling up slightly. Please -- let's see here. Zoom link. Don't care. Skip. I have no idea what this is. Scrolling up. Scrolling up. Okay. Let's pause here.

Q June 24 at 8:05 someone writes. Please.

A This is from Councilor Bok. Dear Yuleidy, Connecting you here with the Reverend Paige Fisher, who is going to do our opening prayer today. If you could get her the Zoom link and all that she needs to get connected, that would be great. Thanks, Kenzi.

Q Is that the same thing we just read? Scroll down again. I don't remember.

A I don't think so. No, the other one was from Julia.

Q Huh, that's odd. So September 15. September 15. June 24. Can you make any sense of this?

A It's just -- it's councilors emailing Yuleidy with the name.

Q Okay. So this is basically just internal communication as to who and when invitations are happening from the -- from at least the City's

perspective?

A They're on the -- they're on Wednesdays. So they -- those are the dates of the Council meeting.

Q Correct. Yeah.

A So it looks like Councilor Bok is giving Yuleidy the person's name so that she can give them the Zoom link and make sure that they're in the Zoom meeting.

Q Perfectly understood.

MR. KEZHAYA: Let's scroll up some more. It's basically the same thing again. Let's scroll up. Okay. Just scrolling. We're just skimming at this point. This all seems to be pretty much the same thing.

I'm confused as to why there's one PDF -- oh, I get it. I sent RFPs, and I just got basically a document dump. These are probably just what my people said these are things I should look at, and I'm looking at them for the first time with you. So let's scroll up, scroll up.

Okay. What is this again? This is 6, 2723 to 2726. Miscellaneous ...

Q Madam witness, how would you describe this, this PDF? I can't think of a designation.

A Emails regarding invocation Zoom links.

Q Re Zoom. Sorry. Zoom -- what -- how did you -- prior to saying Zoom links, you said emails regarding ...

A Invocation names for Zoom links.

Q Invocation links.

A And, and I don't know if you want to indicate that they're internal.

Q Yeah. Yeah, I like that. Internal -- miscellaneous internal emails about invocation Zoom links. Great.

MR. KEZHAYA: Number next one, please. Oh, wait. For benefit of a clear record, we just finished looking at Exhibit 6 that begins Bates stamps 2723 to 26. So designated. Let's move on.

MS. O'CONNOR: Could we take a quick restroom break?

MR. KEZHAYA: Yes. Yes. Absolutely.

MS. O'CONNOR: Thank you.

THE VIDEOGRAPHER: Okay. The time is 1:27. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 1:38.

(Exhibit 7 was introduced.)

BY MR. KEZHAYA:

Q Okay. I apparently neglected to take note of something else that was important on Defendant's 2320 which we had an undesignated number 3. I now see why this was brought to my attention. Let's scroll up ever so slightly to something about honoree. There it is, honoree.

What, City of Boston, does honoree mean in whatever this kind of document is that we're looking at?

A I believe that document is -- refers to the Black History Month event. So honoree, each councilor was picking a black member from their community to honor at the event.

Q Okay. And how do you know -- well, first of all, is this name -- how, how did you come to that conclusion? Help me, help me draw the dots between honoree --

A Because I knew about the event because I was working at the City Council in my same job --

Q Oh.

A -- at the time. So I knew about the event, and I knew the councilors were picking people to

recognize at the event.

Q Basically you remember?

A Yes.

Q Okay. Cool. No longer care about this one.

MR. KEZHAYA: Let's skip to number next one which is after 2723 to 26. Oh, I'm sorry. Are there -- are there more things that we should care about on here? I think we're looking for ... 2723 to 26 was the preceding one.

MS. KING: Okay. So next one here?

MR. KEZHAYA: Yeah, number next one.

Okay. We're looking at ... Bates number all the way at the bottom, please. That's a signature page. Let's scroll up. Scroll up. Scroll up. Scroll up. 2729 all the way. Could we zoom in so madam witness can read the body here, also me?

Q Let's see here. This appears to be a June 10, 2020 email from one Michael Bonetti with whom we are adequately familiar. Have we already gone through this? This looks familiar.

MS. O'CONNOR: Yes.

THE WITNESS: It does look familiar.

MR. KEZHAYA: Yeah. I'm pretty sure this is the same thing. We're going to skip -- wait.

Wait. Let's go all the way to the top. Maybe there's something that I missed.

Q How about this one, Tuesday, June 16: Hi Michael, Would you have some invocation tomorrow. I don't remember if I informed you or the councilor. Apologize if I didn't.

And as I recall, Yuleidy is the staff -- the central staff chief. Basically Yuleidy -- it seems to me that Yuleidy administers support staff for all of the councilors. Is that ...

A Yes.

Q Okay. Support staff head talks to guy for councilor. "Would you have some for invocation tomorrow?" I deduce under the circumstances that some more adequately or more appropriately means someone for an invocation tomorrow. Is that consistent with your reading?

A Yes.

MR. KEZHAYA: Okay. And once again, that was June 16, 2020. So number 7, once again, please, someone, remind me what my Bates stamps are, very bottom. 2729. And I'm going to call this just another scheduling email.

Q Okay. And scrolling back at the top, the,

the notice was issued on June -- well, the inquiry was made on June 16 which Google helpfully tells us is Tuesday and at 1:24.

What time do the councilor meetings happen again?

A They happen at Wednesdays -- on Wednesdays at noon.

Q At noon. So this is basically about a day beforehand. And the, the agenda items actually don't get cemented in til Tuesday. So this doesn't seem unusual in terms of timing.

A The agenda items are completed on Monday afternoon. The agenda is released on Monday afternoon. The invocations are not part of the agenda.

Q Mmm. Huh. So when is the decision to lock in who's doing the invocation? Like when's the deadline? Surely at some point it's too late.

A Again, that is the councilor invites someone. I imagine councilors have different timeframes.

Q Yeah.

A This email is between Yuleidy and Michael Bonetti. And for context purposes, it was during the time when the City Council was remote because of the pandemic.

And it looks as if Yuleidy is asking Michael for the name so that Yuleidy is able to let the individual into the Zoom meeting. Because you needed to be let into the Zoom meeting because it was for the councilors and they were participating via Zoom.

It was on the City of Boston's website for the public to watch because there is not a common public period for City Council meetings. So that is why -- it appears that Julie was looking for the name so she would have -- so she would know who to let in to the Zoom meeting.

Q I --

A And to give the infor -- and to give the link to that individual.

Q Okay. I understand that's the proposition, but all I see is this text. So where are you getting that extra information that's not in the text?

A Because I know how the process works because I worked there at the time.

Q Okay. So --

A We were all on Zoom. So we all get the Zoom link. And Yuleidy would need to know because she was the one that let people in. Yuleidy Valdez or Kerry Jordan would let people, the councilors, people meaning

staffers and councilors, into the Zoom meeting.

Q Okay. And to be discrete here, the next -- after the question "Would you have someone for an avoca -- an invocation tomorrow?" is followed up with "I don't remember if I informed you or the councilor. Apologize if I didn't."

Why would this person need to inform the recipient of this email or the councilor? What's the inform part tell you?

A I don't know if that's -- I don't know if she meant to put if I asked you or the councilor. I don't, I don't know --

Q Well, I mean --

A -- what she means by that.

Q We're stuck with the text, right. I mean we can't change the text with what we propose this email could mean. We're -- it has to -- this email very clearly requires some kind of an information being transmitted. I, I proffer. Do you disagree with this proffer?

A It looks as if she's asking if they have someone for the invocation. She's asking a question.

Q I understand that. I asked you a yes/no question, but I didn't receive a yes or a no.

A Yes.

Q Okay.

MR. KEZHAYA: Scrolling up slightly. Okay. In case I didn't mention this already, this is -- we just finished talking about No. 7, 2729. Is this 2729; am I mistaken? Scrolling down again to the Bates stamp. Yep, 2729, I described this as another scheduling email dated June 16, Tuesday at 1:24 PM for a Wednesday -- Wednesday at noon meeting.

Okay. Eight, what does our No. 8 look like? Scrolling down to the bottom, this is 2720 -- wait, 2-7-7-1.

Okay. Scrolling up just enough to -- whoa. Whoa. Whoa. The first email, please. Hmm. Well, this is confusing. Let's scroll up ever so slightly. It looks like the first email is offset dated September 15 at 6:54 AM.

Q Madam witness, I believe you already read this email to me.

A Yes.

MR. KEZHAYA: Okay. Skipping 8. Deleting 2771.

(Exhibit 8 was introduced.)

MR. KEZHAYA: All right. Number next

one, we have a December 12, 2020 email. Bates stamp number, please. 2849.

(Exhibit 9 was introduced.)

Q This is an email from an R. Zed to Kim Janey at Boston.gov. A bunch of people are cc'd. Who is Kim Janey at Boston.gov?

A At the time she was City Council President.

Q Okay.

A And also a district councilor.

Q Okay. And so this is December 12, 2020 at 2:26 AM Eastern Time. R. Zed asks to - functionally the Council for our purposes - about the invocation request. States: Dear President Janey, Will you please schedule me to read invocation remotely in the next city council meeting -- sorry, Boston City Council meeting and inform me accordingly. I am a Hindu leader. Thank you. Sincerely, sender.

So it appears that it's not just TST who wants in and is not being invited, to me. Is that consistent with your reading of this email?

A Yes.

Q Okay.

MR. KEZHAYA: And once again, that's 2849 to confirm, please.

MS. KING: Yes.

MR. KEZHAYA: Confirmed as 2849. That's number 8, email dated Decem -- or actually, scheduling request or invitation request is how I'll call it. I'm gonna call this Hindu. Hindu or Hindi? Hindu. Hindu invitation request. Invocation request. And that satisfies my purposes.

So let's move on to the next one. Oh, sorry, number next one, whatever the next PD -- or are we done with PDFs?

MS. KING: Let's see. Yeah, that's the last one.

MR. KEZHAYA: Okay. That's the last one Nick found, but there's another one that's more important to me. So we're gonna take another break while I find it.

MS. KING: Very good.

THE VIDEOGRAPHER: Okay. The time is 1:49. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We're back on the record. The time is 2:45.

BY MR. KEZHAYA:

Q Okay. Due to technological errors, I have an

email dated October 19, 2017 that I can't put up on the projector. We will fix this later. The Bates stamp number is 2890. This comes from 2890. Once again, it's not going to be up there. It's on my tablet. You guys gotta come huddle in and take a look at it. I will zoom in. Everyone come see.

This is an email from Alana Olsen, for benefit of the record, dated Thursday, October 19, 2017 to ... madam witness, could you please state the person's name here?

A To Annissa Essaibi-George.

Q Okay. And who is that in the City?

A She was a former At-large City Councilor.

Q Okay. And as of October 19, 2017 was that her position?

A Yes.

Q Okay. Recently Mayor Wu had a -- an opponent who I believe is the same person. Is this the mayoral candidate opponent against Mayor Wu?

A Yes.

Q Okay. Great.

Please read, for benefit of the record, in full this, this paragraph here, the body.

A It is absurd that this group feels entitled

to being invited to give remarks at the beginning of the Council Meeting, and frankly its insulting to all of the amazing religious and secular leaders who are invited. They are invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery. I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work with for the Satanic Temple. The City Council does important, serious work for the people of Boston and when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation.

THE REPORTER: Excuse me. I'm sorry.

MR. KEZHAYA: Oh, I'm so sorry.

THE REPORTER: I'm having a technical issue can I just have a ...

MR. KEZHAYA: Yeah, of course. Let's take a break.

THE VIDEOGRAPHER: The time is 2:47. We're off the record.

(Pause.)

THE VIDEOGRAPHER: Okay. We are back on

the record. The time is 2:48.

BY MR. KEZHAYA:

Q Okay. Due to technological issues, we are -- we are back on the record. I'm gonna take over with some expository background and then follow up with a question.

So I take note, please, - everyone else also take note - that the bottom of the screenshot states in bold: Please remember, this is a City of Boston email account, and the content is a matter of public record. Alana Olsen being the chief of staff for Mayor Wu's former opponent.

I know nothing more about this email which is why I called for the 30(b)(6) deposition about all discovery because I figured stuff like this would probably be in here.

So, City of Boston, is it true that your position or at least your employee's position finds it absurd that TST would demand legally an invitation?

A It looks as if --

MS. O'CONNOR: Objection. You may answer.

A It looks as if that's the statement that was prepared.

Q Okay. And it appears to be a matter of public record and contemporaneously so that Mayor Wu's former political opponent found it to be a matter that "I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work for -- or work with for the Satanic Temple."

That is the text of the email. Do you agree with me that that's the text of the email?

MS. O'CONNOR: Matt, I'm sorry, are you reading -- this is an email to Annissa Essaibi-George or from Annissa Essaibi-George?

MR. KEZHAYA: This is from Alana, the chief of staff, to Annissa.

MS. O'CONNOR: Okay. So that's not --

MR. KEZHAYA: For Annissa.

MS. O'CONNOR: Those aren't -- just because I can't see the email, those aren't Annissa Essaibi-George's words; those are the emailer's words?

MR. KEZHAYA: No. No. This is her words by her person on her behalf. That's what we're looking at right now. Again, basic agency principals flow up to her which in turn flow up to the city body public.

Q So I'm very confused by this email because it

seems to me as if it's exclusionary which is why, City of Boston, I inquire in to you as to your employee whether you think as well that your employee appears to be something giving up an opportunity for someone good so that they have to give someone an opportunity to TST. Would you agree with me this is your employee's statement?

MS. O'CONNOR: Objection. So this is the same type of objection as before, that she can't speak to whatever this person's state of mind is in this email.

MR. KEZHAYA: Oh, so I should talk to Annissa then. That's who I should talk to in a deposition --

MS. O'CONNOR: You should talk to someone other than Christine O'Donnell, correct.

MR. KEZHAYA: Okay, cool. We will depose her personally unless you object right now because it seems to me that before when I sought to take Mayor Wu's individual testimony for the purpose of talking about that there video, you know, it was a whole thing. So I'm, I'm confused as to what's going on here. You're blocking me with Michelle Wu. You're blocking me with her. Are you gonna block me with

Michelle Wu again?

MS. O'CONNOR: I'm -- I don't agree with the characterization that you just provided, but Christine is not here to testify about what other people's opinions are or the actions that they took on a specific occasion.

MR. KEZHAYA: That's true.

BY MR. KEZHAYA:

Q City of Boston, I would like to depose your former employee about this matter. Do you have an objection about this?

MS. O'CONNOR: Well, I will make objections(verbatim) as to who is or is not deposed. And if we get a deposition subpoena, we'll cross that bridge when we get to it. But I'm not making a, a statement on the record now as to what the City will or will not do in response to a deposition subpoena that's properly noticed.

MR. KEZHAYA: I see. Very good. Okay. Well, then we're at an impasse because I called a 30(b)(6) deposition for all things discovery-related and this witness cannot speak to it and you are also not providing me a different witness today who can speak to it. And you're also not agreeing that I can

depose a person. So how do you propose that we resolve this issue?

MS. O'CONNOR: This, to me, is not responsive to any 30(b)(6) topic for which Christine O'Donnell is identified.

MR. KEZHAYA: Really, it's not within the 30(b)(6) designation? That is your, Nicole O'Connor's for and on behalf of the City of Boston's position on this matter, correct?

MS. O'CONNOR: If you want to point out to me which paragraph you think it's responsive to, I'm happy to take a look.

MR. KEZHAYA: I would be very happy to. Very, very happy to indeed. Paragraph 30, any documents provided by the City to TST in discovery, very end, page 9, right above the signature.

MS. O'CONNOR: To the extent that you want to ask about what the intent was of the document, to me that's a totally different request. So I think we have a different understanding of what this means. This is -- she has testified about what this document is, but as far as what the person's intent was who sent it, that's a totally different question.

MR. KEZHAYA: Mm-hmm. And so where in

30 does it eliminate intent from any?

MS. O'CONNOR: I mean we're not having a discussion about the semantics. That's never how I interpreted it. We have a disagreement then about what is within the scope of a 30(b)(6) depo.

MR. KEZHAYA: Ah, okay. That's fine. Let's start over from the top and see if I missed anything else of importance.

BY MR. KEZHAYA:

Q Okay. On to phase 2 of the deposition. We've covered your identity. We've covered your scope. We've covered your agency. We've covered that you don't have any other relationships. Grounds for your testimony, we covered that. What investigation you did, covered that. This sounds good.

Madam -- madam witness, did the City have you investigate Mayor Wu's former political opponent on any of the discovery that it provided, namely, this email that we just looked at?

A I looked at the emails that were produced. I don't specifically recall this one. There was -- there was numerous pages.

Q That's fine.

MR. KEZHAYA: Could we put up the next,

the next email, the number next one?

MS. O'CONNOR: I do just want to put on the record that we had a discussion about this during our call about the deposition, and you agreed that you would provide any emails that you had particular concerns about or --

MR. KEZHAYA: Yeah, I forgot that.

MS. O'CONNOR: Well, I'm -- well, that's a -- that's, that's part of the problem here. And I just want to put this on the record, that you said that you would pull certain emails that you intended to inquire of the witness about, and I would make sure that she was prepared on those emails. We never received from you the emails that you were intending to inquire about. So to now suggest that she's not prepared or she -- you know, is, is not appropriate given our past discussions.

MR. KEZHAYA: Okay. So I want to be abundantly clear here. My understanding from the City's attorney, for and on behalf of the City's attorney's behalf is that it provided these, the City, which is to say it, it, the City, received requests, document requests from me about a religious discrimination case, produced emails one of which

appears to be a smoking gun of religious discrimination, received a 30(b)(6) notice saying I want to ask about everything that you've been given -- you have given to me with -- and the City did not think to have the witness look at the smoking gun email?

MS. O'CONNOR: So when we spoke, as you recognize, the federal rules require us to confer prior to a 30(b)(6) deposition to make sure we're all on the same page. I flagged this concern that there were so many emails I couldn't possibly prepare her on all of them, and you agreed to provide me, two weeks in advance of the deposition, with the emails that you intended to inquire about.

MR. KEZHAYA: I see.

MS. O'CONNOR: You didn't do that so she's not prepared to testify about this particular email further than what she already has.

MR. KEZHAYA: I see. Okay. Well, let's take a look at the next one, and we'll all see it together. Scrolling all the way to the bottom -- well, actually, scroll all the way to the bottom, please.

And by the way, the last one was number 9, 2890. I call it the absurd email. Number 10, this is number 3374. Let's see here. Scrolling up.

Scrolling up. Scrolling up. Scrolling up a little bit more. Continuing. Continuing. Okay. Little bit more because we need to be able to see who sent it. There we go.

(Exhibit 10 was introduced.)

Q Okay. This is 3373, I apologize, to 3374. On February 14, 2019, which I take note is during the course of this litigation, Molly Jacobson at Jacobson Strategy emails to someone at Boston Herald a forwarded message stating: Hi Meghan -- again, with Boston Herald which I presume everyone takes note is a publication of general circulation in Boston; is that correct?

A Yes.

Q Thank you.

So Boston Herald takes note that -- from Meghan: Please let me know if I can schedule an interview with The Satanic Temple regarding this breaking news. Breaking news is the characterization of importance. Thanks! Details unnecessary.

MR. KEZHAYA: Scrolling down, we're just looking for the word "absurd". Ah, there it is.

Q On 3374, line one, two, three, four, the sentence begins -- preceding sentence, line 3, that is

to say, the sentence begins midway through: The City Council maintains that this practice is nondiscriminatory, a claim that TST views as absurd.

So we receive your statement that it's absurd. We respond in kind that your position is absurd. I feel like we're at an impasse here. Is that fair to say, City of Boston witness?

A Yes.

Q Okay.

MR. KEZHAYA: So scrolling up a little bit more. Okay. Pausing here.

Q Boston Herald then on February 14, 2019, which again I take note is during the pendency of this dispute, Subject: Story running tomorrow about claim against City Council, to someone at Boston.gov.

Madam witness, who is this Boston.gov person, if you know?

A At the time David Viterinni was chief of staff to at the time Councilor Wu.

Q Councilor Wu. Councilor Wu's person received notice that TST, generally speaking, takes issue with not getting an invite as of at least 2019. Is that a correct understanding of this document here?

A Yes.

Q Now, madam witness, we've talked about Councilor Wu before. On or around 2017 things changed where people stopped giving or stopped receiving money for and in consideration of providing the blessing to the City. The importance being 2017. Is that a correct recollection of mine about your prior testimony?

A Yes.

Q Did you take note of the timing of the email that we took note of earlier?

A No.

Q Okay. Let's --

MR. KEZHAYA: Suffice it to say, 2017 everyone agree that they remember it? Otherwise, we can see it again. Any objections?

MS. O'CONNOR: It's up to Christine.

Q Madam witness, do you recall that it was 2017?

A That the council stopped paying?

Q Well, no, more particularly that Mayor Wu's --

A Oh, that TST reached out?

Q No. No. No. The prior, the prior exhibit that we looked at, this email dated, let's see here,

October 19 - it's not up there; it's on my thing - October 19, 2017. Everyone can see. Madam witness in particular.

A Oh, yes. Yes.

Q Yes, right here.

A I couldn't remember the date.

Q Yeah, of course not. It's a date. Who would remember that.

So it seems to me that there's a very heavy cluster of activity in and around the City which I'm being precluded from talking about with you. Who do you think would be the best person for me to talk to to shed light on what happened that the money stopped changing hands and also that your other employees stated that they would not give up the opportunity to highlight one of these amazing leaders to work -- "who I am privileged to work with" for The Satanic Temple?

That's the end of the sentence, but I take the implication that they are not privileged to work with The Satanic Temple and also The Satanic Temple is not amazing nor are they leaders in the public.

MS. O'CONNOR: Objection. You can answer.

A The payment issue, that was Councilor Wu when

she was President Wu.

Q Okay.

A Again, around 2016/2017.

Q Okay.

A And any other questions about the intent of the councilors would be for the councilors themselves.

Q I agree.

Is it normal for a chief of staff inside the organization to have made press release-like statements?

A It depends on the councilor, but it's -- it is normal, generally normal.

Q Okay. All I have is bookending quotes, you know, beginning this email and ending this email.

Did you in the course of your investigation run into anything that could shed light documentary-wise, like in terms of literally physical documents that I could look at or, you know, electronic data consisting of the same, within the City that could help me understand, without talking to Mayor Wu's former political opponent, why she found it to be absurd for TST to insist on this invitation?

A No.

Q So I really have to talk to her?

A Yes.

Q Okay. Same for Wu, you're the best person to have talked about it, and you can't talk about it so I really have to talk to Wu, right?

A Yes.

MR. KEZHAYA: Let's see. Let's scroll up to see if there's anything of interest here. Scroll up. Scroll up. Huh.

Q Okay. So I see then that press request for invita -- oh, I'm sorry. I don't think we ever covered this. So going back to the next one, this email dated February 14 from Boston Herald to Boston.gov which, madam witness, could you please remind me who this guy is?

A At the time chief of staff for Councilor Wu.

Q Okay. So Boston Herald asks Councilor Wu about this present dispute wherein it gets forwarded up to Elizabeth Pimentel. Is that a correct ...

A Pimentel, yeah.

Q Pimentel I apologize. Who is that?

A She was the chief of staff for Councilor Campbell.

Q And --

A And at that time Councilor Campbell was --

no, no, at that time she was just council -- Councilor Campbell.

Q Okay. I remember --

A I can't recall. No, excuse me. Sorry. She was Council President in 2019.

Q I seem to remember seeing an email ... ah, here we go. So Exhibit 1 to the First Amended Complaint, this is doc 16-1, also known here apparently as ECF 16-1, another email.

MR. KEZHAYA: For benefit of counsel, I'm showing them on my tablet because it's faster.

Q So this is -- my understanding of the email that TST sent -- oh, there we go, to Andrea Campbell on October 2, 2018. That's my understanding, but I didn't receive it from the City.

Does the City dispute that on or around October 2, 2018, The Satanic Temple sent an email to Andrea Campbell at Boston.gov with cc to Michelle Wu at Boston.gov requesting essentially an invitation? Is that a subject of dispute?

A No.

Q Okay. The details of the email I don't care about, and I don't want to waste your time with.

Okay. Let's just make sure I don't miss

anything at all. We're back on the 30(b)(6) matters of exam -- matters for examination. It's not up there. I'm gesturing generally. So, madam witness, if you could take a look with me while we go through it.

Okay. One, we've dealt with. Two, what have we got here? Both as a general matter. Okay. I feel like I've have kinda covered this.

Ah, this text -- oh, no, never mind that's just ... okay.

I've seen this policy written down somewhere. I don't recall. Have you seen the policy written down anywhere? I say policy. I'm using your words. Custom is the word I would use.

A I have not.

Q Okay. All right. And to be a little bit more precise, I remember seeing it in an email from Michelle Wu to TST essentially stating the position that we don't have to give you an invite if we don't want to. Is that a fair recitation of the email?

A Yes.

Q Okay. Let's see here. So background on ceremony. When it first arose. Covered it.

Legal chal -- has anyone challenged this before, this, this custom legally?

A No.

Q Okay. Covered it. Sorry for getting ... Okay. Okay. Okay. Very good. Surrounding payment, covered that.

Record keeping policies, I don't remember if we addressed that. You said they hold, they hold it seven years, and it goes to treasury department; is that correct?

A For payments.

Q For payments specifically. I don't really care about the rest of it.

Okay. City's recordkeeping policies surrounding written communications sent or received by ... Okay. Recordkeeping policies, have you all given me anything or everything? Has anything mysteriously gone missing, things of that nature?

A No.

Q No? Cool.

Intra-City written communications up to the date of the original, okay. So here's paragraph 6 where I also I felt adequately specified that it's an intra-City written communication about TST's invocation demand. Apparently that was unclear. I apologize for wasting your time once again, madam witness.

Seven: Dates, time, attendees, subjects of discussion, ah, those are agendas. I can get those later.

Subjective bases, that's a Wu question.

General information about any individuals or groups who have demanded participation. Okay. Number 9, we saw the Hindu leader Raj Zed, if memory serves, Mr. Zed. Has anyone else other than TST -- well, let me, let me strike that and start over.

Other than TST and Mr. Zed has anyone else, to the best of your knowledge, requested an invitation?

A No.

Q Okay. They always only receive the invitation?

A Yes.

Q They never have any discussions off the record or anything like that you're aware of at least because the City doesn't keep contemporaneous records of the fact that discussions may or may not be happening between councilors and, you know, potential officiants?

A Correct.

Q Okay. Subjective bases for why each Councilor did or did not heed the demand described in

9. That's a Wu question. 11 --

Well, actually correct me if I'm wrong, madam witness. Would you agree with me this paragraph 10, the subjective bases for why each Councilor did or did not heed the demand described in paragraph 9 from January 1, 2011 to the present, would minimally address Michelle Wu and also Michelle Wu's former political opponent?

A Yes.

Q Okay. 11, identifying information. Eh, I don't care about that. Twelve, same thing. Thirteen.

Have you been over these? I've forgotten these since I've sent them.

A I have been, but I don't remember all of them.

Q Okay. That's -- yeah, there's a lot of words in here.

A Yeah, I've gone over them.

Q Okay. Any instances in which the City had a vacancy. Okay. So we covered instances in which the City had a vacancy. I feel like it's adequately clear that vacancies happen. There are, you know, needs to fill and then that need for filling it does not usually happen until sometimes at least, of the times that we

saw -- I say usually. Let me back up.

There are probably instances where a need was unmet as of call it the day before the meeting. Do you recall those exhibits?

A I recall them, but I don't agree with the fact that a need was unmet.

Q Okay. What is, what is the subject of the dispute there?

A Because a lot of those documents were internal between staff from different offices where a staffer was asking for information in order to prepare notes for their respective boss, and other documents regarding the names were internal for purposes of sending out the Zoom link.

Q Okay.

A So from, from those documents alone it is not clear to me that it was the day before when the person given the invocation knew. They could have known a couple of weeks before. They could have known a month before. Those were just internal emails where other individuals were asking for the name so that they could complete their jobs.

MR. KEZHAYA: Okay. I propose rather than deposing each of the individuals and asking them

like one question to issue an interrogatory. Would it suit the organization's purpose that we reduce the number of depositions and instead resolve the questions as to why this need was unmet as of that date - informational need, I apologize - why this informational need was left unmet until such time and more importantly when that informational need is typically filled?

MS. O'CONNOR: I think written discovery would be an excellent tool to get to the answers to these questions.

MR. KEZHAYA: Great. I don't want to play semantics with that. So I propose to write it out right now. Interrogatory number 1 or whatever, interrogatory number next one: For each exhibit made reference -- actually, I can actually identify them discretely. So scheduling emails we've got 5, 4, 6, 7.

Four through 7, I propose to have an interrogatory explicitly state for each of Exhibits 4 through 7 provide, call in, whatever's in that 30(b)(6) deposition notice, I'm going to copy, paste it, and specifically sub-itemize. It might be letters. It might be bullet points. I don't know. We'll figure it out as we go. For now we're going to do A. I don't

feel the need to copy/paste those in handwriting.

Am I going to get a form objection when I send an interrogatory for each of Exhibits 4 through 7, please provide A through whatever discretely copied?

MS. O'CONNOR: I, I don't know --

MR. KEZHAYA: Are these words --

MS. O'CONNOR: -- remember what exhibits your referencing. I can't --

MR. KEZHAYA: That's okay.

MS. O'CONNOR: I can't give you an answer to that without being served with an actual written discovery request, but rather, --

MR. KEZHAYA: Oh.

MS. O'CONNOR: -- I agree with you that rather --

MR. KEZHAYA: Okay.

MS. O'CONNOR: -- than have unnecessary depos, I'd much rather answer interrogatories.

MR. KEZHAYA: Yeah, I -- well, I do too.

MS. O'CONNOR: So I'll work with you to be reasonable about that.

MR. KEZHAYA: Okay. So more particularly, so for each of Exhibits 4 through 7, please identify with particularity as follows: (a) why

was there a vacancy at that time; (b) the date of the meeting in which there was a vacancy for the invocation at that time; and (c) how, if at all, the time slotted for the invocation ceremony. The text ends but I'll fill it off. How, if at all, the time slotted for the invocation ceremony typically gets filled. Like when, when is this normally filled. Is it abnormal that Tuesday right before the -- in my opinion right before the meeting we don't know who's blessing the thing.

MS. O'CONNOR: Those seem like reasonable questions that can be answered.

MR. KEZHAYA: Okay. I agree that they are reasonable questions. I agree that they can be answered. I'm questioning you as to whether there's going to be a form objection with that exact text that I just described.

MS. O'CONNOR: I, I don't know. I, I can't imagine so.

MR. KEZHAYA: I would like you to please waive any opportunity to waive that; otherwise, we're going to have to have another 30(b)(6) depo.

MS. O'CONNOR: I think this is a discussion we can have after the deposition. If you want to have it on the record we can do that.

MR. KEZHAYA: I strongly prefer to have the deposition -- the conversation on the record because you and I took materially different understandings of our last phone call. That's why we're having it here and now.

MS. O'CONNOR: Correct.

MR. KEZHAYA: Yes, correct. So --

MS. O'CONNOR: What do you mean by a form objection? This seems like a waste of everyone's time, but what do you mean by a form objection?

MR. KEZHAYA: A form objection is one to the effect of I don't understand what this interrogatory is asking.

MS. O'CONNOR: No, you're not gonna get an objection like that.

MR. KEZHAYA: Okay. That's a form objection. Great.

BY MR. KEZHAYA:

Q Okay. So number next one, 14, any instances in which the invocation ceremony did not literally implore a supernatural entity to give advice and guidance to the Councilors.

