# 1:21-cv-10102

---

IN THE UNITED STATES COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

**THE SATANIC TEMPLE**, INC.
*Plaintiff*

*v.*

CITY OF **BOSTON**
*Defendant.*

---

# APPENDIX

---



**Matt Kezhaya**            matt@crown.law
Ark. # 2014161             direct: (479) 431-6112
Minn. # 0403196           general: (612) 349-2216

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

# Table of contents

| Exhibit # | Title | Page |
|---|---|---|
| Exhibit A | Notice of Deposition | 3 |
| Exhibit B | Transcripts | 12 |
| Exhibit C | All Emails regarding 30(b)(6) | 332 |
| Exhibit D | Post Deposition Email | 389 |

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC.<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF BOSTON, MA<br><br>DEFENDANT. | CASE NO. 21-CV-10102<br><br>TST'S NOTICE OF DEPOSITION OF THE CITY OF BOSTON, MA |

**To**: Defendant and its counsel of record, Nicole O'Connor and Robert Arcangeli, 1 City Hall Square, Boston, MA 02201.

**LET IT BE KNOWN** that, pursuant to FRCP 26 and 30(b)(6), Plaintiff will take the deposition of the City of Boston, MA through one or more of Defendant's officers, directors, managing agents, or such other persons who consent to testify on its behalf, concerning the matters set forth below.

The deposition(s) will take place by oral examination, before a person authorized to administer oaths and take testimony and will be recorded by stenographic and videographic means. The deposition(s) will take place at 64 Bridge Street, Salem, MA, 01970 on **August 25, 2022** beginning at **9:30 am EST** and continuing thereafter until complete.

## Definitions

(1) "TST" is The Satanic Temple, a congregation of atheistic Satanists which began in 2013 and continues to present. TST is the plaintiff in this action.

(2) The "City" is the City of Boston, Massachusetts, a world-renowned center of cultural significance. The City is the defendant in this action.

(3) TST's "first demand" is the first time TST demanded of the City to have an equal right to participate in the invocation ceremony.

(4) The "invocation ceremony" is an opportunity for a person to speak before the regular meeting of the City Council for the contemplated purpose of engaging in a religious expression, which opportunity is available only to those who have been expressly invited by the City.

## Matters for examination

1. The identity of the 30(b)(6) deponent, the scope of their agency for the City, any other relationship they have with the City or its decisionmakers, the grounds for their testimony on any of the following topics, and what investigation or preparation (if any) they have done to speak for the City on any of the following topics.

2. Any policies, practices, or customs surrounding the public's opportunity to influence the City's decision-making; both as a general matter and specific to the invocation ceremony at issue.

    a. "The public's opportunity to influence the City's decision-making" more specifically refers to mechanisms, other than voting, for people to notify the City how the person feels about any issue of interest.

3. A background on the City's invocation ceremony, including without limitation: when it first arose, what legal challenges (if any) it has faced over time, how (if at all) the invocation ceremony has changed over time, how (if at all) any policies, practices, or customs surrounding the invocation ceremony have changed over time, the bases for limiting who may participate, how and why a particular speaker is selected, how and why any particular speaker is not selected, and the City's concept of a typical invocation.

4. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony.

5. The City's record keeping policies surrounding written communications sent or received by any City agent about this case, from January 1, 2015 to the

date of the original complaint.

6. All intra-City written communications about TST's invocation demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint.

7. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's invocation demands, up to the date of the original complaint.

8. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

9. General information about any individuals or groups who have demanded participation in the City's invocation ceremony, from January 1, 2011 to present. Including without limitation: their name, faith group, residential address at the time of the demand, business or congregation address at the time of the demand, and how many times the guest speaker has performed an invocation for the City or otherwise, and whether the City extended a demand to the subject individual or group.

10. The subjective bases for why each Councilor did or did not heed the

demand described in ¶ 9, from January 1, 2011 to present.

11. Identifying information about each invited speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business or congregation address at the time of the invite, how many times the guest speaker has performed the invocation for the City, how much money or other valuable consideration the City provided to the guest speaker in return for their services, and any other collateral benefits the guest speaker received because of the speaking opportunity.

12. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

13. Any instances in which the City had a vacancy in the guest speaker role for the invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present. Particularly: why there was a vacancy, the date of the meeting in which there was a vacancy for the invocation ceremony and how (if at all) the time slotted for the invocation ceremony

14. Any instances in which the invocation ceremony did not implore a literal

supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence).

15. Any instances in which the invocation ceremony addressed a topic which was not reflected on the Council's agenda for that meeting (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements imploring divine wisdom be granted to the Council).

16. Any instances in which a guest speaker identified the Council as subservient to any literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or which otherwise subordinates the will of the Council to the will of the supernatural entity; or which otherwise implies the Council is unable to perform their public service function without reliance on the deity being prayed to).

17. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18. The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first

impression and as that understanding has evolved over time, if at all.

19. Each Councilor's subjective opinion about the bona fides of TST's sin-cerely-held religious beliefs, from TST's first demand to present.

20. Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21. Each Councilor's subjective understanding about TST's intra-organiza-tional activities, and the bases therefor.

22. Any statement (inclusive of any statements that were oral, written, rec-orded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

23. Any other of the City's policies, practices, or customs surrounding gov-ernmental control, or lack thereof, over the invocation ceremony (including without limitation: any instance in which any City personnel sought to review a invocation before it was given, any instance in which any City personnel sought to modify a invocation before it was given, any instance in which any City per-sonnel commented on a invocation after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an

anticipated invocation, and any other facts the City finds important to the question of whether it exercised any level of control over the invocation ceremony).

24. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present; and relied-upon grounds therefor.

25. The relative proportionate share of each faith groups' representation in the City's invocation ceremony, year-over-year, from January 1, 2011 to present; and relied-upon grounds therefor.

26. The sum of money the City has paid to each guest speaker at the invocation ceremony, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received.

27. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the invocation ceremony.

28. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each

councilor to deny TST an invitation for equal access to the invocation ceremony.

29. Any other facts the City finds relevant to the litigation.

30. Any documents provided by the City to TST in discovery.

> Propounded on July 6, 2022,
> on behalf of Plaintiff
>
> By:  /s/ Matthew A. Kezhaya
>
> Matthew A. Kezhaya, ABA# 2014161
> Kᴇᴢʜᴀʏᴀ Lᴀᴡ PLC
> 300 N. Washington Ave. #300,
> Minneapolis MN 55401
> phone:  (479) 431-6112
> facsimile:  (479) 282-2892
> email:  matt@kezhaya.law

### Cᴇʀᴛɪғɪᴄᴀᴛᴇ ᴀɴᴅ Nᴏᴛɪᴄᴇ ᴏғ Sᴇʀᴠɪᴄᴇ

Nᴏᴛɪᴄᴇ ɪs ɢɪᴠᴇɴ that I, Matthew A. Kezhaya, provided the foregoing document by email to opposing counsel at nicole.oconnor@boston.gov and robert.arcangeli@boston.gov on July 6, 2022.  /s/ Matthew A. Kezhaya

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                        CASE NO. 21-cv-10102

4    - - - - - - - - - - - - - - - - - -

5    THE SATANIC TEMPLE, INC.,

6                    Plaintiff,

7         v.

8    CITY OF BOSTON, MA,

9                    Defendant.

10   - - - - - - - - - - - - - - - - - -

11

12

13

14         AUDIOVISUAL DEPOSITION of CHRISTINE

15   O'DONNELL, a witness called by counsel for the

16   Plaintiff, taken pursuant to the Federal Rules of Civil

17   Procedure before Kristen L. Kelly, Registered

18   Professional Reporter, MA CSR No. 115893 and Notary

19   Public in and for the Commonwealth of Massachusetts, at

20   The Satanic Temple, 64 Bridge Street, Salem,

21   Massachusetts, on Thursday, August 25, 2022, commencing

22   at 9:32 a.m.

23

24

Page 2

```
 1   A P P E A R A N C E S:
 2   CROWN LAW
 3     By:  Matthew A. Kezhaya, Esquire
 4          Sonia A. Kezhaya, Esquire
 5          300 N. Washington Avenue, #300
 6          Minneapolis, Minnesota 55401
 7          479.431.6112
 8          matt@crown.law
 9          sonia@crown.law
10          For the Plaintiff
11
12   CITY OF BOSTON LAW DEPARTMENT
13     By:  Nicole O'Connor, Esquire
14          Robert S. Arcangeli, Esquire
15          City Hall, Room 615
16          Boston, Massachusetts 02201
17          617.635.2902
18          nicole.oconnor@boston.gov
19          robert.arcangeli@boston.gov
20          For the Defendant
21
22   ALSO PRESENT:
23     Shawn Budd, Videographer
24     Lucien Greaves, Ada King, and Mobius
```

Page 3

```
 1                    I N D E X

 2  Deponent:              Direct   Cross   Redirect   Recross

 3  CHRISTINE O'DONNELL

 4     By Mr. Kezhaya

 5

 6

 7                    E X H I B I T S

 8  No.

 9  Exhibit 1   8.30.2017 Mark Thomas Email;

10              DEF0002870

11  Exhibit 2   10.19.2020 Email, Gabriela Coletta

12              to Fr. Paolo; DEF0003434-3436

13  Exhibit 3   2.19.2020 BHM Planning Meeting

14              Notes; DEF0002320-2322

15  Exhibit 4   11.03.2020 Email, Elizabeth Pimentel

16              to Makayla Parkin; DEF0002391

17  Exhibit 5   06.16.2020 Email, Michael Bonetti to

18              Yuleidy Valdez; DEF0002733-2734

19  Exhibit 6   09.29.2020 Email, David Vittorini to

20              Makayla Parkin; DEF0002723-2726

21  Exhibit 7   06.16.2020 Email, Yuleidy Valdez to

22              Michael Bonetti; DEF0002729-2730

23  Exhibit 8   12.12.20 Email, R. Zed to Kim Janey;

24              DEF2849
```

```
                                              Page 4

 1                    E X H I B I T S

 2   No.                                            Page

 3   Exhibit 9    10.19.2017 Email, Alana Olsen to

 4                Annissa Essaibi-George; DEF0002890

 5   Exhibit 10   02.14.2019 Email, Marie Szaniszlo to

 6                David Vittorini; DEF0003373-3374

 7   Exhibit 11  TST Brochure                 ID ONLY

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        (Exhibits provided electronically to reporter.)
```

Page 5

1                    P R O C E E D I N G S

2

3                    THE VIDEOGRAPHER:  We are on the record.

4    The time is 9:32.

5                    MR. KEZHAYA:  Okay.  Ada, if you could

6    get us started please.

7                    MS. KING:  Very good.  Welcome,

8    everyone.  My name is Ada King.  I'm an ordained

9    Minister of Satan.  And I will be lowering the lights,

10   lighting some candles and reading our invocation.

11                   Let us stand now unavowed and unfettered

12   by arcane doctrines borne of fearful minds in darkened

13   times.

14                   Let us embrace the Luciferian impulse to

15   eat of the tree of knowledge and dissipate our blissful

16   and comforting delusions of old.

17                   Let us demand that individuals be judged

18   for their concrete actions not their fealty to

19   arbitrary social norms and elusory categorizations.

20                   Let us reason our solutions with

21   agnosticism in all things, holding fast only to that

22   which is demonstrably true.

23                   Let us stand firm against any and all

24   arbitrary authority that threatens the personal

                                                      Page 6

1    sovereignty of one or of all.

2              That which will not bend must break and

3    that which can be destroyed by the truth should never

4    be spared its demise.

5                   It is done.  Hail Satan.

6              MR. KEZHAYA:  Hail Satan.  Great.

7

8                   DIRECT EXAMINATION

9    BY MR. KEZHAYA:

10       Q    So pleased that you all are gathered here

11   today.  I want to be very, very clear.  The purpose of

12   today's meeting is to get to the truth, that's it.  We

13   are not a threat to you.  I want you to know that.

14   It's very important to me that you are aware of that.

15   Do you understand that, Christine?

16       A    I do.

17       Q    Thank you.

18              MR. KEZHAYA:  I presumed -- sorry.  I

19   shouldn't have been so presumptuous.  We should start

20   with who we are.  So I'm Matt Kezhaya.  I represent The

21   Satanic Temple against the City of Boston on charges

22   that City of Boston is not inviting TST to the

23   legislative prayer event that opens public meetings.

24              You just heard the invocation that we

Page 7

1    would have done.  We've demanded it three times.  The

2    consistent response has been unless you have a

3    invitation, you are not welcome.  We cannot get an

4    invitation of our own devices, so we are seeking the

5    court's assistance to give us that invitation.  That's

6    it.  That's all we're here for.  The City denies the

7    charge.  Says that it's our speech, and you are subject

8    to invitation-only policies because that's just how we

9    like to do things.  And so that's the, the nature of

10   the dispute.

11              Once again, I'm Matt Kezhaya.  I

12   represent plaintiffs.

13              We have -- Rob and Nicole, if you guys

14   could introduce yourselves for the defendants.

15              MS. O'CONNOR:  Sure.  So Nicole O'Connor

16   for the City of Boston.

17              MR. ARCANGELI:  Rob Arcangeli for the

18   City of Boston.

19              MR. KEZHAYA:  I have also with me my

20   wife and law partner, Sonia, at counsel table.  And

21   representative -- or plural, representatives of TST,

22   Lucien Greaves, co-founder is also at counsel table.

23   And this matter is being publicly recorded by agreement

24   of the parties to be used only for posterity purposes

Page 8

1   not live broadcast.  That was a subject of dispute.  We

2   resolved it through rational discourse.

3             That's what we're here for today is just

4   rationale discourse to try to seek an understanding, a

5   joint understanding as to our side of the story and

6   your side of the story.

7             We have brought pamphlets so that you

8   guys can see who we are.  You will take notice that

9   this pamphlet will be -- I'll just use this one as

10  Exhibit 1.  You guys already have copies.  Have you

11  guys looked through these pamphlets yet?

12             MS. O'CONNOR:  No.

13             MR. KEZHAYA:  Okay.

14             MS. O'CONNOR:  Are we doing the usual

15  stipulations, Matt?

16             MR. KEZHAYA:  No.  No, no stipulations

17  so far.  We can get to that point.  Actually, that's a,

18  that's a good point.  In terms of stipulations I

19  propose as follows:  There are lots of legal rules.  I

20  can't, frankly, remember all of them unless they're

21  very specifically cited and I'm researching at the

22  time, so I propose to simplify them as follows:  I

23  promise not to harass.  I promise not to intimidate.  I

24  am trying to be -- although I'm angry about this

Page 9

1    matter, I'm trying to be very, very clear that my anger

2    is not directed at you personally or anyone in this

3    room.  I feel angry personally about being excluded

4    from things.  That's, that's my deal.  I'm trying to

5    keep it under wraps.  So please bear with me if I

6    sometimes get excitable in the matter.  I relatedly

7    will not threaten anyone.  I ask that no one threatens

8    me because, again, I'm prone to excitement.

9              Only questions about this dispute, no

10   getting into anything untoward.  If anyone has an

11   objection as to anything that I do please let it be

12   known.  We'll try to address it, again, through

13   rational discourse.  No statements only questions.  I'm

14   inquiring into your mind.  I'm not here to make any

15   particular points.

16             These are my proposed offers.  Are these

17   offers acceptable to you guys?

18             MS. O'CONNOR:  That's acceptable to me.

19   I'm also going to abide by the usual stipulation in

20   that I'm going to reserve all of my objections as to --

21   except as to form, until the time of trial.

22             MR. KEZHAYA:  Okay.  I would like, if

23   it's a form objection, for us to have like a specific

24   addressing of what the objection is --

Page 10

1              MS. O'CONNOR:  Sure.

2              MR. KEZHAYA:  -- so that I can try to

3    fix it.  I also request no semantics games, no games

4    of, you know, I don't know, mincing of words.  I'm not

5    very good with words myself.  Despite being a lawyer, I

6    find myself consulting the dictionary quite regularly,

7    in fact.

8              No leaving.  We're kinda stuck in here

9    until we understand each other.  That's all I'm trying

10   to get to.  No talking to your lawyers during these

11   proceedings.  So we are now in the part of the

12   conversation where I'm inquiring into your state of

13   mind, yours, of course, being the City of Boston's.

14             Also, short of there being a privilege

15   objection, I ask that you answer the question.  It will

16   be sometimes perhaps subject to an objection as to form

17   perhaps or some other kind of objection.  To the extent

18   we can't resolve the objection amongst ourselves, I

19   propose that we just discretely table them.  That's all

20   I ask is that the issue be discretely stated.

21             Any, any objections as to that?

22             MS. O'CONNOR:  No.

23             MR. KEZHAYA:  Okay.

24             THE VIDEOGRAPHER:  Before we begin, can

Page 11

1   we put the lights up just a little bit to where they

2   were?  Thank you.

3                  MR. KEZHAYA:  Let's see here.  So phase

4   two of things, you mentioned that you're going to

5   reserve all objections for trial, that would resolve

6   the next phase.  To the extent you have any

7   objections -- I say for trial.  For, you know, whatever

8   next set of proceedings.

9                  I also propose that any disputes be

10  resolved by Rob.  I know Rob.  I trust Rob.  I know

11  that Rob knows the law.

12                 MS. O'CONNOR:  So it will be either one

13  of us.  It may be me.  I'm sorry if you're stuck with

14  me.  I'll do my best to get the law right, but you've

15  got me today.

16                 MR. KEZHAYA:  I'm not -- hold on.  I'm

17  not stuck with you.  To be clear, I want to talk with

18  you.  I brought you guys here for the purpose of

19  talking to you, for the purpose of saying here's where

20  we are coming from.  I want to know where you are

21  coming from.  That's it.

22                 And again, not through statement because

23  that part happened already, through a question.  So you

24  and I might have a dispute.  I say you, counsel table,

Page 12

1   City of Boston and I might have a dispute.  All I

2   request is that to the extent there be contention, Rob

3   be intervening to fix the contention.

4            MS. O'CONNOR:  I hope it's a nonissue,

5   but I think, I think this will be an issue that we

6   don't need to worry about.

7            MR. KEZHAYA:  Okay.  Can we table that

8   then in the event of contention?

9            MS. O'CONNOR:  I mean these are very

10  bizarre sort of stipulations or suggestions for a

11  typical deposition.  I'm happy to -- we'll work with

12  you amicably to resolve any issues, and I think this is

13  nonissue that we don't need to worry about.  And if we

14  should get into some sort of dispute, I think we can

15  cross that bridge when we get to it.

16           MR. KEZHAYA:  Understood.  Once again,

17  no contention.  Just looking for the truth.  And to the

18  extent we have any tabled issues, those obviously have

19  to go to the judge.

20           Any objections as to anything that I, I

21  have proposed here?

22           MS. O'CONNOR:  No.

23           MR. KEZHAYA:  Anyone at all?  Okay.

24           All right.  So that being the case, we

Page 13

```
 1   have some important public documents that I just want
 2   to make reference to.  I see no reason to show anyone
 3   them.  There was the Complaint.  There was the answer.
 4   There was a motion to dismiss.  There was the order
 5   granting the motion to dismiss as to part, importantly
 6   on the issue of government speech, and then Shurtleff
 7   came out which importantly said that government speech
 8   cannot be used to exclude certain religions.
 9               Any objections as to the court taking
10   note in, in the court -- in the course of understanding
11   the rest of this deposition of its own public docket?
12               MS. O'CONNOR:  I don't really understand
13   what you're asking on the record but ...
14               MR. KEZHAYA:  And to be clear, I'm not
15   saying this for the court's benefit.  I'm saying this
16   for the congregants' benefit.
17               MS. O'CONNOR:  Okay.  I don't --
18               MR. KEZHAYA:  The congregants are, are
19   gonna be needing to know that they need to take a look
20   at the Complaint, the answer, the motion to dismiss,
21   the order granting motion to dismiss importantly as to
22   government speech and Shurtleff which overturned
23   government speech.  That's the only thing that the
24   congregants need to take note of.  I'm telling them
```

Page 14

1   this by using those words.

2                   MS. O'CONNOR:  Okay.

3                   MR. KEZHAYA:  But, you know, again,

4   obviously the court's going to take note of its own

5   docket.  We'll -- we'll figure out docket numbers if,

6   if the needs end up being.

7                   So, that all being the case, I propose

8   that we proceed with the deposition.  Any objections?

9                   MS. O'CONNOR:  No.

10     Q    Please identify yourself for the benefit of

11   the public.

12     A    Christine O'Donnell.  I'm the Compliance

13   Director and staff counsel for the Boston City Council.

14                   THE REPORTER:  Do you want -- I'm sorry

15   to interrupt.  Do you want her sworn in first or ...

16     Q    Oh.  Christine, are you gonna lie?

17     A    I'm not but ...

18                   MS. O'CONNOR:  I think we should swear

19   her in just for consistency of the testimony.

20                   MR. KEZHAYA:  I like ceremony.  Let's

21   swear her in.

22

23                   CHRISTINE O'DONNELL

24

Page 15

1  having been satisfactorily identified by the production

2  of her Massachusetts driver's license and duly sworn

3  was examined and testified as follows:

4

5  BY MR. KEZHAYA:

6      Q    Great.  Let's -- let's start over.

7      A    Okay.

8      Q    Please identify yourself.

9      A    Christine O'Donnell.  I'm the Compliance

10 Director and staff counsel for the Boston City Council.

11     Q    Okay.  And why are you here?

12     A    I am here under the deposition.  I'm

13 representing the City of Boston.

14     Q    Okay.  And that's pursuant to a Rule 30(b)(6)

15 deposition; is that correct?

16     A    Correct.

17     Q    What is a Rule 30(b)(6) deposition to your

18 understanding?

19     A    To my understanding, I'm here to represent

20 the City of Boston under the federal rules.

21     Q    And with regard to the federal rules, you're

22 referring to the Federal Rules of Procedure, I gather;

23 is that correct?

24     A    Yes.  Yes.

Page 16

1       Q     Tell us more about the Federal Rules of Civil

2    Procedure.

3                    MS. O'CONNOR:  Objection.

4                    MR. KEZHAYA:  What -- what's the nature

5    of your objection?

6                    MS. O'CONNOR:  As they pertain to what?

7                    MR. KEZHAYA:  She's the one who said it.

8    I'm asking her to expound.

9                    MS. O'CONNOR:  On her understanding of

10   what the Federal Rules of Civil Procedure are?

11                   MR. KEZHAYA:  Correct.

12                   MS. O'CONNOR:  Okay.

13      A     Just my understanding is I'm here because of

14   that rule.  I am not a litigator for the Boston City

15   Council so that -- it's my understanding that I'm here

16   pursuant to that rule.

17      Q     Let me back up with a little bit of

18   exposition.  The lawyers in the room speak a certain

19   language that the congregants do not speak.  I'm trying

20   to take out the legalese.  So 30(b)(6) means something

21   to all four of us and also Sonia.  I doesn't mean

22   anything to them.  So when you say 30(b)(6), I know

23   what you mean.  They don't know what you mean.

24                   What is a 30(b)(6) deposition?

Page 17

```
 1     A    To my understanding, I am here representing
 2  the City of Boston.
 3     Q    In the matter of The Satanic Temple vs. The
 4  City of Boston, --
 5     A    Yes.
 6     Q    -- correct?
 7     A    Yes.
 8     Q    Okay.  And you are here because we called for
 9  the deposition, correct?
10     A    Yes.
11     Q    And more particularly, we called the City of
12  Boston to send a representative to defend itself
13  against the Complaint, and we're gonna be talking,
14  generally speaking, about the Complaint and answer and
15  the allegations therein.  Is that also correct?
16     A    Correct.
17     Q    Okay.  Would you agree that the subject of
18  dispute is whether The Satanic Temple is entitled to an
19  invitation as opposed to subject to an invitation-only
20  policy with regard to the opening of public proceedings
21  with a legislative prayer?
22     A    Could you repeat that?
23     Q    Sorry.  What is your understanding of the
24  nature of the dispute?
```

Page 18

1      A    My understanding of the nature of the dispute

2   is that The Satanic Temple is suing the City of Boston

3   so that The Satanic Temple can give the invocation.

4      Q    And you heard the invocation earlier; is that

5   correct?

6      A    I did.

7      Q    Okay.  How did the invocation make you feel?

8                  MS. O'CONNOR:  Objection.  So she's here

9   for a 30(b)(6) deposition.

10                 MR. KEZHAYA:  Correct.

11                 MS. O'CONNOR:  Her personal thoughts and

12  opinions are not relevant and not part of a 30(b)(6)

13  deposition.

14                 MR. KEZHAYA:  Do you have a rule to

15  support your premise?

16                 MS. O'CONNOR:  Rule 30(b)(6).

17                 MR. KEZHAYA:  What does the text of Rule

18  30(b)(6) say?

19                 MS. O'CONNOR:  I don't have these types

20  of rules offhand.  But my position throughout this

21  deposition, so that we're clear, is that Christine will

22  only be answering questions about the topics that we

23  have designated her to testify about in the 30(b)(6)

24  subpoena.

Page 19

```
 1              MR. KEZHAYA:  I respectfully disagree.
 2   It's my understanding of 30(b)(6), and I'm quoting here
 3   from my 30(b)(6) book and I'm -- the title of the book
 4   being 30(b)(6) Deposing Corporations, Organizations and
 5   the Government, second decision, by an author whose
 6   name I can't pronounce.  I'm looking at page 172 now.
 7   The title of this, of this section is:  What can you
 8   ask in the matters of examination.  Given the title of
 9   book, we all know it's about a 30(b)(6) deposition.  It
10   states:  30(b)(6) itself does not limit the matters of
11   examination that a requesting party may seek in any
12   way.  So your proposition of the law is inconsistent
13   with mine.  Do you have authority that overpowers my
14   authority?
15              MS. O'CONNOR:  So my position is that
16   she's not going to be answering questions that are
17   outside the topic on the 30(b)(6) deposition subpoena.
18              MR. KEZHAYA:  So --
19              MS. O'CONNOR:  Perhaps it makes sense
20   for us to caucus.  Rob and I can caucus.  And maybe we
21   need to file a motion with the court to get some
22   parameters on what will govern this deposition, because
23   we're in for a long day if we don't have at least a
24   basic understanding of, of that.
```

Page 20

```
 1              MR. KEZHAYA:  I thought we just
 2   addressed that when I said I'm not gonna be doing any
 3   harassing, any -- no threats, only questions about this
 4   dispute.  You guys agreed to all of this.  This is
 5   about this dispute; is it not?
 6              MS. O'CONNOR:  This dispute in the
 7   context of a 30(b)(6) deposition.  And I'm not
 8   suggesting that you're harassing her.  I don't think
 9   you intend to do anything like that.  But the purpose
10   of a 30(b)(6) is the designated topics.
11              MR. KEZHAYA:  Yes.
12              MS. O'CONNOR:  And she is here to
13   testify about the topics for which we have designated
14   her.
15              MR. KEZHAYA:  Okay.  So it seems to me
16   that you're proposing that this is outside of the
17   topics listed in the deposition notice.  Is that
18   correct?
19              MS. O'CONNOR:  Exactly.
20              MR. KEZHAYA:  Okay.  Let me pull that up
21   because, frankly, I don't remember what it says.
22              And you also invited a possibility of
23   caucusing.  Do you guys want to caucus and then --
24   caucus off the record, reconvene and then we can
```

Page 21

```
 1   discuss further or how do you guys want to do it?
 2              MS. O'CONNOR:  Sure.  While you review
 3   the, the 30(b)(6) topics, why don't Rob and I go speak,
 4   and we'll see how we want to proceed.
 5              MR. KEZHAYA:  Okay.
 6              THE VIDEOGRAPHER:  Okay.  The time is
 7   9:49.  We're off the record.
 8                 (Break was taken.)
 9              THE VIDEOGRAPHER:  Okay.  We are back on
10   the record.  The time is 9:53.
11              MR. KEZHAYA:  All right.  Are you guys
12   ready to proceed?
13              MS. O'CONNOR:  We are.
14              THE WITNESS:  Yes.
15              MR. KEZHAYA:  Okay.  I did not get very
16   far into my 30(b)(6) notice.  I noticed that the first
17   clause of the first enumerated paragraph is the
18   identity of the 30(b)(6) deponent.  Part of identity is
19   the internal workings of the mind is my understanding.
20   That was my intended meaning with the word "identity".
21   Did I misuse the word "identity"?
22              MS. O'CONNOR:  My plain reading of that
23   clause is just her name, Christine O'Donnell, is the
24   identity of the 30(b)(6) deponent.
```

Page 22

1            MR. KEZHAYA:  But I didn't say --

2            MS. O'CONNOR:  Her inner workings of her

3    mind are not relevant to a 30(b)(6) deposition.  And I

4    want to be clear that that is the position that we will

5    take throughout this deposition.

6            MR. KEZHAYA:  Okay.  It's my

7    understanding that the City of -- my burden of proof is

8    that I must prove that the City of Boston intentionally

9    did not invite TST; is that correct?

10            MS. O'CONNOR:  Correct.

11            MR. KEZHAYA:  And she's here to speak

12   for the City of Boston, also correct?

13            MS. O'CONNOR:  Correct.

14            MR. KEZHAYA:  And she's speaking as the

15   City of Boston.  Is that also correct?

16            MS. O'CONNOR:  Correct.

17            MR. KEZHAYA:  So I don't understand why

18   her inner workings of her mind is not the question --

19   the ultimate question of the case.

20            MS. O'CONNOR:  Because she's not

21   designated on the subjective intent questions, but

22   also, they're not topics that she's been identified to

23   talk about.

24            MR. KEZHAYA:  Well, again, that was my

Page 23

1    intended meaning with the word "identity" of the

2    30(b)(6) deponent instead of just their name and

3    designation of, you know, their office title or

4    whatever.  That -- that was my intended meaning.

5                   Are you telling me that you're asserting

6    privilege on this matter or are you telling me that you

7    just are instructing her not to answer these questions

8    on some nonprivilege ground?

9                   MS. O'CONNOR:  I'm instructing her not

10   to answer questions that she was not designated to

11   testify about on the 30(b)(6) notice.  And I appreciate

12   that perhaps we have disagreements as to what your

13   intentions were with certain clauses.  I'm going by the

14   plain reading of what's written, as well as the usual

15   practice in every 30(b)(6) deposition I have ever been

16   a part of.

17                   MR. KEZHAYA:  I understand.  That's your

18   experience.  My experience is different.

19                   MS. O'CONNOR:  Mm-hmm.

20                   MR. KEZHAYA:  When I take someone's

21   deposition, I can ask them questions about how they

22   feel normally.  Not in a 30(b)(6) deposition, just in a

23   normal deposition.  That's why it's a deposition.

24                   MS. O'CONNOR:  I agree with you there.

1          MR. KEZHAYA:  Well, this is a

2     subcategory of normal depositions.  This is a

3     subcategory of deposing organiza -- because

4     organizations are a legal fiction, you see.  The City

5     doesn't have feelings.  The City is comprised of people

6     who have feelings.

7          MS. O'CONNOR:  I think we're in for a

8     long day, Matt, if we're gonna have to debate all of

9     these issues.  So unless it's a specific topic -- she's

10    more than happy to answer all of your questions on the

11    items that we have designated her for, but we're in for

12    a long day if we're gonna be talking about the meaning

13    of identity.

14         MR. KEZHAYA:  I agree we are in a -- in,

15    in for a long time day.  That's why I started off with

16    no semantics games.  I don't play semantics games.  I

17    don't like semantics games.  They make me frustrated.

18    My intention was to depose someone at the City of

19    Boston who can speak to why the City of Boston will not

20    invite TST.

21         MS. O'CONNOR:  But that's not the topics

22    that she's been designated for, Matt.

23         MR. KEZHAYA:  Okay.  So what's your

24    understanding of word "identity" again?

Page 25

1            MS. O'CONNOR:  Her name.

2            MR. KEZHAYA:  That's your, that's your

3    understanding?

4            MS. O'CONNOR:  I think that's the, the

5    plain understanding in the usual 30(b)(6) context.

6            MR. KEZHAYA:  Okay.  So in my world

7    identity includes name as a subordinate understanding.

8    It includes name, in other words.  It's not only name.

9    Is, is that different from the way you use identity?

10            MS. O'CONNOR:  It seems that way.  But I

11    also don't find these exchanges particularly helpful.

12            MR. KEZHAYA:  I agree, but you're the

13    one telling me I'm not allowed to ask these questions.

14    That's why we're having this discussion right now.

15            MS. O'CONNOR:  Sure.  And so that's our

16    position.  So I'm going to instruct her not to answer

17    questions about her personal feelings --

18            MR. KEZHAYA:  Okay.

19            MS. O'CONNOR:  -- on a particular

20    matter.  But if you have any questions about the topics

21    that she's been designated to testify about, and there

22    are many of them, --

23            MR. KEZHAYA:  Yes, many.

24            MS. O'CONNOR:  -- she will answer them.

Page 26

1              MR. KEZHAYA:  Many indeed.

2              One additional question.  Are you

3     asserting a particular privilege ground or is it

4     literally just it's not specifically identified as an

5     enumerated topic in my matters of examination in my

6     30(b)(6) notice?

7              MS. O'CONNOR:  It's the latter.

8              MR. KEZHAYA:  Okay.  Just making sure.

9     Let's skip that part.

10    BY MR. KEZHAYA:

11         Q    You have read the pamphlet; is that correct?

12         A    This pamphlet?

13         Q    Have you read the pamphlet?  Let's start with

14    that.

15         A    I have not.

16         Q    Okay.  Let's read it.  So --

17              MS. O'CONNOR:  Objection again.  Matt,

18    again, what does this have to do with any of the topics

19    that she's designated for?

20              MR. KEZHAYA:  She's --

21              MS. O'CONNOR:  For the 30(b)(6).

22              MR. KEZHAYA:  Okay.  Let's return to the

23    30(b)(6) notice.  I seem to remember putting at the

24    very end here:  Any other facts the City finds

Page 27

1    relevant, any documents provided by the City in

2    discovery, any pleadings.

3              We talked about the pleadings earlier

4    today.  The pleadings obviously includes the plaintiff

5    as one of the people in this dispute.  This is about

6    us, quite literally.  I don't understand how this is

7    not within the scope of the dispute.

8              MS. O'CONNOR:  So if you're referring to

9    paragraphs 28-29-30, those are facts that the City

10   finds important.

11             MR. KEZHAYA:  Ah-huh.

12             MS. O'CONNOR:  Facts that the City finds

13   relevant.

14             MR. KEZHAYA:  Okay.

15             MS. O'CONNOR:  And documents provided to

16   the City during discovery, was that pamphlet provided

17   to the City during discovery?

18             MR. KEZHAYA:  No.  No.  Again, my

19   understanding of 30(b)(6) is that I'm not limited to

20   these things.  This is just me telling you what to be

21   ready to hear.

22             MS. O'CONNOR:  Yeah, so we have a

23   fundamental disagreement about the scope of a 30(b)(6)

24   deposition then.

Page 28

1                    MR. KEZHAYA:  I see that.

2                    MS. O'CONNOR:  So maybe it makes to

3       table this entire deposition --

4                    MR. KEZHAYA:  No.

5                    MS. O'CONNOR:  -- and get some guidance

6       from the court.

7                    MR. KEZHAYA:  No, we're not doing that.

8                    MS. O'CONNOR:  Well, we're --

9                    MR. KEZHAYA:  If you do that, I'll be

10      moving to strike your answer, and I'll be seeking a

11      default judgment.  We are not exiting this conversation

12      until she and I have a meeting of the minds.  That's

13      the point of depositions.

14                   MS. O'CONNOR:  That's not how this is

15      going to work.  We'll -- we will leave if we feel it's

16      necessary to leave or if we're not sticking to the

17      topics that are on the 30(b)(6) deposition notice.

18                   MR. KEZHAYA:  Okay.  So do you want to

19      take the deposition?

20                   MS. O'CONNOR:  I don't.  I didn't --

21      this is not helpful, Matt.  This is not how typical

22      depositions proceed.  I can't help but underscore one

23      more time and give you another opportunity to ask her a

24      question about any of the topics for which she has been

Page 29

1    identified --

2                  MR. KEZHAYA:  You say --

3                  MS. O'CONNOR:  -- as a witness.

4                  MR. KEZHAYA:  Sorry.  I don't mean to

5    interrupt.

6                  You say one more time.  You're telling

7    me that I get one strike and then you're going to

8    revoke the witness from my opportunity to understand

9    where the City is coming from, correct?

10                 MS. O'CONNOR:  I don't think it's

11   helpful to proceed with a line of questions that she's

12   not here to testify about.  So if -- I will instruct

13   her not to answer any questions about the pamphlet.

14                 MR. KEZHAYA:  Okay.  I think that's the

15   subject of the dispute.  So it appears to me that your

16   position is that you provided her of your own free will

17   not I pulled her into the temple; is that correct?

18                 MS. O'CONNOR:  I don't understand what

19   you just said.

20                 MR. KEZHAYA:  A 30(b)(6) notice is a

21   summons.  She shall attend or you guys don't get to

22   have an answer.  That's how depositions work.  That's

23   how the rules of procedure work.  Correct?

24                 MS. O'CONNOR:  I'm still not

Page 30

1    understanding what you're trying to say.

2                   MR. KEZHAYA:  What part do you not

3    understand?

4                   MS. O'CONNOR:  About her answer?

5                   MR. KEZHAYA:  No.  No.  No.  About what

6    I'm saying right now.  Do you disagree that the rules

7    of procedure allow me to have a -- entitle me, in fact,

8    to a deposition?

9                   MS. O'CONNOR:  Of course.

10                  MR. KEZHAYA:  Okay.  Do you agree also

11   that you have to provide the person to speak to

12   specifically designated topics?

13                  MS. O'CONNOR:  Yes.

14                  MR. KEZHAYA:  Okay.  You also agree that

15   I'm the one who drafts the notice, correct?

16                  MS. O'CONNOR:  Yes.

17                  MR. KEZHAYA:  And it seems odd that you

18   would have a right to tell me how I go about my notice.

19   So that's where the confusion's happening here.  What's

20   going on?

21                  MS. O'CONNOR:  So we had a discussion,

22   right.  We had a phone conversation in which we went

23   through all of these topics, and I thought we had a

24   meeting of the minds as to what things meant.

Page 31

1              MR. KEZHAYA:  Well, back up.  Back up.

2     Back up.

3              MS. O'CONNOR:  Okay.

4              MR. KEZHAYA:  It's August 25th.  We had

5     this that discussion when, like July?

6              MS. O'CONNOR:  Yes.

7              MR. KEZHAYA:  I don't remember it.  I've

8     been doing other things.  What happened in that

9     discussion?

10             MS. O'CONNOR:  We had a discussion about

11    any items that Rob and I had some confusion about and

12    we had a meetings of minds and I think we were all on

13    the same page as to the topics were and what

14    information you were looking for.  And so far in this

15    deposition none of the questions have been about any of

16    those topics that we understood she was here to testify

17    about.

18             So this isn't personal to TST.  I take

19    this position in every 30(b)(6) deposition.

20             MR. KEZHAYA:  I understand.

21             MS. O'CONNOR:  And I don't want to waste

22    anyone's time by proceeding with a bunch of questions

23    that I'm not going to have her answer.

24             MR. KEZHAYA:  I understand that, but the

Page 32

```
 1   subject of dispute is whether she should answer it.
 2              MS. O'CONNOR:  Yes.
 3              MR. KEZHAYA:  So that's what we're
 4   talking about.
 5              MS. O'CONNOR:  Yes.
 6              MR. KEZHAYA:  So going back to the
 7   original premise that we last agreed to, I'm entitled
 8   to a deposition.  I'm entitled to notice the
 9   deposition, meaning you don't -- it's not a stipulated
10   deposition.  It's a notice of deposition.  Then we
11   talked about it.  We agreed that these were the items
12   that we were going to talk about.  We had an
13   opportunity for you guys to object and say, no, not
14   identity, specifically name.  You didn't strike any of
15   those words.
16              MS. O'CONNOR:  Well, of course I
17   wouldn't understand that you were going to ask a
18   question about her identity that was beyond its plain
19   meaning in the subpoena.  So --
20              MR. KEZHAYA:  Well --
21              MS. O'CONNOR:  -- to expect for me to
22   put all of my potential objections, when I don't even
23   know what your questions are, at the beginning of the
24   deposition just doesn't make a whole lot of sense on my
```

Page 33

1  end.

2              MR. KEZHAYA:  Well, maybe I'm the one

3  who's misusing the word "identity".  As I said, I find

4  myself finding need to consult a dictionary

5  periodically.  Do you have a preferred dictionary that

6  we use?

7              MS. O'CONNOR:  I don't.  So I'm not here

8  to answer questions or be cross-examined by you

9  about --

10             MR. KEZHAYA:  Whoa.  Whoa.  Whoa.  Whoa.

11 There's no cross-examination.

12             MS. O'CONNOR:  And that's how it feels.

13             MR. KEZHAYA:  I know it feels like that

14 because we are in contention.  That's what this is.

15 This is just contention.  You and I are trying to have

16 rational discourse to resolve a dispute.  If it cannot

17 be resolved, that's the end of that, but I, I feel like

18 this is something that's resolvable.

19             So I'm just opening up Microsoft Bing

20 because I've got Microsoft and all of my stuff is

21 Microsoft now.  I'm kind of a Microsoft guy nowadays.

22 Identity:  The fact of being who or what a person or

23 thing is.  Who, it seems to me, includes what they

24 feel.  What, obviously would also include what they

Page 34

1  feel.  And is, I feel like if you are experiencing it,

2  you are feeling that thing.  You are angry.  That's how

3  I normally use the word.  For example, with angry or,

4  you know, what have you.  I don't know how she feels

5  about it.  That's why I'm asking the question.

6           MS. O'CONNOR:  So we're in for a long

7  day if we're going to be consulting dictionaries on

8  meanings of words.

9           MR. KEZHAYA:  I agree.  But again, this

10  is why I tried to avoid semantics games by --

11           MS. O'CONNOR:  This does feel an awful

12  lot like semantics.

13           MR. KEZHAYA:  It does feel an awful lot

14  like semantics, but I'm not the one who's brought the

15  discussion.

16           MS. O'CONNOR:  So we're not --

17           MR. KEZHAYA:  I want out of the

18  discussion.  I want to be asking the questions.

19           MS. O'CONNOR:  We're not having this

20  conversation anymore.  I don't think it's helpful.  Why

21  don't you ask your next question.  And we can go

22  question by question if we have to, and we'll see how

23  it unfolds.

24           MR. KEZHAYA:  I'm not quite done yet.

Page 35

1    You said that identity by the plain meaning only means
2    thing, to your understanding, by the plain meaning.
3    You've used the word "plain" quite a few times.  I
4    don't see anywhere in identity that it says name only.
5    So where are you coming from?  What dictionary
6    definition are you using to say name only means
7    identity?  Is there a dictionary that supports that
8    definition?
9              MS. O'CONNOR:  Well, when you started
10   the deposition, you said identify yourself for the
11   record, and she said I'm Christine O'Donnell.
12             MR. KEZHAYA:  Ah-huh.
13             MS. O'CONNOR:  So that's my
14   understanding.  I think that was probably Christine's
15   understanding.  I'm not going to speak for her.  But
16   this exchange is not helpful, Matt, so ask your next
17   question, please.
18             MR. KEZHAYA:  I -- I'm not there yet.
19   You told me that the plain meaning only means name.
20   You told me that you are understanding that based off
21   of how she answered.  You're also telling me that
22   that's what you're consistently understanding based off
23   of your prior experience with depositions, but that's
24   inconsistent with my prior deposition experience.

Page 36

1   That's why I had to go to the deposition -- or the

2   dictionary.

3              So it seems to me that when I use the

4   word "identity" and I'm the one who's entitled to send

5   the notice and I'm entitled to write the notice and you

6   guys don't have an opportunity to say no to the notice,

7   it seems to me that how I feel like the word "identity"

8   is defined should be how it goes.  I'm not seeing from

9   your perspective how that's not the case other than you

10  don't want her to answer the question.  Is that the

11  case?

12             MS. O'CONNOR:  I think I've answered the

13  question, and we can agree to disagree about the

14  meaning of the word "identity".

15             MR. KEZHAYA:  Okay.

16             MS. O'CONNOR:  I will ask you to ask

17  your next question, please, so we can proceed with the

18  deposition.

19             MR. KEZHAYA:  Very well.  To, to be

20  clear, the dispute which we are tabling for later is

21  the meaning of the word "identity".  Is that your

22  understanding as well?

23             MS. O'CONNOR:  It appears as much.

24             MR. KEZHAYA:  Okay.  Let's continue.  So

Page 37

```
 1    do you object to us considering and talking about the
 2    plaintiffs in this matter?
 3                    MS. O'CONNOR:  It depends on the
 4    question.
 5                    MR. KEZHAYA:  Well, right now we haven't
 6    gotten to the question yet.  I don't know what the
 7    question is.
 8                    MS. O'CONNOR:  Well, I can't tell you if
 9    I object yet until I hear the question.  So depositions
10    are questions and answers.  So I have to hear the
11    question before I know what the answer is -- what my
12    response will be.
13                    MR. KEZHAYA:  Okay.  I feel like I was
14    being unclear here.  My, my topic question, it's not a
15    specific question.  My question to you is whether the
16    topic of who the plaintiffs are and how, how she
17    perceives the plaintiffs is part of this dispute?
18                    MS. O'CONNOR:  No, I would object to
19    that question.
20                    MR. KEZHAYA:  What is your ground to
21    object to that?
22                    MS. O'CONNOR:  Because it's not part of
23    the 30(b)(6) topics for which she was designated to
24    testify about.
```

Page 38

```
 1                    MR. KEZHAYA:  Okay.  Let's return back
 2       to my 30(b)(6) book which says I'm not limited to the
 3       topics.  You have not presented me with --
 4                    MS. O'CONNOR:  I disagree with that
 5       understanding, and I don't have to present you with any
 6       sort of -- I don't, I don't have my legal paperwork
 7       here.  I'm very comfortable maintaining that position
 8       with the court.
 9                    MR. KEZHAYA:  Okay.  Why is that?
10                    MS. O'CONNOR:  You'll see when I
11       probably oppose your motion to compel.  I'm not sure.
12                    MR. KEZHAYA:  Oh, no, I won't be moving
13       to compel.  I'll be moving to strike your answer if you
14       guys leave without some kind of privilege-based
15       objection to not answer the question as posed.
16                    MS. O'CONNOR:  Are you free to file
17       whatever you see fit.
18                    MR. KEZHAYA:  Ah, I see.  You're -- I'm,
19       I'm kind of gathering in between your words that the
20       judge might be biased.  Is that your position?
21                    MS. O'CONNOR:  Not at all.  I'm just
22       saying in any litigation are you, of course, free to
23       file whatever you would like.
24                    MR. KEZHAYA:  Of course.
```

Page 39

```
 1                 MS. O'CONNOR:  And I will oppose.
 2     That's just what the rules provide.  If you think
 3     you --
 4                 MR. KEZHAYA:  What is the nature of your
 5     opposition?
 6                 MS. O'CONNOR:  Matt, this is not
 7     helpful.  I object to questions about her feelings
 8     about the people who have brought this lawsuit.
 9                 MR. KEZHAYA:  You object --
10                 MS. O'CONNOR:  If you have another
11     question --
12                 MR. KEZHAYA:  You object to the witness
13     testifying about the people that the City will not
14     invite to the City's meeting.
15                 MS. O'CONNOR:  Because she --
16                 MR. KEZHAYA:  That is the nature of the
17     objection, correct?
18                 MS. O'CONNOR:  That's not the nature of
19     the objection.
20                 MR. KEZHAYA:  Oh, please correct my
21     understanding.
22                 MS. O'CONNOR:  She is not designated --
23     that is, first of all, not a topic on your 30(b)(6)
24     deposition notice, and she's not been designated to
```

Page 40

1   talk about that particular topic.

2                   So the spirit of the 30(b)(6) rule is so

3   that we can prepare the witness to answer your

4   questions, and so she has a right to know the topics

5   about which she is testifying at a 30(b)(6) depo.  We

6   can't possibly prepare her for questions that are

7   beyond the scope of what she's been designated to

8   testify about.

9                   MR. KEZHAYA:  That's the point.  I don't

10  expect --

11                  MS. O'CONNOR:  Not in a 30(b)(6).

12                  MR. KEZHAYA:  Okay.  Well, we're just

13  going to have to agree to disagree on that point.  But

14  you're telling me that if it's not specifically

15  identified, I don't get to talk about it, and yet, we

16  also talked about the pleadings in which the plaintiff

17  is the subject matter of the dispute.

18                  MS. O'CONNOR:  But the pleadings are not

19  a topic on the 30(b)(6) notice.

20                  MR. KEZHAYA:  Why would I need to

21  identify all of the pleadings in the 30(b)(6) notice?

22                  MS. O'CONNOR:  Because if you want a

23  witness to talk about them, we need to be apprised of

24  what we need to educate the witness about in the

Page 41

1    context of a 30(b)(6) deposition.

2              And while this is perhaps fun, I'm not

3    sure, this seems like a waste of time if we're in

4    disagreement about what a 30(b)(6) deposition is.  I

5    would suggest you ask your next question.  But I think

6    we are at an impasse because we're not going to resolve

7    that issue.  So we might need some court intervention

8    and have to table this deposition, unfortunately.

9              MR. KEZHAYA:  Well, no, we're just going

10   to table the issue, and I'm going to move on to the

11   next set of questions.

12             MS. O'CONNOR:  Okay.  Then please do.

13             MR. KEZHAYA:  I just wanted to reach the

14   point of impasse.

15             Before we proceed, though, I want to

16   understand and make very precise my understanding of

17   what impasse means.  Impasse to you is that she, short

18   of it being specifically identified here in the matters

19   of examination, not in the style, the style did not

20   adequately apprize her that this is about The Satanic

21   Temple, but the matters of examination part of the

22   30(b)(6) notice, it has to be enumerated, correct?

23             MS. O'CONNOR:  Correct.

24             MR. KEZHAYA:  Okay.  Just making sure.

Page 42

1    And she shall not answer pursuant to your, Nicole

2    O'Connor's, orders.

3                    MS. O'CONNOR:  That's just my

4    instruction to my client.

5                    MR. KEZHAYA:  Yes.  Yeah, instruction,

6    order, directive, I don't care what you call it.

7                    MS. O'CONNOR:  Sure.

8                    MR. KEZHAYA:  Okay.  And there's not a

9    privilege ground.

10                   MS. O'CONNOR:  There's no privilege

11   ground.  I mean if there was --

12                   MR. KEZHAYA:  Okay.  No.  No.  No.

13   That's sufficient for my purposes.  Thank you.

14                   Well, that being the case, I'm going to

15   scrap my old plan and just start a new one as we speak.

16   So let's start over.

17   BY MR. KEZHAYA:

18        Q    Remind me who you are.

19        A    Christine O'Donnell.  I'm the Compliance

20   Director and staff counsel for the Boston City Council.

21        Q    Okay.  I see that the next clause of this is

22   the scope of your agency.  So why don't you tell me

23   about the scope of your agency for the City.

24                   Well, wait.  Let's, let's define our words

Page 43

1    here real quick.  What is agent -- are you a lawyer?

2        A    I am, yes.

3        Q    You're trained in law?

4        A    Yes.

5        Q    Have you practiced law like in a litigation

6    context?

7        A    Not in litigation, no.

8        Q    Okay.  How about --

9              MR. KEZHAYA:  May I ask her about her

10   background just so I can understand when she's using

11   words the context with which she's --

12             MS. O'CONNOR:  Sure.  That's --

13   absolutely.

14             MR. KEZHAYA:  Okay.

15       Q    What's your background?  You're a lawyer.

16   What does that mean?

17            What -- how you -- you went to law school

18   presumably at some point, and now you're here.

19   Operatively speaking within the bounds of, you know,

20   legal education, what has your experience been?

21       A    So I am primarily a government attorney.  I

22   provide legal research, legal writing.  In my capacity

23   for the Boston City Council, I provide legal research

24   for all 13 councilors.  It's a 13-member body.

Page 44

1          Primarily I handle the Government Operations

2    Committee which deals with all proposed ordinances and

3    home rule petitions to ensure that they're valid within

4    the City's charter, that it's within the City's

5    authority.  I --

6          Q     Can I interject there?  That was a lot of

7    words.  I've already started losing you.

8          So you're a government -- you're a government

9    attorney, correct?

10         A     Yes.

11         Q     You do government law-related things; is that

12   correct?

13         A     Legal research and writing primarily.

14         Q     Yeah.  Well, again, they don't know what

15   legal research and writing is.  Those have words --

16   those words mean something to me.  They don't know what

17   that means.  So what does --

18              MS. O'CONNOR:  Matt, if you have a

19   question, a follow-up question about what she means by

20   a particular word, you're free to ask her that, but

21   she's not here to educate whoever maybe watching this

22   deposition down the road.  So if you have a question,

23   feel free to ask her what she means by a particular

24   word.

Page 45

1           MR. KEZHAYA:  I do have these questions.
2     I'm trying to examine her statements.
3           Q    So going back to my question, what is legal
4     research and writing?  How do you define that?
5           A    In my role in the context of what I do, I
6     instruct and advise the councilors on what they are
7     proposing if they have the authority to do it.
8           Q    Okay.  So your, your job includes receiving a
9     request from a councilor and opining upon that request;
10    is that correct?
11          A    Correct.
12          Q    Okay.  And specifically within the bounds of
13    the law like the legal rules that are written down
14    somewhere presumably which is why you have to do legal
15    research and writing; is that correct?
16          A    Yes.
17          Q    Okay.  So within the bounds of the legal
18    rules, if they want to do something are they authorized
19    to do so; is that correct?
20          A    Yes.
21          Q    And I assume also on the opposite side of
22    things, if the law -- when you can't do that, that goes
23    past the law, you can't do that.  Do you also tell
24    them, hey, you can't do that?

Page 46

```
 1        A     Sure.

 2        Q     Have you ever had to do that?

 3        A     I -- in my capacity I write legal memorandums

 4   all the time.

 5        Q     Okay.

 6        A     And provide options.  I cite case law.  I

 7   cite Massachusetts state law, federal law.

 8        Q     Do you handle much First Amendment law?

 9        A     It depends on the issue.  Generally it's

10   local issues because Boston City Council is a local

11   form of government.

12        Q     Okay.  Do you dispute that Boston is subject

13   to the requirements of the First Amendment?

14        A     I do not.

15        Q     Okay.  Do you -- do you do a lot of research

16   and interpretation of what the First Amendment means,

17   how it applies, stuff like that?

18        A     I've done some.

19        Q     Okay.  What -- please tell me about some.

20              MS. O'CONNOR:  Objection.  You can

21   answer that to the extent you're not divulging any sort

22   of attorney work product and attorney-client

23   communications.

24              MR. KEZHAYA:  I agree.  Don't -- you
```

Page 47

1    know, whatever, whatever privilege objection she has

2    that's, that's clearly not objectionable.

3         A    If the issue comes up, if a councilor wants

4    to propose an ordinance, I would, I would research the

5    impact of the First Amendment in that case.

6         Q    Okay.

7                   MR. KEZHAYA:  Give me just a second

8    here.  We're just going to start over with a new

9    paragraph 1.

10        Q    Did you do any research on this matter?

11        A    I have.

12        Q    Okay.  Did you do any legal writing on this

13   matter?

14        A    I did.

15        Q    Okay.  Did you issue any legal opinions in

16   this matter?

17        A    It wasn't a formal legal opinion, but I did

18   legal research for a particular councilor advising how

19   to respond to a request by TST.

20        Q    Okay.  Who that was councilor?

21                   MS. O'CONNOR:  You can answer.

22        A    Councilor Andrea Campbell.

23        Q    Okay.  When was that?

24        A    About two -- no, it wasn't.  2018/2019,

Page 48

1   approximately.

2       Q    So if I understand -- if I understand your

3   testimony so far, in or around 2018/2019 a councilor

4   came to you with a question - the nature of the

5   question I'm not asking about - to you with a request

6   as to whether the law allows them to do something,

7   correct?

8       A    Not exactly.

9       Q    Oh.  Tell me, tell me what it was --

10              MS. O'CONNOR:  Well, objection.  If you

11  can answer that without divulging any conversations.

12      Q    Yeah, no conversations, but the subject

13  matter.

14              MR. KEZHAYA:  Unless you object.

15              MS. O'CONNOR:  Let me hear that question

16  again.

17              MR. KEZHAYA:  Well, I don't recall.

18      Q    To the effect of Andrea Campbell, a

19  councilor, came to you with a request to ask if she was

20  allowed to do something within the bounds of the law,

21  and you said not exactly.

22      A    It wasn't more so if she was allowed to do

23  something.  It was what would the City Council's

24  obligations be.

Page 49

1        Q     Ah, so she asked if she had to do something?

2        A     I wouldn't classify it as that.  She was

3  asking me to look into what the City Council's

4  obligations would be for a particular issue.

5        Q     Well, the City Council is comprised of

6  people, yes?

7        A     Yes.

8        Q     Is she on the Council?

9        A     She -- at the time she was a City Councilor.

10       Q     Okay.

11       A     She's no longer on the Council.

12       Q     I see.  Yeah, at the time.  I don't, I don't

13  care what she is now.

14             At -- at the relevant time she was on the

15  Council asking you what councilors generally are

16  required to do then; is that correct?

17       A     What the City Council's obligations were for

18  a particular issue.  So her as a councilor and the body

19  as a whole, as an entity.  They're an entity, a

20  governmental entity.

21       Q     Yeah, they're an entity like TST is an

22  entity.  But again, TST's not like a, like a ship or a

23  thing.  It's a body of people.  It's a number of people

24  are together, and it's just a convenient way for

Page 50

1   lawyers to, you know, assign designations to those

2   people.  Or at least that's my understanding.  Do you

3   disagree with that understanding?

4        A    I do not disagree.

5        Q    Okay.  So going back to my question then,

6   she's on the Council or -- what was her title at the

7   time?

8        A    She was a City Councilor for District 4, but

9   at the time she was council president.

10        Q    And what does a Council President do?

11        A    The Council President is the head of the City

12   Council, the administrative head.  And the Council

13   President is the chair when the City Council meets for

14   its weekly meetings.  The chair of the --

15        Q    Way too much information.

16        A    Okay.

17        Q    I'm asking very specific questions because I

18   can't remember all, all of your statements.

19        A    That's the responsibilities of the Council

20   President.

21        Q    Okay.  So they're admin president so far; is

22   that right?

23        A    Mm-hmm.

24        Q    They do -- what is it again that they do in

Page 51

1    the course?

2         A    They chair the weekly City Council meetings.

3         Q    Okay.  So there are weekly meetings --

4         A    Yes.

5         Q    -- as City Council?

6         A    Yes.

7         Q    Is that all that they do?

8         A    She's also a District City Councilor so she

9    has constituents that she represents.

10        Q    Okay.

11        A    And the Council is legislative body.  She

12   also serves on City Council committees where

13   legislation passes through.  Councilors have to vote on

14   it.  She has a vote.

15        Q    So if I'm, if I'm reading in between your

16   lines, it seems to me that someone may have come to her

17   with an objection to TST getting an invite at some

18   point.  Is that, is that the case?

19             MS. O'CONNOR:  Objection.

20        A    No.

21        Q    No?

22             MS. O'CONNOR:  You can answer if you

23   know.

24        A    No, that's not the case.

Page 52

1      Q      Okay.  Or at least not to your knowledge?

2      A      Not to my knowledge.

3      Q      Okay.  Let's see here.

4             Okay.  So going back to the topic at hand,

5      the Council President came to you with a request as to

6      the Council's legal obligations as to a nondescript

7      matter; is that correct?

8      A      Yes.

9      Q      What was the matter?

10     A      The matter was at the time I believe she

11     received an email from TST to request being put on to

12     give the invocation, requesting an invitation to give

13     the invocation.

14     Q      Okay.  And so her --

15     A      And I believe the email to her, in my review

16     I believe it was around the Lund case, citing because

17     of recent case law the Satanic Temple would like to be

18     put on the next available meeting to give the

19     invocation.

20            I was asked to look into the -- that case and

21     whether or not the City Council was required to oblige.

22     The City Council does not take requests.  It -- the

23     invitations for the invocation are based upon personal

24     relationships the councilors have.  It's by invitation

Page 53

1  only.

2       Q    Don't take requests.

3            Why don't -- why doesn't the City Councilors

4  take requests?  What's the reason why not?

5       A    Because the invocation is each councilor has

6  a turn for a particular meeting to invite someone to

7  give the invocation, and it's based upon personal

8  relationships that that councilor has.  It's based upon

9  people that they have relationships with because of

10 their districts.  It might be work that the individual

11 does in their districts or does for their constituents.

12 That has been the policy.

13      Q    That's been the policy or has that been the

14 custom?

15      A    Policy and custom.  I would say both.

16      Q    And I, I -- I do a lot of First Amendment.

17 I'll just tell you.  In my understanding those two mean

18 slightly different things.  Policies are written down,

19 codified, and there are like procedures involved;

20 whereas, customs are just like this is kinda how we do

21 things.  So was this -- is this more of a custom or is

22 this more of a policy?

23      A    In my capa -- in my work, what I do, I do not

24 really consider a policy being written down.

Page 54

1      Q     Okay.

2      A     I use the terms interchangeably.  With your

3  definition, I would define it more as a custom.

4      Q     Okay.

5      A     The City Council does not have a written

6  policy --

7      Q     Okay.

8      A     -- about it's -- but it's understood that

9  it's by invitation.

10     Q     Okay.  I understand that it's understood that

11  it's by invitation.  I'm asking why not.

12              MS. O'CONNOR:  Objection.  But you can

13  answer if you understand.

14     A     You're -- can I ask a clarification?

15     Q     Yeah.  Yeah.

16     A     You're asking me why not -- why it's not

17  written down?

18     Q     Well, yeah, let's start there.  Why isn't it

19  written down?

20     A     I am not sure.

21     Q     Okay.  I was actually going a different, a

22  different route which is why is there not some kind of

23  a mechanism for people to request an invite?

24     A     Because the mechanism is that the councilor

Page 55

1    is the individual that controls who they invite.

2         Q    Okay.  It sounds like it's just whatever the

3    councilor wants to do then.

4         A    Correct.

5         Q    Okay.  Why?

6         A    That's been the custom.

7         Q    That's just how things go, in other words?

8         A    Yes.

9         Q    Okay.  All right.  So you issued an opinion,

10   the details of which I don't much care about,

11   essentially, no, suffice it to say, you don't have to

12   order them in because the way we've always done things

13   is that you can if you want to.  If you don't want to,

14   you don't have to.  Is that a fair recitation of the

15   way things go?

16        A    Yes.

17        Q    Okay.

18        A    And if I could just clarify.

19        Q    Yeah.

20        A    It wasn't a formal legal memo.  I was asked

21   to assist the councilor in drafting a letter.  I

22   believe she provided an email response back to TST.

23        Q    I, I think that ... let's see here.

24        A    If I recall.

Page 56

1        Q     Well, I have --

2        A     In my review of the emails that were

3    produced, I recall documents relating to this.

4        Q     Yeah.

5                    MR. KEZHAYA:  Ada, do we have -- well,

6    more importantly, do you have a means to put up the,

7    the Complaint, the FAC?

8                    MS. KING:  I certainly do.  Give me just

9    one moment to get that set up.

10                   MR. KEZHAYA:  Do you guys have a copy of

11   the Amended -- the First Amended Complaint.  It's

12   docket 16.  I'm specifically looking for 16-2.  I see

13   an email by Christine.  Let's see if I have a prior

14   one.

15       Q     Christine, I have an email attached to the

16   Complaint that bears your name.  And you say you helped

17   her write it.  I'm a little bit confused because it

18   came from your email address.  Are there -- is there

19   another email that I'm not thinking of that's -- I'll

20   just show you this while we get that set up.

21                   MR. KEZHAYA:  Do you want to see first?

22                   MS. O'CONNOR:  Sure.  We can look

23   simultaneously.

24                   MR. KEZHAYA:  Okay.  Yeah.

Page 57

1      Q    And so for the benefit of a clear record, we

2    are looking at -- well ... Exhibit 2 to the First

3    Amended Complaint, Docket 16-2 and 1:21-cv-10102, the

4    matter of Satanic Temple vs. Boston, i.e., this case,

5    this is Exhibit 2.  It's -- it appears to be an email

6    from Christine O'Donnell.  And since --

7              MR. KEZHAYA:  You know what, Ada, never

8    mind.  I'll just show them on my tablet.  And then we

9    can, we can probably like put this in later I assume.

10   Oh, there we go.  What do we have here?  This is not

11   that.  This is not that.

12     Q    Okay.  So I instead have the Exhibit 2 to the

13   First Amended Complaint.

14              MR. KEZHAYA:  If you could just hide

15   that.  We're not, we're not talking about that yet.

16     Q    The, the details of the body is not what I'm

17   specifically referring to.  I'm just referring to the

18   from line.

19     A    Yes, that is me.

20     Q    That's -- well, I know that's you.  My

21   question is if this is the email you're talking about.

22     A    And that date is just my -- that's --

23   October 9th, 2018, correct?  It's not 2016?  That's

24   2018?

Page 58

1      Q    Let me see.  Oh, you were talking about an
2   '18 email.  Yeah, this one's '18.
3      A    Yes, that's the email I was talking about.
4      Q    Oh, okay.  Cool.
5      A    Sorry.  I just need -- I couldn't tell if it
6   was an 8 or a 6.
7      Q    Oh, yeah.  Ah, bad copy.  What can you do.
8      A    Yes, that's the email I'm referring to.
9      Q    Okay.
10      A    I could not remember if I sent the email or
11   if Councilor Campbell sent the email.
12      Q    Oh, I don't, I don't care who sent it.  I was
13   just making sure we were talking about the same thing.
14      A    No, we are.  We are.
15      Q    Okay.
16      A    I was just clarifying why I was a tad
17   confused because I couldn't remember if the email came
18   from Councilor Campbell or myself.  That is the email.
19      Q    No need to be defensive.
20      A    I'm not being defensive.  Just answering.
21      Q    Okay.  I apologize.  I apologize.  I
22   apologize for misunderstanding.
23           Okay.  So going back to what we were talking
24   about, you received a request from the Council

Page 59

1   President at the time.  She asked if she has to accept

2   this -- or has to accept this request for invitation.

3   Essentially you reviewed the case law and you found,

4   no, I don't think you have to do that, and the

5   substantiating ground is that's how we've always done

6   things?

7       A    Correct.

8       Q    Okay.  So the councilors are -- well,

9   actually, going back to the original matter at hand,

10  we're back at paragraph 1 of the matters of

11  examination.  I asked about scope, some more particular

12  matters.  Basically you give legal opinions, and you do

13  legal research and writing for the City of Boston in

14  matters of legal stuff.  Is that basically the gist?

15      A    Correct.

16      Q    Okay.  On to agency.  What is agency in this,

17  in this legal context?

18      A    Agency is when you have the authority to act

19  for somebody.

20      Q    Okay.  And does that carry additional like

21  legal implications when you're acting for someone?

22            MS. O'CONNOR:  Objection.  You can

23  answer.

24      A    Yes, it does.  You're -- in some instances

Page 60

1    you're responsible for -- in this case I'm an agent of

2    the City in Bos -- of Boston.  I'm an employee.  So in

3    some cases, yes, if you're acting on behalf of the

4    employer.

5         Q    Well, you're referring to the respondeat

6    superior; is that correct?  Do you know what --

7         A    I'm not -- I don't understand your ...

8         Q    Sorry, that's, that's a jargon term.

9    Respondeat superior is the tort liability that

10   sometimes a principal will have because of the actions

11   or misactions of their agents.  Is that what you're

12   referring to?

13        A    Yes, I beli -- but I know with government

14   there's -- in Massachusetts there's limits on tort

15   liability.

16        Q    Yeah, but this isn't a tort.  This is, this

17   is not a tort.

18        A    No, I understand that.

19        Q    Yeah.  So more generally with respect to

20   agency, like principles of attribution of the agent's

21   knowledge, things of that nature, are you familiar with

22   these concepts?

23        A    Not really.

24        Q    Okay.  So how about you tell me again your,

Page 61

1   your understanding of the word "agency".

2        A    I already answered that I feel like.

3        Q    I know.  I forgot, though.

4        A    My understanding of an agent is you're acting

5   on behalf of somebody, whether it's a supervisor.  It

6   can -- it -- my understanding is the definition of an

7   agent depends upon what relationship you're talking

8   about.  I used the example, and you said, oh, well,

9   that's a tort.

10       Q    Yeah.  Yeah.

11       A    So that's the example I gave.  I feel that I

12  answered the question.

13       Q    Okay.  So that's a discrete example of, it

14  sounds like, a more umbrella terminology; is that

15  correct?

16       A    Sure.

17       Q    And that's, that's your understanding.

18  Again, I'm not trying to inject understanding into your

19  mind.  I'm literally just trying to understand where

20  you're coming from.

21            Is that the full understanding of your

22  concept of agency?

23       A    I guess it would depend on a fact pattern or

24  the situation.  But that's my answer.  That's my full

Page 62

1   understanding.

2        Q    Okay.  Well, let's try a fact pattern then.

3   A person charged with a decision to invite or not

4   invite a religious organization has requested a -- an

5   invite.  They approach their attorney to ask whether

6   they have to.  You are the attorney who reviewed the

7   matter and found that, no, you don't have to.  Was that

8   within the scope of your agency?

9                MS. O'CONNOR:  Objection.  This is

10  outside the scope of the 30(b)(6) notice.  You asked

11  her about her, her partic --

12               MR. KEZHAYA:  This --

13               MS. O'CONNOR:  Let me finish.  -- about

14  her particular agency with the City, and if you'd like

15  to ask her that, that's fair game.  But you're asking

16  her hypotheticals about what she would do, I don't

17  know, as a lawyer in a particular situation.  So that's

18  not what she's here to testify about.

19               MR. KEZHAYA:  I'm sorry.  I, I was

20  unclear.  The -- your -- fair point.

21       Q    Remove the "if".  That in fact did happen.

22  Was it within the scope of your agency to issue that

23  opinion?

24       A    It was in the scope of my employment.

Page 63

1        Q     Yeah.

2        A     My duties as the Compliance Director and

3   staff counsel.

4        Q     Would you disagree with -- you emphasized

5   employment.  Is there a legal difference between

6   employment and agent, to your mind?

7        A     There could be.

8        Q     Yes, I agree.  Okay.  As pertains to this

9   case, though, is there?

10       A     Are you -- I am not an agent of Councilor

11  Campbell.

12       Q     No.  No.  Agency for the City.  You all are

13  co-agents, in other words, in my opinion, correct?

14              MS. O'CONNOR:  Objection.

15       Q     Well, remove the "my opinion" part.

16              Are you all co-agents?

17       A     We all work for the City.

18       Q     Yes.

19       A     Yes.

20       Q     Okay.  So are you both agents of the City?

21       A     Yes.

22       Q     Okay.  Outside of your co-working

23  relationship do you have any other relationship with

24  City decision makers, any personal relationship, for

Page 64

1    example?

2         A    With City decision makers?

3         Q    Yeah.  I mean the people at the City who make

4    the decisions I assume are called the Council; is that

5    correct?

6         A    I know them because I work for them.

7         Q    Yeah.  Outside of that, though, do you have

8    any relationship of any sort?

9         A    No.

10        Q    Okay.  Investigation, okay.

11             What investigation or preparation have you

12   done so far?  Up to, up to walking into that door, what

13   preparation, what did that entail?

14        A    So I've met with my counsel, Rob and Nicole,

15   numerous times to talk about this.  I spoke with

16   Councilors' staff, the employees that work for the City

17   Councilors.  I've researched City Council minutes, City

18   Council agendas.  I looked through the documents that

19   were produced for discovery.

20        Q    Okay.

21        A    I spoke with other relevant parties that

22   were -- that have experience with the subject matter in

23   the, the deposition to find out, you know, City

24   policies.

Page 65

1        Q    Okay.  Let's take these in turn.

2            So you said you talked with members of the

3    Coun -- well, you said Council.  I may have misheard.

4    Did you speak with members of the people who vote on

5    things for the City or did you speak with your

6    attorney's counsel, because those are -- you know, they

7    sound the same.

8        A    I spoke with Rob and Nicole.

9        Q    Okay.  Did you talk to any of the people who

10   actually send the invitations or request the

11   invitations?

12       A    Oh, okay.  I'm sorry.  I -- when you -- when

13   I said counsel, I meant my counsel, Rob and Nicole.

14       Q    Okay.

15       A    The City Councilors, --

16       Q    Mm-hmm.

17       A    -- I spoke with their staff about how the

18   councilors decide.

19       Q    Councilors, okay.

20       A    And I also have -- only because in my

21   capacity I attend the City Council meetings.

22       Q    Oh, okay.

23       A    They generally happen on Wednesdays.

24       Q    Okay.

Page 66

1      A     I attend them, and I've been present for the

2   invocations, so I see how they work.

3      Q     Okay.  So that's another topic I want to talk

4   about.

5      A     So I, I didn't speak to -- to clarify.

6      Q     Yeah.

7      A     I didn't speak to the City Councilors.

8      Q     Yeah, that's why the X is there.

9      A     I have spoken to their staff.

10     Q     Yeah.  Yeah.

11           MR. KEZHAYA:  I'm -- a lot -- for

12   benefit of the record, she's seeing me handwrite on my

13   tablet here.  I'm just trying to keep track of what all

14   is going on.

15     Q     I have a big X on councilors to mean that you

16   did not speak to the people who actually issue the

17   invitations or do not issue the invitations?

18     A     Correct.

19     Q     Okay.  But you did talk to their staff?

20     A     Yes.

21     Q     You did talk to their employees.  You looked

22   through discovery.

23           And then I have another category that just

24   says other parties.  I've already forgotten what you

Page 67

1  said.  Do you know what that means?

2       A    I believe that there was a question in there

3  about the length of time for keeping documents.  So I

4  spoke with the City's public records officer.

5       Q    Okay.  In legal jargon I would call that a

6  records retention policy.  Is that something you looked

7  at?

8       A    Sure.

9       Q    What is the City's record retention pol --

10  well, actually let's start by defining.  What is a

11  records retention policy?  What does that mean?

12       A    Well, under the state's public records law,

13  the City of Boston is a local government.

14       Q    Mm-hmm.

15       A    So the City of Boston must retain certain

16  records.

17       Q    Okay.

18       A    And I believe one of the questions in the

19  deposition was how long -- it specifically related to

20  payment of individuals that give the invocations and

21  how long do the City -- does the City have to maintain

22  payment records.

23       Q    Okay.  So we're gonna add --

24       A    So I spoke with the retentions records

Page 68

1    officer to confirm how long the City has to retain

2    those records.

3         Q    And how long is that?

4         A    It's seven years.

5         Q    Seven years, okay.

6              Did you find in the course of the produced

7    discovery materials any payment records produced?

8         A    I did not, I did not review those types of

9    records.

10        Q    But they exist and there's -- they go back

11   seven years?

12        A    I believe that they exist with the City's

13   treasury department.

14        Q    Okay.

15        A    They did not exist in the City Council's.

16        Q    Okay.  But it's -- importantly, though, so go

17   back seven years.  Seven years.  And they are held by,

18   what did you say, treasury?

19        A    I believe so.

20        Q    Treasury department, okay.

21        A    Either treasurer or auditing.

22        Q    Or maybe auditing, okay.

23             Anyone else that I should look for these?

24        A    No.

Page 69

1      Q    Okay.  Okay.  When -- just still narrowing

2    down on this other parties.  Are there any other other

3    parties that are in this other parties category?

4      A    No, I think that covers it.

5      Q    Okay.  So then we've got that one done.

6            You talked to staff.  Who, who did you -- who

7    all staff did you talk to?

8      A    So there's 13 City Councilors.  So I asked

9    the employees -- do you want specific names or ...

10     Q    Yeah.  Yeah, let's talk names.  What have we

11   got?

12     A    I spoke to Amanda Curley.  She works for

13   Councilor Baker.  I asked her how does the councilor

14   generally decide, and she said it's people that he has

15   a personal relationship with or that he knows from the

16   district that are -- that do work within the district.

17     Q    Okay.

18     A    I've spoken to -- I can't even recall.

19   Most -- I've spoken to pretty much someone in every

20   single council office to ask.

21     Q    But that's the gist?

22     A    Yes.

23     Q    Is that ...

24     A    Yes.  For all of them it's those common

Page 70

1    factors exist.

2         Q    How far back does this custom go?

3         A    So I did research as I indicated.

4         Q    Oh.

5         A    I did research the City documents and City

6    Council minutes.  I am not sure of the exact time that

7    the invocation originated, but going back to the 1800s,

8    the City Council has had someone give an invocation.

9    When I went back to look at the documents from the

10   1800s, the -- a clergy person gave the invocation

11   generally at the inauguration.  With the way the

12   minutes were done back then, it's hard to tell if every

13   single meeting after that there was an invocation.

14        Q    Mm-hmm.

15        A    But from the 1800s, clergy and invocations

16   were part of the City Council meetings.

17        Q    It's basically always been part of the thing?

18        A    Yes.

19        Q    Did anyone address why it's part of the

20   thing, in any of the records that you've seen?

21        A    Not that I have seen.

22        Q    Do you have an opinion as to why it is?

23             MS. O'CONNOR:  Objection.  You can

24   answer that.

Page 71

1      Q     Not a legal opinion, just literally like an

2   opinion.  As a person who has seen these things do you

3   have an opinion?

4      A     My -- I don't have a personal opinion.  I --

5   my guess would be tradition.

6      Q     Tradition.

7      A     Looking as, as, you know, councilors -- you

8   know, as different councilors come in, I am assuming

9   that they look back to see what was done previously.

10     Q     But you didn't ask that question?

11     A     I did not, no.

12     Q     Okay.  So the notion of where did this policy

13  come from probably needs to be answered by someone

14  else?

15     A     Yes.

16     Q     Well, actually, who, who better than you

17  could answer the question of where did this come from,

18  if anyone?

19     A     I'm not sure because -- my guess would be if

20  you ask a councilor, they would probably have a similar

21  answer to mine that --

22     Q     Probably it just has always been like this?

23     A     Mm-hmm.

24     Q     Okay.  You mentioned that you went through

Page 72

1  some kind of primary historical rec -- I'm using jargon

2  terms again.  You looked through papers from like the

3  1800s; is that correct?

4       A     Yes, the minutes.

5       Q     Okay.  Where did you find those?

6       A     The City of Boston has books of all the past

7  minutes going back to the 1800s.  In the 1800s it was

8  an alderman form of government so it's a little bit

9  different.  But the City Council has books that are

10  available to the public.  It's also at the City of

11  Boston archives.  And more recently, all of the City

12  Council meetings are online.

13       Q     Yes.  Yes.  I think they're on YouTube

14  nowadays, right?

15       A     Yes.  And I believe they have been online

16  since 2011.

17       Q     Okay.  Now, you said it used to be an

18  alderman government, and things are different now.

19  What's the distinction between aldermen and whatever it

20  is now?

21            And do you -- actually, let me back up.

22  Before, before you answer that question, let's start

23  with you said it was aldermen before, and now it's

24  something different.  What is it called now, so we have

Page 73

1    a short designation for that?

2         A     City Council.

3         Q     Okay.  So alderman vs. city council.

4         A     They, they both were the local government for

5    the City of Boston.

6         Q     Yeah.  Yeah.

7         A     And -- right.  The City Council has 13

8    members.

9         Q     Yeah, I'm starting off because I want to, I

10   want to understand the distinction between al -- you

11   saw fit to mention.  It's clearly something of

12   interest.  What is the difference between alderman and

13   City Council form of government?

14        A     I'm not sure what the difference is except

15   for the -- they're both local form of governments.  I

16   didn't look into what the difference was.

17        Q     I see.

18        A     I just know that right now it's the City

19   Council.  1909 was the Chapter 486 of the Acts of 1909.

20        Q     Wait.  Wait.  Wait.  Slow down.  Slow down.

21   So Chapter 84.

22        A     Chapter 486.

23        Q     Sorry.  486?

24        A     Yes.

Page 74

1      Q      486.

2      A      Of the Acts of 1909.

3      Q      Of 1909.

4      A      That was when the City of Boston became a

5   council form of government.

6      Q      Was that like a charter by the state

7   government or like a --

8      A      It was a charter within the City of Boston.

9      Q      Okay.  So it sounds like a statute was passed

10  in Massachusetts proper.  Boston encoded its

11  organizational purposes into some kind of a written

12  document.  Is that right so far?

13     A      Boston -- Boston -- it, it started with

14  Boston then the state approved it.

15     Q      Okay.

16     A      That's how it works.

17     Q      So internal inside of Boston sometime before

18  1909 there was some kind of internal movement to say,

19  hey, things are different.  We should encode, encode

20  how things are -- should be going moving forward?

21     A      I'm assuming that that's how --

22     Q      Well, yeah.

23     A      -- it happened.

24     Q      Well, yeah.  That's, that's the best that we

Page 75

1    can surmise based off the fact that it's here.

2        A    But, but that -- the cite that I gave you,

3    that is what established the City Council form of

4    government.

5        Q    Okay.  Let's see.  So I think that answers

6    all of my history-related questions.

7             Did you have any other staff who were

8    noteworthy in the course of your investigation?

9        A    No.

10       Q    Okay.  What about employees?

11       A    No.

12       Q    Okay.  I have a note looked through.  I think

13   that had something to do with discovery.  Did you find

14   anything of interest in the course of looking through

15   discovery, in your opinion?

16       A    No.

17       Q    Okay.  I have -- okay.  This is just

18   generally about meetings.  Payment records I think I'm

19   good on that.

20            Okay.  You addressed meetings.  You said, if

21   I remember correctly, they happen on Wednesdays.  How

22   long do these meetings usually last?

23       A    So it depends on what's on the agenda.  And

24   it's not every single Wednesday, but it's most

Page 76

1    Wednesdays.  It depends on what the agenda is.  The

2    City Council controls the agenda.  The agenda is based

3    upon -- it's when the City Council receives legislation

4    from the mayor, and councilors, as the legislative

5    body, also are allowed to file legislation so ...

6        Q    Let me interject real quick because we've got

7    to unpack that.

8            So you said the mayor creates a request that

9    legislation be passed.  Is that, is that right so far?

10       A    No.

11       Q    Okay.

12       A    The mayor, when the mayor files legislation,

13   the Council has to approve legislation from the mayor

14   as well in the City of Boston.  So when the mayor files

15   legislation, that is on the City Council agenda at its

16   meetings.

17       Q    Okay.  And ...

18       A    And the agendas are all available online.

19   The City Council meetings recorded.

20       Q    Yeah.

21       A    Available online.  When the Council has its

22   meetings, anything that's on the agenda gets referred

23   to a City Council com -- committee.

24       Q    Wait.  Wait.  Wait.  Let's back up.  It

Page 77

1   sounds like you're getting into a topic of this is what

2   the Council does.  Is that, is that fair to assume?

3        A    Yes, but you had asked --

4        Q    Yeah.

5        A    -- you had asked a question about the mayor's

6   legislation so it's -- my explanation is relevant to

7   that, what happens at the meetings.

8        Q    Oh, no, that's fine.  I just wanted to -- I

9   like this topic of --

10       A    Yeah.

11       Q    -- what does the council do --

12       A    Mm-hmm.

13       Q    -- because, frankly, I know nothing about

14  them.

15       A    Okay.

16       Q    But -- well, let's, let's do it like this.

17            The Council does meetings; is that right?  Do

18  they do other things than meetings?

19       A    Yeah, so the, the structure of the City

20  Council, as I said, there's 13 of them.

21       Q    Mm-hmm.

22       A    The Wednesday meetings are when matters are

23  referred to the City Council from the mayor, and at its

24  Council meetings the Council also votes on legislative

Page 78

1    matters.  The Council in addition -- the City Council

2    meetings are when all 13 councilors come together, and

3    that's -- it's at those meetings where the Council

4    votes on matters.  In addition to that, the councilors

5    also -- they -- they're the legislative body.  They

6    serve constituents.  They also do constituent work.

7         Q    Well --

8         A    I am not part of their constituent work.

9         Q    Well --

10        A    That's their office staff.

11        Q    Let's -- let's just interject there because

12   I'm gonna have two follow-up questions and ... let's --

13   let's see.  And they do constituent work.  Do

14   constituent work.

15             Okay.  So you've used this term "legislative

16   matters" a bunch of times.  I don't know that I

17   understand what you mean.

18        A    Okay.

19        Q    What's a legislative matter?

20        A    So it's -- for agenda purposes they all have

21   docket numbers.

22        Q    Mm-hmm.

23        A    Legislative matters can be grants, loan

24   orders which are budgetary matters, ordinances, home

Page 79

1  rule petitions, resolutions, hearing orders.

2      Q    Local government stuff basically?

3      A    Yes.

4      Q    Okay.

5      A    Yes.

6      Q    They, they do constituent work.  What is

7  constituent work?

8      A    In -- based on my -- I don't really deal with

9  constituent work, but because I've worked for the City

10  Council for many years, the councilors assist

11  constituents with City services.  If constituents need

12  help navigating, you know, assistance with City

13  departments and things like that, the councilors' staff

14  assists them with that.

15      Q    Okay.

16      A    You know, local things like trash pickup.

17  Help, you know, help with government documents, things

18  like that.  Just kind of -- sort of a referral service

19  and helping them through that.

20      Q    Yeah, point of contact for the public

21  basically.

22      A    Mm-hmm.  Yes.

23      Q    Okay.  How do councilors typically run into

24  members of the public?  Like how do they, how do

Page 80

1  they -- literally for the first time how do they

2  interact?

3       A    City Hall's a public building.  Councilors

4  all have their own offices.  The public can come in and

5  meet with them.  The public can email them.  The public

6  can call them.  A lot of councilors go -- there's

7  events throughout the City.  A lot of them go to events

8  in their districts.  They meet councilors that way.

9  Some of them have office hours set aside for their

10 constituents.  That's how they interact with them.

11      Q    Okay.  It seems to me that this procedure of

12 having these councilors send the -- issue invitations

13 if they feel like it, it seems like that's at risk of

14 selection bias.  What is your, what is your position on

15 that?

16                MS. O'CONNOR:  Objection.  She's not

17 going to answer that question.

18                MR. KEZHAYA:  Why not?

19                MS. O'CONNOR:  It's not part of the

20 30(b)(6) notice.

21                MR. KEZHAYA:  It's outside of the

22 30(b)(6) notice --

23                MS. O'CONNOR:  Correct.

24                MR. KEZHAYA:  -- for me to ask her

Page 81

1   whether, whether this is subject to a selection-bias

2   concern?

3                  MS. O'CONNOR:  Yes.  Her personal

4   thoughts on that, yes.

5                  MR. KEZHAYA:  Okay.

6   BY MR. KEZHAYA:

7       Q    All right.  So they do constituent work.

8   They run into members of the public because basically

9   they're public officers.  They -- they're, you know,

10  the point of interaction between the public and their

11  government.  Is that fair to summarize as constituent

12  work?

13      A    Yes.

14      Q    Okay.  Do they do anything else you find

15  noteworthy with regard to this -- specifically with

16  regard to this dispute?

17      A    No.

18      Q    Okay.  All right.  In addition, obviously,

19  they do meetings, so let's talk about those.  They

20  happen on Wednesdays, to recap.  They are of varying

21  lengths depending on the nature of the agenda.

22      A    Yes.

23      Q    What else do you have to say about meetings?

24      A    So the meetings -- so again, that's where all

Page 82

```
 1   of the councilors, that's where the councilors vote on

 2   matters.

 3        Q    Mm-hmm.

 4        A    That's where anything that -- any budgetary

 5   matter, any proposed law needs the approval of the City

 6   Council before it goes to the mayor, and at these

 7   meetings that's where all of those documents are voted

 8   on.  Or, if it's something that's initially filed, it's

 9   referred to one of the relevant City Council

10   committees.

11        Q    Okay.

12        A    And as I said, they vary according to length.

13   It's where -- it depends upon what's on the agenda.

14   Each councilor has an opportunity to speak on the

15   dockets that are on the agenda.  Sometimes -- some of

16   them always speak or, you know, all of them may speak

17   on a docket, only a couple may speak.  It just, it just

18   depends on, on the councilor.

19        Q    It depends on the thing basically.  Not

20   everyone has an opinion about everything.

21        A    Correct.  Correct.

22        Q    Okay.  All right.

23        A    But the main thing is that's -- it's at those

24   Council meetings where the Council votes on matters and
```

Page 83

1    then once that happens, it goes to the mayor.

2         Q    Okay.  So if I understand correctly, if we

3    can, if we can kind of break down meetings into a

4    who-what-when-where-why.  Why, they're voting on stuff.

5    When, Wednesdays for varying amounts of time.  Who,

6    obviously the councilors.  And also the public's at

7    these meetings; is that correct?

8         A    The public can attend, but there's not a

9    public comment period.

10        Q    Not at all?

11        A    No.

12        Q    How do peop -- how do people get their voices

13   by heard by their --

14        A    So the City Council has standing

15   committees --

16        Q    Mm-hmm.

17        A    -- based on the topic and usually there's

18   public hearings on particular and that's when the

19   public -- that's the time for a public comment period.

20             But in addition to that, the public can also

21   weigh in.  They can email their councilors.  They all

22   have emails.  They can email their councilors.  They

23   can call their councilor and tell them how they feel

24   about things.  They can submit testimony.

Page 84

1           And that happens a lot.  That's a big part of

2    what the City Council staff handles, the constituent

3    work, where members are calling telling their

4    councilors how they feel about something, whether they

5    support or are against something.  That's how the

6    public weighs in.

7        Q    Okay.  How -- what is the volume of time that

8    a councilor has spent interfacing with these matters of

9    just basically like public discussion, public

10   discourse?

11       A    I can't really answer to a specific amount of

12   time.

13       Q    A lot?  A little?

14       A    Yeah, I mean that -- yes, they're, they're

15   the legislative body.  They're the ones that the

16   constituents primarily interact with.

17       Q    Okay.  So if the constituents care about

18   something, they will let their councilors know, and

19   they expect the councilor to vote appropriately on the,

20   on the Council meeting?

21       A    They -- I mean they -- as, as a member of the

22   public, they have -- I mean some are more engaged than

23   others.

24       Q    Sure.

Page 85

1        A     So ...

2        Q     You've got to --

3        A     I mean I don't know if the councilor is -- I

4    don't know how councilors weigh the votes, you know.

5    I'm sure, I'm sure some of them --

6        Q     Oh, I'm not suggesting weights.  I'm

7    literally just asking the volume.

8        A     Again, it depends on the issue.

9        Q     Yeah.

10       A     And it depends on the engagement.  There --

11   you know, some districts, people are just more engaged

12   in government than others.

13       Q     Okay.  I, I very much imagine so.  People get

14   very, very excitable about their public government, I

15   imagine; is that correct?

16       A     Yes.  Some, yeah.

17       Q     Do you have any entertaining stories about

18   people getting excitable about things?

19       A     I --

20            MS. O'CONNOR:  Objection.  She's not

21   providing personal anecdotes.

22            MR. KEZHAYA:  Oh, no, no personal

23   anecdotes just entertaining stories.

24       A     I, I don't --

Page 86

1              MS. O'CONNOR:  No.  Objection.

2              MR. KEZHAYA:  Very well.

3      Q    Okay.  Let's see here.  So you've mentioned

4   public input.  As pertains to this particular dispute

5   did the public make objections known to any of the

6   councilors or ...

7      A    I did see some emails when I was looking

8   through what was produced during discovery where some

9   members of the public didn't want their councilor to

10  invite TST.

11     Q    Okay.  And do you think that had any weight

12  in the councilors' minds?

13             MS. O'CONNOR:  Objection.  She can't

14  answer that question.

15             MR. KEZHAYA:  Why not?

16             MS. O'CONNOR:  Because she can't speak

17  to the subjective intent of the councilors.

18             MR. KEZHAYA:  Well, I mean it's -- well,

19  let's back up a little bit.

20  BY MR. KEZHAYA:

21     Q    So in terms of agency do you understand the

22  principle of attribution?

23     A    Are you speaking of that in terms of quid pro

24  quo that for which or --

Page 87

1      Q    No.  No.  Attribu --

2      A    If you don't do something then I'm not going

3  to do this for you or ...

4      Q    No.  No.  No.  No.  No.  So backing up to the

5  definition of agency, we talked about sometimes people

6  will do something for some -- someone or something else

7  which is designated the, the principal; is that

8  correct?

9      A    Yeah.  Yes.

10      Q    Principals have agents.

11      A    Yeah.

12      Q    You have principal up here.  Principal tells

13  agent what to do.  Agent does the thing.

14           Are you familiar with the other way around?

15  Sometimes an agent does a thing, and it's treated as if

16  the principal did the thing?

17      A    Okay.

18      Q    I'm asking.  Is that a thing that you're

19  already familiar with?

20      A    Not real -- not in my work it doesn't apply

21  that way.

22      Q    But in, in terms of like the --

23      A    I'm not --

24      Q    -- just the general legal understanding of an

Page 88

1   agent, agents do stuff, and sometimes it's treated as

2   if the principal did the thing?

3       A    Sure.  Yes.

4       Q    Are you also aware that sometimes agents know

5   things and that is presumed to be known by the

6   principal as well?

7       A    Sure.

8       Q    Okay.  And you know that there's -- well, I'm

9   asking.  Question posed being do you know whether

10  there's like a delineation between what things are or

11  are not passed up, so to speak, to the principal?

12                  MS. O'CONNOR:  Objection.  You can

13  answer if you understand.

14      A    Can you clarify that question?  I'm not -- I

15  don't really understand it.

16      Q    I'm struggling to say this.  Agents sometimes

17  receive information, and the question is whether that

18  information is known by the principal is whether it's

19  material to the agent's scope of duties.  I proffer

20  that as a legal role.  Do you accept that proffer or do

21  you dispute it?

22      A    I --

23                  MS. O'CONNOR:  Objection.  You can

24  answer.

Page 89

1    A    I accept.  It's just when you're -- you're

2  using the term "agency" and "principal" with -- in --

3  yes, I'm an agent of the City of Boston and councilors

4  are too.  Their staffs are, are agents.  But councilors

5  are elected officials.

6    Q    Yeah.

7    A    So it's a little bit -- it's different

8  because the councilors are elected officials.  They've

9  have their staff and then there's the public.

10    Q    Yeah.

11    A    So are you talking about -- when you're --

12  are you talking about an agent with the councilor's

13  staff and the councilor being principal?

14    Q    Well --

15    A    Or I guess I just ...

16    Q    Let's, let's try to speak in terms of

17  analogies.

18    A    Okay.

19    Q    All right.  TST is a corporation.  TST as a

20  body knows certain things because TST as a corporation

21  is comprised of people, fundamentally is comprised of

22  people.  People doing stuff.

23    A    Yeah.

24    Q    People doing stuff all for a singular unitary

Page 90

1    purpose.  It's a body of people doing things; likewise,

2    Boston is a body of people doing things.  They're doing

3    the public's business.  They're picking up trash.

4    They're, I don't know, sewers, roads.  I don't know

5    what you guys do.  Presumably very important stuff

6    because society I see is doing all right.  You

7    understand that these two are analogous terms?

8         A    Mm-hmm.

9         Q    Okay.  Both are corporations as I understand

10   it.  TST's a proper corporation.  Is Boston a proper

11   like corporate body?  Is there a term for the

12   designation of its legal structure?

13        A    That -- I'm not aware of.  I think it's ...

14        Q    Is it fair to say they're analogous, though?

15        A    Sure.  Sure.

16        Q    I mean they're groups of people doing

17   things --

18        A    Sure.

19        Q    -- pursuant to certain purposes.

20             TST's purposes are the seven fundamental

21   tenets.  The City of Boston has a charter.  These are

22   our organizational purposes.  I don't -- I haven't read

23   your charter.  Presumably it also has like procedures

24   and stuff.  This is how you go about doing stuff.  So

Page 91

1    yours are little bit more refined than the seven

2    fundamental tenets.  You know, there's, there's more,

3    obviously, to TST than just those seven things.

4            So next layer down is the people inside of

5    the organization who actually do the things.  TST has,

6    obviously, for example, Lucien Greaves is here.  They

7    do stuff.  You met Ada.  There's Mobius.  People doing

8    things pursuant to the organizational purpose.

9    Likewise, you, for example, have your business purpose

10   which is, for example, issuing legal memoranda, legal

11   opinions, legal research, et cetera.  You see how those

12   two are synonomous.

13        A    (Nodded.)

14        Q    Next layer down -- and I, I saw that you nod.

15   I just want to make sure there's a clear record.  Yes?

16        A    Yes.

17        Q    Okay.  Next layer down is the cutoff.  So in

18   between the people doing the things pursuant to the

19   organizational purposes for the public body, next layer

20   down there's a cutoff here on TST's side of things.

21   There's the congregants.  There's these people who

22   follow these organizational purposes, and they identify

23   as members of this body.  And then the public, on the

24   other hand, these are just people who identify as

Page 92

1   members of this public body which happens to be defined

2   by the geographic scope over here, which is to say the

3   City is defined by a geographic scope; whereas, TST is

4   not.  TST is defined by organizational ideals.  Do you

5   understand that?

6        A    Yes.

7        Q    Okay.  So you see how they're all analogous,

8   right.  So as I understand it, what you're saying is

9   here at the bottom, the members of the public, which to

10  draw an analogy is the congregants, their beliefs and

11  opinions and whatnot are not attributable up to the

12  corporate body.

13            MS. O'CONNOR:  Objection.

14       Q    That's what you're saying, right?

15            MS. O'CONNOR:  Objection.  You can

16  answer if you can.

17       Q    I'm just asking to understand your point.

18       A    I just -- I don't -- I don't understand the,

19  the question.  Whether or not -- I, I just -- I don't

20  understand the question.

21            MS. O'CONNOR:  I mean this is a

22  five-minute question almost.  I mean if we could break

23  it down with more straightforward questions, I think it

24  would be helpful.

Page 93

```
 1              MR. KEZHAYA:  Well, I mean I had to
 2    define my terms so ...
 3         Q    Your earlier statement was the, the people's
 4    opinions.  I gather the implicit meaning was the
 5    people's opinions are not the City of Boston's
 6    opinions; is that accurate?
 7         A    I mean they, they could be some -- sometimes.
 8         Q    Well, they're not synonymous, you see.  Like
 9    people --
10              MS. O'CONNOR:  Objection but you can
11    answer.  I don't know if you're trying to educate her
12    or if you're looking to get a factual response from
13    her.
14              MR. KEZHAYA:  I'm trying to get a
15    factual response from her.
16              MS. O'CONNOR:  Okay.  Let's do it.
17              MR. KEZHAYA:  But in order to get the
18    factual response, I need to start with some exposition.
19         A    Are you asking me -- are you asking me if
20    councilors attribute what their constituents feel
21    onto ...
22         Q    No.
23         A    I just -- I don't understand the question.
24         Q    Maybe I've forgotten your sentence.  Could
```

Page 94

1    you restart your sentence to the effect of --

2         A    You were asking me about agency and if I was

3    familiar with attribution and you went into a big

4    analogy and I just -- I don't understand the question.

5         Q    It was prompted by an earlier statement.  Do

6    you remember your earlier statement?

7                   MS. O'CONNOR:  Objection.  What earlier

8    statement?  Enlighten her, please.

9         Q    The preceding statement that you made which

10   was itself prompted by my question which is what we're

11   doing here today which is called a deposition prompted

12   me to ask you a clarifying question which I felt like

13   we were speaking two different languages so I tried to

14   speak your language by using analogy.  Are we still

15   speaking two different languages?

16        A    I believe so, yes.

17        Q    Okay.  Where did I lose you?

18        A    Your -- you were talking about agency,

19   principal and then if I was familiar with the concept

20   of attribution, and that's where you lost me.

21        Q    Okay.

22        A    So if you could just ask me a question.

23        Q    I'll just back up before that.  So backing up

24   before that, you had mentioned that people sometimes

Page 95

1    communicate things to their councilors.

2         A    Yes.

3         Q    They communicate more particularly how they

4    feel about things to their councilors.

5         A    Yes.

6         Q    Okay.  My question posed to you was whether

7    councilors receive those feelings communicated in the

8    course of doing their job?

9              MS. O'CONNOR:  Objection.  You can

10   answer.

11        A    Yes, if -- you know, they, they may receive

12   it by a phone message.  They may talk to the individual

13   themselves.  They may receive an email.  They may

14   receive a letter.  So, yes, they do receive.

15        Q    Okay.  And --

16        A    The messages.

17        Q    And not only do they receive messages but

18   do you -- would the City of Boston suggest that the

19   councilors will hear a policy request or something like

20   that, for example, legislative matter, and will, you

21   know, vote on it based on the way that they think their

22   constituents would feel about that matter?

23             MS. O'CONNOR:  Objection.  She can't

24   answer that question.

Page 96

```
 1                    MR. KEZHAYA:  She's the City of Boston.
 2                    MS. O'CONNOR:  On the topics for which
 3    she has been designated.  She has not been designated
 4    to talk about how the councilors may vote in a
 5    particular situation, so she can't answer that
 6    question.  What's your next question?
 7                    MR. KEZHAYA:  Well, that was -- the
 8    question posed wasn't pertaining to any of these
 9    particular topics.  One of the particular topics was
10    scope of agency for the City which led to --
11                    MS. O'CONNOR:  Her scope of agency for
12    the City.
13                    MR. KEZHAYA:  Their, actually.
14                    MS. O'CONNOR:  Her is what you're actual
15    deposition notice says.
16                    MR. KEZHAYA:  I'm reading it right now.
17    The scope of their agency for the City, page 2,
18    paragraph 1, clause 2.
19                    MS. O'CONNOR:  Because you haven't
20    identified the deponent.  The their, if we want to get
21    into it, I think is referring to the deponent in
22    paragraph 1.
23                    MR. KEZHAYA:  Nicole, this is why I
24    don't like semantics games.
```

Page 97

1        A     I agree with you.  So she can't answer

2   questions about what the councilors were feeling or if

3   they would have voted in a certain way.  She can't

4   possibly answer that.  That's not what she's here to --

5                    MR. KEZHAYA:  Why can't she possibly

6   answer that?

7                    MS. O'CONNOR:  Because she's not the

8   councilor.  She doesn't know how they would vote.

9                    MR. KEZHAYA:  Well, as we already

10  addressed, she's representing the City which is

11  analogous to TST.  So if we go down two levels --

12                   MS. O'CONNOR:  I lost -- you lose me on

13  that analogy too.  So she can't answer that question.

14  If you have a next question, if you want to file a

15  motion about it, please -- please do so but ...

16                   MR. KEZHAYA:  I'm, I'm confused, Nicole.

17  Are you really suggesting to me that the City is not a

18  legal entity?

19                   MS. O'CONNOR:  No.

20                   MR. KEZHAYA:  You're not suggesting

21  that?

22                   MS. O'CONNOR:  I'm not suggesting that

23  at all.  I'm suggesting that --

24                   MR. KEZHAYA:  Okay.  Well, then let's --

Page 98

1              MS. O'CONNOR:  Let me finish, please.

2    Christine is here to answer questions for which she has

3    been designated on the 30(b)(6) topics.

4              MR. KEZHAYA:  Correct.

5              MS. O'CONNOR:  She has not been

6    designated to talk about whether a councilor adopts the

7    opinions of its voters when it's making its decision in

8    terms of passing legislation or voting in a particular

9    way.  That's what she's not here to testify about.

10             MR. KEZHAYA:  Okay.  I proffer that that

11   is true.  Does the City deny my proffer?

12             MS. O'CONNOR:  I, I don't understand

13   what you mean when you say -- what, what proffer?

14             MR. KEZHAYA:  I posit a point which I

15   suppose is deducible using Boston's statements against

16   it.  Said proffer is as follows:  The City of Boston is

17   a legal entity which is also a principal.  Its agents

18   are the City Councilors.  And as we have already

19   addressed in the course of this discussion, as

20   councilors they are agents who do things for their

21   principal which is to say the body public.

22             MS. O'CONNOR:  Sure, as a general matter

23   I'm sure that that is true.

24             MR. KEZHAYA:  Okay.  So we agree there.

Page 99

```
 1  Next layer down --

 2              MS. O'CONNOR:  We're not doing this.

 3  Ask your question.

 4              MR. KEZHAYA:  Well, I'm trying to ask my

 5  question.

 6              MS. O'CONNOR:  I don't have to

 7  explain --

 8              MR. KEZHAYA:  You're telling her to stop

 9  answering my questions.  That's why I'm getting

10  frustrated very quickly here.

11              MS. O'CONNOR:  And you can be

12  frustrated.  But I'm frustrated that you're asking her

13  to answer things -- and I've given some leeway here

14  because I think it's helpful in terms of the background

15  of the council, but she's not testifying about

16  subjective opinions, thoughts, the way the councilors

17  think.

18              MR. KEZHAYA:  Okay.

19              MS. O'CONNOR:  So your question

20  necessarily asks her to know what the councilors are

21  thinking when they're taking a particular action.

22              MR. KEZHAYA:  I believe I have found an

23  impasse.  I propose that the impasse is as follows:  I

24  want to know what is going on in the minds of the
```

Page 100

```
 1   specific councilors who are not voting TST's -- or not

 2   voting, rather, they are extending an invitation to TST

 3   proper.  I am wanting that information.  You are

 4   telling me she does not have that information for me.

 5                 MS. O'CONNOR:  Absolutely.  And as I

 6   expressed --

 7                 MR. KEZHAYA:  No.  No.  That's

 8   sufficient.

 9                 MS. O'CONNOR:  No.  No.  You don't get

10   to shut me off like that.

11                 MR. KEZHAYA:  Well, okay.

12                 MS. O'CONNOR:  So as I explained in my

13   email to you, we are not designating individuals and

14   certainly not Christine.  Christine has not been

15   designated to testify about the subjective intent of

16   the councilors.  We did offer chiefs of staff for some

17   of the councilors.

18                 MR. KEZHAYA:  Ah.

19                 MS. O'CONNOR:  But she is not here to

20   testify about that.

21                 MR. KEZHAYA:  That's, that's where the

22   confusion is.  I did not read your email.

23                 MS. O'CONNOR:  You should have.

24                 MR. KEZHAYA:  I received the email.  I
```

Page 101

1    know, but I get a lot of emails.

2              MS. O'CONNOR:  Okay.  Well, that would

3    avoid a lot of confusion then.

4              MR. KEZHAYA:  Perhaps but here we are.

5    So I want that information.  Who will give me that

6    information?

7              MS. O'CONNOR:  Not Christine O'Donnell.

8              MR. KEZHAYA:  Great.  Who will give me

9    that information?

10             MS. O'CONNOR:  The people that I

11   identified in the email.

12             MR. KEZHAYA:  I see.  Where are they?

13             MS. O'CONNOR:  And I told you that they

14   would be here on the dates that we identified.  We put

15   certain dates on hold in September, and we articulated

16   to you that they would be present on those dates in

17   September.

18             MR. KEZHAYA:  Yeah, but I don't remember

19   that conversation.  We don't have it in writing so --

20             MS. O'CONNOR:  We do have it in writing.

21   I emailed it to you.

22             MR. KEZHAYA:  No, you emailed me your

23   position.  I did not accept or deny your position.  I

24   did not read it.

Page 102

1           MS. O'CONNOR:  Okay.

2           MR. KEZHAYA:  So you communicated

3   something to me which I did not accept or reject.  My

4   position was that when I issue a notice to the City of

5   Boston certain things that I want to know that pursuant

6   to Rule 30(b)(6), to which we have previously addressed

7   I'm entitled to know this information, they were going

8   to send me someone who does, in fact, know that

9   information.  So I see that this is an impasse.  Do you

10  agree that this is an impasse?

11          MS. O'CONNOR:  I agree this is an

12  impasse.

13          MR. KEZHAYA:  Okay.  And do you also

14  agree that you're instructing the witness not to answer

15  to the specific items relating to subjective

16  motivations of the particular people who do not extend

17  the invitations to the congregants which is the subject

18  matter of this dispute?

19          MS. O'CONNOR:  Yes.

20          MR. KEZHAYA:  Okay.  Okay.

21          MS. O'CONNOR:  So as I explained in the

22  email, I would not be producing Christine O'Donnell to

23  answer those questions.  We identified a couple of

24  individuals who would testify on behalf of certain

Page 103

```
1    councilors.
2                    MR. KEZHAYA:  Okay.
3                    MS. O'CONNOR:  And we suggested that if
4    you disagree with our premise, go ahead and file a
5    motion, but we have -- you have been on notice of the
6    City's position about that at least a month prior to
7    this deposition.
8                    MR. KEZHAYA:  Yeah, but before that I
9    sent a Notice of Deposition that says let it be known
10   that pursuant to Rule 26 and 30(b)(6), Federal Rules of
11   Civil Procedure, I will deposing the City of Boston
12   through anyone who consent to testify on its behalf
13   concerning the matters set forth below.  Said
14   deposition taking place here now.  She is here now.
15                   MS. O'CONNOR:  Correct, but she wasn't
16   designated on those topics.
17                   MR. KEZHAYA:  Oh, you didn't designate
18   her?
19                   MS. O'CONNOR:  Correct.
20                   MR. KEZHAYA:  I see.  Why didn't you
21   designate her?
22                   MS. O'CONNOR:  Because she's not
23   knowledgeable about those topics and we designated
24   other individuals.
```

Page 104

1                    MR. KEZHAYA:  I see.  When will they get

2    here?

3                    MS. O'CONNOR:  I gave you the dates in

4    the email.

5                    MR. KEZHAYA:  I understand you suggested

6    dates in the email, but the deposition is here and now.

7                    MS. O'CONNOR:  So I don't know how they

8    do things in Arkansas, but typically if you -- those

9    dates don't work for you, we're happy to coordinate

10   dates.  A 30(b)(6) depo can oftentimes take more than

11   one day.

12                   MR. KEZHAYA:  Mmm.

13                   MS. O'CONNOR:  So if you had a different

14   position, I think the time to volunteer it would have

15   been in response to my email over a month ago.

16                   MR. KEZHAYA:  Perhaps.  But I would

17   proffer that Rule 26 provides for protective orders

18   which you guys did not move for one.  So I issued my

19   notice, and I expect that something will be filed with

20   the court if there's something wrong with my notice.

21                   MS. O'CONNOR:  Okay.

22                   MR. KEZHAYA:  And nothing was filed with

23   the court.

24                   MS. O'CONNOR:  We did not file anything

Page 105

1  with the court.

2              MR. KEZHAYA:  And we are here in the

3  deposition.

4              MS. O'CONNOR:  You are correct.

5              MR. KEZHAYA:  And one of the matters in

6  the deposition notice is something that you're telling

7  this witness not to give me.

8              MS. O'CONNOR:  Because she's not

9  designated on that topic, that's correct.

10              MR. KEZHAYA:  I don't care that she's

11  not to give me the information --

12              MS. O'CONNOR:  Okay.  So how do you

13  suggest we move forward and resolve the issue?

14              MR. KEZHAYA:  Could they be here

15  tomorrow?

16              MS. O'CONNOR:  No.

17              MR. KEZHAYA:  When can they -- Okay.  So

18  you want me to fly from Minneapolis to Boston twice

19  because you don't want her to tell me the information?

20              MS. O'CONNOR:  She doesn't have the

21  information that you want.  So this is very standard

22  practice.

23              MR. KEZHAYA:  I understand it's

24  standard, but I don't care what's standard.  I care

Page 106

1    what the rules say.

2                    MS. O'CONNOR:  Okay.

3                    MR. KEZHAYA:  I'm following the rules.

4                    MS. O'CONNOR:  So if we were in a

5    disagreement about what would be happening here, I

6    tried to put you on notice of what the City's position

7    was.

8                    MR. KEZHAYA:  Okay.

9                    MS. O'CONNOR:  So as to avoid these

10   potential issues so that you're not booking flights

11   unnecessarily.  If you had a differing view, it would

12   have been helpful at that time.  But there is no one

13   here to testify on those topics today because as I told

14   you in the email, those dates were on hold for dates in

15   September.  And I think Rob can also attest to the fact

16   that we talked about this on our phone call, and I said

17   we're going to need to put some holds on dates in

18   September.

19                   MR. KEZHAYA:  Yeah.  Yeah.

20                   MS. O'CONNOR:  And we agreed on dates in

21   September, and I think they're September 12th, 13th,

22   and 14th.

23                   MR. KEZHAYA:  Yeah, that would be the,

24   the subject of disagreement here because we held those

Page 107

1    dates.  I blocked them down as necessary in the event

2    we needed to get there.  But the deposition's here and

3    now.

4                    MS. O'CONNOR:  Okay.  So we just

5    fundamentally disagree then so how do you propose that

6    we resolve it?

7                    MR. KEZHAYA:  Table it and move on.

8                    MS. O'CONNOR:  Great.

9    BY MR. KEZHAYA:

10        Q    All right.  So you mentioned earlier that

11   sometimes members of the public body will make known

12   their opinions to their counselors, correct?

13        A    Members of the public will, yes.

14        Q    Yeah.  Sorry.  When I say public body, I mean

15   literally members of the public --

16        A    Okay.

17        Q    -- who are not part of the organization, --

18        A    Okay.

19        Q    -- that is, the corporation or whatever you

20   call it.

21        A    In my, in my work, just for clarification,

22   when you say public body, I think of the City Council

23   because that's ...

24        Q    You know what, you're right.  I am misusing

Page 108

1   that.

2        A    No, it's ...

3        Q    Public body is actually the organization.

4   The public is the not body.  So members of the public

5   will communicate to the public body their desires

6   pursuant to designated person?

7        A    Yes.

8        Q    Okay.  And some of those opinions were we

9   don't want TST to give a prayer?

10       A    I reviewed some emails where the public sent

11  to their councilors.  I can't recall which ones in

12  particular, but I did see emails where members of the

13  public expressed that view to their councilor.

14       Q    Okay.  Do you have any specific instances in

15  mind?

16       A    I, I can't recall.  I just -- I remember

17  seeing some emails.

18            MR. KEZHAYA:  You know, we've been going

19  on for a decent amount of time now.  I'm parched.  Does

20  anyone else want a break?  Because I also have to like

21  get some emails together and do some exhibit stuff.

22            MS. O'CONNOR:  Sure, we can take a

23  break.

24            THE VIDEOGRAPHER:  Okay.  The time is

Page 109

1    11:13.  We're going off the record.

2                    (Break was taken.)

3                    THE VIDEOGRAPHER:  Okay.  We are back on

4    the record.  The time is 11:37.

5    BY MR. KEZHAYA:

6        Q    Great.  Okay.  You mentioned earlier that we

7    have invocations at these meetings.  Do you remember

8    that?

9        A    Yes.  Yes.

10                   MR. KEZHAYA:  Oops.  Sorry.  I don't

11   have my mic on.  Do I need to retake?

12                   THE VIDEOGRAPHER:  No, we're good.

13                   MR. KEZHAYA:  Okay.  Great.

14       Q    So meetings happen.  It's meetings of the

15   public body.  The public body has these meetings for

16   the purpose of voting on things.  And is it fair to say

17   that the public body starts its meetings with an

18   invocation?

19       A    Yes.

20       Q    Okay.  Tell me about these invocations.

21       A    So like I said, the councilors invite someone

22   to give the invocation and at the beginning of --

23   before the meeting starts, at the beginning an

24   invocation is given.

```
                                          Page 110
 1      Q    Okay.  Describe the invocations that are
 2  typically given.
 3      A    So generally they're relatively short.  Some
 4  have been a few minutes, but generally they're
 5  relatively short.  And whoever is giving it -- let me
 6  backtrack a little bit.  The councilor that extends the
 7  invitation introduces the individual prior to the in --
 8  prior to the individual giving the invocation.
 9      Q    Can I, can I pause you there?
10      A    Sure.
11      Q    What does a typical introduction look like?
12      A    The councilor says, oh, I'm here with
13  so-and-so.  So-and-so is from wherever.  I know
14  so-and-so personally.  We've been friends.  Or I know
15  so-and-so because they do work in my district or
16  they've done -- you know, my constituents are familiar
17  with them.  Things of that nature.
18      Q    Okay.  And to recap, this is happening at a
19  public proceeding, correct?
20      A    Yes.
21      Q    Okay.
22      A    They're re -- they're recorded.
23      Q    Yeah.  And they're on YouTube we talked
24  about?
```

Page 111

1      A     Yes.

2      Q     I happen to have a YouTube ready to go for an

3   example invocation introduction.  Let's watch it

4   together.  This is for benefit --

5                    MR. KEZHAYA:  Do -- does it have the

6   caption in the official court record?  Meaning like

7   does it say when this meeting takes place or do I need

8   to identify that benefit of the record?

9                    THE VIDEOGRAPHER:  You'd have to ask

10   her.

11                    THE WITNESS:  It says it up there I

12   believe.

13                    MR. KEZHAYA:  Well, let's just, let's

14   just make it easy.  This is August 18, 2021 which

15   obviously is after the Complaint.  If we could press

16   play, please.

17                    (Video playing.)

18                    MR. KEZHAYA:  Let's pause here.

19      Q     We are presently watching a video with some

20   guy in a suit with red hair talking.  He appears to be

21   at the hem -- head of the proceeding.  Who is this guy?

22      A     That is former councilor Matt O'Malley.  He

23   was the Council president pro tempore at the time of

24   that meeting, which means because the Council president

Page 112

1  before him was serving as acting mayor at the time.  So

2  when the Council president becomes acting mayor, the

3  title that we give Councilor O'Malley was vice

4  president of the Council, but when he's acting as the

5  president, the title is Council President pro tempore.

6       Q    Latin for literally just temporary?

7       A    Yes.

8       Q    Okay.  So this person is actually

9  administering the proceedings.  He's not just some guy;

10 he's officiating the proceedings?

11      A    I wouldn't use the term "officiating".

12      Q    Oh, I'm sorry.

13      A    But he's acting as the chair.

14      Q    Yes.

15      A    Council president.  And he also is the

16 District 6 City Councilor.

17      Q    Sorry.  That's a --

18      A    At the time.

19      Q    That's a -- that's a translation error.  So

20 officiate, what you just said to me is the word

21 "officiate".

22      A    Okay.

23      Q    Literally just to administer a matter.

24           MR. KEZHAYA:  So this person is

Page 113

1    officiating.  He's about to introduce someone

2    presumably.  Let's -- let's proceed.

3                    (Video playing.)

4                    MR. KEZHAYA:  Okay.  Let's pause here.

5        Q    This is now Mayor Wu, correct?

6        A    Correct.

7        Q    And as we see on the subtitles, pro --

8    temporary officiant says she invited this person.  She

9    decided, in fact, to invite, as, as I recall what he

10   said.

11       A    Yes.

12       Q    Is that consistent with your recollection?

13       A    Yes.

14       Q    Okay.  Is this phase so far pretty much the

15   norm?

16       A    Yes.

17       Q    Okay.  Let's continue.

18                    (Video playing.)

19                    MR. KEZHAYA:  Pause here.

20       Q    Is it normal for an introduction to involve

21   some kind of an endorsement of the person who's being

22   introduced, humbled and honored?

23                    MS. O'CONNOR:  Objection.  You can

24   answer.

Page 114

1      A    I've, I've heard it said in the past.

2      Q    I mean --

3      A    I don't know if I'd consider that an

4  endorsement.  I mean obviously if the councilor is

5  extending an invite to somebody, they know the

6  person --

7      Q    Yeah.

8      A    -- through various work and things like that.

9      Q    Yeah.

10     A    So I would think that that's common speak in

11  the interest of politeness.

12     Q    Okay.  And common, though, this is pursuant

13  to the custom?

14     A    I -- well, maybe I should -- I've heard it

15  said before.  I, I can't approximate how many times,

16  but I've heard similar language.

17     Q    Okay.  And --

18     A    I'm pleased, I'm pleased to have with us,

19  things like that.

20     Q    Okay.  And when you said you've heard it

21  said -- how many of these meetings have you seen

22  personally?

23     A    Oh, well, I've been --

24     Q    A lot?

Page 115

1        A    -- there 11 years and they're on Wednesdays.

2    We have give or take about 25 to 30 a year so -- and

3    I've attended most of them unless I'm on vacation or

4    things like that so I -- because of my, my job.

5        Q    Okay.  So if I, if I understood you

6    correctly, you've been there 11 years.  There's on the

7    order of 25 to 30 per year.  Whatever that math works

8    out to is give or take probably about as many as you've

9    seen?

10       A    Yes.

11       Q    How often can you recall them not including

12   some kind of pleased to introduce, I'm humbled and

13   honored, some kind of a, you know, like a welcoming

14   introduction?

15       A    I mean I don't know if I can say an exact

16   amount generally because the councilor brings the

17   person up.  They say I'm inviting so-and-so up.  So I

18   don't how else --

19       Q    That's okay.

20       A    -- they would bring a person up.

21       Q    Is it fair to say that it's the City of

22   Boston's perspective that obviously they're inviting

23   this person; they literally invited them?

24       A    Yes.

Page 116

1        Q     Okay.  All right.  Let's continue.

2                    (Video playing.)

3                    MR. KEZHAYA:  Pause here.

4        Q     The banner is covering it or maybe the

5   subtitles are, but I seem to remember -- well,

6   actually, I deduce from the way that she's looking, she

7   appears to be looking down as if at her phone.  Is it

8   normal for the -- who would normally write this

9   introductory speech or whatever it is that you want to

10  call it?

11       A     It depends on offices.  Some councilors write

12  their own notes.  Some have a staffer do it and make

13  edits.

14       Q     Okay.

15       A     So it would, it would depend on how Councilor

16  Wu at the time structured her office.

17       Q     Okay.  This was in August of 2021.  I

18  designated this deposition in June of 2022.  So this is

19  on the order of like ten months beforehand.  Did you

20  talk with any of Mayor Wu's staff at any point?

21       A     Are you asking if I talked about this

22  particular meeting or --

23       Q     No, just generally --

24       A     I --

1      Q     Generally.  I'm trying to understand her

2  general way of doing things.

3      A     I talk to her staff all the time.

4      Q     Well, remember earlier we talked about you

5  performed some kind of an investigation in preparation

6  for today's meeting.  I'm inquiring into whether that

7  deposition(verbatim) included determining whether she

8  normally reads off her own notes or she normally reads

9  off someone else's given speech?

10     A     I have -- did not talk to her staff about

11  that.

12     Q     Okay.  That's fine.

13               MR. KEZHAYA:  Well, hold on now.  Let

14  me -- let me note that.  Did not talk to staff.  Wu

15  staff.  Let's proceed.

16                    (Video playing.)

17               MR. KEZHAYA:  Pause here.

18     Q     She specified a university in Boston neither

19  of which I'm familiar with.  Are these fancy degrees?

20  Is this, is this something that I'm suppose to be

21  impressed by?

22               MS. O'CONNOR:  Objection.

23     Q     In your opinion.

24               MS. O'CONNOR:  I don't know.  Are you?

Page 118

1              You can answer, if you can, Christine.

2      A    I mean I don't know.  I, I imagine some

3  people are impressed by advanced degrees.

4      Q    Well, I'm asking if these are fancy

5  institutions?

6              MS. O'CONNOR:  Objection.  You can

7  answer.

8      Q    In your opinion.

9      A    I don't know.  Perhaps.

10     Q    Have you heard of these -- have you heard of

11  these institutions?

12     A    I have, yes.

13     Q    Okay.  When did you first hear of these

14  institutions?

15     A    I can't recall.

16     Q    When did you most recently hear of these

17  institutions other than this?

18     A    Well, I mean this was -- like I said, you

19  know, we -- we're busy in the City of Boston.  So I

20  can't remember if I first heard of them then.  This was

21  in 2021.  Now I'm, I'm recalling it so ...

22     Q    Well, I -- yeah, I don't care about this.

23  I'm asking something different.

24     A    I don't, I don't -- I can't recall when I

Page 119

1   first heard of the institutions.

2        Q    I more accurately asked you when most

3   recently short of hearing it on here.

4        A    I cannot recall.

5        Q    So it's something that without a particular

6   event, you just know what these things are, these

7   institutions that she's describing, correct?

8        A    Yes.

9        Q    Famous would be a word that I would use to

10  describe something that I don't need to specifically

11  recall.  I just know what it is.  Would you describe

12  these institutions as famous?

13       A    No.

14       Q    No?  Okay.

15            What is your definition of famous?

16       A    I normally don't think of it, but something

17  that is widely known.  But again, famous can be

18  subjective based on an individual's interest.

19       Q    Okay.  So you're, you're eliminating the

20  subjectivity from the matter.  How would you describe

21  these institutions that she is designating?

22       A    I don't know how I would describe them.

23       Q    You have no way of knowing how you would

24  describe these institutions that you have no need to

Page 120

1    specifically recall.  You just know what it is?

2        A    I guess higher, higher --

3            MS. O'CONNOR:  Objection.  You can

4    answer.

5        A    Higher educational institutions.

6        Q    Okay.

7            MR. KEZHAYA:  Please continue.

8                (Video playing.)

9            MR. KEZHAYA:  Pause here.

10       Q    I take note in the subtitles that she's

11   referring to this church as a dynamic church.  She's

12   characterizing the church in the course of this speech.

13   Do you take note of this?

14       A    Yes, I see that.

15       Q    Okay.

16           MR. KEZHAYA:  Please continue.

17               (Video playing.)

18           MR. KEZHAYA:  Pause there.

19       Q    In your, in your experience how frequently do

20   the inviting councilors vouch for the credibility or

21   integrity of the people whom they invite?

22       A    Often because, like I said, it's by

23   invitation, and the councilors have a personal

24   relationship with the individual or are familiar with

Page 121

1    them because of work in their district.

2         Q    Okay.  Vouch has a very particular meaning to

3    me, and I don't want to color your understanding of the

4    word.  How do you define the meaning of the word

5    "vouch"?

6         A    That you're -- that you're standing -- not

7    standing.  That you're attesting to somebody.

8         Q    Okay.  So she is -- well when you say

9    attesting, to me that means just in court.  So maybe

10   that's not -- maybe that word's not carrying over.

11   What do you mean by attesting to someone's character?

12        A    That you know the person.

13        Q    Well, she's describing the person's character

14   and --

15        A    Well, my definition of vouch is that I know

16   somebody.

17        Q    Okay.  All right.  And so as City of Boston's

18   representative, this is your City employee currently

19   vouching for the integrity of a particular clergy

20   member.  How do you respond to the charge that that is

21   a governmental endorsement of a particular religion?

22             MS. O'CONNOR:  Objection.  She's not

23   answering that question.

24        Q    Admit or deny?

Page 122

1          MS. O'CONNOR:  It's not within the scope

2     of the 30(b)(6) deposition topics for which she has

3     been identified.

4        Q    Admit or deny?

5          MS. O'CONNOR:  No, she's not answering

6     the question.

7          MR. KEZHAYA:  Oh, I'm sorry.  You're

8     telling this witness that whether the government

9     endorsed this particular religious belief is outside

10    the scope of this 30(b)(6) examination, correct?

11         MS. O'CONNOR:  Correct.

12         MR. KEZHAYA:  Okay.  And once again, you

13    don't assert any privilege ground for this, correct?

14         MS. O'CONNOR:  Correct.

15         MR. KEZHAYA:  Let's continue.

16            (Video playing.)

17         MR. KEZHAYA:  Pause here.

18       Q    Is it common for the councilors in these

19    kinds of introductory speeches to make mention that not

20    only is this person that you're about to hear from a

21    religious leader, but they also are a leader in the

22    public as well?

23       A    Yes, that is common.

24       Q    Okay.

Page 123

1                    MR. KEZHAYA:  Please continue.

2                         (Video playing.)

3                    MR. KEZHAYA:  Pause here.

4        Q     Have you heard of this BMA, Black ... I don't

5    remember the rest of it, but basically whatever this

6    alliance organization is, is that a public body or is

7    that some nonpublic charity?

8        A     I am not sure.  I don't believe it's a public

9    body, according to my definition.

10       Q     Okay.  Yeah, well, literally is it part of

11   the City is what I'm trying to ask.

12       A     No.

13       Q     Like a City organization.

14       A     No.

15       Q     Okay.  Cool.

16             So I didn't hear anything that appeared to be

17   abnormal relative to the norm in this example

18   introductory speech.  Do you agree with me that that

19   was a relatively normal speech?

20       A     Yes.

21       Q     Was there anything about that which sets you

22   off as that -- that's abnormal?

23       A     That it's what?

24       Q     Abnormal?

Page 124

1      A      No.

2      Q      You said it's relatively normal.  I just want

3  to, you know, back in it from the other end.  It's --

4  you know, this is a, this is a normal intro, --

5      A      Yes.

6      Q      -- in other words?

7      A      Yes.

8      Q      Okay.  Cool.

9             All right.  Now, let's watch -- we've seen

10  the introduction.  Now let's see how these things

11  normally go.

12                    MR. KEZHAYA:  Resume.

13                       (Video playing.)

14                    MR. KEZHAYA:  Pause here.

15      Q      How often, how often does this begin with

16  some kind of pre-blessing blessing?

17      A      So I can't state a specific time.  Like I've

18  said, I've gone to numerous of these.  They're all

19  recorded.  They're all online.

20      Q      Mm-hmm.

21      A      So it just depends.

22      Q      Did you watch any other invocations than what

23  we're watching right now?

24      A      Yes.  As I said, I've attended pretty much

Page 125

1   every single meeting since I started in 2011.

2        Q    I asked a poor question.  I apologize.  I

3   meant, more particularly, did you watch any of these

4   pursuant to your investigation for this particular

5   purpose?

6        A    No.

7        Q    Okay.

8             MR. KEZHAYA:  Please continue.

9                  (Video playing.)

10            MR. KEZHAYA:  Pause here.

11       Q    She mentions that she's been here earlier

12  this year which means since this Complaint this person

13  that we're looking at has been here at least two times.

14  Do you agree with this?

15       A    Yes.  And if I could just -- I didn't watch

16  any videos, but I reviewed the minutes --

17       Q    Mm-hmm.

18       A    -- which list the clergy.  And, yes, there

19  are some individuals that have come more than once.

20       Q    I see.  So she's a -- how often is it that

21  people are invited more than once in any given year?

22       A    I don't know an exact amount.  But there has

23  been times.  In my research there may be -- you know,

24  probably, probably under, under ten people have done it

Page 126

1    more than once.  But there are people that have come

2    more than once.  And reasons for that is there's 13

3    members of the council.  There's four at-large members.

4    So four members are city-wide, and there may be times

5    where a citywide councilor and a district councilor

6    have overlap so that ...

7         Q    That could be?

8         A    Yes.

9         Q    But you didn't actually talk to Wu's people.

10   So you have no idea whether or not that's actually the

11   case, correct?

12        A    I didn't talk to Wu's people about who wrote

13   her notes.

14        Q    Oh, I'm sorry.  Did you talk to Wu's people

15   about this particular invocation and why this

16   particular person was invited more than once?

17        A    No.

18        Q    I didn't think so.

19             Let's -- you said that there were ten people

20   over the course of your research that have been invited

21   more than once.

22        A    I said approximately.  I was trying to --

23        Q    Thereabouts.

24        A    -- give a number based upon my review of the

Page 127

1    minutes, and I -- I did notice that some people have

2    come more than once.

3          Q    Do you have a list of -- like have you taken

4    notes?  Did you literally write down the number of

5    people or the identities of said people who have come

6    more than once?

7          A    I didn't write them down.  I did take some

8    notes, but I didn't write every single one down.  But I

9    did notice that there were some people that gave an

10   invocation more than once.  I don't know if it was a

11   particular year where it was more than once or if it

12   was over my course of review --

13         Q    Yeah.

14         A    -- that they've come more than once

15   throughout my 11 years of being there.

16         Q    Okay.  You mentioned you took notes.  Did you

17   take the notes for the purpose of preparing for this

18   deposition?

19         A    I did, yes.

20         Q    Can I have those notes?

21              MS. O'CONNOR:  Objection.  I'll think

22   about that.

23              MR. KEZHAYA:  Well, you're objecting to

24   it, and you're saying you'll think about it.  I'm not

Page 128

```
 1   sure which it is.
 2                  MS. O'CONNOR:  Well, I'll think about
 3   whether we'll produce them.
 4                  MR. KEZHAYA:  Okay.
 5       Q    When did you create these notes?
 6       A    Over the course of the last couple weeks.
 7       Q    Okay.  How -- what form are those notes in?
 8       A    They're handwritten because they're my
 9   personal notes.
10       Q    Handwritten.
11            Well, they're not really your personal notes.
12   They're pursuant to the requirements of your job,
13   correct?
14       A    (Nodded.)
15       Q    Okay.  So they're handwritten notes made
16   because --
17       A    Well, actually, it's not the requirement of
18   my job.  I was taking them in preparation for this
19   deposition.
20       Q    Yeah, but you're here for the purpose of
21   deposition, right?
22       A    Yes.
23       Q    Who told you that you have to be the person
24   who's doing this?
```

Page 129

1        A     I was designated as the person on City

2   Council central staff that can speak to the policies of

3   how the invocation is given.

4        Q     Okay.  So you're talking about central staff.

5   What is central staff?

6        A     Central staff is where I work.  We work --

7   there's ten of us about that work for all 13

8   councilors.

9        Q     Okay.  So it's just like a, like a cen --

10  literally central staff?

11       A     Yes.  Yes.

12       Q     Other than you who are the kinds of people

13  are on this central staff?

14       A     We have a technology person; we have a budget

15  person; and we have legislative aides.

16       Q     Do you have --

17       A     That --

18       Q     Oh, sorry.  Please continue.

19       A     That -- they help with committee hearings and

20  things like that.

21       Q     Do legislative aides have any notes or

22  anything to the effect of -- basically is there

23  anything relevant to this dispute within central

24  staff's --

Page 130

1      A    No.

2      Q    -- records?

3      A    No.

4      Q    Okay.  You guys did a comprehensive sweep of

5  everything, then I have everything of relevance?

6      A    Yes.

7      Q    Other than your notes?

8      A    Yes.

9      Q    Okay.  So you made this -- so some -- you

10 were designated you emphasize or, rather, I emphasize.

11 You were, passive tense, designated.  Who designated

12 you?

13     A    Well, for certain subject matters I was

14 designated.

15     Q    I understand that.  I -- it's been made

16 abundantly clear that for certain matters you were

17 designated.  I'm asking you who designated you.  Who

18 made the decision to designate you?

19     A    When I met with counsel and I explained what

20 I did, it was agreed by the president of the City

21 Council and in discussions with our counsel that I

22 would be the one designated for these topics.

23     Q    I honestly don't know what you're saying.

24 I'm asking who's the person who told you that you have

Page 131

1    to do this?  Did you volunteer or were you directed to

2    do it?

3         A    I mean I, I volunteered based on my role for

4    the City Council.

5         Q    Okay.  Okay.  So you --

6         A    And in discussions with the City's lawyers in

7    preparation for this.

8         Q    I see.  And to recap, you are an agent of the

9    City, and also, you made these notes pursuant to your

10   agency and, more importantly, pursuant to the greater

11   purpose of preparing for this here deposition, correct?

12        A    Yes.

13        Q    Okay.  And so to recap, they're handwritten

14   notes.  They were made within the past two weeks.

15   Where are these notes?

16        A    They're in my office.

17        Q    Okay.  So you --

18        A    And they're not complete, by the way.  I just

19   review -- I was going through past minutes from years

20   2011 to 2015 --

21        Q    Yeah.

22        A    -- just to refresh my memory.

23        Q    Yeah.  Yeah.

24        A    So they're not complete.  They're very -- you

Page 132

1    know, just to -- so I would have a track in my memory.

2    So they're not complete.

3         Q    Well, if I have -- I mean if you're anything

4    like me, your notes are nothing more than chicken

5    scratch anyway.

6         A    (Gestured.)

7         Q    I mean I'm just saying that that's what my

8    notes are.  I'm not suggesting that yours are.  I'm

9    just saying that those are mine.

10        A    Yeah, probably.  Yeah.

11        Q    So two weeks, handwritten notes.

12             You are the custodian?

13        A    Yes.

14        Q    Okay.  I'm notifying you now.  Please don't

15   shred those.  Please don't --

16        A    Sure.

17        Q    -- lose those.  I will be seeking those

18   pursuant to the rules of discovery.

19             Okay.  So we're turning back to central

20   staff.  There's on the order of ten people.  No, we

21   don't need -- we're done with that.

22                  MR. KEZHAYA:  Okay.  Let's continue.

23                      (Video playing.)

24                  MR. KEZHAYA:  Pause here.

Page 133

1       Q    She is directing this blessing to the people

2  who vote on public matters, correct?

3       A    She's -- you're asking if she's addressing it

4  to them?

5       Q    She's literally blessing those people.  The

6  body public which is being met, she is literally

7  blessing the proceedings.  You understand this, right?

8       A    I don't know if I'd --

9            MS. O'CONNOR:  Objection.  But you can

10  answer.

11       A    I don't know if I'd classify it as that.

12  I --

13       Q    She's --

14       A    I --

15       Q    -- said let us pray like three times in the

16  past, I don't know, minute or so that she's been

17  talking.  You would not characterize let us pray as a

18  blessing?

19       A    No.

20       Q    How would you describe it?

21       A    I look at it, it's, it's a time to -- before

22  the proceedings for government work start, it's a time

23  to recognize the seriousness of the proceedings.

24  That's how I look at it.

Page 134

1        Q    Well, sure.  Yeah, I mean we did the same
2   thing here.  This is, this is an analogous concept that
3   both, that both of our separate institutions follow.
4        A    Mm-hmm.
5        Q    I get that.  That's not the question posed.
6   The question posed is how is this not a blessing?
7        A    I don't interpret it like that.
8        Q    Would you interpret what we just did as a
9   blessing at the beginning of this thing?
10             MS. O'CONNOR:  Objection.  You can
11   answer that question.
12        A    I, I don't.
13        Q    Okay.  How would you describe what we did
14   earlier?
15        A    I -- having a, a moment to come together
16   before a proceeding is started.
17        Q    Okay.  Having a moment before the proceeding
18   has started is how you describe a blessing?
19        A    Mm-hmm.  And this is different than what
20   you're showing on video.
21        Q    Why is it different?
22        A    What we're doing right now is different
23   than what we're -- we're in a deposition.
24        Q    Yeah.

Page 135

1      A     This is a City Council that is at their

2   regular meeting where they're voting on City matters.

3   So in my opinion that is different to me.

4      Q     Do you know why we're entitled to require you

5   guys to be here?

6               MS. O'CONNOR:  Objection.

7      Q     Question posed.

8      A     Yes.

9      Q     Why are we entitled to be here?

10     A     Be -- under the, the deposition.  The

11  30(b)(6) I believe is the cite.

12     Q     Okay.  And why do those rules require us guys

13  to come here?

14               MS. O'CONNOR:  Objection.

15     Q     Do you know?

16               MS. O'CONNOR:  Matt, she's not going to

17  answer these questions.  They have nothing to do with

18  the reason for --

19               MR. KEZHAYA:  She's a lawyer.  She knows

20  how to say that the --

21               THE WITNESS:  I'm not a litigator.  I, I

22  told you that.

23     Q     Okay.  Let's start with the basics.  Are you

24  familiar with the text of the First Amendment?

Page 136

1              MS. O'CONNOR:  Objection.  Matt --
2         Q    Yes or no.
3              MS. O'CONNOR:  She's not -- no, she's
4    not answering questions about -- I've given I think
5    significant leeway about general background questions.
6    But Christine's not here to talk about her
7    understanding of the law.  It has no relation to the
8    topics for which she's been designated.
9              MR. KEZHAYA:  Why is that not literally
10   the subject matter of this dispute?
11             MS. O'CONNOR:  She's not here to testify
12   about the subject matter of this dispute.
13             MR. KEZHAYA:  Ah.
14             MS. O'CONNOR:  She's here to testify
15   about the topics for which she has been designated.
16             MR. KEZHAYA:  That was a mistranslation.
17   It was my intended purpose that she would be discussing
18   the topics of this dispute, the subject matter of the
19   dispute.  In my opinion all of these questions go to
20   the ultimate question of fact which is did the City
21   discriminate, yes or no.  You all posit no.  We post it
22   yes.
23             I'm trying to figure out what's going on
24   in between the yes and the no so that we can see if we

Page 137

1   can at least join minds and understand what we're

2   arguing about.  That's what I'm trying to figure out

3   here.  Your position is, no, we're not here.  We are

4   doing literally the least we can get away with under

5   the rules, correct?

6              MS. O'CONNOR:  I am following the rules.

7   I'm following the rules of what a 30(b)(6) deposition

8   is, and so I'm limiting her testimony to the topics for

9   which she has been designated.  And I appreciate that

10   you have a different understanding, but that's my

11   position on the record.

12              MR. KEZHAYA:  I understand that's your

13   on-record position.  I just want to make sure one more

14   point is abundantly clear.  You are not asserting a

15   privilege.  You're just telling her not to answer.

16   Correct?

17              MS. O'CONNOR:  Correct.

18              MR. KEZHAYA:  You, Nicole O'Connor,

19   specifically are directing this witness specifically

20   not to answer this question even though you don't have

21   a privilege argument, correct?

22              MS.O'CONNOR:  I'm object -- I'm

23   instructing her not to answer questions outside the

24   scope of her designated topics, and I think I've given

Page 138

```
 1   significant leeway where appropriate to be reasonable;
 2   but I think we're going down avenues that are not
 3   productive.
 4                 MR. KEZHAYA:  Well, I'm asking a yes/no
 5   question because I'm trying to find a point of impasse.
 6                 MS. O'CONNOR:  I can only answer the
 7   best I can.
 8                 MR. KEZHAYA:  Well, I asked you a yes/
 9   no question --
10                 MS. O'CONNOR:  I'm not here to answer
11   your questions.
12                 MR. KEZHAYA:  Well, then that means
13   we're not at a point of impasse.
14                 MS. O'CONNOR:  We -- I don't, I don't --
15   we don't -- this isn't some sort of proceeding where we
16   need to reach points of impasse.  You know my position.
17   She's not answering questions about the legalities of
18   certain things.  And if you have a next question, I
19   think now's the time to ask it.
20                 MR. KEZHAYA:  I think that's -- I think
21   that's what the misunderstanding is.  I'm not asking
22   her legal opinion.  I'm literally asking her
23   definitionally.  I asked a question that used the word
24   "blessing".  She's disagreeing with me about the word
```

Page 139

1   "blessing".  This is why I try to avoid semantics

2   games.  She said no.  I don't see how it's different.

3   I'm asking her to substantiate her no.

4            MS. O'CONNOR:  And her personal opinion

5   as to whether this is a blessing or not is not within

6   the scope of the 30(b)(6).

7            MR. KEZHAYA:  Well, then I'm getting

8   confused about your understanding of a 30(b)(6) because

9   her role in your mind seems to dance whether or not you

10  want her to give me the answer.

11           MS. O'CONNOR:  It doesn't.  I'm giving

12  some leeway on -- she knows a lot about these hearings

13  having sat in them.

14           MR. KEZHAYA:  Fine.  All right.  My

15  client representative informs me to tell you that

16  O'Malley -- I wanted to have this as a surprise for

17  trial, but since I'm having to spoil the surprise

18  anyway, he literally called it a blessing, all right.

19  Do we need to rewind and go re-watch him call it a

20  blessing or can we get over this blessing impasse with

21  semantics?

22           MS. O'CONNOR:  No, she's going to answer

23  the questions how she sees fit.  She doesn't answer

24  them to reach the conclusion that you want her to

Page 140

1    reach.  She, in her opinion, said that this wasn't a

2    blessing, okay.  Her opinion not only is not relevant

3    to her 30(b)(6) topics, but her opinion is what it is.

4    So that's her answer to the question.  You are here to

5    ask questions, and she is here to give her answers.

6    Whether you like her answers or not is not the question

7    for today.

8                    MR. KEZHAYA:  I disagree.

9                    MS. O'CONNOR:  Okay.

10                    MR. KEZHAYA:  That's literally our role

11    here.  That's what a deposition is.  Let's rewind.

12    Let's watch him say blessing and then let's have you

13    say it's not a blessing.

14                    MS. O'CONNOR:  Well, you can ask her did

15    she say it's a blessing.  That's a fair question.  But

16    whether Christine feels it's a blessing is an entirely

17    different question.

18                    MR. KEZHAYA:  Christine's not talking

19    today.  The City of Boston is talking through Christine

20    today.

21                    MS. O'CONNOR:  We're at a, a

22    fundamental -- I agree with that, that she has been

23    designated on certain topics.  But whether this

24    constitutes a blessing in Christine's opinion is not a

Page 141

1   question before these 30(b)(6) topics.

2              MR. KEZHAYA:  I see.  Okay.  So I'm

3   stuck with the 30(b)(6) matters of designation when you

4   don't want me to go outside of that, but I'm also stuck

5   outside of the 30(b)(6) matters of deposition when I'm

6   talking to Christine.  So I'm stuck with her personal

7   knowledge pursuant to her investigation.  I'm not

8   allowed to ask the things that I want to know from the

9   person who the City of Boston sent here to talk about

10  the subject matter of this case.

11             MS. O'CONNOR:  If you had issued a

12  subpoena in her personal capacity or in her individual

13  capacity, sure, those questions would be appropriate --

14             MR. KEZHAYA:  Ah.

15             MS. O'CONNOR:  -- perhaps, but she

16  wasn't designated on those topics.

17             MR. KEZHAYA:  So maybe the confusion

18  goes like this.  City of Boston, I speak to you through

19  this human who stands before me.  Let's rewatch your

20  employee call this a blessing first.

21             Rewind ... I don't know.  Let's just go

22  back to about 5:00.  5:00-ish.  Right before Wu starts

23  talking.

24             MS. KING:  How's this?

Page 142

1            MS. O'CONNOR:  A little bit further.

2    More like 4:30.  All right.  Take note, everyone.

3    We're at 7:00.  A little bit more.  That's fine.

4    Let's, let's just start here.

5            MS. KING:  At 4:30 or 4:07?

6            MR. KEZHAYA:  4:07 is fine.  Okay.  Let

7    us resume.

8                (Video playing.)

9            MR. KEZHAYA:  Pause.

10       Q    Did anyone else in the room take notice how

11   he emphasized the word "bless"?  I did.  Did you, City

12   of Boston, notice that your employee emphasized the

13   word "bless"?

14       A    I just heard him say that, yes.

15       Q    I see.  And, City of Boston, would you also

16   agree that this, in fact, is a blessing?

17            MS. O'CONNOR:  Objection.

18       Q    Yes or no.

19            MS. O'CONNOR:  No, her personal opinion

20   is irrelevant.

21            MR. KEZHAYA:  I'm not talking to

22   Christine.  I'm talking to the City of Boston that

23   hovers over her.

24            MS. O'CONNOR:  But she is not --

Page 143

1              MR. KEZHAYA:  City of Boston --

2              MS. O'CONNOR:  -- designated on those

3     topics.  And, Matt, this is not productive.  So if you

4     want to seek leave of court to perhaps put some

5     parameters on what our understanding of what this

6     deposition is.  You know my position.  I know your

7     position.  We don't have the same position.  So

8     continuing to go down this road is neither productive,

9     helpful or a productive use of anyone's time.

10             MR. KEZHAYA:  I agree.

11             MS. O'CONNOR:  So I've got my objection

12    on the record.

13             MR. KEZHAYA:  Mm-hmm.

14             MS. O'CONNOR:  If you would like to, to

15    revisit that in court, you are certainly welcome to do

16    so, but the next question, please.

17             MR. KEZHAYA:  Thank you.

18    BY MR. KEZHAYA:

19        Q    City of Boston, is this in fact a blessing?

20             MS. O'CONNOR:  Objection.  So if we are

21    going to continue to do this, I'm more -- I'm telling

22    you that we're going to leave.

23             MR. KEZHAYA:  I'm confused.  I'm asking

24    a different question from my prior one that you just

Page 144

1    objected to.  Is there something that I'm

2    misunderstanding about your objection?

3              MS. O'CONNOR:  Ask your question again.

4    Let me hear it.

5    BY MR. KEZHAYA:

6         Q    City of Boston, do you bless your meetings?

7              MS. O'CONNOR:  That's a fair question.

8         Q    Yes or no.

9         A    No.

10        Q    You do not.  Okay.

11             MR. KEZHAYA:  Let us continue.  Back at

12   7:00.

13             MS. KING:  7:00?

14             MR. KEZHAYA:  Seven minutes even.  Ah,

15   6:50, 7:00 minutes.  That's fine.  Whatever, 7:00.  I'm

16   sure she's saying nothing of importance.  That's good.

17   6:49, that's good too.

18                  (Video playing.)

19             MR. KEZHAYA:  Pause here.

20        Q    In the past 45 seconds I've heard her call

21   the councilors your servants, servants.  She's called

22   this a blessing, and she has requested that God

23   literally endow his servants with knowledge.  Have you

24   heard all those things or do we need to watch the last

Page 145

1    45 seconds?

2        A    I heard it.

3        Q    Okay.

4             MR. KEZHAYA:  Please continue.

5                  (Video playing.)

6             MR. KEZHAYA:  Pause.

7        Q    Where are we at?  8:09.  In the past call it

8    35 seconds I've heard this person with an emphatically

9    impassionate voice describe this current speech as a

10   prayer.  She has once again recited that the councilors

11   require God's wisdom and knowledge to do their basic

12   governmental tasks.  And I, I believe I, I remember

13   somewhere in here I heard the word "need".  So I just

14   want to emphasize that the word "need" is in here.

15   They need God to do their job.  Is that correct?

16           From the City of Boston's perspective is it

17   correct that the government needs God to do its job?

18             MS. O'CONNOR:  Objection.

19       Q    Yes or no.

20             MS. O'CONNOR:  She's not answering that

21   question.

22       Q    You are not answering that question?

23       A    I am not on the advice of counsel.

24       Q    Okay.  And once again, on advice of counsel

Page 146

1   you're not answering it even though there is no

2   privilege, correct?

3        A    Yes, correct.

4        Q    Thank you.

5              MS. O'CONNOR:  It's not within the scope

6   of the 30(b)(6) topics, correct.

7              MR. KEZHAYA:  Okay.  Continuing forward.

8                   (Video playing.)

9              MR. KEZHAYA:  Pause.

10       Q    Why is the government inviting someone to

11   bless the councilors' families?

12             MS. O'CONNOR:  Objection.

13       Q    It happened.  We see that it just happened.

14   Why is the government doing that?

15             MS. O'CONNOR:  Objection.  So that's

16   again not a topic that's designated on the 30(b)(6)

17   subpoena.

18             MR. KEZHAYA:  Do I really need to go

19   read through my 30(b)(6) to go find something that

20   sounds a lot like I want to inquire as to why you guys

21   have this policy?  Because I can do that.  We can do it

22   off the record too if you all don't mind.

23             MS. O'CONNOR:  Why you have the policy

24   of what?

Page 147

1              MR. KEZHAYA:  Having this person come up

2    here, deliver an impassioned plea to God that the

3    servants, which is to say our public employees, be

4    endowed with knowledge and wisdom that they otherwise

5    lack.  Why is that a thing?  I can look through the

6    30(b)(6) depo or you guys can answer the question,

7    which is your preference?

8              MS. O'CONNOR:  Well, why don't you

9    explain to me where you see that in the 30(b)(6)

10   deposition subpoena.

11             MR. KEZHAYA:  Let's take a break.  I

12   will go find it and highlight very many instances in

13   which I can do that.

14             MS. O'CONNOR:  Great.

15             THE VIDEOGRAPHER:  Okay.  The time is

16   12:17.  We're off the record.

17                  (Break was taken.)

18             THE VIDEOGRAPHER:  Okay.  We are back on

19   the record.  The time is 12:17.

20   BY MR. KEZHAYA:

21        Q    Okay.  Taking note of the 30(b)(6) notice,

22   paragraph 3 states as follows:  A background on the

23   City's invocation policy ceremo -- or invocation

24   ceremony, including without limitation: when it first

Page 148

1   arose - we've covered that - what legal challenges (if

2   any) it has faced over time - very interested in

3   hearing about that - how (if at all) the invocation

4   ceremony has changed over time - sounds like the

5   answer's not - how (if at all) any policies, practices,

6   or customs surrounding the ceremony has changed over

7   time.

8           Employee, what -- has it changed over time,

9   to the best of your knowledge, or has it pretty much

10  been the same?

11      A    It's been the same.

12      Q    Okay.  The bases for limiting who may

13  participate.  Why won't you invite TST?  What is your

14  basis or, plural, bases?

15              MS. O'CONNOR:  So she can't answer

16  specifically as to TNT, but she can answer in general

17  why --

18              MR. KEZHAYA:  Sorry.  To interject, it's

19  The Satanic Temple, not T-N-T, T-S-T.

20              MS. O'CONNOR:  I apologize if I

21  misspoke.

22              MR. KEZHAYA:  Thank you.  Please

23  continue.

24              MS. O'CONNOR:  She can answer as to the

Page 149

1    bases for why any entity is -- or why any entity is

2    limited from participating.

3                    MR. KEZHAYA:  Where in paragraph 3 which

4    states:  A bacro -- a background on the City's

5    invocation policy ceremony suggesting to you that I'm

6    asking about other people's ceremonies which is not the

7    subject matter of this dispute?

8                    MS. O'CONNOR:  To me this reads as a

9    general, you want to know the general background on the

10   City's invocation ceremony process and who is invited

11   to participate and who isn't.

12                   MR. KEZHAYA:  You said just the City.

13   Who is the City in this context?

14                   MS. O'CONNOR:  I am not asking --

15   answering your questions, Matt.  I don't --

16                   MR. KEZHAYA:  Well, then she will answer

17   my question.

18                   MS. O'CONNOR:  I don't -- I'm

19   fundamentally confused.  I'm really not trying to be

20   difficult.  I think this is all really straightforward,

21   and I would really love for her to answer the

22   questions.

23                   MR. KEZHAYA:  Okay.  Let's recap.

24                   MS. O'CONNOR:  But she can certainly

Page 150

1  answer how the City determines who may or may not

2  participate in the invocation process.

3            MR. KEZHAYA:  I designated the bases for

4  the City to limit who may participate in the City's

5  invocation ceremony.  That's part of paragraph 3.

6  You're not gonna get away with that one.  No one's

7  getting away with that one.

8            MS. O'CONNOR:  No one's trying to get

9  away with anything.

10            MR. KEZHAYA:  Okay.

11            MS. O'CONNOR:  I'm trying to be clear

12  about what the position is during this --

13            MR. KEZHAYA:  Your position has been

14  made adequately clear.  Let's restate the question.

15  BY MR. KEZHAYA:

16     Q    City of Boston who brought this human here to

17  talk about this very subject matter pursuant to a

18  30(b)(6) deposition in which I stated that I want to

19  know the bases for you, City of Boston, to limit who

20  may participate.  I demand that you tell me now --

21            MS. O'CONNOR:  So -- you --

22     Q    -- where are your bases?

23            MS. O'CONNOR:  You -- we have to give

24  respect to the witness.  And I appreciate that you're

Page 151

1    very excited about this topic, but she can certainly

2    answer how invocation speakers are selected and when

3    they may or may not participate.  That's a fair

4    question that you just asked.  But I'm asking that you

5    please show some respect to the witness.  And you don't

6    need to issue demands.  She is more than happy to

7    answer your questions.

8              MR. KEZHAYA:  This is a legal demand.

9    You all are not here of your own accord.  You are here

10   because I demanded pursuant to a Complaint that you

11   come here.  You acquiesced.  You brought this one.

12   This one is to speak to the bases for limiting who may

13   participate.

14             MS. O'CONNOR:  So this --

15             MR. KEZHAYA:  That one is telling me

16   that this one will not answer.

17             MS. O'CONNOR:  Please.  This is

18   Christine O'Donnell.  I'm Nicole O'Connor.  You can

19   call me Nicole, but you can't refer to me as "this

20   one".  I'm really uncomfortable with the way that this

21   deposition is unfolding.

22             MR. KEZHAYA:  Fine.

23             MS. O'CONNOR:  I'm really trying to

24   have our witness answer your questions, but we can't do

Page 152

1    it disrespectfully.

2                    MR. KEZHAYA:  Then I need a break.

3                    MS. O'CONNOR:  Okay.  That makes sense.

4                    THE VIDEOGRAPHER:  Okay.  The time is

5    12:21.  We're off the record.

6                    (Break was taken.)

7                    THE VIDEOGRAPHER:  Okay.  We are back on

8    the record.  The time is 12:31.

9                    MR. KEZHAYA:  Okay.  Off the record I

10   apologized for my errant ways.  Once again, looking you

11   both eyes, I apologize sincerely.  Sincerely, okay?

12                    MS. O'CONNOR:  Thank you.

13                    MR. KEZHAYA:  You're welcome.

14   BY MR. KEZHAYA:

15       Q    The subject of dispute is basically I'm

16   coloring outside the lines of my 30(b)(6) notice.  So

17   that being the case, specifically with regard to "the

18   bases for limiting who may participate" which is more

19   particularly included with the term "a background on

20   the City's invocation ceremony", my question to you is

21   whether there are bases for limiting who may

22   participate, yes or no?

23       A    It's by invitation.  So the limit would be if

24   you don't get an invitation, you don't give the

Page 153

1    invocation.

2         Q    So the answer is yes, and the basis is

3    singular which is you were not invited?

4         A    Yes.

5         Q    Okay.  All right.  And as I recall, earlier

6    you said you investigated why -- how and why a

7    particular speaker is selected in the course of

8    preparing for this deposition; is that correct?

9         A    I didn't investigate how or why -- oh, well,

10   if you're asking -- I asked staffers of city councilors

11   how a councilor determines who they invite.  Is that

12   what you're asking?

13        Q    That is what I'm trying to ask.

14        A    Yes.

15             MR. KEZHAYA:  Nicole, may I rephrase it

16   as I see fit or am I bound --

17             MS. O'CONNOR:  Sure.

18             MR. KEZHAYA:  -- to the language?

19        Q    Basically what I'm trying to get at here is

20   pursuant to your earlier conversation here, you -- like

21   you got here.  Before you got here, --

22        A    Yes.

23        Q    -- you did an investigation.  That

24   investigation included talking to people.

Page 154

1        A     Yes.

2        Q     Did you talk to the people for your

3   investigation why a particular matter or why a

4   particular speaker is selected or any permutation in

5   your mind thereof?

6        A     I asked how a councilor determines who

7   they're going to invite for the invocation.

8        Q     Okay.  Pause there.  And why.  Did you ask

9   why, yes or no?

10       A     I did not because that answer was part of the

11  answer that the staff person gave me.

12       Q     So the -- I tasked you with giving me how and

13  why a particular speaker is selected.  You went out.

14  You found how.  You did not investigate why; is that

15  correct?

16       A     The --

17             MS. O'CONNOR:  Objection.  You can

18  answer.

19       A     The response from the staff persons that I

20  asked said, oh, it's someone that the councilor has a

21  personal relationship with or does work within our

22  district or has done work with our constituents.

23       Q     Okay.  And --

24       A     So that would be the why.  That would be why

Page 155

1    a councilor extends an invitation to somebody.

2         Q    Yes.  Yes.  Thank you.

3              That sounded like a quote.  Were you given a

4    quote or is this just you referencing your prior

5    statement?

6         A    It's not a quote.  It's me summarizing the

7    question that I asked the staffers.

8         Q    Okay.  So you had some kind of a dialogue

9    with staffers?

10        A    Yes.

11        Q    Minimally you asked a question.  Did you get

12   one statement or more than one statement in return?

13        A    I, I asked more than one staffer so, yes,

14   more than one statement.

15        Q    Did you ask each staffer -- let's do it like

16   this.  How did you ask each staffer this question?

17        A    I asked what does -- how, how does the

18   councilor determine who to invite for the invocation.

19        Q    In what form --

20        A    The same question.

21        Q    Yeah.  Yeah.

22             What form was this inquiry made?  Was it

23   spoken, written or something else?

24        A    Spoken.

Page 156

1      Q     Okay.  So you met with them in person or did

2   you talk to them on the phone or was there some other

3   means of communication?

4      A     It was in person.

5      Q     Okay.  When was this meeting?

6      A     It wasn't a meeting.  It was just a

7   conversation.  Probably about two weeks ago.

8      Q     Okay.  So give or take two weeks ago.  How

9   many -- well, was this -- did you guys all meet in one

10  place?  Because you mentioned you talked to multiple

11  staff, plural staff people.

12     A     Talked to a couple of people.

13     Q     Okay.  Who were the two people that you

14  talked to?

15     A     Amanda Curley.

16     Q     C -- how do I spell Curley?

17     A     C-u-r-l-e-y.

18     Q     E-y.  Thank you.

19     A     You're welcome.

20     Q     And just for sake of good notes, a-n-d-a.

21           Okay.  So you talked to Amanda.  Who else did

22  you ...

23     A     Sophia Wang.

24     Q     Sophia Wang.

                                                    Page 157

1            Okay.  Who is Amanda Curley in the

2     organization?

3       A    Amanda Curley is the Chief of Staff for

4     Councilor Baker.

5       Q    Chief Staff Baker.  K-e-r?

6       A    Yes.

7       Q    Okay.  Sophia Wang is?

8       A    She is the policy director for councilor

9     Flynn.

10      Q    C director for F-l-y-n-n.

11           And it's the City's position that the

12    councilors may -- basically the councilors have -- you

13    know, whatever they do, that's pretty much up to them.

14    That's pretty much the custom; is that correct?

15      A    Yes.

16      Q    In terms of extending invites, each -- each

17    person does whatever they feel like is essentially ...

18      A    Yes.

19      Q    You talked to two, by my count, councilors

20    for a time period, an agreed time period discoverable

21    scope of 2011 until minimally the date of the

22    complaint, although that's a subject of dispute as

23    well.  How, how many councilors have been, you know,

24    employed by the City during that timeframe?

Page 158

1    A    So there has been a lot of turnover.

2    Q    Yeah.

3    A    The City Council has -- their election is

4    every two years.  It's a two-year term.  So since I

5    started in 2011, there -- actually, all of the

6    councilors are gone since I first started in 2011.

7    It's all new councilors right now.

8    Q    Okay.

9    A    So part of the reason why I reached out to

10   those two councilors' offices, Councilor Baker started

11   in 2012/2013.

12   Q    Okay.

13   A    And although Councilor Flynn is a newer

14   councilor, I believe his first term was 20 ... 2018.  I

15   think.  But he is the Council president.  So that is my

16   reasoning for speaking to those two offices.

17   Q    So he's the council president?

18   A    Councilor Flynn is the council president,

19   yes, the current council president.

20   Q    Okay.  So Flynn is currently the -- currently

21   the Council president, correct?

22   A    Yes.

23   Q    When did he first became council president?

24   A    This, this year.

Page 159

1      Q     Oh, wow, okay.

2      A     Yes.

3      Q     Council pres, all right.

4            You gave me beginning dates for both Baker

5      and Flynn.  Are they still --

6      A     Yeah, approximately.

7      Q     Well, yeah, obviously.

8      A     Yeah.

9      Q     Yeah, everything's approximate.  I'm not

10     playing semantics games here.  Give or take 2012,

11     that's what this squiggly line means for my purposes.

12     A     Mm-hmm.

13     Q     Are they still councilors, though?

14     A     Yes.

15     Q     Okay.  Present.  And present.

16           Okay.  So you talked to Flynn to determine

17     how Flynn does things, but you did not talk to anyone

18     else, it seems, or other than Baker?

19     A     No.

20     Q     Okay.  All right.  Turning once again back to

21     here.  Mm-hmm.  Mm-hmm.  Mm-hmm.

22           All right.  Why didn't you talk to anyone

23     other than Flynn's people?

24     A     Well, I talked to Councilor Baker's --

Page 160

1        Q    Oh, yes.

2        A    -- people because, again, he's been there the

3    longest now and Councilor Flynn because he's the

4    council president.

5        Q    Oh, so you --

6        A    And I -- as I said previously, I have

7    attended the meetings so I can see from the

8    introduction and I know that the policy is based on

9    invitation and that's why I'm here to discuss that

10   policy.  So I spoke to those two offices just to get an

11   idea how their councilors pick the individual that

12   gives the invocation.

13       Q    You specify how, but I also charged you with

14   specifying why.

15       A    And again, I feel that I answered that.  It's

16   individuals that the councilors have a relationship

17   with, and the Council -- it's by invitation.

18       Q    Well, sorry, I was --

19       A    I, I -- I feel that the councilors are the

20   only ones that can speak to why they're asking

21   somebody.  I can infer based on the invites that it's

22   people that they know because of a personal

23   relationship or work they do within the City.

24       Q    Yes, but that's an inference, and as their

Page 161

1   employer who has charged them to do certain tasks for

2   your business purposes, that, I posit, is a material

3   aspect of the agency seeing as how you, 30(b)(6)

4   witness, are unable or unwilling to testify to that

5   effect.  Would you agree then that I need to talk to

6   the individual councilors, each?

7        A    Yes.

8        Q    Okay.  In order -- to be more -- to make a

9   better record, I heard yes.  I interpreted that to mean

10  yes for the particular purpose of why are they not

11  inviting TST, why are they inviting these other people.

12  For example, I would need to talk to Wu about this

13  particular person and why Wu in particular would not

14  invite TST, correct?

15       A    Wu didn't invite TST.  There -- there was

16  never an invite.

17       Q    I understand.  The why question is addressed

18  to Wu, though, correct?

19       A    Yes.

20       Q    Okay.  Who would I talk to in Wu's office or

21  on Wu's behalf in order to get her deposition set up

22  because we only have like two months left in discovery?

23             MS. O'CONNOR:  Objection.  I mean I'm

24  happy to coordinate --

Page 162

1                    MR. KEZHAYA:  Okay.

2                    MS. O'CONNOR:  -- that information.  I

3     don't think Christine will know it.  You can ask her.

4                    MR. KEZHAYA:  You don't need to call an

5     objection.  You can just ...

6                    MS. O'CONNOR:  Okay.

7                    MR. KEZHAYA:  Okay.  All right.  I, I

8     bring that up because words like "objection" have a

9     tendency to, to get me riled up.  I'm trying to, trying

10    to keep it down.

11                   MS. O'CONNOR:  That's just pretty

12    standard.

13                   MR. KEZHAYA:  Okay.

14    BY MR. KEZHAYA:

15       Q    All right.  And I also see on my handy list

16    here, paragraph 4, City's recordkeeping policies

17    surrounding payment to guest speakers at the invocation

18    policy which presupposes that this person who is

19    presently blessing the proceedings, although that's

20    subject to dispute, Wu invited this priest and this

21    priest is paid by the City for speaking at this event;

22    is that correct?

23       A    The people that give the invocation are no

24    longer paid.

Page 163

1          Q     No longer paid.  When did that stop?

2          A     I believe it stopped in 2016 or 2017.  I'm

3    not sure of the actual year.

4          Q     How do you know that they stopped being paid?

5          A     Because, again, I was, I was in my same job,

6    and the staff director at the time informed us that the

7    clergy weren't being paid anymore.

8          Q     2016 or 2017, that was the timeframe that

9    people stopped getting paid; is that correct?

10         A     Yes.  That was when now Mayor Wu was council

11   president.

12         Q     Mm-hmm.  That coincides with TST's first

13   request to TST -- to demand, basically, an invitation;

14   is that correct?

15         A     Yes.

16         Q     Was it because of TST's demand?

17         A     It was looked at and considered best practice

18   to stop the stipend.

19         Q     I understand.  But did the process of looking

20   at the process of whether we are giving money to these

21   priests, was that occasioned by TST's demand for

22   invite?

23         A     Yes, the policy was looked at then.

24         Q     Okay.  So just to make, just to make a

Page 164

1    cohesive sentence, in 2016 TST demanded an invite of

2    the City Council.  City Council goes to you requesting

3    a legal opinion as to whether they have to.  Is there

4    anything --

5         A    They, they -- I was not involved in that

6    decision whether or not to stop the payment.  I was not

7    involved in it.

8         Q    Ah, I was mistaken.  I'm so sorry.

9              So TST demanded an invite in 2016.  I was

10   confused as to which one you opined as to the City

11   doesn't have to extended an invite.  That was 2018.

12        A    Yes.

13        Q    So there have been at least two demands for

14   invitation.  Do you know how many times TST has

15   demanded, legally demanded an invite?

16        A    I do not.

17        Q    Okay.  If I told you it's at least three does

18   that sound like something you can disprove, as we sit

19   here today?

20        A    No, that seems reasonable.  I don't ...

21        Q    Okay.

22        A    Again, I'm not aware how many times.

23        Q    Okay.  That's, that's fine.  I don't really

24   care about the number anyway.

Page 165

1           So TST first issues a demand in 2016 which

2     prompts a process of reviewing its prayer policy to

3     avoid a subject lawsuit not unlike this one.  Because

4     of TST's legal demand and it seems, from my perspective

5     at least and I'm curious as to your position on the

6     matter, it seems like it was for the purpose of either

7     avoiding or winning a lawsuit not unlike this one.

8                 MS. O'CONNOR:  Objection.

9       Q    City of Boston, do I need to have your

10    employee speak to this matter?

11                MS. O'CONNOR:  Objection.  You can

12    answer if you can.

13      A    I --

14                MR. KEZHAYA:  I object to this if you

15    can business.  She can -- she knows that she answer my

16    questions if she can.

17      A    Can you repeat your question?

18      Q    Was the purpose of reviewing the

19    determination to pay these priests part of a purpose of

20    avoiding liability thereby avoiding a court order

21    requiring TST to have an invitation?  Is that why you

22    guys did your, your review?

23                MS. O'CONNOR:  Objection.

24      A    The re -- the review was done.  And again, I

Page 166

1   did not conduct this review.  But the review of the

2   policy of paying the people giving the invocation was

3   looked at, and it was determined that it was best

4   practice to stop the stipend.

5        Q    Okay.  And, City of Boston, was it -- is it

6   your testimony, as we sit here today, that since

7   approximately 2016 - let's bookend it at 2018 - people

8   have not been getting paid since at least going back to

9   2018-ish?

10       A    Correct.  And I'm, I'm pretty -- I'm pretty

11  sure it was 2017.  I'm pretty sure you can settle on,

12  on that.

13       Q    Okay.

14       A    That it was 2017 when the payment stopped.

15       Q    Okay.  Who made that decision?

16       A    At the time it was Council President Wu.

17       Q    Oh, so Councilor Wu, here who invited this

18  particular person, I should probably ask her why she

19  decided to turn off this money thing?

20       A    Yes.

21       Q    Okay.

22            MR. KEZHAYA:  Let us proceed.

23                 (Video playing.)

24            MR. KEZHAYA:  Amen.  All right.  Pause

Page 167

1   it, please.

2       Q    So going back to this matter, I have a lot of

3   follow-up questions about this.  I feel like you're not

4   the right person for me to talk to.  Should I talk to

5   Michelle Wu about this?

6                MS. O'CONNOR:  It probably depends on

7   the question.

8                MR. KEZHAYA:  Oh, do we want to go

9   through that?

10      Q    Okay.  That felt a lot like proselytizing to

11  me.  What say you, City of Boston?

12               MS. O'CONNOR:  So, yes, objection.  That

13  is not a question that Christine can answer based on

14  the 30(b)(6) topics.

15               MR. KEZHAYA:  Okay.  I can, I can go

16  through the list or --

17               MS. O'CONNOR:  You need not.

18               MR. KEZHAYA:  -- that's basically the

19  topic.

20               All right.  Now, I feel like this is a

21  good time for lunch unless the witness would like to

22  proceed.

23               MS. O'CONNOR:  It's totally up to

24  Christine.

Page 168

1              MR. KEZHAYA:  It's entirely up to you,

2     Christine.

3              THE WITNESS:  I'm -- I mean I'm fine

4     with ...

5              MS. O'CONNOR:  You can break now.  You

6     can take -- you can go for another half hour if you

7     wanted.  You could -- whatever you want to do.

8              MR. KEZHAYA:  The next phase of things

9     will be public input to councilors.  It's probably

10    gonna run into another impasse.  Suffice it to say,

11    we're just going to look at them.  I'm not gonna -- I'm

12    not gonna get too detailed on it.  I feel like I have a

13    lot of why questions that are really better addressed

14    to Wu.  So I'm just going to leave those for her.  How

15    about we just take a look at the emails and then call

16    it a day?

17             MS. O'CONNOR: Sure.

18             THE WITNESS:  Okay.

19             MR. KEZHAYA:  Sound good?

20             THE WITNESS:  Sure.

21             MR. KEZHAYA:  All right.

22    BY MR. KEZHAYA:

23        Q    Let's just drop this, drop this YouTube

24    thing.  We now have some emails that we received

Page 169

1    through discovery.

2              To recap, Christine, you looked at the

3    discovery, correct?

4         A    Yes.

5         Q    Okay.  And more particularly, I apologize,

6    discovery is a legal jargon term.  Could you please

7    explain to the, the congregants what it means to have

8    discovery?

9              MS. O'CONNOR:  Objection.  You can

10   answer.

11        A    My understanding is that it's requests for

12   information and documents pur -- before litigation or

13   during litigation.  Again, I'm not a litigator so I'm

14   not familiar with the proper terms.

15        Q    That's okay.  If I, if I dispute any part of

16   what you have to say to me, I ask further examining

17   questions until we get to the place where I feel like

18   we're either at an impasse or I understand what you're

19   saying.

20        A    Okay.

21        Q    So if I could rephrase it in my own words, is

22   it fair to say that discovery is a means by which you

23   prepare for trial that the rules allow you to have?

24        A    Yes.

Page 170

1          (Exhibit 1 was introduced.)

2     Q    Okay.  All right.  So pursuant to that we

3 sent discovery requests, the details of which are

4 irrelevant.  Because of the discovery requests, you

5 guys gave us documents.  These are some of the

6 documents.

7          You will take note that this particular item

8 is designated as Defendant's 2870, Bates stamp 2870.

9 If we could please open it up and then let's scroll

10 down to the very bottom so we can see in fact this is

11 Defendant's 0002870.  This is 2870.

12          There and then on -- well, sorry, August 30,

13 2017, Mark Thomas states to -- is it -- would you

14 describe this list of email addresses as the City

15 Council?

16     A    Yes, at that time those are all of the

17 councilors, and I believe the current mayor, Martin

18 Walsh, is on that email as well.

19     Q    Okay.  The subject line states:  Satanic City

20 Council Meetings.  Is that correct?

21     A    Yes.

22     Q    Okay.  And there and then marked Tom -- first

23 of all, before we get into the text of the email, is

24 this pretty normal to see -- you know, we talked about

Page 171

1    members of the public communicating to their

2    councilors.  Is this pretty much what that looks like?

3         A    The -- honestly, the City Council doesn't

4    really get many requests for the invocation.  Usually

5    communications from the public relate to legislation,

6    if there's issues in the community, things like that.

7         Q    Okay.  So if I --

8         A    But it's a -- but if you're asking about

9    means of communication, --

10        Q    Yeah.

11        A    -- that would be a means to communicate with

12   the councilors via email.

13        Q    I was literally just asking as to form.

14        A    Okay.

15        Q    This appears normal, in other words, is

16   that -- is that fair?

17             Is this abnormal that someone would send an

18   email to the whole City Council?

19        A    No, that's normal.

20        Q    As stated there and then, Mark Thomas states:

21   Dear Councilors, it has come to my attention that a

22   proposal is being circulated to open City Council

23   meetings with a "prayer" from an alleged Satanist.  If

24   it isn't clear to every City councilor and Mayor Martin

Page 172

1  Walsh, that would be a very bad idea and cross far over

2  any bounds of sanity and decency.

3       Moreover, as an act of hate blasphemy, and

4  rejection of God it should be immediately commended as

5  just that.

6       I trust that this is all that needs to be

7  said on the matter.  It is a very matter to incur the

8  wrath of God for either yourselves or the City of

9  Boston.  Respectfully, Mark Thomas - Boston.

10       Did I read that email in full correctly?

11       A    Yes.

12       Q    Okay.  And then I see from Andrea Campbell to

13  Christine O'Donnell.  You're the To:; is that correct?

14       A    Yes.

15       Q    Okay.  And Andrea Campbell is the then

16  Council president.  No.  No.  No, actually --

17       A    Yeah.  No.  No.  No.  She was a district

18  councilor at that time.

19       Q    Okay.  And to reiterate, "that time" being

20  August 30, 2017 was the original email.  The secondary

21  email being or the responsive email, whatever this is,

22  maybe forward.  Is this a forward?  You tell me.

23       A    It is a forward because, as you can see, the

24  August 30th email I was not on.

Page 173

1      Q     Mm-hmm.

2      A     And then from the text --

3      Q     Ah.

4      A     -- of the email on September 1st, it looks as

5  if I was forwarded that email because it was a public

6  records request.

7      Q     I see.  I also now take note, this would have

8  probably made things easier, above Mark Thomas it

9  literally says forwarded message.  So we know now that

10  it was forwarded to you.

11      A     Oh.

12      Q     So going back, September 1, 2017, Andrea says

13  to you, Christine O'Donnell:  Hi Christine, I'm

14  checking on the Councilor's email during her leave and

15  will send you all emails related to this request now.

16            You received this email.  I did not receive

17  any other responsive documentation about this.  Who is

18  the councilor, to your understanding, from Andrea

19  Campbell?

20      A     That -- Eli is -- was Councilor Campbell's

21  chief of staff at the time.  So she's telling me that

22  she's reviewing the councilor's emails.

23      Q     Okay.

24      A     That related --

Page 174

1      Q     Oh, I see.

2      A     This was subject to a public rec -- looking

3   at the context in the sense that that was forwarded to

4   me.

5      Q     Okay.

6      A     It look -- it appears to me that this was

7   subject to a public records request, and that's why

8   Eli, who was Council Campbell's Chief of Staff is

9   forwarding this to me.

10     Q     I see now also this email is sub -- well, no.

11  How do you know this is a public records request?

12     A     Based on my job for the past 11 years, it

13  says:  I'm checking the councilor's email during her

14  leave and will send you all emails related to this

15  request now.

16     Q     Ah.

17     A     When I get a public records request, I work

18  with the City's records access officer, and I also

19  reach out to all the councilors and say do you have any

20  emails, documents responsive to this request.  There

21  must have been a request.  I don't know if it was from

22  TST or if it was from -- any member of the public can

23  request records.

24     Q     Sure.

Page 175

1     A    Emails, unless they're privileged, are

2  subject to public records.  Any document is subject to

3  a public record, unless the statutory exemption

4  applies.

5     Q    Mm-hmm.

6     A    So it looks like the language from Eli to me,

7  that someone requested a public record.

8     Q    Okay.

9     A    And this, this was subject to that public

10  record.  Again, I'm just looking at it on the one page,

11  but that's what it looks like to me.

12     Q    Well, that makes sense because, you know, we

13  have August 30 --

14     A    Yes.

15     Q    -- and checking so-and-so's.  I didn't see

16  this Eli.  I saw the Andrea Campbell.  So that, that

17  all makes sense, especially with this request now.

18  This request being public records request.

19             MR. KEZHAYA:  Okay.  Let's move on to

20  the next exhibit.  This is -- for benefit of the

21  record, we're going to call this Bates ... All right.

22  So we've called -- if we could scroll back down I've

23  already forgotten the Bates number.  Here we are, 2870.

24  And this is -- I'm going to call this the frightening

Page 176

1   email.

2           Okay.  Let's just tab on to the number

3   next one, whatever we're going to call it.  I see this

4   is Defendant's 3434.  Scroll all the way to the bottom

5   because it's a page range.  3436.

6           Does anyone object to me disregarding --

7   we just saw -- if we could scroll down one more time.

8   For benefit of the record, we're looking at 3434

9   through 3436.  Pages 3435 and 3436 are just a bunch of

10  signatures.  Does anyone object to me disregarding 3435

11  and 3436 in the presentation of the argument at trial?

12          MS. O'CONNOR:  No.

13          MR. KEZHAYA:  Okay.  So I'm going to

14  strike those remaining two.

15          (Exhibit 2 was introduced.)

16     Q    Now, we're looking now at 3434 which

17  subsequently is gonna just be a one-page.  This is

18  appearing -- appearing to be an email dated October 19,

19  2020 from someone named P. Cumin to Gabriel Coletta --

20  or, sorry, Gabriela Coletta.

21          And I'm afraid my eyes have failed me.  Madam

22  witness, could you please, to the, to the best of your

23  ability, I imagine you can probably decipher these

24  people's names and whatnot better than I can.

Page 177

1      A     Yep.

2      Q     From -- well, on date, from who, to who, cc

3   who, subject what?

4      A     Date: Monday, October 19th, 2020; from P.

5   Cummin to Gabriela Coletta.  Oh, I skipped subject:

6   Regarding Providing Virtual Invocation to City Council

7   Meeting; To: Gabriela Coletta; Cc: Theresa Malionek.

8      Q     Okay.  So I, I note the To: has a Boston.gov

9   email address.  Who is this Gabriela Coletta?

10      A     At that time she was Chief of Staff for

11   Councilor Lydia Edwards.

12      Q     A chief of staff -- oh, here we are,

13   Councilor Edwards.  Oh, that's great.

14      A     Yup.

15      Q     P. Cumin appears to be I see at the

16   signature, some kind of a priest.  So why don't you,

17   why don't you read us this, this email, madam -- madam

18   witness.

19      A     Hi Gabriela, Thank you for your email.  I'm

20   honored to accept Councilor Edwards' invitation to

21   provide the opening invocation for the City Council

22   this coming Wednesday but I have a practical question

23   to ask to make sure that that's something feasible for

24   me.  I have a mass at 12:10 pm on Wednesday.  Do you

Page 178

1   think the City Council will start at 12 pm sharp?  I'm

2   just asking because I could stay on the call until

3   12:05 but then I'll have to leave and get ready for

4   mass.  Do you think it'd be feasible for me to give the

5   invocation and then leave the call to get ready for my

6   mass?  Please let me know what Councilor Edwards

7   thinks.  Thank you for your help.  Take care, Fr.

8   Parlo -- Paolo.

9        Q    Okay.  So I see here that -- I think it's

10  friar is F-r.  Is it father or friar?

11       A    No, it's father.

12       Q    I'm so sorry.

13       A    That's been my experience.  I don't know.

14  Could be friar.  I don't know.

15       Q    I apologize.  I have difficulty with

16  language.  So it's -- if it's an abbreviation then I

17  just assume it's the shortest one it could be.

18            So Fr. Paolo, are you personally familiar

19  with Fr. Paola?

20       A    No.

21       Q    Okay.  Are you personally familiar with

22  whatever San Carlo.org is?

23       A    I am not.

24       Q    Okay.  Let's scroll down.  Maybe this will

Page 179

1   give us some more insight.

2           So this is in re -- this prior email I see is

3   in response to an email dated when, by whom, to, et

4   cetera.  Please -- please explain to the people.

5       A    Do you want me to read the email?

6       Q    Oh, no, literally say -- we have to do some

7   minimal legal required stuff.  We have to give

8   background on what is it that we're looking at.  So for

9   people that are not literally looking at this document,

10  they're going to be seeing a court transcript of

11  everything that's going on here so for --

12      A    It's an email on October 19th, 2020 at

13  7:51 AM.  Gabriela Coletta wrote:  Good morning Father

14  Paola, I'm reaching out on behalf of Boston City

15  Councilor Lydia Edwards to ask if you'd be willing to

16  provide the opening invocation for this week's virtual

17  Boston City Council hearing on Wednesday at 12 PM.

18  We'd be honored to have you represent our district for

19  this hearing.  Kindly let me know when you can.  Best,

20  Gabriela.

21      Q    Okay.  So I see now the relevance of this

22  document appears to be that Councilor Lydia Edwards

23  invited Fr. Paolo.  I probably needn't figure out who

24  or why, rather, Fr. Paola was invited which is outside

Page 180

1    your, your knowledge scope.  So we're going to set that

2    aside.

3                    MR. KEZHAYA:  We're calling this the Fr.

4    Paolo invite.  How do I spell that?  P-a-o-l-o.

5    Invitation.  All right.

6                    And for benefit of a more clear record,

7    Exhibit 1 was 2870 "frightening email".  Exhibit 2 is

8    Bates 3434.  I'm calling it the Fr. Paolo invitation.

9    No need for email.

10                   Now, let's move on to number next one.

11       Q    Okay.  Madam witness, if you could -- earlier

12   you said I skipped over subject.  That's actually -- it

13   makes more sense to know who's talking with whom, when,

14   and about what.  So if you could say the From, To, Cc,

15   when and then about and then we'll figure out together

16   what this is all about.

17       A    From Gabriela Coletta; sent Tuesday,

18   February 19th, 2019; To: Carl -- Carl Jean-Louis; Cc:

19   Candace Morales, Makayla Parkin, Elizabeth Pimen --

20       Q    Oh, you can, you can just summarize.  Just a

21   bunch of people at Boston.

22       A    Okay.  Okay.  Sent -- cc'd to Boston

23   employees.  Subject: Regarding agenda for tomorrow's

24   planning meeting.

Page 181

1      Q    Okay.  All I see is a sea of Boston.gov
2   emails and I see also a Gmail in here.  Do you have any
3   idea who any of these people are?
4      A    I do.  Some not all.
5      Q    I, I don't care about the ones you don't
6   know.  Tell me about the ones you do know.
7      A    So Candace Morales is one of my colleagues on
8   central staff.  She is the communications person for
9   the City Council.  Makayla Parkin used to work for
10  former Councilor Janey.  She is no longer employed at
11  City Council.  Elizabeth Pimentel used to be Council
12  Campbell's Chief of Staff.  Mark Mur -- I don't know --
13  Yuleidy Valdez used to be the staff director for City
14  Council.  And Kristen Halbert used to be a staffer for
15  Councilor Michelle Wu.
16     Q    Basically a bunch of support staff for
17  councilors.  Is that fair to say?
18     A    Yes.
19          MR. KEZHAYA:  Okay.  Let's scroll down,
20  see what our Bates stamp is.  Bates numbering that is
21  to say.  I just need to know the first page and then
22  the last page.  2320.  Beginning and ending when?
23  2322.
24          (Exhibit 3 was introduced.)

Page 182

1      Q      Okay.  What is this all about?  This appears

2   to be some kind of meeting notes.  Is -- is that fair

3   to say?

4      A      BHM stands for Black History Month.

5      Q      Okay.

6      A      That's an event that the City Council has.

7      Q      Okay.  What is CJ?  Who is CJ?

8      A      CJ worked for Councilor Campbell.

9      Q      "Will check with staff from president's

10  office."  Do these words mean anything to you?

11     A      It looks like, based on the agenda, that he's

12  looking to the council president's office for guidance

13  but ...

14     Q      Okay.  What is UMB?

15     A      I, I do not know.

16     Q      Okay.  All right.  Well, it seems to me --

17  let's scroll down so I can just kind of skim through

18  this email.

19     A      UMB is -- sometimes refers to UMass Boston,

20  but in this context I don't know if that's what that

21  means.

22     Q      Oh, you know what, I am vaguely familiar that

23  some of these documents appear to suggest that there's

24  like last-minute needs for invocations.  Maybe I could

Page 183

1    summarize all this by asking you just directly.

2             How -- was it ever the case that there's like

3    a last-minute need, we need an invocation for whatever

4    meeting?  Is that a thing that happens at the City?

5         A    Yes.

6         Q    Okay.  How often does that happen?

7         A    It happens -- I can't give an approximate

8    amount, but maybe a couple of times a year, a few times

9    a year.  Five.  Five times a year.  But not, not often

10   in the overall amount of meetings.

11        Q    Okay.  So about two to five times per year

12   there's an opening for invocations that requires

13   someone to -- need to fill and obviously that we all

14   know that TST was not invited; is that correct?

15        A    Yes.

16        Q    Okay.  Let's move on to the next document.

17                  MR. KEZHAYA:  No.  No.  No.  We don't --

18   we're done with this one.

19                  For benefit of a clean record, this was

20   Exhibit 3, Bates range 2320 to 2322.  I'll figure out a

21   designation later.  We can move on to the next one.

22                  Let's see here.  Okay.  Let's just

23   scroll down to the, to the Bates number.  It will be --

24   it'll be at the bottom of the page.  Okay.  23 -- well,

Page 184

1   actually, what's gonna be four is beginning 2391 to

2   2392.

3              (Exhibit 4 was introduced.)

4        Q    This appears to me to be another instance in

5   which -- another discrete instance, provable instance

6   in which someone needed a last-minute invite.  Is that

7   consistent with your reading of this email?

8        A    Do you need me to read it out loud?

9        Q    No.

10       A    It looks as if it's last-minute since it's

11  tomorrow, but it also looks as if they found someone.

12       Q    Okay.  Last minute, that's -- that brings a

13  good point.  Last minute isn't discrete terminology.

14             Does the City of Boston have a meaning for

15  last minute or is it just used in its common parlance?

16       A    Used in its common parlance.

17       Q    Okay.  Last minute as used in common term.

18       A    Actually, after looking at this again, I

19  cannot confirm whether or not it was last minute

20  because Makayla Parkin worked for the time it was

21  Council President Janey.  And since the Council

22  president chairs the Council meeting, it looks as if

23  Makayla is emailing Eli since it was Councilor

24  Campbell's turn to see who was giving the invocation.

Page 185

1          So I'm not sure -- Makayla sent it on Monday.

2     The meeting's on Wednesday.  I'm not sure if -- when

3     Councilor Campbell reached out to Pastor Yansen it

4     looks like.

5          Q    In other --

6          A    So I don't want to be inaccurate and say that

7     Councilor Campbell waited til the last minute when I'm

8     not clear on that based on the email.

9          Q    Okay.  I, I don't mean to be contentious, but

10    I see Makayla here ends the email or the second to last

11    sentence of the Monday, November 2 at 1:01 PM Makayla

12    writes:  Please let me know if you can find someone by

13    end of day tomorrow!

14         A    And Makayla likely sent that because the

15    staffers of whoever, whoever the Council president

16    is --

17         Q    Mm-hmm.

18         A    -- generally prepare prep notes --

19         Q    Mm-hmm.

20         A    -- for the Council president.  So Makayla --

21    and like I said, our meetings are on Wednesday.

22    Makayla likely sent Eli that email so she could include

23    the name of the individual giving the invocation in

24    Council President Janey's script.

Page 186

1      Q      I see.

2             What, what is the usual advanced notice that

3      the City receives that it will have a particular person

4      giving a particular ... I'm going to call it blessing.

5      I know it's a subject of dispute.  I'm just going to

6      keep calling it blessing.  How -- you've got this

7      person who's going to be doing a blessing.  How long

8      before the meeting do you know they're going to be

9      doing the blessing?

10     A      Do I know or does the --

11     Q      The City.

12     A      I -- the individual councilor, I -- they may

13     reach out to them well ahead in advance whoever is, is

14     inviting someone.  That I can't speak to.

15     Q      Sorry.  I, I -- again, I hate the theatrics

16     about it, but technically I'm not talking to you.  I'm

17     talking to the City of Boston.

18     A      So it would vary --

19     Q      Yeah.

20     A      -- on councilors.

21     Q      Yeah.

22     A      Depending on how much notice they would give.

23     Q      So I probably need to talk to them, huh?

24     A      Yes.

Page 187

1       Q     Okay.

2                   MR. KEZHAYA:  All right.  So how much

3    advanced notice do councilors give.

4       Q     And now that's, that's in terms of what the

5    councilors receive.  What about in terms of putting

6    together an agenda?  Presumably an agenda gets put

7    together for these meetings.  Is that fair to say?

8       A     Yes.

9       Q     When does that get locked in?

10      A     The agenda has to come out the Monday before

11   the Wednesday meeting.

12      Q     Monday before the Wednesday meeting?

13      A     Yes.

14      Q     Okay.  So we're turning back to our email

15   then.  This is Monday at 1:01.  She's freaking out

16   because it's, it's due tomorrow, and she probably needs

17   to have the agenda done.

18      A     This email does not refer to the agenda.

19      Q     Ah.

20      A     Makayla is asking her for the name so she can

21   put it in the script that she preps for Councilor

22   Janey's notes.  Makayla is a staff person for Councilor

23   Janey who was president at the time, Council president

24   at the time.  As president they -- the president chairs

Page 188

1    the City Council meetings.  So she -- whoever the

2    Council president is opens the meetings and has a

3    script, and likely says, oh, I now invite so-and-so who

4    has -- I, I invite Councilor so -- in this case,

5    Councilor Campbell up who has invited Pastor James W.S.

6    Yansen to come to speak.

7              So this looks like to me that Makayla is

8    reaching out to Eli so she can have the name to put in

9    the script because Councilor Janey liked to look at the

10   script the night before the Council meeting.

11        Q    Okay.

12        A    So this is not the agenda.

13        Q    I know.

14        A    This is not the agenda.

15        Q    I understand.  I'm saying that she needs it

16   for purposes of the agenda possibly or actually more

17   likely it seems because I see November at 3:00 PM.  If

18   the thing's -- if the meeting is actually on Wednesday,

19   you know, it, it seems to me that they're just looking

20   to fill the slot.

21        A    I disagree with that characterization.

22        Q    Okay.  Well, that's an impasse.  Let's move

23   on.

24                   MR. KEZHAYA:  And for benefit of the

Page 189

1   record, this is 2391 to 2392.  I'll figure out a

2   designation later.  Let's move on to number next one.

3                   Oh, thank you.  2733 to 2734.  Let's see

4   the top of 34.  Yeah, those are just signatures so

5   we're just gonna do 2733.  Unless, unless, opposing

6   counsel, do you object to me only using --

7                   MS. O'CONNOR:  No problem.

8                   MR. KEZHAYA:  As a, as a general

9   proposition, can I just skip signatures?

10                  MS. O'CONNOR:  Please.  Yes.

11                  MR. KEZHAYA:  Okay.  Less paper I

12  prefer.

13                  (Exhibit 5 was introduced.)

14      Q    Let's scroll up slightly more.  What is going

15  on here?  So these are a lot of emails.  Let's start

16  with the bottom most.  We are looking at an email --

17  and, sorry, I'm just going to take over this.  I think

18  it's going to be a little more efficient.  We see

19  June 10, 2020 at 8:33 AM.  Michael Bonetti writes to

20  someone named ... madam witness, could you please state

21  the pronunciation?

22      A    Yuleidy.

23      Q    Yuleidy, thank you.

24                  Please -- please carry away with the body of

Page 190

1    the text.

2        A    We have a priest to preside over the

3    invocation today.  His name is Fr. Michael Della Penna,

4    ofm, pastor of Saint Leonard of Port Maurice Parish in

5    the North End.  Thanks, Michael.

6        Q    Okay.  Does the shorthand OFM mean anything

7    to you?

8        A    It does not.

9        Q    Okay.  I see that the -- it follows a

10   priest -- you're going to have to forgive me.  I

11   apologize.  I don't, I don't speak the, the jargon of

12   the Catholic tongue.  Is this Fr. Michael Della Penna,

13   is that correct, an ofm -- ofm pastor.  It seems to be

14   like a priest, some kind of honorary suffix.  Is

15   that --

16       A    I, I don't know --

17       Q    Okay.

18       A    -- what the -- what that is.

19       Q    Okay.  But --

20       A    I don't know what that reference is.

21       Q    Okay.  And he's a pastor of somewhere in the

22   North End which I presume from context that this is a

23   neighborhood or smaller subpart of the City of Boston;

24   is that correct?

Page 191

1          A     Yes, it's a neighborhood of the City.

2          Q     Okay.  So we see that once again happened at

3    Wednesday at 8:33 AM.  And as we've been over multiple

4    times, the meetings are on Wednesday.  So this appears

5    to be what I would call a last-minute email example.

6          A     Again, you're -- you are taking this out of

7    context.  Yuleidy was the staff director.  Michael is a

8    staffer for Senator -- excuse me, for Councilor

9    Edwards.  He is letting Yuleidy know who is giving the

10   invocation.  This was also during when we were on Zoom.

11         Q     Mm-hmm.

12         A     So we were having staffers coordinate who was

13   going to be let into -- as a, as a pa -- as a panelist.

14   So Mike is letting Yuleidy know that this person is

15   giving the invocation.  It doesn't necessarily mean it

16   was last-minute.  It's just that this is the day of the

17   meeting.

18         Q     Mm-hmm.

19         A     So Michael is letting Yuleidy know.

20         Q     Okay.  So --

21         A     So it's -- I do not think that we can say

22   that it's last-minute.

23         Q     Well, not on the strength of this email

24   alone.  I'd probably need to go talk to someone.  So is

Page 192

1    Yuleidy still at the City.

2         A    Not with the City Council.

3         Q    Is she anywhere in the City?

4         A    Yes.

5         Q    Okay.  What does she do with the City?

6    Sorry.  I'm assuming genders.  What is the preferred

7    gender denomination?

8         A    I believe she prefers she/her.

9         Q    Okay.

10        A    I'm not sure of her exact title.  I know

11   she's in the property management division.

12        Q    Do you know Yuleidy's last name?

13        A    Yes.

14        Q    What's --

15        A    Valdez, V-a-l-d-e-z.

16        Q    Okay.  And who is this Michael Bonetti?  I

17   see a long string of texts but --

18        A    Michael Bonetti used to work for Councilor

19   Edwards.

20        Q    Okay.  So he is a staff member of Edwards?

21        A    Yes.

22        Q    Okay.  Let's scroll up to see -- slowly to

23   see if we can see if there's anything of any

24   recognizable relevance.  No.  No.  No.

Page 193

1          Okay.  On Wednesday, June 10, Yuleidy --

2    well, now I'm confused.  "Would you forward the link to

3    him.  Already did.  Thanks!  I will be using my zoom to

4    log him in.  Okay.  You are simply AWESOME!"

5          Does it -- in the norms of your organization

6    is it normal to inform someone that is simply awesome

7    in all caps with an exclamation mark about just a --

8    what appears to be a simple notice that this is who

9    we're, you know, gonna have at the meeting, you know,

10   and here's, here's the means by which to get to the

11   meeting?

12       A    I would say it's normal to thank people.

13       Q    Well, sure, but simply awesome is kind of a,

14   kind of an emphatic thanks.  Would you not agree with

15   that?

16       A    I would agree with that.

17       Q    And we see that she said simply awesome.  You

18   see this, correct?

19       A    Yes.

20       Q    And you're telling me that it's normal in the

21   Boston culture to -- that this is normal to call

22   someone simply awesome for simply providing the Zoom

23   meeting information.  This is normal?

24       A    I would say that's not normal.

Page 194

1      Q    Oh, what's abnormal about it?

2      A    I would, I would say that a simply -- a

3  simple thank you would suffice, but perhaps this is how

4  Yuleidy communicates.

5      Q    I should probably talk to Yuleidy about that.

6      A    Sure.

7      Q    Let's scroll up to see if there's anything

8  else of relevance.  Scrolling up.  Scrolling up.

9           All of these people, I mean that's not

10  inconsistent with the rest of these communications.

11  They appear to be -- there's a lot more exclamation

12  marks than I see in, in my business, that's for sure,

13  but I'm not mad about that one in the slightest.  I

14  like people thanking people.  That's nice.

15                MR. KEZHAYA:  So this appears to be the

16  exhaustion of use on here.  So we're at Exhibit 5, once

17  again, 2733.  I'm gonna call this the simply awesome

18  email.  Awesome being in caps, of course, exclamation

19  mark.

20                All right.  Let's go on to number next

21  one.  Scrolling to the bottom, 2723 to 2726.  Let's

22  begin with the bottom most, please, so that we see a

23  proper chronological order.  What did we say, 23 to 26?

24  To 26.

Page 195

1              (Exhibit 6 was introduced.)

2         Q     Okay.  This email correspondence begins --

3    it's a series of emails that begins on June 17, 2020

4    from, once again, Michael Bonetti to -- madam witness,

5    does Kerry Jordan ring any bells?

6         A     Yes.

7         Q     Who is that?

8         A     Kerry was my former coworker.  He was the

9    technology manager.

10        Q     Okay.

11        A     For the City Council.

12        Q     And please refresh my memory.  At the time

13   who was Yuleidy?  What was she doing in the

14   organization?

15        A     The staff director for the City Council.

16        Q     Okay.  For, for all of the City Council or

17   any particular person?

18        A     For central staff.

19        Q     Okay.  So basically central staff is talking

20   about logging in Fr. Scrima?

21        A     Central staff is not talk -- well, Michael

22   Bonetti, --

23        Q     Mm-hmm.

24        A     -- who Councilor Edwards was inviting this

Page 196

1    person, is emailing Kerry because he is the

2    individual -- at this time the -- all the City Council

3    meetings were on Zoom because of the pandemic.  So

4    Michael is emailing Kerry and Yuleidy the name so they

5    know to let this person in.

6         Q    Okay.

7         A    For the meeting.

8         Q    Okay.

9         A    That's the context of this.

10        Q    Yeah, that's, that's what begins our

11   discussion with whatever's going on with these

12   documents.

13             MR. KEZHAYA:  So let's scroll up ever so

14   slightly just to the next email enough to see the body,

15   the who and the when.  Okay.  That's good.

16        Q    September 15, 2020 at 6:54 AM someone writes?

17        A    Good morning Yuleidy, Pastor Alcevedo from

18   Lion de Judas will be joining us to pray over the

19   council.  I've cc'd him here.  He just needs the Zoom

20   link and details.  Thank you again Pastor Alcevedo.

21   Zoom you tomorrow.  Julia.

22             MR. KEZHAYA:  Okay.  Once again, we are

23   at what I'll probably describe as an impasse as to

24   whether this is a last-minute email or just an -- a

Page 197

1    scheduling email.  No problem, we'll skip over the

2    impasse.

3              Scrolling up slightly.  Please -- let's

4    see here.  Zoom link.  Don't care.  Skip.  I have no

5    idea what this is.  Scrolling up.  Scrolling up.  Okay.

6    Let's pause here.

7        Q    June 24 at 8:05 someone writes.  Please.

8        A    This is from Councilor Bok.  Dear Yuleidy,

9    Connecting you here with the Reverend Paige Fisher, who

10   is going to do our opening prayer today.  If you could

11   get her the Zoom link and all that she needs to get

12   connected, that would be great.  Thanks, Kenzi.

13       Q    Is that the same thing we just read?  Scroll

14   down again.  I don't remember.

15       A    I don't think so.  No, the other one was from

16   Julia.

17       Q    Huh, that's odd.  So September 15.

18   September 15.  June 24.  Can you make any sense of

19   this?

20       A    It's just -- it's councilors emailing Yuleidy

21   with the name.

22       Q    Okay.  So this is basically just internal

23   communication as to who and when invitations are

24   happening from the -- from at least the City's

Page 198

1  perspective?

2      A    They're on the -- they're on Wednesdays.  So

3  they -- those are the dates of the Council meeting.

4      Q    Correct.  Yeah.

5      A    So it looks like Councilor Bok is giving

6  Yuleidy the person's name so that she can give them the

7  Zoom link and make sure that they're in the Zoom

8  meeting.

9      Q    Perfectly understood.

10              MR. KEZHAYA:  Let's scroll up some more.

11  It's basically the same thing again.  Let's scroll up.

12  Okay.  Just scrolling.  We're just skimming at this

13  point.  This all seems to be pretty much the same

14  thing.

15              I'm confused as to why there's one

16  PDF -- oh, I get it.  I sent RFPs, and I just got

17  basically a document dump.  These are probably just

18  what my people said these are things I should look at,

19  and I'm looking at them for the first time with you.

20  So let's scroll up, scroll up.

21              Okay.  What is this again?  This is 6,

22  2723 to 2726.  Miscellaneous ...

23      Q    Madam witness, how would you describe this,

24  this PDF?  I can't think of a designation.

Page 199

1      A     Emails regarding invocation Zoom links.

2      Q     Re Zoom.  Sorry.  Zoom -- what -- how did

3   you -- prior to saying Zoom links, you said emails

4   regarding ...

5      A     Invocation names for Zoom links.

6      Q     Invocation links.

7      A     And, and I don't know if you want to indicate

8   that they're internal.

9      Q     Yeah.  Yeah, I like that.  Internal --

10  miscellaneous internal emails about invocation Zoom

11  links.  Great.

12              MR. KEZHAYA:  Number next one, please.

13  Oh, wait.  For benefit of a clear record, we just

14  finished looking at Exhibit 6 that begins Bates stamps

15  2723 to 26.  So designated.  Let's move on.

16              MS. O'CONNOR:  Could we take a quick

17  restroom break?

18              MR. KEZHAYA:  Yes.  Yes.  Absolutely.

19              MS. O'CONNOR:  Thank you.

20              THE VIDEOGRAPHER:  Okay.  The time is

21  1:27.  We're off the record.

22                  (Break was taken.)

23              THE VIDEOGRAPHER:  Okay.  We are back on

24  the record.  The time is 1:38.

Page 200

1              (Exhibit 7 was introduced.)

2    BY MR. KEZHAYA:

3        Q    Okay.  I apparently neglected to take note of

4    something else that was important on Defendant's 2320

5    which we had an undesignated number 3.  I now see why

6    this was brought to my attention.  Let's scroll up ever

7    so slightly to something about honoree.  There it is,

8    honoree.

9              What, City of Boston, does honoree mean in

10   whatever this kind of document is that we're looking

11   at?

12       A    I believe that document is -- refers to the

13   Black History Month event.  So honoree, each councilor

14   was picking a black member from their community to

15   honor at the event.

16       Q    Okay.  And how do you know -- well, first of

17   all, is this name -- how, how did you come to that

18   conclusion?  Help me, help me draw the dots between

19   honoree --

20       A    Because I knew about the event because I was

21   working at the City Council in my same job --

22       Q    Oh.

23       A    -- at the time.  So I knew about the event,

24   and I knew the councilors were picking people to

Page 201

1    recognize at the event.

2         Q    Basically you remember?

3         A    Yes.

4         Q    Okay.  Cool.  No longer care about this one.

5              MR. KEZHAYA:  Let's skip to number next

6    one which is after 2723 to 26.  Oh, I'm sorry.  Are

7    there -- are there more things that we should care

8    about on here?  I think we're looking for ... 2723 to

9    26 was the preceding one.

10             MS. KING:  Okay.  So next one here?

11             MR. KEZHAYA:  Yeah, number next one.

12             Okay.  We're looking at ... Bates number

13   all the way at the bottom, please.  That's a signature

14   page.  Let's scroll up.  Scroll up.  Scroll up.  Scroll

15   up.  2729 all the way.  Could we zoom in so madam

16   witness can read the body here, also me?

17        Q    Let's see here.  This appears to be a June

18   10, 2020 email from one Michael Bonetti with whom we

19   are adequately familiar.  Have we already gone through

20   this?  This looks familiar.

21             MS. O'CONNOR:  Yes.

22             THE WITNESS:  It does look familiar.

23             MR. KEZHAYA:  Yeah.  I'm pretty sure

24   this is the same thing.  We're going to skip -- wait.

Page 202

1   Wait.  Let's go all the way to the top.  Maybe there's

2   something that I missed.

3        Q    How about this one, Tuesday, June 16:  Hi

4   Michael, Would you have some invocation tomorrow.  I

5   don't remember if I informed you or the councilor.

6   Apologize if I didn't.

7             And as I recall, Yuleidy is the staff -- the

8   central staff chief.  Basically Yuleidy -- it seems to

9   me that Yuleidy administers support staff for all of

10  the councilors.  Is that ...

11       A    Yes.

12       Q    Okay.  Support staff head talks to guy for

13  councilor.  "Would you have some for invocation

14  tomorrow?"  I deduce under the circumstances that some

15  more adequately or more appropriately means someone for

16  an invocation tomorrow.  Is that consistent with your

17  reading?

18       A    Yes.

19             MR. KEZHAYA:  Okay.  And once again,

20  that was June 16, 2020.  So number 7, once again,

21  please, someone, remind me what my Bates stamps are,

22  very bottom.  2729.  And I'm going to call this just

23  another scheduling email.

24       Q    Okay.  And scrolling back at the top, the,

Page 203

1   the notice was issued on June -- well, the inquiry was

2   made on June 16 which Google helpfully tells us is

3   Tuesday and at 1:24.

4            What time do the councilor meetings happen

5   again?

6        A    They happen at Wednesdays -- on Wednesdays at

7   noon.

8        Q    At noon.  So this is basically about a day

9   beforehand.  And the, the agenda items actually don't

10  get cemented in til Tuesday.  So this doesn't seem

11  unusual in terms of timing.

12       A    The agenda items are completed on Monday

13  afternoon.  The agenda is released on Monday afternoon.

14  The invocations are not part of the agenda.

15       Q    Mmm.  Huh.  So when is the decision to lock

16  in who's doing the invocation?  Like when's the

17  deadline?  Surely at some point it's too late.

18       A    Again, that is the councilor invites someone.

19  I imagine councilors have different timeframes.

20       Q    Yeah.

21       A    This email is between Yuleidy and Michael

22  Bonetti.  And for context purposes, it was during the

23  time when the City Council was remote because of the

24  pandemic.

Page 204

1         And it looks as if Yuleidy is asking Michael

2    for the name so that Yuleidy is able to let the

3    individual into the Zoom meeting.  Because you needed

4    to be let into the Zoom meeting because it was for the

5    councilors and they were participating via Zoom.

6         It was on the City of Boston's website for

7    the public to watch because there is not a common

8    public period for City Council meetings.  So that is

9    why -- it appears that Julie was looking for the name

10   so she would have -- so she would know who to let in to

11   the Zoom meeting.

12        Q    I --

13        A    And to give the infor -- and to give the link

14   to that individual.

15        Q    Okay.  I understand that's the proposition,

16   but all I see is this text.  So where are you getting

17   that extra information that's not in the text?

18        A    Because I know how the process works because

19   I worked there at the time.

20        Q    Okay.  So --

21        A    We were all on Zoom.  So we all get the Zoom

22   link.  And Yuleidy would need to know because she was

23   the one that let people in.  Yuleidy Valdez or Kerry

24   Jordan would let people, the councilors, people meaning

Page 205

1   staffers and councilors, into the Zoom meeting.

2        Q    Okay.  And to be discrete here, the next --

3   after the question "Would you have someone for an avoca

4   -- an invocation tomorrow?" is followed up with "I

5   don't remember if I informed you or the councilor.

6   Apologize if I didn't."

7             Why would this person need to inform the

8   recipient of this email or the councilor?  What's the

9   inform part tell you?

10       A    I don't know if that's -- I don't know if she

11  meant to put if I asked you or the councilor.  I don't,

12  I don't know --

13       Q    Well, I mean --

14       A    -- what she means by that.

15       Q    We're stuck with the text, right.  I mean we

16  can't change the text with what we propose this email

17  could mean.  We're -- it has to -- this email very

18  clearly requires some kind of an information being

19  transmitted.  I, I proffer.  Do you disagree with this

20  proffer?

21       A    It looks as if she's asking if they have

22  someone for the invocation.  She's asking a question.

23       Q    I understand that.  I asked you a yes/no

24  question, but I didn't receive a yes or a no.

Page 206

1      A    Yes.

2      Q    Okay.

3               MR. KEZHAYA:   Scrolling up slightly.

4   Okay.  In case I didn't mention this already, this

5   is -- we just finished talking about No. 7, 2729.  Is

6   this 2729; am I mistaken?  Scrolling down again to the

7   Bates stamp.  Yep, 2729, I described this as another

8   scheduling email dated June 16, Tuesday at 1:24 PM for

9   a Wednesday -- Wednesday at noon meeting.

10              Okay.  Eight, what does our No. 8 look

11  like?  Scrolling down to the bottom, this is 2720 --

12  wait, 2-7-7-1.

13              Okay.  Scrolling up just enough to --

14  whoa.  Whoa.  Whoa.  The first email, please.  Hmm.

15  Well, this is confusing.  Let's scroll up ever so

16  slightly.  It looks like the first email is offset

17  dated September 15 at 6:54 AM.

18      Q    Madam witness, I believe you already read

19  this email to me.

20      A    Yes.

21              MR. KEZHAYA:   Okay.  Skipping 8.

22  Deleting 2771.

23              (Exhibit 8 was introduced.)

24              MR. KEZHAYA:   All right.  Number next

Page 207

1   one, we have a December 12, 2020 email.  Bates stamp

2   number, please.  2849.

3                    (Exhibit 9 was introduced.)

4       Q     This is an email from an R. Zed to Kim Janey

5   at Boston.gov.  A bunch of people are cc'd.  Who is Kim

6   Janey at Boston.gov?

7       A     At the time she was City Council President.

8       Q     Okay.

9       A     And also a district councilor.

10      Q     Okay.  And so this is December 12, 2020 at

11  2:26 AM Eastern Time.  R. Zed asks to - functionally

12  the Council for our purposes - about the invocation

13  request.  States:  Dear President Janey, Will you

14  please schedule me to read invocation remotely in the

15  next city council meeting -- sorry, Boston City Council

16  meeting and inform me accordingly.  I am a Hindu

17  leader.  Thank you.  Sincerely, sender.

18            So it appears that it's not just TST who

19  wants in and is not being invited, to me.  Is that

20  consistent with your reading of this email?

21      A     Yes.

22      Q     Okay.

23                    MR. KEZHAYA:  And once again, that's

24  2849 to confirm, please.

Page 208

1            MS. KING:  Yes.

2            MR. KEZHAYA:  Confirmed as 2849.  That's

3    number 8, email dated Decem -- or actually, scheduling

4    request or invitation request is how I'll call it.  I'm

5    gonna call this Hindu.  Hindu or Hindi?  Hindu.  Hindu

6    invitation request.  Invocation request.  And that

7    satisfies my purposes.

8            So let's move on to the next one.  Oh,

9    sorry, number next one, whatever the next PD -- or are

10   we done with PDFs?

11           MS. KING:  Let's see.  Yeah, that's the

12   last one.

13           MR. KEZHAYA:  Okay.  That's the last one

14   Nick found, but there's another one that's more

15   important to me.  So we're gonna take another break

16   while I find it.

17           MS. KING:  Very good.

18           THE VIDEOGRAPHER:  Okay.  The time is

19   1:49.  We're off the record.

20               (Break was taken.)

21           THE VIDEOGRAPHER:  Okay.  We're back on

22   the record.  The time is 2:45.

23   BY MR. KEZHAYA:

24       Q    Okay.  Due to technological errors, I have an

Page 209

1  email dated October 19, 2017 that I can't put up on the

2  projector.  We will fix this later.  The Bates stamp

3  number is 2890.  This comes from 2890.  Once again,

4  it's not going to be up there.  It's on my tablet.  You

5  guys gotta come huddle in and take a look at it.  I

6  will zoom in.  Everyone come see.

7          This is an email from Alana Olsen, for

8  benefit of the record, dated Thursday, October 19, 2017

9  to ... madam witness, could you please state the

10  person's name here?

11     A    To Annissa Essaibi-George.

12     Q    Okay.  And who is that in the City?

13     A    She was a former At-large City Councilor.

14     Q    Okay.  And as of October 19, 2017 was that

15  her position?

16     A    Yes.

17     Q    Okay.  Recently Mayor Wu had a -- an opponent

18  who I believe is the same person.  Is this the mayoral

19  candidate opponent against Mayor Wu?

20     A    Yes.

21     Q    Okay.  Great.

22          Please read, for benefit of the record, in

23  full this, this paragraph here, the body.

24     A    It is absurd that this group feels entitled

Page 210

1    to being invited to give remarks at the beginning of

2    the Council Meeting, and frankly its insulting to all

3    of the amazing religious and secular leaders who are

4    invited.  They are invited because of all of the

5    incredible work that they do across the City, work to

6    end youth violence, work to provide shelter and

7    stability to the homeless, or compassion and support

8    for people in recovery.  I will not give up the

9    opportunity to highlight one of these amazing leaders

10   who I am privileged to work with for the Satanic

11   Temple.  The City Council does important, serious work

12   for the people of Boston and when we invite someone to

13   participate in our meeting it is out of a profound

14   respect, not a sense of obligation.

15                  THE REPORTER:  Excuse me.  I'm sorry.

16                  MR. KEZHAYA:  Oh, I'm so sorry.

17                  THE REPORTER:  I'm having a technical

18   issue can I just have a ...

19                  MR. KEZHAYA:  Yeah, of course.  Let's

20   take a break.

21                  THE VIDEOGRAPHER:  The time is 2:47.

22   We're off the record.

23                        (Pause.)

24                  THE VIDEOGRAPHER:  Okay.  We are back on

Page 211

1    the record.   The time is 2:48.

2    BY MR. KEZHAYA:

3        Q    Okay.  Due to technological issues, we are --

4    we are back on the record.   I'm gonna take over with

5    some expository background and then follow up with a

6    question.

7             So I take note, please, - everyone else also

8    take note - that the bottom of the screenshot states in

9    bold:  Please remember, this is a City of Boston email

10   account, and the content is a matter of public record.

11   Alana Olsen being the chief of staff for Mayor Wu's

12   former opponent.

13            I know nothing more about this email which is

14   why I called for the 30(b)(6) deposition about all

15   discovery because I figured stuff like this would

16   probably be in here.

17            So, City of Boston, is it true that your

18   position or at least your employee's position finds it

19   absurd that TST would demand legally an invitation?

20       A    It looks as if --

21            MS. O'CONNOR:  Objection.  You may

22   answer.

23       A    It looks as if that's the statement that was

24   prepared.

Page 212

1      Q    Okay.  And it appears to be a matter of

2   public record and contemporaneously so that Mayor Wu's

3   former political opponent found it to be a matter that

4   "I will not give up the opportunity to highlight one of

5   these amazing leaders who I am privileged to work

6   for -- or work with for the Satanic Temple."

7           That is the text of the email.  Do you agree

8   with me that that's the text of the email?

9           MS. O'CONNOR:  Matt, I'm sorry, are you

10  reading -- this is an email to Annissa Essaibi-George

11  or from Annissa Essaibi-George?

12          MR. KEZHAYA:  This is from Alana, the

13  chief of staff, to Annissa.

14          MS. O'CONNOR:  Okay.  So that's not --

15          MR. KEZHAYA:  For Annissa.

16          MS. O'CONNOR:  Those aren't -- just

17  because I can't see the email, those aren't Annissa

18  Essaibi-George's words; those are the emailer's words?

19          MR. KEZHAYA:  No.  No.  This is her

20  words by her person on her behalf.  That's what we're

21  looking at right now.  Again, basic agency principals

22  flow up to her which in turn flow up to the city body

23  public.

24      Q    So I'm very confused by this email because it

Page 213

1   seems to me as if it's exclusionary which is why, City

2   of Boston, I inquire in to you as to your employee

3   whether you think as well that your employee appears to

4   be something giving up an opportunity for someone good

5   so that they have to give someone an opportunity to

6   TST.  Would you agree with me this is your employee's

7   statement?

8              MS. O'CONNOR:  Objection.  So this is

9   the same type of objection as before, that she can't

10   speak to whatever this person's state of mind is in

11   this email.

12             MR. KEZHAYA:  Oh, so I should talk to

13   Annissa then.  That's who I should talk to in a

14   deposition --

15             MS. O'CONNOR:  You should talk to

16   someone other than Christine O'Donnell, correct.

17             MR. KEZHAYA:  Okay, cool.  We will

18   depose her personally unless you object right now

19   because it seems to me that before when I sought to

20   take Mayor Wu's individual testimony for the purpose of

21   talking about that there video, you know, it was a

22   whole thing.  So I'm, I'm confused as to what's going

23   on here.  You're blocking me with Michelle Wu.  You're

24   blocking me with her.  Are you gonna block me with

Page 214

1  Michelle Wu again?

2              MS. O'CONNOR:  I'm -- I don't agree with

3  the characterization that you just provided, but

4  Christine is not here to testify about what other

5  people's opinions are or the actions that they took on

6  a specific occasion.

7              MR. KEZHAYA:  That's true.

8  BY MR. KEZHAYA:

9     Q    City of Boston, I would like to depose your

10 former employee about this matter.  Do you have an

11 objection about this?

12             MS. O'CONNOR:  Well, I will make

13 objections(verbatim) as to who is or is not deposed.

14 And if we get a deposition subpoena, we'll cross that

15 bridge when we get to it.  But I'm not making a, a

16 statement on the record now as to what the City will or

17 will not do in response to a deposition subpoena that's

18 properly noticed.

19             MR. KEZHAYA:  I see.  Very good.  Okay.

20 Well, then we're at an impasse because I called a

21 30(b)(6) deposition for all things discovery-related

22 and this witness cannot speak to it and you are also

23 not providing me a different witness today who can

24 speak to it.  And you're also not agreeing that I can

Page 215

1    depose a person.  So how do you propose that we resolve

2    this issue?

3                    MS. O'CONNOR:  This, to me, is not

4    responsive to any 30(b)(6) topic for which Christine

5    O'Donnell is identified.

6                    MR. KEZHAYA:  Really, it's not within

7    the 30(b)(6) designation?  That is your, Nicole

8    O'Connor's for and on behalf of the City of Boston's

9    position on this matter, correct?

10                   MS. O'CONNOR:  If you want to point out

11   to me which paragraph you think it's responsive to, I'm

12   happy to take a look.

13                   MR. KEZHAYA:  I would be very happy to.

14   Very, very happy to indeed.  Paragraph 30, any

15   documents provided by the City to TST in discovery,

16   very end, page 9, right above the signature.

17                   MS. O'CONNOR:  To the extent that you

18   want to ask about what the intent was of the document,

19   to me that's a totally different request.  So I think

20   we have a different understanding of what this means.

21   This is -- she has testified about what this document

22   is, but as far as what the person's intent was who sent

23   it, that's a totally different question.

24                   MR. KEZHAYA:  Mm-hmm.  And so where in

Page 216

1    30 does it eliminate intent from any?

2                    MS. O'CONNOR:  I mean we're not having a

3    discussion about the semantics.  That's never how I

4    interpreted it.  We have a disagreement then about what

5    is within the scope of a 30(b)(6) depo.

6                    MR. KEZHAYA:  Ah, okay.  That's fine.

7    Let's start over from the top and see if I missed

8    anything else of importance.

9    BY MR. KEZHAYA:

10        Q    Okay.  On to phase 2 of the deposition.

11   We've covered your identity.  We've covered your scope.

12   We've covered your agency.  We've covered that you

13   don't have any other relationships.  Grounds for your

14   testimony, we covered that.  What investigation you

15   did, covered that.  This sounds good.

16                    Madam -- madam witness, did the City have you

17   investigate Mayor Wu's former political opponent on any

18   of the discovery that it provided, namely, this email

19   that we just looked at?

20        A    I looked at the emails that were produced.  I

21   don't specifically recall this one.  There was -- there

22   was numerous pages.

23        Q    That's fine.

24                    MR. KEZHAYA:  Could we put up the next,

Page 217

1    the next email, the number next one?

2                    MS. O'CONNOR:  I do just want to put on

3    the record that we had a discussion about this during

4    our call about the deposition, and you agreed that you

5    would provide any emails that you had particular

6    concerns about or --

7                    MR. KEZHAYA:  Yeah, I forgot that.

8                    MS. O'CONNOR:  Well, I'm -- well, that's

9    a -- that's, that's part of the problem here.  And I

10   just want to put this on the record, that you said that

11   you would pull certain emails that you intended to

12   inquire of the witness about, and I would make sure

13   that she was prepared on those emails.  We never

14   received from you the emails that you were intending to

15   inquire about.  So to now suggest that she's not

16   prepared or she -- you know, is, is not appropriate

17   given our past discussions.

18                   MR. KEZHAYA:  Okay.  So I want to be

19   abundantly clear here.  My understanding from the

20   City's attorney, for and on behalf of the City's

21   attorney's behalf is that it provided these, the City,

22   which is to say it, it, the City, received requests,

23   document requests from me about a religious

24   discrimination case, produced emails one of which

Page 218

1    appears to be a smoking gun of religious

2    discrimination, received a 30(b)(6) notice saying I

3    want to ask about everything that you've been given --

4    you have given to me with -- and the City did not think

5    to have the witness look at the smoking gun email?

6              MS. O'CONNOR:  So when we spoke, as you

7    recognize, the federal rules require us to confer prior

8    to a 30(b)(6) deposition to make sure we're all on the

9    same page.  I flagged this concern that there were so

10   many emails I couldn't possibly prepare her on all of

11   them, and you agreed to provide me, two weeks in

12   advance of the deposition, with the emails that you

13   intended to inquire about.

14             MR. KEZHAYA:  I see.

15             MS. O'CONNOR:  You didn't do that so

16   she's not prepared to testify about this particular

17   email further than what she already has.

18             MR. KEZHAYA:  I see.  Okay.  Well, let's

19   take a look at the next one, and we'll all see it

20   together.  Scrolling all the way to the bottom -- well,

21   actually, scroll all the way to the bottom, please.

22             And by the way, the last one was number

23   9, 2890.  I call it the absurd email.  Number 10, this

24   is number 3374.  Let's see here.  Scrolling up.

Page 219

1    Scrolling up.  Scrolling up.  Scrolling up a little bit

2    more.  Continuing.  Continuing.  Okay.  Little bit more

3    because we need to be able to see who sent it.  There

4    we go.

5                    (Exhibit 10 was introduced.)

6         Q    Okay.  This is 3373, I apologize, to 3374.

7    On February 14, 2019, which I take note is during the

8    course of this litigation, Molly Jacobson at Jacobson

9    Strategy emails to someone at Boston Herald a forwarded

10   message stating:  Hi Meghan -- again, with Boston

11   Herald which I presume everyone takes note is a

12   publication of general circulation in Boston; is that

13   correct?

14        A    Yes.

15        Q    Thank you.

16             So Boston Herald takes note that -- from

17   Meghan:  Please let me know if I can schedule an

18   interview with The Satanic Temple regarding this

19   breaking news.  Breaking news is the characterization

20   of importance.  Thanks!  Details unnecessary.

21                  MR. KEZHAYA:  Scrolling down, we're just

22   looking for the word "absurd".  Ah, there it is.

23        Q    On 3374, line one, two, three, four, the

24   sentence begins -- preceding sentence, line 3, that is

Page 220

1  to say, the sentence begins midway through:  The City

2  Council maintains that this practice is

3  nondiscriminatory, a claim that TST views as absurd.

4          So we receive your statement that it's

5  absurd.  We respond in kind that your position is

6  absurd.  I feel like we're at an impasse here.  Is that

7  fair to say, City of Boston witness?

8      A    Yes.

9      Q    Okay.

10         MR. KEZHAYA:  So scrolling up a little

11  bit more.  Okay.  Pausing here.

12     Q    Boston Herald then on February 14, 2019,

13  which again I take note is during the pendency of this

14  dispute, Subject:  Story running tomorrow about claim

15  against City Council, to someone at Boston.gov.

16         Madam witness, who is this Boston.gov person,

17  if you know?

18     A    At the time David Viterinni was chief of

19  staff to at the time Councilor Wu.

20     Q    Councilor Wu.  Councilor Wu's person received

21  notice that TST, generally speaking, takes issue with

22  not getting an invite as of at least 2019.  Is that a

23  correct understanding of this document here?

24     A    Yes.

Page 221

1      Q     Now, madam witness, we've talked about
2   Councilor Wu before.  On or around 2017 things changed
3   where people stopped giving or stopped receiving money
4   for and in consideration of providing the blessing to
5   the City.  The importance being 2017.  Is that a
6   correct recollection of mine about your prior
7   testimony?
8      A     Yes.
9      Q     Did you take note of the timing of the email
10  that we took note of earlier?
11     A     No.
12     Q     Okay.  Let's --
13           MR. KEZHAYA:  Suffice it to say, 2017
14  everyone agree that they remember it?  Otherwise, we
15  can see it again.  Any objections?
16           MS. O'CONNOR:  It's up to Christine.
17     Q     Madam witness, do you recall that it was
18  2017?
19     A     That the council stopped paying?
20     Q     Well, no, more particularly that Mayor
21  Wu's --
22     A     Oh, that TST reached out?
23     Q     No.  No.  No.  The prior, the prior exhibit
24  that we looked at, this email dated, let's see here,

Page 222

1    October 19 - it's not up there; it's on my thing -

2    October 19, 2017.  Everyone can see.  Madam witness in

3    particular.

4        A    Oh, yes.  Yes.

5        Q    Yes, right here.

6        A    I couldn't remember the date.

7        Q    Yeah, of course not.  It's a date.  Who would

8    remember that.

9             So it seems to me that there's a very heavy

10   cluster of activity in and around the City which I'm

11   being precluded from talking about with you.  Who do

12   you think would be the best person for me to talk to to

13   shed light on what happened that the money stopped

14   changing hands and also that your other employees

15   stated that they would not give up the opportunity to

16   highlight one of these amazing leaders to work -- "who

17   I am privileged to work with" for The Satanic Temple?

18             That's the end of the sentence, but I take

19   the implication that they are not privileged to work

20   with The Satanic Temple and also The Satanic Temple is

21   not amazing nor are they leaders in the public.

22             MS. O'CONNOR:  Objection.  You can

23   answer.

24        A    The payment issue, that was Councilor Wu when

Page 223

1    she was President Wu.

2         Q    Okay.

3         A    Again, around 2016/2017.

4         Q    Okay.

5         A    And any other questions about the intent of

6    the councilors would be for the councilors themselves.

7         Q    I agree.

8              Is it normal for a chief of staff inside the

9    organization to have made press release-like

10   statements?

11        A    It depends on the councilor, but it's -- it

12   is normal, generally normal.

13        Q    Okay.  All I have is bookending quotes, you

14   know, beginning this email and ending this email.

15             Did you in the course of your investigation

16   run into anything that could shed light

17   documentary-wise, like in terms of literally physical

18   documents that I could look at or, you know, electronic

19   data consisting of the same, within the City that could

20   help me understand, without talking to Mayor Wu's

21   former political opponent, why she found it to be

22   absurd for TST to insist on this invitation?

23        A    No.

24        Q    So I really have to talk to her?

Page 224

1        A     Yes.

2        Q     Okay.  Same for Wu, you're the best person to

3    have talked about it, and you can't talk about it so I

4    really have to talk to Wu, right?

5        A     Yes.

6              MR. KEZHAYA:  Let's see.  Let's scroll

7    up to see if there's anything of interest here.  Scroll

8    up.  Scroll up.  Huh.

9        Q     Okay.  So I see then that press request for

10   invita -- oh, I'm sorry.  I don't think we ever covered

11   this.  So going back to the next one, this email dated

12   February 14 from Boston Herald to Boston.gov which,

13   madam witness, could you please remind me who this guy

14   is?

15       A     At the time chief of staff for Councilor Wu.

16       Q     Okay.  So Boston Herald asks Councilor Wu

17   about this present dispute wherein it gets forwarded up

18   to Elizabeth Pimentel.  Is that a correct ...

19       A     Pimentel, yeah.

20       Q     Pimentel I apologize.  Who is that?

21       A     She was the chief of staff for Councilor

22   Campbell.

23       Q     And --

24       A     And at that time Councilor Campbell was --

Page 225

1   no, no, at that time she was just council -- Councilor

2   Campbell.

3       Q    Okay.  I remember --

4       A    I can't recall.  No, excuse me.  Sorry.  She

5   was Council President in 2019.

6       Q    I seem to remember seeing an email ... ah,

7   here we go.  So Exhibit 1 to the First Amended

8   Complaint, this is doc 16-1, also known here apparently

9   as ECF 16-1, another email.

10              MR. KEZHAYA:  For benefit of counsel,

11  I'm showing them on my tablet because it's faster.

12      Q    So this is -- my understanding of the email

13  that TST sent -- oh, there we go, to Andrea Campbell on

14  October 2, 2018.  That's my understanding, but I didn't

15  receive it from the City.

16          Does the City dispute that on or around

17  October 2, 2018, The Satanic Temple sent an email to

18  Andrea Campbell at Boston.gov with cc to Michelle Wu at

19  Boston.gov requesting essentially an invitation?  Is

20  that a subject of dispute?

21      A    No.

22      Q    Okay.  The details of the email I don't care

23  about, and I don't want to waste your time with.

24          Okay.  Let's just make sure I don't miss

Page 226

1    anything at all.  We're back on the 30(b)(6) matters of

2    exam -- matters for examination.  It's not up there.

3    I'm gesturing generally.  So, madam witness, if you

4    could take a look with me while we go through it.

5              Okay.  One, we've dealt with.  Two, what have

6    we got here?  Both as a general matter.  Okay.  I feel

7    like I've have kinda covered this.

8              Ah, this text -- oh, no, never mind that's

9    just ... okay.

10             I've seen this policy written down somewhere.

11   I don't recall.  Have you seen the policy written down

12   anywhere?  I say policy.  I'm using your words.  Custom

13   is the word I would use.

14        A    I have not.

15        Q    Okay.  All right.  And to be a little bit

16   more precise, I remember seeing it in an email from

17   Michelle Wu to TST essentially stating the position

18   that we don't have to give you an invite if we don't

19   want to.  Is that a fair recitation of the email?

20        A    Yes.

21        Q    Okay.  Let's see here.  So background on

22   ceremony.  When it first arose.  Covered it.

23             Legal chal -- has anyone challenged this

24   before, this, this custom legally?

Page 227

1          A    No.

2          Q    Okay.  Covered it.  Sorry for getting ...

3    Okay.  Okay.  Okay.  Very good.  Surrounding payment,

4    covered that.

5               Record keeping policies, I don't remember if

6    we addressed that.  You said they hold, they hold it

7    seven years, and it goes to treasury department; is

8    that correct?

9          A    For payments.

10         Q    For payments specifically.  I don't really

11   care about the rest of it.

12              Okay.  City's recordkeeping policies

13   surrounding written communications sent or received

14   by ...  Okay.  Recordkeeping policies, have you all

15   given me anything or everything?  Has anything

16   mysteriously gone missing, things of that nature?

17         A    No.

18         Q    No?  Cool.

19              Intra-City written communications up to the

20   date of the original, okay.  So here's paragraph 6

21   where I also I felt adequately specified that it's an

22   intra-City written communication about TST's invocation

23   demand.  Apparently that was unclear.  I apologize for

24   wasting your time once again, madam witness.

Page 228

1              Seven:  Dates, time, attendees, subjects of

2       discussion, ah, those are agendas.  I can get those

3       later.

4              Subjective bases, that's a Wu question.

5              General information about any individuals or

6       groups who have demanded participation.  Okay.  Number

7       9, we saw the Hindu leader Raj Zed, if memory serves,

8       Mr. Zed.  Has anyone else other than TST -- well, let

9       me, let me strike that and start over.

10             Other than TST and Mr. Zed has anyone else,

11      to the best of your knowledge, requested an invitation?

12         A    No.

13         Q    Okay.  They always only receive the

14      invitation?

15         A    Yes.

16         Q    They never have any discussions off the

17      record or anything like that you're aware of at least

18      because the City doesn't keep contemporaneous records

19      of the fact that discussions may or may not be

20      happening between councilors and, you know, potential

21      officiants?

22         A    Correct.

23         Q    Okay.  Subjective bases for why each

24      Councilor did or did not heed the demand described in

Page 229

1    9.  That's a Wu question.   11 --

2          Well, actually correct me if I'm wrong, madam

3    witness.  Would you agree with me this paragraph 10,

4    the subjective bases for why each Councilor did or did

5    not heed the demand described in paragraph 9 from

6    January 1, 2011 to the present, would minimally address

7    Michelle Wu and also Michelle Wu's former political

8    opponent?

9          A    Yes.

10         Q    Okay.  11, identifying information.  Eh, I

11   don't care about that.  Twelve, same thing.  Thirteen.

12         Have you been over these?  I've forgotten

13   these since I've sent them.

14         A    I have been, but I don't remember all of

15   them.

16         Q    Okay.  That's -- yeah, there's a lot of words

17   in here.

18         A    Yeah, I've gone over them.

19         Q    Okay.  Any instances in which the City had a

20   vacancy.  Okay.  So we covered instances in which the

21   City had a vacancy.  I feel like it's adequately clear

22   that vacancies happen.  There are, you know, needs to

23   fill and then that need for filling it does not usually

24   happen until sometimes at least, of the times that we

Page 230

1  saw -- I say usually.  Let me back up.

2          There are probably instances where a need was

3  unmet as of call it the day before the meeting.  Do you

4  recall those exhibits?

5      A    I recall them, but I don't agree with the

6  fact that a need was unmet.

7      Q    Okay.  What is, what is the subject of the

8  dispute there?

9      A    Because a lot of those documents were

10  internal between staff from different offices where a

11  staffer was asking for information in order to prepare

12  notes for their respective boss, and other documents

13  regarding the names were internal for purposes of

14  sending out the Zoom link.

15      Q    Okay.

16      A    So from, from those documents alone it is not

17  clear to me that it was the day before when the person

18  given the invocation knew.  They could have known a

19  couple of weeks before.  They could have known a month

20  before.  Those were just internal emails where other

21  individuals were asking for the name so that they could

22  complete their jobs.

23          MR. KEZHAYA:  Okay.  I propose rather

24  than deposing each of the individuals and asking them

Page 231

1   like one question to issue an interrogatory.  Would it

2   suit the organization's purpose that we reduce the

3   number of depositions and instead resolve the questions

4   as to why this need was unmet as of that date -

5   informational need, I apologize - why this

6   informational need was left unmet until such time and

7   more importantly when that informational need is

8   typically filled?

9           MS. O'CONNOR:  I think written discovery

10  would be an excellent tool to get to the answers to

11  these questions.

12          MR. KEZHAYA:  Great.  I don't want to

13  play semantics with that.  So I propose to write it out

14  right now.  Interrogatory number 1 or whatever,

15  interrogatory number next one:  For each exhibit made

16  reference -- actually, I can actually identify them

17  discretely.  So scheduling emails we've got 5, 4, 6, 7.

18          Four through 7, I propose to have an

19  interrogatory explicitly state for each of Exhibits 4

20  through 7 provide, call in, whatever's in that 30(b)(6)

21  deposition notice, I'm going to copy, paste it, and

22  specifically sub-itemize.  It might be letters.  It

23  might be bullet points.  I don't know.  We'll figure it

24  out as we go.  For now we're going to do A.  I don't

Page 232

1   feel the need to copy/paste those in handwriting.

2                   Am I going to get a form objection when

3   I send an interrogatory for each of Exhibits 4 through

4   7, please provide A through whatever discretely copied?

5                   MS. O'CONNOR:  I, I don't know --

6                   MR. KEZHAYA:  Are these words --

7                   MS. O'CONNOR:  -- remember what exhibits

8   your referencing.  I can't --

9                   MR. KEZHAYA:  That's okay.

10                  MS. O'CONNOR:  I can't give you an

11  answer to that without being served with an actual

12  written discovery request, but rather, --

13                  MR. KEZHAYA:  Oh.

14                  MS. O'CONNOR:  -- I agree with you that

15  rather --

16                  MR. KEZHAYA:  Okay.

17                  MS. O'CONNOR:  -- than have unnecessary

18  depos, I'd much rather answer interrogatories.

19                  MR. KEZHAYA:  Yeah, I -- well, I do too.

20                  MS. O'CONNOR:  So I'll work with you to

21  be reasonable about that.

22                  MR. KEZHAYA:  Okay.  So more

23  particularly, so for each of Exhibits 4 through 7,

24  please identify with particularity as follows:  (a) why

Page 233

1    was there a vacancy at that time; (b) the date of the

2    meeting in which there was a vacancy for the invocation

3    at that time; and (c) how, if at all, the time slotted

4    for the invocation ceremony.  The text ends but I'll

5    fill it off.  How, if at all, the time slotted for the

6    invocation ceremony typically gets filled.  Like when,

7    when is this normally filled.  Is it abnormal that

8    Tuesday right before the -- in my opinion right before

9    the meeting we don't know who's blessing the thing.

10             MS. O'CONNOR:  Those seem like

11   reasonable questions that can be answered.

12             MR. KEZHAYA:  Okay.  I agree that they

13   are reasonable questions.  I agree that they can be

14   answered.  I'm questioning you as to whether there's

15   going to be a form objection with that exact text that

16   I just described.

17             MS. O'CONNOR:  I, I don't know.  I, I

18   can't imagine so.

19             MR. KEZHAYA:  I would like you to please

20   waive any opportunity to waive that; otherwise, we're

21   going to have to have another 30(b)(6) depo.

22             MS. O'CONNOR:  I think this is a

23   discussion we can have after the deposition.  If you

24   want to have it on the record we can do that.

Page 234

1             MR. KEZHAYA:  I strongly prefer to have

2    the deposition -- the conversation on the record

3    because you and I took materially different

4    understandings of our last phone call.  That's why

5    we're having it here and now.

6             MS. O'CONNOR:  Correct.

7             MR. KEZHAYA:  Yes, correct.  So --

8             MS. O'CONNOR:  What do you mean by a

9    form objection?  This seems like a waste of everyone's

10   time, but what do you mean by a form objection?

11            MR. KEZHAYA:  A form objection is one to

12   the effect of I don't understand what this

13   interrogatory is asking.

14            MS. O'CONNOR:  No, you're not gonna get

15   an objection like that.

16            MR. KEZHAYA:  Okay.  That's a form

17   objection.  Great.

18   BY MR. KEZHAYA:

19        Q    Okay.  So number next one, 14, any instances

20   in which the invocation ceremony did not literally

21   implore a supernatural entity to give advice and

22   guidance to the Councilors.

23            Madam witness, you've been seemingly

24   functionally a part of all of them.  You're probably

Page 235

1   the best person to talk about these invocation

2   ceremonies.  How often do people give benediction for

3   Satan to bless the matter?

4        A    There hasn't been any.

5        Q    Never.

6             How often do people suggest that Satan as a

7   general concept is bad?

8        A    That hasn't happened.

9        Q    Not ever?

10       A    Not for the invocation.

11       Q    I'm confused.  Not for the invocation or ...

12  during the invocation your --

13       A    There hasn't been references that I recall

14  that ...

15       Q    Well, earlier you said not ever.  Now you're

16  telling me not that you recall.  So now my job task is

17  gonna be to go find each and every instance that

18  someone said something bad about Satan so that I can

19  clip it out and have, I don't know, however long -- how

20  ever many clips we'd need for trial.  So are you going

21  to go back on that or are you just gonna agree that

22  sometimes people say bad things about Satan?

23             MS. O'CONNOR:  Objection.  You can

24  answer.

Page 236

1        A    To the best of my knowledge, I haven't heard

2    anyone in the invocation say anything bad about Satan.

3        Q    To the best of your recollection as we speak

4    today?

5        A    Yes.

6        Q    But you reserve the opportunity to change

7    that at trial should hypothetically I go through

8    YouTube, find a whole bunch of instances of people

9    talking bad stuff about Satan, --

10       A    Sure.

11       Q    -- correct?  Great.

12            All right.  Fifteen:  Any instances in which

13   the invocation ceremony addressed a topic which was not

14   reflected on the agenda, for example, praying for

15   emotional relief from a tragedy.

16            How often do these blessings entail

17   non-council agenda items?

18       A    Generally they do not, they do not address

19   agenda items.

20       Q    Mmm.

21       A    Sometimes they may speak to issues that are

22   going on in the City.

23       Q    Mm-hmm.

24       A    But all the agenda items have specific docket

Page 237

1  numbers, and I do not recall any instance where an

2  invocation referenced a specific document number.

3          Invocations may, may reference topics in the

4  City, such as violence, homelessness, hunger, things

5  like that, but other than that the invocations do not

6  reference specific items on the agenda.

7      Q    Okay.  So I'm sorry.  I'm using the word

8  "agenda".  You used docket to refer to that.  I, I got

9  confused.

10     A    The agenda is made up of dockets.

11     Q    Yeah.  Okay.  And, and --

12     A    And they're all online.  Available online.

13     Q    Yes.  Yes.  In my parlance docket literally

14 just refers to a court's docket, so I'm not familiar

15 with your words.

16         Going back to this, so it seems fairly often

17 is a fair response to, I don't know, sometimes people

18 talk about -- actually, pretty much exclusively they

19 don't address specific topics on the agenda was my

20 understanding of your response.

21     A    Correct.  Yes.

22     Q    Okay.  How often -- expanding somewhat beyond

23 the agenda, how often does this invocation not just

24 bless the event or, or, you know, the proceeding, but

Page 238

1    just more generally give blessings?  For example, we

2    saw the former -- in the earlier YouTube clip, the

3    priest giving blessings to the, the congre -- or not

4    congregants, the councilors' families.

5              I asked an unclear question.  I apologize.

6              How often do they bless people or things or

7    ideas outside of the notion of this discrete event?

8    A    They -- I don't know of an exact number

9    because the individuals use different terminology.

10   Q    Sure.

11   A    But the invocations are there to recognize

12   the seriousness of the work.

13   Q    Sure.

14   A    They're done before the councilors begin

15   their proceedings for the day.  I do not recall how

16   many times a person giving an invocation has blessed

17   the councilor's family.

18   Q    Okay.  Well, at least one is the ... I

19   mean ...

20   A    Sure, we all saw it today.

21   Q    Yeah.  So I mean really that's, that's all

22   the number I care about.

23             Now, going back more discretely to the

24   question, would you take note, would you take note if

Page 239

1    you're watching a blessing happen and they happen to

2    bless something that's not the discrete event because

3    to you you're just hearing a blessing?  Is that

4    something that would happen?

5         A    I'm not sure I understand.

6         Q    Would you take note -- like, for example, did

7    you take note that this priest or whatever, blessed the

8    councilors' families?  Did you take note of that

9    because I took note of that?

10        A    I did not take note of that.

11        Q    Okay.  So you don't recall, but it's entirely

12   possible with the information that we have available

13   that it's happened other times as well?

14        A    Yes.

15        Q    Okay.  Let's see here.  Any instances in

16   which a guest.

17             Is it the general norm that these blessings

18   generally propose that the council is subservient to

19   some literal supernatural deity?

20        A    That is not the general norm.  I know we all

21   saw a video today where the person giving the

22   invocation referred to the councilors as God's

23   servants, but that generally isn't the norm.

24        Q    Okay.  As a proportion, how often do they

Page 240

1   say, you know, generally bless the event and more
2   particularly these are literally your slaves?
3                    MS. O'CONNOR:  Objection.  You can
4   answer.
5        A    I can't give an exact number.  I am not sure
6   if -- and I -- honestly, I can't even recall if the
7   video we saw today referenced the councilors as slaves.
8   I don't recall any instance where they were referenced
9   as slaves.
10            Occasionally there may be a reference to the
11  councilors as servants, sheep.  However, I do not
12  recall where there's ever been a reference of the
13  councilors doing God's work, where that's the norm for
14  the invocation.
15       Q    Okay.  In the -- are you familiar with
16  biblical history and text -- literally the book, the
17  Bible?
18       A    I know what the Bible is.  I'm not a scholar
19  on it.
20       Q    Okay.  You don't have to be.
21            You know it wasn't written in English, right?
22  Originally, it was not originally written in English.
23       A    Sure.
24       Q    It, it had to be translated for something for

Page 241

1    us to have it in English.

2          Do you know how many times it was translated?

3    A    I do not.

4    Q    Okay.  Do you know when it was originally

5    written?

6    A    I do not.

7    Q    If I told you it was written, give or take, I

8    mean it's about a 200-year period, but call it about up

9    to 200 common era/ -- well, do they call it common era

10   nowadays?  You know, within the past 2,000 years it's

11   not been written.  So about 2,000 years ago it was,

12   wide margin.  Back then they didn't have butlers.  You

13   would agree with me, yes?

14   A    Yes.

15   Q    They had slaves, right?

16          MS. O'CONNOR:  Objection.  You can

17   answer.

18   A    Yes.

19   Q    Okay.  But the Lord's servants to you, City

20   of Boston - not this particular witness - City of

21   Boston, it's not your position that Lord servants is

22   really meaningfully different from Lord slaves or is

23   it?

24          MS. O'CONNOR:  Objection.  She can't

Page 242

1   offer the City's opinion on that particular question of

2   what the City's impression or use of that phrase is.

3        Q    I will ask you.  What is the material

4   distinction between servants and slaves in your

5   parlance?

6                MS. O'CONNOR:  Objection.  You can

7   answer as to you individually.

8        A    My understanding, not in a biblical sense,

9   ser -- I'm sure some use the term interchangeably.

10  Servants may be paid in -- during some times.  Slaves,

11  it's forced labor.

12       Q    Yes.  Yes, it is.  I agree that slavery is

13  forced labor.  It's subservience.  You don't have a

14  choice.  That's obsequiousness is the word I would use.

15           That priest described governmental employees,

16  in my opinion, as Lord's slaves.  She used the words

17  "Lord's servants", but it's a reference to a book that

18  says Aramaic words for literally slaves or so I

19  proffer.

20           As you sit here right now are you in a

21  position to challenge my proffer?

22                MS. O'CONNOR:  Objection.

23       Q    Yes or --

24                MS. O'CONNOR:  She can answer that

Page 243

1    question.

2                    MR. KEZHAYA:  She can answer yes or no.

3                    MS. O'CONNOR:  Can she challenge your

4    proffer?  As to what?  I, I don't understand your

5    question.

6                    Christine, I don't know if you

7    understand that question.

8                    THE WITNESS:  No, I do not.

9                    MR. KEZHAYA:  I object to speaking

10   objections.

11                   MS. O'CONNOR:  Okay.

12                   MR. KEZHAYA:  There shall be no speaking

13   objections or that's gonna be an issue for me.

14                   MS. O'CONNOR:  Okay.

15                   MR. KEZHAYA:  Okay.  No speaking

16   objections.  I know we've been doing a little

17   loosey-goosey but no instructing the witness on the

18   record.

19                   MS. O'CONNOR:  I'm not instructing the

20   witness.  I'm confused by your question.  It's a form

21   objection.  I can't even make heads or tails of that

22   question.

23                   MR. KEZHAYA:  Okay.  The form of a form

24   objection is object.  Please con -- please answer.

Page 244

1  That's the full statement; otherwise, it's a speaking

2  objection which is objectionable and grounds for

3  discovery sanctions.

4          MS. O'CONNOR:  Oh, okay.  Christine,

5  answer that question if you can.

6      Q    Please do.  Yes or no:  Are you in a position

7  to disprove that in Aramaic words 2000 years ago Lord's

8  servants was meaningfully different from Lord's slaves?

9      A    No.

10     Q    Okay.

11          MR. KEZHAYA:  That's a Wu question.  17

12  is just a Wu question.  I'm kinda just skimming through

13  to get us through the end of this.  Bases or source of

14  each.  Ah, that's a Wu question.  Wu question.  Wu

15  question.  Wu question.  Mm-hmm.

16     Q    I take note, number 22, once again

17  specifically identifies any statement -- inclusive of

18  any statements that were written that any councilor has

19  made or either has prepared or has had prepared for

20  them but did not make about Satanism, TST, its

21  membership or its activities.

22          I take note that you are not prepared to talk

23  about that Mayor Wu's former political opponent email

24  in which she found TST and its viewpoint absurd; is

Page 245

1    that correct?

2         A     Yes.

3         Q     Okay.

4                MR. KEZHAYA:  Just once again making

5    very abundantly clear that the witness was unprepared

6    to speak to item number 22.

7         Q     Number 23 --

8                MS. O'CONNOR:  She's prepared to speak

9    about 22.

10               MR. KEZHAYA:  Oh, she is.  Fantastic.

11        Q     So what was going on in Mayor Wu's former

12   political opponent's head when she described it as

13   absurd that TST would think it entitled to an invite?

14               MS. O'CONNOR:  So paragraph 22 doesn't

15   ask for the subjective intent of the councilor.  It

16   just asks for a statement that any councilor has made

17   and so she has fully answered those questions today

18   about that statement that was put up on the screen.

19               MR. KEZHAYA:  These are matters for

20   examination.  I get to ask the who-what-when-where-why.

21               MS. O'CONNOR:  We fundamentally disagree

22   about that.

23               MR. KEZHAYA:  I see.  Well, you

24   understand that my next thing is to move for discovery

Page 246

1    sanctions.

2              MS. O'CONNOR:  You, you can certainly do

3    that.

4    BY MR. KEZHAYA:

5        Q    Okay.  Going back to the next thing, if I can

6    find it.

7              Number 23 was just basically let's talk about

8    the invocation.  Let me be abundantly clear as to the

9    kinds of questions I want to ask.

10             24, City demographics, that's a good one.

11   City of Boston, do you keep official statistics of

12   people's religious beliefs or preferences?

13       A    No.

14       Q    Do you feel like it would be appropriate for

15   the City to take note of the public's religious beliefs

16   or preferences?

17             MS. O'CONNOR:  Objection.  You can

18   answer.

19       A    No.

20       Q    Okay.  Why not?

21             MS. O'CONNOR:  Objection.  Again, you

22   can answer.  Again, this is outside the scope of the

23   30(b)(6), but I will give a bit of leeway here.

24             MR. KEZHAYA:  Thank you.

Page 247

1      A    I'm just not sure if it's relevant for the

2   government's work with regard to trash pickup, public

3   works, parks, things like that.

4      Q    I think we may have had a misunderstanding as

5   to the question and answer.

6      A    Sure.

7      Q    I asked if it would be improper not proper.

8      A    Oh, okay.

9      Q    So I -- as I understand your statement then,

10  I should have asked, to make your statement make sense,

11  would it be proper for the City to do that, and I think

12  that would make your statement make sense; is that

13  correct?

14              MS. O'CONNOR:   Objection.   You can

15  answer.

16      A    So you're asking if it's proper if the City

17  of Boston would take ...

18      Q    Yeah, socially proper.   Let's start with

19  that.

20      A    If the City took data on the religious

21  demographics?

22      Q    Correct.   If the City had a record within its

23  own records that identified here's how many Christians

24  are here in the City.   This is the proportion of our

Page 248

1    population that identify as Christian at least as of

2    the date of this record.

3                    MS. O'CONNOR:  Objection.  So I maintain

4    the position that this is outside the scope of the

5    30(b)(6) topics for which she is designated to testify.

6                    MR. KEZHAYA:  So noted.

7        Q    Witness, please answer the question.  Would

8    that be right or wrong?

9                    MS. O'CONNOR:  No, so I'm instructing my

10   client not to answer the question.

11                   MR. KEZHAYA:  Oh, I'm sorry.  I

12   misunderstood.

13                   MS. O'CONNOR:  It's outside of the scope

14   of the 30(b)(6) topics for which she is identified.

15                   MR. KEZHAYA:  And once again, because we

16   have to keep going through this, you, Nicole O'Connor,

17   is speci -- are specifically directing the witness not

18   to answer a why-not question as to follow up on the

19   response to item number 24?  I want to make sure I'm

20   abundantly clear about that.

21                   MS. O'CONNOR:  Correct.  I don't think

22   that falls within the scope of topic of 24.

23                   MR. KEZHAYA:  Okay.  And you do not

24   assert a privilege objection, correct?

Page 249

```
 1              MS. O'CONNOR:  There's no privilege.
 2              MR. KEZHAYA:  I agree.
 3    BY MR. KEZHAYA:
 4       Q    Okay.  Twenty-five, relative proportionate
 5    share.  Well, 25's basically the same thing.  It's a
 6    spin on the same question.  Does the City take note or
 7    otherwise record or otherwise even consider the
 8    relative proportion of how many people within the City
 9    are of any particular religious persuasion?
10       A    No.
11       Q    Okay.  So, for example, the City doesn't have
12    anything to compete with my Pew research article I
13    found on the internet that says Christianity is, give
14    or take, a 50 percent populous pursuant to its
15    following practices?
16       A    No.
17       Q    Can we agree that that's probably right?
18              MS. O'CONNOR:  Objection.
19       Q    Do you dispute it?
20              MS. O'CONNOR:  You can answer.
21       A    No.
22       Q    You do not dispute, okay.
23       A    (Shakes head.)
24       Q    Okay.  Sum of money the City has ...
```

Page 250

1          Having sat through 11 years worth of

2   meetings, how many of these invocations are Christian?

3       A    I don't have an exact number.  There -- the

4   majority Christian but within Christianity there's

5   different sects of religion.

6       Q    Sure.

7       A    There's also been a number of representatives

8   from other types of religion.  There's been some

9   laypeople throughout the years.

10       Q    So --

11       A    So I cannot give -- I do not have an exact

12   number or percentage.

13       Q    Okay.  So the City will even extend

14   invitations to nonministers of proper religious

15   entities, just any random person of the public who

16   wants to give a prayer?

17              MS. O'CONNOR:  Objection.

18       Q    Correct?

19              MS. O'CONNOR:  You can answer.

20       A    Again, it's by invitation from the City

21   Councilor.

22       Q    Mm-hmm.

23       A    And there have been instances where an

24   individual from an organization that does work within

Page 251

1   the community may give the invocation.

2            MR. KEZHAYA:  Okay.  Number 27, skip.

3   Skip.  Skip.  Okay.  That's the end of those topics.

4       Q    I posit -- I keep using words like posit and

5   proffer.  These are formal legal -- formal logic, I

6   should say, not legal.  Law is based on formal

7   discourse which is formal logic, so I kind of use the

8   terms interchangeably.  I apologize.  Again, I'm bad

9   with words.

10           A proffer is to make a statement that you

11  posit is true.  Something can be either true or false.

12  Opinions cannot be proved true or false.  Not because

13  opinions are not true or false, but because the First

14  Amendment says that the government may not punish true

15  or false opinions.  That's where we get defamation law

16  from.

17           So back in the day in common law, defamation

18  was strict liability.  You said something bad about

19  someone, well, you better be prepared -- you better be

20  ready to prove it's true.  All of that changed in the

21  mid 1960s or so with a bunch of free speech stuff.

22           I say all of that to say that irrespective as

23  to the impasse on whether, in fact, the City of Boston

24  finds TST's religious viewpoint to be absurd, we see

Page 252

1    that at least one member of its governing body found

2    that to be the case.  Do you agree with me that we see

3    that that person said that?

4         A    Yes.

5         Q    Okay.  How is that not definitionally

6    discrimination?

7               MS. O'CONNOR:  Objection.  She can't

8    answer that question.  It's not within the scope of the

9    30(b)(6) topics.

10              MR. KEZHAYA:  We took note earlier at

11   the beginning of these proceedings of the answer in

12   which the City denies that this is religious

13   discrimination.  We took note of that.  I don't

14   understand how that text is not definitionally

15   discrimination.  I need the City's position as to

16   whether the City thinks that is definitionally

17   discrimination, yes or no.

18              MS. O'CONNOR:  And that's not a topic

19   for which she has been designated to testify, so she

20   can't answer that question.

21              MR. KEZHAYA:  I see.  So going back then

22   to number 30, am I really to believe that the witness

23   was not informed that the City's position is that it

24   will not extend an invite to TST?  They file an answer

Page 253

1   providing it to TST.  It's a matter of public record.

2   And the City's 30(b)(6) witness is unprepared to speak

3   as to the why not of its legal position.  Is that my

4   understanding?

5              MS. O'CONNOR:  This witness cannot

6   testify as to whether something constitutes

7   discrimination or not under the law.

8              MR. KEZHAYA:  I'm not asking the

9   witness's opinion.  I'm asking the witness to explain

10  to me how that is not discrimination in the regular

11  sense.  I'm not talking legal sense.  Literally just it

12  seems to me that a conscious decision was made by a

13  City employee in writing to explicitly state that they

14  intentionally do not invite TST because they find them

15  not amazing and not leaders of the public.

16              I'm just trying to understand how I lose

17  this case from the City's perspective seeing as how

18  this is my opportunity to speak to the City about its

19  legal positions.  That's what depositions are, you see.

20              MS. O'CONNOR:  So same objection.

21  That's not actually a question.  Thank you for that

22  explanation.  She cannot answer the question about

23  whether this constitutes discrimination.  That is not

24  for Christine O'Donnell to answer during this

Page 254

1    deposition.  And if you -- I don't think it's helpful

2    to have continuous debate about this.  If you'd like to

3    add this to your motion, that makes sense.

4              MR. KEZHAYA:  Yes, this is -- I believe

5    we are at a point of impasse.  I posit that the point

6    of the impasse is as follows beginning, quote, now,

7    whether the City discriminated against TST by refusing

8    to extend an invitation is not a valid subject for the

9    30(b)(6) deposition, correct?

10             MS. O'CONNOR:  Correct.

11             MR. KEZHAYA:  And that is the position

12   of Nicole O'Connor, once again, chief -- counsel of

13   record for City of Boston in the course and scope of

14   Nicole O'Connor's employment?

15             MS. O'CONNOR:  And --

16             MR. KEZHAYA:  Correct?

17             MS. O'CONNOR:  -- just so that the

18   record is clear, because it was not a topic for which

19   she is designated to talk about.

20             MR. KEZHAYA:  Great.  Okay.  And one

21   more just, just to put a bow on it, there is not an

22   assertion of privilege, correct?

23             MS. O'CONNOR:  There is no privilege.

24             MR. KEZHAYA:  I agree.  There is no

Page 255

1   privilege.   I propose to adjourn this meeting.

2                    MS. O'CONNOR:  Sounds good.

3                    THE VIDEOGRAPHER:  Okay.  The time is

4   3:36.  We're off the record.

5                 (Whereupon the deposition was

6                    adjourned at 3:36 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 256

```
 1                    CERTIFICATE

 2   Commonwealth of Massachusetts

 3   Suffolk, ss.

 4

 5        I, Kristen L. Kelly, Registered Professional

 6   Reporter, CSR and Notary Public in and for the

 7   Commonwealth of Massachusetts, do hereby certify that

 8   CHRISTINE O'DONNELL, the witness whose deposition is

 9   hereinbefore set forth, was duly sworn by me and that

10   such deposition is a true record of the testimony given

11   by the witness.

12        I further certify that I am neither related to or

13   employed by any of the parties in or counsel to this

14   action, nor am I financially interested in the outcome

15   of this action.

16        In witness whereof, I have hereunto set my hand

17   and seal this 9th day of September 2022.

18

19

20

21   CSR No. 115893

22

23   My commission expires:

24   February 3, 2023
```

```
                                                        Page 257
 1                        Veritext Legal Solutions
                             1100 Superior Ave
 2                             Suite 1820
                           Cleveland, Ohio 44114
 3                         Phone: 216-523-1313
 4
     September 13, 2022
 5
     To: Nicole O'Connor, Esq.
 6
     Case Name: The Satanic Temple, Inc. v. City of Boston, MA
 7
     Veritext Reference Number: 5406929
 8
     Witness:  Christine O'Donnell       Deposition Date:  8/25/2022
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24   NO NOTARY REQUIRED IN CA
```

Page 258

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
           ASSIGNMENT REFERENCE NO: 5406929
 3         CASE NAME: The Satanic Temple, Inc. v.
                      City of Boston, MA
           DATE OF DEPOSITION: 8/25/2022
 4         WITNESS' NAME: Christine O'Donnell
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8
      _____          _____
 9    Date                      Christine O'Donnell
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
                 Statement; and
14         Their execution of this Statement is of
                 their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions

Exhibit B
Page 269

Page 259

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 5406929
 3       CASE NAME: The Satanic Temple, Inc. v.
                  City of Boston, MA
         DATE OF DEPOSITION: 8/25/2022
 4       WITNESS' NAME: Christine O'Donnell
 5       In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7       I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9       I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____       _____
     Date                   Christine O'Donnell
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

Page 260

1                       ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                    ASSIGNMENT NO: 5406929
3    PAGE/LINE(S) /         CHANGE          /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                   Christine O'Donnell
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

**[0002870 - 27]**

**0**

**0002870**   170:11
**02.14.2019**   4:5
**02201**   2:16
**06.16.2020**   3:17
3:21
**09.29.2020**   3:19

**1**

**1**   3:9 8:10 47:9
59:10 96:18,22
170:1 173:12
180:7 225:7
229:6 231:14
**10**   4:5 189:19
193:1 201:18
218:23 219:5
229:3
**10.19.2017**   4:3
**10.19.2020**   3:11
**10102**   1:3 57:3
**11**   4:7 115:1,6
127:15 174:12
229:1,10 250:1
**11.03.2020**   3:15
**1100**   257:1
**115893**   1:18
256:21
**11:13**   109:1
**11:37**   109:4
**12**   178:1 179:17
207:1,10
**12.12.20**   3:23
**12:05**   178:3
**12:10**   177:24
**12:17**   147:16,19
**12:21**   152:5

**12:31**   152:8
**12th**   106:21
**13**   43:24,24 69:8
73:7 77:20 78:2
126:2 129:7
257:4
**13th**   106:21
**14**   219:7 220:12
224:12 234:19
**14th**   106:22
**15**   196:16 197:17
197:18 206:17
**16**   56:12 202:3
202:20 203:2
206:8
**16-1**   225:8,9
**16-2**   56:12 57:3
**17**   195:3 244:11
**172**   19:6
**18**   58:2,2 111:14
**1800s**   70:7,10,15
72:3,7,7
**1820**   257:2
**19**   176:18 209:1
209:8,14 222:1,2
**1909**   73:19,19
74:2,3,18
**1960s**   251:21
**19th**   177:4
179:12 180:18
**1:01**   185:11
187:15
**1:21**   57:3
**1:24**   203:3 206:8
**1:27**   199:21
**1:38**   199:24
**1:49**   208:19

**1st**   173:4

**2**

**2**   3:11 57:2,5,12
96:17,18 176:15
180:7 185:11
216:10 225:14
225:17
**2,000**   241:10,11
**2-7-7-1**   206:12
**2.19.2020**   3:13
**20**   158:14 258:16
259:22 260:22
**200**   241:8,9
**2000**   244:7
**2011**   72:16 125:1
131:20 157:21
158:5,6 229:6
**2012**   159:10
**2012/2013**
158:11
**2015**   131:20
**2016**   57:23 163:2
163:8 164:1,9
165:1 166:7
**2016/2017**   223:3
**2017**   163:2,8
166:11,14
170:13 172:20
173:12 209:1,8
209:14 221:2,5
221:13,18 222:2
**2018**   57:23,24
158:14 164:11
166:7,9 225:14
225:17
**2018/2019**   47:24
48:3

**2019**   180:18
219:7 220:12,22
225:5
**2020**   176:19
177:4 179:12
189:19 195:3
196:16 201:18
202:20 207:1,10
**2021**   111:14
116:17 118:21
**2022**   1:21 116:18
256:17 257:4
**2023**   256:24
**21**   1:3
**21433**   256:20
**216-523-1313**
257:3
**22**   244:16 245:6
245:9,14
**23**   183:24 194:23
245:7 246:7
**2320**   181:22
183:20 200:4
**2322**   181:23
183:20
**2391**   184:1 189:1
**2392**   184:2 189:1
**24**   197:7,18
246:10 248:19
248:22
**25**   1:21 115:2,7
**25's**   249:5
**25th**   31:4
**26**   103:10 104:17
194:23,24
199:15 201:6,9
**27**   251:2

**[2720 - 7:00]**

**2720**   206:11
**2723**   194:21
   198:22 199:15
   201:6,8
**2726**   194:21
   198:22
**2729**   201:15
   202:22 206:5,6,7
**2733**   189:3,5
   194:17
**2734**   189:3
**2771**   206:22
**28-29-30**   27:9
**2849**   207:2,24
   208:2
**2870**   170:8,8,11
   175:23 180:7
**2890**   209:3,3
   218:23
**2:26**   207:11
**2:45**   208:22
**2:47**   210:21
**2:48**   211:1

#### 3

**3**   3:13 147:22
   149:3 150:5
   181:24 183:20
   200:5 219:24
   256:24
**30**   15:14,17
   16:20,22,24 18:9
   18:12,16,18,23
   19:2,3,4,9,10,17
   20:7,10 21:3,16
   21:18,24 22:3
   23:2,11,15,22
   25:5 26:6,21,23

27:19,23 28:17
29:20 31:19
37:23 38:2
39:23 40:2,5,11
40:19,21 41:1,4
41:22 62:10
80:20,22 98:3
102:6 103:10
104:10 115:2,7
122:2,10 135:11
137:7 139:6,8
140:3 141:1,3,5
146:6,16,19
147:6,9,21
150:18 152:16
161:3 167:14
170:12 172:20
175:13 211:14
214:21 215:4,7
215:14 216:1,5
218:2,8 226:1
231:20 233:21
246:23 248:5,14
252:9,22 253:2
254:9
**300**   2:5,5
**30th**   172:24
**3373**   219:6
**3374**   218:24
   219:6,23
**34**   189:4
**3434**   176:4,8,16
   180:8
**3435**   176:9,10
**3436**   176:5,9,9
   176:11
**35**   145:8

**3:00**   188:17
**3:36**   255:4,6

#### 4

**4**   3:15 50:8
   162:16 184:3
   231:17,19 232:3
   232:23
**44114**   257:2
**45**   144:20 145:1
**479.431.6112**   2:7
**486**   73:19,22,23
   74:1
**4:07**   142:5,6
**4:30**   142:2,5

#### 5

**5**   3:17 189:13
   194:16 231:17
**50**   249:14
**5406929**   257:7
   258:2 259:2
   260:2
**55401**   2:6
**5:00**   141:22,22

#### 6

**6**   3:19 15:14,17
   16:20,22,24 18:9
   18:12,16,18,23
   19:2,3,4,9,10,17
   20:7,10 21:3,16
   21:18,24 22:3
   23:2,11,15,22
   25:5 26:6,21,23
   27:19,23 28:17
   29:20 31:19
   37:23 38:2
   39:23 40:2,5,11
   40:19,21 41:1,4

41:22 58:6
62:10 80:20,22
98:3 102:6
103:10 104:10
112:16 122:2,10
135:11 137:7
139:6,8 140:3
141:1,3,5 146:6
146:16,19 147:6
147:9,21 150:18
152:16 161:3
167:14 195:1
198:21 199:14
211:14 214:21
215:4,7 216:5
218:2,8 226:1
227:20 231:17
231:20 233:21
246:23 248:5,14
252:9 253:2
254:9
**615**   2:15
**617.635.2902**
   2:17
**64**   1:20
**6:49**   144:17
**6:50**   144:15
**6:54**   196:16
   206:17

#### 7

**7**   3:21 200:1
   202:20 206:5
   231:17,18,20
   232:4,23
**7:00**   142:3
   144:12,13,15,15

**[7:51 - agent]**

**7:51** 179:13

**8**

**8** 3:23 58:6
206:10,21,23
208:3
**8.30.2017** 3:9
**8/25/2022** 257:8
258:3 259:3
**84** 73:21
**8:05** 197:7
**8:09** 145:7
**8:33** 189:19
191:3

**9**

**9** 4:3 207:3
215:16 218:23
228:7 229:1,5
**9:32** 1:22 5:4
**9:49** 21:7
**9:53** 21:10
**9th** 57:23 256:17

**a**

**a.m.** 1:22
**abbreviation**
178:16
**abide** 9:19
**ability** 176:23
**able** 204:2 219:3
**abnormal**
123:17,22,24
171:17 194:1
233:7
**absolutely** 43:13
100:5 199:18
**absurd** 209:24
211:19 218:23
219:22 220:3,5,6

223:22 244:24
245:13 251:24
**abundantly**
130:16 137:14
217:19 245:5
246:8 248:20
**accept** 59:1,2
88:20 89:1
101:23 102:3
177:20
**acceptable** 9:17
9:18
**access** 174:18
**accord** 151:9
**account** 211:10
**accurate** 93:6
**accurately** 119:2
**acknowledge**
258:11 259:16
**acquiesced**
151:11
**act** 59:18 172:3
258:14 259:20
**acting** 59:21
60:3 61:4 112:1
112:2,4,13
**action** 99:21
256:14,15
**actions** 5:18
60:10 214:5
**activities** 244:21
**activity** 222:10
**acts** 73:19 74:2
**actual** 96:14
163:3 232:11
**ada** 2:24 5:5,8
56:5 57:7 91:7

**add** 67:23 254:3
**addition** 78:1,4
81:18 83:20
**additional** 26:2
59:20
**address** 9:12
56:18 70:19
177:9 229:6
236:18 237:19
257:15
**addressed** 20:2
75:20 97:10
98:19 102:6
161:17 168:13
227:6 236:13
**addresses**
170:14
**addressing** 9:24
133:3
**adequately**
41:20 150:14
201:19 202:15
227:21 229:21
**adjourn** 255:1
**adjourned** 255:6
**admin** 50:21
**administer**
112:23
**administering**
112:9
**administers**
202:9
**administrative**
50:12
**admit** 121:24
122:4
**adopts** 98:6

**advance** 186:13
218:12
**advanced** 118:3
186:2 187:3
**advice** 145:23,24
234:21
**advise** 45:6
**advising** 47:18
**affixed** 258:15
259:21
**afraid** 176:21
**afternoon**
203:13,13
**agency** 42:22,23
59:16,18
60:20 61:1,22
62:8,14,22 63:12
86:21 87:5 89:2
94:2,18 96:10,11
96:17 131:10
161:3 212:21
216:12
**agenda** 75:23
76:1,2,2,15,22
78:20 81:21
82:13,15 180:23
182:11 187:6,6
187:10,17,18
188:12,14,16
203:9,12,13,14
236:14,17,19,24
237:6,8,10,19,23
**agendas** 64:18
76:18 228:2
**agent** 43:1 60:1
61:4,7 63:6,10
87:13,13,15 88:1
89:3,12 131:8

**agent's** 60:20
88:19
**agents** 60:11
63:13,16,20
87:10 88:1,4,16
89:4 98:17,20
**agnosticism** 5:21
**ago** 104:15 156:7
156:8 241:11
244:7
**agree** 17:17
23:24 24:14
25:12 30:10,14
34:9 36:13
40:13 46:24
63:8 97:1 98:24
102:10,11,14
123:18 125:14
140:22 142:16
143:10 161:5
193:14,16 212:7
213:6 214:2
221:14 223:7
229:3 230:5
232:14 233:12
233:13 235:21
241:13 242:12
249:2,17 252:2
254:24
**agreed** 20:4 32:7
32:11 106:20
130:20 157:20
217:4 218:11
**agreeing** 214:24
**agreement** 7:23
**ah** 27:11 35:12
38:18 49:1 58:7
100:18 136:13

141:14 144:14
164:8 173:3
174:16 187:19
216:6 219:22
225:6 226:8
228:2 244:14
**ahead** 103:4
186:13
**aides** 129:15,21
**al** 73:10
**alana** 4:3 209:7
211:11 212:12
**alcevedo** 196:17
196:20
**alderman** 72:8
72:18 73:3,12
**aldermen** 72:19
72:23
**allegations**
17:15
**alleged** 171:23
**alliance** 123:6
**allow** 30:7
169:23
**allowed** 25:13
48:20,22 76:5
141:8
**allows** 48:6
**amanda** 69:12
156:15,21 157:1
157:3
**amazing** 210:3,9
212:5 222:16,21
253:15
**amen** 166:24
**amended** 56:11
56:11 57:3,13
225:7

**amendment** 46:8
46:13,16 47:5
53:16 135:24
251:14
**amicably** 12:12
**amount** 84:11
108:19 115:16
125:22 183:8,10
**amounts** 83:5
**analogies** 89:17
**analogous** 90:7
90:14 92:7
97:11 134:2
**analogy** 92:10
94:4,14 97:13
**andrea** 47:22
48:18 172:12,15
173:12,18
175:16 225:13
225:18
**anecdotes** 85:21
85:23
**anger** 9:1
**angry** 8:24 9:3
34:2,3
**annissa** 4:4
209:11 212:10
212:11,13,15,17
213:13
**answer** 10:15
13:3,20 17:14
23:7,10 24:10
25:16,24 28:10
29:13,22 30:4
31:23 32:1 33:8
36:10 37:11
38:13,15 40:3
42:1 46:21

47:21 48:11
51:22 54:13
59:23 61:24
70:24 71:17,21
72:22 80:17
84:11 86:14
88:13,24 92:16
93:11 95:10,24
96:5 97:1,4,6,13
98:2 99:13
102:14,23
113:24 118:1,7
120:4 133:10
134:11 135:17
137:15,20,23
138:6,10 139:10
139:22,23 140:4
147:6 148:15,16
148:24 149:16
149:21 150:1
151:2,7,16,24
153:2 154:10,11
154:18 165:12
165:15 167:13
169:10 211:22
222:23 232:11
232:18 235:24
240:4 241:17
242:7,24 243:2
243:24 244:5
246:18,22 247:5
247:15 248:7,10
248:18 249:20
250:19 252:8,11
252:20,24
253:22,24
**answer's** 148:5

answered   35:21
  36:12 61:2,12
  71:13 160:15
  233:11,14
  245:17
answering   18:22
  19:16 58:20
  99:9 121:23
  122:5 136:4
  138:17 145:20
  145:22 146:1
  149:15
answers   37:10
  75:5 140:5,6
  231:10
anymore   34:20
  163:7
anyone's   31:22
  143:9
anyway   132:5
  139:18 164:24
apologize   58:21
  58:21,22 125:2
  148:20 152:11
  169:5 178:15
  190:11 202:6
  205:6 219:6
  224:20 227:23
  231:5 238:5
  251:8
apologized
  152:10
apparently
  200:3 225:8
  227:23
appear   182:23
  194:11 258:11
  259:15

appeared   123:16
appearing
  176:18,18
appears   29:15
  36:23 57:5
  111:20 116:7
  171:15 174:6
  177:15 179:22
  182:1 184:4
  191:4 193:8
  194:15 201:17
  204:9 207:18
  212:1 213:3
  218:1
appended
  259:11,18
applies   46:17
  175:4
apply   87:20
appreciate   23:11
  137:9 150:24
apprize   41:20
apprized   40:23
approach   62:5
appropriate
  138:1 141:13
  217:16 246:14
appropriately
  84:19 202:15
approval   82:5
approve   76:13
approved   74:14
approximate
  114:15 159:9
  183:7
approximately
  48:1 126:22
  159:6 166:7

aramaic   242:18
  244:7
arbitrary   5:19
  5:24
arcane   5:12
arcangeli   2:14
  7:17,17
archives   72:11
arguing   137:2
argument
  137:21 176:11
arkansas   104:8
arose   148:1
  226:22
article   249:12
articulated
  101:15
aside   80:9 180:2
asked   49:1 52:20
  55:20 59:1,11
  62:10 69:8,13
  77:3,5 119:2
  125:2 138:8,23
  151:4 153:10
  154:6,20 155:7
  155:11,13,17
  205:11,23 238:5
  247:7,10
asking   13:13
  16:8 34:5,18
  48:5 49:3,15
  50:17 54:11,16
  62:15 85:7
  87:18 88:9
  92:17 93:19,19
  94:2 99:12
  116:21 118:4,23
  130:17,24 133:3

138:4,21,22
  139:3 143:23
  149:6,14 151:4
  153:10,12
  160:20 171:8,13
  178:2 183:1
  187:20 204:1
  205:21,22
  230:11,21,24
  234:13 247:16
  253:8,9
asks   99:20
  207:11 224:16
  245:16
aspect   161:3
assert   122:13
  248:24
asserting   23:5
  26:3 137:14
assertion   254:22
assign   50:1
assignment
  258:2 259:2
  260:2
assist   55:21
  79:10
assistance   7:5
  79:12
assists   79:14
assume   45:21
  57:9 64:4 77:2
  178:17
assuming   71:8
  74:21 192:6
attached   56:15
  259:7
attend   29:21
  65:21 66:1 83:8

**attended** 115:3 124:24 160:7
**attendees** 228:1
**attention** 171:21 200:6
**attest** 106:15
**attesting** 121:7,9 121:11
**attorney** 43:21 44:9 46:22,22 62:5,6 217:20
**attorney's** 65:6 217:21
**attribu** 87:1
**attributable** 92:11
**attribute** 93:20
**attribution** 60:20 86:22 94:3,20
**audiovisual** 1:14
**auditing** 68:21 68:22
**august** 1:21 31:4 111:14 116:17 170:12 172:20 172:24 175:13
**author** 19:5
**authority** 5:24 19:13,14 44:5 45:7 59:18
**authorize** 259:11
**authorized** 45:18
**available** 52:18 72:10 76:18,21 237:12 239:12

**ave** 257:1
**avenue** 2:5
**avenues** 138:2
**avoca** 205:3
**avoid** 34:10 101:3 106:9 139:1 165:3
**avoiding** 165:7 165:20,20
**aware** 6:14 88:4 90:13 164:22 228:17
**awesome** 193:4 193:6,13,17,22 194:17,18
**awful** 34:11,13

**b**

**b** 3:7 4:1 15:14 15:17 16:20,22 16:24 18:9,12,16 18:18,23 19:2,3 19:4,9,10,17 20:7,10 21:3,16 21:18,24 22:3 23:2,11,15,22 25:5 26:6,21,23 27:19,23 28:17 29:20 31:19 37:23 38:2 39:23 40:2,5,11 40:19,21 41:1,4 41:22 62:10 80:20,22 98:3 102:6 103:10 104:10 122:2,10 135:11 137:7 139:6,8 140:3

141:1,3,5 146:6 146:16,19 147:6 147:9,21 150:18 152:16 161:3 167:14 211:14 214:21 215:4,7 216:5 218:2,8 226:1 231:20 233:1,21 246:23 248:5,14 252:9 253:2 254:9
**back** 16:17 21:9 31:1,1,2 32:6 38:1 45:3 50:5 52:4 55:22 58:23 59:9,10 68:10,17 70:2,7 70:9,12 71:9 72:7,21 76:24 86:19 94:23 109:3 124:3 132:19 141:22 144:11 147:18 152:7 159:20 166:8 167:2 173:12 175:22 187:14 199:23 202:24 208:21 210:24 211:4 224:11 226:1 230:1 235:21 237:16 238:23 241:12 246:5 251:17 252:21 257:15
**background** 43:10,15 99:14 136:5 147:22

149:4,9 152:19 179:8 211:5 226:21
**backing** 87:4 94:23
**backtrack** 110:6
**bacro** 149:4
**bad** 58:7 172:1 235:7,18,22 236:2,9 251:8,18
**baker** 69:13 157:4,5 158:10 159:4,18
**baker's** 159:24
**banner** 116:4
**based** 35:20,22 38:14 52:23 53:7,8 75:1 76:2 79:8 83:17 95:21 119:18 126:24 131:3 160:8,21 167:13 174:12 182:11 185:8 251:6
**bases** 148:12,14 149:1 150:3,19 150:22 151:12 152:18,21 228:4 228:23 229:4 244:13
**basic** 19:24 145:11 212:21
**basically** 59:12 59:14 70:17 79:2,21 81:8 82:19 84:9 123:5 129:22 152:15 153:19

157:12 163:13
167:18 181:16
195:19 197:22
198:11,17 201:2
202:8 203:8
246:7 249:5
**basics** 135:23
**basis** 148:14
153:2
**bates** 170:8
175:21,23 180:8
181:20,20
183:20,23
199:14 201:12
202:21 206:7
207:1 209:2
**bear** 9:5
**bears** 56:16
**beginning** 32:23
109:22,23 134:9
159:4 181:22
184:1 210:1
223:14 252:11
254:6
**begins** 195:2,3
196:10 199:14
219:24 220:1
**behalf** 60:3 61:5
102:24 103:12
161:21 179:14
212:20 215:8
217:20,21
**beli** 60:13
**belief** 122:9
**beliefs** 92:10
246:12,15
**believe** 52:10,15
52:16 55:22

67:2,18 68:12,19
72:15 94:16
99:22 111:12
123:8 135:11
145:12 158:14
163:2 170:17
192:8 200:12
206:18 209:18
252:22 254:4
**bells** 195:5
**bend** 6:2
**benediction**
235:2
**benefit** 13:15,16
14:10 57:1
66:12 111:4,8
175:20 176:8
180:6 183:19
188:24 199:13
209:8,22 225:10
**best** 11:14 74:24
138:7 148:9
163:17 166:3
176:22 179:19
222:12 224:2
228:11 235:1
236:1,3
**better** 71:16
161:9 168:13
176:24 251:19
251:19
**beyond** 32:18
40:7 237:22
**bhm** 3:13 182:4
**bias** 80:14 81:1
**biased** 38:20
**bible** 240:17,18

**biblical** 240:16
242:8
**big** 66:15 84:1
94:3
**bing** 33:19
**bit** 11:1 16:17
56:17 72:8
86:19 89:7 91:1
110:6 142:1,3
219:1,2 220:11
226:15 246:23
**bizarre** 12:10
**black** 123:4
182:4 200:13,14
**blasphemy**
172:3
**bless** 142:11,13
144:6 146:11
235:3 237:24
238:6 239:2
240:1
**blessed** 238:16
239:7
**blessing** 124:16
124:16 133:1,5,7
133:18 134:6,9
134:18 138:24
139:1,5,18,20,20
140:2,12,13,15
140:16,24
141:20 142:16
143:19 144:22
162:19 186:4,6,7
186:9 221:4
233:9 239:1,3
**blessings** 236:16
238:1,3 239:17

**blissful** 5:15
**block** 213:24
**blocked** 107:1
**blocking** 213:23
213:24
**bma** 123:4
**body** 43:24
49:18,23 51:11
57:16 76:5 78:5
84:15 89:20
90:1,2,11 91:19
91:23 92:1,12
98:21 107:11,14
107:22 108:3,4,5
109:15,15,17
123:6,9 133:6
189:24 196:14
201:16 209:23
212:22 252:1
**bok** 197:8 198:5
**bold** 211:9
**bonetti** 3:17,22
189:19 192:16
192:18 195:4,22
201:18 203:22
**book** 19:3,3,9
38:2 240:16
242:17
**bookend** 166:7
**bookending**
223:13
**booking** 106:10
**books** 72:6,9
**borne** 5:12
**bos** 60:2
**boss** 230:12
**boston** 1:8 2:12
2:16 6:21,22

Exhibit B

7:16,18 12:1
14:13 15:10,13
15:20 16:14
17:2,4,12 18:2
22:8,12,15 24:19
24:19 42:20
43:23 46:10,12
57:4 59:13 60:2
67:13,15 72:6,11
73:5 74:4,8,10
74:13,13,14,17
76:14 89:3 90:2
90:10,21 95:18
96:1 98:16
102:5 103:11
105:18 117:18
118:19 140:19
141:9,18 142:12
142:15,22 143:1
143:19 144:6
150:16,19 165:9
166:5 167:11
172:9,9 179:14
179:17 180:21
180:22 182:19
184:14 186:17
190:23 193:21
200:9 207:15
210:12 211:9,17
213:2 214:9
219:9,10,12,16
220:7,12 224:12
224:16 241:20
241:21 246:11
247:17 251:23
254:13 257:6
258:3 259:3

**boston's**   10:13
93:5 98:15
115:22 121:17
145:16 204:6
215:8
**boston.gov**   2:18
2:19 177:8
181:1 207:6
220:16 224:12
225:18,19
**boston.gov.**
207:5 220:15
**bottom**   92:9
170:10 176:4
183:24 189:16
194:21,22
201:13 202:22
206:11 211:8
218:20,21
**bound**   153:16
**bounds**   43:19
45:12,17 48:20
172:2
**bow**   254:21
**break**   6:2 21:8
83:3 92:22
108:20,23 109:2
147:11,17 152:2
152:6 168:5
199:17,22
208:15,20
210:20
**breaking**   219:19
219:19
**bridge**   1:20
12:15 214:15
**bring**   115:20
162:8

**brings**   115:16
184:12
**broadcast**   8:1
**brochure**   4:7
**brought**   8:7
11:18 34:14
39:8 150:16
151:11 200:6
**budd**   2:23
**budget**   129:14
**budgetary**   78:24
82:4
**building**   80:3
**bullet**   231:23
**bunch**   31:22
78:16 176:9
180:21 181:16
207:5 236:8
251:21
**burden**   22:7
**business**   90:3
91:9 161:2
165:15 194:12
**busy**   118:19
**butlers**   241:12

**c**

**c**   2:1 5:1 156:16
156:17 157:10
233:3
**ca**   257:24
**call**   42:6 67:5
80:6 83:23
106:16 107:20
116:10 139:19
141:20 144:20
145:7 151:19
162:4 168:15

175:21,24 176:3
178:2,5 186:4
191:5 193:21
194:17 202:22
208:4,5 217:4
218:23 230:3
231:20 234:4
241:8,9
**called**   1:15 17:8
17:11 64:4
72:24 94:11
139:18 144:21
175:22 211:14
214:20
**calling**   84:3
180:3,8 186:6
**campbell**   47:22
48:18 58:11,18
63:11 172:12,15
173:19 175:16
182:8 185:3,7
188:5 224:22,24
225:2,13,18
**campbell's**
173:20 174:8
181:12 184:24
**candace**   180:19
181:7
**candidate**
209:19
**candles**   5:10
**capa**   53:23
**capacity**   43:22
46:3 65:21
141:12,13
**caps**   193:7
194:18

**[caption - christine]**

**caption** 111:6
**care** 42:6 49:13
55:10 58:12
84:17 105:10,24
105:24 118:22
164:24 178:7
181:5 197:4
201:4,7 225:22
227:11 229:11
238:22
**carl** 180:18,18
**carlo.org** 178:22
**carry** 59:20
189:24
**carrying** 121:10
**case** 1:3 12:24
14:7 22:19 36:9
36:11 42:14
46:6 47:5 51:18
51:24 52:16,17
52:20 57:4 59:3
60:1 63:9
126:11 141:10
152:17 183:2
188:4 206:4
217:24 252:2
253:17 257:6
258:3 259:3
**cases** 60:3
**categorizations**
5:19
**category** 66:23
69:3
**catholic** 190:12
**caucus** 19:20,20
20:23,24
**caucusing** 20:23

**cc** 177:2,7
180:14,18
225:18
**cc'd** 180:22
196:19 207:5
**cemented** 203:10
**cen** 129:9
**central** 129:2,4,5
129:6,10,13,23
132:19 181:8
195:18,19,21
202:8
**ceremo** 147:23
**ceremonies**
149:6 235:2
**ceremony** 14:20
147:24 148:4,6
149:5,10 150:5
152:20 226:22
233:4,6 234:20
236:13
**certain** 13:8
16:18 23:13
67:15 89:20
90:19 97:3
101:15 102:5,24
130:13,16
138:18 140:23
161:1 217:11
**certainly** 56:8
100:14 143:15
149:24 151:1
246:2
**certificate** 256:1
259:11
**certification**
258:1 259:1

**certify** 256:7,12
**cetera** 91:11
179:4
**chair** 50:13,14
51:2 112:13
**chairs** 184:22
187:24
**chal** 226:23
**challenge** 242:21
243:3
**challenged**
226:23
**challenges** 148:1
**change** 205:16
236:6 257:13,14
259:8 260:3
**changed** 148:4,6
148:8 221:2
251:20
**changes** 257:12
258:7 259:7,9
**changing** 222:14
**chapter** 73:19,21
73:22
**character**
121:11,13
**characterization**
188:21 214:3
219:19
**characterize**
133:17
**characterizing**
120:12
**charge** 7:7
121:20
**charged** 62:3
160:13 161:1

**charges** 6:21
**charity** 123:7
**charter** 44:4
74:6,8 90:21,23
**check** 182:9
**checking** 173:14
174:13 175:15
**chicken** 132:4
**chief** 157:3,5
173:21 174:8
177:10,12
181:12 202:8
211:11 212:13
220:18 223:8
224:15,21
254:12
**chiefs** 100:16
**choice** 242:14
**christian** 248:1
250:2,4
**christianity**
249:13 250:4
**christians**
247:23
**christine** 1:14
3:3 6:15 14:12
14:16,23 15:9
18:21 21:23
35:11 42:19
56:13,15 57:6
98:2 100:14,14
101:7 102:22
118:1 140:16,19
141:6 142:22
151:18 162:3
167:13,24 168:2
169:2 172:13
173:13,13

Exhibit B

**[christine - clear]**

| | | | |
|---|---|---|---|
| 213:16 214:4 | 54:5 59:13 60:2 | 166:5 167:11 | **city's** 39:14 44:4 |
| 215:4 221:16 | 62:14 63:12,17 | 170:14,19 171:3 | 44:4 67:4,9 |
| 243:6 244:4 | 63:20,24 64:2,3 | 171:18,22,24 | 68:12 103:6 |
| 253:24 256:8 | 64:16,17,17,23 | 172:8 177:6,21 | 106:6 131:6 |
| 257:8 258:4,9 | 65:5,15,21 66:7 | 178:1 179:14,17 | 147:23 149:4,10 |
| 259:4,13 260:20 | 67:13,15,21,21 | 181:9,11,13 | 150:4 152:20 |
| **christine's** 35:14 | 68:1,15 69:8 | 182:6 183:4 | 157:11 162:16 |
| 136:6 140:18,24 | 70:5,5,8,16 72:6 | 184:14 186:3,11 | 174:18 197:24 |
| **chronological** | 72:9,10,11 73:2 | 186:17 188:1 | 217:20,20 |
| 194:23 | 73:3,5,7,13,18 | 190:23 191:1 | 227:12 242:1,2 |
| **church** 120:11 | 74:4,8 75:3 76:2 | 192:1,2,3,5 | 252:15,23 253:2 |
| 120:11,12 | 76:3,14,15,19,23 | 195:11,15,16 | 253:17 |
| **circulated** | 77:19,23 78:1 | 196:2 200:9,21 | **citywide** 126:5 |
| 171:22 | 79:9,11,12 80:3 | 203:23 204:6,8 | **civil** 1:16 16:1 |
| **circulation** | 80:7 82:5,9 | 207:7,15,15 | 16:10 103:11 |
| 219:12 | 83:14 84:2 89:3 | 209:12,13 210:5 | 258:5 259:5 |
| **circumstances** | 90:21 92:3 93:5 | 210:11 211:9,17 | **cj** 182:7,7,8 |
| 202:14 | 95:18 96:1,10,12 | 212:22 213:1 | **claim** 220:3,14 |
| **cite** 46:6,7 75:2 | 96:17 97:10,17 | 214:9,16 215:8 | **clarification** |
| 135:11 | 98:11,16,18 | 215:15 216:16 | 54:14 107:21 |
| **cited** 8:21 | 102:4 103:11 | 217:21,22 218:4 | **clarify** 55:18 |
| **citing** 52:16 | 107:22 112:16 | 220:1,7,15 221:5 | 66:5 88:14 |
| **city** 1:8 2:12,15 | 115:21 118:19 | 222:10 223:19 | **clarifying** 58:16 |
| 6:21,22 7:6,16 | 121:17,18 | 225:15,16 | 94:12 |
| 7:18 10:13 12:1 | 123:11,13 126:4 | 227:19,22 | **classify** 49:2 |
| 14:13 15:10,13 | 129:1 130:20 | 228:18 229:19 | 133:11 |
| 15:20 16:14 | 131:4,9 135:1,2 | 229:21 236:22 | **clause** 21:17,23 |
| 17:2,4,11 18:2 | 136:20 140:19 | 237:4 241:19,20 | 42:21 96:18 |
| 22:7,8,12,15 | 141:9,18 142:11 | 246:10,11,15 | **clauses** 23:13 |
| 24:4,5,18,19 | 142:15,22 143:1 | 247:11,16,20,22 | **clean** 183:19 |
| 26:24 27:1,9,12 | 143:19 144:6 | 247:24 249:6,8 | **clear** 6:11 9:1 |
| 27:16,17 29:9 | 145:16 149:12 | 249:11,24 | 11:17 13:14 |
| 39:13 42:20,23 | 149:13 150:1,4 | 250:13,20 | 18:21 22:4 |
| 43:23 46:10 | 150:16,19 | 251:23 252:12 | 36:20 57:1 |
| 48:23 49:3,5,9 | 153:10 157:24 | 252:16 253:13 | 91:15 130:16 |
| 49:17 50:8,11,13 | 158:3 160:23 | 253:18 254:7,13 | 137:14 150:11 |
| 51:2,5,8,12 | 162:21 164:2,2 | 257:6 258:3 | 150:14 171:24 |
| 52:21,22 53:3 | 164:10 165:9 | 259:3 | 180:6 185:8 |

Exhibit B

199:13 217:19
229:21 230:17
245:5 246:8
248:20 254:18
**clearly** 47:2
73:11 205:18
**clergy** 70:10,15
121:19 125:18
163:7
**cleveland** 257:2
**client** 42:4 46:22
139:15 248:10
**clip** 235:19
238:2
**clips** 235:20
**cluster** 222:10
**codified** 53:19
**cohesive** 164:1
**coincides** 163:12
**coletta** 3:11
176:19,20 177:5
177:7,9 179:13
180:17
**colleagues** 181:7
**color** 121:3
**coloring** 152:16
**com** 76:23
**come** 51:16 71:8
71:13,17 78:2
80:4 125:19
126:1 127:2,5,14
134:15 135:13
147:1 151:11
171:21 187:10
188:6 200:17
209:5,6
**comes** 47:3
209:3

**comfortable**
38:7
**comforting** 5:16
**coming** 11:20,21
29:9 35:5 61:20
177:22
**commencing**
1:21
**commended**
172:4
**comment** 83:9
83:19
**commission**
256:23 258:19
259:25 260:25
**committee** 44:2
76:23 129:19
**committees**
51:12 82:10
83:15
**common** 69:24
114:10,12
122:18,23
184:15,16,17
204:7 241:9,9
251:17
**commonwealth**
1:19 256:2,7
**communicate**
95:1,3 108:5
171:11
**communicated**
95:7 102:2
**communicates**
194:4
**communicating**
171:1

**communication**
156:3 171:9
197:23 227:22
**communications**
46:23 171:5
181:8 194:10
227:13,19
**community**
171:6 200:14
251:1
**compassion**
210:7
**compel** 38:11,13
**compete** 249:12
**complaint** 13:3
13:20 17:13,14
56:7,11,16 57:3
57:13 111:15
125:12 151:10
157:22 225:8
**complete** 131:18
131:24 132:2
230:22
**completed**
203:12 257:15
**compliance**
14:12 15:9
42:19 63:2
**comprehensive**
130:4
**comprised** 24:5
49:5 89:21,21
**con** 243:24
**concept** 61:22
94:19 134:2
235:7
**concepts** 60:22

**concern** 81:2
218:9
**concerning**
103:13
**concerns** 217:6
**conclusion**
139:24 200:18
**concrete** 5:18
**conduct** 166:1
**confer** 218:7
**confirm** 68:1
184:19 207:24
**confirmed** 208:2
**confused** 56:17
58:17 97:16
139:8 143:23
149:19 164:10
193:2 198:15
212:24 213:22
235:11 237:9
243:20
**confusing**
206:15
**confusion** 31:11
100:22 101:3
141:17
**confusion's**
30:19
**congre** 238:3
**congregants**
13:16,18,24
16:19 91:21
92:10 102:17
169:7 238:4
**connected**
197:12
**connecting**
197:9

conscious
  253:12
consent   103:12
consider   53:24
  114:3 249:7
consideration
  221:4
considered
  163:17
considering   37:1
consistency
  14:19
consistent   7:2
  113:12 184:7
  202:16 207:20
consistently
  35:22
consisting
  223:19
constituent   78:6
  78:8,13,14 79:6
  79:7,9 81:7,11
  84:2
constituents
  51:9 53:11 78:6
  79:11,11 80:10
  84:16,17 93:20
  95:22 110:16
  154:22
constitutes
  140:24 253:6,23
consult   33:4
consulting   10:6
  34:7
contact   79:20
contemporane...
  228:18

contemporane...
  212:2
content   211:10
contention   12:2
  12:3,8,17 33:14
  33:15
contentious
  185:9
context   20:7
  25:5 41:1 43:6
  43:11 45:5
  59:17 149:13
  174:3 182:20
  190:22 191:7
  196:9 203:22
continue   36:24
  113:17 116:1
  120:7,16 122:15
  123:1 125:8
  129:18 132:22
  143:21 144:11
  145:4 148:23
continuing   143:8
  146:7 219:2,2
continuous
  254:2
controls   55:1
  76:2
convenient
  49:24
conversation
  10:12 28:11
  30:22 34:20
  101:19 153:20
  156:7 234:2
conversations
  48:11,12

cool   58:4 123:15
  124:8 201:4
  213:17 227:18
coordinate   104:9
  161:24 191:12
copied   232:4
copies   8:10
copy   56:10 58:7
  231:21 232:1
corporate   90:11
  92:12
corporation
  89:19,20 90:10
  107:19
corporations
  19:4 90:9
correct   15:15,16
  15:23 16:11
  17:6,9,15,16
  18:5,10 20:18
  22:9,10,12,13,15
  22:16 26:11
  29:9,17,23 30:15
  39:17,20 41:22
  41:23 44:9,12
  45:10,11,15,19
  48:7 49:16 52:7
  55:4 57:23 59:7
  59:15 60:6
  61:15 63:13
  64:5 66:18 72:3
  80:23 82:21,21
  83:7 85:15 87:8
  98:4 103:15,19
  105:4,9 107:12
  110:19 113:5,6
  119:7 122:10,11
  122:13,14

126:11 128:13
  131:11 133:2
  137:5,16,17,21
  145:15,17 146:2
  146:3,6 153:8
  154:15 157:14
  158:21 161:14
  161:18 162:22
  163:9,14 166:10
  169:3 170:20
  172:13 183:14
  190:13,24
  193:18 198:4
  213:16 215:9
  219:13 220:23
  221:6 224:18
  227:8 228:22
  229:2 234:6,7
  236:11 237:21
  245:1 247:13,22
  248:21,24
  250:18 254:9,10
  254:16,22
corrections
  257:12 259:17
correctly   75:21
  83:2 115:6
  172:10
correspondence
  195:2
coun   65:3
council   14:13
  15:10 16:15
  42:20 43:23
  46:10 49:5,8,11
  49:15 50:6,9,10
  50:11,12,12,13
  50:19 51:2,5,11

**[council - course]** Page 13

51:12 52:5,21,22
54:5 58:24 64:4
64:17,18 65:3,21
69:20 70:6,8,16
72:9,12 73:2,3,7
73:13,19 74:5
75:3 76:2,3,13
76:15,19,21,23
77:2,11,17,20,23
77:24,24 78:1,1
78:3 79:10 82:6
82:9,24,24 83:14
84:2,20 99:15
107:22 111:23
111:24 112:2,4,5
112:15 126:3
129:2 130:21
131:4 135:1
158:3,15,17,18
158:19,21,23
159:3 160:4,17
163:10 164:2,2
166:16 170:15
170:20 171:3,18
171:22 172:16
174:8 177:6,21
178:1 179:17
181:9,11,11,14
182:6,12 184:21
184:21,22
185:15,20,24
187:23 188:1,2
188:10 192:2
195:11,15,16
196:2,19 198:3
200:21 203:23
204:8 207:7,12
207:15,15 210:2

210:11 220:2,15
221:19 225:1,5
236:17 239:18
**council's** 48:23
49:3,17 52:6
68:15
**councilor** 45:9
47:3,18,20,22
48:3,19 49:9,18
50:8 51:8 53:5,8
54:24 55:3,21
58:11,18 63:10
69:13,13 71:20
82:14,18 83:23
84:8,19 85:3
86:9 89:13 97:8
98:6 108:13
110:6,12 111:22
112:3,16 114:4
115:16 116:15
126:5,5 153:11
154:6,20 155:1
155:18 157:4,8
158:10,13,14,18
159:24 160:3
166:17 171:24
172:18 173:18
173:20 177:11
177:13,20 178:6
179:15,22
181:10,15 182:8
184:23 185:3,7
186:12 187:21
187:22 188:4,5,9
191:8 192:18
195:24 197:8
198:5 200:13
202:5,13 203:4

203:18 205:5,8
205:11 207:9
209:13 220:19
220:20,20 221:2
222:24 223:11
224:15,16,21,24
225:1 228:24
229:4 244:18
245:15,16
250:21
**councilor's**
89:12 173:14,22
174:13 238:17
**councilors** 43:24
45:6 49:15
51:13 52:24
53:3 59:8 64:16
64:17 65:15,18
65:19 66:7,15
69:8 71:7,8 76:4
78:2,4 79:10,13
79:23 80:3,6,8
80:12 82:1,1
83:6,21,22 84:4
84:18 85:4 86:6
86:12,17 89:3,4
89:8 93:20 95:1
95:4,7,19 96:4
97:2 98:18,20
99:16,20 100:1
100:16,17 103:1
108:11 109:21
116:11 120:20
120:23 122:18
129:8 144:21
145:10 146:11
153:10 157:12
157:12,19,23

158:6,7,10
159:13 160:11
160:16,19 161:6
168:9 170:17
171:2,12,21
174:19 181:17
186:20 187:3,5
197:20 200:24
202:10 203:19
204:5,24 205:1
223:6,6 228:20
234:22 238:4,14
239:8,22 240:7
240:11,13
**counsel** 1:15
7:20,22 11:24
14:13 15:10
42:20 63:3
64:14 65:6,13,13
130:19,21
145:23,24 189:6
225:10 254:12
256:13
**counselors**
107:12
**count** 157:19
**county** 258:10
259:15
**couple** 82:17
102:23 128:6
156:12 183:8
230:19
**course** 10:13
13:10 30:9
32:16 38:22,24
51:1 68:6 75:8
75:14 95:8
98:19 120:12

**[course - defendant's]** Page 14

126:20 127:12
128:6 153:7
194:18 210:19
219:8 222:7
223:15 254:13
**court** 1:1 13:9,10
19:21 28:6 38:8
41:7 104:20,23
105:1 111:6
121:9 143:4,15
165:20 179:10
258:7
**court's** 7:5 13:15
14:4 237:14
**covered** 148:1
216:11,11,12,12
216:14,15
224:10 226:7,22
227:2,4 229:20
**covering** 116:4
**covers** 69:4
**coworker** 195:8
**create** 128:5
**creates** 76:8
**credibility**
120:20
**cross** 3:2 12:15
33:8,11 172:1
214:14
**crown** 2:2
**crown.law** 2:8,9
**csr** 1:18 256:6
256:21
**culture** 193:21
**cumin** 176:19
177:15
**cummin** 177:5

**curious** 165:5
**curley** 69:12
156:15,16 157:1
157:3
**current** 145:9
158:19 170:17
**currently** 121:18
158:20,20
**custodian**
132:12
**custom** 53:14,15
53:21 54:3 55:6
70:2 114:13
157:14 226:12
226:24
**customs** 53:20
148:6
**cutoff** 91:17,20
**cv** 1:3 57:3

**d**

**d** 3:1 5:1 156:20
192:15
**dance** 139:9
**darkened** 5:12
**data** 223:19
247:20
**date** 57:22
157:21 177:2,4
222:6,7 227:20
231:4 233:1
248:2 257:8
258:3,9,19 259:3
259:13,25
260:20,25
**dated** 176:18
179:3 206:8,17
208:3 209:1,8

221:24 224:11
**dates** 101:14,15
101:16 104:3,6,9
104:10 106:14
106:14,17,20
107:1 159:4
198:3 228:1
**david** 3:19 4:6
220:18
**day** 19:23 24:8
24:12,15 34:7
104:11 168:16
185:13 191:16
203:8 230:3,17
238:15 251:17
256:17 258:16
259:22 260:22
**days** 257:18
**de** 196:18
**deadline** 203:17
**deal** 9:4 79:8
**deals** 44:2
**dealt** 226:5
**dear** 171:21
197:8 207:13
257:10
**debate** 24:8
254:2
**decem** 208:3
**december** 207:1
207:10
**decency** 172:2
**decent** 108:19
**decide** 65:18
69:14
**decided** 113:9
166:19

**decipher** 176:23
**decision** 19:5
62:3 63:24 64:2
98:7 130:18
164:6 166:15
203:15 253:12
**decisions** 64:4
**deduce** 116:6
202:14
**deducible** 98:15
**deed** 258:14
259:20
**deemed** 257:19
**def0002320-2...**
3:14
**def0002391** 3:16
**def0002723-2...**
3:20
**def0002729-2...**
3:22
**def0002733-2...**
3:18
**def0002870** 3:10
**def0002890** 4:4
**def0003373-3...**
4:6
**def0003434-3...**
3:12
**def2849** 3:24
**defamation**
251:15,17
**default** 28:11
**defend** 17:12
**defendant** 1:9
2:20
**defendant's**
170:8,11 176:4
200:4

Exhibit B

| | | | |
|---|---|---|---|
| **defendants** 7:14 | **demographics** | **deposing** 19:4 | **deposition's** |
| **defensive** 58:19 | 246:10 247:21 | 24:3 103:11 | 107:2 |
| 58:20 | **demonstrably** | 230:24 | **depositions** 24:2 |
| **define** 42:24 | 5:22 | **deposition** 1:14 | 28:13,22 29:22 |
| 45:4 54:3 93:2 | **denies** 7:6 | 12:11 13:11 | 35:23 37:9 |
| 121:4 | 252:12 | 14:8 15:12,15,17 | 231:3 253:19 |
| **defined** 36:8 | **denomination** | 16:24 17:9 18:9 | **describe** 110:1 |
| 92:1,3,4 | 192:7 | 18:13,21 19:9,17 | 119:10,11,20,22 |
| **defining** 67:10 | **deny** 98:11 | 19:22 20:7,17 | 119:24 133:20 |
| **definition** 35:6,8 | 101:23 121:24 | 22:3,5 23:15,21 | 134:13,18 145:9 |
| 54:3 61:6 87:5 | 122:4 | 23:22,23,23 | 170:14 196:23 |
| 119:15 121:15 | **department** 2:12 | 27:24 28:3,17,19 | 198:23 |
| 123:9 | 68:13,20 227:7 | 30:8 31:15,19 | **described** 206:7 |
| **definitionally** | 257:22 | 32:8,9,10,10,24 | 228:24 229:5 |
| 138:23 252:5,14 | **departments** | 35:10,24 36:1,18 | 233:16 242:15 |
| 252:16 | 79:13 | 39:24 41:1,4,8 | 245:12 |
| **degrees** 117:19 | **depend** 61:23 | 44:22 64:23 | **describing** 119:7 |
| 118:3 | 116:15 | 67:19 94:11 | 121:13 |
| **deity** 239:19 | **depending** 81:21 | 96:15 103:7,9,14 | **designate** 103:17 |
| **deleting** 206:22 | 186:22 | 104:6 105:3,6 | 103:21 130:18 |
| **delineation** | **depends** 37:3 | 116:18 117:7 | **designated** 18:23 |
| 88:10 | 46:9 61:7 75:23 | 122:2 127:18 | 20:10,13 22:21 |
| **deliver** 147:2 | 76:1 82:13,18,19 | 128:19,21 | 23:10 24:11,22 |
| **della** 190:3,12 | 85:8,10 116:11 | 131:11 134:23 | 25:21 26:19 |
| **delusions** 5:16 | 124:21 167:6 | 135:10 137:7 | 30:12 37:23 |
| **demand** 5:17 | 223:11 | 140:11 141:5 | 39:22,24 40:7 |
| 150:20 151:8 | **depo** 40:5 | 143:6 147:10 | 87:7 96:3,3 98:3 |
| 163:13,16,21 | 104:10 147:6 | 150:18 151:21 | 98:6 100:15 |
| 165:1,4 211:19 | 216:5 233:21 | 153:8 161:21 | 103:16,23 105:9 |
| 227:23 228:24 | **deponent** 3:2 | 211:14 213:14 | 108:6 116:18 |
| 229:5 | 21:18,24 23:2 | 214:14,17,21 | 129:1 130:10,11 |
| **demanded** 7:1 | 96:20,21 | 216:10 217:4 | 130:11,14,17,17 |
| 151:10 164:1,9 | **depos** 232:18 | 218:8,12 231:21 | 130:22 136:8,15 |
| 164:15,15 228:6 | **depose** 24:18 | 233:23 234:2 | 137:9,24 140:23 |
| **demands** 151:6 | 213:18 214:9 | 254:1,9 255:5 | 141:16 143:2 |
| 164:13 | 215:1 | 256:8,10 257:8 | 146:16 150:3 |
| **demise** 6:4 | **deposed** 214:13 | 257:11 258:1,3 | 170:8 199:15 |
| | | 259:1,3 | 248:5 252:19 |

254:19

**designating**
100:13 119:21

**designation**   23:3
73:1 90:12
141:3 183:21
189:2 198:24
215:7

**designations**
50:1

**desires**   108:5

**despite**   10:5

**destroyed**   6:3

**detailed**   168:12

**details**   55:10
57:16 170:3
196:20 219:20
225:22

**determination**
165:19

**determine**
155:18 159:16

**determined**
166:3

**determines**
150:1 153:11
154:6

**determining**
117:7

**devices**   7:4

**dialogue**   155:8

**dictionaries**   34:7

**dictionary**   10:6
33:4,5 35:5,7
36:2

**difference**   63:5
73:12,14,16

**different**   23:18
25:9 53:18
54:21,22 71:8
72:9,18,24 74:19
89:7 94:13,15
104:13 118:23
134:19,21,22
135:3 137:10
139:2 140:17
143:24 203:19
214:23 215:19
215:20,23
230:10 234:3
238:9 241:22
244:8 250:5

**differing**   106:11

**difficult**   149:20

**difficulty**   178:15

**direct**   3:2 6:8

**directed**   9:2
131:1

**directing**   133:1
137:19 248:17

**directive**   42:6

**directly**   183:1

**director**   14:13
15:10 42:20
63:2 157:8,10
163:6 181:13
191:7 195:15

**disagree**   19:1
30:6 36:13 38:4
40:13 50:3,4
63:4 103:4
107:5 140:8
188:21 205:19
245:21

**disagreeing**
138:24

**disagreement**
27:23 41:4
106:5,24 216:4

**disagreements**
23:12

**discourse**   8:2,4
9:13 33:16
84:10 251:7

**discoverable**
157:20

**discovery**   27:2
27:16,17 64:19
66:22 68:7
75:13,15 86:8
132:18 161:22
169:1,3,6,8,22
170:3,4 211:15
214:21 215:15
216:18 231:9
232:12 244:3
245:24

**discrete**   61:13
184:5,13 205:2
238:7 239:2

**discretely**   10:19
10:20 231:17
232:4 238:23

**discriminate**
136:21

**discriminated**
254:7

**discrimination**
217:24 218:2
252:6,13,15,17
253:7,10,23

**discuss**   21:1
160:9

**discussing**
136:17

**discussion**   25:14
30:21 31:5,9,10
34:15,18 84:9
98:19 196:11
216:3 217:3
228:2 233:23

**discussions**
130:21 131:6
217:17 228:16
228:19

**dismiss**   13:4,5
13:20,21

**disprove**   164:18
244:7

**dispute**   7:10 8:1
9:9 11:24 12:1
12:14 17:18,24
18:1 20:4,5,6
27:5,7 29:15
32:1 33:16
36:20 37:17
40:17 46:12
81:16 86:4
88:21 102:18
129:23 136:10
136:12,18,19
149:7 152:15
157:22 162:20
169:15 186:5
220:14 224:17
225:16,20 230:8
249:19,22

**disputes**   11:9

**disregarding**
176:6,10
**disrespectfully**
152:1
**dissipate** 5:15
**distinction** 72:19
73:10 242:4
**district** 1:1,2
50:8 51:8 69:16
69:16 110:15
112:16 121:1
126:5 154:22
172:17 179:18
207:9
**districts** 53:10
53:11 80:8
85:11
**division** 192:11
**divulging** 46:21
48:11
**doc** 225:8
**docket** 13:11
14:5,5 56:12
57:3 78:21
82:17 236:24
237:8,13,14
**dockets** 82:15
237:10
**doctrines** 5:12
**document** 74:12
175:2 179:9,22
183:16 198:17
200:10,12
215:18,21
217:23 220:23
237:2
**documentary**
223:17

**documentation**
173:17
**documents** 13:1
27:1,15 56:3
64:18 67:3 70:5
70:9 79:17 82:7
169:12 170:5,6
174:20 182:23
196:12 215:15
223:18 230:9,12
230:16
**doing** 8:14 20:2
28:7 31:8 89:22
89:24 90:1,2,2,6
90:16,24 91:7,18
94:11 95:8 99:2
117:2 128:24
134:22 137:4
146:14 186:7,9
195:13 203:16
240:13 243:16
**door** 64:12
**dots** 200:18
**drafting** 55:21
**drafts** 30:15
**draw** 92:10
200:18
**driver's** 15:2
**drop** 168:23,23
**due** 187:16
208:24 211:3
**duly** 15:2 256:9
**dump** 198:17
**duties** 63:2
88:19
**dynamic** 120:11

**e**

**e** 2:1,1 3:1,7 4:1
5:1,1 156:17,18
157:5 192:15
**earlier** 18:4 27:3
93:3 94:5,6,7
107:10 109:6
117:4 125:11
134:14 153:5,20
180:11 221:10
235:15 238:2
252:10
**easier** 173:8
**eastern** 207:11
**easy** 111:14
**eat** 5:15
**ecf** 225:9
**edits** 116:13
**educate** 40:24
44:21 93:11
**education** 43:20
**educational**
120:5
**edwards** 177:11
177:13,20 178:6
179:15,22 191:9
192:19,20
195:24
**effect** 48:18 94:1
129:22 161:5
234:12
**efficient** 189:18
**eh** 229:10
**eight** 206:10
**either** 11:12
68:21 165:6
169:18 172:8
244:19 251:11

**elected** 89:5,8
**election** 158:3
**electronic**
223:18
**electronically**
4:24
**eli** 173:20 174:8
175:6,16 184:23
185:22 188:8
**eliminate** 216:1
**eliminating**
119:19
**elizabeth** 3:15
180:19 181:11
224:18
**else's** 117:9
**elusory** 5:19
**email** 3:9,11,15
3:17,19,21,23
4:3,5 52:11,15
55:22 56:13,15
56:18,19 57:5,21
58:2,3,8,10,11
58:17,18 80:5
83:21,22 95:13
100:13,22,24
101:11 102:22
104:4,6,15
106:14 170:14
170:18,23
171:12,18
172:10,20,21,21
172:24 173:4,5
173:14,16
174:10,13 176:1
176:18 177:9,17
177:19 179:2,3,5
179:12 180:7,9

Exhibit B

182:18 184:7
185:8,10,22
187:14,18
189:16 191:5,23
194:18 195:2
196:14,24 197:1
201:18 202:23
203:21 205:8,16
205:17 206:8,14
206:16,19 207:1
207:4,20 208:3
209:1,7 211:9,13
212:7,8,10,17,24
213:11 216:18
217:1 218:5,17
218:23 221:9,24
223:14,14
224:11 225:6,9
225:12,17,22
226:16,19
244:23 257:17
**emailed** 101:21
101:22
**emailer's** 212:18
**emailing** 184:23
196:1,4 197:20
**emails** 56:2
83:22 86:7
101:1 108:10,12
108:17,21
168:15,24
173:15,22
174:14,20 175:1
181:2 189:15
195:3 199:1,3,10
216:20 217:5,11
217:13,14,24
218:10,12 219:9

230:20 231:17
**embrace** 5:14
**emotional**
236:15
**emphasize**
130:10,10
145:14
**emphasized** 63:4
142:11,12
**emphatic** 193:14
**emphatically**
145:8
**employed**
157:24 181:10
256:13
**employee** 60:2
121:18 141:20
142:12 148:8
165:10 213:2,3
214:10 253:13
**employee's**
211:18 213:6
**employees** 64:16
66:21 69:9
75:10 147:3
180:23 222:14
242:15
**employer** 60:4
161:1
**employment**
62:24 63:5,6
254:14
**enclosed** 257:11
**encode** 74:19,19
**encoded** 74:10
**endorsed** 122:9
**endorsement**
113:21 114:4

121:21
**endow** 144:23
**endowed** 147:4
**ends** 185:10
233:4
**engaged** 84:22
85:11
**engagement**
85:10
**english** 240:21
240:22 241:1
**enlighten** 94:8
**ensure** 44:3
**entail** 64:13
236:16
**entered** 259:9
**entertaining**
85:17,23
**entire** 28:3 258:5
259:5
**entirely** 140:16
168:1 239:11
**entities** 250:15
**entitle** 30:7
**entitled** 17:18
32:7,8 36:4,5
102:7 135:4,9
209:24 245:13
**entity** 49:19,19
49:20,21,22
97:18 98:17
149:1,1 234:21
**enumerated**
21:17 26:5
41:22
**era** 241:9,9
**errant** 152:10

**errata** 257:13,18
259:7,10,18
260:1
**error** 112:19
**errors** 208:24
**especially**
175:17
**esq** 257:5
**esquire** 2:3,4,13
2:14
**essaibi** 4:4
209:11 212:10
212:11,18
**essentially** 55:11
59:3 157:17
225:19 226:17
**established** 75:3
**et** 91:11 179:3
**event** 6:23 12:8
107:1 119:6
162:21 182:6
200:13,15,20,23
201:1 237:24
238:7 239:2
240:1
**events** 80:7,7
**everyone's** 234:9
**everything's**
159:9
**exact** 70:6
115:15 125:22
192:10 233:15
238:8 240:5
250:3,11
**exactly** 20:19
48:8,21
**exam** 226:2

**examination**  6:8
  19:8,11 26:5
  33:11 41:19,21
  59:11 122:10
  226:2 245:20
**examine**  45:2
**examined**  15:3
  33:8
**examining**
  169:16
**example**  34:3
  61:8,11,13 64:1
  91:6,9,10 95:20
  111:3 123:17
  161:12 191:5
  236:14 238:1
  239:6 249:11
**excellent**  231:10
**exchange**  35:16
**exchanges**  25:11
**excitable**  9:6
  85:14,18
**excited**  151:1
**excitement**  9:8
**exclamation**
  193:7 194:11,18
**exclude**  13:8
**excluded**  9:3
**exclusionary**
  213:1
**exclusively**
  237:18
**excuse**  191:8
  210:15 225:4
**executed**  259:10
**execution**  258:14
  259:19

**exemption**  175:3
**exhaustion**
  194:16
**exhibit**  3:9,11,13
  3:15,17,19,21,23
  4:3,5,7 8:10
  57:2,5,12 108:21
  170:1 175:20
  176:15 180:7,7
  181:24 183:20
  184:3 189:13
  194:16 195:1
  199:14 200:1
  206:23 207:3
  219:5 221:23
  225:7 231:15
**exhibits**  4:24
  230:4 231:19
  232:3,7,23
**exist**  68:10,12,15
  70:1
**exiting**  28:11
**expanding**
  237:22
**expect**  32:21
  40:10 84:19
  104:19
**experience**  23:18
  23:18 35:23,24
  43:20 64:22
  120:19 178:13
**experiencing**
  34:1
**expiration**
  258:19 259:25
  260:25
**expires**  256:23

**explain**  99:7
  147:9 169:7
  179:4 253:9
**explained**
  100:12 102:21
  130:19
**explanation**  77:6
  253:22
**explicitly**  231:19
  253:13
**exposition**  16:18
  93:18
**expository**  211:5
**expound**  16:8
**expressed**  100:6
  108:13
**extend**  102:16
  250:13 252:24
  254:8
**extended**  164:11
**extending**  100:2
  114:5 157:16
**extends**  110:6
  155:1
**extent**  10:17
  11:6 12:2,18
  46:21 215:17
**extra**  204:17
**eyes**  152:11
  176:21

**f**

**f**  157:10 178:10
**fac**  56:7
**faced**  148:2
**fact**  10:7 30:7
  33:22 61:23
  62:2,21 75:1

102:8 106:15
113:9 136:20
142:16 143:19
170:10 228:19
230:6 251:23
**factors**  70:1
**facts**  26:24 27:9
  27:12
**factual**  93:12,15
  93:18
**failed**  176:21
**fair**  55:14 62:15
  62:20 77:2
  81:11 90:14
  109:16 115:21
  140:15 144:7
  151:3 169:22
  171:16 181:17
  182:2 187:7
  220:7 226:19
  237:17
**fairly**  237:16
**falls**  248:22
**false**  251:11,12
  251:13,15
**familiar**  60:21
  87:14,19 94:3,19
  110:16 117:19
  120:24 135:24
  169:14 178:18
  178:21 182:22
  201:19,20,22
  237:14 240:15
**families**  146:11
  238:4 239:8
**family**  238:17
**famous**  119:9,12
  119:15,17

Exhibit B

**fancy** 117:19 118:4
**fantastic** 245:10
**far** 8:17 21:16 31:14 48:3 50:21 64:12 70:2 74:12 76:9 113:14 172:1 215:22
**fast** 5:21
**faster** 225:11
**father** 178:10,11 179:13
**fealty** 5:18
**fearful** 5:12
**feasible** 177:23 178:4
**february** 180:18 219:7 220:12 224:12 256:24
**federal** 1:16 15:20,21,22 16:1 16:10 46:7 103:10 218:7
**feel** 9:3 18:7 23:22 28:15 33:17,24 34:1,1 34:11,13 36:7 37:13 44:23 61:2,11 80:13 83:23 84:4 93:20 95:4,22 157:17 160:15 160:19 167:3,20 168:12 169:17 220:6 226:6 229:21 232:1 246:14

**feeling** 34:2 97:2
**feelings** 24:5,6 25:17 39:7 95:7
**feels** 33:12,13 34:4 140:16 209:24
**felt** 94:12 167:10 227:21
**fiction** 24:4
**fifteen** 236:12
**figure** 14:5 136:23 137:2 179:23 180:15 183:20 189:1 231:23
**figured** 211:15
**file** 19:21 38:16 38:23 76:5 97:14 103:4 104:24 252:24
**filed** 82:8 104:19 104:22
**files** 76:12,14
**fill** 183:13 188:20 229:23 233:5
**filled** 231:8 233:6,7
**filling** 229:23
**financially** 256:14
**find** 10:6 25:11 33:3 64:23 68:6 72:5 75:13 81:14 138:5 146:19 147:12 185:12 208:16 235:17 236:8

246:6 253:14 257:11
**finding** 33:4
**finds** 26:24 27:10,12 211:18 251:24
**fine** 77:8 117:12 139:14 142:3,6 144:15 151:22 164:23 168:3 216:6,23
**finish** 62:13 98:1
**finished** 199:14 206:5
**firm** 5:23
**first** 14:15 21:16 21:17 39:23 46:8,13,16 47:5 53:16 56:11,21 57:2,13 80:1 118:13,20 119:1 135:24 141:20 147:24 158:6,14 158:23 163:12 165:1 170:22 181:21 198:19 200:16 206:14 206:16 225:7 226:22 251:13
**fisher** 197:9
**fit** 38:17 73:11 139:23 153:16
**five** 92:22 183:9 183:9,11 249:4
**fix** 10:3 12:3 209:2
**flagged** 218:9

**flights** 106:10
**flow** 212:22,22
**fly** 105:18
**flynn** 157:9 158:13,18,20 159:5,16,17 160:3
**flynn's** 159:23
**follow** 44:19 78:12 91:22 134:3 167:3 211:5 248:18
**followed** 205:4
**following** 106:3 137:6,7 249:15
**follows** 8:19,22 15:3 98:16 99:23 147:22 190:9 232:24 254:6
**forced** 242:11,13
**foregoing** 258:13 259:18
**forgive** 190:10
**forgot** 61:3 217:7
**forgotten** 66:24 93:24 175:23 229:12
**form** 9:21,23 10:16 46:11 72:8 73:13,15 74:5 75:3 128:7 155:19,22 171:13 232:2 233:15 234:9,10 234:11,16 243:20,23,23

**formal** 47:17
55:20 251:5,5,6
251:7
**former** 111:22
181:10 195:8
209:13 211:12
212:3 214:10
216:17 223:21
229:7 238:2
244:23 245:11
**forth** 103:13
256:9
**forward** 74:20
105:13 146:7
172:22,22,23
193:2 257:15
**forwarded** 173:5
173:9,10 174:3
219:9 224:17
**forwarding**
174:9
**found** 59:3 62:7
99:22 154:14
184:11 208:14
212:3 223:21
244:24 249:13
252:1
**founder** 7:22
**four** 16:21 126:3
126:4 184:1
219:23 231:18
**fr** 3:12 178:7,18
178:19 179:23
179:24 180:3,8
190:3,12 195:20
**frankly** 8:20
20:21 77:13
210:2

**freaking** 187:15
**free** 29:16 38:16
38:22 44:20,23
251:21 258:14
259:20
**frequently**
120:19
**friar** 178:10,10
178:14
**friends** 110:14
**frightening**
175:24 180:7
**frustrated** 24:17
99:10,12,12
**full** 61:21,24
172:10 209:23
244:1
**fully** 245:17
**fun** 41:2
**functionally**
207:11 234:24
**fundamental**
27:23 90:20
91:2 140:22
**fundamentally**
89:21 107:5
149:19 245:21
**further** 21:1
142:1 169:16
218:17 256:12

**g**

**g** 5:1
**gabriel** 176:19
**gabriela** 3:11
176:20 177:5,7,9
177:19 179:13
179:20 180:17

**game** 62:15
**games** 10:3,3
24:16,16,17
34:10 96:24
139:2 159:10
**gather** 15:22
93:4
**gathered** 6:10
**gathering** 38:19
**gender** 192:7
**genders** 192:6
**general** 87:24
98:22 117:2
136:5 148:16
149:9,9 189:8
219:12 226:6
228:5 235:7
239:17,20
**generally** 17:14
46:9 49:15
60:19 65:23
69:14 70:11
75:18 110:3,4
115:16 116:23
117:1 185:18
220:21 223:12
226:3 236:18
238:1 239:18,23
240:1
**geographic** 92:2
92:3
**george** 4:4
209:11 212:10
212:11
**george's** 212:18
**gestured** 132:6
**gesturing** 226:3

**getting** 9:10
51:17 77:1
85:18 99:9
139:7 150:7
163:9 166:8
204:16 220:22
227:2
**gist** 59:14 69:21
**give** 7:5 18:3
28:23 47:7
52:12,12,18 53:7
56:8 59:12
67:20 70:8
101:5,8 105:7,11
108:9 109:22
112:3 115:2,8
126:24 139:10
140:5 150:23
152:24 156:8
159:10 162:23
178:4 179:1,7
183:7 186:22
187:3 198:6
204:13,13 210:1
210:8 212:4
213:5 222:15
226:18 232:10
234:21 235:2
238:1 240:5
241:7 246:23
249:13 250:11
250:16 251:1
**given** 19:8 99:13
109:24 110:2
117:9 125:21
129:3 136:4
137:24 155:3
217:17 218:3,4

227:15 230:18
256:10
**gives** 160:12
**giving** 110:5,8
139:11 154:12
163:20 166:2
184:24 185:23
186:4 191:9,15
198:5 213:4
221:3 238:3,16
239:21
**gmail** 181:2
**go** 12:19 21:3
30:18 34:21
36:1 55:7,15
57:10 68:10,16
70:2 80:6,7
90:24 97:11
103:4 111:2
124:11 136:19
139:19 141:4,21
143:8 146:18,19
147:12 167:8,15
168:6 191:24
194:20 202:1
219:4 225:7,13
226:4 231:24
235:17,21 236:7
**god** 144:22
145:15,17 147:2
172:4,8
**god's** 145:11
239:22 240:13
**goes** 36:8 45:22
82:6 83:1
141:18 164:2
227:7

**going** 9:19,20
11:4 14:4 19:16
23:13 25:16
28:15 29:7
30:20 31:23
32:6,12,17 34:7
35:15 40:13
41:6,9,10 42:14
45:3 47:8 50:5
52:4 54:21
58:23 59:9
66:14 70:7 72:7
74:20 80:17
87:2 99:24
102:7 106:17
108:18 109:1
131:19 135:16
136:23 138:2
139:22 143:21
143:22 154:7
166:8 167:2
168:11,14
173:12 175:21
175:24 176:3,13
179:10,11 180:1
186:4,5,7,8
189:14,17,18
190:10 191:13
196:11 197:10
201:24 202:22
209:4 213:22
224:11 231:21
231:24 232:2
233:15,21
235:20 236:22
237:16 238:23
245:11 246:5
248:16 252:21

**gonna** 13:19
14:16 17:13
20:2 24:8,12
67:23 78:12
150:6 168:10,11
168:12 176:17
184:1 189:5
193:9 194:17
208:5,15 211:4
213:24 234:14
235:17,21
243:13
**good** 5:7 8:18
10:5 75:19
109:12 144:16
144:17 156:20
167:21 168:19
179:13 184:13
196:15,17
208:17 213:4
214:19 216:15
227:3 246:10
255:2
**google** 203:2
**goosey** 243:17
**gotta** 209:5
**gotten** 37:6
**govern** 19:22
**governing** 252:1
**government**
13:6,7,22,23
19:5 43:21 44:1
44:8,8,11 46:11
60:13 67:13
72:8,18 73:4,13
74:5,7 75:4 79:2
79:17 81:11
85:12,14 122:8

133:22 145:17
146:10,14
251:14
**government's**
247:2
**governmental**
49:20 121:21
145:12 242:15
**governments**
73:15
**granting** 13:5,21
**grants** 78:23
**great** 6:6 15:6
101:8 107:8
109:6,13 147:14
177:13 197:12
199:11 209:21
231:12 234:17
236:11 254:20
**greater** 131:10
**greaves** 2:24
7:22 91:6
**ground** 23:8
26:3 37:20 42:9
42:11 59:5
122:13
**grounds** 216:13
244:2
**group** 209:24
**groups** 90:16
228:6
**guess** 61:23 71:5
71:19 89:15
120:2
**guest** 162:17
239:16
**guidance** 28:5
182:12 234:22

**gun** 218:1,5
**guy** 33:21
  111:20,21 112:9
  202:12 224:13
**guys** 7:13 8:8,10
  8:11 9:17 11:18
  20:4,23 21:1,11
  29:21 32:13
  36:6 38:14
  56:10 90:5
  104:18 130:4
  135:5,12 146:20
  147:6 156:9
  165:22 170:5
  209:5

**h**

**h** 3:7 4:1
**hail** 6:5,6
**hair** 111:20
**halbert** 181:14
**half** 168:6
**hall** 2:15
**hall's** 80:3
**hand** 52:4 59:9
  91:24 256:16
**handle** 44:1 46:8
**handles** 84:2
**hands** 222:14
**handwrite** 66:12
**handwriting**
  232:1
**handwritten**
  128:8,10,15
  131:13 132:11
**handy** 162:15
**happen** 62:21
  65:23 75:21

81:20 109:14
  111:2 183:6
  203:4,6 229:22
  229:24 239:1,1,4
**happened** 11:23
  31:8 74:23
  146:13,13 191:2
  222:13 235:8
  239:13
**happening** 30:19
  106:5 110:18
  197:24 228:20
**happens** 77:7
  83:1 84:1 92:1
  183:4,7
**happy** 12:11
  24:10 104:9
  151:6 161:24
  215:12,13,14
**harass** 8:23
**harassing** 20:3,8
**hard** 70:12
**hate** 172:3
  186:15
**head** 50:11,12
  111:21 202:12
  245:12 249:23
**heads** 243:21
**hear** 27:21 37:9
  37:10 48:15
  95:19 118:13,16
  122:20 123:16
  144:4
**heard** 6:24 18:4
  83:13 114:1,14
  114:16,20
  118:10,10,20
  119:1 123:4

142:14 144:20
  144:24 145:2,8
  145:13 161:9
  236:1
**hearing** 79:1
  119:3 148:3
  179:17,19 239:3
**hearings** 83:18
  129:19 139:12
**heavy** 222:9
**heed** 228:24
  229:5
**held** 68:17
  106:24
**help** 28:22 79:12
  79:17,17 129:19
  178:7 200:18,18
  223:20
**helped** 56:16
**helpful** 25:11
  28:21 29:11
  34:20 35:16
  39:7 92:24
  99:14 106:12
  143:9 254:1
**helpfully** 203:2
**helping** 79:19
**hem** 111:21
**herald** 219:9,11
  219:16 220:12
  224:12,16
**hereinbefore**
  256:9
**hereunto** 256:16
**hey** 45:24 74:19
**hi** 173:13 177:19
  202:3 219:10

**hide** 57:14
**higher** 120:2,2,5
**highlight** 147:12
  210:9 212:4
  222:16
**hindi** 208:5
**hindu** 207:16
  208:5,5,5,5
  228:7
**historical** 72:1
**history** 75:6
  182:4 200:13
  240:16
**hmm** 23:19
  50:23 65:16
  67:14 70:14
  71:23 77:12,21
  78:22 79:22
  82:3 83:16 90:8
  124:20 125:17
  134:4,19 143:13
  159:12,21,21,21
  163:12 173:1
  175:5 185:17,19
  191:11,18
  195:23 206:14
  215:24 236:23
  244:15 250:22
**hold** 11:16
  101:15 106:14
  117:13 227:6,6
**holding** 5:21
**holds** 106:17
**home** 44:3 78:24
**homeless** 210:7
**homelessness**
  237:4

**[honestly - information]**                                    Page 24

**honestly**   130:23
  171:3 240:6
**honor**   200:15
**honorary**   190:14
**honored**   113:22
  115:13 177:20
  179:18
**honoree**   200:7,8
  200:9,13,19
**hope**   12:4
**hour**   168:6
**hours**   80:9
**hovers**   142:23
**how's**   141:24
**huddle**   209:5
**huh**   27:11 35:12
  186:23 197:17
  203:15 224:8
**human**   141:19
  150:16
**humbled**   113:22
  115:12
**hunger**   237:4
**hypothetically**
  236:7
**hypotheticals**
  62:16

**i**

**i.e.**   57:4
**idea**   126:10
  160:11 172:1
  181:3 197:5
**ideals**   92:4
**ideas**   238:7
**identified**   15:1
  22:22 26:4 29:1
  40:15 41:18

96:20 101:11,14
102:23 122:3
215:5 247:23
248:14
**identifies**   244:17
**identify**   14:10
  15:8 35:10
  40:21 91:22,24
  111:8 231:16
  232:24 248:1
**identifying**
  229:10
**identities**   127:5
**identity**   21:18,18
  21:20,21,24 23:1
  24:13,24 25:7,9
  32:14,18 33:3,22
  35:1,4,7 36:4,7
  36:14,21 216:11
**imagine**   85:13
  85:15 118:2
  176:23 203:19
  233:18
**immediately**
  172:4
**impact**   47:5
**impasse**   41:6,14
  41:17,17 99:23
  99:23 102:9,10
  102:12 138:5,13
  138:16 139:20
  168:10 169:18
  188:22 196:23
  197:2 214:20
  220:6 251:23
  254:5,6
**impassionate**
  145:9

**impassioned**
  147:2
**implication**
  222:19
**implications**
  59:21
**implicit**   93:4
**implore**   234:21
**importance**
  144:16 216:8
  219:20 221:5
**important**   6:14
  13:1 27:10 90:5
  200:4 208:15
  210:11
**importantly**
  13:5,7,21 56:6
  68:16 131:10
  231:7
**impressed**
  117:21 118:3
**impression**
  242:2
**improper**   247:7
**impulse**   5:14
**inaccurate**   185:6
**inauguration**
  70:11
**include**   33:24
  185:22
**included**   117:7
  152:19 153:24
  257:13
**includes**   25:7,8
  27:4 33:23 45:8
**including**   115:11
  147:24

**inclusive**   244:17
**inconsistent**
  19:12 35:24
  194:10
**incorporated**
  259:12
**incredible**   210:5
**incur**   172:7
**indicate**   199:7
**indicated**   70:3
**indicating**
  257:13
**individual**   53:10
  55:1 95:12
  110:7,8 120:24
  141:12 160:11
  161:6 185:23
  186:12 196:2
  204:3,14 213:20
  250:24
**individual's**
  119:18
**individually**
  242:7
**individuals**   5:17
  67:20 100:13
  102:24 103:24
  125:19 160:16
  228:5 230:21,24
  238:9
**infer**   160:21
**inference**   160:24
**infor**   204:13
**inform**   193:6
  205:7,9 207:16
**information**
  31:14 50:15
  88:17,18 100:3,4

101:5,6,9 102:7
102:9 105:11,19
105:21 162:2
169:12 193:23
204:17 205:18
228:5 229:10
230:11 239:12
**informational**
231:5,6,7
**informed** 163:6
202:5 205:5
252:23
**informs** 139:15
**initially** 82:8
**inject** 61:18
**inner** 22:2,18
**input** 86:4 168:9
**inquire** 146:20
213:2 217:12,15
218:13
**inquiring** 9:14
10:12 117:6
**inquiry** 155:22
203:1
**inside** 74:17 91:4
223:8
**insight** 179:1
**insist** 223:22
**instance** 184:4,5
184:5 235:17
237:1 240:8
**instances** 59:24
108:14 147:12
229:19,20 230:2
234:19 236:8,12
239:15 250:23
**institutions**
118:5,11,14,17

119:1,7,12,21,24
120:5 134:3
**instruct** 25:16
29:12 45:6
**instructing** 23:7
23:9 102:14
137:23 243:17
243:19 248:9
**instruction** 42:4
42:5
**insulting** 210:2
**integrity** 120:21
121:19
**intend** 20:9
**intended** 21:20
23:1,4 136:17
217:11 218:13
**intending** 217:14
**intent** 22:21
86:17 100:15
215:18,22 216:1
223:5 245:15
**intention** 24:18
**intentionally**
22:8 253:14
**intentions** 23:13
**interact** 80:2,10
84:16
**interaction**
81:10
**interchangeably**
54:2 242:9
251:8
**interest** 73:12
75:14 114:11
119:18 224:7
**interested** 148:2
256:14

**interfacing** 84:8
**interject** 44:6
76:6 78:11
148:18
**internal** 21:19
74:17,18 197:22
199:8,9,10
230:10,13,20
**internet** 249:13
**interpret** 134:7
134:8
**interpretation**
46:16
**interpreted**
161:9 216:4
**interrogatories**
232:18
**interrogatory**
231:1,14,15,19
232:3 234:13
**interrupt** 14:15
29:5
**intervening** 12:3
**intervention**
41:7
**interview** 219:18
**intimidate** 8:23
**intra** 227:19,22
**intro** 124:4
**introduce** 7:14
113:1 115:12
**introduced**
113:22 170:1
176:15 181:24
184:3 189:13
195:1 200:1
206:23 207:3
219:5

**introduces** 110:7
**introduction**
110:11 111:3
113:20 115:14
124:10 160:8
**introductory**
116:9 122:19
123:18
**investigate**
153:9 154:14
216:17
**investigated**
153:6
**investigation**
64:10,11 75:8
117:5 125:4
141:7 153:23,24
154:3 216:14
223:15
**invita** 224:10
**invitation** 7:3,4
7:5,8 17:19,19
52:12,24 54:9,11
59:2 100:2
110:7 120:23
152:23,24 155:1
160:9,17 163:13
164:14 165:21
177:20 180:5,8
208:4,6 211:19
223:22 225:19
228:11,14
250:20 254:8
**invitations** 52:23
65:10,11 66:17
66:17 80:12
102:17 197:23
250:14

Exhibit B

**invite** 22:9 24:20
39:14 51:17
53:6 54:23 55:1
62:3,4,5 86:10
109:21 113:9
114:5 120:21
148:13 153:11
154:7 155:18
161:14,15,16
163:22 164:1,9
164:11,15 180:4
184:6 188:3,4
210:12 220:22
226:18 245:13
252:24 253:14
**invited** 20:22
113:8 115:23
125:21 126:16
126:20 149:10
153:3 162:20
166:17 179:23
179:24 183:14
188:5 207:19
210:1,4,4
**invites** 157:16
160:21 203:18
**inviting** 6:22
115:17,22
120:20 146:10
161:11,11
186:14 195:24
**invocation** 5:10
6:24 18:3,4,7
52:12,13,19,23
53:5,7 70:7,8,10
70:13 109:18,22
109:24 110:8
111:3 126:15

127:10 129:3
147:23,23 148:3
149:5,10 150:2,5
151:2 152:20
153:1 154:7
155:18 160:12
162:17,23 166:2
171:4 177:6,21
178:5 179:16
183:3 184:24
185:23 190:3
191:10,15 199:1
199:5,6,10 202:4
202:13,16
203:16 205:4,22
207:12,14 208:6
227:22 230:18
233:2,4,6 234:20
235:1,10,11,12
236:2,13 237:2
237:23 238:16
239:22 240:14
246:8 251:1
**invocations** 66:2
67:20 70:15
109:7,20 110:1
124:22 182:24
183:12 203:14
237:3,5 238:11
250:2
**involve** 113:20
**involved** 53:19
164:5,7
**irrelevant**
142:20 170:4
**irrespective**
251:22

**ish** 141:22 166:9
**issue** 10:20 12:5
13:6 41:7,10
46:9 47:3,15
49:4,18 62:22
66:16,17 80:12
85:8 102:4
105:13 151:6
210:18 215:2
220:21 222:24
231:1 243:13
**issued** 55:9
104:18 141:11
203:1
**issues** 12:12,18
24:9 46:10
106:10 165:1
171:6 211:3
236:21
**issuing** 91:10
**it'd** 178:4
**it'll** 183:24
**item** 170:7 245:6
248:19
**itemize** 231:22
**items** 24:11
31:11 32:11
102:15 203:9,12
236:17,19,24
237:6

## j

**jacobson** 219:8,8
**james** 188:5
**janey** 3:23
181:10 184:21
187:23 188:9
207:4,6,13

**janey's** 185:24
187:22
**january** 229:6
**jargon** 60:8 67:5
72:1 169:6
190:11
**jean** 180:18
**job** 45:8 95:8
115:4 128:12,18
145:15,17 163:5
174:12 200:21
235:16
**jobs** 230:22
**join** 137:1
**joining** 196:18
**joint** 8:5
**jordan** 195:5
204:24
**judas** 196:18
**judge** 12:19
38:20
**judged** 5:17
**judgment** 28:11
**julia** 196:21
197:16
**julie** 204:9
**july** 31:5
**june** 116:18
189:19 193:1
195:3 197:7,18
201:17 202:3,20
203:1,2 206:8

## k

**k** 157:5
**keep** 9:5 66:13
162:10 186:6
228:18 246:11

Exhibit B

248:16 251:4
**keeping** 67:3
227:5
**kelly** 1:17 256:5
**kenzi** 197:12
**kerry** 195:5,8
196:1,4 204:23
**kezhaya** 2:3,4
3:4 5:5 6:6,9,18
6:20 7:11,19
8:13,16 9:22
10:2,23 11:3,16
12:7,16,23 13:14
13:18 14:3,20
15:5 16:4,7,11
18:10,14,17 19:1
19:18 20:1,11,15
20:20 21:5,11,15
22:1,6,11,14,17
22:24 23:17,20
24:1,14,23 25:2
25:6,12,18,23
26:1,8,10,20,22
27:11,14,18 28:1
28:4,7,9,18 29:2
29:4,14,20 30:2
30:5,10,14,17
31:1,4,7,20,24
32:3,6,20 33:2
33:10,13 34:9,13
34:17,24 35:12
35:18 36:15,19
36:24 37:5,13,20
38:1,9,12,18,24
39:4,9,12,16,20
40:9,12,20 41:9
41:13,24 42:5,8
42:12,17 43:9,14

45:1 46:24 47:7
48:14,17 56:5,10
56:21,24 57:7,14
62:12,19 66:11
80:18,21,24 81:5
81:6 85:22 86:2
86:15,18,20 93:1
93:14,17 96:1,7
96:13,16,23 97:5
97:9,16,20,24
98:4,10,14,24
99:4,8,18,22
100:7,11,18,21
100:24 101:4,8
101:12,18,22
102:2,13,20
103:2,8,17,20
104:1,5,12,16,22
105:2,5,10,14,17
105:23 106:3,8
106:19,23 107:7
107:9 108:18
109:5,10,13
111:5,13,18
112:24 113:4,19
116:3 117:13,17
120:7,9,16,18
122:7,12,15,17
123:1,3 124:12
124:14 125:8,10
127:23 128:4
132:22,24
135:19 136:9,13
136:16 137:12
137:18 138:4,8
138:12,20 139:7
139:14 140:8,10
140:18 141:2,14

141:17 142:6,9
142:21 143:1,10
143:13,17,18,23
144:5,11,14,19
145:4,6 146:7,9
146:18 147:1,11
147:20 148:18
148:22 149:3,12
149:16,23 150:3
150:10,13,15
151:8,15,22
152:2,9,13,14
153:15,18 162:1
162:4,7,13,14
165:14 166:22
166:24 167:8,15
167:18 168:1,8
168:19,21,22
175:19 176:13
180:3 181:19
183:17 187:2
188:24 189:8,11
194:15 196:13
196:22 198:10
199:12,18 200:2
201:5,11,23
202:19 206:3,21
206:24 207:23
208:2,13,23
210:16,19 211:2
212:12,15,19
213:12,17 214:7
214:8,19 215:6
215:13,24 216:6
216:9,24 217:7
217:18 218:14
218:18 219:21
220:10 221:13

224:6 225:10
230:23 231:12
232:6,9,13,16,19
232:22 233:12
233:19 234:1,7
234:11,16,18
243:2,9,12,15,23
244:11 245:4,10
245:19,23 246:4
246:24 248:6,11
248:15,23 249:2
249:3 251:2
252:10,21 253:8
254:4,11,16,20
254:24
**kim** 3:23 207:4,5
**kind** 10:17 33:21
38:14,19 54:22
72:1 74:11,18
79:18 83:3
113:21 115:12
115:13 117:5
124:16 155:8
177:16 182:2,17
190:14 193:13
193:14 200:10
205:18 220:5
251:7
**kinda** 10:8 53:20
226:7 244:12
**kindly** 179:19
**kinds** 122:19
129:12 246:9
**king** 2:24 5:7,8
56:8 141:24
142:5 144:13
201:10 208:1,11
208:17

**[knew - legal]** Page 28

**knew** 200:20,23
200:24 230:18
**know** 6:13 10:4
10:4 11:7,10,10
11:20 13:19
14:3 16:22,23
19:9 23:3 32:23
33:13 34:4,4
37:6,11 40:4
43:19 44:14,16
47:1 50:1 51:23
57:7,20 60:6,13
61:3 62:17 64:6
64:23 65:6 67:1
71:7,8 73:18
77:13 78:16
79:12,16,17 81:9
82:16 84:18
85:3,4,4,11 88:4
88:8,9 90:4,4
91:2 93:11
95:11,21 97:8
99:20,24 101:1
102:5,7,8 104:7
107:24 108:18
110:13,14,16
114:3,5 115:13
115:15 117:24
118:2,9,19 119:6
119:11,22 120:1
121:12,15 124:3
124:4 125:22,23
127:10 130:23
132:1 133:8,11
133:16 135:4,15
138:16 141:8,21
143:6,6 149:9
150:19 157:13

157:23 160:8,22
162:3 163:4
164:14 170:24
173:9 174:11,21
175:12 178:6,13
178:14 179:19
180:13 181:6,6
181:12,21
182:15,20,22
183:14 185:12
186:5,8,10
188:13,19
190:16,20 191:9
191:14,19
192:10,12 193:9
193:9 196:5
199:7 200:16
204:10,18,22
205:10,10,12
211:13 213:21
217:16 219:17
220:17 223:14
223:18 228:20
229:22 231:23
232:5 233:9,17
235:19 237:17
237:24 238:8
239:20 240:1,18
240:21 241:2,4
241:10 243:6,16
**knowing** 119:23
**knowledge** 5:15
52:1,2 60:21
141:7 144:23
145:11 147:4
148:9 180:1
228:11 236:1

**knowledgeable**
103:23
**known** 9:12 86:5
88:5,18 103:9
107:11 119:17
225:8 230:18,19
**knows** 11:11
69:15 89:20
135:19 139:12
165:15
**kristen** 1:17
181:14 256:5

**l**

**l** 1:17 156:17
157:10 180:4
192:15 256:5
**labor** 242:11,13
**lack** 147:5
**language** 16:19
94:14 114:16
153:18 175:6
178:16
**languages** 94:13
94:15
**large** 126:3
209:13
**late** 203:17
**latin** 112:6
**law** 2:2,12 7:20
11:11,14 19:12
43:3,5,17 44:11
45:13,22,23 46:6
46:7,7,8 48:6,20
52:17 59:3
67:12 82:5
136:7 251:6,15
251:17 253:7

**lawsuit** 39:8
165:3,7
**lawyer** 10:5 43:1
43:15 62:17
135:19
**lawyers** 10:10
16:18 50:1
131:6
**layer** 91:4,14,17
91:19 99:1
**laypeople** 250:9
**leader** 122:21,21
207:17 228:7
**leaders** 210:3,9
212:5 222:16,21
253:15
**leave** 28:15,16
38:14 143:4,22
168:14 173:14
174:14 178:3,5
**leaving** 10:8
**led** 96:10
**leeway** 99:13
136:5 138:1
139:12 246:23
**left** 161:22 231:6
**legal** 8:19 24:4
38:6 43:20,22,22
43:23 44:13,15
45:3,13,14,17
46:3 47:12,15,17
47:18 52:6
55:20 59:12,13
59:14,17,21 63:5
67:5 71:1 87:24
88:20 90:12
91:10,10,11
97:18 98:17

**[legal - looks]** Page 29

138:22 148:1
151:8 164:3
165:4 169:6
179:7 226:23
251:5,6 253:3,11
253:19 257:1
260:1
**legalese** 16:20
**legalities** 138:17
**legally** 164:15
211:19 226:24
**legislation** 51:13
76:3,5,9,12,13
76:15 77:6 98:8
171:5
**legislative** 6:23
17:21 51:11
76:4 77:24 78:5
78:15,19,23
84:15 95:20
129:15,21
**length** 67:3
82:12
**lengths** 81:21
**leonard** 190:4
**letter** 55:21
95:14 257:19
**letters** 231:22
**letting** 191:9,14
191:19
**levels** 97:11
**liability** 60:9,15
165:20 251:18
**license** 15:2
**lie** 14:16
**light** 222:13
223:16

**lighting** 5:10
**lights** 5:9 11:1
**liked** 188:9
**likewise** 90:1
91:9
**limit** 19:10 150:4
150:19 152:23
**limitation**
147:24
**limited** 27:19
38:2 149:2
**limiting** 137:8
148:12 151:12
152:18,21
**limits** 60:14
**line** 29:11 57:16
159:11 170:19
219:23,24
257:13 259:7
260:3
**lines** 51:16
152:16
**link** 193:2
196:20 197:4,11
198:7 204:13,22
230:14
**links** 199:1,3,5,6
199:11
**lion** 196:18
**list** 125:18 127:3
162:15 167:16
170:14
**listed** 20:17
259:7,17
**listing** 259:7
**literal** 239:19
**literally** 26:4
27:6 61:19 71:1

80:1 85:7
107:15 112:6,23
115:23 123:10
127:4 129:10
133:5,6 136:9
137:4 138:22
139:18 140:10
144:23 171:13
173:9 179:6,9
223:17 234:20
237:13 240:2,16
242:18 253:11
**litigation** 38:22
43:5,7 169:12,13
219:8
**litigator** 16:14
135:21 169:13
**little** 11:1 16:17
56:17 72:8
84:13 86:19
89:7 91:1 110:6
142:1,3 189:18
219:1,2 220:10
226:15 243:16
**live** 8:1
**loan** 78:23
**local** 46:10,10
67:13 73:4,15
79:2,16
**lock** 203:15
**locked** 187:9
**log** 193:4
**logging** 195:20
**logic** 251:5,7
**long** 19:23 24:8
24:12,15 34:6
67:19,21 68:1,3
75:22 186:7

192:17 235:19
**longer** 49:11
162:24 163:1
181:10 201:4
**longest** 160:3
**look** 13:19 49:3
52:20 56:22
68:23 70:9 71:9
73:16 110:11
133:21,24 147:5
168:11,15 174:6
188:9 198:18
201:22 206:10
209:5 215:12
218:5,19 223:18
226:4
**looked** 8:11
64:18 66:21
67:6 72:2 75:12
163:17,23 166:3
169:2 216:19,20
221:24
**looking** 12:17
19:6 31:14
56:12 57:2 71:7
75:14 86:7
93:12 116:6,7
125:13 152:10
163:19 174:2
175:10 176:8,16
179:8,9 182:12
184:18 188:19
189:16 198:19
199:14 200:10
201:8,12 204:9
212:21 219:22
**looks** 171:2
173:4 175:6,11

**[looks - mean]**

182:11 184:10
184:11,22 185:4
188:7 198:5
201:20 204:1
205:21 206:16
211:20,23
**loosey** 243:17
**lord** 241:21,22
**lord's** 241:19
242:16,17 244:7
244:8
**lose** 94:17 97:12
132:17 253:16
**losing** 44:7
**lost** 94:20 97:12
**lot** 32:24 34:12
34:13 44:6
46:15 53:16
66:11 80:6,7
84:1,13 101:1,3
114:24 139:12
146:20 158:1
167:2,10 168:13
189:15 194:11
229:16 230:9
**lots** 8:19
**loud** 184:8
**louis** 180:18
**love** 149:21
**lowering** 5:9
**lucien** 2:24 7:22
91:6
**luciferian** 5:14
**lunch** 167:21
**lund** 52:16
**lydia** 177:11
179:15,22

**m**

**ma** 1:8,18 257:6
258:3 259:3
**mad** 194:13
**madam** 176:21
177:17,17
180:11 189:20
195:4 198:23
201:15 206:18
209:9 216:16,16
220:16 221:1,17
222:2 224:13
226:3 227:24
229:2 234:23
257:10
**main** 82:23
**maintain** 67:21
248:3
**maintaining**
38:7
**maintains** 220:2
**majority** 250:4
**makayla** 3:16,20
180:19 181:9
184:20,23 185:1
185:10,11,14,20
185:22 187:20
187:22 188:7
**makers** 63:24
64:2
**making** 26:8
41:24 58:13
98:7 214:15
245:4
**malionek** 177:7
**management**
192:11

**manager** 195:9
**margin** 241:12
**marie** 4:5
**mark** 3:9 170:13
171:20 172:9
173:8 181:12
193:7 194:19
**marked** 170:22
**marks** 194:12
**martin** 170:17
171:24
**mass** 177:24
178:4,6
**massachusetts**
1:2,19,21 2:16
15:2 46:7 60:14
74:10 256:2,7
**material** 88:19
161:2 242:3
**materially** 234:3
**materials** 68:7
**math** 115:7
**matt** 2:8 6:20
7:11 8:15 24:8
24:22 26:17
28:21 35:16
39:6 44:18
111:22 135:16
136:1 143:3
149:15 212:9
**matter** 7:23 9:1
9:6 17:3 23:6
25:20 37:2
40:17 47:10,13
47:16 48:13
52:7,9,10 57:4
59:9 62:7 64:22
78:19 82:5

95:20,22 98:22
102:18 112:23
119:20 136:10
136:12,18
141:10 149:7
150:17 154:3
165:6,10 167:2
172:7,7 211:10
212:1,3 214:10
215:9 226:6
235:3 253:1
**matters** 19:8,10
26:5 41:18,21
59:10,12,14
77:22 78:1,4,16
78:23,24 82:2,24
84:8 103:13
105:5 130:13,16
133:2 135:2
141:3,5 226:1,2
245:19
**matthew** 2:3
**maurice** 190:4
**mayor** 76:4,8,12
76:12,13,14
77:23 82:6 83:1
112:1,2 113:5
116:20 163:10
170:17 171:24
209:17,19
211:11 212:2
213:20 216:17
221:20 223:20
244:23 245:11
**mayor's** 77:5
**mayoral** 209:18
**mean** 12:9 16:21
16:23,23 29:4

**[mean - minds]** Page 31

42:11 43:16
44:16 53:17
64:3 66:15
67:11 78:17
84:14,21,22 85:3
86:18 90:16
92:21,22 93:1,7
98:13 107:14
114:2,4 115:15
118:2,18 121:11
131:3 132:3,7
134:1 161:9,23
168:3 182:10
185:9 190:6
191:15 194:9
200:9 205:13,15
205:17 216:2
234:8,10 238:19
238:21 241:8
**meaning** 21:20
23:1,4 24:12
32:9,19 35:1,2
35:19 36:14,21
93:4 111:6
121:2,4 184:14
204:24
**meaningfully**
241:22 244:8
**meanings** 34:8
**means** 16:20
35:1,6,19 41:17
44:17,19,23
46:16 56:6 67:1
111:24 121:9
125:12 138:12
156:3 159:11
169:7,22 171:9
171:11 182:21

193:10 202:15
205:14 215:20
**meant** 30:24
65:13 125:3
205:11
**mechanism**
54:23,24
**meet** 80:5,8
156:9
**meeting** 3:13
6:12 28:12
30:24 39:14
52:18 53:6
70:13 84:20
109:23 111:7,24
116:22 117:6
125:1 135:2
156:5,6 177:7
180:24 182:2
183:4 184:22
186:8 187:11,12
188:10,18
191:17 193:9,11
193:23 196:7
198:3,8 204:3,4
204:11 205:1
206:9 207:15,16
210:2,13 230:3
233:2,9 255:1
**meeting's** 185:2
**meetings** 6:23
31:12 50:14
51:2,3 65:21
70:16 72:12
75:18,20,22
76:16,19,22 77:7
77:17,18,22,24
78:2,3 81:19,23

81:24 82:7,24
83:3,7 109:7,14
109:14,15,17
114:21 144:6
160:7 170:20
171:23 183:10
185:21 187:7
188:1,2 191:4
196:3 203:4
204:8 250:2
**meets** 50:13
**meghan** 219:10
219:17
**member** 43:24
84:21 121:20
174:22 192:20
200:14 252:1
**members** 65:2,4
73:8 79:24 81:8
84:3 86:9 91:23
92:1,9 107:11,13
107:15 108:4,12
126:3,3,4 171:1
**membership**
244:21
**memo** 55:20
**memoranda**
91:10
**memorandums**
46:3
**memory** 131:22
132:1 195:12
228:7
**mention** 73:11
122:19 206:4
**mentioned** 11:4
71:24 86:3
94:24 107:10

109:6 127:16
156:10
**mentions** 125:11
**message** 95:12
173:9 219:10
**messages** 95:16
95:17
**met** 64:14 91:7
130:19 133:6
156:1
**mic** 109:11
**michael** 3:17,22
189:19 190:3,5
190:12 191:7,19
192:16,18 195:4
195:21 196:4
201:18 202:4
203:21 204:1
**michelle** 167:5
181:15 213:23
214:1 225:18
226:17 229:7,7
**microsoft** 33:19
33:20,21,21
**mid** 251:21
**midway** 220:1
**midwest** 257:17
260:1
**mike** 191:14
**mincing** 10:4
**mind** 9:14 10:13
21:19 22:3,18
57:8 61:19 63:6
108:15 139:9
146:22 154:5
213:10 226:8
**minds** 5:12
28:12 30:24

**[minds - need]**

31:12 86:12
99:24 137:1
**mine** 19:13
71:21 132:9
221:6
**minimal** 179:7
**minimally**
155:11 157:21
229:6
**minister** 5:9
**minneapolis** 2:6
105:18
**minnesota** 2:6
**minute** 92:22
133:16 182:24
183:3 184:6,10
184:12,13,15,17
184:19 185:7
191:5,16,22
196:24
**minutes** 64:17
70:6,12 72:4,7
110:4 125:16
127:1 131:19
144:14,15
**misactions** 60:11
**miscellaneous**
198:22 199:10
**misheard** 65:3
**missed** 202:2
216:7
**missing** 227:16
**misspoke** 148:21
**mistaken** 164:8
206:6
**mistranslation**
136:16

**misunderstand...**
58:22 138:21
144:2 247:4
**misunderstood**
248:12
**misuse** 21:21
**misusing** 33:3
107:24
**mm** 23:19 50:23
65:16 67:14
70:14 71:23
77:12,21 78:22
79:22 82:3
83:16 90:8
124:20 125:17
134:4,19 143:13
159:12,21,21,21
163:12 173:1
175:5 185:17,19
191:11,18
195:23 215:24
236:23 244:15
250:22
**mmm** 104:12
203:15 236:20
**mobius** 2:24
91:7
**molly** 219:8
**moment** 56:9
134:15,17
**monday** 177:4
185:1,11 187:10
187:12,15
203:12,13
**money** 163:20
166:19 221:3
222:13 249:24

**month** 103:6
104:15 182:4
200:13 230:19
**months** 116:19
161:22
**morales** 180:19
181:7
**morning** 179:13
196:17
**motion** 13:4,5,20
13:21 19:21
38:11 97:15
103:5 254:3
**motivations**
102:16
**move** 41:10
104:18 105:13
107:7 175:19
180:10 183:16
183:21 188:22
189:2 199:15
208:8 245:24
**movement** 74:18
**moving** 28:10
38:12,13 74:20
**ms.o'connor**
137:22
**multiple** 156:10
191:3
**mur** 181:12
**mysteriously**
227:16

**n**

**n** 2:1,5 3:1 5:1
148:19 156:20
157:10,10

**name** 5:8 19:6
21:23 23:2 25:1
25:7,8,8 32:14
35:4,6,19 56:16
185:23 187:20
188:8 190:3
192:12 196:4
197:21 198:6
200:17 204:2,9
209:10 230:21
257:6 258:3,4,15
259:3,4,21
**named** 176:19
189:20
**names** 69:9,10
176:24 199:5
230:13
**narrowing** 69:1
**nature** 7:9 16:4
17:24 18:1 39:4
39:16,18 48:4
60:21 81:21
110:17 227:16
**navigating** 79:12
**necessarily**
99:20 191:15
**necessary** 28:16
107:1
**need** 12:6,13
13:19,24 19:21
33:4 40:20,23,24
41:7 58:5,19
79:11 93:18
106:17 109:11
111:7 119:10,24
132:21 138:16
139:19 144:24
145:13,14,15

 Exhibit B

146:18 151:6
152:2 161:5,12
162:4 165:9
167:17 180:9
181:21 183:3,3
183:13 184:8
186:23 191:24
204:22 205:7
219:3 229:23
230:2,6 231:4,5
231:6,7 232:1
235:20 252:15
**needed** 107:2
184:6 204:3
**needing** 13:19
**needn't** 179:23
**needs** 14:6 71:13
82:5 145:17
172:6 182:24
187:16 188:15
196:19 197:11
229:22
**neglected** 200:3
**neighborhood**
190:23 191:1
**neither** 117:18
143:8 256:12
**never** 6:3 57:7
161:16 216:3
217:13 226:8
228:16 235:5
**new** 42:15 47:8
158:7
**newer** 158:13
**news** 219:19,19
**nice** 194:14
**nick** 208:14

**nicole** 2:13 7:13
7:15 42:1 64:14
65:8,13 96:23
97:16 137:18
151:18,19
153:15 215:7
248:16 254:12
254:14 257:5
**nicole.oconnor**
2:18
**night** 188:10
**nod** 91:14
**nodded** 91:13
128:14
**non** 236:17
**nondescript** 52:6
**nondiscrimina...**
220:3
**nonissue** 12:4,13
**nonministers**
250:14
**nonprivilege**
23:8
**nonpublic** 123:7
**noon** 203:7,8
206:9
**norm** 113:15
123:17 239:17
239:20,23
240:13
**normal** 23:23
24:2 113:20
116:8 123:19
124:2,4 170:24
171:15,19 193:6
193:12,20,21,23
193:24 223:8,12
223:12

**normally** 23:22
34:3 116:8
117:8,8 119:16
124:11 233:7
**norms** 5:19
193:5
**north** 190:5,22
**notarized** 257:14
**notary** 1:18
256:6 257:24
258:10,18
259:15,23
260:23
**note** 13:10,24
14:4 75:12
117:14 120:10
120:13 142:2
147:21 170:7
173:7 177:8
200:3 211:7,8
219:7,11,16
220:13 221:9,10
238:24,24 239:6
239:7,8,9,10
244:16,22
246:15 249:6
252:10,13
257:12
**noted** 248:6
**notes** 3:14
116:12 117:8
126:13 127:4,8
127:16,17,20
128:5,7,9,11,15
129:21 130:7
131:9,14,15
132:4,8,11
156:20 182:2

185:18 187:22
230:12
**noteworthy** 75:8
81:15
**notice** 8:8 20:17
21:16 23:11
26:6,23 28:17
29:20 30:15,18
32:8,10 36:5,5,6
39:24 40:19,21
41:22 62:10
80:20,22 96:15
102:4 103:5,9
104:19,20 105:6
106:6 127:1,9
142:10,12
147:21 152:16
186:2,22 187:3
193:8 203:1
218:2 220:21
231:21
**noticed** 21:16
214:18
**notifying** 132:14
**notion** 71:12
238:7
**november**
185:11 188:17
**now's** 138:19
**nowadays** 33:21
72:14 241:10
**number** 49:23
126:24 127:4
164:24 175:23
176:2 180:10
183:23 189:2
194:20 199:12
200:5 201:5,11

| | | | |
|---|---|---|---|
| 201:12 202:20 | 29:3,10,18,24 | 117:24 118:6 | 232:14,17,20 |
| 206:24 207:2 | 30:4,9,13,16,21 | 120:3 121:22 | 233:10,17,22 |
| 208:3,9 209:3 | 31:3,6,10,21 | 122:1,5,11,14 | 234:6,8,14 |
| 217:1 218:22,23 | 32:2,5,16,21 | 127:21 128:2 | 235:23 240:3 |
| 218:24 228:6 | 33:7,12 34:6,11 | 133:9 134:10 | 241:16,24 242:6 |
| 231:3,14,15 | 34:16,19 35:9,13 | 135:6,14,16 | 242:22,24 243:3 |
| 234:19 237:2 | 36:12,16,23 37:3 | 136:1,3,11,14 | 243:11,14,19 |
| 238:8,22 240:5 | 37:8,18,22 38:4 | 137:6,17,18 | 244:4 245:8,14 |
| 244:16 245:6,7 | 38:10,16,21 39:1 | 138:6,10,14 | 245:21 246:2,17 |
| 246:7 248:19 | 39:6,10,15,18,22 | 139:4,11,22 | 246:21 247:14 |
| 250:3,7,12 251:2 | 40:11,18,22 | 140:9,14,21 | 248:3,9,13,16,21 |
| 252:22 257:7,13 | 41:12,23 42:3,7 | 141:11,15 142:1 | 249:1,18,20 |
| **numbering** | 42:10 43:12 | 142:17,19,24 | 250:17,19 252:7 |
| 181:20 | 44:18 46:20 | 143:2,11,14,20 | 252:18 253:5,20 |
| **numbers** 14:5 | 47:21 48:10,15 | 144:3,7 145:18 | 254:10,12,15,17 |
| 78:21 237:1 | 51:19,22 54:12 | 145:20 146:5,12 | 254:23 255:2 |
| 259:7 | 56:22 59:22 | 146:15,23 147:8 | 257:5 |
| **numerous** 64:15 | 62:9,13 63:14 | 147:14 148:15 | **o'connor's** 42:2 |
| 124:18 216:22 | 70:23 80:16,19 | 148:20,24 149:8 | 215:8 254:14 |
| | 80:23 81:3 | 149:14,18,24 | **o'donnell** 1:15 |
| **o** | 85:20 86:1,13,16 | 150:8,11,21,23 | 3:3 14:12,23 |
| | 88:12,23 92:13 | 151:14,17,18,23 | 15:9 21:23 |
| **o** 5:1 180:4,4 | 92:15,21 93:10 | 152:3,12 153:17 | 35:11 42:19 |
| **o'connor** 2:13 | 93:16 94:7 95:9 | 154:17 161:23 | 57:6 101:7 |
| 7:15,15 8:12,14 | 95:23 96:2,11,14 | 162:2,6,11 165:8 | 102:22 151:18 |
| 9:18 10:1,22 | 96:19 97:7,12,19 | 165:11,23 167:6 | 172:13 173:13 |
| 11:12 12:4,9,22 | 97:22 98:1,5,12 | 167:12,17,23 | 213:16 215:5 |
| 13:12,17 14:2,9 | 98:22 99:2,6,11 | 168:5,17 169:9 | 253:24 256:8 |
| 14:18 16:3,6,9 | 99:19 100:5,9,12 | 176:12 189:7,10 | 257:8 258:4,9 |
| 16:12 18:8,11,16 | 100:19,23 101:2 | 199:16,19 | 259:4,13 260:20 |
| 18:19 19:15,19 | 101:7,10,13,20 | 201:21 211:21 | **o'malley** 111:22 |
| 20:6,12,19 21:2 | 102:1,11,19,21 | 212:9,14,16 | 112:3 139:16 |
| 21:13,22 22:2,10 | 103:3,15,19,22 | 213:8,15 214:2 | **object** 32:13 |
| 22:13,16,20 23:9 | 104:3,7,13,21,24 | 214:12 215:3,10 | 37:1,9,18,21 |
| 23:19,24 24:7,21 | 105:4,8,12,16,20 | 215:17 216:2 | 39:7,9,12 48:14 |
| 25:1,4,10,15,19 | 106:2,4,9,20 | 217:2,8 218:6,15 | 137:22 165:14 |
| 25:24 26:7,17,21 | 107:4,8 108:22 | 221:16 222:22 | 176:6,10 189:6 |
| 27:8,12,15,22 | 113:23 117:22 | 231:9 232:5,7,10 | 213:18 243:9,24 |
| 28:2,5,8,14,20 | | | |

**[objected - okay]**

**objected** 144:1
**objecting** 127:23
**objection** 9:11
9:23,24 10:15,16
10:17,18 16:3,5
18:8 26:17
38:15 39:17,19
46:20 47:1
48:10 51:17,19
54:12 59:22
62:9 63:14
70:23 80:16
85:20 86:1,13
88:12,23 92:13
92:15 93:10
94:7 95:9,23
113:23 117:22
118:6 120:3
121:22 127:21
133:9 134:10
135:6,14 136:1
142:17 143:11
143:20 144:2
145:18 146:12
146:15 154:17
161:23 162:5,8
165:8,11,23
167:12 169:9
211:21 213:8,9
214:11 222:22
232:2 233:15
234:9,10,11,15
234:17 235:23
240:3 241:16,24
242:6,22 243:21
243:24 244:2
246:17,21
247:14 248:3,24

249:18 250:17
252:7 253:20
**objectionable**
47:2 244:2
**objections** 9:20
10:21 11:5,7
12:20 13:9 14:8
32:22 86:5
214:13 221:15
243:10,13,16
**obligation**
210:14
**obligations**
48:24 49:4,17
52:6
**oblige** 52:21
**obsequiousness**
242:14
**obviously** 12:18
14:4 27:4 33:24
81:18 83:6 91:3
91:6 111:15
114:4 115:22
159:7 183:13
**occasion** 214:6
**occasionally**
240:10
**occasioned**
163:21
**october** 57:23
176:18 177:4
179:12 209:1,8
209:14 222:1,2
225:14,17
**odd** 30:17
197:17
**offer** 100:16
242:1

**offers** 9:16,17
**offhand** 18:20
**office** 23:3 69:20
78:10 80:9
116:16 131:16
161:20 182:10
182:12
**officer** 67:4 68:1
174:18
**officers** 81:9
**offices** 80:4
116:11 158:10
158:16 160:10
230:10
**official** 111:6
246:11 258:15
259:21
**officials** 89:5,8
**officiant** 113:8
**officiants** 228:21
**officiate** 112:20
112:21
**officiating**
112:10,11 113:1
**offset** 206:16
**ofm** 190:4,6,13
190:13
**oftentimes**
104:10
**oh** 14:16 38:12
39:20 48:9
57:10 58:1,4,7
58:12 61:8
65:12,22 70:4
77:8 85:6,22
103:17 110:12
112:12 114:23
122:7 126:14

129:18 153:9
154:20 159:1
160:1,5 166:17
167:8 173:11
174:1 177:5,12
177:13 179:6
180:20 182:22
188:3 189:3
194:1 198:16
199:13 200:22
201:6 208:8
210:16 213:12
221:22 222:4
224:10 225:13
226:8 232:13
244:4 245:10
247:8 248:11
**ohio** 257:2
**okay** 5:5 8:13
9:22 10:23 12:7
12:23 13:17
14:2 15:7,11,14
16:12 17:8,17
18:7 20:15,20
21:5,6,9,15 22:6
24:23 25:6,18
26:8,16,22 27:14
28:18 29:14
30:10,14 31:3
36:15,24 37:13
38:1,9 40:12
41:12,24 42:8,12
42:21 43:8,14
45:8,12,17 46:5
46:12,15,19 47:6
47:12,15,20,23
49:10 50:5,16,21
51:3,10 52:1,3,4

Exhibit B

| | | | |
|---|---|---|---|
| 52:14 54:1,4,7 | 112:22 113:4,14 | 173:23 174:5 | 227:3,3,3,12,14 |
| 54:10,21 55:2,5 | 113:17 114:12 | 175:8,19 176:2 | 227:20 228:6,13 |
| 55:9,17 56:24 | 114:17,20 115:5 | 176:13 177:8 | 228:23 229:10 |
| 57:12 58:4,9,15 | 115:19 116:1,14 | 178:9,21,24 | 229:16,19,20 |
| 58:21,23 59:8,16 | 116:17 117:12 | 179:21 180:11 | 230:7,15,23 |
| 59:20 60:24 | 118:13 119:14 | 180:22,22 181:1 | 232:9,16,22 |
| 61:13 62:2 63:8 | 119:19 120:6,15 | 181:19 182:1,5,7 | 233:12 234:16 |
| 63:20,22 64:10 | 121:2,8,17 | 182:14,16 183:6 | 234:19 237:7,11 |
| 64:10,20 65:1,9 | 122:12,24 | 183:11,16,22,24 | 237:22 238:18 |
| 65:12,14,19,22 | 123:10,15 124:8 | 184:12,17 185:9 | 239:11,15,24 |
| 65:24 66:3,19 | 125:7 127:16 | 187:1,14 188:11 | 240:15,20 241:4 |
| 67:5,17,23 68:5 | 128:4,7,15 129:4 | 188:22 189:11 | 241:19 243:11 |
| 68:14,16,20,22 | 129:9 130:4,9 | 190:6,9,17,19,21 | 243:14,15,23 |
| 69:1,1,5,17 | 131:5,5,13,17 | 191:2,20 192:5,9 | 244:4,10 245:3 |
| 71:12,24 72:5,17 | 132:14,19,22 | 192:16,20,22 | 246:5,20 247:8 |
| 73:3 74:9,15 | 134:13,17 | 193:1,4 195:2,10 | 248:23 249:4,11 |
| 75:5,10,12,17,17 | 135:12,23 140:2 | 195:16,19 196:6 | 249:22,24 |
| 75:20 76:11,17 | 140:9 141:2 | 196:8,15,22 | 250:13 251:2,3 |
| 77:15 78:15,18 | 142:6 144:10 | 197:5,22 198:12 | 252:5 254:20 |
| 79:4,15,23 80:11 | 145:3,24 146:7 | 198:21 199:20 | 255:3 |
| 81:5,14,18 82:11 | 147:15,18,21 | 199:23 200:3,16 | **old**   5:16 42:15 |
| 82:22 83:2 84:7 | 148:12 149:23 | 201:4,10,12 | **olsen**   4:3 209:7 |
| 84:17 85:13 | 150:10 152:3,4,7 | 202:12,19,24 | 211:11 |
| 86:3,11 87:17 | 152:9,11 153:5 | 204:15,20 205:2 | **once**   7:11 12:16 |
| 88:8 89:18 90:9 | 154:8,23 155:8 | 206:2,4,10,13,21 | 83:1 122:12 |
| 91:17 92:7 | 156:1,5,8,13,21 | 207:8,10,22 | 125:19,21 126:1 |
| 93:16 94:17,21 | 157:1,7 158:8,12 | 208:13,18,21,24 | 126:2,16,21 |
| 95:6,15 97:24 | 158:20 159:1,15 | 209:12,14,17,21 | 127:2,6,10,11,14 |
| 98:10,24 99:18 | 159:16,20 161:8 | 210:24 211:3 | 145:10,24 |
| 100:11 101:2 | 161:20 162:1,6,7 | 212:1,14 213:17 | 152:10 159:20 |
| 102:1,13,20,20 | 162:13 163:24 | 214:19 216:6,10 | 191:2 194:16 |
| 103:2 104:21 | 164:17,21,23 | 217:18 218:18 | 195:4 196:22 |
| 105:12,17 106:2 | 166:5,13,15,21 | 219:2,6 220:9,11 | 202:19,20 |
| 106:8 107:4,16 | 167:10,15 | 221:12 223:2,4 | 207:23 209:3 |
| 107:18 108:8,14 | 168:18 169:5,15 | 223:13 224:2,9 | 227:24 244:16 |
| 108:24 109:3,6 | 169:20 170:2,19 | 224:16 225:3,22 | 245:4 248:15 |
| 109:13,20 110:1 | 170:22 171:7,14 | 225:24 226:5,6,9 | 254:12 |
| 110:18,21 112:8 | 172:12,15,19 | 226:15,21 227:2 | |

**[one's - paragraph]**

one's  58:2 150:6
  150:8
ones  84:15
  108:11 160:20
  181:5,6
online  72:12,15
  76:18,21 124:19
  237:12,12
oops  109:10
open  170:9
  171:22
opening  17:20
  33:19 177:21
  179:16 183:12
  197:10
opens  6:23 188:2
operations  44:1
operatively
  43:19
opined  164:10
opining  45:9
opinion  47:17
  55:9 62:23
  63:13,15 70:22
  71:1,2,3,4 75:15
  82:20 117:23
  118:8 135:3
  136:19 138:22
  139:4 140:1,2,3
  140:24 142:19
  164:3 233:8
  242:1,16 253:9
opinions  18:12
  47:15 59:12
  91:11 92:11
  93:4,5,6 98:7
  99:16 107:12
  108:8 214:5

251:12,13,15
opponent  209:17
  209:19 211:12
  212:3 216:17
  223:21 229:8
  244:23
opponent's
  245:12
opportunity
  28:23 29:8
  32:13 36:6
  82:14 210:9
  212:4 213:4,5
  222:15 233:20
  236:6 253:18
oppose  38:11
  39:1
opposed  17:19
opposing  189:5
opposite  45:21
opposition  39:5
options  46:6
ordained  5:8
order  13:4,21
  42:6 55:12
  93:17 115:7
  116:19 132:20
  161:8,21 165:20
  194:23 230:11
orders  42:2
  78:24 79:1
  104:17
ordinance  47:4
ordinances  44:2
  78:24
organiza  24:3
organization
  62:4 91:5

107:17 108:3
  123:6,13 157:2
  193:5 195:14
  223:9 250:24
organization's
  231:2
organizational
  74:11 90:22
  91:8,19,22 92:4
organizations
  19:4 24:4
original  32:7
  59:9 172:20
  227:20
originally
  240:22,22 241:4
originated  70:7
outcome  256:14
outside  19:17
  20:16 62:10
  63:22 64:7
  80:21 122:9
  137:23 141:4,5
  152:16 179:24
  238:7 246:22
  248:4,13
overall  183:10
overlap  126:6
overpowers
  19:13
overturned
  13:22

**p**

p  2:1,1 5:1
  176:19 177:4,15
  180:4

p.m.  255:6
pa  191:13
page  4:2 19:6
  31:13 96:17
  175:10 176:5,17
  181:21,22
  183:24 201:14
  215:16 218:9
  257:13,15 259:7
  260:3
pages  176:9
  216:22
paid  162:21,24
  163:1,4,7,9
  166:8 242:10
paige  197:9
pamphlet  8:9
  26:11,12,13
  27:16 29:13
pamphlets  8:7
  8:11
pandemic  196:3
  203:24
panelist  191:13
paola  178:19
  179:14,24
paolo  3:12 178:8
  178:18 179:23
  180:4,8
paper  189:11
papers  72:2
paperwork  38:6
paragraph  21:17
  47:9 59:10
  96:18,22 147:22
  149:3 150:5
  162:16 209:23
  215:11,14

**[paragraph - perceives]**                                    Page 38

227:20 229:3,5
245:14
**paragraphs**   27:9
**parameters**
19:22 143:5
**parched**   108:19
**parish**   190:4
**parkin**   3:16,20
180:19 181:9
184:20
**parks**   247:3
**parlance**   184:15
184:16 237:13
242:5
**parlo**   178:8
**part**   10:11 11:23
13:5 18:12
21:18 23:16
26:9 30:2 37:17
37:22 41:21
63:15 70:16,17
70:19 78:8
80:19 84:1
107:17 123:10
150:5 154:10
158:9 165:19
169:15 203:14
205:9 217:9
234:24 259:9
**partic**   62:11
**participate**
148:13 149:11
150:2,4,20 151:3
151:13 152:18
152:22 210:13
**participating**
149:2 204:5

**participation**
228:6
**particular**   9:15
25:19 26:3 40:1
44:20,23 47:18
49:4,18 53:6
59:11 62:14,17
83:18 86:4 96:5
96:9,9 98:8
99:21 102:16
108:12 116:22
119:5 121:2,19
121:21 122:9
125:4 126:15,16
127:11 153:7
154:3,4,13
161:10,13,13
166:18 170:7
186:3,4 195:17
217:5 218:16
222:3 241:20
242:1 249:9
**particularity**
232:24
**particularly**
17:11 25:11
95:3 125:3
152:19 169:5
221:20 232:23
240:2
**parties**   7:24
64:21 66:24
69:2,3,3 256:13
**partner**   7:20
**party**   19:11
**passed**   74:9 76:9
88:11

**passes**   51:13
**passing**   98:8
**passive**   130:11
**paste**   231:21
232:1
**pastor**   185:3
188:5 190:4,13
190:21 196:17
196:20
**pattern**   61:23
62:2
**pause**   110:9
111:18 113:4,19
116:3 117:17
120:9,18 122:17
123:3 124:14
125:10 132:24
142:9 144:19
145:6 146:9
154:8 166:24
197:6 210:23
**pausing**   220:11
**pay**   165:19
**paying**   166:2
221:19
**payment**   67:20
67:22 68:7
75:18 162:17
164:6 166:14
222:24 227:3
**payments**   227:9
227:10
**pd**   208:9
**pdf**   198:16,24
**pdfs**   208:10
**pendency**   220:13
**penna**   190:3,12

**peop**   83:12
**people**   24:5 27:5
39:8,13 49:6,23
49:23 50:2 53:9
54:23 64:3 65:4
65:9 66:16
69:14 83:12
85:11,13,18 87:5
89:21,22,22,24
90:1,2,16 91:4,7
91:18,21,24 93:9
94:24 101:10
102:16 118:3
120:21 125:21
125:24 126:1,9
126:12,14,19
127:1,5,5,9
129:12 132:20
133:1,5 153:24
154:2 156:11,12
156:13 159:23
160:2,22 161:11
162:23 163:9
166:2,7 179:4,9
180:21 181:3
193:12 194:9,14
194:14 198:18
200:24 204:23
204:24,24 207:5
210:8,12 221:3
235:2,6,22 236:8
237:17 238:6
249:8
**people's**   93:3,5
149:6 176:24
214:5 246:12
**perceives**   37:17

**percent** 249:14
**percentage**
  250:12
**perfectly** 198:9
**performed** 117:5
**period** 83:9,19
  157:20,20 204:8
  241:8
**periodically**
  33:5
**permutation**
  154:4
**person** 30:11
  33:22 62:3
  70:10 71:2
  108:6 112:8,24
  113:8,21 114:6
  115:17,20,23
  121:12 122:20
  125:12 126:16
  128:23 129:1,14
  129:15 130:24
  141:9 145:8
  147:1 154:11
  156:1,4 157:17
  161:13 162:18
  166:18 167:4
  181:8 186:3,7
  187:22 191:14
  195:17 196:1,5
  205:7 209:18
  212:20 215:1
  220:16,20
  222:12 224:2
  230:17 235:1
  238:16 239:21
  250:15 252:3

**person's** 121:13
  198:6 209:10
  213:10 215:22
**personal** 5:24
  18:11 25:17
  31:18 52:23
  53:7 63:24
  69:15 71:4 81:3
  85:21,22 120:23
  128:9,11 139:4
  141:6,12 142:19
  154:21 160:22
**personally** 9:2,3
  110:14 114:22
  178:18,21
  213:18 258:11
  259:15
**persons** 154:19
**perspective** 36:9
  115:22 145:16
  165:4 198:1
  253:17
**persuasion**
  249:9
**pertain** 16:6
**pertaining** 96:8
**pertains** 63:8
  86:4
**petitions** 44:3
  79:1
**pew** 249:12
**phase** 11:3,6
  113:14 168:8
  216:10
**phone** 30:22
  95:12 106:16
  116:7 156:2
  234:4 257:3

**phrase** 242:2
**physical** 223:17
**pick** 160:11
**picking** 90:3
  200:14,24
**pickup** 79:16
  247:2
**pimen** 180:19
**pimentel** 3:15
  181:11 224:18
  224:19,20
**place** 103:14
  111:7 156:10
  169:17
**plain** 21:22
  23:14 25:5
  32:18 35:1,2,3
  35:19
**plaintiff** 1:6,16
  2:10 27:4 40:16
**plaintiffs** 7:12
  37:2,16,17
**plan** 42:15
**planning** 3:13
  180:24
**play** 24:16
  111:16 231:13
**playing** 111:17
  113:3,18 116:2
  117:16 120:8,17
  122:16 123:2
  124:13 125:9
  132:23 142:8
  144:18 145:5
  146:8 159:10
  166:23
**plea** 147:2

**pleadings** 27:2,3
  27:4 40:16,18,21
**please** 5:6 9:5,11
  14:10 15:8
  35:17 36:17
  39:20 41:12
  46:19 94:8
  97:15,15 98:1
  111:16 120:7,16
  123:1 125:8
  129:18 132:14
  132:15 143:16
  145:4 148:22
  151:5,17 167:1
  169:6 170:9
  176:22 178:6
  179:4,4 185:12
  189:10,20,24,24
  194:22 195:12
  197:3,7 199:12
  201:13 202:21
  206:14 207:2,14
  207:24 209:9,22
  211:7,9 218:21
  219:17 224:13
  232:4,24 233:19
  243:24,24 244:6
  248:7 257:11,11
**pleased** 6:10
  114:18,18
  115:12
**plural** 7:21
  148:14 156:11
**pm** 177:24 178:1
  179:17 185:11
  188:17 206:8
**point** 8:17,18
  28:13 40:9,13

41:14 43:18
51:18 62:20
79:20 81:10
92:17 98:14
116:20 137:14
138:5,13 184:13
198:13 203:17
215:10 254:5,5
**points** 9:15
138:16 231:23
**pol** 67:9
**policies** 7:8
53:18 64:24
129:2 148:5
162:16 227:5,12
227:14
**policy** 17:20
53:12,13,15,22
53:24 54:6 67:6
67:11 71:12
95:19 146:21,23
147:23 149:5
157:8 160:8,10
162:18 163:23
165:2 166:2
226:10,11,12
**politeness**
114:11
**political** 212:3
216:17 223:21
229:7 244:23
245:12
**poor** 125:2
**population**
248:1
**populous** 249:14
**port** 190:4

**posed** 38:15 88:9
95:6 96:8 134:5
134:6 135:7
**posit** 98:14
136:21 161:2
251:4,4,11 254:5
**position** 18:20
19:15 22:4
25:16 29:16
31:19 38:7,20
80:14 101:23,23
102:4 103:6
104:14 106:6
137:3,11,13
138:16 143:6,7,7
150:12,13
157:11 165:5
209:15 211:18
211:18 215:9
220:5 226:17
241:21 242:21
244:6 248:4
252:15,23 253:3
254:11
**positions** 253:19
**possibility** 20:22
**possible** 239:12
**possibly** 40:6
97:4,5 188:16
218:10
**post** 136:21
**posterity** 7:24
**potential** 32:22
106:10 228:20
**practical** 177:22
**practice** 23:15
105:22 163:17
166:4 220:2

**practiced** 43:5
**practices** 148:5
249:15
**pray** 133:15,17
196:18
**prayer** 6:23
17:21 108:9
145:10 165:2
171:23 197:10
250:16
**praying** 236:14
**pre** 124:16
**preceding** 94:9
201:9 219:24
**precise** 41:16
226:16
**precluded**
222:11
**prefer** 189:12
234:1
**preference** 147:7
**preferences**
246:12,16
**preferred** 33:5
192:6
**prefers** 192:8
**premise** 18:15
32:7 103:4
**prep** 185:18
**preparation**
64:11,13 117:5
128:18 131:7
**prepare** 40:3,6
169:23 185:18
218:10 230:11
**prepared** 211:24
217:13,16
218:16 244:19

244:19,22 245:8
251:19
**preparing**
127:17 131:11
153:8
**preps** 187:21
**pres** 159:3
**present** 2:22
38:5 66:1
101:16 159:15
159:15 224:17
229:6
**presentation**
176:11
**presented** 38:3
**presently** 111:19
162:19
**preside** 190:2
**president** 50:9
50:10,11,13,20
50:21 52:5 59:1
111:23,24 112:2
112:4,5,5,15
130:20 158:15
158:17,18,19,21
158:23 160:4
163:11 166:16
172:16 184:21
184:22 185:15
185:20,24
187:23,23,24,24
188:2 207:7,13
223:1 225:5
**president's**
182:9,12
**press** 111:15
223:9 224:9

**[presumably - propose]**

**presumably**
43:18 45:14
90:5,23 113:2
187:6
**presume** 190:22
219:11
**presumed** 6:18
88:5
**presumptuous**
6:19
**presupposes**
162:18
**pretty** 69:19
113:14 124:24
148:9 157:13,14
162:11 166:10
166:10,11
170:24 171:2
198:13 201:23
237:18
**previously** 71:9
102:6 160:6
**priest** 162:20,21
177:16 190:2,10
190:14 238:3
239:7 242:15
**priests** 163:21
165:19
**primarily** 43:21
44:1,13 84:16
**primary** 72:1
**principal** 60:10
87:7,12,12,16
88:2,6,11,18
89:2,13 94:19
98:17,21
**principals** 87:10
212:21

**principle** 86:22
**principles** 60:20
**prior** 35:23,24
56:13 103:6
110:7,8 143:24
155:4 179:2
199:3 218:7
221:6,23,23
**privilege** 10:14
23:6 26:3 38:14
42:9,10 47:1
122:13 137:15
137:21 146:2
248:24 249:1
254:22,23 255:1
**privileged** 175:1
210:10 212:5
222:17,19
**pro** 86:23 111:23
112:5 113:7
**probably** 35:14
38:11 57:9
71:13,20,22
115:8 125:24,24
132:10 156:7
166:18 167:6
168:9 173:8
176:23 179:23
186:23 187:16
191:24 194:5
196:23 198:17
211:16 230:2
234:24 249:17
**problem** 189:7
197:1 217:9
**procedure** 1:17
15:22 16:2,10
29:23 30:7

80:11 103:11
258:5 259:5
**procedures**
53:19 90:23
**proceed** 14:8
21:4,12 28:22
29:11 36:17
41:15 113:2
117:15 166:22
167:22
**proceeding**
31:22 110:19
111:21 134:16
134:17 138:15
237:24
**proceedings**
10:11 11:8
17:20 112:9,10
133:7,22,23
162:19 238:15
252:11
**process** 149:10
150:2 163:19,20
165:2 204:18
**produce** 128:3
**produced** 56:3
64:19 68:6,7
86:8 216:20
217:24
**producing**
102:22
**product** 46:22
**production** 15:1
257:15,17,22
**productive**
138:3 143:3,8,9
**professional**
1:18 256:5

**proffer** 88:19,20
98:10,11,13,16
104:17 205:19
205:20 242:19
242:21 243:4
251:5,10
**profound** 210:13
**projector** 209:2
**promise** 8:23,23
**prompted** 94:5
94:10,11
**prompts** 165:2
**prone** 9:8
**pronounce** 19:6
**pronunciation**
189:21
**proof** 22:7
**proper** 74:10
90:10,10 100:3
169:14 194:23
247:7,11,16,18
250:14
**properly** 214:18
**property** 192:11
**proportion**
239:24 247:24
249:8
**proportionate**
249:4
**proposal** 171:22
**propose** 8:19,22
10:19 11:9 14:7
47:4 99:23
107:5 205:16
215:1 230:23
231:13,18
239:18 255:1

Exhibit B

| | | | |
|---|---|---|---|
| **proposed** 9:16<br>12:21 44:2 82:5<br>**proposing** 20:16<br>45:7<br>**proposition**<br>19:12 189:9<br>204:15<br>**proselytizing**<br>167:10<br>**protective**<br>104:17<br>**provable** 184:5<br>**prove** 22:8<br>251:20<br>**proved** 251:12<br>**provide** 30:11<br>39:2 43:22,23<br>46:6 177:21<br>179:16 210:6<br>217:5 218:11<br>231:20 232:4<br>**provided** 4:24<br>27:1,15,16 29:16<br>55:22 214:3<br>215:15 216:18<br>217:21<br>**provides** 104:17<br>**providing** 85:21<br>177:6 193:22<br>214:23 221:4<br>253:1<br>**public** 1:19 6:23<br>13:1,11 14:11<br>17:20 67:4,12<br>72:10 79:20,24<br>80:3,4,5,5 81:8,9<br>81:10 83:8,9,18<br>83:19,19,20 84:6 | 84:9,9,22 85:14<br>86:4,5,9 89:9<br>91:19,23 92:1,9<br>98:21 107:11,13<br>107:14,15,22<br>108:3,4,4,5,10<br>108:13 109:15<br>109:15,17<br>110:19 122:22<br>123:6,8 133:2,6<br>147:3 168:9<br>171:1,5 173:5<br>174:2,7,11,17,22<br>175:2,3,7,9,18<br>204:7,8 211:10<br>212:2,23 222:21<br>247:2 250:15<br>253:1,15 256:6<br>258:10,18<br>259:15,23<br>260:23<br>**public's** 83:6<br>90:3 246:15<br>**publication**<br>219:12<br>**publicly** 7:23<br>**pull** 20:20<br>217:11<br>**pulled** 29:17<br>**punish** 251:14<br>**pur** 169:12<br>**purpose** 6:11<br>11:18,19 20:9<br>90:1 91:8,9<br>109:16 125:5<br>127:17 128:20<br>131:11 136:17<br>161:10 165:6,18 | 165:19 213:20<br>231:2<br>**purposes** 7:24<br>42:13 74:11<br>78:20 90:19,20<br>90:22 91:19,22<br>159:11 161:2<br>188:16 203:22<br>207:12 208:7<br>230:13<br>**pursuant** 1:16<br>15:14 16:16<br>42:1 90:19 91:8<br>91:18 102:5<br>103:10 108:6<br>114:12 125:4<br>128:12 131:9,10<br>132:18 141:7<br>150:17 151:10<br>153:20 170:2<br>249:14<br>**put** 11:1 32:22<br>52:11,18 56:6<br>57:9 101:14<br>106:6,17 143:4<br>187:6,21 188:8<br>205:11 209:1<br>216:24 217:2,10<br>245:18 254:21<br>**putting** 26:23<br>187:5<br><br>**q**<br><br>**question** 10:15<br>11:23 22:18,19<br>26:2 28:24<br>32:18 34:5,21,22<br>34:22 35:17 | 36:10,13,17 37:4<br>37:6,7,9,11,14<br>37:15,15,19<br>38:15 39:11<br>41:5 44:19,19,22<br>45:3 48:4,5,15<br>50:5 57:21<br>61:12 67:2<br>71:10,17 72:22<br>77:5 80:17<br>86:14 88:9,14,17<br>92:19,20,22<br>93:23 94:4,10,12<br>94:22 95:6,24<br>96:6,6,8 97:13<br>97:14 99:3,5,19<br>121:23 122:6<br>125:2 134:5,6,11<br>135:7 136:20<br>137:20 138:5,9<br>138:18,23 140:4<br>140:6,15,17<br>141:1 143:16,24<br>144:3,7 145:21<br>145:22 147:6<br>149:17 150:14<br>151:4 152:20<br>155:7,11,16,20<br>161:17 165:17<br>167:7,13 177:22<br>205:3,22,24<br>211:6 215:23<br>228:4 229:1<br>231:1 238:5,24<br>242:1 243:1,5,7<br>243:20,22 244:5<br>244:11,12,14,14<br>244:15,15 247:5 |

Exhibit B

248:7,10,18
249:6 252:8,20
253:21,22
**questioning**
233:14
**questions** 9:9,13
18:22 19:16
20:3 22:21 23:7
23:10,21 24:10
25:13,17,20
29:11,13 31:15
31:22 32:23
33:8 34:18
37:10 39:7 40:4
40:6 41:11 45:1
50:17 67:18
75:6 78:12
92:23 97:2 98:2
99:9 102:23
135:17 136:4,5
136:19 137:23
138:11,17
139:23 140:5
141:13 149:15
149:22 151:7,24
165:16 167:3
168:13 169:17
223:5 231:3,11
233:11,13
245:17 246:9
**quick** 43:1 76:6
199:16
**quickly** 99:10
**quid** 86:23
**quite** 10:6 27:6
34:24 35:3
**quo** 86:24

**quote** 155:3,4,6
254:6
**quotes** 223:13
**quoting** 19:2

**r**

**r** 2:1 3:23 5:1
156:17 157:5
178:10 207:4,11
**raj** 228:7
**random** 250:15
**range** 176:5
183:20
**rational** 8:2 9:13
33:16
**rationale** 8:4
**reach** 41:13
138:16 139:24
140:1 174:19
186:13
**reached** 158:9
185:3 221:22
**reaching** 179:14
188:8
**read** 26:11,13,16
90:22 100:22
101:24 146:19
172:10 177:17
179:5 184:8
197:13 201:16
206:18 207:14
209:22 258:5,6
258:12 259:5,6
259:17
**reading** 5:10
21:22 23:14
51:15 96:16
184:7 202:17

207:20 212:10
257:19
**reads** 117:8,8
149:8
**ready** 21:12
27:21 111:2
178:3,5 251:20
**real** 43:1 76:6
87:20
**really** 13:12
53:24 60:23
79:8 84:11
88:15 97:17
128:11 146:18
149:19,20,21
151:20,23
164:23 168:13
171:4 215:6
223:24 224:4
227:10 238:21
241:22 252:22
**reason** 5:20 13:2
53:4 135:18
158:9 257:14
259:8 260:3
**reasonable**
138:1 164:20
232:21 233:11
233:13
**reasoning**
158:16
**reasons** 126:2
**rec** 72:1 174:2
**recall** 48:17
55:24 56:3
69:18 108:11,16
113:9 115:11
118:15,24 119:4

119:11 120:1
153:5 202:7
216:21 221:17
225:4 226:11
230:4,5 235:13
235:16 237:1
238:15 239:11
240:6,8,12
**recalling** 118:21
**recap** 81:20
110:18 131:8,13
149:23 169:2
**receipt** 257:18
**receive** 88:17
95:7,11,13,14,14
95:17 173:16
187:5 205:24
220:4 225:15
228:13
**received** 52:11
58:24 100:24
168:24 173:16
217:14,22 218:2
220:20 227:13
**receives** 76:3
186:3
**receiving** 45:8
221:3
**recipient** 205:8
**recitation** 55:14
226:19
**recited** 145:10
**recognizable**
192:24
**recognize** 133:23
201:1 218:7
238:11

Exhibit B

**recollection**
113:12 221:6
236:3
**reconvene** 20:24
**record** 5:3 13:13
20:24 21:7,10
35:11 57:1
66:12 67:9
91:15 109:1,4
111:6,8 137:11
137:13 143:12
146:22 147:16
147:19 152:5,8,9
161:9 175:3,7,10
175:21 176:8
180:6 183:19
189:1 199:13,21
199:24 208:19
208:22 209:8,22
210:22 211:1,4
211:10 212:2
214:16 217:3,10
227:5 228:17
233:24 234:2
243:18 247:22
248:2 249:7
253:1 254:13,18
255:4 256:10
259:9
**recorded** 7:23
76:19 110:22
124:19
**recordkeeping**
162:16 227:12
227:14
**records** 67:4,6
67:11,12,16,22
67:24 68:2,7,9

70:20 75:18
130:2 173:6
174:7,11,17,18
174:23 175:2,18
228:18 247:23
**recovery** 210:8
**recross** 3:2
**red** 111:20
**redirect** 3:2
**reduce** 231:2
**refer** 151:19
187:18 237:8
**reference** 13:2
190:20 231:16
237:3,6 240:10
240:12 242:17
257:7 258:2
259:2
**referenced** 237:2
240:7,8 258:11
259:15
**references**
235:13
**referencing**
155:4 232:8
**referral** 79:18
**referred** 76:22
77:23 82:9
239:22
**referring** 15:22
27:8 57:17,17
58:8 60:5,12
96:21 120:11
**refers** 182:19
200:12 237:14
**refined** 91:1
**reflected** 236:14

**refresh** 131:22
195:12
**refusing** 254:7
**regard** 15:21
17:20 81:15,16
152:17 247:2
**regarding** 177:6
180:23 199:1,4
219:18 230:13
**registered** 1:17
256:5
**regular** 135:2
253:10
**regularly** 10:6
**reiterate** 172:19
**reject** 102:3
**rejection** 172:4
**relate** 171:5
**related** 44:11
67:19 75:6
173:15,24
174:14 214:21
256:12
**relatedly** 9:6
**relating** 56:3
102:15
**relation** 136:7
**relationship**
61:7 63:23,23,24
64:8 69:15
120:24 154:21
160:16,23
**relationships**
52:24 53:8,9
216:13
**relative** 123:17
249:4,8

**relatively** 110:3
110:5 123:19
124:2
**release** 223:9
**released** 203:13
**relevance** 130:5
179:21 192:24
194:8
**relevant** 18:12
22:3 27:1,13
49:14 64:21
77:6 82:9
129:23 140:2
247:1
**relief** 236:15
**religion** 121:21
250:5,8
**religions** 13:8
**religious** 62:4
122:9,21 210:3
217:23 218:1
246:12,15
247:20 249:9
250:14 251:24
252:12
**remaining**
176:14
**remarks** 210:1
**remember** 8:20
20:21 26:23
31:7 50:18
58:10,17 75:21
94:6 101:18
108:16 109:7
116:5 117:4
118:20 123:5
145:12 197:14
201:2 202:5

205:5 211:9
221:14 222:6,8
225:3,6 226:16
227:5 229:14
232:7
**remind** 42:18
202:21 224:13
**remote** 203:23
**remotely** 207:14
**remove** 62:21
63:15
**repeat** 17:22
165:17
**rephrase** 153:15
169:21
**reporter** 1:18
4:24 14:14
210:15,17 256:6
258:7
**represent** 6:20
7:12 15:19
179:18
**representative**
7:21 17:12
121:18 139:15
**representatives**
7:21 250:7
**representing**
15:13 17:1
97:10
**represents** 51:9
**request** 10:3
12:2 45:9,9
47:19 48:5,19
52:5,11 54:23
58:24 59:2
65:10 76:8
95:19 163:13

173:6,15 174:7
174:11,15,17,20
174:21,23
175:17,18,18
207:13 208:4,4,6
208:6 215:19
224:9 232:12
259:9,11
**requested** 62:4
144:22 175:7
228:11
**requesting** 19:11
52:12 164:2
225:19
**requests** 52:22
53:2,4 169:11
170:3,4 171:4
217:22,23
**require** 135:4,12
145:11 218:7
**required** 49:16
52:21 179:7
257:24
**requirement**
128:17
**requirements**
46:13 128:12
**requires** 183:12
205:18
**requiring** 165:21
**research** 43:22
43:23 44:13,15
45:4,15 46:15
47:4,10,18 59:13
70:3,5 91:11
125:23 126:20
249:12

**researched**
64:17
**researching** 8:21
**reserve** 9:20
11:5 236:6
**resolutions** 79:1
**resolvable** 33:18
**resolve** 10:18
11:5 12:12
33:16 41:6
105:13 107:6
215:1 231:3
**resolved** 8:2
11:10 33:17
**respect** 60:19
150:24 151:5
210:14
**respectfully** 19:1
172:9
**respective**
230:12
**respond** 47:19
121:20 220:5
**respondeat** 60:5
60:9
**response** 7:2
37:12 55:22
93:12,15,18
104:15 154:19
179:3 214:17
237:17,20
248:19
**responsibilities**
50:19
**responsible** 60:1
**responsive**
172:21 173:17
174:20 215:4,11

**rest** 13:11 123:5
194:10 227:11
**restart** 94:1
**restate** 150:14
**restroom** 199:17
**resume** 124:12
142:7
**retain** 67:15
68:1
**retake** 109:11
**retention** 67:6,9
67:11
**retentions** 67:24
**return** 26:22
38:1 155:12
**returned** 257:18
**reverend** 197:9
**review** 21:2
52:15 56:2 68:8
126:24 127:12
131:19 165:22
165:24 166:1,1
257:12 258:1
259:1
**reviewed** 59:3
62:6 108:10
125:16
**reviewing** 165:2
165:18 173:22
**revisit** 143:15
**revoke** 29:8
**rewatch** 141:19
**rewind** 139:19
140:11 141:21
**rfps** 198:16
**right** 11:14
12:24 21:11
25:14 30:6,18,22

37:5 40:4 50:22
55:9 72:14 73:7
73:18 74:12
76:9 77:17 81:7
81:18 82:22
89:19 90:6 92:8
92:14 96:16
107:10,24 116:1
121:17 124:9,23
128:21 133:7
134:22 139:14
139:18 141:22
142:2 153:5
158:7 159:3,20
159:22 162:7,15
166:24 167:4,20
168:21 170:2
175:21 180:5
182:16 187:2
194:20 205:15
206:24 212:21
213:18 215:16
222:5 224:4
226:15 231:14
233:8,8 236:12
240:21 241:15
242:20 248:8
249:17
**riled**   162:9
**ring**   195:5
**risk**   80:13
**road**   44:22 143:8
**roads**   90:4
**rob**   7:13,17
11:10,10,10,11
12:2 19:20 21:3
31:11 64:14
65:8,13 106:15

**robert**   2:14
**robert.arcangeli**
2:19
**role**   45:5 88:20
131:3 139:9
140:10
**room**   2:15 9:3
16:18 142:10
**route**   54:22
**rule**   15:14,17
16:14,16 18:14
18:16,17 40:2
44:3 79:1 102:6
103:10 104:17
**rules**   1:16 8:19
15:20,21,22 16:1
16:10 18:20
29:23 30:6 39:2
45:13,18 103:10
106:1,3 132:18
135:12 137:5,6,7
169:23 218:7
258:5 259:5
**run**   79:23 81:8
168:10 223:16
**running**   220:14

**s**

**s**   2:1,14 3:7 4:1
5:1 148:19
257:15 259:8,8
260:3
**saint**   190:4
**sake**   156:20
**salem**   1:20
**san**   178:22
**sanctions**   244:3
246:1

**sanity**   172:2
**sat**   139:13 250:1
**satan**   5:9 6:5,6
235:3,6,18,22
236:2,9
**satanic**   1:5,20
6:21 17:3,18
18:2,3 41:20
52:17 57:4
148:19 170:19
210:10 212:6
219:18 222:17
222:20,20
225:17 257:6
258:3 259:3
**satanism**   244:20
**satanist**   171:23
**satisfactorily**
15:1
**satisfies**   208:7
**saw**   73:11 91:14
175:16 176:7
228:7 230:1
238:2,20 239:21
240:7
**saying**   11:19
13:15,15 30:6
38:22 92:8,14
127:24 130:23
132:7,9 144:16
169:19 188:15
199:3 218:2
**says**   7:7 20:21
35:4 38:2 66:24
96:15 103:9
110:12 111:11
113:8 173:9,12
174:13 188:3

242:18 249:13
251:14
**schedule**   207:14
219:17
**scheduling**   197:1
202:23 206:8
208:3 231:17
**scholar**   240:18
**school**   43:17
**scope**   27:7,23
40:7 42:22,23
59:11 62:8,10,22
62:24 88:19
92:2,3 96:10,11
96:17 122:1,10
137:24 139:6
146:5 157:21
180:1 216:5,11
246:22 248:4,13
248:22 252:8
254:13
**scrap**   42:15
**scratch**   132:5
**screen**   245:18
**screenshot**   211:8
**scrima**   195:20
**script**   185:24
187:21 188:3,9
188:10
**scroll**   170:9
175:22 176:4,7
178:24 181:19
182:17 183:23
189:14 192:22
194:7 196:13
197:13 198:10
198:11,20,20
200:6 201:14,14

**[scroll - sets]**

201:14,14
206:15 218:21
224:6,7,8
**scrolling**   194:8,8
194:21 197:3,5,5
198:12 202:24
206:3,6,11,13
218:20,24 219:1
219:1,1,21
220:10
**sea**   181:1
**seal**   256:17
258:15 259:21
**second**   19:5 47:7
185:10
**secondary**
172:20
**seconds**   144:20
145:1,8
**section**   19:7
**sects**   250:5
**secular**   210:3
**see**   8:8 11:3 13:2
21:4 24:4 28:1
34:22 35:4
38:10,17,18
42:21 49:12
52:3 55:23
56:12,13,21 58:1
66:2 71:9 73:17
75:5 78:13 86:3
86:7 90:6 91:11
92:7 93:8
101:12 102:9
103:20 104:1
108:12 113:7
120:14 124:10
125:20 131:8

136:24 139:2
141:2 142:15
146:13 147:9
153:16 160:7
162:15 170:10
170:24 172:12
172:23 173:7
174:1,10 175:15
176:3 177:15
178:9 179:2,21
181:1,2,20
183:22 184:24
185:10 186:1
188:17 189:3,18
190:9 191:2
192:17,22,23,23
193:17,18 194:7
194:12,22
196:14 197:4
200:5 201:17
204:16 208:11
209:6 212:17
214:19 216:7
218:14,18,19,24
219:3 221:15,24
222:2 224:6,7,9
226:21 239:15
245:23 251:24
252:2,21 253:19
**seeing**   36:8
66:12 108:17
161:3 179:10
225:6 226:16
253:17
**seek**   8:4 19:11
143:4
**seeking**   7:4
28:10 132:17

**seemingly**
234:23
**seen**   70:20,21
71:2 114:21
115:9 124:9
226:10,11
**sees**   139:23
**selected**   151:2
153:7 154:4,13
**selection**   80:14
81:1
**semantics**   10:3
24:16,16,17
34:10,12,14
96:24 139:1,21
159:10 216:3
231:13
**senator**   191:8
**send**   17:12 36:4
65:10 80:12
102:8 171:17
173:15 174:14
232:3
**sender**   207:17
**sending**   230:14
**sense**   19:19
32:24 152:3
174:3 175:12,17
180:13 197:18
210:14 242:8
247:10,12
253:11,11 254:3
**sent**   58:10,11,12
103:9 108:10
141:9 170:3
180:17,22 185:1
185:14,22
198:16 215:22

219:3 225:13,17
227:13 229:13
**sentence**   93:24
94:1 164:1
185:11 219:24
219:24 220:1
222:18
**separate**   134:3
**september**
101:15,17
106:15,18,21,21
173:4,12 196:16
197:17,18
206:17 256:17
257:4
**ser**   242:9
**series**   195:3
**serious**   210:11
**seriousness**
133:23 238:12
**servants**   144:21
144:21,23 147:3
239:23 240:11
241:19,21 242:4
242:10,17 244:8
**serve**   78:6
**served**   232:11
**serves**   51:12
228:7
**service**   79:18
**services**   79:11
**serving**   112:1
**set**   11:8 41:11
56:9,20 80:9
103:13 161:21
180:1 256:9,16
**sets**   123:21

**[settle - speak]**

settle   166:11
seven   68:4,5,11
    68:17,17 90:20
    91:1,3 144:14
    227:7 228:1
sewers   90:4
shakes   249:23
share   249:5
sharp   178:1
shawn   2:23
shed   222:13
    223:16
sheep   240:11
sheet   257:13
    259:7,10,18
    260:1
shelter   210:6
ship   49:22
short   10:14
    41:17 73:1
    110:3,5 119:3
shortest   178:17
shorthand   190:6
show   13:2 56:20
    57:8 151:5
showing   134:20
    225:11
shown   257:16
shred   132:15
shurtleff   13:6,22
shut   100:10
side   8:5,6 45:21
    91:20
signature   177:16
    201:13 215:16
    256:20 257:14
signatures
    176:10 189:4,9

signed   258:13
    259:18
significant   136:5
    138:1
signing   257:19
similar   71:20
    114:16
simple   193:8
    194:3
simplify   8:22
simply   193:4,6
    193:13,17,22,22
    194:2,17
simultaneously
    56:23
sincerely   152:11
    152:11 207:17
    257:21
single   69:20
    70:13 75:24
    125:1 127:8
singular   89:24
    153:3
sir   257:10
sit   164:18 166:6
    242:20
situation   61:24
    62:17 96:5
skim   182:17
skimming
    198:12 244:12
skip   26:9 189:9
    197:1,4 201:5,24
    251:2,3,3
skipped   177:5
    180:12
skipping   206:21

slavery   242:12
slaves   240:2,7,9
    241:15,22 242:4
    242:10,16,18
    244:8
slightest   194:13
slightly   53:18
    189:14 196:14
    197:3 200:7
    206:3,16
slot   188:20
slotted   233:3,5
slow   73:20,20
slowly   192:22
smaller   190:23
smoking   218:1,5
so's   175:15
social   5:19
socially   247:18
society   90:6
solutions   5:20
    257:1 260:1
somebody   59:19
    61:5 114:5
    121:7,16 155:1
    160:21
someone's   23:20
    121:11
somewhat
    237:22
sonia   2:4,9 7:20
    16:21
sophia   156:23,24
    157:7
sorry   6:18 11:13
    14:14 17:23
    29:4 58:5 60:8
    62:19 65:12

73:23 107:14
109:10 112:12
112:17 122:7
126:14 129:18
148:18 160:18
164:8 170:12
176:20 178:12
186:15 189:17
192:6 199:2
201:6 207:15
208:9 210:15,16
212:9 224:10
225:4 227:2
237:7 248:11
sort   12:10,14
    38:6 46:21 64:8
    79:18 138:15
sought   213:19
sound   65:7
    164:18 168:19
sounded   155:3
sounds   55:2
    61:14 74:9 77:1
    146:20 148:4
    216:15 255:2
source   244:13
sovereignty   6:1
spared   6:4
speak   16:18,19
    21:3 22:11
    24:19 30:11
    35:15 42:15
    65:4,5 66:5,7,16
    82:14,16,16,17
    86:16 88:11
    89:16 94:14
    114:10 129:2
    141:18 151:12

Exhibit B

160:20 165:10
186:14 188:6
190:11 213:10
214:22,24 236:3
236:21 245:6,8
253:2,18
**speaker** 153:7
154:4,13
**speakers** 151:2
162:17
**speaking** 17:14
22:14 43:19
86:23 94:13,15
158:16 162:21
220:21 243:9,12
243:15 244:1
**speci** 248:17
**specific** 9:23
24:9 37:15
50:17 69:9
84:11 100:1
102:15 108:14
124:17 214:6
236:24 237:2,6
237:19
**specifically** 8:21
26:4 30:12
32:14 40:14
41:18 45:12
56:12 57:17
67:19 81:15
119:10 120:1
137:19,19
148:16 152:17
216:21 227:10
231:22 244:17
248:17

**specified** 117:18
227:21
**specify** 160:13
**specifying**
160:14
**speech** 7:7 13:6
13:7,22,23 116:9
117:9 120:12
123:18,19 145:9
251:21
**speeches** 122:19
**spell** 156:16
180:4
**spent** 84:8
**spin** 249:6
**spirit** 40:2
**spoil** 139:17
**spoke** 64:15,21
65:8,17 67:4,24
69:12 160:10
218:6
**spoken** 66:9
69:18,19 155:23
155:24
**squiggly** 159:11
**ss** 256:3
**stability** 210:7
**staff** 14:13 15:10
42:20 63:3
64:16 65:17
66:9,19 69:6,7
75:7 78:10
79:13 84:2 89:9
89:13 100:16
116:20 117:3,10
117:14,15 129:2
129:4,5,6,10,13
132:20 154:11

154:19 156:11
156:11 157:3,5
163:6 173:21
174:8 177:10,12
181:8,12,13,16
182:9 187:22
191:7 192:20
195:15,18,19,21
202:7,8,9,12
211:11 212:13
220:19 223:8
224:15,21
230:10
**staff's** 129:24
**staffer** 116:12
155:13,15,16
181:14 191:8
230:11
**staffers** 153:10
155:7,9 185:15
191:12 205:1
**staffs** 89:4
**stamp** 170:8
181:20 206:7
207:1 209:2
**stamps** 199:14
202:21
**stand** 5:11,23
**standard** 105:21
105:24,24
162:12
**standing** 83:14
121:6,7
**stands** 141:19
182:4
**start** 6:19 15:6
26:13 42:15,16
47:8 54:18

67:10 72:22
93:18 133:22
135:23 142:4
178:1 189:15
216:7 228:9
247:18
**started** 5:6 24:15
35:9 44:7 74:13
125:1 134:16,18
158:5,6,10
**starting** 73:9
**starts** 109:17,23
141:22
**state** 10:12 46:7
74:6,14 124:17
189:20 209:9
213:10 231:19
253:13 258:10
259:15
**state's** 67:12
**stated** 10:20
150:18 171:20
222:15
**statement** 11:22
93:3 94:5,6,8,9
155:5,12,12,14
211:23 213:7
214:16 220:4
244:1,17 245:16
245:18 247:9,10
247:12 251:10
258:13,14
259:19,19
**statements** 9:13
45:2 50:18
98:15 223:10
244:18

Veritext Legal Solutions

Exhibit B

states 1:1 19:10
147:22 149:4
170:13,19
171:20 207:13
211:8
stating 219:10
226:17
statistics 246:11
statute 74:9
statutory 175:3
stay 178:2
sticking 28:16
stipend 163:18
166:4
stipulated 32:9
stipulation 9:19
stipulations 8:15
8:16,18 12:10
stop 99:8 163:1
163:18 164:6
166:4
stopped 163:2,4
163:9 166:14
221:3,3,19
222:13
stories 85:17,23
story 8:5,6
220:14
straightforward
92:23 149:20
strategy 219:9
street 1:20
strength 191:23
strict 251:18
strike 28:10 29:7
32:14 38:13
176:14 228:9

string 192:17
strongly 234:1
structure 77:19
90:12
structured
116:16
struggling 88:16
stuck 10:8 11:13
11:17 141:3,4,6
205:15
stuff 33:20 46:17
59:14 79:2 83:4
88:1 89:22,24
90:5,24,24 91:7
108:21 179:7
211:15 236:9
251:21
style 41:19,19
sub 174:10
231:22
subcategory
24:2,3
subject 7:7 8:1
10:16 17:17,19
29:15 32:1
40:17 46:12
48:12 64:22
81:1 102:17
106:24 130:13
136:10,12,18
141:10 149:7
150:17 152:15
157:22 162:20
165:3 170:19
174:2,7 175:2,2
175:9 177:3,5
180:12,23 186:5
220:14 225:20

230:7 254:8
subjective 22:21
86:17 99:16
100:15 102:15
119:18 228:4,23
229:4 245:15
subjectivity
119:20
subjects 228:1
submit 83:24
subordinate
25:7
subpart 190:23
subpoena 18:24
19:17 32:19
141:12 146:17
147:10 214:14
214:17
subscribed
258:10 259:14
260:21
subsequently
176:17
subservience
242:13
subservient
239:18
substantiate
139:3
substantiating
59:5
subtitles 113:7
116:5 120:10
suffice 55:11
168:10 194:3
221:13
sufficient 42:13
100:8

suffix 190:14
suffolk 256:3
suggest 41:5
95:18 105:13
182:23 217:15
235:6
suggested 103:3
104:5
suggesting 20:8
85:6 97:17,20,22
97:23 132:8
149:5
suggestions
12:10
suing 18:2
suit 111:20
231:2
suite 257:2
sum 249:24
summarize
81:11 180:20
183:1
summarizing
155:6
summons 29:21
superior 60:6,9
257:1
supernatural
234:21 239:19
supervisor 61:5
support 18:15
84:5 181:16
202:9,12 210:7
supports 35:7
suppose 98:15
117:20
sure 7:15 10:1
21:2 25:15 26:8

38:11 41:3,24
42:7 43:12 46:1
54:20 56:22
58:13 61:16
67:8 70:6 71:19
73:14 84:24
85:5,5 88:3,7
90:15,15,18
91:15 98:22,23
108:22 110:10
123:8 128:1
132:16 134:1
137:13 141:13
144:16 153:17
163:3 166:11,11
168:17,20
174:24 177:23
185:1,2 192:10
193:13 194:6,12
198:7 201:23
217:12 218:8
225:24 236:10
238:10,13,20
239:5 240:5,23
242:9 247:1,6
248:19 250:6
**surely** 203:17
**surmise** 75:1
**surprise** 139:16
139:17
**surrounding**
148:6 162:17
227:3,13
**swear** 14:18,21
**sweep** 130:4
**sworn** 14:15
15:2 256:9
258:10,13

259:14,18
260:21
**synonomous**
91:12
**synonymous**
93:8
**szaniszlo** 4:5

**t**

**t** 3:7 4:1 148:19
148:19,19,19
**tab** 176:2
**table** 7:20,22
10:19 11:24
12:7 28:3 41:8
41:10 107:7
**tabled** 12:18
**tablet** 57:8 66:13
209:4 225:11
**tabling** 36:20
**tad** 58:16
**tails** 243:21
**take** 8:8 13:19
13:24 14:4
16:20 22:5
23:20 28:19
31:18 52:22
53:2,4 65:1
104:10 108:22
115:2,8 120:10
120:13 127:7,17
142:2,10 147:11
156:8 159:10
168:6,15 170:7
173:7 178:7
189:17 199:16
200:3 208:15
209:5 210:20

211:4,7,8 213:20
215:12 218:19
219:7 220:13
221:9 222:18
226:4 238:24,24
239:6,7,8,10
241:7 244:16,22
246:15 247:17
249:6,14
**taken** 1:16 21:8
109:2 127:3
147:17 152:6
199:22 208:20
**takes** 111:7
219:11,16
220:21
**talk** 11:17 22:23
32:12 40:1,15,23
64:15 65:9 66:3
66:19,21 69:7,10
81:19 95:12
96:4 98:6
116:20 117:3,10
117:14 126:9,12
126:14 136:6
141:9 150:17
154:2 156:2
159:17,22 161:5
161:12,20 167:4
167:4 186:23
191:24 194:5
195:21 213:12
213:13,15
222:12 223:24
224:3,4 235:1
237:18 244:22
246:7 254:19

**talked** 27:3
32:11 40:16
65:2 69:6 87:5
106:16 110:23
116:21 117:4
156:10,12,14,21
157:19 159:16
159:24 170:24
221:1 224:3
**talking** 10:10
11:19 17:13
24:12 32:4 37:1
57:15,21 58:1,3
58:13,23 61:7
89:11,12 94:18
111:20 129:4
133:17 140:18
140:19 141:6,23
142:21,22
153:24 180:13
186:16,17
195:19 206:5
213:21 222:11
223:20 236:9
253:11
**talks** 202:12
**task** 235:16
**tasked** 154:12
**tasks** 145:12
161:1
**technical** 210:17
**technically**
186:16
**technological**
208:24 211:3
**technology**
129:14 195:9

**[tell - things]** Page 52

tell 16:1 30:18
  37:8 42:22
  45:23 46:19
  48:9,9 53:17
  58:5 60:24
  70:12 83:23
  105:19 109:20
  139:15 150:20
  172:22 181:6
  205:9
telling 13:24
  23:5,6 25:13
  27:20 29:6
  35:21 40:14
  84:3 99:8 100:4
  105:6 122:8
  137:15 143:21
  151:15 173:21
  193:20 235:16
tells 87:12 203:2
temple 1:5,20
  6:21 17:3,18
  18:2,3 29:17
  41:21 52:17
  57:4 148:19
  210:11 212:6
  219:18 222:17
  222:20,20
  225:17 257:6
  258:3 259:3
temporary 112:6
  113:8
tempore 111:23
  112:5
ten 116:19
  125:24 126:19
  129:7 132:20

tendency 162:9
tenets 90:21 91:2
tense 130:11
term 60:8 78:15
  89:2 90:11
  112:11 152:19
  158:4,14 169:6
  184:17 242:9
terminology
  61:14 184:13
  238:9
terms 8:18 54:2
  72:2 86:21,23
  87:22 89:16
  90:7 93:2 98:8
  99:14 157:16
  169:14 187:4,5
  203:11 223:17
  251:8
testified 15:3
  215:21
testify 18:23
  20:13 23:11
  25:21 29:12
  31:16 37:24
  40:8 62:18 98:9
  100:15,20
  102:24 103:12
  106:13 136:11
  136:14 161:4
  214:4 218:16
  248:5 252:19
  253:6
testifying 39:13
  40:5 99:15
testimony 14:19
  48:3 83:24
  137:8 166:6

213:20 216:14
  221:7 256:10
  258:6,7 259:6,9
  259:12
text 18:17
  135:24 170:23
  173:2 190:1
  204:16,17
  205:15,16 212:7
  212:8 226:8
  233:4,15 240:16
  252:14
texts 192:17
thank 6:17 11:2
  42:13 143:17
  146:4 148:22
  152:12 155:2
  156:18 177:19
  178:7 189:3,23
  193:12 194:3
  196:20 199:19
  207:17 219:15
  246:24 253:21
thanking 194:14
thanks 190:5
  193:3,14 197:12
  219:20
theatrics 186:15
thereabouts
  126:23
thereof 154:5
theresa 177:7
thing 13:23
  33:23 34:2 35:2
  49:23 58:13
  70:17,20 82:19
  82:23 87:13,15
  87:16,18 88:2

134:2,9 147:5
  166:19 168:24
  183:4 197:13
  198:11,14
  201:24 213:22
  222:1 229:11
  233:9 245:24
  246:5 249:5
thing's 188:18
things 5:21 7:9
  9:4 11:4 27:20
  30:24 31:8
  44:11 45:22
  53:18,21 55:7,12
  55:15 59:6
  60:21 65:5 71:2
  72:18 74:19,20
  77:18 79:13,16
  79:17 83:24
  85:18 88:5,10
  89:20 90:1,2,17
  91:3,5,8,18,20
  95:1,4 98:20
  99:13 102:5
  104:8 109:16
  110:17 114:8,19
  115:4 117:2
  119:6 124:10
  129:20 138:18
  141:8 144:24
  159:17 168:8
  171:6 173:8
  198:18 201:7
  214:21 221:2
  227:16 235:22
  237:4 238:6
  247:3

**[think - topics]**

**think** 12:5,5,12
12:14 14:18
20:8 24:7 25:4
29:10,14 31:12
34:20 35:14
36:12 39:2 41:5
55:23 59:4 69:4
72:13 75:5,12,18
86:11 90:13
92:23 95:21
96:21 99:14,17
104:14 106:15
106:21 107:22
114:10 119:16
126:18 127:21
127:24 128:2
136:4 137:24
138:2,19,20,20
149:20 158:15
162:3 178:1,4,9
189:17 191:21
197:15 198:24
201:8 213:3
215:11,19 218:4
222:12 224:10
231:9 233:22
245:13 247:4,11
248:21 254:1
**thinking** 56:19
99:21
**thinks** 178:7
252:16
**thirteen** 229:11
**thirty** 257:18
**thomas** 3:9
170:13 171:20
172:9 173:8

**thought** 20:1
30:23
**thoughts** 18:11
81:4 99:16
**threat** 6:13
**threaten** 9:7
**threatens** 5:24
9:7
**threats** 20:3
**three** 7:1 133:15
164:17 219:23
**thursday** 1:21
209:8
**time** 5:4 8:22
9:21 21:6,10
24:15 28:23
29:6 31:22 41:3
46:4 49:9,12,14
50:7,9 52:10
59:1 67:3 70:6
80:1 83:5,19
84:7,12 104:14
106:12 108:19
108:24 109:4
111:23 112:1,18
116:16 117:3
124:17 133:21
133:22 138:19
143:9 147:15,19
148:2,4,7,8
152:4,8 157:20
157:20 163:6
166:16 167:21
170:16 172:18
172:19 173:21
176:7 177:10
184:20 187:23
187:24 195:12

196:2 198:19
199:20,24
200:23 203:4,23
204:19 207:7,11
208:18,22
210:21 211:1
220:18,19
224:15,24 225:1
225:23 227:24
228:1 231:6
233:1,3,5
234:10 255:3
**timeframe**
157:24 163:8
**timeframes**
203:19
**times** 5:13 7:1
35:3 64:15
78:16 114:15
125:13,23 126:4
133:15 164:14
164:22 183:8,8,9
183:11 191:4
229:24 238:16
239:13 241:2
242:10
**timing** 203:11
221:9
**title** 19:3,7,8
23:3 50:6 112:3
112:5 192:10
**tnt** 148:16
**today** 6:11 8:3
11:15 27:4
94:11 106:13
140:7,19,20
164:19 166:6
190:3 197:10

214:23 236:4
238:20 239:21
240:7 245:17
**today's** 6:12
117:6
**told** 35:19,20
101:13 106:13
128:23 130:24
135:22 164:17
241:7
**tom** 170:22
**tomorrow**
105:15 184:11
185:13 187:16
196:21 202:4,14
202:16 205:4
220:14
**tomorrow's**
180:23
**tongue** 190:12
**tool** 231:10
**top** 189:4 202:1
202:24 216:7
**topic** 19:17 24:9
26:5 37:14,16
39:23 40:1,19
52:4 66:3 77:1,9
83:17 105:9
146:16 151:1
167:19 215:4
236:13 248:22
252:18 254:18
**topics** 18:22
20:10,13,17 21:3
22:22 24:21
25:20 26:18
28:17,24 30:12
30:23 31:13,16

Exhibit B

**[topics - understand]**

Page 54

37:23 38:3 40:4
96:2,9,9 98:3
103:16,23
106:13 122:2
130:22 136:8,15
136:18 137:8,24
140:3,23 141:1
141:16 143:3
146:6 167:14
237:3,19 248:5
248:14 251:3
252:9
**tort** 60:9,14,16
60:17 61:9
**totally** 167:23
215:19,23
**track** 66:13
132:1
**tradition** 71:5,6
**tragedy** 236:15
**trained** 43:3
**transcribed**
258:7
**transcript**
179:10 257:11
257:12 258:5,12
259:5,11,17
**translated**
240:24 241:2
**translation**
112:19
**transmitted**
205:19
**trash** 79:16 90:3
247:2
**treasurer** 68:21
**treasury** 68:13
68:18,20 227:7

**treated** 87:15
88:1
**tree** 5:15
**trial** 9:21 11:5,7
139:17 169:23
176:11 235:20
236:7
**tried** 34:10
94:13 106:6
**true** 5:22 98:11
98:23 211:17
214:7 251:11,11
251:12,13,14,20
256:10
**trust** 11:10
172:6
**truth** 6:3,12
12:17
**try** 8:4 9:12 10:2
62:2 89:16
139:1
**trying** 8:24 9:1,4
10:9 16:19 30:1
33:15 45:2
61:18,19 66:13
93:11,14 99:4
117:1 123:11
126:22 136:23
137:2 138:5
149:19 150:8,11
151:23 153:13
153:19 162:9,9
253:16
**tst** 4:7 6:22 7:21
22:9 24:20
31:18 47:19
49:21 51:17
52:11 55:22

86:10 89:19,19
89:20 91:3,5
92:3,4 97:11
100:2 108:9
148:13 161:11
161:14,15
163:13 164:1,9
164:14 165:1,21
174:22 183:14
207:18 211:19
213:6 215:15
220:3,21 221:22
223:22 225:13
226:17 228:8,10
244:20,24
245:13 252:24
253:1,14 254:7
**tst's** 49:22 90:10
90:20 91:20
100:1 163:12,16
163:21 165:4
227:22 251:24
**tuesday** 180:17
202:3 203:3,10
206:8 233:8
**turn** 53:6 65:1
166:19 184:24
212:22
**turning** 132:19
159:20 187:14
**turnover** 158:1
**twelve** 229:11
**twenty** 249:4
**twice** 105:18
**two** 11:4 47:24
53:17 78:12
90:7 91:12
94:13,15 97:11

125:13 131:14
132:11 156:7,8
156:13 157:19
158:4,4,10,16
160:10 161:22
164:13 176:14
183:11 218:11
219:23 226:5
**type** 213:9
**types** 18:19 68:8
250:8
**typical** 12:11
28:21 110:11
**typically** 79:23
104:8 110:2
231:8 233:6

**u**

**u** 156:17
**ultimate** 22:19
136:20
**umass** 182:19
**umb** 182:14,19
**umbrella** 61:14
**unable** 161:4
**unavowed** 5:11
**unclear** 37:14
62:20 227:23
238:5
**uncomfortable**
151:20
**underscore**
28:22
**understand** 6:15
10:9 13:12
22:17 23:17
27:6 29:8,18
30:3 31:20,24

32:17 41:16
43:10 48:2,2
54:10,13 60:7,18
61:19 73:10
78:17 83:2
86:21 88:13,15
90:7,9 92:5,8,17
92:18,20 93:23
94:4 98:12
104:5 105:23
117:1 130:15
133:7 137:1,12
161:17 163:19
169:18 188:15
204:15 205:23
223:20 234:12
239:5 243:4,7
245:24 247:9
252:14 253:16
**understanding**
8:4,5 13:10
15:18,19 16:9,13
16:15 17:1,23
18:1 19:2,24
21:19 22:7
24:24 25:3,5,7
27:19 30:1 35:2
35:14,15,20,22
36:22 38:5
39:21 41:16
50:2,3 53:17
61:1,4,6,17,18
61:21 62:1
87:24 121:3
136:7 137:10
139:8 143:5
169:11 173:18
215:20 217:19

220:23 225:12
225:14 237:20
242:8 253:4
**understandings**
234:4
**understood**
12:16 31:16
54:8,10 115:5
198:9
**undesignated**
200:5
**unfettered** 5:11
**unfolding**
151:21
**unfolds** 34:23
**unfortunately**
41:8
**unitary** 89:24
**united** 1:1
**university**
117:18
**unmet** 230:3,6
231:4,6
**unnecessarily**
106:11
**unnecessary**
219:20 232:17
**unpack** 76:7
**unprepared**
245:5 253:2
**untoward** 9:10
**unusual** 203:11
**unwilling** 161:4
**use** 8:9 25:9 33:6
34:3 36:3 54:2
112:11 119:9
143:9 194:16
226:13 238:9

242:2,9,14 251:7
**usual** 8:14 9:19
23:14 25:5
186:2
**usually** 75:22
83:17 171:4
229:23 230:1

| v |
|---|

**v** 1:7 192:15
257:6 258:3
259:3
**vacancies**
229:22
**vacancy** 229:20
229:21 233:1,2
**vacation** 115:3
**vaguely** 182:22
**valdez** 3:18,21
181:13 192:15
204:23
**valid** 44:3 254:8
**various** 114:8
**vary** 82:12
186:18
**varying** 81:20
83:5
**verbatim** 117:7
214:13
**veritext** 257:1,7
260:1
**veritext.com.**
257:17
**vice** 112:3
**video** 111:17,19
113:3,18 116:2
117:16 120:8,17
122:16 123:2

124:13 125:9
132:23 134:20
142:8 144:18
145:5 146:8
166:23 213:21
239:21 240:7
**videographer**
2:23 5:3 10:24
21:6,9 108:24
109:3,12 111:9
147:15,18 152:4
152:7 199:20,23
208:18,21
210:21,24 255:3
**videos** 125:16
**view** 106:11
108:13
**viewpoint**
244:24 251:24
**views** 220:3
**violence** 210:6
237:4
**virtual** 177:6
179:16
**viterinni** 220:18
**vittorini** 3:19 4:6
**voice** 145:9
**voices** 83:12
**volume** 84:7
85:7
**volunteer** 104:14
131:1
**volunteered**
131:3
**vote** 51:13,14
65:4 82:1 84:19
95:21 96:4 97:8
133:2

Exhibit B

**voted** 82:7 97:3
**voters** 98:7
**votes** 77:24 78:4
82:24 85:4
**voting** 83:4 98:8
100:1,2 109:16
135:2
**vouch** 120:20
121:2,5,15
**vouching** 121:19
**vs** 17:3 57:4 73:3

**w**

**w.s.** 188:5
**wait** 42:24 73:20
73:20,20 76:24
76:24,24 199:13
201:24 202:1
206:12
**waited** 185:7
**waive** 233:20,20
**waived** 257:19
**walking** 64:12
**walsh** 170:18
172:1
**wang** 156:23,24
157:7
**want** 6:11,13
11:17,20 13:1
14:14,15 20:23
21:1,4 22:4
28:18 31:21
34:17,18 36:10
40:22 41:15
45:18 55:13,13
56:21 66:3 69:9
73:9,10 86:9
91:15 96:20

97:14 99:24
101:5 102:5
105:18,19,21
108:9,20 116:9
121:3 124:2
137:13 139:10
139:24 141:4,8
143:4 145:14
146:20 149:9
150:18 167:8
168:7 179:5
185:6 199:7
215:10,18 217:2
217:10,18 218:3
225:23 226:19
231:12 233:24
246:9 248:19
**wanted** 41:13
77:8 139:16
168:7
**wanting** 100:3
**wants** 47:3 55:3
207:19 250:16
**washington** 2:5
**waste** 31:21 41:3
225:23 234:9
**wasting** 227:24
**watch** 111:3
124:9,22 125:3
125:15 139:19
140:12 144:24
204:7
**watching** 44:21
111:19 124:23
239:1
**way** 19:12 25:9
25:10 49:24
50:15 55:12,15

70:11 80:8
87:14,21 95:21
97:3 98:9 99:16
116:6 117:2
119:23 131:18
151:20 176:4
201:13,15 202:1
218:20,21,22
**ways** 152:10
**we've** 7:1 55:12
59:5 69:5 76:6
108:18 110:14
124:9 148:1
175:22 191:3
216:11,11,12,12
221:1 226:5
231:17 243:16
**website** 204:6
**wednesday**
75:24 77:22
177:22,24
179:17 185:2,21
187:11,12
188:18 191:3,4
193:1 206:9,9
**wednesdays**
65:23 75:21
76:1 81:20 83:5
115:1 198:2
203:6,6
**week's** 179:16
**weekly** 50:14
51:2,3
**weeks** 128:6
131:14 132:11
156:7,8 218:11
230:19

**weigh** 83:21 85:4
**weighs** 84:6
**weight** 86:11
**weights** 85:6
**welcome** 5:7 7:3
143:15 152:13
156:19
**welcoming**
115:13
**went** 30:22
43:17 70:9
71:24 94:3
154:13
**whatever's**
196:11 231:20
**whatnot** 92:11
176:24
**when's** 203:16
**whereof** 256:16
**whoa** 33:10,10
33:10,10 206:14
206:14,14
**wide** 126:4
241:12
**widely** 119:17
**wife** 7:20
**willing** 179:15
**winning** 165:7
**wisdom** 145:11
147:4
**wise** 223:17
**witness** 1:15
21:14 29:3,8
39:12 40:3,23,24
102:14 105:7
111:11 122:8
135:21 137:19
150:24 151:5,24

161:4 167:21
168:3,18,20
176:22 177:18
180:11 189:20
195:4 198:23
201:16,22
206:18 209:9
214:22,23
216:16 217:12
218:5 220:7,16
221:1,17 222:2
224:13 226:3
227:24 229:3
234:23 241:20
243:8,17,20
245:5 248:7,17
252:22 253:2,5,9
256:8,11,16
257:8,11 258:1,4
258:11 259:1,4
259:15
**witness's** 253:9
**witness'** 257:14
**word** 21:20,21
23:1 24:24 33:3
34:3 35:3 36:4,7
36:14,21 44:20
44:24 61:1
112:20 119:9
121:4,4 138:23
138:24 142:11
142:13 145:13
145:14 219:22
226:13 237:7
242:14
**word's** 121:10
**words** 10:4,5
14:1 25:8 32:15

34:8 38:19
42:24 43:11
44:7,15,16 55:7
63:13 124:6
162:8 169:21
171:15 182:10
212:18,18,20
226:12 229:16
232:6 237:15
242:16,18 244:7
251:4,9
**work** 12:11
28:15 29:22,23
46:22 53:10,23
63:17 64:6,16
66:2 69:16 78:6
78:8,13,14 79:6
79:7,9 81:7,12
84:3 87:20
104:9 107:21
110:15 114:8
121:1 129:6,6,7
133:22 154:21
154:22 160:23
174:17 181:9
192:18 210:5,5,6
210:10,11 212:5
212:6 222:16,17
222:19 232:20
238:12 240:13
247:2 250:24
**worked** 79:9
182:8 184:20
204:19
**working** 63:22
200:21
**workings** 21:19
22:2,18

**works** 69:12
74:16 115:7
204:18 247:3
**world** 25:6
**worry** 12:6,13
**worth** 250:1
**wow** 159:1
**wraps** 9:5
**wrath** 172:8
**write** 36:5 46:3
56:17 116:8,11
127:4,7,8 231:13
**writes** 185:12
189:19 196:16
197:7
**writing** 43:22
44:13,15 45:4,15
47:12 59:13
101:19,20
253:13
**written** 23:14
45:13 53:18,24
54:5,17,19 74:11
155:23 226:10
226:11 227:13
227:19,22 231:9
232:12 240:21
240:22 241:5,7
241:11 244:18
**wrong** 104:20
229:2 248:8
**wrote** 126:12
179:13
**wu** 113:5 116:16
117:14 141:22
161:12,13,15,18
162:20 163:10
166:16,17 167:5

168:14 181:15
209:17,19
213:23 214:1
220:19,20 221:2
222:24 223:1
224:2,4,15,16
225:18 226:17
228:4 229:1,7
244:11,12,14,14
244:14,15
**wu's** 116:20
126:9,12,14
161:20,21
211:11 212:2
213:20 216:17
220:20 221:21
223:20 229:7
244:23 245:11

| x |
|---|

**x** 3:1,7 4:1 66:8
66:15

| y |
|---|

**y** 156:17,18
157:10
**yansen** 185:3
188:6
**yeah** 27:22 42:5
44:14 48:12
49:12,21 54:15
54:15,18 55:19
56:4,24 58:2,7
60:16,19 61:10
61:10 63:1 64:3
64:7 66:6,8,10
66:10 69:10,10
73:6,6,9 74:22
74:24 76:20

**[yeah - zoom]**

Page 58

77:4,10,19 79:20
84:14 85:9,16
87:9,11 89:6,10
89:23 101:18
103:8 106:19,19
106:23 107:14
110:23 114:7,9
118:22 123:10
127:13 128:20
131:21,23,23
132:10,10 134:1
134:24 155:21
155:21 158:2
159:6,7,8,9
171:10 172:17
186:19,21 189:4
196:10 198:4
199:9,9 201:11
201:23 203:20
208:11 210:19
217:7 222:7
224:19 229:16
229:18 232:19
237:11 238:21
247:18
**year**   115:2,7
125:12,21
127:11 158:4,24
163:3 183:8,9,9
183:11 241:8
**years**   68:4,5,11
68:17,17 79:10
115:1,6 127:15
131:19 158:4
174:12 227:7
241:10,11 244:7
250:1,9

**yep**   177:1 206:7
**youth**   210:6
**youtube**   72:13
110:23 111:2
168:23 236:8
238:2
**yuleidy**   3:18,21
181:13 189:22
189:23 191:7,9
191:14,19 192:1
193:1 194:4,5
195:13 196:4,17
197:8,20 198:6
202:7,8,9 203:21
204:1,2,22,23
**yuleidy's**   192:12
**yup**   177:14

**z**

**z**   192:15
**zed**   3:23 207:4
207:11 228:7,8
228:10
**zoom**   191:10
193:3,22 196:3
196:19,21 197:4
197:11 198:7,7
199:1,2,2,3,5,10
201:15 204:3,4,5
204:11,21,21
205:1 209:6
230:14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

 **Gmail**

Matthew A. Kezhaya <matt@kezhaya.law>

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                                   Fri, May 27, 2022 at 4:32 PM
To: Nailah Freeman <nailah.freeman@boston.gov>
Cc: Nicole O'Connor <nicole.oconnor@boston.gov>, "Sonia A. Kezhaya" <sonia@kezhaya.law>, Marc Randazza
<mjr@randazza.com>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Cassidy Curran <csc@randazza.com>

Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);
11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;

Exhibit C                                                                                    Page 332

18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);

19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;

20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;

21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;

22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and

23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

Exhibit C                                    Page 333

 Gmail

**Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                    Wed, Jun 8, 2022 at 1:55 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>

Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

Exhibit C                    Page 334

 **Gmail**

**Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                                   Fri, Jun 24, 2022 at 4:47 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete.
The designations are not substantively different from the prior email, but I added more precise language
to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest
opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file
soon.


Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular
recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

 **2022 06 24 notice of 30(b)(6) deposition.pdf**
124K

Exhibit C                                   Page 335

 **Gmail**

**Matthew A. Kezhaya <matt@kezhaya.law>**

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                    Thu, Jun 30, 2022 at 8:34 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

Exhibit C                    Page 336

 **Matthew A. Kezhaya <matt@kezhaya.law>**

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Nicole O'Connor** <nicole.oconnor@boston.gov>                               Fri, Jul 1, 2022 at 7:52 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Can you do Wednesday, July 6th at 11 a.m.?

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

[Quoted text hidden]

Exhibit C                                                                    Page 337

**Jul 6, 2022|** 📅 **TST v. Boston - 30(b)(6) meet and confer**

Attendees:  Nicole O'Connor   Robert Arcangeli   Sonia A. Kezhaya

Attached files: 📄 2022 06 24 notice of 30(b)(6) deposition.pdf

Notes

- ¶ 2 - Any policies, practices, or customs surrounding the public's opportunity to influence the City's decision-making; both as a general matter and specific to the invocation ceremony at issue.
  - No issue as to invocation ceremony
  - "The public's opportunity to influence the City's decision-making" more specifically refers to mechanisms, other than voting, for the people to notify the City how the people feel about any issue of interest
- ¶ 6 - All intra-City written communications about TST's invocation demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint.
  - Concern: each writing may need a separate deponent (author-by-author)
  - Emails would be a good starting point; Matt to circle back with emails two weeks before deposition


- Potential issue: former councilors' subjective motivations are not available to a 30(b)(6) deponent
  - Can a 30(b)(6) deponent testify to matters that were in the knowledge of an agent during the relevant time, which agent is no longer an employee of the deponent?
  - If so, how is the deponent to be prepared?
  - Matt to look to 30(b)(6) book
  - ¶¶ 8, 10, 12, 17-21

Exhibit C                                    Page 338

- If, due to timing, depositions cannot be done in time, the parties agree to move out the discovery deadline

Action items
- ☐ August 1 may need to be moved toward Mid-August
    - ☐ As of now: Rob and Nicole, both, will be defending the depos.
- ☐ August 25-26 new deposition dates; Sept. 12-14 backup dates
- ☐ Two weeks ahead of depo: Matt to get emails (¶ 6); if a new document comes up we'll deal with it as it arises
- ☐ City's position: 30(b)(6) deposition is limited to 7 hours

Exhibit C                                                           Page 339



Matthew A. Kezhaya <matt@kezhaya.law>

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                                     Wed, Jul 6, 2022 at 1:11 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Following up with answers to the two legal questions raised during the meet and confer.

### *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*

Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:

> For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

### *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760

Exhibit C                                             Page 340

e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

Exhibit C                                                           Page 341

 **Gmail**

Matthew A. Kezhaya <matt@kezhaya.law>

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                    Wed, Jul 6, 2022 at 10:47 AM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Thanks for meeting, everyone, please see attached for the shared notes.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

[Quoted text hidden]

---

**2 attachments**

 **2022 07 06 notice of 30(b)(6) deposition.pdf**
118K

 **2022 07 06 30(b)(6) examination meet and confer notes.pdf**
36K

Exhibit C                                                        Page 342

 **Gmail**

**Matthew A. Kezhaya <matt@kezhaya.law>**

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Nicole O'Connor** <nicole.oconnor@boston.gov>                        Mon, Jul 18, 2022 at 10:18 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Matthew:

Following up on our phone call, I wanted to let you know that we are confirmed for August 25th.  The deponent that day
will be Christine O'Donnell.  She will be designated on the following topics:  1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24,
25, 26, 27, 28, 29, and 30.

While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6)
deposition is limited to 7 hours in total, regardless of the number of designees.  In recent history I've had at least one
judge in the District of Massachusetts agree with this position.

Thanks,
Nicole

   **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be
confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and
confidential attorney work-product or a privileged and confidential attorney-client communication.***  The
Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information
may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have
received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward
it.  Thank you for your cooperation.

On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Following up with answers to the two legal questions raised during the meet and confer.

### 1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?

Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule
30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment,
subd. (d)(2)). The 30(b)(6) book sheds further light:

For example, if you have listed four topics and the responding organization designates three witnesses to testify
about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial
Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules
contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal
Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001)

Exhibit C                                              Page 343

(allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

## 2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶ 2 and 6 are now annotated per the meeting and the date is updated to August 25).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

Exhibit C                                    Page 344

On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
  Thanks for meeting, everyone, please see attached for the shared notes.

  Matthew A. Kezhaya

  Arkansas office:
  Kezhaya Law PLC
  1202 NE McClain Rd
  Bentonville, AR 72712
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  Minnesota office:
  Kezhaya Law PLC
  333 N Washington Ave, #300
  Minneapolis, MN 55401
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  This message may contain confidential or privileged information and was intended for a particular
  recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


  On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
    Can you do Wednesday, July 6th at 11 a.m.?

     **Nicole M. O'Connor**
    Senior Assistant Corporation Counsel
    City of Boston Law Department
    City Hall, Room 615
    Boston, MA 02201
    (617) 635-4039
    Nicole.OConnor@boston.gov


    The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"),
    may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may
    be privileged and confidential attorney work-product or a privileged and confidential attorney-client
    communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for
    internal use only.  The Information may not be disclosed without the prior written consent of the Corporation
    Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it
    from your system.  Please do not copy or forward it.  Thank you for your cooperation.


    On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
      Nicole/Rob:

      I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or
      promptly after the notice or subpoena is served, the serving party and the organization must
      confer in good faith about the matters for examination."

      FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

      When is good for y'all to meet?

      Matthew A. Kezhaya

Exhibit C                    Page 345

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.


Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Matthew:

Exhibit C                                    Page 346

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF0002046-2771 and 3397-3438.  In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality).  In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

📄 **DEF0002046-2296[unredacted].pdf**

📄 **DEF0002296-2771[unredacted].pdf**

📄 **DEF0003397-3406 [unredacted].pdf**

📄 **DEF0003407-3438 [unredacted].pdf**

Thanks,
Nicole

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Thanks, that motion will go out later on this month.

Exhibit C                    Page 347

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Hi Matthew:

Yes, the City will oppose the motion.  You can consider your 7.1 obligation satisfied.

Nicole

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a

Exhibit C                                        Page 348

filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed).  As you probably saw, I filed the protective order yesterday.  Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel

Exhibit C                    Page 349



City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment

Exhibit C                                                                 Page 350

of silence);

11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);

12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)

13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;

14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;

15. Each Councilor's subjective understanding about TST's engagement with the broader community;

16. Each Councilor's subjective understanding about TST's intra-organizational activities;

17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;

18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);

19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;

20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;

21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;

22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and

23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Exhibit C                                                    Page 351

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Hey Nailah and Nicole,

Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
Thank you.

On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
That's fine

Matthew A. Kezhaya

Exhibit C                                    Page 352

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

Hi Matthew,

As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?

Please let me know as soon as you can. Thank you.

On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Let's do tomorrow at 3:00 pm ET

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

Exhibit C                                        Page 353

On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman
<nailah.freeman@boston.gov> wrote:

Hi Matthew,

Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.

On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman
<nailah.freeman@boston.gov> wrote:

Hi Matthew,

We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.

Wed, 2/16: 2-5pm et
Thurs, 2/17: 11-3pm et
Fri, 2/18:  11-3:30pm et

Thank you.

On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya
<matt@kezhaya.law> wrote:

Please see attached for a discovery deficiency letter regarding the first discovery requests, and a second set of discovery requests.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201

Exhibit C                                                    Page 354

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

Exhibit C                              Page 355

--

COB_B_Blue_square-01.png  **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

Exhibit C                                                                 Page 356



**Matthew A. Kezhaya <matt@kezhaya.law>**

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

**Matthew A. Kezhaya** <matt@kezhaya.law>                                  Fri, Jul 22, 2022 at 6:31 AM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli
<robert.arcangeli@boston.gov>

Hi Nicole,

Thanks for the update. There is an outstanding need for the City to designate a representative to speak
on the below-specified matters for examination. As the 30(b)(6) deponent, the City "must" designate
someone to testify as to the enumerated matters for examination. FRCP 30(b)(6).

This case presents a novel constitutional question of whether the First Amendment permits a city to
categorically exclude a particular religious minority from a legislative prayer ceremony. Whether the City
categorically excluded TST because of TST's religious beliefs is the fact question at hand. Indisputably, the
City has that information in its possession because the City has claimed that the Councilors have the sole
right to determine who speaks. Obviously, the Councilors are all agents of the City. And that fact matter is
"material" to the agency. Thus, the City is deemed to know the information sought. Restatement (Third)
Of Agency §§ 5.03, 8.11 (2006).

These fact questions speak to the very heart of this case.  We all agreed on dates for this deposition, one
month after I gave you advanced notice of the matters to be examined. You have had two months
to prepare a witness to speak to these issues, and you have another month to go. The discovery deadline
is in three months, and I anticipate a need for supplemental written discovery and possibly even another
round of depositions.

By next Friday, **July 29**, the City must designate one or more people to testify about the below matters
on August 25 at 9:30 in TST's headquarters as agreed, or I will move to compel.


Matters for examination yet to be designated:

8 - The subjective bases for why each Councilor selected each guest speaker for the
invocation ceremony, from January 1, 2011 to present.

10 - The subjective bases for why each Councilor did or did not heed the demand
described in ¶ 9, from January 1, 2011 to present.

12 - The subjective bases for why each Councilor did not select TST for each invocation
ceremony, from the first Council meeting immediately following each of TST's demands
for an invite to the invocation ceremony to present.

17 - Each Councilor's subjective understanding of TST's religious doctrine, rituals,
iconography, literature, dress, or any other arguable indicia of sincerely-held religious
beliefs; both as a matter of first impression and as that understanding has evolved over
time, if at all.

18 - The bases or source for each Councilor's subjective understanding of TST's religious
doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-

Exhibit C                                                    Page 357

held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

19 - Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20 - Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21 - Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22 - Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.


Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Mon, Jul 18, 2022 at 10:19 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Matthew:

Following up on our phone call, I wanted to let you know that we are confirmed for August 25th.  The deponent that day will be Christine O'Donnell.  She will be designated on the following topics:  1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24, 25, 26, 27, 28, 29, and 30.

While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6) deposition is limited to 7 hours in total, regardless of the number of designees.  In recent history I've had at least one judge in the District of Massachusetts agree with this position.

Thanks,
Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department

Exhibit C                    Page 358



City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.**  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Following up with answers to the two legal questions raised during the meet and confer.

## *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*

Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:

> For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d)(2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

## *2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?*

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300

Exhibit C                                          Page 359

Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular
recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶
2 and 6 are now annotated per the meeting and the date is updated to August 25).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular
recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Thanks for meeting, everyone, please see attached for the shared notes.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular
recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Can you do Wednesday, July 6th at 11 a.m.?

Exhibit C                                    Page 360



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.


On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Nicole/Rob:

I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Thanks, Nicole.

Rob, good to see you back on the case.

Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added

Exhibit C                                                          Page 361

more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.

The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.


Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Matthew:

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF0002046-2771 and 3397-3438.  In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality).  In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

📄 **DEF0002046-2296[unredacted].pdf**

📄 **DEF0002296-2771[unredacted].pdf**

📄 **DEF0003397-3406 [unredacted].pdf**

📄 **DEF0003407-3438 [unredacted].pdf**

Thanks,
Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged***

Exhibit C                    Page 362

*and confidential attorney-client communication.*  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.


On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.


On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Thanks, that motion will go out later on this month.

Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

Exhibit C                    Page 363

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:

Hi Matthew:

Yes, the City will oppose the motion.  You can consider your 7.1 obligation satisfied.

Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

Exhibit C                                                        Page 364

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed).  As you probably saw, I filed the protective order yesterday.  Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Exhibit C                                                    Page 365

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or other valuable consideration the City provided to the guest speaker in return for their services)
8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;
9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;
10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);
11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);
12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)
13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;
14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;
15. Each Councilor's subjective understanding about TST's engagement with the broader community;
16. Each Councilor's subjective understanding about TST's intra-organizational activities;
17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;
18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel

Exhibit C                                                        Page 366

sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);

19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;

20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;

21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;

22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and

23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
  Hey Nailah and Nicole,

Exhibit C                                                           Page 367

Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
> Thank you.
>
> On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>> That's fine
>>
>> Matthew A. Kezhaya
>>
>> Arkansas office:
>> Kezhaya Law PLC
>> 1202 NE McClain Rd
>> Bentonville, AR 72712
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> Minnesota office:
>> Kezhaya Law PLC
>> 333 N Washington Ave, #300
>> Minneapolis, MN 55401
>> p: (479) 431-6112
>> f: (612) 349-2760
>> e: matt@kezhaya.law
>>
>> This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.
>>
>> On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>>> Hi Matthew,

Exhibit C                    Page 368

As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?

Please let me know as soon as you can. Thank you.

On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Let's do tomorrow at 3:00 pm ET
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman <nailah.freeman@boston.gov> wrote:

> Hi Matthew,
>
> Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.
>
> On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>
>> Hi Matthew,
>>
>> We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.
>>
>> Wed, 2/16: 2-5pm et
>> Thurs, 2/17: 11-3pm et
>> Fri, 2/18:  11-3:30pm et
>>
>> Thank you.

Exhibit C                                    Page 369

On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya
<matt@kezhaya.law> wrote:
> Please see attached for a discovery deficiency letter
> regarding the first discovery requests, and a second set of
> discovery requests.
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged
> information and was intended for a particular recipient.  If it
> appears that I sent this to you in error, please inform me
> and delete this message.


--

COB_B_Blue_square-01.png     **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov


The information contained in this electronic transmission ("e-mail"),
including any attachment (the "Information"), may be confidential or
otherwise exempt from disclosure. It is for the addressee only. **This
information may be privileged and confidential attorney work-
product or a privileged and confidential attorney-client
communication.** The information may also be deliberative and pre-
decisional in nature. As such, it is for internal use only. The information
may not be disclosed without the prior written consent of the
Corporation Counsel of the City of Boston. If you have received this e-
mail by mistake, please notify the sender and delete it from your
system. Please do not copy or forward it. Thank you for your
cooperation.


--

COB_B_Blue_square-01.png     **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615

Exhibit C                                    Page 370

Boston, MA 02201

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png   **Nailah A. Freeman**

Assistant Corporation Counsel

City of Boston Law Department

One City Hall Square, Room 615

Boston, MA 02201

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png   **Nailah A. Freeman**

Assistant Corporation Counsel

City of Boston Law Department

One City Hall Square, Room 615

Boston, MA 02201

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

Exhibit C                                    Page 371

**2022 07 06 notice of 30(b)(6) deposition.pdf**
118K

Exhibit C                    Page 372

 **Matthew A. Kezhaya <matt@kezhaya.law>**

---

## TST v. Boston (21-cv-10102) -- deficiency letter; second discovery requests

Nicole O'Connor <nicole.oconnor@boston.gov>                          Fri, Jul 29, 2022 at 8:05 AM
To: "Matthew A. Kezhaya" <matt@kezhaya.law>
Cc: "Sonia A. Kezhaya" <sonia@kezhaya.law>, "Brendan Durrigan, Esq." <bdurrigan@gmail.com>, Robert Arcangeli <robert.arcangeli@boston.gov>

Matthew:

The City designates the chiefs of staff for Councilors Flynn, Flaherty, and Baker, as well as the former chief of staff for Mayor Wu, to testify regarding topics 8, 10, 12, 17, 18, 29, 20, 21, and and 22 on their behalf.  These folks will testify on one of the dates we put on hold in September (9/12-9/14, I believe).  The remaining Councilors who were on the Council at the time relevant to Plaintiff's complaint (as well as their chiefs of staff) are no longer employees of the City and therefore are not within the our "control", so to speak.  There are no current City employees who can testify regarding the "subjective intent" of these Councilors.  From a practical standpoint (at least from my view), it does not make much sense to insist on moving forward with these "subjective intent" questions via a 30(b)(6) deposition, particularly where you can get this testimony via other means (like issuing individual deposition subpoenas).  Of course, you're free to proceed how you see fit, but we'll oppose any motion to compel on these grounds.

Nicole

 **Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Fri, Jul 22, 2022 at 7:31 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

> Hi Nicole,
>
> Thanks for the update. There is an outstanding need for the City to designate a representative to speak on the below-specified matters for examination. As the 30(b)(6) deponent, the City "must" designate someone to testify as to the enumerated matters for examination. FRCP 30(b)(6).
>
> This case presents a novel constitutional question of whether the First Amendment permits a city to categorically exclude a particular religious minority from a legislative prayer ceremony. Whether the City categorically excluded TST because of TST's religious beliefs is the fact question at hand. Indisputably, the City has that information in its possession because the City has claimed that the Councilors have the sole right to determine who speaks. Obviously, the Councilors are all agents of the City. And that fact matter is "material" to the agency. Thus, the City is deemed to know the information sought. Restatement (Third) Of Agency §§ 5.03, 8.11 (2006).
>
> These fact questions speak to the very heart of this case.  We all agreed on dates for this deposition, one month after I gave you advanced notice of the matters to be examined. You have had two months

Exhibit C                                    Page 373

to prepare a witness to speak to these issues, and you have another month to go. The discovery deadline is in three months, and I anticipate a need for supplemental written discovery and possibly even another round of depositions.

By next Friday, **July 29**, the City must designate one or more people to testify about the below matters on August 25 at 9:30 in TST's headquarters as agreed, or I will move to compel.

Matters for examination yet to be designated:

8 - The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present.

10 - The subjective bases for why each Councilor did or did not heed the demand described in ¶ 9, from January 1, 2011 to present.

12 - The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following each of TST's demands for an invite to the invocation ceremony to present.

17 - Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

18 - The bases or source for each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs; both as a matter of first impression and as that understanding has evolved over time, if at all.

19 - Each Councilor's subjective opinion about the bona fides of TST's sincerely-held religious beliefs, from TST's first demand to present.

20 - Each Councilor's subjective understanding about TST's engagement with the broader community, and the bases therefor.

21 - Each Councilor's subjective understanding about TST's intra-organizational activities, and the bases therefor.

22 - Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712

Exhibit C                    Page 374

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Mon, Jul 18, 2022 at 10:19 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Matthew:

Following up on our phone call, I wanted to let you know that we are confirmed for August 25th.  The deponent that day will be Christine O'Donnell.  She will be designated on the following topics:  1, 2, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 23, 24, 25, 26, 27, 28, 29, and 30.

While we appreciate the research you did on the 7-hour issue, we'll be maintaining our position that the 30(b)(6) deposition is limited to 7 hours in total, regardless of the number of designees.  In recent history I've had at least one judge in the District of Massachusetts agree with this position.

Thanks,
Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it.  Thank you for your cooperation.


On Wed, Jul 6, 2022 at 2:12 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Following up with answers to the two legal questions raised during the meet and confer.

## *1: Does the 7-hour limit mean all of the matters of examination must be completed within 7 hours?*

Clearly no. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition. "FRCP 30, advisory comments (2000 Amendment, subd. (d)(2)). The 30(b)(6) book sheds further light:

> For example, if you have listed four topics and the responding organization designates three witnesses to testify about those four topics … each witness can testify up to seven hours for a total of twenty-one hours.

Exhibit C                                    Page 375

Mark Kosieradzki, *30(b)(6): Deposing Corporations, Organizations & the Government (2nd. Ed.)* (Trial Guides, LLC 2020), at 69.

If, in the unlikely event that I will need more than seven hours with any particular designee, the Rules contemplate a motion to extend the available time on a motion for good cause. FRCP 30(d) (2); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001) (allowing deposition of one designee to last for three, seven-hour days to question about 56 different barges).

## 2: Can the 30(b)(6) designee testify to former councilors' subjective motivations?

No, but the designee can testify to the City's understanding of the former councilors' subjective motivations and can testify to the City's interpretation of the former councilors' decisions to not invite TST. *Canal Barge*, 2001 WL 817853 at *1 ("The deponent must testify to both the facts within the knowledge of the business entity *and the entity's opinions and subjective beliefs, including the entity's interpretation of events and documents*") (emphasis added).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jul 6, 2022 at 10:49 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Supplement: the prior email also includes the revised 30(b)(6) notice based on our meeting (i.e., ¶¶ 2 and 6 are now annotated per the meeting and the date is updated to August 25).

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401

Exhibit C                                                                                      Page 376

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Wed, Jul 6, 2022 at 10:47 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
  Thanks for meeting, everyone, please see attached for the shared notes.

  Matthew A. Kezhaya

  Arkansas office:
  Kezhaya Law PLC
  1202 NE McClain Rd
  Bentonville, AR 72712
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  Minnesota office:
  Kezhaya Law PLC
  333 N Washington Ave, #300
  Minneapolis, MN 55401
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


  On Fri, Jul 1, 2022 at 7:52 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
    Can you do Wednesday, July 6th at 11 a.m.?

       **Nicole M. O'Connor**
             Senior Assistant Corporation Counsel
             City of Boston Law Department
             City Hall, Room 615
             Boston, MA 02201
             (617) 635-4039
             Nicole.OConnor@boston.gov


    The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.


  On Thu, Jun 30, 2022 at 9:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
    Nicole/Rob:

    I just learned that a Rule 30(b)(6) deposition now requires a good faith conference: "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

Exhibit C                    Page 377

FRCP 30(b)(6). Apparently, the Rule was amended effective December 1, 2020.

When is good for y'all to meet?

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Fri, Jun 24, 2022 at 4:47 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
> Thanks, Nicole.
>
> Rob, good to see you back on the case.
>
> Please see attached for a 30(b)(6) notice, to begin **August 1** and continuing thereafter until complete. The designations are not substantively different from the prior email, but I added more precise language to aid in preparation. If this/these date(s) don't work for y'all, please propose alternatives at your earliest opportunity.
>
> The motion to reconsider has been pushed out by the needs of other cases. I am hopeful to get it on file soon.
>
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law

Exhibit C                                      Page 378

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Tue, Jun 14, 2022 at 2:59 PM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Matthew:

As promised, and pursuant to your previous discussions with Nailah, attached are unredacted versions of documents marked DEF0002046-2771 and 3397-3438.  In the interest of getting these documents to you ASAP, I've marked several entire sets as confidential pursuant to the protective order (rather than go through page by page to assess potential confidentiality).  In the event you want to challenge the confidentiality of any page or run into any issues with something you want to file publicly down the road, just let me know and I'd be happy to discuss removing the confidentiality designation on those particular records.

| 📄 DEF0002046-2296[unredacted].pdf |
| 📄 DEF0002296-2771[unredacted].pdf |
| 📄 DEF0003397-3406 [unredacted].pdf |
| 📄 DEF0003407-3438 [unredacted].pdf |

Thanks,
Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  *This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.


On Mon, Jun 13, 2022 at 10:15 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Additionally, now that the Court has endorsed the protective order I can send over the materials referenced by Nailah - hopefully by end of day tomorrow.



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  *This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may

Exhibit C                                        Page 379

not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Wed, Jun 8, 2022 at 2:56 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
  Thanks, that motion will go out later on this month.

  Re: 30(b)(6) date(s), just following up on calendaring. We need to get something on the books soon because I foresee that the testimony will result in a need for supplemental written discovery. Can you get us some dates by end of week? If not, I anticipate issuing a notice of deposition for dates that are good for us on the understanding that we can move the dates if needs be.

  Matthew A. Kezhaya

  Arkansas office:
  Kezhaya Law PLC
  1202 NE McClain Rd
  Bentonville, AR 72712
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  Minnesota office:
  Kezhaya Law PLC
  333 N Washington Ave, #300
  Minneapolis, MN 55401
  p: (479) 431-6112
  f: (612) 349-2760
  e: matt@kezhaya.law

  This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 9:21 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
  Hi Matthew:

  Yes, the City will oppose the motion.  You can consider your 7.1 obligation satisfied.

  Nicole

   **Nicole M. O'Connor**
  Senior Assistant Corporation Counsel
  City of Boston Law Department
  City Hall, Room 615
  Boston, MA 02201
  (617) 635-4039
  Nicole.OConnor@boston.gov

  The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

Exhibit C                                                              Page 380

On Wed, Jun 1, 2022 at 12:45 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Supplement: on further research of the motion to reconsider, I think it falls under FRCP 60(b)(6). The deadline to file a motion is ambiguous ("reasonable," FRCP 60(c)(1)), but "reasonable" appears to assume a longer deadline than the applicable to FRCP 60(b)(1), (2), and (3) ("a year," FRCP 60(c)(1)). I anticipate filing the motion to reconsider in advance of the one-year mark (I was thinking later this month), but let me know if you think the "reasonable" deadline would require a filing in the early or middle part of the month. One year out from the order of dismissal is **July 21, 2022**.

Additionally, these emails are intended to meet the meet-and-confer requirement. Please let me know if you would like to discuss further, or if you consider my good faith obligation satisfied. I assume you will object to the motion, please let me know if I am mistaken.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Jun 1, 2022 at 11:09 AM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Removing Marc and Cassidy from the email thread (I errantly forgot to do so after Marc withdrew).

Thanks for the update. I also plan on moving the court to reconsider the 12(b)(1) dismissal of the hybrid claim in light of Shurtleff. Although Shurtleff (the First Circuit one) was not cited as grounds for dismissal, I think Shurtleff (the SCOTUS one) clarifies the analytical framework for when speech is accommodated by the government as opposed to being made by the government. In my opinion, Town of Greece (which posits that governments may not, consistent with the Establishment Clause, exercise control over the content of the prayer opportunity) requires a finding that the prayer opportunity is not "government speech, " as defined by SCOTUS in Shurtleff. Or, at least, there is enough room for doubt that I should be able to develop a record on the issue.

I don't think it should require amending the scheduling order because the hybrid issues should be anything meaningfully different than what we already have out there.

On Wed, Jun 1, 2022, 9:05 AM Nicole O'Connor <nicole.oconnor@boston.gov> wrote:
Hi Matthew:

As a heads up, I wanted to let you know that Nailah recently left our office (hence the delay in getting the protective order filed).  As you probably saw, I filed the protective order yesterday.  Once the court endorses it, I can produce any outstanding documents that Nailah agreed to produce subject to a protective order.

Exhibit C                                                        Page 381

I will touch base with my client and get back to you regarding dates for the 30(b)(6).

Thanks,
Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Fri, May 27, 2022 at 5:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
Nailah and Nicole,

It has been over a week since I requested you to enter the agreed-upon protective order and produce the documents. In that time, I have not seen the proposed protective order get filed. If I have missed it, please let me know and provide the materials you have been withholding pending an agreement on the form of the protective order. If not, I intend to move for an order to compel all outstanding materials. If we need to have another meet and confer on the topic, please let me know your earliest availability.

Additionally, I'd like to get one or more 30(b)(6) depositions scheduled. The topics of testimony will be:

1. The City's record keeping policies surrounding payment to guest speakers at the invocation ceremony;
2. The City's record keeping policies surrounding intra-City communications;
3. All intra-City written communications about TST's prayer demands ("communications" includes emails, instant messaging transcripts, text messages, paper memoranda, and any other form of the written word), up to the date of the original complaint;
4. The dates, times, attendees, and subjects of discussion on any meetings involving any City personnel about TST's prayer demands, up to the date of the original complaint;
5. Any other individuals or groups who have demanded participation in the City's prayer opportunity;
6. The subjective bases for why each Councilor selected each guest speaker for the invocation ceremony, from January 1, 2011 to present;
7. Identifying information about each guest speaker for the invocation ceremony, from January 1, 2011 to present (particularly: name, faith group, residential address at the time of the invite, business address at the time of the invite, each time the guest speaker performed the invocation for the City, and how much money or

Exhibit C                                                    Page 382

other valuable consideration the City provided to the guest speaker in return for their services)

8. The subjective bases for why each Councilor did not select TST for each invocation ceremony, from the first Council meeting immediately following TST's 2016 demand to present;

9. Any instances in which the City had a vacancy in the guest speaker role for the prayer opportunity, from the first Council meeting immediately following TST's 2016 demand to present;

10. Any instances in which the prayer opportunity did not appeal to a literal supernatural entity to give guidance to the Councilors (*e.g.*, a moment of silence);

11. Any instances in which the prayer opportunity addressed a particular topic not on the Council's agenda (*e.g.*, praying for emotional relief from a tragedy, giving thanks for a perceived divine boon, but not generalized statements seeking divine wisdom be bestowed on the Council);

12. Any instances in which a guest speaker identified the Council as subservient to any particular literal supernatural entity (*e.g.*, any instance in which the Councilors are referred to as the "Lord's servants," or "sheep," or otherwise unable to perform their public service function without reliance on the deity being prayed to)

13. Each Councilor's subjective understanding of TST's religious doctrine, rituals, iconography, literature, dress, or any other arguable indicia of sincerely-held religious beliefs, from TST's 2016 demand to present;

14. Each Councilor's subjective opinion about the *bona fides* of TST's sincerely-held religious beliefs, from TST's 2016 demand to present;

15. Each Councilor's subjective understanding about TST's engagement with the broader community;

16. Each Councilor's subjective understanding about TST's intra-organizational activities;

17. Any statement (inclusive of any statements that were oral, written, recorded, or any combination thereof) that any Councilor has made (or either has prepared or has had prepared for them, but did not make) about Satanism, TST, its membership, or its activities;

18. Any other of the City's policies, practices, or customs surrounding governmental control, or lack thereof, over the prayer opportunity (including without limitation: any instance in which any City personnel sought to review a prayer before it was given, any instance in which any City personnel sought to modify a prayer before it was given, any instance in which any City personnel commented on a prayer after it was given, any instance in which City personnel did not extend an invitation because of the anticipated response to an anticipated prayer, and any other facts the City finds important to the question of whether it exercised any level of control over the prayer opportunity);

19. City demographics, limited to the relative proportionate share of faith groups, from January 1, 2011 to present;

20. The relative proportionate share of each faith groups' representation in the City's prayer opportunity, year-over-year, from January 1, 2011 to present;

21. The sum of money the City has paid to each guest speaker at the prayer opportunity, how that sum was determined, and, if guest speakers are paid different sums, how and why each guest speaker came to receive the particular sum received;

22. Any other facts the City finds important to the question of whether it "advanced" or "disparaged" any particular religion, or class of religion (*e.g.*, theistic over atheistic), by purporting to have an unfettered right to pick and choose which faith groups are allowed to have equal representation in the prayer opportunity; and

Exhibit C                                                                 Page 383

23. Any other facts the City finds important to the question of whether it "substantially interfered" with TST's religious expression by allowing each councilor to deny TST an invitation for equal access to the prayer opportunity.

I intend to do the deposition(s) at TST's headquarters in Salem. They will be audio and video recorded. Please let me know your availability mid-July and later. Please also let me know who will be serving as 30(b)(6) deponents, and for which topics.

If the City is unable to procure a 30(b)(6) deponent to testify about any topic identified, please identify the topic with specificity and provide your availability for a meet-and-confer to determine next steps.

Please let me know if I can answer any questions.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, May 18, 2022 at 5:28 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Hey Nailah and Nicole,

Sorry for the delay in getting back on this. The proposed protective order is approved as written. Please feel free to submit to the Court as a stipulated order and provide the confidential materials at your earliest convenience.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112

Exhibit C                    Page 384

f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:35 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

Thank you.

On Tue, Feb 22, 2022 at 2:32 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

That's fine

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Tue, Feb 22, 2022 at 1:30 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:

Hi Matthew,

As a follow up to our teleconference on Thursday, I am reaching out to give an update and request additional time to address the discovery concerns that you raised. I spoke with my client to get a better sense of the time they would need to locate and gather records dating back to 2011 and they seemed hopeful that they could get this done with more time. Can we agree to extend the City's response date from February 24, 2022 to **March 4, 2022**?

Please let me know as soon as you can. Thank you.

On Wed, Feb 16, 2022 at 2:19 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:

Let's do tomorrow at 3:00 pm ET

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712

Exhibit C                          Page 385

p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

On Wed, Feb 16, 2022 at 9:55 AM Nailah Freeman <nailah.freeman@boston.gov> wrote:
> Hi Matthew,
>
> Following up to my email below, please let me know as soon as possible if you are available during any of the times below to discuss your letter regarding the City's responses to TST's first set of discovery requests. If those times cannot work on your end, please propose a few dates and times. Thank you.
>
> On Mon, Feb 14, 2022 at 3:55 PM Nailah Freeman <nailah.freeman@boston.gov> wrote:
>> Hi Matthew,
>>
>> We've reviewed your letter regarding the City's responses to TST's first set of discovery requests and believe that it may make the most sense to set up a call to discuss. If you're amenable, please let me know if there's a time from the blocks below that works for you, and I'll set up a call.
>>
>> Wed, 2/16: 2-5pm et
>> Thurs, 2/17: 11-3pm et
>> Fri, 2/18:  11-3:30pm et
>>
>> Thank you.
>>
>> On Thu, Feb 10, 2022 at 4:33 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
>>> Please see attached for a discovery deficiency letter regarding the first discovery requests, and a second set of discovery requests.
>>>
>>> Matthew A. Kezhaya
>>>
>>> Arkansas office:
>>> Kezhaya Law PLC
>>> 1202 NE McClain Rd
>>> Bentonville, AR 72712
>>> p: (479) 431-6112
>>> f: (612) 349-2760
>>> e: matt@kezhaya.law
>>>
>>> Minnesota office:
>>> Kezhaya Law PLC
>>> 333 N Washington Ave, #300

Exhibit C                    Page 386

Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged
information and was intended for a particular recipient.  If
it appears that I sent this to you in error, please inform
me and delete this message.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"),
including any attachment (the "Information"), may be confidential or
otherwise exempt from disclosure. It is for the addressee only. **This
information may be privileged and confidential attorney work-
product or a privileged and confidential attorney-client
communication.** The information may also be deliberative and pre-
decisional in nature. As such, it is for internal use only. The
information may not be disclosed without the prior written consent of
the Corporation Counsel of the City of Boston. If you have received
this e-mail by mistake, please notify the sender and delete it from
your system. Please do not copy or forward it. Thank you for your
cooperation.

--

COB_B_Blue_square-01.png  **Nailah A. Freeman**
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
617-635-4064 (w)
nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"),
including any attachment (the "Information"), may be confidential or
otherwise exempt from disclosure. It is for the addressee only. **This
information may be privileged and confidential attorney work-
product or a privileged and confidential attorney-client
communication.** The information may also be deliberative and pre-
decisional in nature. As such, it is for internal use only. The information
may not be disclosed without the prior written consent of the
Corporation Counsel of the City of Boston. If you have received this e-
mail by mistake, please notify the sender and delete it from your
system. Please do not copy or forward it. Thank you for your
cooperation.

--

Exhibit C                                    Page 387

COB_B_Blue_square-01.png

**Nailah A. Freeman**

Assistant Corporation Counsel

City of Boston Law Department

One City Hall Square, Room 615

Boston, MA 02201

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

--

COB_B_Blue_square-01.png

**Nailah A. Freeman**

Assistant Corporation Counsel

City of Boston Law Department

One City Hall Square, Room 615

Boston, MA 02201

617-635-4064 (w)

nailah.freeman@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. **This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.** The information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

Exhibit C                                                      Page 388

Re: Deposition schedule

Nicole O'Connor <nicole.oconnor@boston.gov>

Fri 9/9/2022 6:53 AM

To: Matt Kezhaya <matt@crown.law>

Cc: robert.arcangeli@boston.gov <robert.arcangeli@boston.gov>;Bill Rohla <bill@crown.law>;John Hayden <john@crown.law>;Nick Henry <nick@crown.law>;Sonia Kezhaya <sonia@crown.law>

Matt:

As I understand you're no longer going forward with the depositions on September 12/13, I'll let the deponents know they do not need to appear.

Thanks.

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Sep 8, 2022 at 7:47 PM Matt Kezhaya <matt@crown.law> wrote:

> Time's up. I consider our preexisting "September 12-14" agreement, which Nicole helpfully recited on the record, to be broken. That will give me more time to work up the motion for sanctions, anyway.
>
> I look forward to seeing y'all on **September 20**, at **9:30 am** for the deposition of **Mayor Wu** at **TST HQ**, as previously noticed.
>
> Ensaibi-George may or may not happen on the date previously noticed. I will confer with her separately and will let you know the product of her and my mutual agreement.

Exhibit D      Page 389

**From:** Matt Kezhaya
**Sent:** Thursday, September 8, 2022 11:50 AM
**To:** Nicole O'Connor <nicole.oconnor@boston.gov>; robert.arcangeli@boston.gov
**Cc:** Bill Rohla <bill@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>; Sonia Kezhaya <sonia@crown.law>
**Subject:** RE: Deposition schedule


Nicole/Rob:


This back-and-forth is unproductive. I propose that we all have a recorded and auto-transcribed meeting video conference to address all things "discovery." Crown's IT systems has that capability.


How soon can y'all have such a call?


**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Thursday, September 8, 2022 10:25 AM
**To:** Matt Kezhaya <matt@crown.law>
**Cc:** Bill Rohla <bill@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>; Sonia Kezhaya <sonia@crown.law>; robert.arcangeli@boston.gov
**Subject:** Re: Deposition schedule


Matt:


Chiefs of staff for Mayor Wu (David Vittorini), Councilor Baker (Amanda Curley), and Councilor Flynn (Charles Levin) will appear on Tuesday, September 13 to testify as I've explained below. Please let me know what time each of them should arrive.

The deposition for the designee for Councilor Flaherty will need to be on a different date. We're happy to work with your schedule to come up with a date that works for all parties.

Thanks,

Nicole

On Wed, Sep 7, 2022 at 10:57 PM Matt Kezhaya <matt@crown.law> wrote:

Nicole:

# "Designations"

You keep saying that you are "designating" certain witnesses for certain topics. I'm concerned this means you intend to instruct the witnesses not to answer questions unless they fit within your interpretation of the word "designate." Please note the applicable rule:

- "A person may instruct a deponent not to answer **only** when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

# FRCP 30(c)(2) (emphasis added).

# Wrangling the chiefs' schedules.

It's a deposition and we scheduled this back in July. The chiefs will be there because this is the City's last opportunity to substantiate the good faith basis of its denials. FRCP 8(b).

# "back-up" vs. "designee"

We've already made an adequate record of our respective positions.

# City Clerk

That was an error on my part. I've reviewed several invocations by the former City Clerk and did not know she is no longer involved with the City. I will confer with her separately and will give you notice of her deposition when she and I agree on a mutually-convenient date.

# Revised deposition notice for Mayor Wu

**You are notified** that TST will take the deposition of **Michelle Wu** on **September 20, 2022** at **9:30 am** at **64 Bridge St., Salem, MA 01970**. The deposition will occur pursuant to Rules 26 and 30, FRCP, and it will be recorded by audiographic, videographic, and stenographic means. The court reporter will be supplied by Veritext.

# Revised deposition notice for Anissa Ensaibi-George

**You are notified** that TST will take the deposition of **Anissa Ensaibi-George** on **September 19, 2022** at **9:30 am** at **64 Bridge St., Salem, MA 01970**. The deposition will occur pursuant to Rules 26 and 30, FRCP, and it will be recorded by audiographic, videographic, and stenographic means. The court reporter will be supplied by Veritext.

---

**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Wednesday, September 7, 2022 6:39 PM
**To:** Bill Rohla <bill@crown.law>
**Cc:** robert.arcangeli@boston.gov; Matt Kezhaya <matt@crown.law>; Sonia Kezhaya <sonia@crown.law>; John Hayden <john@crown.law>; Nick Henry <nick@crown.law>
**Subject:** Re: Deposition schedule

Hi Bill:

We're aiming to have chiefs of staff for Councilors Flynn, Baker, Flaherty and Mayor Wu available on September 12 and 13. Ideally, we'd like to schedule two depositions per day. We're coordinating schedules with these folks and will circle back as soon as possible as

to who is available on which date. I want to flag, however, that since we did not have confirmation that Plaintiff intended to move forward with these depositions until yesterday, some chiefs of staff may no longer be available. In the event that happens, we'll propose alternative dates for their depositions.

The chiefs of staff are being designated to testify on behalf of their respective councilors on the following topics of Plaintiff's 30(b)(6) deposition notice: 8, 10, 12, 17, 18, 19, 20, 21. To be clear, these are not "back up" 30(b)(6) designees; these are the designees the City originally designated to testify regarding these topics on July 29, 2022.

It is the City's position that there is an order prohibiting the Plaintiff from taking Mayor Wu's deposition. Given that, as well as the pending motion to quash, we're not going to coordinate dates for Mayor Wu's deposition at this time.

Regarding the City Clerk, we have not yet received a deposition notice or subpoena for him (yesterday was the first time we heard that Plaintiff intended to depose the City Clerk). Given that short notice, the deposition cannot take place next week.

Thanks,

Nicole



**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. *This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.* The

Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.

On Tue, Sep 6, 2022 at 2:58 PM Bill Rohla <bill@crown.law> wrote:

Hi Nicole,

We'd like to coordinate schedules for 9/12-14 for the backup 30(b)(6) designees as well as the City Clerk. Please let us know who will appear at which dates and times.

Additionally, if you'd like your schedule taken into consideration for the depositions of Mayor Wu and Annissa Essaibi-George, please let us know what dates work for you in September.

Thank you,

Bill Rohla

Paralegal

Arkansas office:

Crown Law

1202 NE McClain Rd

Bentonville, AR 72712

p: (479) 431-6112

f:  (612) 349-2760

e: bill@crown.law

Exhibit D                              Page 394

Minnesota office:

Crown Law

333 N. Washington Ave., Suite 300

Minneapolis, MN 55401

p: (612) 276-2216

f:  (612) 349-2760

e: bill@crown.law


This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.


--

| | **Nicole M. O'Connor**<br>Senior Assistant Corporation Counsel<br>City of Boston Law Department<br>City Hall, Room 615<br>Boston, MA 02201<br>(617) 635-4039<br>Nicole.OConnor@boston.gov |
|---|---|


The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure.  It is for the addressee only.  ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.***  The Information may also be deliberative and pre-decisional in nature.  As such, it is for internal use only.  The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston.  If you have received this e-mail by mistake, please notify the sender and delete it from your system.  Please do not copy or forward it.  Thank you for your cooperation.