## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

THE SATANIC TEMPLE, INC.,

          Plaintiff,

v.

CITY OF BOSTON,

          Defendant.

**Civil Action No. 1:21-cv-10102-AK**

## THE CITY OF BOSTON'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The City of Boston (the "City") submits this memorandum of law in support if its motion

for summary judgment on the remaining counts[1] of the First Amended Complaint of plaintiff The

Satanic Temple, Inc. ("TST").  TST's two surviving counts against the City are based on alleged

violations of the Establishment Clause of the United States Constitution and the Free Exercise

Clause of the Massachusetts Constitution (Art. XLVI, §1).[2]  TST alleges that the City violated

these rights when City Councilors did not extend an invitation to TST or allow its request to present

an invocation before the start of one of its regular legislative sessions.  TST is wrong.

---

[1] TST pleaded four counts against the City: Count I for violation of the Establishment Clause; Count II for Violations of the Free Speech and Free Exercise Clauses; Count III for violation of the Equal Protection Clause; and Count IV for Violation of Massachusetts' Free Exercise Clause. The federal causes of action were brought pursuant to 42 U.S.C. §1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  The Court (Burroughs, J.) dismissed Count II for lack of standing and Count III for failure to state a claim.

[2] The Court dismissed the federal Free Exercise Claim for lack of standing, but noted that the City did not dispute that there was particularized injury under the Massachusetts Constitution for standing purposes.  ECF Doc. No. 21, at p. 6 of 16, n. 2.  In ruling on the First Amendment Free Exercise Claim, however, the Court found that there was no public forum and that the invocations were government speech.  As discussed below, this should compel dismissal of Count IV as well.

## Preliminary Statement

"If you don't get an invitation, you don't give the invocation."  That quote from staff counsel for the Boston City Council perfectly summarizes the process for selecting individuals to give invocations before regular Council meetings.  TST seeks to demonize the City for this process because it did not result in an invitation for TST.  However, there is nothing constitutionally wrong with the process, even if it creates disproportionate representation among religious affiliations, as long as there is no evidence that the Councilors that issued the invitations did so with discriminatory intent.  That evidence does not exist.  TST took *one* deposition of a City Councilor, Councilor Essaibi-George.  TST did not take the depositions of the Chiefs of Staff designated by the City on issues related to Councilors' subjective intent.  TST was so singularly focused on taking the videotaped deposition of Mayor Wu that it utterly failed to take any depositions that could have shed light on the principal issue it was required to prove.

The Council's process here does not run afoul of the constitutional framework for analyzing legislative prayer under the Establishment Clause that was established in the Supreme Court's decisions in *Marsh v. Chambers*, 463 U.S. 783 (1983) and *Town of Greece v. Galloway*, 572 U.S. 565, 575 (2014).  Ironically, in *Town of Greece*, the Supreme Court looked to the Boston City Council's history of legislative prayer in upholding the legislative prayer there under its "historical practices and understandings" Establishment Clause analysis.  The content of the prayer and the demographic breakdown of the speakers is irrelevant.  The proper inquiry is whether the legislative prayer opportunity has been exploited to proselytize or advance any one faith or belief or to disparage any other.  Courts should view this from the perspective of a "reasonable observer."  In these legislative prayer cases, the *Marsh* Court reasoned that "the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."

2

Here, there is no real threat that the City Council for the City of Boston is using the invocation process to advance one faith over others.  TST's protestations to the contrary are mere shadow.

TST's remaining state law claim for violations of the Massachusetts free exercise clause fails for the reasons that its federal counterpart failed.  At issue is government speech in a nonpublic forum that in no way interferes with TST's right to exercise its beliefs, whether it does so at its temple in Salem or at the recent "SatanCon" convention at the Marriott Copley Place.  The right to free exercise of religion under the Massachusetts Constitution is not a right to dictate the content of government speech.

TST's two remaining claims fail as a matter of law.  The Court should grant the City's motion and enter judgment of dismissal in its favor.

**Undisputed Facts[3]**

***The City Council Invocation Invitation Process***

Invocations at Boston City Council meetings date back to the 1800s.[4]  Every week, unless otherwise ordered and except on holidays, the Boston City Council holds a meeting.[5]  Meetings generally occur on Wednesdays, but not every Wednesday.[6]  There are approximately thirty-five meetings per year.[7]  Time is set aside at the beginning of each Council meeting for an invited member of the public, often clergy, to say a few words before official Council business begins.[8]

---

[3] The City sets forth its statement of facts solely for summary judgment and makes no admission with respect to the facts contained herein.  All facts contained herein are derived from the City's L.R. 56.1 Concise Statement of Material Facts as to Which There is no Genuine Issue to be Tried (the "Rule 56.1 Statement") filed herewith.

