# EXHIBIT 1

Page 1

1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                             CASE NO. 21-cv-10102

4    - - - - - - - - - - - - - - - - - - -

5    THE SATANIC TEMPLE, INC.,

6                        Plaintiff,

7          v.

8    CITY OF BOSTON, MA,

9                        Defendant.

10   - - - - - - - - - - - - - - - - - - -

11

12

13

14          AUDIOVISUAL DEPOSITION of CHRISTINE

15   O'DONNELL, a witness called by counsel for the

16   Plaintiff, taken pursuant to the Federal Rules of Civil

17   Procedure before Kristen L. Kelly, Registered

18   Professional Reporter, MA CSR No. 115893 and Notary

19   Public in and for the Commonwealth of Massachusetts, at

20   The Satanic Temple, 64 Bridge Street, Salem,

21   Massachusetts, on Thursday, August 25, 2022, commencing

22   at 9:32 a.m.

23

24

Page 2

```
 1   A P P E A R A N C E S:
 2   CROWN LAW
 3      By:  Matthew A. Kezhaya, Esquire
 4           Sonia A. Kezhaya, Esquire
 5           300 N. Washington Avenue, #300
 6           Minneapolis, Minnesota 55401
 7           479.431.6112
 8           matt@crown.law
 9           sonia@crown.law
10           For the Plaintiff
11
12   CITY OF BOSTON LAW DEPARTMENT
13      By:  Nicole O'Connor, Esquire
14           Robert S. Arcangeli, Esquire
15           City Hall, Room 615
16           Boston, Massachusetts 02201
17           617.635.2902
18           nicole.oconnor@boston.gov
19           robert.arcangeli@boston.gov
20           For the Defendant
21
22   ALSO PRESENT:
23      Shawn Budd, Videographer
24      Lucien Greaves, Ada King, and Mobius
```

Page 5

1                    P R O C E E D I N G S

2

3                    THE VIDEOGRAPHER:  We are on the record.

4    The time is 9:32.

5                    MR. KEZHAYA:  Okay.  Ada, if you could

6    get us started please.

7                    MS. KING:  Very good.  Welcome,

8    everyone.  My name is Ada King.  I'm an ordained

9    Minister of Satan.  And I will be lowering the lights,

10   lighting some candles and reading our invocation.

11                   Let us stand now unavowed and unfettered

12   by arcane doctrines borne of fearful minds in darkened

13   times.

14                   Let us embrace the Luciferian impulse to

15   eat of the tree of knowledge and dissipate our blissful

16   and comforting delusions of old.

17                   Let us demand that individuals be judged

18   for their concrete actions not their fealty to

19   arbitrary social norms and elusory categorizations.

20                   Let us reason our solutions with

21   agnosticism in all things, holding fast only to that

22   which is demonstrably true.

23                   Let us stand firm against any and all

24   arbitrary authority that threatens the personal

```
                                              Page 6
 1   sovereignty of one or of all.
 2              That which will not bend must break and
 3   that which can be destroyed by the truth should never
 4   be spared its demise.
 5              It is done.  Hail Satan.
 6              MR. KEZHAYA:  Hail Satan.  Great.
 7
 8              DIRECT EXAMINATION
 9   BY MR. KEZHAYA:
10       Q    So pleased that you all are gathered here
11   today.  I want to be very, very clear.  The purpose of
12   today's meeting is to get to the truth, that's it.  We
13   are not a threat to you.  I want you to know that.
14   It's very important to me that you are aware of that.
15   Do you understand that, Christine?
16       A    I do.
17       Q    Thank you.
18              MR. KEZHAYA:  I presumed -- sorry.  I
19   shouldn't have been so presumptuous.  We should start
20   with who we are.  So I'm Matt Kezhaya.  I represent The
21   Satanic Temple against the City of Boston on charges
22   that City of Boston is not inviting TST to the
23   legislative prayer event that opens public meetings.
24              You just heard the invocation that we
```

Page 12

1   City of Boston and I might have a dispute.  All I

2   request is that to the extent there be contention, Rob

3   be intervening to fix the contention.

4            MS. O'CONNOR:  I hope it's a nonissue,

5   but I think, I think this will be an issue that we

6   don't need to worry about.

7            MR. KEZHAYA:  Okay.  Can we table that

8   then in the event of contention?

9            MS. O'CONNOR:  I mean these are very

10  bizarre sort of stipulations or suggestions for a

11  typical deposition.  I'm happy to -- we'll work with

12  you amicably to resolve any issues, and I think this is

13  nonissue that we don't need to worry about.  And if we

14  should get into some sort of dispute, I think we can

15  cross that bridge when we get to it.

16           MR. KEZHAYA:  Understood.  Once again,

17  no contention.  Just looking for the truth.  And to the

18  extent we have any tabled issues, those obviously have

19  to go to the judge.

20           Any objections as to anything that I, I

21  have proposed here?

