# EXHIBIT 6

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF MASSACHUSETTS
3   _____
4   THE SATANIC TEMPLE, INC.,
5          Plaintiff,
6       v.                              Civil Action No.
7   CITY OF BOSTON, MA,                  1:21-cv-10102
8          Defendant.
9   _____
10              VIDEOCONFERENCE DEPOSITION OF
11                 ANNISSA ESSAIBI-GEORGE
12   DATE:          Monday, September 19, 2022
13   TIME:          10:01 a.m.
14   LOCATION:      The Satanic Temple
15                  64 Bridge Street
16                  Salem, MA 01970
17   REPORTED BY:   Robert Lombardi, Notary Public
18   JOB NO.:       5488484

```
 1                A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF THE SATANIC TEMPLE, INC.:
 3        MATTHEW A. KEZHAYA, ESQUIRE (by videoconference)
 4        Crown Law
 5        333 North Washington Avenue, Suite 300
 6        Minneapolis, MN 55401
 7        matt@crown.law
 8
 9        SONIA KEZHAYA, ESQUIRE (by videoconference)
10        Crown Law
11        333 North Washington Avenue, Suite 300
12        Minneapolis, MN 55401
13        sonia@crown.law
14
15   ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS
16   ANNISSA ESSAIBI-GEORGE:
17        NICOLE O'CONNOR, ESQUIRE
18        City of Boston Law Department
19        1 City Hall Square, Room 615
20        Boston, MA 02201
21        nicole.oconnor@boston.gov
22
23
24
25
```

Page 3

1           A P P E A R A N C E S (Cont'd.)
2    ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS
3    ANNISSA ESSAIBI-GEORGE:
4         ROBERT S. ARCANGELI, ESQUIRE
5         City of Boston Law Department
6         1 City Hall Square, Room 615
7         Boston, MA 02201
8         robert.arcangeli@boston.gov
9
10   ALSO PRESENT:
11        Sean Budd, Videographer
12        Lucien Greaves
13        Ada King
14        Mobius

Page 105

1  that it is in oversimplification, whether we go down
2  to the middle Mesoamerican Aztec traditions or, you
3  know, following thereafter into the South American
4  traditions, any of those varietals of Native American
5  traditions, pre- or during or post-political life, did
6  you have any exposure to any of that?
7       A    Not that I recall.
8       Q    Okay.  And then back up north through, you
9  know, Canadian and leading into the Inuits, any of
10 those pre-, post-, or during?
11      A    Not that I recall; no.
12      Q    Can you speak to Michelle Wu's exposure to
13 the various religions of the world, whether pre-
14 political life, during political life, or now in her
15 mayoral life?
16      A    I cannot.
17      Q    Would you agree with me that I need to talk
18 to Michelle Wu about that?
19      A    That's not my decision to make.
20      Q    I understand that but since you --
21      A    I can't answer or speak for her or her
22 experiences.
23      Q    Correct.  That's all I need.
24           MR. KEZHAYA:  This is a good stopping
25 point to take lunch.  Also, this laptop is about to

Page 106

1  die.  We can go off record now if it pleases the
2  group.
3              THE WITNESS:  I don't need to come off
4  record.  I don't -- I'd prefer to work through lunch
5  if possible.
6              MR. KEZHAYA:  Oh, this is approximately
7  half of the deposition.  So I imagine you're going to
8  want to take lunch.  This is a good halfway point.
9              THE WITNESS:  How --
10             MR. KEZHAYA:  Once we get started into
11 the next thing, we're going to have a solid -- what
12 time is it now, it's 12:48; we've been here about four
13 hours.  This is an all-day affair.  I don't know if
14 you were apprised of this.
15             MS. O'CONNOR:  What's the briefest
16 amount of time we can take for lunch?
17             MR. KEZHAYA:  That's a question for the
18 group.  I don't know.
19             MS. O'CONNOR:  I think 20 minutes would
20 probably be fine on our end.
21             MR. KEZHAYA:  Well then let me confer
22 with my group and then we will reconvene.
23             THE VIDEOGRAPHER:  Okay.  The time is
24 12:49.  We are off the record.
25             (Off the record.)

