# EXHIBIT 7

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF MASSACHUSETTS
 3               1:21-CV-10102
 4
 5                                   Vol. I
                                     Pgs 1-33
 6                                   Ex. 1
 7
   -----------------------------------
 8  The Satanic Temple, Inc.         )
 9           Plaintiff,              )
10  V.                               )
11  City of Boston,                  )
12           Defendant.              )
13 -----------------------------------
14
15
16
17           REMOTE DEPOSITION OF
18           ANNE MARIE ROUSSEAU
19           November 16, 2022
20           11:14  a.m.
21
22
23
    Reported By:  Lori J. Atkinson
24  Job No: MW 5572382
```

```
 1   A P P E A R A N C E S:   (Remote)
 2   FOR THE PLAINTIFF:
 3   Matthew A. Kezhaya Esq.
 4   Crown Law
 5   333 N. Washington Ave
 6   Suite 300
 7   Minneapolis MN 55401
 8   Matt@crown.law
 9   479.431.6112
10
11   FOR THE DEFENDANT:
12   Edward F. Whitesell, Jr., Esq.
13   Robert Arcangeli, Esq.
14   City of Boston Law Department
15   One City Hall Plaza
16   Room 615
17   Boston, MA 02201
18   Edward.whitesell@boston.gov
19   617.635.4045
20
21
22   Also Present:   Lucien Greaves
23
24
```

1           P R O C E E D I N G S
2                ANNE MARIE ROUSSEAU,
3    having been satisfactorily identified and first duly
4    sworn by the Notary Public, was examined and testified
5    as follows:
6                 DIRECT EXAMINATION
7    BY MR. KEZHAYA:
8       Q.  Good morning, Ms. Rousseau.  How do you prefer I
9    address you?
10      A.  Ms. Rousseau is fine.
11      Q.  We have found your information in some of the
12   discovery that the City has provided us in this case.
13   You have given the invocation a good seven times as of
14   February of 2018 that we can tell.  Is that accurate?
15      A.  I believe I started doing invocations annually in
16   2012.
17      Q.  But the question posed is whether as of February
18   of 2018 you had, in fact, had given seven of them?
19      A.  Just doing the math here.  That's correct.
20      Q.  Are you familiar with the nature of this case?
21      A.  I am not.
22      Q.  Okay.  By way of brief exposition, we are suing
23   the City of Boston -- first of all, do you know who we
24   are?

1    A.   I don't know any more than the name that I
2    received on the notice of deposition.
3    Q.   Okay.  The Satanic Temple is a nontheistic
4    religious organization that is suing the City of Boston
5    for an order to allow TST to give the same invocation
6    that you have.  That's our goal out of this litigation.
7         Your information came out in the course of
8    discovery, essentially we issued document demands upon
9    the City.  The City provides this document, your name
10   came up.  That's how we came across your name.
11        Do you know anyone who has given more than --
12   more than, as of February 2018, seven invocations?
13   A.   I'm not privy to that information.
14   Q.   Okay.  Have you talked to anyone about this case
15   before today?
16   A.   I consulted a friend who is also a lawyer.
17   Q.   What is the name of that friend?
18   A.   Ed Burley.
19   Q.   Is Ed associated with the City at all?
20   A.   No, he is not.  He's not representing me.
21   Q.   That's no problem.
22        You had mentioned that you started giving these
23   invocations in 2012; is that correct?
24   A.   That's correct.

1   Q.   What prompted you to start giving the
2   invocations?
3   A.   I was invited by my district city counselor,
4   Counselor Matt O'Malley.
5   Q.   Have you exclusively been invited by Matt
6   O'Malley?
7   A.   Yes.
8   Q.   How many of these invocations have you given?
9   A.   So I believe I gave one annually from 2012 to
10  2020.
11  Q.   You mentioned annually, I saw in some of the
12  materials that I have been given by my client that three
13  of them were in October.  The dates that I have been
14  given is October 31st of 2012, October 23rd of 2013, and
15  October 8th of 2014.  Is that consistent with your
16  recollection?
