IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC.<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF BOSTON, MA<br><br>DEFENDANT. | CASE NO. 21-CV-10102<br><br><br>BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>ORAL ARGUMENT REQUESTED |

## SUMMARY OF THE ARGUMENT

At issue is a *quid pro quo* prayer selection scheme, where only political allies of elected officials receive the governmental "endorsement."  Through a haphazard invite-only selection process, Boston withheld this endorsement from TST in direct violation of the Establishment Clause bar against legislative prayers discriminatory prayer opportunities. The City's prayer selection scheme is discriminatory *per se*, being predicated on the unrestrained whim of petty government officials.

The Court should order the City to invite TST to bless the next council meeting and add a neutral administrative mechanism for interested parties to sign up for an opportunity to give the invocation.

## Material facts beyond dispute

The City of Boston blesses each City Council meeting with an invocation delivered by a prayer leader selected by a council member. *See* https://www.youtube.com/watch?v=qb5iu6B1TxA ("I'd like to invite Councilor Wu to please offer remarks introducing the clergy whom she has decided to have bless this meeting."). This has been described as an "endorsement" of the prayer leader, an "honor", and a showing of "profound respect." Appx. 4-5, 9-11.

The Satanic Temple (TST), a minority religion with a chapter in Boston. The members are active in the community. Appx. 12. Travis LeSaffre, the TST Chapter Head of the Boston Chapter, requested to give the invocation at a council meeting. Appx. 22. The request was denied. Appx. 18. TST co-founder, Malcolm Jarry, followed up with Boston, seeking an explanation. Appx. 17. Jarry was informed by Boston's attorney and then-Councilor Wu that there were no rules or limitations on the selection process, but a prayer leader must receive an invitation to deliver the invocation. Appx. 18; 22-23. He was also told that council members had limited

numbers of invitations and long lists of desired invitees. Id.

TST was forced to file this lawsuit against the City of Boston to vindicate its rights. See Complaint. Discovery proved contentious, but it ultimately revealed that Boston's proffered reasons for denying TST's request were entirely false. Other religious groups had requested invitations and had been granted the opportunity to deliver the invocation at council meetings within weeks. Appx. 24-25. Often, finding a prayer leader involved last-minute scrambling. Appx. 25-33. Selection was not based on good works; it was granted to political insiders. Appx. 7 ("Politics is very much a part of every decision I made as a city councilor."). Moreover, the City had been paying prayer leaders until TST made its request, at which point Michelle Wu ceased the practice in contemplation of this lawsuit. Appx 34-38.

The City Attorney's excuses for why TST was denied an opportunity to give the invocation we not based on facts but fear of retaliation in the polls. Appx. 39-45. They were commended for denying TST's request—on ground different than what they proffered to

TST. Appx. 45 ("I commend you for having rejected a prior request a year ago and urge you to continue to NOT accept a request for a Satanic invocation at the start of your City Council meeting. Your reason for rejecting the prior request: that Satanism is not a religion, was sound reasoning and remains so.")

**ARGUMENT**

## 1:  Legal standard

Upon a motion for summary judgment, the Court's role is to determine whether there is a genuine issue of material fact and, if not, whether the movant is entitled to judgment as a matter of law. *Mu v. Omni Hotels Management Corporation*, 882 F.3d 1, 5 (1st Cir., 2018). An issue is "genuine" when a rational factfinder could resolve it either direction. *Id.* A fact is "material" when its (non)existence could change a case's outcome. *Id.*

## 2:  An invite-only *quid pro quo* policy is discrimination.

There is no genuine issue of material fact and TST is entitled to judgment as a matter of law on the Establishment Clause count.

Legislative prayers, being government-sponsored religious ceremo-
nies, are constitutional only when they "stand[] out as an example
of respect and tolerance for differing views, an honest endeavor to
achieve inclusivity and nondiscrimination, and a recognition of the
important role that religion plays in the lives of many Americans."
*American Legion v. American Humanist Association*, 139 S.Ct. 2067,
2089 (2019); *see also Marsh v. Chambers*, 103 S.Ct. 3330, 3338, 463
U.S. 783, 794–95 (1983) (the prayer opportunity may *not* be ex-
ploited to "proselytize or advance any one, or to disparage any
other, faith or belief.")

### 3:  Whim-based selection is discrimination.

Through the Establishment Clause, the Founders prohibited the
comingling of secular and religious power to "cut off the means of
religious persecution." 3 Joseph Story, *Commentaries on the Constitu-
tion of the United States* § 1871, at 728 (1833). The policy furthered by
the Establishment Clause is traceable back to the 13th Century.
Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77

N.Y.U. L. Rev. 346, 356–57 (2002). The principle is that spiritual questions are matters rightly reserved for the individual, free from influence by the Church or the civil government. *Id.*, at 358-61.

