IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-10102 |
| PLAINTIFF, | |
| V. | RESPONSE TO BOSTON'S STATE-MENT OF FACTS |
| CITY OF BOSTON, MA | |
| DEFENDANT. | |

COMES NOW TST, by and through counsel of record with a response to Boston's statement of facts.

1.      Invocations at Boston City Council meetings date back to the 1800s. Prior to 1909, the City had an alderman form of local governance rather than a City Council, but invocations were still given. See Transcript of Rule 30(b)(6) Deposition of Christine O'Donnell excerpts of which were filed with the Court as Exhibit 1 at p. 70, 72-74.

Response: Admitted.

2.      Every week, unless otherwise ordered and except on holidays, the Boston City Council holds a meeting. ECF Doc. No. 16 at ¶9 and ECF Doc. No. 23 at ¶9.

Response: Undisputed.

3.      Meetings generally occur on Wednesdays, but not every Wednesday. Exhibit 1 at 65, 75.

Response: Undisputed.

4.      There are approximately thirty-five meetings per year. ECF Doc. No. 16 at ¶10 and ECF Doc. No. 23 at ¶10.

Response: Undisputed.

5.      Time is set aside at the beginning of each Council meeting for an invited member of the public, often clergy, to say a few words before official Council business begins. See email exchange Bates-stamped DEF0000228 to DEF0000230, a copy of which was filed with the Court as Exhibit 2.

Response: Disputed because this description fails to fully describe the invocation practice. Prior to the meeting, the invited individual meets with the councilors for coffee and schmoozing. ECF 104-1, at 24. After that, the inviting councilor introduces the speaker with some level of endorsement. ECF 104-1, at 5. Then the audience is directed to stand for the prayer and to remain standing for the pledge of allegiance. ECF 104-1, at 68.

6.      At the beginning of each calendar year, City Council staff assigns dates for each City Councilor to coordinate an invocation, including inviting a guest to deliver it. See City of Boston's Answers to TST's First Set of Interrogatories, a copy of which was filed with the Court as Exhibit 3 at Answer No. 3.

Response: Undisputed.

7.      Council staff attempts to assign the same number of dates to all City Councilors, but due to scheduling and availability, that is not always possible. Exhibit 3 at Answer No. 3.

Response: Undisputed.

8.     The Central Staff Director prepares a schedule of dates for City Council meetings along with the names of the City Councilors responsible for securing an invocation speaker. See City of Boston's Answers to TST's Second Set of Interrogatories, a copy of which was filed with the Court as Exhibit 4 at Answer No. 10; Boston City Council Schedules Bates-stamped DEF0003397 to DEF0003406 and DEF0003439-DEF0003445, a copy of which were filed with the Court as Exhibit 5.

Response: Undisputed.

9.     At one point, invocation speakers received a stipend from the City, but the payment of invocation speakers ceased sometime around 2016 or 2017. Ex. 1 at pp. 162-163, 166; see also Transcript of Deposition of Annissa Essaibi-George excerpts of which were filed with the Court as Exhibit 6 at p. 154.

Response: Disputed as mischaracterizing the evidence. The payment of invocation speakers ceased because of TST's initial demand for inclusion, and in contemplation of this litigation. See Defendant's Exhibit 1, at pp. 162-163, 166.

10.    One of the speakers, Anne Marie Rousseau, testified that she received a $75 stipend the first time she gave an invocation in 2012, but could not remember receiving one after that. See Transcript of Deposition of Anne Marie Rousseau excerpts of which were filed with the Court as Exhibit 7 at p. 15-16.

Response: Undisputed.

11.    The selection of an invocation speaker is left within the discretion of the individual City Councilors and their respective staffs. Exhibit 4 at Answer No. 10.

Response: Undisputed.

12.    There are no guidelines or rules governing whom a City Councilor may choose to give an invocation and the practice has

not been reduced to writing. ECF Doc. No. 16 at ¶¶15, 16 and ECF Doc. No. 23 at ¶¶15, 16; Exhibit 1 at p. 54.

Response: Disputed that the practice has not been reduced to writing. Michelle Wu gave the first written description of the practice in October 2016. ECF 100-11, at 2.

13.    Absent an invitation from a City Councilor, there is no opportunity to offer an invocation prior to the Council's meetings. ECF Doc. No. 16 at ¶17 and ECF Doc. No. 23 at ¶17.

Response: Undisputed.

14.    The City Council does not take requests. Exhibit 1 at pp. 52-55.

Response: Undisputed.

