# 21-CV-10102

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

The Satanic Temple, Inc.
*Plaintiff*,

*v.*

City of Boston, Massachusetts
*Defendant*.

---

## TST'S SUPPLEMENTAL APPENDIX

---



| | |
|---|---|
| **Matt Kezhaya** | **matt@crown.law** |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Suite 1900, Minneapolis, MN 55402

# Table of contents

| Exhibit | Description | Supp. Appx. |
|---|---|---|
| 1 | Rule 56(d) affidavit | 3 |
| 2 | Boston's Rule 26(f) disclosures | 6 |
| 3 | Depo. Boston clips | 18 |
| 4 | Depo. Essaibi-George clips | 21 |
| 5 | Depo. Rousseau clips | 32 |

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-10102 |
| PLAINTIFF, | |
| V. | FRCP 56(d) AFFIDAVIT |
| CITY OF BOSTON, MA | |
| DEFENDANT. | |

COMES NOW Matt Kezhaya, who states as follows.

1.    **Purpose**. I make this affidavit pursuant to Rule 56(d) to substantiate the point that TST cannot present facts essential to its opposition to Boston's cross-motion for summary judgment.

2.    **Identity and qualifications of witness**. I am an adult with sound mind and no felonies. I make the below statements based on my own personal knowledge.

3.    **Facts essential to opposition**. At issue is an assertedly-discriminatory government practice of hosting religious speech, by invite only and subject only to the arbitrary whims of the

– 1 –

decisionmaker. The case-dispositive question is whether any of the decisionmakers intentionally discriminated. Thus, all and each of the decisionmakers' intent is discoverable. Up until the unexplained reassignment from Judge Burroughs to Judge Kelley shortly after the denial of Boston's motion to dismiss, this was an undisputed legal proposition. See **Exhibit 2** (Boston's Rule 26(f) disclosures, identifying all of the councilors) and ECF 25, at 1-2. Wu, particularly, is a witness with personal knowledge and upon whose testimony Boston intends to rely. **Exhibit 2**, at 3 ¶ 9.

4.    **For specified reasons, these facts are unavailable**. Despite TST's repetitious efforts, this discoverable information has been withheld from TST on the shifting explanation that Wu possesses no "relevant information personally" (ECF 47, at 12); is protected from compulsory process by virtue of her newfound "rising political leader" status (ECF 47, at 10); and, despite Wu's unique personal knowledge, Boston's refusal to honor an agreement to depose four witnesses across three days is somehow TST's fault (ECF 78).

5.    **FRCP 56(d)**. Because the City's motion relies on an appeal to ignorance as to why the councilors did not invite TST, the Court should defer considering the cross-motions for summary judgment pursuant to FRCP 56(d)(1) and direct Wu to submit to a deposition pursuant to FRCP 56(d)(2).

6.    **FRCP 56(e)**. Alternatively, the City's failure to support the facts surrounding the councilors' individual reasons for not inviting TST requires granting TST's cross-motion for summary judgment. FRCP 56(e)(3), (4).

**FURTHER AFFIANT SAYETH NOT**.

Signed under penalty of perjury of the laws of the United States on May 22, 2023 in Hennepin County, Minnesota. *s/ Matt Kezhaya*

Supp. Appx. 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE SATANIC TEMPLE, INC.                          CASE NO. 1:21-CV-10102

PLAINTIFF,

v.

CITY OF BOSTON, MA

DEFENDANT.

## DEFENDANT CITY OF BOSTON'S INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)

Pursuant to Federal Rule of Civil Procedure 26(a), Defendant City of Boston ("Defendant") hereby makes its initial disclosures. Defendant reserves the right to supplement these disclosures as new information becomes available.

### Introduction

The following disclosures are made based on the information reasonably available to Defendant as of this date.  By making these disclosures, Defendant does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this lawsuit.  Rather, Defendant's disclosures represent a good faith effort to identify documents and individuals likely to have discoverable information that Defendant may use to support its defenses (other than solely for impeachment).

All the disclosures set forth below are made subject to, and without in any way waiving, the following objections and qualifications:

1.      The right to object on any proper ground to the use of any disclosed information in this action or in any other proceeding;

2.      The right to object on any proper ground to any discovery request or proceeding involving or relating to the subject matter of these disclosures; or

3.      The right to object to the production of any document or tangible thing disclosed in these disclosures on the basis of any privilege, the work-product doctrine, or any other valid objection or protection from disclosure.

## Disclosures

### A. Individuals Likely to Have Discoverable Information
*The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.*

1. Travis LeSaffre
   Travis LeSaffre, an individual who identified himself as a member of Plaintiff's organization, is expected to have discoverable information regarding Plaintiff's requests to deliver an invocation.

2. Christine O'Donnell
   c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201 at (617) 635-4064.

   Ms. O'Donnell is expected to have discoverable information regarding the City's invocation speaker selection practices and Plaintiff's requests to deliver an invocation from January 1, 2018 to the date of this Complaint.

3. Edward Flynn
   c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

   Councilor Flynn is expected to have discoverable information regarding the City's invocation selection practices.

4. Annissa Essaibi George
   c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

   Councilor Essaibi George is expected to have discoverable information regarding the City's invocation speaker selection practices from January 1, 2018 to the date of this Complaint.

5. Josh Zakim
   c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor Zakim is expected to have discoverable information regarding the City's invocation selection speaker practices.

6. <u>Timothy McCarthy</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor McCarthy is expected to have discoverable information regarding the City's invocation speaker selection practices.

7. <u>Mark Ciommo</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor Ciommo is expected to have discoverable information regarding the City's invocation speaker selection practices and Plaintiff's requests to deliver an invocation.

8. <u>Andrea Campbell</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor Campbell is expected to have discoverable information regarding the City's invocation speaker selection practices.

9. <u>Michelle Wu</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor Wu is expected to have discoverable information regarding the City's invocation speaker selection practices and Plaintiff's 2018 requests to deliver an invocation.

10. <u>Matt O'Malley</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor O'Malley is expected to have discoverable information regarding the City's invocation selection practices.

11. <u>Frank Baker</u>
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Councilor Baker is expected to have discoverable information regarding the City's invocation speaker selection practices.

12. <u>Michael Flaherty</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Councilor Flaherty is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

13. <u>Althea Garrison</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Councilor Garrison is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

14. <u>Lydia Edwards</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Councilor Edwards is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

15. <u>Ayanna Pressley</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Rep. Pressley is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

16. <u>Julia Mejia</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Councilor Mejia is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

17. <u>Riccardo Arroyo</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Councilor Arroyo is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

18. <u>Kenzie Bok</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

Councilor Bok is expected to have discoverable information regarding the City's invocation speaker selection practices.

19. <u>Liz Breadon</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Councilor Breadon is expected to have discoverable information regarding the City's invocation speaker selection practices.

20. <u>Kim Janey</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Acting Mayor Janey is expected to have discoverable information regarding the City's invocation speaker selection practices.

21. <u>Maureen Feeney</u>
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Clerk Feeney is expected to have discoverable information regarding the City's invocation speaker selection practices.

22. <u>Elizabeth Pimental</u>
    Chief of Staff to City Councilor Andrea Campbell
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Ms. Pimental is expected to have discoverable information regarding the City's invocation selection practices as well as Plaintiff's October 2018 request to deliver an invocation.

23. <u>Yuleidy Valdez</u>
    City Council Central Staff Director
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Ms. Valdez is expected to have discoverable information regarding the City's invocation speaker selection practices as well as Plaintiff's October 2018 request to deliver an invocation.

24. <u>David Vittorini</u>
    Chief of Staff to City Councilor Michelle Wu

c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Mr. Vittorini is expected to have discoverable information regarding the City's invocation speaker selection practices as well as Plaintiff's October 2018 requests to deliver an invocation.

25. Gabriela Coletta
    Chief of Staff to City Councilor Lydia Edwards
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Ms. Coletta is expected to have discoverable information regarding the City's invocation speaker selection practices.

26. Ryan Spitz
    Chief of Staff to City Councilor Michael Flaherty
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Mr. Spitz is expected to have discoverable information regarding the City's invocation speaker selection practices.

27. Thomas Jackson
    Former Chief of Staff to Former City Councilor Mark Ciommo
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Mr. Jackson is expected to have discoverable information regarding the City's invocation speaker selection practices.

28. Amy Frigulietti
    Former Chief of Staff to City Councilor Frank Baker
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Ms. Frigulietti is expected to have discoverable information regarding the City's invocation speaker selection practices.

29. William MacGregor
    Chief of Staff to City Councilor Matt O'Malley
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

    Mr. MacGregor is expected to have discoverable information regarding the City's invocation speaker selection practices.

