## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| The Satanic Temple, Inc., )<br><br>Plaintiff, )<br><br>v. )<br><br>City of Boston, )<br><br>Defendant. ) | Civil Action No. 21-CV-10102-AK |

## MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A. KELLEY, D.J.**

Plaintiff The Satanic Temple, Inc. ("TST"), brings this suit against Defendant City of Boston (the "City"), alleging that the Boston City Council (the "City Council") violated TST's First Amendment rights under the United States Constitution and its free exercise rights under the Massachusetts Constitution when City Councilors did not extend an invitation to TST or allow its request to give the invocation before the start of one of its weekly meetings. Both parties have filed motions for summary judgment. [See Dkt. 98; Dkt. 101]. For the following reasons, the City's motion for summary judgment [Dkt. 98] is **GRANTED**, and TST's motion for summary judgment [Dkt. 101] is **DENIED**.

## I.   BACKGROUND

In evaluating the cross-motions for summary judgment, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted. [See Dkt. 100; Dkt. 104; Dkt. 110; Dkt. 112]. The Court accepts as true each material fact to the extent it has not been disputed by the opposing party and considers contested

each material fact that either party has disputed.  Unless otherwise noted, the facts below are undisputed.

A.    **Invocations at City Council Meetings**

City Council holds meetings every week, usually on Wednesday, except on holidays or when otherwise ordered.  [Dkt. 112 at ¶¶ 2-3].  There are approximately thirty-five meetings per year.  [Id. at ¶ 4].  Time is set aside at the beginning of each meeting for an invited member of the public, often clergy, to say a few words.  [Id. at ¶ 5].  These invocations have been given at City Council meetings, or prior iterations of the City's local government, since the 1800s.[1]  [Id. at ¶ 1].  At the beginning of the calendar year, City Council staff prepares a schedule of dates for City Council meetings, including the name of the City Councilor responsible for securing an invocation speaker for each meeting.  [Id. at ¶ 8].  While the staff attempts to assign the same number of dates to each City Councilor, it is not always possible.  [Id. at ¶ 7].

The selection of the invocation speaker is left to the discretion of individual City Councilors and their staffs.  [Id. at ¶ 11].  An individual must receive an invitation from a City Councilor to offer an invocation prior to Council meetings, and the City Council does not take requests to give an invocation.  [Id. at ¶ 13].  There are no guidelines or rules governing whom a City Councilor may invite to give an invocation, and no formal, written policy exists.  [Id. at ¶ 12].  The City states that invocation invitations are "based upon personal relationships the Councilors have and the work that the individual invitee does in the district or for their constituents."  [Id. at ¶ 18].  In 2016, in response to TST's first request for an invitation to give the invocation, Michelle Wu ("Wu"), a former City Councilor who is now the Mayor of Boston, described the practice, in writing:

---

[1] The City had an alderman form of local government, not a city council, prior to 1909.  [Dkt. 112 at ¶ 1].

[E]ach Councilor has the chance to invite 2-3 faith leaders per year to deliver the opening invocation at one of our Council meetings.  The invitations are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts.  There is no restriction or criteria based on any Councilors' religious preferences.  Many of us have a long list of folks we'd like to invite but haven't been able to accommodate.

[Dkt. 100-11 at 2].  Another City employee separately explained that Councilors "have invited members from their district . . . who are active in their neighborhood and engaged community members in addition to being members of the clergy."  [Dkt. 104-1 at 23].

Other City Council members and their staff describe the invocation invitations in similar terms.  Christine O'Donnell ("O'Donnell"), who is the Compliance Director and counsel for the City Council, explained in a deposition that "the invitations for the invocation are based upon personal relationships the [C]ouncilors have," in other words, "people that they have relationships with because of their districts.  It might be work that the individual does in their districts or does for their constituents.  That has been the policy."  [Dkt. 100-1 at 52:22-24, 53:7-12].  When asked whether there was a basis for limiting who may participate in the invocations, O'Donnell responded, "It's by invitation.  So, the limit would be if you don't get an invitation, you don't give the invocation."  [Id. at 152:20-153:1].  TST has characterized the selection process as City Councilors "extend[ing] invites only to their friends and political allies."  [Dkt. 110 at ¶ 2].

One invocation speaker, Anne Marie Rousseau ("Rousseau"), gave an invocation annually from 2012 to 2020 at the invitation of former Councilor Matt O'Malley ("O'Malley").  [Dkt. 112 at ¶ 17].  In addition to volunteering for Councilor O'Malley's campaign, Rosseau was co-chair of the Ward 11 Democratic Committee, co-founded JP Progressives, a "local community-based organization [] concerned about issues and electing progressive candidates," and worked at Metro Housing Boston.  [Dkt. 100-7 at 7:17-22, 8:1-2].  She was also an on-call

minister at Hope Central Church in Jamaica Plain, which is affiliated with the United Church of Christ and the Disciples of Christ, and she had been a chaplain at another organization.  [Id. at 7:23-8:1, 9:9-13, 11:13-20].  Rosseau also "knew the councilor personally" and "had interacted with him many times."  [Id. at 8:3-4].  When extending an invitation to a different community leader to give the invocation at a meeting, former City Councilor Kim Janey acknowledged that the "Unitarian Universalist Urban Ministry, under [the reverend's] leadership, is deeply active in the Roxbury community, providing and hosting [a] wide array of services and events.  [The reverend's] work to restore the First Church of Roxbury, and continued efforts to reinvigorate the building, are evidence of this commitment to social justice and service."  [Dkt. 100-8 at 3].

Former Councilor Janey explained to one invocation speaker that "[o]pening our meetings with prayer provides the Council with a moment of meditation and reflection as we address the important work before us as a body."  [Id.].  The content of the invocations is written or determined by the invited speaker.  [Dkt. 112 at ¶ 22].  The invocations may take the form of a "blessing," "opening remarks," "a prayer," "a sermon," a "poem," a "reflection," or "something like that."  [Dkt. 112 at ¶¶ 21, 29; see Dkt. 100-6 at 107:15-25].  The majority of invocations have been given by individuals from a variety of Christian denominations, but there have "also been a number of representatives from other types of religions," including rabbis and an imam.  [Dkt. 112 at ¶¶ 24-26].  There have also been "some laypeople" or "non-religious speakers," including individuals from organizations doing work within the community, who have given invocations.  [Id. at ¶¶ 24, 27-28].  For example, the City Clerk has given several invocations, usually reading from a "book of reflections," and a leader of the Boston Debate League, who was also in divinity school, gave an invocation.  [Id. at ¶¶ 30-31].