Madam witness, you've been seemingly functionally a part of all of them. You're probably

the best person to talk about these invocation ceremonies. How often do people give benediction for Satan to bless the matter?

A There hasn't been any.

Q Never.

How often do people suggest that Satan as a general concept is bad?

A That hasn't happened.

Q Not ever?

A Not for the invocation.

Q I'm confused. Not for the invocation or ... during the invocation your --

A There hasn't been references that I recall that ...

Q Well, earlier you said not ever. Now you're telling me not that you recall. So now my job task is gonna be to go find each and every instance that someone said something bad about Satan so that I can clip it out and have, I don't know, however long -- how ever many clips we'd need for trial. So are you going to go back on that or are you just gonna agree that sometimes people say bad things about Satan?

MS. O'CONNOR: Objection. You can answer.

A To the best of my knowledge, I haven't heard anyone in the invocation say anything bad about Satan.

Q To the best of your recollection as we speak today?

A Yes.

Q But you reserve the opportunity to change that at trial should hypothetically I go through YouTube, find a whole bunch of instances of people talking bad stuff about Satan, --

A Sure.

Q -- correct? Great.

All right. Fifteen: Any instances in which the invocation ceremony addressed a topic which was not reflected on the agenda, for example, praying for emotional relief from a tragedy.

How often do these blessings entail non-council agenda items?

A Generally they do not, they do not address agenda items.

Q Mmm.

A Sometimes they may speak to issues that are going on in the City.

Q Mm-hmm.

A But all the agenda items have specific docket

numbers, and I do not recall any instance where an invocation referenced a specific document number.

Invocations may, may reference topics in the City, such as violence, homelessness, hunger, things like that, but other than that the invocations do not reference specific items on the agenda.

Q Okay. So I'm sorry. I'm using the word "agenda". You used docket to refer to that. I, I got confused.

A The agenda is made up of dockets.

Q Yeah. Okay. And, and --

A And they're all online. Available online.

Q Yes. Yes. In my parlance docket literally just refers to a court's docket, so I'm not familiar with your words.

Going back to this, so it seems fairly often is a fair response to, I don't know, sometimes people talk about -- actually, pretty much exclusively they don't address specific topics on the agenda was my understanding of your response.

A Correct. Yes.

Q Okay. How often -- expanding somewhat beyond the agenda, how often does this invocation not just bless the event or, or, you know, the proceeding, but

just more generally give blessings? For example, we saw the former -- in the earlier YouTube clip, the priest giving blessings to the, the congre -- or not congregants, the councilors' families.

I asked an unclear question. I apologize.

How often do they bless people or things or ideas outside of the notion of this discrete event?

A They -- I don't know of an exact number because the individuals use different terminology.

Q Sure.

A But the invocations are there to recognize the seriousness of the work.

Q Sure.

A They're done before the councilors begin their proceedings for the day. I do not recall how many times a person giving an invocation has blessed the councilor's family.

Q Okay. Well, at least one is the ... I mean ...

A Sure, we all saw it today.

Q Yeah. So I mean really that's, that's all the number I care about.

Now, going back more discretely to the question, would you take note, would you take note if

you're watching a blessing happen and they happen to bless something that's not the discrete event because to you you're just hearing a blessing? Is that something that would happen?

A I'm not sure I understand.

Q Would you take note -- like, for example, did you take note that this priest or whatever, blessed the councilors' families? Did you take note of that because I took note of that?

A I did not take note of that.

Q Okay. So you don't recall, but it's entirely possible with the information that we have available that it's happened other times as well?

A Yes.

Q Okay. Let's see here. Any instances in which a guest.

Is it the general norm that these blessings generally propose that the council is subservient to some literal supernatural deity?

A That is not the general norm. I know we all saw a video today where the person giving the invocation referred to the councilors as God's servants, but that generally isn't the norm.

Q Okay. As a proportion, how often do they

say, you know, generally bless the event and more particularly these are literally your slaves?

MS. O'CONNOR: Objection. You can answer.

A I can't give an exact number. I am not sure if -- and I -- honestly, I can't even recall if the video we saw today referenced the councilors as slaves. I don't recall any instance where they were referenced as slaves.

Occasionally there may be a reference to the councilors as servants, sheep. However, I do not recall where there's ever been a reference of the councilors doing God's work, where that's the norm for the invocation.

Q Okay. In the -- are you familiar with biblical history and text -- literally the book, the Bible?

A I know what the Bible is. I'm not a scholar on it.

Q Okay. You don't have to be.

You know it wasn't written in English, right? Originally, it was not originally written in English.

A Sure.

Q It, it had to be translated for something for

us to have it in English.
Do you know how many times it was translated?
A I do not.
Q Okay. Do you know when it was originally written?
A I do not.
Q If I told you it was written, give or take, I mean it's about a 200-year period, but call it about up to 200 common era/ -- well, do they call it common era nowadays? You know, within the past 2,000 years it's not been written. So about 2,000 years ago it was, wide margin. Back then they didn't have butlers. You would agree with me, yes?
A Yes.
Q They had slaves, right?
MS. O'CONNOR: Objection. You can answer.
A Yes.
Q Okay. But the Lord's servants to you, City of Boston - not this particular witness - City of Boston, it's not your position that Lord servants is really meaningfully different from Lord slaves or is it?
MS. O'CONNOR: Objection. She can't

offer the City's opinion on that particular question of what the City's impression or use of that phrase is.

Q I will ask you. What is the material distinction between servants and slaves in your parlance?

MS. O'CONNOR: Objection. You can answer as to you individually.

A My understanding, not in a biblical sense, ser -- I'm sure some use the term interchangeably. Servants may be paid in -- during some times. Slaves, it's forced labor.

Q Yes. Yes, it is. I agree that slavery is forced labor. It's subservience. You don't have a choice. That's obsequiousness is the word I would use.

That priest described governmental employees, in my opinion, as Lord's slaves. She used the words "Lord's servants", but it's a reference to a book that says Aramaic words for literally slaves or so I proffer.

As you sit here right now are you in a position to challenge my proffer?

MS. O'CONNOR: Objection.

Q Yes or --

MS. O'CONNOR: She can answer that

question.

MR. KEZHAYA: She can answer yes or no.

MS. O'CONNOR: Can she challenge your proffer? As to what? I, I don't understand your question.

Christine, I don't know if you understand that question.

THE WITNESS: No, I do not.

MR. KEZHAYA: I object to speaking objections.

MS. O'CONNOR: Okay.

MR. KEZHAYA: There shall be no speaking objections or that's gonna be an issue for me.

MS. O'CONNOR: Okay.

MR. KEZHAYA: Okay. No speaking objections. I know we've been doing a little loosey-goosey but no instructing the witness on the record.

MS. O'CONNOR: I'm not instructing the witness. I'm confused by your question. It's a form objection. I can't even make heads or tails of that question.

MR. KEZHAYA: Okay. The form of a form objection is object. Please con -- please answer.

That's the full statement; otherwise, it's a speaking objection which is objectionable and grounds for discovery sanctions.

MS. O'CONNOR: Oh, okay. Christine, answer that question if you can.

Q Please do. Yes or no: Are you in a position to disprove that in Aramaic words 2000 years ago Lord's servants was meaningfully different from Lord's slaves?

A No.

Q Okay.

MR. KEZHAYA: That's a Wu question. 17 is just a Wu question. I'm kinda just skimming through to get us through the end of this. Bases or source of each. Ah, that's a Wu question. Wu question. Wu question. Wu question. Mm-hmm.

Q I take note, number 22, once again specifically identifies any statement -- inclusive of any statements that were written that any councilor has made or either has prepared or has had prepared for them but did not make about Satanism, TST, its membership or its activities.

I take note that you are not prepared to talk about that Mayor Wu's former political opponent email in which she found TST and its viewpoint absurd; is

that correct?

A Yes.

Q Okay.

MR. KEZHAYA: Just once again making very abundantly clear that the witness was unprepared to speak to item number 22.

Q Number 23 --

MS. O'CONNOR: She's prepared to speak about 22.

MR. KEZHAYA: Oh, she is. Fantastic.

Q So what was going on in Mayor Wu's former political opponent's head when she described it as absurd that TST would think it entitled to an invite?

MS. O'CONNOR: So paragraph 22 doesn't ask for the subjective intent of the councilor. It just asks for a statement that any councilor has made and so she has fully answered those questions today about that statement that was put up on the screen.

MR. KEZHAYA: These are matters for examination. I get to ask the who-what-when-where-why.

MS. O'CONNOR: We fundamentally disagree about that.

MR. KEZHAYA: I see. Well, you understand that my next thing is to move for discovery

sanctions.

MS. O'CONNOR: You, you can certainly do that.

BY MR. KEZHAYA:

Q Okay. Going back to the next thing, if I can find it.

Number 23 was just basically let's talk about the invocation. Let me be abundantly clear as to the kinds of questions I want to ask.

24, City demographics, that's a good one. City of Boston, do you keep official statistics of people's religious beliefs or preferences?

A No.

Q Do you feel like it would be appropriate for the City to take note of the public's religious beliefs or preferences?

MS. O'CONNOR: Objection. You can answer.

A No.

Q Okay. Why not?

MS. O'CONNOR: Objection. Again, you can answer. Again, this is outside the scope of the 30(b)(6), but I will give a bit of leeway here.

MR. KEZHAYA: Thank you.

A I'm just not sure if it's relevant for the government's work with regard to trash pickup, public works, parks, things like that.

Q I think we may have had a misunderstanding as to the question and answer.

A Sure.

Q I asked if it would be improper not proper.

A Oh, okay.

Q So I -- as I understand your statement then, I should have asked, to make your statement make sense, would it be proper for the City to do that, and I think that would make your statement make sense; is that correct?

MS. O'CONNOR: Objection. You can answer.

A So you're asking if it's proper if the City of Boston would take ...

Q Yeah, socially proper. Let's start with that.

A If the City took data on the religious demographics?

Q Correct. If the City had a record within its own records that identified here's how many Christians are here in the City. This is the proportion of our

population that identify as Christian at least as of the date of this record.

MS. O'CONNOR: Objection. So I maintain the position that this is outside the scope of the 30(b)(6) topics for which she is designated to testify.

MR. KEZHAYA: So noted.

Q Witness, please answer the question. Would that be right or wrong?

MS. O'CONNOR: No, so I'm instructing my client not to answer the question.

MR. KEZHAYA: Oh, I'm sorry. I misunderstood.

MS. O'CONNOR: It's outside of the scope of the 30(b)(6) topics for which she is identified.

MR. KEZHAYA: And once again, because we have to keep going through this, you, Nicole O'Connor, is speci -- are specifically directing the witness not to answer a why-not question as to follow up on the response to item number 24? I want to make sure I'm abundantly clear about that.

MS. O'CONNOR: Correct. I don't think that falls within the scope of topic of 24.

MR. KEZHAYA: Okay. And you do not assert a privilege objection, correct?

MS. O'CONNOR: There's no privilege.

MR. KEZHAYA: I agree.

BY MR. KEZHAYA:

Q Okay. Twenty-five, relative proportionate share. Well, 25's basically the same thing. It's a spin on the same question. Does the City take note or otherwise record or otherwise even consider the relative proportion of how many people within the City are of any particular religious persuasion?

A No.

Q Okay. So, for example, the City doesn't have anything to compete with my Pew research article I found on the internet that says Christianity is, give or take, a 50 percent populous pursuant to its following practices?

A No.

Q Can we agree that that's probably right?

MS. O'CONNOR: Objection.

Q Do you dispute it?

MS. O'CONNOR: You can answer.

A No.

Q You do not dispute, okay.

A (Shakes head.)

Q Okay. Sum of money the City has ...

Having sat through 11 years worth of meetings, how many of these invocations are Christian?

A I don't have an exact number. There -- the majority Christian but within Christianity there's different sects of religion.

Q Sure.

A There's also been a number of representatives from other types of religion. There's been some laypeople throughout the years.

Q So --

A So I cannot give -- I do not have an exact number or percentage.

Q Okay. So the City will even extend invitations to nonministers of proper religious entities, just any random person of the public who wants to give a prayer?

MS. O'CONNOR: Objection.

Q Correct?

MS. O'CONNOR: You can answer.

A Again, it's by invitation from the City Councilor.

Q Mm-hmm.

A And there have been instances where an individual from an organization that does work within

the community may give the invocation.

MR. KEZHAYA: Okay. Number 27, skip. Skip. Skip. Okay. That's the end of those topics.

Q I posit -- I keep using words like posit and proffer. These are formal legal -- formal logic, I should say, not legal. Law is based on formal discourse which is formal logic, so I kind of use the terms interchangeably. I apologize. Again, I'm bad with words.

A proffer is to make a statement that you posit is true. Something can be either true or false. Opinions cannot be proved true or false. Not because opinions are not true or false, but because the First Amendment says that the government may not punish true or false opinions. That's where we get defamation law from.

So back in the day in common law, defamation was strict liability. You said something bad about someone, well, you better be prepared -- you better be ready to prove it's true. All of that changed in the mid 1960s or so with a bunch of free speech stuff.

I say all of that to say that irrespective as to the impasse on whether, in fact, the City of Boston finds TST's religious viewpoint to be absurd, we see

that at least one member of its governing body found that to be the case. Do you agree with me that we see that that person said that?

A Yes.

Q Okay. How is that not definitionally discrimination?

MS. O'CONNOR: Objection. She can't answer that question. It's not within the scope of the 30(b)(6) topics.

MR. KEZHAYA: We took note earlier at the beginning of these proceedings of the answer in which the City denies that this is religious discrimination. We took note of that. I don't understand how that text is not definitionally discrimination. I need the City's position as to whether the City thinks that is definitionally discrimination, yes or no.

MS. O'CONNOR: And that's not a topic for which she has been designated to testify, so she can't answer that question.

MR. KEZHAYA: I see. So going back then to number 30, am I really to believe that the witness was not informed that the City's position is that it will not extend an invite to TST? They file an answer

providing it to TST. It's a matter of public record. And the City's 30(b)(6) witness is unprepared to speak as to the why not of its legal position. Is that my understanding?

MS. O'CONNOR: This witness cannot testify as to whether something constitutes discrimination or not under the law.

MR. KEZHAYA: I'm not asking the witness's opinion. I'm asking the witness to explain to me how that is not discrimination in the regular sense. I'm not talking legal sense. Literally just it seems to me that a conscious decision was made by a City employee in writing to explicitly state that they intentionally do not invite TST because they find them not amazing and not leaders of the public.

I'm just trying to understand how I lose this case from the City's perspective seeing as how this is my opportunity to speak to the City about its legal positions. That's what depositions are, you see.

MS. O'CONNOR: So same objection. That's not actually a question. Thank you for that explanation. She cannot answer the question about whether this constitutes discrimination. That is not for Christine O'Donnell to answer during this

deposition. And if you -- I don't think it's helpful to have continuous debate about this. If you'd like to add this to your motion, that makes sense.

MR. KEZHAYA: Yes, this is -- I believe we are at a point of impasse. I posit that the point of the impasse is as follows beginning, quote, now, whether the City discriminated against TST by refusing to extend an invitation is not a valid subject for the 30(b)(6) deposition, correct?

MS. O'CONNOR: Correct.

MR. KEZHAYA: And that is the position of Nicole O'Connor, once again, chief -- counsel of record for City of Boston in the course and scope of Nicole O'Connor's employment?

MS. O'CONNOR: And --

MR. KEZHAYA: Correct?

MS. O'CONNOR: -- just so that the record is clear, because it was not a topic for which she is designated to talk about.

MR. KEZHAYA: Great. Okay. And one more just, just to put a bow on it, there is not an assertion of privilege, correct?

MS. O'CONNOR: There is no privilege.

MR. KEZHAYA: I agree. There is no

privilege. I propose to adjourn this meeting.

MS. O'CONNOR: Sounds good.

THE VIDEOGRAPHER: Okay. The time is 3:36. We're off the record.

(Whereupon the deposition was adjourned at 3:36 p.m.)

CERTIFICATE

Commonwealth of Massachusetts

Suffolk, ss.

I, Kristen L. Kelly, Registered Professional Reporter, CSR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that CHRISTINE O'DONNELL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 9th day of September 2022.

CSR No. 115893

My commission expires:

February 3, 2023

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 13, 2022

To: Nicole O'Connor, Esq.

Case Name: The Satanic Temple, Inc. v. City of Boston, MA

Veritext Reference Number: 5406929

Witness: Christine O'Donnell Deposition Date: 8/25/2022

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5406929
CASE NAME: The Satanic Temple, Inc. v. City of Boston, MA
DATE OF DEPOSITION: 8/25/2022
WITNESS' NAME: Christine O'Donnell

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Christine O'Donnell

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5406929
CASE NAME: The Satanic Temple, Inc. v. City of Boston, MA
DATE OF DEPOSITION: 8/25/2022
WITNESS' NAME: Christine O'Donnell

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date Christine O'Donnell

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5406929

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

_______________ ________________________

Date Christine O'Donnell

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**0**

**0002870** 170:11
**02.14.2019** 4:5
**02201** 2:16
**06.16.2020** 3:17 3:21
**09.29.2020** 3:19

**1**

**1** 3:9 8:10 47:9 59:10 96:18,22 170:1 173:12 180:7 225:7 229:6 231:14
**10** 4:5 189:19 193:1 201:18 218:23 219:5 229:3
**10.19.2017** 4:3
**10.19.2020** 3:11
**10102** 1:3 57:3
**11** 4:7 115:1,6 127:15 174:12 229:1,10 250:1
**11.03.2020** 3:15
**1100** 257:1
**115893** 1:18 256:21
**11:13** 109:1
**11:37** 109:4
**12** 178:1 179:17 207:1,10
**12.12.20** 3:23
**12:05** 178:3
**12:10** 177:24
**12:17** 147:16,19
**12:21** 152:5
**12:31** 152:8
**12th** 106:21
**13** 43:24,24 69:8 73:7 77:20 78:2 126:2 129:7 257:4
**13th** 106:21
**14** 219:7 220:12 224:12 234:19
**14th** 106:22
**15** 196:16 197:17 197:18 206:17
**16** 56:12 202:3 202:20 203:2 206:8
**16-1** 225:8,9
**16-2** 56:12 57:3
**17** 195:3 244:11
**172** 19:6
**18** 58:2,2 111:14
**1800s** 70:7,10,15 72:3,7,7
**1820** 257:2
**19** 176:18 209:1 209:8,14 222:1,2
**1909** 73:19,19 74:2,3,18
**1960s** 251:21
**19th** 177:4 179:12 180:18
**1:01** 185:11 187:15
**1:21** 57:3
**1:24** 203:3 206:8
**1:27** 199:21
**1:38** 199:24
**1:49** 208:19
**1st** 173:4

**2**

**2** 3:11 57:2,5,12 96:17,18 176:15 180:7 185:11 216:10 225:14 225:17
**2,000** 241:10,11
**2-7-7-1** 206:12
**2.19.2020** 3:13
**20** 158:14 258:16 259:22 260:22
**200** 241:8,9
**2000** 244:7
**2011** 72:16 125:1 131:20 157:21 158:5,6 229:6
**2012** 159:10
**2012/2013** 158:11
**2015** 131:20
**2016** 57:23 163:2 163:8 164:1,9 165:1 166:7
**2016/2017** 223:3
**2017** 163:2,8 166:11,14 170:13 172:20 173:12 209:1,8 209:14 221:2,5 221:13,18 222:2
**2018** 57:23,24 158:14 164:11 166:7,9 225:14 225:17
**2018/2019** 47:24 48:3
**2019** 180:18 219:7 220:12,22 225:5
**2020** 176:19 177:4 179:12 189:19 195:3 196:16 201:18 202:20 207:1,10
**2021** 111:14 116:17 118:21
**2022** 1:21 116:18 256:17 257:4
**2023** 256:24
**21** 1:3
**21433** 256:20
**216-523-1313** 257:3
**22** 244:16 245:6 245:9,14
**23** 183:24 194:23 245:7 246:7
**2320** 181:22 183:20 200:4
**2322** 181:23 183:20
**2391** 184:1 189:1
**2392** 184:2 189:1
**24** 197:7,18 246:10 248:19 248:22
**25** 1:21 115:2,7
**25's** 249:5
**25th** 31:4
**26** 103:10 104:17 194:23,24 199:15 201:6,9
**27** 251:2

**2720** 206:11
**2723** 194:21 198:22 199:15 201:6,8
**2726** 194:21 198:22
**2729** 201:15 202:22 206:5,6,7
**2733** 189:3,5 194:17
**2734** 189:3
**2771** 206:22
**28-29-30** 27:9
**2849** 207:2,24 208:2
**2870** 170:8,8,11 175:23 180:7
**2890** 209:3,3 218:23
**2:26** 207:11
**2:45** 208:22
**2:47** 210:21
**2:48** 211:1

**3**

**3** 3:13 147:22 149:3 150:5 181:24 183:20 200:5 219:24 256:24
**30** 15:14,17 16:20,22,24 18:9 18:12,16,18,23 19:2,3,4,9,10,17 20:7,10 21:3,16 21:18,24 22:3 23:2,11,15,22 25:5 26:6,21,23 27:19,23 28:17 29:20 31:19 37:23 38:2 39:23 40:2,5,11 40:19,21 41:1,4 41:22 62:10 80:20,22 98:3 102:6 103:10 104:10 115:2,7 122:2,10 135:11 137:7 139:6,8 140:3 141:1,3,5 146:6,16,19 147:6,9,21 150:18 152:16 161:3 167:14 170:12 172:20 175:13 211:14 214:21 215:4,7 215:14 216:1,5 218:2,8 226:1 231:20 233:21 246:23 248:5,14 252:9,22 253:2 254:9
**300** 2:5,5
**30th** 172:24
**3373** 219:6
**3374** 218:24 219:6,23
**34** 189:4
**3434** 176:4,8,16 180:8
**3435** 176:9,10
**3436** 176:5,9,9 176:11
**35** 145:8
**3:00** 188:17
**3:36** 255:4,6

**4**

**4** 3:15 50:8 162:16 184:3 231:17,19 232:3 232:23
**44114** 257:2
**45** 144:20 145:1
**479.431.6112** 2:7
**486** 73:19,22,23 74:1
**4:07** 142:5,6
**4:30** 142:2,5

**5**

**5** 3:17 189:13 194:16 231:17
**50** 249:14
**5406929** 257:7 258:2 259:2 260:2
**55401** 2:6
**5:00** 141:22,22

**6**

**6** 3:19 15:14,17 16:20,22,24 18:9 18:12,16,18,23 19:2,3,4,9,10,17 20:7,10 21:3,16 21:18,24 22:3 23:2,11,15,22 25:5 26:6,21,23 27:19,23 28:17 29:20 31:19 37:23 38:2 39:23 40:2,5,11 40:19,21 41:1,4 41:22 58:6 62:10 80:20,22 98:3 102:6 103:10 104:10 112:16 122:2,10 135:11 137:7 139:6,8 140:3 141:1,3,5 146:6 146:16,19 147:6 147:9,21 150:18 152:16 161:3 167:14 195:1 198:21 199:14 211:14 214:21 215:4,7 216:5 218:2,8 226:1 227:20 231:17 231:20 233:21 246:23 248:5,14 252:9 253:2 254:9
**615** 2:15
**617.635.2902** 2:17
**64** 1:20
**6:49** 144:17
**6:50** 144:15
**6:54** 196:16 206:17

**7**

**7** 3:21 200:1 202:20 206:5 231:17,18,20 232:4,23
**7:00** 142:3 144:12,13,15,15

**7:51** 179:13

**8**

**8** 3:23 58:6 206:10,21,23 208:3
**8.30.2017** 3:9
**8/25/2022** 257:8 258:3 259:3
**84** 73:21
**8:05** 197:7
**8:09** 145:7
**8:33** 189:19 191:3

**9**

**9** 4:3 207:3 215:16 218:23 228:7 229:1,5
**9:32** 1:22 5:4
**9:49** 21:7
**9:53** 21:10
**9th** 57:23 256:17

**a**

**a.m.** 1:22
**abbreviation** 178:16
**abide** 9:19
**ability** 176:23
**able** 204:2 219:3
**abnormal** 123:17,22,24 171:17 194:1 233:7
**absolutely** 43:13 100:5 199:18
**absurd** 209:24 211:19 218:23 219:22 220:3,5,6 223:22 244:24 245:13 251:24
**abundantly** 130:16 137:14 217:19 245:5 246:8 248:20
**accept** 59:1,2 88:20 89:1 101:23 102:3 177:20
**acceptable** 9:17 9:18
**access** 174:18
**accord** 151:9
**account** 211:10
**accurate** 93:6
**accurately** 119:2
**acknowledge** 258:11 259:16
**acquiesced** 151:11
**act** 59:18 172:3 258:14 259:20
**acting** 59:21 60:3 61:4 112:1 112:2,4,13
**action** 99:21 256:14,15
**actions** 5:18 60:10 214:5
**activities** 244:21
**activity** 222:10
**acts** 73:19 74:2
**actual** 96:14 163:3 232:11
**ada** 2:24 5:5,8 56:5 57:7 91:7
**add** 67:23 254:3
**addition** 78:1,4 81:18 83:20
**additional** 26:2 59:20
**address** 9:12 56:18 70:19 177:9 229:6 236:18 237:19 257:15
**addressed** 20:2 75:20 97:10 98:19 102:6 161:17 168:13 227:6 236:13
**addresses** 170:14
**addressing** 9:24 133:3
**adequately** 41:20 150:14 201:19 202:15 227:21 229:21
**adjourn** 255:1
**adjourned** 255:6
**admin** 50:21
**administer** 112:23
**administering** 112:9
**administers** 202:9
**administrative** 50:12
**admit** 121:24 122:4
**adopts** 98:6
**advance** 186:13 218:12
**advanced** 118:3 186:2 187:3
**advice** 145:23,24 234:21
**advise** 45:6
**advising** 47:18
**affixed** 258:15 259:21
**afraid** 176:21
**afternoon** 203:13,13
**agency** 42:22,23 59:16,16,18 60:20 61:1,22 62:8,14,22 63:12 86:21 87:5 89:2 94:2,18 96:10,11 96:17 131:10 161:3 212:21 216:12
**agenda** 75:23 76:1,2,2,15,22 78:20 81:21 82:13,15 180:23 182:11 187:6,6 187:10,17,18 188:12,14,16 203:9,12,13,14 236:14,17,19,24 237:6,8,10,19,23
**agendas** 64:18 76:18 228:2
**agent** 43:1 60:1 61:4,7 63:6,10 87:13,13,15 88:1 89:3,12 131:8

**agent's** 60:20
88:19
**agents** 60:11
63:13,16,20
87:10 88:1,4,16
89:4 98:17,20
**agnosticism** 5:21
**ago** 104:15 156:7
156:8 241:11
244:7
**agree** 17:17
23:24 24:14
25:12 30:10,14
34:9 36:13
40:13 46:24
63:8 97:1 98:24
102:10,11,14
123:18 125:14
140:22 142:16
143:10 161:5
193:14,16 212:7
213:6 214:2
221:14 223:7
229:3 230:5
232:14 233:12
233:13 235:21
241:13 242:12
249:2,17 252:2
254:24
**agreed** 20:4 32:7
32:11 106:20
130:20 157:20
217:4 218:11
**agreeing** 214:24
**agreement** 7:23
**ah** 27:11 35:12
38:18 49:1 58:7
100:18 136:13

141:14 144:14
164:8 173:3
174:16 187:19
216:6 219:22
225:6 226:8
228:2 244:14
**ahead** 103:4
186:13
**aides** 129:15,21
**al** 73:10
**alana** 4:3 209:7
211:11 212:12
**alcevedo** 196:17
196:20
**alderman** 72:8
72:18 73:3,12
**aldermen** 72:19
72:23
**allegations**
17:15
**alleged** 171:23
**alliance** 123:6
**allow** 30:7
169:23
**allowed** 25:13
48:20,22 76:5
141:8
**allows** 48:6
**amanda** 69:12
156:15,21 157:1
157:3
**amazing** 210:3,9
212:5 222:16,21
253:15
**amen** 166:24
**amended** 56:11
56:11 57:3,13
225:7

**amendment** 46:8
46:13,16 47:5
53:16 135:24
251:14
**amicably** 12:12
**amount** 84:11
108:19 115:16
125:22 183:8,10
**amounts** 83:5
**analogies** 89:17
**analogous** 90:7
90:14 92:7
97:11 134:2
**analogy** 92:10
94:4,14 97:13
**andrea** 47:22
48:18 172:12,15
173:12,18
175:16 225:13
225:18
**anecdotes** 85:21
85:23
**anger** 9:1
**angry** 8:24 9:3
34:2,3
**annissa** 4:4
209:11 212:10
212:11,13,15,17
213:13
**answer** 10:15
13:3,20 17:14
23:7,10 24:10
25:16,24 28:10
29:13,22 30:4
31:23 32:1 33:8
36:10 37:11
38:13,15 40:3
42:1 46:21

47:21 48:11
51:22 54:13
59:23 61:24
70:24 71:17,21
72:22 80:17
84:11 86:14
88:13,24 92:16
93:11 95:10,24
96:5 97:1,4,6,13
98:2 99:13
102:14,23
113:24 118:1,7
120:4 133:10
134:11 135:17
137:15,20,23
138:6,10 139:10
139:22,23 140:4
147:6 148:15,16
148:24 149:16
149:21 150:1
151:2,7,16,24
153:2 154:10,11
154:18 165:12
165:15 167:13
169:10 211:22
222:23 232:11
232:18 235:24
240:4 241:17
242:7,24 243:2
243:24 244:5
246:18,22 247:5
247:15 248:7,10
248:18 249:20
250:19 252:8,11
252:20,24
253:22,24
**answer's** 148:5

**answered** 35:21 36:12 61:2,12 71:13 160:15 233:11,14 245:17
**answering** 18:22 19:16 58:20 99:9 121:23 122:5 136:4 138:17 145:20 145:22 146:1 149:15
**answers** 37:10 75:5 140:5,6 231:10
**anymore** 34:20 163:7
**anyone's** 31:22 143:9
**anyway** 132:5 139:18 164:24
**apologize** 58:21 58:21,22 125:2 148:20 152:11 169:5 178:15 190:11 202:6 205:6 219:6 224:20 227:23 231:5 238:5 251:8
**apologized** 152:10
**apparently** 200:3 225:8 227:23
**appear** 182:23 194:11 258:11 259:15
**appeared** 123:16
**appearing** 176:18,18
**appears** 29:15 36:23 57:5 111:20 116:7 171:15 174:6 177:15 179:22 182:1 184:4 191:4 193:8 194:15 201:17 204:9 207:18 212:1 213:3 218:1
**appended** 259:11,18
**applies** 46:17 175:4
**apply** 87:20
**appreciate** 23:11 137:9 150:24
**apprize** 41:20
**apprized** 40:23
**approach** 62:5
**appropriate** 138:1 141:13 217:16 246:14
**appropriately** 84:19 202:15
**approval** 82:5
**approve** 76:13
**approved** 74:14
**approximate** 114:15 159:9 183:7
**approximately** 48:1 126:22 159:6 166:7
**aramaic** 242:18 244:7
**arbitrary** 5:19 5:24
**arcane** 5:12
**arcangeli** 2:14 7:17,17
**archives** 72:11
**arguing** 137:2
**argument** 137:21 176:11
**arkansas** 104:8
**arose** 148:1 226:22
**article** 249:12
**articulated** 101:15
**aside** 80:9 180:2
**asked** 49:1 52:20 55:20 59:1,11 62:10 69:8,13 77:3,5 119:2 125:2 138:8,23 151:4 153:10 154:6,20 155:7 155:11,13,17 205:11,23 238:5 247:7,10
**asking** 13:13 16:8 34:5,18 48:5 49:3,15 50:17 54:11,16 62:15 85:7 87:18 88:9 92:17 93:19,19 94:2 99:12 116:21 118:4,23 130:17,24 133:3 138:4,21,22 139:3 143:23 149:6,14 151:4 153:10,12 160:20 171:8,13 178:2 183:1 187:20 204:1 205:21,22 230:11,21,24 234:13 247:16 253:8,9
**asks** 99:20 207:11 224:16 245:16
**aspect** 161:3
**assert** 122:13 248:24
**asserting** 23:5 26:3 137:14
**assertion** 254:22
**assign** 50:1
**assignment** 258:2 259:2 260:2
**assist** 55:21 79:10
**assistance** 7:5 79:12
**assists** 79:14
**assume** 45:21 57:9 64:4 77:2 178:17
**assuming** 71:8 74:21 192:6
**attached** 56:15 259:7
**attend** 29:21 65:21 66:1 83:8