[4] Rule 56.1 Statement at ¶ 1 and **Exhibit 1** at p. 70.  Prior to 1909, the City had an alderman form of governance rather than a City Council, but invocations were still given.  Ex. 1 at pp. 72-74.

[5] Rule 56.1 Statement at ¶ 2, ECF Doc. No. 16 at ¶9 and ECF Doc. No. 23 at ¶9.

[6] Rule 56.1 Statement at ¶ 3 and Ex. 1 at pp. 65, 75.

[7] Rule 56.1 Statement at ¶ 4, ECF Doc. No. 16 at ¶10 and ECF Doc. No. 23 at ¶10.

[8] Rule 56.1 Statement at ¶ 5 and **Exhibit 2**.

At the beginning of each calendar year, City Council staff assigns dates for each City Councilor to coordinate an invocation, including inviting a guest to deliver it.[9]   Council staff attempts to assign the same number of dates to all City Councilors, but due to scheduling and availability, that is not always possible.[10]  The Central Staff Director prepares a schedule of dates for City Council meetings along with the names of the City Councilors responsible for securing an invocation speaker.[11]  At one point, invocation speakers received a stipend from the City, but the payment of invocation speakers ceased sometime around 2016 or 2017.[12]  One of the speakers, Anne Marie Rousseau, testified that she received a $75 stipend the first time she gave an invocation in 2012, but could not remember receiving one after that.[13]

The selection of an invocation speaker is left within the discretion of the individual City Councilors and their respective staffs.[14]  There are no guidelines or rules governing whom a City Councilor may choose to give an invocation and the practice has not been reduced to writing.[15]  Absent an invitation from a City Councilor, there is no opportunity to offer an invocation prior to the Council's meetings.[16]  The City Council does not take requests.[17]  Councilor Essaibi-George was certain that one group referenced during her deposition did not solicit an invite, and that, with the exception of TST, no one had ever asked her if they could "offer remarks, a prayer or a blessing before the City Council."[18]  In the words of staff counsel, "It's by invitation.  So, the limit would

---

[9] Rule 56.1 Statement at ¶ 6 and **Exhibit 3** at Answer No. 3.

[10] Rule 56.1 Statement at ¶ 7 and Ex. 3 at Answer No. 3.

[11] Rule 56.1 Statement at ¶ 8 and **Exhibit 4** at Answer No. 10; **Exhibit 5**.

[12] Rule 56.1 Statement at ¶ 9 and Ex. 1 at pp. 162-163, 166; **Exhibit 6** at p. 154.

[13] Rule 56.1 Statement at ¶ 10 and **Exhibit 7** at pp. 15-16.

[14] Rule 56.1 Statement at ¶ 11 and Ex. 4 at Answer No. 10.

[15] Rule 56.1 Statement at ¶ 12, ECF Doc. No. 16 at ¶¶15, 16 and ECF Doc. No. 23 at ¶¶15, 16; Ex. 1 at p. 54.

[16] Rule 56.1 Statement at ¶ 13, ECF Doc. No. 16 at ¶17 and ECF Doc. No. 23 at ¶17.

[17] Rule 56.1 Statement at ¶ 14 and Ex. 1 at pp. 52-55.

[18] Rule 56.1 Statement at ¶ 15 and Ex. 6 at p. 121.

be if you don't get an invitation, you don't give the invocation."[19]  The one presenter deposed by

TST, Anne Marie Rousseau, testified that she gave an invocation annually from 2012 to 2020 at

the invitation of then-Councilor Matt O'Malley.[20]

It is the policy and custom of the Council that invitations for the invocation are based upon

personal relationships the Councilors have and the work that the individual invitee does in the

district or for their constituents.[21]  An example of an invitation is the May 13, 2019 letter from

then-Councilor Kim Janey to the Rev. Mary Margaret Earl, acknowledging her congregation's

work in the community and asking her to offer the invocation at a meeting scheduled on June 26,

2019.[22]  Rousseau, who testified every year for eight years, had volunteered on Councilor's

O'Malley's campaign and was very involved in the community in his district.[23]  The invocations

may have a variety of different forms, such as "a blessing," "opening remarks," "a prayer," "a

sermon" or "a poem or something like that."[24]  The content of the invocations is written or

determined by the invited speaker.[25]  The City does not "bless" its own Council meetings.[26]

While the majority of invocations are given by individuals from a variety of Christian

denominations, there have "also been a number of representatives from other types of religions,"

and there have "been some laypeople throughout the years."[27]  Numerous Rabbis have been invited

to give invocations.[28]  At the last Council meeting prior to the filing of this motion, an Imam gave