22           MS. O'CONNOR:  No.

23           MR. KEZHAYA:  Anyone at all?  Okay.

24           All right.  So that being the case, we

1    have some important public documents that I just want

2    to make reference to.  I see no reason to show anyone

3    them.  There was the Complaint.  There was the answer.

4    There was a motion to dismiss.  There was the order

5    granting the motion to dismiss as to part, importantly

6    on the issue of government speech, and then Shurtleff

7    came out which importantly said that government speech

8    cannot be used to exclude certain religions.

9              Any objections as to the court taking

10   note in, in the court -- in the course of understanding

11   the rest of this deposition of its own public docket?

12             MS. O'CONNOR:  I don't really understand

13   what you're asking on the record but ...

14             MR. KEZHAYA:  And to be clear, I'm not

15   saying this for the court's benefit.  I'm saying this

16   for the congregants' benefit.

17             MS. O'CONNOR:  Okay.  I don't --

18             MR. KEZHAYA:  The congregants are, are

19   gonna be needing to know that they need to take a look

20   at the Complaint, the answer, the motion to dismiss,

21   the order granting motion to dismiss importantly as to

22   government speech and Shurtleff which overturned

23   government speech.  That's the only thing that the

24   congregants need to take note of.  I'm telling them

Page 14

1   this by using those words.

2                   MS. O'CONNOR:  Okay.

3                   MR. KEZHAYA:  But, you know, again,

4   obviously the court's going to take note of its own

5   docket.  We'll -- we'll figure out docket numbers if,

6   if the needs end up being.

7                   So, that all being the case, I propose

8   that we proceed with the deposition.  Any objections?

9                   MS. O'CONNOR:  No.

10      Q    Please identify yourself for the benefit of

11  the public.

12      A    Christine O'Donnell.  I'm the Compliance

13  Director and staff counsel for the Boston City Council.

14                  THE REPORTER:  Do you want -- I'm sorry

15  to interrupt.  Do you want her sworn in first or ...

16      Q    Oh.  Christine, are you gonna lie?

17      A    I'm not but ...

18                  MS. O'CONNOR:  I think we should swear

19  her in just for consistency of the testimony.

20                  MR. KEZHAYA:  I like ceremony.  Let's

21  swear her in.

22

23                  CHRISTINE O'DONNELL

24

 1      Q    Tell us more about the Federal Rules of Civil

 2   Procedure.

 3                MS. O'CONNOR:  Objection.

 4                MR. KEZHAYA:  What -- what's the nature

 5   of your objection?

 6                MS. O'CONNOR:  As they pertain to what?

 7                MR. KEZHAYA:  She's the one who said it.

 8   I'm asking her to expound.

 9                MS. O'CONNOR:  On her understanding of

10   what the Federal Rules of Civil Procedure are?

11                MR. KEZHAYA:  Correct.

12                MS. O'CONNOR:  Okay.

13      A    Just my understanding is I'm here because of

14   that rule.  I am not a litigator for the Boston City

15   Council so that -- it's my understanding that I'm here

16   pursuant to that rule.

17      Q    Let me back up with a little bit of

18   exposition.  The lawyers in the room speak a certain

19   language that the congregants do not speak.  I'm trying

20   to take out the legalese.  So 30(b)(6) means something

21   to all four of us and also Sonia.  I doesn't mean

22   anything to them.  So when you say 30(b)(6), I know

23   what you mean.  They don't know what you mean.

24                What is a 30(b)(6) deposition?

Page 52

1      Q     Okay.  Or at least not to your knowledge?

2      A     Not to my knowledge.

3      Q     Okay.  Let's see here.

4            Okay.  So going back to the topic at hand,

5   the Council President came to you with a request as to

6   the Council's legal obligations as to a nondescript

7   matter; is that correct?

8      A     Yes.

9      Q     What was the matter?

10     A     The matter was at the time I believe she

11  received an email from TST to request being put on to

12  give the invocation, requesting an invitation to give

13  the invocation.

14     Q     Okay.  And so her --

15     A     And I believe the email to her, in my review

16  I believe it was around the Lund case, citing because

17  of recent case law the Satanic Temple would like to be

18  put on the next available meeting to give the

19  invocation.

20            I was asked to look into the -- that case and

21  whether or not the City Council was required to oblige.

22  The City Council does not take requests.  It -- the

23  invitations for the invocation are based upon personal

24  relationships the councilors have.  It's by invitation

Page 53

1   only.

2        Q    Don't take requests.

3             Why don't -- why doesn't the City Councilors

4   take requests?  What's the reason why not?

5        A    Because the invocation is each councilor has

6   a turn for a particular meeting to invite someone to

7   give the invocation, and it's based upon personal

8   relationships that that councilor has.  It's based upon

9   people that they have relationships with because of

10  their districts.  It might be work that the individual

11  does in their districts or does for their constituents.