Page 107

1            THE VIDEOGRAPHER:  Okay.  We are back
2    on the record.  The time is 1:41.
3    BY MR. KEZHAYA:
4        Q    Ms. Essaibi-George, all of that background
5    was essentially to establish your relative familiarity
6    with essentially all of the world religions, both pre-
7    political life and during your political life.  That's
8    necessary background before we can get to the next
9    phase of the questioning which is as pertains to this
10   litigation.
11            As I understand it, the City of Boston has a
12   council and you were on that council.  Is that
13   correct?
14       A    I was on that council; yes.
15       Q    Okay.  And in the course and scope of your
16   employment for the City of Boston as a councilor, you
17   invited various people to give a blessing over city
18   council meetings.  Is that also correct?
19       A    Yes.  Blessing, invocation, opening remarks;
20   yes.
21       Q    All three of those words are interchangeable
22   in your parlance.  Is that correct?
23       A    Well, sometimes the remarks would be more of
24   a blessing as opposed to remarks.  Sometimes it was
25   more of a prayer as opposed to a poem or something

Page 121

1   time in our public schools; I think I named a couple
2   of schools in which they work in.  So I'm sure I came
3   to know of them either during one of my visits to a
4   classroom in our school -- school district or one of
5   -- maybe a classroom teacher perhaps referenced some
6   of their work in our schools.  I don't -- I don't
7   recall exactly but I imagine that's how it could have
8   happened.
9        Q   Okay.  More --
10       A   -- schools I mentioned specifically in my
11  remarks here were the Ohrenberger, which is in West
12  Roxbury part of the city and the Winship which is in
13  the Brighton part of our city.
14       Q   Sorry.  I'm trying to figure out how to --
15  oh, that's the -- okay.  More particularly, do you
16  recall whether they solicited the invite?
17       A   They did not.
18       Q   They definitely did not?
19       A   I'm -- I'm certain that they didn't and I
20  don't think anyone's ever asked me, with the
21  exception, I think, why I'm here today, to offer
22  remarks, a prayer, or a blessing before the city
23  council.
24       Q   Okay.  In the course of giving these
25  remarks, did you prepare those or did they prepare

1      Q    And it's subject, statement on Satanic
2  Temple.  Also correct?
3      A    That's what I'm reading.
4      Q    And the date and time of this e-mail is
5  October 19, 2017, at 3:17 p.m.  Is that also correct?
6      A    That's what it says.
7      Q    Okay.  Please read the body of this e-mail
8  in full.
9      A    It --
10          THE WITNESS:  Mobius, could you make it
11  just a hair bigger for me?  Can you just zoom in just
12  a little bit?  I'll do my best.  That's great.  Thank
13  you.
14               It is absurd that this group feels
15  entitled to being invited to give remarks at the
16  beginning of the council meeting.  And frankly, it's
17  insulting to all of the amazing religious and secular
18  leaders who are invited.  They are invited because of
19  all the incredible work that they do across the city;
20  work to end youth violence, work to provide shelter
21  and stability to the homeless, or compassion and
22  support for those in recovery.  I will not give up the
23  opportunity to highlight one of those amazing leaders
24  who I am privileged to work with for The Satanic
25  Temple.  The city council does important, serious work

1  for the people of Boston and when we invite someone to
2  participate in our meeting, it -- it is out of
3  profound -- a profound respect, not a sense of
4  obligation.
5  BY MR. KEZHAYA:
6      Q    Did you confer with any attorneys about the
7  state of constitutional while at the time you sent
8  this e-mail as pertains --
9      A    I --
10     Q    -- rights?
11     A    I -- I don't think so.
12     Q    Have you since conferred with any attorneys
13 about the state of constitutional law with respect to
14 TST's equal right to participate in this legislative
15 prayer ceremony?
16     A    I have not.
17          MS. O'CONNOR:  Objection.
18 BY MR. KEZHAYA:
19     Q    Let's drill down a little bit further.  As
20 of 2017, did you perform any form of investigation to
21 determine what, if any, involvement TST has with the
22 community of Boston at all?
23     A    I have not -- I have not.
24     Q    So you indicate, for example, that the
25 people who you do invite do incredible work, for

Page 150

1  example, to end youth violence, provide shelter and
2  stability to the homeless, or compassion and support
3  for people in recovery.  These are qualities of people
4  who you do invite.  Correct?
5       A    Those are qualities of people and
6  organizations; yes.
7       Q    Well, TST is an organization also.  Correct?
8       A    Yes.
9       Q    TST as an organization is comprised of
10 people.  Correct?
11      A    Yes.  I think so.
12      Q    Yes.  I'll tell you the answer's yes.
13           You, at the time of writing this e-mail, had
14 no basis to believe that TST as an organization does
15 not provide what I would describe as charitable
16 contributions to the Boston community.  Is that also
17 correct?
18      A    I had no reason to believe that you did or
19 did not.  I didn't look it up and the most information
20 I've ever read about TST is in the pamphlet that's
21 before me today.
22      Q    So before this reading of this pamphlet
23 today, you had essentially no idea who the membership
24 of TST or -- comprised of, what they do in the Boston
25 community.  All you knew is that you had never heard