17  A.   Yes, it is.
18  Q.   Were they always in October?
19  A.   I don't believe so.  I don't have -- my Outlook
20  doesn't go back that far, but I don't think they were
21  always in October.
22  Q.   I see you looking down.  Are you looking at some
23  kind of notes or something to that effect?
24  A.   I'm just looking at the -- I just pulled out the

1  last time I did an invocation and what I wrote, so I had
2  it.  The last time I did it was on 2020 over Zoom.
3     Q.  Do you know when in 2020 by chance?
4     A.  I don't.  I don't have a date on this.
5     Q.  You mentioned that in 2012, you had been invited
6  by Matt O'Malley, how did that invitation arise?
7     A.  I don't remember if he asked me in person or via
8  email, but he asked me if I would like to give the
9  invocation at a City Council meeting, and I said yes.
10    Q.  Did you ask any additional information of him?
11 What it would entail?  Anything to that effect?
12    A.  No.  I have seen City Council meetings before so
13 I was used to the practice of an invocation occurring at
14 the start of the Wednesday meetings.
15    Q.  What had prompted you to go to the meetings
16 before?
17    A.  I'm very involved in my community.  I live in
18 Jamaica Plain, which is a neighborhood of Boston.  I'm
19 co-chair of the Ward 11 Democratic Committee.  I am one
20 of the founders of JP progressives, which is a local
21 community-based organization that is concerned about
22 issues and electing progressive candidates.
23        In 2012, I was also an on-call minister at Hope
24 Central Church in Jamaica Plain.  I had been a chaplain

1  at another organization.  I also have been working at
2  Metro Housing Boston now for currently over 25 years.  I
3  knew the councilor personally, had interacted with him
4  many times.
5       Q.   Let's start with JP Progressives, what is -- you
6  mentioned that it is a political organization of some
7  sort.  Is that true?
8       A.   It is a little neighborhood organization with,
9  you know, voluntary runs that we have forums on issues
10 and candidates.
11      Q.   Is it fair to call it kind of like a Town Hall
12 sort of meetings?
13      A.   Yes, most of our -- yes.  Yes.
14      Q.   And I gather it is progressive in nature.  Does
15 JP stand for anything any particular?
16      A.   Jamaica Plain.
17      Q.   Then you also mentioned that you are on Board 11,
18 I think you said?
19      A.   Yes.  Boston's Ward 11 Democratic Committee.
20      Q.   Ward 11.  I apologize.
21           You say "committee," this is some kind of a
22 government organization, I assume, is that correct?
23      A.   It is part of the -- it is part of the Mass.
24 Dems, Massachusetts Democratic party.

1        There are ward committees or Town committees that
2   are democratic.  There are also republican ward
3   committees or town committees.
4       Q.  Then you also mentioned that you in 2012 were an
5   on-call minister at Hope Central Church; is that
6   correct?
7       A.  That's correct.
8       Q.  Tell me what Hope Central Church is?
9       A.  Hope Central Church is a church located in
10  Jamaica Plain.  It is -- I am ordained in the United
11  Church of Christ.  That is the denomination.  It also --
12  it is a bidenominational church.  But my representation
13  was as the United Church of Christ minister.
14      Q.  You mentioned it is bidenominational.  I presume
15  that means there is another denomination?
16      A.  Yes.  And the Disciples of Christ is the other
17  denomination.  It is a yoke church, I guess you would
18  call it.
19      Q.  Okay.  And you mentioned that you were an on-call
20  minister, how does that work?
21      A.  Non-stipend.  When the minister was on vacation,
22  I could fill in if there was a pastoral emergency.
23          I served on a couple of committees.  I'm no
24  longer active in that church, but I served on a couple

1  of small committees?
2     Q.  So how did you come to be an on-call minister for
3  that church?