The First Amendment facilitates fair and equal religious competition in a free marketplace of ideas, which supplanted centuries of persecution and religious civil wars. *Larson v. Valente*, 456 U.S. 228, 245 (1982). But this equality requires that politicians "accord to their own religions the very same treatment given to small, new, or unpopular religions." *Id.* The corollary is also true: equality in the prayer opportunity requires that small, new, and unpopular religions get the very same benefits relegated to the political allies of politicians.

The evidence shows that Boston's prayer selection is unequal. The political class and their allies, adherents to majority religions, are granted public recognition and a commensurate opportunity to attract new followers. In return, the religious class actively court politicians to come to church events to attract new supporters. Appx. 61 (mixing church and politicking). TST did not get the invite

because it is an outsider, minority religion. Appx. 007.

The City will doubtlessly retort that this is just "politics as usual" and TST's relief lies in the polls. But while transparent cronyism is permissibly *de rigueur* in secular politics, "the First Amendment is not a majority rule." *Town of Greece v. Galloway*, 572 U.S. 565, 566 (2014). We do not count heads before enforcing the First Amendment because these matters are beyond the reach of the polls. *McCreary Cnty., Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 884 (2005) (O'Connor, J., concurring); *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943).

The First Amendment requirement of nondiscrimination inclusivity is antithetical to Boston's whim-based invitation scheme. Without neutrality-enforcing safeguards and without any proactive measures to support inclusivity, Boston's whim-based invitation scheme has corrupted a tradition "meant to lend gravity to the occasion and reflect values long part of the Nation's heritage" into a cheap *quid pro quo*: sermons for stump speeches. *Galloway*, 572 U.S. at 566; see also *Rubin v. City of Lancaster*, 710 F.3d 1087, 1097 (9th

Cir. 2013) (prayer scheme constitutional because it had neutrality-enforcing mechanisms, accepted invitations, and actively reached out to local congregations to achieve inclusivity).

### 4:  It is an endorsement of political insider's preferred faiths.

Boston's prayer policy violates the Establishment Clause because the prayer opportunity is a *quid pro quo* reward reserved for political allies of the councilors. Appx. 7 (only those who play "important role in my – my work" get invite).

As this Court has held, the Boston's City Council invocation is government speech. ECF 21, 76. Government speech must comport with the Establishment Clause. *Pleasant Grove City, Utah v. Summum*, 129 S.Ct. 1125, 1127 (2009). The Establishment Clause "forbids" government speech endorsing a particular religion. *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 302 (2000). Thus, legislative prayers must *not* be discriminatory. *Town of Greece*, at 585-586; *American Legion*, 139 S.Ct. at 2089. Boston's scheme flaunts this constitutional bar with introductory remarks puffing the invited minister

and because "there's also an assumed level of endorsement by inviting them." Appx. 007.

This unlawful merger of politics with religion is best shown by Anne Rousseau, an archetypal political insider. She is the co-chair of the Ward 11 Democratic Committee for the Massachusetts Democratic Party. Appx 53. She is an avid volunteer on campaigns, having served on ward campaigns, mayoral campaigns, congressional campaigns, and presidential campaigns. Id. She donated $48,698.14 to local politicians between 2004 and 2022. Appx. 57-61. And she is the chief financial officer of Metro Housing Boston, a state-funded administrator of public housing assistance all around the Boston metropolitan area. Appx 53.

Ms. Rousseau has given the invocation seven times, the most repeat performances known. Appx. 52. Each time, she was invited by then-councilor O'Malley, on whose election campaign she volunteered. Id., 22:20-23; 11:16-17. She saw the invitation as an "honor" (one TST cannot procure) to pray over the public and the councilors at the public meeting. Id., 20:3-18, 22:12. But her invitations ceased

once her patron councilor was no longer on the city council. *Id.,* 22:20-23.

But government-sponsored prayer opportunities are *not* a matter of legislative grace. *Town of Greece*, at 585-86 (the prayer opportunity must be characterized by nondiscrimination); *American Legion*, 139 S.Ct. at 2089 (the prayer opportunity must be characterized by an effort to reach inclusion and appreciation of differing views). For councilors to disseminate speaking opportunities based on "personal connection" is an unabashed admission that the invitees are political insiders, leaving everyone else—TST included—relegated to outsider status. This, the Constitution prohibits. *Santa Fe*, 530 U.S. at 309-10.