15.    Councilor Essaibi-George was certain that one group referenced during her deposition did not solicit an invite, and that, with the exception of TST, no one had ever asked her if they could "offer

remarks, a prayer or a blessing before the City Council." Exhibit 6 at p. 121.

Response: Undisputed that Councilor Essaibi-George testified that she was "certain" of this, but she was mistaken. ECF 104-1, at 25 (a Jewish group outside of Boston sought and received an invitation from Councilor Essaibi-George).

16.    16. In the words of staff counsel, "It's by invitation. So, the limit would be if you don't get an invitation, you don't give the invocation." Exhibit 1, pp. 152-53.

Response: Undisputed.

17.    The one presenter deposed by TST, Anne Marie Rousseau, testified that she gave an invocation annually from 2012 to 2020 at the invitation of then-Councilor Matt O'Malley. Exhibit 7 at pp. 4-7, 19.

Response: Undisputed.

18.    It is the policy and custom of the Council that invitations for the invocation are based upon personal relationships the Councilors have and the work that the individual invitee does in the district or for their constituents. Exhibit 1, pp. 52-55, 154-160.

Response: Disputed. The custom is that only those with a "relationship" to the Councilor may receive an invite; and, then, only if the Councilor "wanted to" invite that "very specific" set of "folks and organizations." Defendant's Exhibit 6, at 14 (Depo. Essaibi-George) 153:12-18 and 154:7-12.

19.    An example of an invitation is the May 13, 2019 letter from then-Councilor Kim Janey to the Rev. Mary Margaret Earl, acknowledging her congregation's work in the community and asking her to offer the invocation at a meeting scheduled on June 26, 2019. See email correspondence and letter Bates-stamped DEF0001059 to DEF0001060, a copy of which was filed with the Court as Exhibit 8.

Response: Undisputed that this is an example of an invitation.

20.    Rousseau, who testified every year for eight years, had volunteered on Councilor's O'Malley's campaign and was very involved in the community in his district. Exhibit 7 at pp. 7-14, 19, 26-28.

Response: Disputed that Rousseau's repeat invitations were rooted in her involvement in the community. Rousseau ceased receiving invitations after Councilor O'Malley was no longer a councilor, despite her continued involvement in her community. Depo. Rousseau, at 22:20-23. Rousseau's repetitious invitations were rooted in her volunteering on Councilor O'Malley's campaign and contributions of time and money to the Democratic Party. Depo. Rousseau, at 7:17-22; see also ECF 104-1, at 57-61.

21.    The invocations may have a variety of different forms, such as "a blessing," "opening remarks," "a prayer," "a sermon" or "a poem or something like that." Exhibit 6 at p. 107.

Response: Undisputed.

22.     The content of the invocations is written or determined by the invited speaker. Exhibit 7 at p. 29.

Response: Undisputed.

23.     The City does not "bless" its own Council meetings. Exhibit 1 at p. 144.

Response: Disputed. The City Clerk, in the course and scope of her agency, "often" blessed the Council meetings; usually because of a no-show by the invited speaker, but sometimes by councilor invitation. Depo. Essaibi-George, at 152:16-153:7.

24.     While the majority of invocations are given by individuals from a variety of Christian denominations, there have "also been a number of representatives from other types of religions," and there have "been some laypeople throughout the years." Exhibit 1 at p. 250

Response: Undisputed.

25.     Numerous Rabbis have been invited to give invocations. See email correspondence and charts Bates-stamped DEF0002046 and DEF0002090 to DEF0002092, a copy of which was filed with the Court as Exhibit 9.

Response: Disputed that "numerous" rabbis have been invited. The number of rabbis of record is "4". In a custom that extends back to the 1800s.

26.     At the last Council meeting prior to the filing of this motion, an Imam gave the invocation at the invitation of Councilor Fernandes Anderson, and indicated that he had been previously invited by Councilor Yancey, who left the Council in 2015. YouTube channel: https://www.youtube.com/watch?v=Ti7QMgpUK8Q&list=PLQaoo0hI2DAjk5JId3kvv1N3WJt8GgBFr&index=23 at 4:00.

Response: Undisputed that a single imam has been allowed inclusion in this custom that dates back to the 1800s.

27.    Non-religious speakers have been invited to give invocations. Exhibit 1 at p. 250.

Response: Disputed as mischaracterizing the evidence. The word "non-religious" does not appear on p. 250 of Boston's deposition; nor anywhere else in Boston's deposition. The word "nonministers" appears in a question at p.250, but that relates to the distinction between laypeople and clergy. *Oxford English Dictionary*, laity.