30. Jessica Rodriguez
    Chief of Staff to City Councilor Annissa Essaibi-George
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Ms. Rodriguez is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

31. Samuel Hurtado
    Chief of Staff to Kim Janey (in her capacity as City Councilor)
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Mr. Hurtado is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

32. Jordan Frias
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Mr. Frias is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

33. Lauren Brody
    Chief of Staff to City Councilor Kenzie Bok
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Ms. Brody is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

34. Samantha Bennett
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Ms. Bennett is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

35. Alana Olsen
    Former Chief of Staff to City Councilor Annissa Essaibi-George
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Ms. Olsen is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

36. <u>Lee Blasi</u>
    Former Chief of Staff to Former City Councilor Timothy McCarthy
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Lee Blasi is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

37. <u>Eric White</u>
    Former Chief of Staff to Rep. Pressley (in her capacity as Boston City Council)
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Mr. White is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

38. <u>Kyndal Feinman</u>
    Chief of Staff to Former City Councilor Josh Zakim
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Feinman is expected to have discoverable information regarding the City's invocation
    speaker selection practices.

39. <u>Kelly Ransom</u>
    Former Chief of Staff to City Councilor Annissa Essaibi-George
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Ms. Ransom is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

40. <u>Steven Moore</u>
    Former Chief of Staff to City Councilor Ed Flynn
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

    Mr. Moore is expected to have discoverable information regarding the City's
    invocation speaker selection practices.

41. <u>Charlie Levin</u>
    Chief of Staff to City Councilor Ed Flynn
    c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square,
    Room 615, Boston, MA 02201

Mr. Levin is expected to have discoverable information regarding the City's invocation speaker selection practices.

42. Mark Murphy
Former Chief of Staff to Former City Councilor Althea Garrison
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Mr. Murphy is expected to have discoverable information regarding the City's invocation speaker selection practices.

43. Jamie Howell-Walton
Former Chief of Staff to Former City Councilor Josh Zakim
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Howell-Walton is expected to have discoverable information regarding the City's invocation speaker selection practices.

44. Amanda Curley
Chief of Staff to City Councilor Frank Baker
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Ms. Curley is expected to have discoverable information regarding the City's invocation speaker selection practices.

45. Lee Nave Jr.
Chief of Staff to City Councilor Liz Breadon
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Mr. Nave is expected to have discoverable information regarding the City's invocation speaker selection practices.

46. Sandra Sanchez-Saavedra
Chief of Staff to City Councilor Julia Mejia
c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Ms. Sanchez-Saavedra is expected to have discoverable information regarding the City's invocation speaker selection practices.

47. Caitlin Fleishman
Chief of Staff to City Councilor Riccardo Arroyo

c/o Nailah A. Freeman of City of Boston Law Department, One City Hall Square, Room 615, Boston, MA 02201

Ms. Fleishman is expected to have discoverable information regarding the City's invocation speaker selection practices.

B. **Documents**
*A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.*

  1. Documents regarding Plaintiff's requests to deliver invocations at the City Council's meetings from January 1, 2018 to the date of this Complaint

  2. Documents concerning the schedule of City Council meetings and the individual councilors assigned to coordinate the invocation speaker by meeting from January 1, 2018 to the date of this Complaint

  3. Documents related to weekly City Council meetings from January 1, 20218 to the date of this Complaint

  4. Video & audio recordings of weekly City Council meetings from January 1, 2018 to the date of this Complaint

  5. Documents concerning the City Council's rules and procedures from January 1, 2018 to the date of this Complaint

By identifying these document categories, Defendant does not admit or concede that the documents above are discoverable or admissible, and expressly reserves the right to object to any request for production of such documents or the admission into evidence of any documents included within the categories identified. Defendant also reserves the right to supplement the list of categories of documents that have been identified.

C. **Damages Computation**
*A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.*

Plaintiff has not asserted a claim for monetary damages.

D. *Insurance Agreements*
   *For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.*

   Defendant is self-insured and has attached a certificate of insurance indicating the same.

   Defendant reserves their right to supplement, amend or modify these disclosures at any time and to the extent necessary under the Federal Rules of Civil Procedure.

   Respectfully submitted,

   DEFENDANT,

   CITY OF BOSTON,

   By its attorney,
   Henry Luthin,
   Corporation Counsel

   /s/ Nailah A. Freeman_____
   Robert Arcangeli (BBO #689034)
   Nailah A. Freeman (BBO #695910)
   City of Boston Law Department
   One City Hall Square, Room 615
   Boston, MA 02201
   Telephone: (617) 635-4064
   Facsimile: (617) 635-2012
   Robert.arcangeli@boston.gov
   nailah.freeman@boston.gov

Dated: September 9, 2021

Supp. Appx. 17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 9, 2021, this document was served on Plaintiff by electronic mail as follows:


<u>/s/ Nailah A. Freeman</u>
Nailah A. Freeman

Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                               CASE NO. 21-cv-10102

4     - - - - - - - - - - - - - - - - - -

5     THE SATANIC TEMPLE, INC.,

6                         Plaintiff,

7          v.

8     CITY OF BOSTON, MA,

9                         Defendant.

10    - - - - - - - - - - - - - - - - - -

11

12

13

14          AUDIOVISUAL DEPOSITION of CHRISTINE

15    O'DONNELL, a witness called by counsel for the

16    Plaintiff, taken pursuant to the Federal Rules of Civil

17    Procedure before Kristen L. Kelly, Registered

18    Professional Reporter, MA CSR No. 115893 and Notary

19    Public in and for the Commonwealth of Massachusetts, at

20    The Satanic Temple, 64 Bridge Street, Salem,

21    Massachusetts, on Thursday, August 25, 2022, commencing

22    at 9:32 a.m.

23

24

Page 2

1  A P P E A R A N C E S :
2  CROWN LAW
3    By:  Matthew A. Kezhaya, Esquire
4       Sonia A. Kezhaya, Esquire
5       300 N. Washington Avenue, #300
6       Minneapolis, Minnesota 55401
7       479.431.6112
8       matt@crown.law
9       sonia@crown.law
10      For the Plaintiff
11
12  CITY OF BOSTON LAW DEPARTMENT
13    By:  Nicole O'Connor, Esquire
14       Robert S. Arcangeli, Esquire
15       City Hall, Room 615
16       Boston, Massachusetts 02201
17       617.635.2902
18       nicole.oconnor@boston.gov
19       robert.arcangeli@boston.gov
20       For the Defendant
21
22  ALSO PRESENT:
23    Shawn Budd, Videographer
24    Lucien Greaves, Ada King, and Mobius

Page 3

1              I N D E X
2  Deponent:        Direct  Cross  Redirect  Recross
3  CHRISTINE O'DONNELL
4    By Mr. Kezhaya
5
6
7           E X H I B I T S
8  No.
9  Exhibit 1  8.30.2017 Mark Thomas Email;
10        DEF0002870
11  Exhibit 2  10.19.2020 Email, Gabriela Coletta
12        to Fr. Paolo; DEF0003434-3436
13  Exhibit 3  2.19.2020 BHM Planning Meeting
14        Notes; DEF0002320-2322
15  Exhibit 4  11.03.2020 Email, Elizabeth Pimentel
16        to Makayla Parkin; DEF0002391
17  Exhibit 5  06.16.2020 Email, Michael Bonetti to
18        Yuleidy Valdez; DEF0002733-2734
19  Exhibit 6  09.29.2020 Email, David Vittorini to
20        Makayla Parkin; DEF0002723-2726
21  Exhibit 7  06.16.2020 Email, Yuleidy Valdez to
22        Michael Bonetti; DEF0002729-2730
23  Exhibit 8  12.12.20 Email, R. Zed to Kim Janey;
24        DEF2849

Page 4

1            E X H I B I T S
2  No.                          Page
3  Exhibit 9  10.19.2017 Email, Alana Olsen to
4        Annissa Essaibi-George; DEF0002890
5  Exhibit 10  02.14.2019 Email, Marie Szaniszlo to
6        David Vittorini; DEF0003373-3374
7  Exhibit 11  TST Brochure              ID ONLY
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24    (Exhibits provided electronically to reporter.)

Page 5

1          P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  We are on the record.
4  The time is 9:32.
5       MR. KEZHAYA:  Okay.  Ada, if you could
6  get us started please.
7       MS. KING:  Very good.  Welcome,
8  everyone.  My name is Ada King.  I'm an ordained
9  Minister of Satan.  And I will be lowering the lights,
10  lighting some candles and reading our invocation.
11       Let us stand now unavowed and unfettered
12  by arcane doctrines borne of fearful minds in darkened
13  times.
14       Let us embrace the Luciferian impulse to
15  eat of the tree of knowledge and dissipate our blissful
16  and comforting delusions of old.
17       Let us demand that individuals be judged
18  for their concrete actions not their fealty to
19  arbitrary social norms and elusory categorizations.
20       Let us reason our solutions with
21  agnosticism in all things, holding fast only to that
22  which is demonstrably true.
23       Let us stand firm against any and all
24  arbitrary authority that threatens the personal

2 (Pages 2 - 5)

[need - number]                                                    Page 33

146:18 151:6
152:2 161:5,12
162:4 165:9
167:17 180:9
181:21 183:3,3
183:13 184:8
186:23 191:24
204:22 205:7
219:3 229:23
230:2,6 231:4,5
231:6,7 232:1
235:20 252:15
**needed** 107:2
184:6 204:3
**needing** 13:19
**needn't** 179:23
**needs** 14:6 71:13
82:5 145:17
172:6 182:24
187:16 188:15
196:19 197:11
229:22
**neglected** 200:3
**neighborhood**
190:23 191:1
**neither** 117:18
143:8 256:12
**never** 6:3 57:7
161:16 216:3
217:13 226:8
228:16 235:5
**new** 42:15 47:8
158:7
**newer** 158:13
**news** 219:19,19
**nice** 194:14
**nick** 208:14