TST provides video evidence of one invocation given at a City Council meeting.  <u>See</u> https://www.youtube.com/watch?v=qb5iu6B1TxA ("August 2021 Video").  In that video clip, the City Council is called to order and roll call occurs.  <u>Id.</u> at 3:00-3:45.  The City Councilor who invited the invocation speaker then introduces the speaker, who founded a church in Boston and served on several boards of directors in Boston.  <u>Id.</u> at 4:03-5:57.  The speaker, who is a pastor, then takes the microphone.  In addition to welcoming remarks, she references the Bible and states, "Let us pray," before she gives a prayer.  <u>Id.</u> at 6:24.  She states that she "pray[s] for each member of the Boston City Council" and asks for the Lord to give them "understanding," "wisdom," and "knowledge" as they proceed with their duties.  <u>Id.</u> at 7:17-9:49.  The meeting then proceeds with the Pledge of Allegiance and the first order of business.  <u>Id.</u> at 9:56-10:43.  Contrary to TST's characterization in its statement of facts, the video shows that the audience is not instructed to stand for the invocation, nor are they directed to participate in the prayer.  [<u>See</u> Dkt. 110 at ¶¶ 1, 4].

There are two other videos of City Council meetings mentioned briefly in the parties' papers.  One is referenced by the City in its statement of facts, and it is of an imam who gave the invocation in April 2023.[2]  <u>See</u> https://www.youtube.com/watch?v=Ti7QMgpUK8Q &list=PLQaoo0hI2DAjk5JId3kvv1N3WJt8GgBFr&index=24 ("April 2023 Video").  The meeting proceeds much as the other did—the City Clerk conducts roll call, the City Councilor introduces the speaker, and the speaker gives the invocation.  The imam opens by stating that he always greets "the audience" by saying, in Arabic, "Peace be upon you."  <u>Id.</u> at 5:30-5:44.  He then proceeds to read from the Koran and gives a few remarks at the end.  In those remarks, he states that it is "incumbent upon you [the City Councilors], as our representatives, to get to know

---

[2] The imam had previously been invited to give the invocation by Councilor Charles Yancey, who left City Council in 2015.  [Dkt. 112 at ¶ 26].

one another, not in the superficial way . . . because you represent me and us," and "the more you get to know each other outside of the walls of the City Hall, the more you all can come together . . . [and] we'll get the benefit of your relationship."  Id. 8:35-9:34.  At no point in the video, which begins prior to the roll call, are people instructed to stand.  Still, after reading from the Koran, the imam states, "You can sit down now," which suggests that people were standing and may have done so of their own volition.  Id. at 6:58.

The other video is cited by TST in a footnote in its response to the City's statement of facts.  [See Dkt. 112 at ¶ 31 n.1].  In that video, which is from a September 2016 City Council meeting, the City Clerk does roll call, the City Councilor introduces the speaker, and the speaker gives the invocation.  See https://www.youtube.com/watch?v=T1rDy1ioPnE ("September 2016 Video").  At this meeting, the City Councilor instructs everyone to stand for the invocation and the Pledge of Allegiance.  Id. at 1:50-1:59.  The speaker, who was involved in several nonprofits and studying at divinity school, speaks about the mission of the Boston Debate League.  She then instructs everyone to bow their heads before offering a prayer that thanks the Lord for the City Councilors' service, asking the Lord to remind the Councilors that "nothing is too hard for [them]" and if they "humble themselves" before the Lord, they will be lifted up.  Id. at 5:57-9:57.  She asks for guidance to allow the City Council to be "the best politicians, the best governing body that this nation has ever seen."  Id.

Invocation speakers previously received a stipend from the City.  [Dkt. 112 at ¶ 9].  One invocation speaker testified that she received a $75 stipend when she first gave an invocation in 2012, though she did not remember receiving one after that.  [Id. at ¶ 10].  The stipend practice stopped in 2016 or 2017 after City Council investigated the practice.  [Id. at ¶ 9; see Dkt. 110 at

¶¶ 8-10].  TST claims that this practice ceased because of TST's initial demand for inclusion and in contemplation of this litigation.[3]  [Dkt. 112 at ¶ 9; see Dkt. 104 at ¶ 10].

### B.    TST's Requests for Inclusion

On October 6, 2016, Travis LeSaffre ("LeSaffre"), Head of the Boston Chapter of TST, sent an email to former Councilor Mark Ciommo ("Ciommo"), asking him to "appoint[] [LeSaffre] as [Ciommo's] invited clergy member to perform an invocation."  [Dkt. 100-10 at 2; see Dkt. 112 at ¶ 32].  LeSaffre similarly reached out to former Councilor Tito Jackson and former Councilor Wu.  [Dkt. 112 at ¶ 33; see Dkt. 100-11].  In response, former Councilor Wu explained that many Councilors had a "long list" of individuals they would like to invite but are unable to accommodate, and the invitations are "often used to recognize faith leaders who are active in the community and organizations that are representative of [the Councilors'] districts." [Dkt. 100-11 at 2].

LeSaffre sent another email to several City Councilors on August 17, 2017.  [Dkt. 112 at ¶ 36; see Dkt. 100-12].  In that email, LeSaffre asked the City Council to "[a]llow all individuals equal opportunity to perform invocations" or "[r]emove invocations from all future City Council meetings."  [Dkt. 100-12 at 2].  Around this time, some City Councilors received emails from individuals stating that they did not want TST to give an invocation.  [Dkt. 104-1 at 42-45].

---

[3] The deposition testimony TST cites to support this claim is that of O'Donnell.  [See Dkt. 104-1 at 34-38]. O'Donnell acknowledged that the investigation into the stipend "coincides with TST's first request."  [Id. at 35]. When asked, "Was it because of TST's demand?" she responded, "It was looked at and considered best practice to stop the stipend."  [Id.].  When counsel persisted, "But did the process of looking at the process of whether we are giving money to these priests, was that occasioned by TST's demand for invite?" O'Donnell responded, "Yes, the policy was looked at then."  [Id.].  When TST continued to push O'Donnell on the topic, she explained, "I was not involved in that decision whether or not to stop the payment."  [Id. at 36].  And when TST again asked, "Was the purpose of reviewing the determination to pay these priests part of a purpose of avoiding liability thereby avoiding a court order requiring TST to have an invitation?  Is that why you guys did you, your [sic] review?" O'Donnell responded, "The re—the review was done.  And again, I did not conduct this review.  But the review of the policy of paying the people giving the invocation was looked at, and it was determined that it was best practice to stop the stipend."  [Id. at 37-38].

There is no evidence that any City Councilors responded to those emails.  [See id.].  One former City Councilor, Annissa Essaibi-George ("Essaibi-George"), commented in response to TST's request[4]:

> It is absurd that this group feels entitled to being invited to give remarks at the beginning of the Council [m]eeting, and frankly its [sic] insulting to all of the amazing religious and secular leaders who are invited.  They are invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery.  I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work with for the Satanic Temple.  The City Council does important, serious work for the people of Boston and when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation.