**attended** 115:3
124:24 160:7
**attendees** 228:1
**attention** 171:21
200:6
**attest** 106:15
**attesting** 121:7,9
121:11
**attorney** 43:21
44:9 46:22,22
62:5,6 217:20
**attorney's** 65:6
217:21
**attribu** 87:1
**attributable**
92:11
**attribute** 93:20
**attribution**
60:20 86:22
94:3,20
**audiovisual** 1:14
**auditing** 68:21
68:22
**august** 1:21 31:4
111:14 116:17
170:12 172:20
172:24 175:13
**author** 19:5
**authority** 5:24
19:13,14 44:5
45:7 59:18
**authorize** 259:11
**authorized**
45:18
**available** 52:18
72:10 76:18,21
237:12 239:12

**ave** 257:1
**avenue** 2:5
**avenues** 138:2
**avoca** 205:3
**avoid** 34:10
101:3 106:9
139:1 165:3
**avoiding** 165:7
165:20,20
**aware** 6:14 88:4
90:13 164:22
228:17
**awesome** 193:4
193:6,13,17,22
194:17,18
**awful** 34:11,13

**b**

**b** 3:7 4:1 15:14
15:17 16:20,22
16:24 18:9,12,16
18:18,23 19:2,3
19:4,9,10,17
20:7,10 21:3,16
21:18,24 22:3
23:2,11,15,22
25:5 26:6,21,23
27:19,23 28:17
29:20 31:19
37:23 38:2
39:23 40:2,5,11
40:19,21 41:1,4
41:22 62:10
80:20,22 98:3
102:6 103:10
104:10 122:2,10
135:11 137:7
139:6,8 140:3

141:1,3,5 146:6
146:16,19 147:6
147:9,21 150:18
152:16 161:3
167:14 211:14
214:21 215:4,7
216:5 218:2,8
226:1 231:20
233:1,21 246:23
248:5,14 252:9
253:2 254:9
**back** 16:17 21:9
31:1,1,2 32:6
38:1 45:3 50:5
52:4 55:22
58:23 59:9,10
68:10,17 70:2,7
70:9,12 71:9
72:7,21 76:24
86:19 94:23
109:3 124:3
132:19 141:22
144:11 147:18
152:7 159:20
166:8 167:2
173:12 175:22
187:14 199:23
202:24 208:21
210:24 211:4
224:11 226:1
230:1 235:21
237:16 238:23
241:12 246:5
251:17 252:21
257:15
**background**
43:10,15 99:14
136:5 147:22

149:4,9 152:19
179:8 211:5
226:21
**backing** 87:4
94:23
**backtrack** 110:6
**bacro** 149:4
**bad** 58:7 172:1
235:7,18,22
236:2,9 251:8,18
**baker** 69:13
157:4,5 158:10
159:4,18
**baker's** 159:24
**banner** 116:4
**based** 35:20,22
38:14 52:23
53:7,8 75:1 76:2
79:8 83:17
95:21 119:18
126:24 131:3
160:8,21 167:13
174:12 182:11
185:8 251:6
**bases** 148:12,14
149:1 150:3,19
150:22 151:12
152:18,21 228:4
228:23 229:4
244:13
**basic** 19:24
145:11 212:21
**basically** 59:12
59:14 70:17
79:2,21 81:8
82:19 84:9
123:5 129:22
152:15 153:19

157:12 163:13 167:18 181:16 195:19 197:22 198:11,17 201:2 202:8 203:8 246:7 249:5
**basics** 135:23
**basis** 148:14 153:2
**bates** 170:8 175:21,23 180:8 181:20,20 183:20,23 199:14 201:12 202:21 206:7 207:1 209:2
**bear** 9:5
**bears** 56:16
**beginning** 32:23 109:22,23 134:9 159:4 181:22 184:1 210:1 223:14 252:11 254:6
**begins** 195:2,3 196:10 199:14 219:24 220:1
**behalf** 60:3 61:5 102:24 103:12 161:21 179:14 212:20 215:8 217:20,21
**beli** 60:13
**belief** 122:9
**beliefs** 92:10 246:12,15
**believe** 52:10,15 52:16 55:22 67:2,18 68:12,19 72:15 94:16 99:22 111:12 123:8 135:11 145:12 158:14 163:2 170:17 192:8 200:12 206:18 209:18 252:22 254:4
**bells** 195:5
**bend** 6:2
**benediction** 235:2
**benefit** 13:15,16 14:10 57:1 66:12 111:4,8 175:20 176:8 180:6 183:19 188:24 199:13 209:8,22 225:10
**best** 11:14 74:24 138:7 148:9 163:17 166:3 176:22 179:19 222:12 224:2 228:11 235:1 236:1,3
**better** 71:16 161:9 168:13 176:24 251:19 251:19
**beyond** 32:18 40:7 237:22
**bhm** 3:13 182:4
**bias** 80:14 81:1
**biased** 38:20
**bible** 240:17,18
**biblical** 240:16 242:8
**big** 66:15 84:1 94:3
**bing** 33:19
**bit** 11:1 16:17 56:17 72:8 86:19 89:7 91:1 110:6 142:1,3 219:1,2 220:11 226:15 246:23
**bizarre** 12:10
**black** 123:4 182:4 200:13,14
**blasphemy** 172:3
**bless** 142:11,13 144:6 146:11 235:3 237:24 238:6 239:2 240:1
**blessed** 238:16 239:7
**blessing** 124:16 124:16 133:1,5,7 133:18 134:6,9 134:18 138:24 139:1,5,18,20,20 140:2,12,13,15 140:16,24 141:20 142:16 143:19 144:22 162:19 186:4,6,7 186:9 221:4 233:9 239:1,3
**blessings** 236:16 238:1,3 239:17
**blissful** 5:15
**block** 213:24
**blocked** 107:1
**blocking** 213:23 213:24
**bma** 123:4
**body** 43:24 49:18,23 51:11 57:16 76:5 78:5 84:15 89:20 90:1,2,11 91:19 91:23 92:1,12 98:21 107:11,14 107:22 108:3,4,5 109:15,15,17 123:6,9 133:6 189:24 196:14 201:16 209:23 212:22 252:1
**bok** 197:8 198:5
**bold** 211:9
**bonetti** 3:17,22 189:19 192:16 192:18 195:4,22 201:18 203:22
**book** 19:3,3,9 38:2 240:16 242:17
**bookend** 166:7
**bookending** 223:13
**booking** 106:10
**books** 72:6,9
**borne** 5:12
**bos** 60:2
**boss** 230:12
**boston** 1:8 2:12 2:16 6:21,22

7:16,18 12:1 14:13 15:10,13 15:20 16:14 17:2,4,12 18:2 22:8,12,15 24:19 24:19 42:20 43:23 46:10,12 57:4 59:13 60:2 67:13,15 72:6,11 73:5 74:4,8,10 74:13,13,14,17 76:14 89:3 90:2 90:10,21 95:18 96:1 98:16 102:5 103:11 105:18 117:18 118:19 140:19 141:9,18 142:12 142:15,22 143:1 143:19 144:6 150:16,19 165:9 166:5 167:11 172:9,9 179:14 179:17 180:21 180:22 182:19 184:14 186:17 190:23 193:21 200:9 207:15 210:12 211:9,17 213:2 214:9 219:9,10,12,16 220:7,12 224:12 224:16 241:20 241:21 246:11 247:17 251:23 254:13 257:6 258:3 259:3

**boston's** 10:13 93:5 98:15 115:22 121:17 145:16 204:6 215:8

**boston.gov** 2:18 2:19 177:8 181:1 207:6 220:16 224:12 225:18,19

**boston.gov.** 207:5 220:15

**bottom** 92:9 170:10 176:4 183:24 189:16 194:21,22 201:13 202:22 206:11 211:8 218:20,21

**bound** 153:16

**bounds** 43:19 45:12,17 48:20 172:2

**bow** 254:21

**break** 6:2 21:8 83:3 92:22 108:20,23 109:2 147:11,17 152:2 152:6 168:5 199:17,22 208:15,20 210:20

**breaking** 219:19 219:19

**bridge** 1:20 12:15 214:15

**bring** 115:20 162:8

**brings** 115:16 184:12

**broadcast** 8:1

**brochure** 4:7

**brought** 8:7 11:18 34:14 39:8 150:16 151:11 200:6

**budd** 2:23

**budget** 129:14

**budgetary** 78:24 82:4

**building** 80:3

**bullet** 231:23

**bunch** 31:22 78:16 176:9 180:21 181:16 207:5 236:8 251:21

**burden** 22:7

**business** 90:3 91:9 161:2 165:15 194:12

**busy** 118:19

**butlers** 241:12

**c**

**c** 2:1 5:1 156:16 156:17 157:10 233:3

**ca** 257:24

**call** 42:6 67:5 80:6 83:23 106:16 107:20 116:10 139:19 141:20 144:20 145:7 151:19 162:4 168:15

175:21,24 176:3 178:2,5 186:4 191:5 193:21 194:17 202:22 208:4,5 217:4 218:23 230:3 231:20 234:4 241:8,9

**called** 1:15 17:8 17:11 64:4 72:24 94:11 139:18 144:21 175:22 211:14 214:20

**calling** 84:3 180:3,8 186:6

**campbell** 47:22 48:18 58:11,18 63:11 172:12,15 173:19 175:16 182:8 185:3,7 188:5 224:22,24 225:2,13,18

**campbell's** 173:20 174:8 181:12 184:24

**candace** 180:19 181:7

**candidate** 209:19

**candles** 5:10

**capa** 53:23

**capacity** 43:22 46:3 65:21 141:12,13

**caps** 193:7 194:18

**caption** 111:6
**care** 42:6 49:13 55:10 58:12 84:17 105:10,24 105:24 118:22 164:24 178:7 181:5 197:4 201:4,7 225:22 227:11 229:11 238:22
**carl** 180:18,18
**carlo.org** 178:22
**carry** 59:20 189:24
**carrying** 121:10
**case** 1:3 12:24 14:7 22:19 36:9 36:11 42:14 46:6 47:5 51:18 51:24 52:16,17 52:20 57:4 59:3 60:1 63:9 126:11 141:10 152:17 183:2 188:4 206:4 217:24 252:2 253:17 257:6 258:3 259:3
**cases** 60:3
**categorizations** 5:19
**category** 66:23 69:3
**catholic** 190:12
**caucus** 19:20,20 20:23,24
**caucusing** 20:23
**cc** 177:2,7 180:14,18 225:18
**cc'd** 180:22 196:19 207:5
**cemented** 203:10
**cen** 129:9
**central** 129:2,4,5 129:6,10,13,23 132:19 181:8 195:18,19,21 202:8
**ceremo** 147:23
**ceremonies** 149:6 235:2
**ceremony** 14:20 147:24 148:4,6 149:5,10 150:5 152:20 226:22 233:4,6 234:20 236:13
**certain** 13:8 16:18 23:13 67:15 89:20 90:19 97:3 101:15 102:5,24 130:13,16 138:18 140:23 161:1 217:11
**certainly** 56:8 100:14 143:15 149:24 151:1 246:2
**certificate** 256:1 259:11
**certification** 258:1 259:1
**certify** 256:7,12
**cetera** 91:11 179:4
**chair** 50:13,14 51:2 112:13
**chairs** 184:22 187:24
**chal** 226:23
**challenge** 242:21 243:3
**challenged** 226:23
**challenges** 148:1
**change** 205:16 236:6 257:13,14 259:8 260:3
**changed** 148:4,6 148:8 221:2 251:20
**changes** 257:12 258:7 259:7,9
**changing** 222:14
**chapter** 73:19,21 73:22
**character** 121:11,13
**characterization** 188:21 214:3 219:19
**characterize** 133:17
**characterizing** 120:12
**charge** 7:7 121:20
**charged** 62:3 160:13 161:1
**charges** 6:21
**charity** 123:7
**charter** 44:4 74:6,8 90:21,23
**check** 182:9
**checking** 173:14 174:13 175:15
**chicken** 132:4
**chief** 157:3,5 173:21 174:8 177:10,12 181:12 202:8 211:11 212:13 220:18 223:8 224:15,21 254:12
**chiefs** 100:16
**choice** 242:14
**christian** 248:1 250:2,4
**christianity** 249:13 250:4
**christians** 247:23
**christine** 1:14 3:3 6:15 14:12 14:16,23 15:9 18:21 21:23 35:11 42:19 56:13,15 57:6 98:2 100:14,14 101:7 102:22 118:1 140:16,19 141:6 142:22 151:18 162:3 167:13,24 168:2 169:2 172:13 173:13,13

213:16 214:4 215:4 221:16 243:6 244:4 253:24 256:8 257:8 258:4,9 259:4,13 260:20
**christine's** 35:14 136:6 140:18,24
**chronological** 194:23
**church** 120:11 120:11,12
**circulated** 171:22
**circulation** 219:12
**circumstances** 202:14
**cite** 46:6,7 75:2 135:11
**cited** 8:21
**citing** 52:16
**city** 1:8 2:12,15 6:21,22 7:6,16 7:18 10:13 12:1 14:13 15:10,13 15:20 16:14 17:2,4,11 18:2 22:7,8,12,15 24:4,5,18,19 26:24 27:1,9,12 27:16,17 29:9 39:13 42:20,23 43:23 46:10 48:23 49:3,5,9 49:17 50:8,11,13 51:2,5,8,12 52:21,22 53:3 54:5 59:13 60:2 62:14 63:12,17 63:20,24 64:2,3 64:16,17,17,23 65:5,15,21 66:7 67:13,15,21,21 68:1,15 69:8 70:5,5,8,16 72:6 72:9,10,11 73:2 73:3,5,7,13,18 74:4,8 75:3 76:2 76:3,14,15,19,23 77:19,23 78:1 79:9,11,12 80:3 80:7 82:5,9 83:14 84:2 89:3 90:21 92:3 93:5 95:18 96:1,10,12 96:17 97:10,17 98:11,16,18 102:4 103:11 107:22 112:16 115:21 118:19 121:17,18 123:11,13 126:4 129:1 130:20 131:4,9 135:1,2 136:20 140:19 141:9,18 142:11 142:15,22 143:1 143:19 144:6 145:16 149:12 149:13 150:1,4 150:16,19 153:10 157:24 158:3 160:23 162:21 164:2,2 164:10 165:9 166:5 167:11 170:14,19 171:3 171:18,22,24 172:8 177:6,21 178:1 179:14,17 181:9,11,13 182:6 183:4 184:14 186:3,11 186:17 188:1 190:23 191:1 192:1,2,3,5 195:11,15,16 196:2 200:9,21 203:23 204:6,8 207:7,15,15 209:12,13 210:5 210:11 211:9,17 212:22 213:1 214:9,16 215:8 215:15 216:16 217:21,22 218:4 220:1,7,15 221:5 222:10 223:19 225:15,16 227:19,22 228:18 229:19 229:21 236:22 237:4 241:19,20 246:10,11,15 247:11,16,20,22 247:24 249:6,8 249:11,24 250:13,20 251:23 252:12 252:16 253:13 253:18 254:7,13 257:6 258:3 259:3
**city's** 39:14 44:4 44:4 67:4,9 68:12 103:6 106:6 131:6 147:23 149:4,10 150:4 152:20 157:11 162:16 174:18 197:24 217:20,20 227:12 242:1,2 252:15,23 253:2 253:17
**citywide** 126:5
**civil** 1:16 16:1 16:10 103:11 258:5 259:5
**cj** 182:7,7,8
**claim** 220:3,14
**clarification** 54:14 107:21
**clarify** 55:18 66:5 88:14
**clarifying** 58:16 94:12
**classify** 49:2 133:11
**clause** 21:17,23 42:21 96:18
**clauses** 23:13
**clean** 183:19
**clear** 6:11 9:1 11:17 13:14 18:21 22:4 36:20 57:1 91:15 130:16 137:14 150:11 150:14 171:24 180:6 185:8

199:13 217:19 229:21 230:17 245:5 246:8 248:20 254:18
**clearly** 47:2 73:11 205:18
**clergy** 70:10,15 121:19 125:18 163:7
**cleveland** 257:2
**client** 42:4 46:22 139:15 248:10
**clip** 235:19 238:2
**clips** 235:20
**cluster** 222:10
**codified** 53:19
**cohesive** 164:1
**coincides** 163:12
**coletta** 3:11 176:19,20 177:5 177:7,9 179:13 180:17
**colleagues** 181:7
**color** 121:3
**coloring** 152:16
**com** 76:23
**come** 51:16 71:8 71:13,17 78:2 80:4 125:19 126:1 127:2,5,14 134:15 135:13 147:1 151:11 171:21 187:10 188:6 200:17 209:5,6
**comes** 47:3 209:3
**comfortable** 38:7
**comforting** 5:16
**coming** 11:20,21 29:9 35:5 61:20 177:22
**commencing** 1:21
**commended** 172:4
**comment** 83:9 83:19
**commission** 256:23 258:19 259:25 260:25
**committee** 44:2 76:23 129:19
**committees** 51:12 82:10 83:15
**common** 69:24 114:10,12 122:18,23 184:15,16,17 204:7 241:9,9 251:17
**commonwealth** 1:19 256:2,7
**communicate** 95:1,3 108:5 171:11
**communicated** 95:7 102:2
**communicates** 194:4
**communicating** 171:1
**communication** 156:3 171:9 197:23 227:22
**communications** 46:23 171:5 181:8 194:10 227:13,19
**community** 171:6 200:14 251:1
**compassion** 210:7
**compel** 38:11,13
**compete** 249:12
**complaint** 13:3 13:20 17:13,14 56:7,11,16 57:3 57:13 111:15 125:12 151:10 157:22 225:8
**complete** 131:18 131:24 132:2 230:22
**completed** 203:12 257:15
**compliance** 14:12 15:9 42:19 63:2
**comprehensive** 130:4
**comprised** 24:5 49:5 89:21,21
**con** 243:24
**concept** 61:22 94:19 134:2 235:7
**concepts** 60:22
**concern** 81:2 218:9
**concerning** 103:13
**concerns** 217:6
**conclusion** 139:24 200:18
**concrete** 5:18
**conduct** 166:1
**confer** 218:7
**confirm** 68:1 184:19 207:24
**confirmed** 208:2
**confused** 56:17 58:17 97:16 139:8 143:23 149:19 164:10 193:2 198:15 212:24 213:22 235:11 237:9 243:20
**confusing** 206:15
**confusion** 31:11 100:22 101:3 141:17
**confusion's** 30:19
**congre** 238:3
**congregants** 13:16,18,24 16:19 91:21 92:10 102:17 169:7 238:4
**connected** 197:12
**connecting** 197:9

**conscious**
253:12
**consent** 103:12
**consider** 53:24
114:3 249:7
**consideration**
221:4
**considered**
163:17
**considering** 37:1
**consistency**
14:19
**consistent** 7:2
113:12 184:7
202:16 207:20
**consistently**
35:22
**consisting**
223:19
**constituent** 78:6
78:8,13,14 79:6
79:7,9 81:7,11
84:2
**constituents**
51:9 53:11 78:6
79:11,11 80:10
84:16,17 93:20
95:22 110:16
154:22
**constitutes**
140:24 253:6,23
**consult** 33:4
**consulting** 10:6
34:7
**contact** 79:20
**contemporane...**
228:18

**contemporane...**
212:2
**content** 211:10
**contention** 12:2
12:3,8,17 33:14
33:15
**contentious**
185:9
**context** 20:7
25:5 41:1 43:6
43:11 45:5
59:17 149:13
174:3 182:20
190:22 191:7
196:9 203:22
**continue** 36:24
113:17 116:1
120:7,16 122:15
123:1 125:8
129:18 132:22
143:21 144:11
145:4 148:23
**continuing** 143:8
146:7 219:2,2
**continuous**
254:2
**controls** 55:1
76:2
**convenient**
49:24
**conversation**
10:12 28:11
30:22 34:20
101:19 153:20
156:7 234:2
**conversations**
48:11,12

**cool** 58:4 123:15
124:8 201:4
213:17 227:18
**coordinate** 104:9
161:24 191:12
**copied** 232:4
**copies** 8:10
**copy** 56:10 58:7
231:21 232:1
**corporate** 90:11
92:12
**corporation**
89:19,20 90:10
107:19
**corporations**
19:4 90:9
**correct** 15:15,16
15:23 16:11
17:6,9,15,16
18:5,10 20:18
22:9,10,12,13,15
22:16 26:11
29:9,17,23 30:15
39:17,20 41:22
41:23 44:9,12
45:10,11,15,19
48:7 49:16 52:7
55:4 57:23 59:7
59:15 60:6
61:15 63:13
64:5 66:18 72:3
80:23 82:21,21
83:7 85:15 87:8
98:4 103:15,19
105:4,9 107:12
110:19 113:5,6
119:7 122:10,11
122:13,14

126:11 128:13
131:11 133:2
137:5,16,17,21
145:15,17 146:2
146:3,6 153:8
154:15 157:14
158:21 161:14
161:18 162:22
163:9,14 166:10
169:3 170:20
172:13 183:14
190:13,24
193:18 198:4
213:16 215:9
219:13 220:23
221:6 224:18
227:8 228:22
229:2 234:6,7
236:11 237:21
245:1 247:13,22
248:21,24
250:18 254:9,10
254:16,22
**corrections**
257:12 259:17
**correctly** 75:21
83:2 115:6
172:10
**correspondence**
195:2
**coun** 65:3
**council** 14:13
15:10 16:15
42:20 43:23
46:10 49:5,8,11
49:15 50:6,9,10
50:11,12,12,13
50:19 51:2,5,11

51:12 52:5,21,22 54:5 58:24 64:4 64:17,18 65:3,21 69:20 70:6,8,16 72:9,12 73:2,3,7 73:13,19 74:5 75:3 76:2,3,13 76:15,19,21,23 77:2,11,17,20,23 77:24,24 78:1,1 78:3 79:10 82:6 82:9,24,24 83:14 84:2,20 99:15 107:22 111:23 111:24 112:2,4,5 112:15 126:3 129:2 130:21 131:4 135:1 158:3,15,17,18 158:19,21,23 159:3 160:4,17 163:10 164:2,2 166:16 170:15 170:20 171:3,18 171:22 172:16 174:8 177:6,21 178:1 179:17 181:9,11,11,14 182:6,12 184:21 184:21,22 185:15,20,24 187:23 188:1,2 188:10 192:2 195:11,15,16 196:2,19 198:3 200:21 203:23 204:8 207:7,12 207:15,15 210:2 210:11 220:2,15 221:19 225:1,5 236:17 239:18

**council's** 48:23 49:3,17 52:6 68:15

**councilor** 45:9 47:3,18,20,22 48:3,19 49:9,18 50:8 51:8 53:5,8 54:24 55:3,21 58:11,18 63:10 69:13,13 71:20 82:14,18 83:23 84:8,19 85:3 86:9 89:13 97:8 98:6 108:13 110:6,12 111:22 112:3,16 114:4 115:16 116:15 126:5,5 153:11 154:6,20 155:1 155:18 157:4,8 158:10,13,14,18 159:24 160:3 166:17 171:24 172:18 173:18 173:20 177:11 177:13,20 178:6 179:15,22 181:10,15 182:8 184:23 185:3,7 186:12 187:21 187:22 188:4,5,9 191:8 192:18 195:24 197:8 198:5 200:13 202:5,13 203:4 203:18 205:5,8 205:11 207:9 209:13 220:19 220:20,20 221:2 222:24 223:11 224:15,16,21,24 225:1 228:24 229:4 244:18 245:15,16 250:21

**councilor's** 89:12 173:14,22 174:13 238:17

**councilors** 43:24 45:6 49:15 51:13 52:24 53:3 59:8 64:16 64:17 65:15,18 65:19 66:7,15 69:8 71:7,8 76:4 78:2,4 79:10,13 79:23 80:3,6,8 80:12 82:1,1 83:6,21,22 84:4 84:18 85:4 86:6 86:12,17 89:3,4 89:8 93:20 95:1 95:4,7,19 96:4 97:2 98:18,20 99:16,20 100:1 100:16,17 103:1 108:11 109:21 116:11 120:20 120:23 122:18 129:8 144:21 145:10 146:11 153:10 157:12 157:12,19,23 158:6,7,10 159:13 160:11 160:16,19 161:6 168:9 170:17 171:2,12,21 174:19 181:17 186:20 187:3,5 197:20 200:24 202:10 203:19 204:5,24 205:1 223:6,6 228:20 234:22 238:4,14 239:8,22 240:7 240:11,13

**counsel** 1:15 7:20,22 11:24 14:13 15:10 42:20 63:3 64:14 65:6,13,13 130:19,21 145:23,24 189:6 225:10 254:12 256:13

**counselors** 107:12

**count** 157:19

**county** 258:10 259:15

**couple** 82:17 102:23 128:6 156:12 183:8 230:19

**course** 10:13 13:10 30:9 32:16 38:22,24 51:1 68:6 75:8 75:14 95:8 98:19 120:12

126:20 127:12 128:6 153:7 194:18 210:19 219:8 222:7 223:15 254:13
**court** 1:1 13:9,10 19:21 28:6 38:8 41:7 104:20,23 105:1 111:6 121:9 143:4,15 165:20 179:10 258:7
**court's** 7:5 13:15 14:4 237:14
**covered** 148:1 216:11,11,12,12 216:14,15 224:10 226:7,22 227:2,4 229:20
**covering** 116:4
**covers** 69:4
**coworker** 195:8
**create** 128:5
**creates** 76:8
**credibility** 120:20
**cross** 3:2 12:15 33:8,11 172:1 214:14
**crown** 2:2
**crown.law** 2:8,9
**csr** 1:18 256:6 256:21
**culture** 193:21
**cumin** 176:19 177:15
**cummin** 177:5
**curious** 165:5
**curley** 69:12 156:15,16 157:1 157:3
**current** 145:9 158:19 170:17
**currently** 121:18 158:20,20
**custodian** 132:12
**custom** 53:14,15 53:21 54:3 55:6 70:2 114:13 157:14 226:12 226:24
**customs** 53:20 148:6
**cutoff** 91:17,20
**cv** 1:3 57:3

**d**

**d** 3:1 5:1 156:20 192:15
**dance** 139:9
**darkened** 5:12
**data** 223:19 247:20
**date** 57:22 157:21 177:2,4 222:6,7 227:20 231:4 233:1 248:2 257:8 258:3,9,19 259:3 259:13,25 260:20,25
**dated** 176:18 179:3 206:8,17 208:3 209:1,8
221:24 224:11
**dates** 101:14,15 101:16 104:3,6,9 104:10 106:14 106:14,17,20 107:1 159:4 198:3 228:1
**david** 3:19 4:6 220:18
**day** 19:23 24:8 24:12,15 34:7 104:11 168:16 185:13 191:16 203:8 230:3,17 238:15 251:17 256:17 258:16 259:22 260:22
**days** 257:18
**de** 196:18
**deadline** 203:17
**deal** 9:4 79:8
**deals** 44:2
**dealt** 226:5
**dear** 171:21 197:8 207:13 257:10
**debate** 24:8 254:2
**decem** 208:3
**december** 207:1 207:10
**decency** 172:2
**decent** 108:19
**decide** 65:18 69:14
**decided** 113:9 166:19
**decipher** 176:23
**decision** 19:5 62:3 63:24 64:2 98:7 130:18 164:6 166:15 203:15 253:12
**decisions** 64:4
**deduce** 116:6 202:14
**deducible** 98:15
**deed** 258:14 259:20
**deemed** 257:19
**def0002320-2...** 3:14
**def0002391** 3:16
**def0002723-2...** 3:20
**def0002729-2...** 3:22
**def0002733-2...** 3:18
**def0002870** 3:10
**def0002890** 4:4
**def0003373-3...** 4:6
**def0003434-3...** 3:12
**def2849** 3:24
**defamation** 251:15,17
**default** 28:11
**defend** 17:12
**defendant** 1:9 2:20
**defendant's** 170:8,11 176:4 200:4

**defendants** 7:14
**defensive** 58:19 58:20
**define** 42:24 45:4 54:3 93:2 121:4
**defined** 36:8 92:1,3,4
**defining** 67:10
**definition** 35:6,8 54:3 61:6 87:5 119:15 121:15 123:9
**definitionally** 138:23 252:5,14 252:16
**degrees** 117:19 118:3
**deity** 239:19
**deleting** 206:22
**delineation** 88:10
**deliver** 147:2
**della** 190:3,12
**delusions** 5:16
**demand** 5:17 150:20 151:8 163:13,16,21 165:1,4 211:19 227:23 228:24 229:5
**demanded** 7:1 151:10 164:1,9 164:15,15 228:6
**demands** 151:6 164:13
**demise** 6:4
**demographics** 246:10 247:21
**demonstrably** 5:22
**denies** 7:6 252:12
**denomination** 192:7
**deny** 98:11 101:23 121:24 122:4
**department** 2:12 68:13,20 227:7 257:22
**departments** 79:13
**depend** 61:23 116:15
**depending** 81:21 186:22
**depends** 37:3 46:9 61:7 75:23 76:1 82:13,18,19 85:8,10 116:11 124:21 167:6 223:11
**depo** 40:5 104:10 147:6 216:5 233:21
**deponent** 3:2 21:18,24 23:2 96:20,21
**depos** 232:18
**depose** 24:18 213:18 214:9 215:1
**deposed** 214:13
**deposing** 19:4 24:3 103:11 230:24
**deposition** 1:14 12:11 13:11 14:8 15:12,15,17 16:24 17:9 18:9 18:13,21 19:9,17 19:22 20:7,17 22:3,5 23:15,21 23:22,23,23 27:24 28:3,17,19 30:8 31:15,19 32:8,9,10,10,24 35:10,24 36:1,18 39:24 41:1,4,8 44:22 64:23 67:19 94:11 96:15 103:7,9,14 104:6 105:3,6 116:18 117:7 122:2 127:18 128:19,21 131:11 134:23 135:10 137:7 140:11 141:5 143:6 147:10 150:18 151:21 153:8 161:21 211:14 213:14 214:14,17,21 216:10 217:4 218:8,12 231:21 233:23 234:2 254:1,9 255:5 256:8,10 257:8 257:11 258:1,3 259:1,3
**deposition's** 107:2
**depositions** 24:2 28:13,22 29:22 35:23 37:9 231:3 253:19
**describe** 110:1 119:10,11,20,22 119:24 133:20 134:13,18 145:9 170:14 196:23 198:23
**described** 206:7 228:24 229:5 233:16 242:15 245:12
**describing** 119:7 121:13
**designate** 103:17 103:21 130:18
**designated** 18:23 20:10,13 22:21 23:10 24:11,22 25:21 26:19 30:12 37:23 39:22,24 40:7 87:7 96:3,3 98:3 98:6 100:15 103:16,23 105:9 108:6 116:18 129:1 130:10,11 130:11,14,17,17 130:22 136:8,15 137:9,24 140:23 141:16 143:2 146:16 150:3 170:8 199:15 248:5 252:19