---

[19] Rule 56.1 Statement at ¶ 16 and Ex. 1, pp. 152-53.
[20] Rule 56.1 Statement at ¶ 17 and Ex. 7 at pp. 4-7, 19.
[21] Rule 56.1 Statement at ¶ 18 and Ex. 1, pp. 52-55, 154-160.
[22] Rule 56.1 Statement at ¶ 19 and **Exhibit 8**.
[23] Rule 56.1 Statement at ¶ 20 and Ex. 7 at pp. 7-14, 19, 26-28.
[24] Rule 56.1 Statement at ¶ 21 and Ex. 6 at p. 107.
[25] Rule 56.1 Statement at ¶ 22 and Ex. 7 at p. 29 ("I usually write my invocations depending on what is going on or what time or year something is happening.")
[26] Rule 56.1 Statement at ¶ 23 and Ex. 1 at p. 144
[27] Rule 56.1 Statement at ¶ 24 and Ex. 1 at p. 250.
[28] Rule 56.1 Statement at ¶ 25 and **Exhibit 9**.

the invocation at the invitation of Councilor Fernandes Anderson, and indicated that he had been previously invited by Councilor Yancey, who left the Council in 2015.[29]   Non-religious speakers have been invited to give invocations.[30]   Indeed, "there have been instances where an individual from an organization that does work within the community may give the invocation."[31]   The Council has had "poems and reflections" read by many people for the invocation.[32]   The City Clerk, Maureen Feeney, gave a number of invocations, usually reading from a "book of reflections."[33]   In 2017, one invocation was given by a member of the Boston Debate League, a non-profit organization seeking to integrate argument and debate into public schools.[34]

### *TST Seeks to Obtain an Invocation Invitation*

On October 6, 2016, Travis LeSaffre, Chapter Head of the Boston Chapter of the Satanic Temple, sent an email to then-Councilor Mark Ciommo asking him to consider appointing him as an invitee to perform an invocation.[35]   LeSaffre then reached out to then-Councilors Tito Jackson and Michelle Wu seeking an invocation invitation.[36]   Wu responded that each Councilor only had two or three chances to invite faith leaders for the invocation and that the invitations were often used to recognize faith leaders who are active in the community and organizations that are representative of the districts.[37]   Wu informed LeSaffre that "[t]here is no restriction or criteria

---

[29] The video from this Council meeting is publicly available at the Council YouTube channel: https://www.youtube.com/watch?v=Ti7QMgpUK8Q&list=PLQaoo0hI2DAjk5JId3kvv1N3WJt8 GgBFr&index=23.   The introduction to the invocation by the Imam begins at 4:00. Rule 56.1 Statement at ¶ 26.

[30] Rule 56.1 Statement at ¶ 27 and Ex. 1 at p. 250.

[31] Rule 56.1 Statement at ¶ 28and Ex. 1 at pp. 250-251.

[32] Rule 56.1 Statement at ¶ 29 and Ex. 6 at p. 152.

[33] Rule 56.1 Statement at ¶ 30 and Ex. 6 at p. 152-153.

[34] Rule 56.1 Statement at ¶ 31 and Ex. 9.

[35] Rule 56.1 Statement at ¶ 32 and **Exhibit 10**.

[36] Rule 56.1 Statement at ¶ 33 and **Exhibit 11**.

[37] Rule 56.1 Statement at ¶ 34 and Ex. 11.

based on any Councilor's religious preferences," and that many Councilors "had a long list of folks" they would like to invite but haven't been able to accommodate.[38]

On August 17, 2017, LeSaffre sent an email to then-Councilor Wu and the other Councilors asking for the Council to either allow all individuals an opportunity to perform invocations or to cease the invocations, threatening litigation in the absence of the "right choice."[39]  During these attempts by TST to obtain an invitation, Councilors received emails expressing the view that they did not want TST to give an invocation.[40]  Councilor Essaibi-George declined to issue an invitation to TST, finding it "absurd" that TST felt entitled to an invitation from her to offer an opening remark without any relationship or interaction, or playing an important role in her work.[41]

On October 2, 2018, one of the co-founders of TST, Malcolm Jarry, sent an email to then-City Council President Andrea Campbell requesting an opportunity for someone from TST to give the invocation at an upcoming City Council meeting.[42]  The next day, Staff Counsel Christine O'Donnell responded that the Council did not accept requests from speakers to deliver an invocation, that the Council does not have a written policy concerning invocations and that Councilors decide who will deliver the invocations at Council meetings.[43]  On October 9, 2018, Attorney O'Donnell again emailed Jarry to explain the process for selecting individuals to give invocations prior to the start of City Council meetings.[44]  O'Donnell explained again that the

---

[38] Rule 56.1 Statement at ¶ 35 and Ex. 11.
[39] Rule 56.1 Statement at ¶ 36 and **Exhibit 12**.
[40] Rule 56.1 Statement at ¶ 37 and Ex. 1, at p. 108.
[41] Rule 56.1 Statement at ¶ 38 and Ex. 6 at pp. 148-151, 153-154, 168-169; **Exhibit 13**.
[42] Rule 56.1 Statement at ¶ 39, ECF Doc. No. 16-1.
[43] Rule 56.1 Statement at ¶ 40 and **Exhibit 14** [DEF0000620]
[44] Rule 56.1 Statement at ¶ 41, ECF Doc. No. 16-2.