12  That has been the policy.

13       Q    That's been the policy or has that been the

14  custom?

15       A    Policy and custom.  I would say both.

16       Q    And I, I -- I do a lot of First Amendment.

17  I'll just tell you.  In my understanding those two mean

18  slightly different things.  Policies are written down,

19  codified, and there are like procedures involved;

20  whereas, customs are just like this is kinda how we do

21  things.  So was this -- is this more of a custom or is

22  this more of a policy?

23       A    In my capa -- in my work, what I do, I do not

24  really consider a policy being written down.

Page 54

1      Q     Okay.

2      A     I use the terms interchangeably.  With your

3  definition, I would define it more as a custom.

4      Q     Okay.

5      A     The City Council does not have a written

6  policy --

7      Q     Okay.

8      A     -- about it's -- but it's understood that

9  it's by invitation.

10      Q     Okay.  I understand that it's understood that

11  it's by invitation.  I'm asking why not.

12                MS. O'CONNOR:  Objection.  But you can

13  answer if you understand.

14      A     You're -- can I ask a clarification?

15      Q     Yeah.  Yeah.

16      A     You're asking me why not -- why it's not

17  written down?

18      Q     Well, yeah, let's start there.  Why isn't it

19  written down?

20      A     I am not sure.

21      Q     Okay.  I was actually going a different, a

22  different route which is why is there not some kind of

23  a mechanism for people to request an invite?

24      A     Because the mechanism is that the councilor

Page 55

1   is the individual that controls who they invite.

2       Q    Okay.  It sounds like it's just whatever the

3   councilor wants to do then.

4       A    Correct.

5       Q    Okay.  Why?

6       A    That's been the custom.

7       Q    That's just how things go, in other words?

8       A    Yes.

9       Q    Okay.  All right.  So you issued an opinion,

10  the details of which I don't much care about,

11  essentially, no, suffice it to say, you don't have to

12  order them in because the way we've always done things

13  is that you can if you want to.  If you don't want to,

14  you don't have to.  Is that a fair recitation of the

15  way things go?

16      A    Yes.

17      Q    Okay.

18      A    And if I could just clarify.

19      Q    Yeah.

20      A    It wasn't a formal legal memo.  I was asked

21  to assist the councilor in drafting a letter.  I

22  believe she provided an email response back to TST.

23      Q    I, I think that ... let's see here.

24      A    If I recall.

Page 64

1    example?

2        A    With City decision makers?

3        Q    Yeah.  I mean the people at the City who make

4    the decisions I assume are called the Council; is that

5    correct?

6        A    I know them because I work for them.

7        Q    Yeah.  Outside of that, though, do you have

8    any relationship of any sort?

9        A    No.

10        Q    Okay.  Investigation, okay.

11            What investigation or preparation have you

12    done so far?  Up to, up to walking into that door, what

13    preparation, what did that entail?

14        A    So I've met with my counsel, Rob and Nicole,

15    numerous times to talk about this.  I spoke with

16    Councilors' staff, the employees that work for the City

17    Councilors.  I've researched City Council minutes, City

18    Council agendas.  I looked through the documents that

19    were produced for discovery.

20        Q    Okay.

21        A    I spoke with other relevant parties that

22    were -- that have experience with the subject matter in

23    the, the deposition to find out, you know, City

24    policies.

Page 65

```
 1      Q    Okay.  Let's take these in turn.
 2           So you said you talked with members of the
 3  Coun -- well, you said Council.  I may have misheard.
 4  Did you speak with members of the people who vote on
 5  things for the City or did you speak with your
 6  attorney's counsel, because those are -- you know, they
 7  sound the same.
 8      A    I spoke with Rob and Nicole.
 9      Q    Okay.  Did you talk to any of the people who
10  actually send the invitations or request the
11  invitations?
12      A    Oh, okay.  I'm sorry.  I -- when you -- when
13  I said counsel, I meant my counsel, Rob and Nicole.
14      Q    Okay.
15      A    The City Councilors, --
16      Q    Mm-hmm.
17      A    -- I spoke with their staff about how the
18  councilors decide.
19      Q    Councilors, okay.
20      A    And I also have -- only because in my
21  capacity I attend the City Council meetings.
22      Q    Oh, okay.
23      A    They generally happen on Wednesdays.
24      Q    Okay.
```

1      Q     Okay.  Okay.  When -- just still narrowing

2   down on this other parties.  Are there any other other

3   parties that are in this other parties category?

4      A     No, I think that covers it.

5      Q     Okay.  So then we've got that one done.

6            You talked to staff.  Who, who did you -- who

7   all staff did you talk to?

8      A     So there's 13 City Councilors.  So I asked

9   the employees -- do you want specific names or ...

10     Q     Yeah.  Yeah, let's talk names.  What have we

11  got?