1  of them.  Is that correct?
2       A    That is correct.
3       Q    Is that why you felt it was absurd that this
4  group felt entitled to an equal --
5       A    I think any -- anyone that feels entitled to
6  offer an opening remark without having a relationship
7  or playing an important role in my -- my work, yes, I
8  think that that -- I didn't appreciate that sense of
9  entitlement.  Now, I can't speak for other councilors.
10 But for me, when I selected an individual or
11 organization or set of work to highlight before the
12 city council, I did it based on my experiences and the
13 work that I was doing in the City of Boston.
14      Q    Earlier you testified that your
15 understanding of an event being religious or community
16 oriented turned on there being a religious ceremony.
17 Do you recall that?
18      A    When we were in the questions around when an
19 event or community meeting took place in a building
20 that had a religious affiliation.
21      Q    So if there's a religious ceremony in a
22 building that does not happen to have religious
23 affiliation, that religious ceremony is not religious
24 to you?
25      A    It is -- it -- because I participated in,

Page 152

1  for example, a blessing offered by a rabbi, it does
2  not make me Jewish.
3       Q    When you, as the city government, direct
4  that the public stand for that particular prayer and
5  you bow your head and everyone is directed to bow
6  their head, that does not involve participation in the
7  ceremony that you have invited the officiant to
8  officiate?
9       A    I have -- I have never felt mandated to
10 stand and -- and bow my head.  I do that out of
11 respect for my guest and for the prayer and blessing
12 that they're offering for the council.  I would also
13 bow my head in a moment of reflection when we have
14 had, and I have had, offered a simple poem read before
15 the council.
16      Q    Who read this poem that you're referencing?
17      A    Oh, we've had poems and reflections read by
18 many people including our city -- our former city
19 clerk who would often do that if -- I once had, I
20 don't recall who it was, but a guest assigned to come
21 in and offer this blessing and that -- something
22 happened with the schedule, I don't recall exactly
23 what, but we would have our clerk step in and she had
24 a handy book of reflections that she would read from.
25      Q    Was that clerk -- is it Maureen Feeney?

1      A    Yes.

2      Q    I saw a number of her invocations, for lack
3  of a better word.  Was that pretty much typical
4  whenever she's giving that blessings, something fell
5  through?

6      A    No, sometimes she was actually invited to
7  offer them by the individual; by the councilor.

8      Q    Okay.  So as I understand it, your grounds
9  for not inviting TST -- well, actually, let me just
10 back up.  Please recite your grounds for not inviting
11 TST during your tenure.

12     A    I had no relationship with TST.  Had no
13 interaction with TST.  And as the city councilor, I
14 have very few opportunities to invite someone to offer
15 either opening remarks or a blessing or a prayer prior
16 -- before the start of a council meeting and utilized
17 those opportunities for, you know, very specific folks
18 and organizations that I wanted to do that with.

19     Q    Did any of them ever drop out on you?

20     A    I -- like I just mentioned, I had one that
21 something happened last minute, so we had Maureen, the
22 Clerk Feeney, step in and offer a reflection.

23     Q    And yet you knew that TST wanted to get in,
24 why did you not invite this group that announced a
25 desire to come in?