4     A.  I had actually gone to seminary with the pastor
5  of that church and she asked me if I could help fill in
6  for her.  I was worshiping there at the time, so I said
7  yes.
8     Q.  Is your vocation in the clergy?
9     A.  I am bivocational.  I was -- I have been an
10 outreach -- a in -- a nonstipend outreach minister at
11 the congregational church in Needham.  I was -- for over
12 13 years, I was a chaplain at what was Germaine
13 Lawrence, which was a residential school and program for
14 young girls that was located in Arlington.
15        And I have done that work since -- I attended the
16 Episcopal Divinity School and graduated in 1993 and then
17 was ordained in the United Church of Christ.
18    Q.  You mentioned that you are bivocational, and I
19 believe that this has something to do with this Metro
20 Housing Boston; is that correct?
21    A.  Yes.  I'm the chief financial officer.
22    Q.  Tell me about Metro Housing Boston, what is this?
23    A.  It is a regional nonprofit housing organization
24 that receives funding from the state, City of Boston and

1  other entities that -- to perform, you know, rental
2  assistance, emergency assistance.  We have many programs
3  large and small.  What would probably be most familiar
4  would be to you what is commonly referred to as a
5  Section Eight program.  So we administer that for Boston
6  in 29 areas, cities, and towns for the Commonwealth of
7  Massachusetts.
8     Q.  So this isn't Boston specific.  It extends
9  outside of Boston as well?
10    A.  Right.  It's metropolitan Boston area.
11    Q.  Okay.  That makes sense.
12        So you mentioned earlier you started giving these
13 invocations in 2012.  You had previously been familiar
14 with Matt O'Malley, is that a correct recitation of your
15 testimony?
16    A.  I had actually volunteered on his campaign when
17 he was running for City Council.
18    Q.  When did he run for City Council?
19    A.  I would have to look that up.  I think it was
20 2009.  I'm not sure on that.
21    Q.  I was trying to understand if that's how you came
22 to meet him.  Is that how you came to meet him?
23    A.  I came to meet him at various places in Jamaica
24 Plain at people's houses.  At Doyle's, which was a local

1  institution.  You know, I was -- as I said I was very
2  involved in the community.  I would run across him
3  often.
4      Q.  You are familiar with other city politicians as
5  well?
6      A.  I have volunteered on many campaigns.  Yes, you
7  know, I have met many of them.  I have volunteered on
8  senator campaigns, mayoral campaigns.  Campaigns for
9  Congress.  Presidential campaigns.  I'm what you would
10 call an uber volunteer on campaigns, so I meet a lot of
11 people.
12     Q.  What kind of volunteering are you doing for --
13 let me backup.  In your volunteering efforts, do you
14 usually perform a specific role or is it more broad-
15 based?
16     A.  It is more broad-based.  Sometimes I have just
17 been a canvasser knocking doors or a phone bank or
18 making phone calls.  Sometimes I help to organize the
19 canvasses and the phone banks or, you know, the
20 get-out-the-vote effort.
21     Q.  The get-out-the-vote effort being, I assume, some
22 kind of media outreach to get people to vote?
23     A.  No, no.  Actually, you know, helping volunteers
24 get out and knock the doors and getting people to the

1  poles and making phone calls and making sure there are
2  people at the poles, checking numbers and making sure
3  volunteers are fed and all that kind of stuff that
4  happens on the days leading up and including Election
5  Day.
6      Q.  So you are probably busy in the past couple of
7  weeks, I would assume, is that a fair assumption?
8      A.  Yes.  I often take vacation on Monday and Tuesday
9  before an election.
10     Q.  All right.  You came to meet O'Malley, O'Malley,
11 as I recall, sometime before 2009.  Is that correct?
12     A.  I believe so.  I believe that's when I met him.
13     Q.  Dates are usually not important unless it's -- I
14 will tell you if the date is important.  Otherwise, it
15 is vague, general timelines.