## 5:  Pretextual explanations indicate discrimination.

Boston's excuses for denying TST are unavailing. In response to TST's requests to give the invocation, Kristian Toussaint explained:

> There is time at the beginning of each Council meeting for an invited member of the clergy to say a few words before Council business begins. At the beginning of the

> legislative year meetings are assigned to
> Councilors. Councilors decide which
> clergy they wish to invite to speak. There
> are no rules for this selection. Tradition-
> ally, Councilors have invited members
> from their district (or in the case of at-large
> councilors, members from anywhere in the
> City of Boston) who are active in their
> neighborhood and engaged community
> members in addition to being members of
> the clergy.

Appx. 23.

Mayor Wu, the council member, proffer a similar response to

TST's request:

> Thank you very much for taking the time
> to reach out. As my staff mentioned, each
> Councilor has the chance to invite 2-3 faith
> leaders per year to deliver the opening in-
> vocation at one of our Council meetings.
> The invitations are often used to recognize
> faith leaders who are active in the commu-
> nity and organizations that are representa-
> tive of their districts. There is no restriction
> or criteria based on any Councilors' reli-
> gious preferences. Many of us have a long
> list of folks we'd like to invite but haven't
> been able to accommodate.

Appx. 22.

Boston highlighted that no rules or restrictions applied to the

selection of invocators. Despite the lack of formal policy, they explained that the process was: 1) invitation-only; 2) constrained by limited slots, forcing councilors to make tough choices from extensive lists of potential candidates; and 3) exclusive of TST on the grounds that they were not actively involved in the community or representative of their districts. These proffered excuses for not welcoming TST to give the invocation fall flat when confronted with the facts.

A single instance challenges all explanations simultaneously. On August 1, 2018, Aaron Agulnek, the Director of Government Affairs for the Jewish Community Relations Council of Greater Boston, requested an invitation for a Rabbi associated with their organization, specifically noting that the Rabbi was not from Boston. Appx. 25. The request was granted on September 14, and less than two weeks later, Rav Claudia Kreiman from Brookline, Massachusetts delivered the invocation following a "schmoozing" session. Appx. 24.

In reality, there were no extensive waiting lists. Email exchanges

reveal the frantic search for an invocator just days before a council meeting, sometimes even being decided on the day of the meeting or the day prior. Appx. 25-33.

Excluding TST due to a lack of community works was not a valid reason. TST's ministry in Boston includes "Menstruatin' with Satan," a drive to collect tampons and sanitary napkins for Rosie's Place; "Warmer than Hell," a coat and winter clothing drive for Second Chances; and volunteering at Boston Pride every year. Appx. 12-13. Furthermore, TST's Boston chapter boasts many individual members who actively contribute to the community in significant and positive ways.

Boston's offered explanation was unfounded, and it did not justify denying TST's request to deliver the invocation. With no rules to rely on and knowing their reasons were pretextual, Boston chose to revamp its entire policy and practice to permanently bar TST.

## 6:  Changing the rules further indicates discrimination.

The media picked up on TST's request and a flood of opposition

deluged City Hall. While many community members supported TST, council members received a more objections that were strongly opposed to TST's inclusion on the basis that they did not agree with TST's religious views. Appx. 39-45. Fearful of public response, and with no cogent or constitutional reason for denying TST, Boston investigated its invocation policies and ceased paying prayer leaders. Appx. 34-38. Changing the practice to insulate the City from a decree that TST has an equal right to give the prayer as any political insider is further evidence of discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (departures from normal procedure is evidence of discrimination).

## 7:  The custom excludes outsider religions, like TST.

The problem with governmental endorsements of particular religions is that it sends a constitutionally-impermissible message that there are "insider" religions and "outsider" religions. *Santa Fe*, at 530 U.S. at 309-10. TST is an "outsider" religion. Aff. Greaves at ¶ 3l; Appx 9-10 (Councilors Essaibi-George and McCarthy would

never invite TST); Appx. 33-46. During this very litigation, Boston shrugged off a request for inclusion by a Hindu leader. Appx. 46. This is the recognized problem with religious discrimination, once the tools have been successfully employed against one disfavored group it does not stop.

The exclusion of some religions, despite their stated desire to exercise their equal right to participate in the ceremony, is antithetical to the American tradition of a pluralistic community achieving unity through achievement of tolerance and diversity. *Galloway*, 572 U.S. at 566–67. Boston's scheme therefore fails to comport with the history and heritage of permissible legislative prayer. *See Marsh*; *Town of Greece*.