28.    Indeed, "there have been instances where an individual from an organization that does work within the community may give the invocation." Exhibit 1 at pp. 250-251.

Response: Undisputed that laity were allowed to give the invocation.

29.    The Council has had "poems and reflections" read by many people for the invocation. Exhibit 6 at p. 152.

Response: Undisputed.

30.     The City Clerk, Maureen Feeney, gave a number of invocations, usually reading from a "book of reflections." Exhibit 6 at p. 152-153.

Response. Undisputed. This statement is mutually exclusive with ¶ 23 because the City Clerk is an agent of the City who, in the course and scope of her agency, blessed the Council meeting. Thus, the City blesses its own meetings.

31.     In 2017, one invocation was given by a member of the Boston Debate League, a non-profit organization seeking to integrate argument and debate into public schools. Exhibit 9.

Response: Disputed. The invocation took place on September 28, 2016 (not 2017).[1] The theme was "One Nation Under God," and was an Abrahamic prayer featuring an entreaty for the God of Abraham to "order their [councilors'] steps," and to direct them "how to

---

[1] https://www.youtube.com/watch?v=T1rDy1ioPnE

pray." Id., at 7:00-7:30. The prayer-giver was a seminary student at the time. Id., at 3:13-16. This is yet another example of a sermon.

32.    On October 6, 2016, Travis LeSaffre, Chapter Head of the Boston Chapter of the Satanic Temple, sent an email to then-Councilor Mark Ciommo asking him to consider appointing him as an invitee to perform an invocation. See email correspondence Bates-stamped DEF0000186 to DEF0000187, a copy of which was filed with the Court as Exhibit 10.

Response: Undisputed.

33.    LeSaffre then reached out to then-Councilors Tito Jackson and Michelle Wu seeking an invocation invitation. See email correspondence Bates-stamped DEF0000244 to DEF0000245, a copy of which was filed with the Court as Exhibit 11.

Response: Undisputed.

34.    Wu responded that each Councilor only had two or three chances to invite faith leaders for the invocation and that the

invitations were often used to recognize faith leaders who are active in the community and organizations that are representative of the districts. Exhibit 11.

Response: Undisputed that Michelle Wu has unique personal involvement in this litigation.

35.    Wu informed LeSaffre that "[t]here is no restriction or criteria based on any Councilor's religious preferences," and that many Councilors "had a long list of folks" they would like to invite but haven't been able to accommodate.

Response: Undisputed that Michelle Wu has unique personal involvement in this litigation, and that there are limited slots for inclusion.

36.    On August 17, 2017, LeSaffre sent an email to then-Councilor Wu and the other Councilors asking for the Council to either allow all individuals an opportunity to perform invocations or to cease the invocations, threatening litigation in the absence of the "right

choice." See email correspondence and letter Bates-stamped DEF0000221 to DEF0000222, a copy of which was filed with the Court as Exhibit 12.

Response: Undisputed.

37.     During these attempts by TST to obtain an invitation, Councilors received emails expressing the view that they did not want TST to give an invocation. Exhibit 1, at p. 108.

Response: Undisputed.

38.     Councilor Essaibi-George declined to issue an invitation to TST, finding it "absurd" that TST felt entitled to an invitation from her to offer an opening remark without any relationship or interaction, or playing an important role in her work. Exhibit 6 at pp. 148-151, 153-154, 168-169; see also email correspondence Bates-stamped DEF0002890, a copy of which was filed with the Court as Exhibit 13.

Response: Undisputed that Councilor Essaibi-George found it "absurd" for TST to demand equal inclusion to a government-sponsored ceremony which is only constitutional if the selection process is nondiscriminatory.

39.   On October 2, 2018, one of the co-founders of TST, Malcolm Jarry, sent an email to then-City Council President Andrea Campbell requesting an opportunity for someone from TST to give the invocation at an upcoming City Council meeting. ECF Doc. No. 16-1.

Response: Undisputed.

40.   The next day, Staff Counsel Christine O'Donnell responded that the Council did not accept requests from speakers to deliver an invocation, that the Council does not have a written policy concerning invocations and that Councilors decide who will deliver the invocations at Council meetings. See Massachusetts Commission Against Discrimination Statement of the Particulars dated October

17, 2018 Bates-stamped DEF0000620 at ¶3 a copy of which was filed with the Court as Exhibit 14.