**nicole** 2:13 7:13
7:15 42:1 64:14
65:8,13 96:23
97:16 137:18
151:18,19
153:15 215:7
248:16 254:12
254:14 257:5
**nicole.oconnor**
2:18
**night** 188:10
**nod** 91:14
**nodded** 91:13
128:14
**non** 236:17
**nondescript** 52:6
**nondiscrimina...**
220:3
**nonissue** 12:4,13
**nonministers**
250:14
**nonprivilege**
23:8
**nonpublic** 123:7
**noon** 203:7,8
206:9
**norm** 113:15
123:17 239:17
239:20,23
240:13
**normal** 23:23
24:2 113:20
116:8 123:19
124:2,4 170:24
171:15,19 193:6
193:12,20,21,23
193:24 223:8,12
223:12

**normally** 23:22
34:3 116:8
117:8,8 119:16
124:11 233:7
**norms** 5:19
193:5
**north** 190:5,22
**notarized** 257:14
**notary** 1:18
256:6 257:24
258:10,18
259:15,23
260:23
**note** 13:10,24
14:4 75:12
117:14 120:10
120:13 142:2
147:21 170:7
173:7 177:8
200:3 211:7,8
219:7,11,16
220:13 221:9,10
238:24,24 239:6
239:7,8,9,10
244:16,22
246:15 249:6
252:10,13
257:12
**noted** 248:6
**notes** 3:14
116:12 117:8
126:13 127:4,8
127:16,17,20
128:5,7,9,11,15
129:21 130:7
131:9,14,15
132:4,8,11
156:20 182:2

185:18 187:22
230:12
**noteworthy** 75:8
81:15
**notice** 8:8 20:17
21:16 23:11
26:6,23 28:17
29:20 30:15,18
32:8,10 36:5,5,6
39:24 40:19,21
41:22 62:10
80:20,22 96:15
102:4 103:5,9
104:19,20 105:6
106:6 127:1,9
142:10,12
147:21 152:16
186:2,22 187:3
193:8 203:1
218:2 220:21
231:21
**noticed** 21:16
214:18
**notifying** 132:14
**notion** 71:12
238:7
**november**
185:11 188:17
**now's** 138:19
**nowadays** 33:21
72:14 241:10
**number** 49:23
126:24 127:4
164:24 175:23
176:2 180:10
183:23 189:2
194:20 199:12
200:5 201:5,11

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3    _____

4    THE SATANIC TEMPLE, INC.,

5             Plaintiff,

6        v.                          Civil Action No.

7    CITY OF BOSTON, MA,             1:21-cv-10102

8             Defendant.

9    _____

10              VIDEOCONFERENCE DEPOSITION OF

11                 ANNISSA ESSAIBI-GEORGE

12   DATE:          Monday, September 19, 2022

13   TIME:          10:01 a.m.

14   LOCATION:      The Satanic Temple

15                  64 Bridge Street

16                  Salem, MA 01970

17   REPORTED BY:   Robert Lombardi, Notary Public

18   JOB NO.:       5488484

19

20

21

22

23

24

25

| | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ON BEHALF OF PLAINTIFF THE SATANIC TEMPLE, INC.: |
| 3 | MATTHEW A. KEZHAYA, ESQUIRE (by videoconference) |
| 4 | Crown Law |
| 5 | 333 North Washington Avenue, Suite 300 |
| 6 | Minneapolis, MN 55401 |
| 7 | matt@crown.law |
| 8 | |
| 9 | SONIA KEZHAYA, ESQUIRE (by videoconference) |
| 10 | Crown Law |
| 11 | 333 North Washington Avenue, Suite 300 |
| 12 | Minneapolis, MN 55401 |
| 13 | sonia@crown.law |
| 14 | |
| 15 | ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS |
| 16 | ANNISSA ESSAIBI-GEORGE: |
| 17 | NICOLE O'CONNOR, ESQUIRE |
| 18 | City of Boston Law Department |
| 19 | 1 City Hall Square, Room 615 |
| 20 | Boston, MA 02201 |
| 21 | nicole.oconnor@boston.gov |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | I N D E X |
| 2 | EXAMINATION:                              PAGE |
| 3 | By Mr. Kezhaya                    8 |
| 4 | |
| 5 | E X H I B I T S |
| 6 | NO.        DESCRIPTION             PAGE |
| 7 | (None marked.) |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd.) |
| 2 | ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS |
| 3 | ANNISSA ESSAIBI-GEORGE: |
| 4 | ROBERT S. ARCANGELI, ESQUIRE |
| 5 | City of Boston Law Department |
| 6 | 1 City Hall Square, Room 615 |
| 7 | Boston, MA 02201 |
| 8 | robert.arcangeli@boston.gov |
| 9 | |
| 10 | ALSO PRESENT: |
| 11 | Sean Budd, Videographer |
| 12 | Lucien Greaves |
| 13 | Ada King |
| 14 | Mobius |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE VIDEOGRAPHER:  Okay.  We are on the |
| 3 | record.  This is the videographer speaking, Sean Budd, |
| 4 | with Veritext Legal Solutions.  Today's date is |
| 5 | September 19, 2022, and the time is 10:01 a.m. |
| 6 | We are here at The Satanic Temple, |
| 7 | Salem, Massachusetts, in the matter of The Satanic |
| 8 | Temple, Inc. vs. the City of Boston. |
| 9 | Would counsel please introduce |
| 10 | themselves for the record. |
| 11 | MR. KEZHAYA:  This is Matt Kezhaya |
| 12 | appearing on behalf of the plaintiff The Satanic |
| 13 | Temple, Inc.  I have with me Sonia Kezhaya, albeit |
| 14 | remotely, Lucien Greaves, Ada King, and Mobius. |
| 15 | MS. O'CONNOR:  And this is Nicole |
| 16 | O'Connor and with me is my colleague, Rob Arcangeli, |
| 17 | and we represent the City of Boston in this case, and |
| 18 | we are representing Annissa Essaibi-George in this |
| 19 | deposition. |
| 20 | THE VIDEOGRAPHER:  Court Reporter, |
| 21 | please swear in the witness. |
| 22 | THE REPORTER:  Thank you.  Good |
| 23 | morning, everybody.  My name is Robert Lombardi; I am |
| 24 | the reporter assigned by Veritext to take the record |
| 25 | of today's proceedings. |

2 (Pages 2 - 5)

Page 110

1 to limit the crosstalk if you can. Thank you.
2          MR. KEZHAYA: To give a little bit of
3 exposition, cross chatter is very difficult to
4 transcribe.
5          MR. MOBIUS: And was there a specific
6 timecode on this one? Were you --
7          MR. KEZHAYA: If you click the link, it
8 should take you to the precise one.
9          MR. MOBIUS: Yes.
10          MR. KEZHAYA: Yes. Just click in the
11 link. It should be a minute twenty-five.
12          MR. MOBIUS: Do you want to make note
13 of the date?
14          MR. KEZHAYA: Guys, I know I'm plague
15 ridden but do you mind if I come in there so I can
16 administer this a little bit more effectively. Right
17 now, all I see is Mr. Court Reporter's name on my
18 laptop.
19          MR. MOBIUS: Matt, we've got it brought
20 up. I just wanted to make note of the date of the --
21 of the video.
22          MR. KEZHAYA: The date of the video
23 should be September 26, 2018.
24          MR. MOBIUS: Thank you.
25          MR. KEZHAYA: Are we looking -- very

Page 111

1 good. That's much better.
2          THE WITNESS: Yeah --
3 BY MR. KEZHAYA:
4     Q   Now that we're looking at the correct one,
5 Ms. Essaibi-George, do you remember this meeting?
6     A   I mean, that's obviously me, I don't
7 remember it specifically, but --
8     Q   That's okay. Let's watch through the
9 invocation. It doesn't take too much time; I think
10 it's about three minutes or so. So if we could just
11 press play and then I may need to pause periodically
12 for further examination.
13          MR. MOBIUS: I don't know what the
14 level of volume is going to be when this starts. I
15 apologize if it's loud.
16          MR. KEZHAYA: That's okay. And before
17 we press play. When I watched this in preparation for
18 the deposition, there's going to be some audio
19 glitches. That's normal and expected so just rely on
20 the sub-titles more so than the audio. And play when
21 ready.
22          (Video played.)
23          MR. KEZHAYA: Pause. There is no
24 audio.
25          THE VIDEOGRAPHER: Just a second --