[Dkt. 100-13 at 2].  Former Councilor Tim McCarthy responded to NBC Boston's inquiry on the issue by stating, "I would not consider anyone that doesn't have a positive impact on my community, my constituents, my family and me personally.  Every leader I have invited, they all check the forementioned boxes.  This issue is not about the honor bestowed to a faith leader by a Boston City Councilor, this is a publicity stunt."  [Dkt. 104-1 at 10].

On October 2, 2018, a representative from TST again requested an opportunity for someone from TST to give the invocation at an upcoming City Council meeting.  [Dkt. 112 at ¶ 39].  The next day, O'Donnell informed TST via telephone that the City Council does not accept requests from speakers to deliver invocations and City Councilors decide who will deliver the invocation.  [Id. at ¶ 40; see Dkt. 100-14 at 2].  O'Donnell also stated that the City Council does not have a written policy concerning invocations.  [Dkt. 112 at ¶ 40; see Dkt. 100-14 at 2].  On October 9, 2018, O'Donnell emailed the TST representative, explaining that each City Councilor may invite "either clergy or a lay person" to give the invocation, and that the City Councilors do not themselves offer the invocation.  [Dkt. 112 at ¶¶ 41-42; Dkt. 100-14 at 2].

---

[4] It is unclear to whom the message was circulated or whether this was a draft of a public statement to be made.

TST filed a complaint with the Massachusetts Commission Against Discrimination on October 17, 2018.  [Dkt. 100-14].  City Councilors again received emails from members of the public between March – April 2019 regarding TST's request for inclusion as an invocation speaker, and again it appears no City Councilor responded.  [Dkt. 104-1 at 39-41].

TST provides an affidavit from its co-founder and co-director, Lucien Greaves, which states that TST engaged in "charitable acts and community involvement activities within the Boston community."  [Dkt. 104-1 at 13].  These activities included "Menstruatin' with Satan," a drive to collect tampons and sanitary napkins for Rosie's Place, a safe haven for LGBTQIA+ women, in November through December 2016, November 2019 to March 2020, and July 2021; "Warmer than Hell," a coat and winter clothing drive for Second Chances in January 2017; and tabling at Boston Pride every year from 2016 to 2019.  [Id. at 13-14].  TST does not provide evidence that any of the City Councilors knew of or were also involved in these activities.  There is no evidence in the record of other groups requesting invocation invitations and receiving them. In fact, at a deposition for this action, former Councilor Essaibi-George stated, "I don't think anyone's ever asked me, with the exception, I think, why I'm here today, to offer remarks, a prayer, or a blessing before the [C]ity [C]ouncil," when asked whether other groups have "solicited an invite."  [Dkt. 100-6 at 121:15-23].

C.    **Litigation**

TST filed the suit before this Court on January 20, 2021.  [See Dkt. 1].  While TST asserted violations of the Establishment Clause of the U.S. Constitution ("Count I"), the Free Speech and Free Exercise Clause of the U.S. Constitution ("Count II"), the Equal Protection Clause of the U.S. Constitution ("Count III"), and the Free Exercise Clause of the Massachusetts Constitution ("Count IV"), the Court dismissed Counts II and III.  [See Dkt. 21].  TST then spent

the majority of fact discovery attempting to take the deposition of then-mayoral candidate, and later Mayor, Wu, including issuing a notice of deposition for November 2, 2021—Election Day. [See, e.g., Dkt. 40; see also Dkt. 90; Dkt. 96].  The Court ultimately granted the City's motion for a protective order to quash Wu's deposition and awarded the City attorneys' fees and costs for TST's counsel's use of abusive discovery tactics when he continued to pursue Wu's deposition.  [See Dkt. 47; Dkt. 63; Dkt. 78; Dkt. 96].  Each party has filed a motion for summary judgment, which are opposed.  [Dkt. 98; Dkt. 101; Dkt. 109; Dkt. 111].  The Court held a motion hearing on the cross-motions for summary judgment on June 28, 2023.

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted).  Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  A factual dispute is "genuine" when the evidence is such that a reasonable factfinder could resolve the issue in favor of the non-moving party, and a fact is "material" where it might affect the outcome of the suit under the applicable law.  See Patco Constr. Co., Inc. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012); Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994).  Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving part[y]."  Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citation omitted). "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism."  Id.  A non-moving party may "defeat a

summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted).  Where the non-moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion."  Mesnick, 950 F.2d at 822.

## III.   DISCUSSION

The Court must determine whether either party is entitled to judgment as a matter of law on two claims.  The first is whether the City violated the Establishment Clause when it did not extend an invitation to TST or grant its request to present an invocation at a City Council meeting.  While TST does not claim that the City's legislative prayer practice generally runs afoul of the Establishment Clause, the Court still must consider whether the City Council's selection process for invocation speakers renders its legislative prayer practice unconstitutional. The second is whether City Council's invocation selection process burdens TST's religious beliefs in violation of Massachusetts free exercise law.

### A.    The Establishment Clause

The First Amendment, which applies to the states through the Fourteenth Amendment, states that the government "shall make no law respecting an establishment of religion."  U.S. Const. amend. I; Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Larson v. Valente, 456 U.S. 228, 244 (1982).  The City Council's invocations are a form of legislative prayer, a practice that "is deeply embedded in the history and tradition of this country."  Marsh v. Chambers, 463 U.S. 783, 786 (1983).  This practice "has coexisted with the principles of disestablishment and religious freedom" from "colonial times through the founding of the Republic and ever since."  Id.  Legislative prayer "is meant to lend gravity to the occasion

and reflect values long part of the Nation's heritage.  Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function."  Town of Greece v. Galloway, 572 U.S. 565, 582-83 (2014).  Legislative prayer need not be nonsectarian.  Id. at 580-81 ("Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content. . . .  Nor did the Court imply the rule that prayer violates the Establishment Clause any time it is given in the name of a figure deified by only one faith or creed.").  To be lawful, the legislative prayer practice at issue must "fit[] within the tradition long followed in Congress and the state legislatures."  Id. at 577.

### 1.    Discrimination Against TST

TST does not claim that the City's practice of opening City Council meetings with an invocation violates the Establishment Clause.  As TST explained at the motion hearing, the essence of this action is an allegation of discrimination—TST claims that the City discriminated against it because of its religious views when the City Council refused to invite TST to give the invocation.  The City counters that there is no evidence that its religious beliefs are the reason TST did not receive an invitation to give an invocation, and the true question is whether the City Council's legislative prayer practice endorses or establishes a particular religion over another.