254:19

**designating**
100:13 119:21

**designation** 23:3
73:1 90:12
141:3 183:21
189:2 198:24
215:7

**designations**
50:1

**desires** 108:5

**despite** 10:5

**destroyed** 6:3

**detailed** 168:12

**details** 55:10
57:16 170:3
196:20 219:20
225:22

**determination**
165:19

**determine**
155:18 159:16

**determined**
166:3

**determines**
150:1 153:11
154:6

**determining**
117:7

**devices** 7:4

**dialogue** 155:8

**dictionaries** 34:7

**dictionary** 10:6
33:4,5 35:5,7
36:2

**difference** 63:5
73:12,14,16

**different** 23:18
25:9 53:18
54:21,22 71:8
72:9,18,24 74:19
89:7 94:13,15
104:13 118:23
134:19,21,22
135:3 137:10
139:2 140:17
143:24 203:19
214:23 215:19
215:20,23
230:10 234:3
238:9 241:22
244:8 250:5

**differing** 106:11

**difficult** 149:20

**difficulty** 178:15

**direct** 3:2 6:8

**directed** 9:2
131:1

**directing** 133:1
137:19 248:17

**directive** 42:6

**directly** 183:1

**director** 14:13
15:10 42:20
63:2 157:8,10
163:6 181:13
191:7 195:15

**disagree** 19:1
30:6 36:13 38:4
40:13 50:3,4
63:4 103:4
107:5 140:8
188:21 205:19
245:21

**disagreeing**
138:24

**disagreement**
27:23 41:4
106:5,24 216:4

**disagreements**
23:12

**discourse** 8:2,4
9:13 33:16
84:10 251:7

**discoverable**
157:20

**discovery** 27:2
27:16,17 64:19
66:22 68:7
75:13,15 86:8
132:18 161:22
169:1,3,6,8,22
170:3,4 211:15
214:21 215:15
216:18 231:9
232:12 244:3
245:24

**discrete** 61:13
184:5,13 205:2
238:7 239:2

**discretely** 10:19
10:20 231:17
232:4 238:23

**discriminate**
136:21

**discriminated**
254:7

**discrimination**
217:24 218:2
252:6,13,15,17
253:7,10,23

**discuss** 21:1
160:9

**discussing**
136:17

**discussion** 25:14
30:21 31:5,9,10
34:15,18 84:9
98:19 196:11
216:3 217:3
228:2 233:23

**discussions**
130:21 131:6
217:17 228:16
228:19

**dismiss** 13:4,5
13:20,21

**disprove** 164:18
244:7

**dispute** 7:10 8:1
9:9 11:24 12:1
12:14 17:18,24
18:1 20:4,5,6
27:5,7 29:15
32:1 33:16
36:20 37:17
40:17 46:12
81:16 86:4
88:21 102:18
129:23 136:10
136:12,18,19
149:7 152:15
157:22 162:20
169:15 186:5
220:14 224:17
225:16,20 230:8
249:19,22

**disputes** 11:9

**disregarding**
176:6,10
**disrespectfully**
152:1
**dissipate** 5:15
**distinction** 72:19
73:10 242:4
**district** 1:1,2
50:8 51:8 69:16
69:16 110:15
112:16 121:1
126:5 154:22
172:17 179:18
207:9
**districts** 53:10
53:11 80:8
85:11
**division** 192:11
**divulging** 46:21
48:11
**doc** 225:8
**docket** 13:11
14:5,5 56:12
57:3 78:21
82:17 236:24
237:8,13,14
**dockets** 82:15
237:10
**doctrines** 5:12
**document** 74:12
175:2 179:9,22
183:16 198:17
200:10,12
215:18,21
217:23 220:23
237:2
**documentary**
223:17

**documentation**
173:17
**documents** 13:1
27:1,15 56:3
64:18 67:3 70:5
70:9 79:17 82:7
169:12 170:5,6
174:20 182:23
196:12 215:15
223:18 230:9,12
230:16
**doing** 8:14 20:2
28:7 31:8 89:22
89:24 90:1,2,2,6
90:16,24 91:7,18
94:11 95:8 99:2
117:2 128:24
134:22 137:4
146:14 186:7,9
195:13 203:16
240:13 243:16
**door** 64:12
**dots** 200:18
**drafting** 55:21
**drafts** 30:15
**draw** 92:10
200:18
**driver's** 15:2
**drop** 168:23,23
**due** 187:16
208:24 211:3
**duly** 15:2 256:9
**dump** 198:17
**duties** 63:2
88:19
**dynamic** 120:11

**e**
**e** 2:1,1 3:1,7 4:1
5:1,1 156:17,18
157:5 192:15
**earlier** 18:4 27:3
93:3 94:5,6,7
107:10 109:6
117:4 125:11
134:14 153:5,20
180:11 221:10
235:15 238:2
252:10
**easier** 173:8
**eastern** 207:11
**easy** 111:14
**eat** 5:15
**ecf** 225:9
**edits** 116:13
**educate** 40:24
44:21 93:11
**education** 43:20
**educational**
120:5
**edwards** 177:11
177:13,20 178:6
179:15,22 191:9
192:19,20
195:24
**effect** 48:18 94:1
129:22 161:5
234:12
**efficient** 189:18
**eh** 229:10
**eight** 206:10
**either** 11:12
68:21 165:6
169:18 172:8
244:19 251:11

**elected** 89:5,8
**election** 158:3
**electronic**
223:18
**electronically**
4:24
**eli** 173:20 174:8
175:6,16 184:23
185:22 188:8
**eliminate** 216:1
**eliminating**
119:19
**elizabeth** 3:15
180:19 181:11
224:18
**else's** 117:9
**elusory** 5:19
**email** 3:9,11,15
3:17,19,21,23
4:3,5 52:11,15
55:22 56:13,15
56:18,19 57:5,21
58:2,3,8,10,11
58:17,18 80:5
83:21,22 95:13
100:13,22,24
101:11 102:22
104:4,6,15
106:14 170:14
170:18,23
171:12,18
172:10,20,21,21
172:24 173:4,5
173:14,16
174:10,13 176:1
176:18 177:9,17
177:19 179:2,3,5
179:12 180:7,9

182:18 184:7 185:8,10,22 187:14,18 189:16 191:5,23 194:18 195:2 196:14,24 197:1 201:18 202:23 203:21 205:8,16 205:17 206:8,14 206:16,19 207:1 207:4,20 208:3 209:1,7 211:9,13 212:7,8,10,17,24 213:11 216:18 217:1 218:5,17 218:23 221:9,24 223:14,14 224:11 225:6,9 225:12,17,22 226:16,19 244:23 257:17
**emailed** 101:21 101:22
**emailer's** 212:18
**emailing** 184:23 196:1,4 197:20
**emails** 56:2 83:22 86:7 101:1 108:10,12 108:17,21 168:15,24 173:15,22 174:14,20 175:1 181:2 189:15 195:3 199:1,3,10 216:20 217:5,11 217:13,14,24 218:10,12 219:9 230:20 231:17
**embrace** 5:14
**emotional** 236:15
**emphasize** 130:10,10 145:14
**emphasized** 63:4 142:11,12
**emphatic** 193:14
**emphatically** 145:8
**employed** 157:24 181:10 256:13
**employee** 60:2 121:18 141:20 142:12 148:8 165:10 213:2,3 214:10 253:13
**employee's** 211:18 213:6
**employees** 64:16 66:21 69:9 75:10 147:3 180:23 222:14 242:15
**employer** 60:4 161:1
**employment** 62:24 63:5,6 254:14
**enclosed** 257:11
**encode** 74:19,19
**encoded** 74:10
**endorsed** 122:9
**endorsement** 113:21 114:4 121:21
**endow** 144:23
**endowed** 147:4
**ends** 185:10 233:4
**engaged** 84:22 85:11
**engagement** 85:10
**english** 240:21 240:22 241:1
**enlighten** 94:8
**ensure** 44:3
**entail** 64:13 236:16
**entered** 259:9
**entertaining** 85:17,23
**entire** 28:3 258:5 259:5
**entirely** 140:16 168:1 239:11
**entities** 250:15
**entitle** 30:7
**entitled** 17:18 32:7,8 36:4,5 102:7 135:4,9 209:24 245:13
**entity** 49:19,19 49:20,21,22 97:18 98:17 149:1,1 234:21
**enumerated** 21:17 26:5 41:22
**era** 241:9,9
**errant** 152:10
**errata** 257:13,18 259:7,10,18 260:1
**error** 112:19
**errors** 208:24
**especially** 175:17
**esq** 257:5
**esquire** 2:3,4,13 2:14
**essaibi** 4:4 209:11 212:10 212:11,18
**essentially** 55:11 59:3 157:17 225:19 226:17
**established** 75:3
**et** 91:11 179:3
**event** 6:23 12:8 107:1 119:6 162:21 182:6 200:13,15,20,23 201:1 237:24 238:7 239:2 240:1
**events** 80:7,7
**everyone's** 234:9
**everything's** 159:9
**exact** 70:6 115:15 125:22 192:10 233:15 238:8 240:5 250:3,11
**exactly** 20:19 48:8,21
**exam** 226:2

**examination** 6:8
  19:8,11 26:5
  33:11 41:19,21
  59:11 122:10
  226:2 245:20
**examine** 45:2
**examined** 15:3
  33:8
**examining**
  169:16
**example** 34:3
  61:8,11,13 64:1
  91:6,9,10 95:20
  111:3 123:17
  161:12 191:5
  236:14 238:1
  239:6 249:11
**excellent** 231:10
**exchange** 35:16
**exchanges** 25:11
**excitable** 9:6
  85:14,18
**excited** 151:1
**excitement** 9:8
**exclamation**
  193:7 194:11,18
**exclude** 13:8
**excluded** 9:3
**exclusionary**
  213:1
**exclusively**
  237:18
**excuse** 191:8
  210:15 225:4
**executed** 259:10
**execution** 258:14
  259:19

**exemption** 175:3
**exhaustion**
  194:16
**exhibit** 3:9,11,13
  3:15,17,19,21,23
  4:3,5,7 8:10
  57:2,5,12 108:21
  170:1 175:20
  176:15 180:7,7
  181:24 183:20
  184:3 189:13
  194:16 195:1
  199:14 200:1
  206:23 207:3
  219:5 221:23
  225:7 231:15
**exhibits** 4:24
  230:4 231:19
  232:3,7,23
**exist** 68:10,12,15
  70:1
**exiting** 28:11
**expanding**
  237:22
**expect** 32:21
  40:10 84:19
  104:19
**experience** 23:18
  23:18 35:23,24
  43:20 64:22
  120:19 178:13
**experiencing**
  34:1
**expiration**
  258:19 259:25
  260:25
**expires** 256:23

**explain** 99:7
  147:9 169:7
  179:4 253:9
**explained**
  100:12 102:21
  130:19
**explanation** 77:6
  253:22
**explicitly** 231:19
  253:13
**exposition** 16:18
  93:18
**expository** 211:5
**expound** 16:8
**expressed** 100:6
  108:13
**extend** 102:16
  250:13 252:24
  254:8
**extended** 164:11
**extending** 100:2
  114:5 157:16
**extends** 110:6
  155:1
**extent** 10:17
  11:6 12:2,18
  46:21 215:17
**extra** 204:17
**eyes** 152:11
  176:21

**f**

**f** 157:10 178:10
**fac** 56:7
**faced** 148:2
**fact** 10:7 30:7
  33:22 61:23
  62:2,21 75:1

102:8 106:15
  113:9 136:20
  142:16 143:19
  170:10 228:19
  230:6 251:23
**factors** 70:1
**facts** 26:24 27:9
  27:12
**factual** 93:12,15
  93:18
**failed** 176:21
**fair** 55:14 62:15
  62:20 77:2
  81:11 90:14
  109:16 115:21
  140:15 144:7
  151:3 169:22
  171:16 181:17
  182:2 187:7
  220:7 226:19
  237:17
**fairly** 237:16
**falls** 248:22
**false** 251:11,12
  251:13,15
**familiar** 60:21
  87:14,19 94:3,19
  110:16 117:19
  120:24 135:24
  169:14 178:18
  178:21 182:22
  201:19,20,22
  237:14 240:15
**families** 146:11
  238:4 239:8
**family** 238:17
**famous** 119:9,12
  119:15,17

**fancy** 117:19
118:4
**fantastic** 245:10
**far** 8:17 21:16
31:14 48:3
50:21 64:12
70:2 74:12 76:9
113:14 172:1
215:22
**fast** 5:21
**faster** 225:11
**father** 178:10,11
179:13
**fealty** 5:18
**fearful** 5:12
**feasible** 177:23
178:4
**february** 180:18
219:7 220:12
224:12 256:24
**federal** 1:16
15:20,21,22 16:1
16:10 46:7
103:10 218:7
**feel** 9:3 18:7
23:22 28:15
33:17,24 34:1,1
34:11,13 36:7
37:13 44:23
61:2,11 80:13
83:23 84:4
93:20 95:4,22
157:17 160:15
160:19 167:3,20
168:12 169:17
220:6 226:6
229:21 232:1
246:14

**feeling** 34:2 97:2
**feelings** 24:5,6
25:17 39:7 95:7
**feels** 33:12,13
34:4 140:16
209:24
**felt** 94:12 167:10
227:21
**fiction** 24:4
**fifteen** 236:12
**figure** 14:5
136:23 137:2
179:23 180:15
183:20 189:1
231:23
**figured** 211:15
**file** 19:21 38:16
38:23 76:5
97:14 103:4
104:24 252:24
**filed** 82:8 104:19
104:22
**files** 76:12,14
**fill** 183:13
188:20 229:23
233:5
**filled** 231:8
233:6,7
**filling** 229:23
**financially**
256:14
**find** 10:6 25:11
33:3 64:23 68:6
72:5 75:13
81:14 138:5
146:19 147:12
185:12 208:16
235:17 236:8

246:6 253:14
257:11
**finding** 33:4
**finds** 26:24
27:10,12 211:18
251:24
**fine** 77:8 117:12
139:14 142:3,6
144:15 151:22
164:23 168:3
216:6,23
**finish** 62:13 98:1
**finished** 199:14
206:5
**firm** 5:23
**first** 14:15 21:16
21:17 39:23
46:8,13,16 47:5
53:16 56:11,21
57:2,13 80:1
118:13,20 119:1
135:24 141:20
147:24 158:6,14
158:23 163:12
165:1 170:22
181:21 198:19
200:16 206:14
206:16 225:7
226:22 251:13
**fisher** 197:9
**fit** 38:17 73:11
139:23 153:16
**five** 92:22 183:9
183:9,11 249:4
**fix** 10:3 12:3
209:2
**flagged** 218:9

**flights** 106:10
**flow** 212:22,22
**fly** 105:18
**flynn** 157:9
158:13,18,20
159:5,16,17
160:3
**flynn's** 159:23
**follow** 44:19
78:12 91:22
134:3 167:3
211:5 248:18
**followed** 205:4
**following** 106:3
137:6,7 249:15
**follows** 8:19,22
15:3 98:16
99:23 147:22
190:9 232:24
254:6
**forced** 242:11,13
**foregoing**
258:13 259:18
**forgive** 190:10
**forgot** 61:3
217:7
**forgotten** 66:24
93:24 175:23
229:12
**form** 9:21,23
10:16 46:11
72:8 73:13,15
74:5 75:3 128:7
155:19,22
171:13 232:2
233:15 234:9,10
234:11,16
243:20,23,23

**formal** 47:17
55:20 251:5,5,6
251:7
**former** 111:22
181:10 195:8
209:13 211:12
212:3 214:10
216:17 223:21
229:7 238:2
244:23 245:11
**forth** 103:13
256:9
**forward** 74:20
105:13 146:7
172:22,22,23
193:2 257:15
**forwarded** 173:5
173:9,10 174:3
219:9 224:17
**forwarding**
174:9
**found** 59:3 62:7
99:22 154:14
184:11 208:14
212:3 223:21
244:24 249:13
252:1
**founder** 7:22
**four** 16:21 126:3
126:4 184:1
219:23 231:18
**fr** 3:12 178:7,18
178:19 179:23
179:24 180:3,8
190:3,12 195:20
**frankly** 8:20
20:21 77:13
210:2

**freaking** 187:15
**free** 29:16 38:16
38:22 44:20,23
251:21 258:14
259:20
**frequently**
120:19
**friar** 178:10,10
178:14
**friends** 110:14
**frightening**
175:24 180:7
**frustrated** 24:17
99:10,12,12
**full** 61:21,24
172:10 209:23
244:1
**fully** 245:17
**fun** 41:2
**functionally**
207:11 234:24
**fundamental**
27:23 90:20
91:2 140:22
**fundamentally**
89:21 107:5
149:19 245:21
**further** 21:1
142:1 169:16
218:17 256:12

**g**

**g** 5:1
**gabriel** 176:19
**gabriela** 3:11
176:20 177:5,7,9
177:19 179:13
179:20 180:17

**game** 62:15
**games** 10:3,3
24:16,16,17
34:10 96:24
139:2 159:10
**gather** 15:22
93:4
**gathered** 6:10
**gathering** 38:19
**gender** 192:7
**genders** 192:6
**general** 87:24
98:22 117:2
136:5 148:16
149:9,9 189:8
219:12 226:6
228:5 235:7
239:17,20
**generally** 17:14
46:9 49:15
60:19 65:23
69:14 70:11
75:18 110:3,4
115:16 116:23
117:1 185:18
220:21 223:12
226:3 236:18
238:1 239:18,23
240:1
**geographic** 92:2
92:3
**george** 4:4
209:11 212:10
212:11
**george's** 212:18
**gestured** 132:6
**gesturing** 226:3

**getting** 9:10
51:17 77:1
85:18 99:9
139:7 150:7
163:9 166:8
204:16 220:22
227:2
**gist** 59:14 69:21
**give** 7:5 18:3
28:23 47:7
52:12,12,18 53:7
56:8 59:12
67:20 70:8
101:5,8 105:7,11
108:9 109:22
112:3 115:2,8
126:24 139:10
140:5 150:23
152:24 156:8
159:10 162:23
178:4 179:1,7
183:7 186:22
187:3 198:6
204:13,13 210:1
210:8 212:4
213:5 222:15
226:18 232:10
234:21 235:2
238:1 240:5
241:7 246:23
249:13 250:11
250:16 251:1
**given** 19:8 99:13
109:24 110:2
117:9 125:21
129:3 136:4
137:24 155:3
217:17 218:3,4

227:15 230:18
256:10
**gives** 160:12
**giving** 110:5,8
139:11 154:12
163:20 166:2
184:24 185:23
186:4 191:9,15
198:5 213:4
221:3 238:3,16
239:21
**gmail** 181:2
**go** 12:19 21:3
30:18 34:21
36:1 55:7,15
57:10 68:10,16
70:2 80:6,7
90:24 97:11
103:4 111:2
124:11 136:19
139:19 141:4,21
143:8 146:18,19
147:12 167:8,15
168:6 191:24
194:20 202:1
219:4 225:7,13
226:4 231:24
235:17,21 236:7
**god** 144:22
145:15,17 147:2
172:4,8
**god's** 145:11
239:22 240:13
**goes** 36:8 45:22
82:6 83:1
141:18 164:2
227:7

**going** 9:19,20
11:4 14:4 19:16
23:13 25:16
28:15 29:7
30:20 31:23
32:6,12,17 34:7
35:15 40:13
41:6,9,10 42:14
45:3 47:8 50:5
52:4 54:21
58:23 59:9
66:14 70:7 72:7
74:20 80:17
87:2 99:24
102:7 106:17
108:18 109:1
131:19 135:16
136:23 138:2
139:22 143:21
143:22 154:7
166:8 167:2
168:11,14
173:12 175:21
175:24 176:3,13
179:10,11 180:1
186:4,5,7,8
189:14,17,18
190:10 191:13
196:11 197:10
201:24 202:22
209:4 213:22
224:11 231:21
231:24 232:2
233:15,21
235:20 236:22
237:16 238:23
245:11 246:5
248:16 252:21

**gonna** 13:19
14:16 17:13
20:2 24:8,12
67:23 78:12
150:6 168:10,11
168:12 176:17
184:1 189:5
193:9 194:17
208:5,15 211:4
213:24 234:14
235:17,21
243:13
**good** 5:7 8:18
10:5 75:19
109:12 144:16
144:17 156:20
167:21 168:19
179:13 184:13
196:15,17
208:17 213:4
214:19 216:15
227:3 246:10
255:2
**google** 203:2
**goosey** 243:17
**gotta** 209:5
**gotten** 37:6
**govern** 19:22
**governing** 252:1
**government**
13:6,7,22,23
19:5 43:21 44:1
44:8,8,11 46:11
60:13 67:13
72:8,18 73:4,13
74:5,7 75:4 79:2
79:17 81:11
85:12,14 122:8

133:22 145:17
146:10,14
251:14
**government's**
247:2
**governmental**
49:20 121:21
145:12 242:15
**governments**
73:15
**granting** 13:5,21
**grants** 78:23
**great** 6:6 15:6
101:8 107:8
109:6,13 147:14
177:13 197:12
199:11 209:21
231:12 234:17
236:11 254:20
**greater** 131:10
**greaves** 2:24
7:22 91:6
**ground** 23:8
26:3 37:20 42:9
42:11 59:5
122:13
**grounds** 216:13
244:2
**group** 209:24
**groups** 90:16
228:6
**guess** 61:23 71:5
71:19 89:15
120:2
**guest** 162:17
239:16
**guidance** 28:5
182:12 234:22

**gun** 218:1,5
**guy** 33:21
  111:20,21 112:9
  202:12 224:13
**guys** 7:13 8:8,10
  8:11 9:17 11:18
  20:4,23 21:1,11
  29:21 32:13
  36:6 38:14
  56:10 90:5
  104:18 130:4
  135:5,12 146:20
  147:6 156:9
  165:22 170:5
  209:5

**h**

**h** 3:7 4:1
**hail** 6:5,6
**hair** 111:20
**halbert** 181:14
**half** 168:6
**hall** 2:15
**hall's** 80:3
**hand** 52:4 59:9
  91:24 256:16
**handle** 44:1 46:8
**handles** 84:2
**hands** 222:14
**handwrite** 66:12
**handwriting**
  232:1
**handwritten**
  128:8,10,15
  131:13 132:11
**handy** 162:15
**happen** 62:21
  65:23 75:21

81:20 109:14
111:2 183:6
203:4,6 229:22
229:24 239:1,1,4
**happened** 11:23
  31:8 74:23
  146:13,13 191:2
  222:13 235:8
  239:13
**happening** 30:19
  106:5 110:18
  197:24 228:20
**happens** 77:7
  83:1 84:1 92:1
  183:4,7
**happy** 12:11
  24:10 104:9
  151:6 161:24
  215:12,13,14
**harass** 8:23
**harassing** 20:3,8
**hard** 70:12
**hate** 172:3
  186:15
**head** 50:11,12
  111:21 202:12
  245:12 249:23
**heads** 243:21
**hear** 27:21 37:9
  37:10 48:15
  95:19 118:13,16
  122:20 123:16
  144:4
**heard** 6:24 18:4
  83:13 114:1,14
  114:16,20
  118:10,10,20
  119:1 123:4

142:14 144:20
144:24 145:2,8
145:13 161:9
236:1
**hearing** 79:1
  119:3 148:3
  179:17,19 239:3
**hearings** 83:18
  129:19 139:12
**heavy** 222:9
**heed** 228:24
  229:5
**held** 68:17
  106:24
**help** 28:22 79:12
  79:17,17 129:19
  178:7 200:18,18
  223:20
**helped** 56:16
**helpful** 25:11
  28:21 29:11
  34:20 35:16
  39:7 92:24
  99:14 106:12
  143:9 254:1
**helpfully** 203:2
**helping** 79:19
**hem** 111:21
**herald** 219:9,11
  219:16 220:12
  224:12,16
**hereinbefore**
  256:9
**hereunto** 256:16
**hey** 45:24 74:19
**hi** 173:13 177:19
  202:3 219:10

**hide** 57:14
**higher** 120:2,2,5
**highlight** 147:12
  210:9 212:4
  222:16
**hindi** 208:5
**hindu** 207:16
  208:5,5,5,5
  228:7
**historical** 72:1
**history** 75:6
  182:4 200:13
  240:16
**hmm** 23:19
  50:23 65:16
  67:14 70:14
  71:23 77:12,21
  78:22 79:22
  82:3 83:16 90:8
  124:20 125:17
  134:4,19 143:13
  159:12,21,21,21
  163:12 173:1
  175:5 185:17,19
  191:11,18
  195:23 206:14
  215:24 236:23
  244:15 250:22
**hold** 11:16
  101:15 106:14
  117:13 227:6,6
**holding** 5:21
**holds** 106:17
**home** 44:3 78:24
**homeless** 210:7
**homelessness**
  237:4

**honestly** 130:23 171:3 240:6
**honor** 200:15
**honorary** 190:14
**honored** 113:22 115:13 177:20 179:18
**honoree** 200:7,8 200:9,13,19
**hope** 12:4
**hour** 168:6
**hours** 80:9
**hovers** 142:23
**how's** 141:24
**huddle** 209:5
**huh** 27:11 35:12 186:23 197:17 203:15 224:8
**human** 141:19 150:16
**humbled** 113:22 115:12
**hunger** 237:4
**hypothetically** 236:7
**hypotheticals** 62:16

**i**

**i.e.** 57:4
**idea** 126:10 160:11 172:1 181:3 197:5
**ideals** 92:4
**ideas** 238:7
**identified** 15:1 22:22 26:4 29:1 40:15 41:18 96:20 101:11,14 102:23 122:3 215:5 247:23 248:14
**identifies** 244:17
**identify** 14:10 15:8 35:10 40:21 91:22,24 111:8 231:16 232:24 248:1
**identifying** 229:10
**identities** 127:5
**identity** 21:18,18 21:20,21,24 23:1 24:13,24 25:7,9 32:14,18 33:3,22 35:1,4,7 36:4,7 36:14,21 216:11
**imagine** 85:13 85:15 118:2 176:23 203:19 233:18
**immediately** 172:4
**impact** 47:5
**impasse** 41:6,14 41:17,17 99:23 99:23 102:9,10 102:12 138:5,13 138:16 139:20 168:10 169:18 188:22 196:23 197:2 214:20 220:6 251:23 254:5,6
**impassionate** 145:9
**impassioned** 147:2
**implication** 222:19
**implications** 59:21
**implicit** 93:4
**implore** 234:21
**importance** 144:16 216:8 219:20 221:5
**important** 6:14 13:1 27:10 90:5 200:4 208:15 210:11
**importantly** 13:5,7,21 56:6 68:16 131:10 231:7
**impressed** 117:21 118:3
**impression** 242:2
**improper** 247:7
**impulse** 5:14
**inaccurate** 185:6
**inauguration** 70:11
**include** 33:24 185:22
**included** 117:7 152:19 153:24 257:13
**includes** 25:7,8 27:4 33:23 45:8
**including** 115:11 147:24
**inclusive** 244:17
**inconsistent** 19:12 35:24 194:10
**incorporated** 259:12
**incredible** 210:5
**incur** 172:7
**indicate** 199:7
**indicated** 70:3
**indicating** 257:13
**individual** 53:10 55:1 95:12 110:7,8 120:24 141:12 160:11 161:6 185:23 186:12 196:2 204:3,14 213:20 250:24
**individual's** 119:18
**individually** 242:7
**individuals** 5:17 67:20 100:13 102:24 103:24 125:19 160:16 228:5 230:21,24 238:9
**infer** 160:21
**inference** 160:24
**infor** 204:13
**inform** 193:6 205:7,9 207:16
**information** 31:14 50:15 88:17,18 100:3,4

101:5,6,9 102:7 102:9 105:11,19 105:21 162:2 169:12 193:23 204:17 205:18 228:5 229:10 230:11 239:12
**informational** 231:5,6,7
**informed** 163:6 202:5 205:5 252:23
**informs** 139:15
**initially** 82:8
**inject** 61:18
**inner** 22:2,18
**input** 86:4 168:9
**inquire** 146:20 213:2 217:12,15 218:13
**inquiring** 9:14 10:12 117:6
**inquiry** 155:22 203:1
**inside** 74:17 91:4 223:8
**insight** 179:1
**insist** 223:22
**instance** 184:4,5 184:5 235:17 237:1 240:8
**instances** 59:24 108:14 147:12 229:19,20 230:2 234:19 236:8,12 239:15 250:23
**institutions** 118:5,11,14,17 119:1,7,12,21,24 120:5 134:3
**instruct** 25:16 29:12 45:6
**instructing** 23:7 23:9 102:14 137:23 243:17 243:19 248:9
**instruction** 42:4 42:5
**insulting** 210:2
**integrity** 120:21 121:19
**intend** 20:9
**intended** 21:20 23:1,4 136:17 217:11 218:13
**intending** 217:14
**intent** 22:21 86:17 100:15 215:18,22 216:1 223:5 245:15
**intention** 24:18
**intentionally** 22:8 253:14
**intentions** 23:13
**interact** 80:2,10 84:16
**interaction** 81:10
**interchangeably** 54:2 242:9 251:8
**interest** 73:12 75:14 114:11 119:18 224:7
**interested** 148:2 256:14
**interfacing** 84:8
**interject** 44:6 76:6 78:11 148:18
**internal** 21:19 74:17,18 197:22 199:8,9,10 230:10,13,20
**internet** 249:13
**interpret** 134:7 134:8
**interpretation** 46:16
**interpreted** 161:9 216:4
**interrogatories** 232:18
**interrogatory** 231:1,14,15,19 232:3 234:13
**interrupt** 14:15 29:5
**intervening** 12:3
**intervention** 41:7
**interview** 219:18
**intimidate** 8:23
**intra** 227:19,22
**intro** 124:4
**introduce** 7:14 113:1 115:12
**introduced** 113:22 170:1 176:15 181:24 184:3 189:13 195:1 200:1 206:23 207:3 219:5
**introduces** 110:7
**introduction** 110:11 111:3 113:20 115:14 124:10 160:8
**introductory** 116:9 122:19 123:18
**investigate** 153:9 154:14 216:17
**investigated** 153:6
**investigation** 64:10,11 75:8 117:5 125:4 141:7 153:23,24 154:3 216:14 223:15
**invita** 224:10
**invitation** 7:3,4 7:5,8 17:19,19 52:12,24 54:9,11 59:2 100:2 110:7 120:23 152:23,24 155:1 160:9,17 163:13 164:14 165:21 177:20 180:5,8 208:4,6 211:19 223:22 225:19 228:11,14 250:20 254:8
**invitations** 52:23 65:10,11 66:17 66:17 80:12 102:17 197:23 250:14