Councilors themselves do not offer the invocations and that they invite individuals from the community, either clergy or laypeople, to give the invocations.[45]

### Procedural History and Lack of Discovery

On July 6, 2022, TST served a Rule 30(b)(6) deposition notice articulating thirty (30) deposition topics upon which it sought to elicit testimony from the City.[46]  Attorney O'Donnell was designated by the City to testify on topics 1-7, 9, 11, 13-16 and 23-30.[47]  The topics for which O'Donnell was not designated dealt with the individual Councilors' "subjective bases" (8, 10, 12), "subjective understanding" (17, 18, 20, 21), "subjective opinion" (29) or statements that each had made (30).[48]  For Councilors still sitting on the Council in July 2022, the City designated their respective Chiefs of Staff for these topics, as well as the former Chief of Staff for now-Mayor Wu.[49]  TST did not take the depositions of the proffered Chiefs of Staff or attempt to take the deposition of any current or former Councilor other than Annissa Essaibi George and Mayor Wu.[50]

TST opened the Rule 30(b)(6) deposition of Attorney O'Donnell with an invocation.[51]  In preparation for the deposition, O'Donnell spoke with the staffs of the current City Councilors about how the Councilors decide who to invite to give invocations.[52]  It was evident from the start of the deposition of Attorney O'Donnell that its purpose was less about discovering information for TST's case and more about creating a video record for other uses – with counsel addressing the

---

[45] Rule 56.1 Statement at ¶ 42, ECF Doc. No. 16-2.
[46] Rule 56.1 Statement at ¶ 43, ECF Doc. No. 79-1, at pp. 3-11 of 395.
[47] Rule 56.1 Statement at ¶ 44, ECF Doc. No. 79-1, at p. 343 of 395.
[48] Rule 56.1 Statement at ¶ 45, ECF Doc. No. 79-1, at pp. 3-11 of 395.
[49] Rule 56.1 Statement at ¶ 46, ECF Doc. No. 79-1, at p. 373 of 395.
[50] Rule 56.1 Statement at ¶ 47 and Ex. 6; ECF Doc. No. 34-1, at pp. 2-5 of 27; ECF Doc. No. 57-1; ECF Doc. No. 62-1.
[51] Rule 56.1 Statement at ¶ 48 and Ex. 1 at pp. 5-6.
[52] Rule 56.1 Statement at ¶ 49 and Ex. 1 at pp. 64-65, 69-70.

"congregants" and attempting to eliminate "legalese" so that they would understand.[53]   During

the Rule 30(b)(6) deposition, counsel for TST attempted to pigeon-hole certain questions as a "Wu

question" in an effort to convince the Court that a deposition of the Mayor was necessary to prove

TST's case.[54]  Similar efforts were made during the Essaibi-George and Rousseau depositions.[55]

TST's central focus in this litigation has been taking the deposition of Mayor Wu.   On

October 22, 2021, TST served a notice of deposition and subpoena for candidate and soon-to-be

Mayor Wu to take place on November 2, 2021 – ***Election Day***.[56]  TST admitted, in this Court's

words, its "intent to invite maximum inconvenience, political attention, and media scrutiny of

TST's litigation through the deposition notice."[57]  The Court refused to allow the deposition to go

forward on that date and requested further briefing on whether it should be allowed at all.[58]  The

Court subsequently granted the motion to quash the deposition entirely, and awarded attorneys'

fees and costs to the City to be determined at the close of discovery.[59]  Notwithstanding this fact,

on August 21, 2022, TST again noticed the deposition of Mayor Wu for September 12, 2022,

subsequently serving a subpoena for a September 20, 2022 deposition date.[60]  The Court again

granted motions to quash the subpoena, and explained to TST the circumstances pursuant to which

it would modify the existing protective order.[61]  TST then immediately sought recusal, in part

based on orders regarding the Wu deposition, and reconsideration of the protective order for the