12     A     I spoke to Amanda Curley.  She works for

13  Councilor Baker.  I asked her how does the councilor

14  generally decide, and she said it's people that he has

15  a personal relationship with or that he knows from the

16  district that are -- that do work within the district.

17     Q     Okay.

18     A     I've spoken to -- I can't even recall.

19  Most -- I've spoken to pretty much someone in every

20  single council office to ask.

21     Q     But that's the gist?

22     A     Yes.

23     Q     Is that ...

24     A     Yes.  For all of them it's those common

Page 70

1  factors exist.

2       Q    How far back does this custom go?

3       A    So I did research as I indicated.

4       Q    Oh.

5       A    I did research the City documents and City

6  Council minutes.  I am not sure of the exact time that

7  the invocation originated, but going back to the 1800s,

8  the City Council has had someone give an invocation.

9  When I went back to look at the documents from the

10  1800s, the -- a clergy person gave the invocation

11  generally at the inauguration.  With the way the

12  minutes were done back then, it's hard to tell if every

13  single meeting after that there was an invocation.

14       Q    Mm-hmm.

15       A    But from the 1800s, clergy and invocations

16  were part of the City Council meetings.

17       Q    It's basically always been part of the thing?

18       A    Yes.

19       Q    Did anyone address why it's part of the

20  thing, in any of the records that you've seen?

21       A    Not that I have seen.

22       Q    Do you have an opinion as to why it is?

23            MS. O'CONNOR:  Objection.  You can

24  answer that.

Page 72

1  some kind of primary historical rec -- I'm using jargon

2  terms again.  You looked through papers from like the

3  1800s; is that correct?

4       A    Yes, the minutes.

5       Q    Okay.  Where did you find those?

6       A    The City of Boston has books of all the past

7  minutes going back to the 1800s.  In the 1800s it was

8  an alderman form of government so it's a little bit

9  different.  But the City Council has books that are

10 available to the public.  It's also at the City of

11 Boston archives.  And more recently, all of the City

12 Council meetings are online.

13      Q    Yes.  Yes.  I think they're on YouTube

14 nowadays, right?

15      A    Yes.  And I believe they have been online

16 since 2011.

17      Q    Okay.  Now, you said it used to be an

18 alderman government, and things are different now.

19 What's the distinction between aldermen and whatever it

20 is now?

21           And do you -- actually, let me back up.

22 Before, before you answer that question, let's start

23 with you said it was aldermen before, and now it's

24 something different.  What is it called now, so we have

Page 73

1    a short designation for that?

2         A    City Council.

3         Q    Okay.  So alderman vs. city council.

4         A    They, they both were the local government for

5    the City of Boston.

6         Q    Yeah.  Yeah.

7         A    And -- right.  The City Council has 13

8    members.

9         Q    Yeah, I'm starting off because I want to, I

10   want to understand the distinction between al -- you

11   saw fit to mention.  It's clearly something of

12   interest.  What is the difference between alderman and

13   City Council form of government?

14        A    I'm not sure what the difference is except

15   for the -- they're both local form of governments.  I

16   didn't look into what the difference was.

17        Q    I see.

18        A    I just know that right now it's the City

19   Council.  1909 was the Chapter 486 of the Acts of 1909.

20        Q    Wait.  Wait.  Wait.  Slow down.  Slow down.

21   So Chapter 84.

22        A    Chapter 486.

23        Q    Sorry.  486?

24        A    Yes.

Page 74

1        Q     486.

2        A     Of the Acts of 1909.

3        Q     Of 1909.

4        A     That was when the City of Boston became a

5     council form of government.

6        Q     Was that like a charter by the state

7     government or like a --

8        A     It was a charter within the City of Boston.

9        Q     Okay.  So it sounds like a statute was passed

10    in Massachusetts proper.  Boston encoded its

11    organizational purposes into some kind of a written

12    document.  Is that right so far?

13       A     Boston -- Boston -- it, it started with

14    Boston then the state approved it.

15       Q     Okay.

16       A     That's how it works.

17       Q     So internal inside of Boston sometime before

18    1909 there was some kind of internal movement to say,

19    hey, things are different.  We should encode, encode

20    how things are -- should be going moving forward?

21       A     I'm assuming that that's how --

22       Q     Well, yeah.

23       A     -- it happened.

24       Q     Well, yeah.  That's, that's the best that we

Page 75

1    can surmise based off the fact that it's here.

2         A    But, but that -- the cite that I gave you,

3    that is what established the City Council form of

4    government.

5         Q    Okay.  Let's see.  So I think that answers

6    all of my history-related questions.

7              Did you have any other staff who were

8    noteworthy in the course of your investigation?

9         A    No.

10        Q    Okay.  What about employees?

11        A    No.

12        Q    Okay.  I have a note looked through.  I think

13   that had something to do with discovery.  Did you find

14   anything of interest in the course of looking through

15   discovery, in your opinion?

16        A    No.

17        Q    Okay.  I have -- okay.  This is just

18   generally about meetings.  Payment records I think I'm

19   good on that.