1    A    I didn't have a desire to invite you.
2    Q    Why not?
3    A    I can't tell you why I did or why I didn't;
4    I just didn't.
5    Q    I know that you didn't --
6    A    That, we have had -- huh?
7    Q    The purpose of the deposition is to
8    understand why not.
9    A    There -- there is no reason why not.  I
10   don't have a relationship with TST.  I did not have a
11   relationship with TST.  I, therefore, had no desire to
12   invite you as an organization for the city council.
13   Q    The people who you did invite up until about
14   2016 or so were paid.  Is that correct?
15   A    I did not take office until 2016.  I do
16   believe I recall a small stipend at some point being
17   discussed.  But I don't know when that ended over, you
18   know, what -- I don't know what year that was.
19   Q    As I recall prior testimony, it was during
20   your tenure.  If I remember correctly, it was 2017 or
21   2018.
22   A    Perhaps.  I don't know.
23   Q    You were not involved in that determination
24   to end the stipend?
25   A    Not that I recall.

```
 1   that.
 2        Q    I understand, but the question posed is as
 3   to the investigation about this custom.
 4        A    I'm sorry; is there a question there?
 5        Q    The question posed is whether you know
 6   anything about the investigation into this matter?
 7        A    I -- isn't that why I'm here?
 8        Q    Not exactly.  No, you're here because I need
 9   to understand why TST was not afforded an invite; at
10   least from you.  Because each councilor had different
11   ways of going about things.  Correct?
12        A    That's my understanding.
13        Q    So you can only really speak to you and your
14   office as to why you did or did not invite certain
15   people.  Correct?
16        A    That is true.  Yes.
17        Q    Now, Mayor Wu had her own means of inviting
18   or not inviting people.  Correct?
19        A    I would say that's correct.
20        Q    Did you and then councilor, now Mayor Wu,
21   have any discussions as to her practices of inviting
22   or not inviting people?
23        A    No.
24        Q    So I really need to talk to Wu to determine
25   why she did or did not invite any particular groups.
```

1  Is that correct?
2      A    Yes.
3              MR. KEZHAYA:  Let's take a brief break.
4              THE VIDEOGRAPHER:  The time is 3:01.
5  We're off the record.
6              (Off the record.)
7              THE VIDEOGRAPHER:  And we're back on
8  the record.  The time is 3:08.
9              MR. KEZHAYA:  Okay.  Mobius, if you
10 could please take us to this -- and still in folder
11 number 3, the Boston Herald article dated February 14,
12 2019.
13             MR. MOBIUS:  Okay.
14             THE WITNESS:  2019?
15             MR. KEZHAYA:  Well, that's the date of
16 -- or that's the -- yes.  That's correct; yes.  2019.
17             THE WITNESS:  Oh.  No, I'm looking at
18 the print.  It says 2022, but --
19             MR. KEZHAYA:  Oh, yes.  That's just
20 when we printed it off.  If you take a look, you'll
21 see a Lucien Greaves photo and then underneath, it
22 should say, published February 14, 2019, at 8:04 p.m.,
23 updated the next day.
24             THE WITNESS:  I see it.
25             MR. KEZHAYA:  Mobius, directing our

1 relationship with you. I didn't have one as a -- in
2 my capacity as a city councilor. I don't have one
3 today in my capacity as a private citizen.
4     Q   I understand that. Earlier you said that if
5 you were a counselor, you still would not invite TST.
6     A   I -- I would still today not have a working
7 relationship with TST.
8     Q   So it doesn't really much matter whether you
9 have an invitation; what really matters is that you
10 don't have a relationship with TST. Correct?
11     A   I'd say both of those things are true.
12     Q   Okay. Well, let's rewind back to 2017. You
13 were aware of TST. Yes?
14     A   I was made aware -- yes, through your
15 request and demand to offer invocation at the city
16 council.
17     Q   Okay. So having been made aware of them and
18 having had the power, you still did not invite TST
19 despite knowing TST wanted in. Correct?
20     A   That is correct. I also did not and still
21 do not have a working relationship or any overlapping
22 my work as a member of the city council with TST.
23     Q   And that is the only reason why you did not
24 invite TST. Correct?
25     A   I'd say so. I would say there was never a

1   decision made to invite or not invite.  You were not
2   on my radar.  We did not have any work or overlapping
3   work and my -- quite frankly, my dance card was very
4   much full every year thinking about who I would invite
5   to the few opportunities I had to invite someone to --
6   to kick off and start our council meetings.
7        Q    Then, why did you invite the clerk?
8        A    Because I had a last-minute cancellation.
9        Q    You had a last-minute cancellation, you knew
10  that TST wanted in --
11       A    No.  I -- I will tell you that I wasn't
12  thinking about TST.  TST has not ever been front of
13  mind for me.
14       Q    I see.  Have you ever invited any atheistic
15  religious speakers?
16       A    To open and give the opening blessing or
17  reflection, I don't believe so.
18       Q    To the best of your --
19       A    -- I'd have to look at -- I'd have to look
20  at my -- I don't believe so.  To the best of my
21  recollection, I do not believe so.  I have used my
22  opportunity as a city councilor to invite lots of
23  individuals and lots of organizations that have zero
24  connection to religious organizations to the council
25  to be recognized for the work that they're doing in