16         So about pre-2009, give or take, you meet Matt
17 O'Malley, you volunteer on his campaign.  Was the
18 election in 2009 or was that when you started
19 volunteering?
20     A.  I would really have to look that up.  I mean that
21 is public record of when he ran.  You know -- you know,
22 I knocked a few doors for him.  I did a few shifts.
23 This is the first time.
24         Actually the first time I met him -- I remember

1 meeting him, he was standing outside of Dunkin' Donuts
2 in Jamaica Plain, getting signatures; as every candidate
3 has to do to get on the ballot.  I had a long
4 conversation with him and I signed his nomination papers
5 and I liked him and I thought he was the best candidate
6 for the job at that time.
7     Q.  Is he still a councilor?
8     A.  No, he is not.
9     Q.  All right.  When did he stop being a councilor in
10 terms of the year?
11     A.  By 2021.  So he -- the last City Council -- city
12 councilors are elected every two years.  He did not seek
13 re-election.  The last time his election was up was
14 2021.  He ceased being a councilor, I think, the
15 beginning of January, if not December 31, 2020.
16 Whenever the term rolled over.
17     Q.  Do you know who your current councilor is?
18     A.  Yes, that would be Kendra Lara, who is currently
19 the District 6 City Council.
20     Q.  Are you familiar with your current councilor,
21 Lauren, was it?
22     A.  Lara, L-A-R-A.
23     Q.  Lara.
24     A.  What was the question?

1  shortly from 2018.
2         Okay, so 2012, you started giving the invocation.
3  You get a $75 stipend.  Did you get any other benefits?
4     A.  No.
5     Q.  These are broadcasted in some way; is that
6  correct?
7     A.  Yes, the City Council live broadcasts their
8  meetings.  There is an open meeting law, as you probably
9  are aware of in Boston.
10    Q.  In terms of, I don't know, media exposure,
11 general building of goodwill, did you notice any
12 benefits along those lines?
13    A.  No, I don't think too many people actually
14 watched the City Council proceedings.  No, I don't ever
15 recall me being mentioned in any media for giving an
16 invocation at City Council.
17    Q.  In terms of your -- well, you say you are
18 bivocational.  Do you consider one of the vocations
19 primary?
20    A.  Yes.  I don't say primary.  I mean if I didn't --
21 my faith has led me to do the work that I do in housing.
22 I don't separate them either.  My paid job is a CFO.
23    Q.  The other one is something more than a hobby,
24 something less than a job.  Is that fair to say?

Page 19

1    A.  I don't see the difference.  A chaplain is a -- a
2    chaplain usually designates someone who is not a pastor
3    in a congregation or a church.
4    Q.  So the word chaplain then doesn't necessarily
5    refer to someone's denomination, so much as the
6    organization for which they serve?  Is that fair to say?
7    A.  No.  I would say it's a role.  Such as a CFO is a
8    role.  A chaplain is a role.  A pastor is a role.  It's
9    not attached to a particular denomination.
10   Q.  Yeah.  Yeah.  That's what my understanding of the
11   word as well.
12          Going back to the invocation in 2012, you were
13   asked -- you were prompted by it.  Do you remember why
14   you were prompted in 2012 to give the invocation?
15   A.  I was invited.  And if you go back and you listen
16   to any of the invocations, Matt -- Councilor O'Malley
17   would introduce me as being an active member in the
18   community and I believe that's why I was invited.
19   Q.  So 2012, then you mentioned every year
20   thereafter, I see October 31st, 10-23 of the next year,
21   10-8 of the next year.  Actually, we had one dated
22   5-4-11 in our records.  Does that ring any bells for you
23   as well?  That could also be an error.
24   A.  It could be.  Like I said, I don't remember the

```
 1     A.  I don't -- I can't answer that question.  I can
 2  only speak for myself.
 3     Q.  You are familiar with Boston politics, are you
 4  not?
 5     A.  I'm familiar with Boston politics, but I guess I
 6  don't understand your question.