**8: *Lund* was correctly decided; *Bormuth* was not.**

Boston's prayer selection scheme shares a feature with the subject of a circuit split: whether the Establishment Clause bars government control over the legislative prayer. See *Lund v. Rowan Cnty., N. Carolina*, 863 F.3d 268 (4th Cir. 2017) (yes); *Bormuth v. Cnty. of*

*Jackson*, 870 F.3d 494 (6th Cir. 2017) (6th Cir.) (no). The Court should find that *Lund* was correctly decided and *Bormuth* was not.

In *Lund*, a legislative prayer was unconstitutional where: (1) county board meeting officials were the exclusive prayer-givers, (2) prayers were sometimes used to proselytize, (3) they instructed audience participation, and (4) they prayed at a local government meeting, with more personally impactful issues than in, *e.g.*, a State legislature or in Congressional hearing. Mary Nobles Hancock, *God Save the United States and This Honorable County Board of Commissioners: Lund, Bormuth, and the Fight over Legislative Prayer*, 76 Wash. & Lee L. Rev. 397 (2019).

*Lund* is indistinguishable. The council members might as well be the sole providers of invocations, given their exclusive authority over the selection of prayer-givers (and thus the essence of the prayer). They often introduce the clergy using religious commendations and language. Appx 52; Dr. Hall's sermon. In some circumstances, the prayer is sent to the council ahead of time for their review. Appx. 47-51. Council members are active participants in the

prayer, too, making the sign of the cross by the clergy's side at the prayer's conclusion. Appx. https://youtu.be/qb5iu6B1TxA?t=585. This contravenes the prohibition on government influence over prayer.

Indisputably, the prayer opportunity is sometimes used to prose-lytize.                                   Appx.                                   4; https://www.youtube.com/watch?v=qb5iu6B1TxA   (Dr.   Hall's sermon). This runs afoul of explicit bar in *Marsh*. *Id.*, 463 U.S. at 794-95 (there must be "*no* indication that the prayer opportunity has been exploited to proselytize").

The audience is directed to participate. Appx. 5, ("there's an ex-pectation that people generally stand during the prayer."). This shifts the audience from the legislators (permissible) to the pews (im-permissible). *Town of Greece*, 134 S.Ct. at 1825-26.

And this prayer opportunity takes place at the municipal level, far more directly personally relevant than, e.g., a congressional hearing. *Lund*, 863 F.3d at 287.

In *Bormuth*, the Sixth Circuit retorted that legislative prayer is a

political question. *Bormuth*, 870 F.3d at 513 (suggesting minority religions should get one of their own elected if they want that kind of prayer). This wholly ignores that the Establishment Clause is there to *not* make religion a political issue. Freund, Comment, *Public Aid to Parochial Schools*, 82 Harv.L.Rev. 1680, 1692 (1969) ("Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect"); *see also* U.S. Const. amend. I (there shall be "*no* law respecting an establishment of religion") (emphasis added).

The remainder of *Bormuth* relies on the constitutionality of legislative prayers, generally, but does not regard the limits thereof. Since *Bormuth*, the Supreme Court has again reiterated the requirement that legislative prayers be an active effort to demonstrate inclusivity of minority religions, not to marginalize them. *American Legion*, 139 S.Ct. at 2089.

*Lund* is the better reasoned opinion and is in line with the First

Amendment authorities listed above. Legislative prayers, being "by definition religious," only furthers a secular governmental purpose when it is a display of inclusivity and tolerance to all, regardless of disagreement on matters of spiritual significance. *American Legion*, 139 S.Ct. at 2087. The law does not tolerate religious gerrymanders. *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring); Hancock, 76 Wash. & Lee L. Rev. at 439 ("discrimination against minority faiths should not be ignored by courts. As in *Lund*, Boston's publicly elected officials are "elbow-deep in the activities banned by the Establishment Clause—selecting and prescribing sectarian prayers." *Lund*, 863 F.3d at 281.

WHEREFORE the Court should direct that the City shall invite TST to bless the next council meeting, add a neutral administrative mechanism for interested parties to sign up for an opportunity to give the invocation, and keep this matter open for assessment of costs and attorneys fees.

Respectfully submitted on May 1, 2023 by:



| Matt Kezhaya | matt@crown.law |
|---|---|
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

## LR 7.1 certificate

NOTICE IS GIVEN that I, Matt Kezhaya, conferred with opposing counsel in good faith on the subject of this motion but could not resolve all or any part of it. *s/ Matt Kezhaya*

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/Appx. system on May 1, 2023, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*