Response: Undisputed. To the extent that ¶ 18 states that Boston has a "policy" on this topic, this paragraph is mutually exclusive. The selection process is a "custom" or a "practice" but not a "policy."

41.    On October 9, 2018, Attorney O'Donnell again emailed Jarry to explain the process for selecting individuals to give invocations prior to the start of City Council meetings. ECF Doc. No. 16-2.

Response: Undisputed.

42.    O'Donnell explained again that the Councilors themselves do not offer the invocations and that they invite individuals from the community, either clergy or laypeople, to give the invocations. ECF Doc. No. 16-2.

Response: Undisputed.

43.     On July 6, 2022, TST served a Rule 30(b)(6) deposition notice articulating thirty (30) deposition topics upon which it sought to elicit testimony from the City. ECF Doc. No. 79-1, at pp. 3-11 of 395.

Response: Undisputed but immaterial to the merits of this case.

44.     Attorney O'Donnell was designated by the City to testify on topics 1-7, 9, 11, 13-16 and 23-30. ECF Doc. No. 79-1, at p. 343 of 395.

Response: Undisputed but immaterial to the merits of this case.

45.     The topics for which O'Donnell was not designated dealt with the individual Councilors' "subjective bases" (8, 10, 12), "subjective understanding" (17, 18, 20, 21), "subjective opinion" (29) or statements that each had made (30). ECF Doc. No. 79-1, at pp. 3-11 of 395.

Response: Undisputed but immaterial to the merits of this case.

46.    For Councilors still sitting on the Council in July 2022, the
City designated their respective Chiefs of Staff for these topics, as
well as the former Chief of Staff for now-Mayor Wu. ECF Doc. No.
79-1, at p. 373 of 395.

Response: Undisputed but immaterial to the merits of this case.

47.    TST did not take the depositions of the proffered Chiefs of
Staff or attempt to take the deposition of any current or former
Councilor other than Annissa Essaibi George and Mayor Wu. Ex-
hibit 6; ECF Doc. No. 34-1, at pp. 2-5 of 27; ECF Doc. No. 57-1;
ECF Doc. No. 62-1.

Response: Undisputed but immaterial to the merits of this case.
Stating further: TST did not take the depositions because the parties
agreed to deposition dates of September 12 through September 14.
ECF 80-1, at 339 and 112-115. The City agreed to provide four wit-
nesses. ECF 80-1, at 373. But as the agreed time approached, the
City nar-rowed its list of witnesses to three and then narrowed its
will-ingness to provide those witnesses to just one day. One day is

inadequate for three depositions. The City flatly refused to provide any discovery on the Councilors' subjective intent, the ultimate question of fact in this case, so this issue is still outstanding.

48.    TST opened the Rule 30(b)(6) deposition of Attorney O'Donnell with an invocation. Exhibit 1 at pp. 5-6.

Response: Undisputed but immaterial to the merits of this case.

49.    In preparation for the deposition, O'Donnell spoke with the staffs of the current City Councilors about how the Councilors decide who to invite to give invocations. Exhibit 1 at pp. 64-65, 69-70.

Response: Undisputed but immaterial to the merits of this case.

50.    It was evident from the start of the deposition of Attorney O'Donnell that its purpose was less about discovering information for TST's case and more about creating a video record for other uses – with counsel addressing the "congregants" and attempting to eliminate "legalese" so that they would understand. Exhibit 1 at pp. 12-14, 16, 169.

Response: Undisputed that counsel questioned the witness in plain English. Disputed that counsel ever addressed TST's congregants. The purpose of the deposition was to make a record sufficient to support TST's motion for summary judgment and, failing summary disposition, to support cross-examination.

51.    During the Rule 30(b)(6) deposition, counsel for TST attempted to pigeon-hole certain questions as a "Wu question" in an effort to convince the Court that a deposition of the Mayor was necessary to prove TST's case. Exhibit 1 at pp. 244-245

Response: Undisputed that several "Wu questions" were raised with the specific purpose of showing that Wu has unique personal knowledge entitling TST to a deposition of Wu. Disputed that the deposition is "necessary" for TST to prove its case, as Councilor Essaibi-George's testimony is sufficient in itself to grant summary judgment to TST. It is still unclear how this statement has anything to do with the merits of this case, however.

52.     Similar efforts were made during the Essaibi-George and Rousseau depositions. Exhibit 6 at p. 105, 156-157; Exhibit 7 at p. 28.