Page 112

1 just doublecheck.
2          MR. KEZHAYA: Also, the screen does
3 flicker black sometimes so that's also expected.
4          THE VIDEOGRAPHER: I'm not getting any
5 -- audio through the set there -- speakers here but
6 I'm going to -- Matt, it's -- it's not going through
7 here. It's going through the mobile -- so I'm going
8 to play it through my magical speakers.
9          MR. KEZHAYA: That's fine. What's
10 important to me is that the witness can hear it; not
11 so much everyone else. We can patch this all through
12 with a link.
13          (Video played.)
14          MR. KEZHAYA: If we could pause here.
15 I didn't hear the Pledge of Allegiance on my end. Did
16 part of the Pledge of Allegiance play on y'all's end?
17          THE WITNESS: Yes.
18          MR. KEZHAYA: Okay. I'm sorry. I just
19 misheard. Please continue.
20          (Video played.)
21          MR. KEZHAYA: Okay. Pause here.
22 BY MR. KEZHAYA:
23     Q   Ms. Essaibi-George, I have not watched the
24 rest of this video. I have no idea how long this goes
25 on. Is the rest of this substantially about this

Page 113

1 particular organization?
2     A   I think so; yes.
3          MR. KEZHAYA: That fulfills my
4 purposes. Could we please return the camera to Madam
5 Witness?
6          THE WITNESS: Here I am.
7          MR. KEZHAYA: Thank you.
8 BY MR. KEZHAYA:
9     Q   Was that a fairly normal invocation,
10 blessing, ceremony, however it is that you want to
11 describe it?
12     A   Yeah. I'd say pretty normal.
13     Q   There were certain elements of this that I
14 just want to take note of and make sure that these are
15 all normal. At the beginning, you acknowledged that
16 Rosh Hashanah had just happened and that, more
17 particularly, Jews celebrate Rosh Hashanah; this is a
18 Jewish holiday in other words. Is that correct?
19     A   Yes.
20     Q   Is it also normal that, you know, if there's
21 some kind of --
22          MR. KEZHAYA: There's a lens flare. If
23 we could get the camera modified slightly so that
24 there's not a lens flare.
25          THE WITNESS: That's coming from the

29 (Pages 110 - 113)

Page 114

1 mirror behind me.
2        MR. KEZHAYA:  Yes.  Can we maybe move
3 the camera so that it's not -- because it's -- I don't
4 know, for example, if it's the laptop --
5        THE WITNESS:  Is that better --
6        MR. KEZHAYA:  So there are two sets of
7 video.  I'm trying to make a record as well as see
8 you.  If the video is good, that's all I care about.
9 Me seeing you, that's not the problem.
10        Can we go off record so that I can
11 maybe get a better understanding?  I need to make a
12 good record as well as a good examination.  There are
13 two different things.
14        THE VIDEOGRAPHER:  -- off the record.
15        (Off the record.)
16        THE VIDEOGRAPHER:  Okay.  We are back
17 on the record.  The time is 1:59.
18 BY MR. KEZHAYA:
19    Q   To recap, it's not abnormal for you to
20 acknowledge a particular religious holiday has
21 recently happened in the course of introducing a
22 particular religious speaker at the outset of a city
23 hall meeting.  Is that correct?
24    A   That's correct.
25    Q   Sorry; say again?

Page 115

1    A   That's correct; that's not unusual.
2    Q   Thank you.  It's also not abnormal for you
3 to introduce the speaker with some level of
4 endorsement.  Is that also correct?
5    A   That is correct.  We invite them ourselves
6 so there's also a level of assumed endorsement by
7 inviting them.
8    Q   And in the background, your head and there
9 was another city employee's head, both of which were
10 bowed as the religious speaker was praying over the
11 city hall meeting.  Is that abnormal?
12    A   I missed the tail end of your question but
13 it is not abnormal to bow one's head when a prayer is
14 being offered --
15    Q   I neglected to ask, but beforehand, the
16 other city employee who is not you, whose identity is
17 unknown to me, she stated to the effect of, everyone
18 please stand for the prayer and continue standing
19 while Ms. Essaibi-George officiates --
20    A   -- the Pledge; yes.
21    Q   Right.  Thank you.  Is that normal?
22    A   That is -- I don't know whether I
23 characterize it as normal.  Every council president or
24 whoever's leading the body, sometimes phrases it in
25 different ways.  Sometimes there are councilors and --

Page 116

1 and whoever's in the chamber is not necessarily asked,
2 stands on their own, if they're able.  So I actually
3 don't know whether I'd say that's normal.  But I think
4 there's an expectation that people generally stand
5 during the prayer, if they're --
6    Q   Okay.  And then after the prayer --
7    A   -- yep --
8    Q   -- remark, after the opening remarks while
9 the Pledge of Allegiance is given, I noticed the
10 superimposed American flag waiving during the
11 presentation of the Pledge of Allegiance.  Is that
12 normal?
13    A   I actually don't know whether that's normal.
14 I generally don't watch the council meetings,
15 especially during that time, I was in the chamber, so
16 I wasn't watching them.  And today, watching it, I
17 said, oh, that's kind of a cool graphic that they did
18 that.  So I don't know whether or not that's normal.
19    Q   Now the time duration between the remark and
20 the Pledge of Allegiance is essentially zero.  Is that
21 normal?
22    A   That's normal.  We generally move from that
23 opening prayer, remark, or blessing, whatever it is,
24 into the Pledge.
25    Q   Okay.  So insofar as the remarks and the

Page 117

1 Pledge back-to-back like that, that whole process of
2 what we just saw was pretty normal; par for the
3 course, so to speak.  Is that correct?
4    A   Yes.
5    Q   Okay.
6    A   Yes.
7    Q   And then after that, I've candidly never
8 watched any of the Boston City meetings in full.  I
9 gather there was some kind of a Jewish educational
10 volunteer group that was being acknowledged at this
11 particular city hall meeting.  Is that a fair summary
12 of this particular meeting?
13    A   Yes.
14    Q   Okay.  Is that normal as well, that the
15 person who gives the prayer is also the subject of the
16 meeting as well?
17    A   On occasion; not always.
18    Q   Occasionally --
19    A   -- depends upon -- it depends again, as a
20 former teacher, there was some real direct correlation
21 between my work on the council and this group and --
22 and the work that they do.  So to have them there both
23 with Claudia to offer the opening blessing and to
24 recognize the work that her and her work were doing,
25 seemed to be very reasonable for me to do sort of

Page 118

1 those things together.
2         Councilors at different times throughout the
3 year, if there is something happening, which is either
4 seasonal or there's been a need to give some special
5 recognition to a group that might happen.  For
6 example, February, there is an event that I
7 participated in, still today, called the winter walk
8 which is an -- the organization is called the Winter
9 Walk and they organize a winter walk which is their
10 work to fundraise to end homelessness and bring
11 awareness to the plight of homelessness in the city of
12 Boston.  So they don't come and offer an opening
13 blessing or give remarks but I do invite them in
14 February to recognize them to bring attention to their
15 work because it's timely.
16     Q    You say timely because of it being winter or
17 --
18     A    It's when the walk is happening, for
19 example.  We may also recognize -- you know, I'm of
20 Polish descent and during Polish -- Polish
21 Constitution Day is in May so I may -- I have, on
22 occasion, recognized that day.  I'm trying to think if
23 I've ever brought a Polish group into the council
24 chamber before a meeting.  But things like that happen
25 and it is an opportunity to acknowledge work that's

Page 119

1 happening in our community and at times bring those
2 people or that -- a group of people from that
3 organization to the council to recognize that work.
4     Q    But redirecting your attention back to this
5 particular, if I remember correctly, September 26,
6 2018, meeting, the group that was being portrayed is
7 the same group that gave the blessing that day or
8 invocation or whatever you want to call it --
9     A    There was a -- there was certainly a
10 relationship between the two.  So the -- Claudia and
11 her congregation are actively involved in that
12 tutoring group, it's based out of their congregation,
13 so it was the -- a great opportunity to do both things
14 at once.
15     Q    Do you know where that congregation is
16 centered?
17     A    I think they're based out of Brookline and I
18 think they're -- they're a synagogue.
19     Q    I may have missed the geographic location;
20 what was it again?
21     A    I think that they're -- I think they're
22 actual synagogue is in Brookline.
23     Q    Okay.  Is Brookline another neighborhood of
24 Boston?
25     A    It is not.  It is a -- it is a neighboring

Page 120

1 -- I don't know if it's even a city officially; a town
2 or city of Boston.
3     Q    Some kind of Boston metro area --
4     A    Neighbor -- it's neighboring -- neighboring
5 town.
6     Q    But more particularly, it's within the
7 Boston metro area.  Is that correct?
8     A    I guess so, yeah.  It's not Boston; it's
9 next door.
10     Q    Yes.
11     A    But it's -- metro area; yes.
12     Q    In terms of driving distance, perhaps that
13 would be a better way of asking, if I were in Boston,
14 say, City Hall, and I want to go to wherever this
15 congregation is centered in, about how long would it
16 take to drive there?
17     A    Ten, fifteen minutes, tops.
18     Q    Okay.  Very close then.
19     A    Yeah.  Maybe; depending on traffic.
20     Q    All right.  Do you remember how they came to
21 be -- well, obviously, you invited them, but do you
22 remember what occasioned your invite to them?
23     A    I don't recall exactly but from some of the
24 remarks I gave in 2018, four years ago, I referenced
25 the work that they're doing -- they were doing at that