Establishment Clause jurisprudence is not a paragon of clarity on the issue of legislative prayer.  Although "historical patterns cannot justify contemporary violations of constitutional guarantees," Marsh, 463 U.S. at 790, "the Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" Town of Greece, 572 U.S. at 576 (citation omitted).  While there are no bright-line rules or tests to apply to legislative prayer cases, the Supreme Court has made it clear that "the prayer opportunity [cannot be] exploited to proselytize

or advance any one, or to disparage any other, faith or belief."  <u>Marsh</u>, 463 U.S. at 794-95; <u>see</u>

<u>Town of Greece</u>, 572 U.S. at 585 ("Absent a pattern of prayers that over time denigrate,

proselytize, or betray an impermissible government purpose, a challenge based solely on the

content of a prayer will not likely establish a constitutional violation.").  The ultimate question is

whether the legislative prayer practice "compelled its citizens to engage in religious observance,"

which is a "fact-sensitive" inquiry "that considers both the setting in which the prayer arises and

the audience to whom it is directed."  <u>Town of Greece</u>, 572 U.S. at 587.

There is even less guidance on the proof required for a discrimination claim in the

legislative prayer context of the Establishment Clause.  However, the Supreme Court has

provided some direction on the issue.  In <u>Marsh v. Chambers</u>, the Supreme Court found that a

state legislature's prayer practice did not violate the First Amendment when "[w]eighed against

the historical background."  463 U.S. at 793.  There, a single clergyman of one denomination had

given prayers in the Judeo-Christian tradition for sixteen years and was paid at the public

expense.  <u>Id.</u>  The Supreme Court explained that "[a]bsent proof that the chaplain's

reappointment stemmed from an impermissible motive," his "long tenure does not in itself

conflict with the Establishment Clause."  <u>Id.</u> at 793-94.  The Supreme Court articulated a similar

explanation decades later in <u>Town of Greece v. Galloway</u>:

> [T]he Court disagrees with the view taken by the Court of Appeals that the town of
> Greece contravened the Establishment Clause by inviting a predominantly Christian set
> of ministers to lead the prayer.  The town made reasonable efforts to identify all of the
> congregations located within its borders and represented that it would welcome a prayer
> by any minister or layman who wished to give one.  That nearly all of the congregations
> in town turned out to be Christian does not reflect *an aversion or bias on the part of town
> leaders against minority faiths*.  So long as the town maintains *a policy of
> nondiscrimination*, the Constitution does not require it to search beyond its borders for
> non-Christian prayer givers in an effort to achieve religious balancing.  The quest to
> promote "a 'diversity' of religious views" would require the town "to make wholly
> inappropriate judgments about the number of religions [it] should sponsor and the relative

frequency with which it should sponsor each," a form of government entanglement with religion that is far more troublesome than the current approach.

572 U.S. at 585-86 (emphasis added).

Taken together, these cases suggest that allowing some individuals to give prayers at a legislative session but not others due to "an aversion or bias . . . against minority faiths" or other "impermissible motive" is discrimination in violation of the Establishment Clause.  Id. at 585; Marsh, 463 U.S. at 793.  Other federal courts to consider similar claims have applied this same approach.  See Williamson v. Brevard County, 928 F.3d 1296, 1308 (11th Cir. 2019) (finding that the selection process employed by a board of commissioners reflected "an aversion or bias on the part of the [county] leaders against minority faiths" and had therefore failed to maintain "a policy of nondiscrimination," which indicated that "the prayer opportunity has been exploited to proselytize or advance" a "class of religions to the exclusion of many others" (citations omitted)); The Satanic Temple, Inc. v. City of Scottsdale, No. 18-CV-00621-PHX-DGC, 2020 WL 587822, at *2, 7 (D. Ariz. Feb. 6, 2020) (considering whether the city's denial of the plaintiff's request to give an invocation was "because of 'an aversion or bias . . . against minority faiths'" and therefore in violation of the Establishment Clause (citation omitted)), aff'd The Satanic Temple, Inc. v. City of Scottsdale, 856 Fed. Appx. 724, 726 (9th Cir. 2021) ("After weighing the credibility of the witnesses, the district court properly concluded that TST had failed to prove by a preponderance of the evidence that TST's religious beliefs were a factor, let alone a substantial motivating factor, in [the] decision not to approve TST to give a legislative prayer.").[5]

---

[5] TST itself acknowledges that the "case-dispositive question is whether any of the decisionmakers intentionally discriminated."  [Dkt. 113 at ¶ 3].

TST can prevail on its Establishment Clause claim if the evidence shows that the City's denial of TST's request to give the invocation was based on TST's religious beliefs.  The City provides ample evidence that the refusal to invite TST to give an invocation was not because of TST's religious beliefs.  All of the evidence submitted suggests that individual City Councilors invited speakers who served their constituents and were active in their communities, and TST did not qualify as such.  For example:

- In response to TST's first request for an invocation, former Councilor Wu explained that the invocation invitations are used to recognize leaders "who are active in the community and organizations that are representative of their districts."  [Dkt. 100-11 at 2].

- In a deposition, O'Donnell similarly stated that invitations are extended to people the Councilors "have relationships with because of their districts," such as "work that the individual does in their districts or does for their constituents."  [Dkt. 100-1 at 53:7-12].

- In 2017, apparently in response to one of TST's requests for an invocation, former Councilor Essaibi-George, like former Councilor Wu, stated that invocation speakers are "invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery."  [Dkt. 100-13 at 2].

This evidence shows that the City Council's refusal to extend an invitation to TST was not motivated by an "aversion or bias" toward TST's beliefs.  Town of Greece, 572 U.S. at 585. The introductions of the invocation speakers in the videos in the record similarly focus on the work the speakers had done in the community.  Moreover, TST's own papers suggest that City

Council invited invocation speakers based on their status as "political insiders," not their religious beliefs.  [See Dkt. 102 at 3].  It is possible that City Councilors select invocation speakers based on political affiliations and connections, as TST states.  But those political considerations do not equate to discrimination based on religious beliefs.