**invite** 22:9 24:20
  39:14 51:17
  53:6 54:23 55:1
  62:3,4,5 86:10
  109:21 113:9
  114:5 120:21
  148:13 153:11
  154:7 155:18
  161:14,15,16
  163:22 164:1,9
  164:11,15 180:4
  184:6 188:3,4
  210:12 220:22
  226:18 245:13
  252:24 253:14
**invited** 20:22
  113:8 115:23
  125:21 126:16
  126:20 149:10
  153:3 162:20
  166:17 179:23
  179:24 183:14
  188:5 207:19
  210:1,4,4
**invites** 157:16
  160:21 203:18
**inviting** 6:22
  115:17,22
  120:20 146:10
  161:11,11
  186:14 195:24
**invocation** 5:10
  6:24 18:3,4,7
  52:12,13,19,23
  53:5,7 70:7,8,10
  70:13 109:18,22
  109:24 110:8
  111:3 126:15

127:10 129:3
147:23,23 148:3
149:5,10 150:2,5
151:2 152:20
153:1 154:7
155:18 160:12
162:17,23 166:2
171:4 177:6,21
178:5 179:16
183:3 184:24
185:23 190:3
191:10,15 199:1
199:5,6,10 202:4
202:13,16
203:16 205:4,22
207:12,14 208:6
227:22 230:18
233:2,4,6 234:20
235:1,10,11,12
236:2,13 237:2
237:23 238:16
239:22 240:14
246:8 251:1
**invocations** 66:2
  67:20 70:15
  109:7,20 110:1
  124:22 182:24
  183:12 203:14
  237:3,5 238:11
  250:2
**involve** 113:20
**involved** 53:19
  164:5,7
**irrelevant**
  142:20 170:4
**irrespective**
  251:22

**ish** 141:22 166:9
**issue** 10:20 12:5
  13:6 41:7,10
  46:9 47:3,15
  49:4,18 62:22
  66:16,17 80:12
  85:8 102:4
  105:13 151:6
  210:18 215:2
  220:21 222:24
  231:1 243:13
**issued** 55:9
  104:18 141:11
  203:1
**issues** 12:12,18
  24:9 46:10
  106:10 165:1
  171:6 211:3
  236:21
**issuing** 91:10
**it'd** 178:4
**it'll** 183:24
**item** 170:7 245:6
  248:19
**itemize** 231:22
**items** 24:11
  31:11 32:11
  102:15 203:9,12
  236:17,19,24
  237:6

**j**

**jacobson** 219:8,8
**james** 188:5
**janey** 3:23
  181:10 184:21
  187:23 188:9
  207:4,6,13

**janey's** 185:24
  187:22
**january** 229:6
**jargon** 60:8 67:5
  72:1 169:6
  190:11
**jean** 180:18
**job** 45:8 95:8
  115:4 128:12,18
  145:15,17 163:5
  174:12 200:21
  235:16
**jobs** 230:22
**join** 137:1
**joining** 196:18
**joint** 8:5
**jordan** 195:5
  204:24
**judas** 196:18
**judge** 12:19
  38:20
**judged** 5:17
**judgment** 28:11
**julia** 196:21
  197:16
**julie** 204:9
**july** 31:5
**june** 116:18
  189:19 193:1
  195:3 197:7,18
  201:17 202:3,20
  203:1,2 206:8

**k**

**k** 157:5
**keep** 9:5 66:13
  162:10 186:6
  228:18 246:11

248:16 251:4
**keeping** 67:3
227:5
**kelly** 1:17 256:5
**kenzi** 197:12
**kerry** 195:5,8
196:1,4 204:23
**kezhaya** 2:3,4
3:4 5:5 6:6,9,18
6:20 7:11,19
8:13,16 9:22
10:2,23 11:3,16
12:7,16,23 13:14
13:18 14:3,20
15:5 16:4,7,11
18:10,14,17 19:1
19:18 20:1,11,15
20:20 21:5,11,15
22:1,6,11,14,17
22:24 23:17,20
24:1,14,23 25:2
25:6,12,18,23
26:1,8,10,20,22
27:11,14,18 28:1
28:4,7,9,18 29:2
29:4,14,20 30:2
30:5,10,14,17
31:1,4,7,20,24
32:3,6,20 33:2
33:10,13 34:9,13
34:17,24 35:12
35:18 36:15,19
36:24 37:5,13,20
38:1,9,12,18,24
39:4,9,12,16,20
40:9,12,20 41:9
41:13,24 42:5,8
42:12,17 43:9,14

45:1 46:24 47:7
48:14,17 56:5,10
56:21,24 57:7,14
62:12,19 66:11
80:18,21,24 81:5
81:6 85:22 86:2
86:15,18,20 93:1
93:14,17 96:1,7
96:13,16,23 97:5
97:9,16,20,24
98:4,10,14,24
99:4,8,18,22
100:7,11,18,21
100:24 101:4,8
101:12,18,22
102:2,13,20
103:2,8,17,20
104:1,5,12,16,22
105:2,5,10,14,17
105:23 106:3,8
106:19,23 107:7
107:9 108:18
109:5,10,13
111:5,13,18
112:24 113:4,19
116:3 117:13,17
120:7,9,16,18
122:7,12,15,17
123:1,3 124:12
124:14 125:8,10
127:23 128:4
132:22,24
135:19 136:9,13
136:16 137:12
137:18 138:4,8
138:12,20 139:7
139:14 140:8,10
140:18 141:2,14

141:17 142:6,9
142:21 143:1,10
143:13,17,18,23
144:5,11,14,19
145:4,6 146:7,9
146:18 147:1,11
147:20 148:18
148:22 149:3,12
149:16,23 150:3
150:10,13,15
151:8,15,22
152:2,9,13,14
153:15,18 162:1
162:4,7,13,14
165:14 166:22
166:24 167:8,15
167:18 168:1,8
168:19,21,22
175:19 176:13
180:3 181:19
183:17 187:2
188:24 189:8,11
194:15 196:13
196:22 198:10
199:12,18 200:2
201:5,11,23
202:19 206:3,21
206:24 207:23
208:2,13,23
210:16,19 211:2
212:12,15,19
213:12,17 214:7
214:8,19 215:6
215:13,24 216:6
216:9,24 217:7
217:18 218:14
218:18 219:21
220:10 221:13

224:6 225:10
230:23 231:12
232:6,9,13,16,19
232:22 233:12
233:19 234:1,7
234:11,16,18
243:2,9,12,15,23
244:11 245:4,10
245:19,23 246:4
246:24 248:6,11
248:15,23 249:2
249:3 251:2
252:10,21 253:8
254:4,11,16,20
254:24
**kim** 3:23 207:4,5
**kind** 10:17 33:21
38:14,19 54:22
72:1 74:11,18
79:18 83:3
113:21 115:12
115:13 117:5
124:16 155:8
177:16 182:2,17
190:14 193:13
193:14 200:10
205:18 220:5
251:7
**kinda** 10:8 53:20
226:7 244:12
**kindly** 179:19
**kinds** 122:19
129:12 246:9
**king** 2:24 5:7,8
56:8 141:24
142:5 144:13
201:10 208:1,11
208:17

**knew** 200:20,23 200:24 230:18
**know** 6:13 10:4 10:4 11:7,10,10 11:20 13:19 14:3 16:22,23 19:9 23:3 32:23 33:13 34:4,4 37:6,11 40:4 43:19 44:14,16 47:1 50:1 51:23 57:7,20 60:6,13 61:3 62:17 64:6 64:23 65:6 67:1 71:7,8 73:18 77:13 78:16 79:12,16,17 81:9 82:16 84:18 85:3,4,4,11 88:4 88:8,9 90:4,4 91:2 93:11 95:11,21 97:8 99:20,24 101:1 102:5,7,8 104:7 107:24 108:18 110:13,14,16 114:3,5 115:13 115:15 117:24 118:2,9,19 119:6 119:11,22 120:1 121:12,15 124:3 124:4 125:22,23 127:10 130:23 132:1 133:8,11 133:16 135:4,15 138:16 141:8,21 143:6,6 149:9 150:19 157:13 157:23 160:8,22 162:3 163:4 164:14 170:24 173:9 174:11,21 175:12 178:6,13 178:14 179:19 180:13 181:6,6 181:12,21 182:15,20,22 183:14 185:12 186:5,8,10 188:13,19 190:16,20 191:9 191:14,19 192:10,12 193:9 193:9 196:5 199:7 200:16 204:10,18,22 205:10,10,12 211:13 213:21 217:16 219:17 220:17 223:14 223:18 228:20 229:22 231:23 232:5 233:9,17 235:19 237:17 237:24 238:8 239:20 240:1,18 240:21 241:2,4 241:10 243:6,16
**knowing** 119:23
**knowledge** 5:15 52:1,2 60:21 141:7 144:23 145:11 147:4 148:9 180:1 228:11 236:1
**knowledgeable** 103:23
**known** 9:12 86:5 88:5,18 103:9 107:11 119:17 225:8 230:18,19
**knows** 11:11 69:15 89:20 135:19 139:12 165:15
**kristen** 1:17 181:14 256:5

**l**

**l** 1:17 156:17 157:10 180:4 192:15 256:5
**labor** 242:11,13
**lack** 147:5
**language** 16:19 94:14 114:16 153:18 175:6 178:16
**languages** 94:13 94:15
**large** 126:3 209:13
**late** 203:17
**latin** 112:6
**law** 2:2,12 7:20 11:11,14 19:12 43:3,5,17 44:11 45:13,22,23 46:6 46:7,7,8 48:6,20 52:17 59:3 67:12 82:5 136:7 251:6,15 251:17 253:7
**lawsuit** 39:8 165:3,7
**lawyer** 10:5 43:1 43:15 62:17 135:19
**lawyers** 10:10 16:18 50:1 131:6
**layer** 91:4,14,17 91:19 99:1
**laypeople** 250:9
**leader** 122:21,21 207:17 228:7
**leaders** 210:3,9 212:5 222:16,21 253:15
**leave** 28:15,16 38:14 143:4,22 168:14 173:14 174:14 178:3,5
**leaving** 10:8
**led** 96:10
**leeway** 99:13 136:5 138:1 139:12 246:23
**left** 161:22 231:6
**legal** 8:19 24:4 38:6 43:20,22,22 43:23 44:13,15 45:3,13,14,17 46:3 47:12,15,17 47:18 52:6 55:20 59:12,13 59:14,17,21 63:5 67:5 71:1 87:24 88:20 90:12 91:10,10,11 97:18 98:17

138:22 148:1 151:8 164:3 165:4 169:6 179:7 226:23 251:5,6 253:3,11 253:19 257:1 260:1
**legalese** 16:20
**legalities** 138:17
**legally** 164:15 211:19 226:24
**legislation** 51:13 76:3,5,9,12,13 76:15 77:6 98:8 171:5
**legislative** 6:23 17:21 51:11 76:4 77:24 78:5 78:15,19,23 84:15 95:20 129:15,21
**length** 67:3 82:12
**lengths** 81:21
**leonard** 190:4
**letter** 55:21 95:14 257:19
**letters** 231:22
**letting** 191:9,14 191:19
**levels** 97:11
**liability** 60:9,15 165:20 251:18
**license** 15:2
**lie** 14:16
**light** 222:13 223:16
**lighting** 5:10
**lights** 5:9 11:1
**liked** 188:9
**likewise** 90:1 91:9
**limit** 19:10 150:4 150:19 152:23
**limitation** 147:24
**limited** 27:19 38:2 149:2
**limiting** 137:8 148:12 151:12 152:18,21
**limits** 60:14
**line** 29:11 57:18 159:11 170:19 219:23,24 257:13 259:7 260:3
**lines** 51:16 152:16
**link** 193:2 196:20 197:4,11 198:7 204:13,22 230:14
**links** 199:1,3,5,6 199:11
**lion** 196:18
**list** 125:18 127:3 162:15 167:16 170:14
**listed** 20:17 259:7,17
**listing** 259:7
**literal** 239:19
**literally** 26:4 27:6 61:19 71:1 80:1 85:7 107:15 112:6,23 115:23 123:10 127:4 129:10 133:5,6 136:9 137:4 138:22 139:18 140:10 144:23 171:13 173:9 179:6,9 223:17 234:20 237:13 240:2,16 242:18 253:11
**litigation** 38:22 43:5,7 169:12,13 219:8
**litigator** 16:14 135:21 169:13
**little** 11:1 16:17 56:17 72:8 84:13 86:19 89:7 91:1 110:6 142:1,3 189:18 219:1,2 220:10 226:15 243:16
**live** 8:1
**loan** 78:23
**local** 46:10,10 67:13 73:4,15 79:2,16
**lock** 203:15
**locked** 187:9
**log** 193:4
**logging** 195:20
**logic** 251:5,7
**long** 19:23 24:8 24:12,15 34:6 67:19,21 68:1,3 75:22 186:7 192:17 235:19
**longer** 49:11 162:24 163:1 181:10 201:4
**longest** 160:3
**look** 13:19 49:3 52:20 56:22 68:23 70:9 71:9 73:16 110:11 133:21,24 147:5 168:11,15 174:6 188:9 198:18 201:22 206:10 209:5 215:12 218:5,19 223:18 226:4
**looked** 8:11 64:18 66:21 67:6 72:2 75:12 163:17,23 166:3 169:2 216:19,20 221:24
**looking** 12:17 19:6 31:14 56:12 57:2 71:7 75:14 86:7 93:12 116:6,7 125:13 152:10 163:19 174:2 175:10 176:8,16 179:8,9 182:12 184:18 188:19 189:16 198:19 199:14 200:10 201:8,12 204:9 212:21 219:22
**looks** 171:2 173:4 175:6,11

182:11 184:10 184:11,22 185:4 188:7 198:5 201:20 204:1 205:21 206:16 211:20,23
**loosey** 243:17
**lord** 241:21,22
**lord's** 241:19 242:16,17 244:7 244:8
**lose** 94:17 97:12 132:17 253:16
**losing** 44:7
**lost** 94:20 97:12
**lot** 32:24 34:12 34:13 44:6 46:15 53:16 66:11 80:6,7 84:1,13 101:1,3 114:24 139:12 146:20 158:1 167:2,10 168:13 189:15 194:11 229:16 230:9
**lots** 8:19
**loud** 184:8
**louis** 180:18
**love** 149:21
**lowering** 5:9
**lucien** 2:24 7:22 91:6
**luciferian** 5:14
**lunch** 167:21
**lund** 52:16
**lydia** 177:11 179:15,22

**m**

**ma** 1:8,18 257:6 258:3 259:3
**mad** 194:13
**madam** 176:21 177:17,17 180:11 189:20 195:4 198:23 201:15 206:18 209:9 216:16,16 220:16 221:1,17 222:2 224:13 226:3 227:24 229:2 234:23 257:10
**main** 82:23
**maintain** 67:21 248:3
**maintaining** 38:7
**maintains** 220:2
**majority** 250:4
**makayla** 3:16,20 180:19 181:9 184:20,23 185:1 185:10,11,14,20 185:22 187:20 187:22 188:7
**makers** 63:24 64:2
**making** 26:8 41:24 58:13 98:7 214:15 245:4
**malionek** 177:7
**management** 192:11
**manager** 195:9
**margin** 241:12
**marie** 4:5
**mark** 3:9 170:13 171:20 172:9 173:8 181:12 193:7 194:19
**marked** 170:22
**marks** 194:12
**martin** 170:17 171:24
**mass** 177:24 178:4,6
**massachusetts** 1:2,19,21 2:16 15:2 46:7 60:14 74:10 256:2,7
**material** 88:19 161:2 242:3
**materially** 234:3
**materials** 68:7
**math** 115:7
**matt** 2:8 6:20 7:11 8:15 24:8 24:22 26:17 28:21 35:16 39:6 44:18 111:22 135:16 136:1 143:3 149:15 212:9
**matter** 7:23 9:1 9:6 17:3 23:6 25:20 37:2 40:17 47:10,13 47:16 48:13 52:7,9,10 57:4 59:9 62:7 64:22 78:19 82:5 95:20,22 98:22 102:18 112:23 119:20 136:10 136:12,18 141:10 149:7 150:17 154:3 165:6,10 167:2 172:7,7 211:10 212:1,3 214:10 215:9 226:6 235:3 253:1
**matters** 19:8,10 26:5 41:18,21 59:10,12,14 77:22 78:1,4,16 78:23,24 82:2,24 84:8 103:13 105:5 130:13,16 133:2 135:2 141:3,5 226:1,2 245:19
**matthew** 2:3
**maurice** 190:4
**mayor** 76:4,8,12 76:12,13,14 77:23 82:6 83:1 112:1,2 113:5 116:20 163:10 170:17 171:24 209:17,19 211:11 212:2 213:20 216:17 221:20 223:20 244:23 245:11
**mayor's** 77:5
**mayoral** 209:18
**mean** 12:9 16:21 16:23,23 29:4

42:11 43:16 44:16 53:17 64:3 66:15 67:11 78:17 84:14,21,22 85:3 86:18 90:16 92:21,22 93:1,7 98:13 107:14 114:2,4 115:15 118:2,18 121:11 131:3 132:3,7 134:1 161:9,23 168:3 182:10 185:9 190:6 191:15 194:9 200:9 205:13,15 205:17 216:2 234:8,10 238:19 238:21 241:8
**meaning** 21:20 23:1,4 24:12 32:9,19 35:1,2 35:19 36:14,21 93:4 111:6 121:2,4 184:14 204:24
**meaningfully** 241:22 244:8
**meanings** 34:8
**means** 16:20 35:1,6,19 41:17 44:17,19,23 46:16 56:6 67:1 111:24 121:9 125:12 138:12 156:3 159:11 169:7,22 171:9 171:11 182:21 193:10 202:15 205:14 215:20
**meant** 30:24 65:13 125:3 205:11
**mechanism** 54:23,24
**meet** 80:5,8 156:9
**meeting** 3:13 6:12 28:12 30:24 39:14 52:18 53:6 70:13 84:20 109:23 111:7,24 116:22 117:6 125:1 135:2 156:5,6 177:7 180:24 182:2 183:4 184:22 186:8 187:11,12 188:10,18 191:17 193:9,11 193:23 196:7 198:3,8 204:3,4 204:11 205:1 206:9 207:15,16 210:2,13 230:3 233:2,9 255:1
**meeting's** 185:2
**meetings** 6:23 31:12 50:14 51:2,3 65:21 70:16 72:12 75:18,20,22 76:16,19,22 77:7 77:17,18,22,24 78:2,3 81:19,23 81:24 82:7,24 83:3,7 109:7,14 109:14,15,17 114:21 144:6 160:7 170:20 171:23 183:10 185:21 187:7 188:1,2 191:4 196:3 203:4 204:8 250:2
**meets** 50:13
**meghan** 219:10 219:17
**member** 43:24 84:21 121:20 174:22 192:20 200:14 252:1
**members** 65:2,4 73:8 79:24 81:8 84:3 86:9 91:23 92:1,9 107:11,13 107:15 108:4,12 126:3,3,4 171:1
**membership** 244:21
**memo** 55:20
**memoranda** 91:10
**memorandums** 46:3
**memory** 131:22 132:1 195:12 228:7
**mention** 73:11 122:19 206:4
**mentioned** 11:4 71:24 86:3 94:24 107:10 109:6 127:16 156:10
**mentions** 125:11
**message** 95:12 173:9 219:10
**messages** 95:16 95:17
**met** 64:14 91:7 130:19 133:6 156:1
**mic** 109:11
**michael** 3:17,22 189:19 190:3,5 190:12 191:7,19 192:16,18 195:4 195:21 196:4 201:18 202:4 203:21 204:1
**michelle** 167:5 181:15 213:23 214:1 225:18 226:17 229:7,7
**microsoft** 33:19 33:20,21,21
**mid** 251:21
**midway** 220:1
**midwest** 257:17 260:1
**mike** 191:14
**mincing** 10:4
**mind** 9:14 10:13 21:19 22:3,18 57:8 61:19 63:6 108:15 139:9 146:22 154:5 213:10 226:8
**minds** 5:12 28:12 30:24

31:12 86:12
99:24 137:1
**mine** 19:13
71:21 132:9
221:6
**minimal** 179:7
**minimally**
155:11 157:21
229:6
**minister** 5:9
**minneapolis** 2:6
105:18
**minnesota** 2:6
**minute** 92:22
133:16 182:24
183:3 184:6,10
184:12,13,15,17
184:19 185:7
191:5,16,22
196:24
**minutes** 64:17
70:6,12 72:4,7
110:4 125:16
127:1 131:19
144:14,15
**misactions** 60:11
**miscellaneous**
198:22 199:10
**misheard** 65:3
**missed** 202:2
216:7
**missing** 227:16
**misspoke** 148:21
**mistaken** 164:8
206:6
**mistranslation**
136:16

**misunderstand...**
58:22 138:21
144:2 247:4
**misunderstood**
248:12
**misuse** 21:21
**misusing** 33:3
107:24
**mm** 23:19 50:23
65:16 67:14
70:14 71:23
77:12,21 78:22
79:22 82:3
83:16 90:8
124:20 125:17
134:4,19 143:13
159:12,21,21,21
163:12 173:1
175:5 185:17,19
191:11,18
195:23 215:24
236:23 244:15
250:22
**mmm** 104:12
203:15 236:20
**mobius** 2:24
91:7
**molly** 219:8
**moment** 56:9
134:15,17
**monday** 177:4
185:1,11 187:10
187:12,15
203:12,13
**money** 163:20
166:19 221:3
222:13 249:24

**month** 103:6
104:15 182:4
200:13 230:19
**months** 116:19
161:22
**morales** 180:19
181:7
**morning** 179:13
196:17
**motion** 13:4,5,20
13:21 19:21
38:11 97:15
103:5 254:3
**motivations**
102:16
**move** 41:10
104:18 105:13
107:7 175:19
180:10 183:16
183:21 188:22
189:2 199:15
208:8 245:24
**movement** 74:18
**moving** 28:10
38:12,13 74:20
**ms.o'connor**
137:22
**multiple** 156:10
191:3
**mur** 181:12
**mysteriously**
227:16

**n**

**n** 2:1,5 3:1 5:1
148:19 156:20
157:10,10

**name** 5:8 19:6
21:23 23:2 25:1
25:7,8,8 32:14
35:4,6,19 56:16
185:23 187:20
188:8 190:3
192:12 196:4
197:21 198:6
200:17 204:2,9
209:10 230:21
257:6 258:3,4,15
259:3,4,21
**named** 176:19
189:20
**names** 69:9,10
176:24 199:5
230:13
**narrowing** 69:1
**nature** 7:9 16:4
17:24 18:1 39:4
39:16,18 48:4
60:21 81:21
110:17 227:16
**navigating** 79:12
**necessarily**
99:20 191:15
**necessary** 28:16
107:1
**need** 12:6,13
13:19,24 19:21
33:4 40:20,23,24
41:7 58:5,19
79:11 93:18
106:17 109:11
111:7 119:10,24
132:21 138:16
139:19 144:24
145:13,14,15

146:18 151:6
152:2 161:5,12
162:4 165:9
167:17 180:9
181:21 183:3,3
183:13 184:8
186:23 191:24
204:22 205:7
219:3 229:23
230:2,6 231:4,5
231:6,7 232:1
235:20 252:15
**needed** 107:2
184:6 204:3
**needing** 13:19
**needn't** 179:23
**needs** 14:6 71:13
82:5 145:17
172:6 182:24
187:16 188:15
196:19 197:11
229:22
**neglected** 200:3
**neighborhood**
190:23 191:1
**neither** 117:18
143:8 256:12
**never** 6:3 57:7
161:16 216:3
217:13 226:8
228:16 235:5
**new** 42:15 47:8
158:7
**newer** 158:13
**news** 219:19,19
**nice** 194:14
**nick** 208:14

**nicole** 2:13 7:13
7:15 42:1 64:14
65:8,13 96:23
97:16 137:18
151:18,19
153:15 215:7
248:16 254:12
254:14 257:5
**nicole.oconnor**
2:18
**night** 188:10
**nod** 91:14
**nodded** 91:13
128:14
**non** 236:17
**nondescript** 52:6
**nondiscrimina...**
220:3
**nonissue** 12:4,13
**nonministers**
250:14
**nonprivilege**
23:8
**nonpublic** 123:7
**noon** 203:7,8
206:9
**norm** 113:15
123:17 239:17
239:20,23
240:13
**normal** 23:23
24:2 113:20
116:8 123:19
124:2,4 170:24
171:15,19 193:6
193:12,20,21,23
193:24 223:8,12
223:12

**normally** 23:22
34:3 116:8
117:8,8 119:16
124:11 233:7
**norms** 5:19
193:5
**north** 190:5,22
**notarized** 257:14
**notary** 1:18
256:6 257:24
258:10,18
259:15,23
260:23
**note** 13:10,24
14:4 75:12
117:14 120:10
120:13 142:2
147:21 170:7
173:7 177:8
200:3 211:7,8
219:7,11,16
220:13 221:9,10
238:24,24 239:6
239:7,8,9,10
244:16,22
246:15 249:6
252:10,13
257:12
**noted** 248:6
**notes** 3:14
116:12 117:8
126:13 127:4,8
127:16,17,20
128:5,7,9,11,15
129:21 130:7
131:9,14,15
132:4,8,11
156:20 182:2

185:18 187:22
230:12
**noteworthy** 75:8
81:15
**notice** 8:8 20:17
21:16 23:11
26:6,23 28:17
29:20 30:15,18
32:8,10 36:5,5,6
39:24 40:19,21
41:22 62:10
80:20,22 96:15
102:4 103:5,9
104:19,20 105:6
106:6 127:1,9
142:10,12
147:21 152:16
186:2,22 187:3
193:8 203:1
218:2 220:21
231:21
**noticed** 21:16
214:18
**notifying** 132:14
**notion** 71:12
238:7
**november**
185:11 188:17
**now's** 138:19
**nowadays** 33:21
72:14 241:10
**number** 49:23
126:24 127:4
164:24 175:23
176:2 180:10
183:23 189:2
194:20 199:12
200:5 201:5,11

201:12 202:20 206:24 207:2 208:3,9 209:3 217:1 218:22,23 218:24 228:6 231:3,14,15 234:19 237:2 238:8,22 240:5 244:16 245:6,7 246:7 248:19 250:3,7,12 251:2 252:22 257:7,13
**numbering** 181:20
**numbers** 14:5 78:21 237:1 259:7
**numerous** 64:15 124:18 216:22

**o**

**o** 5:1 180:4,4
**o'connor** 2:13 7:15,15 8:12,14 9:18 10:1,22 11:12 12:4,9,22 13:12,17 14:2,9 14:18 16:3,6,9 16:12 18:8,11,16 18:19 19:15,19 20:6,12,19 21:2 21:13,22 22:2,10 22:13,16,20 23:9 23:19,24 24:7,21 25:1,4,10,15,19 25:24 26:7,17,21 27:8,12,15,22 28:2,5,8,14,20 29:3,10,18,24 30:4,9,13,16,21 31:3,6,10,21 32:2,5,16,21 33:7,12 34:6,11 34:16,19 35:9,13 36:12,16,23 37:3 37:8,18,22 38:4 38:10,16,21 39:1 39:6,10,15,18,22 40:11,18,22 41:12,23 42:3,7 42:10 43:12 44:18 46:20 47:21 48:10,15 51:19,22 54:12 56:22 59:22 62:9,13 63:14 70:23 80:16,19 80:23 81:3 85:20 86:1,13,16 88:12,23 92:13 92:15,21 93:10 93:16 94:7 95:9 95:23 96:2,11,14 96:19 97:7,12,19 97:22 98:1,5,12 98:22 99:2,6,11 99:19 100:5,9,12 100:19,23 101:2 101:7,10,13,20 102:1,11,19,21 103:3,15,19,22 104:3,7,13,21,24 105:4,8,12,16,20 106:2,4,9,20 107:4,8 108:22 113:23 117:22 117:24 118:6 120:3 121:22 122:1,5,11,14 127:21 128:2 133:9 134:10 135:6,14,16 136:1,3,11,14 137:6,17,18 138:6,10,14 139:4,11,22 140:9,14,21 141:11,15 142:1 142:17,19,24 143:2,11,14,20 144:3,7 145:18 145:20 146:5,12 146:15,23 147:8 147:14 148:15 148:20,24 149:8 149:14,18,24 150:8,11,21,23 151:14,17,18,23 152:3,12 153:17 154:17 161:23 162:2,6,11 165:8 165:11,23 167:6 167:12,17,23 168:5,17 169:9 176:12 189:7,10 199:16,19 201:21 211:21 212:9,14,16 213:8,15 214:2 214:12 215:3,10 215:17 216:2 217:2,8 218:6,15 221:16 222:22 231:9 232:5,7,10 232:14,17,20 233:10,17,22 234:6,8,14 235:23 240:3 241:16,24 242:6 242:22,24 243:3 243:11,14,19 244:4 245:8,14 245:21 246:2,17 246:21 247:14 248:3,9,13,16,21 249:1,18,20 250:17,19 252:7 252:18 253:5,20 254:10,12,15,17 254:23 255:2 257:5
**o'connor's** 42:2 215:8 254:14
**o'donnell** 1:15 3:3 14:12,23 15:9 21:23 35:11 42:19 57:6 101:7 102:22 151:18 172:13 173:13 213:16 215:5 253:24 256:8 257:8 258:4,9 259:4,13 260:20
**o'malley** 111:22 112:3 139:16
**object** 32:13 37:1,9,18,21 39:7,9,12 48:14 137:22 165:14 176:6,10 189:6 213:18 243:9,24

**objected** 144:1
**objecting** 127:23
**objection** 9:11 9:23,24 10:15,16 10:17,18 16:3,5 18:8 26:17 38:15 39:17,19 46:20 47:1 48:10 51:17,19 54:12 59:22 62:9 63:14 70:23 80:16 85:20 86:1,13 88:12,23 92:13 92:15 93:10 94:7 95:9,23 113:23 117:22 118:6 120:3 121:22 127:21 133:9 134:10 135:6,14 136:1 142:17 143:11 143:20 144:2 145:18 146:12 146:15 154:17 161:23 162:5,8 165:8,11,23 167:12 169:9 211:21 213:8,9 214:11 222:22 232:2 233:15 234:9,10,11,15 234:17 235:23 240:3 241:16,24 242:6,22 243:21 243:24 244:2 246:17,21 247:14 248:3,24 249:18 250:17 252:7 253:20
**objectionable** 47:2 244:2
**objections** 9:20 10:21 11:5,7 12:20 13:9 14:8 32:22 86:5 214:13 221:15 243:10,13,16
**obligation** 210:14
**obligations** 48:24 49:4,17 52:6
**oblige** 52:21
**obsequiousness** 242:14
**obviously** 12:18 14:4 27:4 33:24 81:18 83:6 91:3 91:6 111:15 114:4 115:22 159:7 183:13
**occasion** 214:6
**occasionally** 240:10
**occasioned** 163:21
**october** 57:23 176:18 177:4 179:12 209:1,8 209:14 222:1,2 225:14,17
**odd** 30:17 197:17
**offer** 100:16 242:1
**offers** 9:16,17
**offhand** 18:20
**office** 23:3 69:20 78:10 80:9 116:16 131:16 161:20 182:10 182:12
**officer** 67:4 68:1 174:18
**officers** 81:9
**offices** 80:4 116:11 158:10 158:16 160:10 230:10
**official** 111:6 246:11 258:15 259:21
**officials** 89:5,8
**officiant** 113:8
**officiants** 228:21
**officiate** 112:20 112:21
**officiating** 112:10,11 113:1
**offset** 206:16
**ofm** 190:4,6,13 190:13
**oftentimes** 104:10
**oh** 14:16 38:12 39:20 48:9 57:10 58:1,4,7 58:12 61:8 65:12,22 70:4 77:8 85:6,22 103:17 110:12 112:12 114:23 122:7 126:14 129:18 153:9 154:20 159:1 160:1,5 166:17 167:8 173:11 174:1 177:5,12 177:13 179:6 180:20 182:22 188:3 189:3 194:1 198:16 199:13 200:22 201:6 208:8 210:16 213:12 221:22 222:4 224:10 225:13 226:8 232:13 244:4 245:10 247:8 248:11
**ohio** 257:2
**okay** 5:5 8:13 9:22 10:23 12:7 12:23 13:17 14:2 15:7,11,14 16:12 17:8,17 18:7 20:15,20 21:5,6,9,15 22:6 24:23 25:6,18 26:8,16,22 27:14 28:18 29:14 30:10,14 31:3 36:15,24 37:13 38:1,9 40:12 41:12,24 42:8,12 42:21 43:8,14 45:8,12,17 46:5 46:12,15,19 47:6 47:12,15,20,23 49:10 50:5,16,21 51:3,10 52:1,3,4