---

[53] Rule 56.1 Statement at ¶ 50 and Ex. 1 at pp. 12-14, 16, 169.
[54] Rule 56.1 Statement at ¶ 51 and Ex. 1 at pp. 244-245.
[55] Rule 56.1 Statement at ¶ 52 and Ex. 6 at p. 105, 156-157, Ex. 7 at p. 28.
[56] Rule 56.1 Statement at ¶ 53, ECF Doc. No. 34-1, at pp. 2-5 of 27.
[57] Rule 56.1 Statement at ¶ 54, ECF Doc. No. 47 at p. 4, citing ECF Doc. No. 38.
[58] Rule 56.1 Statement at ¶ 55, ECF Doc. No. 40.
[59] Rule 56.1 Statement at ¶ 56, ECF Doc. No. 47.
[60] Rule 56.1 Statement at ¶ 57, ECF Doc. No. 57-1; ECF Doc. No. 62-1.
[61] Rule 56.1 Statement at ¶ 58, ECF Doc. No. 63.

Wu deposition, each of which was denied.[62]  TST's response was to file a motion for sanctions against the City based on the O'Donnell deposition, seeking as sanctions, *inter alia*, a deposition of Mayor Wu, which was denied.[63]  In the subsequent Joint Status Report of the parties, TST **again** requested a deposition of Mayor Wu, despite discovery having been long completed and a total lack of compliance with the Court's orders regarding same.[64]  That request was denied when the Court ruled that discovery was closed and set a briefing schedule for summary judgment.[65]

**Argument**

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, at 247-48.  "For this purpose, 'genuine' means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and 'material' means that the fact is one that might affect the outcome of the suit under the applicable law." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19

---

[62] Rule 56.1 Statement at ¶ 59, ECF Doc. No. 65; ECF Doc. No. 66; ECF Doc. No. 75; ECF Doc. No. 78.
[63] Rule 56.1 Statement at ¶ 60, ECF Doc. No. 80, at p. 29 of 31; ECF Doc. No. 88.
[64] Rule 56.1 Statement at ¶ 61, ECF Doc. No. 90.
[65] Rule 56.1 Statement at ¶ 62, ECF Doc. No. 96.

(1st Cir. 2003) (internal citations omitted). The "nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005) (quoting *Mulvihill,* 335 F.3d at 19).

## II. THE BOSTON CITY COUNCIL'S INVOCATION PROCESS DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE

As the Court noted in its order on the City's motion to dismiss, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). In the context of legislative prayer, the framework for Establishment Clause jurisprudence is centered on two Supreme Court cases, *Town of Greece*, 572 U.S. at 565 and *Marsh*, 463 U.S. at 783. In its order on the motion to dismiss, the Court found that the alleged facts, if true, established a discriminatory motive and thus the Council's policy fell outside of the scope of the holding *Marsh*. During discovery, however, TST failed to uncover any evidence of a discriminatory motive. In fact, TST did very little discovery into that issue at all. As such, the City is entitled to judgment as a matter of law on TST's Establishment Clause claim under *Marsh* and *Town of Greece*.

There is a "presumption of constitutionality for longstanding monuments, symbols, and practices." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2082 (2019). "In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2411 (2022) (quoting *Town of Greece*, 572 U.S. at 576)). "*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Town of Greece*, 572 U.S. at 577. "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding

Fathers." *Kennedy*, 142 S. Ct. at 2411.  In a twist of fate, the *Town of Greece* Court cited the City

Council of Boston as historical precedent for the practice of opening meetings of local legislative

bodies under this Establishment Clause standard.  572 U.S. at 576 (citing Reports of Proceedings

of the City Council of Boston for the Year Commencing Jan. 1, 1909, and Ending Feb. 5, 1910,

pp. 1–2 (1910) (Rev. Arthur Little)).

      "The opening of sessions of legislative and other deliberative public bodies with prayer is

deeply embedded in the history and tradition of this country." *Marsh*, 463 U.S. at 786.  "From

colonial times through the founding of the Republic and ever since, the practice of legislative

prayer has coexisted with the principles of disestablishment and religious freedom." *Id*.  "Clearly

the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains

and opening prayers as a violation of that Amendment, for the practice of opening sessions with

prayer has continued without interruption ever since that early session of Congress." *Id*.[66]  "[T]he

delegates did not consider opening prayers as a proselytizing activity or as symbolically placing

the government's official seal of approval on one religious view." *Id*. at 792 (internal quotation

omitted).  The Supreme Court has accepted "the interpretation of the First Amendment draftsmen

who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that

now challenged."  The same is true of the City's invocation practice.