20              Okay.  You addressed meetings.  You said, if

21   I remember correctly, they happen on Wednesdays.  How

22   long do these meetings usually last?

23        A    So it depends on what's on the agenda.  And

24   it's not every single Wednesday, but it's most

Page 108

1    that.

2         A    No, it's ...

3         Q    Public body is actually the organization.

4    The public is the not body.  So members of the public

5    will communicate to the public body their desires

6    pursuant to designated person?

7         A    Yes.

8         Q    Okay.  And some of those opinions were we

9    don't want TST to give a prayer?

10        A    I reviewed some emails where the public sent

11   to their councilors.  I can't recall which ones in

12   particular, but I did see emails where members of the

13   public expressed that view to their councilor.

14        Q    Okay.  Do you have any specific instances in

15   mind?

16        A    I, I can't recall.  I just -- I remember

17   seeing some emails.

18             MR. KEZHAYA:  You know, we've been going

19   on for a decent amount of time now.  I'm parched.  Does

20   anyone else want a break?  Because I also have to like

21   get some emails together and do some exhibit stuff.

22             MS. O'CONNOR:  Sure, we can take a

23   break.

24             THE VIDEOGRAPHER:  Okay.  The time is

Page 144

1    objected to.  Is there something that I'm

2    misunderstanding about your objection?

3              MS. O'CONNOR:  Ask your question again.

4    Let me hear it.

5    BY MR. KEZHAYA:

6         Q    City of Boston, do you bless your meetings?

7              MS. O'CONNOR:  That's a fair question.

8         Q    Yes or no.

9         A    No.

10        Q    You do not.  Okay.

11             MR. KEZHAYA:  Let us continue.  Back at

12   7:00.

13             MS. KING:  7:00?

14             MR. KEZHAYA:  Seven minutes even.  Ah,

15   6:50, 7:00 minutes.  That's fine.  Whatever, 7:00.  I'm

16   sure she's saying nothing of importance.  That's good.

17   6:49, that's good too.

18                  (Video playing.)

19             MR. KEZHAYA:  Pause here.

20        Q    In the past 45 seconds I've heard her call

21   the councilors your servants, servants.  She's called

22   this a blessing, and she has requested that God

23   literally endow his servants with knowledge.  Have you

24   heard all those things or do we need to watch the last

Page 152

1    it disrespectfully.

2                    MR. KEZHAYA:  Then I need a break.

3                    MS. O'CONNOR:  Okay.  That makes sense.

4                    THE VIDEOGRAPHER:  Okay.  The time is

5    12:21.  We're off the record.

6                        (Break was taken.)

7                    THE VIDEOGRAPHER:  Okay.  We are back on

8    the record.  The time is 12:31.

9                    MR. KEZHAYA:  Okay.  Off the record I

10   apologized for my errant ways.  Once again, looking you

11   both eyes, I apologize sincerely.  Sincerely, okay?

12                    MS. O'CONNOR:  Thank you.

13                    MR. KEZHAYA:  You're welcome.

14   BY MR. KEZHAYA:

15       Q    The subject of dispute is basically I'm

16   coloring outside the lines of my 30(b)(6) notice.  So

17   that being the case, specifically with regard to "the

18   bases for limiting who may participate" which is more

19   particularly included with the term "a background on

20   the City's invocation ceremony", my question to you is

21   whether there are bases for limiting who may

22   participate, yes or no?

23       A    It's by invitation.  So the limit would be if

24   you don't get an invitation, you don't give the

Page 153

1    invocation.

2         Q    So the answer is yes, and the basis is

3    singular which is you were not invited?

4         A    Yes.

5         Q    Okay.  All right.  And as I recall, earlier

6    you said you investigated why -- how and why a

7    particular speaker is selected in the course of

8    preparing for this deposition; is that correct?

9         A    I didn't investigate how or why -- oh, well,

10   if you're asking -- I asked staffers of city councilors

11   how a councilor determines who they invite.  Is that

12   what you're asking?

13        Q    That is what I'm trying to ask.

14        A    Yes.

15             MR. KEZHAYA:  Nicole, may I rephrase it

16   as I see fit or am I bound --

17             MS. O'CONNOR:  Sure.

18             MR. KEZHAYA:  -- to the language?

19        Q    Basically what I'm trying to get at here is

20   pursuant to your earlier conversation here, you -- like

21   you got here.  Before you got here, --

22        A    Yes.

23        Q    -- you did an investigation.  That

24   investigation included talking to people.

Page 154

1      A    Yes.

2      Q    Did you talk to the people for your

3  investigation why a particular matter or why a

4  particular speaker is selected or any permutation in

5  your mind thereof?

6      A    I asked how a councilor determines who

7  they're going to invite for the invocation.

8      Q    Okay.  Pause there.  And why.  Did you ask

9  why, yes or no?