 7     Q.  The question is as to whether you would be
 8  surprised to learn that Boston has a practice of
 9  excluding a particular faith group from giving the same
10  invocation as you have?
11             MR. WHITESELL:  Objection.
12     Q.  Ms. Rousseau?
13     A.  Would I be surprised that Boston excluded a
14  particular faith?  Is that what the question is?
15     Q.  Yeah, from giving the -- having the same
16  opportunity to give this invocation as you have been
17  given?
18     A.  I guess I don't see it as Boston excluding
19  anyone.  I see this as individual City Councilors having
20  the opportunity to invite people that they know.  So I
21  -- and that are involved in the City.  I guess I'm
22  uncomfortable answering that question because I don't
23  think I -- I don't think I can and I don't think it is a
24  fair question about the practice.
```

1      Q.   To give a little bit more exposition as to how we
2   got here today.  My client had demanded, at least three
3   times, to give the same invocation.  We have case law
4   that says that they are entitled to give this invocation
5   on equal footing as any other religious group or clergy
6   member or what have you.
7           They have been consistently informed that they
8   will not be given an invocation opportunity because of
9   their identity?
10     A.   My understanding is that clergy are invited by
11  the City Councilors, so I don't know that -- I couldn't
12  demand that I give an invocation.
13          So, as I said, I don't feel like I can answer
14  your question.  It is not the way it works.
15     Q.   So it is your understanding that this is
16  something that they can pick and choose among faith
17  groups if they feel like it.  Is that your
18  understanding?
19     A.   If -- they can choose people that they know and
20  they know are active in the community that's my
21  understanding.
22     Q.   Sure.  But the question posed is whether -- if
23  they felt like it, they could exclude someone because of
24  their religious identification.

1              MR. WHITESELL: Objection.
2     Q.   Correct?
3     A.   I don't see this as excluding -- this is just my
4  personal opinion.  I don't think it is a question of
5  excluding anyone.  I think it's a question of inviting
6  people, so I don't feel like I can answer your question.
7     Q.   Let me rephrase it.  If they did not feel like
8  inviting someone because of their particular faith
9  group, they could do that, in your opinion?
10    A.   I don't see how my opinion matters.  But, you
11 know, I guess you would have to ask the City Councilor.
12    Q.   One of the people that we have been told no by
13 explicitly was now Mayor Wu.
14         Do you know of anything of Wu's predilection to
15 inviting any particular faith groups?
16             MR. WHITESELL:  Objection.
17    A.   I don't.  I don't know.  I don't know how she
18 makes her decisions.
19    Q.   In order for me to get that information, I would
20 have to ask Wu, wouldn't I?
21    A.   Yes.
22             MR. KEZHAYA:  No further questions.  Pass
23 the witness.
24             MR. WHITESELL:  I don't have any questions.

Page 29

1          MR. KEZHAYA:  Ms. Rousseau, thank you so
2     much for your time.  Do you have any -- well, if you
3     have any questions for me, feel free to reach out.  Do
4     you have City of Boston counsel's contact information?
5          THE WITNESS:  It was included in the emails
6     that you sent.
7          MR. KEZHAYA:  If you have any questions,
8     feel free to reach out to me.  I'm sure the same goes
9     for them as well.  Thank you very much for your time.  I
10    appreciate you.
11         THE WITNESS:  Thank you.
12         MR. KEZHAYA:  Actually, one last question.
13    BY MR. KEZHAYA:
14       Q.   The February 28th, 2018 is that pretty common for
15    how our invocations go?
16       A.   Yeah.  I usually write my invocations depending
17    on what is going on or what time or year something is
18    happening.
19         MR. KEZHAYA:  All right.  Thank you for your
20    time.
21         THE WITNESS:  Thank you.
22         THE COURT REPORTER:  Mr. Whitesell, do you
23    need a copy?
24         MR. WHITESELL:  Yes.