Response: Undisputed that several "Wu questions" were raised with the specific purpose of showing that Wu has unique personal knowledge entitling TST to a deposition of Wu. It is still unclear how this statement has anything to do with the merits of this case, however.

53.     On October 22, 2021, TST served a notice of deposition and subpoena for candidate and soon-to-be Mayor Wu to take place on November 2, 2021 – Election Day. ECF Doc. No. 34-1, at pp. 2-5 of 27.

Response: Undisputed that TST noticed Wu's deposition before she was Mayor. It is still unclear how this statement has anything to do with the merits of this case.

54.    TST admitted, in this Court's words, its "intent to invite max-
imum inconvenience, political attention, and media scrutiny of
TST's litigation through the deposition notice." ECF Doc. No. 47
at p. 4, citing ECF Doc. No. 38.

Response: Undisputed that the Court mischaracterized TST's ex-
planatory letter. It is still unclear how this statement has anything
to do with the merits of this case.

55.    The Court refused to allow the deposition to go forward on
that date and requested further briefing on whether it should be al-
lowed at all. ECF Doc. No. 40.

Response: Disputed that the Court refused to "allow the deposition
to go forward on that date." TST vacated the date of the deposition
during the parties' LR 7.1 conference. It is still unclear how this
statement has anything to do with the merits of this case.

56.    The Court subsequently granted the motion to quash the deposition entirely, and awarded attorneys' fees and costs to the City to be determined at the close of discovery. ECF Doc. No. 47.

Response: Undisputed that the Court directed monetary sanctions against TST for seeking the deposition of a declared witness, who issued the first written description of the subject of this lawsuit, and whose deposition was the subject of a written stipulation (ECF 25, at 1-2). It is still unclear how this statement has anything to do with the merits of this case.

57.    Notwithstanding this fact, on August 21, 2022, TST again noticed the deposition of Mayor Wu for September 12, 2022, subsequently serving a subpoena for a September 20, 2022 deposition date. ECF Doc. No. 57-1; ECF Doc. No. 62-1.

Response: Undisputed. This was based on a misunderstanding of the Court's order which states that it has "*not* barred … any categories of discovery, *nor* has it prohibited TST from taking depositions of Mayor Wu or any other current or former councilor." ECF 51,

at 2 (cleaned up; emphasis added). It is still unclear how this statement has anything to do with the merits of this case.

58.    The Court again granted motions to quash the subpoena, and explained to TST the circumstances pursuant to which it would modify the existing protective order. ECF Doc. No. 63.

Response: Undisputed that the Court has systematically prevented TST from making a record of Wu's personal involvement in this case. It is still unclear how this statement has anything to do with the merits of this case.

59.    TST then immediately sought recusal, in part based on orders regarding the Wu deposition, and reconsideration of the protective order for the Wu deposition, each of which was denied. ECF Doc. No. 65; ECF Doc. No. 66; ECF Doc. No. 75; ECF Doc. No. 78.

Response: Undisputed that TST takes issue with the Court's efforts to protect a "rising political leader" from political fallout because of her unconstitutional effort to create a religious gerrymander in

direct violation of plain caselaw. It is still unclear how this statement has anything to do with the merits of this case.

60.    TST's response was to file a motion for sanctions against the City based on the O'Donnell deposition, seeking as sanctions, inter alia, a deposition of Mayor Wu, which was denied. ECF Doc. No. 80, at p. 29 of 31; ECF Doc. No. 88.

Response: Undisputed that TST sought discovery sanctions because of Boston's repetitious speaking objections, repetitious refusal to answer questions without an assertion of privilege and without pausing the deposition to seek a protective order, and failure to produce 30(b)(6) witness on the date of the noticed deposition to speak to the topics of examination. It is still unclear how this statement has anything to do with the merits of this case.

61.    In the subsequent Joint Status Report of the parties, TST again requested a deposition of Mayor Wu, despite discovery having been long completed and a total lack of compliance with the Court's orders regarding same. ECF Doc. No. 90.

Response: Undisputed that TST truthfully responded to the Court's directive to state whether there is outstanding fact discovery (ECF 89) and is unabashedly preserving error in the refusal to allow TST to depose a declared witness whose deposition was the subject of a written stipulation. It is still unclear how this statement has anything to do with the merits of this case.

62.    That request was denied when the Court ruled that discovery was closed and set a briefing schedule for summary judgment. ECF Doc. No. 96.

Response: Undisputed that the Court entered an adverse discovery order to TST on the subject of a forthcoming appeal. It is still unclear how this statement has anything to do with the merits of this case.