Page 121

1 time in our public schools; I think I named a couple
2 of schools in which they work in.  So I'm sure I came
3 to know of them either during one of my visits to a
4 classroom in our school -- school district or one of
5 -- maybe a classroom teacher perhaps referenced some
6 of their work in our schools.  I don't -- I don't
7 recall exactly but I imagine that's how it could have
8 happened.
9     Q    Okay.  More --
10     A    -- schools I mentioned specifically in my
11 remarks here were the Ohrenberger, which is in West
12 Roxbury part of the city and the Winship which is in
13 the Brighton part of our city.
14     Q    Sorry.  I'm trying to figure out how to --
15 oh, that's the -- okay.  More particularly, do you
16 recall whether they solicited the invite?
17     A    They did not.
18     Q    They definitely did not?
19     A    I'm -- I'm certain that they didn't and I
20 don't think anyone's ever asked me, with the
21 exception, I think, why I'm here today, to offer
22 remarks, a prayer, or a blessing before the city
23 council.
24     Q    Okay.  In the course of giving these
25 remarks, did you prepare those or did they prepare

31 (Pages 118 - 121)

Page 146

1    Q   -- like a demand letter to a lawyer doesn't
2  mean the same thing as, you know, so and so demanded
3  such and such in colloquial.  So when TST demands an
4  invite, to lawyers, it doesn't mean the same thing as
5  it might mean to a lay person.
6    A   Okay.  Thank you for the clarification.
7  'Cause you used both terms; I didn't know the
8  difference.
9    Q   Yes.  Demand and seek is really the same
10 thing, in my mind, in legal parliament.  So going back
11 to the question, was it spoken about within Boston
12 City Government during your tenure that TST was
13 seeking an invite?
14    A   I don't recall specific conversations about
15 it but I'm sure it was discussed or, you know,
16 offhanded comments about TST wanting to give an
17 invocation.
18    Q   When you say you're sure it was discussed,
19 help me understand -- drill down further for me.
20    A   Yeah.  I mean, I -- I can't tell you
21 specifically when I would have had any of those
22 conversations or participated in those conversations,
23 I just have a sense of it being something that was --
24 that was on, you know, around.  But beyond that, I
25 couldn't be any more specific.

Page 147

1    Q   Did you ever talk with your chief of staff
2  about TST and their demand for an invite?
3    A   I know it came up, again, a number of times
4  over the course of my time on the city council that
5  TST wanted to give the opening invocation but we,
6  beyond saying we weren't extending the invitation as
7  an office, that -- that was the extent of it.  I do
8  know that there was an e-mail that was sent between
9  myself and my chief of staff communicating what our
10 response would be and beyond that, that was it.
11        MR. KEZHAYA:  Okay.  Well, let's pull
12 up that e-mail.  In that folder 3, it's the bottom
13 most PDF, Moby.
14        MR. MOBIUS:  2890?
15        MR. KEZHAYA:  Correct.  Is it up?
16        THE WITNESS:  Yep.  Yes.
17 BY MR. KEZHAYA:
18    Q   If you could, please explain to me -- so is
19 it Alana Olsen?
20    A   Alana.
21    Q   Alana; that's your chief of staff.  Correct?
22    A   That was my chief of staff at that time.
23    Q   Yes.  At that time.  And that's sent to you.
24 Is that also correct?
25    A   That is correct.

Page 148

1    Q   And it's subject, statement on Satanic
2  Temple.  Also correct?
3    A   That's what I'm reading.
4    Q   And the date and time of this e-mail is
5  October 19, 2017, at 3:17 p.m.  Is that also correct?
6    A   That's what it says.
7    Q   Okay.  Please read the body of this e-mail
8  in full.
9    A   It --
10       THE WITNESS:  Mobius, could you make it
11 just a hair bigger for me?  Can you just zoom in just
12 a little bit?  I'll do my best.  That's great.  Thank
13 you.
14       It is absurd that this group feels
15 entitled to being invited to give remarks at the
16 beginning of the council meeting.  And frankly, it's
17 insulting to all of the amazing religious and secular
18 leaders who are invited.  They are invited because of
19 all the incredible work that they do across the city;
20 work to end youth violence, work to provide shelter
21 and stability to the homeless, or compassion and
22 support for those in recovery.  I will not give up the
23 opportunity to highlight one of those amazing leaders
24 who I am privileged to work with for The Satanic
25 Temple.  The city council does important, serious work

Page 149

1  for the people of Boston and when we invite someone to
2  participate in our meeting, it -- it is out of
3  profound -- a profound respect, not a sense of
4  obligation.
5  BY MR. KEZHAYA:
6    Q   Did you confer with any attorneys about the
7  state of constitutional while at the time you sent
8  this e-mail as pertains --
9    A   I --
10   Q   -- rights?
11   A   I -- I don't think so.
12   Q   Have you since conferred with any attorneys
13 about the state of constitutional law with respect to
14 TST's right to participate in this legislative
15 prayer ceremony?
16   A   I have not.
17       MS. O'CONNOR:  Objection.
18 BY MR. KEZHAYA:
19   Q   Let's drill down a little bit further.  As
20 of 2017, did you perform any form of investigation to
21 determine what, if any, involvement TST has with the
22 community of Boston at all?
23   A   I have not -- I have not.
24   Q   So you indicate, for example, that the
25 people who you do invite do incredible work, for

38 (Pages 146 - 149)

Page 150

1 example, to end youth violence, provide shelter and
2 stability to the homeless, or compassion and support
3 for people in recovery. These are qualities of people
4 who you do invite. Correct?
5     A   Those are qualities of people and
6 organizations; yes.
7     Q   Well, TST is an organization also. Correct?
8     A   Yes.
9     Q   TST as an organization is comprised of
10 people. Correct?
11    A   I think so.
12    Q   Yes. I'll tell you the answer's yes.
13        You, at the time of writing this e-mail, had
14 no basis to believe that TST as an organization does
15 not provide what I would describe as charitable
16 contributions to the Boston community. Is that also
17 correct?
18    A   I had no reason to believe that you did or
19 did not. I didn't look it up and the most information
20 I've ever read about TST is in the pamphlet that's
21 before me today.
22    Q   So before this reading of this pamphlet
23 today, you had essentially no idea who the membership
24 of TST or -- comprised of, what they do in the Boston
25 community. All you knew is that you had never heard

Page 151

1 of them. Is that correct?
2     A   That is correct.
3     Q   Is that why you felt it was absurd that this
4 group felt entitled to an equal --
5     A   I think any -- anyone that feels entitled to
6 offer an opening remark without having a relationship
7 or playing an important role in my -- my work, yes, I
8 think that that -- I didn't appreciate that sense of
9 entitlement. Now, I can't speak for other councilors.
10 But for me, when I selected an individual or
11 organization or set of work to highlight before the
12 city council, I did it based on my experiences and the
13 work that I was doing in the City of Boston.
14    Q   Earlier you testified that your
15 understanding of an event being religious or community
16 oriented turned on there being a religious ceremony.
17 Do you recall that?
18    A   When we were in the questions around when an
19 event or community meeting took place in a building
20 that had a religious affiliation.
21    Q   So if there's a religious ceremony in a
22 building that does not happen to have religious
23 affiliation, that religious ceremony is not religious
24 to you?
25    A   It is -- it -- because I participated in,

Page 152

1 for example, a blessing offered by a rabbi, it does
2 not make me Jewish.
3     Q   When you, as the city government, direct
4 that the public stand for that particular prayer and
5 you bow your head and everyone is directed to bow
6 their head, that does not involve participation in the
7 ceremony that you have invited the officiant to
8 officiate?
9     A   I have -- I have never felt mandated to
10 stand and -- and. bow my head. I do that out of
11 respect for my guest and for the prayer and blessing
12 that they're offering for the council. I would also
13 bow my head in a moment of reflection when we have
14 had, and I have had, offered a simple poem read before
15 the council.
16    Q   Who read this poem that you're referencing?
17    A   Oh, we've had poems and reflections read by
18 many people including our city -- our former city
19 clerk who would often do that if -- I once had, I
20 don't recall who it was, but a guest assigned to come
21 in and offer this blessing and that -- something
22 happened with the schedule, I don't recall exactly
23 what, but we would have our clerk step in and she had
24 a handy book of reflections that she would read from.
25    Q   Was that clerk -- is it Maureen Feeney?

Page 153

1     A   Yes.
2     Q   I saw a number of her invocations, for lack
3 of a better word. Was that pretty much typical
4 whenever she's giving that blessings, something fell
5 through?
6     A   No, sometimes she was actually invited to
7 offer them by the individual; by the councilor.
8     Q   Okay. So as I understand it, your grounds
9 for not inviting TST -- well, actually, let me just
10 back up. Please recite your grounds for not inviting
11 TST during your tenure.
12    A   I had no relationship with TST. Had no
13 interaction with TST. And as the city councilor, I
14 have very few opportunities to invite someone to offer
15 either opening remarks or a blessing or a prayer prior
16 -- before the start of a council meeting and utilized
17 those opportunities for, you know, very specific folks
18 and organizations that I wanted to do that with.
19    Q   Did any of them ever drop out on you?
20    A   I -- like I just mentioned, I had one that
21 something happened last minute, so we had Maureen, the
22 Clerk Feeney, step in and offer a reflection.
23    Q   And yet you knew that TST wanted to get in,
24 why did you not invite this group that announced a
25 desire to come in?