TST provides no evidence that the decision not to extend an invitation to TST was motivated by animus or bias.  The City provides evidence that it was, in fact, motivated by other, lawful reasons.  This evidence ranges from the City Councilors' contemporaneous responses to TST's requests for an invitation to evidence revealed years later through fact discovery, such as depositions.  The evidence, viewed as a whole, does not suggest that these reasons were pretextual.[6]  There is no evidence that other groups asked to give an invocation and an invitation was then extended to them.[7]  [See Dkt. 100-6 at 121:19-23].  While TST provides some evidence that it had been involved in the greater Boston community, which is the primary factor City Councilors consider when selecting invocation speakers, through "Menstruatin' with Satan,"

---

[6] While TST acknowledges that the "case-dispositive question is whether any of the decisionmakers intentionally discriminated," it maintains that "discoverable information" regarding such intent has been withheld from TST because it was not allowed to take now-Mayor Wu's deposition.  [Dkt. 113 at ¶¶ 3-4].  The Court has already discussed, on multiple occasions and at length, TST's attempt to take Mayor Wu's deposition.  [See, e.g., Dkt. 96].  TST ignores the fact that the City Council is comprised of many members, and it chose to depose only former Councilor Essaibi-George and one 30(b)(6) designee, even though the City identified several other 30(b)(6) deponents, and the identities of other City Council members are publicly known.  If relevant evidence is absent from the summary judgment record, it is the result of TST's own actions.

[7] TST cites to an email exchange between City Councilors and representatives of the Jewish Community Relations Council of Greater Boston ("JCRCGB") to support its assertion that other groups have requested and received invitations to give the invocation.  [Dkt. 102 at 12; see Dkt. 104-1 at 24-25].  The emails themselves do not support that conclusion.  In that email exchange, the JCRCGB representatives write that they are excited to "showcase GBJCL (our literacy program) at the September 26th City Council meeting."  [Dkt. 104-1 at 25].  They inquire, "Would the invited clergy member have to be from the City of Boston or could we open it up to a Rabbi that is involved in our programming?  What does this actually look like during the meeting?"  [Id. at 25].  These questions are not a request for an invitation.  In context, it is clear that the invitation to give the invocation had already been extended to JCRCGB, and the organization's representatives wanted to know whether they could select a rabbi from the organization that is generally involved in their programming.  [Id.].  There is no response to these questions included in the email exchange.  [See id. at 24-25].  Moreover, even if the rabbi the organization chose to give the invocation was not from Boston—and the record is not clear on that matter—the organization is clearly Boston-based.

"Warmer than Hell," and Boston Pride tabling, there is no evidence that the City Councilors knew of those activities, nor that those activities took place within the Councilors' districts. Indeed, the evidence clearly conflicts with that conclusion—former Councilor Essaibi-George explained that she was unaware of TST's activities and community contributions when they sought inclusion in the invocation calendar and, indeed, the most she had read about TST was in the pamphlet given to her on the day of her deposition for this litigation.  [Dkt. 100-6 at 150:18-21].

The emails sent from the public to the City Councilors fall short of supporting TST's discrimination claim.  Emails from the public expressing disagreement with TST's beliefs—particularly where, as here, there is no evidence that any City Councilor responded to those emails—do not support an inference that City Councilors did not invite TST to give an invocation because they shared the same opinion as the senders.  City Councilors are public officials who interact with constituents regularly and whose email addresses are publicly available.  See https://www.boston.gov/departments/city-council#city-council-members.  If they could be held liable for every belief a constituent expressed, there would be no end to their liability.  That is a step too far that the Court is not willing to take.

TST's reliance on the City Council's decision to end the stipend given to invocation speakers is misplaced.  Even if the Court assumes that City Council reviewed its stipend policy as a result of receiving TST's request for inclusion, the decision to terminate that practice does not suggest discriminatory intent.  While TST cites to Village of Arlington Heights v. Metro. Hous. Dev. Corp., for the proposition that a change in the City Council's process is evidence of discrimination, Arlington Heights stands only for the proposition that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a

role." 429 U.S. 252, 267 (1977).  There was no such departure and "improper" purpose here.

City Council did not give a stipend to one speaker and not to another; rather, it ended a practice

for everyone after it determined that the "best practice" was to stop the stipend.  [See Dkt. 104-1

at 37-38].  Nor did City Council terminate the invocation practice entirely to keep one group

from participating; it simply eliminated a singular element of the practice—an element that says

nothing about how and why a speaker is selected.  Despite TST's claims otherwise, it is unclear

how the termination of the stipend demonstrates "aversion or bias" based on religious beliefs.

Town of Greece, 572 U.S. at 585.  The decision to end the stipend affected all invocation

speakers equally.

 The Court would be remiss not to acknowledge the differences between Town of Greece

and this case.  In Town of Greece, the town made "reasonable efforts to identify all of the

congregations located within its borders and represented that it would welcome a prayer by any

minister or layman who wished to give one."  572 U.S. at 585.  Such practices would support a

finding that there has been no Establishment Clause violation.  The City Council here does

neither of these things.  Instead, invocation speakers are invited at the discretion of the individual

City Councilors, which heightens Establishment Clause concerns.  The evidence on record,

however, suggests that the City Councilors' discretion was not exercised in such a way that

individuals or groups were excluded from giving an invocation because of their religious beliefs.

The City Council did not allow some requests while denying others, and the City Councilors'

primary motivation in inviting an invocation speaker, based on the evidence before the Court,

has always been the individual or organization's involvement in the community.  While the

Court understands TST's desire to enjoy what it describes as the "benefit" of sharing its message

in this forum, the record is simply devoid of any evidence that would support the conclusion that

the failure to extend an invocation invitation to TST stemmed from an "impermissible motive." Marsh, 463 U.S. at 793.

### 2.     City Council's Legislative Prayer Practice as a Whole

In their briefs, the parties discuss a number of cases that have considered the constitutionality of various legislative prayer practices.  See Town of Greece, 572 U.S. at 565; Marsh, 463 U.S. at 783; Lund v. Rowan County, 863 F.3d 268 (4th Cir. 2017); Bormuth v. County of Jackson, 870 F.3d 494 (6th Cir. 2017); Rubin v. City of Lancaster, 710 F.3d 1087, 1097 (9th Cir. 2013).  The case before this Court is unlike those cases.  In those cases, the plaintiffs brought broad challenges against the government's legislative prayer policies and practices.  They argued that the government's actions, through its legislative prayer, had the effect of placing an "official seal of approval" on Christianity.  Rubin, 710 F.3d at 1097; see also, e.g., Lund, 863 F.3d at 274 (plaintiffs arguing that "the Board, by delivering exclusively Christian prayers, affiliated the county with Christianity, advanced Christianity, and coerced the plaintiffs into participating in religious exercises").  TST makes no such claim here.  TST instead asserts that it was discriminated against when it asked for and was denied an opportunity to give the invocation at a City Council meeting.  [Dkt. 102 at 2-3].  As explained, it was not.  And even if the Court assumes that TST does claim, like the plaintiffs in the cases that have come before this, that City Council's legislative prayer practice as a whole violates the Establishment Clause, TST's Establishment Clause action fails.