52:14 54:1,4,7 54:10,21 55:2,5 55:9,17 56:24 57:12 58:4,9,15 58:21,23 59:8,16 59:20 60:24 61:13 62:2 63:8 63:20,22 64:10 64:10,20 65:1,9 65:12,14,19,22 65:24 66:3,19 67:5,17,23 68:5 68:14,16,20,22 69:1,1,5,17 71:12,24 72:5,17 73:3 74:9,15 75:5,10,12,17,17 75:20 76:11,17 77:15 78:15,18 79:4,15,23 80:11 81:5,14,18 82:11 82:22 83:2 84:7 84:17 85:13 86:3,11 87:17 88:8 89:18 90:9 91:17 92:7 93:16 94:17,21 95:6,15 97:24 98:10,24 99:18 100:11 101:2 102:1,13,20,20 103:2 104:21 105:12,17 106:2 106:8 107:4,16 107:18 108:8,14 108:24 109:3,6 109:13,20 110:1 110:18,21 112:8 112:22 113:4,14 113:17 114:12 114:17,20 115:5 115:19 116:1,14 116:17 117:12 118:13 119:14 119:19 120:6,15 121:2,8,17 122:12,24 123:10,15 124:8 125:7 127:16 128:4,7,15 129:4 129:9 130:4,9 131:5,5,13,17 132:14,19,22 134:13,17 135:12,23 140:2 140:9 141:2 142:6 144:10 145:3,24 146:7 147:15,18,21 148:12 149:23 150:10 152:3,4,7 152:9,11 153:5 154:8,23 155:8 156:1,5,8,13,21 157:1,7 158:8,12 158:20 159:1,15 159:16,20 161:8 161:20 162:1,6,7 162:13 163:24 164:17,21,23 166:5,13,15,21 167:10,15 168:18 169:5,15 169:20 170:2,19 170:22 171:7,14 172:12,15,19 173:23 174:5 175:8,19 176:2 176:13 177:8 178:9,21,24 179:21 180:11 180:22,22 181:1 181:19 182:1,5,7 182:14,16 183:6 183:11,16,22,24 184:12,17 185:9 187:1,14 188:11 188:22 189:11 190:6,9,17,19,21 191:2,20 192:5,9 192:16,20,22 193:1,4 195:2,10 195:16,19 196:6 196:8,15,22 197:5,22 198:12 198:21 199:20 199:23 200:3,16 201:4,10,12 202:12,19,24 204:15,20 205:2 206:2,4,10,13,21 207:8,10,22 208:13,18,21,24 209:12,14,17,21 210:24 211:3 212:1,14 213:17 214:19 216:6,10 217:18 218:18 219:2,6 220:9,11 221:12 223:2,4 223:13 224:2,9 224:16 225:3,22 225:24 226:5,6,9 226:15,21 227:2 227:3,3,3,12,14 227:20 228:6,13 228:23 229:10 229:16,19,20 230:7,15,23 232:9,16,22 233:12 234:16 234:19 237:7,11 237:22 238:18 239:11,15,24 240:15,20 241:4 241:19 243:11 243:14,15,23 244:4,10 245:3 246:5,20 247:8 248:23 249:4,11 249:22,24 250:13 251:2,3 252:5 254:20 255:3

**old** 5:16 42:15

**olsen** 4:3 209:7 211:11

**once** 7:11 12:16 83:1 122:12 125:19,21 126:1 126:2,16,21 127:2,6,10,11,14 145:10,24 152:10 159:20 191:2 194:16 195:4 196:22 202:19,20 207:23 209:3 227:24 244:16 245:4 248:15 254:12

**one's** 58:2 150:6 150:8
**ones** 84:15 108:11 160:20 181:5,6
**online** 72:12,15 76:18,21 124:19 237:12,12
**oops** 109:10
**open** 170:9 171:22
**opening** 17:20 33:19 177:21 179:16 183:12 197:10
**opens** 6:23 188:2
**operations** 44:1
**operatively** 43:19
**opined** 164:10
**opining** 45:9
**opinion** 47:17 55:9 62:23 63:13,15 70:22 71:1,2,3,4 75:15 82:20 117:23 118:8 135:3 136:19 138:22 139:4 140:1,2,3 140:24 142:19 164:3 233:8 242:1,16 253:9
**opinions** 18:12 47:15 59:12 91:11 92:11 93:4,5,6 98:7 99:16 107:12 108:8 214:5 251:12,13,15
**opponent** 209:17 209:19 211:12 212:3 216:17 223:21 229:8 244:23
**opponent's** 245:12
**opportunity** 28:23 29:8 32:13 36:6 82:14 210:9 212:4 213:4,5 222:15 233:20 236:6 253:18
**oppose** 38:11 39:1
**opposed** 17:19
**opposing** 189:5
**opposite** 45:21
**opposition** 39:5
**options** 46:6
**ordained** 5:8
**order** 13:4,21 42:6 55:12 93:17 115:7 116:19 132:20 161:8,21 165:20 194:23 230:11
**orders** 42:2 78:24 79:1 104:17
**ordinance** 47:4
**ordinances** 44:2 78:24
**organiza** 24:3
**organization** 62:4 91:5 107:17 108:3 123:6,13 157:2 193:5 195:14 223:9 250:24
**organization's** 231:2
**organizational** 74:11 90:22 91:8,19,22 92:4
**organizations** 19:4 24:4
**original** 32:7 59:9 172:20 227:20
**originally** 240:22,22 241:4
**originated** 70:7
**outcome** 256:14
**outside** 19:17 20:16 62:10 63:22 64:7 80:21 122:9 137:23 141:4,5 152:16 179:24 238:7 246:22 248:4,13
**overall** 183:10
**overlap** 126:6
**overpowers** 19:13
**overturned** 13:22

**p**

**p** 2:1,1 5:1 176:19 177:4,15 180:4
**p.m.** 255:6
**pa** 191:13
**page** 4:2 19:6 31:13 96:17 175:10 176:5,17 181:21,22 183:24 201:14 215:16 218:9 257:13,15 259:7 260:3
**pages** 176:9 216:22
**paid** 162:21,24 163:1,4,7,9 166:8 242:10
**paige** 197:9
**pamphlet** 8:9 26:11,12,13 27:16 29:13
**pamphlets** 8:7 8:11
**pandemic** 196:3 203:24
**panelist** 191:13
**paola** 178:19 179:14,24
**paolo** 3:12 178:8 178:18 179:23 180:4,8
**paper** 189:11
**papers** 72:2
**paperwork** 38:6
**paragraph** 21:17 47:9 59:10 96:18,22 147:22 149:3 150:5 162:16 209:23 215:11,14

227:20 229:3,5 245:14
**paragraphs** 27:9
**parameters** 19:22 143:5
**parched** 108:19
**parish** 190:4
**parkin** 3:16,20 180:19 181:9 184:20
**parks** 247:3
**parlance** 184:15 184:16 237:13 242:5
**parlo** 178:8
**part** 10:11 11:23 13:5 18:12 21:18 23:16 26:9 30:2 37:17 37:22 41:21 63:15 70:16,17 70:19 78:8 80:19 84:1 107:17 123:10 150:5 154:10 158:9 165:19 169:15 203:14 205:9 217:9 234:24 259:9
**partic** 62:11
**participate** 148:13 149:11 150:2,4,20 151:3 151:13 152:18 152:22 210:13
**participating** 149:2 204:5
**participation** 228:6
**particular** 9:15 25:19 26:3 40:1 44:20,23 47:18 49:4,18 53:6 59:11 62:14,17 83:18 86:4 96:5 96:9,9 98:8 99:21 102:16 108:12 116:22 119:5 121:2,19 121:21 122:9 125:4 126:15,16 127:11 153:7 154:3,4,13 161:10,13,13 166:18 170:7 186:3,4 195:17 217:5 218:16 222:3 241:20 242:1 249:9
**particularity** 232:24
**particularly** 17:11 25:11 95:3 125:3 152:19 169:5 221:20 232:23 240:2
**parties** 7:24 64:21 66:24 69:2,3,3 256:13
**partner** 7:20
**party** 19:11
**passed** 74:9 76:9 88:11
**passes** 51:13
**passing** 98:8
**passive** 130:11
**paste** 231:21 232:1
**pastor** 185:3 188:5 190:4,13 190:21 196:17 196:20
**pattern** 61:23 62:2
**pause** 110:9 111:18 113:4,19 116:3 117:17 120:9,18 122:17 123:3 124:14 125:10 132:24 142:9 144:19 145:6 146:9 154:8 166:24 197:6 210:23
**pausing** 220:11
**pay** 165:19
**paying** 166:2 221:19
**payment** 67:20 67:22 68:7 75:18 162:17 164:6 166:14 222:24 227:3
**payments** 227:9 227:10
**pd** 208:9
**pdf** 198:16,24
**pdfs** 208:10
**pendency** 220:13
**penna** 190:3,12
**peop** 83:12
**people** 24:5 27:5 39:8,13 49:6,23 49:23 50:2 53:9 54:23 64:3 65:4 65:9 66:16 69:14 83:12 85:11,13,18 87:5 89:21,22,22,24 90:1,2,16 91:4,7 91:18,21,24 93:9 94:24 101:10 102:16 118:3 120:21 125:21 125:24 126:1,9 126:12,14,19 127:1,5,5,9 129:12 132:20 133:1,5 153:24 154:2 156:11,12 156:13 159:23 160:2,22 161:11 162:23 163:9 166:2,7 179:4,9 180:21 181:3 193:12 194:9,14 194:14 198:18 200:24 204:23 204:24,24 207:5 210:8,12 221:3 235:2,6,22 236:8 237:17 238:6 249:8
**people's** 93:3,5 149:6 176:24 214:5 246:12
**perceives** 37:17

**percent** 249:14
**percentage** 250:12
**perfectly** 198:9
**performed** 117:5
**period** 83:9,19 157:20,20 204:8 241:8
**periodically** 33:5
**permutation** 154:4
**person** 30:11 33:22 62:3 70:10 71:2 108:6 112:8,24 113:8,21 114:6 115:17,20,23 121:12 122:20 125:12 126:16 128:23 129:1,14 129:15 130:24 141:9 145:8 147:1 154:11 156:1,4 157:17 161:13 162:18 166:18 167:4 181:8 186:3,7 187:22 191:14 195:17 196:1,5 205:7 209:18 212:20 215:1 220:16,20 222:12 224:2 230:17 235:1 238:16 239:21 250:15 252:3
**person's** 121:13 198:6 209:10 213:10 215:22
**personal** 5:24 18:11 25:17 31:18 52:23 53:7 63:24 69:15 71:4 81:3 85:21,22 120:23 128:9,11 139:4 141:6,12 142:19 154:21 160:22
**personally** 9:2,3 110:14 114:22 178:18,21 213:18 258:11 259:15
**persons** 154:19
**perspective** 36:9 115:22 145:16 165:4 198:1 253:17
**persuasion** 249:9
**pertain** 16:6
**pertaining** 96:8
**pertains** 63:8 86:4
**petitions** 44:3 79:1
**pew** 249:12
**phase** 11:3,6 113:14 168:8 216:10
**phone** 30:22 95:12 106:16 116:7 156:2 234:4 257:3
**phrase** 242:2
**physical** 223:17
**pick** 160:11
**picking** 90:3 200:14,24
**pickup** 79:16 247:2
**pimen** 180:19
**pimentel** 3:15 181:11 224:18 224:19,20
**place** 103:14 111:7 156:10 169:17
**plain** 21:22 23:14 25:5 32:18 35:1,2,3 35:19
**plaintiff** 1:6,16 2:10 27:4 40:16
**plaintiffs** 7:12 37:2,16,17
**plan** 42:15
**planning** 3:13 180:24
**play** 24:16 111:16 231:13
**playing** 111:17 113:3,18 116:2 117:16 120:8,17 122:16 123:2 124:13 125:9 132:23 142:8 144:18 145:5 146:8 159:10 166:23
**plea** 147:2
**pleadings** 27:2,3 27:4 40:16,18,21
**please** 5:6 9:5,11 14:10 15:8 35:17 36:17 39:20 41:12 46:19 94:8 97:15,15 98:1 111:16 120:7,16 123:1 125:8 129:18 132:14 132:15 143:16 145:4 148:22 151:5,17 167:1 169:6 170:9 176:22 178:6 179:4,4 185:12 189:10,20,24,24 194:22 195:12 197:3,7 199:12 201:13 202:21 206:14 207:2,14 207:24 209:9,22 211:7,9 218:21 219:17 224:13 232:4,24 233:19 243:24,24 244:6 248:7 257:11,11
**pleased** 6:10 114:18,18 115:12
**plural** 7:21 148:14 156:11
**pm** 177:24 178:1 179:17 185:11 188:17 206:8
**point** 8:17,18 28:13 40:9,13

41:14 43:18
51:18 62:20
79:20 81:10
92:17 98:14
116:20 137:14
138:5,13 184:13
198:13 203:17
215:10 254:5,5
**points** 9:15
138:16 231:23
**pol** 67:9
**policies** 7:8
53:18 64:24
129:2 148:5
162:16 227:5,12
227:14
**policy** 17:20
53:12,13,15,22
53:24 54:6 67:6
67:11 71:12
95:19 146:21,23
147:23 149:5
157:8 160:8,10
162:18 163:23
165:2 166:2
226:10,11,12
**politeness**
114:11
**political** 212:3
216:17 223:21
229:7 244:23
245:12
**poor** 125:2
**population**
248:1
**populous** 249:14
**port** 190:4

**posed** 38:15 88:9
95:6 96:8 134:5
134:6 135:7
**posit** 98:14
136:21 161:2
251:4,4,11 254:5
**position** 18:20
19:15 22:4
25:16 29:16
31:19 38:7,20
80:14 101:23,23
102:4 103:6
104:14 106:6
137:3,11,13
138:16 143:6,7,7
150:12,13
157:11 165:5
209:15 211:18
211:18 215:9
220:5 226:17
241:21 242:21
244:6 248:4
252:15,23 253:3
254:11
**positions** 253:19
**possibility** 20:22
**possible** 239:12
**possibly** 40:6
97:4,5 188:16
218:10
**post** 136:21
**posterity** 7:24
**potential** 32:22
106:10 228:20
**practical** 177:22
**practice** 23:15
105:22 163:17
166:4 220:2

**practiced** 43:5
**practices** 148:5
249:15
**pray** 133:15,17
196:18
**prayer** 6:23
17:21 108:9
145:10 165:2
171:23 197:10
250:16
**praying** 236:14
**pre** 124:16
**preceding** 94:9
201:9 219:24
**precise** 41:16
226:16
**precluded**
222:11
**prefer** 189:12
234:1
**preference** 147:7
**preferences**
246:12,16
**preferred** 33:5
192:6
**prefers** 192:8
**premise** 18:15
32:7 103:4
**prep** 185:18
**preparation**
64:11,13 117:5
128:18 131:7
**prepare** 40:3,6
169:23 185:18
218:10 230:11
**prepared** 211:24
217:13,16
218:16 244:19

244:19,22 245:8
251:19
**preparing**
127:17 131:11
153:8
**preps** 187:21
**pres** 159:3
**present** 2:22
38:5 66:1
101:16 159:15
159:15 224:17
229:6
**presentation**
176:11
**presented** 38:3
**presently** 111:19
162:19
**preside** 190:2
**president** 50:9
50:10,11,13,20
50:21 52:5 59:1
111:23,24 112:2
112:4,5,5,15
130:20 158:15
158:17,18,19,21
158:23 160:4
163:11 166:16
172:16 184:21
184:22 185:15
185:20,24
187:23,23,24,24
188:2 207:7,13
223:1 225:5
**president's**
182:9,12
**press** 111:15
223:9 224:9

**presumably** 43:18 45:14 90:5,23 113:2 187:6
**presume** 190:22 219:11
**presumed** 6:18 88:5
**presumptuous** 6:19
**presupposes** 162:18
**pretty** 69:19 113:14 124:24 148:9 157:13,14 162:11 166:10 166:10,11 170:24 171:2 198:13 201:23 237:18
**previously** 71:9 102:6 160:6
**priest** 162:20,21 177:16 190:2,10 190:14 238:3 239:7 242:15
**priests** 163:21 165:19
**primarily** 43:21 44:1,13 84:16
**primary** 72:1
**principal** 60:10 87:7,12,12,16 88:2,6,11,18 89:2,13 94:19 98:17,21
**principals** 87:10 212:21
**principle** 86:22
**principles** 60:20
**prior** 35:23,24 56:13 103:6 110:7,8 143:24 155:4 179:2 199:3 218:7 221:6,23,23
**privilege** 10:14 23:6 26:3 38:14 42:9,10 47:1 122:13 137:15 137:21 146:2 248:24 249:1 254:22,23 255:1
**privileged** 175:1 210:10 212:5 222:17,19
**pro** 86:23 111:23 112:5 113:7
**probably** 35:14 38:11 57:9 71:13,20,22 115:8 125:24,24 132:10 156:7 166:18 167:6 168:9 173:8 176:23 179:23 186:23 187:16 191:24 194:5 196:23 198:17 211:16 230:2 234:24 249:17
**problem** 189:7 197:1 217:9
**procedure** 1:17 15:22 16:2,10 29:23 30:7 80:11 103:11 258:5 259:5
**procedures** 53:19 90:23
**proceed** 14:8 21:4,12 28:22 29:11 36:17 41:15 113:2 117:15 166:22 167:22
**proceeding** 31:22 110:19 111:21 134:16 134:17 138:15 237:24
**proceedings** 10:11 11:8 17:20 112:9,10 133:7,22,23 162:19 238:15 252:11
**process** 149:10 150:2 163:19,20 165:2 204:18
**produce** 128:3
**produced** 56:3 64:19 68:6,7 86:8 216:20 217:24
**producing** 102:22
**product** 46:22
**production** 15:1 257:15,17,22
**productive** 138:3 143:3,8,9
**professional** 1:18 256:5
**proffer** 88:19,20 98:10,11,13,16 104:17 205:19 205:20 242:19 242:21 243:4 251:5,10
**profound** 210:13
**projector** 209:2
**promise** 8:23,23
**prompted** 94:5 94:10,11
**prompts** 165:2
**prone** 9:8
**pronounce** 19:6
**pronunciation** 189:21
**proof** 22:7
**proper** 74:10 90:10,10 100:3 169:14 194:23 247:7,11,16,18 250:14
**properly** 214:18
**property** 192:11
**proportion** 239:24 247:24 249:8
**proportionate** 249:4
**proposal** 171:22
**propose** 8:19,22 10:19 11:9 14:7 47:4 99:23 107:5 205:16 215:1 230:23 231:13,18 239:18 255:1

**proposed** 9:16 12:21 44:2 82:5
**proposing** 20:16 45:7
**proposition** 19:12 189:9 204:15
**proselytizing** 167:10
**protective** 104:17
**provable** 184:5
**prove** 22:8 251:20
**proved** 251:12
**provide** 30:11 39:2 43:22,23 46:6 177:21 179:16 210:6 217:5 218:11 231:20 232:4
**provided** 4:24 27:1,15,16 29:16 55:22 214:3 215:15 216:18 217:21
**provides** 104:17
**providing** 85:21 177:6 193:22 214:23 221:4 253:1
**public** 1:19 6:23 13:1,11 14:11 17:20 67:4,12 72:10 79:20,24 80:3,4,5,5 81:8,9 81:10 83:8,9,18 83:19,19,20 84:6 84:9,9,22 85:14 86:4,5,9 89:9 91:19,23 92:1,9 98:21 107:11,13 107:14,15,22 108:3,4,4,5,10 108:13 109:15 109:15,17 110:19 122:22 123:6,8 133:2,6 147:3 168:9 171:1,5 173:5 174:2,7,11,17,22 175:2,3,7,9,18 204:7,8 211:10 212:2,23 222:21 247:2 250:15 253:1,15 256:6 258:10,18 259:15,23 260:23
**public's** 83:6 90:3 246:15
**publication** 219:12
**publicly** 7:23
**pull** 20:20 217:11
**pulled** 29:17
**punish** 251:14
**pur** 169:12
**purpose** 6:11 11:18,19 20:9 90:1 91:8,9 109:16 125:5 127:17 128:20 131:11 136:17 161:10 165:6,18 165:19 213:20 231:2
**purposes** 7:24 42:13 74:11 78:20 90:19,20 90:22 91:19,22 159:11 161:2 188:16 203:22 207:12 208:7 230:13
**pursuant** 1:16 15:14 16:16 42:1 90:19 91:8 91:18 102:5 103:10 108:6 114:12 125:4 128:12 131:9,10 132:18 141:7 150:17 151:10 153:20 170:2 249:14
**put** 11:1 32:22 52:11,18 56:6 57:9 101:14 106:6,17 143:4 187:6,21 188:8 205:11 209:1 216:24 217:2,10 245:18 254:21
**putting** 26:23 187:5

**q**

**question** 10:15 11:23 22:18,19 26:2 28:24 32:18 34:5,21,22 34:22 35:17 36:10,13,17 37:4 37:6,7,9,11,14 37:15,15,19 38:15 39:11 41:5 44:19,19,22 45:3 48:4,5,15 50:5 57:21 61:12 67:2 71:10,17 72:22 77:5 80:17 86:14 88:9,14,17 92:19,20,22 93:23 94:4,10,12 94:22 95:6,24 96:6,6,8 97:13 97:14 99:3,5,19 121:23 122:6 125:2 134:5,6,11 135:7 136:20 137:20 138:5,9 138:18,23 140:4 140:6,15,17 141:1 143:16,24 144:3,7 145:21 145:22 147:6 149:17 150:14 151:4 152:20 155:7,11,16,20 161:17 165:17 167:7,13 177:22 205:3,22,24 211:6 215:23 228:4 229:1 231:1 238:5,24 242:1 243:1,5,7 243:20,22 244:5 244:11,12,14,14 244:15,15 247:5

248:7,10,18 249:6 252:8,20 253:21,22
**questioning** 233:14
**questions** 9:9,13 18:22 19:16 20:3 22:21 23:7 23:10,21 24:10 25:13,17,20 29:11,13 31:15 31:22 32:23 33:8 34:18 37:10 39:7 40:4 40:6 41:11 45:1 50:17 67:18 75:6 78:12 92:23 97:2 98:2 99:9 102:23 135:17 136:4,5 136:19 137:23 138:11,17 139:23 140:5 141:13 149:15 149:22 151:7,24 165:16 167:3 168:13 169:17 223:5 231:3,11 233:11,13 245:17 246:9
**quick** 43:1 76:6 199:16
**quickly** 99:10
**quid** 86:23
**quite** 10:6 27:6 34:24 35:3
**quo** 86:24
**quote** 155:3,4,6 254:6
**quotes** 223:13
**quoting** 19:2

**r**

**r** 2:1 3:23 5:1 156:17 157:5 178:10 207:4,11
**raj** 228:7
**random** 250:15
**range** 176:5 183:20
**rational** 8:2 9:13 33:16
**rationale** 8:4
**reach** 41:13 138:16 139:24 140:1 174:19 186:13
**reached** 158:9 185:3 221:22
**reaching** 179:14 188:8
**read** 26:11,13,16 90:22 100:22 101:24 146:19 172:10 177:17 179:5 184:8 197:13 201:16 206:18 207:14 209:22 258:5,6 258:12 259:5,6 259:17
**reading** 5:10 21:22 23:14 51:15 96:16 184:7 202:17 207:20 212:10 257:19
**reads** 117:8,8 149:8
**ready** 21:12 27:21 111:2 178:3,5 251:20
**real** 43:1 76:6 87:20
**really** 13:12 53:24 60:23 79:8 84:11 88:15 97:17 128:11 146:18 149:19,20,21 151:20,23 164:23 168:13 171:4 215:6 223:24 224:4 227:10 238:21 241:22 252:22
**reason** 5:20 13:2 53:4 135:18 158:9 257:14 259:8 260:3
**reasonable** 138:1 164:20 232:21 233:11 233:13
**reasoning** 158:16
**reasons** 126:2
**rec** 72:1 174:2
**recall** 48:17 55:24 56:3 69:18 108:11,16 113:9 115:11 118:15,24 119:4 119:11 120:1 153:5 202:7 216:21 221:17 225:4 226:11 230:4,5 235:13 235:16 237:1 238:15 239:11 240:6,8,12
**recalling** 118:21
**recap** 81:20 110:18 131:8,13 149:23 169:2
**receipt** 257:18
**receive** 88:17 95:7,11,13,14,14 95:17 173:16 187:5 205:24 220:4 225:15 228:13
**received** 52:11 58:24 100:24 168:24 173:16 217:14,22 218:2 220:20 227:13
**receives** 76:3 186:3
**receiving** 45:8 221:3
**recipient** 205:8
**recitation** 55:14 226:19
**recited** 145:10
**recognizable** 192:24
**recognize** 133:23 201:1 218:7 238:11

**recollection**
  113:12 221:6
  236:3
**reconvene** 20:24
**record** 5:3 13:13
  20:24 21:7,10
  35:11 57:1
  66:12 67:9
  91:15 109:1,4
  111:6,8 137:11
  137:13 143:12
  146:22 147:16
  147:19 152:5,8,9
  161:9 175:3,7,10
  175:21 176:8
  180:6 183:19
  189:1 199:13,21
  199:24 208:19
  208:22 209:8,22
  210:22 211:1,4
  211:10 212:2
  214:16 217:3,10
  227:5 228:17
  233:24 234:2
  243:18 247:22
  248:2 249:7
  253:1 254:13,18
  255:4 256:10
  259:9
**recorded** 7:23
  76:19 110:22
  124:19
**recordkeeping**
  162:16 227:12
  227:14
**records** 67:4,6
  67:11,12,16,22
  67:24 68:2,7,9

  70:20 75:18
  130:2 173:6
  174:7,11,17,18
  174:23 175:2,18
  228:18 247:23
**recovery** 210:8
**recross** 3:2
**red** 111:20
**redirect** 3:2
**reduce** 231:2
**refer** 151:19
  187:18 237:8
**reference** 13:2
  190:20 231:16
  237:3,6 240:10
  240:12 242:17
  257:7 258:2
  259:2
**referenced** 237:2
  240:7,8 258:11
  259:15
**references**
  235:13
**referencing**
  155:4 232:8
**referral** 79:18
**referred** 76:22
  77:23 82:9
  239:22
**referring** 15:22
  27:8 57:17,17
  58:8 60:5,12
  96:21 120:11
**refers** 182:19
  200:12 237:14
**refined** 91:1
**reflected** 236:14

**refresh** 131:22
  195:12
**refusing** 254:7
**regard** 15:21
  17:20 81:15,16
  152:17 247:2
**regarding** 177:6
  180:23 199:1,4
  219:18 230:13
**registered** 1:17
  256:5
**regular** 135:2
  253:10
**regularly** 10:6
**reiterate** 172:19
**reject** 102:3
**rejection** 172:4
**relate** 171:5
**related** 44:11
  67:19 75:6
  173:15,24
  174:14 214:21
  256:12
**relatedly** 9:6
**relating** 56:3
  102:15
**relation** 136:7
**relationship**
  61:7 63:23,23,24
  64:8 69:15
  120:24 154:21
  160:16,23
**relationships**
  52:24 53:8,9
  216:13
**relative** 123:17
  249:4,8

**relatively** 110:3
  110:5 123:19
  124:2
**release** 223:9
**released** 203:13
**relevance** 130:5
  179:21 192:24
  194:8
**relevant** 18:12
  22:3 27:1,13
  49:14 64:21
  77:6 82:9
  129:23 140:2
  247:1
**relief** 236:15
**religion** 121:21
  250:5,8
**religions** 13:8
**religious** 62:4
  122:9,21 210:3
  217:23 218:1
  246:12,15
  247:20 249:9
  250:14 251:24
  252:12
**remaining**
  176:14
**remarks** 210:1
**remember** 8:20
  20:21 26:23
  31:7 50:18
  58:10,17 75:21
  94:6 101:18
  108:16 109:7
  116:5 117:4
  118:20 123:5
  145:12 197:14
  201:2 202:5

205:5 211:9
221:14 222:6,8
225:3,6 226:16
227:5 229:14
232:7
**remind** 42:18
202:21 224:13
**remote** 203:23
**remotely** 207:14
**remove** 62:21
63:15
**repeat** 17:22
165:17
**rephrase** 153:15
169:21
**reporter** 1:18
4:24 14:14
210:15,17 256:6
258:7
**represent** 6:20
7:12 15:19
179:18
**representative**
7:21 17:12
121:18 139:15
**representatives**
7:21 250:7
**representing**
15:13 17:1
97:10
**represents** 51:9
**request** 10:3
12:2 45:9,9
47:19 48:5,19
52:5,11 54:23
58:24 59:2
65:10 76:8
95:19 163:13

173:6,15 174:7
174:11,15,17,20
174:21,23
175:17,18,18
207:13 208:4,4,6
208:6 215:19
224:9 232:12
259:9,11
**requested** 62:4
144:22 175:7
228:11
**requesting** 19:11
52:12 164:2
225:19
**requests** 52:22
53:2,4 169:11
170:3,4 171:4
217:22,23
**require** 135:4,12
145:11 218:7
**required** 49:16
52:21 179:7
257:24
**requirement**
128:17
**requirements**
46:13 128:12
**requires** 183:12
205:18
**requiring** 165:21
**research** 43:22
43:23 44:13,15
45:4,15 46:15
47:4,10,18 59:13
70:3,5 91:11
125:23 126:20
249:12

**researched**
64:17
**researching** 8:21
**reserve** 9:20
11:5 236:6
**resolutions** 79:1
**resolvable** 33:18
**resolve** 10:18
11:5 12:12
33:16 41:6
105:13 107:6
215:1 231:3
**resolved** 8:2
11:10 33:17
**respect** 60:19
150:24 151:5
210:14
**respectfully** 19:1
172:9
**respective**
230:12
**respond** 47:19
121:20 220:5
**respondeat** 60:5
60:9
**response** 7:2
37:12 55:22
93:12,15,18
104:15 154:19
179:3 214:17
237:17,20
248:19
**responsibilities**
50:19
**responsible** 60:1
**responsive**
172:21 173:17
174:20 215:4,11

**rest** 13:11 123:5
194:10 227:11
**restart** 94:1
**restate** 150:14
**restroom** 199:17
**resume** 124:12
142:7
**retain** 67:15
68:1
**retake** 109:11
**retention** 67:6,9
67:11
**retentions** 67:24
**return** 26:22
38:1 155:12
**returned** 257:18
**reverend** 197:9
**review** 21:2
52:15 56:2 68:8
126:24 127:12
131:19 165:22
165:24 166:1,1
257:12 258:1
259:1
**reviewed** 59:3
62:6 108:10
125:16
**reviewing** 165:2
165:18 173:22
**revisit** 143:15
**revoke** 29:8
**rewatch** 141:19
**rewind** 139:19
140:11 141:21
**rfps** 198:16
**right** 11:14
12:24 21:11
25:14 30:6,18,22