      The City Council's tradition of legislative prayer dates back to the 1800s, a similar period

as that of the Nebraska Legislature "practice of over a century." *Id*. at 790.  Although "[s]tanding

---

[66] The *Marsh* Court noted that the chaplaincy was challenged in the 1850s, when after
consideration by the senate Judiciary Committee, the Senate decided that the practice did not
violate the Establishment Clause.  463 U.S. at 786, n. 10.  The Senate "reasoned that since prayer
was said by the very Congress that adopted the Bill of Rights, the Founding Fathers could not have
intended the First Amendment to forbid legislative prayer or viewed prayer as a step toward an
established church." *Id*.

alone, historical patterns cannot justify contemporary violations or constitutional guarantees," like *Marsh*, "there is far more here than simply historical patterns." *Id*.   In *Marsh*, the Supreme Court rejected three factual arguments that the Nebraska legislative prayer policy violated the Establishment Clause: (1) that a clergyman of only one denomination had been selected for 16 years; (2) that the chaplain was paid at the public expense; and (3) that the prayers were exclusively in the Judeo-Christian tradition.  463 U.S. at 792-793.  Weighed against the historical background of legislative prayer, the *Marsh* Court held that none of these factors invalidated the Nebraska legislative prayer practice under the Establishment Clause.  *Id*. at 793.  Subsequent decisions have looked at other factors in analyzing what this Court determined was a "fact specific" inquiry. Here, none of these factors weigh in favor of finding that the City Council violated the Establishment Clause through its invocation invitation process.

The Supreme Court in *Marsh* rejected the argument that the long-standing tenure of the chaplain had "the effect of giving preference to his religious views." *Id*.  "Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause." *Id*. at 793-794 (noting that guest chaplains had officiated by request of the legislators or during the chaplain's absences).  Here, the City Council does not have a paid chaplain on call; the invocations rotate through the thirteen Councilors who have the discretion to select an individual from any religion or no religion at all to give the invocation.  And while some speakers certainly did give invocations more than once, or even annually like Rousseau, the holding of *Marsh* stands for the proposition that this does not run afoul of the Establishment Clause.  In welcoming a variety of speakers to give invocations, it cannot be said that the Council was giving preference to any one religious view.  This case is more akin to *Town of Greece*, where there was an informal method for selecting invocation speakers –

a town employee called congregations until she found a minister available for the meetings, keeping a list of those willing to return in the future – that did not violate the Establishment Clause. 572 U.S. at 571.

TST makes much of the fact that at one point, the individuals delivering the invocation were paid a small stipend.  This ignores the fact that this is no longer true, and has not been since at least 2016-2017, bringing the facts of the present case more in line with *Town of Greece*, where the invocation speakers were unpaid.  *Id*.  Moreover, this argument was the second argument expressly rejected in *Marsh* – there, the fact that the chaplain was a paid position did not render the legislative prayer unconstitutional under the Establishment Clause.  463 U.S. at 794.

TST further emphasizes that the majority of the Council invocations were given by Abrahamic speakers.  Again, this argument was expressly rejected by the *Marsh* Court, where the Nebraska prayers were exclusively Judeo-Christian.  *Id*. at 794-795.   "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."  *Id*. Likewise, in *Town of Greece*, despite the fact that town leaders "maintained that a minister or layperson of any persuasion, including an atheist, could give an invocation … nearly all of the congregations in town were Christian; and from 1999 to 2007, all of the participating ministers were too."  572 U.S. at 571.  It was only after they received complaints that the board invited a Jewish layman, the chairman of the local Baha'i temple and a Wiccan priestess to give invocations. *Id*. at 572.  The Supreme Court nonetheless held that that level of religious homogeneity did not violate the Establishment Clause.  *Id*. at 570.  As the Supreme Court held:

> The tradition reflected in *Marsh* permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that

> tradition. These religious themes provide particular means to universal ends. Prayer
> that reflects beliefs specific to only some creeds can still serve to solemnize the
> occasion, so long as the practice over time is not "exploited to proselytize or
> advance any one, or to disparage any other, faith or belief."

*Id*. at 583 (quoting *Marsh*).  "An insistence on nonsectarian or ecumenical prayer as a single, fixed

standard is not consistent with the tradition of legislative prayer outlined in the Court's cases."  *Id*.

at 578.[67]  "So long as the town maintains a policy of nondiscrimination, the Constitution does not

require it to search beyond its borders for non-Christian prayer givers in an effort to achieve

religious balancing."  *Id*. at 585-586.  Similar to the legislators in *Town of Greece*, the City

Councilors exercised no control over the invocations other than to select the speaker, nor did they

provide guidance as to their tone or contents.  *Id*. at 571.

Town of Greece instructs courts to consider a prayer practice from the perspective of the

"reasonable observer," who is presumed to be "acquainted with [the] tradition" of legislative

prayer.  *Id*. at 587.  For example, "[t]he principal audience for these invocations is not, indeed, the

public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets

the mind to a higher purpose and thereby eases the task of governing."  *Id*. at 587.  Here, like

*Marsh*, "the individual claiming injury by the practice is an adult, presumably not readily

susceptible to 'religious indoctrination' or peer pressure."  463 U.S. at 792 (internal citations

omitted); *Town of Greece*, 572 U.S. at 590 (choice to exit during a prayer they find distasteful or

remain and acquiesce does not "represent an unconstitutional imposition to mature adults").