10     A    I did not because that answer was part of the

11  answer that the staff person gave me.

12     Q    So the -- I tasked you with giving me how and

13  why a particular speaker is selected.  You went out.

14  You found how.  You did not investigate why; is that

15  correct?

16     A    The --

17           MS. O'CONNOR:  Objection.  You can

18  answer.

19     A    The response from the staff persons that I

20  asked said, oh, it's someone that the councilor has a

21  personal relationship with or does work within our

22  district or has done work with our constituents.

23     Q    Okay.  And --

24     A    So that would be the why.  That would be why

Page 155

1    a councilor extends an invitation to somebody.

2        Q    Yes.  Yes.  Thank you.

3            That sounded like a quote.  Were you given a

4    quote or is this just you referencing your prior

5    statement?

6        A    It's not a quote.  It's me summarizing the

7    question that I asked the staffers.

8        Q    Okay.  So you had some kind of a dialogue

9    with staffers?

10       A    Yes.

11       Q    Minimally you asked a question.  Did you get

12   one statement or more than one statement in return?

13       A    I, I asked more than one staffer so, yes,

14   more than one statement.

15       Q    Did you ask each staffer -- let's do it like

16   this.  How did you ask each staffer this question?

17       A    I asked what does -- how, how does the

18   councilor determine who to invite for the invocation.

19       Q    In what form --

20       A    The same question.

21       Q    Yeah.  Yeah.

22           What form was this inquiry made?  Was it

23   spoken, written or something else?

24       A    Spoken.

1    Q    Okay.  So you met with them in person or did

2  you talk to them on the phone or was there some other

3  means of communication?

4    A    It was in person.

5    Q    Okay.  When was this meeting?

6    A    It wasn't a meeting.  It was just a

7  conversation.  Probably about two weeks ago.

8    Q    Okay.  So give or take two weeks ago.  How

9  many -- well, was this -- did you guys all meet in one

10  place?  Because you mentioned you talked to multiple

11  staff, plural staff people.

12    A    Talked to a couple of people.

13    Q    Okay.  Who were the two people that you

14  talked to?

15    A    Amanda Curley.

16    Q    C -- how do I spell Curley?

17    A    C-u-r-l-e-y.

18    Q    E-y.  Thank you.

19    A    You're welcome.

20    Q    And just for sake of good notes, a-n-d-a.

21         Okay.  So you talked to Amanda.  Who else did

22  you ...

23    A    Sophia Wang.

24    Q    Sophia Wang.

Page 157

1          Okay.  Who is Amanda Curley in the

2     organization?

3          A    Amanda Curley is the Chief of Staff for

4     Councilor Baker.

5          Q    Chief Staff Baker.  K-e-r?

6          A    Yes.

7          Q    Okay.  Sophia Wang is?

8          A    She is the policy director for councilor

9     Flynn.

10         Q    C director for F-l-y-n-n.

11              And it's the City's position that the

12    councilors may -- basically the councilors have -- you

13    know, whatever they do, that's pretty much up to them.

14    That's pretty much the custom; is that correct?

15         A    Yes.

16         Q    In terms of extending invites, each -- each

17    person does whatever they feel like is essentially ...

18         A    Yes.

19         Q    You talked to two, by my count, councilors

20    for a time period, an agreed time period discoverable

21    scope of 2011 until minimally the date of the

22    complaint, although that's a subject of dispute as

23    well.  How, how many councilors have been, you know,

24    employed by the City during that timeframe?

Page 158

1       A     So there has been a lot of turnover.

2       Q     Yeah.

3       A     The City Council has -- their election is

4   every two years.  It's a two-year term.  So since I

5   started in 2011, there -- actually, all of the

6   councilors are gone since I first started in 2011.

7   It's all new councilors right now.

8       Q     Okay.

9       A     So part of the reason why I reached out to

10  those two councilors' offices, Councilor Baker started

11  in 2012/2013.

12      Q     Okay.

13      A     And although Councilor Flynn is a newer

14  councilor, I believe his first term was 20 ... 2018.  I

15  think.  But he is the Council president.  So that is my

16  reasoning for speaking to those two offices.

17      Q     So he's the council president?

18      A     Councilor Flynn is the council president,

19  yes, the current council president.

20      Q     Okay.  So Flynn is currently the -- currently

21  the Council president, correct?

22      A     Yes.

23      Q     When did he first became council president?

24      A     This, this year.

Page 159

1      Q      Oh, wow, okay.

2      A      Yes.

3      Q      Council pres, all right.

4             You gave me beginning dates for both Baker

5      and Flynn.  Are they still --

6      A      Yeah, approximately.

7      Q      Well, yeah, obviously.

8      A      Yeah.

9      Q      Yeah, everything's approximate.  I'm not

10     playing semantics games here.  Give or take 2012,

11     that's what this squiggly line means for my purposes.