39 (Pages 150 - 153)

Page 154

1   A   I didn't have a desire to invite you.
2   Q   Why not?
3   A   I can't tell you why I did or why I didn't;
4 I just didn't.
5   Q   I know that you didn't --
6   A   That, we have had -- huh?
7   Q   The purpose of the deposition is to
8 understand why not.
9   A   There -- there is no reason why not. I
10 don't have a relationship with TST. I did not have a
11 relationship with TST. I, therefore, had no desire to
12 invite you as an organization for the city council.
13   Q   The people who you did invite up until about
14 2016 or so were paid. Is that correct?
15   A   I did not take office until 2016. I do
16 believe I recall a small stipend at some point being
17 discussed. But I don't know when that ended over, you
18 know, what -- I don't know what year that was.
19   Q   As I recall prior testimony, it was during
20 your tenure. If I remember correctly, it was 2017 or
21 2018.
22   A   Perhaps. I don't know.
23   Q   You were not involved in that determination
24 to end the stipend?
25   A   Not that I recall.

Page 155

1   Q   Do you know who was involved in it?
2   A   Nope. I do not.
3   Q   Do you know who participated in the
4 determination?
5   A   I do not.
6   Q   Earlier testimony informs us that an
7 investigation was performed as to the City's
8 legislative prayer practice. Do you know anything
9 about this investigation?
10   A   What -- no. What investigation? Say it
11 again.
12   Q   An investigation into the City's legislative
13 prayer practice.
14   A   I don't know. I don't -- I'm not familiar
15 with it.
16   Q   Are you familiar with the terminology
17 legislative prayer?
18   A   I am not.
19   Q   What we observed earlier, the rabbi giving
20 the prayer at a government meeting, that's called a
21 legislative prayer --
22   A   Okay.
23   Q   -- the city council legislative body; so
24 it's a prayer over the body.
25   A   I've never heard that reference made for

Page 156

1 that.
2   Q   I understand, but the question posed is as
3 to the investigation about this custom.
4   A   I'm sorry; is there a question there?
5   Q   The question posed is whether you know
6 anything about the investigation into this matter?
7   A   I -- isn't that why I'm here?
8   Q   Not exactly. No, you're here because I need
9 to understand why TST was not afforded an invite; at
10 least from you. Because each councilor had different
11 ways of going about things. Correct?
12   A   That's my understanding.
13   Q   So you can only really speak to you and your
14 office as to why you did or did not invite certain
15 people. Correct?
16   A   That is true. Yes.
17   Q   Now, Mayor Wu had her own means of inviting
18 or not inviting people. Correct?
19   A   I would say that's correct.
20   Q   Did you and then councilor, now Mayor Wu,
21 have any discussions as to her practices of inviting
22 or not inviting people?
23   A   No.
24   Q   So I really need to talk to Wu to determine
25 why she did or did not invite any particular groups.

Page 157

1 Is that correct?
2   A   Yes.
3       MR. KEZHAYA: Let's take a brief break.
4       THE VIDEOGRAPHER: The time is 3:01.
5 We're off the record.
6       (Off the record.)
7       THE VIDEOGRAPHER: And we're back on
8 the record. The time is 3:08.
9       MR. KEZHAYA: Okay. Mobius, if you
10 could please take us to this -- and still in folder
11 number 3, the Boston Herald article dated February 14,
12 2019.
13       MR. MOBIUS: Okay.
14       THE WITNESS: 2019?
15       MR. KEZHAYA: Well, that's the date of
16 -- or that's the -- yes. That's correct; yes. 2019.
17       THE WITNESS: Oh. No, I'm looking at
18 the print. It says 2022, but --
19       MR. KEZHAYA: Oh, yes. That's just
20 when we printed it off. If you take a look, you'll
21 see a Lucien Greaves photo and then underneath, it
22 should say, published February 14, 2019, at 8:04 p.m.,
23 updated the next day.
24       THE WITNESS: I see it.
25       MR. KEZHAYA: Mobius, directing our

40 (Pages 154 - 157)

Page 162

1    Q   Allow me to finish my question before you
2  start answering --
3    A   Go ahead.  Yeah.  Go ahead.  Sorry.
4    Q   -- for the record.  The question posed is,
5  earlier you testified that in order to qualify for an
6  invitation, they were a representative of the city.
7  Correct?
8    A   Representative of the work that was
9  happening in the city as it related to my work in my
10  capacity as a city council.
11    Q   Do you acknowledge that it's possible that
12  TST does do work in the city and you just didn't
13  happen to run across it in your duties?
14    A   Oh, yes, it's possible.
15    Q   Particularly, since you performed no
16  investigation into the good works, if any, of TST.
17  Correct?
18    A   Yes, it's possible.
19    Q   So, hypothetically, if TST did do good works
20  and you just didn't happen to run across it, would you
21  agree with me that that is discriminatory?
22        MS. O'CONNOR:  Objection.
23        You can answer.
24        THE WITNESS:  Again, every councilor
25  has their own process to follow.  And I don't think

Page 163

1  it's discriminatory -- 'cause you can't -- not every
2  organization gets invited.  So I don't -- I don't know
3  how else other to answer your question.
4  BY MR. KEZHAYA:
5    Q   Well, you've not yet actually defined
6  discriminatory so let's go back to that.  How do you
7  define discriminatory?
8    A   I would -- I base discrimination to --
9  around race, really, is what I base discrimination on.
10    Q   Okay.  So if you only invited Catholics and
11  you never invited Protestants, you had an explicit
12  policy, I refuse to invite Protestants.  You deny that
13  that's discriminatory?
14    A   That -- no, I'd say to officially deny a
15  group would be discriminatory; yes.
16    Q   Did you not --
17    A   -- the question that way is, yes.
18    Q   Did you not explicitly deny TST in your
19  prepared statement?
20    A   I have not explicitly denied you.  I have
21  had no relationship with TST and didn't desire to
22  invite you.
23    Q   You had no desire to invite TST.  Correct?
24    A   [Unintelligible response.]
25    Q   I didn't hear; was that a "no"?

Page 164

1    A   No.  The answer was no.  I have no desire --
2  I had no desire.
3    Q   And if you were a councilor as you sit here
4  today, you still would not invite TST.  Is that also
5  correct?
6    A   That is correct.
7    Q   Why not?
8    A   I have zero relationship other than what
9  we've experienced today or knowledge of the work that
10  you may be doing in the City of Boston.
11    Q   Is it your position that TST must lobby you
12  for an invitation in order to receive an invitation?
13    A   It is not my position.
14    Q   Okay.  How would TST go about creating this
15  relationship but for seeking the relationship?
16        MS. O'CONNOR:  Objection.
17        You can answer.
18        THE WITNESS:  Okay.  Thank you.  I
19  don't -- sorry.  I don't know what to do.
20        I would have knowledge of your work and
21  I would have run across it in my work as an at-large
22  city councilor.
23  BY MR. KEZHAYA:
24    Q   So is it fair to say then that if TST had
25  more members, then TST would have gotten an

Page 165

1  invitation?
2    A   No.  That's incorrect.
3    Q   If TST had more members who were engaged in
4  the community in the way that you are familiar with,
5  then TST would have gotten an invitation?
6    A   Possibly, but not likely.
7    Q   Why not?
8    A   As a city councilor, I only have -- I have
9  very few opportunities to invite prior to the start of
10  a council meeting for just a few minutes, as you saw.
11  And again, with that limit and without, you know, now,
12  today, as much as I know and really don't know about
13  TST, I don't see how I would have you invited for the
14  council, as my guest.
15    Q   What I struggle with is how that is not
16  definitionally discrimination.  Perhaps we should have
17  the definition of discrimination.  Let's pull it up.
18        MR. KEZHAYA:  Mobi, if you could just
19  Google, define discrimination.
20  BY MR. KEZHAYA:
21    Q   Ms. Essaibi-George, once it's up, if you
22  could please just read the definition into the record.
23        MR. MOBIUS:  It's from -- Webster
24        THE WITNESS:  Make it -- would you mind
25  making it bigger?