Because there is no definitive test to apply to legislative prayer challenges, it is necessary to understand how previous courts have evaluated this issue.  In Marsh, the Supreme Court evaluated a "challenge to the practice of opening sessions with prayers by a State-employed clergyman."  463 U.S. at 786.  It found that the state's practice did not run afoul of the

Establishment Clause after examining the "features" of the legislature's practice: a clergyman of only one denomination had been selected for sixteen years; the chaplain was "paid at public expense"; and the prayers offered followed "the Judeo-Christian tradition."  Id. at 793.  In Town of Greece, the Supreme Court considered whether the town "impose[d] an impermissible establishment of religion by opening its monthly board meetings with a prayer."  572 U.S. at 569-70.  There, the Court noted that the town "made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one," though it stopped short of *requiring* such efforts in legislative prayer cases.  Id. at 585.  The Supreme Court also determined that the offering of the invocation did not compel "citizens to engage in a religious observance," because the "principal audience for these invocations is not, indeed, the public but lawmakers themselves," and the government had not "directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity."  Id. at 587-88.  The town board "at no point solicited . . . gestures by the public," such as standing, bowing their heads, or making the sign of the cross.  Id. at 588.  Moreover, the town "neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content," and the "prayers often sounded both civic and religious themes."  Id. at 571.  Under Town of Greece, the question is whether "the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," which would suggest the prayer "fall[s] short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort."  Id. at 583.

Appellate courts have used Marsh and Town of Greece to evaluate similar legislative prayer claims under the Establishment Clause.  In Rubin v. City of Lancaster, the plaintiff

challenged a city council's practice of opening its meetings with invocations, which were frequently in the Christian tradition. 710 F.3d at 1090, 1095. The city compiled a database of religious congregations with an established presence in the city and invited those groups to open a city-council meeting with an invocation. Id. at 1089. The question at the heart of the case was "whether the City itself has taken steps to affiliate itself with Christianity" through its legislative prayer practices. Id. at 1097. Given the "litany of neutrality-enforcing safeguards," the Ninth Circuit held that it had not. Id. The court described these safeguards: "No person attending a city-council meeting, including a city employee or official, is required to participate in any prayer. No volunteer is paid to pray. Neither the council nor the clerk may engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered. Moreover, the clerk has never removed a congregation's name from the list of invitees or refused to include one." Id. (internal quotation marks omitted).

The Fourth Circuit confronted a similar question in Lund v. Rowan County. Four factors convinced the court that the county's legislative prayer practice violated the Establishment Clause. See 863 F.3d at 271-272. First, the government actors themselves, elected members of the county's board of commissioners, gave the prayers. Id. at 277. These "elected officials [therefore] took up a ministerial function." Id. at 290. Moreover, the content of the prayers was "entirely at the discretion of the commissioner." Id. at 273. Second, the prayers were used to proselytize. The prayers were "invariably and unmistakably Christian in content," with several prayers "confess[ing] sin and ask[ing] for forgiveness on the community's behalf," and others "impl[ying] that Christianity was superior to other faiths" and "implor[ing] attendees to accept Christianity." Id. Third, the public audience was instructed to participate. For example, after calling the meeting to order, the chairperson would ask everyone in attendance, including

constituents, to stand up, and a commissioner would then ask the community to "join him in worship." Id. at 272.  Fourth, the "intimate setting of a municipal board meeting present[ed] a heightened potential for coercion."  Id. at 287.  The Fourth Circuit emphasized the need to look at the "totality of the circumstances"—the "crucial interaction between the elements"—when evaluating legislative prayer practices under the Establishment Clause.  Id. at 289.  In Bormuth v. County of Jackson, the Sixth Circuit evaluated a similar challenge to legislator-led prayer, considering largely the same factors but reaching the opposite conclusion on the record before it. 870 F.3d at 512.

From these cases, the Court gleans five general factors to consider when evaluating broad challenges to a legislative prayer practice: (1) the identity of the speaker; (2) whether the speaker is paid to give a prayer; (3) the government's review of the speaker's chosen prayer content; (4) whether the nature of the prayer proselytizes or denigrates other religions; and (5) the selection process.[8]

As to the first factor, the City Council's invocation speaker is a guest, often a member of the clergy, not the City Councilors themselves.  Contrary to TST's assertions, the fact that these speakers are selected by individual City Councilors does not require the Court to conclude that the "[C]ouncil members might as well be the sole providers of invocations."  [Dkt. 102 at 16]. This argument ignores the fundamental differences in lawmaker-led prayer and prayer led by guest speakers.  See Lund, 863 F.3d at 278 (explaining that "lawmaker-led prayer . . . both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate and by sectarian prayers").  When

---

[8] The particular setting, e.g., that of a municipal board meeting versus a state legislature, has not been considered by the majority of courts, and this Court does not find it necessary to evaluate that factor now.  Even if it did, the Court notes that the invocation here occurs right after roll call, before the City Council's official business begins, which lessens any concerns of possible coercion.  See Lund, 863 F.3d at 287.

government actors "themselves, not guest ministers, [lead] the community in prayer" and "compose[] each invocation 'according to their personal faiths,'" there is "much greater and more intimate government involvement." Id. Such is not the case here.

While the majority of City Council's invocation speakers have been undoubtedly of a Christian denomination, speakers of other denominations and laypeople have also been asked to give the invocation. [See Dkt. 112 at ¶¶ 24-31]. The inclusion of rabbis, an imam, and laypersons allows for a "'diversity' of religious views." Town of Greece, 572 U.S. at 585-86. While there could be even more diversity of speakers, the fact that the majority of speakers have been of a Christian denomination is not a sufficient basis to determine that City Council's invocation practice violates the Establishment Clause. See Marsh, 463 U.S. at 793 ("We, no more than Members of the Congresses of this century, can perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church."); Town of Greece, 572 U.S. at 570-71, 584-85; Brevard, 928 F.3d at 1310 ("We have found no Establishment Clause problems presented when local governments mostly invited Christian volunteer invocation-givers, so long as this was reasonably reflective of the community's demographics and did not advance a single faith."). Furthermore, the Court must view this fact in combination with the other facts before it.

As to the second factor, it is undisputed that the invocation speakers received a stipend for their participation until 2016 or 2017 when the practice ceased. [See Dkt. 112 at ¶¶ 9-10]. The evidence suggests that the stipend was nominal, and speakers received no other financial benefits. [See id. at ¶ 10; see also Dkt. 100-7 at 16:2-4]. Given the nominal financial amount at issue, and the fact that the practice has not existed for at least five years, the Court is not persuaded that this feature of City Council's historical legislative practice violates the

Establishment Clause, particularly when viewing the facts as a whole.  See Marsh, 463 U.S. at

794 ("Nor is the compensation of the chaplain from public funds a reason to invalidate the

Nebraska Legislature's chaplaincy . . . .").