37:5 40:4 50:22
55:9 72:14 73:7
73:18 74:12
76:9 77:17 81:7
81:18 82:22
89:19 90:6 92:8
92:14 96:16
107:10,24 116:1
121:17 124:9,23
128:21 133:7
134:22 139:14
139:18 141:22
142:2 153:5
158:7 159:3,20
159:22 162:7,15
166:24 167:4,20
168:21 170:2
175:21 180:5
182:16 187:2
194:20 205:15
206:24 212:21
213:18 215:16
222:5 224:4
226:15 231:14
233:8,8 236:12
240:21 241:15
242:20 248:8
249:17
**riled** 162:9
**ring** 195:5
**risk** 80:13
**road** 44:22 143:8
**roads** 90:4
**rob** 7:13,17
11:10,10,10,11
12:2 19:20 21:3
31:11 64:14
65:8,13 106:15

**robert** 2:14
**robert.arcangeli**
2:19
**role** 45:5 88:20
131:3 139:9
140:10
**room** 2:15 9:3
16:18 142:10
**route** 54:22
**rule** 15:14,17
16:14,16 18:14
18:16,17 40:2
44:3 79:1 102:6
103:10 104:17
**rules** 1:16 8:19
15:20,21,22 16:1
16:10 18:20
29:23 30:6 39:2
45:13,18 103:10
106:1,3 132:18
135:12 137:5,6,7
169:23 218:7
258:5 259:5
**run** 79:23 81:8
168:10 223:16
**running** 220:14

**s**

**s** 2:1,14 3:7 4:1
5:1 148:19
257:15 259:8,8
260:3
**saint** 190:4
**sake** 156:20
**salem** 1:20
**san** 178:22
**sanctions** 244:3
246:1

**sanity** 172:2
**sat** 139:13 250:1
**satan** 5:9 6:5,6
235:3,6,18,22
236:2,9
**satanic** 1:5,20
6:21 17:3,18
18:2,3 41:20
52:17 57:4
148:19 170:19
210:10 212:6
219:18 222:17
222:20,20
225:17 257:6
258:3 259:3
**satanism** 244:20
**satanist** 171:23
**satisfactorily**
15:1
**satisfies** 208:7
**saw** 73:11 91:14
175:16 176:7
228:7 230:1
238:2,20 239:21
240:7
**saying** 11:19
13:15,15 30:6
38:22 92:8,14
127:24 130:23
132:7,9 144:16
169:19 188:15
199:3 218:2
**says** 7:7 20:21
35:4 38:2 66:24
96:15 103:9
110:12 111:11
113:8 173:9,12
174:13 188:3

242:18 249:13
251:14
**schedule** 207:14
219:17
**scheduling** 197:1
202:23 206:8
208:3 231:17
**scholar** 240:18
**school** 43:17
**scope** 27:7,23
40:7 42:22,23
59:11 62:8,10,22
62:24 88:19
92:2,3 96:10,11
96:17 122:1,10
137:24 139:6
146:5 157:21
180:1 216:5,11
246:22 248:4,13
248:22 252:8
254:13
**scrap** 42:15
**scratch** 132:5
**screen** 245:18
**screenshot** 211:8
**scrima** 195:20
**script** 185:24
187:21 188:3,9
188:10
**scroll** 170:9
175:22 176:4,7
178:24 181:19
182:17 183:23
189:14 192:22
194:7 196:13
197:13 198:10
198:11,20,20
200:6 201:14,14

201:14,14
206:15 218:21
224:6,7,8
**scrolling** 194:8,8
194:21 197:3,5,5
198:12 202:24
206:3,6,11,13
218:20,24 219:1
219:1,1,21
220:10
**sea** 181:1
**seal** 256:17
258:15 259:21
**second** 19:5 47:7
185:10
**secondary**
172:20
**seconds** 144:20
145:1,8
**section** 19:7
**sects** 250:5
**secular** 210:3
**see** 8:8 11:3 13:2
21:4 24:4 28:1
34:22 35:4
38:10,17,18
42:21 49:12
52:3 55:23
56:12,13,21 58:1
66:2 71:9 73:17
75:5 78:13 86:3
86:7 90:6 91:11
92:7 93:8
101:12 102:9
103:20 104:1
108:12 113:7
120:14 124:10
125:20 131:8

136:24 139:2
141:2 142:15
146:13 147:9
153:16 160:7
162:15 170:10
170:24 172:12
172:23 173:7
174:1,10 175:15
176:3 177:15
178:9 179:2,21
181:1,2,20
183:22 184:24
185:10 186:1
188:17 189:3,18
190:9 191:2
192:17,22,23,23
193:17,18 194:7
194:12,22
196:14 197:4
200:5 201:17
204:16 208:11
209:6 212:17
214:19 216:7
218:14,18,19,24
219:3 221:15,24
222:2 224:6,7,9
226:21 239:15
245:23 251:24
252:2,21 253:19
**seeing** 36:8
66:12 108:17
161:3 179:10
225:6 226:16
253:17
**seek** 8:4 19:11
143:4
**seeking** 7:4
28:10 132:17

**seemingly**
234:23
**seen** 70:20,21
71:2 114:21
115:9 124:9
226:10,11
**sees** 139:23
**selected** 151:2
153:7 154:4,13
**selection** 80:14
81:1
**semantics** 10:3
24:16,16,17
34:10,12,14
96:24 139:1,21
159:10 216:3
231:13
**senator** 191:8
**send** 17:12 36:4
65:10 80:12
102:8 171:17
173:15 174:14
232:3
**sender** 207:17
**sending** 230:14
**sense** 19:19
32:24 152:3
174:3 175:12,17
180:13 197:18
210:14 242:8
247:10,12
253:11,11 254:3
**sent** 58:10,11,12
103:9 108:10
141:9 170:3
180:17,22 185:1
185:14,22
198:16 215:22

219:3 225:13,17
227:13 229:13
**sentence** 93:24
94:1 164:1
185:11 219:24
219:24 220:1
222:18
**separate** 134:3
**september**
101:15,17
106:15,18,21,21
173:4,12 196:16
197:17,18
206:17 256:17
257:4
**ser** 242:9
**series** 195:3
**serious** 210:11
**seriousness**
133:23 238:12
**servants** 144:21
144:21,23 147:3
239:23 240:11
241:19,21 242:4
242:10,17 244:8
**serve** 78:6
**served** 232:11
**serves** 51:12
228:7
**service** 79:18
**services** 79:11
**serving** 112:1
**set** 11:8 41:11
56:9,20 80:9
103:13 161:21
180:1 256:9,16
**sets** 123:21

**settle** 166:11
**seven** 68:4,5,11 68:17,17 90:20 91:1,3 144:14 227:7 228:1
**sewers** 90:4
**shakes** 249:23
**share** 249:5
**sharp** 178:1
**shawn** 2:23
**shed** 222:13 223:16
**sheep** 240:11
**sheet** 257:13 259:7,10,18 260:1
**shelter** 210:6
**ship** 49:22
**short** 10:14 41:17 73:1 110:3,5 119:3
**shortest** 178:17
**shorthand** 190:6
**show** 13:2 56:20 57:8 151:5
**showing** 134:20 225:11
**shown** 257:16
**shred** 132:15
**shurtleff** 13:6,22
**shut** 100:10
**side** 8:5,6 45:21 91:20
**signature** 177:16 201:13 215:16 256:20 257:14
**signatures** 176:10 189:4,9
**signed** 258:13 259:18
**significant** 136:5 138:1
**signing** 257:19
**similar** 71:20 114:16
**simple** 193:8 194:3
**simplify** 8:22
**simply** 193:4,6 193:13,17,22,22 194:2,17
**simultaneously** 56:23
**sincerely** 152:11 152:11 207:17 257:21
**single** 69:20 70:13 75:24 125:1 127:8
**singular** 89:24 153:3
**sir** 257:10
**sit** 164:18 166:6 242:20
**situation** 61:24 62:17 96:5
**skim** 182:17
**skimming** 198:12 244:12
**skip** 26:9 189:9 197:1,4 201:5,24 251:2,3,3
**skipped** 177:5 180:12
**skipping** 206:21
**slavery** 242:12
**slaves** 240:2,7,9 241:15,22 242:4 242:10,16,18 244:8
**slightest** 194:13
**slightly** 53:18 189:14 196:14 197:3 200:7 206:3,16
**slot** 188:20
**slotted** 233:3,5
**slow** 73:20,20
**slowly** 192:22
**smaller** 190:23
**smoking** 218:1,5
**so's** 175:15
**social** 5:19
**socially** 247:18
**society** 90:6
**solutions** 5:20 257:1 260:1
**somebody** 59:19 61:5 114:5 121:7,16 155:1 160:21
**someone's** 23:20 121:11
**somewhat** 237:22
**sonia** 2:4,9 7:20 16:21
**sophia** 156:23,24 157:7
**sorry** 6:18 11:13 14:14 17:23 29:4 58:5 60:8 62:19 65:12 73:23 107:14 109:10 112:12 112:17 122:7 126:14 129:18 148:18 160:18 164:8 170:12 176:20 178:12 186:15 189:17 192:6 199:2 201:6 207:15 208:9 210:15,16 212:9 224:10 225:4 227:2 237:7 248:11
**sort** 12:10,14 38:6 46:21 64:8 79:18 138:15
**sought** 213:19
**sound** 65:7 164:18 168:19
**sounded** 155:3
**sounds** 55:2 61:14 74:9 77:1 146:20 148:4 216:15 255:2
**source** 244:13
**sovereignty** 6:1
**spared** 6:4
**speak** 16:18,19 21:3 22:11 24:19 30:11 35:15 42:15 65:4,5 66:5,7,16 82:14,16,16,17 86:16 88:11 89:16 94:14 114:10 129:2 141:18 151:12

160:20 165:10
186:14 188:6
190:11 213:10
214:22,24 236:3
236:21 245:6,8
253:2,18
**speaker** 153:7
154:4,13
**speakers** 151:2
162:17
**speaking** 17:14
22:14 43:19
86:23 94:13,15
158:16 162:21
220:21 243:9,12
243:15 244:1
**speci** 248:17
**specific** 9:23
24:9 37:15
50:17 69:9
84:11 100:1
102:15 108:14
124:17 214:6
236:24 237:2,6
237:19
**specifically** 8:21
26:4 30:12
32:14 40:14
41:18 45:12
56:12 57:17
67:19 81:15
119:10 120:1
137:19,19
148:16 152:17
216:21 227:10
231:22 244:17
248:17

**specified** 117:18
227:21
**specify** 160:13
**specifying**
160:14
**speech** 7:7 13:6
13:7,22,23 116:9
117:9 120:12
123:18,19 145:9
251:21
**speeches** 122:19
**spell** 156:16
180:4
**spent** 84:8
**spin** 249:6
**spirit** 40:2
**spoil** 139:17
**spoke** 64:15,21
65:8,17 67:4,24
69:12 160:10
218:6
**spoken** 66:9
69:18,19 155:23
155:24
**squiggly** 159:11
**ss** 256:3
**stability** 210:7
**staff** 14:13 15:10
42:20 63:3
64:16 65:17
66:9,19 69:6,7
75:7 78:10
79:13 84:2 89:9
89:13 100:16
116:20 117:3,10
117:14,15 129:2
129:4,5,6,10,13
132:20 154:11

154:19 156:11
156:11 157:3,5
163:6 173:21
174:8 177:10,12
181:8,12,13,16
182:9 187:22
191:7 192:20
195:15,18,19,21
202:7,8,9,12
211:11 212:13
220:19 223:8
224:15,21
230:10
**staff's** 129:24
**staffer** 116:12
155:13,15,16
181:14 191:8
230:11
**staffers** 153:10
155:7,9 185:15
191:12 205:1
**staffs** 89:4
**stamp** 170:8
181:20 206:7
207:1 209:2
**stamps** 199:14
202:21
**stand** 5:11,23
**standard** 105:21
105:24,24
162:12
**standing** 83:14
121:6,7
**stands** 141:19
182:4
**start** 6:19 15:6
26:13 42:15,16
47:8 54:18

67:10 72:22
93:18 133:22
135:23 142:4
178:1 189:15
216:7 228:9
247:18
**started** 5:6 24:15
35:9 44:7 74:13
125:1 134:16,18
158:5,6,10
**starting** 73:9
**starts** 109:17,23
141:22
**state** 10:12 46:7
74:6,14 124:17
189:20 209:9
213:10 231:19
253:13 258:10
259:15
**state's** 67:12
**stated** 10:20
150:18 171:20
222:15
**statement** 11:22
93:3 94:5,6,8,9
155:5,12,12,14
211:23 213:7
214:16 220:4
244:1,17 245:16
245:18 247:9,10
247:12 251:10
258:13,14
259:19,19
**statements** 9:13
45:2 50:18
98:15 223:10
244:18

**states** 1:1 19:10 147:22 149:4 170:13,19 171:20 207:13 211:8
**stating** 219:10 226:17
**statistics** 246:11
**statute** 74:9
**statutory** 175:3
**stay** 178:2
**sticking** 28:16
**stipend** 163:18 166:4
**stipulated** 32:9
**stipulation** 9:19
**stipulations** 8:15 8:16,18 12:10
**stop** 99:8 163:1 163:18 164:6 166:4
**stopped** 163:2,4 163:9 166:14 221:3,3,19 222:13
**stories** 85:17,23
**story** 8:5,6 220:14
**straightforward** 92:23 149:20
**strategy** 219:9
**street** 1:20
**strength** 191:23
**strict** 251:18
**strike** 28:10 29:7 32:14 38:13 176:14 228:9
**string** 192:17
**strongly** 234:1
**structure** 77:19 90:12
**structured** 116:16
**struggling** 88:16
**stuck** 10:8 11:13 11:17 141:3,4,6 205:15
**stuff** 33:20 46:17 59:14 79:2 83:4 88:1 89:22,24 90:5,24,24 91:7 108:21 179:7 211:15 236:9 251:21
**style** 41:19,19
**sub** 174:10 231:22
**subcategory** 24:2,3
**subject** 7:7 8:1 10:16 17:17,19 29:15 32:1 40:17 46:12 48:12 64:22 81:1 102:17 106:24 130:13 136:10,12,18 141:10 149:7 150:17 152:15 157:22 162:20 165:3 170:19 174:2,7 175:2,2 175:9 177:3,5 180:12,23 186:5 220:14 225:20 230:7 254:8
**subjective** 22:21 86:17 99:16 100:15 102:15 119:18 228:4,23 229:4 245:15
**subjectivity** 119:20
**subjects** 228:1
**submit** 83:24
**subordinate** 25:7
**subpart** 190:23
**subpoena** 18:24 19:17 32:19 141:12 146:17 147:10 214:14 214:17
**subscribed** 258:10 259:14 260:21
**subsequently** 176:17
**subservience** 242:13
**subservient** 239:18
**substantiate** 139:3
**substantiating** 59:5
**subtitles** 113:7 116:5 120:10
**suffice** 55:11 168:10 194:3 221:13
**sufficient** 42:13 100:8
**suffix** 190:14
**suffolk** 256:3
**suggest** 41:5 95:18 105:13 182:23 217:15 235:6
**suggested** 103:3 104:5
**suggesting** 20:8 85:6 97:17,20,22 97:23 132:8 149:5
**suggestions** 12:10
**suing** 18:2
**suit** 111:20 231:2
**suite** 257:2
**sum** 249:24
**summarize** 81:11 180:20 183:1
**summarizing** 155:6
**summons** 29:21
**superior** 60:6,9 257:1
**supernatural** 234:21 239:19
**supervisor** 61:5
**support** 18:15 84:5 181:16 202:9,12 210:7
**supports** 35:7
**suppose** 98:15 117:20
**sure** 7:15 10:1 21:2 25:15 26:8

38:11 41:3,24
42:7 43:12 46:1
54:20 56:22
58:13 61:16
67:8 70:6 71:19
73:14 84:24
85:5,5 88:3,7
90:15,15,18
91:15 98:22,23
108:22 110:10
123:8 128:1
132:16 134:1
137:13 141:13
144:16 153:17
163:3 166:11,11
168:17,20
174:24 177:23
185:1,2 192:10
193:13 194:6,12
198:7 201:23
217:12 218:8
225:24 236:10
238:10,13,20
239:5 240:5,23
242:9 247:1,6
248:19 250:6
**surely** 203:17
**surmise** 75:1
**surprise** 139:16
139:17
**surrounding**
148:6 162:17
227:3,13
**swear** 14:18,21
**sweep** 130:4
**sworn** 14:15
15:2 256:9
258:10,13

259:14,18
260:21
**synonomous**
91:12
**synonymous**
93:8
**szaniszlo** 4:5

**t**

**t** 3:7 4:1 148:19
148:19,19,19
**tab** 176:2
**table** 7:20,22
10:19 11:24
12:7 28:3 41:8
41:10 107:7
**tabled** 12:18
**tablet** 57:8 66:13
209:4 225:11
**tabling** 36:20
**tad** 58:16
**tails** 243:21
**take** 8:8 13:19
13:24 14:4
16:20 22:5
23:20 28:19
31:18 52:22
53:2,4 65:1
104:10 108:22
115:2,8 120:10
120:13 127:7,17
142:2,10 147:11
156:8 159:10
168:6,15 170:7
173:7 178:7
189:17 199:16
200:3 208:15
209:5 210:20

211:4,7,8 213:20
215:12 218:19
219:7 220:13
221:9 222:18
226:4 238:24,24
239:6,7,8,10
241:7 244:16,22
246:15 247:17
249:6,14
**taken** 1:16 21:8
109:2 127:3
147:17 152:6
199:22 208:20
**takes** 111:7
219:11,16
220:21
**talk** 11:17 22:23
32:12 40:1,15,23
64:15 65:9 66:3
66:19,21 69:7,10
81:19 95:12
96:4 98:6
116:20 117:3,10
117:14 126:9,12
126:14 136:6
141:9 150:17
154:2 156:2
159:17,22 161:5
161:12,20 167:4
167:4 186:23
191:24 194:5
195:21 213:12
213:13,15
222:12 223:24
224:3,4 235:1
237:18 244:22
246:7 254:19

**talked** 27:3
32:11 40:16
65:2 69:6 87:5
106:16 110:23
116:21 117:4
156:10,12,14,21
157:19 159:16
159:24 170:24
221:1 224:3
**talking** 10:10
11:19 17:13
24:12 32:4 37:1
57:15,21 58:1,3
58:13,23 61:7
89:11,12 94:18
111:20 129:4
133:17 140:18
140:19 141:6,23
142:21,22
153:24 180:13
186:16,17
195:19 206:5
213:21 222:11
223:20 236:9
253:11
**talks** 202:12
**task** 235:16
**tasked** 154:12
**tasks** 145:12
161:1
**technical** 210:17
**technically**
186:16
**technological**
208:24 211:3
**technology**
129:14 195:9

**tell** 16:1 30:18 37:8 42:22 45:23 46:19 48:9,9 53:17 58:5 60:24 70:12 83:23 105:19 109:20 139:15 150:20 172:22 181:6 205:9
**telling** 13:24 23:5,6 25:13 27:20 29:6 35:21 40:14 84:3 99:8 100:4 105:6 122:8 137:15 143:21 151:15 173:21 193:20 235:16
**tells** 87:12 203:2
**temple** 1:5,20 6:21 17:3,18 18:2,3 29:17 41:21 52:17 57:4 148:19 210:11 212:6 219:18 222:17 222:20,20 225:17 257:6 258:3 259:3
**temporary** 112:6 113:8
**tempore** 111:23 112:5
**ten** 116:19 125:24 126:19 129:7 132:20
**tendency** 162:9
**tenets** 90:21 91:2
**tense** 130:11
**term** 60:8 78:15 89:2 90:11 112:11 152:19 158:4,14 169:6 184:17 242:9
**terminology** 61:14 184:13 238:9
**terms** 8:18 54:2 72:2 86:21,23 87:22 89:16 90:7 93:2 98:8 99:14 157:16 169:14 187:4,5 203:11 223:17 251:8
**testified** 15:3 215:21
**testify** 18:23 20:13 23:11 25:21 29:12 31:16 37:24 40:8 62:18 98:9 100:15,20 102:24 103:12 106:13 136:11 136:14 161:4 214:4 218:16 248:5 252:19 253:6
**testifying** 39:13 40:5 99:15
**testimony** 14:19 48:3 83:24 137:8 166:6 213:20 216:14 221:7 256:10 258:6,7 259:6,9 259:12
**text** 18:17 135:24 170:23 173:2 190:1 204:16,17 205:15,16 212:7 212:8 226:8 233:4,15 240:16 252:14
**texts** 192:17
**thank** 6:17 11:2 42:13 143:17 146:4 148:22 152:12 155:2 156:18 177:19 178:7 189:3,23 193:12 194:3 196:20 199:19 207:17 219:15 246:24 253:21
**thanking** 194:14
**thanks** 190:5 193:3,14 197:12 219:20
**theatrics** 186:15
**thereabouts** 126:23
**thereof** 154:5
**theresa** 177:7
**thing** 13:23 33:23 34:2 35:2 49:23 58:13 70:17,20 82:19 82:23 87:13,15 87:16,18 88:2 134:2,9 147:5 166:19 168:24 183:4 197:13 198:11,14 201:24 213:22 222:1 229:11 233:9 245:24 246:5 249:5
**thing's** 188:18
**things** 5:21 7:9 9:4 11:4 27:20 30:24 31:8 44:11 45:22 53:18,21 55:7,12 55:15 59:6 60:21 65:5 71:2 72:18 74:19,20 77:18 79:13,16 79:17 83:24 85:18 88:5,10 89:20 90:1,2,17 91:3,5,8,18,20 95:1,4 98:20 99:13 102:5 104:8 109:16 110:17 114:8,19 115:4 117:2 119:6 124:10 129:20 138:18 141:8 144:24 159:17 168:8 171:6 173:8 198:18 201:7 214:21 221:2 227:16 235:22 237:4 238:6 247:3

**think** 12:5,5,12 12:14 14:18 20:8 24:7 25:4 29:10,14 31:12 34:20 35:14 36:12 39:2 41:5 55:23 59:4 69:4 72:13 75:5,12,18 86:11 90:13 92:23 95:21 96:21 99:14,17 104:14 106:15 106:21 107:22 114:10 119:16 126:18 127:21 127:24 128:2 136:4 137:24 138:2,19,20,20 149:20 158:15 162:3 178:1,4,9 189:17 191:21 197:15 198:24 201:8 213:3 215:11,19 218:4 222:12 224:10 231:9 233:22 245:13 247:4,11 248:21 254:1
**thinking** 56:19 99:21
**thinks** 178:7 252:16
**thirteen** 229:11
**thirty** 257:18
**thomas** 3:9 170:13 171:20 172:9 173:8
**thought** 20:1 30:23
**thoughts** 18:11 81:4 99:16
**threat** 6:13
**threaten** 9:7
**threatens** 5:24 9:7
**threats** 20:3
**three** 7:1 133:15 164:17 219:23
**thursday** 1:21 209:8
**time** 5:4 8:22 9:21 21:6,10 24:15 28:23 29:6 31:22 41:3 46:4 49:9,12,14 50:7,9 52:10 59:1 67:3 70:6 80:1 83:5,19 84:7,12 104:14 106:12 108:19 108:24 109:4 111:23 112:1,18 116:16 117:3 124:17 133:21 133:22 138:19 143:9 147:15,19 148:2,4,7,8 152:4,8 157:20 157:20 163:6 166:16 167:21 170:16 172:18 172:19 173:21 176:7 177:10 184:20 187:23 187:24 195:12 196:2 198:19 199:20,24 200:23 203:4,23 204:19 207:7,11 208:18,22 210:21 211:1 220:18,19 224:15,24 225:1 225:23 227:24 228:1 231:6 233:1,3,3,5 234:10 255:3
**timeframe** 157:24 163:8
**timeframes** 203:19
**times** 5:13 7:1 35:3 64:15 78:16 114:15 125:13,23 126:4 133:15 164:14 164:22 183:8,8,9 183:11 191:4 229:24 238:16 239:13 241:2 242:10
**timing** 203:11 221:9
**title** 19:3,7,8 23:3 50:6 112:3 112:5 192:10
**tnt** 148:16
**today** 6:11 8:3 11:15 27:4 94:11 106:13 140:7,19,20 164:19 166:6 190:3 197:10 214:23 236:4 238:20 239:21 240:7 245:17
**today's** 6:12 117:6
**told** 35:19,20 101:13 106:13 128:23 130:24 135:22 164:17 241:7
**tom** 170:22
**tomorrow** 105:15 184:11 185:13 187:16 196:21 202:4,14 202:16 205:4 220:14
**tomorrow's** 180:23
**tongue** 190:12
**tool** 231:10
**top** 189:4 202:1 202:24 216:7
**topic** 19:17 24:9 26:5 37:14,16 39:23 40:1,19 52:4 66:3 77:1,9 83:17 105:9 146:16 151:1 167:19 215:4 236:13 248:22 252:18 254:18
**topics** 18:22 20:10,13,17 21:3 22:22 24:21 25:20 26:18 28:17,24 30:12 30:23 31:13,16

37:23 38:3 40:4 96:2,9,9 98:3 103:16,23 106:13 122:2 130:22 136:8,15 136:18 137:8,24 140:3,23 141:1 141:16 143:3 146:6 167:14 237:3,19 248:5 248:14 251:3 252:9
**tort** 60:9,14,16 60:17 61:9
**totally** 167:23 215:19,23
**track** 66:13 132:1
**tradition** 71:5,6
**tragedy** 236:15
**trained** 43:3
**transcribed** 258:7
**transcript** 179:10 257:11 257:12 258:5,12 259:5,11,17
**translated** 240:24 241:2
**translation** 112:19
**transmitted** 205:19
**trash** 79:16 90:3 247:2
**treasurer** 68:21
**treasury** 68:13 68:18,20 227:7
**treated** 87:15 88:1
**tree** 5:15
**trial** 9:21 11:5,7 139:17 169:23 176:11 235:20 236:7
**tried** 34:10 94:13 106:6
**true** 5:22 98:11 98:23 211:17 214:7 251:11,11 251:12,13,14,20 256:10
**trust** 11:10 172:6
**truth** 6:3,12 12:17
**try** 8:4 9:12 10:2 62:2 89:16 139:1
**trying** 8:24 9:1,4 10:9 16:19 30:1 33:15 45:2 61:18,19 66:13 93:11,14 99:4 117:1 123:11 126:22 136:23 137:2 138:5 149:19 150:8,11 151:23 153:13 153:19 162:9,9 253:16
**tst** 4:7 6:22 7:21 22:9 24:20 31:18 47:19 49:21 51:17 52:11 55:22 86:10 89:19,19 89:20 91:3,5 92:3,4 97:11 100:2 108:9 148:13 161:11 161:14,15 163:13 164:1,9 164:14 165:1,21 174:22 183:14 207:18 211:19 213:6 215:15 220:3,21 221:22 223:22 225:13 226:17 228:8,10 244:20,24 245:13 252:24 253:1,14 254:7
**tst's** 49:22 90:10 90:20 91:20 100:1 163:12,16 163:21 165:4 227:22 251:24
**tuesday** 180:17 202:3 203:3,10 206:8 233:8
**turn** 53:6 65:1 166:19 184:24 212:22
**turning** 132:19 159:20 187:14
**turnover** 158:1
**twelve** 229:11
**twenty** 249:4
**twice** 105:18
**two** 11:4 47:24 53:17 78:12 90:7 91:12 94:13,15 97:11 125:13 131:14 132:11 156:7,8 156:13 157:19 158:4,4,10,16 160:10 161:22 164:13 176:14 183:11 218:11 219:23 226:5
**type** 213:9
**types** 18:19 68:8 250:8
**typical** 12:11 28:21 110:11
**typically** 79:23 104:8 110:2 231:8 233:6

**u**

**u** 156:17
**ultimate** 22:19 136:20
**umass** 182:19
**umb** 182:14,19
**umbrella** 61:14
**unable** 161:4
**unavowed** 5:11
**unclear** 37:14 62:20 227:23 238:5
**uncomfortable** 151:20
**underscore** 28:22
**understand** 6:15 10:9 13:12 22:17 23:17 27:6 29:8,18 30:3 31:20,24

32:17 41:16
43:10 48:2,2
54:10,13 60:7,18
61:19 73:10
78:17 83:2
86:21 88:13,15
90:7,9 92:5,8,17
92:18,20 93:23
94:4 98:12
104:5 105:23
117:1 130:15
133:7 137:1,12
161:17 163:19
169:18 188:15
204:15 205:23
223:20 234:12
239:5 243:4,7
245:24 247:9
252:14 253:16
**understanding**
8:4,5 13:10
15:18,19 16:9,13
16:15 17:1,23
18:1 19:2,24
21:19 22:7
24:24 25:3,5,7
27:19 30:1 35:2
35:14,15,20,22
36:22 38:5
39:21 41:16
50:2,3 53:17
61:1,4,6,17,18
61:21 62:1
87:24 121:3
136:7 137:10
139:8 143:5
169:11 173:18
215:20 217:19

220:23 225:12
225:14 237:20
242:8 253:4
**understandings**
234:4
**understood**
12:16 31:16
54:8,10 115:5
198:9
**undesignated**
200:5
**unfettered** 5:11
**unfolding**
151:21
**unfolds** 34:23
**unfortunately**
41:8
**unitary** 89:24
**united** 1:1
**university**
117:18
**unmet** 230:3,6
231:4,6
**unnecessarily**
106:11
**unnecessary**
219:20 232:17
**unpack** 76:7
**unprepared**
245:5 253:2
**untoward** 9:10
**unusual** 203:11
**unwilling** 161:4
**use** 8:9 25:9 33:6
34:3 36:3 54:2
112:11 119:9
143:9 194:16
226:13 238:9

242:2,9,14 251:7
**usual** 8:14 9:19
23:14 25:5
186:2
**usually** 75:22
83:17 171:4
229:23 230:1

**v**

**v** 1:7 192:15
257:6 258:3
259:3
**vacancies**
229:22
**vacancy** 229:20
229:21 233:1,2
**vacation** 115:3
**vaguely** 182:22
**valdez** 3:18,21
181:13 192:15
204:23
**valid** 44:3 254:8
**various** 114:8
**vary** 82:12
186:18
**varying** 81:20
83:5
**verbatim** 117:7
214:13
**veritext** 257:1,7
260:1
**veritext.com.**
257:17
**vice** 112:3
**video** 111:17,19
113:3,18 116:2
117:16 120:8,17
122:16 123:2

124:13 125:9
132:23 134:20
142:8 144:18
145:5 146:8
166:23 213:21
239:21 240:7
**videographer**
2:23 5:3 10:24
21:6,9 108:24
109:3,12 111:9
147:15,18 152:4
152:7 199:20,23
208:18,21
210:21,24 255:3
**videos** 125:16
**view** 106:11
108:13
**viewpoint**
244:24 251:24
**views** 220:3
**violence** 210:6
237:4
**virtual** 177:6
179:16
**viterinni** 220:18
**vittorini** 3:19 4:6
**voice** 145:9
**voices** 83:12
**volume** 84:7
85:7
**volunteer** 104:14
131:1
**volunteered**
131:3
**vote** 51:13,14
65:4 82:1 84:19
95:21 96:4 97:8
133:2