Simply stated, the Councilors select these invocation speakers for their own private reflection, not

---

[67] The *Town of Greece* Court recognized that there were some constraints on content: "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." 572 U.S. at 583.  There is no evidence that occurred in the invocations here.

as an imposition on the public as a whole. "The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Town of Greece*, 572 U.S. at 588. None of that exists here.[68]

The City's position is that this case falls squarely within the *Marsh* and *Town of Greece* framework, and thus the City is entitled to judgment as a matter of law on the Establishment Clause claim. However, this Court left open the door for TST to discover an impermissible discriminatory motive that might take the case outside of this framework and allow for the possibility that TST's Establishment Clause claim would survive. TST failed to pass through that door. The one decisionmaker deposed by TST, Councilor Essaibi-George, was clear in her reasons for not extending an invite to TST – she did not know anything about the entity. There is no evidence that any failure to extend an invocation invitation to TST had anything to do with TST's beliefs.

Furthermore, in denying the motion to dismiss the Court analogized the selection of invocation speakers to the "so-called legislator-led prayer cases," where there is an evident conflict between the Fourth and Sixth Circuits that remains unresolved. Compare *Lund v. Rowan Cty.,* 863 F.3d 268 (4th Cir. 2017) (Constitutional violation) with *Bormuth v. Cty of Jackson*, 870 F. 3d 494 (6th Cir. 2017) (no Constitutional violation). That the prayers in those cases were led by the legislators themselves does not make them analogous, it makes them distinguishable. *See Lund*, 863 F. 3d at 277-279 (specifically distinguishing *Marsh* and *Town of Greece* because the prayers were led by guest ministers rather than the legislators creating a "closed universe of prayer-

---

[68] The *Town of Greece* Court distinguished the "conclusions and holding" in *Lee v. Weisman*, 505 U.S. 577 (1992), finding that case to involve a graduation where school authorities maintained strict control over the conduct of the students and the substance of the ceremony and the religious invocation was thus deemed to be coercive. 572 U.S. at 590. Those factors are not present here.

givers").  In *Lund*, no religion other than Christianity was represented, prayers represented that Christianity was superior to other faiths, board members on occasion would appear "to implore attendees to accept Christianity," and most importantly, the prayers were given by the board members themselves based on their personal faiths.  863 F.3d at 273, 280 ("the identity of the prayer-giver is relevant to the constitutional inquiry").  As the *Lund* Court noted, the distinction between guest-led prayer and legislator-led prayer is crucial in the eyes of the reasonable observer. *Id*. at 287.  In the present case, the Councilors chose the invocation speakers and TST offers ***zero*** evidence that they do so based on their own personal faiths.  In short, *Lund* represents the type of proselytizing that deviated from the history and tradition of legislative prayer and which the Establishment Clause was meant to bar.  There is no evidence of that here.

The facts of present case – or lack thereof – are in stark contrast to those in *Williamson v. Brevard County*, 928 F.3d 1296, 1299 (11th Cir. 2019).  Assuming the First Circuit would apply the Eleventh Circuit's three-factor test, there the plaintiff was able to present evidence – ***the testimony of the inviting lawmakers themselves*** - making it "abundantly clear that most if not all of the Commissioners exercise their discretion in a way that discriminates among religions based on their beliefs, favoring some but not all monotheistic and familiar religious sects over those faiths that fall outside the 'mainstream.'"  *Id*.  The Eleventh Circuit elaborated:

> Moreover, some religions are scrutinized by the Commissioners more closely, and others are even categorically excluded from consideration. Secular humanists are far from the only group viewed with disfavor. Thus, for example, some of the Commissioners and former Commissioners have testified unambiguously that they would not allow deists, Wiccans, Rastafarians, or, for that matter, polytheists to deliver prayers, and that they would have to think long and hard before inviting a Hindu, a Sikh, or a follower of a Native American religion. Nothing could be clearer from this record than that more than a few of the Commissioners rejected speakers based squarely on the nature of the religious beliefs they held.