12     A      Mm-hmm.

13     Q      Are they still councilors, though?

14     A      Yes.

15     Q      Okay.  Present.  And present.

16            Okay.  So you talked to Flynn to determine

17     how Flynn does things, but you did not talk to anyone

18     else, it seems, or other than Baker?

19     A      No.

20     Q      Okay.  All right.  Turning once again back to

21     here.  Mm-hmm.  Mm-hmm.  Mm-hmm.

22            All right.  Why didn't you talk to anyone

23     other than Flynn's people?

24     A      Well, I talked to Councilor Baker's --

1      Q    Oh, yes.

2      A    -- people because, again, he's been there the

3  longest now and Councilor Flynn because he's the

4  council president.

5      Q    Oh, so you --

6      A    And I -- as I said previously, I have

7  attended the meetings so I can see from the

8  introduction and I know that the policy is based on

9  invitation and that's why I'm here to discuss that

10 policy.  So I spoke to those two offices just to get an

11 idea how their councilors pick the individual that

12 gives the invocation.

13     Q    You specify how, but I also charged you with

14 specifying why.

15     A    And again, I feel that I answered that.  It's

16 individuals that the councilors have a relationship

17 with, and the Council -- it's by invitation.

18     Q    Well, sorry, I was --

19     A    I, I -- I feel that the councilors are the

20 only ones that can speak to why they're asking

21 somebody.  I can infer based on the invites that it's

22 people that they know because of a personal

23 relationship or work they do within the City.

24     Q    Yes, but that's an inference, and as their

1  employer who has charged them to do certain tasks for

2  your business purposes, that, I posit, is a material

3  aspect of the agency seeing as how you, 30(b)(6)

4  witness, are unable or unwilling to testify to that

5  effect.  Would you agree then that I need to talk to

6  the individual councilors, each?

7      A    Yes.

8      Q    Okay.  In order -- to be more -- to make a

9  better record, I heard yes.  I interpreted that to mean

10 yes for the particular purpose of why are they not

11 inviting TST, why are they inviting these other people.

12 For example, I would need to talk to Wu about this

13 particular person and why Wu in particular would not

14 invite TST, correct?

15     A    Wu didn't invite TST.  There -- there was

16 never an invite.

17     Q    I understand.  The why question is addressed

18 to Wu, though, correct?

19     A    Yes.

20     Q    Okay.  Who would I talk to in Wu's office or

21 on Wu's behalf in order to get her deposition set up

22 because we only have like two months left in discovery?

23            MS. O'CONNOR:  Objection.  I mean I'm

24 happy to coordinate --

```
                                              Page 162
```

1              MR. KEZHAYA:  Okay.

2              MS. O'CONNOR:  -- that information.  I

3    don't think Christine will know it.  You can ask her.

4              MR. KEZHAYA:  You don't need to call an

5    objection.  You can just ...

6              MS. O'CONNOR:  Okay.

7              MR. KEZHAYA:  Okay.  All right.  I, I

8    bring that up because words like "objection" have a

9    tendency to, to get me riled up.  I'm trying to, trying

10   to keep it down.

11             MS. O'CONNOR:  That's just pretty

12   standard.

13             MR. KEZHAYA:  Okay.

14   BY MR. KEZHAYA:

15        Q    All right.  And I also see on my handy list

16   here, paragraph 4, City's recordkeeping policies

17   surrounding payment to guest speakers at the invocation

18   policy which presupposes that this person who is

19   presently blessing the proceedings, although that's

20   subject to dispute, Wu invited this priest and this

21   priest is paid by the City for speaking at this event;

22   is that correct?

23        A    The people that give the invocation are no

24   longer paid.

Page 166

1   did not conduct this review.  But the review of the

2   policy of paying the people giving the invocation was

3   looked at, and it was determined that it was best

4   practice to stop the stipend.

5         Q    Okay.  And, City of Boston, was it -- is it

6   your testimony, as we sit here today, that since

7   approximately 2016 - let's bookend it at 2018 - people

8   have not been getting paid since at least going back to

9   2018-ish?

10        A    Correct.  And I'm, I'm pretty -- I'm pretty

11  sure it was 2017.  I'm pretty sure you can settle on,

12  on that.

13        Q    Okay.

14        A    That it was 2017 when the payment stopped.

15        Q    Okay.  Who made that decision?

16        A    At the time it was Council President Wu.

17        Q    Oh, so Councilor Wu, here who invited this

18  particular person, I should probably ask her why she

19  decided to turn off this money thing?

20        A    Yes.

21        Q    Okay.

22             MR. KEZHAYA:  Let us proceed.

23                  (Video playing.)

24             MR. KEZHAYA:  Amen.  All right.  Pause

Page 169

1   through discovery.

2        To recap, Christine, you looked at the

3   discovery, correct?

4        A    Yes.

5        Q    Okay.  And more particularly, I apologize,

6   discovery is a legal jargon term.  Could you please

7   explain to the, the congregants what it means to have

8   discovery?

9             MS. O'CONNOR:  Objection.  You can

10   answer.

11       A    My understanding is that it's requests for

12   information and documents pur -- before litigation or

13   during litigation.  Again, I'm not a litigator so I'm

14   not familiar with the proper terms.

15       Q    That's okay.  If I, if I dispute any part of

16   what you have to say to me, I ask further examining

17   questions until we get to the place where I feel like

18   we're either at an impasse or I understand what you're

19   saying.

20       A    Okay.

21       Q    So if I could rephrase it in my own words, is

22   it fair to say that discovery is a means by which you

23   prepare for trial that the rules allow you to have?

24       A    Yes.

Page 244

1    That's the full statement; otherwise, it's a speaking

2    objection which is objectionable and grounds for

3    discovery sanctions.

4             MS. O'CONNOR:  Oh, okay.  Christine,

5    answer that question if you can.

6        Q    Please do.  Yes or no:  Are you in a position

7    to disprove that in Aramaic words 2000 years ago Lord's

8    servants was meaningfully different from Lord's slaves?

9        A    No.

10       Q    Okay.

11            MR. KEZHAYA:  That's a Wu question.  17

12   is just a Wu question.  I'm kinda just skimming through

13   to get us through the end of this.  Bases or source of

14   each.  Ah, that's a Wu question.  Wu question.  Wu

15   question.  Wu question.  Mm-hmm.

16       Q    I take note, number 22, once again

17   specifically identifies any statement -- inclusive of

18   any statements that were written that any councilor has

19   made or either has prepared or has had prepared for

20   them but did not make about Satanism, TST, its

21   membership or its activities.

22            I take note that you are not prepared to talk

23   about that Mayor Wu's former political opponent email

24   in which she found TST and its viewpoint absurd; is

Page 245

1    that correct?

2        A    Yes.

3        Q    Okay.

4             MR. KEZHAYA:  Just once again making

5    very abundantly clear that the witness was unprepared

6    to speak to item number 22.

7        Q    Number 23 --

8             MS. O'CONNOR:  She's prepared to speak

9    about 22.

10            MR. KEZHAYA:  Oh, she is.  Fantastic.

11       Q    So what was going on in Mayor Wu's former

12   political opponent's head when she described it as

13   absurd that TST would think it entitled to an invite?

14            MS. O'CONNOR:  So paragraph 22 doesn't

15   ask for the subjective intent of the councilor.  It

16   just asks for a statement that any councilor has made

17   and so she has fully answered those questions today

18   about that statement that was put up on the screen.

19            MR. KEZHAYA:  These are matters for

20   examination.  I get to ask the who-what-when-where-why.

21            MS. O'CONNOR:  We fundamentally disagree

22   about that.

23            MR. KEZHAYA:  I see.  Well, you

24   understand that my next thing is to move for discovery

1         Having sat through 11 years worth of

2    meetings, how many of these invocations are Christian?

3         A    I don't have an exact number.  There -- the

4    majority Christian but within Christianity there's

5    different sects of religion.

6         Q    Sure.

7         A    There's also been a number of representatives

8    from other types of religion.  There's been some

9    laypeople throughout the years.

10        Q    So --

11        A    So I cannot give -- I do not have an exact

12   number or percentage.

13        Q    Okay.  So the City will even extend

14   invitations to nonministers of proper religious

15   entities, just any random person of the public who

16   wants to give a prayer?

17             MS. O'CONNOR:  Objection.

18        Q    Correct?

19             MS. O'CONNOR:  You can answer.

20        A    Again, it's by invitation from the City

21   Councilor.

22        Q    Mm-hmm.

23        A    And there have been instances where an

24   individual from an organization that does work within

Page 251

1    the community may give the invocation.

2                    MR. KEZHAYA:  Okay.  Number 27, skip.

3    Skip.  Skip.  Okay.  That's the end of those topics.

4        Q    I posit -- I keep using words like posit and

5    proffer.  These are formal legal -- formal logic, I

6    should say, not legal.  Law is based on formal

7    discourse which is formal logic, so I kind of use the

8    terms interchangeably.  I apologize.  Again, I'm bad

9    with words.

10                  A proffer is to make a statement that you

11   posit is true.  Something can be either true or false.

12   Opinions cannot be proved true or false.  Not because

13   opinions are not true or false, but because the First

14   Amendment says that the government may not punish true

15   or false opinions.  That's where we get defamation law

16   from.

17                  So back in the day in common law, defamation

18   was strict liability.  You said something bad about

19   someone, well, you better be prepared -- you better be

20   ready to prove it's true.  All of that changed in the

21   mid 1960s or so with a bunch of free speech stuff.

22                  I say all of that to say that irrespective as

23   to the impasse on whether, in fact, the City of Boston

24   finds TST's religious viewpoint to be absurd, we see