42 (Pages 162 - 165)

Page 166

1        Ready?
2  BY MR. KEZHAYA:
3    Q   Yes.
4    A   Definition of discrimination:  Prejudiced or
5  prejudicial -- sorry -- outlook, action, or treatment:
6  racial discrimination.  B:  the act, practice, or
7  instance of discriminating categorically rather than
8  individually.
9        I can also continue; 2:  the quality or
10  power of finely distinguishing.  3a:  the act of
11  making or perceiving a difference:  the act of
12  discriminating.  A bloodhound's scent is
13  discrimination.  3b:  psychology:  the process by
14  which two stimuli differing in some aspects are
15  responding -- responded to differently.
16    Q   And what source are you reading from?
17    A   It is Merriam-Webster.
18    Q   Let me see if I can read this because I hear
19  your words but I can't see them.
20        Would you agree with me that those are the
21  defining terms of discrimination?
22    A   Yes.
23    Q   Okay.  Let's see here.  I want to take note
24  that there's a link on 3a:  the act of making or
25  perceiving a difference.  There appears to be a colon,

Page 167

1  the act of discriminating.  Do you see that?
2    A   As in a bloodhound's scent.
3    Q   Well, a bloodhound's scent discriminates but
4  that's perceiving a difference.  You perceive a
5  difference between TST and other religions; yes?
6    A   I don't perceive a difference.  I don't know
7  about TST.
8    Q   You just read the pamphlet.  You do know
9  about TST.
10    A   -- now I know about you but I didn't know
11  about you before and I really don't know more than
12  what's on this pamphlet before me.
13    Q   Okay.  So --
14    A   I don't have a --
15    Q   -- having read the pamphlet, you still
16  decline to invite TST.  You understand that TST is a
17  religion.  Yes?
18    A   So two things:  One, I have no opportunity
19  to invite, and B, I have no working relationship with
20  TST.
21    Q   So it really boils down to whether TST has a
22  working relationship with you as to whether TST will
23  get an invite.  Correct?
24    A   I have no invitation to offer.  I am no
25  longer a Boston city councilor.  And I have no working

Page 168

1  relationship with you.  I didn't have one as a --
2  in my capacity as a city councilor.  I don't have one
3  today in my capacity as a private citizen.
4    Q   I understand that.  Earlier you said that if
5  you were a counselor, you still would not invite TST.
6    A   I -- I would still today not have a working
7  relationship with TST.
8    Q   So it doesn't really much matter whether you
9  have an invitation; what really matters is that you
10  don't have a relationship with TST.  Correct?
11    A   I'd say both of those things are true.
12    Q   Okay.  Well, let's rewind back to 2017.  You
13  were aware of TST.  Yes?
14    A   I was made aware -- yes, through your
15  request and demand to offer invocation at the city
16  council.
17    Q   Okay.  So having been made aware of them and
18  having had the power, you still did not invite TST
19  despite knowing TST wanted in.  Correct?
20    A   That is correct.  I also did not and still
21  do not have a working relationship or any overlapping
22  my work as a member of the city council with TST.
23    Q   And that is the only reason why you did not
24  invite TST.  Correct?
25    A   I'd say so.  I would say there was never a

Page 169

1  decision made to invite or not invite.  You were not
2  on my radar.  We did not have any work or overlapping
3  work and my -- quite frankly, my dance card was very
4  much full every year thinking about who I would invite
5  to the few opportunities I had to invite someone to --
6  to kick off and start our council meetings.
7    Q   Then, why did you invite the clerk?
8    A   Because I had a last-minute cancellation.
9    Q   You had a last-minute cancellation, you knew
10  that TST wanted in --
11    A   No.  I -- I will tell you that I wasn't
12  thinking about TST.  TST has not ever been front of
13  mind for me.
14    Q   I see.  Have you ever invited any atheistic
15  religious speakers?
16    A   To open and give the opening blessing or
17  reflection, I don't believe so.
18    Q   To the best of your --
19    A   -- I'd have to look at -- I'd have to look
20  at my -- I don't believe so.  To the best of my
21  recollection, I do not believe so.  I have used my
22  opportunity as a city councilor to invite lots of
23  individuals and lots of organizations that have zero
24  connection to religious organizations to the council
25  to be recognized for the work that they're doing in

43 (Pages 166 - 169)

Page 170

1 our communities over -- over my six years serving as a
2 city councilor and I don't know any one of those
3 individuals that were on the podium with me, on the --
4 with me, they're religious beliefs, their preferences,
5 whether or not they had any.
6     Q    Did politics play any role in your decision
7 to invite people to give this ceremonial prayer?
8     A    I'm a politician.  Politics is very much a
9 part of every decision I made as a city councilor.
10    Q    Is that a "yes"?
11    A    Politics always plays a role in every
12 decision I make as a city councilor.
13    Q    Including in who to invite.  Correct?
14    A    Of course.  It's based on relationships and
15 the work that's happening in our city.
16         MR. KEZHAYA:  That concludes my
17 purposes.  I now pass the witness for cross.
18         MS. O'CONNOR:  No questions on our end.
19 Thank you.
20         MR. KEZHAYA:  All right.  Annissa,
21 thank you so much for your time.  This concludes the
22 deposition.  It ran a little bit longer than you may
23 have expected but this is about as long as depositions
24 take.  So thank you for your time today.
25         THE WITNESS:  Very good.  Thank you.

Page 171

1         THE REPORTER:  Okay.  Counsel, before
2 we jump off the record here, starting with Attorney
3 Kezhaya, what can I do for you for a transcript order
4 today?
5         MR. KEZHAYA:  We would like it by
6 electronic means only, please.
7         THE REPORTER:  Okay.  Perfect.
8         And for defense, what can I do for you
9 today?
10        MS. O'CONNOR:  The City will take
11 electronic also.  That'd be great.
12        THE REPORTER:  Okay.  Perfect.  Then
13 with that, Mr. Budd, if you'll take us off the record.
14        THE VIDEOGRAPHER:  Time is 3:26.  We're
15 off the record.
16        (Signature reserved.)
17        (Whereupon, at 3:26 p.m., the
18        proceeding was concluded.)
19
20
21
22
23
24
25

Page 172

1         CERTIFICATE OF DEPOSITION OFFICER
2         I, ROBERT LOMBARDI, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in the
16 outcome of this a

17              ROBERT LOMBARDI
18           Notary Public in and for the
19           Commonwealth of Massachusetts
20
21 [X] Review of the transcript was requested.
22
23
24
25

Page 173

1         CERTIFICATE OF TRANSCRIBER
2         I, SANDRA SCHWAB, do hereby certify that
3 this transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15           SANDRA SCHWAB
16
17
18
19
20
21
22
23
24
25

44 (Pages 170 - 173)

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3             1:21-CV-10102

4

5                              Vol. I

                              Pgs 1-33

6                              Ex. 1

7

  ----------------------------------

8  The Satanic Temple, Inc.           )

9             Plaintiff,              )

10  V.                                 )

11  City of Boston,                    )

12            Defendant.              )

13  ----------------------------------

14

15

16

17            REMOTE DEPOSITION OF

18            ANNE MARIE ROUSSEAU

19            November 16, 2022

20            11:14  a.m.

21

22

23

  Reported By:  Lori J. Atkinson

24  Job No: MW 5572382

Page 2

1    A P P E A R A N C E S:   (Remote)

2    FOR THE PLAINTIFF:

3    Matthew A. Kezhaya Esq.

4    Crown Law

5    333 N. Washington Ave

6    Suite 300

7    Minneapolis MN 55401

8    Matt@crown.law

9    479.431.6112

10

11   FOR THE DEFENDANT:

12   Edward F. Whitesell, Jr., Esq.

13   Robert Arcangeli, Esq.

14   City of Boston Law Department

15   One City Hall Plaza

16   Room 615

17   Boston, MA 02201

18   Edward.whitesell@boston.gov

19   617.635.4045

20

21

22   Also Present:  Lucien Greaves

23

24

Page 3

1                          I N D E X

2   WITNESS:                                        Page

3   ANNE MARIE ROUSSEAU                               4

4

5

6

7                      E X H I B I T S

8

9      No.        Description                       Page

10      1         Boston City Council

                  YouTube Video link-

11                Time code 130 to time code 6        30

12

13

14

15

16

17

18

19

20

21

22   ***Exhibit video link attached to transcript.***

23

24

Page 18

1    Arlington Heights, Massachusetts.  They called them

2    troubled girls.  They were not troubled.  The world is

3    troubled.  It's a residential program for girls that

4    needed residential school and residential onsite mental

5    health substance abuse issue treatment.

6        Q.  You are a chaplain there as I recall; is that

7    correct?

8        A.  That's correct.

9        Q.  Was Germaine Lawrence affiliated with any

10   religious organization?

11       A.  No.  It had originally been started as a school

12   by school nuns.  But it was a private nonprofit

13   foundation.  However, on the campus was a beautiful over

14   a hundred year old chapel that I would use to do

15   services on Sunday nights.

16       Q.  Was this a primarily Christian organization?  Or

17   did you give nondenominational or --

18       A.  It was Christian but nondenominational.  But it

19   was as inclusive as I could be.

20       Q.  Okay.  Having spent some time working with

21   hospital chaplains, as I understand the word "chaplain,"

22   is meaningfully different from minister.  At least in

23   the hospital role.  Is it the same in the residential

24   schooling world?

Page 19

1    A.   I don't see the difference.  A chaplain is a -- a

2    chaplain usually designates someone who is not a pastor

3    in a congregation or a church.

4    Q.   So the word chaplain then doesn't necessarily

5    refer to someone's denomination, so much as the

6    organization for which they serve?  Is that fair to say?

7    A.   No.   I would say it's a role.  Such as a CFO is a

8    role.  A chaplain is a role.  A pastor is a role.  It's

9    not attached to a particular denomination.

10   Q.   Yeah.  Yeah.  That's what my understanding of the

11   word as well.

12        Going back to the invocation in 2012, you were

13   asked -- you were prompted by it.  Do you remember why

14   you were prompted in 2012 to give the invocation?

15   A.   I was invited.  And if you go back and you listen

16   to any of the invocations, Matt -- Councilor O'Malley

17   would introduce me as being an active member in the

18   community and I believe that's why I was invited.

19   Q.   So 2012, then you mentioned every year

20   thereafter, I see October 31st, 10-23 of the next year,

21   10-8 of the next year.  Actually, we had one dated

22   5-4-11 in our records.  Does that ring any bells for you

23   as well?  That could also be an error.

24   A.   It could be.  Like I said, I don't remember the

Page 20

1   exact dates.

2       Q.  Yeah, that's fine.

3       A.  I don't know how it was determined who gave an

4   invocation when.  If I was invited, I would accept.  I

5   felt it as an honor.

6       Q.  Why did you feel honored to do that?

7       A.  Any time that you are asked to perform -- I

8   considered it a sacred duty and I think it is important

9   before any important decisions are being made that

10  concern people.  That if they want to have a moment to

11  be quiet and still and remind them of why they are

12  performing the job that they are performing, then I

13  think it is an important time.

14      Q.  In the course of giving the invocation, did you

15  consider your service to be the councilors?  The public?

16  Or both?

17      A.  Both.  I would pray for both for the public and

18  also for counselors.  The universal good.

19      Q.  So 2012, O'Malley invited you, I think, we

20  actually said that O'Malley always invited you.  Is that

21  right?

22      A.  Yes.

23      Q.  That makes it easy.  Were there any occasions

24  that prompted your invitations, to your knowledge?

Page 21

1      A.  No.

2      Q.  Was there any -- if you were to guess, why were

3   you invited?

4      A.  I would -- I don't think it's guessing.  I think

5   Matt said it at the beginning when he was introducing

6   me.  Is it because I was actively involved in my

7   community.  And he knew me.  And he respected me.  He

8   also knew I was a clergy person.

9      Q.  Okay.  But in terms of, you know, there is --

10  presumably you have been to multiple City Council

11  meetings prior to; is that correct?

12     A.  Yes, I have watched them and I have been in

13  person at some.

14     Q.  You know that it's a limited speaking

15  opportunity; correct?

16     A.  Yes, it is a -- it is always at the start of the

17  City Council and then there is always the pledge

18  allegiance to the flag.  And then they go on with their

19  business.  Then usually the clergy then leave, whoever

20  is doing the invocation, they usually leave.  And if

21  work allowed, I would sometimes stay and listen to the

22  proceedings.

23     Q.  In terms of what I was getting at, you aren't the

24  only active member in the community who O'Malley knew,

                                                              Page 22

1    obviously, because you didn't do all of the invocations;

2    correct?

3        A.  I don't think that Matt -- that Councilor

4    O'Malley -- I think the -- my understanding is that the

5    councilors each had a couple of opportunities a year to

6    invite someone to give the invocation and Matt chose me

7    when he was elected.

8        Q.  I see.  Do you know if you were the one that he

9    always chose?

10       A.  I don't know who else he invited to give the

11   invocations.

12           I felt honored that he would ask me back.

13       Q.  As we say, you do give among the best.

14   Obviously, you are a repeat service provider.  All

15   right.  So we go back to -- we go up to 2018, you have

16   -- did you say you did it annually, so there is probably

17   one in '19 and one in '20 as well?

18       A.  I know there was one in '20.  You said that you

19   had one in '18.  I believe I also did one in 2019.

20       Q.  Okay.  Is there a particular reason why you

21   stopped giving them?

22       A.  Matt O'Malley is no longer City Council.  So I

23   did not get invited in 2021 or so far this year.

24       Q.  All right.  Let's watch the one from 2018.

Page 23

1            This is from the Boston City Council meeting on

2    February 28, 2018, for benefit of a clean record.

3    Approximately centered on the screen appears to be you,

4    Ms. Rousseau; is that correct?

5        A.  That's correct.

6        Q.  Then two people to our left, a man with red hair

7    and a red beard, presumably that is Matt O'Malley?

8        A.  That is City Councilor O'Malley and I believe the

9    other person is City Councilor Andrea Campbell.  It is

10   kind of blurry.

11       Q.  That's okay.  That is much better.

12           The person in between from prior testimony, I

13   will tell you, a pretty fair amount of certainty this is

14   -- it says it right here.  Campbell.

15           And then in the green, further to the right, this

16   is the City clerk, from prior understanding as well?

17       A.  That's correct.

18       Q.  The clerk at the time -- the clerk is no longer

19   there, as I understand it.  Is that correct?

20       A.  That's correct.

21       Q.  Let's go ahead and watch this.  I don't know if

22   the audio is going to play through.  Please let me know

23   if this does not come through.  While we have this up,

24   I'm going to pull the transcript as well, so we can make

Page 24

1   sure that this is at least close enough to accurate.

2   All right.

3                (Video played.)

4   BY MR. KEZHAYA:

5       Q.  Do you happen to remember -- this is almost five

6   years ago now.  Are the people standing as you are

7   giving this invocation?

8       A.  Yes.

9                (Video played.)

10  BY MR. KEZHAYA:

11      Q.  That was beautiful.  Thank you for giving that.

12           I take note of a couple themes here.  Number one,

13  it is notably Ecumenical.  I don't detect beyond general

14  themes of -- general themes of monotheism.  General

15  themes of compassion.  General themes of -- what was the

16  word that you used.  Inclusive -- inclusivity is the

17  best way that I would describe that.

18           You come from a community where most people

19  believe like you, is that fair to say, in terms of

20  venerating a monotheistic god.  Is that correct?

21      A.  That is correct.  Although my wife is a

22  non-practicing Buddhist at the moment.  She is not a

23  very good meditative, but...

24      Q.  None of us good at it.  We all try.

Page 25

1          But in terms of the general political structure

2     of the area, it seems, at least, from outside of Boston,

3     it is renowned for a very strong Catholic presence and a

4     very strong religious notably Christian presence.  Is

5     that a fair statement of the Boston community?

6          A.  I would say probably a majority.  Right across

7     the street from me there is a large mosque.  I have many

8     Jewish friends, acquaintances.  So it is not just a

9     Catholic city.  But, yes, it was -- there's a large

10    Catholic population here.

11         Q.  I can't seem to unshare my screen.

12             In any event, these notions of diversity and

13    inclusion, would you be surprised to learn that Boston

14    has a policy of excluding a certain faith from their

15    practice?

16                  MR. WHITESELL:  Objection.

17                  You can answer if I object.

18    BY MR. KEZHAYA:

19         Q.  We normally cover ground rules at the beginning

20    of the depositions.

21             Objections are to form unless stated otherwise.

22    I purposely avoided any kind of privileged-related

23    answer or -- questions.  So generally proposition, if he

24    objects, go ahead and answer unless he says otherwise.

Page 26

1     A.  I don't -- I can't answer that question.  I can

2   only speak for myself.

3     Q.  You are familiar with Boston politics, are you

4   not?

5     A.  I'm familiar with Boston politics, but I guess I

6   don't understand your question.

7     Q.  The question is as to whether you would be

8   surprised to learn that Boston has a practice of

9   excluding a particular faith group from giving the same

10  invocation as you have?

11          MR. WHITESELL:  Objection.

12    Q.  Ms. Rousseau?

13    A.  Would I be surprised that Boston excluded a

14  particular faith?  Is that what the question is?

15    Q.  Yeah, from giving the -- having the same

16  opportunity to give this invocation as you have been

17  given?

18    A.  I guess I don't see it as Boston excluding

19  anyone.  I see this as individual City Councilors having

20  the opportunity to invite people that they know.  So I

21  -- and that are involved in the City.  I guess I'm

22  uncomfortable answering that question because I don't

23  think I -- I don't think I can and I don't think it is a

24  fair question about the practice.

Page 31

1                COMMONWEALTH OF MASSACHUSETTS

2    COUNTY OF SUFFOLK, SS.

3          I, Lori J. Atkinson, Professional Court Reporter

4    and Notary Public duly and qualified in and for the

5    State of Massachusetts do hereby certify that the

6    foregoing transcript is a true and correct transcript of

7    my original stenographic notes.

8    I further certify that I am neither an attorney or

9    counsel for, nor related to or employed by any of the

10   parties to the action in which this deposition is taken;

11   and furthermore, that I am not a relative or employee of

12   any attorney or counsel employed by the parties hereto

13   or financially interested in the action.

14   IN WITNESS THEREOF, I have hereunto

15   Set my hand and affixed my Notarial Seal this 29th day

16   of December, 2022.

17

18

19          LORI J. ATKINSON

20          NOTARY PUBLIC

21

            ***PLEASE NOTE***

22   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

     APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE

23   SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

     SUPERVISION OF THE CERTIFYING COURT REPORTER.

24