Regarding the third consideration, there is no evidence that the City Councilors review or

are otherwise involved in the speaker's prayer selection.  See Town of Greece, 572 U.S. at 571

("Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to

their tone or content . . . .   The town instead left the guest clergy free to compose their own

devotions.").  The evidence instead shows that the speakers determine and write their own

invocations.  [See Dkt. 100-7 at 29:16-18 ("I usually write my invocations depending on what is

going on or what time or year something is happening.")].

As to the fourth factor, whether the nature of the prayers given at City Council meetings

evinces "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible

government purpose," the evidence on record suggests that it does not.  Town of Greece, 572

U.S. at 585.  There are few examples of City Council invocations in the record before this Court,

especially when considering that the City Council meets every week.  Of the three examples, all

of the speakers direct their prayer largely toward the City Council itself.  One speaker explicitly

notes, "I pray for each member of the Boston City Council," asking the Lord to give them

understanding, wisdom, and knowledge as they proceed with their duties.  August 2021 Video at

7:17-9:49.  Another speaker reads from the Koran and then implores the City Councilors to get

to know one another outside of the walls of City Hall, as they represent the people, and the more

they can come together, the more the people benefit.  April 2023 Video at 8:35-9:34.  In the third

video, the speaker thanks the Lord for the service of the City Councilors and asks the Lord to

remind them that "nothing is too hard" and to guide them to be the "best politicians, the best

governing body that this nation has ever seen." September 2016 Video at 5:57-9:57. To be sure, each of the speakers incorporates religious references, sometimes beginning with, "Let us pray," and reading from holy books, "but they also invoked universal themes, as by . . . calling for a 'spirit of cooperation' among town leaders." Town of Greece, 572 U.S. at 584. In other words, the invocations included "both civic and religious themes" and largely serve "to elevate the purpose of the occasion and to unite lawmakers in their common effort." Id. at 571, 582-83. Indeed, it appears that the "principal audience for these invocations is not . . . the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." Id. at 587. Such prayers "do not fall outside the tradition [the Supreme] Court has recognized" as allowed by the Establishment Clause. Id. at 584. None of the prayers, at least those in the record before the Court, "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," even with their references to a deity or prayer. Id. at 582-83.

Moreover, the prayers do not demonstrate an intent to force "citizens to engage in a religious observance." Id. at 587. In one video, the City Councilor asks people to rise for the invocation and the Pledge of Allegiance. At no point in the other two videos do City Councilors ask the public to rise for the invocation, nor do any of the videos indicate any requests from City Councilors to bow heads, make the sign of the cross, or participate in any similar gestures. The singular instance on record of a City Councilor asking everyone to rise—not just for the invocation, but also for the Pledge of Allegiance—does not suggest a "pattern of prayers" that violates the Establishment Clause by "direct[ing] the public to participate in the prayers, singl[ing] out dissidents for opprobrium, or indicat[ing] that their decisions might be influenced

by a person's acquiescence in the prayer opportunity."[9]  Id. at 588; see also Bormuth, 870 F.3d at 517 ("[W]e do not agree that soliciting adult members of the public to assist in solemnizing the meetings by rising and remaining quiet in a reverent position is coercive.  These 'commonplace' and 'reflexive' requests—whether from ministers or elected individuals following their own faith's normative cues—do not alone mandate participation, especially as most are preceded with a polite 'please.'" (citations omitted)).  A City Councilor requesting the audience to stand for the invocation and the Pledge of Allegiance is a far cry from asking the audience to "join . . . in worship."  See Lund, 863 F.3d at 272.

That leaves us with the fifth factor, the process used to identify and invite invocation speakers.  While the Court has already evaluated City Council's invocation speaker selection process as it relates to TST's particular claim of discrimination, it has not examined City Council's process generally.  TST's claim could be construed not as an individual allegation of discrimination, but rather as alleging that the City's legislative prayer practice generally violates the Establishment Clause because the selection process is discriminatory.

---

[9] In rebuttal to the City's argument that the audience was not directed to stand for the invocation in the August 2021 Video, TST provides a link to another video for the first time in its reply in support of its motion for summary judgment, stating that it "conflated" one invocation invitee with another.  [See Dkt. 114 at 2].  The video is not included in TST's statement of facts or in its response to the City's statement of facts.  "[A]rguments raised for the first time in a reply memorandum will not be considered," and TST's claim that it "conflated" one invitee with another does not convince the Court that the video is properly before the Court.  Facey v. Dickhaut, 91 F. Supp. 3d 12, 22 (D. Mass. 2014).  Even if the Court does consider the video, it does not change the Court's review.  In that video, which is from a September 2018 City Council meeting, the former City Council President asks "the guests [to] please rise as Councilor Essaibi-George comes up to introduce our clergy for the day . . . and remain standing as Councilor Essaibi-George leads us in the Pledge of Allegiance."  https://www.youtube.com/watch?v=NTXFgOjpbTE at 1:33-1:46.  As in the other video, the public is asked to stand not just for the invocation but also for the Pledge of Allegiance.  And two examples in which the public is asked to stand does not, any more than the one example properly before the Court, convince the Court that there is a "pattern" of forced public participation.  See Town of Greece, 572 U.S. at 589; Bormuth, 870 F.3d at 571.  Moreover, when asked whether it was "normal" to ask everyone to stand for the invocation and Pledge of Allegiance, former Councilor Essaibi-George responded, "I don't know whether I characterize it as normal.  Every [C]ouncil [P]resident or whoever's leading the body, sometimes phrases it in different ways.  Sometimes there are [C]ouncilors and—and whoever's in the chamber is not necessarily asked, stands on their own, if they're able.  So I actually don't know whether I'd say that's normal."  [Dkt. 113 at 24].  While she acknowledges that there may be "an expectation that people generally stand during the prayer," that is a far cry from a consistent request from a City Councilor to the public to stand only for the invocation.  [Id.].

The City Council's process—or lack thereof—for selecting invocation speakers is the most troublesome to the Court of all factors to consider regarding legislative prayer practices. There is no dispute that the selection of the invocation speaker is left to each individual City Councilor's discretion, and there are no formal written policies governing this procedure.  This leaves ample room for abuse, which concerns the Court.  However, the lack of a formal, written policy does not by itself create a constitutional problem (though the existence of one could provide neutrality-enforcing guidelines that would help avoid constitutional issues in the future), nor does the fact that the selection of speakers is left to the discretion of the individual Councilors.  Brevard, 928 F.3d at 1314.  The ultimate question is whether the City "maintains a policy of nondiscrimination" in the way it chooses invocation speakers.  Town of Greece, 572 U.S. at 585.  In other words, the "issue lies in how the [Councilors] exercised their discretion in practice."  Brevard, 928 F.3d at 1314-15.

The evidence the City provides shows that it does maintain a policy of nondiscrimination, and TST fails to provide evidence that the City Councilors "exercised [their] plenary discretion in plainly unconstitutional ways."  Brevard, 928 F.3d at 1312.  Speakers from a variety of Christian denominations, rabbis, and leaders of other faiths, including an imam, in addition to laypeople, have been asked to give the invocation at City Council meetings.  All evidence before the Court indicates that City Councilors choose invocation speakers not because of the religion they are affiliated with, but because of their involvement in the communities the Councilors represent.  TST's own briefing repeatedly suggests—without evidence—that invocation invitations are reserved for "political allies," not certain religious groups.  [See, e.g., Dkt. 102 at 8].  Of course, this is not a case where City Council "at no point excluded or denied an opportunity to a would-be prayer giver," nor has City Council made "reasonable efforts to

identify all of the congregations located within its borders," as in <u>Town of Greece</u>.  572 U.S. at 571, 585.  City Councilors did, in fact, deny one request—TST's—to give an invocation, and speaker selection is left to each City Councilor's individual discretion.  But, as the Court has already explained, here, the rejection of one group (there are no other rejections on record)[10] who had been previously unknown to the City Councilors does not constitute a violation of the Establishment Clause.  Moreover, the evidence before the Court suggests that the City Councilors' discretion generally has been exercised within the limits of the Establishment Clause, as nothing in the record suggests that the selection or exclusion of speakers is based on religious beliefs rather than community involvement.

This case is unlike <u>Williamson v. Brevard County</u>, which found that a county board's selection process rendered its legislative prayer practice unconstitutional.  928 F.3d at 1314-15. In <u>Brevard</u>, the evidence suggested that the commissioners used their plenary discretion "to discriminate on the basis of religious beliefs, favoring some monotheistic religions over others and disfavoring and excluding—at least—religions that are polytheistic, pantheistic, or otherwise outside of the 'mainstream.'"  <u>Id.</u> at 1311.  This evidence included statements from the commissioners themselves which indicated that they considered "the specific religious beliefs of a prospective invocation-giver" and that "certain religions or types of religions would be flatly banned from giving an invocation."  <u>Id.</u> at 1313-14.  The court found that these comments reflected "an aversion or bias on the part of [county] leaders against minority faiths," and a "fair

---

[10] TST provides an email dated December 12, 2020, from Rajan Zed, "a Hindu leader," in which he asks to read an invocation at a City Council meeting.  [Dkt. 104-1 at 46].  The recipients of the email are a number of City Councilors.  There is no indication that any of the Councilors responded.  Even if the Court assumes Zed's request was not granted, this second denial fails to support a claim that the selection process is discriminatory.  There is nothing in the record regarding Zed's congregation—merely that he is "a Hindu leader"— his involvement in the community, or the City Councilors' reasons for not extending an invitation to lead an invocation to Zed.  If anything, this email suggests that the City Council did, in fact, follow a non-discriminatory policy of not allowing requests to give the invocation.

examination of the lengthy summary judgment record" showed that the "[c]ommissioners consciously held and acted upon views about which religions and types of religious beliefs were the right kind for invocations and which were not." Id. at 1315.  No such evidence exists here. This is not to say that there must be a "smoking gun" indicating clear religious bias to find that the City Council's selection process fails to adhere to a policy of nondiscrimination, but there must be *something* to suggest that the selection process reflects "an aversion or bias on the part of town leaders against minority faiths." Town of Greece, 572 U.S. at 585.  On the summary judgment record before this Court, the selection process here does not reflect such prejudice. This is particularly true when the Court views the selection process in light of the other factors discussed.  When the Court considers the City Council's legislative prayer practice as a whole, it cannot say that "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief," Marsh, 463 at 794-95, such that it "promote[s] a preferred system of belief or code of moral behavior" in violation of the Establishment Clause, Town of Greece, 572 U.S. at 581.  Judgment must be awarded in favor of the City on TST's Establishment Clause claim.

### B.       Massachusetts Free Exercise Claim

The City also seeks summary judgment on TST's claim that the City Council's legislative prayer practice burdens TST's free exercise of religion under Massachusetts law.  See Mass. Gen. Laws. Const. amend. art. 46, § 1.  The question is whether the state action complained of "substantially burdens [the] free exercise of religion, and, if it does, whether the [government] has shown that it has an interest sufficiently compelling to justify that burden." Society of Jesus of New Eng. v. Massachusetts, 808 N.E.2d 272, 279 (Mass. 2004) (first modification in original). "The party claiming an unconstitutional burden on the free exercise of religion must show (1) a

sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement.  Once the claimant has made that showing, the burden shifts to the state" to demonstrate "both that the (3) requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal."  Id. (citation and internal quotation marks omitted).

TST's claim fails on the second prong of this analysis.  See Curtis v. Sch. Comm. of Falmouth, 652 N.E.2d 580, 587 (Mass. 1995) ("The preliminary inquiry in a free exercise analysis is whether the challenged governmental action creates a burden on the exercise of a plaintiff's religion.").  TST argues that City Council's legislative prayer practice is unlawfully burdensome because "it amounts to a forced choice" that requires TST to "continue to venerate Satan and thereby forfeit [its] opportunity to access a prayer opportunity," or it can "abandon the defining aspect of [its] creed in the hopes that this will make [it] sufficiently palatable to the political ruling class."  [Dkt. 111 at 10].  This manufactured burden cannot sustain TST's free exercise challenge.  A "'substantial burden' is one that is coercive or compulsory in nature."  Curtis, 652 N.E.2d at 587 (citations omitted).  The City Council's legislative prayer practice is neither.  The City has neither "condition[ed] receipt of an important benefit on conduct proscribed by a religious faith," nor has it "denie[d] such a benefit because of conduct mandated by a religious belief," and there is no indication that the City Council's legislative prayer practice has made it "more difficult to practice certain religions."  Id. at 588.  Because TST's "right to maintain [its] religion has not been hampered" by the City Council's legislative prayer practice, judgment must be awarded in favor of the City.  Fedele v. Sch. Comm. of Westwood, 587 N.E.2d 757, 761 (Mass. 1992).

**IV.     CONCLUSION**

For the foregoing reasons, the City's motion for summary judgment [Dkt. 98] is

**GRANTED**, and TST's motion for summary judgment [Dkt. 101] is **DENIED**.

**SO ORDERED.**

Dated: July 31, 2023                                         /s/ Angel Kelley

                                                            Hon. Angel Kelley
                                                            United States District Judge