**voted** 82:7 97:3
**voters** 98:7
**votes** 77:24 78:4
  82:24 85:4
**voting** 83:4 98:8
  100:1,2 109:16
  135:2
**vouch** 120:20
  121:2,5,15
**vouching** 121:19
**vs** 17:3 57:4 73:3

**w**

**w.s.** 188:5
**wait** 42:24 73:20
  73:20,20 76:24
  76:24,24 199:13
  201:24 202:1
  206:12
**waited** 185:7
**waive** 233:20,20
**waived** 257:19
**walking** 64:12
**walsh** 170:18
  172:1
**wang** 156:23,24
  157:7
**want** 6:11,13
  11:17,20 13:1
  14:14,15 20:23
  21:1,4 22:4
  28:18 31:21
  34:17,18 36:10
  40:22 41:15
  45:18 55:13,13
  56:21 66:3 69:9
  73:9,10 86:9
  91:15 96:20

97:14 99:24
101:5 102:5
105:18,19,21
108:9,20 116:9
121:3 124:2
137:13 139:10
139:24 141:4,8
143:4 145:14
146:20 149:9
150:18 167:8
168:7 179:5
185:6 199:7
215:10,18 217:2
217:10,18 218:3
225:23 226:19
231:12 233:24
246:9 248:19
**wanted** 41:13
  77:8 139:16
  168:7
**wanting** 100:3
**wants** 47:3 55:3
  207:19 250:16
**washington** 2:5
**waste** 31:21 41:3
  225:23 234:9
**wasting** 227:24
**watch** 111:3
  124:9,22 125:3
  125:15 139:19
  140:12 144:24
  204:7
**watching** 44:21
  111:19 124:23
  239:1
**way** 19:12 25:9
  25:10 49:24
  50:15 55:12,15

70:11 80:8
87:14,21 95:21
97:3 98:9 99:16
116:6 117:2
119:23 131:18
151:20 176:4
201:13,15 202:1
218:20,21,22
**ways** 152:10
**we've** 7:1 55:12
  59:5 69:5 76:6
  108:18 110:14
  124:9 148:1
  175:22 191:3
  216:11,11,12,12
  221:1 226:5
  231:17 243:16
**website** 204:6
**wednesday**
  75:24 77:22
  177:22,24
  179:17 185:2,21
  187:11,12
  188:18 191:3,4
  193:1 206:9,9
**wednesdays**
  65:23 75:21
  76:1 81:20 83:5
  115:1 198:2
  203:6,6
**week's** 179:16
**weekly** 50:14
  51:2,3
**weeks** 128:6
  131:14 132:11
  156:7,8 218:11
  230:19

**weigh** 83:21 85:4
**weighs** 84:6
**weight** 86:11
**weights** 85:6
**welcome** 5:7 7:3
  143:15 152:13
  156:19
**welcoming**
  115:13
**went** 30:22
  43:17 70:9
  71:24 94:3
  154:13
**whatever's**
  196:11 231:20
**whatnot** 92:11
  176:24
**when's** 203:16
**whereof** 256:16
**whoa** 33:10,10
  33:10,10 206:14
  206:14,14
**wide** 126:4
  241:12
**widely** 119:17
**wife** 7:20
**willing** 179:15
**winning** 165:7
**wisdom** 145:11
  147:4
**wise** 223:17
**witness** 1:15
  21:14 29:3,8
  39:12 40:3,23,24
  102:14 105:7
  111:11 122:8
  135:21 137:19
  150:24 151:5,24

161:4 167:21 168:3,18,20 176:22 177:18 180:11 189:20 195:4 198:23 201:16,22 206:18 209:9 214:22,23 216:16 217:12 218:5 220:7,16 221:1,17 222:2 224:13 226:3 227:24 229:3 234:23 241:20 243:8,17,20 245:5 248:7,17 252:22 253:2,5,9 256:8,11,16 257:8,11 258:1,4 258:11 259:1,4 259:15
**witness's** 253:9
**witness’** 257:14
**word** 21:20,21 23:1 24:24 33:3 34:3 35:3 36:4,7 36:14,21 44:20 44:24 61:1 112:20 119:9 121:4,4 138:23 138:24 142:11 142:13 145:13 145:14 219:22 226:13 237:7 242:14
**word's** 121:10
**words** 10:4,5 14:1 25:8 32:15 34:8 38:19 42:24 43:11 44:7,15,16 55:7 63:13 124:6 162:8 169:21 171:15 182:10 212:18,18,20 226:12 229:16 232:6 237:15 242:16,18 244:7 251:4,9
**work** 12:11 28:15 29:22,23 46:22 53:10,23 63:17 64:6,16 66:2 69:16 78:6 78:8,13,14 79:6 79:7,9 81:7,12 84:3 87:20 104:9 107:21 110:15 114:8 121:1 129:6,6,7 133:22 154:21 154:22 160:23 174:17 181:9 192:18 210:5,5,6 210:10,11 212:5 212:6 222:16,17 222:19 232:20 238:12 240:13 247:2 250:24
**worked** 79:9 182:8 184:20 204:19
**working** 63:22 200:21
**workings** 21:19 22:2,18
**works** 69:12 74:16 115:7 204:18 247:3
**world** 25:6
**worry** 12:6,13
**worth** 250:1
**wow** 159:1
**wraps** 9:5
**wrath** 172:8
**write** 36:5 46:3 56:17 116:8,11 127:4,7,8 231:13
**writes** 185:12 189:19 196:16 197:7
**writing** 43:22 44:13,15 45:4,15 47:12 59:13 101:19,20 253:13
**written** 23:14 45:13 53:18,24 54:5,17,19 74:11 155:23 226:10 226:11 227:13 227:19,22 231:9 232:12 240:21 240:22 241:5,7 241:11 244:18
**wrong** 104:20 229:2 248:8
**wrote** 126:12 179:13
**wu** 113:5 116:16 117:14 141:22 161:12,13,15,18 162:20 163:10 166:16,17 167:5 168:14 181:15 209:17,19 213:23 214:1 220:19,20 221:2 222:24 223:1 224:2,4,15,16 225:18 226:17 228:4 229:1,7 244:11,12,14,14 244:14,15
**wu's** 116:20 126:9,12,14 161:20,21 211:11 212:2 213:20 216:17 220:20 221:21 223:20 229:7 244:23 245:11

**x**

**x** 3:1,7 4:1 66:8 66:15

**y**

**y** 156:17,18 157:10
**yansen** 185:3 188:6
**yeah** 27:22 42:5 44:14 48:12 49:12,21 54:15 54:15,18 55:19 56:4,24 58:2,7 60:16,19 61:10 61:10 63:1 64:3 64:7 66:6,8,10 66:10 69:10,10 73:6,6,9 74:22 74:24 76:20

77:4,10,19 79:20 84:14 85:9,16 87:9,11 89:6,10 89:23 101:18 103:8 106:19,19 106:23 107:14 110:23 114:7,9 118:22 123:10 127:13 128:20 131:21,23,23 132:10,10 134:1 134:24 155:21 155:21 158:2 159:6,7,8,9 171:10 172:17 186:19,21 189:4 196:10 198:4 199:9,9 201:11 201:23 203:20 208:11 210:19 217:7 222:7 224:19 229:16 229:18 232:19 237:11 238:21 247:18
**year** 115:2,7 125:12,21 127:11 158:4,24 163:3 183:8,9,9 183:11 241:8
**years** 68:4,5,11 68:17,17 79:10 115:1,6 127:15 131:19 158:4 174:12 227:7 241:10,11 244:7 250:1,9
**yep** 177:1 206:7
**youth** 210:6
**youtube** 72:13 110:23 111:2 168:23 236:8 238:2
**yuleidy** 3:18,21 181:13 189:22 189:23 191:7,9 191:14,19 192:1 193:1 194:4,5 195:13 196:4,17 197:8,20 198:6 202:7,8,9 203:21 204:1,2,22,23
**yuleidy's** 192:12
**yup** 177:14

**z**

**z** 192:15
**zed** 3:23 207:4 207:11 228:7,8 228:10
**zoom** 191:10 193:3,22 196:3 196:19,21 197:4 197:11 198:7,7 199:1,2,2,3,5,10 201:15 204:3,4,5 204:11,21,21 205:1 209:6 230:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



Matthew A. Kezhaya <matt@kezhaya.law>

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Fri, May 27, 2022 at 4:32 PM
To: Nailah Freeman <nailah.freeman@boston.gov>
Cc: Nicole O'Connor <nicole.oconnor@boston.gov>, "Sonia A. Kezhaya" <sonia@kezhaya.law>, Marc Randazza <mjr@randazza.com>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Cassidy Curran <csc@randazza.com>

Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);
11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;

18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);
19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;
20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;
21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;
22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and
23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]



**Matthew A. Kezhaya <matt@kezhaya.law>**

# TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Wed, Jun 8, 2022 at 1:55 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>

Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

 **Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Fri, Jun 24, 2022 at 4:47 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

**2022 06 24 notice of 30(b)(6) deposition.pdf**
124K



**Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Thu, Jun 30, 2022 at 8:34 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

 **Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Nicole O'Connor** <nicole.oconnor@boston.gov> Fri, Jul 1, 2022 at 7:52 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Can you do Wednesday, July 6th at 11 a.m.?

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

[Quoted text hidden]

**Jul 6, 2022| TST v. Boston - 30(b)(6) meet and confer**

Attendees: Nicole O'Connor Robert Arcangeli Sonia A. Kezhaya

Attached files: 2022 06 24 notice of 30(b)(6) deposition.pdf

Notes

- ¶ 2 - Any policies, practices, or customs surrounding the public's opportunity to influence the City's decision-making; both as a general matter and specific to the invocation ceremony at issue.
  - No issue as to invocation ceremony
  - "The public's opportunity to influence the City's decision-making" more specifically refers to mechanisms, other than voting, for the people to notify the City how the people feel about any issue of interest
- ¶ 6 - All intra-City written communications about TST's invocation demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint.
  - Concern: each writing may need a separate deponent (author-by-author)
  - Emails would be a good starting point; Matt to circle back with emails by two weeks before deposition

- Potential issue: former councilors' subjective motivations are not available to a 30(b)(6) deponent
  - Can a 30(b)(6) deponent testify to matters that were in the knowledge of an agent during the relevant time, which agent is no longer an employee of the deponent?
  - If so, how is the deponent to be prepared?
  - Matt to look to 30(b)(6) book
  - ¶¶ 8, 10, 12, 17-21

- If, due to timing, depositions cannot be done in time, the parties agree to move out the discovery deadline

Action items

- ☐ August 1 may need to be moved toward Mid-August
    - ☐ As of now: Rob and Nicole, both, will be defending the depos.
- ☐ August 25-26 new deposition dates; Sept. 12-14 backup dates
- ☐ Two weeks ahead of depo: Matt to get emails (¶ 6); if a new document comes up we'll deal with it as it arises
- ☐ City's position: 30(b)(6) deposition is limited to 7 hours



Matthew A. Kezhaya <matt@kezhaya.law>

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Wed, Jul 6, 2022 at 1:11 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Following up with answers to the two legal questions raised during the meet and confer.

### *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*

Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:

> For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

### *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760

e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

 **Matthew A. Kezhaya <matt@kezhaya.law>**

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

---

**Matthew A. Kezhaya** <matt@kezhaya.law> Wed, Jul 6, 2022 at 10:47 AM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Thanks for meeting, everyone, please see attached for the shared notes.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

---

**2 attachments**

**2022 07 06 notice of 30(b)(6) deposition.pdf**
118K

**2022 07 06 30(b)(6) examination meet and confer notes.pdf**
36K

 Matthew A. Kezhaya <matt@kezhaya.law>

# TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Nicole O'Connor** <nicole.oconnor@boston.gov> Mon, Jul 18, 2022 at 10:18 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Matthew:

Following up on our phone call, I wanted to let you know that we are confirmed for August 25th. The deponent that day will be Christine O'Donnell. She will be designated on the following topics: 1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24, 25, 26, 27, 28, 29, and 30.

While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6) deposition is limited to 7 hours in total, regardless of the number of designees. In recent history I've had at least one judge in the District of Massachusetts agree with this position.

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Following up with answers to the two legal questions raised during the meet and confer.
>
> ## *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*
>
> Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:
>
> > For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.
>
> Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.
>
> If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001)

(allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

## *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶ 2 and 6 are now annotated per the meeting and the date is updated to August 25).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks for meeting, everyone, please see attached for the shared notes.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Can you do Wednesday, July 6th at 11 a.m.?

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Matthew:

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF0002046-2771 and 3397-3438. In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality). In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

- **DEF0002046-2296[unredacted].pdf**
- **DEF0002296-2771[unredacted].pdf**
- **DEF0003397-3406 [unredacted].pdf**
- **DEF0003407-3438 [unredacted].pdf**

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

> Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.
>
> 
>
> **Nicole M. O'Connor**
> Senior Assistant Corporation Counsel
> City of Boston Law Department
> City Hall, Room 615
> Boston, MA 02201
> (617) 635-4039
> Nicole.OConnor@boston.gov
>
> The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.
>
> On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
>> Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

Yes, the City will oppose the motion. You can consider your 7.1 obligation satisfied.

Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a

filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed). As you probably saw, I filed the protective order yesterday. Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel



City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment

of silence);

11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;
18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);
19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;
20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;
21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;
22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and
23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Hey Nailah and Nicole,
>
> Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
>
> On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>
>> Thank you.
>>
>> On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>>
>>> That's fine
>>>
>>> Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

> Hi Matthew,
>
> As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?
>
> Please let me know as soon as you can. Thank you.
>
> On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
>> Let's do tomorrow at 3:00 pm ET
>>
>> Matthew A. Kezhaya
>>
>> Arkansas office:
>> Kezhaya Law PLC
>> 1202 NE McClain Rd
>> Bentonville, AR 72712
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> Minnesota office:
>> Kezhaya Law PLC
>> 333 N Washington Ave, #300
>> Minneapolis, MN 55401
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman <nailah.freeman@boston.gov> wrote:

Hi Matthew,

Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.

On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

Hi Matthew,

We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.

Wed, 2/16: 2-5pm et
Thurs, 2/17: 11-3pm et
Fri, 2/18: 11-3:30pm et

Thank you.

On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Please see attached for a discovery deficiency letter regarding the first discovery requests, and a second set of discovery requests.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201

617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission (“e-mail”), including any attachment (the “Information”), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission (“e-mail”), including any attachment (the “Information”), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission (“e-mail”), including any attachment (the “Information”), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

 Matthew A. Kezhaya <matt@kezhaya.law>

# TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law> Fri, Jul 22, 2022 at 6:31 AM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Hi Nicole,

Thanks for the update. There is an outstanding need for the City to designate a representative to speak on the below-specified matters for examination. As the 30(b)(6) deponent, the City "must" designate someone to testify as to the enumerated matters for examination. FRCP 30(b)(6).

This case presents a novel constitutional question of whether the First Amendment permits a city to categorically exclude a particular religious minority from a legislative prayer ceremony. Whether the City categorically excluded TST because of TST's religious beliefs is the fact question at hand. Indisputably, the City has that information in its possession because the City has claimed that the Councilors have the sole right to determine who speaks. Obviously, the Councilors are all agents of the City. And that fact matter is "material" to the agency. Thus, the City is deemed to know the information sought. Restatement (Third) Of Agency §§ 5.03, 8.11 (2006).

These fact questions speak to the very heart of this case. We all agreed on dates for this deposition, one month after I gave you advanced notice of the matters to be examined. You have had two months to prepare a witness to speak to these issues, and you have another month to go. The discovery deadline is in three months, and I anticipate a need for supplemental written discovery and possibly even another round of depositions.

By next Friday, **July 29**, the City must designate one or more people to testify about the below matters on August 25 at 9:30 in TST's headquarters as agreed, or I will move to compel.

Matters for examination yet to be designated:

8 - The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

10 - The subjective bases for why each Councilor did or did not heed the demand described in ¶ 9, from January 1, 2011 to present.

12 - The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

17 - Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18 - The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-

held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

19 - Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20 - Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21 - Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22 - Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jul 18, 2022 at 10:19 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

> Matthew:
>
> Following up on our phone call, I wanted to let you know that we are confirmed for August 25th. The deponent that day will be Christine O'Donnell. She will be designated on the following topics: 1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24, 25, 26, 27, 28, 29, and 30.
>
> While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6) deposition is limited to 7 hours in total, regardless of the number of designees. In recent history I've had at least one judge in the District of Massachusetts agree with this position.
>
> Thanks,
> Nicole
>
> **Nicole M. O'Connor**
> Senior Assistant Corporation Counsel
> City of Boston Law Department



City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Following up with answers to the two legal questions raised during the meet and confer.
>
> ## *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*
>
> Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:
>
> > For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.
>
> Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.
>
> If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).
>
> ## *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*
>
> No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300

Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶ 2 and 6 are now annotated per the meeting and the date is updated to August 25).
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
>
> On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
>> Thanks for meeting, everyone, please see attached for the shared notes.
>>
>> Matthew A. Kezhaya
>>
>> Arkansas office:
>> Kezhaya Law PLC
>> 1202 NE McClain Rd
>> Bentonville, AR 72712
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> Minnesota office:
>> Kezhaya Law PLC
>> 333 N Washington Ave, #300
>> Minneapolis, MN 55401
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
>>
>> On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
>>
>>> Can you do Wednesday, July 6th at 11 a.m.?



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added

more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Matthew:

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF0002046-2771 and 3397-3438. In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality). In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

- **DEF0002046-2296[unredacted].pdf**
- **DEF0002296-2771[unredacted].pdf**
- **DEF0003397-3406 [unredacted].pdf**
- **DEF0003407-3438 [unredacted].pdf**

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged***

***and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

Yes, the City will oppose the motion. You can consider your 7.1 obligation satisfied.

Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed). As you probably saw, I filed the protective order yesterday. Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);
11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;
18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel

sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);

19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;
20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;
21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;
22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and
23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Hey Nailah and Nicole,

Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

> Thank you.
>
> On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
>> That's fine
>>
>> Matthew A. Kezhaya
>>
>> Arkansas office:
>> Kezhaya Law PLC
>> 1202 NE McClain Rd
>> Bentonville, AR 72712
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> Minnesota office:
>> Kezhaya Law PLC
>> 333 N Washington Ave, #300
>> Minneapolis, MN 55401
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
>>
>> On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>>
>>> Hi Matthew,

As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?

Please let me know as soon as you can. Thank you.

On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Let's do tomorrow at 3:00 pm ET
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
>
> On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>
>> Hi Matthew,
>>
>> Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.
>>
>> On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>>
>>> Hi Matthew,
>>>
>>> We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.
>>>
>>> Wed, 2/16: 2-5pm et
>>> Thurs, 2/17: 11-3pm et
>>> Fri, 2/18: 11-3:30pm et
>>>
>>> Thank you.

On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Please see attached for a discovery deficiency letter regarding the first discovery requests, and a second set of discovery requests.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615

Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

**2022 07 06 notice of 30(b)(6) deposition.pdf**
118K

Exhibit C                                    Page 372

 Matthew A. Kezhaya <matt@kezhaya.law>

# TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Nicole O'Connor** <nicole.oconnor@boston.gov> Fri, Jul 29, 2022 at 8:05 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Matthew:

The City designates the chiefs of staff for Councilors Flynn, Flaherty, and Baker, as well as the former chief of staff for Mayor Wu, to testify regarding topics 8, 10, 12, 17, 18, 29, 20, 21, and and 22 on their behalf. These folks will testify on one of the dates we put on hold in September (9/12-9/14, I believe). The remaining Councilors who were on the Council at the time relevant to Plaintiff's complaint (as well as their chiefs of staff) are no longer employees of the City and therefore are not within the our "control", so to speak. There are no current City employees who can testify regarding the "subjective intent" of these Councilors. From a practical standpoint (at least from my view), it does not make much sense to insist on moving forward with these "subjective intent" questions via a 30(b)(6) deposition, particularly where you can get this testimony via other means (like issuing individual deposition subpoenas). Of course, you're free to proceed how you see fit, but we'll oppose any motion to compel on these grounds.

Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Fri, Jul 22, 2022 at 7:31 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Hi Nicole,
>
> Thanks for the update. There is an outstanding need for the City to designate a representative to speak on the below-specified matters for examination. As the 30(b)(6) deponent, the City "must" designate someone to testify as to the enumerated matters for examination. FRCP 30(b)(6).
>
> This case presents a novel constitutional question of whether the First Amendment permits a city to categorically exclude a particular religious minority from a legislative prayer ceremony. Whether the City categorically excluded TST because of TST's religious beliefs is the fact question at hand. Indisputably, the City has that information in its possession because the City has claimed that the Councilors have the sole right to determine who speaks. Obviously, the Councilors are all agents of the City. And that fact matter is "material" to the agency. Thus, the City is deemed to know the information sought. Restatement (Third) Of Agency §§ 5.03, 8.11 (2006).
>
> These fact questions speak to the very heart of this case. We all agreed on dates for this deposition, one month after I gave you advanced notice of the matters to be examined. You have had two months

to prepare a witness to speak to these issues, and you have another month to go. The discovery deadline is in three months, and I anticipate a need for supplemental written discovery and possibly even another round of depositions.

By next Friday, **July 29**, the City must designate one or more people to testify about the below matters on August 25 at 9:30 in TST's headquarters as agreed, or I will move to compel.

Matters for examination yet to be designated:

8 - The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

10 - The subjective bases for why each Councilor did or did not heed the demand described in ¶ 9, from January 1, 2011 to present.

12 - The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

17 - Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18 - The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

19 - Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20 - Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21 - Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22 - Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jul 18, 2022 at 10:19 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

> Matthew:
>
> Following up on our phone call, I wanted to let you know that we are confirmed for August 25th. The deponent that day will be Christine O'Donnell. She will be designated on the following topics: 1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24, 25, 26, 27, 28, 29, and 30.
>
> While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6) deposition is limited to 7 hours in total, regardless of the number of designees. In recent history I've had at least one judge in the District of Massachusetts agree with this position.
>
> Thanks,
> Nicole
>
> 
>
> **Nicole M. O'Connor**
> Senior Assistant Corporation Counsel
> City of Boston Law Department
> City Hall, Room 615
> Boston, MA 02201
> (617) 635-4039
> Nicole.OConnor@boston.gov
>
> The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.
>
> On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
>> Following up with answers to the two legal questions raised during the meet and confer.
>>
>> ## *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*
>>
>> Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:
>>
>>> For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

## *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶ 2 and 6 are now annotated per the meeting and the date is updated to August 25).
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks for meeting, everyone, please see attached for the shared notes.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Can you do Wednesday, July 6th at 11 a.m.?

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Matthew:

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF000204620-2771 and 3397-3438. In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality). In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

Thanks,
Nicole



Nicole M. O'Connor
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

📄 DEF0002046-2296[unredacted].pdf

📄 DEF0002296-2771[unredacted].pdf

📄 DEF0003397-3406 [unredacted].pdf

📄 DEF0003407-3438 [unredacted].pdf

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. *This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.* The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.



Nicole M. O'Connor
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. *This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.* The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may

Exhibit C
Page 379

not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

Yes, the City will oppose the motion. You can consider your 7.1 obligation satisfied.

Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed). As you probably saw, I filed the protective order yesterday. Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or

other valuable consideration the City provided to the guest speaker in return for their services)

8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);
11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;
18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);
19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;
20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;
21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;
22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and

23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Hey Nailah and Nicole,
>
> Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112

f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

> Thank you.
>
> On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>
> > That's fine
> >
> > Matthew A. Kezhaya
> >
> > Arkansas office:
> > Kezhaya Law PLC
> > 1202 NE McClain Rd
> > Bentonville, AR 72712
> > p: (479) 431-6112
> > f: (612) 349-2760
> > e: matt@kezhaya.law
> >
> > Minnesota office:
> > Kezhaya Law PLC
> > 333 N Washington Ave, #300
> > Minneapolis, MN 55401
> > p: (479) 431-6112
> > f: (612) 349-2760
> > e: matt@kezhaya.law
> >
> > This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.
> >
> > On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
> >
> > > Hi Matthew,
> > >
> > > As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?
> > >
> > > Please let me know as soon as you can. Thank you.
> > >
> > > On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
> > >
> > > > Let's do tomorrow at 3:00 pm ET
> > > >
> > > > Matthew A. Kezhaya
> > > >
> > > > Arkansas office:
> > > > Kezhaya Law PLC
> > > > 1202 NE McClain Rd
> > > > Bentonville, AR 72712

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman <nailah.freeman@boston.gov> wrote:

> Hi Matthew,
>
> Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.
>
> On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>
>> Hi Matthew,
>>
>> We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.
>>
>> Wed, 2/16: 2-5pm et
>> Thurs, 2/17: 11-3pm et
>> Fri, 2/18: 11-3:30pm et
>>
>> Thank you.
>>
>> On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>>
>>> Please see attached for a discovery deficiency letter regarding the first discovery requests, and a second set of discovery requests.
>>>
>>> Matthew A. Kezhaya
>>>
>>> Arkansas office:
>>> Kezhaya Law PLC
>>> 1202 NE McClain Rd
>>> Bentonville, AR 72712
>>> p: (479) 431-6112
>>> f: (612) 349-2760
>>> e: matt@kezhaya.law
>>>
>>> Minnesota office:
>>> Kezhaya Law PLC
>>> 333 N Washington Ave, #300

Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

# Re: Deposition schedule

Nicole O'Connor <nicole.oconnor@boston.gov>
Fri 9/9/2022 6:53 AM

To: Matt Kezhaya <matt@crown.law>

Cc: robert.arcangeli@boston.gov <robert.arcangeli@boston.gov>;Bill Rohla <bill@crown.law>;John Hayden <john@crown.law>;Nick Henry <nick@crown.law>;Sonia Kezhaya <sonia@crown.law>

Matt:

As I understand you're no longer going forward with the depositions on September 12/13, I'll let the deponents know they do not need to appear.

Thanks.

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Sep 8, 2022 at 7:47 PM Matt Kezhaya <matt@crown.law> wrote:

> Time's up. I consider our preexisting "September 12-14" agreement, which Nicole helpfully recited on the record, to be broken. That will give me more time to work up the motion for sanctions, anyway.
>
> I look forward to seeing y'all on **September 20**, at **9:30 am** for the deposition of **Mayor Wu** at **TST HQ**, as previously noticed.
>
> Ensaibi-George may or may not happen on the date previously noticed. I will confer with her separately and will let you know the product of her and my mutual agreement.

**From:** Matt Kezhaya
**Sent:** Thursday, September 8, 2022 11:50 AM
**To:** Nicole O'Connor <nicole.oconnor@boston.gov>; robert.arcangeli@boston.gov
**Cc:** Bill Rohla <bill@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>; Sonia Kezhaya <sonia@crown.law>
**Subject:** RE: Deposition schedule

Nicole/Rob:

This back-and-forth is unproductive. I propose that we all have a recorded and auto-transcribed meeting video conference to address all things "discovery." Crown's IT systems has that capability.

How soon can y'all have such a call?

---

**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Thursday, September 8, 2022 10:25 AM
**To:** Matt Kezhaya <matt@crown.law>
**Cc:** Bill Rohla <bill@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>; Sonia Kezhaya <sonia@crown.law>; robert.arcangeli@boston.gov
**Subject:** Re: Deposition schedule

Matt:

Chiefs of staff for Mayor Wu (David Vittorini), Councilor Baker (Amanda Curley), and Councilor Flynn (Charles Levin) will appear on Tuesday, September 13 to testify as I've explained below. Please let me know what time each of them should arrive.

The deposition for the designee for Councilor Flaherty will need to be on a different date. We're happy to work with your schedule to come up with a date that works for all parties.


Thanks,

Nicole


On Wed, Sep 7, 2022 at 10:57 PM Matt Kezhaya <matt@crown.law> wrote:

Nicole:

# "Designations"

You keep saying that you are "designating" certain witnesses for certain topics. I'm concerned this means you intend to instruct the witnesses not to answer questions unless they fit within your interpretation of the word "designate." Please note the applicable rule:

- "A person may instruct a deponent not to answer **only** when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

# FRCP 30(c)(2) (emphasis added).

# Wrangling the chiefs' schedules.

It's a deposition and we scheduled this back in July. The chiefs will be there because this is the City's last opportunity to substantiate the good faith basis of its denials. FRCP 8(b).

# "back-up" vs. "designee"

We've already made an adequate record of our respective positions.

# City Clerk

That was an error on my part. I've reviewed several invocations by the former City Clerk and did not know she is no longer involved with the City. I will confer with her separately and will give you notice of her deposition when she and I agree on a mutually-convenient date.

# Revised deposition notice for Mayor Wu

**You are notified** that TST will take the deposition of **Michelle Wu** on **September 20, 2022** at **9:30 am** at **64 Bridge St., Salem, MA 01970**. The deposition will occur pursuant to Rules 26 and 30, FRCP, and it will be recorded by audiographic, videographic, and stenographic means. The court reporter will be supplied by Veritext.

# Revised deposition notice for Anissa Ensaibi-George

**You are notified** that TST will take the deposition of **Anissa Ensaibi-George** on **September 19, 2022** at **9:30 am** at **64 Bridge St., Salem, MA 01970**. The deposition will occur pursuant to Rules 26 and 30, FRCP, and it will be recorded by audiographic, videographic, and stenographic means. The court reporter will be supplied by Veritext.

---

**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Wednesday, September 7, 2022 6:39 PM
**To:** Bill Rohla <bill@crown.law>
**Cc:** robert.arcangeli@boston.gov; Matt Kezhaya <matt@crown.law>; Sonia Kezhaya <sonia@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>
**Subject:** Re: Deposition schedule

Hi Bill:

We're aiming to have chiefs of staff for Councilors Flynn, Baker, Flaherty and Mayor Wu available on September 12 and 13.  Ideally, we'd like to schedule two depositions per day.  We're coordinating schedules with these folks and will circle back as soon as possible as

to who is available on which date. I want to flag, however, that since we did not have confirmation that Plaintiff intended to move forward with these depositions until yesterday, some chiefs of staff may no longer be available. In the event that happens, we'll propose alternative dates for their depositions.

The chiefs of staff are being designated to testify on behalf of their respective councilors on the following topics of Plaintiff's 30(b)(6) deposition notice: 8, 10, 12, 17, 18, 19, 20, 21. To be clear, these are not "back up" 30(b)(6) designees; these are the designees the City originally designated to testify regarding these topics on July 29, 2022.

It is the City's position that there is an order prohibiting the Plaintiff from taking Mayor Wu's deposition. Given that, as well as the pending motion to quash, we're not going to coordinate dates for Mayor Wu's deposition at this time.

Regarding the City Clerk, we have not yet received a deposition notice or subpoena for him (yesterday was the first time we heard that Plaintiff intended to depose the City Clerk). Given that short notice, the deposition cannot take place next week.

Thanks,

Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The

Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Tue, Sep 6, 2022 at 2:58 PM Bill Rohla <bill@crown.law> wrote:

Hi Nicole,

We'd like to coordinate schedules for 9/12-14 for the backup 30(b)(6) designees as well as the City Clerk. Please let us know who will appear at which dates and times.

Additionally, if you'd like your schedule taken into consideration for the depositions of Mayor Wu and Annissa Essaibi-George, please let us know what dates work for you in September.

Thank you,

Bill Rohla

Paralegal

Arkansas office:

Crown Law

1202 NE McClain Rd

Bentonville, AR 72712

p: (479) 431-6112

f: (612) 349-2760

e: bill@crown.law

Minnesota office:

Crown Law

333 N. Washington Ave., Suite 300

Minneapolis, MN 55401

p: (612) 276-2216

f: (612) 349-2760

e: bill@crown.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

--

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.