*Id*.  Following *Town of Greece*, the Eleventh Circuit held that it was not the predominance of Christian speakers that ran afoul of the Establishment Clause, but rather their unabashed admissions that reflected "an aversion or bias on the part of [county] leaders against minority faiths."  *Id*. at 1315.  TST cannot present any similar evidence here.  TST did nothing to even attempt to discover such evidence, if it existed, deposing ***one*** former Councilor while wasting the discovery period in an endless pursuit of a deposition of Mayor Wu.[69]

"[T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."  *Marsh*, 463 U.S. at 795 (citing *Abington School Dist. v. Schempp,* 374 U.S. 203, 237 (1963)).  Here, a reasonable observer familiar with the history of the Establishment Clause would determine that there is no real threat that the City's policy for choosing its invocation speakers will lead to the establishment of a particular religion.  There is nothing more that the mere shadow of TST disdain for the Council's invocation process.  The invocation process does not run afoul of the Establishment Clause and the City is thus entitled to judgment as a matter of law dismissing Count I of the Amended Complaint

### III.   AS THIS COURT HAS DETERMINED THAT THE INVOCATIONS ARE NONPUBLIC GOVERNMENT SPEECH COUNT IV SHOULD BE DISMISSED

While the Court did not directly address the state law free exercise claim (Count IV) in its decision on the City's Motion to Dismiss, it effectively decided the claim's fate.  The Court found

---

[69] It should be noted that this is not the first time that TST has challenged a city invocation process under the Establishment Clause.  *See*, *e.g.*, *Satanic Temple, Inc. v. City of Scottsdale*, 856 F. App'x 724 (9th Cir. 2021).  In *City of Scottsdale*, the Ninth Circuit held that the district court "properly concluded that TST had failed to prove by a preponderance of the evidence that TST's religious beliefs were a factor, let alone a substantial motivating factor, in Biesemeyer's decision not to approve TST to give a legislative prayer." *Id*. at 726.  "Therefore, the district court did not err in determining that TST failed to show an Establishment Clause or Equal Protection Clause violation under *Monell*." *Id*.  TST again fails to meet its burden.  There is no evidence on this limited record that TST's religious beliefs had anything to do with the decision of individual Councilors to refuse to offer TST an invitation to give an invocation.

that the City was "correct that the invocation given at the start of each City Council meeting is government speech." The Court explained that "under the 'government speech doctrine' a government entity is free to express its own views, either through its members or private parties," and that "claims of viewpoint discrimination under the Free Speech Clause or Free Exercise Clause do not apply to government speech such as the prayers offered here." As a result, the Court dismissed the claim based on both of those clauses of the First Amendment (Count II).

The claim based on the Massachusetts Free Exercise Clause fares no better. The Massachusetts Declaration of Rights is generally coextensive with the federal constitution when it comes to the rights guaranteed by the First Amendment. *See In re Opinion of the Justices to the Senate*, 430 Mass. 1205, 1209 (2000) (analysis of free speech and buffer zones same under federal and state constitutions). It is true that where the two depart, the Massachusetts version provides more extensive freedom of expression protections than its federal counterpart. *See, e.g., Mendoza v. Licensing Bd. of Fall River*, 444 Mass. 188, 201 (2005) (state free speech rights broader on issue of strip clubs). However, there are no cases indicating that Massachusetts courts would allow for a free exercise claim in context of government speech. On the contrary, "Massachusetts cases addressing the issue of religious freedom under both the State and the Federal Constitutions have generally also inquired, as a preliminary matter, whether the State action creates a substantial burden on a claimant's free exercise of religion." *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749, 761, n. 11 (1995).[70] The City Council invocation process does not.

---

[70] The Appeals Court's decision in *Krupien v. Ritcey* is inapposite. 94 Mass. App. Ct. 131, 136, n. 9 (2018). There, the question was whether an employer was entitled to qualified immunity after barring access to an employees' place of employment, which included **her church**, for thirty-seven days, including Christmas. *See id.* at 132. The City Council chamber is not the Satanic Temple.

Government speech in a nonpublic forum does not create a substantial burden on the free exercise rights of TST.  TST certainly has the right to freely exercise its religious beliefs and does so right here in the Commonwealth at its temple in Salem and just this past weekend at SatanCon in downtown Boston.  However, it has no right to compel the City Council to exercise TST's religious beliefs in the Council's own government speech.  Count IV should be dismissed.

### Conclusion

For the reasons set forth herein, the City respectfully requests that this Honorable Court grant its motion, enter summary judgment dismissing all remaining counts of Plaintiffs' Amended Complaint, and grant such other and further relief as it deems just and proper.

Dated:  May 1, 2023

Respectfully submitted,
**CITY OF BOSTON**,

By its attorney:

ADAM CEDERBAUM
Corporation Counsel


/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr. (BBO#644331)
Senior Assistant Corporation Counsel
Elizabeth L. Bostwick (BBO #644498)
Senior Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4045 (EFW)
(617) 635-4031 (ELB)
edward.whitesell@boston.gov
elizabeth.bostwick@boston.gov

**Certificate of Service**

I, Edward F. Whitesell, Jr., hereby certify that on May 1, 2023, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr.